**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEAN LEE, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> IQIYI, INC., YU GONG, and XIAODONG WANG, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Jean Lee ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by iQIYI, Inc. ("iQIYI" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

**NATURE OF THE ACTION**

1

1.      Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired iQIYI's securities between March 29, 2018 and April 7, 2020, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of Sections 10(b) and  20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      In March 2018, Defendants held the IPO, offering approximately 125 million American Depositary Shares ("ADSs") to the investing public at $18.00 per share, raising approximately $2.25 billion.

## JURISDICTION AND VENUE

3.      The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

4.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act.

5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

6.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of iQIYI securities in this District.

## **PARTIES**

7.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

8.      Defendant iQIYI, "the Netflix of China," purports to be an innovative market-leading online entertainment service in China. Defendant iQIYI is incorporated in the Cayman Islands, and maintains its principal executive offices in Beijing, China. iQIYI ADSs are listed on NASDAQ under the ticker symbol "IQ." The Company's agent for service in the United States, as stated in the Registration Statement, is Law Debenture Corporate Services Inc., 801 2nd Avenue, Suite 403, New York, NY 10017.

9.      Defendant Yu Gong ("Gong") is and was at all pertinent times the Company's Chief Executive Officer ("CEO"), Principal Executive Officer, and a Director.

10.     Defendant Xiaodong Wang ("Wang") is and was at all pertinent the Company's Chief Financial Officer ("CFO"), and Principal Financial and Accounting Officer.

11.     The Defendants Gong and Wang are referred to herein as the "Individual Defendants."

12.     Both of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

13.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

15.     On February 27, 2018, iQIYI filed with the SEC a Registration Statement on Form F-1, which in combination with subsequent amendments of Forms F-1/A and filed pursuant to Rule 424(b)(4), would be used for the IPO.

16.     On March 29, 2018, iQIYI filed with the SEC its final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement.

17.     In the Registration Statement, iQIYI reported the following, in relevant part, regarding advertising revenue:

> Our online advertising revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, and further by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017. We have proven capabilities of adapting a single popular work into a variety of entertainment

products, creating multiple channels to amplify the popularity and monetary value of the original work. Our sophisticated monetization model fosters an environment for high-quality content production and distribution on our platform, which in turn expands our user base and increases user engagement, creating a virtuous cycle.

\*       \*       \*

*Online advertising services.* Our online advertising services revenue grew by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017, as a result of the increase of brand advertising, which is primarily due to the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, as well as the growth of our in-feed advertising service launched in the fourth quarter of 2016. Average brand advertising revenue per brand advertiser increased by 16.3% from RMB4.9 million in 2016 to RMB5.7 million (US$0.9 million) in 2017.

\*       \*       \*

*Online advertising services.* Our online advertising services revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, primarily as a result of the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, and partially offset by the decrease in the number of brand advertisers. Average brand advertising revenue per brand advertiser increased by 80.3% from RMB2.7 million in 2015 to RMB4.9 million in 2016.

\*       \*       \*

 We appeal to advertisers through broad and efficient user reach, as well as innovative and effective advertising products. Our online advertising revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, and further by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017.

18.     In the Registration Statement, iQIYI reported the following, in pertinent part, regarding bartering transactions:

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926, *Entertainment – Films* ("ASC 926"). The Group recognized barter sublicensing revenues of RMB349,834, RMB382,478 and RMB762,741 (US$117,231) and related costs of RMB265,410, RMB362,760 and RMB650,442 (US$99,971) for the years ended December 31, 2015, 2016 and

2017, respectively.

19.      On October 30, 2018, iQIYI issued a press release entitled "iQIYI Announces Third Quarter 2018 Financial Results" (the "3Q 18 Press Release") which stated the following, in pertinent part, regarding iQIYI subscribers: "The number of total subscribing members was 80.7 million as of September 30, 2018, over 98% of whom were paying subscribing members. This compares to 42.7 million of total subscribing members as of September 30, 2017, up 89% year over year."

