UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
                              :     20-CV-1830 (LDH)(JO)
JEAN LEE, et al.,             :     20-CV-2653 (LDH)(JO)
                              :     20-CV-3068 (LDH)(JO)
          Plaintiff,          :
                              :     August 3, 2020
                              :
     V.                       :     Brooklyn, New York
                              :
iQIYI, INC., et al.,          :
                              :
          Defendant.          :
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
      BEFORE THE HONORABLE JAMES ORENSTEIN
         UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Le Rivage:              KEVIN RUF, ESQ.
For G&H and Plaintiff:      PHILLIP KIM, ESQ.
For Tranquil Bay:           KIM MILLER, ESQ.
For Moreno:                 DAVID ROSENFELD, ESQ.

For the Defendant:          ROBERT FUMERTON, ESQ.
                            MICHAEL GRIFFIN, ESQ.

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

THE COURT:  We're on the record in Lee v. iQIYI, Inc., 20-CV-1830.  It's also the related cases of Le Rivage v. iQIYI, Inc., 20-CV-2653, and Jenkins v. iQIYI, Inc., 20-CV-3068.

Just to make it easier to take a record of who is here, please allow me to call out parties who have either moved or appeared as parties and get their appearances.  Do we have anyone here for Le Rivage?

MR. RUF:  Yes, your Honor.  This is Kevin Ruf, R-u-f as in Frank, of the Glancy firm.

THE COURT:  Okay.  Anyone else with you, sir?

MR. RUF:  No, your Honor.

THE COURT:  Okay.  And we have the movants Hershberger and Gereige.  And everybody please forgive me if I'm mispronouncing names.  Do we have somebody for those two movants?

MR. KIM:  Yes, your Honor.  It's Phillip Kim from the Rosen law firm for Mr. Hershberger and Mr. Gereige, if you were curious as to the pronunciation.

THE COURT:  Gereige, I'll try and remember that.  I also have you down, Mr. Kim, as representing Jean Lee, is that correct?

MR. KIM:  Yeah, that's the initial named plaintiff, that's correct.

THE COURT:  All right.

MR. McCONVILLE:  Your Honor, good afternoon. This is Francis P. McConville from Labaton Sucharow, also on behalf of Hershberger and Gereige.

THE COURT:  Okay.

MR. McCONVILLE:  Mr. Kim will be doing the argument today.

THE COURT:  All right.  Are you also representation Jean Lee?

MR. McCONVILLE:  No, your Honor, just the two lead plaintiff movants.

THE COURT:  I see, okay.  Give me a moment to make a record of that.  Okay, great.

Do we have counsel for Tranquil Bay?

MS. MILLER:  Good afternoon, your Honor, Kim Miller.

THE COURT:  Good afternoon.

Do we have counsel for Moreno?

MR. ROSENFELD:  Yes, your Honor, good afternoon.  David Rosenfeld from Robbins Geller Rudman & Dowd.

THE COURT:  Good afternoon.

Do we have counsel for the Chiha and Shah Family Group?  Okay, no appearance.

Do we have counsel for Dae Kim?  Okay.

Do we have counsel for Glenn Wanger?

Do we have counsel for Hung Truong?  Okay.

Do we have counsel for Wing Yiu Chan?  Okay.

And do we have counsel for the defendant?

MR. FUMERTON:  We do, your Honor.  Robert Fumerton and Michael Griffin from Skadden Arps for defendant iQIYI.

THE COURT:  How do you pronounce it, sir?

MR. FUMERTON:  We use I-Q, your Honor.

MS. MILLER:  Good idea.

THE COURT:  Okay, I'll try to remember that as well.

There are also two individual defendants named, at least in the Lee docket.  I don't have all the dockets open in front of me -- Yu Gong and Xiaodong Wang.  Mr. Griffin or Mr. Fumerton, do you represent those individuals?

MR. FUMERTON:  We do not, your Honor.  They have not been served.

THE COURT:  Okay, all right.  So we've got the competing motions for appointment as lead counsel. I'm just going to go in the order -- what I propose to do is, I may have some questions.  I'll try not to interrupt too much but what I'd like to do is give each of the movants a chance to be heard.  Please assume

that I'm familiar with your papers.  I'd rather not spend the afternoon having you recite what's in your papers but please use this as an opportunity to make responsive arguments to papers that you haven't had a chance to respond to or expand on what's in your papers.  But please don't just recapitulate what you've already submitted to me.

So with that, why don't I call on counsel for Le Rivage to go first.

MR. RUF:  Thank you, your Honor.  Well, your Honor, there are several items I guess to be unpacked, and I guess the first is the suggestion -- I don't know if you want to hear much from me on the idea that there's gamesmanship with respect to the filing of a new complaint with the allegations of a partial disclosure.

THE COURT:  Okay, well, tell me what you want me to keep in mind on that.

MR. RUF:  Well, I think the essence of the PSLRA --

THE COURT:  Before we get much farther, please, we don't have a court reporter.  We're making an audio recording from which a transcript can be made.  For clarity of the record, I think context will make the speaker obvious in most instances but please, when

you start speaking, identify yourself and the party on whose behalf you're speaking.  That will help us create a transcript.  Go ahead, start again, sir, with identifying yourself and your client.

