# EXHIBIT 1

Case 1:20-cv-02653   Document 1   Filed 06/15/20   Page 1 of 30 PageID #: 1

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LE RIVAGE LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>IQIYI, INC., YU GONG, and XIAODONG WANG,<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Case 1:20-cv-01830-DG-TAM Document 76-2 Filed 11/03/20 Page 3 of 31 PageID #:
1674
Case 1:20-cv-02653 Document 1 Filed 06/15/20 Page 2 of 30 PageID #: 2

Plaintiff Le Rivage LLC ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by iQIYI, Inc. ("iQIYI" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by iQIYI; and (c) review of other publicly available information concerning iQIYI.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired iQIYI securities between March 29, 2018 and April 7, 2020, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. iQIYI, "the Netflix of China," purports to be an innovative market-leading online entertainment service in China.

3. On October 30, 2018, iQIYI stated that it had "cleaned up some not so healthy advertisements on the in-feed side" by "let[ting] go" of customers who lacked "documents to prove they are qualified advertisers."

4. On this news, the Company's share price fell $2.56, or nearly 12%, to close at $19.64 per share on October 31, 2018.

5. On April 7, 2020, during market hours, Wolfpack Research released a report (the "Report") detailing, among other things, how iQIYI had misled investors and failed to disclose pertinent information generally and in its Registration Statement, including: (i) iQIYI overstating

CLASS ACTION COMPLAINT

1

its user numbers; (ii) iQIYI inflating its revenues; (iii) iQIYI inflating expenses and prices of assets to conceal its revenue inflation; and (iv) iQIYI misleading financial reporting creating the appearance of a cash generative company.

6.      On this news, the Company's share price fell $0.99 per share, or nearly 6%, to close at $16.51 per share on April 8, 2020, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (i) that the Company's advertising growth rate was overstated; (ii) that the Company had inflated its revenue metrics; (iii) that the Company had inflated its user numbers; (iv) that iQIYI inflated its expenses to cover up other fraud; and (v) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section

CLASS ACTION COMPLAINT

2

27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13.     Plaintiff Le Rivage LLC, as set forth in the accompanying certification, incorporated by reference herein, purchased iQIYI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant iQIYI is incorporated under the laws of the Cayman Islands with its principal executive offices located in Beijing China. iQIYI's American Depositary Shares ("ADSs" or "shares") trade on the NASDAQ exchange under the symbol "IQ."

15.     Defendant Yu Gong ("Gong") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.     Defendant Xiaodong Wang ("Wang") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.     Defendants Gong and Wang (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and

portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     iQIYI, "the Netflix of China," purports to be an innovative market leading online entertainment service in China.

19.     In March 2018, Defendants held the IPO, offering approximately 125 million American Depositary Shares ("ADSs") to the investing public at $18.00 per share, raising approximately $2.25 billion.

20.     On February 27, 2018, iQIYI filed with the SEC a Registration Statement on Form F-1, which in combination with subsequent amendments of Forms F-1/A and filed pursuant to Rule 424(b)(4), would be used for the IPO.

### Materially False and Misleading Statements Issued During the Class Period

21.     The Class Period begins on March 29, 2018. On that day, iQIYI filed with the SEC its final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement.

22.     In the Registration Statement, iQIYI reported the following, in relevant part,

CLASS ACTION COMPLAINT
4

regarding advertising revenue:

Our online advertising revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, and further by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017. We have proven capabilities of adapting a single popular work into a variety of entertainment products, creating multiple channels to amplify the popularity and monetary value of the original work. Our sophisticated monetization model fosters an environment for high-quality content production and distribution on our platform, which in turn expands our user base and increases user engagement, creating a virtuous cycle.

\* \* \*

*Online advertising services.* Our online advertising services revenue grew by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017, as a result of the increase of brand advertising, which is primarily due to the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, as well as the growth of our in-feed advertising service launched in the fourth quarter of 2016. Average brand advertising revenue per brand advertiser increased by 16.3% from RMB4.9 million in 2016 to RMB5.7 million (US$0.9 million) in 2017.

\* \* \*

*Online advertising services.* Our online advertising services revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, primarily as a result of the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, and partially offset by the decrease in the number of brand advertisers. Average brand advertising revenue per brand advertiser increased by 80.3% from RMB2.7 million in 2015 to RMB4.9 million in 2016.

