UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE iQIYI, INC. SECURITIES LITIGATION

     : 20-cv-01830 (DG) (TAM)
     :
     : **ECF CASE**
     : **Electronically Filed**
     :
     : **Oral Argument Requested**
     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF THE iQIYI DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

*Attorneys for Defendants iQIYI, Inc., Baidu, Inc., Yu Gong, Xiaodong Wang, Robin Yanhong Li, Qi Lu, Herman Yu, Victor Zhixiang Liang, and Giselle Manon*

Served on: July 16, 2021

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ............................................................................................................5

        A.     iQIYI's Business and March 2018 IPO .................................................................5

        B.     In August 2018, iQIYI Announces a Joint Venture With Super Sports Media.......6

        C.     iQIYI Continues To Grow Throughout 2018 and 2019...........................................7

        D.     In April 2020, a Short Seller Attacks iQIYI .........................................................7

        E.     This Action............................................................................................................8

ARGUMENT ................................................................................................................................8

I.       PLAINTIFFS' EXCHANGE ACT CLAIMS SHOULD BE DISMISSED .......................8

        A.     Plaintiffs Fail To Allege Any Misrepresentation ........................................................9

              1.     Plaintiffs Fail To Allege Daily Active Users Were Overstated ......................9

              2.     Plaintiffs Fail To Allege Deferred Revenue Was Overstated ......................12

              3.     Plaintiffs Fail To Allege Membership Services Revenue Was Overstated ..14

              4.     Plaintiffs Fail To Allege the Accounting for iQIYI's
Investment in Xin'ai Sports Was Improper .................................................16

        B.     Plaintiffs Fail To Allege a Strong Inference of Scienter.......................................19

              1.     Plaintiffs Fail To Allege Motive and Opportunity.......................................19

              2.     Plaintiffs Fail To Allege Conscious Misbehavior or Recklessness ..............20

        C.     Plaintiffs Fail To Allege Loss Causation .............................................................22

II.      PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED......................24

        A.     Plaintiffs Lack Standing Because They Have Not Suffered Any Damages ..........24

        B.     Plaintiffs Fail To Allege Any Misrepresentation in the Offering Documents.......25

        C.     The Absence of Loss Causation Is Apparent on the Face of the Complaint ........25

CONCLUSION...........................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

*Alpern v. UtiliCorp United, Inc.*,
 84 F.3d 1525 (8th Cir. 1996) ..................................................................................24

*In re AmTrust Financial Services, Inc. Securities Litigation*,
 No. 17-cv-1545 (LAK), 2020 WL 2787117 (S.D.N.Y. Apr. 20, 2020) ............................17

*In re A-Power Energy Generation Systems Ltd. Securities Litigation*,
 No. 11–MDL–2302-GW (CWx), 2012 WL 1983341 (C.D. Cal. May 31, 2012) .............10

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007).................................................................................5, 19

*In re Autodesk, Inc. Securities Litigation*,
 132 F. Supp. 2d 833 (N.D. Cal. 2000) .............................................................13, 18

*In re Barclays Bank PLC Securities Litigation*,
 No. 09 Civ. 1989 (PAC), 2016 WL 3235290 (S.D.N.Y. June 9, 2016) ............................24

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)................................................................................................23

*In re Bayou Hedge Fund Litigation*,
 534 F. Supp. 2d 405 (S.D.N.Y. 2007)....................................................................20

*In re Centerline Holding Co. Securities Litigation*,
 380 F. App'x 91 (2d. Cir. 2010) .............................................................................21

*Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan
   Mortgage Corp.*,
 543 F. App'x 72 (2d Cir. 2013) ..............................................................................23

*Chill v. General Electric Co.*,
 101 F.3d 263 (2d Cir. 1996)..............................................................................19, 20

*In re China Valves Technology Securities Litigation*,
 979 F. Supp. 2d 395 (S.D.N.Y. 2013)......................................................................14

*In re China XD Plastics Co. Ltd. Securities Litigation*,
 No. 14-CV-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016).............9, 12, 18

*Delfonce v. Eltman Law, P.C.*,
 No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017) ...................5

*Dresner v. Utility.com, Inc.*,
 371 F. Supp. 2d 476 (S.D.N.Y. 2005)........................................................................11

*In re Elan Corp.*,
   No. 02-CIV-865 (RMB) (FM), 2004 WL 1305845 (S.D.N.Y. May 18, 2004)................22

*Ford v. Voxx International Corp.*,
   No. 14-CV-4183 (JS) (AYS), 2016 WL 3982466 (E.D.N.Y. July 22, 2016).....................9

*Goldsmith v. Weibo Corp.*,
   C.A. No. 17-4728 (SRC), 2018 WL 2733694 (D.N.J. June 7, 2018) ...............................18

*Harris v. AmTrust Financial Services, Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015)...........................................................................9, 17

*Harris v. AmTrust Financial Services, Inc.*,
   649 F. App'x 7 (2d Cir. 2016) ........................................................................................12

*Hutchison v. Deutsche Bank Securities Inc.*,
   647 F.3d 479 (2d Cir. 2011)............................................................................................25

*In re Initial Public Offering Securities Litigation*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................................24

*In re Initial Public Offering Securities Litigation*,
   383 F. Supp. 2d 566 (S.D.N.Y. 2005)...............................................................................7

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020)..............................................................................................20

*Janbay v. Canadian Solar, Inc.*,
   No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..................22, 23

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001).......................................................................................19, 20

*In re L & L Energy, Inc. Securities Litigation*,
   908 F. Supp. 2d 1147 (W.D. Wash. 2012)..................................................................12, 14

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)............................................................................................22

*Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012).............................................................................11

*In re Lions Gate Ent. Corp. Securities Litigation*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) .................................................................................21

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)...........................................................................9, 13

iii

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..................................................................................23

*In re Netflix, Inc. Sec. Litig.*, No. C 04-2978 (FMS), 2005 WL 1562858, at *7 (N.D. Cal.
    June 28, 2005) .............................................................................................................11

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ...................................................................................................17

*Pierce v. Morris*,
    No. 4:03-CV-026-Y, Nos. 4:03-CV-026 et seq., 2006 WL 2370343 (N.D. Tex.
    Aug. 16, 2006) ...........................................................................................................24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .......................................................................................25

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*,
    339 F. Supp. 3d 169 (S.D.N.Y. 2018) .......................................................................15

*Schick v. Ernst & Young*,
    141 F.R.D. 23 (S.D.N.Y. 1992) .................................................................................16

*Sinay v. CNOOC Ltd.*,
    554 F. App'x 40 (2d Cir. 2014) .................................................................................21

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) ...........................................................................................8

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011) .......................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................................19

*In re Turquoise Hill Resources Ltd. Securities Litigation*,
    No. 13 Civ. 8846 (LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ...................21

*In re XP Inc. Securities Litigation*,
    No. 20-cv-1502, 2021 WL 861917 (E.D.N.Y. Mar. 8, 2021) .....................................21

