# Exhibit Q

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen, Esq.
Jing Chen
Daniel Tyre-Karp
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
    lrosen@rosenlegal.com
    jchen@rosenlegal.com
    dtyrekarp@rosenlegal.com

**LABATON SUCHAROW LLP**
James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
Email: jjohnson@labaton.com
    mrogers@labaton.com
    dschwartz@labaton.com
    jchristie@labaton.com

*Co-Lead Counsel for Lead Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re iQIYI, Inc. Securities Litigation | Master File No. 1:20-cv-01830-DG-TAM |
| | AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| This Document Relates To: | |
| All Actions | JURY TRIAL DEMANDED |
| | CLASS ACTION |

## TABLE OF CONTENTS

I.     VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT ........... 2

II.    NATURE OF THE EXCHANGE ACT VIOLATIONS ................................................. 2

   A.  iQIYI Misled Investors Throughout the Class Period ....................................... 3

   B.  Wolfpack Report and iQIYI's Downfall ............................................................. 4

III.   JURISDICTION AND VENUE ............................................................................... 5

IV.   PARTIES ................................................................................................................. 6

   A.  Plaintiffs ............................................................................................................. 6

   B.  Defendants .......................................................................................................... 6

       1.   Corporate Defendant ............................................................................... 6

       2.   Individual Defendants ............................................................................. 6

       3.   Baidu ...................................................................................................... 7

V.    SUBSTANTIVE ALLEGATIONS .......................................................................... 8

   A.  iQIYI Touted Itself as the Netflix of China While Raising $2 Billion From U.S. Investors in an IPO ............................................................................................................ 8

       1.   iQIYI's Online Streaming Service Business ........................................... 8

       2.   iQIYI was a Complex and Opaque Organization ................................... 9

       4.   iQIYI Raised Over $2 Billion From U.S. Investors in its IPO ............... 10

       5.   iQIYI's Active User and Deferred Revenue Figures Were Crucial to the Company's Success ............................................................................... 11

       6.   iQIYI Issued Overstated Average Mobile Daily Active User Metrics Misleading Investors About the Company's Success ............................. 12

       7.   Exchange Act Defendants Materially Misstated iQIYI's Membership Services Revenue ................................................................................... 15

       8.   iQIYI's PRC-based Credit Reports Derived from SAIC filings in China Further Belie the Deferred Revenue Reported to Investors ...................... 20

9.   Exchange Act Defendants Misstated the Purchase Price and Improperly Recorded Deferred Revenues and Revenues in Connection with its Investment in Xin'ai Sports Joint Venture ........................................................................................... 21

B.   The Truth Behind iQIYI's Financial Performance Begins to Emerge ............................ 30

1.   April 7, 2020 –Financial Research Report Began Revealing the True Nature of iQIYI's Financial and Operating Metrics.................................................................. 30

2.   Exchange Act Defendants Continued to Reassure Investors that Their Reported Financial Figures Were Accurate.................................................................. 32

3.   August 13, 2020 – Exchange Act Defendants Disclose SEC and NASDAQ Investigations.. ................................................................................................ 32

C.   iQIYI Violated Applicable Chinese and U.S. Accounting Principles ............................ 34

1.   The PRC Required iQIYI to File Accurate Financial Statements with Chinese Regulators ........................................................................................ 34

2.   SAIC and SAMR Filings Are Reliable ........................................................ 36

3.   Chinese GAAP, U.S. GAAP, and iQIYI's Own Accounting Policies Were the Same for Revenue Recognition Purposes ........................................................ 36

4.   iQIYI's Use of VIEs Does Not Explain the Divergence in U.S. and Chinese Reported Revenues ............................................................................ 39

VI.   EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS. 40

A.   Exchange Act Defendants Misrepresented iQIYI's Daily Active Users ......................... 40

B.   Exchange Act Defendants Misrepresented iQIYI's Deferred Revenue .......................... 43

C.   Exchange Act Defendants Misled Investors about Their Equity Interest in Xin'ai Sports ............................................................................................................ 44

D.   Exchange Act Defendants Misled Investors by Reassuring Investors that the Wolfpack Report Lacked Merit ................................................................................ 47

VII.   LOSS CAUSATION ...................................................................................... 48

A.   April 7, 2020 – First Partial Disclosure ........................................................ 48

B.   August 13, 2020 – Final Partial Disclosure ................................................... 50

VIII.   ADDITIONAL INDICIA OF SCIENTER ........................................................ 53

A.   iQIYI's User Numbers and Revenue Figures Were Critical to Its Core Operations ........ 54

B. Exchange Act Defendants Waiting Months to Tell Investors about the SEC and NASDAQ Investigations Supports a Strong Inference of Scienter ................................... 58

C. Defendants' Financial Motivation to Inflate iQIYI's User Numbers and Deferred Revenue Supports a Strong Inference of Scienter ........................................................... 58

D. Defendants Gong and Wang's SOX Certifications Support a Strong Inference of Scienter ........................................................................................................................... 59

IX.    CONTROL PERSON ALLEGATIONS ................................................................... 60

X.     CLASS ACTION ALLEGATIONS ......................................................................... 62

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........................................................................................... 64

XII.   NO SAFE HARBOR .............................................................................................. 66

XIII.  EXCHANGE ACT CAUSES OF ACTION ............................................................ 67

COUNT I .......................................................................................................................... 67

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against iQIYI and the Individual Defendants ...................................................................................................... 67

COUNT II ......................................................................................................................... 69

Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ........ 69

PRAYER FOR RELIEF .................................................................................................... 71

*       *       *

XIV.   VIOLATIONS OF SECTIONS 11 AND 15 OF THE SECURITIES ACT .................. 71

A. Factual Background ...................................................................................................... 72

1. iQIYI Touted Itself as the Netflix of China While Raising $2 Billion From U.S. Investors in an IPO ....................................................................................................... 72

2. iQIYI was a Complex and Opaque Organization ........................................................ 73

3. iQIYI Raised Over $2 Billion From U.S. Investors in a Massive IPO ........................ 75

4. iQIYI's Active User and Deferred Revenue Figures Were Crucial to the Company's Success ........................................................................................................................ 75

5. iQIYI's Offering Documents Contained Overstated Average Daily Active User Metrics, Which Misled Investors about the Company's Subscription Revenues ....... 77

6. iQIYI's Credit Reports Filed in China Further Belie the Revenue Reported to Investors.................................................................................................. 79

B. iQIYI Violated Applicable Chinese and U.S. Accounting Principles. ............................ 80

1. The PRC Required iQIYI to File Accurate Financial Statements with Chinese Regulators ........................................................................................... 80

2. SAIC and SAMR Filings Are Reliable .................................................................... 81

3. Chinese GAAP, U.S. GAAP, and iQIYI's Own Accounting Policies Were the Same for Revenue Recognition Purposes ................................................................. 82

4. iQIYI's Use of VIEs Does Not Explain the Divergence in U.S. and Chinese Reported Revenues ........................................................................... 85

C. Description of the March 29, 2018 Public Offering ........................................................ 86

XV. JURISDICTION .................................................................................................................. 86

XVI. THE SECURITIES ACT PARTIES ................................................................................... 87

A. Plaintiffs ........................................................................................................................... 87

B. Defendants ........................................................................................................................ 87

1. Corporate Defendant ............................................................................................... 87

2. Individual Defendants ............................................................................................. 88

3. Director Defendants ................................................................................................ 88

4. Baidu, Inc. ............................................................................................................... 90

5. Underwriter Defendants .......................................................................................... 90

XVII. THE MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS ................................................................................................ 93

A. iQIYI's Offering Documents Contained False or Misleading Statements about User Numbers .................................................................................................................... 94

B. iQIYI's Offering Documents Contained False or Misleading Deferred Revenue Figures 95

XVIII. CLASS ALLEGATIONS .................................................................................................... 96

XIX. CAUSES OF ACTION ....................................................................................................... 98

COUNT III ............................................................................................................................ 98

iv

Violations of Section 11 of the Securities Act Against All Securities Act Defendants ....... 98

COUNT IV ................................................................................................................................. 99

Violations of Section 15 of the Securities Act Against Baidu and the Individual
Defendants… .............................................................................................................. 99

PRAYER FOR RELIEF ....................................................................................................... 100

XX.   DEMAND FOR TRIAL BY JURY .............................................................. 101

Court Appointed Lead Plaintiffs Robert J. Gereige, M.D. and Ronald L. Hershberger (collectively, "Plaintiffs"), bring this action under Section 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act Claims") and separately under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act Claims") against iQIYI, Inc. (iQIYI or the "Company"); Baidu, Inc. ("Baidu"), iQIYI's parent Company controlling shareholder; several of iQIYI's officers and directors; and the underwriters of iQIYI's Initial Public Offering ("IPO").

As it pertains to the Exchange Act Claims, Plaintiffs bring the Consolidated Class Action Complaint against iQIYI and iQIYI's Chief Executive Officer ("CEO") Yu Gong ("Gong"), and Chief Financial Officer ("CFO") Xiaodong Wang ("Wang") (Defendants Gong and Wang are referred to herein as the "Individual Defendants") and Baidu (collectively the "Exchange Act Defendants").

As it pertains to the Securities Act Claims, Plaintiffs bring the Consolidated Class Action Complaint against Defendants: iQIYI, the Individual Defendants, Baidu, members of iQIYI's board of directors Robin Yanhong Li ("Li"), Qi Lu, Herman Yu, Xuyang Ren, Victor Zhixiang Liang, Chuan Wang and Giselle Manon (the "Director Defendants"), and the underwriters of iQIYI's IPO, Goldman Sachs (Asia) LLC ("Goldman Sachs"); Credit Suisse Securities (USA) LLC ("Credit Suisse"); Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch"); China Renaissance Securities (Hong Kong) Limited ("China Renaissance"); Citigroup Global Markets Inc. ("Citigroup") and UBS Securities LLC ("UBS") (the "Underwriter Defendants" and collectively the "Securities Act Defendants").

Plaintiffs' claims are brought upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by iQIYI with the Securities and Exchange

1

Commission ("SEC"); (2) reports issued by analysts covering or concerning iQIYI and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about iQIYI, its business, and the Individual Defendants; (4) reports and documents filed by or about iQIYI in China with Chinese regulators and third parties; and (5) other publicly available information concerning iQIYI, its business, and the allegations contained herein. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Plaintiffs have a reasonable opportunity for discovery.

## I.    VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

The Exchange Act Claims set forth below in Counts I and II allege violations of Sections 10(b) and (20a) of the Securities and Exchange Act of 1934. Plaintiffs bring the Exchange Act Claims individually and on behalf of all persons and entities who, during the period from March 29, 2018 through August 13, 2020, inclusive (the "Class Period"), purchased the publicly traded common stock of iQIYI on the NASDAQ stock exchange or on any U.S.-based trading platform during the Class Period and were damaged thereby (the "Exchange Act Class"). [1]

## II.   NATURE OF THE EXCHANGE ACT VIOLATIONS

1.    The Exchange Act Claims arise from Exchange Act Defendants' fraudulent attempts to garner and maintain investor excitement about its online entertainment streaming service by artificially inflating its viewership (and revenue) numbers and then attempting to cover it up with convoluted accounting tricks in connection with iQIYI's initial public offering.

---

[1] The following are excluded from the Exchange Act Class: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of iQIYI during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (v) iQIYI's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

2

2.      On March 29, 2018 iQIYI held its much-anticipated initial public offering ("IPO") of American Depository Shares ("ADSs")—raising over $2 billion from U.S. investors based on the Company's purportedly massive viewership numbers and the revenues it promised. As with all frauds, however, iQIYI could not keep its fraudulent inflation of viewership numbers concealed forever. Eventually, a global financial research and due diligence firm, Wolfpack Research ("Wolfpack"), investigated iQIYI and uncovered the Company's bogus viewership and revenue numbers and untangled the complex accounting manipulation iQIYI was passing on to investors.

3.      On April 7, 2020 Wolfpack released a report detailing iQIYI's fraudulent behavior (the "Wolfpack Report"), causing the Company's share price to drop 4.3% over the course of two days. iQIYI vehemently denied the report's accuracy, issuing a press release the very same day denying the allegations in the report. However, investors would eventually learn the true extent of the seriousness of Exchange Act Defendants' wrongdoing on August 13, 2020 when Exchange Act Defendants finally disclosed what they had known for approximately four months—that the SEC and NASDAQ initiated investigations into iQIYI based on the allegations contained in the Wolfpack Report. As a result, iQIYI's share price fell again by 11.4%, further damaging investors.

**A. iQIYI Misled Investors Throughout the Class Period**

4.      Throughout the Class Period, Exchange Act Defendants knowingly or recklessly misled investors about the Company's key operating metrics. Specifically, Defendants repeatedly and materially misled investors by (i) overstating the number of iQIYI's daily active users, (ii) overstating deferred revenue, (iii) overstating the amounts paid to acquire an equity interest in an online sports streaming service called Xin'ai Sports; and (iv) improperly recording as deferred revenue and revenue the non-cash portion of the purchase price paid, in the form of content and

3

services, iQIYI purportedly will and has provided to Xin'ai Sports in exchange for its equity stake. These false and misleading statements artificially inflated the value of iQIYI's securities.

5.      On April 7, 2020, Wolfpack published the Wolfpack Report revealing for the first time that iQIYI significantly inflated its customer base, its revenue, and other operating and performance measures. Wolfpack cited to financial statements iQIYI filed with the Chinese government, as well as other reliable Chinese sources to support its findings that iQIYI misled investors.

### B. Wolfpack Report and iQIYI's Downfall

6.      Publication of the Wolfpack Report at 10:35 A.M. on April 7, 2020 caused iQIYI's share price to immediately fall $2.75 per share to $14.51 at 10:45 A.M. iQIYI's share price closed at $16.51 per share at the end of the next trading day on April 8, 2020, a 4.3% decline. CNBC reported that "[s]hares of iQiyi briefly plunged 13% to session lows Tuesday after the report, though the stock ended the day up 3% during a volatile session for U.S. stocks, more broadly. Shares fell more than 3% in extended trading."

7.      Then, on August 13, 2020, after the market closed, iQIYI issued a press release disclosing that the "SEC's Division of Enforcement is seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in a report issued by short-seller firm Wolfpack Research in April 2020." iQIYI issued the press release on its website at 4:30 P.M., causing the price of iQIYI shares to drop $4.25 by 4:32 P.M. to a low of $17.50 per share.

8.      On August 14, 2020, iQIYI further disclosed on an investor call that NASDAQ had also launched an inquiry into the Wolfpack Report and its findings. Following these disclosures, iQIYI's ADS price fell $2.49 per share, or 11.4%, to close at $19.26 on August 14.

4

9.     CNBC reported that "[s]hares of Chinese streaming service iQiyi plunged in after-hours trading in the U.S. after it announced the Securities and Exchange Commission (SEC) has launched a probe into [iQIYI]" and noted that "[t]he SEC probe into iQiyi comes amid rising scrutiny on U.S.-listed Chinese companies following the Luckin Coffee scandal earlier this year."

10.     Exchange Act Defendants' fraudulent misstatements and omissions artificially inflated the price of iQIYI's securities, and Plaintiffs and other Class members were significantly damaged upon the corrective disclosures and the materialization of the risks concealed by iQIYI's fraud.

## III.     JURISDICTION AND VENUE

11.     The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa(c)) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this Judicial District.

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, Exchange Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Exchange Act Defendants disseminated the statements alleged to be false and misleading herein into this District, and Exchange Act Defendants solicited purchasers of iQIYI securities in this District.

5

## IV.  PARTIES

### A.  Plaintiffs

15.  Plaintiffs, as set forth in their respective Certifications previously filed with the Court and incorporated herein, purchased the Company's securities during the Class Period pursuant and traceable to the Registration Statement and suffered damages as a result of the federal securities law violations alleged herein.[2]

### B.  Defendants

#### 1.  Corporate Defendant

16.  Defendant iQIYI, "the Netflix of China," purports to be an innovative market-leading online entertainment service in China. iQIYI is incorporated in the Cayman Islands, and maintains its principal executive offices in Beijing, China. iQIYI ADSs are listed on NASDAQ under the ticker symbol "IQ." The Company's agent for service in the United States, as stated in the Registration Statement, is Law Debenture Corporate Services Inc., 801 2nd Avenue, Suite 403, New York, NY 10017. iQIYI is a subsidiary of Baidu Holdings Limited.

17.  iQIYI, together with its subsidiaries, provides online entertainment services under the iQIYI brand in China. iQIYI's digital platform provides a collection of internet video content, including professionally produced content licensed from content providers and self-produced content. The Company also provides membership, content distribution, online advertising, live broadcasting, online gaming and literature, e-commerce, and talent agency services.

#### 2.  Individual Defendants

18.  Defendant Yu Gong ("Gong") is and was at all pertinent times the Company's Chief Executive Officer ("CEO"), Principal Executive Officer, and a Director.

---

[2] *See* ECF No. 25-3.

