UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE iQIYI, INC. SECURITIES LITIGATION | Master File No. 1:20-cv-01830-DG-TAM<br><br>August 30, 2021 |

**LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS ................................................................ 3

     A.   iQIYI Reaped Over $2.0 Billion In Cash From American Investors In Its IPO..... 3

     B.   Defendants Lured Investors By Touting iQIYI's Key Financial And Operating
          Performance Metrics .................................................................................... 4

          1.   Offering Documents Contained False And Misleading Statements ........... 4

          2.   Defendants Touted Inflated Viewership Metrics And Revenues
               Throughout The Class Period ........................................................ 4

     C.   Investors Ultimately Learned The Truth Over The Course Of Several Events ...... 6

III. ARGUMENT ......................................................................................................... 6

     A.   Legal Standard On A Motion To Dismiss ............................................................ 6

     B.   Defendants Overstated DAUs, Revenue, And Deferred Revenue......................... 7

          1.   The Complaint Adequately Alleged Actionable Misstatements................. 7

               a.   Daily Active Users Were Overstated ............................................. 8

               b.   iQIYI Overstated Deferred Revenue ......................................... 10

               c.   Membership Services Revenue Was Overstated .......................... 14

               d.   iQIYI Improperly Accounted For Its Xin'ai Sports Investment ... 16

          2.   The Complaint Adequately Alleges Strong Inferences Of Scienter ......... 19

               a.   iQIYI's User Numbers And Revenue Figures Were Critical To
                    Its Core Operations ................................................................... 20

               b.   Defendants' Concealment Of Investigations Supports A Strong
                    Inference Of Scienter ................................................................ 22

               c.   iQIYI Knew its Accounting Treatment of Xinai Sports Violated
                    GAAP and Misled Investors ....................................................... 23

               d.   Additional Evidence Supports A Strong Inference Of Scienter ... 24

          3.   The Complaint Adequately Alleges Loss Causation .............................. 24

a.      The First Partial Disclosure Established Loss Causation ............. 25

b.      The Final Partial Disclosure Established Loss Causation............. 26

C.      The Complaint Alleges Viable Securities Act Claims........................................ 28

1.      Plaintiffs Suffered Damages And Have Section 11 Standing................... 28

2.      The Complaint's Section 11 Claim Alleges Actionable Misrepresentations In The Offering Documents...................................... 31

a.      The Section 11 Claim Does Not Sound In Fraud ........................ 32

b.      The UW Defendants Are Not Subject To Heightened Pleading Standards................................................................................. 33

c.      Plaintiffs Are Not Required To Allege Scienter For Section 11 .. 34

IV.      THE COMPLAINT ADEQUATELY ALLEGED SECTIONS 20(a) AND 15............... 35

V.      CONCLUSION...................................................................................................... 35

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A-Power Energy Generation Sys. Ltd. Securities Litigation*,
2012 WL 1983341 (C.D. Cal. May 31, 2012) ........................................................9, 13

*In re Adelphia Commc'ns Corp. Securities & Derivative Litigation*,
2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007)...........................................................33

*In re Advanced Battery Technologies, Inc. Securities Litigation*,
2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)........................................11, 12, 13, 14

*In re Aegean Marine Petroleum Network, Inc. Securities Litigation*,
2021 WL 1178216 (S.D.N.Y. Mar. 29, 2021) ...........................................................22

*AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*,
2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005).............................................................9

*In re Alcatel Securities Litigation*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005*)*.......................................................................33

*Alpern v. UtiliCorp United, Inc.*,
84 F.3d 1525 (8th Cir. 1996) ....................................................................................29

*In re Ambac Financial Grp., Inc. Securities Litigation*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................................19

*In re AmTrust Financial Services, Inc. Securities Litigation*,
2020 WL 2787117 (S.D.N.Y. Apr. 20, 2020)...........................................................18

*In re AOL Time Warner, Inc. Securities & "ERISA" Litigation*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004).......................................................................30

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).........................................9, 21, 22, 34, 35

*In re Autodesk, Inc. Securities Litigation*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) ......................................................................12

*In re Avon Securities Litigation*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)...........................................................24

*In re Barclays Bank PLC Securities Litigation*,
2016 WL 3235290 (S.D.N.Y. June 9, 2016) .............................................................29

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................................26

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
    2021 WL 2646353 (E.D.N.Y. June 28, 2021) .........................................................26

*In re Bristol Myers Squibb Co. Securities Litigation*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)......................................................................27

*In re Broderbund/Learning Co. Securities Litigation*,
    294 F.3d 1201 (9th Cir. 2002) .................................................................................28

*Brown v. China Integrated Energy, Inc.*,
    875 F. Supp. 2d 1096 (C.D. Cal. 2012) ...................................................................11

*Central Laborers' Pension Fund v. SIRVA, Inc.*,
    2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) .....................................................28, 29

*In re Centerline Holding Co. Securities Litigation*,
    380 F. App'x 91 (2d Cir. 2010) ...............................................................................23

*Central States, Southeast & Southwest Areas Pension Fund
    v. Federal Home Loan Mortgage Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ...............................................................................26

*In re Chicago Bridge & Iron Co. N.V. Securities Litigation*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) .........................................................18

*In re China Education Alliance, Inc. Securities Litigation*,
    2011 WL 4978483 (C.D. Cal. Oct. 11, 2011)...........................................................7

*In re China Mobile Games & Entm't Grp., Ltd Securities Litigation*,
    2016 WL 922711 (S.D.N.Y. Mar. 7, 2016)..............................................................26

*In re China Valves Technology Securities Litigation*,
    979 F. Supp. 2d 395 (S.D.N.Y. 2013).......................................................................11

*In re China XD Plastics Co. Ltd. Securities Litigation*,
    2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016) .......................................................9, 14

*Christine Asia Co. Ltd. v. Ma*,
    718 F. App'x 20 (2d Cir. 2017) ...........................................................................7, 16

*In re CINAR Corp. Securities Litigation*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) .................................................................32, 34

*In re CitiGroup Inc. Bond Litigation*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010)......................................................................32

iv

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*,
2010 WL 6617866 (E.D.N.Y. Dec. 23, 2010) ............................................................30

*In re Cognizant Technology Solutions Corp. Securities Litigation*,
2020 WL 3026564 (D.N.J. June 5, 2020) ...........................................................15, 16

*In re Computer Associates Class Action Securities Litigation*,
75 F. Supp. 2d 68 (E.D.N.Y. 1999) .........................................................................9

*Dean v. China Agritech, Inc.*,
2011 WL 5148598 (C.D. Cal. Oct. 27, 2011) ...........................................................11

*DoubleLine Capital LP v. Odebrecht Finance, Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018) ...............................................................25, 28

*Dresner v. Utility.com, Inc.*,
371 F. Supp. 2d 476 (S.D.N.Y. 2005) ......................................................................10

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ..............................................................................................25

*Eastman Kodak Co. v. Henry Bath LLC*,
936 F.3d 86 (2d Cir. 2019) ......................................................................................9

*In re Elan Corp. Securities Litigation*,
2004 WL 1305845 (S.D.N.Y. May 18, 2004) .....................................................23, 32

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ..............................................................................................26

*Fait v. Regions Financial Corp.*,
655 F.3d 105 (2d Cir. 2011) ...................................................................................18

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004) .....................................................................10

*Fresno County Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...............................................................33, 34

*Freudenberg v. E*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................................................21, 27

*In re Fuwei Films Securities Litigation*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009) .....................................................................26

*In re General Electric Co. Securities Litigation*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012) ...................................................................9, 10

v

*In re Gentiva Securities Litigation*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...............................................................27, 28

*In re Global Crossing, Ltd. Securities Litigation*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) .....................................................................19

*Gordon v. Vanda Pharmaceuticals Inc.*,
   2021 WL 911755 (E.D.N.Y. Mar. 10, 2021) ......................................................25, 26

*Harris v. AmTrust Financial Services, Inc.*,
   649 F. App'x 7 (2d Cir. 2016) .................................................................................14

*Harris v. AmTrust Financial Services, Inc*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015),
   *aff'd,* 649 F. App'x 7 (2d Cir. 2016) ..................................................................18, 19

*Henning v. Orient Paper, Inc.*,
   2011 WL 2909322 (C.D. Cal. July 20, 2011) ..................................................9, 12, 14

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ...............................................................................................31

*In re Hi-Crush Partners L.P. Securities Litigation*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ......................................................20, 21

*Ho v. Duoyuan Global Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012) ...................................................................7, 8, 9

*In re IMAX Securities Litigation*,
   272 F.R.D. 138 (S.D.N.Y. 2010) .............................................................................27

*In re Initial Public Offering Securities Litigation*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ......................................................................31

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ......................................................................................22

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .....................................................26, 27

*Jiajia Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020) .......................................................................33

*In re JP Morgan Chase Securities Litigation*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) .......................................................................33

*In re Jumei Int'l Holding Ltd. Securities Litigation*,
   2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ...............................................................33

*In re KeySpan Corp. Securities Litigation*,
   2003 WL 21981806 (E.D.N.Y. July 30, 2003).................................................................16

*In re L&L Energy, Inc. Securities Litigation*,
   908 F. Supp. 2d 1147 (W.D. Wash. 2012).................................................................11, 14

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
   2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)...........................................................32, 33

*Lea v. TAL Education Group*,
   837 F. App'x 20 (2d Cir. 2020) .................................................................................26

*Lighthouse Financial Grp. v. Royal Bank of Scotland Group, PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012).......................................................................10

*Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund*,
   608 F.2d 55 (2d Cir. 1979) .......................................................................................22

*In re Lions Gate Entertainment Corp. Securities Litigation*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016)...........................................................................23

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)......................................................................................31

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)..................................................................12, 13

*Longo v. OSI Sys., Inc.*,
   2021 WL 1232678 (C.D. Cal. Mar. 31, 2021)...........................................................26

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ....................................................................................20

*In re Marsh & Mclennan Cos., Inc. Securities Litigation*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................................................33

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)......................................................................................................7

*Maverick Fund, L.D.C. v. Comverse Technology, Inc.*,
   801 F. Supp. 2d 41 (E.D.N.Y. 2011) ........................................................................25

*Menaldi v. Och-Ziff Capital Management Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016).......................................................................23

*Merzin v. Provident Financial Grp., Inc.*,
   311 F. Supp. 2d 674 (S.D. Ohio 2004) .....................................................................29

