UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
           :

IN RE iQIYI, INC. SECURITIES LITIGATION  : 20-cv-01830 (DG) (TAM)
           :

           : **ECF CASE**
           :

           : **Oral Argument Requested**
           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
           :

IN RE BAIDU, INC. SECURITIES LITIGATION  : 20-cv-3794 (DG) (TAM)
           :

           : **ECF CASE**
           :

           : **Oral Argument Requested**
           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' COMMON MOTION TO DISMISS THE *iQIYI* AND *BAIDU* ACTIONS <u>FOR FAILURE TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION</u>

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000

*Attorneys for Defendants Goldman Sachs (Asia) LLC, Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith, Incorporated, China Renaissance Securities (Hong Kong) Limited, Citigroup Global Markets Inc., and UBS Securities LLC (the "Underwriter Defendants")*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

*Attorneys for Defendants iQIYI, Inc., Baidu, Inc., Yu Gong, Xiaodong Wang, Robin Yanhong Li, Qi Lu, Herman Yu, Victor Zhixiang Liang, and Giselle Manon*

Served: November 30, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS ..............................................................................................5

          A.    iQIYI's Business and March 2018 IPO ..................................................5

          B.    Baidu's Business ......................................................................................6

          C.    In August 2018, iQIYI Announces a Joint Venture With Super Sports Media .......7

          D.    iQIYI Continues To Grow Throughout 2018 and 2019..............................7

          E.    In April 2020, a Short Seller Attacks iQIYI .............................................8

          F.    The *iQIYI* and *Baidu* Actions..................................................................9

ARGUMENT .................................................................................................................10

I.      ALL OF PLAINTIFFS' CLAIMS SOUND IN FRAUD ....................................10

II.     ALL PLAINTIFFS' FAIL TO STATE A MATERIAL MISREPRESENTATION .........11

          A.    Plaintiffs Improperly Rely Solely on a Short-Seller Report ...................11

          B.    Plaintiffs Fail To Allege Defendants Overstated iQIYI's Daily Active Users ......12

          C.    Plaintiffs Fail To Allege Defendants Overstated iQIYI's Deferred Revenue .......15

          D.    Plaintiffs Fail To Allege Defendants Overstated iQIYI's Membership Services Revenue..........................................................................................19

          E.    Plaintiffs Fail To Allege the Accounting for iQIYI's Investment in Xin'ai Sports Was Improper............................................................................................23

CONCLUSION..............................................................................................................26

## TABLE OF AUTHORITIES

Page(s)

### CASES

*In re AmTrust Financial Services, Inc. Securities Litigation*,
No. 17-cv-1545 (LAK), 2020 WL 2787117 (S.D.N.Y. Apr. 20, 2020) ...........................23

*In re A-Power Energy Generation Systems Ltd. Securities Litigation*,
No. 11–MDL–2302-GW (CWx), 2012 WL 1983341 (C.D. Cal. May 31, 2012) .............14

*Arfa v. Mecox Lane Ltd.*,
No. 10 CIV. 9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F.
App'x 14 (2d Cir. 2012)..............................................................................................14, 17

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................................5, 10

*In re Autodesk, Inc. Securities Litigation*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) ........................................................................17, 24

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................11, 22

*In re China Valves Technology Securities Litigation*,
979 F. Supp. 2d 395 (S.D.N.Y. 2013)...............................................................................18

*In re China XD Plastics Co. Ltd. Securities Litigation*,
No. 14-CV-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016)............13, 17, 24

*Delfonce v. Eltman Law, P.C.*,
No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017), *aff'd*,
712 F. App'x 17 (2d Cir. 2017) .........................................................................................5

*Diesenhouse v. Social Learning & Payments, Inc.*,
No. 20-CV-7436 (LJL), 2022 WL 3100562 (S.D.N.Y. Aug. 3, 2022)..............................17

*Dresner v. Utility.com, Inc.*,
371 F. Supp. 2d 476 (S.D.N.Y. 2005)...............................................................................15

*In re Gentiva Securities Litigation*,
932 F. Supp. 2d 352, 367 (E.D.N.Y. 2013) ......................................................................16

*Goldsmith v. Weibo Corp.*,
C.A. No. 17-4728 (SRC), 2018 WL 2733694 (D.N.J. June 7, 2018) ...............................24

*Harris v. AmTrust Financial Services, Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)..............12, 23

ii

*Harris v. AmTrust Financial Services, Inc.*,
  649 F. App'x 7 (2d Cir. 2016) ....................................................................................16

*In re HEXO Corp. Securities Litigation*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021)........................................................................11

*In re Initial Public Offering Securities Litigation*,
  383 F. Supp. 2d 566 (S.D.N.Y. 2005)..........................................................................8

*In re L & L Energy, Inc. Securities Litigation*,
  908 F. Supp. 2d 1147 (W.D. Wash. 2012)..............................................................16, 18

*Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*,
  902 F. Supp. 2d 329 (S.D.N.Y. 2012).......................................................................14

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020).....................................................................12, 18

*In re Morgan Stanley Information Fund Securities Litigation*,
  592 F.3d 347 (2d Cir. 2010)......................................................................................11

*In re Netflix, Inc. Sec. Litig.*,
  No. C 04-2978 (FMS), 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005)...................15

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)................................................................................................23

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).....................................................................................11

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*,
  339 F. Supp. 3d 169 (S.D.N.Y. 2018)........................................................................22

*Schick v. Ernst & Young*,
  141 F.R.D. 23 (S.D.N.Y. 1992) ................................................................................20

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)........................................................................................11

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ...........................................................................10, 19, 20, 26

Defendants iQIYI, Inc. ("iQIYI"), Baidu, Inc. ("Baidu"), Yu Gong, Xiaodong Wang, Robin Yanhong Li, and Herman Yu, (collectively, the "*Baidu* Action Defendants"), Qi Lu, Victor Zhixiang Liang, Giselle Manon, and Goldman Sachs (Asia) LLC; Credit Suisse Securities (USA) LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; China Renaissance Securities (Hong Kong) Limited; Citigroup Global Markets Inc.; and UBS Securities LLC, (collectively with the *Baidu* Action Defendants, the "*iQIYI* Action Defendants" or "Defendants") respectfully submit this joint memorandum of law in support of their motion to dismiss the Amended Consolidated Class Action Complaint ("*iQIYI* Complaint" or "*iQIYI* Compl.") filed in *In re iQIYI, Inc. Sec. Litig.*, No. 1:20-cv-1830 (DG) (TAM) (the "*iQIYI* Action") (ECF No. 104) and the Consolidated Class Action Complaint ("*Baidu* Complaint" or "*Baidu* Compl.") filed in *In re Baidu, Inc. Sec. Litig.*, No. 1:20-cv-3794 (DG) (TAM) (the "*Baidu* Action") (ECF No. 48) for failure to allege any material misstatement or omission, pursuant to this Court's October 6, 2022 Order Granting the Parties' Coordinated Briefing Proposal, Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1) (the "PSLRA").[1]

## PRELIMINARY STATEMENT

Defendants jointly bring this Common Motion to Dismiss to set forth common issues that warrant dismissal of both the *iQIYI* and *Baidu* Actions. Plaintiffs in both Actions (respectively, "*iQIYI* Plaintiffs" and "*Baidu* Plaintiffs," and collectively, "Plaintiffs") brought these two securities class actions based on nothing more than allegations parroted from a false and conclusory short-seller report issued in April 2020 against Defendant iQIYI. Often called the "Netflix of China," iQIYI is a leading online entertainment service in China whose American

---

[1] To Defendants' knowledge, Jennifer Xinzhe Li, who is named as a Defendant in the *Baidu* Action, has not been served.