20.      The 3Q 18 Press Release also stated that customer advances and deferred revenue was RMB2,356,275,000.

21.      On February 21, 2019, iQIYI issued a press release entitled "iQIYI Announces Fourth Quarter and Fiscal Year 2018 Financial Results" (the "4Q 18 Press Release") which stated the following, in pertinent part, regarding iQIYI subscribers: "The number of total subscribing members was 87.4 million as of December 31, 2018, 98.5% of whom were paying subscribing members. This compares to 50.8 million of total subscribing members as of December 31, 2017, up 72% year over year."

22.      The 4Q 18 Press Release also stated that customer advances and deferred revenue was RMB2,195,283,000.

23.      On March 15, 2019, iQIYI filed with the SEC its annual report on Form 20-F, for the year ended December 31, 2018 (the "2018 Annual Report"). Attached to the 2018 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the company's internal control over financial reporting and the disclosure of all fraud.

24.     The 2018 Annual Report stated the following, in pertinent part, about iQIYI's advertising revenue:

> *Online advertising services.* Our online advertising services revenue grew by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million in 2017, as a result of the increase of brand advertising, which is primarily due to the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, as well as the growth of our in-feed advertising service launched in the fourth quarter of 2016. Average brand advertising revenue per brand advertiser increased by 16.3% from RMB4.9 million in 2016 to RMB5.7 million in 2017.

25.     The 2018 Annual Report also stated the following, in pertinent part, regarding iQIYI's daily active user ("DAUs") and monthly active users ("MAUs"): "For the year of 2018, our average mobile MAUs were 454.5 million and our average mobile DAUs were 135.4 million."

26.     The 2018 Annual Report stated the following, in pertinent part, about iQIYI's bartering transactions:

> The Group accounts for these nonmonetary exchanges in accordance with ASC 606, and records the transaction based on the fair value of the asset received starting from January 1, 2018. Barter sublicensing revenues are recognized in accordance with the same ASC 606 criteria above. The Group estimates the fair value of the licensed copyrights received based on various factors, including broadcasting schedule, cast and crew, theme and popularity, box office and market share of counterparties to the exchange. The attributable cost of sublicensing transactions, whether for cash or through nonmonetary exchanges, is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926 ("ASC 926"), *Entertainment—Films*.

> The Group recognized barter sublicensing revenues of RMB382,478, RMB762,741 and RMB1,082,964 (US$157,511) and related costs of RMB362,760, RMB650,442 and RMB1,026,140 (US$149,246) for the years ended December 31, 2016, 2017 and 2018, respectively.

27.     The 2018 Annual Report stated the following, in pertinent part, about iQIYI's acquisition of Skymoons (defined below):

On July 17, 2018, we completed the acquisition of 100% equity stake in Skymoons

Inc. and Chengdu Skymoons Digital Entertainment Co., Ltd., or Chengdu Skymoons (together with Skymoons Inc., "Skymoons"). The aggregate consideration consists of a fixed payment of RMB1.27 billion, as well as additional consideration valued at RMB730 million as of June 30, 2018 to be delivered in the event the acquiree satisfies the agreed upon performance benchmarks in the next two years.

\*     \*     \*

*Others*. Other revenues increased by 104.1% from RMB1,409.2 million (net of VAT) in 2017 to RMB2,875.6 million (US$418.2 million) in 2018, primarily as a result of strong performance across various vertical business lines, and revenue contribution from Skymoons, a mobile game company we acquired in July 2018.

\*     \*     \*

### Acquisition of Skymoons

On July 17, 2018 (the "acquisition date"), the Group completed the acquisition of a 100% equity stake in Skymoons Inc. and Chengdu Skymoons Digital Entertainment Co., Ltd. (collectively, "Skymoons"). Headquartered in Chengdu, China, Skymoons focuses on the development and global publishing of mobile games. The Group completed the acquisition of Skymoons on July 17, 2018, the date on which control was obtained to govern the financial and operating policies of Skymoons and obtained benefits from its activities. The Group believes Skymoons is a natural extension to its business and will strengthen its media platform and overall ecosystem. The results of Skymoons' operations have been included in the consolidated financial statements of the Group since the acquisition date.

The aggregate payment for the acquisition of Skymoons consists of a fixed payment of cash of RMB1,157.0 million (US$168.3 million), as well as a contingent payment of up to RMB130.0 million in cash and issuance of 23,777,706 Class A ordinary shares if specified adjusted net profit targets are met post-acquisition (the "Earn-Out").