MR. RUF:  Absolutely.  This is Kevin Ruf on behalf of Le Rivage.  I'm of the firm Glancy Prongay & Murray.  Your Honor, I would begin by just talking about the PSLRA process and its design to sort of end this so-called mad rush for the courthouse and provide some order for people to identify themselves and to make themselves available to act in the lead capacity in a securities class action.

Virtually all of the other movants have suggested that there was some kind of gamesmanship here because on the last day of the sixty-day notice, on the last day of that, we filed a new complaint alleging this partial disclosure.  But tellingly, nobody is suggesting that the notice period should be extended for an additional period of time, and that really would be the only issue here.  The issue -- I guess the abstract issue is and the suggestion is that there are other investors out there who lost significant amounts of money but who sold at some point before the Wolfpack short-selling report that ends this class period in April of 2020, and that those people never came forward

because they just "didn't know" that they could or didn't know that there would be a new complaint filed that would allege that there was a partial disclosure in October.

We haven't heard from any such people.  You would imagine -- and my client lost over five million dollars.  You can imagine if there's somebody out there who lost a substantial amount of money and saw that there are securities class actions being filed against the company, that they would presumably seek counsel and they would explore the possibility that they in fact have a cognizable claim.

THE COURT:  If they had --

MR. RUF:  So the idea that --

THE COURT:  Excuse me.  If they had losses that they could attribute to the earlier disclosures on which you're relying, right?

MR. RUF:  Right.  And, you know, we have all the sort of, you know -- some of the best and the brightest of the securities class action world are on this phone call right now, all of whom have situations -- each firm of which has a -- we can provide examples of their being in very similar positions.  If you look at the class actions that are on file and historically have been filed, partial disclosures are very commonly

alleged.  And the reason for that of course is that you're doing your best for all of the holders of the stock and you want to obviously identify any opportunity you can to make people whole.

THE COURT:  Right.

MR. RUF:  So you look --

THE COURT:  Can I ask a question now?

MR. RUF:  I would also point out, your Honor -- I'm sorry?

THE COURT:  I was going to ask a question. I understand your point about, you know, what the remedy would be for the so-called gamesmanship and I see of course why that argument advances your cause on that complaint.  What do you think it means that no one else came out of the woodwork either before or after the filing deadline to allege the timing you alleged, that what really caused the loss and what caused the sell-off was the earlier partial disclosure?  How come nobody else said that or figured that out before your client did?

MR. RUF:  Well, I want to be -- I want to be clear --

THE COURT:  You said you've got the best and the brightest and I have no doubt that that's true. Could really nobody else figure it out?

MR. RUF:  Well, I think that for the most part, at this stage of the litigation -- and we have to look at the fact that the original complaint here, Lee, was filed a mere week after the short-selling report or the report of the short seller Wolfpack that gave rise to the litigation.  With respect to why somebody else hasn't come forward, one reason presumably is that my client lost five million dollars, which is a very substantial sum of money.  And in the area of PSLRA, the movant with the largest financial interest in the litigation is the presumed lead plaintiff.  So presumably --

THE COURT:  Right, but you came in at the last moment, right under the deadline.  It just strikes me that -- again, I understand how it helps you on the gamesmanship argument but how do you explain that we've heard from nobody else who can attribute losses to the earlier partial disclosure?

MR. RUF:  Well, your Honor, I believe that this case invariably will include -- whether we become the lead or not, that partial disclosure will certainly be alleged.  And as I said --

THE COURT:  Will anybody else say, we figured out after that partial disclosure what was going on and so we sustained losses then and didn't

wait for the later disclosure?  Is anybody else going to say that, you think?

MR. RUF:  Well, I think the narrative would be a little different.  I think because it's an alleged partial disclosure, we're not suggesting that it was a complete disclosure.

THE COURT:  It was enough.  It was enough for your client to figure out what was going on and sell and thereby sustain losses, right?

MR. RUF:  Well, under Basic, I think the idea is that --

THE COURT:  Just tell me if I'm right or wrong, please.  Don't talk around the question, please. Just tell me if I'm right or wrong.

MR. RUF:  Essentially, yes.

THE COURT:  I won't take offense if you say I'm wrong.  Okay, so --

MR. RUF:  Well, the only difference I'm drawing --

THE COURT:  What makes your client so uniquely qualified to detect and act on fraud?

MR. RUF:  And this is where, your Honor, I guess I do disagree.  I'm not -- I don't think we are alleging -- we're not alleging that our client figured out the fraud.  What we're alleging is that the stock

price under Basic reflected that new information that turned out, we learned at the end of the class period, to be part of a bigger fraud. But no, we're absolutely not alleging that our client figured out that there was a fraud.

What we're alleging is that the stock price went down as a result of this information in the partial disclosure and that our client was concerned about the stock and ultimately sold all of his stock by the end of 2018. But there's no -- we're not going to pretend like our guy is a clairvoyant. That would not be -- nor would we need to prove that to win this case.

THE COURT: All right, anything else?

MR. RUF: I think I've -- I guess I've spoken a while. Does the Court have any questions about our position?

THE COURT: So you're not alleging that -- if I understand your last answer correctly, then you're not saying, as I thought you had been arguing, that the earlier losses that you sustained that get you to your five million, you're not saying that you acted on that because of the fraud or because you understood that there was fraud. You just acted on it and later realized hey, wait a minute, we got out and had this

loss in value and so we get to be lead plaintiff.