\* \* \*

We appeal to advertisers through broad and efficient user reach, as well as innovative and effective advertising products. Our online advertising revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, and further by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017.

23.    In the Registration Statement, iQIYI reported the following, in pertinent part, regarding bartering transactions:

The attributable cost of the barter transaction is recognized as cost of revenues

CLASS ACTION COMPLAINT

5

through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926, *Entertainment – Films* ("ASC 926"). The Group recognized barter sublicensing revenues of RMB349,834, RMB382,478 and RMB762,741 (US$117,231) and related costs of RMB265,410, RMB362,760 and RMB650,442 (US$99,971) for the years ended December 31, 2015, 2016 and 2017, respectively.

24.     The above statements identified in ¶¶ 21-23 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (i) that the Company's advertising growth rate was overstated; and (ii) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis

25.     The truth began to emerge on October 30, 2018 when iQIYI stated that it had "cleaned up some not so healthy advertisements on the in-feed side." In connection with its third quarter 2018 financial results, the Company held a conference call, during which defendant Wang stated, in relevant part:

> [W]e have some customers which do not have the accelerated license needed to put their ads on the Internet. So we don't know whether they are like say a good customer and a bad customer. But from our perspective, because they don't have like I said, related documents to prove they are qualified advertisers so we just let them go. I think that's a major reason why we see something like a decline on our customers numbers in this sort of quarter in our SME business.

26.     On this news, the Company's share price fell $2.56, or nearly 12%, to close at $19.64 per share on October 31, 2018.

27.     Also on October 30, 2018, iQIYI announced its third quarter 2018 financial results in a press release that stated, in relevant part: "The number of total subscribing members was 80.7 million as of September 30, 2018, over 98% of whom were paying subscribing members. This compares to 42.7 million of total subscribing members as of September 30, 2017, up 89% year

CLASS ACTION COMPLAINT
6

over year." It also stated that customer advances and deferred revenue was RMB2,356,275,000.

28. On February 21, 2019, iQIYI issued a press release entitled "iQIYI Announces Fourth Quarter and Fiscal Year 2018 Financial Results" which stated the following, in pertinent part, regarding iQIYI subscribers: "The number of total subscribing members was 87.4 million as of December 31, 2018, 98.5% of whom were paying subscribing members. This compares to 50.8 million of total subscribing members as of December 31, 2017, up 72% year over year." The press release also stated that customer advances and deferred revenue was RMB2,195,283,000

29. On March 15, 2019, iQIYI filed with the SEC its annual report on Form 20-F, for the year ended December 31, 2018 (the "2018 Annual Report"). Attached to the 2018 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the company's internal control over financial reporting and the disclosure of all fraud.

30. The 2018 Annual Report stated the following, in pertinent part, about iQIYI's advertising revenue:

> *Online advertising services*. Our online advertising services revenue grew by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million in 2017, as a result of the increase of brand advertising, which is primarily due to the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, as well as the growth of our in-feed advertising service launched in the fourth quarter of 2016. Average brand advertising revenue per brand advertiser increased by 16.3% from RMB4.9 million in 2016 to RMB5.7 million in 2017.

31. The 2018 Annual Report also stated the following, in pertinent part, regarding iQIYI's daily active user ("DAUs") and monthly active users ("MAUs"): "For the year of 2018, our average mobile MAUs were 454.5 million and our average mobile DAUs were 135.4 million."

32. The 2018 Annual Report stated the following, in pertinent part, about iQIYI's

bartering transactions:

> The Group accounts for these nonmonetary exchanges in accordance with ASC 606, and records the transaction based on the fair value of the asset received starting from January 1, 2018. Barter sublicensing revenues are recognized in accordance with the same ASC 606 criteria above. The Group estimates the fair value of the licensed copyrights received based on various factors, including broadcasting schedule, cast and crew, theme and popularity, box office and market share of counterparties to the exchange. The attributable cost of sublicensing transactions, whether for cash or through nonmonetary exchanges, is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926 ("ASC 926"), *Entertainment—Films*.

> The Group recognized barter sublicensing revenues of RMB382,478, RMB762,741 and RMB1,082,964 (US$157,511) and related costs of RMB362,760, RMB650,442 and RMB1,026,140 (US$149,246) for the years ended December 31, 2016, 2017 and 2018, respectively.