**STATUTES**

15 U.S.C. § 77k(e) .................................................................................................................24

iv

Defendants iQIYI, Inc. ("iQIYI" or the "Company"), Baidu, Inc. ("Baidu"), Yu Gong, Xiaodong Wang, Robin Yanhong Li, Qi Lu, Herman Yu, Victor Zhixiang Liang and Giselle Manon (collectively, the "iQIYI Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Consolidated Class Action Complaint (ECF No. 104) ("Complaint" or "CAC") pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").[1]

## PRELIMINARY STATEMENT

This putative securities fraud action does nothing more than parrot conclusory allegations from an unsuccessful short-seller attack on Defendant iQIYI, which was followed by a sustained *increase* in iQIYI's stock price. Often called the "Netflix of China," iQIYI is a leading online entertainment service in China whose American Depositary Shares ("ADSs") trade on the NASDAQ. In April 2020, two years after the Company's initial public offering ("IPO"), short-seller Wolfpack Research published a report (the "Wolfpack Report") accusing iQIYI of misrepresenting certain financial and operational metrics in its IPO Prospectus and Registration Statement (together, the "Offering Documents") and in its 2018 and 2019 annual reports. Specifically, the Wolfpack Report contends that iQIYI (i) inflated its mobile daily active users ("DAUs"), membership services revenue and deferred revenue, and (ii) improperly accounted for its investment in a post-IPO joint venture called Beijing Xin'ai Sports Media Technology Co., Ltd. ("Xin'ai Sports"). These meritless allegations rest largely on apples-to-oranges comparisons

---

[1] A true and correct copy of the Complaint is attached as Exhibit Q to the accompanying Declaration of Robert A. Fumerton, dated July 16, 2021, exhibits to which are otherwise cited herein as "Ex. __." Pincites for all exhibits reference the original pagination at the bottom of the page. All citations and internal quotation marks are omitted, and all emphases in quotations are added, unless otherwise indicated.

between the data reported in iQIYI's U.S. public filings and metrics drawn from third-party sources or the Chinese public filings of a number of variable interest entities ("VIEs") that had contractual arrangements with iQIYI to comply with local law requirements.

iQIYI swiftly and unequivocally denied the Wolfpack Report's allegations. To date, iQIYI has not restated any of its prior financial or operational results and has not been subject to any regulatory enforcement actions. The market was appropriately unfazed by the Wolfpack Report, with iQIYI's ADS price closing at $17.30/share on the day it was released—$0.54 (3.22%) *above* the prior day's closing. Two weeks later, when various plaintiffs began copying the Wolfpack Report's allegations to assert the securities claims at issue here, iQIYI's ADS price was at $19.24/share—*above* the IPO price of $18.00. The CAC, like the Wolfpack Report on which it relies, is facially deficient and should be dismissed for multiple independent reasons.

**First**, Plaintiffs fail to allege facts showing that iQIYI's disclosures were false. Plaintiffs claim that iQIYI's reported mobile DAUs must have been overstated because two consulting firms allegedly estimated lower numbers. But Plaintiffs allege nothing about how these third parties calculated their numbers, what data and assumptions they used, and why these third parties' *estimates* should be credited over the Company's reporting of *actual data*. Indeed, the two firms' estimates are not even consistent with each other. Plaintiffs' conclusory assertions fall far short of the particularized factual allegations required by Rule 9(b) and the PSLRA. (*Infra* §§ I.A.1, II.B.)

Plaintiffs similarly fail to plead that iQIYI overstated its deferred revenue based on lower numbers allegedly reported in third-party credit reports, which in turn were allegedly based on the PRC tax filings of various iQIYI VIEs. Plaintiffs do not allege any facts showing this amalgam of third-party information is reliable or comparable to iQIYI's data. (*Infra* §§ I.A.2, II.B.)

2

Elsewhere, Plaintiffs rely on iQIYI's reported deferred revenues to claim that iQIYI faked its membership services revenue.  They argue that because iQIYI reported increases in membership services revenue in Q4 2018 and Q1 2019 while reporting decreases in deferred revenue, the membership services revenue numbers must have been false.  But Plaintiffs cannot have it both ways—alleging that iQIYI's deferred revenues were fabricated and then using those same numbers as the yardstick by which to allege that membership services revenue was inflated. In any event, Plaintiffs allege no facts to support their premise that deferred revenue and membership services revenue must be positively correlated.  As Plaintiffs implicitly concede, numerous factors—including the length of subscription period and time at which such purchases were made—render the correlation between deferred revenue and membership services revenue more nuanced and variable than Plaintiffs' simplistic lockstep assumption.  (*Infra* § I.A.3.)

Finally, Plaintiffs fail to show that iQIYI improperly accounted for its investment in Xin'ai Sports.  To begin with, such disagreements about the application of accounting principles do not state a federal securities claim as a matter of law.  Moreover, the relevant accounting principles confirm that iQIYI properly recorded its obligations to provide goods and services to Xin'ai Sports as deferred revenue, and, in accordance with those accounting principles, recognized revenue as those goods and services were provided.  (*Infra* § I.A.4.)

**Second**, Plaintiffs' Exchange Act claims should also be dismissed because Plaintiffs fail to allege facts giving rise to the requisite strong inference of scienter—*i.e.*, an intent to defraud investors.  Plaintiffs make the unremarkable observation that iQIYI's parent company, Defendant Baidu, and iQIYI's chairman, Defendant Li (who is also Baidu's CEO), wished to see iQIYI's share price increase.  But this universal desire shared by any large shareholder does not evidence a motive to commit securities fraud.  Separately, Plaintiffs point to the "core operations" doctrine

3

and to the Sarbanes-Oxley Act ("SOX") certifications signed by certain of the iQIYI's officers to insist that they must have known iQIYI's statements were false.  But courts routinely reject such bare-bones allegations as insufficient to plead scienter.  Plaintiffs also argue that iQIYI's disclosure of the SEC's and NASDAQ's investigations into the Wolfpack Report's allegations supports an inference of scienter because the disclosure allegedly came four months after the investigations began.  But as Plaintiffs concede, iQIYI had no duty to disclose those investigations at all.  Its decision to do so voluntarily and proactively shows candor, not scienter.  (*Infra* § I.B.)

**Third**, all of Plaintiffs' claims independently fail for lack of loss causation.  Plaintiffs in federal securities cases typically plead loss causation by alleging a drop in the company's stock price when the falsity of the prior misrepresentations was revealed by a "corrective disclosure." Here, Plaintiffs allege the Wolfpack Report supposedly revealed misstatements in iQIYI's Offering Documents and annual reports.  The problem for Plaintiffs is that iQIYI's ADS price *increased* on the day the Wolfpack Report was released.  Plaintiffs also point to iQIYI's disclosure of the SEC and NASDAQ investigations, but that neither corrected any prior misstatement by the Company, nor implied anything about the veracity of the Wolfpack Report's allegations.  And even then, iQIYI's stock price held steady.  (*Infra* §§ I.C, II.C.)