19.    Defendant Xiaodong Wang ("Wang") is and was at all pertinent the Company's Chief Financial Officer ("CFO"), and Principal Financial and Accounting Officer. Wang has served as the Company's CFO since 2013 and oversees its finance and legal functions. Prior to officially joining iQIYI in 2017, Wang served as vice president of Baidu for financial planning and analysis, responsible for treasury, budgeting, and related analysis between 2009 and 2016. Between 2013 and 2016, Wang served in iQIYI on a secondment basis while still employed by Baidu. From 2003 to 2009, Wang served as senior manager of General Motors in Shanghai, responsible for budgeting, cost control, pricing, and other related functions. From 1998 to 2000, Wang served in Dupont China as financial specialist responsible for Dupont trading. Wang holds a bachelor's degree in economics from Tsinghua University and a master's degree in accounting and finance from The London School of Economics and Political Science.

20.    Defendants Gong and Wang are referred to herein as the "Individual Defendants." The Individual Defendants each made false and misleading statements to investors during the Class Period. The Individual Defendants signed the Registration Statement as well as iQIYI's annual statements in 2018 and 2019, each of which contained false and misleading statements.

### 3. Baidu

21.    iQIYI was controlled during the Class Period by its parent company, Baidu. Following the IPO, and throughout the Class Period, Baidu owned a majority of iQIYI and maintained 92.7% voting control. With complete control over iQIYI, Baidu had the ability to, and did, enter into myriad related-party transactions that provided benefits to Baidu and exhibited control over iQIYI's operations.

7

## V. SUBSTANTIVE ALLEGATIONS[3]

### A. iQIYI Touted Itself as the Netflix of China While Raising $2 Billion From U.S. Investors in an IPO

#### 1. iQIYI's Online Streaming Service Business

22.     Launched in 2010, iQIYI is a Beijing, China-based online streaming entertainment provider. iQIYI's online video platform features original content produced by iQIYI, as well as a library of other professionally-produced content, and user-generated content. According to iQIYI's 2018 annual report, filed with the SEC on Form 20-F, iQIYI touted itself to investors as the "leading internet video streaming service in China." Hailed as the Netflix of China, iQIYI marketed itself to U.S. investors as the top online streaming entertainment providers in Asia—a market with billions of potential subscribing customers. "Through [iQIYI's] curated premium content, [the Company] attracts[s] a *massive user base with tremendous user engagement, and generate[s] significant monetization opportunities*."

23.     Like Netflix, iQIYI's customers primarily access the Company's entertainment offerings content through a monthly or annual subscription which allows them to view the Company's entertainment programs. The Company represented in SEC filings that the majority of its daily active users were subscribing members "and, to a lesser extent, users who gain access to [iQIYI's] premium content library through paid video on-demand service." iQIYI generates advertising revenue through various methods, such as commercials that run prior to streaming, pop-up advertisements, and product placement in videos.

24.     Critically, iQIYI's two primary sources of revenue—membership subscriptions and advertising—are both dependent on, and a function of, the number of customers subscribing to

---

[3] Unless otherwise noted, all references to iQIYI's business and operations refer to events that occurred during the Class Period as defined herein.

8

iQIYI's service and viewing its programs. Thus, it is vital to iQIYI to maintain and grow a large and active user base to generate revenue.

### 2. iQIYI was a Complex and Opaque Organization

25. Prior to and during the Class Period it was extremely difficult for investors to understand iQIYI's corporate structure and accounting methods. iQIYI operates through a complex web of on-shore and off-shore companies which results in inherently unclear accounting structure. The following diagram sets forth the Company's organizational structure.



26. Complicating matters further, while iQIYI purportedly operates under U.S. Generally Accepted Accounting Principles (GAAP) and the U.S. Public Company Accounting

9

Oversight Board (PCAOB), the Company acknowledges that its "**annual report is prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board**." Gaining 100% transparency into iQIYI's, membership numbers, financial information and accounting for such financial information is difficult and, in some cases, not possible.

27.     Further, much of the third-party research related to iQIYI's operations such as mobile advertising data, financial research and governmental filings were not easily accessible because of limitations imposed by the Chinese government and language barriers. Accordingly, many U.S. investors were forced to rely almost entirely on the substantive representations and financial data contained in the Company's SEC filings.

**4.  iQIYI Raised Over $2 Billion From U.S. Investors in its IPO**

28.     On February 27, 2018, iQIYI filed a registration statement on Form F-1 with the SEC in connection with the Company's IPO. After several amendments, the SEC declared the registration statement effective on March 28, 2018.[4] On March 29, 2018, iQIYI conducted its IPO pursuant to the Offering Documents and issued 125 million ADSs to the public at the Offering price of $18.00 per share. As a result of the Offering, iQIYI received approximately $2,182,500,000 in proceeds upon the IPO's completion, after underwriting discounts and commission.

29.     Following the IPO, iQIYI shares traded on the NASDAQ market, a major United States securities exchange. However, along with being listed on a major U.S. exchange came heightened regulatory requirements as well as the requirements of the federal securities laws. As

---

[4] On March 29, 2018, iQIYI filed a prospectus on Form 424B4 with the SEC in connection with the IPO ("Prospectus"), which incorporated and formed part of the Registration Statement. The Registration Statement and Prospectus are together referred to herein as the "Offering Documents."

part of those requirements, iQIYI was required to file accurate, audited, GAAP compliant financial statements with the SEC.

### 5. iQIYI's Active User and Deferred Revenue Figures Were Crucial to the Company's Success

30. Despite the heightened requirements that came with raising $2 billion of capital in the U.S., iQIYI issued Offering Documents that contained significantly inflated viewership and revenue numbers to make it appear as though the Company had significantly more active users than it actually did.

31. Critically, active users is one of the most important metrics investors look to when investing in a media company like iQIYI because the Company generates a majority (over 75%) of its revenue through a combination of selling subscriptions to its online streaming service and by selling advertisements on its platform. Both revenue streams depend almost entirely on the number of users subscribing to and watching the Company's programs.

32. The most accurate way for investors to assess iQIYI's overall viewership numbers (and the revenues it generated therefrom) was by looking to the number of daily active users ("DAU") that were using iQIYI's platform. Indeed, all major online media and social media platforms, including YouTube, TikTok and Facebook, use DAU as a critical user metric.

33. iQIYI's registration statement and annual reports claimed iQIYI was the largest internet video streaming service in China for both mobile apps and PCs in terms of average DAUs and total user time spent on the platform. In its SEC filings, iQIYI defined mobile DAUs on its platform as the number of unique mobile devices that had accessed the iQIYI platform through its mobile app at least once during a day. iQIYI's SEC filings stated that a "massive and highly engaged user base," which includes DAUs, was one of iQIYI's key competitive strengths and that the Company's success "was primarily attributable" to those key competitive strengths.

11

34.     The other key metric for assessing iQIYI's success was its membership services revenue. Membership services revenue was primarily the revenue the Company generated from membership subscriptions for its streaming services. And because service subscriptions (such as annual and monthly subscriptions) are generally for future services that are to be performed by iQIYI, GAAP required iQIYI to record subscription payments as deferred revenue that is recognized ratably over the term of the subscription. iQIYI's primary source of deferred revenue is the sale of customer memberships, which range from one month to twelve months. For example, when iQIYI sells an annual subscription, the Company records the sale as deferred revenue because iQIYI has not yet provided twelve months of online streaming services. As iQIYI delivers its streaming services to its members each month, the Company recognizes that ratable portion of deferred revenue as earned revenue.

35.     Accordingly, daily active user metrics and deferred revenue were crucial metrics to investors and served as the two leading indicators for the growth and success of iQIYI's membership services and advertising revenues—the two revenue streams that accounted for over 75% of iQIYI's overall revenues.

### 6. iQIYI Issued Overstated Average Mobile Daily Active User Metrics Misleading Investors About the Company's Success

36.     Throughout the Class Period, iQIYI issued inflated DAU numbers to investors. Specifically, in the Offering Documents, and in the Company's 2018 and 2019 annual reports, iQIYI issued historical mobile DAU data that was materially inflated.

37.     In the Offering Documents, iQIYI falsely stated that its average mobile DAUs at the end of the year in 2015, 2016 and 2017 were 88.3 million, 125.4 million and 126 million respectively.

> *Membership services*. Our membership services revenue increased by 277.5% from
> RMB996.7 million in 2015 to RMB3,762.2 million in 2016, primarily driven by

12

the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 182.7% from 10.7 million as of December 31, 2015 to 30.2 million as of December 31, 2016. Excluding individuals with trial memberships, the number of subscribing members increased by 180.4% from 10.7 million as of December 31, 2015 to 30.0 million as of December 31, 2016. ***Between the fourth quarters of 2015 and 2016, our average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million,*** and our average mobile MAUs increased by 10.9% from 365.5 million to 405.4 million. Daily average total user time spent on our iQIYI platform increased by 52.5% from 169.9 million hours in 2015 to 259.1 million hours in 2016.

\* \* \*

*Membership services.* Our membership services revenue increased by 73.7% from RMB3,762.2 million in 2016 to RMB6,536.0 million (US$1,004.6 million) in 2017, primarily driven by the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 68.4% from 30.2 million as of December 31, 2016 to 50.8 million as of December 31, 2017. "Subscribing members" refers to the individuals who purchased our monthly, quarterly or annual membership packages, including individuals with trial membership, and excluding individuals who used paid video on-demand service. The number of individuals with trial memberships has consistently accounted for less than 5% of the total number of subscribing members. Excluding individuals with trial memberships, the number of subscribing members increased by 66.8% from 30.0 million as of December 31, 2016 to 50.0 million as of December 31, 2017. ***Between the fourth quarters of 2016 and 2017, our average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million***, and our average mobile MAUs increased by 3.9% from 405.4 million to 421.3 million. Daily average total user time spent on our iQIYI platform increased by 15.8% from 259.1 million hours in 2016 to 300.1 million hours in 2017.

38. Likewise, in iQIYI's 2018 annual report dated March 15, 2019 and filed with the SEC on Form-20F the Company stated: "For the year of 2018, our average mobile MAUs were 454.5 million and ***our average mobile DAUs were 135.4 million***."

39. Finally, in iQIYI's 2019 annual report dated March 12, 2020 and filed with the SEC on Form-20F the Company stated: "For the year of 2019, our average mobile MAUs were 476.0 million and o***ur average mobile DAUs were 139.9 million***."

13

40.     However, as discussed below, iQIYI's reported DAU numbers were materially false and misleading because they were significantly overstated.

41.     According to Plaintiffs' in-depth research into data from two leading industry research firms that cover China's mobile internet market—QuestMobile Research Institute ("QuestMobile") and Aurora Mobile Limited ("Aurora")—the actual average mobile DAU's were substantially lower than iQIYI reported to investors.[5] Specifically, according to data from QuestMobile, the true average mobile DAUs for iQIYI for 2015, 2016, and 2017 were overstated by 50%, 33.4%, and 11.5%, respectively. Likewise, iQIYI overstated its DAUs for the full years 2018 and 2019 by 10.4% and 22.5%, respectively.

| iQIYI's Average Mobile Daily Active Users (in millions) | | | | |
|---|---|---|---|---|
| Time Period | DAUs as Disclosed by iQIYI | DAUs According to QuestMobile | Amount overstated vs. QuestMobile | Percentage overstated vs. QuestMobile |
| 2015 Q4 | 88.3 | 59.0 | 29.3 | 50.0% |
| 2016 Q4 | 125.4 | 94.0 | 31.4 | 33.4% |
| 2017 Q4 | 126.0 | 113.0 | 13.0 | 11.5% |
| 2018 (full year) | 135.4 | 122.6 | 12.8 | 10.4% |
| 2019 (full year) | 139.9 | 114.2 | 25.7 | 22.5% |

42.     Aurora's data, as shown in the table below, corroborates QuestMobile's data and further supports that iQIYI materially overstated its average mobile DAU figures:

---

[5] Plaintiffs were only able to obtain the QuestMobile and Aurora data after conducting extensive research and data analysis of PRC media reports and archived industry reports, which are only published in Chinese and not readily obtainable by investors.

| Month | iQIYI's Average Mobile DAUs According to Aurora |
|---|---|
| December 2017 | 86.1 million[6] |
| March 2018 | 87.6 million |
| June 2018 | 86.3 million |
| September 2018 | 85.6 million[7] |
| December 2018 | 82.0 million |
| March 2019 | 87.5 million[8] |

43.     According to Aurora's data, between December 2017 and March 2019, **iQIYI never had more than 90 million mobile DAU** despite the Company reporting 126 million mobile DAU for the fourth quarter of 2017 and 135.4 million mobile DAU for 2018.

**7. Exchange Act Defendants Materially Misstated iQIYI's Membership Services Revenue**

44.     As explained in the Registration Statement, iQIYI's deferred revenue is generated from two sources. The primary source is the sale of customer memberships that range from one month to twelve months. The receipt of membership fees is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered. The Company explained its accounting policy for Membership Services in its 2018 and 2019 Annual Reports:

*Membership services*

The Group offers membership services to subscribing members with various privileges, which primarily including access to exclusive and ad-free streaming of premium content 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others. **When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered.**

---

[6] http://www.199it.com/archives/711971.html, last viewed December 11, 2020.

[7] http://www.199it.com/archives/789526.html, last viewed December 11, 2020.

[8] http://www.199it.com/archives/872190.html, last viewed December 11, 2020.

15

Membership services revenue also includes fees earned from on-demand content purchases made by members and the sale of the right to services such as other memberships, which the Group acquires and controls before they are transferred to subscribing members.[9] (Emphasis added)

45. A second, and much smaller source of deferred revenue is virtual currency sold by iQIYI's live broadcasting division. Cash received from the sale of virtual currency sold but not yet consumed by the purchasers is recorded as "Customer advances and deferred revenue".

46. Customer memberships is the largest portion of deferred revenue and represents at least 80% of total deferred revenue based on the relative revenue contributions of customer memberships and sales of virtual currency.

47. An analysis of the Company's membership services revenue compared to its deferred revenues confirms that the Company materially misstated membership services revenue during the Class Period.

48. The Company's 2018 20-F describes the four sources of revenues: (1) membership services, (2) online advertising services, (3) content distribution, and (4) others, including live broadcasting and online games.[10]

49. Based on the Company's filings with the SEC, over eight quarters, beginning with the quarter ended December 31, 2017, through the quarter ended September 30, 2019, membership services revenues combined with online advertising services revenues represented between approximately 75% to 86% of the Company's total consolidated revenues with the balance comprised of content distribution and other revenues. During this period, membership services

---

[9] 2018 20-F. Notes to the consolidated financial statement for the year ended December 31, 2018. Page F23.

[10] A portion of live broadcasting revenues included sales of virtual currency. Virtual currency sold but not yet consumed by the purchasers was recorded as "Customer advances and deferred revenue." 2018 Form 20-F, pages 65 and 66. Other revenues represented from approximately 8% to 16% of total revenues of which broadcasting revenues was a part.

revenues as a percentage of total revenues grew from 40% to over 50%.

50.     The Company attributed the growth in membership services revenues primarily to increases in the number of subscribing members.[11] The Company stated that membership revenues grew by 72% from 2017 to 2018, in-line with the 72% growth in the number of subscribing members.[12] At September 31, 2019, the number of subscribing members had purportedly grown 31% over the prior twelve months, mirroring the reported growth in the membership services revenue over the same period.[13]

51.     As discussed above, according to iQIYI's 2019 annual report, amounts received for subscriptions were initially reported as deferred revenue, a balance sheet account, and then recognized as income ratably as member services revenue over the subscription period. Thus, the balance in deferred revenue would decrease as the amounts were recognized over the subscription period as membership services revenue. Therefore, in a static environment without growth, revenues would remain constant while deferred revenue balances would remain the same or decline. However, in a high-growth environment, with paying memberships increasing, like that reported by iQIYI, declining deferred revenue balances on existing contracts would be replaced by and would grow from new, increasing numbers of subscriptions.

52.     Accordingly, deferred revenues should track and be positively correlated with the increase in paying members and the corresponding increase in membership services revenue. Simply put, if paying members and membership services revenue are increasing, so should deferred revenue. And similarly, if deferred revenue decreases, membership services revenue and

---

[11] 2018 Form 20-F, page 72. 2019 Form 20-F, page 81.

[12] 2018 Form 20-F, page 72.

[13] September 30, 2019 Form 6-K, Exhibit 99.1, Announcement of Third Quarter 2019 Financial Results.

17

the number of paying members should decrease.

53.     However, as it pertains to iQIYI's performance during the Class Period, there was a material divergence between the two reported amounts. In particular, at times during the Class Period, iQIYI experienced increasing membership service revenue while at the same time experiencing decreasing deferred revenue. The inexplicable divergence in iQIYI's increasing paying members and membership services revenues and its decreasing deferred revenue balances indicates that Exchange Act Defendants were overstating the number of paying members and therefore the amount of membership services revenue.



54.     As discussed below and shown in the above table, according to Plaintiffs' in-depth data analysis of iQIYI's financial statements over numerous quarters, the Company reported a

significant increase in the number of subscribing members and membership services revenue over the period beginning with the quarter ended December 31, 2017, through the quarter ended September 30, 2019.

55.     Through the third quarter ended September 30, 2018, there was a close relationship between changes in the number of paying members, membership services revenues and deferred revenue balances. This correlation would be expected, based on the Company's accounting policies, as the number of paying members and membership services revenues increased, the balances of deferred revenues also increased.