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................................27

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)....................................................................................30

*In re Netflix, Inc. Securities Litigation*,
   2005 WL 1562858 (N.D. Cal. June 28, 2005).....................................10, 11, 12, 18, 19, 29

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013) ..............................................................................14, 15

*In re New Oriental Education & Technology Grp. Securities Litigation*,
   988 F. Supp. 2d 406 (S.D.N.Y. 2013).......................................................................27

*In re NIO, Inc. Securities Litigation*,
   2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021)...........................................................33

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................24

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................18, 19

*In re Openwave Sys. Securities Litigation*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007).......................................................................27

*In re OSG Securities Litigation*,
   971 F. Supp. 2d 387 (S.D.N.Y. 2013).................................................................32, 33

*Pierce v. Morris*,
   2006 WL 2370343 (N.D. Tex. Aug. 16, 2006)...........................................................29

*Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust
   v. J.P. Morgan Acceptance Corp.*,
   2012 WL 601448 (E.D.N.Y. Feb. 23, 2012)..............................................................30

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).............................................................24

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)....................................................................25, 27

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).............................................................................33, 34, 35

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*,
   339 F. Supp. 3d 169 (S.D.N.Y. 2018).......................................................................15

*Sanders v. Realreal, Inc.*,
2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ........................................................10

*In re Sanofi Securities Litigation*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015),
*aff'd sub nom. Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ........................................................................34, 35

*Schick v. Ernst & Young*,
141 F.R.D. 23 (S.D.N.Y. 1992) ........................................................................10

*In re Scholastic Corp. Securities Litigation*,
252 F.3d 63 (2d Cir. 2001) ........................................................................10, 20

*Set Capital LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) ........................................................................31

*Shaev v. Baker*,
2017 WL 1735573 (N.D. Cal. May 4, 2017) ........................................................15

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
248 F. Supp. 3d 428 (S.D.N.Y. 2017) ........................................................33

*Sinay v. CNOOC Ltd.*,
554 F. App'x 40 (2d Cir. 2014) ........................................................................22

*In re Snap Inc. Securities Litigation*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) ........................................................30

*Snellink v. Gulf Resources, Inc.*,
870 F. Supp. 2d 930 (C.D. Cal. 2012) ........................................................11, 14, 26

*In re Take-Two Interactive Securities Litigation*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................6, 7, 20

*In re Turquoise Hill Resources Ltd. Securities Litigation*,
2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ........................................................24

*In re Twinlab Corp. Securities Litigation*,
103 F. Supp. 2d 193 (E.D.N.Y. 2000) ........................................................31

*United States v. Rittweger*,
2003 WL 22290228 (S.D.N.Y. Oct. 6, 2003) ........................................................22

*In re Vivendi, S.A. Securities Litigation,*
838 F.3d 223 (2d Cir. 2016)..................................................................................................10, 25

*In re Wachovia Equity Securities Litigation,*
753 F. Supp. 2d 326 (S.D.N.Y. 2011).........................................................................................32

*In re Washington Mutual Securities, Derivative & ERISA Litigation,*
2010 WL 4272567 (W.D. Wash. Oct. 12, 2010) ........................................................................29

*In re XP Inc. Securities Litigation,*
2021 WL 861917 (E.D.N.Y. Mar. 8, 2021) .................................................................................23

**Statutes**

15 U.S.C. § 77(k)(e)(1) ..........................................................................................................28, 30

15 U.S.C. § 78u-4(b)(2)(A).........................................................................................................20

## I.    INTRODUCTION[1]

The Complaint alleges claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") against iQIYI, a Chinese online entertainment service company, and certain of its executives, for misrepresentations made from March 29, 2018 through August 13, 2020, inclusive (the "Class Period").  The Complaint also alleges strict liability claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act")  against iQIYI, and certain of its executives, directors, and underwriters in connection with iQIYI's March 29, 2018 $2.25 billion initial public offering ("IPO").  In order to raise $2.25 billion in its IPO at the highest possible price per share, Defendants inflated iQIYI's viewership figures—measured as the number of Daily Active Users ("DAUs"), as well as deferred revenue.  Their goal was to make iQIYI's business appear to be larger and more successful.  This inflation of viewership figures and revenues was difficult to conceal and was ultimately uncovered.

Investors began to learn the truth on April 7, 2020, when global financial research firm Wolfpack Research released a report detailing that iQIYI overstated its user base, revenue, and deferred revenue (the "Wolfpack Report"), causing the Company's share price to drop 4.3% over two days.  To mitigate its share price decline, iQIYI immediately reassured investors that the

---

[1] Undefined terms have the same meaning as set forth in the Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint," ECF No. 104), cited as "¶__".  "Plaintiffs" shall refer to Lead Plaintiffs Robert J. Gereige, M.D. and Ronald L. Hershberger.  "Defendants" shall refer to iQIYI, Inc. ("iQIYI" or the "Company"), Baidu, Inc. ("Baidu"), Yu Gong, Xiaodong Wang, Robin Yanhong Li, Qi Lu, Herman Yu, Xuyang Ren, Victor Zhixiang Liang, Chuan Wang and Giselle Manon.  "UW Defendants" shall refer to Goldman Sachs (Asia) LLC, Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith, Incorporated, China Renaissance Securities (Hong Kong) Limited, Citigroup Global Markets Inc., and UBS Securities LLC.  "MTD" shall refer to Defendants' memorandum in support of their motion.  "UW's MTD" shall refer to the UW Defendants' memorandum in support of their joinder in Defendants' motion.  Additionally, because Plaintiffs are filing a single opposition in response to both motions and for both Sections 10(b) and 11 claims, any references to "Defendants" or "Individual Defendants" in the context of elements or standards relevant only to Section 10(b) refer only to the "Exchange Act Defendants."

Wolfpack Report was flawed. However, investors learned the full truth on August 13, 2020, when Defendants disclosed what they admittedly had known for approximately four months—that the SEC and NASDAQ had already initiated investigations into iQIYI based on the allegations contained in the Wolfpack Report, causing iQIYI's share price to fall by another 11.4%.[2]

Defendants' motion primarily attacks the Wolfpack Report, credit reports, and third-party reports from leading industry research firms, claiming that any contradictions between the Company's SEC filings and such reports cannot establish falsity because the reports are biased, inaccurate, or unreliable. However, in cases such as this where plaintiffs allege that a company's financial figures are overstated as compared to its Chinese regulatory or tax filings, courts regularly hold the complaint adequately pleads falsity. *See* Section III.B.1. Courts routinely find as credible reports filed with the State Administration for Industry and Commerce ("SAIC") and other People's Republic of China ("PRC") filings, such as tax filings and credit reports that aggregate a company's financials. *Id.*

As to scienter, DAUs, revenue, and deferred revenue figures were critical, and iQIYI's management widely reported and consistently discussed these metrics with analysts on conference calls. Second Circuit law instructs courts to infer defendants' knowledge of matters that represent a significant part of the company's business and are critical to the company's core operations. *See* Section III.B.2.

---

[2] Interestingly, the investigations into iQIYI come in the midst of a heightened concern over transparency issues with China-based companies in general. Indeed, at the forefront of the U.S. Securities and Exchange Commission's ("SEC") recent agenda has been a growing concern over "Chinese companies [] systematically flouting U.S. rules," which pressured lawmakers to conduct "thorough investigations of U.S. listed Chinese companies' concerning lack of transparency." *See* Ex. 1. These problems prompted SEC Chairman Gary Gensler to issue a statement on investor protection on July 30, 2021, asking his staff to "engage in targeted additional reviews of filings for companies with significant China-based operations" because these issues "are at the heart of the SEC's mandate to protect investors in U.S. capital markets." *See* Ex. 2.

2

The Complaint adequately pleads loss causation. A corrective disclosure may take two days before its effects are fully incorporated into the stock price. And announcements of governmental investigations can establish loss causation where, as here, the investigation is focused on the very subject matter forming the basis of Defendants' misrepresentations. *See* Section III.B.3.

Defendants' and UW Defendants' efforts to dismiss the Section 11 claim also falls flat. Statutory damages are measured using iQIYI's stock price on the date a complaint alleging a Section 11 claim is first filed—not the date when a related Section 10(b) claim is first filed. Under this correct method, Plaintiffs have suffered Section 11 damages. *See* Section III.C.1. Nor does the Section 11 claim sound in fraud because it is based on some of the same misrepresentations alleged in the Section 10(b) claim. An overwhelming majority of cases hold that when, as here, a complaint separates its Sections 10(b) and 11 claims, and disclaims all fraud as to the Section 11 claim, the Section 11 claim does not sound in fraud. *See* Section III.C.2. The Court should deny Defendants' motions in their entirety.

## II.    STATEMENT OF RELEVANT FACTS

### A.    iQIYI Reaped Over $2.0 Billion In Cash From American Investors In Its IPO

iQIYI—the self-proclaimed Netflix of China—is a PRC-based online video streaming entertainment provider. ¶¶22–23. iQIYI generates revenue from two primary sources: (i) monthly, quarterly, or annual membership subscriptions, and (ii) advertising. Both are dependent on, and a function of, the number of customers subscribing to iQIYI's service and viewing its programs. ¶24.

Notwithstanding the façade iQIYI created to appear as if it abided by all applicable SEC rules and regulations concerning its reporting and disclosure requirements, iQIYI in reality was an opaque organization, making it difficult for investors to independently verify iQIYI's reported

3

figures and to understand iQIYI's corporate structure and accounting methods both prior to and during the Class Period. ¶25. Indeed, iQIYI operated through a complex web of companies, and third-party research and governmental filings related to iQIYI's operations were not readily accessible to U.S. investors due to this complex corporate web, limitations imposed by the Chinese government, and language barriers. ¶¶25–27.

**B.      Defendants Lured Investors By Touting iQIYI's Key Financial And Operating Performance Metrics**

**1.      Offering Documents Contained False And Misleading Statements**

On March 29, 2018, iQIYI completed its IPO pursuant to the Offering Documents, issuing 125 million ADSs at $18.00 per share—reaping iQIYI $2.25 billion in proceeds. *Id.* The Offering Documents contained materially overstated DAU and deferred revenue figures. ¶¶316–328.