Depositary Shares ("ADSs") trade on the NASDAQ. Baidu is one of the most well-known Internet companies in China, and operates the largest search engine in China that is also one of the largest in the world. Baidu, whose shares also trade on the NASDAQ, owns a majority stake in iQIYI and incorporates iQIYI's financials and other metrics in Baidu's SEC filings.

On April 7, 2020, two years after iQIYI's initial public offering ("IPO"), short-seller Wolfpack Research published a report (the "Wolfpack Report") that accused iQIYI of misrepresenting certain financial and operational metrics in its IPO Prospectus and Registration Statement (together, the "iQIYI Offering Documents") and 2018 and 2019 annual reports. The Wolfpack Report claimed that iQIYI (i) inflated its mobile daily active users ("DAUs"), membership services revenue, and deferred revenue; and (ii) improperly accounted for its investment in a post-IPO joint venture called Beijing Xin'ai Sports Media Technology Co., Ltd. ("Xin'ai Sports"). These meritless allegations rest largely on apples-to-oranges comparisons between the data reported in iQIYI's U.S. public filings and metrics drawn from third-party sources or the Chinese public filings of a number of variable interest entities ("VIEs"), entities that had contractual arrangements with iQIYI that were necessary to allow non-Chinese investors to participate in the earnings and losses of Chinese operating companies such as iQIYI.

iQIYI swiftly and unequivocally denied the Wolfpack Report's allegations. The market was appropriately unfazed by the Wolfpack Report, with iQIYI's ADS closing at $17.30/share on the day the Wolfpack Report was released—$0.54 (3.22%) *above* the prior day's closing—and Baidu's ADS price closing at $101.79, only a 1% decrease from the prior day's closing price of $102.94. To date, neither iQIYI nor Baidu has restated any of its prior financial or operational results, and more than two years later, neither company been subject to any regulatory enforcement actions relating to the Wolfpack Report's allegations.

2

As explained in this Common Motion to Dismiss, all of Plaintiffs' claims fail because they do not allege facts showing that Defendants made any material misstatement or omission.  Other multiple independent grounds for dismissal are set forth in the individual briefs in each action.

**First**, both Complaints merely copy and paste all of their allegations from the report of a professedly self-interested short seller.  Plaintiffs' failure to undertake any meaningful independent corroboration of these claims alone warrants dismissal.  (*Infra* § II.A.)

**Second**, Plaintiffs claim that iQIYI's reported mobile DAUs must have been overstated because two consulting firms allegedly estimated lower numbers.  But Plaintiffs allege no facts demonstrating how these third parties calculated their numbers, what data and assumptions they used, and why their *estimates* should be credited over Defendants' reporting of *actual data*.  Indeed, the third-party estimates on which Plaintiffs rely are not even consistent with each other.  (*Infra* § II.B.)

**Third**, Plaintiffs similarly fail to plead facts showing that Defendants overstated iQIYI and Baidu's deferred revenue.  Plaintiffs allege no facts whatsoever in support of their claims that iQIYI and Baidu's 2018 and 2019 deferred revenue was false.  Their claim that iQIYI's deferred revenue from 2015 through 2017 was false is based on lower numbers allegedly reported in third-party credit reports, which in turn were allegedly based on the PRC tax filings of various iQIYI VIEs.  Plaintiffs do not allege any facts showing that this amalgam of third-party information is reliable or comparable to iQIYI's actual data.  Moreover, the *Baidu* Plaintiffs fail to demonstrate that Baidu's deferred revenue incorporated iQIYI's figures as alleged, as the two companies report deferred revenue differently.  (*Infra* § II.C.)

**Fourth**, Plaintiffs rely on iQIYI's reported deferred revenues to claim that iQIYI faked its membership services revenue.  They argue that because iQIYI reported increases in membership

3

services revenue in Q4 2018 and Q1 2019 while reporting decreases in deferred revenue, the membership services revenue numbers must have been false.  But Plaintiffs cannot have it both ways—alleging that iQIYI's deferred revenues were fabricated and then assuming those same numbers were accurate to support allegations that membership services revenue was inflated. Worse still, Plaintiffs fail to specify the statements they contend were misleading, warranting dismissal of their Exchange Act claims.  In any event, Plaintiffs allege no facts to support their premise that deferred revenue and membership services revenue must be positively correlated.  As Plaintiffs implicitly concede, numerous factors—including the length of subscription period and time at which such purchases were made—render the correlation between deferred revenue and membership services revenue more nuanced and variable than Plaintiffs' simplistic lockstep assumption.  (*Infra* § II.D.)

**Fifth**, Plaintiffs fail to plead facts showing that iQIYI improperly accounted for its investment in Xin'ai Sports.  To begin, such disagreements about the application of accounting principles do not state a federal securities claim as a matter of law.  Moreover, the relevant accounting principles confirm that iQIYI properly recorded as deferred revenue its obligations to provide goods and services to Xin'ai Sports, and, in accordance with those accounting principles, recognized revenue as those goods and services were provided.  (*Infra* § II.E.)

As explained below, Plaintiffs' failure to state a material misstatement or omission warrants dismissal of both the iQIYI and Baidu Complaints.  Dismissal is also warranted for the reasons identified in iQIYI and Baidu Defendants' respective Additional Motions to Dismiss.

## STATEMENT OF FACTS[2]

### A.     iQIYI's Business and March 2018 IPO

Often called the "Netflix of China," iQIYI is a market-leading online entertainment service in China.  (Ex. A[3], Form F-1, at 1; *iQIYI* Compl. ¶ 16; *Baidu* Compl. ¶ 2.)  iQIYI operates an online platform featuring original, professionally-produced, and user-created content to generate revenue through membership subscriptions, online advertising services, and content distribution. (Ex. A at 1, 2; *iQIYI* Compl. ¶¶ 22, 48; *Baidu* Compl. ¶¶ 32, 78.)  iQIYI completed its IPO on March 29, 2018, issuing 125,000,000 ADSs at $18.00 per share.  (*iQIYI* Compl. ¶ 315; *Baidu* Compl. ¶ 36.)

iQIYI offers monthly, quarterly, and annual subscriptions that provide "access to streaming of premium content in exchange for a non-refundable upfront membership fee." (Ex. A at 93.)  As iQIYI's Offering Documents explain, "[t]he receipt of membership fees is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered." (*Id.*; *iQIYI* Compl. ¶ 44; *Baidu* Compl. ¶ 68.)  Thus, payments for monthly subscriptions are recognized as revenue when received, whereas prepayments for quarterly or annual subscriptions are initially recorded as deferred revenue and recognized as revenue on a prorated