The acquisition-date fair value of the consideration transferred totaled RMB1,242.9 million (US$180.8 million), which consisted of the fixed payment of cash amounting to RMB1,157.0 million (US$168.3 million) and the portion of the Earn-Out payment described above of RMB85.9 million (US$12.5 million), which are not contingent on the continued employment. RMB1,018.6 million (US$148.1 million) of the Earn-Out is contingent on the continued employment of certain key employees for the three years following the acquisition date, and was accounted for as a transaction separate from the business combination based on its economic substance and will be recorded as post-combination compensation expense in the Group's financial statements over the requisite service period.

*          *          *

The addition of intangible assets RMB707,000 is generated from the acquisition of Skymoons occurred on July 17, 2018 (Note 3), of which RMB366,000 was attributed to published mobile games with a useful life of two years, RMB101,000 attributable to technology with a useful life of five years and RMB240,000 attributable to mobile games in development. Once the mobile games in development achieve technological feasibility, they will be amortized over a maximum of four years. The carrying amount of mobile games in development with an indefinite useful life was RMB nil and RMB232,298 (US$33,786), as of December 31, 2017 and 2018, respectively.

28.     On May 16, 2019, iQIYI issued a press release entitled "iQIYI Announces first Quarter 2019 Financial Results" (the "1Q 19 Press Release") which stated the following, in pertinent part, regarding its subscribers: "The number of total subscribing members was 96.8 million as of March 31, 2019, 98.6% of whom were paying subscribing members. This compares to 61.3 million of total subscribing members as of March 31, 2018, up 58% year over year."

29.     The 1Q 19 Press Release also stated that customer advances and deferred revenue was RMB1,960,719,000.

30.     On March 12, 2020, iQIYI filed with the SEC its annual report on Form 20-F for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

31.     The 2019 Annual Report stated the following, in pertinent part, about iQIYI's advertising revenue:

*Online advertising services*. Our online advertising services revenue decreased by 11.3% from RMB9,328.1 million in 2018 to RMB8,270.6 million (US$1,188.0 million) in 2019, as a result of the challenging macroeconomic environment in China, the uncertainty of certain content scheduling, the tightened regulatory environment, and the intensified competition in advertising business. Average

brand advertising revenue per brand advertiser decreased by 11.9% from RMB6.7 million in 2018 to RMB5.9 million (US$0.9 million) in 2019. Average brand advertising revenue per brand advertiser is the main driver for our online advertising services revenue. We track the average brand advertising revenue per brand advertiser as a key indicator to evaluate our advertising services business and adapt our sales strategy, advertisement solutions and content scheduling accordingly.

32.     The 2019 Annual Report also stated the following, in pertinent part, regarding iQIYI's DAUs and MAUs: "For the year of 2019, our average mobile MAUs were 476.0 million and our average mobile DAUs were 139.9 million."

33.     The 2019 Annual Report stated the following, in pertinent part, about iQIYI's bartering transactions:

> Barter sublicensing revenues are recognized in accordance with the same revenue recognition criteria above. The Group estimates the fair value of the licensed copyrights received based on various factors, including the purchase price of similar non-exclusive and/or exclusive contents, broadcasting schedule, cast and crew, theme, popularity and box office. The attributable cost of sublicensing transactions, whether for cash or through nonmonetary exchanges, is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, calculated based on its estimated usage pattern.
>
> The Group recognized barter sublicensing revenues of RMB762,741, RMB1,082,964 and RMB682,941 (US$98,098) and related costs of RMB650,442, RMB1,026,140 and RMB570,201 (US$81,904) for the years ended December 31, 2017, 2018 and 2019, respectively.

34.     The statements referenced in ¶¶15-33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) iQIYI inflated its revenue figures; (2) iQIYI inflated its user numbers; (3) iQIYI inflated its expenses to cover up other fraud; and (4) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

35.     On April 7, 2020, during market hours, Wolfpack Research released a report (the "Report") detailing, among other things, how iQIYI had misled investors and failed to disclose pertinent information generally and in its Registration Statement, including: (i) iQIYI overstating its user numbers; (ii) iQIYI inflating its revenues; (iii) iQIYI inflating expenses and prices of assets to conceal its revenue inflation; and (iv) iQIYI misleading financial reporting creating the appearance of a cash generative company.