MR. RUF: Yes. I mean, I think by analogy, if it were a situation where a company said, you know, in 2018, hey, all of a sudden, all of our advertising just dried up. We don't know why but it just dried up and you ended up selling the stock and then later found out that it was part of an ongoing fraud, you would have been damaged by that fraud and maybe --

THE COURT: It's not damaged. You have to sustain it because of the fraud. Here's the question and I'm curious to know how you say this plays out. Let's the say the reason company X sells off stock has nothing to do with any concern about the value of the stock. They just need to raise money for something else that they want to do and have to sell off assets, and they choose that stock and it later turns out that there was a fraud going on. Can they take that loss as the basis for the lead plaintiff motion?

MR. RUF: Yes.

THE COURT: Okay, all right. I'll of course be happy to hear anybody when it's their turn disagree or agree with that. I'd be curious to know your position on it. All right, anything else?

MR. RUF: No, thank you, your Honor.

THE COURT: Okay. Let's turn next to --

I've already forgotten -- G and H I'm going to call them because forgotten -- Gereige, is it, Gereige and Hershberger?

MR. KIM:  Yes, your Honor.  It's Phillip Kim, Rosen law firm, for Gereige and Hershberger.

THE COURT:  Gosh, okay, I'd already forgotten.  Go ahead, Mr. Kim.

MR. KIM:  Sure.  I mean, I think the --

THE COURT:  I need you to speak up.  I can barely hear you.

MR. KIM:  Okay, let me -- let me -- your Honor, I think the issue with respect to the partial disclosure is not whether people have alleged partial disclosures in the past or whether there should be a new notice or whether there should be an issue to cure it, and whether this disclosure, you know, resulted in something else.  I think you have to look at the record and what's been pled.  And the issue with the partial disclosure is, there are no facts connecting sort of the company's I guess cleaning up of some advertisers on October 31st, 2018, connecting it to the fraud that was later disclosed almost two years later in the Wolfpack report, and that's really fatal to Le Rivage and that's -- the inquiry should end there.

And if you look at the cases, I think Judge

Pollack's case in Falconstore (ph) is directly on point.  In that case, you had a situation where the corrected disclosure were bribes that were paid in order to get sales contracts.  And in the middle of the class period, it was alleged by another plaintiff/movant that the company missed its revenue forecast, and it was alleged in a conclusory manner that that earnings miss was due to the fact that the company stopped paying bribes.  And that wasn't sufficient because there were no facts alleged to show that the earnings missed was either a proximate result or materialization of the alleged fraud, which was illegal payments.

Here, there are no facts to allege that. All there are are arguments and speculation that perhaps maybe later on, when we get discovery, that we're able to connect this October 30th, 2018 issue to the alleged fraud, and that's the problem for Le Rivage.  So I think that ends the inquiry and they have no loss on the present record because I think everyone agrees that when the Court is selecting a lead plaintiff, you look at the record that is presnetly before it.  There's nothing in the record specifically identifying with facts other than a conclusory assertion that somehow this is related to the alleged

fraud.  So with that --

THE COURT:  Mr. Kim, let me ask you this.  I understand that argument and before we're done, I'll give Mr. Ruf a chance to respond.  But I take it that the argument about the lack of a relationship between the earlier disclosure and the fraud has nothing to do with the timing of the complaint itself, in other words the gamesmanship argument.  I'm really hard pressed to know why that is a freestanding argument to determine the outcome of this motion or these motions, I should say.

MR. KIM:  Well, I think --

THE COURT:  What would it matter if it came at the end of the period or the beginning?  You had already put in your claim and it wouldn't affect you, right?

MR. KIM:  Well, I think -- I think when courts decide issues like this, you know, there's a nebula of facts that it will consider, and I think --

THE COURT:  I'm not interested in a nebula.

MR. KIM:  I don't think gamesmanship is --

THE COURT:  Mr. Kim, Mr. Kim, I'm not interested in a nebula.

MR. KIM:  Of course.

THE COURT:  Why are you hurt?  Why is your

client -- why are your clients hurt by the timing of Le Rivage's motion?

MR. KIM:  Well, I think -- I don't necessarily think it's been materially hurt.

THE COURT:  Okay.

MR. KIM:  I think what it does is, it calls into fairness the overall process.  But I think -- I think the real issue --

THE COURT:  Okay, that's not -- that's not a freestanding -- it's not a freestanding reason to determine the motions, correct?

MR. KIM:  That is correct, your Honor.

THE COURT:  Okay.

MR. KIM:  It just provides background information.

THE COURT:  All right, anything else?

MR. KIM:  With respect to that issue, that's all I have to say about that.  I mean, I know there are some attacks that are made on my clients because under the --

THE COURT:  Yeah, go ahead.

MR. KIM:  -- PSLRA process, once the movant who claims to be in first gets knocked out, the Court, in sort of a serial process, will look at the next movant and that's my client, Mr. Hershberger and Dr.

Gereige, and there are basically two arguments against them.  The first argument is that, you know, this is an unrelated group of investors and as such, they should be rejected.  And, you know, while the Second Circuit has not made a ruling on whether unrelated investors can be appointed lead plaintiff, the various district courts in the Second Circuit have a body of case law that talk about this issue.