33. The 2018 Annual Report stated the following, in pertinent part, about iQIYI's

acquisition of Skymoons (defined below):

> On July 17, 2018, we completed the acquisition of 100% equity stake in Skymoons Inc. and Chengdu Skymoons Digital Entertainment Co., Ltd., or Chengdu Skymoons (together with Skymoons Inc., "Skymoons"). The aggregate consideration consists of a fixed payment of RMB1.27 billion, as well as additional consideration valued at RMB730 million as of June 30, 2018 to be delivered in the event the acquiree satisfies the agreed upon performance benchmarks in the next two years.

*       *       *

> *Others*. Other revenues increased by 104.1% from RMB1,409.2 million (net of VAT) in 2017 to RMB2,875.6 million (US$418.2 million) in 2018, primarily as a result of strong performance across various vertical business lines, and revenue contribution from Skymoons, a mobile game company we acquired in July 2018.

*       *       *

> ***Acquisition of Skymoons***

> On July 17, 2018 (the "acquisition date"), the Group completed the acquisition of a 100% equity stake in Skymoons Inc. and Chengdu Skymoons Digital Entertainment Co., Ltd. (collectively, "Skymoons"). Headquartered in Chengdu,

CLASS ACTION COMPLAINT

China, Skymoons focuses on the development and global publishing of mobile games. The Group completed the acquisition of Skymoons on July 17, 2018, the date on which control was obtained to govern the financial and operating policies of Skymoons and obtained benefits from its activities. The Group believes Skymoons is a natural extension to its business and will strengthen its media platform and overall ecosystem. The results of Skymoons' operations have been included in the consolidated financial statements of the Group since the acquisition date.

The aggregate payment for the acquisition of Skymoons consists of a fixed payment of cash of RMB1,157.0 million (US$168.3 million), as well as a contingent payment of up to RMB130.0 million in cash and issuance of 23,777,706 Class A ordinary shares if specified adjusted net profit targets are met post-acquisition (the "Earn-Out").

The acquisition-date fair value of the consideration transferred totaled RMB1,242.9 million (US$180.8 million), which consisted of the fixed payment of cash amounting to RMB1,157.0 million (US$168.3 million) and the portion of the EarnOut payment described above of RMB85.9 million (US$12.5 million), which are not contingent on the continued employment. RMB1,018.6 million (US$148.1 million) of the Earn-Out is contingent on the continued employment of certain key employees for the three years following the acquisition date, and was accounted for as a transaction separate from the business combination based on its economic substance and will be recorded as post-combination compensation expense in the Group's financial statements over the requisite service period.

*       *       *

The addition of intangible assets RMB707,000 is generated from the acquisition of Skymoons occurred on July 17, 2018 (Note 3), of which RMB366,000 was attributed to published mobile games with a useful life of two years, RMB101,000 attributable to technology with a useful life of five years and RMB240,000 attributable to mobile games in development. Once the mobile games in development achieve technological feasibility, they will be amortized over a maximum of four years. The carrying amount of mobile games in development with an indefinite useful life was RMB nil and RMB232,298 (US$33,786), as of December 31, 2017 and 2018, respectively.

34.    On May 16, 2019, iQIYI issued a press release entitled "iQIYI Announces first Quarter 2019 Financial Results" which stated the following, in pertinent part, regarding its subscribers: "The number of total subscribing members was 96.8 million as of March 31, 2019, 98.6% of whom were paying subscribing members. This compares to 61.3 million of total

Case 1:20-cv-01830-DG-TAM    Document 76-3   Filed 11/03/20   Page 12 of 31 PageID
Case 1:20-cv-02653-AMD   Document 1   Filed 06/15/20   Page 11 of 30 PageID #: 11
#: 1683

subscribing members as of March 31, 2018, up 58% year over year." The Company also stated

that customer advances and deferred revenue was RMB1,960,719,000.

35.    On March 12, 2020, iQIYI filed with the SEC its annual report on Form 20-F for

the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual

Report were certifications pursuant to SOX signed by Defendants Gong and Wang attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's internal

control over financial reporting and the disclosure of all fraud.