**Fourth**, Plaintiffs lack standing for their Section 11 claims because they have no cognizable damages under Section 11's statutory damages formula.  As relevant here, statutory damages are determined by comparing the IPO price to the stock price on the day this litigation was commenced or, if applicable, the price at which Plaintiffs sold their shares before this litigation.  But iQIYI's stock price, whether measured when this lawsuit was filed or when Plaintiffs sold their shares before this lawsuit, was *above* the IPO price.  Plaintiffs thus have no damages and no cognizable claim under Section 11.  (*Infra* § II.A.)

4

## STATEMENT OF FACTS[2]

### A.    iQIYI's Business and March 2018 IPO

iQIYI is a market-leading online entertainment service in China.  (Ex. A, Form F-1, at 1.) iQIYI leverages an online platform featuring original, professionally-produced, and user-created content to generate revenue through membership subscriptions, online advertising services, and content distribution.  (Ex. A at 1, 2; CAC ¶¶ 22, 48.)  iQIYI completed its IPO on March 29, 2018, issuing 125,000,000 ADSs at $18.00 per share.  (CAC ¶ 315.)

iQIYI offers monthly, quarterly, and annual subscriptions that provide "access to streaming of premium content in exchange for a non-refundable upfront membership fee." (Ex. A at 93.)  As the Offering Documents explain, "[t]he receipt of membership fees is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered." (Ex. A at 93; CAC ¶ 44.)  Thus, payments for monthly subscriptions are recognized as revenue when received, whereas prepayments for quarterly or annual subscriptions are initially recorded as deferred revenue and recognized as revenue on a prorated basis each month.  (CAC ¶ 34.)  On the Company's balance sheet, deferred revenue relating to membership services is recorded as a liability and is included in the line item for "[c]ustomer advances and deferred revenue." (Ex. A at F-4; *see also* Ex. C, 2018 Form 20-F, at F-25.)  That line item also includes virtual currency that customers have paid for but not yet used.[3]  (Ex. A at 95; CAC ¶ 45.)

---

[2]    These facts are drawn from the well-pleaded allegations and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint." *Delfonce v. Eltman Law, P.C.*, No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 16, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[3]    Users "purchase virtual currency for usage in [iQIYI's live broadcasting platform] to acquire consumable virtual gifts . . . or time-based virtual items."  (Ex. A at 95.)

iQIYI's subscription service became increasingly popular before its IPO.  iQIYI had 10.7 million subscribing members at the close of 2015, and generated RMB 996.7 million in membership services revenue.  (Ex. A at 83; CAC ¶ 37.)  By the end of 2016, iQIYI had 30.2 million subscribing members, generating RMB 3.76 billion in membership services revenue.  (Ex. A at 81; CAC ¶ 37.)  At the end of 2017, iQIYI had 50.8 million subscribing members, generating RMB 6.54 billion in membership services revenue.  (Ex. A at 81; CAC ¶ 37.)

iQIYI's mobile DAUs also generally increased preceding the IPO.  (Ex. A at 1; CAC ¶ 37.)  The Offering Documents define mobile DAUs as the "number of unique mobile devices" that access its platform each day.  (Ex. A at 7; CAC ¶ 33.)  Between Q4 2015 and Q4 2016, iQIYI's average mobile DAUs increased from 88.3 million to 125.4 million.  (Ex. A at  83; CAC ¶ 37.)  In 2017, iQIYI's mobile DAUs remained relatively stable, averaging 126.0 million mobile DAUs for Q4 2017.  (Ex. A at 81; CAC ¶ 37.)

## B.    In August 2018, iQIYI Announces a Joint Venture With Super Sports Media

On August 6, 2018, iQIYI announced its agreement to partner with Super Sports Media to launch the Xin'ai Sports joint venture (also known as iQIYI Sports).  (Ex. D, August 6, 2018 Press Release, at 1; CAC ¶ 64.)  The joint venture aims to "bring[] together an extensive offering of sports content with smoother user experience."  (Ex. E, Q3 2018 Earnings Call, at 5; CAC ¶ 65.)  iQIYI contributed a combination of cash and future content distribution, IP licensing, and traffic support services in exchange for a 31.88% equity interest in Xin'ai Sports valued at RMB796,000.  (Ex. C at F-33; Ex. F, Excerpt of Nov. 28, 2018 Form 6-K, at 24; CAC ¶ 69.)

6

## C.    iQIYI Continues To Grow Throughout 2018 and 2019

iQIYI's average mobile DAUs, subscribing members, membership services revenue, and customer advances and deferred revenue continued to grow in 2018 and 2019:

| Metric | 2018[4] | Change | % | 2019[5] | Change | % |
|---|---|---|---|---|---|---|
| Ave. Mobile DAUs (Full Year) | 135.4m | 9.7m | 7.7% | 139.9m | 4.5m | 3.25% |
| Subscribing Members (End of Year) | 87.4m | 36.6m | 72% | 106.9m | 19.5m | 22.3% |
| Membership Services Revenue (Full Year) | RMB 10.62b | RMB 4.45b | 72.3% | RMB 14.44b | RMB 3.82b | 35.9% |
| Customer Advances and Deferred Revenue (End of Year) | RMB 2.2b | RMB 570m | 34.4% | RMB 3.08b | RMB 886m | 40% |

## D.    In April 2020, a Short Seller Attacks iQIYI

On April 7, 2020, short-seller Wolfpack Research published its report on iQIYI.  (Ex. H, Wolfpack Report, at 1; CAC ¶ 88.)  Standing to profit from a fall in iQIYI's stock price, the Wolfpack Report, which purports to synthesize information from exclusively "public sources," alleges that iQIYI "was committing fraud well before its IPO in 2018 and has continued to do so ever since."  (Ex. H at 1.)  In particular, the Wolfpack Report alleges that iQIYI misrepresented its mobile DAUs, deferred revenue, membership service revenue, and Xin'ai Sports investment—the precise allegations made in the Complaint.  (Ex. H at 3, 8, 9, 14.)  Notwithstanding these serious charges, iQIYI's ADS price closed at $17.30, up $0.54 from the day before.[6]  (Ex. B at 12.)

iQIYI promptly and publicly denied the Wolfpack Report's allegations shortly after market close, and stated unequivocally that "the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the

---

[4]    (*See* Ex. C at 38 (mobile DAUs), 72 (subscribing members and membership services revenue), F-4 (customer advances and deferred revenue).)

[5]    (*See* Ex. G, 2019 Form 20-F at 45 (mobile DAUs), 81 (subscribing members and membership services revenue), F-7 (customer advances and deferred revenue).)

[6]    The Court "may take judicial notice of well-publicized stock prices" on a motion to dismiss. *In re Initial Public Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005).