56.     Inexplicably, during the fourth quarter ended December 31, 2018, and the first quarter ended March 31, 2019, the previously highly-correlated relationship between reported membership services revenue, the number of paying members, and deferred revenue balances changed dramatically. During these two quarterly accounting periods, while reported membership services revenues continued to grow steadily, deferred revenue balances declined significantly. With the reported number of paying members continuing to increase along with membership services revenue, a decline in deferred revenue balances was completely contrary to the structure of the Company's subscription service and its accounting policies.

57.     The only innocent explanation for such a change would be a sudden and dramatic shortening of the average length of subscription periods. For example, if the Company had suddenly switched from an average subscription period of six to eight months down to an average subscription period of two to three months, the deferred revenue balances would have been amortized much more quickly and declined relative to membership services revenue. However, no information contained in the Company's public filings indicates the occurrence of such an event. Indeed, the opposite is true. Between 3Q18 and 1Q19, iQIYI reported an increase of 16.1

19

million paying subscribers and an **increase in the average subscription** period from 6 months to 8 months.

58.     Beginning in the quarter ended June 30, 2019, immediately following the sudden divergence of membership services revenue and deferred revenue balances, the balance of deferred revenue began to increase again and directly correlate with increases in membership services revenue and paying members. This return to normalcy raises red flags regarding what occurred during the prior two quarters that suddenly and without explanation reversed itself in the following periods. The only plausible explanation is that Defendants overstated their membership services revenue in one or more periods.

### 8.  iQIYI's PRC-based Credit Reports Derived from SAIC filings in China Further Belie the Deferred Revenue Reported to Investors

59.     Credit reports obtained by Plaintiffs based on PRC tax filings by iQIYI's Variable Interest Entities ("VIEs)" further demonstrate that the deferred revenue amounts the Company reported in the Registration Statement are inaccurate.[14] In truth, iQIYI had much smaller amounts of deferred revenue from 2015 to 2017 as detailed in the table below.

---

[14] VIEs are entities controlled by a company by means other than a majority of voting rights. Chinese companies commonly use VIE structures to access foreign capital. iQIYI primarily conducts its business in China through VIEs because PRC laws and regulations prohibit or restrict foreign ownership of companies. The Company conducts its business in China through VIEs Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Beijing iQIYI Cinema, and their respective subsidiaries. Certain contractual agreements (i) give the Company or its wholly-owned subsidiaries the power to direct the activities that most significantly affect the economic performance of the VIEs; (ii) obligate the Company to absorb losses of the VIEs that could potentially be significant to the VIEs; and (iii) entitle the Company or its wholly-owned subsidiaries to receive economic benefits from the VIEs that potentially could be significant to the VIEs. ASC 810-25-38 requires companies to consolidate VIEs in their financial statements if the company will absorb or receive the majority of the VIE's expected losses or returns. iQIYI purports to comply with GAAP by consolidating its VIEs and their subsidiaries as required by ASC 810 and SEC Regulation SX-3A-02.

| iQIYI's Deferred Revenue (RMB in thousands) | | | |
|---|---|---|---|
| | 2015 | 2016 | 2017 |
| Deferred Revenue as Reported in Registration Statement | 339,880 | 796,703 | 1,633,649 |
| Deferred Revenue Reported for VIEs | 93,963 | 300,037 | 877,206 |
| Overstatement of Deferred Revenue | 245,917 | 496,666 | 756,443 |
| Percentage Overstatement of Deferred Revenue | 261.7% | 165.5% | 86.2% |

60.     Specifically, iQIYI's deferred revenue for the years 2015, 2016, and 2017 were overstated by 261.7%, 165.5%, and 86.2%, respectively.

61.     The deferred revenue reported in iQIYI's credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of IQIYI's VIEs.

62.     Filings with the SAIC and PRC tax authorities are the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers often operate beyond the reach of criminal and civil judgments and sanctions imposed by American courts but are subject to penalties imposed in China for filing false documents with the SAIC or PRC tax authorities. Further, FASB Accounting Standards Codification ("ASC") Rule 810 and iQIYI's own accounting policies required the Company to consolidate its VIEs' deferred revenue in its financial statements. Accordingly, iQIYI's VIEs PRC tax filings further demonstrate that the Company inflated its reported deferred revenue amounts for the years 2015, 2016, and 2017.

> **9.   Exchange Act Defendants Misstated the Purchase Price and Improperly Recorded Deferred Revenues and Revenues in Connection with its Investment in Xin'ai Sports Joint Venture**

63.     Given the irreconcilable disparity between iQIYI's (1) real user and revenue figures; and (2) overstated reported user and revenue figures, iQIYI needed a way to make it seem as though the Company's deferred revenue tracked the purported user and revenue growth the Company was touting to investors. To do so, iQIYI used fraudulent accounting of an equity

21

investment, in violation of GAAP, that generated RMB763,750 of deferred revenue for the Company out of thin air.

64.     On August 6, 2018, iQIYI issued a press release announcing the Company would partner with Super Sports Media, a subsidiary of DDMC Group, to set up a joint venture named Beijing Xin'ai Sports Media Technology Co., Ltd ("Xin'ai"). The press release stated that existing members of both Super Sports Media and the tennis-focused membership program on iQIYI would receive full membership status in the new app.

65.     On October 31, 2018, as part of iQIYI's earnings call for the third quarter of 2018, Defendant Yu stated that "the new joint venture will operate all sports-related content business, including the upgraded iQIYI Sports app, which brings together an extensive offering of sports content with smoother user experience."

66.     On August 20, 2019, as part of iQIYI's earnings call for the second quarter of 2019, Defendant Yu asserted that Xin'ai was "an important part of our content library." In the question-and-answer session, Defendant Yu reaffirmed that "sports content is obviously a very important racetrack for us."

67.     An August 2019 analyst report from Industrial Securities echoed Defendant Yu's enthusiasm, stating that "sports content is highly valued by iQIYI" and "may become a new growth point for iQIYI."

68.     Further, an October 2019 analyst report from CCB International stated that iQIYI's plan to increase sports video content would "extend the company's audience base to more elderly and affluent viewers," which would help provide a "considerable increase" of paying subscribers.

69.     According to iQIYI's SEC filings, in July 2018, the Company acquired a 32%

22

interest in Xin'ai for a combination of cash and noncash consideration totaling RMB796,000.[15]

iQIYI's 2018 20-F described its accounting for the investment as follows:

### Equity method investments

In July 2018, the Company acquired a 32% outstanding equity interest amounting to RMB796,000 (US$115,773) in Beijing Xin'ai Sports Media Technology co., LTD (or "Xin'ai") that is engaged in the operation of a sports content platform. The Company has significant influence over the investee and therefore accounts for its equity interest as an equity method investment. The excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 (US$88,648) was recognized as basis differences and investment goodwill. As of December 31, 2018, the Group held 29% of Xin'ai's equity interest due to new financing investors' dilution.[16]

70.     The noncash portion of the consideration iQIYI purportedly paid to acquire its equity interest in Xin'ai totaled RMB763,750,[17] and iQIYI recorded this non-cash consideration as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai."[18]

71.     The RMB32,250 difference between the total acquisition price of RMB796,000 and the noncash consideration of RMB763,750 represented the cash portion of the consideration. Based on these amounts, approximately 96% of the acquisition price was noncash consideration that iQIYI recorded as deferred revenue related to property and services iQIYI was to provide to Xin'ai in the future.

72.     The Notes to the Company's financial statements disclose that the Company recognized total revenue from content licensed to an "equity investee" in the amount of

---

[15] RMB amounts are in 1,000s.

[16] 2018 Form 20-F. Note 5, Long-term Investments, page F-33, Financial Statements for the year ended December 31, 2018.

[17] 2018 20-F Consolidated Statements of Cash Flows, page F-10 "Acquisition of long-term investments with non-cash consideration."

[18] Note 6. Long-Term Investments, page 23 and 24 of September 30, 2018 unaudited financial statements, filed November 28, 2018.

23

RMB88,457 for the year ended December 31, 2018, and RMB443,503 for the year ended December 31, 2019. No cost of revenues is reported associated with the content licensed to the equity investee.[19] Moreover, 2018 was the first year the Company recognized revenue for content licensed to an equity investee, and the Company held no other significant equity method investments in 2018 and 2019,[20] evidencing that the revenue the Company recognized in those years is directly attributable to the iQIYI's equity method investment in Xin'ai Sports. The Xin'ai joint venture is therefore the only possible source of this revenue from an equity investee that iQIYI reported in 2018 and 2019.

73.     At December 31, 2018 and December 31, 2019, the remaining balance of deferred revenue in relation to services to be provided to Xin'ai totaled RMB726,155 and RMB579,864, respectively. These amounts were reported as part of amounts due to related parties in the Company's consolidated financial statements.[21] Based on the changes in the reported deferred revenue balances, iQIYI recognized RMB37,595 of the deferred revenue balance as revenue during the fourth quarter of 2018[22] and it recognized another RMB146,291 of the deferred revenue balance as revenue during the year ended December 31, 2019, in connection with its investment into Xin'ai.[23]

74.     The Company described its accounting policy with respect to equity method investments, which included the Company's policy of recording its investment at cost, as required

---

[19] 2018 Form 20-F. Note 22, Related party transactions, page F-50. 2019 Form 20-F, Note 24, Related Party Transactions, page F-60.

[20] 2019 Form 20-F, page F-38; 2018 Form 20-F page F-33.

[21] 2019 Form 20-F, Note 24, Related Party Transactions, page F-61.

[22] RMB763,750 minus RMB726,155.

[23] RMB726,155 minus RMB579,864,

by GAAP, as follows:

> Investments in entities in which the Group can exercise significant influence and holds an investment in voting common stock or in-substance common stock (or both) of the investee but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323 ("ASC 323"), Investments— Equity Method and Joint Ventures. **Under the equity method, the Group initially records its investments at cost** and the difference between the cost of the equity investee and the fair value of the underlying equity in the net assets of the equity investee is recognized as equity method goodwill, which is included in the equity method investment on the consolidated balance sheets. The Group subsequently adjusts the carrying amount of the investments to recognize the Group's proportionate share of each equity investee's net income or loss into earnings after the date of investment. The Group evaluates the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.[24]

75. Based on the disclosures in the Company's financial statements, iQIYI recorded its initial investment in Xin'ai with the following entries to assets and liabilities (RMB in thousands):[25]

|  | Debit | Credit |
|---|---|---|
| Equity investment in Xin'ai | 796,000 |  |
| Cash |  | 32,250 |
| Deferred revenue |  | 763,750 |

76. The Company's accounting for the transaction is appropriate insofar as it purports to record the investment in Xin'ai at iQIYI's cost as required by GAAP.[26,] In this case, the cost of the acquisition included the cash paid and iQIYI's cost of goods and services to be provided to Xin'ai, which iQIYI chose to record on the balance sheet as deferred revenue. The amount reported by iQIYI as deferred revenue represented an obligation (liability) to provide Xin'ai with content,

---

[24] 2018 Form 20-F, Summary of Significant Accounting Policies, page F-20.

[25] 2018 Form 20-F. Notes 5 and 6, Long-term Investments, page F-33, Financial Statements for the year ended December 31, 2018. 2018 20-F Consolidated Statements of Cash Flows, page F-10 "Acquisition of long-term investments with non-cash consideration."

[26] ASC 323-10-30

licenses of intellectual property and traffic support services at iQIYI's cost. Because GAAP requires these goods and services to be valued and transferred to Xin'ai at cost, no profit could be recognized by iQIYI upon fulfillment of its obligation.

77. As disclosed in the notes to the Company's financial statements, deferred revenue was considered a contract liability balance associated with a revenue contract, comprised of payments received from customers for services which had not yet been provided to the customer:

> *Contract balances*
>
> When either party to a **revenue contract** has performed, the Group presents the contract in the consolidated balance sheets as a contract asset or a contract liability, depending on the relationship between the entity's performance and the customer's payment. (Emphasis added)
>
>        \*      \*      \*
>
> Contract liabilities are mainly comprised of payments received for membership fees and virtual currency sold for which the corresponding services have not yet been provided to customers and are presented as "Customer advances and deferred revenue" on the consolidated balance sheets. The increase in customer advances and deferred revenue as compared to the year ended December 31, 2017 is a result of the increase in consideration received from the Group's customers.[27]

78. The Company's description of contract liabilities in its financial statements is not inconsistent with GAAP, which provides that contract liabilities represent an obligation to transfer goods or services to a customer for which the entity has received consideration from the customer.[28]

79. However, the Company's characterization of its obligation to transfer goods and services to Xin'ai as deferred revenue was improper. This was not a revenue contract. This was consideration given by iQIYI in an investment transaction, its equity investment in Xin'ai. This was a promise to transfer goods and services at cost as consideration for the purchase of a long-

---

[27] 2018 Form 20-F, page F-25

[28] ASC 606-10-25.

26

term investment. Therefore, under GAAP the transaction should have been recorded as a liability, not as deferred revenue later to be recognized as revenue in the Company's income statement when the serviced are rendered as a culmination of an earnings process.

80. To illustrate the point, consider the same set of facts except that instead of promising to transfer content, licenses of intellectual property and traffic support services, iQIYI had promised to provide physical inventory (goods) to Xin'ai. When the inventory (goods) was later transferred, the transaction would simply be reported as the satisfaction (reduction) of the outstanding liability (deferred revenue) and a corresponding reduction on the asset side of the balance sheet by reducing inventory by the amount of the cost of the goods transferred. There would be no effect on iQIYI's income statement, simply the offsetting reduction of an asset and a liability. The nature or form of the goods or services provided should have no impact on the accounting and reporting of the transaction. This was not a revenue contract or a revenue producing transaction, it was an investment transaction, transferring one asset (the goods and services being transferred by iQIYI at cost) in exchange for another (the equity investment in Xin'ai). The timing of the transfers should make no difference as it was part of the same transaction.

81. The proper accounting entries for iQIYI to record its investment in Xin' ai' are:

| | Debit | Credit |
|---|---|---|
| Equity investment in Xin'ai | 796,000 | |
| Cash | | 32,250 |
| Obligation to Transfer Assets to Xin'ai | | 763,750 |

In the correct accounting method, instead of crediting (increasing) deferred revenue by RMB763,750, iQIYI should have recorded as a liability an obligation or payable in the amount of the cost of the goods and services that iQIYI owed to Xin'ai for the non-cash portion of the

27

purchase price of the equity investment.

82. iQIYI records the cost of licensed copyrights and produced content as assets on its consolidated balance sheet.[29] As with the physical inventory example, when the Company later transferred the licensed or produced content to Xin'ai it should have simply offset the liability (obligation to transfer assets to Xin'ai) against the asset (cost of the content transferred) removing both the asset and liability from its balance sheet with no effect on the Company's income statement. By classifying the obligation as deferred revenue and later recognizing the transfer as revenue, the Company significantly overstated its reported revenues. Essentially, the Company's method of accounting for the acquisition, in which it recorded the non-cash portion of the acquisition as deferred revenue, impermissibly created "built-in" revenues to be recognized subsequent to the acquisition.

83. The fact that the transfers of assets to Xin'ai were reported as revenues rather than as a reduction in the assets, indicates that the associated costs of these assets were not removed from the Company's financial statements, thereby overstating remaining assets or understating expenses, and thereby overstating income or profit.

84. In addition to overstating revenue, iQIYI also recognized profit on the overstated revenue. The Company's financial statements for the years ended December 31, 2018 and 2019 disclose transactions with related parties. The related party transaction notes to the financial statements disclose revenue from related parties and costs of revenue with related parties. For both the years ended December 31, 2018 and 2019, the notes to the Company's financial statements disclose revenue from content licensed to an equity investee (RMB88,457 in 2018 and

---

[29] 2018 Form 20-F, page F-3.

28

RMB443,503 in 2019) but no associated cost of revenue is reported.[30] The absence of reported cost of revenues associated with revenue from content licensed to equity investees indicates that the Company recognized profit on such revenue. As discussed above, based solely on the changes in the deferred revenue balances for the Xin'ai transaction, iQIYI improperly recognized revenue, and profit, of RMB37,595 during the fourth quarter of 2018[31] and another RMB146,291 during the year ended December 31, 2019[32] associated with its original equity investment in Xin'ai.

85.     The audited financial statements of Wuhan DDMC, the other major equity investor in Xin'ai Sports, state that iQIYI made a RMB38.25 mm cash only investment into Xin'ai Sports and received 38.25% of the equity in return (rather than investing RMB32.25mm of cash and RMB763.75mm of non-cash consideration reported in iQIYI's financial statements for 32%). These facts are confirmed by Xin'ai Sports' financial statements it filed with the Shanghai Stock Exchange on August 7, 2018, as well as by Qixin (a respected third-party platform aggregating SAIC and other government records in PRC).

86.     If one accepts that Xin'ai Sports' financial statement treatment of iQIYI's investment in Xin'ai Sports is correct, and iQIYI invested cash of RMB38.25mm only and no non-cash consideration, then iQIYI's financial statements understated the cash amount paid for the investment by RMB6.0mm. In addition, if no non-cash consideration was given in connection with the transaction, iQIYI therefore overstated the cost of its investment and overstated the amount that iQIYI reported as deferred revenue by RMB763,750[33] and overstated the amounts it

---

[30] 2018 Form 20-F, page F-50. 2019 Form 20-F, page F-60. (RMB in thousands).

[31] RMB763,750 minus RMB726,155.