**2.      Defendants Touted Inflated Viewership Metrics And Revenues Throughout The Class Period**

Prior to and throughout the Class Period, Defendants inflated key metrics to make iQIYI appear more successful. Because a majority of iQIYI's revenue depends on the number of users subscribed to iQIYI, the key metrics to which investors look when investing in streaming companies like iQIYI are DAUs and membership services (*i.e.*, subscription) revenue generated from those users. ¶¶30–34. Relatedly, investors also tracked iQIYI's deferred revenues which represented its pipeline of subscription revenue that it would recognize ratably over the monthly, quarterly, or annual subscription period. *Id.*

Defendants touted materially inflated DAUs in iQIYI's Offering Documents and 2018 and 2019 annual reports. ¶36. Two leading industry research firms that cover China's mobile internet market—QuestMobile Research Institute ("QuestMobile") and Aurora Mobile Limited ("Aurora")—reported that the true average DAUs were substantially lower than iQIYI reported to investors. ¶41. Specifically, according to QuestMobile, iQIYI overstated its DAUs for 2015,

4

2016, and 2017 by 50%, 33.4%, and 11.5%, respectively, and for the full years 2018 and 2019 by 10.4% and 22.5%, respectively. *Id.* Likewise, according to Aurora, between December 2017 and March 2019, iQIYI never had more than 90 million mobile DAU despite the Company reporting 126 million mobile DAU for the fourth quarter of 2017 and 135.4 million mobile DAU for 2018. ¶¶42–43. Notably, Plaintiffs were able to obtain the QuestMobile and Aurora data only after conducting extensive research and data analysis of PRC media reports and archived industry reports, which are published only in Chinese and not readily obtainable by investors. ¶41.

Defendants also materially inflated iQIYI's deferred revenue for the years 2015 to 2017. ¶59. Specifically, according to Chinese credit reports detailing financial data from iQIYI's Variable Interest Entities' ("VIEs") PRC tax filings, iQIYI overstated its deferred revenue for the years 2015, 2016, and 2017 by 261.7%, 165.5%, and 86.2%, respectively. ¶¶59–60.

Defendants similarly misstated iQIYI's membership services revenue. ¶47. According to fundamental accounting concepts governing the relationship between membership services revenue and deferred revenue, deferred revenues are positively correlated with the increase in paying members and corresponding increase in membership services revenue that iQIYI was reporting. ¶¶52–54. But, based upon an analysis performed on historical data from the Class Period, the previously highly-correlated relationship began inexplicably diverging during the fourth quarter of 2018 ("Q4 FY 2018") and the first quarter of 2019 ("Q1 FY 2019")—signaling that iQIYI's revenue metrics were overstated. ¶¶53–58.

Furthermore, to mask the difference between iQIYI's actual figures and its overstated reported figures, iQIYI entered into a joint venture on August 6, 2018 called Beijing Xin'ai Sports Media Technology Co., Ltd ("Xin'ai"). ¶¶63–64, 79. Defendants explained that Xin'ai was a crucial investment for iQIYI. ¶¶65–68. The Company claimed to purchase a 32% interest for

5

RMB32,250,000 cash and a promise to provide RMB763,750,000 of future goods and services. iQIYI violated GAAP accounting standards by accounting for its obligation to transfer goods and services to Xin'ai in the future as deferred revenue. This treatment was improper and misleading because GAAP accounting standards required iQIYI to record that future obligation as a liability. ¶¶69–86. iQIYI thus overstated its deferred revenue by RMB763,750,000 as a result of the Xin'ai transaction. ¶87.

### C.    Investors Ultimately Learned The Truth Over The Course Of Several Events

On April 7, 2020, during market hours, the Wolfpack Report revealed that iQIYI's viewership and revenue figures were materially overstated. ¶¶3, 88. The Wolfpack Report detailed iQIYI's PRC regulatory filings and third-party Chinese research and financial reports, showing how and why iQIYI overstated its DAUs, membership services revenues, and deferred revenues. ¶¶88–91. As a result, iQIYI's share price fell 4.3% over the course of two days. ¶92. Defendants continued to mislead investors, reassuring them that "the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company." ¶93. On August 13, 2020, after the market closed, investors learned the true extent of Defendants' wrongdoing when Defendants announced that the SEC was investigating iQIYI based on the Wolfpack Report's allegations. ¶94. iQIYI also disclosed that it engaged advisers to conduct an internal review. *Id.* Notably, on August 14, 2020, Defendant Wang revealed that Defendants knew for about four months that NASDAQ and the SEC had opened inquiries into iQIYI based on the Wolfpack Report. ¶95. As a result, iQIYI's share price fell 11.4% that same day. ¶96.

## III.    ARGUMENT

### A.    Legal Standard On A Motion To Dismiss

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept

6

all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). Courts must also construe the "complaint in the light most favorable to the [p]laintiffs, and [] draw reasonable inferences in the [p]laintiffs' favor." *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017).

### B.    Defendants Overstated DAUs, Revenue, And Deferred Revenue

#### 1.    The Complaint Adequately Alleged Actionable Misstatements

Defendants argue that the Complaint does not adequately allege that their statements concerning DAUs, membership services revenues, and deferred revenues, were false or misleading. MTD at 9.[3] Defendants' primary defense is that the Wolfpack Report is biased and PRC filings are inaccurate. MTD at 9. An author's bias or even short position does not render a report unreliable or not credible at the motion to dismiss stage. *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 563–64 (S.D.N.Y. 2012) (denying dismissal, in part, because "[e]ven though [d]efendants claim that [the analyst] is a biased party, and that it openly admits the possible inaccuracy of the [r]eport, 'the reliability of the report is a question of fact'"); *In re China Educ. All., Inc. Sec. Litig.*, 2011 WL 4978483, at *2, *4 (C.D. Cal. Oct. 11, 2011) (denying dismissal and holding that despite Chinese analyst having short positions and a "motive to cause [the] stock to decline," such issue was "a factual dispute not appropriate for resolution at this stage"). Further, Defendants attempt to distract the Court by cherry-picking reasons for why the Court should take their word that iQIYI's SEC filings were more accurate than their own Chinese tax and regulatory filings and credible third-party reports. However, at bottom, the fact that every viewership and

---

[3] Defendants effectively concede the falsity of Defendants' statements reassuring investors that the Wolfpack Report lacked merit (¶¶146–147) as Defendants did not challenge their falsity.

revenue metric that iQIYI reported was materially overstated underscores that iQIYI leveraged its opaque reporting and accounting standards to raise billions of dollars from U.S. investors in violation of the federal securities laws.

### a.    Daily Active Users Were Overstated

The Complaint alleges iQIYI overstated DAUs based on two independent third-party research firms' reports. Defendants' suggestion that QuestMobile and Aurora measured DAUs differently than iQIYI and that iQIYI's SEC filings should trump QuestMobile and Aurora reports is baseless[4] and contradicts iQIYI's prior statements. MTD at 9–11. iQIYI regularly recognizes the accuracy and reliability of third-party research firms' data, particularly QuestMobile's. At numerous earnings calls, iQIYI repeatedly cited QuestMobile data and other third-party research firms' data to support the Company's performance and also asked investors to rely on those data.[5] Now, Defendants reverse course and deny the reliability of these reputable third-party research firms' data. Such self-contradictory argument is nothing more than an improper request for the Court to credit their version of the facts over Plaintiffs' particularized and corroborative allegations from numerous third parties, the accuracy of which had been repeatedly recognized by iQIYI. *Ho*,

---

[4] QuestMobile is a leading big data analytics firm in China focusing on mobile internet and monitors more than 750 million mobile devices every month. *See* https://www.linkedin.com/company/questmobile/. Aurora also is a leading data analytics platform and data solutions provider in China and, as of December 31, 2020, its services covered approximately 1.4 billion monthly active unique mobile devices, accounting for approximately 90% of mobile device coverage in China. *See* Ex. 3.

[5] *See* Ex. 4: iQIYI Q4 2018 Earnings Call (Defendant Gong: "Thanks to the popular digital novel of same name, our iQIYI reading app ranked among the top 10 mobile apps with the fastest growing user base in 2018 according to ***QuestMobile***."); *see also* Ex. 5: iQIYI Q2 2019 Earnings Call (Dahlia Wei, iQIYI Director of Investor Relations: "For your questions on competitive landscape. I do not think there's much change now compared to 6 months ago. ***I will suggest some third-party data for you***, among others, of course. The first two is iResearch and ***QuestMobile***, which provides the platform matrix, for example, DAU, MAU and total time spent."); Ex. 6: iQIYI Q3 2019 Earnings Call (Defendant Gong: "According to ***QuestMobile***, there are more than 600 million mobile [i]nternet users in the third-tier and below cities.").

887 F. Supp. 2d at 563–64 (rejecting arguments that a report was "unreliable and unsubstantiated" because "the reliability of the report is a question of fact"). Indeed, courts have upheld falsity allegations based upon the corroboration of third-party reports, such as those at issue here. *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 2005 WL 2385854, at *12 (S.D.N.Y. Sept. 26, 2005) (falsity allegations concerning overstated financials upheld where the "estimates were shown to be wrong in a subsequent report prepared by a third-party servicer"); *Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *4, *6 (C.D. Cal. July 20, 2011) (falsity established for statements based on corroborating third-party report). The Court must construe all facts in the light most favorable to Plaintiffs. *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 (2d Cir. 2019).[6]

Defendants' argument that the Complaint does not allege the amount by which Defendants misstated iQIYI's DAUs is unavailing. MTD at 11. First, the Complaint alleges such facts by precisely charting the true amounts of iQIYI's DAUs according to QuestMobile and Aurora. ¶¶40–43. Second, Plaintiffs are not required to "precisely quantify the amount by which financial statements were overstated." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004); *In re Comput. Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (not alleging "exact amount the earnings have been overstated[] [was] not fatal"); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 403 (S.D.N.Y. 2012) (adequately

---

[6] Defendants' citation to *In re China XD Plastics Co. Ltd. Securities Litigation* is misplaced as it did not address comparing different metrics as Defendants' contend here; the court criticized plaintiffs for comparing a company's SEC filings to an incomplete set of the PRC subsidiaries' filings. 2016 WL 1241522, *5–6 (S.D.N.Y. Mar. 23, 2016). Further, Defendants' reliance on *In re A-Power Energy Generation Sys. Ltd. Sec. Litig.*, 2012 WL 1983341, at *8 (C.D. Cal. May 31, 2012) is inapposite. The court found a lack of falsity only because "[p]laintiff does not appear to have alleged that compliance with PRC's GAAP is even required when filing with the SAIC or that A–Power's subsidiaries prepared their filings in compliance with GAAP." *Id*.