---

[2]  These facts are drawn from the well-pleaded allegations and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint." *Delfonce v. Eltman Law, P.C.*, No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 16, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[3]  Exhibits cited herein are attached to the accompanying Declaration of Robert A. Fumerton, dated November 30, 2022.  Pincites for all exhibits reference the original pagination at the bottom of the page.  All citations and internal quotation marks are omitted, and all emphases in quotations are added, unless otherwise indicated.

basis each month.  (*iQIYI* Compl.¶ 34; *Baidu* Compl. ¶¶ 52–53.)  On iQIYI's balance sheet, deferred revenue relating to membership services is recorded as a liability and is included in the line item for "[c]ustomer advances and deferred revenue."  (Ex. A at F-4; *see also* Ex. C, 2018 Form 20-F, at F-25.)  That line item also includes virtual currency for which customers have paid but not yet used.[4]  (Ex. A at 95; *iQIYI* Compl. ¶ 45; *Baidu* Compl. ¶ 69.)

iQIYI's subscription service became increasingly popular before its IPO.  iQIYI had 10.7 million subscribing members at the close of 2015, and generated RMB 996.7 million in membership services revenue.  (Ex. A at 83; *iQIYI* Compl. ¶ 37; *Baidu* Compl. ¶ 57.)  By the end of 2016, iQIYI had 30.2 million subscribing members, generating RMB 3.76 billion in membership services revenue.  (Ex. A at 81; *iQIYI* Compl. ¶ 37; *Baidu* Compl. ¶ 57.)  At the end of 2017, iQIYI had 50.8 million subscribing members, generating RMB 6.54 billion in membership services revenue.  (Ex. A at 81; *iQIYI* Compl. ¶ 37; *Baidu* Compl. ¶ 57.)

iQIYI's mobile DAUs also generally increased preceding the IPO.  (Ex. A at 1; *iQIYI* Compl. ¶ 37; *Baidu* Compl. ¶ 57.)  The Offering Documents define mobile DAUs as the "number of unique mobile devices" that access its platform each day.  (Ex. A at 7; *iQIYI* Compl. ¶ 33; *Baidu* Compl. ¶ 51.)  Between Q4 2015 and Q4 2016, iQIYI's average mobile DAUs increased from 88.3 million to 125.4 million.  (Ex. A at 83; *iQIYI* Compl. ¶ 37.)  In 2017, iQIYI's mobile DAUs remained relatively stable, averaging 126.0 million mobile DAUs for Q4 2017.  (Ex. A at 81; *iQIYI* Compl. ¶ 37; *Baidu* Compl. ¶ 57.)

### B.      Baidu's Business

Baidu is one of the most well-known Internet companies in China.  (*Baidu* Compl. ¶ 2.)

---

[4]    Users "purchase virtual currency for usage in [iQIYI's live broadcasting platform] to acquire consumable virtual gifts . . . or time-based virtual items."  (Ex. A at 95.)

Baidu was originally founded in 2000 as a search engine business, which has since become the largest search engine in China and one of the largest in the world. (*Id.* ¶¶ 2, 29) Baidu first went public on the NASDAQ in 2005, and its ADSs trade under the symbol "BIDU." (*Id.* ¶ 31.) Baidu has grown to offer and invest in numerous other products and services, including its core Baidu app, as well as other products and services relating to social media, marketing, educational and informational content, mapping, video and streaming services, and other AI and technology-related offerings. (Baidu 2019 Annual Rep. at 50–55.) Among its many investments and offerings, Baidu also owns a majority stake in iQIYI, and reports iQIYI's financials and other metrics in Baidu's own filings with the SEC. (*Baidu* Compl. ¶ 2; *see id.* ¶¶ 37–39; *iQIYI* Compl. ¶ 21.)

### C.    In August 2018, iQIYI Announces a Joint Venture With Super Sports Media

On August 6, 2018, after its March 2018 IPO, iQIYI announced its agreement to partner with Super Sports Media to launch the Xin'ai Sports joint venture (also known as iQIYI Sports). (Ex. D, Aug. 6, 2018 Press Release, at 1; *iQIYI* Compl. ¶ 64; *Baidu* Compl. ¶ 89.) The venture aims to "bring[] together an extensive offering of sports content with smoother user experience." (Ex. E, Q3 2018 Earnings Tr., at 5; *iQIYI* Compl. ¶ 65; *Baidu* Compl. ¶ 90.) iQIYI contributed a combination of cash and future content distribution, IP licensing, and traffic support services in exchange for a 31.88% equity interest in Xin'ai Sports valued at RMB796,000. (Ex. C at F-33; Ex. F, Excerpt of Nov. 28, 2018 Form 6-K, at 24; *see iQIYI* Compl. ¶ 69; *Baidu* Compl. ¶ 93.)

### D.    iQIYI Continues To Grow Throughout 2018 and 2019

iQIYI's average mobile DAUs, subscribing members, membership services revenue, and customer advances and deferred revenue continued to grow in 2018 and 2019:

| Metric | 2018[5] | Change | % | 2019[6] | Change | % |
|---|---|---|---|---|---|---|
| Ave. Mobile DAUs (Full Year) | 135.4m | 9.7m | 7.7% | 139.9m | 4.5m | 3.25% |
| Subscribing Members (End of Year) | 87.4m | 36.6m | 72% | 106.9m | 19.5m | 22.3% |
| Membership Services Revenue (Full Year) | RMB 10.62b | RMB 4.45b | 72.3% | RMB 14.44b | RMB 3.82b | 35.9% |
| Customer Advances and Deferred Revenue (End of Year) | RMB 2.2b | RMB 570m | 34.4% | RMB 3.08b | RMB 886m | 40% |

## E.     In April 2020, a Short Seller Attacks iQIYI

On April 7, 2020, short-seller Wolfpack Research published its report on iQIYI. (Ex. H, Wolfpack Report, at 1; *iQIYI* Compl. ¶ 88; *Baidu* Compl. ¶ 112.) Standing to profit from a fall in iQIYI's stock price, the Wolfpack Report, which claims to synthesize information from exclusively "public sources," alleges that iQIYI "was committing fraud well before its IPO in 2018 and has continued to do so ever since." (Ex. H at 1.) In particular, the Wolfpack Report alleges that iQIYI misrepresented its mobile DAUs, deferred revenue, membership service revenue, and Xin'ai Sports investment—the precise allegations made in both Complaints. (Ex. H at 3, 8, 9, 14.) Notwithstanding these serious charges, iQIYI's ADS price closed at $17.30, up $0.54 from the day before.[7] (Ex. B at 12.) Baidu's ADS price closed at $101.79, virtually unchanged from the prior day's closing price of $102.94. (Ex. Q at 24.)

iQIYI promptly and publicly denied the Wolfpack Report's allegations shortly after market close, stating that "the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company." (Ex. I, Apr. 7, 2020 Press Release, at 1; *iQIYI* Compl. ¶ 93; *Baidu* Compl. ¶ 117.) On August 13, 2020, iQIYI

---

[5]   (*See* Ex. C at 38 (mobile DAUs), 72 (subscribing members and membership services revenue), F-4 (customer advances and deferred revenue).)