36.     The Report summarized its findings as:

> Our research shows us that ***iQIYI, Inc. ("IQ") was committing fraud well before its IPO in 2018 and has continued to do so ever since.*** Like so many other China-based companies who IPO with inflated numbers, IQ is unable to legitimately grow their business enough to true up their financial statements. ***We estimate IQ inflated its 2019 revenue by approximately RMB 8-13 billion, or 27%-44%.***
>
> ***IQ does this by overstating its user numbers by approximately 42%-60%. Then, IQ inflates its expenses, the prices it pays for content, other assets and acquisitions in order to burn off fake cash to hide the fraud from its auditor and investors.***

(Emphasis added.)

37.     The Report noted the following, in pertinent part, regarding iQIYI's advertising revenue:

> In its prospectus filed with the SEC, IQ claimed 2015 advertising revenues of RMB 3.4 billion. The tables below show that IQ only reported RMB 1.95 billion of advertising revenues to the SAIC [State Administration for Industry and Commerce] in 2015, an overstatement of 74%. (revenues in RMB 10,000):

### 2015 年上海广告经营单位前十排名
### 2015 Shanghai Top 10 Advertising Companies

**1. 本市广告企业营业收入前十位**

| 序号 | 单位名称 | 广告营业收入（万元） |
|---|---|---|
| 1 | 群邑（上海）广告有限公司 | 1331814 |
| 2 | 上海李奥贝纳广告有限公司 | 836911 |
| 3 | 凯帝珂广告（上海）有限公司 | 826109 |
| 4 | 电通安吉斯（上海）投资有限公司 | 299354 |
| 5 | 上海分众德峰广告传播有限公司 | 292406 |
| 6 | 上海新网迈广告传媒有限公司 | 230784 |
| 7 | 谷歌广告（上海）有限公司 | 166929 |
| 8 | 上海爱奇艺文化传媒有限公司 | 165314 |
|  | Shanghai iQIYI Culture Media Co. Ltd. |  |
| 10 | 上海韵洪广告有限公司 | 155931 |

**4. 本市互联网媒介单位广告营业收入前十位** Top 10 Online Media Co.

| 序号 | 单位名称 | 广告营业收入（万元） |
|---|---|---|
| 1 | 上海全土豆文化传播有限公司 | 483666 |
| 2 | 上海因特菲思网络科技有限公司 | 40182 |
| 3 | 上海二三四五网络科技有限公司 | 40049 |
| 4 | 上海聚力传媒技术有限公司 | 33814 |
| 5 | 上海众源网络有限公司 | 24033 |
|  | Shangahi Zhongyuan Network Co., Ltd. |  |
| 7 | 上海携程商务有限公司 | 11790 |
| 8 | 上海巨流信息科技有限公司 | 9251 |
| 9 | 上海汉涛信息咨询有限公司 | 7600 |
| 10 | 上海平安汽车电子商务有限公司 | 6084 |

There was no online media company top 10 in the 2016 report, so we generously applied Shanghai iQIYI's year-over-year growth rate to Zhong Yuan in order to estimate its 2016 revenue of RMB 488 million. The table below is an excerpt from the 2016 SAIC advertising industry report shows that iQIYI Culture had advertising revenues of RMB 3.358 billion. ***IQ reported advertising revenues of RMB 5.65 billion to the SEC in 2016, a 38.6% overstatement (revenues in RMB 10,000)***:

### 2016 年上海广告经营单位前十排名
#### 2016 Shanghai Top 10 Advertising Companies

**1. 本市广告企业营业收入前十位**

| 序号 | 单位名称 | 广告营业收入（万元） |
|---|---|---|
| 1 | 群邑（上海）广告有限公司 | 1279234 |
| 2 | 上海李奥贝纳广告有限公司 | 928352 |
| 3 | 凯帝珂广告（上海）有限公司 | 746459 |
| 4 | 上海全土豆文化传播有限公司 | 611822 |
| 5 | 电通安吉斯（上海）投资有限公司 | 547837 |
| 6 | 上海爱奇艺文化传媒有限公司 | 335752 |
| | Shanghai iQIYI Culture Media Co. Ltd. | |
| 8 | 上海环胜广告有限公司 | 218941 |
| 9 | 谷歌广告（上海）有限公司 | 163359 |
| 10 | 上海腾迈广告有限公司 | 152387 |

\*     \*     \*

*In total, IQ's SAIC reported advertising revenue was 7.566 billion and 7.791 billion in 2017 and 2018, respectively. IQ reported advertising revenues of RMB 8.16 billion and 9.328 billion to the SEC in those years, representing overstatements of 7.9% and 19.7% in 2017 and 2018, respectively.*

(Emphasis added.)