Particularly in the Eastern District, I think there are several conclusions the Court can draw from the cases.  One, courts will consider unrelated investors as lead plaintiffs on a case-by-case basis.  And in situations where courts have approved unrelated groups, you had a situation where one of the constituent members had the largest individual loss, which no one disputes that's Dr. Gereige.  He's got the largest individual loss before any movants, you know, of course other than Le Rivage, who doesn't have a loss for the reasons mentioned.

Those decisions start with the Top Ships case.  That was Judge Bianco.  In that case, he appointed a group of three unrelated investors.  He approved that group that made a similar evidentiary showing as we made here via joint declaration.  There's more recently the Sequans (ph) case.  That's Judge

Bulsara. He appointed a group of two individual investors, noting that one of the movants in that group had the largest individual loss. Judge Bulsara appointed that group over an institution that had a smaller loss. There's the Blue Apron decision, where Judge Kuntz appointed a group of four unrelated investors. And in that case, in Blue Apron, a similar evidentiary showing via joint declaration. So those cases support, you know, those general conclusions.

There was a case recently where Judge Garaufis in the Neo (ph) case rejected an unrelated group. But there, he rejected the group because the group did not have the largest individual movant that had the largest loss. And there were also other issues with that group calling into question its cohesiveness. So if you look at --

THE COURT: From your perspective, the grouping sort of falls by the wayside if Gereige is appropriately considered as a lead candidate because if you knock out Le Rivage, he beats everyone else anyway. Is that basically it?

MR. KIM: That's correct.

THE COURT: Okay.

MR. KIM: And I'm sure counsel on the phone will argue, well, the Court should not consider the

individual members of either Hershberger or Gereige individually, but that's not what the case law says. In <u>Neo</u>, Judge Garaufis rejected the group and then considered everyone on an individual basis. And as Tranquil Bay's counsel recognizes in their opposition at page 8, the general rule is that if the Court were to reject the group, it would then consider the individual members of that group. And they're citing that <u>Vargace</u> (ph) case out of the Southern District that was issued by Judge Marero (ph).

So, you know, I think -- I think the Court summed it up right. The grouping is sort of a non-issue given that everyone admits that Dr. Gereige has the largest individual loss, and that goes without saying the evidence that we put in through the joint declaration demonstrating Hershberger and Gereige's sophistication. And they certainly have enough time to oversee this case and litigate it.

There was an attack made on Dr. Gereige, suggesting that somehow he was under criminal prosecution for perjury or some other offense. The reality was, as set forth in his declaration, docket number 56.1, he had just forgotten to include his fingerprints when he was renewing his medical license in Maryland. And at the time, he was living

Switzerland and had not practiced medicine for twenty years.  And rather than flying back to the States to meet this new requirement, he just decided to surrender his medical license.  So there's nothing to suggest that Dr. Gereige has a criminal record or that he does not have the ability or the wherewithal to oversee this case, even if the Court were not to accept the group.

But certainly the cases that we cited in our brief, <u>Sequans</u>, <u>Blue Apron</u>, <u>Top Ships</u>, even <u>Putacole</u> (ph) from the Southern District, when a group of unrelated investors make a similar evidentiary showing, like we did in our joint declaration, and demonstrate their sophistication, certainly the Court should appoint that group.

The other point I'd like to add, which I think is very important is, the group has selected the Rosen Law Firm and the Labaton firms as co-lead counasel.  And as I can speak for my firm, this is a case involving a Chinese company.  My firm, I would say, of the securities bar is the most expeirenced litigating against Chinese companies.  We have Chinese-speaking attorneys on staff and we obtained the largest ever class-action settlement involving a Chinese company.

This is important for a couple of reasons.

One, we're qualified to litigate this case and the specialized expertise that's required.  And second, we've gone through sort of the discovery issues that you have with the Chinese company claiming state secrets, issues relating to service of process, and I think the group selection of my firm and the Labaton firm, who you know -- again, another blue-chip firm, will assist in the prosecution of this case and certainly will assist in the smooth operation of these issues once we get into discovery and evidentiary issues.

So unless the Court has any other questions, I can certainly them.  Otherwise, I will mute myself.

THE COURT:  Okay, all right, thank you.

Let's turn next to Ms. Miller for Tranquil Bay.

MS. MILLER:  Yes, thank you, your Honor. Kim Miller for Tranquil Bay.  First, to circle back on a couple of points on Le Rivage, whose name I'm butchering, sorry.  I would disagree with Mr. Kim.  I do believe that it is a stand-alone argument, the timing of that late-filed pleading.  There's a reason why there is case law.  For example, the Maliara v. Eros (ph) case in the Southern District of New York in 2016, and Plaut v. Goldman Sachs (ph) in the Southern

District of New York in 2019 specifically questioning that late timing that happened here and calling it an attempt to include in-and-out transactions that occurred before the first corrected disclosure.

THE COURT:  It's not about in and out here so -- look, what's the remedy.  You want me to reopen the period?

MS. MILLER:  Well, you asked I think the important question, your Honor, which is, how are they hurt?  I'll explain to you why the other movants in the class are hurt because if you --

THE COURT:  Excuse me, Ms. Miller.

MS. MILLER:  Yes.

THE COURT:  I'm confident you were listening to my question.  I'm glad you think I was so perceptive in my earlier comments but give me the credit of knowing what I'm asking now.  So I asked a question, what's the remedy, and you blew that off and went to something else.  Would you tell me what the remedy you want is?  Should I reopen the period?