36.    The 2019 Annual Report stated the following, in pertinent part, about iQIYI's

advertising revenue:

> *Online advertising services.* Our online advertising services revenue decreased by
> 11.3% from RMB9,328.1 million in 2018 to RMB8,270.6 million (US$1,188.0
> million) in 2019, as a result of the challenging macroeconomic environment in
> China, the uncertainty of certain content scheduling, the tightened regulatory
> environment, and the intensified competition in advertising business. Average
> brand advertising revenue per brand advertiser decreased by 11.9% from RMB6.7
> million in 2018 to RMB5.9 million (US$0.9 million) in 2019. Average brand
> advertising revenue per brand advertiser is the main driver for our online
> advertising services revenue. We track the average brand advertising revenue per
> brand advertiser as a key indicator to evaluate our advertising services business and
> adapt our sales strategy, advertisement solutions and content scheduling
> accordingly.

37.    The 2019 Annual Report also stated the following, in pertinent part, regarding

iQIYI's DAUs and MAUs: "For the year of 2019, our average mobile MAUs were 476.0 million

and our average mobile DAUs were 139.9 million."

38.    The 2019 Annual Report stated the following, in pertinent part, about iQIYI's

bartering transactions:

> Barter sublicensing revenues are recognized in accordance with the same revenue
> recognition criteria above. The Group estimates the fair value of the licensed
> copyrights received based on various factors, including the purchase price of
> similar non-exclusive and/or exclusive contents, broadcasting schedule, cast and
> crew, theme, popularity and box office. The attributable cost of sublicensing

CLASS ACTION COMPLAINT

10

Case 1:20-cv-01830-DG-TAM    Document 76-2    Filed 11/03/20    Page 13 of 31 PageID
#: 1684
Case 1:20-cv-02653    Document 1    Filed 06/15/20    Page 12 of 309 PageID #: 12

transactions, whether for cash or through nonmonetary exchanges, is recognized as
cost of revenues through the amortization of the sublicensing right component of
the exclusive licensed copyright, calculated based on its estimated usage pattern.

The Group recognized barter sublicensing revenues of RMB762,741,
RMB1,082,964 and RMB682,941 (US$98,098) and related costs of RMB650,442,
RMB1,026,140 and RMB570,201 (US$81,904) for the years ended December 31,
2017, 2018 and 2019, respectively.

39.    The above statements identified in ¶¶ 25, 27-38 were materially false and/or

misleading, and failed to disclose material adverse facts about the Company's business, operations,

and prospects.  Specifically, Defendants failed to disclose to investors: (i) that the Company's

advertising growth rate was overstated; (ii) that the Company had inflated its revenue metrics; (iii)

that the Company had inflated its user numbers; (iv) that iQIYI inflated its expenses to cover up

other fraud; and (v) that, as a result of the foregoing, Defendants' positive statements about the

Company's business, operations, and prospects, were materially misleading and/or lacked a

reasonable basis.

### Disclosures at the End of the Class Period

40.    On April 7, 2020, during market hours, Wolfpack Research released a report (the

"Report") detailing, among other things, how iQIYI had misled investors and failed to disclose

pertinent information generally and in its Registration Statement, including: (i) iQIYI overstating

its user numbers; (ii) iQIYI inflating its revenues; (iii) iQIYI inflating expenses and prices of assets

to conceal its revenue inflation; and (iv) iQIYI misleading financial reporting creating the

appearance of a cash generative company.

41.    The Report summarized its findings as:

Our research shows us that *iQIYI, Inc. ("IQ") was committing fraud well before
its IPO in 2018 and has continued to do so ever since.* Like so many other China-
based companies who IPO with inflated numbers, IQ is unable to legitimately grow
their business enough to true up their financial statements. *We estimate IQ inflated
its 2019 revenue by approximately RMB 8-13 billion, or 27%-44%.*

Case 1:20-cv-01830-DG-TAM Document 76-6/15 Filed 11/03/20 Page 14 of 31 PageID
Case 1:20-cv-02653-AM Document 1 Filed 06/15/20 Page 13 of 309 PageID #: 13
#: 1685

*IQ does this by overstating its user numbers by approximately 42%-60%. Then, IQ inflates its expenses, the prices it pays for content, other assets and acquisitions in order to burn off fake cash to hide the fraud from its auditor and investors.*

42.     The Report noted the following, in pertinent part, regarding iQIYI's advertising

revenue:

In its prospectus filed with the SEC, IQ claimed 2015 advertising revenues of RMB 3.4 billion. The tables below show that IQ only reported RMB 1.95 billion of advertising revenues to the SAIC [State Administration for Industry and Commerce] in 2015, an overstatement of 74%. (revenues in RMB 10,000) [Images omitted.]