7

Company." (Ex. I, Apr. 7, 2020 Press Release, at 1; CAC ¶ 93.) iQIYI later disclosed that the SEC and NASDAQ had opened confidential inquiries into the Wolfpack Report's allegations and that it was cooperating with these inquiries. (Ex. J, Aug. 13, 2020 Press Release, at 2; Ex. K, Q2 2020 Earnings Call, at 11; CAC ¶¶ 94–96.) On March 9, 2021, iQIYI disclosed that its internal review of the Wolfpack allegations was "substantially complete[] and did not uncover any evidence that would substantiate the allegations." (Ex. L, 2020 20-F, at 102.) To date, iQIYI has not been and is not subject to any enforcement actions relating to the Wolfpack Report allegations.

### E.    This Action

On April 16, 2020—nine days after the Wolfpack Report was released—a shareholder brought suit against iQIYI, its CEO, and CFO, asserting claims under Sections 10(b) and 20(a) of the Exchange Act. (ECF No. 1.) On that day, iQIYI's ADS price closed at $19.24. (Ex. B at 12.) After Lead Plaintiffs were appointed, they filed an amended complaint on January 19, 2021, which added claims under Sections 11 and 15 of the Securities Act, and added as defendants Baidu, iQIYI's directors as of the IPO and the investment banks that served as underwriters for iQIYI's IPO. (ECF. No. 84.) On that day, iQIYI's ADS price closed at $19.49. (Ex. B at 16.) Following a pre-motion conference, the Court consolidated the first-filed action with two other related actions, and Lead Plaintiffs filed the operative Complaint on June 1, 2021. On that day, iQIYI's ADS price closed at $14.78. (*Id.*)

### ARGUMENT

### I.    PLAINTIFFS' EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

To state a claim for securities fraud under Section 10(b) of the Exchange Act, Plaintiffs must allege, among other things, (1) a material misrepresentation or omission; (2) scienter; and (3) loss causation. *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). As demonstrated below, the Complaint fails to allege any facts to satisfy these elements and falls far short of the degree of

particularity required under Rule 9(b) and the PSLRA.  *See Ford v. Voxx Int'l Corp.*, No. 14-CV-4183 (JS) (AYS), 2016 WL 3982466, at *4–5 (E.D.N.Y. July 22, 2016).

### A.      Plaintiffs Fail To Allege Any Misrepresentation

Plaintiffs allege that iQIYI misstated its (i) DAUs; (ii) deferred revenues; (iii) membership services revenues; and (iv) investment in Xin'ai Sports.  Notably, all of these claims (and the majority of sources relied upon in support) are copied directly from the Wolfpack Report, which was authored by a self-professed short-seller with "an obvious motive to exaggerate the infirmities of the securities in which they speculate."  *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  Plaintiffs' failure to undertake any meaningful effort to corroborate these biased and inherently contradictory claims is apparent throughout the Complaint, and exacerbates the reliability concerns presented by "the risk of motivated reporting" by short sellers.  *Id.*  This alone warrants dismissal.  *See, e.g.*, *id.*; *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).  In any event, as demonstrated below, the Complaint fails to allege any misrepresentation.

### 1.      Plaintiffs Fail To Allege Daily Active Users Were Overstated

Plaintiffs contend that the average mobile DAUs reported in iQIYI's Offering Documents and 2018 and 2019 annual reports must have been inflated because two consulting firms—QuestMobile Research Institute ("QuestMobile") and Aurora Mobile Limited ("Aurora")—allegedly estimated lower DAUs for certain periods.  (CAC ¶¶ 36–43.)  This claim fails because Plaintiffs do not plead any facts establishing that these third parties measured DAUs the same way as iQIYI or that their estimates are more accurate than the Company's reported data.

"It is not reasonable to infer that [iQIYI's] SEC filings must be false based upon a comparison to less than a complete set of" information, let alone a different metric entirely.  *In re China XD Plastics Co. Ltd. Sec. Litig.*, No. 14-CV-05308 (GBD), 2016 WL 1241522, at *6

(S.D.N.Y. Mar. 23, 2016).  There are various ways to define and measure DAUs.  iQIYI disclosed that it calculates mobile DAUs as "the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a day."  (Ex. A at 7; Ex. C at 2; Ex. G at 1.)  The Company specifically clarified that it "treat[s] each distinguishable device as a separate user for purposes of calculating mobile DAUs, although it is possible that some people may use more than one mobile device and multiple people may share one mobile device to access our platform."  (Ex. A at 7; Ex. C at 2; Ex. G at 1.)  Plaintiffs admit that "[i]t is not surprising" that average mobile DAU figures would "not [be] identical" if different methods were used to measure such figures.  (ECF No. 98 at 2.)  Critically, however, Plaintiffs do not allege how QuestMobile or Aurora defined or calculated DAUs—and, specifically, whether they followed iQIYI's approach.  It is thus impossible to determine whether these third-party estimates even purport to measure the same thing as iQIYI's DAUs metric, much less that iQIYI's reported DAUs were false.  *See In re A-Power Energy Generation Sys. Ltd. Sec. Litig.*, No. 11–MDL–2302-GW (CWx), 2012 WL 1983341, at *8 (C.D. Cal. May 31, 2012) ("Absent at least [an allegation of common measurements], it is not clear to the Court that Plaintiff has adequately ple[d] falsity[.]").

Moreover, both QuestMobile and Aurora *expressly disclaim* the accuracy and completeness of their estimates.  For example, Aurora warns that "[d]ue to the limitations inherent in the methods, the data and information estimated and derived by Aurora . . . are for reference only," and Aurora "*does not guarantee the accuracy, completeness, applicability and non-infringement of [its] data and information.*"  (Ex. M at 34, Ex. N at 60, Ex. O at 49 (Aurora reports).)  QuestMobile similarly warns that it "does not ensure the complete accuracy or completeness" of its information and readers "should not consider the information to be completely accurate and complete."  (Ex. P, QuestMobile Rep., at 2.)  Plaintiffs do not allege any factual basis

10

for crediting these admittedly incomplete and potentially inaccurate estimates over iQIYI's SEC filings, which are based on actual user data and contain no such disclaimers.