[32] RMB726,155 minus RMB579,864,

[33] In this case, no deferred revenue would have been reported in connection with the acquisition and therefore the amounts recognized as revenue based on the changes in deferred revenue would not have existed in the first place.

subsequently reported as revenue by RMB37,595 in 2018 and RMB146,291 in 2019 for the amounts related to the purported non-cash consideration.

87.     By engaging in this sham accounting for its investment in Xin'ai Sports, iQIYI created RMB763,750 of deferred revenue, which it used to prop up and avoid detection of its fraudulent subscriber and revenue growth figures the Company was reporting to investors.

**B. The Truth Behind iQIYI's Financial Performance Begins to Emerge**

**1. April 7, 2020 –Financial Research Report Began Revealing the True Nature of iQIYI's Financial and Operating Metrics**

88.     On April 7, 2020, during market hours, Wolfpack Research released the Wolfpack Report detailing, among other things, how iQIYI had misled investors and failed to disclose pertinent information related to iQIYI's user numbers and revenue figures.

89.     The Wolfpack Report summarized its findings as:

Our research shows us that ***iQIYI, Inc. ("IQ") was committing fraud well before its IPO in 2018 and has continued to do so ever since.*** Like so many other China-based companies who IPO with inflated numbers, IQ is unable to legitimately grow their business enough to true up their financial statements. ***We estimate IQ inflated its 2019 revenue by approximately RMB 8-13 billion, or 27%-44%.***

***IQ does this by overstating its user numbers by approximately 42%-60%. Then, IQ inflates its expenses, the prices it pays for content, other assets and acquisitions in order to burn off fake cash to hide the fraud from its auditor and investors.***

90.     The Wolfpack Report noted the following, in pertinent part, regarding iQIYI's active users:

**QuestMobile**

In February 2020, QuestMobile published a special report titled *"China Mobile Internet Amid COVID-19 Plague"* which shows that IQ overstates its DAU numbers by at least 42%.

***The report shows that IQ's average mobile DAUs were only 126.2 million during the first 10 days of the 2020 Chinese Lunar New Year, versus 180 million average mobile DAUs claimed by IQ.*** Furthermore, the QuestMobile report shows IQ's DAUs did not grow between the 2019 and 2020 Chinese Lunar New Year[.]

30

91.     The Wolfpack Report noted the following, in pertinent part, regarding iQIYI's contradicting membership growth and declining real deferred revenue figures:

> Between 3Q18 and 1Q19, IQ reported an increase of 16.1 million paying subscribers and an increase in the average subscription period from 6 months to 8 months. However, IQ's deferred revenue declined by 17% during the same period – ***this mathematical contradiction shows that at least one of these numbers is made up.***
>
> ***With stable net membership growth and steady average revenue per user ("ARPU"), the deferred revenue curve should lead the realized revenue curve. Further, increasing average subscription periods should result in greater front-end accumulation of deferred revenues.***
>
> *     *     *
>
> The relationship between IQ's deferred revenues and realized revenues is the opposite of what we would expect based on their claims – the realized revenue curve consistently leads the deferred revenue curve and the gap between the two is widening.
>
> *     *     *
>
> Because IQ's management claimed it added 16.1 million net paying subscribers and that the average subscription period had increased from about 6 months to 8 months between 3Q18 and 1Q19, we expected to find significant growth in deferred revenue as the prepayments accumulated. However, we found the opposite.
>
> *     *     *
>
> IQ's deferred revenues declined from RMB 2,356.3 million at the end of 3Q18 to RMB 1,960.7 million at the end of 1Q19, a 17% decline during that 6-month period. This directly contradicts management's claims of growth in the number of paying subscribers and the average subscription period – ***it is mathematically impossible for both of those statements to be true given the corresponding decline in deferred revenues.***

92.     The publication of the Wolfpack Report at 10:35 A.M. on April 7, 2020 caused iQIYI's share price to immediately fall $2.75 per share to $14.51 at 10:45 A.M. iQIYI's share price closed at $16.51 per share at the end of the next trading day on April 8, 2020, a 4.3% decline, damaging investors.

31

## 2. Exchange Act Defendants Continued to Reassure Investors that Their Reported Financial Figures Were Accurate

93. However, despite the devastating reality that began to emerge from the Wolfpack Report, the Exchange Act Defendants continued issuing false and misleading statements by reassuring investors that the report lacked merit. On April 7, 2020, iQIYI issued a press release on its website denying the allegations made in the Wolfpack Report and assuring investors that the Company is in compliance with all rules and regulations. The press release stated, in relevant part:

> The Company has been made aware of and reviewed the short seller report published by Wolfpack Research on April 7, 2020. The Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company.

> The Company emphasizes that it has always been and will remain committed to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with the applicable rules and regulations of the Securities and Exchange Commission and the Nasdaq Global Select Market.

### 3. August 13, 2020 – Exchange Act Defendants Disclose SEC and NASDAQ Investigations

94. Approximately four months after the Wolfpack Report was made public, investors finally learned the true extent of the seriousness of Exchange Act Defendants' wrongdoing. After the close of business on August 13, 2020, iQIYI issued a press release announcing the Company's financial results for the second quarter of 2020. The press release disclosed that the SEC's Division of Enforcement had opened an investigation into iQIYI based on the allegations in the Wolfpack Report and had requested financial records, operating records, and other documents from iQIYI as part of the investigation. The press release further disclosed that the Company's Audit Committee had engaged professional advisers to conduct an internal review of the Company's books and records. The press release stated, in relevant part:

> The SEC's Division of Enforcement is seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain

acquisitions and investments that were identified in a report issued by short-seller firm Wolfpack Research in April 2020 ("Wolfpack Report"). The Company is cooperating with the SEC. We cannot predict the timing, outcome, or consequences of the SEC investigation.

In addition, shortly after the publication of the Wolfpack Report, the Company engaged professional advisers to conduct an internal review into certain of the key allegations in the Wolfpack Report and to report their findings to the Company's Audit Committee ("Internal Review"). These professional advisers have been examining the Company's books and records and undertaking testing procedures that, in their judgment, are necessary and appropriate to evaluating the key allegations in the Wolfpack Report, including accounting policy analysis, data analytics on whether the Company manufactured orders and inflated revenues and/or expenses. The Internal Review is ongoing and we cannot predict the timing for completion, outcome, or consequences of the Internal Review at this time.

95.     On August 14, 2020, iQIYI hosted an earnings call with analysts to discuss the Company's financial results for the second quarter of 2020. On the call, Defendant Xiaodong Wang *revealed for the first time that Exchange Act Defendants knew for about three to four months already that NASDAQ and the SEC had opened inquiries into iQIYI based on the Wolfpack Report*. For example, Defendant Wang explained Exchange Act Defendants were notified about the inquiries "a couple of weeks" after the report had been published:

I think a couple of weeks after the short seller report, we received inquiry from both NASDAQ and SEC, the inquiry on a confidential basis. However, we still voluntarily to disclose this inquiry at this time because we want to be transparent to all investors. That's basically the logic behind.

96.     iQIYI issued the press release on its website at 4:30 P.M., causing the price of iQIYI shares to drop $4.25 by 4:32 P.M. to $17.50 per share. On August 14, 2020, iQIYI further disclosed on an investor call that NASDAQ had also launched an inquiry into the Wolfpack allegations. Following these disclosures, iQIYI's ADS price fell $2.49 per share, or 11.4%, to close at $19.26 on August 14, damaging investors.

97.     On March 9, 2021, iQIYI filed its Form 20-F with the SEC for the year ending December 31, 2020. The 2020 Form 20-F revealed that the SEC's investigation into iQIYI based

33

on the allegations in the Wolfpack Report is still ongoing and that the SEC is still "seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in the Wolfpack Report."

98.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members suffered significant losses and damages.

### C. iQIYI Violated Applicable Chinese and U.S. Accounting Principles

99.     As discussed above, iQIYI's purportedly GAAP-compliant reported revenues in its SEC filings were overstated as compared to the Company's financial reporting and tax filings with the PRC government. However, the significant difference in reported revenues in China and in the U.S. is not attributable to different standards in the two countries. Indeed, the accounting standards in China and the U.S. are the same with respect to the recording of deferred revenue and come with the same steep penalties and drastic consequences if the reporting company files inaccurate information. Accordingly, the significant disparity between iQIYI's reported revenue in China and the U.S. demonstrates that the Company overstated its revenue figures in its SEC filings.

### 1. The PRC Required iQIYI to File Accurate Financial Statements with Chinese Regulators

100.     Among the many PRC governmental entities with supervision over corporations and their business activities in China is the State Administration for Market Regulation ("SAMR"). SAMR was created in 2018 through the merger of the State Intellectual Property Office and the State Administration for Industry and Commerce ("SAIC"). SAMR succeeded to the responsibilities and oversight previously carried out by the SAIC.

34

101. Up until 2018, the SAIC was the Chinese government body that regulates industry and commerce in China. Those responsibilities are now undertaken by the SAMR.

102. SAMR and the SAIC is and was primarily responsible for overseeing business-organizations, including business registrations, issuing and renewing business licenses, periodic filings and acts as the government supervisor and regulator of corporations. Pursuant to PRC law and regulations, all Chinese companies are required to: 1) file audited financial statements pursuant to Chinese GAAP with the Chinese government annually or bi-annually; 2) file amendments to its business registration records whenever there is a change to its owners, business address, legal representative, and board of directors and etc. within 15 or 30 days of such changes depending on character of its business.

103. Article 9 of the PRC Individual Proprietorship Enterprises Law Company Law requires registration of the enterprise's initial investor and Article 15 of the same law requires filing of an amendment with the SAIC office whenever the investor is changed.

104. Though the law does not specify any effect on the new investors of delayed SAIC registration except a monetary penalty, under PRC laws, a new owner's or investors' registration of ownership with the SAIC office is the conclusive way to determine the true owner or investor of an entity, especially when a third party claims the same interest in the entity. Therefore, in practice, the actual owners and investors will always have their interest registered with the SAIC office immediately after the interest is transferred, and the SAIC registration is often regarded as the final and necessary step in the closing of a transaction.

105. PRC Company Law, Article 165 requires that every business entity file a financial statement that is audited by an accounting firm with the SAIC as part of the annual inspection. The financial statements are required to be prepared according to PRC GAAP, which, as discussed

35

below, is the same as U.S. GAAP for all relevant purposes.

### 2. SAIC and SAMR Filings Are Reliable

106. Under PRC law, penalties for filing false SAIC filings include fines and revocation of the entity's business license. Moreover, if an entity's business license is revoked, the People's Bank of China requires the bank account of that entity to be closed.

107. Without a business license the entity cannot legally conduct business in the PRC. Thus, iQIYI had a strong incentive to file accurate annual reports with the SAIC because its business could be shut down if it was caught filing false financial statements.

108. SAIC filings also must be signed by the legal representative of the entity submitting it. The legal representative also must certify to the accuracy of the financial statements by stating "I confirm that the content of the submitted company's annual inspection report is true."

109. PRC law requires financial statements filed with the SAIC by iQIYI's subsidiaries to be audited by Chinese CPA firms in conformance with Chinese GAAP. Further, the law requires that all revenue earned from any source by the entity must be recorded as revenue during the fiscal year such revenue is earned. This rule governs reporting both to the SAIC and to the State Tax Bureau, and it imposes an obligation to report all revenue (and related financial statement items) timely, completely and accurately.

### 3. Chinese GAAP, U.S. GAAP, and iQIYI's Own Accounting Policies Were the Same for Revenue Recognition Purposes

110. Chinese GAAP is substantially the same as U.S. GAAP. In particular for revenue recognition for sales of goods, U.S. GAAP, Chinese GAAP, and iQIYI's stated revenue recognitions policy are the same.

111. There are no significant differences between Chinese GAAP and U.S. GAAP with respect to revenue recognition. Indeed, global accounting regulators have issued reports

specifically stating that there are no differences between U.S. GAAP and Chinese GAAP.

112. For example, the Committee of European Securities Regulators ("CESR"), issued a report entitled "CESR's advice on the equivalence of Chinese, Japanese and US GAAPs (2007)," which explained that there were no significant differences between US GAAP and International Financial Reporting Standards ("IFRS"). Pg. 25. Moreover, according to the same report, there are no significant differences between IFRS and Chinese GAAP on revenue recognition. *Id*. at 35.Thus, there are no significant differences between U.S. GAAP or Chinese GAAP on revenue recognition and there are no significant differences between U.S. GAAP and Chinese GAAP that can explain the differences in iQIYI's PRC filed financial statements and those it filed with the SEC.

113. iQIYI's stated accounting policies also conform to the same revenue recognition accounting principles as U.S. or Chinese GAAP. In the Registration Statement, iQIYI's describes its revenue recognition policy as:

> Revenue is recognized only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed and collectability of the related fee is reasonably assured under ASC subtopic 605-10, *Revenue Recognition: Overall*, or ASC 605-10.

114. iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding membership services as the following:

> *Membership services*
>
> The Group offers membership services to subscribing members with various privileges, which primarily including access to exclusive and ad-free streaming of premium content 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others. When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered. Membership services revenue also includes fees earned from on-demand content purchases made by members and the sale of the right to services such as other memberships, which the Group acquires and controls before they are transferred to

37

subscribing members.

115.     iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding live broadcasting, in relevant part, as: "Revenue from the sale of consumable virtual gifts is recognized when consumed by the user, or, in the case of time-based virtual items, recognized ratably over the period each virtual item is made available to the user. Virtual currency sold but not yet consumed by the purchasers is recorded as 'Customer advances and deferred revenue.'"

116.     iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding contract balances as the following:

*Contract balances*

Contract liabilities are mainly comprised of payments received for membership fees and virtual currency sold for which the corresponding services have not yet been provided to customers and are presented as "Customer advances and deferred revenue" on the consolidated balance sheets. The increase in customer advances and deferred revenue as compared to the year ended December 31, 2017 is a result of the increase in consideration received from the Group's customers.

117.     The Chinese accounting standard governing revenue recognition for iQIYI's PRC subsidiaries, ASBE 14, is essentially the same. It states:

Chapter II Revenue from Selling Goods

Article 4. No revenue from selling goods may be recognized unless the following conditions are met simultaneously:

(1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;

(2) The enterprise retains neither continuing management involvement to the degree usually associated with ownership, nor effective control over the goods sold;

(3) The relevant amount of revenue can be measured in a reliable way;

(4) The relevant economic benefits associated with the transaction will flow to the enterprise; and

(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

38

118.     Accordingly, there are no significant differences between US GAAP and Chinese GAAP for recognizing revenue and deferred revenue in iQIYI's case. Differences between U.S. GAAP and Chinese GAAP are not the cause of the huge differences in deferred revenue between iQIYI's SEC filed financial statements and its SAIC financial statements. Even if, despite all appearances, iQIYI's subsidiaries' PRC government filings were inaccurate, the Company should have disclosed that it filed inaccurate filings with the Chinese government. If the Chinese government discovered that iQIYI had filed false financial statements by consulting iQIYI's SEC filings, the Chinese government could impose substantial penalties on iQIYI's subsidiaries, including revocation of the responsible subsidiaries' business licenses, accounting for substantially all of iQIYI's revenues and assets.

**4.  iQIYI's Use of VIEs Does Not Explain the Divergence in U.S. and Chinese Reported Revenues**

119.     As discussed above, iQIYI primarily conducts its business in China through VIEs because PRC laws and regulations prohibit or restrict foreign ownership of companies. VIEs are entities controlled by a company by means other than a majority of voting rights. Chinese companies commonly use VIE structures to access foreign capital. The Company conducts its business in China through the following VIEs: Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Beijing iQIYI Cinema, and their respective subsidiaries.

120.     Certain contractual agreements (i) give the Company or its wholly-owned subsidiaries the power to direct the activities that most significantly affect the economic performance of the VIEs; (ii) obligate the Company to absorb losses of the VIEs that could potentially be significant to the VIEs; and (iii) entitle the Company or its wholly-owned subsidiaries to receive economic benefits from the VIEs that potentially could be significant to the VIEs.

121. ASC 810-25-38 requires companies to consolidate VIEs in their financial statements if the company will absorb or receive the majority of the VIE's expected losses or returns. iQIYI purports to comply with GAAP by consolidating its VIEs and their subsidiaries as required by ASC 810 and SEC Regulation SX-3A-02. Accordingly, iQIYI's use of VIEs does not explain why the Company's deferred revenues it reported in the PRC are substantially different than the deferred revenues it reported in the U.S.

## VI. EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS

122. Plaintiffs allege that the Exchange Act Defendants made the following false and misleading statements of material fact highlighted in bold and italics within this section. As alleged herein, such statements artificially inflated or maintained the price of iQIYI's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

### A. Exchange Act Defendants Misrepresented iQIYI's Daily Active Users

123. On March 28, 2018, the SEC declared effective iQIYI's Registration Statement, which iQIYI filed on February 27, 2018 on Form F-1 with the SEC in connection with its IPO. The Registration Statement was signed by Defendants Gong and Wang and contained materially false or misleading statements concerning iQIYI's daily active user metrics ("DAU").

124. The Registration Statement stated that iQIYI's number of DAUs were higher than they actually were. The Registration Statement further stated that the Company has "***a massive and highly engaged user base, which drives [its] revenue growth***."

125. Similarly, the Registration Statement stated, "[b]etween the fourth quarters of 2015 and 2016, ***[the Company's] average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million***, and [its] average mobile MAUs increased by 10.9% from 365.5 million to 405.4

million."