alleged falsity despite not identifying "amount of overstatement").[7]

Defendants also argue that the Complaint's allegations are contradictory since the amount of DAUs reported by QuestMobile and Aurora were not identical. MTD at 11. But "absolute precision" is not required for a pleading. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 260 (S.D.N.Y. 2004). "Any information that sheds light on whether class period statements were false or materially misleading is relevant." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). That such figures differed slightly does not lessen their evidentiary value. The key point is that ***both*** showed that iQIYI's reported figures were materially inflated.[8]

### b.     iQIYI Overstated Deferred Revenue

Defendants take issue with the credit reports (which Plaintiffs obtained as part of their in-depth investigation into iQIYI's financial reporting abroad) that are based on PRC tax filings by

---

[7] Defendants' reliance on *Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*, 902 F. Supp. 2d 329 (S.D.N.Y. 2012) for this proposition (MTD at 11) is unavailing. Unlike that case, the Complaint explicitly lays out what the actual DAUs should have been and the sources from which those numbers were obtained. *Dresner v. Utility.com, Inc.* is likewise distinguishable because in addition to the amounts, the accounts alleged to have been delinquent were also different (*e.g.*, "uncollectible accounts" vs. "uncollected receivables"), so the court reasoned that "[p]laintiffs provide[d] no specific allegations regarding what accounts or types of accounts were allegedly delinquent." 371 F. Supp. 2d 476, 500 (S.D.N.Y. 2005).

[8] Defendants' assertion that the statement about iQIYI's user base being "massive" and "highly engaged" was puffery is wrong because iQIYI's user base is measured by its DAUs (*i.e.*¸ it is objectively verifiable) and Defendants made that statement in the context of "driv[ing] [iQIYI's] revenue growth." ¶124. *Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *2, *9–10 (N.D. Cal. Mar. 31, 2021) ("puffery . . . is incapable of objective verification," and misstatement "must be read in context to determine if it can be understood as an 'integral part of a representation'"). Further, despite Defendants' assertion that the Complaint failed to allege facts that the user base was not "massive," Defendants concealed the inflated nature of iQIYI's DAUs, and "so-called half-truths . . . will support claims for securities fraud." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). *In re Netflix, Inc. Securities Litigation*, 2005 WL 1562858 (N.D. Cal. June 28, 2005) is distinguishable because the statement there—"consumers love our service"— was not verifiable because the complaint did not allege metrics that could refute that claim. Defendants also argue that Plaintiffs were required to allege the amount that the membership services revenue was overstated, relying on *Schick v. Ernst & Young*, 141 F.R.D. 23 (S.D.N.Y. 1992). MTD at 16. For the same reasons laid out in Section III.B.1.a, this argument, too, fails.

10

iQIYI's VIEs and demonstrate that iQIYI inflated the deferred revenues it reported in its SEC filings.  MTD at 12; ¶59.  Defendants incorrectly claim that Plaintiffs fail to establish the credit reports are accurate and more reliable than iQIYI's SEC filings.  MTD at 12.  To the contrary, the Complaint alleges that the "deferred revenue reported in iQIYI's credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's VIEs," and that "[f]ilings with the SAIC and PRC tax authorities are the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers . . . are subject to penalties imposed in China for filing false documents with the SAIC or PRC tax authorities."  ¶¶61–62, 135.  Courts have found the same allegations sufficient.  *See Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1114–16 (C.D. Cal. 2012) (PRC filings "are 'presumably accurate' since a company submitting false information to Chinese regulators is subject to substantial fines and serious criminal penalties").[9]

Indeed, courts routinely find falsity established when a complaint alleges that a company's reported financial or operating performance metrics in its SEC filings differ from those reported by its operating subsidiaries in China.  Particularly instructive here is *In re Advanced Battery Technologies, Inc. Securities Litigation*, where the court found that falsity was established based on the discrepancy between a company's SEC and Chinese SAIC filings.  2012 WL 3758085, at *6 (S.D.N.Y. Aug. 29, 2012).[10]  There, plaintiffs alleged that a Chinese company "grossly

---

[9] For the reasons just stated, *In re China Valves Technology Securities Litigation*, 979 F. Supp. 2d 395 (S.D.N.Y. 2013) and *In re L&L Energy, Inc. Securities Litigation*, 908 F. Supp. 2d 1147, 1153 (W.D. Wash. 2012) do not compel a different result.  In any event, "[t]hough the accuracy of Plaintiffs' financial data financial data may be disputed, it would be premature to dismiss the case in light of these factual disputes at the pleading stage."  *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 938 (C.D. Cal. 2012).

[10] The court in *Advanced Battery* relied heavily on *Dean v. China Agritech, Inc.*, 2011 WL 5148598 (C.D. Cal. Oct. 27, 2011), where "***plaintiffs alleged that the results reported in China were accurate, and the SEC results grossly overstated***," and, as a result, the court "denied a motion to

11

overstated its revenue and operating margins"; specifically, "the revenue and net income that [defendant] reported to [SAIC] differs greatly from that reported in its SEC filings." *Id.* at *1-2. In denying defendants' motion to dismiss, the court relied on facts showing that SAIC filings contradicted SEC filings and found that the "[SAIC] filings strongly suggest that [defendant] kept two sets of books—one for its Chinese regulator and one for the Americans." *Id.* at *10. Although "[d]efendants also suggest[ed] that Chinese and U.S. accounting practices may differ," the court held that "establishing that would require extensive evidence from experts." *Id.*; *Orient Paper*, 2011 WL 2909322, at *4 (upholding complaint where plaintiffs relied on Chinese credit reports to demonstrate falsity of overstated financials in SEC filings and noting that "the underlying truth of the credit reports on which [p]laintiffs rely are a factual dispute inappropriate for determination on a motion to dismiss").

Defendants further call into question the authorship and reliability of the credit reports, including how the credit reports extracted the information, even though it was obtained from iQIYI's official PRC tax filings.[11]  MTD at 13.  These arguments are red herrings.  Even if the

---

dismiss the complaint, holding that ***this allegation alone sufficed to plead falsity***."  2012 WL 3758085, at *10 (emphasis added).

[11] Defendants' reliance on *In re Autodesk, Inc. Securities Litigation*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) is inapposite.  There, the court criticized plaintiffs for relying on internal reports without identifying the contents of the reports or how those contents contradicted defendants' statements.  Here, the Complaint alleges that the credit reports contain such figures—based on iQIYI's PRC tax filings—which, when compared to the reported deferred revenue numbers, demonstrate Defendants misled investors.  Reliance on *Long Miao v. Fanhua, Inc.* is also misplaced because there a short-seller report contained obvious factual inaccuracies and counsel did not attempt to corroborate the report.  442 F. Supp. 3d 774, 802–03 (S.D.N.Y. 2020).  The court held that "[w]hen properly utilized and suitably corroborated or particularized, factual representations by CWs and in short-seller reports may enable a securities fraud complaint to clear the bar set by the PSLRA."  *Id.* at 804 (citing *Ho*, 887 F. Supp. 2d at 564; *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *3–4 (S.D.N.Y. Jan. 27, 2014); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, *14 (S.D.N.Y. Sept. 10, 2012)).  Plaintiffs have done exactly that here.

credit reports were "anonymous" (and they are not),[12] the reports nevertheless are sufficient to establish falsity. *Advanced Battery*, 2012 WL 3758085, at \*6 (falsity established based on an "***anonymous*** blogger/analyst" report that concluded defendant engaged in fraud). The Complaint alleges the reports specifically covered the years 2015 to 2017 (¶¶59–60), rebutting Defendants' assertion that the Complaint does not specify the reporting periods covered. MTD at 13.

Moreover, contrary to Defendants' contention that Plaintiffs do not allege that the credit reports were prepared in accordance with GAAP (MTD at 13), the Complaint does in fact allege the information in the credit reports came from PRC tax filings that require revenue be prepared according to PRC GAAP. ¶266. The Complaint further alleges that PRC GAAP is the same as US GAAP in all material respects for revenue and deferred revenue. ¶¶255, 267–277. The court in *A-Power* suggested that it was proper to compare SEC and SAIC filings to show falsity. 2012 WL 1983341, at \*8. The only reason the court there found that plaintiff's comparison of SEC to SAIC filings was inadequate was because its complaint did not allege that "compliance with PRC's GAAP is even required when filing with the SAIC or that A-Power's subsidiaries prepared their filings in compliance with GAAP." *Id.* Here, however, the Complaint alleges the Company's SAIC filings "are required to be prepared according to PRC GAAP, which . . . is the same as U.S. GAAP for all relevant purposes," that "Chinese GAAP is substantially the same as U.S. GAAP," and that "global accounting regulators have issued reports specifically stating that there are no differences between U.S. GAAP and Chinese GAAP." ¶¶105, 110–112, 267-277.

Defendants also argue that the Complaint improperly relies on the aggerate amount of deferred revenues reported by each of iQIYI's VIEs. MTD at 12. However, Defendants' argument

---

[12] The name of the credit reporting company is CreditVision, which is a Gladtrust product. *See* http://www.gladtrust.com/products?tip=report.

13

simply ignores the Complaint's allegations that GAAP required iQIYI to consolidate its VIEs under GAAP, and it did so.  ¶¶59 n.14, 62; *Snellink*, 870 F. Supp. 2d at 938 ("Plaintiffs allege [defendant's] revenues come exclusively from its two subsidiaries, . . . thus, assuming [subsidiaries'] filings are accurate, [defendant] grossly overstated its financial position in its SEC filings.").[13]  At the very least, such questions regarding the reports' accuracy and the appropriate measurement (MTD at 12), are questions of fact not appropriately decided at this stage.  *Advanced Battery*, 2012 WL 3758085, at *10; *Orient Paper*, 2011 WL 2909322, at *4.