[6]   (*See* Ex. G, 2019 Form 20-F at 45 (mobile DAUs), 81 (subscribing members and membership services revenue), F-7 (customer advances and deferred revenue).)

[7]   The Court "may take judicial notice of well-publicized stock prices" on a motion to dismiss. *In re Initial Public Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005).

disclosed that the SEC and NASDAQ had opened confidential inquiries into the Wolfpack Report's allegations and that it was cooperating with these inquiries.  (Ex. J, Aug. 13, 2020 Press Release, at 2; Ex. K, Q2 2020 Earnings Call, at 11; *iQIYI* Compl. ¶¶ 94–96; *Baidu* Compl. ¶ 118–19.)  On the same day, Baidu also hosted an earnings call in which it also acknowledged the existence of the SEC investigation against iQIYI.  (*Baidu* Compl. ¶ 120.)

On March 9, 2021, iQIYI disclosed that its internal review of the Wolfpack allegations was "substantially complete[] and did not uncover any evidence that would substantiate the allegations." (Ex. L, 2020 20-F, at 102.)  More than two years later, as of the date of this filing, iQIYI has never been subject to any enforcement actions relating to these allegations.

## F.    The *iQIYI* and *Baidu* Actions

On April 16, 2020—nine days after the Wolfpack Report was released—an iQIYI shareholder brought suit against iQIYI, its CEO, and CFO, asserting claims under Sections 10(b) and 20(a) of the Exchange Act.  (*In re iQIYI, Inc. Sec. Litig.*, No. 1:20-cv-01830 (DG) (TAM), ECF No. 1.)  On that day, iQIYI's ADS price closed at $19.24.  (Ex. B at 12.)  After the iQIYI Lead Plaintiffs were appointed, they filed an amended complaint on January 19, 2021, that added claims under Sections 11 and 15 of the Securities Act, and added as defendants Baidu, iQIYI's directors as of the IPO (including Baidu's CEO and CFO, among others), and iQIYI's IPO underwriters.  (*In re iQIYI, Inc. Sec. Litig.*, No. 1:20-cv-01830 (DG) (TAM), ECF. No. 84.)  That day, iQIYI's ADS price closed at $19.49.  (Ex. B at 16.)  Following a pre-motion conference, the Court consolidated the first-filed action with two other related actions, and the *iQIYI* Plaintiffs filed the operative second amended complaint on June 1, 2021.  That day, iQIYI's ADS price closed at $14.78.  (*Id.*)

9

Similarly, beginning on August 19, 2020, two Baidu shareholders brought suit against iQIYI, Baidu, and certain officers and directors of both companies, asserting claims under Sections 10(b) and 20(a) of the Exchange Act. Following the lead plaintiff appointments, the *Baidu* Plaintiffs filed the operative amended complaint on June 22, 2022. (*In re Baidu, Inc. Sec. Litig.*, No. 1:20-cv-3794 (DG) (TAM), ECF. No. 48.)

On October 6, 2022, recognizing the common issues presented by *iQIYI* and *Baidu*, the Court ordered a consolidated briefing schedule for the motions to dismiss both actions. Under that schedule, briefing is to proceed on three tracks, with consolidated briefing for common issues and separate briefing in each action for any unique issues. (*See* Dkt. No. 153.)

## **ARGUMENT**

### I. ALL PLAINTIFFS' CLAIMS SOUND IN FRAUD

Both Plaintiffs assert claims under Sections 10(b) and 20(a) of the Exchange Act, and the *iQIYI* Plaintiffs further assert claims under Sections 11 and 15 of the Securities Act. Plaintiffs' Exchange Act claims are subject to the PSLRA, which requires that they "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). These claims are also subject to Rule 9(b), which requires that "the circumstances constituting fraud . . . shall be stated with particularity." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs fail to meet these heightened standards.

Moreover, because the *iQIYI* Plaintiffs' Securities Act claims are based on the same alleged misrepresentations as their Exchange Act claims,[8] they "sound in fraud" and are also subject to the

---

[8]  *See* Compl. ¶¶ 123-26, 132-35, 313(c)–(d), 315-29.

10

same rigorous Rule 9(b) pleading standards. *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004). Although Plaintiffs copied their Exchange Act allegations into a separate section than their Securities Act claims, this cannot obscure the obvious:  the gravamen of both sets of claims is fraud—*i.e.*, that iQIYI *intentionally* inflated its mobile DAUs and deferred revenues. *See In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021) ("Though plaintiffs separate their claims under the Securities Act and the Exchange Act and disclaim fraud as a basis for their Securities Act claims, their claims rest on the same theory" and "are assessed in accordance with Rule 9(b).")   In any event, the Securities Act claims fail even under Rule 8 because their allegations are insufficient to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## II.    ALL PLAINTIFFS' CLAIMS FAIL TO PLEAD A MATERIAL MISREPRESENTATION

As explained further below, dismissal of both Complaints is warranted because Plaintiffs fail to state a material misrepresentation. *See Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) ("To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege [] a material misrepresentation (or omission)"); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) ("To state a claim under section 11, the plaintiff must allege that . . . the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.").

### A.    Plaintiffs Improperly Rely Solely on a Short-Seller Report

Notably, all of Plaintiffs' claims (and most sources relied upon in support) are copied directly from the Wolfpack Report, which was authored by a self-professed short-seller with "an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Long Miao*

11

*v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  "The developing body of case law involving factual attributions to short-seller reports to satisfy pleading requirements . . . reflects the need for . . . caution and care," particularly in the absence of well-pleaded allegations evidencing Plaintiffs' efforts independently to corroborate the short-seller's findings.  *Id.*  Here, Plaintiffs' failure to undertake any meaningful effort to substantiate these biased and inherently contradictory claims is apparent throughout the Complaint, and exacerbates the reliability concerns presented by "the risk of motivated reporting."[9]  *Id*.  This alone warrants dismissal.  *See, e.g.*, *id.*; *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).  In any event, as explained below, both Complaints fail to plead facts showing that any of the challenged metrics were misstated.

### B.    Plaintiffs Fail To Allege Defendants Overstated iQIYI's Daily Active Users

Plaintiffs contend that the average mobile DAUs reported in iQIYI's Offering Documents, 2018 and 2019 Annual Reports, and Baidu's 2018 and 2019 Annual Reports and April 4, 2020 Prospectus must have been inflated because two consulting firms—QuestMobile Research Institute ("QuestMobile") and Aurora Mobile Limited ("Aurora")—allegedly estimated lower DAUs for certain periods.  (*iQIYI* Compl. ¶¶ 36–43; *Baidu* Compl. ¶¶ 55–67.)  Both Plaintiffs assert claims under Sections 10(b) and 20(a) of the Exchange Act based on these allegations, and the *iQIYI* Plaintiffs also assert claims under Sections 11 and 15 of the Securities Act.  (*iQIYI* Compl. ¶¶ 36–43, 318–23; *Baidu* Compl. ¶¶ 55–67.)  All these claims fail because Plaintiffs do

---

[9]    Although the *Baidu* Plaintiffs contend that their "counsel was able to corroborate [the Wolfpack Report's] substance through their review" of various materials, the referenced materials appear to be the same materials relied upon by Wolfpack Report, which, for the reasons explained below, are insufficient to establish falsity.  (*Baidu* Compl. ¶ 4 n.1.)  The Baidu Complaint also fails to allege what, if anything, they did to verify the accuracy of such supporting documents or the Wolfpack Report.  *See Fanhua*, 442 F. Supp. 3d at 802.

not plead any facts showing that any alleged discrepancy between these third-party figures and iQIYI's reported metrics means that Defendants' statements (as opposed to third-party estimates) were inaccurate.