38.    The Report noted the following, in pertinent part, regarding iQIYI's active users:

*Our research uncovered data from three independent sources showing that IQ overstates its DAU numbers by 42% to 60%.*

**Data from IQ's Back-End System Contradict its DAU Claims**

*Two Chinese advertising companies provided us data from IQ's back-end system which show that IQ's actual mobile DAUs from September 2019 were 60.3% lower than the 175 million average mobile DAUs claimed by IQ in October 2019.*

The advertising agencies had access to IQ's back end DAU data for China's 19 "tier 1" cities. In January 2019 and January 2020, IQ published reports on the state of the online movie industry, wherein it provided a breakdown of the geographic distribution of its users. IQ's reports indicate that in 2018, 36% of IQ's users were in China's 19 Tier 1 cities. The 2019 report only disclosed growth rates for each of China's five tiers of cities from 2018 to 2019. Applying these growth rates to the 2018 distribution, we were able to calculate that the 19 tier 1 cities represented 35.6% of IQ's total users in 2019.

We collected 4 days of DAU data from the same week in China's 19 Tier 1 cities from IQ's back end data provided by the two ad companies (3 weekdays and 1 weekend day) in September 2019. The average mobile DAUs from the data we collected from IQ's

back-end platform was 24.7 million. The lowest day was 23.36 million and the highest day was 25.88 million.

\*     \*     \*

***Based on the 175 million average mobile DAUs number disclosed by IQ in October 2019 and the 35.6% of DAUs in tier 1 cities as disclosed in IQ's 2019 report mentioned above, we expected 62.29 million (175m x 35.6%) DAUs in China's tier 1 cities. However, we found only 24.7 million DAUs in the tier 1 cities from the back-end data provided by the ad companies. This is 60.3% lower than what IQ's disclosures implied.***

\*     \*     \*

**IQ's "Heat Index" Maps Show Evidence of Click Farm Activity**

IQ created its own content monitoring and ranking metric to provide a sense of the popularity of its programming. It is called the Content Heat Index and is publicly available on IQ's website.

According to a note on the Heat Index, these lists are compiled from data from the most recent three months. ***The typical trend for newly released popular programs starts with a spike and then trails off. A few months after the peak, we found that a consistent pattern of provinces/ zones ranked in the top 10 for most viewers included areas with low populations, such as Macau, Hainan, Tibet or Inner Mongolia.***

Mainland China has 23 provinces, 5 autonomous regions, 4 municipalities (Beijing, Shanghai, Guangzhou, and Shenzhen) whose populations are individually reported by the National Bureau of Statistics. Among these total 32 different regions, Tibet always ranks last for population. In 2018, China's National Bureau of Statistics reported it had just 1.478 million residents and only a small percent of which are Han Chinese immigrants.

However, recent checks on IQ's popular programs including *"Old Boy," "Idol Producer"* and *"Hot Blood Dance Crew"* included regions with very small populations such as Tibet, Hainan, Ningxia or Inner Mongolia in the top 10[.] [Image omitted.]

***It is nearly impossible for regions with such small populations to generate enough organic traffic to top IQ's heat index charts. Instead, we believe these highly abnormal patterns are indications that IQ employs methods to inflate the viewership levels of its content.***

**QuestMobile**

In February 2020, QuestMobile published a special report titled *"China Mobile*

*Internet Amid COVID-19 Plague"* which shows that IQ overstates its DAU numbers by at least 42%.

***The report shows that IQ's average mobile DAUs were only 126.2 million during the first 10 days of the 2020 Chinese Lunar New Year, versus 180 million average mobile DAUs claimed by IQ.*** Furthermore, the QuestMobile report shows IQ's DAUs did not grow between the 2019 and 2020 Chinese Lunar New Year[.] [Image omitted.]