MS. MILLER:  So the remedy that I would seek, your Honor, would not be to reopen the period but to take a look at this drop and the reasons for it because if you don't do so, you can put someone in charge --

THE COURT:  I'm looking at it, okay?  You've got the remedy.  Excuse me.  You've got the remedy. I'm looking at it.  Anything else on that?

MS. MILLER:  Okay, yes.  So I would just say that if you put someone in cahrge who only has losses on this drop and not the later period, you can have problems at price impact, you can have problems at the class certification stage with class representation, you can have problems at settlement where there's a desire to include in a plan of allocation harm and damage from that early drop that is probably not something that, frankly, if my firm were appointed, would be included in an amended complaint even.

THE COURT:  So basically -- sorry to interrupt.

MS. MILLER:  Yes.

THE COURT:  These concerns go to the typicality of the Le Rivage claims rather than any concern about the timing of when it filed the complaint.  Does that --

MS. MILLER:  Hello?

THE COURT:  Does that fairly capture what you said?  Hello?

MS. MILLER:  Hello.  I'm so sorry, your Honor.  My phone cut out and I missed the last five

seconds of what you said.

THE COURT:  That's fine, okay.  So what I'm asking is, if I understand what you're saying correctly, your concerns understandably go to the typicality of Le Rivage's claims but not really to the timing of its complaint that it filed at the last minute.  Is that fair?

MS. MILLER:  Your Honor, I apologize because I did not hear everything that you just said.  My phone service is terrible but I think -- I don't disagree with the gist of what I understood your question to be.

THE COURT:  All right, go ahead.

MS. MILLER:  But if I could say one thing about what you had just mentioned about when I quoted one of those cases that I cited.  The reason that I said in and outs is because a way to address the fact that you have a movant with potentially large losses who doesn't have a Dura (ph) loss is to come up with an angle to add an additioanl partial disclosure that might not be a plausible disclosure.  So that's why that case mentioned in and out.

THE COURT:  Okay.  Anything else?

MS. MILLER:  Yeah, if I could just make a couple of points about G and H, who -- I don't want to get into the pronunciation, either.  So regarding Mr.

Hershberger, his Dura loss is outweighed by profits during the class period. So if you just look at the doctor, there are a couple of issues with the doctor, who -- I have no doubt he --

THE COURT: Wait, wait, wait, please stop. And this is -- I may easily be betraying my own ignorance but if somebody managed to take a profit before being victimized by a fraud, the fact that they had additional holdings that suffered a loss because of the fraud can disqualify them from being lead?

MS. MILLER: So the answer is yes.

THE COURT: (Ui).

MS. MILLER: The answer is, the reason you have the Dura analysis is to see who the largest loser is. If the person who had the largest losses has an offset of profits that were very specifically -- as they were in the case of Mr. Hershberger, those were profits from transactions, purchases during the class period. So yes, those should be offset and those would traditionally be offset by -- if we represented Mr. Hershberger, we would have looked at that and we would have assessed that he was not a good candidate because his profits offset his losses. That's how we do a Dura analysis.

THE COURT: Explain to me -- again, I

readily confess my ignorance about this, but why does that make any sense? Just in terms of what's going to incentivize somebody to be a fit leader of the class, if you have suffered tremendous losses but also managed to enjoy some profits notwithstanding the fraud, why are you not just as much incentivized to vindicate your losses?

MS. MILLER: Your Honor, I think the reason is that most class members who suffered losses during this class period due to the alleged fraud are not similarly situated to Mr. Hershberger, and it makes him uniquely not in common with other class members who just had a loss. He had a loss that was offset by gains.

THE COURT: I get it that these are different facts.

MS. MILLER: Yes.

THE COURT: But why is it a distinction that has meaning? What changes his incentives because he also had profits?

MS. MILLER: I don't think his incentives change, your Honor. I think what does change is --

THE COURT: What makes him a poor fit for leadership because he also had profit? What is it about the profit that counts?

MS. MILLER: I will tell you what makes him a poor fit is that Rule 23 looks for someone to be in charge of the case who is adequate and typical. So when you have -- if this case were to go to a trial, you would have the defendants questioning this lead plaintiff, if it got to trial, on the fact that he made money during the class period, which is atypical and unusual.

THE COURT: Look, Ms. Miller, I'm not trying to play games. I'm really not but I was asking about why this makes sense and you're taking me back to the terms of the rule, which I know. I get it about typicality. But look, if he were the only left-handed plaintiff, he would be atypical in that respect but it would be meaningless for purpsoes of Rule 23 typicality. So what is it about the fact that in addition to losses common to everyone in the class, he also had some profits? How is that going to affect how he discharged, if appointed, the leadership role?

MS. MILLER: Your Honor --

THE COURT: What would you expect the difference to be?

MS. MILLER: I agree that it would not affect his prosecution of the case. It's only how he is perceived by a jury when ultimately, he made more

money than he lost.  But I agree with you, it does not affect the prosecution of the case.

THE COURT:  So a jury is going to say, look, you've proved the fraud.  You've proved that you suffered losses because of the fraud but since you also had profits, we're going to disregard the law and the facts and rule against you.  That's the concern for him that would not exist for other lead candidates.

MS. MILLER:  The concern that it makes him -- it puts him in a different category because while other people are just out money, net he had a gain, so it might undermine the prosecution of the case or the damages awarded by a jury.

THE COURT:  Okay, all right.