There was no online media company top 10 in the 2016 report, so we generously applied Shanghai iQIYI's year-over-year growth rate to Zhong Yuan in order to estimate its 2016 revenue of RMB 488 million. The table below is an excerpt from the 2016 SAIC advertising industry report shows that iQIYI Culture had advertising revenues of RMB 3.358 billion. *IQ reported advertising revenues of RMB 5.65 billion to the SEC in 2016, a 38.6% overstatement (revenues in RMB 10,000)* [Images omitted.]

*             *             *

*In total, IQ's SAIC reported advertising revenue was 7.566 billion and 7.791 billion in 2017 and 2018, respectively. IQ reported advertising revenues of RMB 8.16 billion and 9.328 billion to the SEC in those years, representing overstatements of 7.9% and 19.7% in 2017 and 2018, respectively.*

43.     The Report noted the following, in pertinent part, regarding iQIYI's active users:

*Our research uncovered data from three independent sources showing that IQ overstates its DAU numbers by 42% to 60%.*

**Data from IQ's Back-End System Contradict its DAU Claims**

*Two Chinese advertising companies provided us data from IQ's back-end system which show that IQ's actual mobile DAUs from September 2019 were 60.3% lower than the 175 million average mobile DAUs claimed by IQ in October 2019.*

The advertising agencies had access to IQ's back end DAU data for China's 19 "tier 1" cities. In January 2019 and January 2020, IQ published reports on the state of the online movie industry, wherein it provided a breakdown of the geographic distribution of its users. IQ's reports indicate that in 2018, 36% of IQ's users were

CLASS ACTION COMPLAINT
12

in China's 19 Tier 1 cities. The 2019 report only disclosed growth rates for each of China's five tiers of cities from 2018 to 2019. Applying these growth rates to the 2018 distribution, we were able to calculate that the 19 tier 1 cities represented 35.6% of IQ's total users in 2019.

We collected 4 days of DAU data from the same week in China's 19 Tier 1 cities from IQ's back end data provided by the two ad companies (3 weekdays and 1 weekend day) in September 2019. The average mobile DAUs from the data we collected from IQ's back-end platform was 24.7 million. The lowest day was 23.36 million and the highest day was 25.88 million.

\* \* \*

***Based on the 175 million average mobile DAUs number disclosed by IQ in October 2019 and the 35.6% of DAUs in tier 1 cities as disclosed in IQ's 2019 report mentioned above, we expected 62.29 million (175m x 35.6%) DAUs in China's tier 1 cities. However, we found only 24.7 million DAUs in the tier 1 cities from the backend data provided by the ad companies. This is 60.3% lower than what IQ's disclosures implied.***

\* \* \*

**IQ's "Heat Index" Maps Show Evidence of Click Farm Activity**

IQ created its own content monitoring and ranking metric to provide a sense of the popularity of its programming. It is called the Content Heat Index and is publicly available on IQ's website.

According to a note on the Heat Index, these lists are compiled from data from the most recent three months. ***The typical trend for newly released popular programs starts with a spike and then trails off. A few months after the peak, we found that a consistent pattern of provinces/ zones ranked in the top 10 for most viewers included areas with low populations, such as Macau, Hainan, Tibet or Inner Mongolia.***

Mainland China has 23 provinces, 5 autonomous regions, 4 municipalities (Beijing, Shanghai, Guangzhou, and Shenzhen) whose populations are individually reported by the National Bureau of Statistics. Among these total 32 different regions, Tibet always ranks last for population. In 2018, China's National Bureau of Statistics reported it had just 1.478 million residents and only a small percent of which are Han Chinese immigrants.

However, recent checks on IQ's popular programs including "Old Boy," "Idol Producer" and "Hot Blood Dance Crew" included regions with very small populations such as Tibet, Hainan, Ningxia or Inner Mongolia in the top 10[.] [Image omitted.]