Also fatal to Plaintiffs' claim is their failure to allege the amount by which iQIYI's DAUs were purportedly misstated. To establish their claim, Plaintiffs must do more than assert that iQIYI overstated its DAUs. Rather, "Plaintiffs bear the burden of articulating facts that demonstrate what [iQIYI's] actual [DAU figures] were." *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012). Here, Plaintiffs point to two sets of third-party figures that differ significantly from each other and fail to explain which set allegedly represents iQIYI's *actual* DAUs. (*Compare* CAC ¶ 41 (QuestMobile) *with id.* ¶ 42 (Aurora).) Worse still, the Complaint alleges contradictory claims that cannot be squared with each other. For example, while the Complaint alleges that "[a]ccording to Aurora's data, between December 2017 and March 2019, iQIYI *never had more than 90 million mobile DAU*," it elsewhere claims that QuestMobile estimated that iQIYI's DAUs ranged from 113 million to 122.6 million during the same period. (*Id.*) "These allegations are contradictory and therefore not properly particular." *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 500 (S.D.N.Y. 2005) (dismissing securities claim where amount of uncollectible accounts was variously described as $1 million and $2 million). For all these reasons, Plaintiffs fail to adequately allege that iQIYI's reported DAUs were false.[7]

---

[7] Relatedly, to the extent Plaintiffs challenge iQIYI touting its "massive and highly engaged user base" (CAC ¶ 124), such statements are inactionable puffery. *See In re Netflix, Inc. Sec. Litig.*, No. C 04-2978 (FMS), 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (dismissing as puffery "vague and amorphous" statements such as "consumers love our service"). In any event, Plaintiffs' own allegations show iQIYI's user base was massive and highly engaged. (*See, e.g.*, CAC ¶ 42 (alleging iQIYI had more than 80 million mobile DAUs).)

11

## 2.    Plaintiffs Fail To Allege Deferred Revenue Was Overstated

Plaintiffs next contend that iQIYI must have overstated its "customer advances and deferred revenues" because lower "deferred revenues" are allegedly shown in certain third-party credit reports that supposedly aggregate information reported in the PRC tax filings of various iQIYI VIEs.  (CAC ¶¶ 59, 61.)  As with the DAUs, this claim fails because Plaintiffs do not allege any basis to infer that these third-party reports are accurate and comparable to iQIYI's SEC filings.

Plaintiffs cannot allege falsity by comparing different metrics in different filings made by different entities to different regulators for different purposes.  *Harris v. AmTrust Fin. Servs., Inc.*, 649 F. App'x 7, 10 n.3 (2d Cir. 2016) (allegation "that the aggregate revenue or profit of an issuer's individual subsidiaries' financial statements filed with regulators materially differed from the consolidated revenues reported to the SEC" is insufficient to show falsity).  iQIYI's SEC filings do not even individually report deferred revenues; they report "*customer advances and* deferred revenues," as Plaintiffs acknowledge.  (CAC ¶ 45.)  Plaintiffs fail to allege any facts establishing these distinct metrics should be equal.  Thus, nothing can be inferred if they differ.  *See In re L & L Energy, Inc. Sec. Litig.*, 908 F. Supp. 2d 1147, 1153 (W.D. Wash. 2012) (no misstatement alleged where it is "virtually impossible to determine whether the comparisons [Plaintiffs] draw[] are apples-to-apples").  Moreover, Plaintiffs also fail to allege which iQIYI VIEs are aggregated in the credit reports or which VIEs should be aggregated for a comparison to the consolidated financials reported in iQIYI's SEC filings.  *See China XD Plastics*, 2016 WL 1241522, at *5–6 (plaintiffs' failure to "separately identify any of [defendant's] individual subsidiaries nor separately present the relevant financial data for any subsidiary so an accurate aggregate comparison can be made to [defendant's] SEC filings . . . proves fatal to [their claim]").  Because

12

Plaintiffs cannot "close the gap" between the credit reports and iQIYI's SEC filings, any such difference (if it exists) does not establish that iQIYI's SEC filings were inaccurate. *Id.* at *6.

In any event, the Complaint alleges no facts demonstrating that these third-party credit reports—which Plaintiffs again copied from the Wolfpack Report—are reliable. Plaintiffs contend that these credit reports are "*based on* PRC tax filings by iQIYI's [VIEs]" (CAC ¶ 59), but they do not allege who authored them, when they were published or for what purpose, what reporting periods were covered, or what methodologies were used (including whether they were prepared in accordance with GAAP). *See In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("Rule 9 and the PSLRA require that plaintiffs provide details regarding how they obtained the reports, who produced the reports, and specifically what information the reports contained."). Nor do Plaintiffs attach these reports to the CAC, allege how they supposedly obtained them, or explain what, if anything, they did to verify their accuracy. *See Fanhua*, 442 F. Supp. 3d at 802.

Instead, Plaintiffs simply assert that "[t]he deferred revenue reported in [these] credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of IQIYI's VIEs." (CAC ¶ 61.) But Plaintiffs allege no facts supporting the veracity or reliability of PRC tax filings, let alone the credit reports on which Plaintiffs actually rely. Plaintiffs do not explain, for example, how the credit reports extracted the relevant information from PRC tax filings and how one can be reasonably confident that errors were not introduced during this process. Without such allegations, a mere difference between the alleged credit reports and iQIYI's SEC filings does not even plausibly suggest the latter is false.[8]

---

[8]    Plaintiffs do not allege that PRC tax filings are filed with the SAIC or are required to comply with GAAP. Nor is there any merit to their suggestion that submissions to "PRC tax authorities are the most accurate sources of financial information" because iQIYI is subject to penalties for misstatements there but supposedly immune from "criminal and civil judgments and
*(cont'd)*

13

### 3.   Plaintiffs Fail To Allege Membership Services Revenue Was Overstated

Third, and again parroting the Wolfpack Report, Plaintiffs contend that iQIYI must have overstated membership services revenue for Q4 2018 and Q1 2019 because such revenues increased while deferred revenues decreased, and, according to Plaintiffs, "if paying members and membership services revenue are increasing, so should deferred revenue." (CAC ¶ 52.) This claim fails as a matter of law for several reasons.

First, Plaintiffs allege no facts to support their key assumption that, absent fraud, membership services revenue and deferred revenue must be positively correlated. (*Id.*) To the contrary, Plaintiffs concede that one "innocent explanation for [this divergence] would be a sudden and dramatic shortening of the average length of subscription periods," since "the deferred revenue balances would have been amortized much more quickly and decline relative to membership services revenue."[9] (*Id.* ¶ 57.) But this is not the "only innocent explanation." (*Id.*) Numerous other factors, such as the time and the price at which memberships were purchased, could cause deferred revenues to decline even as membership services revenues increase.

For example, assume that, in a given year, iQIYI acquires one annual member each quarter, such that the average subscription period is always 12 months. Further assume that, in the *last* month of Q1, Member 1 purchases an annual membership for $120/year. iQIYI's quarterly results for Q1 would report $10 in membership services revenue (for one month of service to Member 1),

---

sanctions imposed by American courts." (CAC ¶ 62.) *See In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 411 (S.D.N.Y. 2013) ("One who submits false SEC filings face the risk of equally if not more severe penalties [than the author of a false SAIC filing], including possible imprisonment[.]"); *In re L & L Energy*, 908 F. Supp. 2d at 1154 (issuers "face far more significant penalties for false filings in the United States" than in China).