126.    Exchange Act Defendants also stated within their Registration Statement that, "[b]etween the fourth quarters of 2016 and 2017, *[the Company's] average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million*, and [its] average mobile MAUs increased by 3.9% from 405.4 million to 421.3 million."

127.    On March 15, 2019, iQIYI filed with the SEC its annual report on Form 20-F, for the year ended December 31, 2018 (the "2018 Annual Report"). Attached to the 2018 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2018 Annual Report stated that "[f]or the year of 2018, our average mobile MAUs were 454.5 million and *our average mobile DAUs were 135.4 million.*"

128.    On March 12, 2020, iQIYI filed with the SEC its annual report on Form 20-F for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2019 Annual Report stated that "[f]or the year of 2019, our average mobile MAUs were 476.0 million and *our average mobile DAUs were 139.9 million.*"

129.    The statements referenced in ¶¶ 123-128 were materially false and misleading because data provided by two leading research firms that publish industry reports on China's mobile internet market, QuestMobile Research Institute and Aurora Mobile Limited, show iQIYI had substantially fewer mobile DAUs than Exchange Act Defendants disclosed in the Registration

41

Statement.

130.    Indeed, as set forth in Section V(A)(5), iQIYI overstated it DAUs for the fourth quarters of 2015, 2016, and 2017, and its DAUs for the full years 2018 and 2019 in the following amounts and percentages as shown in the following summary table[34]:

| iQIYI's Average Mobile Daily Active Users (in millions) | | | | |
|---|---|---|---|---|
| Time Period | DAUs as Disclosed by iQIYI | DAUs According to QuestMobile | Amount overstated vs. QuestMobile | Percentage overstated vs. QuestMobile |
| 2015 Q4 | 88.3 | 59.0 | 29.3 | 50.0% |
| 2016 Q4 | 125.4 | 94.0 | 31.4 | 33.4% |
| 2017 Q4 | 126.0 | 113.0 | 13.0 | 11.5% |
| 2018 (full year) | 135.4 | 122.6 | 12.8 | 10.4% |
| 2019 (full year) | 139.9 | 114.2 | 25.7 | 22.5% |

131.    Further, a separate independent third-party research company—Aurora Mobile Limited—reported that iQIYI's DAU were far below the DAU metrics disclosed by the Company. In the six monthly examinations between December 2017 and March 2019, iQIYI never had more than 90 million mobile DAU despite the Company reporting 126 million mobile DAU for the fourth quarter of 2017 and 135.4 million mobile DAU for 2018.

---

[34] Number of mobile DAU reported in millions.

42

| Month | iQIYI Mobile DAUs According to Aurora |
|---|---|
| December 2017 | 86.1 million[35] |
| March 2018 | 87.6 million |
| June 2018 | 86.3 million |
| September 2018 | 85.6 million[36] |
| December 2018 | 82.0 million |
| March 2019 | 87.5 million[37] |

**B. Exchange Act Defendants Misrepresented iQIYI's Deferred Revenue**

132.     The Registration Statement, misrepresented the amount of iQIYI's deferred revenue. iQIYI's Registration Statement stated that iQIYI's customer advances and deferred revenue was **RMB339,880** as of December 31, 2015; **RMB796,703** as of December 31, 2016; and **RMB1,633,649** as of December 31, 2017.

133.     The deferred revenue amounts were materially false and misleading because reliable data in third party credit reports obtained by Plaintiffs show that the deferred revenue of iQIYI's operating subsidiaries was substantially lower than Defendants disclosed in the Registration Statement.

134.     Indeed, as set forth in Section V(A)(6)-(8), credit reports obtained by Plaintiffs on iQIYI show that the deferred revenue amounts the Company reported in the Registration Statement are inaccurate:

---

[35] http://www.199it.com/archives/711971.html, last viewed December 11, 2020.

[36] http://www.199it.com/archives/789526.html, last viewed December 11, 2020.

[37] http://www.199it.com/archives/872190.html, last viewed December 11, 2020.

43

| iQIYI's Deferred Revenue (RMB in thousands) | | | |
|---|---|---|---|
| | 2015 | 2016 | 2017 |
| Deferred Revenue as Reported in Registration Statement | 339,880 | 796,703 | 1,633,649 |
| Deferred Revenue Reported for VIEs | 93,963 | 300,037 | 877,206 |
| Overstatement of Deferred Revenue | 245,917 | 496,666 | 756,443 |
| Percentage Overstatement of Deferred Revenue | 261.7% | 165.5% | 86.2% |

135.    Notably, the deferred revenue that Defendants reported in the Registration Statement was overstated, and the deferred revenue reported in iQIYI's credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's VIEs. Filings with the SAIC and PRC tax authorities are the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers often operate beyond the reach of criminal and civil judgments and sanctions imposed by American courts but are subject to penalties imposed in China for false documents with the SAIC or PRC tax authorities. Further, ASC 810 and iQIYI's own accounting policies required the Company to consolidate its VIEs' deferred revenue in its financial statements.

136.   On March 15, 2019, iQIYI filed with the SEC its annual report on Form 20-F, for the year ended December 31, 2018 (the "2018 Annual Report"). Attached to the 2018 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the company's internal control over financial reporting and the disclosure of all fraud. The 2018 Annual Report repeated the false statement that iQIYI's customer advances and deferred revenue were **RMB1,633,197** as of December 31, 2017.

137.   Exchange Act Defendants' statement above was materially false and misleading for the same reasons set forth in ¶¶ 133-135.

C. **Exchange Act Defendants Misled Investors about Their Equity Interest in Xin'ai Sports**

44

138. On August 6, 2018, iQIYI issued a press release announcing the Company would partner with Super Sports Media, a subsidiary of DDMC Group, to set up a joint venture named Beijing Xin'ai Sport Media Technology Co., Ltd ("Xin'ai"). The press release stated that existing members of both Super Sports Media and the tennis-focused membership program on iQIYI would receive full membership status in the new app.

139. On March 15, 2019, iQIYI filed with the SEC the "018 Annual Report. Attached to the 2018 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the company's internal control over financial reporting and the disclosure of all fraud.

140. The 2018 Annual Report stated the following, in pertinent part, about iQIYI's equity interest in Xin'ai:

> In July 2018, the Company acquired a 32% outstanding equity interest amounting to RMB796,000 (US$115,773) in Beijing Xin'ai Sports Media Technology co., LTD (or "Xin'ai") that is engaged in the operation of a sports content platform. The Company has significant influence over the investee and therefore accounts for its equity interest as an equity method investment. The excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 (US$88,648) was recognized as basis differences and investment goodwill. As of December 31, 2018, the Group held 29% of Xin'ai's equity interest due to new financing investors' dilution.

> As of December 31, 2017 and 2018, besides Xin'ai the Group held several other equity method investments through its subsidiaries or VIEs, all of which the Group can exercise significant influence but does not own a majority equity interest in or has control over. The other equity method investments were not significant. The carrying amount of the Group's equity method investments including Xin'ai was RMB10,363 and RMB810,553 (US$117,890) as of December 31, 2017 and 2018, respectively.

141. Critically, the 2018 Annual Report reported **RMB763,750** as "Acquisition of long-term investments with non-cash consideration," which iQIYI ultimately recorded as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services

45

to be provided to Xin'ai."

142.    On March 12, 2020, iQIYI filed with the SEC its annual report on Form 20-F for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

143.    The 2019 Annual Report disclosed the following about the Company's equity investment in Xin'ai:

> In July 2018, the Group acquired a 32% outstanding equity interest amounting to RMB796,000 in Beijing Xin'ai Sports Media Technology co., LTD (or "Xin'ai") that is engaged in the operation of a sports content platform. The Group has significant influence over the investee and therefore accounts for its equity interest as an equity method investment. The excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 was recognized as basis differences and investment goodwill. As of December 31, 2019, the Group's equity interest was diluted to 26% of Xin'ai's total equity due to a subsequent round of equity financing.
>
> As of December 31, 2018 and 2019, besides Xin'ai the Group held several other equity method investments through its subsidiaries or VIEs, all of which the Group can exercise significant influence but does not own a majority equity interest in or has control over. The other equity method investments were not significant. The carrying amount of the Group's equity method investments including Xin'ai was RMB810,553 and RMB663,376 (US$95,288) as of December 31, 2018 and 2019, respectively.

144.    Similarly, the 2019 Annual Report reported ***RMB763,750*** as "Acquisition of long-term investments with non-cash consideration," which iQIYI ultimately recorded as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai."

145.    Exchange Act Defendants' above misstatements concerning iQIYI's interest in Xin'ai were materially false and misleading because iQIYI the RMB763,750 figure was not

46

properly classified as deferred revenue. Indeed, as set forth in Section V(A)(8) the Company's characterization of its obligation to transfer goods and services to Xin'ai as deferred revenue was improper because this was not a revenue transaction with a customer. This was a promise to transfer goods and services at cost as consideration for the purchase of a long-term investment. It represented a liability but not deferred revenue to later be recognized as revenue in the Company's income statement as a culmination of an earnings process. And, for those reasons, the Exchange Ac Defendants also overstated the amounts iQIYI reported as revenue by RMB37,595 in 2018 and RMB146,291 in 2019 for the non-cash consideration it purportedly transferred to Xin' ai in 2018 and 2019 as partial satisfaction of its obligation in connection with its equity investment.

**D. Exchange Act Defendants Misled Investors by Reassuring Investors that the Wolfpack Report Lacked Merit**

146.    April 7, 2020, the Wolfpack Report was published and revealed to investors for the first time that iQIYI's user numbers and deferred revenues were inflated. However, despite the devastating reality that began to emerge from the Wolfpack Report, Exchange Act Defendants continued issuing false and misleading statements by reassuring investors that the report lacked merit. For instance, on April 7, 2020, iQIYI issued a press release on its website denying the allegations made in the Wolfpack Report and assuring investors that the Company is in compliance with all rules and regulations. The press release stated, in relevant part:

> The Company has been made aware of and reviewed the short seller report published by Wolfpack Research on April 7, 2020. ***The Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company.***
>
> ***The Company emphasizes that it has always been and will remain committed to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with the applicable rules and regulations of the Securities and Exchange Commission and the Nasdaq Global Select Market.***

47

147. Notably, iQIYI provided no details to refute the allegations in the Wolfpack Report. The statements referenced in ¶ 146 were materially false and misleading for the same reasons set forth in ¶¶ 129-131, 133-135, and 145.

## VII. LOSS CAUSATION

148. The truth regarding Exchange Act Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred on April 7, 2020 and August 13 and 14 2020. iQIYI's stock price fell precipitously as these news events alerted investors to the Defendants' fraud and the artificial inflation caused by Defendants' unlawful conduct exited IQIYI's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on August 13, 2020 that the full truth was known to the market, such that there was no longer any artificial inflation in iQIYI's stock price attributable to the fraud.

149. The declines in iQIYI's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Exchange Act Defendants' material misrepresentations.

150. These share price declines removed the inflation from the price of iQIYI common stock, causing real economic loss to investors who had purchased iQIYI common stock during the Class Period.

### A. April 7, 2020 – First Partial Disclosure

151. On April 7, 2020, Wolfpack Research released its report during trading hours, detailing the Exchange Act Defendants' fraud. The Wolfpack Report—citing to and relying on financial statements iQIYI filed with the Chinese Government, as well as other reliable sources—

48

explained that iQIYI significantly inflated its user base, its revenue, and other operating and performance measures.

152. For example, *inter alia*, the Wolfpack Report found that "IQ inflated its 2019 revenue by approximately RMB 8-13 billion, or 27%-44%," and that iQIYI "overstat[ed] its user numbers by approximately 42%-60%." Similarly, the report stated that "IQ's average mobile DAUs were only 126.2 million during the first 10 days of the 2020 Chinese Lunar New Year, versus 180 million average mobile DAUs claimed by IQ." Furthermore, the report explained that Exchange Act Defendants misrepresented the Company's deferred revenues. Moreover, the report stated that "IQ created ~$110 million of deferred revenue by overstating its purported contribution to its XIN'ai Sports (iQIYI Sports) JV," and further stated that iQIYI's "management uses [that] to inflate its revenues." The Wolfpack Report provided detailed support and citations for its conclusions and findings.

153. Notably, according to the Wolfpack Report, its research found that "*iQIYI, Inc. ("IQ") was committing fraud well before its IPO in 2018 and has continued to do so ever since.*"

154. Later that day, the Company also issued a press release announcing that the "Company has been made aware of and reviewed the short seller report published by Wolfpack Research on April 7, 2020."

155. The Wolfpack Report partially (but incompletely) revealed some of the relevant truth about Exchange Act Defendants' prior misstatements concerning the Company's daily active users, revenue, deferred revenue, membership services, and its investment in Beijing Xin'ai Sports Media Technology Co., Ltd.

156. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Exchange Act Defendants' fraud, the price of

49

iQIYI common stock immediately fell $2.75 per share within minutes, and as investors continued digesting the adverse news, iQIYI's share price closed at $16.51 per share at the end of the next trading day on April 8, 2020, an over 4% decline from the day prior, damaging investors.

157. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to reassure the market that the Wolfpack Report lacked merit. For example, iQIYI issued a press release on April 7, 2020, stating: "The Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company." Exchange Act Defendants further reassured investors that "[t]he Company emphasizes that it has always been and will remain committed to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with the applicable rules and regulations of the Securities and Exchange Commission and the Nasdaq Global Select Market."

158. Analysts were reassured by Exchange Act Defendants' statements. For example, according to a Jefferies report on April 15, 2020, notwithstanding the Wolfpack Report, "[t]he long term story of iQIYI remains intact, riding on the secular trend of the online video industry in China. Good content is key to driving membership growth in lower tier cities." Oppenheimer similarly stated on April 23, 2020 that it believed iQIYI's "LT story remains intact."

**B. August 13, 2020 – Final Partial Disclosure**

159. On August 13, 2020, the relevant truth and foreseeable risks concealed by Exchange Act Defendants' misconduct and their false representations during the Class Period were fully revealed and/or materialized. On that date, after the market closed, iQIYI issued a press release disclosing that the "SEC's Division of Enforcement is seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to

50

certain acquisitions and investments that were identified in a report issued by short-seller firm Wolfpack Research in April 2020." Exchange Act Defendants also revealed to the public that the Company's Audit Committee had engaged professional advisers to conduct an internal review of the Company's books and records.

160. The very next day, on August 14, 2020 during an earnings call with analysts to discuss the Company's financial results for the second quarter of 2020, iQIYI further disclosed that NASDAQ had also launched an inquiry into the Wolfpack allegations. Notably, Exchange Act Defendants admitted on this call that they had known about the SEC and NASDAQ inquiries for months prior.

161. The August 13, 2020 disclosures that the SEC initiated an investigation into iQIYI and sought iQIYI's financial and operating records and that the Company's Audit Committee initiated its own internal review, as well as the August 14, 2020 disclosure that NASDAQ had also launched an inquiry into the Wolfpack allegations, were foreseeable consequences of, and within the zone of risk concealed by, the Exchange Act Defendants' misrepresentations concerning iQIYI's financial and operating performance and its investment in Xin' ai Sports.

162. Moreover, the August 13 and 14 2020 disclosures revealed new information that Exchange Act Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures revealed the relevant truth concealed and/or obscured by Exchange Act Defendants' prior misstatements and omissions surrounding the Company's daily active users, deferred revenue, membership services, and investment in Beijing Xin'ai Sport Media Technology Co., Ltd.

163. On this shocking news, the price of iQIYI stock immediately fell $4.25 per share within minutes of iQIYI's August 13, 2020 press release, and after Exchange Act Defendants

51

further disclosed that NASDAQ initiated an inquiry, fell precipitously by $2.49 per share—an *11.4% decline*—ultimately closing at $19.26 per share on August 14, 2020.

164.    Analysts understood that the drop in iQIYI's stock price was caused by the aforementioned disclosures and revelations. For example, on August 14, 2020, J.P. Morgan reported: "We retain a cautious view on IQ in the near term in light of weak guidance and ongoing SEC investigation, which could affect market sentiment. The share price is likely to react negatively to the print in the near term, in our view." Credit Suisse also issued a report that same day acknowledging the SEC investigation as a result of the short seller report, and noting: "the share price will likely remain under pressure until the release of a clean assessment report."

165.    J.P. Morgan reiterated its concern the next day and "maintain[ed] our cautious view on IQ's financial outlook in the next two quarters," in part, because of the "impact from the SEC investigation on market sentiment." The report continued, "We believe that the share price will face near-term pressure." Similarly, Oppenheimer issued a report on August 17, 2020, acknowledging that the "SEC started an investigation in IQ's accounting and acquisition practices after a short-seller's report published by Wolfpack Research in April 2020."

166.    The media also linked iQIYI's stock drop to Exchange Act Defendants' disclosures related to the inquiries into the Company because of the Wolfpack Report. For example, CNBC reported that "[s]hares of Chinese streaming service iQiyi plunged in after-hours trade in the U.S. after it announced the Securities and Exchange Commission (SEC) has launched a probe into the company" and noted that "[t]he SEC probe into iQiyi comes amid rising scrutiny on U.S.-listed Chinese companies following the Luckin Coffee scandal earlier this year."