### c.    Membership Services Revenue Was Overstated

Plaintiffs' accounting analysis showing the positive correlation between membership services revenue and deferred revenues—and the unexplained divergence of this relationship in Q4 FY 2018 and Q1 FY 2019 (¶¶44–56)—conclusively establish that iQIYI materially overstated its membership services revenue figures.  Defendants offer several of their own possible scenarios for why the two figures ***may*** have diverged in Q4 FY 2018 and Q1 FY 2019 absent fraud.  MTD at 14–15.  Notably, Defendants neither dispute that membership services revenue and deferred revenue generally are positively correlated, nor explain what caused the divergence in those quarters.  "[T]he existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable." *New Jersey Carpenters Health Fund v. Royal*

---

[13] The cases that Defendants rely on for the point that Plaintiffs cannot aggregate the deferred revenue of iQIYI's VIEs are distinguishable.  Unlike in *Harris v. AmTrust Financial Services, Inc.*, 649 F. App'x 7, 10 (2d Cir. 2016) where the defendant company explicitly stated that its reported losses would differ between filings, the Complaint alleges that iQIYI's very own accounting policies required iQIYI to consolidate its VIEs' deferred revenues, as well as comply with GAAP in doing so, thereby assuring that the aggregate deferred revenues reported by iQIYI's VIEs equal iQIYI's reported deferred revenues.  Similarly, unlike here, the plaintiffs in *China XD*, 2016 WL 1241522, at *5 admitted that the SAIC data did not include financials for several subsidiaries and failed to even identify the defendant's subsidiaries, and the plaintiff in *L&L Energy*, 908 F. Supp. 2d at 1153 included information in the aggregate amount that the company "excluded from the SEC numbers."

*Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013).  Indeed, Defendants do not show any facts on which these competing inferences exist.  They offer hypotheticals untethered from objective reality.[14]

Defendants' feeble attempt to explain how deferred revenue could shrink in the face of rising membership and increasing revenues is easily proven false since Defendants assume that new members only join in the first month of the quarter and not the second or third months of the quarter. But, in reality, members join every month.  When corrected, it becomes clear that deferred revenue must increase when membership is increasing.  *See* Appendix A.  Defendants' other assertion that average subscription lengths might be decreasing (causing declining deferred revenue) is false because iQIYI's SEC filings show that average subscription lengths increased from six to eight months in that time frame.  ¶57.

Defendants' hypothetical scenarios should be disregarded at this stage in light of the Complaint's thorough analysis of historical data from the Class Period, showing that in Q4 FY 2018 and Q1 FY 2019, iQIYI's membership services revenues continued to increase while deferred revenues dropped drastically—indicating that one or both of the metrics were inflated. ¶53; *Shaev v. Baker*, 2017 WL 1735573, at *14 (N.D. Cal. May 4, 2017) ("[B]y focusing on other hypothetical explanations . . . , [] Defendants improperly ignore the rule that any inferences reasonably drawn from the factual allegations of the complaint must be viewed in the light most favorable to the plaintiffs."); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at

---

[14] While Defendants cite *Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 177 (S.D.N.Y. 2018) for the premise that courts can rely on "alternative explanations so obvious that they render plaintiff's inferences unreasonable," the explanations Defendants here offer are only "other factors" that hypothetically "***could*** cause" a divergence between deferred revenues and membership services revenues (MTD at 14–15), which is far from rendering Plaintiffs' explanation "***so obviously***" unreasonable.

*12 (D.N.J. June 5, 2020) (finding it "defie[d] logic at the pleading stage to infer" defendants' hypothetical scenario over plaintiffs'). Thus, such "alternative explanations" cannot overcome Plaintiffs' particularized allegations establishing that iQIYI overstated its revenues as "a motion to dismiss is not a trial." *In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806, at *16 (E.D.N.Y. July 30, 2003); *see also Christine Asia*, 718 F. App'x at 23 (remanding because court "fail[ed] to treat the complaint in the light most favorable to the [p]laintiffs, and to draw reasonable inferences in the [p]laintiffs' favor.").

Lastly, Defendants contend that the Complaint is contradictory because it benchmarks membership services revenues against deferred revenues to show that membership services revenues were inflated at one point in the Class Period, and that deferred revenues were inflated at another point. MTD at 16. But these figures were alleged as false and misleading *at different times* in the Class Period. Specifically, the Complaint alleges that Defendants overstated deferred revenue for the years 2015 to 2017 (¶¶59–60), and overstated membership services revenue after that in Q4 FY 2018 and Q1 FY 2019 (by pointing to the decline in deferred revenue) (¶¶53–56). Accordingly, Defendants' attempts to improperly conflate the Complaint's allegations fail.

### d.       iQIYI Improperly Accounted For Its Xin'ai Sports Investment

The Complaint shows how iQIYI fraudulently characterized the purchase of a 32% interest in Xin'ai Sports. ¶¶69–86. iQIYI claims it paid RMB32,250,000 cash and promised to contribute RMB763,750,000 of goods and services to Xin'ai in the future for its 32% interest. *Id.* iQIYI recorded the investment by increasing equity investments by RMB796,000,000 and crediting cash RMB32,250,000 and Deferred Revenue RMB763,750,000. *Id.* In short, iQIYI manufactured RMB763,750,000 of deferred revenue by falsely recording the future payment in kind as deferred revenue. ¶87.

As a preliminary matter, the Complaint alleges that iQIYI never promised to provide

16

RMB763,750,000 of future goods and services to Xin'ai Sports. ¶¶85–86. The audited financial statements of Wuhan DDMC, the other major equity investor in Xin'ai Sports, state that iQIYI made a RMB38.25 mm cash only investment into Xin'ai Sports and received 38.25% of the equity in return (rather than investing RMB32.25mm of cash and RMB763.75mm of non-cash consideration reported in iQIYI's financial statements for 32%).  These facts are confirmed by a document filed by DDMC with the Shanghai Stock Exchange on August 7, 2018, as well as by Qixin (a respected third-party platform aggregating SAIC and other government records in PRC). ¶85.[15]  If the Court accepts as true the three PRC financial reports Plaintiffs cite, as it must, then iQIYI never promised to provide any future goods or services to Xin'ai Sports and there can be no basis to record RMB763,750,000 of future goods and services as deferred revenue.  The accounting for the transaction was purely fictional.  By engaging in this sham accounting for its investment in Xin'ai Sports, iQIYI created RMB763,750,000 of fake deferred revenue, which it used to prop up and avoid detection of its fraudulent DAUs and revenue growth figures.  ¶¶86–87.

Even if one ignores the three corroborative financial reports showing that iQIYI never exchanged a promise to provide RMB 763,750,000 of future goods and services as part of its purchase of its interest in Xin'ai Sports (¶85), iQIYI's accounting for the transaction is still fraudulent for two additional reasons.  First, the Complaint specifically alleges that, based on the applicable accounting principles, iQIYI should have recorded its future obligations to Xin'ai as a liability—not as deferred revenue.  ¶¶77–82.  Second, iQIYI never attributed any cost of revenue to the revenue it subsequently recorded related to goods and services provided to Xin'ai as part of its investment.  ¶¶83–84.  This allowed iQIYI to falsely record all of the revenue as profit and

---

[15] Defendants dispute the reliability and accuracy of these reports.  MTD at 17–18 n.11.  For the same reasons iQIYI's tax filings are accurate and reliable, so too are these documents.

ignore all associated costs, thus, understating expenses and overstating profit. *Id.*

Defendants make two fallacious arguments for why GAAP could permit Defendants to classify its obligation as deferred revenue. First, they say that iQIYI's decision to report the obligation as deferred revenue was a "subjective judgment," which they claim creates a higher burden for Plaintiffs to establish their accounting misclassification as improper. MTD at 17. Even if one assumes that iQIYI did promise to provide RMB767,750,0000 of future goods and services to Xin'ai, GAAP still does not permit iQIYI's accounting treatment. The Complaint explains that well-accepted GAAP rules required Defendants to classify iQIYI's obligation as a liability, not deferred revenue—taking any purported subjectivity out of the equation. ¶¶77–82.[16] GAAP does not grant an entity the "subjective judgment" to misclassify liabilities on its balance sheet. Only "where there is no objective standard for an accounting decision, that decision should be construed as a statement of opinion and be analyzed under *Omnicare*." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *6 (S.D.N.Y. May 24, 2018); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (loan loss reserves "not a matter of objective fact" but "inherently subjective").[17] The types of judgments Defendants' case citations refer to are items that require estimation such as loss or other reserves or where GAAP specifically permits a choice among alternative accounting treatments.[18] Here, there is no need to estimate or make any subjective judgment and no acceptable alternative. As shown below, GAAP does not permit the accounting

---

[16] Accordingly, Defendants' citation to *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) is unavailing. Nor does *Harris v. AmTrust Financial Services, Inc.* change the calculus because, unlike here, the complaint there conceded that "management has tremendous discretion to determine the current year's loss and loss adjustment expense." 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015), *aff'd,* 649 F. App'x 7 (2d Cir. 2016).

[17] *In re AmTrust Financial Services, Inc. Securities Litigation* does not compel a contrary conclusion since the court dismissed plaintiffs' claims because they did not allege what accounting standard should have applied. 2020 WL 2787117, at *1 (S.D.N.Y. Apr. 20, 2020).

[18] *Id.* at *2; *Harris*, 135 F. Supp. 3d at 171.

18

treatment iQIYI used.  Thus, even if iQIYI's accounting treatment could be considered an opinion, it is false because Defendants made it without a reasonable basis.  *Omnicare*, 575 U.S. at 194–96.

Second, Defendants cite to ASC 610-20-32-4 for their contention that iQIYI was permitted to record its purported non-cash promise of future goods and services as deferred revenue.  MTD at 18.  Defendants incorrectly describe the provisions of ASC 610-20-32-4, as applicable to a "promise [to provide] goods or services" in the future "in exchange for a noncontrolling interest." *Id.*  ASC 610-20-32-4 actually states: "If an entity *transfers control of a distinct nonfinancial asset* or distinct in substance nonfinancial asset in exchange for a noncontrolling interest, the entity shall consider the noncontrolling interest received from the counterparty as noncash consideration and shall measure it in accordance with the guidance in paragraphs 606-10-32-21 through 32-24."[19]  ASC 610-20-32-4 applies only to a *transfer of control of a distinct nonfinancial asset*. The Xin'ai transaction does not fit the requirements for such accounting treatment because iQIYI did not "transfer control of a distinct nonfinancial asset."  At the time of its investment, it had not transferred control of any of the future goods or services to Xin'ai.  It had only made a promise to do so at some future date.  Thus, iQIYI could not treat the promise to provide future goods and services as deferred revenue under ASC 610-20-32-4.  Undoubtedly, Defendants will take issue with this obvious reading of ASC 610-20-32-4, but such accounting questions "raise issues of fact that cannot be resolved on a motion to dismiss."  *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) (whether GAAP was violated and what was "generally accepted" are factual issues not appropriate for motion to dismiss).