To begin, Plaintiffs do not plead any facts establishing that QuestMobile and Aurora measured DAUs the same way as iQIYI or that their estimates are more accurate than Defendants' reported data. "It is not reasonable to infer that [Defendants'] SEC filings must be false based upon a comparison to less than a complete set of" information, let alone a different metric entirely. *In re China XD Plastics Co. Ltd. Sec. Litig.*, No. 14-CV-05308 (GBD), 2016 WL 1241522, at *6 (S.D.N.Y. Mar. 23, 2016). There are various ways to define and measure DAUs. iQIYI and Baidu disclosed that iQIYI calculates mobile DAUs as "the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a day." (Ex. A at 7; Ex. C at 2; Ex. G at 1; *see also* Ex. V, Baidu 2019 Annual Report, at 1; Ex. U, Baidu 2018 Annual Report, at 1.) iQIYI "treat[s] each distinguishable device as a separate user for purposes of calculating mobile DAUs, although it is possible that some people may use more than one mobile device and multiple people may share one mobile device to access our platform." (Ex. A at 7; Ex. C at 2; Ex. G at 1.)

Plaintiffs do not allege how QuestMobile or Aurora defined or calculated DAUs—much less that either followed iQIYI's approach.[10] It is thus impossible to determine whether these third-party estimates even attempted to measure the same thing as iQIYI's DAUs metric, let alone that iQIYI's reported DAUs (and the same figures reproduced in Baidu's disclosures) were false. *See*

---

[10]   In their pre-motion letter to the Court, the *iQIYI* Plaintiffs admitted that "[i]t is not surprising" that average mobile DAU figures would "not [be] identical" if different methods were used to measure such figures. (*In re iQIYI, Inc. Sec. Litig.*, No. 1:20-cv-01830 (DG) (TAM), ECF No. 98 at 2.)

*In re A-Power Energy Generation Sys. Ltd. Sec. Litig.*, No. 11–MDL–2302-GW (CWx), 2012 WL 1983341, at *8 (C.D. Cal. May 31, 2012) ("Absent at least [an allegation of common measurements], it is not clear to the Court that Plaintiff has adequately plead[ed] falsity[.]").

In fact, QuestMobile and Aurora *expressly disclaimed* the accuracy and completeness of their respective estimates. Aurora warned that "[d]ue to the limitations inherent in the methods, the data and information estimated and derived by Aurora . . . are for reference only," and Aurora "*does not guarantee the accuracy, completeness, applicability and non-infringement of [its] data and information.*" (Ex. M at 34, Ex. N at 60, Ex. O at 49 (Aurora Reps.).) And QuestMobile similarly warned that it "does not ensure the complete accuracy or completeness" of its information, and readers "should not consider the information to be completely accurate and complete." (Ex. P, QuestMobile Rep., at 2.) Plaintiffs do not allege any factual basis for crediting these admittedly incomplete and potentially inaccurate estimates over the actual iQIYI user data in Defendants' SEC filings that contain no such disclaimers. *See Arfa v. Mecox Lane Ltd.*, No. 10 CIV. 9053, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012) ("Even when the facts in the Amended Complaint are accepted as true, [it] fails to plead how this discrepancy makes the . . . registration [statement] untrue or misleading"), *aff'd*, 504 F. App'x 14 (2d Cir. 2012).

Plaintiffs also fail to plead the amount by which iQIYI's DAUs were allegedly misstated. To state their claim, Plaintiffs must do more than assert that Defendants overstated iQIYI's DAUs. Rather, "Plaintiffs bear the burden of articulating facts that demonstrate what [iQIYI's] actual [DAU figures] were." *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012). Here, Plaintiffs point to two sets of third-party figures that differ significantly from each other and fail to explain which set allegedly represents iQIYI's *actual* DAUs. (*Compare iQIYI* Compl. ¶ 41 *and Baidu* Compl. ¶ 65 (QuestMobile) *with iQIYI* Compl. ¶

14

42 *and Baidu* Compl. ¶ 66 (Aurora).)  Moreover, Plaintiffs allege contradictory claims that cannot be squared with each other.  For example, while the Complaints allege that "[a]ccording to Aurora's data, between December 2017 and March 2019, iQIYI *never had more than 90 million mobile DAU*," they elsewhere plead that QuestMobile estimated that iQIYI's DAUs ranged from *113 million to 122.6 million* during the same period.  (*iQIYI* Compl. ¶¶ 41–42 (emphasis in original); *Baidu* Compl. ¶¶ 65–66 (same).)  "These allegations are contradictory and therefore not properly particular."  *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 500 (S.D.N.Y. 2005) (dismissing securities claim where amount of uncollectible accounts variously described as $1 million and $2 million).  For all these reasons, Plaintiffs fail to plead that Defendants' reported iQIYI DAUs were false.[11]

## C.    Plaintiffs Fail To Allege Defendants Overstated Deferred Revenue

Plaintiffs next contend that iQIYI must have overstated its "customer advances and deferred revenues" in its Offering Documents and 2018 Annual Report because certain third-party credit reports that supposedly aggregate information reported in the 2015 to 2017 PRC tax filings of various iQIYI VIEs reflect lower "deferred revenues" than in iQIYI's financial statements. (*iQIYI* Compl. ¶¶ 59–61; *Baidu* Compl. ¶¶ 83–85.)  The *iQIYI* Plaintiffs assert that these alleged misstatements violated the Securities Act and Exchange Act.  (*iQIYI* Compl. ¶¶ 59–61, 324–29.) The *Baidu* Plaintiffs bring only Exchange Act claims based on the same iQIYI SEC filings, and

---

[11]    To the extent Plaintiffs challenge iQIYI touting its "massive and highly engaged user base" (*iQIYI* Compl. ¶ 124; *Baidu* Compl. ¶ 51), such statements are inactionable puffery.  *See In re Netflix, Inc. Sec. Litig.*, No. C 04-2978 (FMS), 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (dismissing as puffery "vague and amorphous" statements such as "consumers love our service").  In any event, Plaintiffs' own allegations show that iQIYI's user base was massive and highly engaged.  (*See, e.g.*, *iQIYI* Compl. ¶ 42 (alleging iQIYI had more than 80 million mobile DAUs); *Baidu* Compl. ¶ 66 (same).)

15

on Baidu's Annual Reports from 2016 to 2019, which allegedly "incorporated iQIYI's deferred revenue numbers." (*Baidu* Compl. ¶¶ 159–64, 182–92.)