(Emphasis added.)

39.     The Report noted the following, in pertinent part, regarding iQIYI's contradicting

membership growth and declining real deferred revenue figures:

Between 3Q18 and 1Q19, IQ reported an increase of 16.1 million paying subscribers and an increase in the average subscription period from 6 months to 8 months. However, IQ's deferred revenue declined by 17% during the same period – ***this mathematical contradiction shows that at least one of these numbers is made up.***

***With stable net membership growth and steady average revenue per user ("ARPU"), the deferred revenue curve should lead the realized revenue curve. Further, increasing average subscription periods should result in greater front-end accumulation of deferred revenues.***

                    *        *        *

The relationship between IQ's deferred revenues and realized revenues is the opposite of what we would expect based on their claims – the realized revenue curve consistently leads the deferred revenue curve and the gap between the two is widening.

                    *        *        *

Because IQ's management claimed it added 16.1 million net paying subscribers and that the average subscription period had increased from about 6 months to 8 months between 3Q18 and 1Q19, we expected to find significant growth in deferred revenue as the prepayments accumulated. However, we found the opposite.

                    *        *        *

IQ's deferred revenues declined from RMB 2,356.3 million at the end of 3Q18 to RMB 1,960.7 million at the end of 1Q19, a 17% decline during that 6-month period. This directly contradicts management's claims of growth in the number of paying subscribers and the average subscription period – ***it is mathematically impossible***

*for both of those statements to be true given the corresponding decline in deferred revenues.*

40.     The Report noted the following, in pertinent part, regarding iQIYI's acquisition of

Skymoons:

**The Skymoons Acquisition**

In July 2018, IQ paid ~$300 million to acquire Chengdu Skymoons Digital Entertainment ("Skymoons"). We believe this transaction was a sham intended to burn off fake revenues and siphon off cash from IQ's recent Nasdaq listing. It's simply not credible to us to believe anybody would pay ~$300 million for this company. Skymoons hasn't shown the ability to develop a game on its own. Months before the acquisition, a Chinese court ruled that Skymoons stole the IP and game design underlying its only successful game. IQ only acquired part of Skymoons's business. IQ didn't even get the Skymoons.com domain name in the acquisition.

\*        \*        \*

On March 30, 2018, only three and a half months prior to IQ's July 2018 acquisition, the Suzhou People's Intermediate Court ruled that Skymoons had stolen the IP that formed the foundation and structure of the "*Journey of the Flower*" game. Skymoons and IQ were ordered to cease the infringements, and pay Snail Digital an RMB 30 million fine (a very large sum for an IP case between Chinese domestic firms). ***The fact that Skymoons was not the true originator of the design of its only successful game and depended upon both creativity and talent of others as well as IQ's investments and marketing power to promote and commercialize the game completely undermines the ridiculous valuation that IQ ascribed to it.***

Our reviews of Chinese copyright records found that ***Skymoons has registered no new publication copyrights since the July 2018 acquisition. Instead, we found only the distribution rights for 4 games under its name, all of which were licensed from other game companies[.]*** [Image omitted.]

Of these licensed games, management has only publicly commented on "The Croods." In the prepared remarks of IQ's 1Q19 earnings call, CEO Gong Yu highlighted the game as an example of Skymoons capabilities. The statement is carefully worded to suggest a major role in its development, but in fact only credits Skymoons for *"launching"* and *"adapting"* the game, not designing it[.] [Internal quotation omitted.]

A further check of the IP for the of The Croods, 疯狂原始人, revealed that in November 2016, a mobile version of The Croods had already been produced and distributed by Shanghai Oriental Peral Cultural Development company. As such, it appears that Skymoons did nothing more than publish an updated version of a two-

year-old mobile game. This appears to be the extent of Skymoons' technical capabilities – if this company is actually worth more than RMB 2 billion, then the world is much richer than we thought.

*        *        *

Skymoons' myriad of issues calls into question how IQ's management reached the RMB 2.4 billion valuation and how the acquisition was accounted for. In fact, ***IQ didn't provide a reconciliation of Skymoons' financials to US GAAP financials for the years prior to the acquisition, claiming doing so would require "undue cost" due to a prior reorganization[.]*** [Internal quotation omitted.]