MS. MILLER:  If I might --

THE COURT:  I won't tell you I'm persuaded on that but I will tell you that I think I understand what it is you're trying to say.

MS. MILLER:  Okay.

THE COURT:  Do you have anything else you want to say, Ms. Miller?

MS. MILLER:  If I might add just a couple of quick points about the doctor.

THE COURT:  Yes.

MS. MILLER:  To be very clear, I heard Mr.

Kim saying something about like a criminal conviction. There is absolutely no claim here that has anything to do with criminal misconduct. This is simply a situation where the doctor has conceded that he made a misrepresentation on his form with the licensing board and he chose to surrender his license rather than to correct it, and his declaration he indicating that the reason he chose to surrender the license instead of correct it is because he was in Switzerland leads to two additional points:

One, the requirements of the board at the time did not require him to travel to the U.S. He could have just request by mail or by telephone to have the prints to him and he could have mailed them back in. So that raises one question. But more to the point is, he's currently living in Switzerland and under Swiss penal law, you can't even take a voluntary deposition of a person without getting permission from the Swiss authorities, which can add complications and unique issues.

THE COURT: So you're saying if he's the lead plaintiff, he effectively cannot be deposed without the permission of the Swiss government.

MS. MILLER: So, your Honor, if he decided to travel to the United States to be deposed, that

would not be a concern.

THE COURT:  Okay.

MS. MILLER:  However, since he's indicated that he didn't want to come back because of this other issue, there's a concern that he might not want to come and --

THE COURT:  Wait, wait, wait.

MS. MILLER:  Sorry.

THE COURT:  Don't be too cute about it because that issue is done.  Let's just find out.

Mr. Kim, is your client going to come back for a deposition?

MR. KIM:  Sorry, your Honor, I was on mute.

THE COURT:  Go ahead.

MR. KIM:  I was on mute.

THE COURT:  Go ahead.

MR. KIM:  Yes, your Honor, no problems with coming to the U.S. for a deposition.

THE COURT:  Okay, all right.  So that issue is not --

MS. MILLER:  That solves that point, your Honor.

THE COURT:  It certainly does.  Okay, go ahead, Ms. Miller.

MS. MILLER:  That was it.

THE COURT:  Okay, great.

MS. MILLER:  I was going to make a second point but Mr. Kim cleared it up so there's nothing further on that.

THE COURT:  Okay, great, thank you. Anything else on the other aspect of the motions, Ms. Miller?

MS. MILLER:  I'm sorry, no, your Honor.

THE COURT:  Okay, thank you so much.

I think next on my list I have Mr. Rosenfeld.

MR. ROSENFELD:  Yes, your Honor, thank you. I'll certainly try not to repeat the arguments.  I'm just going to give my own spin on certain arguments, things that have not been touched upon.

Starting briefly with Le Rivage, your Honor, courts generally look at complaints with regard to disclosures to determine if the disclosure is plausible with regard to a claim under the federal securities laws.  This Le Rivage complaint includes an allegation of a disclosure that caused a stock decline.  But if you look at it, your Honor, there's no allegation of a fraud being disclosed, simply information being disclosed, which would be trading losses as opposed to fraud losses.  Therefore, I believe, your Honor, that

there is no recoverable claim for losses incurred based on the current record, based on the October 30th, 2018 decline.  Not to say there won't be later on maybe, based on allegations that are included.

But if you look at this complaint, there's nothing in here suggesting that that decline on October 30th is based on fraud.  It simply discloses that they cleaned up not so healthy advertisements on its in-feed side, but there's no claim, your Honor, that this was a fraud disclosure or that there was fraud beforehand by including these advertisements.  So given that there are no recoverable losses for Le Rivage based on its complaint, therefore, it cannot be appointed as lead plaintiff.

What it appears happened, your Honor, was that Le Rivage approached its counsel it looks like the last day and said, hey, we have these losses, is there anything you can do about it?  They took a look and they found a drop in October and they said, okay, we'll just inmclude the drop in October of 2018.  That's what they did but they didn't really include any allegations of fraud associated with it.  So, your Honor, I respectfully submit that there is no recoverable claim for those losses based on the October 30th drop as currently alleged in the complaint.

Your Honor, with regard to Hershberger --

THE COURT:  Do you want to be heard on -- yeah, go ahead, go ahead.

MR. ROSENFELD:  With regard to the Hershberger group, a couple of points, your Honor. First of all, as set forth in our papers, the PSLRA was enacted to avoid lawyer-driven litigation.  And here you have two movants from two different continents represented by two different firms, who were put together clearly in an effort to aggregate the largest financial interest.  What do I mean by that?

THE COURT:  Wait, is the aggregation necessary?  I mean, if it's just Gereige, if it's just "G," forgive me --

MR. ROSENFELD:  Right, Gereige I think is how they pronounced it.

THE COURT:  You would lose to him alone, right, just in the amount of loss?

MR. ROSENFELD:  Right, yes.  There's a little back story here, your Honor.  That's why I want to make it clear.  I agree that courts in the Eastern District have certainly allowed movants to be combined under certain circumstances.  But where the aggregation was clearly meant to create the largest financial interest, courts have not allowed such aggregation.