CLASS ACTION COMPLAINT

13

*It is nearly impossible for regions with such small populations to generate enough organic traffic to top IQ's heat index charts. Instead, we believe these highly abnormal patterns are indications that IQ employs methods to inflate the viewership levels of its content.*

**QuestMobile**

In February 2020, QuestMobile published a special report titled "China Mobile Internet Amid COVID-19 Plague" which shows that IQ overstates its DAU numbers by at least 42%.

*The report shows that IQ's average mobile DAUs were only 126.2 million during the first 10 days of the 2020 Chinese Lunar New Year, versus 180 million average mobile DAUs claimed by IQ.* Furthermore, the QuestMobile report shows IQ's DAUs did not grow between the 2019 and 2020 Chinese Lunar New Year[.] [Image omitted.]

44. The Report noted the following, in pertinent part, regarding iQIYI's contradicting membership growth and declining real deferred revenue figures:

Between 3Q18 and 1Q19, IQ reported an increase of 16.1 million paying subscribers and an increase in the average subscription period from 6 months to 8 months. However, IQ's deferred revenue declined by 17% during the same period – *this mathematical contradiction shows that at least one of these numbers is made up.*

*With stable net membership growth and steady average revenue per user ("ARPU"), the deferred revenue curve should lead the realized revenue curve. Further, increasing average subscription periods should result in greater frontend accumulation of deferred revenues.*

\* \* \*

The relationship between IQ's deferred revenues and realized revenues is the opposite of what we would expect based on their claims – the realized revenue curve consistently leads the deferred revenue curve and the gap between the two is widening.

\* \* \*

Because IQ's management claimed it added 16.1 million net paying subscribers and that the average subscription period had increased from about 6 months to 8 months between 3Q18 and 1Q19, we expected to find significant growth in deferred revenue as the prepayments accumulated. However, we found the opposite.

CLASS ACTION COMPLAINT

14

Case 1:20-cv-01830-DG-TAM   Document 26-3   Filed 11/03/20   Page 17 of 31 PageID
Case 1:20-cv-02653-AMD   Document 1   Filed 06/15/20   Page 16 of 309 PageID #: 16
#: 1688

\* \* \*

IQ's deferred revenues declined from RMB 2,356.3 million at the end of 3Q18 to
RMB 1,960.7 million at the end of 1Q19, a 17% decline during that 6-month period.
This directly contradicts management's claims of growth in the number of paying
subscribers and the average subscription period – *it is mathematically impossible.*

45.     The Report noted the following, in pertinent part, regarding iQIYI's acquisition of

Skymoons:

**The Skymoons Acquisition**

In July 2018, IQ paid ~$300 million to acquire Chengdu Skymoons Digital
Entertainment ("Skymoons"). We believe this transaction was a sham intended to
burn off fake revenues and siphon off cash from IQ's recent Nasdaq listing. It's
simply not credible to us to believe anybody would pay ~$300 million for this
company. Skymoons hasn't shown the ability to develop a game on its own. Months
before the acquisition, a Chinese court ruled that Skymoons stole the IP and game
design underlying its only successful game. IQ only acquired part of Skymoons's
business. IQ didn't even get the Skymoons.com domain name in the acquisition.

\* \* \*

On March 30, 2018, only three and a half months prior to IQ's July 2018
acquisition, the Suzhou People's Intermediate Court ruled that Skymoons had
stolen the IP that formed the foundation and structure of the "Journey of the
Flower" game. Skymoons and IQ were ordered to cease the infringements, and pay
Snail Digital an RMB 30 million fine (a very large sum for an IP case between
Chinese domestic firms). *The fact that Skymoons was not the true originator of
the design of its only successful game and depended upon both creativity and
talent of others as well as IQ's investments and marketing power to promote and
commercialize the game completely undermines the ridiculous valuation that IQ
ascribed to it.*

Our reviews of Chinese copyright records found that *Skymoons has registered no
new publication copyrights since the July 2018 acquisition. Instead, we found
only the distribution rights for 4 games under its name, all of which were licensed
from other game companies[.]* [Image omitted.]

Of these licensed games, management has only publicly commented on "The
Croods." In the prepared remarks of IQ's 1Q19 earnings call, CEO Gong Yu
highlighted the game as an example of Skymoons capabilities. The statement is
carefully worded to suggest a major role in its development, but in fact only credits
Skymoons for "*launching*" and "*adapting*" the game, not designing it[.] [Internal

CLASS ACTION COMPLAINT
15

quotation omitted.]