[9]   "Average subscription periods," as Plaintiffs use that term, apparently refers to the type of subscription (*i.e.*, 12 months for an annual subscription, 3 months for a quarterly subscription, 1 month for a monthly subscription).

and $110 in deferred revenue.  But if Member 2 bought the exact same plan in the *first* month of Q2 (*i.e.*, April), iQIYI would report $30 in membership services revenue from Member 2 ($10 x three months (April, May, June)) for Q2, and $90 in deferred revenue.  Hence, even though Members 1 and 2 purchased the exact same plan, the amount of deferred revenue attributable to each at the end of each quarter would differ because they began their subscriptions at different times.  If the next two members (Members 3 and 4) bought plans at a 10% discount ($108/year with $9 recognized each month), that, too, would result in smaller deferred revenue amounts.  The below table shows how this scenario would lead to a *decrease* in deferred revenue from Q3 ($191) to Q4 ($185), even as revenues and membership increased.

| Deferred Revenues | Q1 | | | Q2 | | | Q3 | | | Q4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug | Sept. | Oct. | Nov. | Dec. |
| Member 1 | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 | 20 |
| Member 2 | | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 |
| Member 3 | | | | | | | 99 | 90 | 81 | 72 | 63 | 54 |
| Member 4 | | | | | | | | | | 99 | 90 | 81 |
| Total DR | | | **110** | | $80 + 90 = $ **170** | | | $50 + 60 + 81 = $ **191** | | $20 + 30 + 54 + 81 = $ **185** | | |

Other factors, including changes in consumer behavior, market competition, and other economic drivers, also affect the relationship between membership services revenue and deferred revenue.  For example, some fees—such as fees from on-demand purchases—increase membership services revenue, but have no impact on deferred revenue.  (CAC ¶ 44.)  Conversely, other fees unrelated to membership—such as virtual currency that has been purchased but not yet used (*id.* ¶ 45)—affect deferred revenue, but not membership services revenue.[10]  The existence of these obvious "alternative explanations . . . render[s] plaintiff's inferences unreasonable" and disproves the simplistic correlation Plaintiffs seek to draw.  *See Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 177 (S.D.N.Y. 2018).

---

[10]   Virtual currency revenue is included among the "Other" revenue sources.  (Ex. A at F-30–31.)

Second, even if Plaintiffs' assumed correlation were correct (and it is not), they allege no facts to show which sets of numbers were incorrect—*i.e.*, whether membership services revenues were overstated, as Plaintiffs claim, or whether deferred revenues were understated.  Although Plaintiffs urge the former theory, they aver elsewhere that the decline in deferred revenues was more anomalous than the increase in membership services revenue, which occurred in parallel with rising subscribing members over the same period.  (CAC ¶¶ 53, 56.)  Indeed, Plaintiffs' assertion that membership services revenue should be benchmarked against the reported deferred revenue figures directly contradicts their other theories of fraud, including that "the deferred revenue amounts [iQIYI] reported in the Registration Statement are inaccurate," and that "iQIYI needed a way to make it seem as though the Company's deferred revenue tracked the purported user and revenue growth."  (*Id.* ¶¶ 59, 63.)  Plaintiffs cannot have it both ways.  Far from demonstrating that iQIYI reported any metric incorrectly, the self-contradictory nature of Plaintiffs' allegations underscores their speculative nature and implausibility, and further evidences Plaintiffs' failure to corroborate the self-serving claims contained in the Wolfpack Report.

Third, even if Plaintiffs were correct that membership services revenues were overstated (and they are not), their claim would still fail because they do not "allege *the amount* of the purported overstatement"—*i.e.*, what iQIYI's membership services revenues actually were. *Schick v. Ernst & Young*, 141 F.R.D. 23, 27 (S.D.N.Y. 1992).  This failure is independently fatal to their claim.

### 4. Plaintiffs Fail To Allege the Accounting for iQIYI's Investment in Xin'ai Sports Was Improper

Finally, Plaintiffs assert that iQIYI improperly accounted for goods and services it agreed to provide as partial consideration for its equity stake in Xin'ai Sports.  Plaintiffs concede that iQIYI disclosed the precise accounting treatment it employed to account for the Xin'ai Sports

16

transaction, and do not allege that such disclosures were false.  (CAC ¶¶ 69–79.)  Nonetheless, they claim that iQIYI's "characterization of its obligation to transfer goods and services to Xin'ai as deferred revenue was improper."  (*Id.* ¶ 79.)  This claim, too, fails.

The securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Simply alleging that a company's accounting judgments were improper is often insufficient as a matter of law to state a claim, as "the questions of which accounting principle applies and how it applies call for subjective judgment by the issuer or its auditor."  *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545 (LAK), 2020 WL 2787117, at *1 (S.D.N.Y. Apr. 20, 2020).  Thus, to adequately plead a material misstatement on the basis of improper accounting treatment, "plaintiffs [must] allege plausibly that a given accounting standard *objectively was the only correct standard to apply* to the topic at issue and that it applied in an objective and singular way."  *Id.*  Here, Plaintiffs do not even attempt to plead any accounting standard that was "the only correct standard to apply," and thus fall woefully short of meeting their high burden.  *See id.*; *see also Harris*, 135 F. Supp. 3d at 171 (dismissing complaint that "alleged no facts indicating that [defendant] exercised its judgment in a way that violated GAAP beyond [plaintiffs'] disagreement with management's choices among alternative estimates").

Plaintiffs' failure is unsurprising, as the accounting standards employed by iQIYI make clear that its accounting treatment of the Xin'ai Sports transaction was proper.  As iQIYI disclosed to investors, it acquired its 32% equity interest in Xin'ai Sports for a combination of cash and noncash consideration totaling RMB796,000.[11]  (CAC ¶ 69.)  The noncash consideration consisted

---

[11]  Plaintiffs insinuate that iQIYI misstated the cash and noncash amounts paid for its interest in Xin'ai Sports because financial statements of certain other entities state different amounts.
*(cont'd)*

17

of goods and services, including "content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai." (*Id.* ¶ 70.) ASC 610, which governs the transfer of nonfinancial assets (such as those iQIYI agreed to transfer to Xin'ai Sports), explicitly provides that if an entity promises goods or services "in exchange for a noncontrolling interest, the entity shall consider the noncontrolling interest received from the counterparty as noncash consideration and shall measure it in accordance with" ASC 606. ASC 610-20-32-4. As the Complaint itself makes clear, ASC 606 provides that consideration for goods and services not yet provided to a customer are to be presented as deferred revenue, and recognized as revenue when those services are delivered.[12] (CAC ¶¶ 77–78 & n.28 (citing ASC 606-10-25).)

That is precisely what iQIYI did here. In accordance with ASC 610, iQIYI regarded its 32% noncontrolling interest in Xin'ai as noncash consideration in exchange for the goods and services it agreed to provide, and, pursuant to ASC 606, initially measured such consideration as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai." (CAC ¶ 70.) As these services were delivered, iQIYI

---

(CAC ¶¶ 85–86.) But they allege no facts establishing the allegedly conflicting numbers are correct or comparable to iQIYI's SEC disclosures. *See China XD Plastics*, 2016 WL 1241522, at *6. Nor do they allege the purpose of these statements, what they contained, or how Plaintiffs verified their accuracy. *See Autodesk*, 132 F. Supp. 2d at 844. In any case, iQIYI's disclosure did not break out the cash and noncash components of the total consideration, so it could not have misstated them. *See Goldsmith v. Weibo Corp.*, C.A. No. 17-4728 (SRC), 2018 WL 2733694, at *9 (D.N.J. June 7, 2018) ("A securities fraud claim based on purported statements that a defendant did not actually make fails, necessarily, to state a claim[.]").