167.    Each decline in the price of iQIYI common stock, as detailed above, was a direct or proximate result of the nature and extent of Exchange Act Defendants' fraudulent

misrepresentations and/or omissions being revealed to investors and the market.

168. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Exchange Act Defendants' fraudulent scheme to artificially inflate the price of iQIYI common stock and the subsequent significant decline in the value of iQIYI common stock when Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed.

169. The market for iQIYI common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 10,223,327 during the Class Period. As a result of Exchange Act Defendants' misstatements and material omissions, as alleged herein, iQIYI's common stock traded at artificially inflated prices. Plaintiffs and other Class members purchased iQIYI common stock relying upon the integrity of the market relating to iQIYI common stock and suffered economic losses as a result thereof.

170. The declines in iQIYI's common stock price on April 7-8, 2020 and August 13-14, 2020 were a direct result of the nature and extent of Exchange Act Defendants' prior misstatements and omissions being revealed to investors after the markets closed on April 7-8, 2020, and August 13-14, 2020. The timing and magnitude of iQIYI's stock price declines evidence the impact Exchange Act Defendants' false statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Exchange Act Defendants' fraudulent conduct.

## VIII. ADDITIONAL INDICIA OF SCIENTER

171. Exchange Act Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over iQIYI's and the

Individual Defendants' materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section VI were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the numerous allegations above setting forth Exchange Act Defendants' knowledge of inflated user numbers and deferred revenue alleged above, Exchange Act Defendants' scienter is further evidenced by the following facts.

### A. iQIYI's User Numbers and Revenue Figures Were Critical to Its Core Operations

172. The Individual Defendants' knowledge of iQIYI's inflated user numbers—in particular, daily active users ("DAU") and membership service revenues—and deferred revenues can be inferred because these facts were critical to iQIYI's core operations.

173. Indeed, as set forth in Section V(A)(4)-(5), daily active users is one of the most important metrics investors look to when investing in a media company like iQIYI because it generates a majority—over 75%—of its revenue through a combination of selling subscriptions to its online streaming service and by selling advertisements on its platform. Both revenue streams depend almost entirely on the number of active users subscribing to and watching the Company's programs.

174. All major online media and social media platforms, including YouTube, TikTok and Facebook, use DAU as a critical user metric. iQIYI was no different. The most accurate way for investors to assess iQIYI's overall viewership numbers (and the revenues it generated therefrom) was by looking to the number of DAU, that were using iQIYI's platform.

175. Indeed, iQIYI's registration statement and annual reports claimed iQIYI was the

54

largest internet video streaming service in China for both mobile apps and PCs in terms of average DAUs and total user time spent on the platform. In its SEC filings, iQIYI defined mobile DAUs on its platform as the number of unique mobile devices that had accessed the iQIYI platform through its mobile app at least once during a day. iQIYI's SEC filings in fact stated that a "massive and highly engaged user base," which includes DAU, was one of iQIYI's key competitive strengths and that the Company's success "was primarily attributable" to those key competitive strengths.

176.     The Company touted in the Registration Statement that "[w]e are one of the largest internet companies in China in terms of user base." The Registration Statement flatly stated:

> We have a massive and highly engaged user base, which drives our revenue growth. Our ability to continue to effectively maintain and expand our user base will affect the growth of our business and our revenues going forward.

177.     The DAU metric was central to iQIYI's purported success because the Company and the market expect China's non-paying internet video users to rapidly convert into paying customers. Indeed, iQIYI's monetization model centered on converting DAUs into paying members. As the Company explained in the Registration Statement:

> ***Monetization Opportunities in the Internet Video Industry in China***
>
> Internet video platforms in China currently generate revenues mainly from membership services and online advertising. Monetization through derivative works is also expected to become an increasingly important revenue source. The industry has shifted from heavy reliance on online advertising revenues to a more balanced and diversified revenue generation model.
>
> [ ] Chinese consumers are increasingly willing to pay fees to internet video platforms to access premium content and quality services. According to the iResearch Report, paying ratio of internet video users in China, as measured by number of users who pay for video content related services during the year as a percentage of total number of internet video users in the same year, has increased from approximately 1.2% in 2012 to 13.2% in 2016, and is expected to further increase to 40.0% in 2022.

178.     The Registration Statement touts that iQIYI "reshaped the internet video

55

streaming industry in China by successfully cultivating users' willingness to pay for content."

179. As Defendant Gong stated on the Company's May 17, 2019 earnings call, iQIYI's business is "mainly focused on converting free users into paying users." Each DAU that is not a paying member represents an attainable growth opportunity for the Company.

180. Inflating the Company's DAUs thus misled the market about the Company's ability to attract more paying members. As an HSBC analyst report stated in August 2019, "[w]e expect iQIYI's live streaming and game business can leverage on iQIYI's 590m MAU and 120m DAU for traffic conversion and therefore could see upside to help drive faster growth in other revenue." The Individual Defendants undoubtedly closely followed the Company's DAU metrics and fully understood that falsely inflating the DAU would materially mislead investors.

181. Similarly, with respect to membership service revenues, as set forth in Sections V(A)(4) and (6), iQIYI's primary source of deferred revenue was the purchase of customer memberships, making membership service revenues one of iQIYI's top priorities. For instance, according to iQIYI's 2018 Annual Report, membership services accounted for 42.5% of revenues, which, according to its 2019 Annual Report, increased to 49.8% of revenues.

182. In fact, the Individual Defendants themselves stressed the importance of membership service revenues to iQIYI's business. For example, Defendant Wang stated in an October 31, 2018 press release that "[m]embership services . . . [was] the biggest revenue contributor for the Company." Defendant Wang likewise stated in a February 21, 2019 announcement of fourth quarter results that "[m]embership business continued to be the main engine driving our growth." Moreover, Defendant Wang stated in a May 16, 2019 press release that "[m]embership business again spearheaded the growth in the quarter, reflecting the strength and popularity of our vast library of premium content." Furthermore, Defendant Gong stated in a

56

November 6, 2019 press release that "our subscription business contributed more than half of our total quarterly revenues for the first time." And again, in a February 27, 2020 press release Defendant Gong touted that "membership business continued to spearhead our overall growth throughout the year, driven by the increasing number of total subscribing members which reached 107 million at year end."

183.    Even the media recognized iQIYI's active users and membership services to be of utmost important to iQIYI's business. For example, a Seeking Alpha article published on March 28, 2018 explained that "[i]t's clear from iQIYI's strategy [] that it intends membership services to be the anchor of its business."

184.    Additionally, as set forth in Section V(A)(8), Xin'ai Sports represented a significant amount of iQIYI's business. Further, the Company and analysts viewed Xin'ai Sports as a growth vehicle for the Company. Indeed, Defendant Gong explained on an October 31, 2018 earnings call for the third quarter of 2018 that "[t]he new joint venture will operate all sports-related content business, including the upgraded iQIYI Sports app, which brings together an extensive offering of sports content with smoother user experience." On August 20, 2019, as part of iQIYI's earnings call for the second quarter of 2019, Defendant Gong further explained that Xin'ai was "an important part of our content library" and similarly reaffirmed that "sports content is obviously a very important racetrack for us."

185.    Analysts likewise understood the transaction to be important for iQIYI. An August 22, 2019 analyst report from Industrial Securities echoed Defendant Gong's enthusiasm, stating that "sports content is highly valued by iQIYI" and "may become a new growth point for iQIYI." Further, an October 23, 2019 analyst report from CCB International stated that iQIYI's plan to increase sports video content would "extend the company's audience base to include more elderly

and affluent viewers," which would help provide a "considerable increase" of paying subscribers.

186. Therefore, the knowledge that iQIYI inflated its user numbers and deferred revenue figures can be imputed to the Individual Defendants.

**B. Exchange Act Defendants Waiting Months to Tell Investors about the SEC and NASDAQ Investigations Supports a Strong Inference of Scienter**

187. Furthermore, as a way to conceal from investors Defendants' wrongdoing, Exchange Act Defendants hid from investors for roughly four months the fact that the SEC and NASDAQ initiated investigations into the very topics alleged here as false and misleading.

188. Indeed, the Wolfpack Report that first revealed certain of Exchange Act Defendants' wrongdoing was published on April 7, 2020. Notably, a couple of weeks after the Wolfpack Report was released, Exchange Act Defendants received notice that the SEC and NASDAQ initiated investigations and sought documents related to the allegations in the Wolfpack Report. It was not until August 13, 2020 that Exchange Act Defendants revealed that such investigations existed. In fact, Defendant Wang admitted on August 14, 2020 that Exchange Act Defendants had received inquiries from both NASDAQ and the SEC within a "a couple weeks" of the release of the Wolfpack Report in April 2020

189. Even if Exchange Act Defendants did not have an affirmative duty to disclose the investigations, not doing so supports an inference of scienter that they knew their financial and operating performance metrics were inflated, yet were trying to downplay the Wolfpack Report by making investors think the allegations from the report were untrue and nothing to worry about.

**C. Defendants' Financial Motivation to Inflate iQIYI's User Numbers and Deferred Revenue Supports a Strong Inference of Scienter**

190. Defendants Li and Baidu were each highly motivated to mislead investors about iQIYI's financial and operating performance in the Registration Statement and throughout the

58

Class Period.

191. iQIYI reaped $2.25 billion in cash from the IPO, which was the second largest IPO ever for a Chinese company in the United States. Following the IPO, and throughout the Class Period, Baidu owned a majority of iQIYI and maintained 92.7% voting control With complete control over iQIYI, Baidu had the ability to, and did, enter into myriad related party transactions that provided benefits to Baidu. Additionally, Defendant Li beneficially owned over 5.6 million shares of Baidu throughout the Class Period. As iQIYI's annual reports concede, Defendant Li "has the majority voting power in Baidu and is deemed to beneficially own iQIYI's shares held by Baidu Holdings." Defendants Baidu and Li's respective scienter can be imputed to iQIYI.

**D. Defendants Gong and Wang's SOX Certifications Support a Strong Inference of Scienter**

192. Finally, accompanying Defendants' 2018 and 2019 Forms 20-F, which contained materially false and misleading statements, Defendants Gong and Wang executed certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to the [C]ompany's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendants Gong and Wang were "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the Company's disclosure controls and procedures." The SOX Section 302 certifications further stated that Defendants Gong and Wang "evaluat[ed] [] internal control over financial reporting," and that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report." Defendants Gong and Wang also executed certifications pursuant to SOX Section 906, which accompanied the 2018 and 2019 Forms 20-F, attesting to the accuracy of the

59

Company's financial reporting.

193. By signing these certifications, Defendants Gong and Wang certified that the Company's internal controls over financial reporting and disclosure controls and procedures were effective, evidencing their access (and purported review of) iQIYI's financial data as well as the materially false and misleading statements set forth above.

194. Contrary to Defendants Gong's and Wang's representations, throughout the Class Period, iQIYI suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, Defendants' inflated user numbers and deferred revenue figures rendered Defendants' public statements materially false and misleading.

195. Had Defendants Gong and Wang actually conducted the assessments and evaluations required, they would have discovered iQIYI's inflated user numbers and deferred revenue figures misrepresentations and omissions contained within their public statements. Accordingly, Defendants Gong and Wang, knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

## IX. CONTROL PERSON ALLEGATIONS

196. Defendants Gong and Wang and Baidu, by virtue of their high-level and controlling positions at iQIYI, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

60

197.     Defendants Gong and Wang, as senior executive officers of iQIYI, Defendant Gong as a member of the Board of Directors of iQIYI, and Baidu as controlling shareholder of iQIYI—a publicly held company whose common stock was traded on the NASDAQ, and governed by the federal securities laws—each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of iQIYI's publicly-traded common stock would be based on accurate information. Defendants Gong and Wang and Baidu each violated these requirements and obligations during the Class Period.

198.     Defendants Gong and Wang, because of their positions of control and authority as senior executive officers of iQIYI, Defendant Gong, as a member of the Board of Directors of iQIYI , and Baidu, as the controlling shareholder of iQIYI, were able to and did control the content of iQIYI's SEC filings, press releases, and other public statements issued by or on behalf of iQIYI during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Gong and Wang and Baidu are responsible for the accuracy of the public statements alleged herein.

199.     Defendants Gong and Wang and Baidu are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of iQIYI common stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding iQIYI's business, operations, and management, and the intrinsic value of iQIYI's common stock, and caused Plaintiffs and members of the Class to purchase iQIYI common stock at artificially inflated prices.

61

200.   The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

201.   The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

## X.   CLASS ACTION ALLEGATIONS

202.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired iQIYI securities during the Class Period and were damaged thereby (the "Exchange Act Class"). Excluded from the Exchange Act Class are Exchange Act Defendants and their families, the officers and directors and affiliates of Exchange Act Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Exchange Act Defendants have or had a controlling interest.

203.   The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. According to its annual reports filed with the SEC, during the Exchange Act Class Period, iQIYI had approximately 5,135,516,521 ordinary shares outstanding and was actively traded on the NASDAQ under the ticker symbol "IQ." While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by iQIYI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

204. Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class, as all members of the Exchange Act Class are similarly affected by Exchange Act Defendants' wrongful conduct in violation of federal law that is complained of herein.

205. Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities litigation.

206. Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

(a) Whether Exchange Act Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b) Whether the statements Exchange Act Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c) Whether, and to what extent, the market price of iQIYI ADSs were artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) Whether Defendants acted with the requisite level of scienter;

(e) Whether the Individual Defendants and Baidu were controlling persons of iQIYI; and

(f) Whether the members of the Exchange Act Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

207. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense

and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

208. To the extent that Plaintiffs allege that Exchange Act Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(a) the omissions and misrepresentations were material;

(b) iQIYI securities are traded in an efficient market;

(c) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(d) Plaintiffs and other members of the Exchange Act Class purchased iQIYI's securities between the time Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(e) iQIYI stock met the requirements for listing and were listed and actively traded on the NASDAQ, which is a highly efficient and automated market;

(f) as a regulated issuer, iQIYI filed periodic public reports with the SEC;

(g) iQIYI regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the

64

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(h) iQIYI was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, J.P. Morgan, Jefferies, UBS, Credit Suisse, Oppenheimer, HSBC, and Bank of America, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace;

(i) the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

209. As a result of the foregoing, the market for iQIYI's securities promptly digested current information regarding iQIYI from publicly available sources and reflected such information in iQIYI's securities price(s). Under these circumstances, all persons and entities who purchased or otherwise acquired iQIYI's securities during the Class Period suffered similar injuries through their purchase of iQIYI at artificially inflated prices and thus, the presumption of reliance applies.

210. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of iQIYI's common stock.

211. Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Exchange Act Class purchased shares of iQIYI's common stock and exchange-traded options on such common stock between the time Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

65

## XII. NO SAFE HARBOR

212. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Exchange Act Defendants warned of had already come to pass.

213. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

214. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Exchange Act Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Exchange Act Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

215. Furthermore, Exchange Act Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Exchange Act Defendants included any cautionary language, that language was not meaningful because any potential risks identified by

66

Defendants had already passed or manifested. As detailed herein, Exchange Act Defendants failed to disclose to the market that iQIYI's user numbers and deferred revenue figures were overstated.

216. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Exchange Act Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of iQIYI who knew that the statement was false when made.

## XIII. EXCHANGE ACT CAUSES OF ACTION

### <u>COUNT I</u>

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against iQIYI and the Individual Defendants**

217. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

219. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

220. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

**a.** employed devices, schemes and artifices to defraud;

**b.** made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

**c.** engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

221. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

222. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Exchange Act Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Exchange Act Class.

68

223. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Exchange Act Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

224. Had Plaintiffs and the other members of the Exchange Act Class been aware that the market price of iQIYI securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

225. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Exchange Act Class have suffered damages in an amount to be established at trial.

226. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Exchange Act Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

227. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

228. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

229. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

230. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

231. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Exchange Act Class complain.

70

232.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, and certifying Plaintiffs as the Exchange Act Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel for the Exchange Act Class;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Exchange Act Class members against all Exchange Act Defendants, jointly and severally, for all damages sustained as a result of Exchange Act Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.     Awarding Plaintiffs and the Exchange Act Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV.    VIOLATIONS OF SECTIONS 11 AND 15 OF THE SECURITIES ACT

233.     The claims set forth below in Counts III and IV allege violations of Sections 11 and 15 of the Securities Act. Plaintiffs bring these claims individually and on behalf of the Securities Act Class, consisting of all persons and entities who purchased or otherwise acquired iQIYI common stock pursuant and traceable to the Offering Documents issued in connection with the initial public offering, completed on or about March 28, 2018 (the "IPO" or "Offering").[38] The

---

[38] The following are excluded from the Securities Act Class: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of iQIYI during the Class Period; (iv) any firm, trust, corporation, or other entity in which

71

Securities Act Claims solely allege strict liability and negligence causes of action, and do not sound in fraud. Accordingly, for the purpose of these Securities Act Claims, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud, intentional misconduct, or deliberately reckless misconduct. Plaintiffs therefore expressly do not incorporate by reference any allegations contained in Sections I-XIII, *supra*.