### 2.      The Complaint Adequately Alleges Strong Inferences Of Scienter

---

[19] A copy of ASC 610-20-32-4 is attached as Exhibit 7.

Defendants also incorrectly argue that the Complaint did not adequately allege scienter. MTD at 19. The Complaint sets forth detailed allegations that show, *inter alia*, that iQIYI's DAU and revenue figures were so critical to its core operations that Defendants knew or were reckless in not knowing that they were inflated and that Defendants concealed from investors governmental investigations regarding the truth of the Wolfpack Report's veracity. Viewed holistically, as the Court must, such allegations raise a strong inference of scienter.

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *Scholastic Corp.*, 252 F.3d at 74. When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. The "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences;'" rather, "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314, 324. That is, "a tie favors the plaintiff." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (citing *Tellabs*, 551 U.S. at 324).

<blockquote>
**a.**      **iQIYI's User Numbers And Revenue Figures Were Critical To Its Core Operations**
</blockquote>

iQIYI's DAUs, revenue and deferred revenue were critical metrics for analyzing its operating performance, and Defendants constantly touted these core metrics to investors. ¶¶172–186. The core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush*

*Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). Matters that are "critical to the long[-]term viability" of a company and affect a "significant source of income" are core operations and alone can raise a strong inference of scienter. *Id.*; *see also Atlas*, 324 F. Supp. 2d at 489–90 (high-level officers' and directors' knowledge of facts inferred when such facts were critically important to company); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010) (same).

Defendants do not dispute that iQIYI's DAUs, membership services revenues, and deferred revenues were critical to iQIYI's core operations. Thus, the Court should infer that Defendants knew of those inflated figures. DAUs generated over 75% of iQIYI's revenue and was the most accurate way for investors to assess iQIYI's overall viewership numbers. ¶¶173–174. iQIYI claimed that a "massive and highly engaged user base"—which includes DAUs—was one of its key competitive strengths and that its success "was primarily attributable" to those strengths. ¶¶175–176; *see also* ¶¶177–179. Defendants, themselves, acknowledged membership services revenues were critical to iQIYI's core operations. ¶182 ("[m]embership services . . . [was] the biggest revenue contributor for the Company."); *id.* ("[m]embership business continued to be the main engine driving our growth."). The media likewise recognized that "[i]t's clear from iQIYI's strategy [] that it intends membership services to be the anchor of its business." ¶183.

iQIYI's deferred revenue figures were likewise critical to iQIYI's business as they go hand-in-hand with membership services revenues. ¶44. Indeed, customer memberships (and the membership services revenues derived therefrom) are the largest portion of deferred revenue and represents at least 80% of total deferred revenue. ¶46.

Just as important to iQIYI's business was its investment in Xin'ai. Defendant Gong explained that Xin'ai was "an important part of [iQIYI's] content library" and similarly reaffirmed

21

that "sports content is obviously a very important racetrack for[iQIYI]."  ¶184.  The Xin'ai

transaction was also crucial to Defendants' ability to book a considerable amount of deferred

revenue at a time when membership services revenues and deferred revenues were inexplicably

diverging resulting in the finagling of GAAP accounting rules.  *Atlas*, 324 F. Supp. 2d at 490

(acknowledging core operations supports finding defendants knew or should have known about

issues in financial statements where statements issued in connection with important acquisition).

DAUs, membership services revenue, deferred revenues, and the Xin'ai investment were

all critical to iQIYI's core operations, and Defendants "had a duty to familiarize [themselves] with

the facts relevant to the core operations of the [C]ompany and the financial reporting of those

operations."  *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 2021 WL 1178216, at *46

(S.D.N.Y. Mar. 29, 2021).[20]  Accordingly, under the core operations doctrine, "[i]t is reasonable

to infer that in the course of such duties, . . . [Defendants] recognized that [iQIYI] was not in the

strong financial position that it represented publicly."  *In re Aegean*, 2021 WL 1178216 at *46.

> **b.     Defendants' Concealment Of Investigations Supports A Strong Inference Of Scienter**

Defendants falsely denied the allegations in the Wolfpack Report—without first making

any internal investigation.  ¶¶3, 157. These false exculpatory statements prove their scienter.  *Lilly*

*v. State Tchrs. Ret. Sys. of Ohio Pension Fund*, 608 F.2d 55, 62 (2d Cir. 1979); *United States v.*

*Rittweger*, 2003 WL 22290228, at *7 (S.D.N.Y. Oct. 6, 2003).  Defendants also admittedly waited

four months before telling investors that the SEC and NASDAQ were investigating iQIYI for the

---

[20] Defendants' reliance on *Jackson v. Abernathy* is misplaced because, there, plaintiff "offer[ed] no arguments other than merely stating that the MicroCool gown was a 'key product' for the [defendants]."  960 F.3d 94, 99 (2d Cir. 2020).  Here, the Complaint alleges facts as to why those matters were critically important to iQIYI, including that Defendants themselves stated as much throughout the Class Period.  *Sinay v. CNOOC Ltd.* is similarly inapposite since plaintiffs there did not even allege core operations. 554 F. App'x 40 (2d Cir. 2014).

same misconduct alleged in the Complaint.  ¶188.  Defendants' denials and concealment of the investigations demonstrate that they were aware of the severity of the Wolfpack Report's claims yet chose to keep investors in the dark until at least August 13, 2020—approximately four months after they were first informed of the investigations.  *Id.*; *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) (inference of scienter established where defendants "waited to disclose" the existence of a SEC and DOJ investigation).[21]  Defendants cite *In re Elan Corp. Securities Litigation*, 2004 WL 1305845 (S.D.N.Y. May 18, 2004), claiming that their denials of the Wolfpack Report do not support an inference of scienter because Plaintiffs have not adequately alleged that those denials were false.  MTD at 22.  However, unlike in *Elan* where defendants simply decided not to admit to wrongdoing, Defendants here affirmatively referenced the Wolfpack Report and assured investors that the report "contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations," which Defendants knew or were reckless in not knowing was not true.  ¶¶146–147.

### c.     iQIYI Knew its Accounting Treatment of Xinai Sports Violated GAAP and Misled Investors

The Complaint alleges that three independent and reliable sources in PRC reported that iQIYI made a RMB38.25 mm cash only investment into Xin'ai in return for 38.25% of the equity and that iQIYI never promised to provide Xinai with RMB763.75mm of future non-cash consideration reported in connection with its investment.  ¶85.  This evidences that iQIYI's recording of RMB736,750mm of deferred revenue was wholly fraudulent. The Complaint meets

---

[21] *In re Lions Gate Entertainment Corp. Securities Litigation*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016) and *In re XP Inc. Securities Litigation*, 2021 WL 861917 (E.D.N.Y. Mar. 8, 2021) are irrelevant. *In re Centerline Holding Co. Securities Litigation*, 380 F. App'x 91 (2d Cir. 2010) is inapposite because Plaintiffs are not premising liability on Defendants not disclosing the investigations in a timely fashion; instead, their delay serves as evidence of Defendants' bad faith efforts to conceal their wrongdoing—demonstrating scienter.

the scienter requirement because it specifically alleges "defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). There is no innocent explanation for iQIYI recording RMB736,500 million of deferred revenue based on a wholly fictional promise to provide future goods and services.[22]

> **d.     Additional Evidence Supports A Strong Inference Of Scienter**

Defendants also argue that Defendants' SOX certifications cannot support scienter. MTD at 19–21. That simply is not true. While signing SOX certifications in and of itself may not establish scienter, in situations where defendants "attest[] to the adequacy of their internal controls," as here, it provides an additional indicia of scienter when performing the holistic analysis. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) (same). Here, Defendants Gong and Wang both signed SOX certifications, certifying that the Company's internal controls over financial reporting were effective—evidencing their access and purported review of iQIYI's financial data. ¶¶192–193. Thus, Defendants Gong and Wang knew, or at the very least, were severely reckless in not knowing of the underlying facts that rendered their statements regarding their viewership figures and revenues materially false and misleading. ¶¶194–195.[23] Accordingly, the Complaint adequately alleges scienter.

> **3.     The Complaint Adequately Alleges Loss Causation**

The Complaint alleges that upon publication of the Wolfpack Report, iQIYI's share price

---

[22] Defendants also had a motive to mischaracterize the Xin'ai transaction at a time when membership services revenues and deferred revenues were inexplicably diverging and Defendants needed to manufacture substantial deferred revenue to mask this divergence and avoid detection of their fraud.

[23] *In re Turquoise Hill Resources Ltd. Securities Litigation*, 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) is distinguishable because, unlike there, the Complaint here alleges that Gong and Wang either knew or were reckless in not knowing that iQIYI's reported figures were inaccurate. ¶195.

declined 4.3% over a two-day period. ¶¶151–156. Then when iQIYI disclosed the SEC and NASDAQ investigations, its share price declined another 11%. ¶¶161–166. This demonstrates the "causal connection between the material misrepresentation and the loss" incurred. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "[A] plaintiff can establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *In re Vivendi*, 838 F.3d at 261. Loss causation is satisfied under materialization of risk when a "loss was foreseeable" and "within the zone of risk concealed by the misrepresentations." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 456 (S.D.N.Y. 2018). "[L]oss causation is governed by the traditional 'short and plain statement' rule laid out in Rule 8." *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *3 (E.D.N.Y. Mar. 10, 2021).