As an initial matter, although Plaintiffs challenge Defendants' disclosures of iQIYI's and Baidu's 2018 and 2019 deferred revenue, (*iQIYI* Compl. ¶ 136; *Baidu* Compl. ¶¶ 163, 188–92), the Complaints allege that deferred revenue was overstated only from 2015 to 2017. (*iQIYI* Compl. ¶ 60; *Baidu* Compl. ¶ 83.) To the extent Plaintiffs contend that iQIYI and Baidu's 2018 and 2019 deferred revenue figures were false, they allege no facts whatsoever in support of those claims. They also fail to allege the amount by which these metrics were allegedly overstated. *See, e.g., In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 367 (E.D.N.Y. 2013) (dismissing where "Plaintiff also does not allege the amount by which [the] financial results were allegedly inflated").

Moreover, as with the DAUs, this claim fails because Plaintiffs plead no basis to infer that the third-party reports on which they rely are accurate and comparable to iQIYI's SEC filings. To the contrary, the comparisons Plaintiffs seek to draw are apples-to-oranges. iQIYI's SEC filings do not even individually report deferred revenues; rather, as Plaintiffs acknowledge (*iQIYI* Compl. ¶ 45; *Baidu* Compl. ¶ 69), iQIYI reports "*customer advances and* deferred revenues." Plaintiffs fail to allege any facts showing that these distinct metrics should be equal, so nothing can be inferred if they differ. *See In re L & L Energy, Inc. Sec. Litig.*, 908 F. Supp. 2d 1147, 1153 (W.D. Wash. 2012) (no misstatement alleged where it is "virtually impossible to determine whether the comparisons [Plaintiffs] draw[] are apples-to-apples").

Moreover, Plaintiffs cannot allege falsity by comparing iQIYI's SEC filings to the aggregated filings of unspecified VIEs to unspecified PRC tax authorities. *See Harris v. AmTrust Fin. Servs., Inc.*, 649 F. App'x 7, 10 n.3 (D Cir. 2016) (allegation "that the aggregate revenue or profit of an issuer's individual subsidiaries' financial statements filed with regulators materially

16

differed from the consolidated revenues reported to the SEC" is insufficient to show falsity); *Arfa*, 2012 WL 697155, at *12 ("the Amended Complaint does not allege the registration statement's 2008 figures to be false, only that a different figure was filed with the Chinese government"). Plaintiffs do not even allege which iQIYI VIEs are aggregated in the credit reports or which VIEs should be aggregated for a comparison to the consolidated financials reported in iQIYI's SEC filings. *See China XD Plastics*, 2016 WL 1241522, at *5–6 (plaintiffs' failure to "separately identify any of [defendant's] individual subsidiaries nor separately present the relevant financial data for any subsidiary so an accurate aggregate comparison can be made to [defendant's] SEC filings . . . proves fatal to [their claim]"). Because Plaintiffs cannot "close the gap" between the credit reports and iQIYI's SEC filings, any such difference (if it exists at all) does not establish the falsity of Defendants' statements. *Id.* at *6.

In any event, neither Complaint alleges any facts demonstrating that these third-party credit reports—which Plaintiffs again copied from the Wolfpack Report—are reliable. Plaintiffs contend that the credit reports are "*based on* PRC tax filings by iQIYI's [VIEs]" (*iQIYI* Compl. ¶ 59; *Baidu* Compl. ¶ 83), but they do not allege who authored the third-party reports, when they were published or for what purpose, what reporting periods were covered, or what methodologies were used (including whether they were prepared in accordance with GAAP). *See In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("Rule 9 and the PSLRA require that plaintiffs provide details regarding how they obtained the reports, who produced the reports, and specifically what information the reports contained."); *Diesenhouse v. Soc. Learning & Payments, Inc.*, No. 20-CV-7436 (LJL), 2022 WL 3100562, at *7 (S.D.N.Y. Aug. 3, 2022) ("Particularity means the who, what, where, when and how: the first paragraph of any newspaper story."). Nor do Plaintiffs attach these reports to the Complaints, allege how Plaintiffs supposedly obtained the

17

reports, or explain what, if anything, Plaintiffs did to verify the reports' accuracy. *See Fanhua*, 442 F. Supp. 3d at 802.

Instead, Plaintiffs simply assert that "[t]he deferred revenue reported in [these] credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of IQIYI's VIEs." (*iQIYI* Compl. ¶ 61; *Baidu* Compl. ¶ 85.) But Plaintiffs allege no facts supporting the veracity or reliability of the alleged underlying PRC tax filings, let alone the credit reports on which Plaintiffs actually rely. Plaintiffs do not allege that PRC tax filings are filed with the SAIC or are required to comply with GAAP. Nor is there any merit to their suggestion that submissions to "PRC tax authorities are the most accurate sources of financial information" because Defendants are subject to penalties for misstatements there but supposedly immune from "criminal and civil judgments and sanctions imposed by American courts." (*iQIYI* Compl. ¶ 62; *Baidu* Compl. ¶ 86.) In fact, courts have recognized that the civil and criminal consequences of false filings in the United States are more severe than those in China. *See In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 411 (S.D.N.Y. 2013) ("One who submits false SEC filings faces the risk of equally if not more severe penalties [than the author of a false SAIC filing], including possible imprisonment[.]"); *In re L & L Energy*, 908 F. Supp. 2d at 1154 (issuers "face far more significant penalties for false filings in the United States" than in China). And even if the tax filings were reliable and accurate, Plaintiffs do not explain how the credit reports extracted the relevant information from PRC tax filings or how one can be reasonably confident that errors were not introduced during this process. Without such allegations, a mere difference between the alleged credit reports and iQIYI's SEC filings does not suggest the latter is false.

Finally, the *Baidu* Plaintiffs cannot show that Baidu's disclosed deferred revenue figures were false.  (*Baidu* Compl. ¶¶ 182–92.)  As shown above, because Plaintiffs fail to establish that iQIYI's deferred revenue was false, they cannot show that Baidu's alleged incorporation of iQIYI's figures into its own metrics was false.  Moreover, the *Baidu* Plaintiffs fail to plead facts showing that Baidu's deferred revenue figures actually "incorporated iQIYI's deferred revenue numbers."  (*Id.* ¶ 192.)  Unlike iQIYI, which reports "[c]ustomer advances and deferred revenue" as a single line item, (Ex. A at F-4), Baidu reports "[c]ustomer advances and deposits" separately from "[d]eferred revenue" (*see, e.g.*, Ex. R, Baidu 2015 Annual Report, at F-4; Ex. S, Baidu 2016 Annual Report, at F-4; Ex. T, Baidu 2017 Annual Report, at F-4).  The *Baidu* Complaint references only Baidu's "deferred revenue" figures, but alleges no facts demonstrating that these figures actually incorporated all of iQIYI's "customer advances and deferred revenue" that are alleged to be misleading.  (*See Baidu* Compl. ¶¶ 182–92.)  The *Baidu* Plaintiffs thus fail to allege "the reason or reasons why the statement is misleading," as required under the PSLRA.  15 U.S.C. § 78u–4(b)(1).