**We believe the above statement is a bald-faced lie by IQ's management.** The purchase agreement (included as Exhibit 4.66 of the same 20-F) includes the following as a closing condition:

***"The Target Companies have delivered to the Purchasers**: (i) all capital verification reports of the Group Members and all relevant notes and schedules thereto issued by the accountants engaged by them from the date of incorporation of the Target Companies, the details of which are set forth under Schedule VIII: List of Financial Reports; (ii) **the audited balance sheets of the company for 2016 and 2017 prepared on a consolidated basis under the US GAAP, and the relevant audited income statements and cash flow statements, together with all relevant notes and schedules**, and in the absence of audited statements, the management statements shall be provided (hereinafter collectively referred to as the "Financial Statements")"*

***Not only would converting Skymoons' historical financials into U.S. GAAP not require "undue cost," it wouldn't have cost IQ anything at all – Skymoons had delivered GAAP financial statements to IQ prior to the deal's closing date.*** This directly contradicts the already weak excuse provided by IQ's management, exposing their brazen lie.

(Emphasis added.)

41.     The Report noted the following, in pertinent part, regarding iQIYI's bartering

transactions:

Arguably one of the most egregious examples of accounting fraud IQ commits is the inflation of its barter transaction revenue. Barter sublicensing revenues are determined by IQ's internal estimates of the value of the content it traded. In other words, IQ's management can effectively assign *any value they want* to these transactions, providing an easy opportunity to inflate its revenues. Based on the highest-end estimated value per non-exclusive episode provided by a former IQ employee involved in content acquisition, ***IQ would have needed to barter the***

17

*licenses for ~3.9x and ~3.2x the total number of TV series episodes produced by all Chinese production companies to legitimately reach its reported barter revenues in 2018 and 2019, respectively.*

\*       \*       \*

**Barter Transactions: A Black Box**

IQ's barter sublicensing revenues are so inflated that they wouldn't come close to being believable even if IQ bartered every single TV episode produced in China in each of the last three years.

IQ's reported barter sublicensing revenues imply it traded every single TV episode produced in China in 2018 and 2019 for ~RMB 79,000 and ~RMB 64,000 each, respectively. A former IQ employee who worked in content acquisition [] told us that non-exclusive licenses are typically worth RMB 1,000 to 5,000 per episode, or a maximum of up to RMB 20,000 for an extremely popular show.

To give IQ every benefit of the doubt, we used the maximum of RMB 20,000 per episode, according to the former, as the average value of the episodes that IQ bartered. Even doing so, IQ would have needed to barter the licenses for ~3.9x and ~3.2x the total number of TV series episodes produced by all Chinese production companies in order to legitimately reach its reported barter revenues in 2018 and 2019, respectively.

Barter sublicensing revenues are determined by IQ's internal estimates of the value of the content it traded. In other words, IQ's management can effectively assign *any value they want* to these transactions, providing management an easy opportunity to inflate its revenues which it obviously takes advantage of.

\*       \*       \*

The former [employee] also emphasized the massive difference between the value of exclusive and non-exclusive content. An exclusive license for a popular show would be worth between RMB 3 and RMB 5 million – approximately 1,000x more than a non-exclusive license for the same show.

42.     On this news, iQIYI ADSs fell $0.99 per share over the rest of the trading day and the next full trading day, or 5.6%, to close at $16.51 per share on April 8, 2020, damaging investors.

43.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action on behalf of all those who purchased iQIYI securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by iQIYI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the federal securities laws;

b)      whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c)      whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)      whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e)      whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f)      whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g)      to what extent the members of the Class have sustained damages and the proper measure of damages.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **COUNT I**
### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
#### **Against All Defendants**

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

52.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

> a.   employed devices, schemes and artifices to defraud;
>
> b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> c.   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

54.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts

of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

55. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

56. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

57. Had Plaintiff and the other members of the Class been aware that the market price of iQIYI securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

58.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

59.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

60.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

62.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

63.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual

Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

64.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

65.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

A.     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B.     awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.

Dated: April 16, 2020                   Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/Phillip Kim*
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*