And here, even though each one of the movants of the Hershberger group claim losses of around 900,000 and in the aggregate, it would be around 1.84 million, they were doing that for one purpose, your Honor, and that is because our client, in doing her due diligence, had spoken with numerous firms, trying to find out which firm she should select to represent her in this litigation. And she approached one of the counsel for the Hershberger group and at the time told them that she believed her losses were 1.2 million dollars. Knowing this --

THE COURT: Was that true?

MR. ROSENFELD: It was not true because when we requested the backup, we identified an additional sale that had taken place, which reduced her losses to around $400,000. But at the time, those firms did not know this. They only understood her losses to be 1.2 million dollars. And because of that, they knew that was the number they had to beat. And that's why, if you look, these two individuals --

THE COURT: Right, but one way to beat that -- excuse me, excuse me. One way to beat that is to take on your client, either alone or as part of the group, right? I mean, if you've got a couple of people with 900,000 and a potential person with 1.2 million

and you want to be sure you've got the lead client, it seems to me you could take on what might be, you're arguing, a risky strategy of an improvidently-joined group, or take on the person whose got the most loss.

MR. ROSENFELD:  Right, but that's exactly what the Court --

THE COURT:  So if they're really trying to manipulate the system, why didn't they go forward with your client?

MR. ROSENFELD:  Why didn't they go forward with my client?

THE COURT:  Yeah.

MR. ROSENFELD:  Because she didn't pick them.  After doing her due diligence, she selected our firm.  That's why, and they never learned that her losses had in fact been reduced to around $400,000. Going into this motion, they believed her losses were --

THE COURT:  If -- all right, all right, keep going.

MR. ROSENFELD:  Sorry.  Going into this motion, your Honor, they thought her losses were still 1.2 million dollars.  Therefore, even though both of those, Hershberger and -- I forget already his name -- Dr. Gereige, the losses --

THE COURT:  Gereige, that's right.

MR. ROSENFELD:  Gereige, that's right, Gereige.  Both of those certifications were signed around two months before the lead plaintiff motion.  So they understood my client had 1.2 million dollars at the time they filed their motion.  Therefore, they aggregated their motion together, which is exactly what courts frown upon.

THE COURT:  So your argument is --

MR. ROSENFELD:  When you combine your loss --

THE COURT:  Excuse me, excuse me.

MR. ROSENFELD:  Sorry.

THE COURT:  Your argument is, we've got two people, each of whom have more losses by a factor of two or more than your client, but your client should be the lead.

MR. ROSENFELD:  Absolutely, your Honor.

THE COURT:  Because their lawyer -- okay.  Well, once again, we've got an argument that at least I can say I think I understand.

MR. ROSENFELD:  Your Honor, we --

THE COURT:  Anything else?

MR. ROSENFELD:  Your Honor, we provide case law regarding that, explaining precisely the concern

with this.  Given that the PSLRA was enacted to allow for sophisticated investors to control the litigation as opposed to their counsel and here, you clearly have a case of counsel putting together two random people in order to artificially create the largest financial interests.

THE COURT:  But if Gereige alone was seeking lead plaintiff status, what would your argument be?

MR. ROSENFELD:  My argument would be twofold, your Honor.  Number one is, Dr. Gereige signed that medical document.  Clearly --

THE COURT:  What else would your argument be?

MR. ROSENFELD:  I'm saying whether he understood it or not --

THE COURT:  Don't -- let's not spend time on that again.

MR. ROSENFELD:  Okay.

THE COURT:  What else?

MR. ROSENFELD:  Sure, sure.  The other argument would be that he did not move to be appointed lead plaintiff individually, number one.

THE COURT:  Okay, but now you're -- now you're fighting the hypo.

MR. ROSENFELD:  Right.

THE COURT:  I said if he were seeking to be lead plaintiff (ui) --

MR. ROSENFELD:  I would say he's already demonstrated -- sure, sure.  Based on the current facts, I would say that he's already proven himself that he cannot oversee counsel and supervise counsel in this case because he's already been manipulated by his counsel to act and join together with Mr. Hershberger in this manner.  So I would say that that would disqualify both of them.

THE COURT:  Thank you so much.

Is there anybody else who would like to be heard on the motion from the plaintiffs' side?

MR. ROSENFELD:  Your Honor, if I could just point out one more --

MR. KIM:  Your Honor --

THE COURT:  Sorry, who is speaking?

MR. KIM:  Your Honor, it's Phillip Kim from the Rosen Law Firm on behalf of Gereige and Hershberger.

THE COURT:  Wait, wait, wait, Mr. Kim, Mr. Kim?

MR. KIM:  Yes.

THE COURT:  Please wait.

MR. KIM:  Sorry.

THE COURT:  I'm going to go back through the list for rebuttals.  On the plaintiffs' side, I just want to know if there's anybody who hasn't been heard yet.  Who would like to be heard on the plaintiffs' side?

MR. ROSENFELD:  Your Honor, can I just make one point about Tranquil Bay?

THE COURT:  If you identify yourself.

MR. ROSENFELD:  Sure, David Rosenfeld, sorry.

THE COURT:  Okay, go ahead.

MR. ROSENFELD:  Sorry, I was just going to finish out my argument.  With regard to Tranquil Bay, they have asserted a larger loss figure than Ms. Moreno but there are four factors that courts generally consider in determining the largest financial interest.  It's not just the largest loss but rather, the courts consider what's the largest financial interest and there are four factors that are considered.