A further check of the IP for the of The Croods, 疯狂原始人, revealed that in November 2016, a mobile version of The Croods had already been produced and distributed by Shanghai Oriental Peral Cultural Development company. As such, it appears that Skymoons did nothing more than publish an updated version of a two year-old mobile game. This appears to be the extent of Skymoons' technical capabilities – if this company is actually worth more than RMB 2 billion, then the world is much richer than we thought.

\* \* \*

Skymoons' myriad of issues calls into question how IQ's management reached the RMB 2.4 billion valuation and how the acquisition was accounted for. In fact, ***IQ didn't provide a reconciliation of Skymoons' financials to US GAAP financials for the years prior to the acquisition, claiming doing so would require "undue cost" due to a prior reorganization[.]*** [Internal quotation omitted.]

**We believe the above statement is a bald-faced lie by IQ's management.** The purchase agreement (included as Exhibit 4.66 of the same 20-F) includes the following as a closing condition:

"***The Target Companies have delivered to the Purchasers***: (i) all capital verification reports of the Group Members and all relevant notes and schedules thereto issued by the accountants engaged by them from the date of incorporation of the Target Companies, the details of which are set forth under Schedule VIII: List of Financial Reports; (ii) ***the audited balance sheets of the company for 2016 and 2017 prepared on a consolidated basis under the US GAAP, and the relevant audited income statements and cash flow statements, together with all relevant notes and schedules***, and in the absence of audited statements, the management statements shall be provided (hereinafter collectively referred to as the "Financial Statements")"

***Not only would converting Skymoons' historical financials into U.S. GAAP not require "undue cost," it wouldn't have cost IQ anything at all – Skymoons had delivered GAAP financial statements to IQ prior to the deal's closing date.*** This directly contradicts the already weak excuse provided by IQ's management, exposing their brazen lie.

46.     The Report noted the following, in pertinent part, regarding iQIYI's bartering transactions:

Arguably one of the most egregious examples of accounting fraud IQ commits is the inflation of its barter transaction revenue. Barter sublicensing revenues are determined by IQ's internal estimates of the value of the content it traded. In other words, IQ's management can effectively assign any value they want to these

Case 1:20-cv-01830-DG-TAM   Document 26-3   Filed 11/03/20   Page 19 of 31 PageID
Case 1:20-cv-02653   Document 1   Filed 06/15/20   Page 18 of 309 PageID #: 18
#: 1690

transactions, providing an easy opportunity to inflate its revenues. Based on the highest-end estimated value per non-exclusive episode provided by a former IQ employee involved in content acquisition, ***IQ would have needed to barter the licenses for ~3.9x and ~3.2x the total number of TV series episodes produced by all Chinese production companies to legitimately reach its reported barter revenues in 2018 and 2019, respectively.***

\* \* \*

**Barter Transactions: A Black Box**

IQ's barter sublicensing revenues are so inflated that they wouldn't come close to being believable even if IQ bartered every single TV episode produced in China in each of the last three years.

IQ's reported barter sublicensing revenues imply it traded every single TV episode produced in China in 2018 and 2019 for ~RMB 79,000 and ~RMB 64,000 each, respectively. A former IQ employee who worked in content acquisition [] told us that non-exclusive licenses are typically worth RMB 1,000 to 5,000 per episode, or a maximum of up to RMB 20,000 for an extremely popular show.

To give IQ every benefit of the doubt, we used the maximum of RMB 20,000 per episode, according to the former, as the average value of the episodes that IQ bartered. Even doing so, IQ would have needed to barter the licenses for ~3.9x and ~3.2x the total number of TV series episodes produced by all Chinese production companies in order to legitimately reach its reported barter revenues in 2018 and 2019, respectively.

Barter sublicensing revenues are determined by IQ's internal estimates of the value of the content it traded. In other words, IQ's management can effectively assign *any value they want* to these transactions, providing management an easy opportunity to inflate its revenues which it obviously takes advantage of.

\* \* \*

The former [employee] also emphasized the massive difference between the value of exclusive and non-exclusive content. An exclusive license for a popular show would be worth between RMB 3 and RMB 5 million – approximately 1,000x more than a non-exclusive license for the same show.