[12]  ASC 606 applies because Xin'ai Sports meets the definition of a customer, *i.e.*, "[a] party that has contracted with an entity to obtain *goods or services that are an output of the entity's ordinary activities* in exchange for consideration." ASC 606-10-20. Here, Xin'ai Sports contracted with iQIYI to obtain goods and services within the scope of iQIYI's "ordinary activities," namely, content distribution, IP licensing, and traffic support services. (*See* Ex. C at 41 (iQIYI "generate[s] revenues primarily through membership services, online advertising and *content distribution*" as well as "live broadcasting, online games, *IP licensing*").)

*(cont'd)*

18

recognized the consideration as revenue.  Plaintiffs' conclusory claim that "this was not a revenue contract" ignores the accounting standards cited in their own Complaint.  (*Id.* ¶ 79.)[13]

## B.     Plaintiffs Fail To Allege a Strong Inference of Scienter

Plaintiffs' Exchange Act claims also should be dismissed for the independent reason that they fail to allege the requisite strong inference of scienter.  Plaintiffs "must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  The inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* Scienter may be pled through particularized factual allegations showing (i) a "motive and opportunity" to commit fraud, or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comms., Inc.*, 493 F.3d at 99.  Plaintiffs fail on both counts.

## 1.     Plaintiffs Fail To Allege Motive and Opportunity

Plaintiffs fail to plead motive or opportunity to engage in the alleged fraud.  They claim that because Defendants Li and Baidu own a large stake in iQIYI and wanted it to succeed, the Exchange Act Defendants had the motive to defraud iQIYI's investors.  (CAC ¶¶ 190–91.)  As a threshold matter, such generic motives, which are common to any parent company or director, are insufficient to plead scienter.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).  Rather, Plaintiffs must point to "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.

---

[13]    Nor have Plaintiffs adequately alleged that iQIYI failed to report its cost of revenue and overstated its assets.  (CAC ¶¶ 83-84.)  Plaintiffs contend that no cost of revenues was reported in the Company's related party transaction notes, but do not allege that such costs were due to related parties.  iQIYI properly reported all costs of revenues associated with its ordinary revenue-making activities on its balance sheet.  (*See* Ex. C at 63, F-50.)  Similarly, Plaintiffs allege no facts showing iQIYI was required to remove non-rival goods from its balance sheet. (*See id.* at F-24 (noting iQIYI acquires licenses from third-party vendors who grant iQIYI the right to "enter[] into [] *non-exclusive* sub-license agreement[s] with [] sub-licensees")).)

2001).   Here, Plaintiffs do not allege any suspicious stock sales, insider trading, or other compensation dependent on the supposed fruits of the alleged misconduct.

In any event, courts have long held that the motives of parent companies, their subsidiaries, and their executives are not identical or fungible.  *See, e.g.*, *Chill*, 101 F.3d at 268 ("Ultimately, whether [the subsidiary] defrauded plaintiffs and whether its parent, GE, defrauded plaintiffs are different questions.").  Thus, Plaintiffs' allegations regarding Defendant Li—who is not even an Exchange Act Defendant—establish nothing about the Exchange Act Defendants' state of mind. Nor do Plaintiffs' allegations regarding Defendant Baidu demonstrate anything regarding the motives of the remaining Exchange Act Defendants.[14]

### 2.    Plaintiffs Fail To Allege Conscious Misbehavior or Recklessness

Having failed to adequately allege motive, Plaintiffs must "produce a stronger inference of recklessness" to plead scienter.  *Kalnit*, 264 F.3d at 143.  To meet this standard, they must "allege facts approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts."  *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009).

Plaintiffs fail to do so.  They rely principally on the core operations doctrine, asserting that iQIYI's CEO and CFO must have known of the alleged fraud given the purported importance of the information at issue and the duration of the purported fraud.  (CAC ¶¶ 172–86.)  But courts routinely hold that "absent particularized allegations of *specific information* Defendants had at their disposal that rendered their statements false or misleading," allegations emphasizing the core importance of information are insufficient to plead scienter.  *See, e.g.*, *Jackson v. Abernathy*, 960

---

[14]  To the extent Plaintiffs reference related party transaction between iQIYI and Baidu (CAC ¶ 191), they do not allege these transactions were improper or undisclosed.

20

F.3d 94, 99 (2d Cir. 2020) (rejecting plaintiff's "core importance" argument as "plainly insufficient to raise a strong inference" of scienter); *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) (plaintiffs cannot "sufficiently plead[] scienter based on what [defendant] 'must have known'"). Because Plaintiffs do not allege any Exchange Act Defendant had access to any specific information contradicting iQIYI's statements, their attempt to invoke the core operations doctrine adds nothing to their inadequate scienter allegations. For the same reason, Plaintiffs cannot plead scienter by noting that iQIYI's disclosures contained SOX certifications—another tactic that courts have universally rejected. *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS) 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) (allegations of SOX certifications insufficient to plead scienter absent particularized allegations showing the certifications were not honestly and reasonably believed to be true when made).

Plaintiffs also assert that the timing of Defendants' disclosures regarding the SEC and NASDAQ investigations somehow supports a strong inference of scienter. (CAC ¶¶ 187–89.) However, Defendants had no duty to disclose these investigations at all. *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) ("[A] government investigation, without more, does not trigger a generalized duty to disclose."); *In re XP Inc. Sec. Litig.*, No. 20-cv-1502, 2021 WL 861917, at *9 (E.D.N.Y. Mar. 8, 2021) ("[S]everal courts have dismissed claims premised on the failure to disclose ongoing regulatory investigations."). The Second Circuit has made clear that "where liability is premised upon alleged material omissions, if the complaint does not present facts indicating a clear duty to disclose . . . plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness." *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d. Cir. 2010). Indeed, Defendants' decision to disclose the

21

investigations at all (regardless of timing), notwithstanding the absence of any legal obligation to do so, shows prudence and candor—the opposite of "conscious misbehavior" or "recklessness."

Lastly, Defendants' denials of the Wolfpack Report do not support an inference of scienter because Plaintiffs have not adequately alleged that those denials were false. *See In re Elan Corp.*, No. 02-CIV-865 (RMB) (FM), 2004 WL 1305845, at *23 (S.D.N.Y. May 18, 2004) ("[I]f the mere denial of a class action plaintiff's accusations were sufficient to establish a defendant's scienter, the requirement of pleading the requisite mental state with particularity would frequently become a mere formality."). Because Plaintiffs' theory of fraud is less cogent and less compelling than competing inferences of non-fraudulent intent, their Exchange Act claims fail.