## A. Factual Background

### 1. iQIYI Touted Itself as the Netflix of China While Raising $2 Billion From U.S. Investors in an IPO

234. Launched in 2010, iQIYI is a Beijing, China-based online streaming entertainment provider. iQIYI's online video platform features original content produced by iQIYI, as well as a library of other professionally-produced content, and user-generated content. According to iQIYI's 2018 Annual Report, filed with the SEC on Form 20-F, iQIYI touted itself to investors as the "leading internet video streaming service in China." Hailed as the Netflix of China, iQIYI marketed itself to U.S. investors as the top online streaming entertainment providers in Asia—a market with billions of potential subscribing customers: "[t]hrough [iQIYI's] curated premium content, [the Company] attracts[s] a **massive user base with tremendous user engagement, and generate[s] significant monetization opportunities**."

235. Like Netflix, iQIYI's customers primarily access the Company's entertainment offerings content through a monthly or annual subscription which allows them to access the Company's entertainment programs. The Company represented in SEC filings that the majority of its users were subscribing members "and, to a lesser extent, users who gain access to [iQIYI's]

---

any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (v) iQIYI's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

premium content library through paid video on-demand service." iQIYI generates advertising revenue through various methods, such as commercials that run prior to streaming, pop-up advertisements, and product placement in videos.

236. Critically, iQIYI's two primary sources of revenue—membership subscriptions and advertising—are both dependent and a function of the number of customers subscribing to iQIYI's service and viewing its programs. Thus, it is vital to iQIYI to maintain and grow a large and active user base to generate revenue.

## 2. iQIYI was a Complex and Opaque Organization

237. Prior to the IPO, it was extremely difficult for investors to understand iQIYI's corporate structure and accounting methods. iQIYI operates through a complex web of on-shore and off-shore companies which results in inherently unclear accounting structure. The following diagram sets forth the Company's organizational structure.



238. Complicating matters further, while iQIYI purportedly operates under U.S. Generally Accepted Accounting Principles (GAAP) and the U.S. Public Company Accounting Oversight Board (PCAOB), the Company acknowledges that the Registration Statement was "**prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board**." Gaining 100% transparency into iQIYI's, membership numbers, financial information and accounting for such financial information is difficult and, in some cases, not possible.

239.    Further complicating matters, much of the third-party research related to iQIYI's operations such as mobile advertising data, financial research and governmental filings were not easily accessible because of limitations imposed by the Chinese government and language barriers. Accordingly, many U.S. investors were forced to rely almost entirely on the substantive representations and financial data contained in the Company's SEC filings.

### 3.  iQIYI Raised Over $2 Billion From U.S. Investors in a Massive IPO

240.    On February 27, 2018, iQIYI filed a registration statement on Form F-1 with the SEC in connection with the Company's IPO. After several amendments, the SEC declared the registration statement effective on March 28, 2018.[39] On March 29, 2018, iQIYI conducted its IPO pursuant to the Offering Documents and issued 125 million ADSs to the public at the Offering price of $18.00 per share. As a result of the Offering, iQIYI raised approximately $2,182,500,000 in proceeds upon the IPO's completion, after underwriting discounts and commission.

241.    Following the IPO, iQIYI shares traded on the NASDAQ market, a major United States securities exchange. However, along with being listed on a major U.S. exchange iQIYI came heightened regulatory requirements as well as the requirements of the federal securities laws. As part of those requirements, iQIYI was required to file accurate, audited, financial statements with the SEC.

### 4.  iQIYI's Active User and Deferred Revenue Figures Were Crucial to the Company's Success

242.    Despite the heightened requirements that came with raising $2 billion of capital in the U.S., iQIYI issued Offering Documents that contained significantly inflated viewership and

---

[39] On March 29, 2018, iQIYI filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement. The Registration Statement and Prospectus are together referred to herein as the "Offering Documents."

revenue numbers to make it appear as though the Company had significantly more active users than it actually did.

243. Critically, active users is one of the most important metrics investors look to when investing in a media company like iQIYI because the Company generates a majority (over 75%) of its revenue through a combination of selling subscriptions to its online streaming service and by selling advertisements on its platform. Both revenue streams depend almost entirely on the number of users subscribing to and watching the Company's programs.

244. The most accurate way for investors to assess iQIYI's overall viewership numbers (and the revenues it generated therefrom) was by looking to the number of daily active users ("DAU") that were using iQIYI's platform. Indeed, all major online media and social media platforms, including YouTube, TikTok and Facebook, use DAU as a critical user metric.

245. iQIYI's registration statement and annual reports claimed iQIYI was the largest internet video streaming service in China for both mobile apps and PCs in terms of average DAUs and total user time spent on the platform. In its SEC filings, iQIYI defined mobile DAUs on its platform as the number of unique mobile devices that had accessed the iQIYI platform through its mobile app at least once during a day. Indeed, iQIYI's SEC filings stated that a "massive and highly engaged user base," which includes DAU, was one of iQIYI's key competitive strengths and that the Company's success "was primarily attributable" to those key competitive strengths.

246. The other key metric for assessing iQIYI's success was its membership services revenue. Membership services revenue was primarily the revenue the Company generated from membership subscriptions for its streaming services. And because service subscriptions (such as annual and monthly subscriptions) are generally for future services that are to be performed by iQIYI, GAAP required iQIYI to record subscription payments as deferred revenue that is

76

recognized ratably over the term of the subscription. iQIYI's primary source of deferred revenue is the sale of customer memberships, which range from one month to twelve months. For example, when iQIYI sells an annual subscription, the Company records the sale as deferred revenue because iQIYI has not yet provided twelve months of online streaming services. As iQIYI delivers its streaming services to its members each month, the Company recognizes that ratable portion of deferred revenue as earned revenue.

247. Accordingly, daily active user metrics and deferred revenue were crucial metrics to investors and served as the two primary indicators for the success of iQIYI's membership services and advertising revenues—the two revenue streams that accounted for over 75% of iQIYI's overall revenues.

**5. iQIYI's Offering Documents Contained Overstated Average Daily Active User Metrics, Which Misled Investors about the Company's Subscription Revenues**

248. iQIYI's Offering Documents contained inflated DAU numbers. Specifically, in the Offering Documents, iQIYI issued historical mobile DAU data that were materially inflated.

249. In the Offering Documents, iQIYI falsely stated that its average mobile DAUs at the end of the year in 2015, 2016 and 2017 was 88.3 million, 125.4 million and 126 million respectively.

> *Membership services*. Our membership services revenue increased by 277.5% from RMB996.7 million in 2015 to RMB3,762.2 million in 2016, primarily driven by the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 182.7% from 10.7 million as of December 31, 2015 to 30.2 million as of December 31, 2016. Excluding individuals with trial memberships, the number of subscribing members increased by 180.4% from 10.7 million as of December 31, 2015 to 30.0 million as of December 31, 2016. ***Between the fourth quarters of 2015 and 2016, our average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million,*** and our average mobile MAUs increased by 10.9% from 365.5 million to 405.4 million. Daily average total user time spent on our iQIYI platform increased by 52.5% from 169.9 million hours in 2015 to 259.1 million hours in 2016.

77

* * *

*Membership services.* Our membership services revenue increased by 73.7% from RMB3,762.2 million in 2016 to RMB6,536.0 million (US$1,004.6 million) in 2017, primarily driven by the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 68.4% from 30.2 million as of December 31, 2016 to 50.8 million as of December 31, 2017. "Subscribing members" refers to the individuals who purchased our monthly, quarterly or annual membership packages, including individuals with trial membership, and excluding individuals who used paid video on-demand service. The number of individuals with trial memberships has consistently accounted for less than 5% of the total number of subscribing members. Excluding individuals with trial memberships, the number of subscribing members increased by 66.8% from 30.0 million as of December 31, 2016 to 50.0 million as of December 31, 2017. ***Between the fourth quarters of 2016 and 2017, our average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million***, and our average mobile MAUs increased by 3.9% from 405.4 million to 421.3 million. Daily average total user time spent on our iQIYI platform increased by 15.8% from 259.1 million hours in 2016 to 300.1 million hours in 2017.

250. However, as discussed below, iQIYI's reported DAU numbers were materially false and misleading because they were significantly overstated.

251. According to Plaintiffs' in-depth research into data from two leading industry research firms that cover China's mobile internet market, (QuestMobile Research Institute and Aurora Mobile Limited), the actual average mobile DAU's were substantially lower than iQIYI reported to investors.[40] Specifically, according to QuestMobile, the true average mobile DAUs for iQIYI for 2015, 2016, and 2017 were overstated by 50%, 33.4%, and 11.5%, respectively.

---

[40] Plaintiffs were only able to obtain the QuestMobile and Aurora data after conducting extensive research and data analysis of PRC media reports and archived industry reports, which are only published in Chinese and not readily obtainable by investors.

78

| iQIYI's Average Mobile Daily Active Users (in millions) | | | | |
|---|---|---|---|---|
| Time Period | DAUs as Disclosed by iQIYI | DAUs According to QuestMobile | Amount overstated vs. QuestMobile | Percentage overstated vs. QuestMobile |
| 2015 Q4 | 88.3 | 59.0 | 29.3 | 50.0% |
| 2016 Q4 | 125.4 | 94.0 | 31.4 | 33.4% |
| 2017 Q4 | 126.0 | 113.0 | 13.0 | 11.5% |

252. Aurora's data corroborates QuestMobile's data and further supports that iQIYI materially overstated its average mobile DAU figures. According to Aurora's data, **iQIYI did not have more than 90 million mobile DAU** in December 2017, despite the Company reporting 126 million mobile DAU for the fourth quarter of 2017.

### 6. iQIYI's Credit Reports Filed in China Further Belie the Revenue Reported to Investors

253. Similarly, iQIYI's Offering Documents inflated the amount of deferred revenue that iQIYI generate in the years 2015, 2016, and 2017. Specifically, iQIYI reported in its Offering Documents that the Company generated deferred revenue in 2015, 2016, and 2017 in the amounts of *RMB339,880,000, RMB796,703,000, and RMB1,633,649,000,* respectively.

254. However, in reality, iQIYI's deferred revenue figures were much lower than what the Offering Documents reported to investors. Indeed, credit reports obtained by Plaintiffs on iQIYI show that the deferred revenue amounts the Company reported in the Registration Statement were inaccurate. In truth, iQIYI had much smaller amounts of deferred revenue from 2015 to 2017—specifically, that iQIYI's deferred revenue numbers for the years 2015, 2016, and 2017 were overstated by 261.7%, 165.5%, and 86.2%, respectively:

79

| iQIYI's Deferred Revenue (RMB in thousands) | | | |
|---|---|---|---|
| | 2015 | 2016 | 2017 |
| Deferred Revenue as Reported in Registration Statement | 339,880 | 796,703 | 1,633,649 |
| Deferred Revenue Reported for VIEs | 93,963 | 300,037 | 877,206 |
| Overstatement of Deferred Revenue | 245,917 | 496,666 | 756,443 |
| Percentage Overstatement of Deferred Revenue | 261.7% | 165.5% | 86.2% |

**B. iQIYI Violated Applicable Chinese and U.S. Accounting Principles.**

255. As discussed above, iQIYI's purportedly GAAP-compliant reported revenues in its SEC filings were overstated as compared to the Company's financial reporting and tax filings with the PRC government. However, the significant difference in reported revenues in China and in the U.S. is not attributable to different standards in the two countries. Indeed, the accounting standards in China and the U.S. are the same with respect to the recording of deferred revenue and come with the same steep penalties and drastic consequences if the reporting company files inaccurate information. Accordingly, the significant disparity between iQIYI's reported revenue in China and the U.S. demonstrates that the Company overstated its revenue figures in its SEC filings.

**1. The PRC Required iQIYI to File Accurate Financial Statements with Chinese Regulators**

256. Among the many PRC governmental entities with supervision over corporations and their business activities in China is the State Administration for Market Regulation ("SAMR"). SAMR was created in 2018 through the merger of the State Intellectual Property Office and the State Administration for Industry and Commerce ("SAIC"). SAMR succeeded to the responsibilities and oversight previously carried out by the SAIC.

257. Up until 2018, the SAIC was the Chinese government body that regulates industry and commerce in China. Those responsibilities are now undertaken by the SAMR.

258. SAMR and the SAIC is and was primarily responsible for overseeing business

80

organizations, including business registrations, issuing and renewing business licenses, periodic filings and acting as the government supervisor and regulator of corporations. Pursuant to PRC law and regulations, all Chinese companies are required to: 1) file audited financial statements pursuant to Chinese GAAP with the Chinese government annually or bi-annually; 2) file amendments to its business registration records whenever there is a change to its owners, business address, legal representative and board of directors and etc. within 15 or 30 days of such changes depending on character of its business.

259.    Article 9 of the PRC Individual Proprietorship Enterprises Law Company Law requires registration of the enterprise's initial investor, and Article 15 of the same law requires filing of an amendment with the SAIC office whenever the investor is changed.

260.    Though the law does not specify any effect on the new investors of delayed SAIC registration except a monetary penalty, under PRC laws, a new owner's or investors' registration of ownership with the SAIC office is the conclusive way to determine the true owner or investor of an entity, especially when a third party claims the same interest in the entity. Therefore, in practice, the actual owners and investors will always have their interest registered with the SAIC office immediately after the interest is transferred, and the SAIC registration is often regarded as the final and necessary step in the closing of a transaction.

261.    PRC Company Law, Article 165 requires that every business entity file a financial statement that is audited by an accounting firm with the SAIC as part of the annual inspection. The financial statements are required to be prepared according to PRC GAAP, which is the same as U.S. GAAP for all relevant purposes.

### 2. SAIC and SAMR Filings Are Reliable

262.    Under PRC law, penalties for filing false SAIC filings include fines and revocation of the entity's business license.

81

263.     Moreover, if an entity's business license is revoked, the People's Bank of China requires the bank account of that entity to be closed.

264.     Without a business license the entity cannot legally conduct business in the PRC. Thus, iQIYI had a strong incentive to file accurate annual reports with the SAIC because its business could be shut down if it was caught filing false financial statements.

265.     Reflecting their importance, SAIC filings also must be signed by the legal representative of the entity submitting it. The legal representative also must certify to the accuracy of the financial statements by stating "I confirm that the content of the submitted company's annual inspection report is true."

266.     PRC law requires financial statements filed with the SAIC by iQIYI's subsidiaries to be audited by Chinese CPA firms in conformance with Chinese GAAP. Further, the law requires that all revenue earned from any source by the entity must be recorded as revenue during the fiscal year such revenue is earned. This rule governs reporting both to the SAIC and to the State Tax Bureau, and it imposes an obligation to report all revenue (and related financial statement items) timely, completely and accurately.

### 3. Chinese GAAP, U.S. GAAP, and iQIYI's Own Accounting Policies Were the Same for Revenue Recognition Purposes

267.     Chinese GAAP is substantially the same as U.S. GAAP. In particular for revenue recognition for sales of goods, U.S. GAAP, Chinese GAAP, and iQIYI's stated revenue recognitions policy are the same.

268.     There are no significant differences between Chinese GAAP and U.S. GAAP with respect to revenue recognition. Indeed, global accounting regulators have issued reports specifically stating that there are no differences between U.S. GAAP and Chinese GAAP.

269.     For example, the Committee of European Securities Regulators ("CESR"), issued

a report entitled "CESR's advice on the equivalence of Chinese, Japanese and US GAAPs (2007)," which explained that there were no significant differences between US GAAP and International Financial Reporting Standards ("IFRS"). Pg. 25. Moreover, according to the same report, there are no significant differences between IFRS and Chinese GAAP on revenue recognition. *Id.* at 35.Thus, there are no significant differences between U.S. GAAP or Chinese GAAP on revenue recognition and there are no significant differences between U.S. GAAP and Chinese GAAP that can explain the differences in iQIYI's PRC filed financial statements and those it filed with the SEC.

270.    iQIYI's stated accounting policies also conform to the same revenue recognition accounting principles as U.S. or Chinese GAAP. In the Registration Statement, iQIYI describes its revenue recognition policy as:

> Revenue is recognized only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed and collectability of the related fee is reasonably assured under ASC subtopic 605-10, *Revenue Recognition: Overall*, or ASC 605-10.

271.    iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding membership services as the following:

> *Membership services*
>
> The Group offers membership services to subscribing members with various privileges, which primarily including access to exclusive and ad-free streaming of premium content 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others. When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered. Membership services revenue also includes fees earned from on-demand content purchases made by members and the sale of the right to services such as other memberships, which the Group acquires and controls before they are transferred to subscribing members.

272.    iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding live

broadcasting, in relevant part, as: "Revenue from the sale of consumable virtual gifts is recognized when consumed by the user, or, in the case of time-based virtual items, recognized ratably over the period each virtual item is made available to the user. Virtual currency sold but not yet consumed by the purchasers is recorded as 'Customer advances and deferred revenue.'"

273.    iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding contract balances as the following:

*Contract balances*

Contract liabilities are mainly comprised of payments received for membership fees and virtual currency sold for which the corresponding services have not yet been provided to customers and are presented as "Customer advances and deferred revenue" on the consolidated balance sheets. The increase in customer advances and deferred revenue as compared to the year ended December 31, 2017 is a result of the increase in consideration received from the Group's customers.

274.    The Chinese accounting standard governing revenue recognition for iQIYI's PRC subsidiaries, ASBE 14, is essentially the same. It states:

Chapter II Revenue from Selling Goods

Article 4. No revenue from selling goods may be recognized unless the following conditions are met simultaneously:

(1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;

(2) The enterprise retains neither continuing management involvement to the degree usually associated with ownership, nor effective control over the goods sold;

(3) The relevant amount of revenue can be measured in a reliable way;

(4) The relevant economic benefits associated with the transaction will flow to the enterprise; and

(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

275.    Accordingly, there are no significant differences between US GAAP and Chinese GAAP for recognizing revenue for the sale of goods in iQIYI's case.