### a.     The First Partial Disclosure Established Loss Causation

With respect to the April 7, 2020 partial disclosure, Defendants argue that the Wolfpack Report does not support loss causation because there was no stock price decline within a day of publication of the report. MTD at 22–23. However, courts routinely hold that even if a company's stock price does not drop within one trading day of a corrective event, loss causation can still be established when the market digests the information over a two-day period. *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 49, 54 (E.D.N.Y. 2011) (stock decline over two days sufficient to establish loss causation); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 621 (S.D.N.Y. 2015) (same). Here, the Complaint adequately alleges loss causation because on April 7, 2020, the Wolfpack Report—which was 37 pages long and contained complex, cross-border accounting and financial analyses based on complex Chinese filings—was released, and at the end of the next trading day, iQIYI's stock price

25

dropped 4.3% as investors digested the information contained in the report.  ¶¶151-156.[24]

Defendants further criticize the Wolfpack Report for stating that "all [i]nformation . . . has been obtained from public sources."  MTD 23 n.15.  But, Plaintiffs obtained the so-called "already public information" only after conducting extensive research and data analysis of PRC media reports and archived industry reports, which are only published in Chinese and not readily accessible.  ¶251 n.40.  Thus, U.S. investors could not have been expected to obtain such information prior to the report's release.  The Second Circuit agrees.  In *Lea v. TAL Education Group*, despite a report stating that "all information contained herein . . . has been obtained from public sources," the Second Circuit held that the report was a sufficient corrective disclosure because "much of the information, including SAIC filings of multiple entities in a different language and Chinese court documents, was not readily accessible to investors."  837 F. App'x 20, 28 (2d Cir. 2020).[25]  Additionally, there is no real dispute that "a short seller's report can constitute a corrective disclosure."  *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021); *Gordon*, 2021 WL 911755, at *4 (same).

### b.      The Final Partial Disclosure Established Loss Causation

---

[24] *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) is distinguishable because the stock did not drop at all following the release of an article.  Nor does *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) relevant to the loss causation analysis as *Basic* does not ban plaintiffs from alleging loss causation on a multi-day drop in a motion for class certification— where loss causation is not even relevant.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) (securities fraud plaintiffs "need not" "prove loss causation in order to obtain class certification").

[25] *See also In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *9 n.12 (S.D.N.Y. Mar. 7, 2016) ("The [short seller] report contains information that was not readily accessible, including [information from] . . . financial filings in Chinese."); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (Chinese-language article in Chinese news media not public information); *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *7 (C.D. Cal. Mar. 31, 2021) (same); *Snellink*, 870 F. Supp. 2d at 942 (same).  Because such information was effectively ***not*** public, reliance on *Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*, 543 F. App'x 72 (2d Cir. 2013) is misplaced.

Courts have consistently held that announcements of government and internal investigations—such as iQIYI's announcement of the SEC, NASDAQ, and its internal investigations on August 13 and 14—constitute corrective disclosures and support loss causation. *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388 (E.D.N.Y. 2013) ("[A]n announcement regarding a governmental investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify as a partial corrective disclosure."); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 428 (S.D.N.Y. 2013) (same); *Orthofix Int'l*, 89 F. Supp. 3d at 621 (Defendant's announcement that it would be "review[ing]" its prior revenue recognition practices established loss causation).[26]

When Defendants announced the SEC investigation and internal review of iQIYI's books and records on August 13, 2020 (after the market closed), and NASDAQ's investigation on August 14, 2020—which Defendants admitted they had known for months—the truth concealed by Defendants' misrepresentations was fully revealed, causing a 11.4% stock price decline.  ¶¶159–163.  Indeed, the investigations were directly related to iQIYI's financial and operating records as well as documents related to "certain acquisitions and investments that were identified in the [Wolfpack Report]." ¶¶159–160.[27]  Because these investigations were foreseeable consequences

---

[26] *See also In re IMAX Sec. Litig.*, 272 F.R.D. 138, 149 (S.D.N.Y. 2010) ("disclosure of a government investigation may be sufficient to adequately plead loss causation"); *Freudenberg*, 712 F. Supp. 2d at 203 (same); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008) (same); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) (same); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252 (S.D.N.Y. 2007) (same).

[27] *Janbay* is distinguishable because the court found the announcement of the investigation did not "link" the "investigation to the actual fraudulent conduct." 2012 WL 1080306, at *15. In contrast, the Complaint here links the investigations to facts "identified in the [Wolfpack Report]." ¶¶159–160. Defendants similarly cite *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013) for the proposition that announcements of investigations, with nothing more, cannot constitute a corrective disclosure. However, this Court in *Gentiva* discussed *Meyer's* holding and expressly rejected it—finding that "[a]fter this review of the authorities, ultimately, ***the Court rejects the idea that the disclosure of***

27

of, and within the zone of risk concealed by, Defendants' misrepresentations, loss causation has been established under the Rule 8 pleading standard. *DoubleLine*, 323 F. Supp. 3d at 456.

### C. The Complaint Alleges Viable Securities Act Claims

#### 1. Plaintiffs Suffered Damages And Have Section 11 Standing

Defendants argue that Plaintiffs lack standing for the Section 11 claim because Plaintiffs supposedly did not suffer any loss under Section 11's damages formula. MTD at 24; UW's MTD at 3. Under Section 11, damages are measured as: "the difference between the amount paid for the security [not to exceed the IPO price] and the *value thereof* as of the time such suit was brought." 15 U.S.C. § 77(k)(e)(1). Here, the IPO price of iQIYI's stock was $18 per share, and the closing price of iQIYI's stock on April 27, 2020—when the Section 11 claim was first brought—was $17.22. Plaintiffs have thus suffered damages and are entitled to recovery.

Defendants incorrectly contend that the relevant date for measuring Section 11 damages is April 16, 2020, the filing date of the first complaint, on the basis that it contained a Section 10(b) claim that arises from the same events as the later complaints containing a Section 11 claim. MTD at 24; UW's MTD at 3-5. However, the April 16, 2020 complaint did not allege *any Section 11 claim*—the only fact relevant to this statutory analysis. The first complaint to allege a Section 11 claim—and thus the relevant date for assessing statutory damages—is the April 27, 2020 complaint. *See In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1204 (9th Cir. 2002) (Section 11 "damages must be 'measured by the difference between the amount paid for the security and its price at either the time it was sold or *the date the Section 11 claim was filed*.'"); *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, 2006 WL 2787520, at *11 (N.D. Ill. Sept. 22, 2006) (measuring damages based on complaint where "[p]laintiff first asserted its section 11 claims,"

---

*an investigation, absent an actual revelation of fraud, is not a corrective disclosure.*" 932 F. Supp. 2d at 387–88 (emphasis added).

28

rejecting argument that the proper complaint was the first complaint that only asserted Section 10(b) claims); *Merzin v. Provident Fin. Grp., Inc.*, 311 F. Supp. 2d 674, 686 (S.D. Ohio 2004) (measuring damages against date on which complaint alleged Section 11 claims instead of date of initial filing because it "would not comport with the interests of justice to allow . . . relat[ion] back to a [c]omplaint . . . for which no other party had standing to bring a Section 11 claim").

Indeed, even *In re Washington Mutual Securities, Derivative & ERISA Litigation* did not hold that the date to measure damages was necessarily the *first* filed complaint; instead, the court held that the operative complaint for damages should be the "first complaint filed in th[e] case that appears to pursue § 11 claims." 2010 WL 4272567, at \*11–12 (W.D. Wash. Oct. 12, 2010). Nor does *In re Barclays Bank PLC Securities Litigation*, 2016 WL 3235290 (S.D.N.Y. June 9, 2016) compel a contrary conclusion. While the court there used the date on which the first complaint was filed, that complaint *also contained Section 11 claims*, distinguishable from the facts here.[28]

The UW Defendants assert that even if the April 27, 2020 complaint serves as the relevant date for Section 11 damages, the proper date for the UW Defendants should be January 19, 2021 since that is when they were added to the complaint. UW's MTD at 5. The UW Defendants argue that because iQIYI's shares closed at a higher price on January 19, 2021 than the IPO price, Plaintiffs have no Section 11 damages against the UW Defendants. *Id.* This argument is meritless. The relevant date used to measure damages is when the first Section 11 claim was filed. The UW

---

[28] Thus, Defendants' other cited cases for this proposition fail for the same reasons. MTD at 24; UW's MTD at 4. Additionally, reliance on *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525 (8th Cir. 1996) is inapposite because, there, plaintiff asked the court to apply the relation-back doctrine to save his section 11 claim, which is distinguishable from here, where Defendants attempt to *defeat* Plaintiffs' Section 11 claim. *Id.* at 1542–43; *SIRVA,* 2006 WL 2787520, at \*10 (distinguishing *Alpern* for same reason). Nor does *Pierce v. Morris*, compel a different outcome since, unlike here, the same plaintiff there filed both complaints so the court did not want to give that plaintiff "two bites at the apple." 2006 WL 2370343, at\*4 (N.D. Tex. Aug. 16, 2006).

Defendants rely solely on *In re AOL Time Warner, Inc. Securities & "ERISA" Litigation*, for support, but *AOL* is inapposite because, in *AOL*, the date on which the underwriters were added to the complaint was the same date on which the "[a]mended [c]omplaint added new claims under § 11 and § 12(a)(2) of the Securities Act." 381 F. Supp. 2d 192, 203, 245–46 (S.D.N.Y. 2004).[29]

Defendants also assert that Plaintiff Hershberger has no statutory damages for shares he sold before the lawsuit because that sale price exceeded the IPO price. MTD at 24. Because Plaintiff Hershberger's damages and standing are only affected with respect to the shares he sold before the lawsuit, he continues to have damages and standing for the shares he held. (ECF No. 25-3). Accordingly, Defendants' argument is inconsequential to Plaintiff Hershberger's and the Class's right to recover damages for shares held after filing the lawsuit. At most, Defendants' argument boils down to Plaintiffs purportedly not being able to plead the exact amount of damages to which Plaintiff Hershberger is entitled. However, "[t]o survive a motion to dismiss, Plaintiffs need not plead their exact damages." *Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *9 (E.D.N.Y. Feb. 23, 2012); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Tr. Inc.*, 2010 WL 6617866, at *6–7 (E.D.N.Y. Dec. 23, 2010) ("[p]laintiffs allege that they have suffered damage in the form of a drop in the value of their investments. . . . While it remains to be seen whether [p]laintiffs can prove

---

[29] Even assuming, *arguendo*, that the April 16, 2020 or January 19, 2021 complaint is the relevant one for measuring Section 11 damages, dismissal is still not warranted since damages are measured relative to the "value" of the security "as of the time such suit was brought"—not price. 15 U.S.C. § 77(k)(e)(1); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165–66 (2d Cir. 2012) ("[U]nder § 11, the key is not . . . market price; the key is value."). Determining whether Plaintiffs proved damages is "not an appropriate question at this stage" because "'[v]alue' . . . is not necessarily equal to 'price,' and the determination of value is a fact-intensive inquiry." *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *8–9 (C.D. Cal. June 7, 2018).

their damages, they need not set forth any more with respect to damages at the pleading stage.").[30]

### 2.    The Complaint's Section 11 Claim Alleges Actionable Misrepresentations In The Offering Documents

Defendants and the UW Defendants further argue that the Complaint did not allege any actionable misrepresentations in the Offering Documents.  MTD at 25; UW's MTD at 8–10.  Not true.  "Section 11 places a relatively minimal burden on a plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) (same).  "Unlike claims brought under Section 10(b), a plaintiff bringing a claim under Section 11 '***need not allege scienter, reliance, or loss causation***.'"  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84 (2d Cir. 2021) (emphasis added).[31]  Thus, a "defendant's knowledge of the misrepresentations is not an element of a Section 11 claim; indeed, a defendant can be held liable even for an innocent misstatement."  *Twinlab*, 103 F. Supp. 2d at 203.  Additionally, unless a Section 11 claim sounds in fraud—which, here, it does not—Section 11 claims require only "notice pleading," *i.e.*, are "subject only to the 'short and plain statement' requirements of [Rule 8]."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011).