### D.    Plaintiffs Fail To Plead that Defendants Overstated iQIYI's Membership Services Revenue

Next, and again parroting the Wolfpack Report, Plaintiffs allege that iQIYI must have overstated membership services revenue "in one or more periods" in violation of the Exchange Act, because such revenues increased in Q4 2018 and Q1 2019 while deferred revenues decreased, and, according to Plaintiffs, "if paying members and membership services revenue are increasing, so should deferred revenue."[12]  (*iQIYI* Compl. ¶¶ 52, 58; *Baidu* Compl. ¶¶ 76, 82.)  This claim fails as a matter of law for three reasons.

---

[12]    Because these allegations do not apply to the iQIYI offering materials, the iQIYI complaint does not attempt to plead a Securities Act claim based on these allegations.

**1. *Failure to identify the alleged falsity*.**  As a threshold matter, Plaintiffs once again fail to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," as required under the PSLRA.  15 U.S.C. § 78u-4(b)(1)(B).  Although Plaintiffs point to what they perceive to be a discrepancy in membership services revenue and deferred revenue in Q4 2018 and Q1 2019, (*iQIYI* Compl. ¶ 56; *Baidu* Compl. ¶ 80), they fail to specify which of iQIYI's statements was misleading, and allege only generally that "Defendants overstated [iQIYI's] membership services revenue in one or more periods," and that Baidu's revenues were false because they "incorporate[ed] iQIYI's revenues into Baidu's." (*iQIYI* Compl. ¶ 58; *Baidu* Compl. ¶ 82.)  Plaintiffs' failure to specify the precise statements they contend were misleading is fatal to their claims.  Moreover, like their defective DAU claim, Plaintiffs do not "allege *the amount* of the purported overstatement"—*i.e.*, what iQIYI's membership services revenues actually were.  *Schick v. Ernst & Young*, 141 F.R.D. 23, 27 (S.D.N.Y. 1992).

**2. *Failure to support key falsity assumption*.**  Plaintiffs also allege no facts to support their key assumption that, absent fraud, membership services revenue and deferred revenue must be positively correlated.  (*iQIYI* Compl. ¶ 52; *Baidu* Compl. ¶ 76.)  To the contrary, Plaintiffs concede that one "innocent explanation for [this divergence] would be a sudden and dramatic shortening of the average length of subscription periods," since "the deferred revenue balances would have been amortized much more quickly and decline relative to membership services revenue."[13]  (*iQIYI* Compl. ¶ 57; *Baidu* Compl. ¶ 81.)  But this is not the "only innocent explanation." (*iQIYI* Compl. ¶ 57; *Baidu* Compl. ¶ 81.)  Numerous other factors, such as the time and the price at which memberships were purchased, could cause deferred revenues to decline

---

[13]  "Average subscription periods," as Plaintiffs use that term, apparently refers to the type of subscription (*i.e.*, 12 months for an annual subscription, 3 months for a quarterly subscription, 1 month for a monthly subscription).

even as membership services revenues increase.

For example, assume that, in a given year, iQIYI acquires one annual member each quarter, such that the average subscription period is always 12 months.  Further assume that, in the last month of Q1, Member 1 purchases an annual membership for $120/year.  iQIYI's quarterly results for Q1 would report $10 in membership services revenue (for one month of service to Member 1), and $110 in deferred revenue.  But if Member 2 bought the exact same plan in the *first* month of Q2 (*i.e.*, April), iQIYI would report $30 in membership services revenue from Member 2 ($10 x three months (April, May, June)) for Q2, and $90 in deferred revenue.  Hence, even though Members 1 and 2 purchased the exact same plan, the amount of deferred revenue attributable to each at the end of each quarter would differ because they began their subscriptions at different times.  If the next two members (Members 3 and 4) bought plans at a 10% discount ($108/year with $9 recognized each month), that, too, would result in smaller deferred revenue amounts.  The below table shows how this scenario would lead to a *decrease* in deferred revenue from Q3 ($191) to Q4 ($185), even as revenues and membership increased.

| Deferred Revenues | Q1 | | | Q2 | | | Q3 | | | Q4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
| Member 1 | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 | 20 |
| Member 2 | | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 |
| Member 3 | | | | | | | 99 | 90 | 81 | 72 | 63 | 54 |
| Member 4 | | | | | | | | | | 99 | 90 | 81 |
| Total DR | | | 110 | | 80 + 90 = **170** | | | 50 + 60 + 81 = **191** | | | 20 + 30 + 54 + 81 = **185** | |

Other factors, including changes in consumer behavior, market competition, and other economic drivers, also affect the relationship between membership services revenue and deferred revenue.  For example, some fees—such as fees from on-demand purchases—increase membership services revenue, but have no impact on deferred revenue.  (*iQIYI* Compl. ¶ 44; *Baidu* Compl. ¶ 68.)  Conversely, other fees unrelated to membership—such as virtual currency that has been purchased but not yet used (*iQIYI* Compl. ¶ 45; *Baidu* Compl. ¶ 69)—affect deferred revenue,

21

but not membership services revenue.[14]  The existence of these obvious "alternative explanations . . . render[s] plaintiff's inferences unreasonable" and disproves the simplistic correlation Plaintiffs seek to draw.  *See Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 177 (S.D.N.Y. 2018); *Twombly*, 550 U.S. at 554 (allegations "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy" are insufficient to state a claim).

> **3.  *Failure to identify the correct figures*.**  Even if Plaintiffs' assumed correlation were correct (and it is not), they allege no facts to show which sets of numbers were incorrect—*i.e.*, whether membership services revenues were overstated, as Plaintiffs claim, or whether deferred revenues were understated.  Although Plaintiffs urge the former theory, they aver elsewhere that the decline in deferred revenues was more anomalous than the increase in membership services revenue, which occurred in parallel with rising subscribing members over the same period.  (*iQIYI* Compl. ¶¶ 53, 56; *Baidu* Compl. ¶¶ 77, 80.)  Indeed, Plaintiffs' assertion that membership services revenue should be benchmarked against the reported deferred revenue figures directly contradicts Plaintiffs' other fraud theories, including that "the deferred revenue amounts [iQIYI] reported in the Registration Statement are inaccurate," and that "[Defendants] needed a way to make it seem as though [iQIYI]'s deferred revenue tracked the purported user and revenue growth."  (*iQIYI* Compl. ¶¶ 59, 63; *see Baidu* Compl. ¶¶ 83, 88.)  Plaintiffs cannot have it both ways.  Far from demonstrating that iQIYI reported any metric incorrectly, the self-contradictory nature of Plaintiffs' allegations underscores their speculative nature and implausibility, and further evidences Plaintiffs' failure to corroborate the Wolfpack Report's self-serving accusations.

---

[14]  iQIYI's virtual currency revenue is recorded as "Other" revenue.  (Ex. A at F-30–31.)

22

### E.    Plaintiffs Fail To Allege the Accounting for iQIYI's Investment in Xin'ai Sports Was Improper

Finally, Plaintiffs assert that iQIYI improperly accounted for goods and services it agreed to provide as partial consideration for its equity stake in Xin'ai Sports.  Plaintiffs concede that iQIYI disclosed the precise accounting treatment it used for the Xin'ai Sports transaction, and do not allege that such disclosures were false.  (*iQIYI* Compl. ¶¶ 69–79; *Baidu* Compl. ¶¶ 93–103.) Nonetheless, they claim that iQIYI's "characterization of its obligation to transfer goods and services to Xin'ai as deferred revenue was improper."[15]  (*iQIYI* Compl. ¶ 79; *Baidu* Compl. ¶ 103.) This claim, too, fails.

The securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Simply alleging that a company's accounting judgments were improper is generally insufficient as a matter of law to state a claim, as "the questions of which accounting principle applies and how it applies call for subjective judgment by the issuer or its auditor."  *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545 (LAK), 2020 WL 2787117, at *1 (S.D.N.Y. Apr. 20, 2020).  Thus, to adequately plead a material misstatement on the basis of improper accounting treatment, "plaintiffs [must] allege plausibly that a given accounting standard *objectively was the only correct standard to apply* to the topic at issue and that it applied in an objective and singular way."  *Id.*  Here, Plaintiffs do not even attempt to plead any accounting standard that was "the only correct standard to apply," and thus fall far short of satisfying their high burden.  *See id.*; *see also Harris*, 135 F. Supp. 3d at 171 (dismissing complaint that "alleged

---

[15]    The *Baidu* Plaintiffs do not allege that Baidu made any false statement regarding iQIYI's transaction with Xin'ai Sports.

23

no facts indicating that [defendant] exercised its judgment in a way that violated GAAP beyond [plaintiffs'] disagreement with management's choices among alternative estimates").

Plaintiffs' failure is unsurprising, as iQIYI's public filings and Plaintiffs' own allegations show iQIYI's accounting treatment of the Xin'ai Sports transaction was proper.  As iQIYI disclosed to investors, it acquired its 32% equity interest in Xin'ai Sports for a combination of cash and noncash consideration totaling RMB796,000.[16]  (*iQIYI* Compl. ¶ 69; *iQIYI* Compl. ¶ 93.)  The noncash consideration consisted of goods and services, including "content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai."  (*iQIYI* Compl. ¶ 70; *Baidu* Compl. ¶ 94.)  ASC 610, which governs the transfer of nonfinancial assets (such as those iQIYI agreed to transfer to Xin'ai Sports), provides that if an entity promises goods or services "in exchange for a noncontrolling interest, the entity shall consider the noncontrolling interest received from the counterparty as noncash consideration and shall measure it in accordance with" ASC 606. ASC 610-20-32-4.  And as both Complaints make clear, ASC 606 provides that consideration for goods and services not yet provided to a customer are to be presented as deferred revenue, and

---

[16]  Plaintiffs insinuate that iQIYI misstated the cash and noncash amounts paid for its interest in Xin'ai Sports because financial statements of certain other entities state different amounts. (iQIYI Compl ¶¶ 85–86; Baidu Compl ¶¶ 109–10.)  But they allege no facts establishing the allegedly conflicting numbers are correct or comparable to iQIYI's SEC disclosures.  *See China XD Plastics*, 2016 WL 1241522, at *6.  Nor do they allege the purpose of these statements, what they contained, or how Plaintiffs verified their accuracy.  *See Autodesk*, 132 F. Supp. 2d at 844.  In any case, iQIYI's disclosure did not break out the cash and noncash components of the total consideration, so it could not have misstated either component.  *See Goldsmith v. Weibo Corp.*, C.A. No. 17-4728 (SRC), 2018 WL 2733694, at *9 (D.N.J. June 7, 2018) ("A securities fraud claim based on purported statements that a defendant did not actually make fails, necessarily, to state a claim[.]").

recognized as revenue when those services are delivered. (*iQIYI* Compl. ¶¶ 77–78 & n.28 (citing ASC 606-10-25); *Baidu* Compl. ¶¶ 101–02.)[17]

That is precisely what iQIYI did here. In accordance with ASC 610, iQIYI regarded its 32% noncontrolling interest in Xin'ai as noncash consideration in exchange for the goods and services it agreed to provide, and, pursuant to ASC 606, initially measured such consideration as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai." (*iQIYI* Compl. ¶ 70; Baidu Compl ¶ 94.) As these services were delivered, iQIYI recognized the consideration as revenue. Plaintiffs' conclusory claims that "[t]his was not a revenue contract" ignores the accounting standards cited in their Complaints. (*iQIYI* Compl. ¶ 79; Baidu Compl ¶ 103.)

Nor have Plaintiffs pleaded that iQIYI failed to report its cost of revenue and overstated its assets. (*iQIYI* Compl. ¶¶ 83–84; *Baidu* Compl. ¶¶ 107–08.) Plaintiffs allege that no cost of revenues was reported in iQIYI's related party transaction notes, but do not plead facts showing any such accounting or disclosure was required. iQIYI properly reported all costs of revenues associated with its ordinary revenue-making activities. (*See* Ex. C at 63, F-50.) Similarly, Plaintiffs allege no facts showing that iQIYI was required to remove non-rival goods from its balance sheet. (*See id.* at F-24 (noting iQIYI acquires licenses from third-party vendors who grant iQIYI the right to "enter[] into [] *non-exclusive* sub-license agreement[s] with [] sub-licensees").).

---

[17] ASC 606 applies because Xin'ai Sports meets the definition of a customer, *i.e.*, "[a] party that has contracted with an entity to obtain *goods or services that are an output of the entity's ordinary activities* in exchange for consideration." ASC 606-10-20. Here, Xin'ai Sports contracted with iQIYI to obtain goods and services within the scope of iQIYI's "ordinary activities," namely, content distribution, IP licensing, and traffic support services. (*See* Ex. C at 41 (iQIYI "generate[s] revenues primarily through membership services, online advertising and *content distribution*" as well as "live broadcasting, online games, *IP licensing*").).

Finally, because Plaintiffs fail to independently corroborate the Wolfpack Report's allegations or otherwise demonstrate that such allegations were accurate, Plaintiffs' lack any basis to claim that Defendants' denials of the Wolfpack Report are false.  (*iQIYI* Compl. ¶¶ 146–47; Baidu Compl ¶¶ 172–74.)  To the extent the *Baidu* Plaintiffs challenge Defendants' disclosures regarding the SEC's investigation into the Wolfpack Report's allegations, (*see* Baidu Compl ¶¶ 120–25), they fail to allege with particularity the reasons such statements were false, as required under the PSLRA.  15 U.S.C. § 78u-4(b)(1)(B).

## CONCLUSION

For the foregoing reasons, and those demonstrated in the additional Motions to Dismiss, both the *iQIYI* Action and the *Baidu* Action should be dismissed in their entirety with prejudice.

Dated: New York, New York
       November 30, 2022

Respectfully submitted,

/s/ William J. Sushon
Jonathan Rosenberg
William J. Sushon
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000
jrosenberg@omm.com
wsushon@omm.com

*Attorneys for Defendants Goldman Sachs (Asia) LLC; Credit Suisse Securities (USA) LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; China Renaissance Securities (Hong Kong) Limited; Citigroup Global Markets Inc.; and UBS Securities LLC*

/s/ Robert A. Fumerton
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Attorneys for Defendants iQIYI, Inc., Baidu, Inc., Yu Gong, Xiaodong Wang, Robin Yanhong Li, Qi Lu, Herman Yu, Victor Zhixiang Liang, and Giselle Manon*

26