And yes, generally, the loss factor is the most heavily considered but that is only when the claimed loss is much greater than the other movants'.  But here, when you have an individual, Ms. Moreno, who overwhelmingly has the largest of the three of the four factors and the difference in losses is not that great,

courts would generally look at those three other factors as well. Specifically, I would refer the Court to the Safenet (ph) decision, which is cited in our papers.

Lastly, I would just point out, your Honor, that our firm, Robbins Geller, is very well-experienced in handling litigation against Chinese-based companies. We have the largest class-action law firm in the country. We have plenty of experience in the Eastern District, including an interchange case with your Honor and --

THE COURT: Thank you for pointing that out. I'm sure that you assumed that had you not pointed that out, I wouldn't even know, but thank you. Anything else, Mr. Rosenfeld, before I move on?

MR. ROSENFELD: Thank you, your Honor.

THE COURT: Thank you.

Anybody else who hasn't been heard yet wish to be heard on these motions? All right, let me just go back through in order for rebuttal thoughts, starting with Mr. Ruf.

MR. RUF: Thank you, your Honor. First, I would just note that our firm was co-counsel with the Rosen firm on the largest settlement relating to a Chinese company, assuming he was referring to the

Alibaba (ph) case.  With respect to the real question concerning the partial disclosure, I think it's been hit on.  It will be up to the Court to determine whether the allegations of partial disclosure are credible.  Plausible I believe is the standard.

I would just point out that a really significant part of the alleged fraud, as set forth in the Lee case, paragraph 37, is fraud with respect to advertising.  There is just a list of the deltas between the amount of advertising revenue that the company was telling its investors in the United States through its SEC filings, in comparison to the amount of advertising revenue that the company was reporting in China with its filings at the SAIC.  So that's a really significant part of the fraud alleged here, and the partial disclosure is all about advertising.

They said, we cleaned up some not-so-healthy advertisements and they claimed that that was as a result of some of these companies that were advertising lacking the documents to prove that they were qualified investors.  So our argument is that this did disclose a portion -- a portion of the fraud with respect to the company.  We have Exhibit C to our reply and the declaration of Greg Link is the actual transcript of the hearing in question, the October, 2018 hearing, in

which the company described and discussed the partial disclosure.  It was interesting to note that there were, I believe, about ten questions asked during the conference call and half of them, five, dealt in some way with these disclosures about advertising, so it was a significant issue.  With that, I will stand down. Thank you, your Honor, for your time.

THE COURT:  Okay, thank you.

Mr. Kim?

MR. KIM:  Yes, your Honor.  Phillip Kim for Hershberger and Gereige.

THE COURT:  Yes.

MR. KIM:  Just a couple quick points.  There was an argument made that Mr. Hershberger has net profits in connection with this trading.  He had some profits in his options transactions and if you look at our loss chart, which is document 25.4, we net out his modest profits to his stock losses, and he still has a loss well in excess of 900,000.  So the notion that he actually profited from this is incorrect.

I think competing movants' concession that Mr. Hershberger has the same incentive as everyone else is an admission that he's typical, right?  He's in the same -- similarly situated as other investors and has the same incentive to prove fraud.  And that's one of

the -- that's one of the questions the Court will answer in determining whether someone is typical and adequate. So I think there's no concern with respect to Hershberger.

And then the other argument, which is basically, the group should rise and fall together and the constituent members should not be considered, there's not a single Eastern District of New York case that has been cited that supports that showing. Rather, as I indicated, the Neo case specifically says -- Judge Garaufis specifically, in rejecting the group, which I don't think our group should be rejected, the Court would look to the individual constituent members. Cases otherwise are outside of this jurisdiction and have outlier facts that just aren't applicable here. Unless the Court has any other questions, I will mute.

THE COURT: Okay, thank you.

Ms. Miller?

MS. MILLER: Yes, Judge, just a couple of quick things. There's been some commentary about which firm is most qualified. Of course, there is no challenge here. I think everyone on this call would agree that all of the firms are adequate and qualified, and it's just not a consideration.

Also, on Mr. Rosenfeld's point about the

various lax (ph) factors to be assessed, the Dura loss is the most important.  And finally, I respectfully disagree with Mr. Kim's assertion that his Dura losses for Hershberger are approximately 900,000.  But we've discussed already on this call and it's in our papers our reasons for our assessment that it is lower.  But there's no doubt that we don't challenge the doctor on the basis of anything other than the issue regarding the misrepresentation.

THE COURT:  All right.

Finally, Mr. Rosenfeld?

MR. ROSENFELD:  Nothing further, your Honor, thank you.

THE COURT:  Before I turn to the defendants briefly, Mr. Gelson, you're on -- do we have Mr. Gelson on the phone?  I'm sorry, I think made a mistake on that one.

For iQIYI, Mr. Griffin or Mr. Fumerton, do you wish to be heard?  I know this is not really your fight but --

MR. FUMERTON:  Your Honor, Robert Fumerton from Skadden for the company.  The company takes no position on any of the motions.

THE COURT:  I assumed so.  Okay, I just wanted to make sure about that.

MR. FUMERTON:  Thank you.

THE COURT:  All right, I will issue a report and recommendation in due course.  Anything else for today, folks?

MR. RUF:  No, your Honor, thank you.

MS. MILLER:  Thank you, your Honor.

MR. KIM:  Thank you, your Honor.

THE COURT:  Thank you all.  Have a very good day.

* * * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

ELIZABETH BARRON                    October 26, 2020