47.     On this news, the Company's share price fell $0.99 per share, or nearly 6%, to close at $16.51 per share on April 8, 2020, on unusually heavy trading volume.

CLASS ACTION COMPLAINT

17

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired iQIYI securities between March 29, 2018 and April 7, 2020, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, iQIYI's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of iQIYI shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by iQIYI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and

Case 1:20-cv-01830-DG-TAM   Document 76-3   Filed 11/03/20   Page 21 of 31 PageID
Case 1:20-cv-02653   Document 1   Filed 06/15/20   Page 20 of 309 PageID #: 20
#: 1692

predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of iQIYI; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

54.     The market for iQIYI's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, iQIYI's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired iQIYI's securities relying upon the integrity of the market price of the Company's securities and market information relating to iQIYI and have been damaged thereby.

55.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of iQIYI's securities, by publicly issuing false and/or misleading statements

Case 1:20-cv-01830-DG-TAM   Document 76-3   Filed 11/03/20   Page 22 of 31 PageID
Case 1:20-cv-02653   Document 1   Filed 06/15/20   Page 21 of 309 PageID #: 21
#: 1693

and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about iQIYI's business, operations, and prospects as alleged herein.

56.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about iQIYI's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

57.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

58.     During the Class Period, Plaintiff and the Class purchased iQIYI's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

59.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding iQIYI, their control over, and/or receipt and/or modification of iQIYI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning iQIYI, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

60.     The market for iQIYI's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, iQIYI's securities traded at artificially inflated prices during the Class Period.  On June 20, 2018, the Company's share price closed at a Class Period high of $44.20 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of iQIYI's securities and market information relating to iQIYI, and have been damaged thereby.

61.     During the Class Period, the artificial inflation of iQIYI's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

Case 1:20-cv-01830-DG-TAM   Document 76-3   Filed 11/03/23   Page 24 of 31 PageID
Case 1:20-cv-02653-AMD   Document 1   Filed 06/15/20   Page 23 of 309 PageID #: 23
#: 1695

statements about iQIYI's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of iQIYI and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

62. At all relevant times, the market for iQIYI's securities was an efficient market for the following reasons, among others:

(a) iQIYI shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, iQIYI filed periodic public reports with the SEC and/or the NASDAQ;

(c) iQIYI regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) iQIYI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

63. As a result of the foregoing, the market for iQIYI's securities promptly digested current information regarding iQIYI from all publicly available sources and reflected such

information in iQIYI's share price. Under these circumstances, all purchasers of iQIYI's securities during the Class Period suffered similar injury through their purchase of iQIYI's securities at artificially inflated prices and a presumption of reliance applies.

64.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of iQIYI who knew that the statement was false when made.

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

66. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase iQIYI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

68. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for iQIYI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

Case 1:20-cv-01830-DG-TAM Document 26-3 Filed 11/03/20 Page 27 of 31 PageID
Case 1:20-cv-02653 Document 1 Filed 06/15/20 Page 26 of 309 PageID #: 26
#: 1698

continuous course of conduct to conceal adverse material information about iQIYI's financial well-being and prospects, as specified herein.

70. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of iQIYI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about iQIYI and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

71. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

72. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing iQIYI's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

73. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of iQIYI's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired iQIYI's securities during the Class Period at artificially high prices and were damaged thereby.

74. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems

that iQIYI was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their iQIYI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

75.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     Individual Defendants acted as controlling persons of iQIYI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and

had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

80.     As set forth above, iQIYI and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 15, 2020                 **GLANCY PRONGAY & MURRAY LLP**

                                     By:  *s/ Gregory B. Linkh*_____ _____ _____
                                     Gregory B. Linkh (GL-0477)
                                     230 Park Ave., Suite 530
                                     New York, NY 10169
                                     Telephone: (212) 682-5340
                                     Facsimile: (212) 884-0988
                                     Email: glinkh@glancylaw.com

                                             -and-

                                     Robert V. Prongay
                                     Charles H. Linehan
                                     Pavithra Rajesh
                                     1925 Century Park East, Suite 2100
                                     Los Angeles, CA 90067
                                     Telephone: (310) 201-9150
                                     Facsimile: (310) 201-9160

                                     *Attorneys for Plaintiff Le Rivage LLC*

CLASS ACTION COMPLAINT
29