### C.    Plaintiffs Fail To Allege Loss Causation

Plaintiffs' Exchange Act claims also fail because they have not pleaded loss causation. Plaintiffs must allege that the misstatement or omission "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Plaintiffs contend their losses were caused by two purported corrective disclosures: the Wolfpack Report and iQIYI's disclosures of the SEC and NASDAQ investigations. Both theories fail as a matter of law.

Plaintiffs cannot rely on the Wolfpack Report to allege loss causation because the report was not followed by any decline in iQIYI's stock price. "Without a corresponding stock price decline, an announcement cannot establish loss causation." *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012). On April 7, 2020, the day the report was released, iQIYI's ADS price closed at $17.30, a $0.54 (3.22%) *increase* from the previous day. (Ex. B at 12.) Although Plaintiffs point to a slight drop in iQIYI's stock price the following day, they do not allege any facts to suggest that this belated price movement had

22

anything to do with the Wolfpack Report.  To the contrary, Plaintiffs allege that the market for iQIYI's securities was "efficient" (CAC ¶ 169) and "promptly digested current information regarding iQIYI from publicly available sources and reflected such information in iQIYI's securities price(s)" (*id.* ¶ 209).  These admissions negate Plaintiffs' attempt to cherry-pick a different day to measure investors' reaction than the day on which the Wolfpack Report was actually published.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988).[15]

Unable to dispute the increase in iQIYI's ADS price following the publication of the Wolfpack Report, Plaintiffs characterize it as only a partial disclosure, arguing that the "full truth" was not revealed until iQIYI disclosed months later that the SEC and NASDAQ had commenced inquiries into certain of the Wolfpack Report's allegations.  (CAC ¶ 148.)  But the Company's subsequent statements about the SEC and NASDAQ inquiries were not corrective disclosures, as they did not reveal anything about whether iQIYI's prior disclosures were accurate.  "The announcement of an investigation reveals just that—an investigation—and nothing more."  *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *see also Janbay*, 2012 WL 1080306, at *15 ("The announcement of an SEC subpoena or an internal investigation is itself insufficient to plead loss causation.").  While a corresponding stock drop may be attributable to a generalized sense of uncertainty (*see* CAC ¶ 164), "[t]hat does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent."  *Meyer*, 710 F.3d at 1201.

---

[15]  Moreover, disclosures that simply repackage already-public information are not "corrective." *Cent. States, Se. & Sw Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x, 72, 75 (2d Cir. 2013) ("[T]hird-party articles and reports express[ing] negative *opinions* . . . based on information that was already publicly available . . . are not 'corrective' for the purpose of pleading loss causation.").  Here, the Wolfpack Report expressly states that "*all Information . . . has been obtained from public sources*." (Ex. H at 36.)

## II.     PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED

### A.     Plaintiffs Lack Standing Because They Have Not Suffered Any Damages

Plaintiffs lack standing for their Securities Act claims because they did not suffer any loss under Section 11's damages formula. As relevant here, Section 11 defines damages as the difference between the amount paid for the security (not exceeding the IPO price) and either (1) the value of the security at the time the suit was brought, if plaintiff still holds the security, or (2) the price at which the security was sold before suit. 15 U.S.C. § 77k(e). Where, as here, the suit involves several complaints alleging "claims [arising] from the same events," the "proper date" that the suit was brought "is [the date] of the first-filed complaint, rather than of a later-filed amended or consolidated complaint." *See In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2016 WL 3235290, at \*5 (S.D.N.Y. June 9, 2016).

Because iQIYI's ADS price when this lawsuit was filed on April 16, 2020 ($19.24) *exceeds* the IPO price ($18.00), Plaintiffs have no statutory damages with respect to shares they still hold. (ECF No. 25-4 at 1–2; ECF No. 25-3 at 6.) Plaintiff Hershberger also has no statutory damages for the shares he sold before the lawsuit because that sale price also exceeded the IPO price (ECF No. 25-4 at 2). *See In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 351 (S.D.N.Y. 2003) ("[A] plaintiff who sells a security above its offering price has no cognizable damages under Section 11[.]"). The Securities Act claims should be dismissed on this basis alone.[16]

---

[16]   The ADS price when the third-filed complaint—the first to assert Section 11 claims—was filed in the Northern District of California is irrelevant because that complaint alleges the same purported misstatements and thus relates back to the first-filed action. *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1544 (8th Cir. 1996) ("[A]mended complaint [adding Section 11 claim] relates back to the filing date of the original complaint," which asserted only Section 10(b) claim, "for purposes of calculating damages under § 11(e)(1)."); *Pierce v. Morris*, No. 4:03-CV-026-Y, Nos. 4:03-CV-026-Y et seq., 2006 WL 2370343, at \*4 (N.D. Tex. Aug. 16, 2006) ("To rule otherwise would, in essence, allow a Securities-Act plaintiff to file Exchange-
*(cont'd)*

**B.** **Plaintiffs Fail To Allege Any Misrepresentation in the Offering Documents**

Plaintiffs' Securities Act claims are based on the same alleged misrepresentations about mobile DAUs and deferred revenue as their Exchange Act claims.  They are therefore subject to the same rigorous pleading standards under Rule 9(b).  *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  Although Plaintiffs copied their Exchange Act allegations into a separate section for their Securities Act claims, this cannot obscure the obvious:  the gravamen of both sets of claims is fraud—*i.e.*, that iQIYI intentionally inflated its mobile DAUs and deferred revenues.  Regardless, the Securities Act claims fail even under Rule 8 because Plaintiffs have not alleged any facts plausibly showing that the third-party sources on which they rely are more accurate and reliable than iQIYI's Offering Documents.  (*See supra* § I.A.1-2.)

**C.** **The Absence of Loss Causation Is Apparent on the Face of the Complaint**

Finally, Plaintiffs' Securities Act claims also fail for lack of causation on the same grounds as their Exchange Act claims.  Even at the pleading stage, courts dismiss Securities Act claims if "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue."  *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).  That is precisely the case here, where the stock price *increased* on the day of the alleged corrective disclosure.  (*See supra* § I.C.)  Accordingly, Plaintiffs' Securities Act claims should be dismissed for lack of causation.[17]

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed in its entirety with prejudice.

---

Act claims and delay filing Securities-Act claims until stock prices fall (assuming they do), giving the plaintiff two bites at the apple and rendering the defendant a sitting duck.").

[17] Because Plaintiffs fail to plead primary liability, their control person claims also fail.  *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

Dated: New York, New York
         July 16, 2021

Respectfully submitted,


/s/ Robert A. Fumerton
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Attorneys for Defendants iQIYI, Inc.,
Baidu, Inc., Yu Gong, Xiaodong Wang,
Robin Yanhong Li, Qi Lu, Herman Yu,
Victor Zhixiang Liang, and Giselle
Manon*