84

276. Differences between U.S. GAAP and Chinese GAAP are not the cause of the huge differences in revenue and income between iQIYI's SEC filed financial statements and its SAIC financial statements.

277. Even if, despite all appearances, iQIYI's subsidiaries' PRC government filings were inaccurate, the Company should have disclosed that it filed inaccurate filings with the Chinese government. If the Chinese government discovered that iQIYI had filed false financial statements by consulting iQIYI's SEC filings, the Chinese government could impose substantial penalties on iQIYI's subsidiaries, including revocation of the responsible subsidiaries' business licenses, accounting for substantially all of iQIYI's revenues and assets.

#### 4. iQIYI's Use of VIEs Does Not Explain the Divergence in U.S. and Chinese Reported Revenues

278. As discussed above, iQIYI primarily conducts its business in China through VIEs because PRC laws and regulations prohibit or restrict foreign ownership of companies. VIEs are entities controlled by a company by means other than a majority of voting rights. Chinese companies commonly use VIE structures to access foreign capital. The Company conducts its business in China through the following VIEs: Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Beijing iQIYI Cinema, and their respective subsidiaries.

279. Certain contractual agreements (i) give the Company or its wholly-owned subsidiaries the power to direct the activities that most significantly affect the economic performance of the VIEs; (ii) obligate the Company to absorb losses of the VIEs that could potentially be significant to the VIEs; and (iii) entitle the Company or its wholly-owned subsidiaries to receive economic benefits from the VIEs that potentially could be significant to the VIEs.

280. ASC 810-25-38 requires companies to consolidate VIEs in their financial

85

statements if the company will absorb or receive the majority of the VIE's expected losses or returns. iQIYI purports to comply with GAAP by consolidating its VIEs and their subsidiaries as required by ASC 810 and SEC Regulation SX-3A-02. Accordingly, iQIYI's use of VIEs does not explain why the Company's deferred revenues it reported in the PRC are substantially different than the deferred revenues it reported in the U.S.

### C. Description of the March 29, 2018 Public Offering

281. On February 27, 2018, iQIYI filed a Registration Statement on Form F-1 with the U.S. Securities and Exchange Commission (the "SEC") for a proposed offering of securities, which was subsequently amended on March 16, 2018, March 19, 2018, and March 26, 2018 (collectively, the "Registration Statement"). The Registration Statement was signed by Robin Yanhong Li, Qi Lu, Yu Gong, Herman Yu, Xuyang Ren, Victor Zhixiang Liang, Chuan Wang, and Xiaodong Wang. On March 28, 2018, the SEC declared the Registration Statement effective.

282. On March 29, 2018, iQIYI filed a Prospectus ("Prospectus") with the SEC, which offered 125 million Class A ordinary shares at an offering price of $18.00 per share.

283. In the Prospectus, iQIYI incorporated the Registration Statement by reference as part of its offering materials, and the Prospectus and Registration Statement are together referred to as the "Offering Documents."

284. On March 29, 2018, iQIYI completed the Offering, selling 125 million Class A ordinary shares for approximately $2,182,500,000.

## XV. JURISDICTION

285. The claims alleged herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

286.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

287.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Securities Act Defendants' actions, and the subsequent damages took place within this District.

288.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Securities Act Defendants disseminated the statements alleged to be false and misleading herein into this District, and Securities Act Defendants solicited purchasers of iQIYI securities in this District.

## XVI.     THE SECURITIES ACT PARTIES

### A.  Plaintiffs

289.     Plaintiffs bring the Securities Act Claims on behalf of all persons who purchased iQIYI's securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement" or "Offering Documents") issued in connection with iQIYI's March 2018 initial public offering (the "IPO" or "Offering") to recover damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

### B.  Defendants

#### 1.  Corporate Defendant

290.      Defendant iQIYI, "the Netflix of China," purports to be an innovative market-leading online entertainment service in China. iQIYI is incorporated in the Cayman Islands, and maintains its principal executive offices in Beijing, China. iQIYI ADSs are listed on NASDAQ under the ticker symbol "IQ." The Company's agent for service in the United States, as stated in

the Registration Statement, is Law Debenture Corporate Services Inc., 801 2nd Avenue, Suite 403, New York, NY 10017. iQIYI is a subsidiary of Baidu Holdings Limited.

291.    iQIYI, together with its subsidiaries, provides online entertainment services under the iQIYI brand in China. iQIYI's digital platform provides a collection of internet video content, including professionally produced content licensed from content providers and self-produced content. The Company also provides membership, content distribution, online advertising, live broadcasting, online gaming and literature, e-commerce, and talent agency services.

### 2.    Individual Defendants

292.    Defendant Yu Gong ("Gong") is and was at all pertinent times the Company's Chief Executive Officer ("CEO"), Principal Executive Officer, and a Director. Defendant Gong reviewed, contributed to, participated in drafting, and signed the Registration Statement.

293.    Defendant Xiaodong Wang ("Wang") is and was at all pertinent the Company's Chief Financial Officer ("CFO"), and Principal Financial and Accounting Officer. Defendant Wang reviewed, contributed to, participated in drafting, and signed the Registration Statement.

294.    Defendants Gong and Wang are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential iQIYI investors, all motivated by their own and the Company's financial interests.

### 3.    Director Defendants

295.    Defendant Robin Yanhong Li ("Li") is and was at all pertinent times the Chairman of iQIYI's Board of Directors. Defendant Li reviewed, contributed to, participated in drafting, and signed the Registration Statement.

88

296. Defendant Qi Lu was at all pertinent times a Director of iQIYI and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

297. Defendant Herman Yu was at all pertinent times a Director of iQIYI and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

298. Defendant Xuyang Ren was at all pertinent times a Director of iQIYI and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

299. Defendant Victor Zhixiang Liang was at all pertinent times a Director of iQIYI and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

300. Defendant Chuan Wang was at all pertinent times a Director of iQIYI and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

301. Defendant Giselle Manon was at all pertinent times the authorized representative in the United States of the Company and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

302. The Individual Defendants and Defendants named in ¶¶ 295-301 are sometimes referred to herein as the "Director Defendants."

303. Each of the Director Defendants:

(a) signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential investors, all motivated by their own and the Company's financial interests;

(b) directly participated in the management of the Company;

89

(c) was directly involved in the day-to-day operations of the Company at the highest levels;

(d) was privy to confidential proprietary information concerning the Company and its business and operations;

(e) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(f) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(g) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(h) approved or ratified these statements in violation of the federal securities laws.

### 4. Baidu, Inc.

304. Defendant Baidu, Inc. ("Baidu") has been iQIYI's controlling shareholder since iQIYI launched in 2010. Baidu has the right to appoint, remove, and replace a majority of iQIYI's directors as long as it holds no less than 50% of the voting power of iQIYI. Four of Baidu's executive officers served on iQIYI's board at the time of the IPO: Defendant Li is the co-founder, chairman and chief executive officer of Baidu; Defendant Lu was the chief operating officer of Baidu from January 2017 to July 2018; Defendant Yu is currently the chief financial officer of Baidu; and Lu Wang is a vice president of Baidu. Under NASDAQ Stock Market Rules, iQIYI is a "controlled company" because Baidu owns more than 50% of its total voting power. Baidu owned 69.6% of iQIYI's stock immediately prior to the IPO and 100% of iQIYI's Class B Ordinary Shares immediately following the IPO.

### 5. Underwriter Defendants

90

305.     Defendant Goldman Sachs (Asia) LLC ("Goldman Sachs") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Goldman Sachs' address, as provided in the Registration Statement, is 68th Floor, Cheung Kong Center, 2 Queens Road, Central, Hong Kong.

306.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Credit Suisse's address, as provided in the Registration Statement, is Eleven Madison Avenue, New York, New York 10010.

307.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Merrill Lynch's address, as provided in the Registration Statement, is One Bryant Park, New York, NY 10036.

308.     Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. China Renaissance's address, as provided in the Registration Statement, is Unit 8107-08, Level 81, International Commerce Centre, 1 Austin Road West, Kowloon, Hong Kong.

309.     Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Citigroup's address, as provided in the Registration Statement, is 388 Greenwich Street, New York, NY 10013.

310.     Defendant UBS Securities LLC ("UBS") is an investment banking firm that acted as an underwriter of the Company's IPO, helping to draft and disseminate the IPO documents.

UBS' address, as provided in the Registration Statement, is 1285 Avenue of the Americas New York, NY 10019.

311.    Defendants Goldman Sachs, Credit Suisse, and Merrill Lynch were the lead underwriters for the IPO.

312.    Defendants Goldman Sachs, Credit Suisse, Merrill Lynch, China Renaissance, Citigroup, and UBS are referred to herein as the "Underwriter Defendants."

313.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)    The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from iQIYI, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)    The Underwriter Defendants also demanded and obtained an agreement from iQIYI and the Individual Defendants that iQIYI would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)    Representatives of the Underwriter Defendants also assisted iQIYI and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of iQIYI, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's

92

most up-to-date operational and financial results and prospects.

(d)      In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with iQIYI's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which iQIYI securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about iQIYI would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and iQIYI's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, iQIYI's existing problems as detailed herein.

(e)      The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiffs and the other members of the Securities Act Class.

314.      iQIYI, the Director Defendants, Baidu, and the Underwriter Defendants are referred to collectively as "Securities Act Defendants."

## XVII.    THE MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS

315.      On March 29, 2018, iQIYI completed the IPO pursuant to the Offering Documents and issued 125,000,000 ADSs to the public at the offering price of $18.00 per share. iQIYI reaped approximately $2,182,500,000 in proceeds from IPO, after underwriting discounts and commissions.

316.      The Securities Act Defendants negligently prepared the Offering Documents, and

93

as a result, they contained false and misleading statements that inflated important operating and financial performance metrics and created an inaccurate portrait of the value of iQIYI's business for investors.

317.    Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

### A. iQIYI's Offering Documents Contained False or Misleading Statements about User Numbers

318.    The Registration Statement stated that iQIYI's DAU numbers were higher than they actually were. The Registration Statement also stated that the Company has "***a massive and highly engaged user base, which drives [its] revenue growth***."

319.    The Registration Statement also stated that, "[b]etween the fourth quarters of 2016 and 2017, *[the Company's] average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million,* and [its] average mobile MAUs increased by 3.9% from 405.4 million to 421.3 million."

320.    Similarly, the Registration Statement stated, "[b]etween the fourth quarters of 2015 and 2016, *[the Company's] average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million*, and [its] average mobile MAUs increased by 10.9% from 365.5 million to 405.4 million."

321.    The statements referenced in ¶¶ 318-320 were materially false and misleading because data provided by two leading research firms that publish industry reports on China's mobile internet market, QuestMobile Research Institute and Aurora Mobile Limited, show iQIYI had substantially fewer mobile DAUs than Defendants disclosed in the Registration Statement.

322.    Indeed, as set forth in Section XIV(A)(5), iQIYI overstated it DAUs for the fourth quarters of 2015, 2016, and 2017 in the following amounts and percentages as shown in the

94

following summary table:

| iQIYI's Average Mobile Daily Active Users (in millions) | | | | |
|---|---|---|---|---|
| Time Period | DAUs as Disclosed by iQIYI | DAUs According to QuestMobile | Amount overstated vs. QuestMobile | Percentage overstated vs. QuestMobile |
| 2015 Q4 | 88.3 | 59.0 | 29.3 | 50.0% |
| 2016 Q4 | 125.4 | 94.0 | 31.4 | 33.4% |
| 2017 Q4 | 126.0 | 113.0 | 13.0 | 11.5% |

323. Additionally, Aurora reported that iQIYI had just 86.1 million mobile DAU in December 2017—far fewer than the 126 million mobile DAU the Registration Statement disclosed for the fourth quarter of 2017.

**B. iQIYI's Offering Documents Contained False or Misleading Deferred Revenue Figures**

324. iQIYI's Offering Documents similarly misrepresented the amount of iQIYI's deferred revenue.

325. The Registration Statement stated iQIYI's customer advances and deferred revenue was *RMB339,880,000* as of December 31, 2015; *RMB796,703,000* as of December 31, 2016; and *RMB1,633,649,000* as of December 31, 2017.

326. The statements referenced in ¶¶ 324-325 were materially false and misleading because (i) reliable data in third party credit reports obtained by Plaintiffs show that the deferred revenue of iQIYI's operating subsidiaries was substantially lower than Securities Act Defendants disclosed in the Registration Statement; and (ii) Securities Act Defendants violated GAAP and iQIYI's own revenue recognition policies.

327. Indeed, as set forth in Section XIV(A)(6), credit reports obtained by Plaintiffs on iQIYI show that the deferred revenue amounts the Company reported in the Registration Statement are inaccurate:

| iQIYI's Deferred Revenue (RMB in thousands) | | | |
|---|---|---|---|
| | 2015 | 2016 | 2017 |
| Deferred Revenue as Reported in Registration Statement | 339,880 | 796,703 | 1,633,649 |
| Deferred Revenue Reported for VIEs | 93,963 | 300,037 | 877,206 |
| Overstatement of Deferred Revenue | 245,917 | 496,666 | 756,443 |
| Percentage Overstatement of Deferred Revenue | 261.7% | 165.5% | 86.2% |

328. Notably, the deferred revenue that Securities Act Defendants chose to report within their Registration Statement was wrong, and the deferred revenue reported in iQIYI's credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's VIEs. Filings with the SAIC and PRC tax authorities are the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers often operate beyond the reach of criminal and civil judgments and sanctions imposed by American courts but are subject to penalties imposed in China for filing false documents with the SAIC or PRC tax authorities. Further, ASC 810 and iQIYI's own accounting policies required the Company to consolidate its VIEs' deferred revenue in its financial statements.

329. As of the date this action was filed, iQIYI's stock price had fallen below its IPO price, damaging Plaintiffs and other Class members.

## XVIII. CLASS ALLEGATIONS

330. Plaintiffs bring the Securities Act Claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired iQIYI ADSs in the IPO or purchased iQIYI ADSs thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO and were damaged thereby (the "Securities Act Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal

96

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

331. The members of the Securities Act Class are so numerous that joinder of all members is impracticable. While the exact number of Securities Act Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Securities Act Class. Record owners and other members of the Class may be identified from records maintained by iQIYI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

332. Plaintiffs' claims are typical of the claims of the members of the Securities Act Class. All members of the Securities Act Class were similarly affected by the Securities Act Defendants' allegedly wrongful conduct in violation of the Securities Act as complained of herein.

333. Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and have retained counsel competent and experienced in class and securities litigation.

334. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

(a) Whether Securities Act Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b) Whether the Offering Documents were negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein;

97

(c) Whether, and to what extent, the market price of iQIYI common stock and exchange-traded options on such common stock was artificially inflated because of the material misstatements alleged herein;

(d) Whether Baidu and the Individual Defendants were controlling persons of iQIYI; and

(e) Whether the members of the Securities Act Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

335. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

336. Plaintiffs, as set forth in their respective Certifications previously filed with the Court and incorporated herein, purchased the Company's securities during the Class Period pursuant and traceable to the Registration Statement.[41]

## XIX. CAUSES OF ACTION

### COUNT III

**Violations of Section 11 of the Securities Act Against All Securities Act Defendants**

337. Plaintiffs incorporate Sections XIV-XVIII above by reference.

338. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Securities Act Defendants.

---

[41] *See* ECF No. 25-3.

339. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

340. Securities Act Defendants are strictly liable to Plaintiffs and the Securities Act Class for the misstatements and omissions.

341. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

342. By reason of the conduct herein alleged, each Securities Act Defendant violated or controlled a person who violated §11 of the Securities Act.

343. Plaintiffs acquired iQIYI securities pursuant to the Registration Statement.

344. At the time of their purchases of iQIYI securities, Plaintiffs and other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

345. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT IV

**Violations of Section 15 of the Securities Act Against Baidu and the Individual Defendants**

346. Plaintiffs incorporate Sections XIV-XVIII above by reference.

347. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

99

348. The Individual Defendants were controlling persons of iQIYI by virtue of their positions as directors or senior officers of iQIYI. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of iQIYI. The Company controlled the Individual Defendants and all of iQIYI's employees.

349. Baidu and the Individual Defendants were culpable participants in the violations of §11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

350. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Securities Act Class, pray for judgment and relief as follows:

A. declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

B. awarding damages in favor of Plaintiffs and the other Securities Act Class members against all Securities Act Defendants, jointly and severally, together with interest thereon;

C. awarding Plaintiffs and the Securities Act Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

100

D. awarding Plaintiffs and other members of the Securities Act Class such other and further relief as the Court may deem just and proper.

## XX. DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury as to both the Exchange Act Claims and the Securities Act Claims.

DATED: June 1, 2021

Respectfully submitted,
**THE ROSEN LAW FIRM, P.A.**

*/s/ Phillip Kim*
Phillip Kim
Laurence M. Rosen
Daniel Tyre-Karp
Jing Chen
275 Madison Avenue, 40th Floor
New York, NY 10116
Tel: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com
dtyrekarp@rosenlegal.com
jchen@rosenlegal.com

James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the Class*