The Registration Statement materially inflated DAUs and deferred revenue figures.  ¶¶318–320, 324–325.  Contrary to the DAU and deferred revenue figures contained in the Offering Documents, reports from leading research firms, QuestMobile and Aurora, and credit reports based on iQIYI's PRC tax filings, demonstrate that iQIYI's DAUs and deferred revenue were, in reality,

---

[30] Because Defendants do not contend that Plaintiff Hershberger did not retain any shares after selling some prior to the lawsuit, *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) is inapposite.  In fact, *IPO* cuts against Defendants' other arguments concerning Plaintiffs supposedly not having damages because the share price on the date of suit was purportedly higher than the offering price.  *IPO* rejected the same argument made by defendants there, holding that "[w]hile such [p]laintiffs may indeed be unable to prove damages, that is not an appropriate question at this stage."  *Id.* at 351 n.80.

[31] The UW Defendants contend that the Section 11 claim fails for lack of loss causation.  UW's MTD at 10.  However, Plaintiffs need not establish loss causation under Section 11.

31

significantly less than those figures in the Offering Documents.  ¶¶321–323, 326–328.  These allegations easily overcome Rule 8's pleading requirements.

### a.      The Section 11 Claim Does Not Sound In Fraud

Defendants claim that the Complaint's Section 11 claim sounds in fraud because it is based on some of the same misrepresentations alleged in the Section 10(b) claim, and as such, the heightened pleading standards under Rule 9(b) apply.  MTD at 25; UW's MTD at 5-8.  But Defendants cannot force a heightened pleading standard for a Section 11 claim simply because it contains similar statements to a Section 10(b) claim.  "A Section 11 claim does not sound in fraud simply because it is based on acts that also support a claim for securities fraud under Section 10(b)."  *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 308 (E.D.N.Y. 2002).  Even if the same "false statements . . . provide the basis for both the Section 10(b) claims and the Section 11 claims," the Section 11 claims do not necessarily sound in fraud.  *Id.*  Thus, the heightened pleading standards under Rule 9(b) do not apply.

Nor do Section 11 claims sound in fraud by containing phrases such as "materially false or misleading" or "untrue statements of material fact" since such phrases "merely track[] the language of Section 11."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 375 (S.D.N.Y. 2011).  Thus, "[b]ecause '[i]t is clear that the Second Circuit did not intend *Rombach* as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard,' 'mere use of the statutory language is itself insufficient to render a complaint one that 'sounds in fraud.'"  *Id.* (citations omitted); *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 586 (S.D.N.Y. 2010) (same).[32]

---

[32] Based on that reasoning, Defendants' reliance on *Elan*, 2004 WL 1305845 is unavailing. Defendants' own cited case, *In re OSG Securities Litigation*, held that phrases such as "inaccurate and misleading" do not trigger Rule 9(b) pleading standards.  971 F. Supp. 2d 387, 405–06 (S.D.N.Y. 2013).  *Ladmen Partners, Inc. v. Globalstar, Inc.* is inapposite because, unlike here, the complaint there did not distinguish between the Exchange Act defendants and the underwriters,

Courts routinely allow plaintiffs to plead both Sections 10(b) and 11 claims in the alternative, without requiring heightened pleading standards for the Section 11 claims. *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (finding that plaintiffs are "allowed to 'plead claims in the alternative'" and thus Section 11 claims do not sound in fraud where the complaint "disclaims any allegations of fraud" and "is segregated into two parts"); *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021); *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *3 (S.D.N.Y. Jan. 10, 2017) (same); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 448 (S.D.N.Y. 2017) (same, explaining that "mere presence of fraud allegations elsewhere in the complaint does not poison the well").[33]  Even the UW Defendants' cited case, *OSG*, found that a Section 11 claim that disclaimed any allegation of "scienter or fraudulent intent" and was addressed separately from the Section 10(b) claim did not sound in fraud—even though it used phrases such as "inaccurate and misleading."  971 F. Supp. 2d at 405–06.[34]

### b.    The UW Defendants Are Not Subject To Heightened Pleading Standards

Despite the UW Defendants' contention otherwise (UW's MTD at 7–8), the allegations against the UW Defendants "are not subject to the heightened pleading requirements," even if the iQIYI Defendants were to benefit from Rule 9(b). *Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir.

---

and included allegations suggesting underwriters deliberately turned a blind eye. 2008 WL 4449280, at *12 (S.D.N.Y. Sept. 30, 2008).

[33] *Jiajia Luo v. Sogou, Inc.* is distinguishable because, unlike here, that complaint was "replete with explicit claims of fraud," including that "defendants knew or recklessly disregarded that their statements were false and misleading."  465 F. Supp. 3d 393, 408 n.7 (S.D.N.Y. 2020).

[34] The UW Defendants' cited cases are distinguishable because those complaints did not separate the claims. *See, e.g.*, *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005*); In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007).

2004).  There are no Section 10(b) claims against the UW Defendants.  The Second Circuit held that even where a Section 11 claim sounds in fraud, Rule 9(b) does not apply to underwriters if the allegations against them "sound in negligence."  *Id.* (Rule 9(b) did not apply to underwriters when complaint alleged: "each of the [u]nderwriter [d]efendants owed to the purchasers of the shares of [defendant] . . . the duty to make a reasonable and diligent investigation of the statements contained in the [p]rospectus.");  *Atlas*, 324 F. Supp. 2d at 503 (same).

The allegations against the UW Defendants here similarly sound in negligence as the Complaint alleges that they failed to conduct "an adequate and reasonable investigation into the business and operations of iQIYI, an undertaking known as a 'due diligence' investigation," which "was required of the [UW] Defendants in order to engage in the IPO."  ¶313.  The Complaint further alleges that the UW Defendants breached their duty to conduct an adequate and reasonable investigation.  ¶¶341–342.  Notably, the portion of the Complaint alleging a Section 10(b) claim does not mention the UW Defendants.  *CINAR*, 186 F. Supp. 2d at 308 (because fraud allegations "contain[ed] no mention" of a certain defendant, the Section 11 claim against that defendant "more clearly sound[ed] in strict liability, rather than fraud");  *Fresno*, 268 F. Supp. 3d at 558 (certain defendants were "not implicated by any fraud claims," and thus a "fair reading of the [complaint] does not reveal any allegations that could lead to an inference that [those] defendants were complicit in the fraud alleged against the 10(b) defendants").  As such, Plaintiffs "need allege no more than negligence to proceed under Section 11" against the UW Defendants.  *Rombach*, 355 F.3d at 171, 178.

      c.      **Plaintiffs Are Not Required To Allege Scienter For Section 11**

Plaintiffs are not required to establish scienter for Section 11 claims.  UW's MTD at 5–8. While "[c]laims that sound in fraud must satisfy the heightened pleading requirements of Rule 9(b), [] ***that Rule does not add substantive elements such as scienter to any claim***."  *In re Sanofi*

34

*Sec. Litig.*, 87 F. Supp. 3d 510, 528 n.8 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *id.* (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014)) ("Defendants argue that plaintiffs' other federal claims 'sound in fraud' and therefore also require proof of scienter. [] ***That is wrong.***"); *Atlas*, 324 F. Supp. 2d at 503 (even if Section 11 claim sounded in fraud, plaintiffs still need not plead scienter).[35]  The Court should reject the UW Defendants' unsupported attempts to add a scienter requirement where no such requirement exists.

## IV.    THE COMPLAINT ADEQUATELY ALLEGED SECTIONS 20(a) AND 15

Finally, Defendants urge the Court to dismiss the Complaint's Sections 20(a) and 15 claims only because the Complaint supposedly fails to plead primary liability; Defendants do not challenge that the Section 20(a) Defendants did in fact possess control.  MTD at 25 n.17.  Thus, because the Complaint adequately alleges Sections 10(b) and 11 claims and control, the Complaint likewise adequately alleges Sections 20(a) and 15 claims.

## V.    CONCLUSION

Accordingly, the Court should deny both motions to dismiss in their entirety.

DATED: August 30, 2021                              Respectfully submitted,

                                                   **LABATON SUCHAROW LLP**
                                                   /s/ *James W. Johnson*
                                                   James W. Johnson
                                                   Michael H. Rogers
                                                   David J. Schwartz
                                                   James T. Christie
                                                   140 Broadway

---

[35] The UW Defendants' cited cases either do not discuss scienter in the Section 11 context or do not expressly state if scienter was required.  Given the litany of recent Second Circuit case law holding that scienter is never required under Section 11 and that *Rombach* did not create such a requirement, Defendants' other cited cases should likewise be rejected as they either fail to point to any Second Circuit authority that requires scienter, or they misinterpret *Rombach*.

New York, New York 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
Email: jjohnson@labaton.com
        mrogers@labaton.com
        dschwartz@labaton.com
        jchristie@labaton.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Jing Chen
Daniel Tyre-Karp
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        jchen@rosenlegal.com
        dtyrekarp@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

36