# Exhibit A

Table of Contents

As filed with the Securities and Exchange Commission on February 27, 2018

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM F-1
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# iQIYI, Inc.
**(Exact name of Registrant as specified in its charter)**

**Not Applicable**
**(Translation of Registrant's name into English)**

| | | |
|---|---|---|
| **Cayman Islands** | **7389** | **Not Applicable** |
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification Number)** |

**9/F, iQIYI Innovation Building**
**No. 2 Haidian North First Street, Haidian District, Beijing 100080**
**People's Republic of China**
**Tel: +86 10 6267-7171**
**(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)**

**Law Debenture Corporate Services Inc.**
**801 2nd Avenue, Suite 403**
**New York, New York 10017**
**+1 212-750-6474**

**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | | |
|---|---|---|
| **Z. Julie Gao, Esq.** | **Li He, Esq.** | **James C. Lin, Esq.** |
| **Will H. Cai, Esq.** | **Davis Polk & Wardwell LLP** | **Davis Polk & Wardwell LLP** |
| **Skadden, Arps, Slate, Meagher & Flom LLP** | **c/o 2201 China World Office 2** | **c/o 18th Floor** |
| **c/o 42/F, Edinburgh Tower** | **1 Jian Guo Men Wai Avenue** | **The Hong Kong Club Building** |
| **The Landmark** | **Chao Yang District, Beijing 100004** | **3A Chater Road** |
| **15 Queen's Road Central** | **People's Republic of China** | **Central, Hong Kong** |
| **Hong Kong** | **+86 10 8567-5000** | **+852 2533-3300** |
| **+852 3740-4700** | | |

**Approximate date of commencement of proposed sale to the public: as soon as practicable after the effective date of this registration statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933.

Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Proposed maximum aggregate offering price[(1)] | Amount of registration fee |
|---|---|---|
| Class A ordinary shares, par value $0.00001 per share[(2)(3)] | $1,500,000,000 | $186,750 |

(1) Estimated solely for the purpose of determining the amount of registration fee in accordance with Rule 457(o) under the Securities Act of 1933.

(2) Includes Class A ordinary shares initially offered and sold outside the United States that may be resold from time to time in the United States either as part of their distribution or within 40 days after the later of the effective date of this registration statement and the date the shares are first bona fide offered to the public, and also includes Class A ordinary shares that may be purchased by the underwriters pursuant to an over-allotment option. These Class A ordinary shares are not being registered for the purpose of sales outside the United States.

Case 1:20-cv-01830-DG-TAM   Document 160-1   Filed 03/03/23   Page 3 of 1052 PageID #: 5436

(3) American depositary shares issuable upon deposit of the Class A ordinary shares registered hereby will be registered under a separate registration statement on Form F-6 (Registration No.333-____). Each American depositary share represents ___ Class A ordinary shares.

―――――――――――

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to such Section 8(a), may determine.**

Table of Contents

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**Subject to Completion. Dated        , 2018.**

# American Depositary Shares



# iQIYI, Inc.

### Representing        Class A Ordinary Shares

---

This is an initial public offering of American depositary shares, or ADSs, of iQIYI, Inc.

We are offering        ADSs. Each ADS represents        of our Class A ordinary shares, par value US$0.00001 per share.

Prior to this offering, there has been no public market for our ADSs or shares. We have applied to have our ADSs listed on the Nasdaq Global Market under the symbol "IQ."

*Following the completion of this offering, our outstanding share capital will consist of Class A ordinary shares and Class B ordinary shares. Baidu, Inc., our controlling shareholder, will beneficially own all of our issued Class B ordinary shares and will be able to exercise        % of the total voting power of our issued and outstanding share capital immediately following the completing of this offering. Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. Each class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to ten votes and is convertible into one Class A ordinary share. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances.*

*See "Risk Factors" beginning on page 15 for factors you should consider before buying the ADSs.*

---

*PRICE US$        PER ADS*

---

**Neither the United States Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Price to Public | Underwriting Discounts and Commission[1] | Proceeds to us |
|---|---|---|---|
| *Per ADS* | US$ | US$ | US$ |
| *Total* | US$ | US$ | US$ |

(1)    See "Underwriting" for additional disclosure regarding compensation payable by us to the underwriters.

We have granted the underwriters the right to purchase up to an additional        ADSs to cover over-allotments.

---

The underwriters expect to deliver the ADSs against payment in U.S. dollars in New York, New York on        , 2018.

**Goldman Sachs (Asia) L.L.C.**                    **Credit Suisse**                    **BofA Merrill Lynch**

---

**China Renaissance**                    **Citigroup**                    **UBS Investment Bank**

Prospectus dated        , 2018

Table of Contents



Table of Contents



Table of Contents



Table of Contents

## TABLE OF CONTENTS

| | Page | | | Page |
|---|---|---|---|---|
| Prospectus Summary | 1 | Industry | | 102 |
| The Offering | 10 | Business | | 107 |
| Summary Consolidated Financial and Operating Data | 12 | Regulation | | 126 |
| Risk Factors | 15 | Management | | 141 |
| Special Note Regarding Forward-Looking Statements and Industry Data | 55 | Principal Shareholders | | 149 |
| | | Related Party Transactions | | 152 |
| Use of Proceeds | 56 | Description of Share Capital | | 154 |
| Dividend Policy | 58 | Description of American Depositary Shares | | 166 |
| Capitalization | 59 | Shares Eligible for Future Sale | | 179 |
| Dilution | 61 | Taxation | | 181 |
| Exchange Rate Information | 63 | Underwriting | | 187 |
| Enforceability of Civil Liabilities | 64 | Expenses Related to this Offering | | 199 |
| Corporate History and Structure | 66 | Legal Matters | | 200 |
| Our Relationship with Baidu | 72 | Experts | | 201 |
| Selected Consolidated Financial Data | 74 | Where You Can Find Additional Information | | 202 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 76 | Index to Consolidated Financial Statements | | F-1 |

_____

You should rely only on the information contained in this prospectus or in any related free-writing prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus or in any related free-writing prospectus. We are offering to sell, and seeking offers to buy, the ADSs only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is current only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the ADSs.

We have not taken any action to permit a public offering of the ADSs outside the United States or to permit the possession or distribution of this prospectus outside the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about and observe any restrictions relating to the offering of the ADSs and the distribution of the prospectus outside the United States.

**Until                , 2018 (the 25th day after the date of this prospectus), all dealers that buy, sell or trade ADSs, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the obligation of dealers to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.**

i

Table of Contents

<div style="border:1px solid">

### PROSPECTUS SUMMARY

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements appearing elsewhere in this prospectus. In addition to this summary, we urge you to read the entire prospectus carefully, especially the risks of investing in our ADSs discussed under "Risk Factors," before deciding whether to buy our ADSs. This prospectus contains information from an industry report commissioned by us and prepared by iResearch, a third-party research firm, in December 2017 (and updated by iResearch in February 2018) to provide information regarding our industry and our market position in China. We refer to this report as the "iResearch Report." This prospectus also contains information available from iResearch that was not commissioned by us, which we cite and identify in this prospectus with the language "according to iResearch."*

**Our Mission**

We aspire to become a technology-based entertainment giant that brings fun and joy to people and their families.

**Business Overview**

iQIYI is an innovative market-leading online entertainment service in China.

We are at the forefront of the entertainment industry in China. Our corporate DNA combines creative talent with technology, fostering an environment for the continuous innovation and production of blockbuster content. Our platform features highly popular original content, as well as a comprehensive selection of professionally-produced and partner-generated content. Through our curated premium content, we attract a massive user base with tremendous user engagement, and generate significant monetization opportunities.

We are one of the largest internet companies in China in terms of user base. We have successfully built iQIYI into a widely-recognized brand among users, content partners and advertisers, and have redefined online entertainment in China. We are the largest internet video streaming service in China in terms of user time spent and average total MAUs in 2017, according to iResearch. Through our license partner, we also operate the largest smart TV video streaming service in China as measured by monthly active devices in December 2017, according to the iResearch Report. For the three months ended December 31, 2017, we had approximately 421.3 million average mobile MAUs and approximately 126.0 million average mobile DAUs, while our average PC MAUs and average PC DAUs reached 424.1 million and 53.7 million, respectively. In December 2017, our users watched a total of 9.2 billion hours of videos on our platform, and spent an average of 1.7 hours per day per user watching video content on our mobile apps. We have also built a leading entertainment-based social media platform, iQIYI Paopao, for fans to follow and interact with celebrities and the entertainment community. iQIYI Paopao had approximately 45.8 million average mobile DAUs for the three months ended December 31, 2017. For definitions of (i) total user time spent and MAUs, (ii) mobile MAUs, mobile DAUs, PC MAUs and PC DAUs for our iQIYI platform, as well as (iii) mobile DAUs for iQIYI Paopao, see "—Conventions Which Apply to this Prospectus."

We pride ourselves in establishing a track record of producing blockbuster original content. In 2017, our original content accounted for 5 of the top 10 original internet variety shows and 6 of the top 10 original internet drama series in China based on each title's peak monthly active users according to the iResearch Report. *The Lost Tomb* ( 盗墓笔记 ), one of the first high-budget original internet drama series in China that we released in 2015, generated more than 100 million video views within the first 24 hours of debut and over 4 billion video views in total. For the definition of video views for our iQIYI platform, see "—Conventions Which Apply to this Prospectus." Since 2015, we have released several award-winning multi-genre original titles, such as *The Mystic*

</div>

1

Table of Contents

*Nine* ( 老九门 ) and *Burning Ice* ( 无证之罪 ), which two titles in aggregate have generated approximately 13 billion video views. We also pioneered and produced a number of internet variety shows that are highly popular, such as *Qipa Talk* ( 奇葩说 ), released in 2014 and currently in its fourth season*,* and *The Rap of China* ( 中国有嘻哈 ), each of which has generated over 3.0 billion video views. Leveraging on our initial success, we have extended selected popular titles into multi-season format.

Our powerful content distribution capability makes us the go-to partner in China for premium content providers. Equipped with our deep-learning predictive algorithms and massive user data, we have developed industry-leading tools to select third-party content. During 2017, iQIYI featured 42 of the top 50 most popular drama series, variety show and film titles streamed on the internet in China based on each title's peak monthly active users, according to the iResearch Report. We have also built a comprehensive content library catering to the diverse tastes of our users, and cultivated emerging content providers. Our growing network of iQIYI partner accounts provides us with high-quality partner-generated content. This network also enables thousands of content providers to distribute content effectively and monetize their followings through revenue sharing arrangements with us.

We distinguish ourselves in the online entertainment industry by our leading technology platform powered by advanced AI, big data analytics and other core proprietary technologies. Our core proprietary technologies are critical to producing content that caters to user tastes, delivering superior entertainment experience to our users, improving operational efficiency, and increasing return on investment for our advertisers and monetization opportunities for content providers. For example, for our highly popular original title *The Rap of China* ( 中国有嘻哈 ), we used advanced AI technology in our casting process to select the most suitable celebrities for the show as well as for real-time frame analysis to study user preferences.

We have developed a diversified monetization model to capture multiple opportunities arising from the rapid growth of the online entertainment industry in China. We generate revenues through membership services, online advertising services, and a suite of IP-related monetization methods, including content distribution. We pioneered a large scale paid content subscription business in China. Our membership services revenue increased by 277.5% from RMB996.7 million in 2015 to RMB3,762.2 million in 2016, and further by 73.7% from RMB3,762.2 million in 2016 to RMB6,536.0 million (US$1,004.6 million) in 2017. Membership services revenue as a percentage of total revenues increased from 18.7% in 2015 to 33.5% in 2016, and further to 37.6% in 2017. For the foreseeable future, we expect membership services as a percentage of total revenues to remain at a similar level as that in 2017. We appeal to advertisers through broad and efficient user reach, as well as innovative and effective advertising products. Our online advertising revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, and further by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017. We have proven capabilities of adapting a single popular work into a variety of entertainment products, creating multiple channels to amplify the popularity and monetary value of the original work. Our sophisticated monetization model fosters an environment for high-quality content production and distribution on our platform, which in turn expands our user base and increases user engagement, creating a virtuous cycle.

We enjoy significant synergies with our parent company Baidu, Inc., or Baidu. Baidu has provided us with technology, infrastructure and financial support. Our close cooperation in AI technology, user traffic and infrastructure sharing allows us to strengthen our respective leading market positions. We have no experience operating as a stand-alone public company. After this offering, we will face enhanced administrative and compliance requirements, which may result in substantial costs. Furthermore, upon the completion of this offering, Baidu will beneficially own all of our outstanding high voting Class B ordinary shares and continue to be our controlling shareholder. Baidu's voting control may cause transactions to occur that might not be beneficial to you as a holder of ADSs and may prevent transactions that could have been beneficial to you. See "Risk Factors—Risks Related to Our Carve-out from Baidu and Our Relationship with Baidu—Baidu will

2

Table of Contents

control the outcome of shareholder actions in our company." As our business continues to grow and after we become a public company, we expect to rely less on financing support from Baidu and increasingly rely on net cash provided by operating activities, financing through capital markets and commercial banks for our liquidity needs.

We have grown rapidly with total revenues increasing by 111.3% from RMB5,318.6 million 2015 to RMB11,237.4 million in 2016, and further by 54.6% from RMB11,237.4 million in 2016 to RMB17,378.4 million (US$2,671.0 million) in 2017. We had net losses of RMB2,575.1 million, RMB3,074.0 million, and RMB3,736.9 million (US$574.4 million) in 2015, 2016, and 2017, respectively.

We face significant competition in China, primarily from Tencent Video and Youku Tudou. We compete for users, usage time and advertising customers. Some of our competitors have a longer operating history and significantly greater financial resources than we do. If any of our competitors achieves greater market acceptance than we do or is able to offer more attractive video content, our business, financial condition and results of operations may be materially and adversely affected. See "Risk Factors—Risks Related to Our Business and Industry—We operate in a highly competitive market and we may not be able to compete effectively."

**Our Industry**

The online entertainment industry in China has grown rapidly and the growth is expected to continue. According to the iResearch Report, the online entertainment industry in China has grown from approximately RMB50.8 billion in 2012 to RMB156.9 billion in 2016, and is expected to reach approximately RMB688.4 billion in 2022. Video is the leading online entertainment format in China. According to the iResearch Report, out of total time spent by users on online entertainment in China in 2016, over 80% was spent on internet videos. Online entertainment, especially internet video, is attractive to Chinese users due to many favorable factors, including easy accessibility, wide content selection, and innovative platforms with social features. Given the rapidly developing AI and big data technologies and increasing user demand for diversified, rich video content, we believe the internet video industry in China is poised for sustainable strong growth in China.

Internet users in China are increasingly focused on the quality and originality of video content and are willing to pay for premium content. As a result, China's internet video platforms focus on professionally-produced content, or PPC, to cater to viewers' demand. Developing various formats of entertainment content based on a popular IP has become an important business model to address users' diverse entertainment needs and capture the full monetization potential of the IP. Additionally, leading internet video platforms in China benefit from a highly fragmented content production ecosystem, which provides such platforms with greater bargaining power in procuring quality content and expanding content libraries.

Internet video platforms in China currently generate revenues mainly from membership services and online advertising. The membership services market size has grown from RMB0.4 billion in 2012 to RMB12.1 billion (US$1.9 billion) in 2016, and is expected to reach RMB73.0 billion by 2022, representing a compound annual growth rate, or CAGR of 34.9% from 2016, according to the iResearch Report. Online advertising in China has also experienced rapid growth and is expected to continue its growth momentum. According to the iResearch Report, online advertising market size of China's internet video platforms has increased from RMB6.7 billion in 2012 to RMB32.6 billion (US$5.0 billion) in 2016, and is expected to reach RMB125.8 billion by 2022, representing a CAGR of 25.2% from 2016. In addition, internet video platforms in China generate an increasing amount of revenues from adapting popular entertainment content into a variety of derivative works, such as animation, video games, and offline merchandizing. As China's entertainment industry matures, emerging monetization models will provide internet video platforms in China with tremendous growth potential.

3

**Table of Contents**

**Our Competitive Strengths**

We believe our success to date is primarily attributable to the following key competitive strengths:

- we have a massive and highly engaged user base;

- we produce highly popular, trend-setting original content;

- we offer premium third-party content and a vast and diversified content library;

- we cultivate a vibrant partner-generated-content system;

- we capture extensive monetization opportunities;

- we have developed a robust technology platform;

- we enjoy significant synergies with Baidu; and

- we have a visionary management team.

**Our Strategies**

We intend to pursue the following strategies to further grow our business:

- enrich and expand our blockbuster content;

- broaden our content offerings to stay abreast of evolving user preferences;

- expand our user base and strengthen our content distribution capability;

- bolster our monetization channels; and

- continue our technological innovations.

**Our Challenges**

We face risks and uncertainties in realizing our business objectives and executing our strategies, including those relating to:

- net losses incurred since our inception and possible continued losses in the future;

- anticipating user preferences and providing high-quality content, especially popular original content in a cost-effective manner;

- procuring content from content providers upon terms acceptable to us;

- retaining members and attracting new members;

- retaining existing and attracting new advertising customers;

- obtaining sufficient capital to fund our operations, content acquisitions and technology investments;

- increase in market price of professionally-produced content;

- maintaining and enhancing our brand;

- the continued and collaborative efforts of our senior management and key employees; and

- our limited operating history.

Table of Contents

**Corporate History and Structure**

We launched qiyi.com under the QIYI brand in April 2010 as an internet video streaming service in China. Our holding company, Ding Xin, Inc., was incorporated in November 2009 in the Cayman Islands. Ding Xin, Inc. was subsequently renamed Qiyi.com, Inc. in August 2010 and later iQIYI, Inc. in November 2017. QIYI was rebranded as iQIYI in November 2011.

In March 2010, we established a wholly-owned PRC subsidiary, Beijing QIYI Century Science & Technology Co., Ltd., or Beijing QIYI Century. In November 2011, we obtained control over Beijing Xinlian Xinde Advertisement Media Co., Ltd. and in May 2012 we renamed it Beijing iQIYI Science & Technology Co., Ltd., or Beijing iQIYI, to operate our internet video streaming services. In December 2012, Shanghai iQIYI Culture Media Co., Ltd., or Shanghai iQIYI, was established as our exclusive advertising agent. In May 2013, we acquired the online video business of PPS. We primarily provide live broadcasting service through Shanghai Zhong Yuan Network Co., Ltd., or Shanghai Zhong Yuan, the operating entity of PPS. We have control over and are the primary beneficiary of Beijing iQIYI, Shanghai iQIYI and Shanghai Zhong Yuan through a series of contractual arrangements. Beijing iQIYI and Shanghai Zhong Yuan hold our ICP licenses and other licenses and permits necessary for our business operation.

In May 2017, we established a wholly-owned Cayman Islands subsidiary, IQIYI Film Group Limited. Subsequently, we established IQIYI Film Group HK Limited in June 2017, and Beijing iQIYI New Media Science and Technology Co., Ltd., or iQIYI New Media, in July 2017. IQIYI Film Group Limited holds 100% of the equity of IQIYI Film Group HK Limited, which in turn holds 100% of equity in iQIYI New Media. iQIYI Pictures (Beijing) Co., Ltd., or iQIYI Pictures, was established in December 2014, and Beijing iQIYI Cinema Management Co., Ltd., or Beijing iQIYI Cinema, was established in June 2017. We have control over and are the primary beneficiary of iQIYI Pictures and Beijing iQIYI Cinema through a series of contractual arrangements.

Between March 2010 and September 2014, Baidu made substantial investments in our company, and we issued ordinary shares and several series of preferred shares to Baidu Holdings Limited, or Baidu Holdings, a wholly-owned subsidiary of Baidu. In our Series F preferred shares financing, which took place in November 2014, we issued 136,749,954 Series F preferred shares to Baidu Holdings, 341,874,885 Series F preferred shares to Xiaomi Ventures Limited, or Xiaomi Ventures, and 68,374,978 Series F preferred shares to Prominent TMT Limited, an affiliate of Xiaomi Ventures. In January 2017, we raised $1.53 billion from the issuance of convertible notes to a group of investors. These notes were converted into Series G preferred shares in October 2017, including 215,484,776 Series G-1 preferred shares issued to Baidu Holdings and another investor, as well as 798,951,243 Series G-2 preferred shares issued to other investors.

5

**Table of Contents**

The following diagram illustrates our corporate structure, including our significant subsidiaries and consolidated affiliated entities, as of the date of this prospectus:





For details of contractual arrangements, see "Corporate History and Structure — Contractual Arrangements with the Consolidated Affiliated Entities and Their Respective Shareholders."

Equity interest.

Notes:

(1)   The shareholders of Beijing iQIYI Cinema are Dr. Yu Gong, our founder, director and chief executive officer, and Mr. Xianghua Yang, our senior vice president, each holding 50% of equity interest.

(2)   The shareholders of iQIYI Pictures are Dr. Yu Gong and Mr. Ning Ya, senior vice president of the company and president of iQIYI Pictures, each holding 50% of equity interest.

(3)   The shareholders of Shanghai iQIYI are Dr. Yu Gong and Mr. Xiaohua Geng, our senior vice president, each holding 50% of equity interest.

(4)   The shareholder of Beijing iQIYI is Mr. Xiaohua Geng, holding 100% of equity interest.

(5)   The shareholder of Shanghai Zhong Yuan is Dr. Yu Gong, holding 100% of equity interest.

**Corporate Information**

Our principal executive offices are located at 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing, 100080, People's Republic of China. Our telephone number at this address is

Table of Contents

+86 10 6267 7171. Our registered office in the Cayman Islands is located at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands. Our agent for service of process in the United States is Law Debenture Corporate Services Inc., located at 801 2nd Avenue, Suite 403, New York, New York 10017.

Investors should contact us for any inquiries through the address and telephone number of our principal executive offices. Our website is *www.iqiyi.com*. The information contained on our website is not a part of this prospectus.

**Conventions Which Apply to this Prospectus**

Unless we indicate otherwise, all information in this prospectus reflects no exercise by the underwriters of their option to purchase up to       additional ADSs representing           Class A ordinary shares from us.

Except where the context otherwise requires and for purposes of this prospectus only:

- "ACGN" refers to anime, comic, games and light novels;

- "ADSs" refers to our American depositary shares, each of which represents          Class A ordinary shares;

- "AI" refers to artificial intelligence;

- "Baidu" refers to Baidu, Inc., our parent company and controlling shareholder;

- "China" or "PRC" refers to the People's Republic of China, excluding, for the purpose of this prospectus only, Taiwan, Hong Kong, and Macau;

- "IP" refers to intellectual property;

- "IT" refers to information technology;

- "mobile DAUs," for our iQIYI platform, refers to the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a day. Our mobile DAUs are calculated using internal company data that has not been independently verified, and we treat each distinguishable device as a separate user for purposes of calculating mobile DAUs, although it is possible that some people may use more than one mobile device and multiple people may share one mobile device to access our platform;

- "mobile DAUs," for those quoted from the iResearch Report, refers to the number of unique mobile devices that have accessed relevant internet platforms via mobile apps at least once during a day;

- "mobile DAUs," with respect to iQIYI Paopao, refers to the number of unique mobile devices that have accessed iQIYI Paopao functions through our iQIYI mobile app at least once during a day. The numbers of our iQIYI Paopao DAUs are calculated using internal company data that has not been independently verified, and we treat each distinguishable device as a separate user for purposes of calculating iQIYI Paopao mobile DAUs, although it is possible that some people may use more than one mobile device and multiple people may share one mobile device to access iQIYI Paopao;

- "mobile MAUs," for our iQIYI platform, refers to the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a calendar month. Our mobile MAUs are calculated using internal company data that has not been independently verified, and we treat each distinguishable device as a separate user for purposes of calculating mobile MAUs, although it is possible that some people may use more than one mobile device and multiple people may share one mobile device to access our platform;

7

Table of Contents

- "offline entertainment industry," for those quoted from the iResearch Report, refers to recreational services (including scenic spots tourism, recreational services such as playground, internet cafes, dance club and other indoor entertainment, and photography and printing services, etc.), film, television broadcasting, offline performance, offline music and IP operations markets;

- "online entertainment industry," for those quoted from the iResearch Report, refers to internet video, live broadcasting, short-form video, online literature, digital music, and recreational internet anime and comic markets;

- "PC DAUs," for our iQIYI platform, refers to the sum of (i) the number of unique PC devices that have accessed our platform through our PC client terminal, and (ii) the number of PC devices that have accessed our platform through our website, in each case at least once during a day. For (ii), we calculate the number of PC devices that have accessed our platform through our website using unique cookies (a commonly used tracking code) recorded by internet browsers. Our PC DAUs are calculated using internal company data that has not been independently verified. For PC client terminal access, we treat each distinguishable PC device as a separate user for purposes of calculating PC DAUs, although it is possible that some people may use more than one PC and multiple people may share one PC to access our platform. For website access, we treat each distinguishable cookie as a separate user for purposes of calculating PC DAUs, although it is possible that some people may use more than one cookie and multiple people may share one cookie to access our platform. Each access to our iQIYI platform through either of our PC client terminal or our website (with one unique cookie) during the course of a day is counted as one PC DAU under this methodology;

- "PC DAUs," for those quoted from the iResearch Report, refers to the number of unique PC devices that have accessed relevant internet platforms via websites or PC client terminals at least once during a day. If a given PC device accesses the same platform through both its PC website and PC client terminal in a day, such device will be counted as one DAU;

- "PC MAUs," for our iQIYI platform, refers to the sum of (i) the number of unique PC devices that have accessed our platform through our PC client terminal, and (ii) the number of PC devices that have accessed our platform through our website, in each case at least once during a calendar month. For (ii), we calculate the number of PC devices that have accessed our platform through our website using unique cookies (a commonly used tracking code) recorded by internet browsers. Our PC MAUs are calculated using internal company data that has not been independently verified. For PC client terminal access, we treat each distinguishable PC device as a separate user for purposes of calculating PC MAUs, although it is possible that some people may use more than one PC and multiple people may share one PC to access our platform. For website access, we treat each distinguishable cookie as a separate user for purposes of calculating PC MAUs, although it is possible that some people may use more than one cookie and multiple people may share one cookie to access our platform. Each access to our iQIYI platform through either of our PC client terminal or our website (with one unique cookie) during the course of a calendar month is counted as one PC MAU under this methodology;

- "RMB" and "Renminbi" refer to the legal currency of China;

- "shares" or "ordinary shares" prior to this offering refers to our Class A and Class B ordinary shares, par value $0.00001 per share;

- "subscribing members," refers to the individuals who purchased our monthly, quarterly or annual membership packages, including individuals with trial membership, and excluding individuals who pay for video on-demand services;

- "total MAUs," for those quoted from iResearch or the iResearch Report, refers to the sum of the number of mobile devices that have accessed relevant internet platforms via mobile apps and the number of PC devices that have accessed relevant internet platforms via websites or PC client

8

Table of Contents

terminals, in each case at least once during a calendar month. If a given PC device accesses the same platform through both its PC website and PC client terminal in a calendar month, such device will be counted as one MAU;

- "total user time spent," for our iQIYI platform, refers to the cumulative amount of time our video content is played through PC, mobile and smart TV devices during a given period of time;

- "total user time spent," for those quoted from iResearch or the iResearch Report, refers to the cumulative amount of time users spent on relevant internet platform's websites, PC client terminals, and mobile apps during a given period of time;

- "US$," "U.S. dollars," "$," and "dollars" refer to the legal currency of the United States;

- "video views" refers to the number of times a video is launched on our platform, regardless of time spent viewing the video;

- "WAP" refers to wireless application protocol; and

- "we," "us," "our company" and "our" refer to iQIYI, Inc., a Cayman Islands company, and its subsidiaries, and, in the context of describing our operations and combined and consolidated financial information, also include its consolidated affiliated entities in the PRC.

This prospectus contains information and statistics relating to China's economy and the industries in which we operate derived from various publications issued by market research companies and PRC governmental entities, which have not been independently verified by us, the underwriters or any of their respective affiliates or advisers. The information in such sources may not be consistent with our internal operating data and other information compiled in or outside of China.

9

**Table of Contents**

<div style="border:1px solid black">

**THE OFFERING**

| | |
|---|---|
| Offering price | We currently estimate that the initial public offering price will be between $    and $    per ADS. |
| ADSs offered by us |     ADSs (or     ADSs if the underwriters exercise their over-allotment option in full). |
| ADSs to Class A ordinary share ratio | Each ADS represents the right to receive     Class A ordinary shares, par value $0.00001 per share. |
| ADSs outstanding immediately after this offering |     ADSs (or     ADSs if the underwriters exercise their option to purchase additional ADSs representing Class A ordinary shares in full) |
| Ordinary shares outstanding immediately after this offering |     Class A ordinary shares (or     Class A ordinary shares if the underwriters exercise their option to purchase additional ADSs representing Class A ordinary shares in full) and     Class B ordinary shares |
| The ADSs | Each ADS represents     Class A ordinary shares. The depositary will hold the Class A ordinary shares underlying your ADSs and you will have rights as provided in the deposit agreement. |
| | You may turn in your ADSs to the depositary in exchange for Class A ordinary shares. The depositary will charge you fees for any exchange. |
| | We may amend or terminate the deposit agreement without your consent. If you continue to hold your ADSs, you agree to be bound by the deposit agreement as amended. |
| | To better understand the terms of the ADSs, you should carefully read the "Description of American Depositary Shares" section of this prospectus. You should also read the deposit agreement, which is filed as an exhibit to the registration statement that includes this prospectus. |
| Option to purchase additional ADSs | We have granted to the underwriters an option, exercisable within 30 days from the date of this prospectus, to purchase up to an additional     ADSs. |
| Reserved ADSs | At our request, the underwriters have reserved up to     % of the ADSs being offered by this prospectus for sale at the initial public offering price to our directors, officers, employees and other individuals associated with us and members of their families. The sales will be made by UBS Financial Services Inc., a selected dealer affiliated with UBS Securities LLC, an underwriter of this offering, through a directed share program. Any ADSs sold in the directed share program to our directors, executive officers, shareholders or certain holders of equity awards shall be subject to the lock-up agreements described elsewhere in this prospectus. |

</div>

10

**Table of Contents**

| | |
|---|---|
| Use of proceeds | We expect that we will receive net proceeds of approximately $       million from this offering, or approximately $       million if the underwriters exercise their option to purchase additional ADSs from us in full, after deducting underwriting discounts and commissions and estimated offering expenses payable by us. |
| | We plan to use 50% of the net proceeds we receive from this offering to expand and enhance our content offerings, 10% to strengthen our technologies, and the balance for working capital and other general corporate purposes. See "Use of Proceeds" for more information. |
| Nasdaq symbol | IQ |
| Depositary | JPMorgan Chase Bank, N.A. |
| Lock-up | [We, our directors and executive officers, our existing shareholders and certain holders of our share-based awards] have agreed with the underwriters not to sell, transfer or dispose of any ADSs, ordinary shares or similar securities for a period of 180 days after the date of this prospectus, subject to certain exceptions. See "Shares Eligible for Future Sale" and "Underwriting." |
| Risk factors | See "Risk Factors" and other information included in this prospectus for a discussion of risks you should carefully consider before investing in the ADSs. |

The number of ordinary shares that will be outstanding immediately after this offering:

- assumes (i) re-designation or conversion of all outstanding ordinary shares and preferred shares (other than ordinary and preferred shares held by Baidu or its affiliates) into        Class A ordinary shares and (ii) re-designation or conversion of all outstanding ordinary shares and preferred shares held by Baidu or its affiliates into        Class B ordinary shares, in each case immediately upon the completion of this offering;

- assumes no exercise of the underwriters' option to purchase additional ADSs representing Class A ordinary shares;

- excludes        Class A ordinary shares issuable upon the exercise of options outstanding as of the date of this prospectus, at a weighted average exercise price of $       per share; and

- excludes        Class A ordinary shares reserved for future issuances under our equity incentive plans.

11

Table of Contents

## SUMMARY CONSOLIDATED FINANCIAL AND OPERATING DATA

The following summary consolidated statements of operations data for the years ended December 31, 2015, 2016 and 2017 and summary consolidated balance sheet data as of December 31, 2016 and 2017 have been derived from our audited consolidated financial statements included elsewhere in this prospectus. Our consolidated financial statements are prepared and presented in accordance with U.S. GAAP. You should read this Summary Consolidated Financial and Operating Data section together with our consolidated financial statements and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus. Our historical results are not necessarily indicative of results expected for future periods.

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2017** |
| | **RMB** | **RMB** | **RMB** | **US$** |
| | (in thousands, except for share and per share data) | | | |
| **Summary Consolidated Statements of Operations Data:** | | | | |
| Total revenues | 5,318,584 | 11,237,407 | 17,378,350 | 2,671,003 |
| Operating costs and expenses: | | | | |
| Cost of revenues[1] | (6,041,764) | (11,436,595) | (17,386,563) | (2,672,266) |
| Selling, general and administrative[1] | (1,204,464) | (1,765,824) | (2,674,990) | (411,138) |
| Research and development[1] | (499,957) | (824,482) | (1,269,806) | (195,166) |
| Total operating costs and expenses | (7,746,185) | (14,026,901) | (21,331,359) | (3,278,570) |
| Operating loss | (2,427,601) | (2,789,494) | (3,953,009) | (607,567) |
| Total other (expenses)/income, net | (136,345) | (271,440) | 208,512 | 32,047 |
| **Loss before income tax** | **(2,563,946)** | **(3,060,934)** | **(3,744,497)** | **(575,520)** |
| Income tax (expense)/benefit | (11,166) | (13,088) | 7,565 | 1,163 |
| **Net loss** | **(2,575,112)** | **(3,074,022)** | **(3,736,932)** | **(574,357)** |
| Accretion of redeemable convertible preferred shares | (2,342,385) | (4,874,739) | 5,073,140 | 779,727 |
| Extinguishment and reissuance of Series B preferred shares | — | — | (363,279) | (55,835) |
| **Net (loss)/income attributable to ordinary shareholders** | **(4,917,497)** | **(7,948,761)** | **972,929** | **149,535** |
| **Net (loss)/earnings per share:** | | | | |
| Basic | (14.36) | (23.20) | 0.30 | 0.05 |
| Diluted | (14.36) | (23.20) | (1.15) | (0.18) |
| **Shares used in net (loss)/earnings per share computation:** | | | | |
| Basic | 342,548,237 | 342,548,237 | 342,548,237 | 342,548,237 |
| Diluted | 342,548,237 | 342,548,237 | 3,243,147,261 | 3,243,147,261 |
| **Pro forma net loss per share attributable to Class A and Class B ordinary shareholders (unaudited)[2]:** | | | | |
| Basic | | | (0.89) | (0.14) |
| Diluted | | | (0.89) | (0.14) |
| **Class A ordinary shares and Class B ordinary shares used in pro forma net loss per share computation (unaudited)[2]:** | | | | |
| Basic | | | 4,071,371,737 | 4,071,371,737 |
| Diluted | | | 4,071,371,737 | 4,071,371,737 |

12

**Table of Contents**

Notes:

(1) Share-based compensation expense was allocated as follows:

| | For the Year Ended December 31, | | | |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | | | (in thousands) | |
| Cost of revenues | 5,837 | 9,479 | 34,895 | 5,363 |
| Selling, general and administrative | 21,330 | 30,447 | 130,994 | 20,133 |
| Research and development | 17,027 | 22,466 | 67,535 | 10,380 |
| Total | 44,194 | 62,392 | 233,424 | 35,876 |

(2) The unaudited pro forma loss per Class A and Class B ordinary share is computed using the weighted average number of Class A and Class B ordinary shares outstanding as of December 31, 2017, and assumes the automatic conversion of all of the Company's convertible redeemable preferred shares into ordinary shares and re-designation to Class A and Class B ordinary shares upon the closing of the Company's IPO, as if it had occurred on January 1, 2017.

The following table presents our summary consolidated balance sheet data for the years indicated.

| | As of December 31, | | |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| | | (in thousands) | |
| **Summary Consolidated Balance Sheet Data:** | | | |
| Cash and cash equivalents | 964,207 | 733,010 | 112,662 |
| Short-term investments | 902,978 | 779,916 | 119,871 |
| Total current assets | 5,154,305 | 5,700,528 | 876,156 |
| Total assets | 13,631,636 | 20,200,899 | 3,104,822 |
| Total current liabilities | 11,889,853 | 11,625,612 | 1,786,824 |
| Total liabilities | 11,897,142 | 11,918,299 | 1,831,810 |
| Total mezzanine equity | 17,039,167 | 22,601,664 | 3,473,812 |
| Total shareholders' deficit | (15,304,673) | (14,319,064) | (2,200,800) |

The following table presents our summary cash flows for the years indicated.

| | For the Year Ended December 31, | | | |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | | | (in thousands) | |
| **Summary Consolidated Cash Flow Data:** | | | | |
| Net cash provided by operating activities | 1,070,770 | 2,612,121 | 4,011,784 | 616,594 |
| Net cash used for investing activities | (3,133,375) | (6,663,100) | (10,660,674) | (1,638,515) |
| Net cash (used in)/provided by financing activities | (131,708) | 3,411,766 | 6,561,110 | 1,008,424 |
| Effect of exchange rate changes on cash and cash equivalents | 71,951 | 14,681 | (143,417) | (22,037) |
| Net decrease in cash and cash equivalents | (2,122,362) | (624,532) | (231,197) | (35,534) |
| Cash and cash equivalents at the beginning of the year | 3,711,101 | 1,588,739 | 964,207 | 148,196 |
| Cash and cash equivalents at the end of the year | 1,588,739 | 964,207 | 733,010 | 112,662 |

**Table of Contents**

The following tables present our summary key operating data as of the dates and for the periods indicated:

| | For the Quarter Ended December 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2016** | **2017** |
| | | **(in millions)** | |
| **Summary Key Operating Data:** | | | |
| Average mobile DAUs | 88.3 | 125.4 | 126.0 |
| Average mobile MAUs | 365.5 | 405.4 | 421.3 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2016** | **2017** |
| | | **(in millions)** | |
| Subscribing members | 10.7 | 30.2 | 50.8 |

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2016** | **2017** |
| | | **(in millions of hours)** | |
| Daily average total user time spent | 169.9 | 259.1 | 300.1 |

14

Table of Contents

## RISK FACTORS

*An investment in our ADSs involves significant risks. You should carefully consider all of the information in this prospectus, including the risks and uncertainties described below, before making an investment in our ADSs. Any of the following risks could have a material adverse effect on our business, financial condition and results of operations. In any such case, the market price of our ADSs could decline, and you may lose all or part of your investment.*

**Risks Related to Our Business and Industry**

***We have incurred net losses since our inception and may continue to incur losses in the future.***

We incurred net losses since our inception, including net losses in the amount of RMB2.6 billion, RMB3.1 billion, and RMB3.7 billion (US$574.4 million) in 2015, 2016, and 2017, respectively, primarily due to significant content and bandwidth costs. Our ability to achieve profitability is affected by various factors, many of which are beyond our control. For example, our revenues depend on the increased number of subscribing members and advertising customers' allocation of more budget to internet video streaming platforms. In addition, our users' willingness to pay and subscribe to our content depends on the quality and breadth of our content offerings and availability of alternative entertainment content offerings. The production and procurement of content, as well as bandwidth, have historically accounted for the majority of our cost of revenues. We expect our costs to increase on an absolute basis as traffic to our platform grows, users of our platform increase, the resolution of our videos increases and as we produce and acquire more content to enrich user experience. Producing high-quality, popular original content is costly and time-consuming and it will typically take a long period of time to realize returns on investment, if at all. The market prices for professionally-produced content, especially popular TV series and movies, have increased significantly in China during the past few years and may continue to increase in the foreseeable future. If we cannot successfully offset our increased costs with a significant increase in total revenues, our financial condition and results of operations may be materially and adversely affected. We may continue to incur net losses in the future due to our continued investments in content and technology. We may also continue to incur net losses in the future due to changes in the macroeconomic and regulatory environment, competitive dynamics and our inability to respond to these changes in a timely and effective manner.

***If we fail to anticipate user preferences and provide high-quality content, especially popular original content, in a cost-effective manner, we may not be able to attract and retain users to remain competitive.***

Our success depends on our ability to maintain and grow user time spent on our platform. To attract and retain users and compete against our competitors, we must continue to offer high-quality content, especially popular original content, in a cost effective manner, which provides our users with a superior online entertainment experience. To this end, we must continue to produce new original content and source new professionally or partner-produced content in a cost effective manner. Given that we operate in a rapidly evolving industry, we need to anticipate user preferences and industry changes and respond to such changes in a timely and effective manner. If we fail to cater to the needs and preferences of our users, control our costs in doing so or fail to deliver superior user experience, we may suffer from reduced user traffic, and our business, financial condition and results of operations may be materially and adversely affected. Various phases of our original content production are outsourced to our content production partners. If they fail to generate quality content satisfactory to our demands or provide services upon terms commercially acceptable to us, we may be unable to provide high-quality original content offerings to our users.

We rely on our in-house team to generate creative ideas for original content and to supervise the original content origination and production process, and we intend to continue to invest resources in content production. We face fierce competition for qualified personnel in a limited pool of high-quality creative talent. Our competitors include well-capitalized companies that are capable of offering compensation packages more

15

**Table of Contents**

attractive to talents. If we are not able to compete effectively for talents or attract and retain top talents at reasonable costs, our original content production capabilities would be negatively impacted. Any deterioration in our in-house content production capability, inability to attract creative talents at reasonable costs or losses in personnel may materially and adversely affect our business and operating results. If we are unable to offer popular original content that meets user tastes and preferences in a cost effective manner, our user experience may be adversely affected, we may suffer from reduced user traffic and our business, financial condition and results of operations may be materially and adversely affected.

***If we fail to procure content from content providers upon terms acceptable to us, our business may be materially and adversely affected.***

Our ability to provide our users with high-quality, popular content depends in part on our ability to procure content from studios and other content providers. We typically enter into license agreements with third-party content providers. The license periods and the terms and conditions of such licenses vary. If content providers and other rights holders are no longer willing or able to license content to us upon terms acceptable to us, our ability to offer content to our users will be adversely affected and/or our cost could further increase. As competition intensifies, we may see the cost of licensed content increase. As we seek to differentiate our service, we are increasingly focused on securing rights other than merely distribution and online streaming rights. We also acquire other forms of copyright such as rights to adapt the original content into online games, films, drama series, animation and other entertainment formats. We focus on offering an overall mix of content that appeals to our users in a cost efficient manner. If we do not maintain a compelling mix of content, our user acquisition and retention may be adversely affected.

***If our efforts to retain members and attract new members are not successful, our business and results of operations will be materially and adversely affected.***

We have experienced significant membership growth over the past several years. Our ability to continue to retain members and attract new members will depend in part on our ability to consistently provide our members with compelling content choices, as well as a quality experience for selecting and viewing video content. Furthermore, the relative service levels, content offerings, pricing and related features of competitors may adversely impact our ability to attract and retain members. If we introduce new or adjust existing features, adjust pricing or service offerings, or change the mix of content in a manner that is not favorably received by our members, we may not be able to attract and retain members. Many of our members originate from organic growth. If our efforts to satisfy our existing members are not successful, we may not be able to attract new members, and as a result, our ability to maintain and/or grow our membership revenues will be adversely affected. Members may cancel or decide not to renew our service for many reasons, including a perception that they do not use the service sufficiently, payment inconveniences, the need to cut household expenses, availability of content is unsatisfactory, competitive services provide a better value or experience and customer service issues are not satisfactorily resolved. We must retain existing members and continually attract new members to increase our membership base. If we are unable to successfully compete with current and new competitors in both retaining our existing members and attracting new members, our business will be adversely affected. Further, if excessive number of members cancel or opt not to renew our service, we may be required to incur significantly higher marketing expenditures to attract new members than we currently anticipate.

***If we fail to retain existing or attract new advertising customers to advertise on our platform, maintain and increase our wallet share of advertising budget or if we are unable to collect accounts receivable in a timely manner, our financial condition and results of operations may be materially and adversely affected.***

To date, we have generated a majority of our revenues from online advertising. Although online advertising revenue as a percentage of our total revenues has decreased recently, online advertising remains our largest source of revenue. We cannot assure you that we will be able to retain our advertising customers in the future, attract new advertising customers continuously or be able to retain our advertising customers at all. If our

16

**Table of Contents**

advertising customers find that they can generate better returns elsewhere, or if our competitors provide better online advertising services to suit our advertising customers' goals, we may lose our advertising customers. In addition, third parties may develop and use certain technologies to block the display, and our members are able to skip the viewing, of our advertising customers' advertisements on our platform, which may in turn cause us to lose advertising customers and adversely affect our results of operations. If our advertising customers determine that their expenditures on internet video streaming platforms do not generate expected returns, they may allocate a portion or all of their advertising budgets to other advertising channels such as television, newspapers and magazines or other internet channels such as e-commerce and social media platforms, and reduce or discontinue business with us. Since most of our advertising customers are not bound by long-term contracts, they may lessen or discontinue advertising arrangements with us easily without incurring material liabilities. Failure to retain existing advertising customers or attract new advertising customers to advertise on our platform may materially and adversely affect our financial conditions and results of operations.

Our brand advertising customers typically enter into online advertising agreements with us through various third-party advertising agencies. In China's advertising industry, advertising agencies typically have good relationships and maintain longer periods of cooperation with the brand advertising customers they represent. In addition to entering into advertising contracts directly with advertising customers, we also enter into advertising contracts with third-party advertising agencies, which represent advertising customers, even if we have direct contact with such advertisers. As a result, we rely on third-party advertising agencies for sales to, and collection of payment from, our brand advertisers. In consideration for the third-party advertising agencies' services, we offer them rebates based on the volume of business they bring to us. The financial soundness of our advertising customers and advertising agencies may affect our collection of accounts receivable. We make a credit assessment of our advertising customers and advertising agencies to evaluate the collectability of the advertising service fees before entering into an advertising contract. However, we cannot assure you that we are or will be able to accurately assess the creditworthiness of each advertising customer or advertising agency, and any inability of advertising customers or advertising agencies to pay us in a timely manner may adversely affect our liquidity and cash flows. In addition, there has been some consolidation among China's advertising agencies. If this trend continues, a small number of large advertising agencies may be in a position to demand higher rebate for advertising agency services, which could reduce our online advertising revenue.

In addition, we do not have long-term cooperation agreements or exclusive arrangements with third-party advertising agencies and they may elect to direct business opportunities to other advertising service providers, including our competitors. If we fail to retain and enhance the business relationships with third-party advertising agencies, we may suffer from a loss of advertising customers and our financial condition and results of operations may be materially and adversely affected.

***We operate in a capital intensive industry and require a significant amount of cash to fund our operations, content acquisitions and technology investments. If we cannot obtain sufficient capital, our business, financial condition and prospects may be materially and adversely affected.***

The operation of an internet video streaming platform requires significant and continuous investment in content and technology. Producing high-quality original content is costly and time-consuming and it will typically take a long period of time to realize returns on investment, if at all. To date, we have financed our operations primarily with net cash generated from operating activities, as well as through private placements of preferred shares and convertible notes to investors, including the issuance of US$400 million Series F preferred shares in 2014 and the issuance of US$1.53 billion convertible notes in 2017, and the substantial financial support from Baidu. As of December 31, 2017, we had an outstanding loan balance of RMB50.0 million (US$7.7 million) to Baidu. In order to implement our growth strategies, we will incur additional capital in the future to cover, among others, costs to produce and license content. We may need to obtain additional financing, including equity offerings or debt financing, to fund the operation and expansion of business. Our ability to obtain additional financing in the future, however, is subject to a number of uncertainties, including those relating to:

- our future business development, financial condition and results of operations;

17

Table of Contents

- general market conditions for financing activities by companies in our industry;

- macro-economic and other conditions in China and elsewhere; and

- our relationship with Baidu.

As our business continues to grow and after we become a public company, we expect to rely less on financing support from Baidu and increasingly rely on net cash provided by operating activities, financing through capital markets and commercial banks for our liquidity needs. However, we cannot assure you that we will be successful in our efforts to further diversify our sources of liquidity and obtain financing beyond the financing support from Baidu. If we cannot obtain sufficient capital to meet our capital needs, we may not be able to execute our growth strategies and our business, financial condition and prospects may be materially and adversely affected.

*The success of our business depends on our ability to maintain and enhance our brand.*

We believe that maintaining and enhancing our iQIYI (爱奇艺) brand is of significant importance to the success of our business. Our well-recognized brand is critical to increasing our user base and, in turn, expanding our membership base and attractiveness to advertising customers and content providers. Since the internet video industry is highly competitive, maintaining and enhancing our brand depends largely on our ability to remain the market leader in China, which may be difficult and expensive. To the extent our content, in particular, our original content, is perceived as low quality or otherwise not appealing to users, our ability to maintain and enhance our brand may be adversely impacted.

*We may be the subject of detrimental conduct by third parties, including complaints to regulatory agencies and the public dissemination of malicious assessments of our business, which could have a negative impact on our reputation and cause us to lose market share, users, advertisers and revenues, and adversely affect the price of our ADSs.*

We have been, and in the future may be, the target of anti-competitive, harassing or other detrimental conduct by third parties. Such conduct may include complaints, anonymous or otherwise, to regulatory agencies regarding our operations, accounting, revenues, business relationships, business prospects and business ethics. Additionally, allegations and other negative publicity, directly or indirectly against us, may be posted online or otherwise generally disseminated by anyone, whether or not related to us. We may be subject to regulatory investigations, lawsuits or public perception backlash as a result of such third-party conduct and may be required to expend significant time and incur substantial costs to address such third-party conduct, and there is no assurance that we will be able to conclusively refute each of the allegations within a reasonable period of time, or at all. Our reputation may also be negatively affected as a result of the public dissemination of anonymous allegations or malicious statements about our business, which in turn may cause us to lose market share, users, advertisers and revenues, and adversely affect the price of our ADSs.

*Increases in market price of professionally-produced content may have a material and adverse effect on our business, financial condition and results of operations.*

Professionally-produced content constitutes a significant part of our content offerings. The market prices for professionally-produced content, especially TV series and movies, have increased significantly in China during the past few years. Due to the improving monetization prospects, internet video streaming platforms are generating more revenues and are competing aggressively to license popular content titles, which have in turn led to increases in licensing fees of professionally-produced content in general. As the market further grows, the expectations of copyright owners, distributors and industry participants may continue to rise, and as such they may demand higher licensing fees for professionally-produced content. Furthermore, with the expansion of our content library, we expect the costs for professionally-produced content to continue to increase. If we are unable

18

**Table of Contents**

to generate sufficient revenues to outpace the increase in market prices for professionally-produced content, we may incur more losses and our business, financial condition and results of operations may be adversely affected.

***We operate in a highly competitive market and we may not be able to compete effectively.***

We face significant competition in China, primarily from Tencent Video and Youku Tudou. We compete for users, usage time and advertising customers. Some of our competitors have a longer operating history and significantly greater financial resources than we do, and, in turn, may be able to attract and retain more users, usage time and advertising customers. Our competitors may compete with us in a variety of ways, including by obtaining IP rights to popular content, conducting brand promotions and other marketing activities, and making investments in and acquisitions of our business partners. In addition, certain internet video platforms may continue to derive their revenues from providing content that infringes third-party copyright and may not monitor their platforms for any such infringing content. As a result, we may be placed at a disadvantage to some of these companies that do not incur similar costs as we do with respect to content production, acquisition and monitoring. If any of our competitors achieves greater market acceptance than we do or is able to offer more attractive internet video content, our user traffic and our market share may decrease, which may result in a loss of advertising customers and members, as well as have a material and adverse effect on our business, financial condition and results of operations.

We face competition from traditional media such as major TV stations, which are increasing their internet video offerings. Most large companies in China allocate, and will likely continue to allocate, a significant portion of their advertising budgets to traditional media, particularly major TV stations. We also face competition for users and user time from other internet media and entertainment services.

***The continued and collaborative efforts of our senior management and key employees are crucial to our success, and our business may be harmed if we lose their services.***

Our success depends on the continued and collaborative efforts of our senior management, especially our executive officers, including our founder, Dr. Yu Gong. If, however, one or more of our executives or other key personnel are unable or unwilling to continue to provide services to us, we may not be able to find suitable replacements easily or at all. Competition for management and key personnel is intense and the pool of qualified candidates is limited. We may not be able to retain the services of our executives or key personnel, or attract and retain experienced executives or key personnel in the future. If any of our executive officers or key employees joins a competitor or forms a competing business, we may lose crucial business secrets, technological know-how, advertisers and other valuable resources. Each of our executive officers and key employees has entered into an employment agreement with us, which contains non-compete provisions. However, we cannot assure you that they will abide by the employment agreements or our efforts to enforce these agreements will be effective enough to protect our interests.

***Our limited operating history makes it difficult to evaluate our business and prospects.***

We launched our platform and internet video streaming services in 2010 and have grown rapidly since then. We expect to continue to grow our user and customer bases and explore new market opportunities. However, due to our limited operating history, our historical growth rate may not be indicative of our future performance. We cannot assure you that our growth rate will be the same as in the past. Furthermore, as a technology-based entertainment company, we frequently introduce innovative products and services to our users and advertising customers in order to capture new market opportunities. However, we cannot assure you that our products and services will be well received by our users and advertising customers. In addition, it is possible that our users and advertising customers may find our products and services objectionable. For example, there was media reporting in 2017 that the beta-testing version of our *Vivi* virtual assistant service was deemed by some of our users as offensive. We immediately suspended such service pending further modifications. If our existing or new products and services are not well received by our users and customers, we may suffer damages to our brand image and

19

**Table of Contents**

may not be able to maintain or expand our user and customer base, which in turn may have a material and adverse effect on our business, financial condition and results of operations. You should consider our prospects in light of the risks and uncertainties fast-growing companies with limited operating histories in a fast evolving industry may encounter.

### *We may not be able to manage our growth effectively.*

We have experienced rapid growth since we launched our services in 2010. To manage the further expansion of our business and the growth of our operations and personnel, we need to continuously expand and enhance our infrastructure and technology, and improve our operational and financial systems, procedures, compliance and controls. We also need to expand, train and manage our growing employee base. In addition, our management will be required to maintain and expand our relationships with content providers, distributors, advertising customers, advertising agencies and other third parties. We cannot assure you that our current infrastructure, systems, procedures and controls will be adequate to support our expanding operations. If we fail to manage our expansion effectively, our business, results of operations and prospects may be materially and adversely affected.

### *We cannot guarantee our monetization strategies will be successfully implemented or generate sustainable revenues and profit.*

Our monetization model is evolving. We currently generate a substantial majority of our revenues from membership services and online advertising. We plan to strengthen revenue contribution from our IP-related monetization methods, such as content distribution, live broadcasting, online games, and IP licensing. We have no proven track record or experience in generating substantial revenues from IP-related monetization methods. If our strategic initiatives do not enhance our monetization ability or enable us to develop new approaches to monetization, we may not be able to maintain or increase our revenues or recover any associated costs. In addition, we may in the future introduce new services to further diversify our revenue streams, including services with which we have little or no prior development or operating experience. If these new or enhanced services fail to engage users, customers or content partners, we may fail to attract or retain users or to generate sufficient revenues to justify our investments, and our business and operating results may suffer as a result.

### *We have significant working capital requirements and have historically experienced working capital deficits. If we continue to experience such working capital deficits in the future, our business, liquidity, financial condition and results of operations may be materially and adversely affected.*

As a result of changes in our funding position and operating assets and liabilities, we had a working capital deficit of RMB6,735.5 million and RMB5,925.1 million (US$910.7 million) as of December 31, 2016 and 2017, respectively. There is no assurance that we will generate the sufficient net income or operating cash flows to meet our working capital requirements and repay our liabilities as they become due in the future due to a variety of factors. For actions that we plan to take in order to address our working capital deficit, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources." There can be no assurance, however, that we will be able to successfully take any of these actions in a timely manner, including prudently managing our working capital, or raising additional equity or debt financing on terms that are acceptable to us. Our inability to take these actions as and when necessary could materially adversely affect our liquidity, results of operations, financial condition and ability to operate.

### *Our business, prospects and financial results may be impacted by our relationship with third-party platforms.*

In addition to our iQIYI platform, we also distribute video content through third-party platforms. We generate membership service and online advertising service revenues through revenue-sharing arrangements with such third-party platforms, which include leading Internet companies in China. However, there can be no assurance that our arrangements with those platforms will be extended or renewed after their respective

20

Table of Contents

expiration or that we will be able to extend or renew such arrangements on terms and conditions favorable to us. In addition, if any of such third-party platforms breaches its obligations under any of the agreements entered into with us or refuses to extend or renew it when the term expires, and we cannot find suitable replacement on a timely basis, or at all, we may suffer significant loss to our user base and revenue streams we have developed therefrom, or loose the opportunity to expand our business through such platform. We may be involved with legal or other disputes with third-party platforms that may affect our relationship with such platforms or have an adverse effect on our business.

### *We face risks, such as unforeseen costs and potential liability in connection with content we produce, license and/or distribute through our platform.*

As a producer, licensor and distributor of content, we face potential liability for negligence, copyright and trademark infringement, or other claims based on the content that we produce, license, provide and/or distribute. We also may face potential liability for content used in promoting our service, including marketing materials and features on our platform such as user reviews. We are responsible for the production costs and other expenses of our original content. We also take on risks associated with production, such as completion and key talent risk. To the extent we do not accurately anticipate costs or mitigate risks, including for content that we obtain but ultimately does not appear on our platform, or if we become liable for content we produce, license and/or distribute, our business may suffer. Litigation to defend these claims could be costly and the expenses and damages arising from any liability or unforeseen production risks could harm our results of operations. We may not be indemnified against claims or costs of these types and we may not have insurance coverage for these types of claims.

### *Videos and other content displayed on our platform may be found objectionable by PRC regulatory authorities and may subject us to penalties and other administrative actions.*

We are subject to PRC regulations governing internet access and the distribution of videos and other forms of information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet any content that, among other things, violates PRC laws and regulations, impairs the national dignity of China or the public interest, or is obscene, superstitious, frightening, gruesome, offensive, fraudulent or defamatory. Failure to comply with these requirements may result in monetary penalties, revocation of licenses to provide internet content or other licenses, suspension of the concerned platforms and reputational harm. In addition, these laws and regulations are subject to interpretation by the relevant authorities, and it may not be possible to determine in all cases the types of content that could cause us to be held liable as an internet content provider. For a detailed discussion, see "Regulation—Regulations on Internet Content Providers" and "Regulation—Regulations on Information Security, Censorship and Privacy."

Internet platform operators may also be held liable for the content displayed on or linked to its platform that is subject to certain restrictions. In addition to professionally produced content, we allow our users to upload professional or user-generated content, such as videos and other content formats. Although we have adopted internal procedures to monitor the content displayed on our platform, due to the significant amount of content uploaded by our users, we may not be able to identify all videos or other content that may be illegal or otherwise objectionable. In addition, we may not be able to always keep these internal procedures abreast of changes in the PRC government's requirements for content display. See "Business—Content Monitoring" for more details relating to our content monitoring procedures. Failure to identify and prevent illegal or inappropriate content from being displayed on our platform may subject us to liability, government sanctions or loss of licenses and/or permits.

To the extent that PRC regulatory authorities find any content displayed on our platform objectionable, they may require us to limit or eliminate the dissemination of such content on our platform in the form of take-down orders or otherwise. In the past, we have from time to time received phone calls and written notices from the relevant PRC regulatory authorities requesting us to delete or restrict certain content that the government deemed inappropriate or sensitive. The General Administration of Press and Publication, Radio, Film and Television, or

21

Table of Contents

the GAPPRFT, publishes from time to time lists of content that is objectionable, and we monitor content uploaded on to our platform and remove those referenced in the list. In addition, regulatory authorities may impose penalties on us for content displayed on or linked to our platform in cases of material violations or lacking proper license, including a revocation of our operating licenses or a suspension or shutdown of our online operations. Although we have not been materially penalized for our content so far, in the event that the PRC regulatory authorities find the video and other content on our platform objectionable and impose penalties on us or take other actions against us in the future, our business, results of operations and reputation may be materially and adversely affected. Moreover, the costs of compliance with these regulations may continue to increase as a result of more content uploaded by our users.

*We operate in a rapidly evolving industry. If we fail to keep up with the technological developments and users' changing requirements, our business, results of operations and prospects may be materially and adversely affected.*

The internet video streaming industry is rapidly evolving and subject to continuous technological changes. Our success will depend on our ability to keep up with the changes in technology and user behavior resulting from the technological developments. As we make our services available across a variety of mobile operating systems and devices, we are dependent on the interoperability of our services with popular mobile devices and mobile operating systems that we do not control, such as Android and iOS. Any changes in such mobile operating systems or devices that degrade the functionality of our services or give preferential treatment to competitive services could adversely affect usage of our services. Further, if the number of platforms for which we develop our services increases, which is typically seen in a dynamic and fragmented mobile services market such as China, it will result in an increase in our costs and expenses. If we fail to adapt our products and services to such changes in an effective and timely manner, we may suffer from decreased user traffic, which may result in reduced member base and number of advertising customers using our online advertising services. Furthermore, changes in technologies may require substantial capital expenditures in product development as well as in modification of products, services or infrastructure. We may not execute our business strategies successfully due to a variety of reasons such as technical hurdles, misunderstanding or erroneous prediction of market demand or lack of necessary resources. Failure to keep up with technological development may result in our products and services being less attractive, which, in turn, may materially and adversely affect our business, results of operations and prospects.

*We have been, and may continue to be, subject to liabilities for infringement, misappropriation or other violation of third-party intellectual property rights or other allegations based on the content available on our platform or services we provide.*

Our success depends, in large part, on our ability to operate our business without infringing, misappropriating or otherwise violating third-party rights, including third-party intellectual property rights. Companies in the internet, technology and media industries own, and are seeking to obtain, a large number of patents, copyrights, trademarks and trade secrets, and they are frequently involved in litigation based on allegations of infringement, misappropriation or other violations of intellectual property rights or other related legal rights. There may be patents issued or pending that are held by others that cover significant aspects of our technologies, products, or services, and such third parties may attempt to enforce such rights against us. In addition, we may not have obtained licenses for all content we offer and the scope, type and term of the licenses we obtained for certain content may not be broad enough to cover all fashions we currently employ or may employ in the future. In addition, if any purported licensor does not actually have sufficient authorization relating to the content or right to license a content to us, we may be subject to claims of intellectual property infringement from third parties.

Although we have set up certain procedures to enable copyright owners to provide us with notice of alleged infringement, given the volume of content available on our platform, it is not possible, and we do not attempt to, identify and remove or disable all potentially infringing content that may exist. Similarly, although we have set up screening processes to try to filter out or disable access to content that we have previously been informed is

22

**Table of Contents**

subject to claims of copyright or other intellectual property protection, we do not attempt to filter out or disable access to all potentially infringing content available through our services. As a result, third parties may take action and file claims against us if they believe that certain content available on our platform violates their copyrights or other intellectual property rights. We have been, and may in the future be, subject to such claims filed in China and other jurisdictions. We have been involved in litigation based on allegations of infringement of third-party copyright, including information network dissemination rights, and other rights, due to the content available on our platform. We were subject to a total of 1,718 lawsuits in China for alleged copyright infringement between January 1, 2015 and December 31, 2017, in connection with our platform. Approximately 96% of the lawsuits filed from January 1, 2015 through December 31, 2017 in connection with the iQIYI platform were rejected by relevant PRC courts, withdrawn by the plaintiffs or settled by the parties. As of December 31, 2017, a total 69 lawsuits against us in connection with our platform were pending, with the aggregate amount of damages sought under these pending cases being approximately RMB145.7 million (US$22.4 million).

Our platform allows users to search the internet for content that resides on certain third parties' servers and online platforms. While uncertainties still exist with respect to the legal standards as well as the judicial interpretation of such standards for determining liabilities for our providing links and access to content on third-party servers and websites that infringes others' copyrights and other intellectual property rights under PRC laws and the laws of other jurisdictions, third parties may take action and file claims against us if they believe that certain content we provide links or access to through our platform violates their copyrights or other intellectual property rights.

Although we have not been subject to claims or lawsuits with respect to copyright infringement outside of China, we cannot assure you that we will not become subject to copyright laws in other jurisdictions, such as the United States, the ability of users to access our videos and other content in the United States and other jurisdictions, the ownership of our ADSs by investors in the United States and other jurisdictions, the extraterritorial application of foreign law by foreign courts or otherwise. In addition, as a publicly listed company, we may be exposed to increased risk of litigation. If a claim of infringement brought against us in the United States or other jurisdictions is successful, we may be required to, upon enforcement, (i) pay substantial statutory or other damages and fines, (ii) remove relevant content from our platform or (iii) enter into royalty or license agreements which may not be available on commercially reasonable terms or at all.

Moreover, although U.S. copyright laws, including the Digital Millennium Copyright Act (17 U.S.C. § 512), or the DMCA, provide safeguards or "safe harbors" from claims in the U.S. for monetary relief for copyright infringement for certain entities that host user-uploaded content or provide information location tools that may link to infringing content, these safe harbors only apply to companies that comply with specified statutory requirements. While we seek to voluntarily comply with DMCA safe harbor requirements, we cannot ensure that we satisfy all of the requirements of any DMCA safe harbor. It is possible that we could be subject to claims of copyright infringement or other violation of intellectual property rights in the U.S. and be required to pay substantial damages or prevented from offering all or part of our services in the U.S.

We have been subject to lawsuits in China for alleged unfair competition in connection with our platform. We may also face litigation or administrative actions for defamation, negligence, copyright and trademark infringement, or other purported injuries resulting from the content we provide or the nature of our services. Such litigation and administrative actions, with or without merits, may be expensive and time-consuming and may result in significant diversion of resources and management attention from our business operations. Furthermore, such litigation or administrative actions may adversely affect our brand image and reputation.

In addition, we operate our platform primarily through our consolidated affiliated entities and their subsidiaries, and our ability to monitor content as described above depends in large part on the experience and skills of the management of, and our control over, those consolidated affiliated entities. Our control over the management and operations of our consolidated affiliated entities through contractual arrangements may not be as effective as that through direct ownership. See "—Risks Related to Our Corporate Structure—We rely on

23

Table of Contents

contractual arrangements with our consolidated affiliated entities and their shareholders for our business operations, which may not be as effective as direct ownership in providing operational control."

***We may not be able to adequately protect our intellectual property rights, and any failure to protect our intellectual property rights could adversely affect our revenues and competitive position.***

We believe that trademarks, trade secrets, copyright, and other intellectual property we use are critical to our business. We rely on a combination of trademark, copyright and trade secret protection laws in China and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect our intellectual property and our brand. Protection of intellectual property rights in China may not be as effective as in the United States or other jurisdictions, and as a result, we may not be able to adequately protect our intellectual property rights, which could adversely affect our revenues and competitive position. In addition, any unauthorized use of our intellectual property by third parties may adversely affect our revenues and our reputation. In particular, our members may abuse their membership privilege and illegally distribute paid content exclusively available to paid members, which could have a material and adverse effect on our financial condition, results of operations and prospects. Further, we may have difficulty addressing the threats to our business associated with piracy of our copyrighted content, particularly our original content. Our content and streaming services may be potentially subject to unauthorized consumer copying and illegal digital dissemination without an economic return to us. We adopt a variety of measures to mitigate risks associated with piracy, including by litigation and through technology measures. We cannot assure that such measures will be effective.

In addition, while we typically require our employees, consultants and contractors who may be involved in the development of intellectual property to execute agreements assigning such intellectual property to us, we may be unsuccessful in executing such an agreement with each party who in fact develops intellectual property that we regard as our own. In addition such agreements may not be self-executing such that the intellectual property subject to such agreements may not be assigned to us without additional assignments being executed, and we may fail to obtain such assignments. In addition, such agreements may be breached. Accordingly, we may be forced to bring claims against third parties, or defend claims that they may bring against us related to the ownership of such intellectual property.

Furthermore, policing unauthorized use of proprietary technology is difficult and expensive, and we may need to resort to litigation to enforce or defend intellectual property or to determine the enforceability, scope and validity of our proprietary rights or those of others. Such litigation and an adverse determination in any such litigation could result in substantial costs and diversion of resources and management attention.

***If our security measures are breached, or if our products and services are subject to attacks that degrade or deny the ability of users to access our products and services, our products and services may be perceived as insecure, users and advertising customers may curtail or stop using our products and services and our business and operating results may be harmed.***

Our products and services involve the storage and transmission of users' and advertising customers' information, particularly billing data, as well as original content, and security breaches expose us to a risk of loss of this information, loss of users, litigation and potential liability. We experience cyber-attacks of varying degrees on a regular basis, including hacking into our user accounts and redirecting our user traffic to other internet platforms, and we have been able to rectify attacks without significant impact to our operations in the past. Functions that facilitate interactivity with other internet platforms could increase the scope of access of hackers to user accounts. We take measures to protect against unauthorized intrusion into our users' data. Despite these measures we, our payment processing services or other third party services we use could experience an unauthorized intrusion into our users' data. In the event of such a breach, current and potential users may become unwilling to provide the information to us necessary for them to become users or members. Additionally, we could face legal claims or regulatory fines or penalties for such a breach. The costs relating to any data breach could be material, and we currently do not carry insurance against the risk of a data breach. For these reasons, should an unauthorized intrusion into our users' data occur, our business could be adversely affected.

24

**Table of Contents**

Our security measures may also be breached due to employee error, malfeasance or otherwise. For example, we face risks of users bypassing the membership verification process on our platform with illegal technology and manipulating our system into recognizing them as paid members. As a result, such users may illegally gain access to premium content without purchasing our membership. Additionally, outside parties may attempt to fraudulently induce employees, users or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data or accounts, or may otherwise obtain access to such data or accounts. Since our users and customers may use their accounts to establish and maintain online identities, unauthorized communications from accounts that have been compromised may damage their reputations and brands as well as ours. Furthermore, we face the risk of hackers gaining illegal access to and illegally distributing our original content that has not been released. While such incidents have not occurred in the past, we cannot assure you that they will not happen in the future. Any such breach or unauthorized access could result in significant legal and financial exposure, damage to our reputation and a loss of confidence in the security of our products and services that could have an adverse effect on our business and operating results. Because the techniques used to obtain unauthorized access, disable or degrade service or sabotage systems change frequently and often are not recognized until launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures. If an actual or perceived breach of our security occurs, the market perception of the effectiveness of our security measures and our reputation and relationships with users could be harmed, we may lose users and customers and we may be exposed to significant legal and financial risks, including legal claims and regulatory fines and penalties. Any of these actions could have a material and adverse effect on our business, reputation and operating results.

*We rely upon our partner to make our service available through smart TV.*

In smart TV video streaming market, only a small number of qualified license holders can provide internet audio and visual program service to the TV terminal users via smart TVs, set-top boxes and other electronic products. Most of those license holders are radio or TV stations. Private companies that wish to operate such business need to cooperate with those license holders to legally provide relevant services. We entered into a joint venture with Galaxy Internet Television Co., Ltd., our license partner, and the joint venture currently offers certain of our members the ability to receive streaming content through smart TV. If we are not successful in maintaining existing or creating new relationships, or if we encounter technological, content licensing, regulatory or other impediments to delivering our streaming content to our members via these devices, our ability to grow our business may be adversely impacted.

*Advertisements shown on our platform may subject us to penalties and other administrative actions.*

Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our platform to ensure that such content is true, accurate and in full compliance with applicable laws and regulations. In addition, where a special government review is required for specific types of advertisements prior to posting, such as advertisements relating to pharmaceuticals, medical instruments, agrochemicals and veterinary pharmaceuticals, we are obligated to confirm that such review has been performed and approval has been obtained from competent governmental authority. To fulfill these monitoring functions, we include clauses in all of our advertising contracts requiring that all advertising content provided by advertising agencies and advertisers must comply with relevant laws and regulations. Under PRC law, we may have claims against advertising agencies and advertisers for all damages to us caused by their breach of such representations. Violation of these laws and regulations may subject us to penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to publish an announcement correcting the misleading information. In circumstances involving serious violations, such as posting a pharmaceutical product advertisement without approval, or posting an advertisement for fake pharmaceutical product, PRC governmental authorities may force us to terminate our advertising operation or revoke our licenses.

A majority of the advertisements shown on our platform are provided to us by third parties. Although we have implemented automated and manual content monitoring systems and significant efforts have been made to

25

Table of Contents

ensure that the advertisements shown on our platform are in full compliance with applicable laws and regulations, we cannot assure you that all the content contained in such advertisements is true and accurate as required by the advertising laws and regulations, especially given the large volume of in-feed ads and the uncertainty in the application of these laws and regulations. In addition, advertisers, especially in-feed advertisers, may through illegal technology evade our content monitoring procedures to show advertisements on our platform that do not comply with applicable laws and regulations. The inability of our systems and procedures to adequately and timely discover such evasions may subject us to regulatory penalties or administrative sanctions. Although we have not been subject to material penalties or administrative sanctions in the past for the advertisements shown on our platform, if we are found to be in violation of applicable PRC advertising laws and regulations in the future, we may be subject to penalties and our reputation may be harmed, which may have a material and adverse effect on our business, financial condition, results of operations and prospects.

*If we cannot maintain our corporate culture as we grow, we could lose the innovation, collaboration and focus that contribute to our business.*

We believe that a critical component of our success is our corporate culture, which fosters innovation and cultivates creativity. As we continue to expand and grow our business, we may find it difficult to maintain these valuable aspects of our corporate culture. Any failure to preserve our culture could undermine our reputation and negatively impact our ability to attract and retain employees, which would in turn jeopardize our future success.

*Our quarterly operating results may fluctuate, which makes our results of operations difficult to predict and may cause our quarterly results of operations to fall short of expectations.*

Our quarterly operating results have fluctuated in the past and may continue to fluctuate depending upon a number of factors, many of which are out of our control. Our operating results tend to be seasonal. For instance, we have experienced lower online advertising services revenue in the first quarter of each year in connection with the Chinese New Year holiday as advertisers limit their budget for online platforms and less blockbuster content is released during that period. Furthermore, our content distribution revenue may fluctuate significantly from quarter to quarter as a result of the varying availability of popular content titles for distribution and adjustments to our market strategies. For these reasons, comparing our operating results on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly and annual revenues and costs and expenses as a percentage of our revenues in a given period may be significantly different from our historical or projected rates and our operating results in future quarters may fall below expectations.

*Disruption or failure of our IT systems could impair our users' online entertainment experience and adversely affect our reputation.*

Our ability to provide users with a high-quality online entertainment experience depends on the continuous and reliable operation of our IT systems. We cannot assure you that we will be able to procure sufficient bandwidth in a timely manner or on acceptable terms or at all. Failure to do so may significantly impair user experience on our platform and decrease the overall effectiveness of our platform to both users and advertisers. Disruptions, failures, unscheduled service interruptions or a decrease in connection speeds could hurt our reputation and cause our users and advertising customers to switch to our competitors' platforms. Our IT systems and proprietary content delivery network, or CDN, are vulnerable to damage or interruption as a result of fires, floods, earthquakes, power losses, telecommunications failures, undetected errors in software, computer viruses, hacking and other attempts to harm our systems. We have experienced intermittent interruptions for up to 48 hours of viewer access to one popular drama title in the past. Our platform has also experienced general intermittent interruptions for approximately two hours in the past. These interruptions were caused by (i) overload of our servers; (ii) unexpected overflow of user traffic; (iii) service malfunction of payment gateway; and/or (iv) service malfunction of the telecommunications operators, such as power outage of internet data centers or network transmission congestion. We may continue to experience similar interruptions in the future despite our continuous efforts to improve our IT systems. Since we host our servers at third-party internet data

26

Table of Contents

centers, any natural disaster or unexpected closure of internet data centers operated by third-party providers may result in lengthy service interruptions.

If we experience frequent or persistent service disruptions, whether caused by failures of our own systems or those of third-party service providers, our users' experience with us may be negatively affected, which in turn, may have a material and adverse effect on our reputation. We cannot assure you that we will be successful in minimizing the frequency or duration of service interruptions.

### *If the technologies we use in operating our business fails, becomes unavailable, or does not operate to meet expectations, our business and results of operation may be adversely impacted.*

We utilize a combination of proprietary and third party technologies to operate our business. These include the technologies that we have developed to recommend and monetize content to our users as well as enable fast and efficient delivery of content to our users and their various internet connected devices. For example, we use our own CDN, and third-party CDN services to support our operation. To the extent internet service providers do not interconnect with the CDN services we use, or if we experience difficulties in its operation, our ability to efficiently and effectively deliver our streaming content to our users could be adversely impacted and our business and results of operation could be adversely affected. Likewise, if our recommendation and monetization technology does not enable us to predict and recommend content that our users will enjoy, our ability to attract and retain users may be adversely affected. We also utilize third party technology to help market our service, process payments, and otherwise manage the daily operations of our business. If our technology or that of third parties we utilize in our operations fails or otherwise operates improperly, our ability to operate our service, retain existing users and add new users may be impaired. Also, any harm to our users' personal computers or other devices caused by software used in our operations could have an adverse effect on our business, results of operations and financial condition.

### *Any lack of requisite permits for any of our internet video and other content or any of our business may expose us to regulatory sanctions.*

In 2009, the State Administration of Radio, Film and Television, or SARFT, released a Notice on Strengthening the Administration of Online Audio/Video Content. This notice reiterated, among other things, that all films and television shows released or published online must be in compliance with relevant regulations on the administration of radio, film and television. In other words, these films and television shows, whether produced in the PRC or overseas, must be pre-approved by SARFT, which has been replaced by GAPPRFT, and distributors of these films and television shows must obtain an applicable permit before releasing them. In September 2014, GAPPRFT reiterated that all the foreign TV dramas and films published to the public via internet must obtain their respective permit. In addition, all the foreign TV dramas and films published to the public via internet by competent license holders must be registered with GAPPRFT before March 31, 2015 and all un-registered TV dramas and films will be prohibited from broadcasting via internet from April 1, 2015. In addition, online games are also subject to approval by GAPPRFT and approval by or filing with the Ministry of Culture.

In terms of licensed third-party content published or online games distributed jointly with third parties, we obtain and rely on written representations from content providers and third-party operators regarding the GAPPRFT and other approval and filing status of these content and online games, and, to a lesser extent, require content providers and third-party operators to produce evidence demonstrating that they and the licensed content or the online games have received all requisite permits and approvals. We also import some foreign TV dramas and films and apply for the permits for and register such contents with the competent authorities by ourselves. However, we cannot assure you that our monitoring procedures with respect to licensed content and online games are fully adequate, and we cannot guarantee that the remedies provided by these content providers, if any, will be sufficient to compensate us for potential regulatory sanctions imposed by the GAPPRFT due to violations of the approval and permit requirements and for the foreign TV dramas and movies imported by us, we cannot assure you that we will be able to obtain the permits for or register such contents with the competent authorities in a timely manner or at all. Nor can we ensure that any such sanctions will not adversely affect either the general

27

Table of Contents

availability of video, online games or other content on our platform or our reputation. In addition, such risks may persist due to ambiguities and uncertainties relating to the implementation and enforcement of this notice. Although we have internal content monitoring procedures in place to review our procured content, we face risks of termination of permits and approvals, contractual misrepresentations and failure to honor representations or indemnify us against any claims or costs by content providers.

We have obtained the ICP license, the Value-added Telecommunications Business Operation License for information services via mobile network, the Permit for Internet Audio-Video Program Service, the Network Culture Business Permit, the Permit for Internet Drug Information Service, and other relevant permits required for operating our business. However, we have not obtained and are in the process of applying for or upgrading and expanding certain approvals or permits which are required or may be required for our operation of businesses. For example, we have not obtained and are planning to apply for the Permit for Internet News Information Service to publish current political news on our platform or disseminate such news through the internet. Beijing iQIYI has not obtained and is in the process of applying for the Internet Publishing Service License in relation to our online games, comics and online literature operation. We also have not obtained and are in the process of applying for adding and amending certain service items for our Permit for Internet Audio-Video Program Service, such as forwarding the audio-video programs uploaded by the users, rebroadcasting radio and TV channels, displaying current political audio-video news programs and providing video and audio live broadcasting of cultural activities, sports events and other activities organized by the general social groups. We are also planning to apply for adding online performances for the Network Culture Business of Beijing iQIYI and adding electronic data interchange as a permitted business for our Value-added Telecommunications Business Operation License. We are also filing several HTML5 online games operated by us with the Ministry of Culture. Although we are planning to apply or in the process of applying for such licenses and we maintain regular oral communication with relevant regulatory authorities, which have not objected to the operations of our business in question, if we fail to obtain, maintain or renew such licenses, or obtain any additional licenses and permits or make any records or filings required by new laws, regulations or executive orders required for our new business in a timely manner or at all, we could be subject to liabilities or penalties, and our operations could be adversely affected.

***Undetected programming errors could adversely affect our user experience and market acceptance of our video content, which may materially and adversely affect our business and results of operations.***

Video content on our platform may contain programming errors that may only become apparent after their release. We receive user feedbacks in connection with programming errors affecting the user experience from time to time, and such errors may also come to our attention during our monitoring process. We generally have been able to resolve such programming errors in a timely manner. However, we cannot assure you that we will be able to detect and resolve all these programming errors effectively. Undetected audio or video programming errors or defects may adversely affect user experience, cause users to refrain from becoming our paid members or to cancel their membership subscriptions, and cause our advertising customers to reduce their use of our services, any of which could materially and adversely affect our business and results of operations.

***We may invest in or acquire complementary assets, technologies and businesses in the future, and such efforts may fail and may result in equity or earnings dilution.***

We may invest in and acquire assets, technologies and businesses that are complementary to our business in the future. Acquired businesses or assets may not yield the results we expect. In addition, acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, significant amortization expenses related to intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the cost of identifying and consummating acquisitions, and integrating the acquired businesses into ours, may be significant, and the integration of acquired business may be disruptive to our business operations. In addition, we may have to obtain approval from the relevant PRC governmental authorities for the acquisitions and comply with any applicable PRC rules and regulations, which may be costly. In the event our acquisitions are not successful, our financial condition and results of operations may be materially and adversely affected.

28

Table of Contents

*We are subject to payment processing risk.*

Our members pay for our service using a variety of different online payment methods. We rely on third parties to process such payment. Acceptance and processing of these payment methods are subject to certain rules and regulations and require payment of interchange and other fees. To the extent there are increases in payment processing fees, material changes in the payment ecosystem, such as delays in receiving payments from payment processors and/or changes to rules or regulations concerning payment processing, our revenue, operating expenses and results of operation could be adversely impacted.

*A severe or prolonged downturn in the PRC or global economy could materially and adversely affect our business and our financial condition.*

The global macroeconomic environment is facing challenges, including the escalation of the European sovereign debt crisis since 2011, the end of quantitative easing by the U.S. Federal Reserve and the economic slowdown in the Eurozone in 2014. The PRC economy has slowed down since 2012 and such slowdown may continue. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. There have been concerns over unrest and terrorist threats in the Middle East, Europe and Africa, which have resulted in volatility in oil and other markets, and over the conflicts involving Ukraine and Syria. There have also been concerns on the relationship among China and other Asian countries, which may result in or intensify potential conflicts in relation to territorial disputes. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Moreover, the United Nations population projections (2015) project a slowdown in increase in Chinese population from 2015 to 2030 and a decrease in its population thereafter with the percentage of population over 60 predicted to more than double from 2015 to 2050. In the absence of substantial increase in per capita productivity, this projected change in Chinese demographics can result in decrease in overall productivity and growth rates of the Chinese economy. Any severe or prolonged slowdown in the global or PRC economy may materially and adversely affect our business, results of operations and financial condition. In addition, continued turbulence in the international markets may adversely affect our ability to access capital markets to meet liquidity needs.

*Our operations depend on the performance of the internet infrastructure and telecommunications networks in China.*

The successful operation of our business depends on the performance of the internet infrastructure and telecommunications networks in China. Almost all access to the internet is maintained through state-owned telecommunications operators under the administrative control and regulatory supervision of the MIIT. Moreover, we have entered into contracts with various subsidiaries of a limited number of telecommunications service providers at provincial level and rely on them to provide us with data communications capacity through local telecommunications lines. We have limited access to alternative networks or services in the event of disruptions, failures or other problems with China's internet infrastructure or the telecommunications networks provided by telecommunications service providers. Our platform regularly serve a large number of users and advertisers. With the expansion of our business, we may be required to upgrade our technology and infrastructure to keep up with the increasing traffic on our platform. However, we have no control over the costs of the services provided by telecommunications service providers. If the prices we pay for telecommunications and internet services rise significantly, our results of operations may be materially and adversely affected. If internet access fees or other charges to internet users increase, our user traffic may decline and our business may be harmed.

*We have granted, and may continue to grant, share incentives, which may result in increased share-based compensation expenses.*

We adopted an equity incentive plan on October 18, 2010, or the 2010 Plan, which was amended and restated on November 3, 2014 and August 6, 2016. We also adopted an equity incentive plan on November 30,

29

Table of Contents

2017, or the 2017 Plan. We account for compensation costs for all share-based awards using a fair-value based method and recognize expenses in our consolidated statements of comprehensive loss in accordance with U.S. GAAP. Under the 2010 Plan, we are authorized to grant options, stock appreciation rights, restricted stock units and other types of awards that the administrator of the 2010 Plan decides. Under the 2017 Plan, we are authorized to grant options, restricted shares and restricted share units. Under the 2010 Plan, as amended, the maximum aggregate number of shares which may be issued pursuant to all awards is 589,729,714 shares. Under the 2017 Plan, the maximum aggregate number of shares which may be issued pursuant to all awards is 720,000 shares. As of the date of this prospectus, options to purchase a total of 298,766,115 ordinary shares are outstanding under the 2010 Plan, and we have granted 720,000 restricted share units under the 2017 Plan. For the years ended December 31, 2015, 2016 and 2017, we recorded RMB44.2 million, RMB62.4 million, and RMB233.4 million (US$35.9 million), respectively, in share-based compensation expenses. We believe the granting of share-based awards is of significant importance to our ability to attract and retain key personnel and employees, and we will continue to grant share-based awards in the future. As a result, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

*We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations.*

We are vulnerable to natural disasters and other calamities. Fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events may give rise to server interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide products and services on our platform.

Our business could also be adversely affected by the effects of Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or other epidemics. Our business operations could be disrupted if any of our employees is suspected of having Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, SARS or other epidemic, since it could require our employees to be quarantined and/or our offices to be disinfected. In addition, our results of operations could be adversely affected to the extent that any of these epidemics harms the Chinese economy in general.

*We have limited business insurance coverage.*

Insurance companies in China offer limited business insurance products. We do not have any business liability or disruption insurance coverage for our operations in China. Any business disruption may result in our incurring substantial costs and the diversion of our resources, which could have an adverse effect on our results of operations and financial condition.

*While we believe that we currently have adequate internal control procedures in place, we are still exposed to potential risks from legislation requiring companies to evaluate controls under Section 404 of the Sarbanes-Oxley Act of 2002.*

Upon completion of this offering, we will become subject to the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act, or Section 404, requires that we include a report from management on the effectiveness of our internal control over financial reporting in our annual report on Form 20-F beginning with our annual report for the fiscal year ending December 31, 2019. In addition, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting.

While we were a subsidiary of Baidu, we were indirectly subject to requirements to maintain an effective internal control over financial reporting under Section 404 of the Sarbanes–Oxley Act of 2002. Although we believe that we currently have adequate internal control procedures in place, our independent registered public

30

**Table of Contents**

accounting firm, after conducting its own independent testing, may not certify the effectiveness of our internal control if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us.

If we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. If we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information. This could in turn limit our access to capital markets, harm our results of operations, and lead to a decline in the trading price of our ADSs. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions.

**Risks Related to Our Carve-out from Baidu and Our Relationship with Baidu**

*We have no experience operating as a stand-alone public company.*

We have no experience conducting our operations as a stand-alone public company. After we become a stand-alone public company, we may face enhanced administrative and compliance requirements, which may result in substantial costs.

In addition, since we are becoming a public company, our management team will need to develop the expertise necessary to comply with the regulatory and other requirements applicable to public companies, including requirements relating to corporate governance, listing standards and securities and investor relations issues. While we were a private subsidiary of Baidu, we were indirectly subject to requirements to maintain an effective internal control over financial reporting under Section 404 of the Sarbanes–Oxley Act of 2002. However, as a stand-alone public company, our management will have to evaluate our internal control system independently with new thresholds of materiality, and to implement necessary changes to our internal control system. We cannot guarantee that we will be able to do so in a timely and effective manner.

*We may have conflicts of interest with Baidu and, because of Baidu's controlling ownership interest in our company, we may not be able to resolve such conflicts on terms favorable to us.*

Conflicts of interest may arise between Baidu and us in a number of areas relating to our ongoing relationships. Potential conflicts of interest that we have identified include the following:

- *Our board members may have conflicts of interest.* Our directors Mr. Robin Yanhong Li, Mr. Qi Lu, and Mr. Herman Yu are also senior management of Baidu. These relationships could create, or appear to create, conflicts of interest when these persons are faced with decisions with potentially different implications for Baidu and us.

- *Sale of shares in our company.* Baidu may decide to sell all or a portion of our shares that it holds to a third party, including to one of our competitors, thereby giving that third party substantial influence over our business and our affairs. Such a sale could be in conflict with the interests of our employees or our other shareholders.

- *Developing business relationships with Baidu's competitors.* So long as Baidu remains our controlling shareholder, we may be limited in our ability to do business with its competitors. This may limit our ability to market our services for the best interests of our company and our other shareholders.

- *Allocation of business opportunities.* Business opportunities may arise that both we and Baidu find attractive, and which would complement our businesses. We may be prevented from taking advantage of new business opportunities that Baidu has entered into.

31

Table of Contents

Although our company will become a stand-alone public company, we expect to operate, for as long as Baidu is our controlling shareholder, as a subsidiary of Baidu. Baidu may from time to time make strategic decisions that it believes are in the best interests of its business as a whole, including our company. These decisions may be different from the decisions that we would have made on our own. Baidu's decisions with respect to us or our business, including any related party transactions between Baidu and us, may be resolved in ways that favor Baidu and therefore Baidu's own shareholders, which may not coincide with the interests of our other shareholders. If Baidu were to compete with us, our business, financial condition, results of operations and prospects could be materially and adversely affected.

***Our agreements with Baidu may be less favorable to us than similar agreements negotiated with unaffiliated third parties. In particular, our master business cooperation agreement with Baidu limits the scope of business that we are allowed to conduct.***

We have entered into a master business cooperation agreement with Baidu and may enter into additional agreements with Baidu in the future. Under our master business cooperation agreement with Baidu, we agree during the non-competition period, which will end on the eighth anniversary of the date of execution of the agreement unless otherwise terminated earlier pursuant to the agreement, not to compete with Baidu in its core businesses. Such contractual limitations may affect our ability to expand our business and may adversely impact our growth and prospects. Furthermore, while Baidu has agreed not to compete with us in our long-form video businesses, existing business activities conducted by Baidu and its affiliates are not subject to such non-compete limitation. Potential conflicts of interest could arise in connection with the resolution of any dispute between Baidu and us, regarding the terms of the arrangements governing our agreements with Baidu including the master business cooperation agreement. For example, so long as Baidu continues to control us, we may not be able to bring a legal claim against Baidu in the event of contractual breach, notwithstanding our contractual rights under the master business cooperation agreement and other inter-company agreements to be entered into by Baidu and us from time to time.

***If our collaboration with Baidu is terminated or curtailed, or if we are no longer able to benefit from the synergies of our business cooperation with Baidu, our business may be adversely affected.***

Our controlling shareholder and strategic partner, Baidu, is one of the largest internet companies in China. Our business has benefited significantly from Baidu's advanced technological capabilities and strong market position in China. In addition, we have benefited from Baidu's financial support in the past. We cooperate with Baidu in a number of areas, including AI technology, cloud services and traffic. However, we cannot assure you that we will continue to maintain our cooperative relationships with Baidu and its affiliates in the future. To the extent we cannot maintain our cooperative relationships with Baidu at reasonable prices or at all, we will need to source other business partners to provide services, which could result in material and adverse effects to our business and results of operations. We may also need to obtain financing through other means if Baidu ceases to provide financial support to us. In addition, our current customers and content partners may react negatively to our carve-out from Baidu. Our inability to maintain a cooperative relationship with Baidu could materially and adversely affect our business, growth and prospects.

***Baidu will control the outcome of shareholder actions in our company.***

Upon completion of this offering, Baidu will hold        % of our outstanding ordinary shares, representing        % of our total voting power, assuming the underwriters do not exercise their over-allotment option. Baidu has advised us that it does not anticipate disposing of its voting control in us in the near future. Baidu's voting power gives it the power to control certain actions that require shareholder approval under Cayman Islands law, our memorandum and articles of association and Nasdaq Global Market requirements, including approval of mergers and other business combinations, changes to our memorandum and articles of association, the number of shares available for issuance under any share incentive plans, and the issuance of significant amounts of our ordinary shares in private placements.

32

Table of Contents

Baidu's voting control may cause transactions to occur that might not be beneficial to you as a holder of ADSs and may prevent transactions that could have been beneficial to you. For example, Baidu's voting control may prevent a transaction involving a change of control of us, including transactions in which you as a holder of our ADSs might otherwise receive a premium for your securities over the then-current market price. In addition, Baidu is not prohibited from selling a controlling interest in us to a third party and may do so without your approval and without providing for a purchase of your ADSs. In addition, the significant concentration of share ownership may adversely affect the trading price of the ADSs due to investors' perception that conflicts of interest may exist or arise. See "—We may have conflicts of interest with Baidu and, because of Baidu's controlling ownership interest in our company, we may not be able to resolve such conflicts on terms favorable to us."

***We are a "controlled company" within the meaning of the Nasdaq Stock Market Rules and, as a result, will rely on exemptions from certain corporate governance requirements that provide protection to shareholders of other companies.***

We are a "controlled company" as defined under the Nasdaq Stock Market Rules because Baidu beneficially owns more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we are permitted to elect to rely, and will rely, on certain exemptions from corporate governance rules, including:

- an exemption from the rule that a majority of our board of directors must be independent directors;

- an exemption from the rule that the compensation of our chief executive officer must be determined or recommended solely by independent directors; and

- an exemption from the rule that our director nominees must be selected or recommended solely by independent directors.

As a result, you will not have the same protection afforded to shareholders of companies that are subject to these corporate governance requirements.

**Risks Related to Our Corporate Structure**

***If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.***

Foreign ownership of telecommunication businesses and certain other businesses, such as provision of internet video, online advertising and online game services, is subject to restrictions under current PRC laws and regulations. For example, foreign investors are generally not allowed to own more than 50% of the equity interests in a commercial internet content provider or other value-added telecommunication service provider (other than operating e-commerce) and the major foreign investor in a value-added telecommunication service provider in China must have experience in providing value-added telecommunications services overseas and maintain a good track record in accordance with the Guidance Catalog of Industries for Foreign Investment promulgated in 2007, as amended in 2011, 2015 and 2017, and other applicable laws and regulations.

In addition, foreign investors are prohibited from investing in companies engaged in internet video, culture and publishing business and film/drama production business. We are a Cayman Islands company and our PRC subsidiaries are considered foreign-invested enterprises. Accordingly, none of our PRC subsidiaries is eligible to operate internet video, online advertising services and other businesses which foreign-owned companies are prohibited or restricted from conducting in China. To comply with PRC laws and regulations, we conduct such business activities through our consolidated affiliated entities in China, Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Beijing iQIYI Cinema, and their subsidiaries. Our wholly owned subsidiaries,

33

Table of Contents

Beijing QIYI Century and iQIYI New Media, have entered into contractual arrangements with our consolidated affiliated entities and their respective shareholders, and such contractual arrangements enable us to exercise effective control over, receive substantially all of the economic benefits of, and have an exclusive option to purchase all or part of the equity interest and assets in our consolidated affiliated entities when and to the extent permitted by PRC law. Because of these contractual arrangements, we are the primary beneficiary of our consolidated affiliated entities in China and hence consolidate their financial results as our variable interest entities under U.S. GAAP. If the PRC government finds that our contractual arrangements do not comply with its restrictions on foreign investment in online video, online advertising and other foreign-restricted services, or if the PRC government otherwise finds that we, our consolidated affiliated entities, or any of their subsidiaries are in violation of PRC laws or regulations or lack the necessary permits or licenses to operate our business, the relevant PRC regulatory authorities, including the MIIT, the GAPPRFT, the Ministry of Culture and the MOFCOM, would have broad discretion in dealing with such violations or failures, including, without limitation:

- revoking the business licenses and/or operating licenses of such entities;

- discontinuing or placing restrictions or onerous conditions on our operation through any transactions between our PRC subsidiaries and consolidated affiliated entities;

- imposing fines, confiscating the income from our PRC subsidiaries or our consolidated affiliated entities, or imposing other requirements with which we or our consolidated affiliated entities may not be able to comply;

- requiring us to restructure our ownership structure or operations, including terminating the contractual arrangements with our consolidated affiliated entities and deregistering the equity pledges of our consolidated affiliated entities, which in turn would affect our ability to consolidate, derive economic interests from, or exert effective control over our consolidated affiliated entities; or

- restricting or prohibiting our use of the proceeds of this offering to finance our business and operations in China.

In addition, in September 2009, the GAPP (currently known as the SAPPRFT) together with several other government agencies issued a notice, or the Circular 13, prohibiting foreign investors from participating in online game operating businesses through wholly-owned enterprises, equity joint ventures or cooperative joint ventures in China. Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form, such as incorporating user registration, user account management or payment through game cards into online game platforms that are ultimately controlled or owned by foreign investors. Other government agencies that also have the authority to regulate online game operations in China, such as the Ministry of Culture and the MIIT, did not join the GAPP in issuing the Circular 13. To date, neither the GAPP nor the SAPPRFT has issued any interpretation of the Circular 13. Due to the ambiguity among various regulations on online games and a lack of interpretations from the relevant PRC authorities governing online game operations, there are uncertainties regarding whether PRC authorities would consider our relevant contractual arrangements to be foreign investment in online game operation businesses. While we are not aware of any online game companies which use the same or similar contractual arrangements as ours having been penalized or ordered to terminate operation by PRC authorities claiming that the contractual arrangements constitute control over, or participation in, the operation of online game operations through indirect means, it is unclear whether and how the various regulations of the PRC authorities might be interpreted or implemented in the future. If our relevant contractual arrangements were deemed to be "indirect means" or "disguised form" under the Circular 13, the relevant contractual arrangements may be challenged by the SAPPRFT or other governmental authorities. If we were found to be in violation of the Circular 13 to operate our mobile game business, the SAPPRFT, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending or revoking the relevant licenses and registrations. If we were found to be in violation of any existing or future PRC laws or regulations, including

34

**Table of Contents**

the MIIT notice and the Circular 13, the relevant regulatory authorities would have broad discretion in dealing with such violations.

Furthermore, it is uncertain whether any new PRC laws, rules or regulations relating to contractual arrangements will be adopted or if adopted, what they would provide. In particular, in January 2015, the MOFCOM published a discussion draft of the proposed Foreign Investment Law for public review and comments. Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered a foreign-invested enterprise, or an FIE. Under the draft Foreign Investment Law, variable interest entities would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors, and be subject to restrictions on foreign investments. However, the draft law has not taken a position on what actions will be taken with respect to the existing companies with the "variable interest entity" structure, whether or not these companies are controlled by Chinese parties. It is uncertain when the draft would be signed into law and whether the final version would have any substantial changes from the draft.

Any of these events could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If occurrences of any of these events results in our inability to direct the activities of our consolidated affiliated entities in China that most significantly impact their economic performance, and/or our failure to receive the economic benefits from our consolidated affiliated entities, we may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

*We rely on contractual arrangements with our consolidated affiliated entities and their shareholders for our business operations, which may not be as effective as direct ownership in providing operational control.*

We have relied and expect to continue to rely on contractual arrangements with consolidated affiliated entities and their shareholders to operate our business in China. For a description of these contractual arrangements, see "Corporate History and Structure." These contractual arrangements may not be as effective as direct ownership in providing us with control over our consolidated affiliated entities. For example, our consolidated affiliated and their shareholders could breach their contractual arrangements with us by, among other things, failing to conduct its operations in an acceptable manner or taking other actions that are detrimental to our interests.

If we had direct ownership of our consolidated affiliated entities in China, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of our consolidated affiliated entities, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the current contractual arrangements, we rely on the performance by our consolidated affiliated entities and their shareholders of their obligations under the contracts to exercise control over our consolidated affiliated entities. The shareholders of our consolidated affiliated entities may not act in the best interests of our company or may not perform their obligations under these contracts. Such risks exist throughout the period in which we intend to operate certain portion of our business through the contractual arrangements with our consolidated affiliated entities. If any dispute relating to these contracts remains unresolved, we will have to enforce our rights under these contracts through the operations of PRC law and arbitration, litigation and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. See "—Any failure by our consolidated affiliated entities or their shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business." Therefore, our contractual arrangements with our consolidated affiliated entities may not be as effective in ensuring our control over the relevant portion of our business operations as direct ownership would be.

35

Table of Contents

*Any failure by our consolidated affiliated entities or their shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business.*

If our consolidated affiliated entities or their shareholders fail to perform their respective obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements. We may also have to rely on legal remedies under PRC law, including seeking specific performance or injunctive relief, and claiming damages, which we cannot assure you will be effective under PRC law. For example, if the shareholders of our consolidated affiliated entities were to refuse to transfer their equity interests in our consolidated affiliated entities to us or our designee if we exercise the purchase option pursuant to these contractual arrangements, or if they were otherwise to act in bad faith toward us, then we may have to take legal actions to compel them to perform their contractual obligations.

All the agreements under our contractual arrangements are governed by PRC law and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a consolidated affiliated entity should be interpreted or enforced under PRC law. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and if the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delay. In the event we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our consolidated affiliated entities, and our ability to conduct our business may be negatively affected. See "—Risks Related to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

*The shareholders of our consolidated affiliated entities may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.*

The shareholders of our consolidated affiliated entities may have potential conflicts of interest with us. In particular, none of Mr. Ning Ya, who currently holds 50% of equity interest in iQIYI Pictures, and Mr. Xiaohua Geng, who currently holds 50% of the equity interests in Shanghai iQIYI and 100% of the equity interests in Beijing iQIYI, is our shareholder, director and executive officer, and we cannot assure you that their interests will be aligned with ours. These shareholders may breach, or cause our consolidated affiliated entities to breach, or refuse to renew, the existing contractual arrangements we have with them and our consolidated affiliated entities, which would have a material and adverse effect on our ability to effectively control our consolidated affiliated entities and receive economic benefits from it. For example, the shareholders may be able to cause our agreements with our consolidated affiliated entities to be performed in a manner adverse to us by, among other things, failing to remit payments due under the contractual arrangements to us on a timely basis. We cannot assure you that when conflicts of interest arise, any or all of these shareholders will act in the best interests of our company or such conflicts will be resolved in our favor. Currently, we do not have any arrangements to address potential conflicts of interest between these shareholders and our company. If we cannot resolve any conflict of interest or dispute between us and these shareholders, we would have to rely on legal proceedings, which could result in disruption of our business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

36

Table of Contents

***Contractual arrangements in relation to our consolidated affiliated entities may be subject to scrutiny by the PRC tax authorities and they may determine that we or our PRC consolidated affiliated entities owe additional taxes, which could negatively affect our financial condition and the value of your investment.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities within ten years after the taxable year when the transactions are conducted. We could face material and adverse tax consequences if the PRC tax authorities determine that the VIE contractual arrangements were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust income of our consolidated affiliated entities in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by our consolidated affiliated entities for PRC tax purposes, which could in turn increase its tax liabilities without reducing our PRC subsidiary's tax expenses. In addition, the PRC tax authorities may impose late payment fees and other penalties on our consolidated affiliated entities for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if our variable interest entities' tax liabilities increase or if it is required to pay late payment fees and other penalties.

***We may lose the ability to use and enjoy assets held by our consolidated affiliated entities that are material to the operation of certain portion of our business if the entity goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

As part of our contractual arrangements with our consolidated affiliated entities, the entities hold certain assets that are material to the operation of certain portion of our business, including permits, domain names and most of our IP rights. If our consolidated affiliated entities go bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. Under the contractual arrangements, our consolidated affiliated entities may not, in any manner, sell, transfer, mortgage or dispose of their assets or legal or beneficial interests in the business without our prior consent. If our consolidated affiliated entities undergo a voluntary or involuntary liquidation proceeding, the independent third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

***Substantial uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

The MOFCOM published a discussion draft of the proposed Foreign Investment Law in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. The draft Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. The MOFCOM is currently soliciting comments on this draft and substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The draft Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance and business operations in many aspects.

Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered an FIE. The draft Foreign Investment Law specifically provides that entities established in China but "controlled" by foreign investors will be treated as FIEs, whereas an entity set up in a foreign jurisdiction would nonetheless be, upon

37

**Table of Contents**

market entry approval by the MOFCOM, treated as a PRC domestic investor provided that the entity is "controlled" by PRC entities and/or citizens. According to the draft Foreign Investment Law, once an entity is determined to be an FIE, it will be subject to the foreign investment restrictions or prohibitions set forth in a "catalog of special administrative measures", which is classified into the "catalog of prohibitions" and the "catalog of restrictions", to be separately issued by the State Council later. Foreign investors are not allowed to invest in any sector set forth in the catalog of prohibitions.

The draft Foreign Investment Law does not indicate what actions shall be taken with respect to companies with an existing contractual arrangement structure, whether or not these companies are controlled by Chinese parties. Moreover, it is uncertain whether the "catalog of special administrative measures" to be issued will differ from the Catalog for the Guidance of Foreign Investment Industries (Revised in 2017), or the 2017 Catalog, and re-impose foreign investment restrictions or prohibitions on internet video, online advertising services and other certain businesses. If the enacted version of the Foreign Investment Law and the final "catalog of special administrative measures" mandate further actions, such as the MOFCOM market entry approval, to be completed by companies with an existing contractual arrangement structure like us, and if internet video, online advertising services and other businesses conducted by us become once again subject to the foreign investment restrictions or prohibitions, we will face uncertainties as to whether such approval can be timely obtained, or at all. If we are not able to obtain such approval when required, our contractual arrangement structure may be regarded as invalid and illegal. As a result, we would not be able to (i) continue our business in China through our contractual arrangements with our consolidated affiliated entities, (ii) exert control over consolidated affiliated entities, (iii) receive the economic benefits of our consolidated affiliated entities under such contractual arrangements, or (iv) consolidate the financial results of our consolidated affiliated entities. Were this to occur, our results of operations and financial condition would be materially and adversely affected.

The draft Foreign Investment Law, if enacted as proposed, may also materially impact our corporate governance practice and increase our compliance costs. For instance, the draft Foreign Investment Law imposes stringent ad hoc and periodic information reporting requirements on foreign investors and the applicable FIEs.

Aside from an investment information report required at each investment, and investment amendment reports, which shall be submitted upon alteration of investment specifics, it is mandatory for entities established by foreign investors to submit an annual report, and large foreign investors meeting certain criteria are required to report on a quarterly basis. Any company found to be non-compliant with these reporting obligations may potentially be subject to fines and/or administrative or criminal liabilities, and the persons directly responsible may be subject to criminal liabilities.

**Risks Related to Doing Business in China**

*Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.*

Substantially all of our operations are located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by political, economic and social conditions in China generally. The Chinese economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development by imposing industrial policies. The Chinese government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

38

Table of Contents

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy, and the rate of growth has been slowing since 2012. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position. The Chinese government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations. In addition, in the past the Chinese government has implemented certain measures, including interest rate adjustment, to control the pace of economic growth. These measures may cause decreased economic activity in China, which may adversely affect our business and operating results.

### *Uncertainties with respect to the PRC legal system could adversely affect us.*

The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions under the civil law system may be cited for reference but have limited precedential value. Since these laws and regulations are relatively new and the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and the enforcement of these laws, regulations and rules involves uncertainties.

In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past three decades has significantly enhanced the protections afforded to various forms of foreign investments in China. However, China has not developed a fully integrated legal system, and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, the interpretation and enforcement of these laws and regulations involve uncertainties. Since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory provisions and contractual terms, it may be difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy. These uncertainties may affect our judgment on the relevance of legal requirements and our ability to enforce our contractual rights or tort claims. In addition, the regulatory uncertainties may be exploited through unmerited or frivolous legal actions or threats in attempts to extract payments or benefits from us.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all and may have retroactive effect. As a result, we may not be aware of our violation of any of these policies and rules until sometime after the violation. In addition, any administrative and court proceedings in China may be protracted, resulting in substantial costs and diversion of resources and management attention.

### *We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business.*

We are a Cayman Islands holding company and we may rely on dividends and other distributions on equity from our PRC subsidiaries for our cash requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and for services of any debt we may incur. Our subsidiaries' ability to distribute dividends is based upon their distributable earnings. Current PRC regulations permit our PRC subsidiaries to pay dividends to their respective shareholders only out of their accumulated profits, if any, determined in accordance with PRC accounting standards and regulations. In addition, each of our PRC subsidiaries and our consolidated affiliated entities is required to set aside at least 10% of its after-tax profits each year, if any, to fund a statutory reserve until such reserve reaches 50% of its registered capital. Each of such

39

Table of Contents

entities in China is also required to further set aside a portion of its after-tax profits to fund the employee welfare fund, although the amount to be set aside, if any, is determined at the discretion of its board of directors. These reserves are not distributable as cash dividends. If our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments to us. Any limitation on the ability of our PRC subsidiaries to distribute dividends or other payments to their respective shareholders could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our businesses, pay dividends or otherwise fund and conduct our business.

In response to the persistent capital outflow and RMB's depreciation against U.S. dollar in the fourth quarter of 2016, the People's Bank of China and the State Administration of Foreign Exchange, or SAFE, have implemented a series of capital control measures over recent months, including stricter vetting procedures for China-based companies to remit foreign currency for overseas acquisitions, dividend payments and shareholder loan repayments. For instance, the People's Bank of China issued the Circular on Further Clarification of Relevant Matters Relating to Offshore RMB Loans Provided by Domestic Enterprises, or the PBOC Circular 306, on November 22, 2016, which provides that offshore RMB loans provided by a domestic enterprise to offshore enterprises that it holds equity interests in shall not exceed 30% of the domestic enterprise's ownership interest in the offshore enterprise. The PBOC Circular 306 may constrain our PRC subsidiaries' ability to provide offshore loans to us. The PRC government may continue to strengthen its capital controls and our PRC subsidiaries' dividends and other distributions may be subjected to tighter scrutiny in the future. Any limitation on the ability of our PRC subsidiaries to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business. See also "—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

Under the EIT Law and related regulations, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its foreign non-resident enterprise investors, and proceeds from any such foreign enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to a 10% withholding tax, unless the foreign enterprise investor's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax. Undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 are exempted from any withholding tax. The Cayman Islands, where iQIYI, Inc., the direct parent company of our PRC subsidiaries Beijing QIYI Century Science & Technology Co., Ltd., and Chongqing QIYI Tianxia Science & Technology Co., Ltd., is incorporated, does not have such a tax treaty with China. Hong Kong has a tax arrangement with China that provides for a 5% withholding tax on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. For example, IQIYI Film Group HK Limited, which directly owns our PRC subsidiaries Beijing iQIYI New Media Science and Technology Co., Ltd., is incorporated in Hong Kong. However, if IQIYI Film Group HK Limited is not considered to be the beneficial owner of dividends paid to it by Beijing iQIYI New Media Science and Technology Co., Ltd. under the tax circulars promulgated in February and October 2009, such dividends would be subject to withholding tax at a rate of 10%. If our PRC subsidiaries declare and distribute profits to us, such payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of this offering to make loans to or make additional capital contributions to our PRC subsidiaries and consolidated affiliated entities, which could materially and adversely affect our liquidity and our ability to fund and expand our business.***

Any funds we transfer to our PRC subsidiaries, either as a shareholder loan or as an increase in registered capital, are subject to approval by or registration or filing with relevant governmental authorities in China.

40

**Table of Contents**

According to the relevant PRC regulations on foreign-invested enterprises, or FIEs, in China, capital contributions to our PRC subsidiaries are subject to filing with the MOFCOM in its foreign investment comprehensive management information system and registration with other governmental authorities in China. In addition, (a) any foreign loan procured by our PRC subsidiaries and consolidated affiliated entities is required to be registered with the SAFE or its local branches or filed with SAFE in its information system, and (b) each of our PRC subsidiaries and consolidated affiliated entities may not procure loans which exceed the difference between its registered capital and its total investment amount as recorded in the foreign investment comprehensive management information system or, as an alternative, only procure loans subject to the Risk-Weighted Approach and the Net Asset Limits. See "Regulation—Regulations on Foreign Exchange". Any medium or long term loan to be provided by us to our consolidated affiliated entities must also be approved by the NDRC. We may not obtain these government approvals or complete such registrations on a timely basis, if at all, with respect to future capital contributions or foreign loans by us to our PRC subsidiaries and consolidated affiliated entities. If we fail to receive such approvals or complete such registration or filing, our ability to use the proceeds of this offering and to capitalize our PRC operations may be negatively affected, which could adversely affect our liquidity and our ability to fund and expand our business. There is, in effect, no statutory limit on the amount of capital contribution that we can make to our PRC subsidiaries. This is because there is no statutory limit on the amount of registered capital for our PRC subsidiaries, and we are allowed to make capital contributions to our PRC subsidiaries by subscribing for their initial registered capital and increased registered capital, provided that the PRC subsidiaries completes the relevant filing and registration procedures. With respect to loans to the PRC subsidiaries by us, (i) if the relevant PRC subsidiaries adopt the traditional foreign exchange administration mechanism, or the Current Foreign Debt mechanism, the outstanding amount of the loans shall not exceed the difference between the total investment and the registered capital of the PRC subsidiaries and there is, in effect, no statutory limit on the amount of loans that we can make to our PRC subsidiaries under this circumstance because we can increase the registered capital of our PRC subsidiaries by making capital contributions to them, subject to the completion of the required registrations, and the difference between the total investment and the registered capital will increase accordingly; and (ii) if the relevant PRC subsidiaries adopt the foreign exchange administration mechanism as provided in the PBOC Notice No. 9, or the Notice No. 9 Foreign Debt mechanism, the risk-weighted outstanding amount of the loans, which shall be calculated based on the formula provided in the PBOC Notice No. 9, shall not exceed 200% of the net asset of the relevant PRC subsidiary. According to the PBOC Notice No. 9, after a transition period of one year since the promulgation of the PBOC Notice No. 9, the PBOC and SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of the PBOC Notice No. 9. As of the date hereof, neither PBOC nor SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by PBOC and SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries. Currently, our PRC subsidiaries have the flexibility to choose between the Current Foreign Debt mechanism and the Notice No. 9 Foreign Debt mechanism. However, if the Notice No. 9 Foreign Debt Mechanism, or a more stringent foreign debt mechanism becomes mandatory and our PRC subsidiaries are no longer able to choose the Current Foreign Debt mechanism, our ability to provide loans to our PRC subsidiaries or our consolidated affiliated entities may be significantly limited, which may adversely affect our business, financial condition and results of operations.

In 2008, the SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, or SAFE Circular 142. SAFE Circular 142 regulates the conversion by FIEs of foreign currency into Renminbi by restricting the usage of converted Renminbi. SAFE Circular 142 provides that any Renminbi capital converted from registered capitals in foreign currency of FIEs may only be used for purposes within the business scopes approved by PRC governmental authority and such Renminbi capital may not be used for equity investments within China unless otherwise permitted by the PRC law. In addition, the SAFE strengthened its oversight of the flow and use of the Renminbi capital converted from registered capital in foreign currency of FIEs. The use of such Renminbi capital may not be changed without SAFE approval, and such Renminbi capital may not in any case be used to repay Renminbi loans if the proceeds of such loans have not been utilized. On

41

**Table of Contents**

April 8, 2015, the SAFE promulgated the Circular on Reforming the Management Approach Regarding the Foreign Exchange Capital Settlement of Foreign-Invested Enterprises, or SAFE Circular 19. SAFE Circular 19 took effect as of June 1, 2015 and superseded SAFE Circular 142 on the same date. SAFE further promulgated Circular 16, effective on June 9, 2016, which, among other things, amend certain provisions of Circular 19. SAFE Circulars 19 and 16 launched a nationwide reform of the administration of the settlement of the foreign exchange capitals of FIEs and allows FIEs to settle their foreign exchange capital at their discretion, but continues to prohibit FIEs from using the Renminbi fund converted from their foreign exchange capitals for expenditure beyond their business scopes, and also prohibit FIEs from using such Renminbi fund to provide loans to persons other than affiliates unless otherwise permitted under its business scope. As a result, we are required to apply Renminbi funds converted from the net proceeds we received from this offering within the business scopes of our PRC subsidiaries. SAFE Circular 19 and 16 may significantly limit our ability to transfer to and use in China the net proceeds from this offering, which may adversely affect our business, financial condition and results of operations.

*Fluctuations in exchange rates could have a material and adverse effect on our results of operations and the value of your investment.*

The value of the Renminbi against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in political and economic conditions in China and by China's foreign exchange policies. On July 21, 2005, the PRC government changed its decade-old policy of pegging the value of the Renminbi to the U.S. dollar, and the Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, the Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. On November 30, 2015, the Executive Board of the International Monetary Fund, or IMF, completed the regular five-year review of the basket of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, Renminbi is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the RMB has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and we cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

Significant revaluation of the Renminbi may have a material and adverse effect on your investment. For example, to the extent that we need to convert U.S. dollars we receive from this offering into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any material hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

42

Table of Contents

*Our use of some leased properties could be challenged by third parties or governmental authorities, which may cause interruptions to our business operations.*

As of the date of this prospectus, some of the lessors of our properties leased by us in China have not provided us with their property ownership certificates or any other documentation proving their right to lease those properties to us. If our lessors are not the owners of the properties and they have not obtained consents from the owners or their lessors or permits from the relevant governmental authorities, our leases could be invalidated. If this occurs, we may have to renegotiate the leases with the owners or other parties who have the right to lease the properties, and the terms of the new leases may be less favorable to us. Although we may seek damages from such lessors, such leases may be void and we may be forced to relocate. We can provide no assurance that we will be able to find suitable replacement sites on terms acceptable to us on a timely basis, or at all, or that we will not be subject to material liability resulting from third parties' challenges on our use of such properties. As a result, our business, financial condition and results of operations may be materially and adversely affected.

In addition, a substantial portion of our leasehold interests in leased properties have not been registered with the relevant PRC governmental authorities as required by relevant PRC laws. The failure to register leasehold interests may expose us to potential warnings and penalties up to RMB 10,000 per unregistered leased property.

*The enforcement of the PRC Labor Contract Law and other labor-related regulations in the PRC may adversely affect our business and results of operations.*

The Standing Committee of the National People's Congress enacted the Labor Contract Law in 2008, and amended it on December 28, 2012. The Labor Contract Law introduced specific provisions related to fixed-term employment contracts, part-time employment, probationary periods, consultation with labor unions and employee assemblies, employment without a written contract, dismissal of employees, severance, and collective bargaining to enhance previous PRC labor laws. Under the Labor Contract Law, an employer is obligated to sign an unlimited-term labor contract with any employee who has worked for the employer for ten consecutive years. Further, if an employee requests or agrees to renew a fixed-term labor contract that has already been entered into twice consecutively, the resulting contract, with certain exceptions, must have an unlimited term, subject to certain exceptions. With certain exceptions, an employer must pay severance to an employee where a labor contract is terminated or expires. In addition, the PRC governmental authorities have continued to introduce various new labor-related regulations since the effectiveness of the Labor Contract Law.

Under the PRC Social Insurance Law and the Administrative Measures on Housing Fund, employees are required to participate in pension insurance, work-related injury insurance, medical insurance, unemployment insurance, maternity insurance, and housing funds and employers are required, together with their employees or separately, to pay the social insurance premiums and housing funds for their employees. If we fail to make adequate social insurance and housing fund contributions, we may be subject to fines and legal sanctions, and our business, financial conditions and results of operations may be adversely affected.

These laws designed to enhance labor protection tend to increase our labor costs. In addition, as the interpretation and implementation of these regulations are still evolving, our employment practices may not be at all times be deemed in compliance with the regulations. As a result, we could be subject to penalties or incur significant liabilities in connection with labor disputes or investigations.

*The M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.*

The Regulations on Mergers and Acquisitions of Domestic Companies by Foreign Investors, or the M&A Rules, adopted by six PRC regulatory agencies in 2006 and amended in 2009, and some other regulations and

43

**Table of Contents**

rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex, including requirements in some instances that the MOC be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. Moreover, the Anti-Monopoly Law requires that the MOC shall be notified in advance of any concentration of undertaking if certain thresholds are triggered. In addition, the security review rules issued by the MOC that became effective in September 2011 specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire de facto control over domestic enterprises that raise "national security" concerns are subject to strict review by the MOC, and the rules prohibit any activities attempting to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from the MOC or its local counterparts may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

*PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may subject our PRC resident beneficial owners or our PRC subsidiaries to liability or penalties, limit our ability to inject capital into our PRC subsidiaries, limit our PRC subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.*

The SAFE promulgated the Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37, in July 2014 that requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing with such PRC residents or entities' legally owned assets or equity interests in domestic enterprises or offshore assets or interests. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes material events relating to any change of basic information (including change of such PRC citizens or residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, or mergers or divisions.

SAFE Circular 37 is issued to replace the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents Engaging in Financing and Roundtrip Investments via Overseas Special Purpose Vehicles, or SAFE Circular 75.

If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiaries. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

We have notified all PRC residents or entities who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents to complete the foreign exchange registrations. We are aware that Mr. Robin Yanhong Li, our chairman, and Dr. Yu Gong, our chief executive officer and director, both PRC residents, have registered with the relevant local SAFE branch.

However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make, obtain or update any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could

44

**Table of Contents**

subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiaries' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

***Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

Pursuant to SAFE Circular 37, PRC residents who participate in share incentive plans in overseas non-publicly-listed companies may submit applications to SAFE or its local branches for the foreign exchange registration with respect to offshore special purpose companies. In the meantime, our directors, executive officers and other employees who are PRC citizens or who are non-PRC residents residing in the PRC for a continuous period of not less than one year, subject to limited exceptions, and who have been granted share-based awards by us, may follow the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, promulgated by the SAFE in 2012. Pursuant to the 2012 SAFE notices, PRC citizens and non-PRC citizens who reside in China for a continuous period of not less than one year who participate in any stock incentive plan of an overseas publicly listed company, subject to a few exceptions, are required to register with SAFE through a domestic qualified agent, which could be the PRC subsidiaries of such overseas listed company, and complete certain other procedures. In addition, an overseas entrusted institution must be retained to handle matters in connection with the exercise or sale of stock options and the purchase or sale of shares and interests. We, our directors, our executive officers and other employees who are PRC citizens or who reside in the PRC for a continuous period of not less than one year and who have been granted share-based awards will be subject to these regulations when our company becomes an overseas listed company upon the completion of this offering. Failure to complete the SAFE registrations may subject them to fines, and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiaries and limit our PRC subsidiaries' ability to distribute dividends to us. We also face regulatory uncertainties that could restrict our ability to adopt additional incentive plans for our directors, executive officers and employees under PRC law. See "Regulation—Regulations on Employment and Social Welfare—Employee Stock Incentive Plan."

The State Administration of Taxation, or SAT, has issued certain circulars concerning employee share options and restricted shares. Under these circulars, our employees working in China who exercise share options or are granted restricted shares will be subject to PRC individual income tax. Our PRC subsidiaries have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If our employees fail to pay or we fail to withhold their income taxes according to relevant laws and regulations, we may face sanctions imposed by the tax authorities or other PRC governmental authorities. See "Regulation—Regulations on Employment and Social Welfare—Employee Stock Incentive Plan."

***If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.***

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with its "de facto management body" within the PRC is considered a "resident enterprise" and will be subject to PRC enterprise income tax on its global income at the rate of 25%. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control and overall management over the business, productions, personnel, accounts and properties of an enterprise. In 2009, the State Administration of Taxation issued a circular, known as SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners, the criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto

45

**Table of Contents**

management body" text should be applied in determining the tax resident status of all offshore enterprises. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." If the PRC tax authorities determine that iQIYI, Inc. is a PRC resident enterprise for enterprise income tax purposes, we may be required to withhold a 10% withholding tax from dividends we pay to our shareholders that are non-resident enterprises, including the holders of our ADSs. In addition, non-resident enterprise shareholders (including our ADS holders) may be subject to PRC tax at a rate of 10% on gains realized on the sale or other disposition of ADSs or ordinary shares at a rate of 10%, if such income is treated as sourced from within the PRC. Furthermore, if PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, dividends paid to our non-PRC individual shareholders (including our ADS holders) and any gain realized on the transfer of ADSs or ordinary shares by such shareholders may be subject to PRC tax at a rate of 20% (which, in the case of dividends, may be withheld at source by us), if such gains are deemed to be from PRC sources. These rates may be reduced by an applicable tax treaty, but it is unclear whether non-PRC shareholders of iQIYI, Inc. would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that iQIYI, Inc. is treated as a PRC resident enterprise. Any such tax may reduce the returns on your investment in the ADSs.

***The audit report included in this prospectus is prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board and, as such, you are deprived of the benefits of such inspection***

Our independent registered public accounting firm that issues the audit reports included in our prospectus filed with the U.S. Securities and Exchange Commission, as auditors of companies that are traded publicly in the United States and a firm registered with the U.S. Public Company Accounting Oversight Board, or the PCAOB, is required by the laws of the United States to undergo regular inspections by the PCAOB to assess its compliance with the laws of the United States and professional standards. Because our auditors are located in the Peoples' Republic of China, a jurisdiction where the PCAOB is currently unable to conduct inspections without the approval of the Chinese authorities, our auditors are not currently inspected by the PCAOB.

Inspections of other firms that the PCAOB has conducted outside China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. This lack of PCAOB inspections in China prevents the PCAOB from regularly evaluating our auditor's audits and its quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures as compared to auditors outside of China that are subject to PCAOB inspections. Investors may lose confidence in our reported financial information and procedures and the quality of our financial statements.

46

Table of Contents

***Proceedings instituted by the SEC against five PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.***

Starting in 2011 the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, were affected by a conflict between U.S. and Chinese law. Specifically, for certain U.S.-listed companies operating and audited in mainland China, the SEC and the PCAOB sought to obtain from the Chinese firms access to their audit work papers and related documents. The firms were, however, advised and directed that under Chinese law, they could not respond directly to the U.S. regulators on those requests, and that requests by foreign regulators for access to such papers in China had to be channeled through the CSRC.

In December 2012, the SEC instituted proceedings under Rule 102(e)(1)(iii) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against five Chinese-based accounting firms, including our independent registered public accounting firm, alleging that these firms had violated U.S. securities laws and the SEC's rules and regulations thereunder by failing to provide to the SEC the firms' work papers related to their audits of certain China-based companies that are publicly traded in the U.S. Rule 102(e)(1)(iii) grants the SEC the authority to deny to any person, temporarily or permanently, the ability to practice before the SEC who is found by the SEC, after notice and opportunity for a hearing, to have willfully violated any such laws or rules and regulations. On January 22, 2014, an initial administrative law decision was issued, censuring these accounting firms and suspending four of the five firms from practicing before the SEC for a period of six months. Four of these China-based accounting firms appealed to the SEC against this decision and, on February 6, 2015, each of the four China-based accounting firms agreed to a censure and to pay a fine to the SEC to settle the dispute and avoid suspension of their ability to practice before the SEC. The firms' ability to continue to serve all their respective customers is not affected by the settlement. The settlement requires the firms to follow detailed procedures to seek to provide the SEC with access to Chinese firms' audit documents via the China Securities Regulatory Commission. If the firms do not follow these procedures, the SEC could impose penalties such as suspensions, or it could restart the administrative proceedings. The settlement did not require the firms to admit to any violation of law and preserves the firms' legal defenses in the event the administrative proceeding is restarted.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against these audit firms may cause investor uncertainty regarding China-based, U.S.-listed companies and the market price of our ordinary shares may be adversely affected.

If our independent registered public accounting firm was denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of our ADSs from the Nasdaq or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

**Risks Related to Our ADSs and this Offering**

***An active trading market for our ordinary shares or our ADSs may not develop and the trading price for our ADSs may fluctuate significantly.***

We have applied to list our ADSs on the Nasdaq Global Market. We have no current intention to seek a listing for our ordinary shares on any stock exchange. Prior to the completion of this offering, there has been no public market for our ADSs or our ordinary shares, and we cannot assure you that a liquid public market

47

Table of Contents

for our ADSs will develop. If an active public market for our ADSs does not develop following the completion of this offering, the market price and liquidity of our ADSs may be materially and adversely affected. The initial public offering price for our ADSs will be determined by negotiation between us and the underwriters based upon several factors, and we can provide no assurance that the trading price of our ADSs after this offering will not decline below the initial public offering price. As a result, investors in our securities may experience a significant decrease in the value of their ADSs.

***The trading price of our ADSs is likely to be volatile, which could result in substantial losses to investors.***

The trading price of our ADSs is likely to be volatile and could fluctuate widely due to multiple factors, some of which are beyond our control. This may happen because of broad market and industry factors, including the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, operating costs and expenses, earnings and cash flow;

- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;

- announcements of new offerings, solutions and expansions by us or our competitors;

- changes in financial estimates by securities analysts;

- detrimental adverse publicity about us, our services, our employees, our content offerings, our business model or our industry;

- additions or departures of key personnel;

- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities; and

- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.***

The trading market for our ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume for our ADSs to decline.

48

Table of Contents

***The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.***

Sales of substantial amounts of our ADSs in the public market after the completion of this offering, or the perception that these sales could occur, could adversely affect the market price of our ADSs and could materially impair our ability to raise capital through equity offerings in the future. The ADSs sold in this offering will be freely tradable without restriction or further registration under the Securities Act, and shares held by our existing shareholders may also be sold in the public market in the future subject to the restrictions in Rule 144 and Rule 701 under the Securities Act and the applicable lock-up agreements. There will be          ADSs (equivalent to          Class A ordinary shares) outstanding immediately after this offering, or          ADSs (equivalent to          Class A to ordinary shares) if the underwriters exercise their option to purchase additional ADSs in full. In connection with this offering, we, our directors and executive officers, our existing shareholders and certain holders of our share-based awards have agreed not to sell any ordinary shares, ADSs or similar securities for 180 days after the date of this prospectus without the prior written consent of the underwriters, subject to certain exceptions. However, the underwriters may release these securities from these restrictions at any time, subject to applicable regulations of the Financial Industry Regulatory Authority, Inc. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our ADSs. See "Underwriting" and "Shares Eligible for Future Sale" for a more detailed description of the restrictions on selling our securities after this offering.

***Our proposed dual-class voting structure will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Our authorized and issued ordinary shares will be divided into Class A ordinary shares and Class B ordinary shares immediately prior to the completion of this offering (with a third class of undesignated shares authorized but not issued). Holders of Class A ordinary shares will be entitled to one vote per share, while holders of Class B ordinary shares will be entitled to ten votes per share. We will issue Class A ordinary shares represented by our ADSs in this offering. All of the outstanding ordinary and preferred shares held by Baidu or its affiliates as of the date of this prospectus will be automatically re-designated or converted into Class B ordinary shares immediately prior to the completion of this offering. All other ordinary shares or preferred shares that are outstanding as of the date of this prospectus will be automatically redesignated or converted into Class A ordinary shares immediately prior to the completion of this offering. We intend to maintain the dual-class voting structure after the completion of this offering.

Due to the disparate voting powers attached to these two classes of ordinary shares, Baidu will own approximately          % of our total issued and outstanding ordinary shares on an as-converted basis and          % of the voting power of our outstanding shares immediately after this offering, assuming no exercise of the underwriters' over-allotment option. Therefore, Baidu will have decisive influence over matters requiring shareholders' approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control will limit your ability to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A ordinary shares and ADSs may view as beneficial.

***Because we do not expect to pay dividends in the foreseeable future after this offering, you must rely on price appreciation of our ADSs for return on your investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings after this offering to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will

49

**Table of Contents**

depend on our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value after this offering or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

*We have not determined a specific use for a portion of the net proceeds from this offering and we may use these proceeds in ways with which you may not agree.*

We have not determined a specific use for a portion of the net proceeds of this offering, and our management will have considerable discretion in deciding how to apply these proceeds. You will not have the opportunity to assess whether the proceeds are being used appropriately before you make your investment decision. You must rely on the judgment of our management regarding the application of the net proceeds of this offering. We cannot assure you that the net proceeds will be used in a manner that would improve our results of operations or increase our ADS price, nor that these net proceeds will be placed only in investments that generate income or appreciate in value.

*The approval of the China Securities Regulatory Commission may be required in connection with this offering under PRC law.*

The M&A Rules, which were adopted in 2006 by six PRC regulatory agencies, including the CSRC, purport to require offshore special purpose vehicles that are controlled by PRC companies or individuals and that have been formed for the purpose of seeking a public listing on an overseas stock exchange through acquisitions of PRC domestic companies or assets to obtain CSRC approval prior to publicly listing their securities on an overseas stock exchange. The interpretation and application of the regulations remain unclear, and this offering may ultimately require approval from the CSRC. If CSRC approval is required, it is uncertain whether it would be possible for us to obtain the approval and any failure to obtain or delay in obtaining CSRC approval for this offering would subject us to sanctions imposed by the CSRC and other PRC regulatory agencies.

Our PRC counsel, Jingtian & Gongcheng Law Firm, has advised us that, based on its understanding of the current PRC laws and regulations, we will not be required to submit an application to the CSRC for the approval of the listing and trading of our ADSs on Nasdaq Global Market because (i) the CSRC currently has not issued any definitive rule or interpretation concerning whether offerings like ours under this prospectus are subject to this regulation, (ii) our wholly owned PRC subsidiaries were established by foreign direct investment, rather than through a merger or acquisition of a domestic company as defined under the M&A Rules and (iii) no explicit provision in the M&A Rules classifies the respective contractual arrangements among our PRC subsidiaries, the consolidated affiliated entities and their shareholders as a type of acquisition transaction falling under the M&A Rules.

However, we cannot assure you that relevant PRC government agencies, including the CSRC, would reach the same conclusion as our PRC counsel, and hence we may face regulatory actions or other sanctions from the CSRC or other PRC regulatory agencies. These regulatory agencies may impose fines and penalties on our operations in China, limit our ability to pay dividends outside of China, limit our operating privileges in China, delay or restrict the repatriation of the proceeds from this offering into China or take other actions that could have a material adverse effect on our business, financial condition, results of operations and prospects, as well as the trading price of the ADSs. The CSRC or other PRC regulatory agencies also may take actions requiring us, or making it advisable for us, to halt this offering before settlement and delivery of the ADSs offered hereby. Consequently, if you engage in market trading or other activities in anticipation of and prior to settlement and delivery, you do so at the risk that settlement and delivery may not occur. In addition, if the CSRC or other regulatory agencies later promulgate new rules or explanations requiring that we obtain their approvals for this offering, we may be unable to obtain a waiver of such approval requirements, if and when procedures are

50

**Table of Contents**

established to obtain such a waiver. Any uncertainties and/or negative publicity regarding such approval requirement could have a material adverse effect on the trading price of the ADSs.

***Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our ordinary shares and ADSs.***

We will adopt the ninth amended and restated memorandum and articles of association that will become effective immediately prior to the completion of this offering. Our new memorandum and articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. Our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our ordinary shares and ADSs may be materially and adversely affected.

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.***

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Law (2016 Revision) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

Certain corporate governance practices in the Cayman Islands, which is our home country, differ significantly from requirements for companies incorporated in other jurisdictions such as the United States. Currently, we do not plan to rely on home country practice with respect to any corporate governance matter. To the extent we choose to follow home country practice with respect to corporate governance matters, our shareholders may be afforded less protection than they otherwise would under rules and regulations applicable to U.S. domestic issuers.

Table of Contents

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States. For a discussion of significant differences between the provisions of the Companies Law of the Cayman Islands and the laws applicable to companies incorporated in the United States and their shareholders, see "Description of Share Capital—Differences in Corporate Law."

*Certain judgments obtained against us by our shareholders may not be enforceable.*

We are a Cayman Islands company and substantially all of our assets are located outside of the United States. Substantially all of our current operations are conducted in China. In addition, most of our current directors and officers are nationals and residents of countries other than the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers. For more information regarding the relevant laws of the Cayman Islands and China, see "Enforceability of Civil Liabilities."

*The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to vote your Class A ordinary shares.*

As a holder of our ADSs, you will only be able to exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement. Under the deposit agreement, you must vote by giving voting instructions to the depositary. If we ask for your instructions, then upon receipt of your voting instructions, the depositary will try to vote the underlying Class A ordinary shares in accordance with these instructions. If we do not instruct the depositary to ask for your instructions, the depositary may still vote in accordance with instructions you give, but it is not required to do so. You will not be able to directly exercise your right to vote with respect to the underlying shares unless you withdraw the shares. When a general meeting is convened, you may not receive sufficient advance notice to withdraw the shares underlying your ADSs to allow you to vote with respect to any specific matter. If we ask for your instructions, the depositary will notify you of the upcoming vote and will arrange to deliver our voting materials to you. We have agreed to give the depositary at least 30 days' prior notice of shareholder meetings. Nevertheless, we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. This means that you may not be able to exercise your right to vote and you may have no legal remedy if the shares underlying your ADSs are not voted as you requested.

*You may experience dilution of your holdings due to inability to participate in rights offerings.*

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

*You may be subject to limitations on transfer of your ADSs.*

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The

52

Table of Contents

depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

*We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.*

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including: (i) the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC; (ii) the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act; (iii) the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and (iv) the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

We will be required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of Nasdaq Global Market. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information, which would be made available to you, were you investing in a U.S. domestic issuer.

*We will incur additional costs as a result of being a public company.*

Upon completion of this offering, we will become a public company and expect to incur significant accounting, legal and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC and Nasdaq, have detailed requirements concerning corporate governance practices of public companies, including Section 404 of the Sarbanes-Oxley Act relating to internal controls over financial reporting. We expect these rules and regulations applicable to public companies to increase our accounting, legal and financial compliance costs and to make certain corporate activities more time-consuming and costly. Our management will be required to devote substantial time and attention to our public company reporting obligations and other compliance matters. We are currently evaluating and monitoring developments with respect to these rules and regulations, and we cannot predict or estimate the amount of additional costs we may incur or the timing of such costs. Our reporting and other compliance obligations as a public company may place a significant strain on our management, operational and financial resources and systems for the foreseeable future.

*We may be a passive foreign investment company, which could result in adverse U.S. federal income tax consequences to U.S. investors owning our ADSs or ordinary shares.*

A non-U.S. corporation, such as our company, will be considered a passive foreign investment company, or "PFIC," for any taxable year if either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. The value of our assets may be determined by reference to the market price of the ADSs and ordinary shares, which may fluctuate considerably. In addition, because there are uncertainties in the application of the relevant rules and because

53

**Table of Contents**

PFIC status is a fact-intensive determination made on an annual basis, no assurance can be given with respect to our PFIC status for the current or any future taxable year.

Based on our current and expected income and assets (taking into account the expected cash proceeds and our anticipated market capitalization following this offering), we do not presently expect to be a PFIC for the current taxable year or the foreseeable future. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given in this regard. Fluctuations in the market price of our ADSs may cause us to become a PFIC for the current or subsequent taxable years because the value of our assets for the purpose of the asset test may be determined by reference to the market price of our ADSs. The composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets and the cash raised in this offering. In addition, because there are uncertainties in the application of the relevant rules, it is possible that the Internal Revenue Service, or IRS, may challenge our classification of certain income and assets as non-passive or our valuation of our tangible and intangible assets, each of which may result in our becoming a PFIC for the current or subsequent taxable years. Furthermore, we may also be a PFIC if we were not treated as the owner of our consolidated affiliated entities for U.S. tax purposes.

If we were treated as a PFIC for any taxable year during which a U.S. investor held an ADS or an ordinary share, certain adverse U.S. federal income tax consequences could apply to the U.S. Holder. See "Taxation—U.S. Federal Income Tax Considerations—Passive Foreign Investment Company Considerations."

54

Table of Contents

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS
### AND INDUSTRY DATA

This prospectus contains forward-looking statements that involve risks and uncertainties. All statements other than statements of historical facts are forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

- our goals and strategies;

- our ability to retain and increase the number of users, members and advertising customers, and expand our service offerings;

- our future business development, financial condition and results of operations;

- expected changes in our revenues, costs or expenditures;

- our expectation regarding the use of proceeds from this offering;

- competition in our industry;

- relevant government policies and regulations relating to our industry;

- general economic and business conditions globally and in China; and

- assumptions underlying or related to any of the foregoing.

You should read thoroughly this prospectus and the documents that we refer to in this prospectus with the understanding that our actual future results may be materially different from and worse than what we expect. Other sections of this prospectus include additional factors which could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

This prospectus also contains statistical data and estimates that we obtained from industry publications and reports generated by third-party providers of market intelligence. These industry publications and reports generally indicate that the information contained therein was obtained from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. Although we believe that the publications and reports are reliable, we have not independently verified the data.

55

Table of Contents

**USE OF PROCEEDS**

We estimate that we will receive net proceeds from this offering of approximately $        million, or approximately $        million if the underwriters exercise their option to purchase additional ADSs in full, after deducting underwriting discounts and commissions and the estimated offering expenses payable by us. These estimates are based upon an assumed initial offering price of $        per ADS, the mid-point of the range shown on the front cover page of this prospectus. A $1.00 change in the assumed initial public offering price of $        per ADS would, in the case of an increase, increase and, in the case of a decrease, decrease the net proceeds of this offering by $        million, or approximately $        million if the underwriters exercise their option to purchase additional ADSs in full, assuming the sale of        ADSs at $        per ADS, the mid-point of the range shown on the front cover page of this prospectus and after deducting underwriting discounts and commissions and the estimated offering expenses payable by us.

The primary purposes of this offering are to enhance our brand recognition, attract and retain talented employees by providing them with equity incentives, and obtain additional capital. We intend to use the proceeds we receive from this offering as follows:

- approximately US$        million, or 50% of the net proceeds to expand and enhance our content offerings;

- approximately US$        million, or 10% of the net proceeds to strengthen our technologies; and

- the balance, or 40% of the net proceeds, for working capital and other general corporate purposes.

Additionally, we may use a portion of the net proceeds to acquire businesses, products, services or technologies. However, we do not have agreements or commitments for any material acquisitions as of the date of this prospectus. The foregoing represents our current intentions based upon our present plans and business conditions to use and allocate the net proceeds of this offering. The amounts and timing of any expenditures will vary depending on the amount of cash generated by our operations, and the rate of growth, if any, of our business. Accordingly, our management will have significant flexibility in applying the net proceeds of the offering. If an unforeseen event occurs or business conditions change, we may use the proceeds of this offering differently than as described in this prospectus.

In utilizing the proceeds of this offering, we are permitted under PRC laws and regulations to provide funding to our PRC subsidiaries only through loans or capital contributions. Subject to satisfaction of applicable government registration and approval requirements, we may extend inter-company loans to our PRC subsidiary or make additional capital contributions to our PRC subsidiary to fund its capital expenditures or working capital. There is, in effect, no statutory limit on the amount of capital contribution that we can make to our PRC subsidiaries. This is because there is no statutory limit on the amount of registered capital for our PRC subsidiaries, and we are allowed to make capital contributions to our PRC subsidiaries by subscribing for their initial registered capital and increased registered capital, provided that the PRC subsidiaries completes the relevant filing and registration procedures. With respect to loans to the PRC subsidiaries by us, (i) if the relevant PRC subsidiaries determine to adopt the traditional foreign exchange administration mechanism, or the Current Foreign Debt mechanism, the outstanding amount of the loans shall not exceed the difference between the total investment and the registered capital of the PRC subsidiaries and there is, in effect, no statutory limit on the amount of loans that we can make to our PRC subsidiaries under this circumstance since we can increase the registered capital of our PRC subsidiaries by making capital contributions to them, subject to the completion of relevant registrations, and the difference between the total investment and the registered capital will increase accordingly; and (ii) if the relevant PRC subsidiaries determine to adopt the foreign exchange administration mechanism as provided in the PBOC Notice No. 9, or the Notice No. 9 Foreign Debt mechanism, the risk-weighted outstanding amount of the loans, which shall be calculated based on the formula provided in the PBOC Notice No. 9, shall not exceed 200% of the net asset of the relevant PRC subsidiary. According to the PBOC Notice No. 9, after a transition period of one year since the promulgation of the PBOC Notice No. 9, the PBOC and SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of the PBOC Notice No. 9. As of the date hereof, neither

56

Table of Contents

PBOC nor SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by PBOC and SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries. In terms of capital contributions, it typically takes about eight weeks to complete the relevant filings and registrations. In terms of loans, the SAFE registration process typically takes about four weeks to complete. While we currently see no material obstacles to completing the filing and registration procedures with respect to future capital contributions and loans to our PRC subsidiaries, we cannot assure you that we will be able to obtain these government registrations or approvals on a timely basis, if at all. See "Risk Factors—Risks Relating to Doing Business in China—PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of this offering to make loans to or make additional capital contributions to our PRC subsidiaries and consolidated affiliated entities, which could materially and adversely affect our liquidity and our ability to fund and expand our business." It is likely that we will need to convert some of our net proceeds in U.S. dollars into Renminbi in order to use as proceeds as contemplated in this section. For details of PRC regulations governing foreign currency conversion, see "Regulation—Regulations on Foreign Exchange."

Pending use of the net proceeds, we intend to hold our net proceeds in demand deposits or invest them in interest-bearing government securities.

57

Table of Contents

**DIVIDEND POLICY**

Our board of directors has complete discretion on whether to distribute dividends. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant.

We do not have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future after this offering. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

We are a holding company incorporated in the Cayman Islands. We may rely on dividends from our subsidiaries in China for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiaries to pay dividends to us. See "Risk Factors—Risks Related to Doing Business in China—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business."

If we pay any dividends, we will pay our ADS holders to the same extent as holders of our Class A ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. See "Description of American Depositary Shares." Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

58

Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization, defined as our long-term loan and total shareholders' (deficit)/equity, as of December 31, 2017:

- on an actual basis;

- on a pro forma basis to reflect (i) the automatic conversion of all our outstanding preferred shares into 3,728,823,500 ordinary shares; (ii) the re-designation of ordinary shares held by holders other than Baidu or its affiliates into 1,231,841,032 Class A ordinary shares; and (iii) the re-designation of ordinary shares held by Baidu or its affiliates into 2,839,530,705 Class B ordinary shares, in each case immediately prior to the completion of this offering; and

- a pro forma as adjusted basis to reflect (i) the automatic conversion of all our outstanding preferred shares into 3,728,823,500 ordinary shares; (ii) the re-designation of ordinary shares held by holders other than Baidu or its affiliates into 1,231,841,032 Class A ordinary shares; (iii) the re-designation of ordinary shares held by Baidu or its affiliates into 2,839,530,705 Class B ordinary shares, in each case immediately prior to the completion of this offering; and (iv) the issuance and sale of          Class A ordinary shares in the form of ADSs by us in this offering at an assumed initial public offering price of US$          per ADS, the midpoint of the estimated range of the initial public offering price shown on the front cover of this prospectus, after deducting the underwriting discounts and commissions and estimated offering expenses payable by us, assuming the underwriters do not exercise the over-allotment option.

You should read this table together with our consolidated financial statements and the related notes included elsewhere in this prospectus and the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | As of December 31, 2017 | | |
| --- | --- | --- | --- |
| | Actual | Pro forma | Pro forma as adjusted[1] |
| | | (RMB in thousands) | |
| **Non-Current Liabilities** | | | |
| Long-term loan | 284,000 | 284,000 | |
| **Mezzanine Equity** | | | |
| Series A redeemable convertible preferred shares | 606,140 | — | |
| Series A-1 redeemable convertible preferred shares | 6,826 | — | |
| Series B redeemable convertible preferred shares | 1,546,912 | — | |
| Series C redeemable convertible preferred shares | 954,544 | — | |
| Series D redeemable convertible preferred shares | 3,195,670 | — | |
| Series E redeemable convertible preferred shares | 2,344,683 | — | |
| Series F redeemable convertible preferred shares | 3,530,583 | — | |
| Series G redeemable convertible preferred shares | 10,416,306 | — | |
| Total mezzanine equity | 22,601,664 | — | |

59

**Table of Contents**

| | As of December 31, 2017 | | |
|---|---|---|---|
| | **Actual** | **Pro forma** | **Pro forma as adjusted**[1] |
| | | (RMB in thousands) | |
| **Shareholders' (deficit)/equity:** | | | |
| Ordinary shares | 23 | — | |
| Class A ordinary shares | — | 80 | |
| Class B ordinary shares | — | 185 | |
| Additional paid-in capital | 600,834 | 23,202,256 | |
| Accumulated deficit | (15,016,867) | (15,016,867) | |
| Accumulated other comprehensive income | 93,126 | 93,126 | |
| Noncontrolling interests | 3,820 | 3,820 | |
| Total shareholders' (deficit)/equity | (14,319,064) | 8,282,600 | |
| Total capitalization | 8,566,600 | 8,566,600 | |

Notes:

(1)    The pro forma as adjusted information discussed above is illustrative only. Our additional paid-in capital, total shareholders' (deficit)/equity and total capitalization following the completion of this offering are subject to adjustment based on the actual initial public offering price and other terms of this offering determined at pricing.

Assuming the number of ADSs offered by us as set forth on the cover page of this prospectus remains the same, and after deduction of underwriting discounts and commissions and the estimated offering expenses payable by us, a $1.00 change in the assumed initial public offering price of $        per ADS would, in the case of an increase, increase and, in the case of a decrease, decrease each of additional paid-in capital, total shareholders' (deficit)/equity and total capitalization by $        million.

60

**Table of Contents**

**DILUTION**

If you invest in our ADSs, your interest will be diluted to the extent of the difference between the initial public offering price per ADS and our net tangible book value per ADS after this offering. Dilution results from the fact that the initial public offering price per ordinary share is substantially in excess of the book value per ordinary share attributable to the existing shareholders for our presently outstanding ordinary shares.

Our net tangible book value as of December 31, 2017 was approximately US$      million, or US$      per ordinary share and US$      per ADS. Net tangible book value represents the amount of our total consolidated tangible assets, less the amount of our total liabilities. Dilution is determined by subtracting net tangible book value per ordinary share, after giving effect to the additional proceeds we will receive from this offering, from the assumed initial public offering price of US$      per ordinary share, which is the midpoint of the estimated initial public offering price range set forth on the cover page of this prospectus adjusted to reflect the ADS-to-ordinary share ratio, and after deducting underwriting discounts and commissions and estimated offering expenses payable by us. Because the ordinary shares have the same dividend and other rights, except for voting and conversion rights, the dilution is presented based on all ordinary shares.

Without taking into account any other changes in net tangible book value after December 31, 2017, other than to give effect to our issuance and sale of      ADSs, representing      Class A ordinary shares, offered in this offering at the assumed initial public offering price of US$      per ADS, the midpoint of the estimated range of the initial public offering price, after deduction of the underwriting discounts and commissions and estimated offering expenses payable by us, our pro forma as adjusted net tangible book value as of December 31, 2017 would have been US$      million, or US$      per ordinary share and US$      per ADS. This represents an immediate increase in net tangible book value of US$      per ordinary share and US$      per ADS to the existing shareholders and an immediate dilution in net tangible book value of US$      per ordinary share and US$      per ADS to investors purchasing ADSs in this offering. The following table illustrates such dilution:

| | Per Ordinary Share | Per ADS |
|---|---|---|
| Assumed initial public offering price | US$ | US$ |
| Net tangible book value as of December 31, 2017 | US$ | US$ |
| Pro forma net tangible book value after giving effect to the conversion of our preferred shares | US$ | US$ |
| Pro forma as adjusted net tangible book value after giving effect to the conversion of our preferred shares and this offering | US$ | US$ |
| Amount of dilution in net tangible book value to new investors in this offering | US$ | US$ |

A US$1.00 increase (decrease) in the assumed public offering price of US$      per ADS would increase (decrease) our pro forma as adjusted net tangible book value after giving effect to this offering by US$      , the pro forma as adjusted net tangible book value per ordinary share and per ADS after giving effect to this offering by US$      per ordinary share and US$      per ADS and the dilution in pro forma as adjusted net tangible book value per ordinary share and per ADS to new investors in this offering by US$      per ordinary share and US$      per ADS, assuming no change to the number of ADSs offered by us as set forth on the cover page of this prospectus and assuming no exercise by the underwriters of their over-allotment option, and after deducting underwriting discounts and commissions and other offering expenses.

The following table summarizes, on a pro forma as adjusted basis as of December 31, 2017, the differences between existing shareholders and the new investors with respect to the number of ordinary shares (in the form of ADSs or ordinary shares) purchased from us, the total consideration paid and the average price per ordinary share and per ADS paid before deducting the underwriting discounts and commissions and estimated offering

61

**Table of Contents**

expenses. The total number of ordinary shares does not include Class A ordinary shares underlying the ADSs issuable upon the exercise of the over-allotment option granted to the underwriters.

| | Ordinary Shares Purchased | | Total Consideration | | Average Price Per Ordinary Share | Average Price Per ADS |
|---|---|---|---|---|---|---|
| | Number | % | Amount | % | | |
| Existing shareholders | | | US$ | | US$ | US$ |
| New investors | | | US$ | | US$ | US$ |
| Total | | 100.0 | US$ | 100.0 | | |

The pro forma as adjusted information discussed above is illustrative only. Our net tangible book value following the completion of this offering is subject to adjustment based on the actual initial public offering price of our ADSs and other terms of this offering determined at pricing.

Table of Contents

**EXCHANGE RATE INFORMATION**

Substantially all of our operations are conducted in China and substantially all of our revenues are denominated in RMB. This prospectus contains translations of RMB amounts into U.S. dollars at specific rates solely for the convenience of the reader. Unless otherwise noted, all translations from RMB to U.S. dollars and from U.S. dollars to RMB in this prospectus were made at a rate of RMB6.5063 to US$1.00, the noon buying rate in The City of New York for cable transfers of RMB as certified for customs purposes by the Federal Reserve Bank of New York on December 29, 2017. We make no representation that any RMB or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or RMB, as the case may be, at any particular rate, at the rates stated below, or at all. The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of RMB into foreign exchange and through restrictions on foreign trade. On February 23, 2018, the noon buying rate was RMB6.3329 to US$1.00.

The following table sets forth, for the periods indicated, information concerning exchange rates between the Renminbi and the U.S. dollar based on the noon buying rate in New York City as certified for customs purposes by the Federal Reserve Bank of New York. These rates are provided solely for your convenience and are not necessarily the exchange rates that we used in this prospectus or will use in the preparation of our periodic reports or any other information to be provided to you.

| | Noon Buying Rate | | | |
| | Period End | Average[1] | Low | High |
| | | (RMB per US$1.00) | | |
|---|---|---|---|---|
| **Period** | | | | |
| 2013 | 6.0537 | 6.1412 | 6.2438 | 6.0537 |
| 2014 | 6.2046 | 6.1704 | 6.2591 | 6.0402 |
| 2015 | 6.4778 | 6.2869 | 6.4896 | 6.1870 |
| 2016 | 6.9430 | 6.6549 | 6.9580 | 6.4480 |
| 2017 | 6.5063 | 6.7350 | 6.9575 | 6.4773 |
| August | 6.5888 | 6.6670 | 6.7272 | 6.5888 |
| September | 6.6533 | 6.5690 | 6.6591 | 6.4773 |
| October | 6.6328 | 6.6254 | 6.6533 | 6.5712 |
| November | 6.6090 | 6.6200 | 6.6385 | 6.5967 |
| December | 6.5063 | 6.5932 | 6.6210 | 6.5063 |
| 2018 | | | | |
| January | 6.2841 | 6.4233 | 6.5263 | 6.2841 |
| February (through February 23) | 6.3329 | 6.3182 | 6.3471 | 6.2649 |

Note:

(1)   Annual averages are calculated from month-end rates. Monthly averages are calculated using the average of the daily rates during the relevant period.

63

Table of Contents

<center>ENFORCEABILITY OF CIVIL LIABILITIES</center>

**Cayman Islands**

We are incorporated in the Cayman Islands to take advantage of certain benefits associated with being a Cayman Islands exempted company, such as:

- political and economic stability;

- an effective judicial system;

- a favorable tax system;

- the absence of exchange control or currency restrictions; and

- the availability of professional and support services.

However, certain disadvantages accompany incorporation in the Cayman Islands. These disadvantages include:

- the Cayman Islands has a less developed body of securities laws as compared to the United States and provides significantly less protection to investors; and

- Cayman Islands companies may not have standing to sue before the federal courts of the United States.

Our constituent documents do not contain provisions requiring that disputes, including those arising under the securities laws of the United States, between us, our officers, directors and shareholders, be arbitrated.

Substantially all of our operations are conducted in China, and substantially all of our assets are located in China. A majority of our directors and executive officers are nationals or residents of jurisdictions other than the United States and a substantial portion of their assets are located outside the United States. As a result, it may be difficult for a shareholder to effect service of process within the United States upon these persons, or to enforce against us or them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States.

We have appointed Law Debenture Corporate Services Inc., located at 801 2nd Avenue, Suite 403, New York, New York 10017, as our agent upon whom process may be served in any action brought against us under the securities laws of the United States.

We have been advised by Walkers, our counsel as to Cayman Islands law, that the United States and the Cayman Islands do not have a treaty providing for reciprocal recognition and enforcement of judgments of U.S. courts in civil and commercial matters and that there is uncertainty as to whether a final judgment for the payment of money rendered by any federal or state court in the United States based on civil liability provisions, whether or not predicated solely upon the U.S. federal securities laws, would be enforceable in the Cayman Islands. This uncertainty relates to whether such a judgment would be determined by the courts of the Cayman Islands to be penal or punitive in nature. We have also been advised by Walkers that, notwithstanding the above, a final and conclusive judgment obtained in U.S. federal or state courts under which a definite sum of money is payable as compensatory damages and not in respect of laws that are penal in nature (i.e., not being a sum claimed by a revenue authority for taxes or other charges of a similar nature by a governmental authority, or in respect of a fine or penalty or multiple or punitive damages) will be recognized and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court of the Cayman Islands, provided that:

- the court that gave the judgment was competent to hear the action in accordance with private international law principles as applied by the courts in the Cayman Islands and the parties subject to such judgment either submitted to such jurisdiction or were resident or carrying on business within such jurisdiction and were duly served with process;

<center>64</center>

**Table of Contents**

- the judgment given by the foreign court was not in respect of penalties, taxes, fines or similar fiscal or revenue obligations;

- the judgment was final and conclusive and for a liquidated sum;

- the judgment was not obtained by fraud; and

- the judgment was not obtained in a manner and is not of a kind the enforcement of which is contrary to natural justice or public policy in the Cayman Islands.

A Cayman Islands court may impose civil liability on us or our directors or officers in a suit brought in the Grand Court of the Cayman Islands against us or these persons with respect to a violation of U.S. federal securities laws, provided that the facts surrounding any violation constitute or give rise to a cause of action under Cayman Islands law.

**PRC**

Jingtian & Gongcheng, our counsel as to PRC law, has advised us that there is uncertainty as to whether the courts of China would:

- recognize or enforce judgments of United States courts obtained against us or our directors or officers predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States; or

- entertain original actions brought in each respective jurisdiction against us or our directors or officers predicated upon the securities laws of the United States or any state in the United States.

Jingtian & Gongcheng has further advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedures Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedures Law based either on treaties between China and the jurisdiction where the judgment is made or on principles of reciprocity between jurisdictions. China does not have any treaties or other form of reciprocity with the United States that provide for the reciprocal recognition and enforcement of foreign judgments. In addition, according to the PRC Civil Procedures Law, courts in the PRC will not enforce a foreign judgment against us or our directors and officers if they decide that the judgment violates the basic principles of PRC law or national sovereignty, security or public interest. As a result, it is uncertain whether and on what basis a PRC court would enforce a judgment rendered by a court in the United States. Under the PRC Civil Procedures Law, foreign shareholders may originate actions based on PRC law against us in the PRC, if they can establish sufficient nexus to the PRC for a PRC court to have jurisdiction, and meet other procedural requirements, including, among others, the plaintiff must have a direct interest in the case, and there must be a concrete claim, a factual basis and a cause for the suit. However, it would be difficult for foreign shareholders to establish sufficient nexus to the PRC by virtue only of holding our ADSs or ordinary shares.

65

**Table of Contents**

## CORPORATE HISTORY AND STRUCTURE

**Corporate History**

We launched qiyi.com under the QIYI brand in April 2010 as an internet video streaming service in China. Our holding company, Ding Xin, Inc., was incorporated in November 2009 in the Cayman Islands. Ding Xin, Inc. was subsequently renamed Qiyi.com, Inc. in August 2010 and later iQIYI, Inc. in November 2017. QIYI was rebranded as iQIYI in November 2011.

In March 2010, we established a wholly-owned PRC subsidiary, Beijing QIYI Century Science & Technology Co., Ltd., or Beijing QIYI Century. In November 2011, we obtained control over Beijing Xinlian Xinde Advertisement Media Co., Ltd. and in May 2012 we renamed it Beijing iQIYI Science & Technology Co., Ltd., or Beijing iQIYI, to operate our internet video streaming services. In December 2012, Shanghai iQIYI Culture Media Co., Ltd., or Shanghai iQIYI, was established as our exclusive advertising agent. In May 2013, we acquired the online video business of PPS. We primarily provide live broadcasting service through Shanghai Zhong Yuan Network Co., Ltd., or Shanghai Zhong Yuan, the operating entity of PPS. We have control over and are the primary beneficiary of Beijing iQIYI, Shanghai iQIYI and Shanghai Zhong Yuan through a series of contractual arrangements. Beijing iQIYI and Shanghai Zhong Yuan hold our ICP licenses and other licenses and permits necessary for our business operation.

In May 2017, we established a wholly-owned Cayman Islands subsidiary, IQIYI Film Group Limited. Subsequently, we established IQIYI Film Group HK Limited in June 2017, and Beijing iQIYI New Media Science and Technology Co., Ltd., or iQIYI New Media, in July 2017. IQIYI Film Group Limited holds 100% of the equity of IQIYI Film Group HK Limited, which in turn holds 100% of equity in iQIYI New Media. iQIYI Pictures (Beijing) Co., Ltd., or iQIYI Pictures, was established in December 2014, and Beijing iQIYI Cinema Management Co., Ltd., or Beijing iQIYI Cinema, was established in June 2017. We have control and are the primary beneficiary of iQIYI Pictures and Beijing iQIYI Cinema through a series of contractual arrangements.

Between March 2010 and September 2014, Baidu made substantial investments in our company, and we issued ordinary shares and several series of preferred shares to Baidu Holdings. In our Series F preferred shares financing, which took place in November 2014, we issued 136,749,954 Series F preferred shares to Baidu Holdings, 341,874,885 Series F preferred shares to Xiaomi Ventures Limited, or Xiaomi Ventures, and 68,374,978 Series F preferred shares to Prominent TMT Limited, an affiliate of Xiaomi Ventures. In January 2017, we raised $1.53 billion from the issuance of convertible notes to a group of investors. These notes were converted into Series G preferred shares in October 2017, including 215,484,776 Series G-1 preferred shares issued to Baidu Holdings and another investor, as well as 798,951,243 Series G-2 preferred shares issued to other investors.

66

**Table of Contents**

**Corporate Structure**

The following diagram illustrates our corporate structure, including our significant subsidiaries and consolidated affiliated entities, as of the date of this prospectus:





For details of contractual arrangements, see "Corporate History and Structure — Contractual Arrangements with the Consolidated Affiliated Entities and Their Respective Shareholders."

Equity interest.

---

(1)  Shareholders of Beijing iQIYI Cinema are Dr. Yu Gong, our founder, director and chief executive officer, and Mr. Xianghua Yang, our senior vice president, each holding 50% of equity interest.
(2)  Shareholders of iQIYI Pictures are Dr. Yu Gong and Mr. Ning Ya, senior vice president of the company and president of iQIYI Pictures, each holding 50% of equity interest.
(3)  Shareholders of Shanghai iQIYI are Dr. Yu Gong and Mr. Xiaohua Geng, our senior vice president, each holding 50% of equity interest.
(4)  The shareholder of Beijing iQIYI is Mr. Xiaohua Geng, holding 100% of equity interest.
(5)  The shareholder of Shanghai Zhong Yuan is Dr. Yu Gong, holding 100% of equity interest.

**Contractual Arrangements with the Consolidated Affiliated Entities and Their Respective Shareholders**

Current PRC laws and regulations impose certain restrictions or prohibitions on foreign ownership of companies that engage in value-added telecommunication services, Internet audio-video program services and certain other businesses. We are a company registered in the Cayman Islands. Beijing QIYI Century and iQIYI New Media, our PRC subsidiaries, are considered foreign-invested enterprises. To comply with PRC laws and

Table of Contents

regulations, we primarily conduct our business in China through Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Beijing iQIYI Cinema, our consolidated affiliated entities in the PRC, based on a series of contractual arrangements by and among Beijing QIYI Century, iQIYI New Media, our consolidated affiliated entities and their shareholders. As a result of these contractual arrangements, we exert control over our consolidated affiliated entities in the PRC and consolidate their operating results in our financial statements under U.S. GAAP.

The following is a summary of the currently effective contractual arrangements among Beijing QIYI Century, Beijing iQIYI, Beijing iQIYI's shareholders and iQIYI, Inc.

*Loan Agreement*

Pursuant to the amended and restated loan agreement dated January 30, 2013 between Beijing QIYI Century and Mr. Xiaohua Geng, the sole shareholder of Beijing iQIYI, Beijing QIYI Century made loans in an aggregate amount of RMB27 million to Mr. Geng for the acquisition and capitalization of Beijing iQIYI. Pursuant to the amended and restated loan agreement, Mr. Geng can only repay the loans by the sale of all his equity interest in Beijing iQIYI to iQIYI, Inc. insofar as permitted under PRC law and pay all of the proceeds from sale of such equity interests to iQIYI, Inc. In the event that Mr. Geng sells his equity interests in Beijing iQIYI to iQIYI, Inc. with a price equivalent to or less than the amount of the principal, the loans will be interest free. If the price is higher than the amount of the principal, the excess amount will be paid to Beijing QIYI Century as the loan interest to or cost for capital occupancy to the extent allowed under PRC law. The loan maturity date is June 23, 2021 unless otherwise decided by Beijing QIYI Century.

*Share Pledge Agreement*

Pursuant to the amended and restated equity pledge agreement dated January 30, 2013, Mr. Xiaohua Geng has pledged all of his equity interest in Beijing iQIYI to guarantee his and Beijing iQIYI's performance of his obligations under, where applicable, the amended and restated exclusive technology consulting and services agreement and the amended and restated loan agreement. If Beijing iQIYI or Mr. Geng breach their contractual obligations under these agreements, Beijing QIYI Century, as pledgee, will have the right to dispose of the pledged equity interests. Mr. Geng agrees that, during the term of the equity pledge agreements, he will not dispose of the pledged equity interests or create or allow any encumbrance on the pledged equity interests, and he also agrees that Beijing QIYI Century's rights relating to the equity pledge should not be prejudiced by the legal actions of Mr. Geng, his successor or his designatee. During the term of the amended and restated equity pledge agreement, Beijing QIYI Century has the right to receive all of the dividends and profits distributed on the pledged equity. The amended and restated equity pledge agreement will terminate on the date when Beijing iQIYI and Mr. Geng have completed all their obligations under the amended and restated exclusive technology consulting and services agreement and the amended and restated loan agreement unless otherwise unilaterally terminated by Beijing QIYI Century.

*Exclusive Purchase Option Agreement*

Pursuant to the amended and restated exclusive purchase option agreement dated January 30, 2013 by and among iQIYI, Inc., Beijing QIYI Century, Beijing iQIYI, and Mr. Xiaohua Geng, Mr. Geng irrevocably grants iQIYI, Inc. or its designee an exclusive option to purchase at its discretion, to the extent permitted under PRC law, all or part of his equity interests in Beijing iQIYI. In addition, the purchase price should equal the amount that Mr. Geng contributed to Beijing iQIYI as registered capital for the equity interest to be purchased, or be the lowest price permitted by applicable PRC law. If any dividends or assets of other form were distributed, such dividends or distributions, including the purchase consideration received if the exclusive purchase option is exercised, will have to be repaid by Mr. Geng to iQIYI, Inc. Without the prior written consent of iQIYI, Inc., Beijing iQIYI may not amend its articles of associate, increase or decrease the registered capital, sell or otherwise dispose of its assets or beneficial interest, create or allow any encumbrance on its assets or other

68

**Table of Contents**

beneficial interests, provide any loans for any third parties, enter into any material contract with a value of more than RMB300,000 (except those contracts entered into in the ordinary course of business), merge with or acquire any other persons or make any investments, or distribute dividends to the shareholders. Mr. Geng agrees that, without the prior written consent of iQIYI, Inc., he will not dispose of his equity interests in Beijing iQIYI or create or allow any encumbrance on the equity interests, and will not cause Beijing iQIYI to provide any persons with any loans. The initial term of the amended and restated exclusive purchase option agreement is ten years and can be renewed at the discretion of iQIYI, Inc.

*Business Operation Agreement*

Pursuant to the amended and restated business operation agreement dated January 30, 2013 by and among Beijing QIYI Century, Beijing iQIYI and Mr. Xiaohua Geng, Beijing QIYI Century agrees to provide Beijing iQIYI with performance guarantees with respect to any contracts, agreements and transactions Beijing iQIYI entered into in connection with its business. As counter-guarantee, Beijing iQIYI agrees to offer all its account receivables and assets as collateral. The initial term of the business operation agreement is ten years and can be renewed at the discretion of Beijing QIYI Century.

*Business Cooperation Agreement*

Pursuant to the business cooperation agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing iQIYI agrees to provide Beijing QIYI Century with services, including internet information services, online advertising and other services reasonably necessary within the scope of Beijing QIYI Century's business. Beijing iQIYI agrees to use, on the website it operates, technology services provided by Beijing QIYI Century, including but not limited to, P2P download and video on-demand system. As consideration for the internet information services and other services provided by Beijing iQIYI, Beijing QIYI Century agrees to pay specified service fees to Beijing iQIYI. Beijing iQIYI has the right to waive the service fees. The term of the business cooperation agreement is ten years and can be renewed at the discretion of Beijing QIYI Century.

*Commitment Letter*

Pursuant to the commitment letter dated January 30, 2013, under the condition that Beijing iQIYI remains as a consolidated affiliated entity of the Company under U.S. GAAP and the relevant contractual arrangements remain in effect, iQIYI, Inc. and Beijing QIYI Century undertake to provide financial support to Beijing iQIYI for any financial loss that might affect its business operation occurred before and after the execution of the commitment letter as permitted by relevant laws. Such financial support shall be forgiven by iQIYI, Inc. and Beijing QIYI Century. As of December 31, 2017, iQIYI has provided RMB785.8 million (US$120.8 million) in financial support to Beijing iQIYI under this commitment letter, all of which has been forgiven.

*Shareholder Voting Rights Trust Agreement*

Pursuant to the amended and restated shareholder voting rights trust agreement dated January 30, 2013 by and between Beijing QIYI Century and Mr. Xiaohua Geng, Mr. Geng has agreed to irrevocably entrust a person designated by Beijing QIYI Century to represent him to exercise all the voting rights and other shareholders' rights to which he is entitled as the shareholder of Beijing iQIYI. The agreement will remain effective for as long as Mr. Geng remains the shareholder of Beijing iQIYI unless Beijing QIYI Century unilaterally terminates the agreement by written notice.

*Exclusive Technology Consulting and Services Agreement*

Pursuant to the exclusive technology consulting and services agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing QIYI Century has the sole and exclusive

Table of Contents

right to provide specified technology consulting and services to Bejing iQIYI. Beijing iQIYI agrees to accept such services and, without the prior written consent of Beijing QIYI Century, may not accept the same or similar technology consulting and services provided by any third party during the term of the agreement. Beijing iQIYI agrees to pay specified service fees to Beijing QIYI Century on a quarterly basis. Beijing QIYI Century has the right to adjust the calculation basis and payment method through written confirmation, without prior consent of Beijing iQIYI. All the benefits and interests generated from the agreement, including but not limited to software copyrights, intellectual property rights, know-how and trade secrets, will be Beijing QIYI Century's sole and exclusive rights. The term of the exclusive technology consulting and services agreement is ten years and can be renewed at the discretion of Beijing QIYI Century.

*Trademark License Agreement*

Pursuant to the trademark license agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing QIYI Century grants Beijing iQIYI trademark licenses to use the trademarks held by Beijing QIYI Century in specified areas. Beijing QIYI Century may not grant trademark licenses to third parties. Beijing iQIYI agrees to pay specified usage fees to Beijing QIYI Century. The term of this trademark license agreement is five years and is afterwards automatically renewed for one additional year each year, unless terminated by Beijing QIYI Century by written notice.

*Software Usage License Agreement*

Pursuant to the software usage license agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing QIYI Century grants Beijing iQIYI non-exclusive rights to use specified software in China. Beijing iQIYI agrees not to sub-license such software usage rights, and agrees to pay specified usage fees to Beijing QIYI Century. The term of this software usage license agreement is five years and can be renewed at the discretion of Beijing QIYI Century. On December 2, 2016, Beijing QIYI Century executed a confirmation letter to extend the term of the software usage license agreement for another five years.

*Power of Attorney*

On January 30, 2013, Beijing QIYI Century granted iQIYI, Inc. irrevocable power of attorney under the amended and restated shareholder voting rights trust agreement. Pursuant to the irrevocable power of attorney, iQIYI, Inc. may exercise all shareholder rights during the term of the amended and restated shareholder voting rights trust agreement and may transfer such rights to a designated third party without written notice to Beijing QIYI Century.

*Spousal Consent Letter*

The spouse of the shareholder of Beijing iQIYI signed a spousal consent letter. Under the spousal consent letter, the signing spouse unconditionally and irrevocably agreed that the spouse is aware of the above-mentioned loan agreement, share pledge agreement, exclusive purchase option agreement, business operation agreement, and shareholder voting rights trust agreement, and has no objection regarding the contractual arrangements aforesaid. The signing spouse committed not to impose any adverse assertions upon the validity of such contractual arrangement based on the existence or termination of the marital relationship with the relevant shareholder, or exert any impediment or adverse influence over the relevant shareholder's performance of any contractual arrangement or claim rights on Beijing iQIYI.

The contractual arrangements by and among iQIYI, Inc., our subsidiary Beijing QIYI Century, Shanghai iQIYI, and the shareholders of Shanghai iQIYI, including loan agreement, share pledge agreement, exclusive purchase option agreement, business operation agreement, commitment letter, shareholder voting rights trust agreement, spousal consent letter and exclusive technology consulting and services agreement, are substantially the same as the corresponding contractual arrangements discussed above.

70

**Table of Contents**

The contractual arrangements by and among iQIYI, Inc., Beijing QIYI Century, Shanghai Zhong Yuan, and the shareholder of Shanghai Zhong Yuan, including loan agreement, share pledge agreement, exclusive purchase option agreement, business operation agreement, commitment letter, shareholder voting rights trust agreement, spousal consent letter and exclusive technology consulting and services agreement, are substantially the same as the corresponding contractual arrangements discussed above.

The contractual arrangements by and among iQIYI, Inc., our subsidiary iQIYI New Media, Beijing iQIYI Cinema, and the shareholders of Beijing iQIYI Cinema, including loan agreements, share pledge agreements, exclusive purchase option agreement, exclusive management consulting and business cooperation agreement, commitment letter, power of attorney and spousal consent letters, are substantially the same as the corresponding contractual arrangements discussed above.

The contractual arrangements by and among iQIYI, Inc., our subsidiary iQIYI New Media, iQIYI Pictures, and the shareholders of iQIYI Pictures, including loan agreements, share pledge agreements, exclusive purchase option agreement, exclusive management consulting and business cooperation agreement, commitment letters, power of attorney and spousal consent letter, are substantially the same as the corresponding contractual arrangements discussed above.

In the opinion of Jingtian & Gongcheng, our PRC legal counsel:

- the ownership structures of our consolidated affiliated entities and our wholly-foreign owned subsidiaries, both currently and immediately after giving effect to this offering, do not and will not contravene any PRC laws or regulations currently in effect; and

- the contractual arrangements among our wholly-foreign owned subsidiaries, consolidated affiliated entities and their respective shareholder (s) governed by PRC laws are valid and binding upon each party to such arrangements and enforceable against each party thereto in accordance with their terms and applicable PRC laws and regulations currently in effect, and will not contravene any PRC laws or regulations currently in effect.

However, there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may in the future take a view that is contrary to the above opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government finds that the agreements that establish the structure for operating our internet video streaming business and related business do not comply with PRC government restrictions on foreign investment in internet video streaming and related businesses, we could be subject to severe penalties including being prohibited from continuing operations. See "Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations." and "Risk Factors—Risks Related to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

71

Table of Contents

## OUR RELATIONSHIP WITH BAIDU

Baidu is the leading Chinese language internet search provider. Baidu has been our controlling shareholder since our launch in 2010, and will continue to control us after the completion of this offering. We enjoy significant business synergies with Baidu primarily in the form of complementary content offerings for users and cross-sale of each other's services.

Historically, Baidu has provided us with technology, infrastructure and financial support. We operate our own technology, management, financial, legal and human resources functions separately from Baidu's, and we will continue to establish support systems of our own after we become a public company. Therefore, any diminishment in the significant business synergy between Baidu and us will not by itself result in a material increase in our costs for the technology, management, human resources, and other support functions that we expect to establish and are not otherwise covered by the master business cooperation agreement. As our business continues to grow and after we become a public company, we expect to rely less on financing support from Baidu and increasingly rely on net cash provided by operating activities, financing through capital markets and commercial banks for our liquidity needs.

### Master Business Cooperation Agreement

We have entered into a master business cooperation agreement with Baidu on January 19, 2018. The following is a summary of the major terms of the agreement. For the complete text of the agreement, please see the copy filed as an exhibit to the registration statement filed with the SEC of which this prospectus is a part.

Under the master business cooperation agreement, we and Baidu agree to cooperate with each other in areas including but not limited to AI technology, smart devices/DuerOS (the dialog-type AI system and open platform developed by Baidu), cloud services, online advertising, internet traffic, data and content, and to treat each other as the most preferred strategic partner in our areas of cooperation.

Specifically, (i) Baidu agrees to cooperate with us on leveraging AI technology to further improve our user experience; (ii) we and Baidu agree to share sales channel resources to promote smart devices/DuerOS and increase iQIYI's market share in its industry; (iii) Baidu agrees to provide support for our cloud computing infrastructure and provide us with cloud computing infrastructure services on Baidu's most favored terms; (iv) we and Baidu agree to cross sell our respective advertising services, and Baidu agrees to grant us priority to advertise on its platform; (v) we and Baidu agree to leverage our respective services to increase user traffic; and (vi) we and Baidu agree to allow our respective registered users and content providers to log onto each other's platforms.

Under this agreement, (i) Baidu agrees not to compete with us in providing video content services that are the same as or substantially similar to our long-form video businesses (with the exception of existing business activities conducted by Baidu and its affiliates and of the business activities conducted by the entity that currently operates Baidu's online video business), and (ii) we agree not to compete with Baidu in any business that is the same as or substantially similar to Baidu's core businesses (with the exception of existing business activities conducted by us or our affiliates). Long-form video business means long-form video content services currently provided by iQIYI, such long-form video content includes but not limited to movies, TV series, network series, cartoons, variety shows, documentaries, etc. Whether any service is Baidu's core business or is the same as or substantially similar to Baidu's core business shall be determined by Baidu and us in a commercially reasonable manner.

The master business cooperation agreement will expire on the eighth anniversary of the date of execution, extendable for a term of eight years upon agreement by both parties. In the event we are no longer controlled by Baidu, either we or Baidu may terminate this agreement.

**Table of Contents**

**Loan Agreement**

Under the master business cooperation agreement, Baidu will provide us with a RMB650.0 million (US$99.9 million) loan, which will mature on the fifth anniversary of the grant date. We entered into a loan agreement with Baidu with respect to such loan on January 19, 2018. The loan is interest free.

**Share Purchase Agreement and Ticket Business Cooperation Agreement**

On February 12, 2018, we entered into a share purchase agreement with Baidu Holdings, pursuant to which we will issue to Baidu Holdings an aggregate of 36,860,691 Class B ordinary shares. The transaction is expected to close no later than May 31, 2018. As consideration for the issuance of such shares and subject to the conditions set forth in the share purchase agreement, Baidu Holdings agreed to (i) undertake certain non-compete obligations towards us with respect to the online movie ticket and show ticket booking business of Baidu Holdings and its affiliates, (ii) direct user traffic related to such ticket business to us, (iii) provide us with technological support with respect to our ticket booking business, (iv) license certain domain names and certain intellectual property rights to us and (v) enter into a ticket business cooperation agreement with us, which has been signed concurrently.

For the complete text of the share purchase agreement and the ticket business cooperation agreement, please see the copies filed as exhibits to the registration statement filed with the SEC of which this prospectus is a part.

**Termination of Certain Agreements**

Pursuant to certain service agreements entered into between Baidu and us in 2011, Baidu was obligated to provide us with user traffic support. We had entered into a termination agreement with Baidu in January 2018, pursuant to which such earlier service agreements (including the traffic support obligations of Baidu therein) were terminated. For further information on such termination, see Note 25 to our consolidated financial statements included in this prospectus.

73

**Table of Contents**

**SELECTED CONSOLIDATED FINANCIAL DATA**

The following selected consolidated statements of operations data for the years ended December 31, 2015, 2016 and 2017 and selected consolidated balance sheet data as of December 31, 2015, 2016 and 2017 have been derived from our audited consolidated financial statements included elsewhere in this prospectus. The selected consolidated balance sheet data as of December 31, 2015 has been derived from our audited consolidated financial statements for the year ended December 31, 2015, which are not included in this prospectus. We have not included financial information for the years ended December 31, 2013 and 2014, as such information cannot be provided on a stand-alone and U.S. GAAP basis without unreasonable effort or expense. You should read this Selected Consolidated Financial Data section together with our consolidated financial statements and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus. Our consolidated financial statements are prepared and presented in accordance with U.S. GAAP. Our historical results are not necessarily indicative of results expected for future periods.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2015** | **2016** | **2017** | **2017** |
| | **RMB** | **RMB** | **RMB** | **US$** |
| | (in thousands, except for share and per share data) | | | |
| **Selected Consolidated Statements of Operations Data:** | | | | |
| Total revenues | 5,318,584 | 11,237,407 | 17,378,350 | 2,671,003 |
| Operating costs and expenses: | | | | |
|    Cost of revenues[1] | (6,041,764) | (11,436,595) | (17,386,563) | (2,672,266) |
|    Selling, general and administrative[1] | (1,204,464) | (1,765,824) | (2,674,990) | (411,138) |
|    Research and development[1] | (499,957) | (824,482) | (1,269,806) | (195,166) |
| Total operating costs and expenses | (7,746,185) | (14,026,901) | (21,331,359) | (3,278,570) |
| Operating loss | (2,427,601) | (2,789,494) | (3,953,009) | (607,567) |
| Total other (expenses)/income, net | (136,345) | (271,440) | 208,512 | 32,047 |
| **Loss before income tax** | **(2,563,946)** | **(3,060,934)** | **(3,744,497)** | **(575,520)** |
|    Income tax (expense)/benefit | (11,166) | (13,088) | 7,565 | 1,163 |
| **Net loss** | **(2,575,112)** | **(3,074,022)** | **(3,736,932)** | **(574,357)** |
| Accretion of redeemable convertible preferred shares | (2,342,385) | (4,874,739) | 5,073,140 | 779,727 |
| Extinguishment and reissuance of Series B preferred shares | — | — | (363,279) | (55,835) |
| **Net (loss)/income attributable to ordinary shareholders** | **(4,917,497)** | **(7,948,761)** | **972,929** | **149,535** |
| **Net (loss)/earnings per share:** | | | | |
|    Basic | (14.36) | (23.20) | 0.30 | 0.05 |
|    Diluted | (14.36) | (23.20) | (1.15) | (0.18) |
| **Shares used in net (loss)/earnings per share computation:** | | | | |
|    Basic | 342,548,237 | 342,548,237 | 342,548,237 | 342,548,237 |
|    Diluted | 342,548,237 | 342,548,237 | 3,243,147,261 | 3,243,147,261 |
| **Pro forma net loss per share attributable to Class A and Class B ordinary shareholders (unaudited)[2]:** | | | | |
|    Basic | | | (0.89) | (0.14) |
|    Diluted | | | (0.89) | (0.14) |
| Class A ordinary shares and Class B ordinary shares used in pro forma net loss per share computation (unaudited)[2]: | | | | |
|    Basic | | | 4,071,371,737 | 4,071,371,737 |
|    Diluted | | | 4,071,371,737 | 4,071,371,737 |
| Other comprehensive income | | | | |
|    Foreign currency translation adjustments | 151,062 | 195,255 | (264,774) | (40,695) |
|    Unrealized gains/(losses) on available-for-sale debt securities | — | 2,978 | (1,470) | (226) |
| Comprehensive loss | (2,424,050) | (2,875,789) | (4,003,176) | (615,278) |

74

Table of Contents

Notes:

(1) Share-based compensation expense was allocated as follows:

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
| Cost of revenues | 5,837 | 9,479 | 34,895 | 5,363 |
| Selling, general and administrative | 21,330 | 30,447 | 130,994 | 20,133 |
| Research and development | 17,027 | 22,466 | 67,535 | 10,380 |
| Total | 44,194 | 62,392 | 233,424 | 35,876 |

(2) The unaudited pro forma loss per Class A and Class B ordinary share is computed using the weighted average number of Class A and Class B ordinary shares outstanding as of December 31, 2017, and assuming the automatic conversion of all of the Company's convertible redeemable preferred shares into ordinary shares and re-designation to Class A and Class B ordinary shares upon the closing of the Company's IPO, as if it had occurred on January 1, 2017.

The following table presents our selected consolidated balance sheet data for the years indicated.

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| | | | (in thousands) | |
| **Selected Consolidated Balance Sheet Data:** | | | | |
| Cash and cash equivalents | 1,588,739 | 964,207 | 733,010 | 112,662 |
| Short-term investments | 160,000 | 902,978 | 779,916 | 119,871 |
| Total current assets | 4,473,910 | 5,154,305 | 5,700,528 | 876,156 |
| Total assets | 10,424,986 | 13,631,636 | 20,200,899 | 3,104,822 |
| Total current liabilities | 5,862,949 | 11,889,853 | 11,625,612 | 1,786,824 |
| Total liabilities | 5,877,095 | 11,897,142 | 11,918,299 | 1,831,810 |
| Total mezzanine equity | 12,164,428 | 17,039,167 | 22,601,664 | 3,473,812 |
| Total shareholders' deficit | (7,616,537) | (15,304,673) | (14,319,064) | (2,200,800) |

The following table presents our selected cash flows for the years indicated.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
| **Selected Consolidated Cash Flow Data:** | | | | |
| Net cash provided by operating activities | 1,070,770 | 2,612,121 | 4,011,784 | 616,594 |
| Net cash used for investing activities | (3,133,375) | (6,663,100) | (10,660,674) | (1,638,515) |
| Net cash (used in)/provided by financing activities | (131,708) | 3,411,766 | 6,561,110 | 1,008,424 |
| Effect of exchange rate changes on cash and cash equivalents | 71,951 | 14,681 | (143,417) | (22,037) |
| Net decrease in cash and cash equivalents | (2,122,362) | (624,532) | (231,197) | (35,534) |
| Cash and cash equivalents at the beginning of the year | 3,711,101 | 1,588,739 | 964,207 | 148,196 |
| Cash and cash equivalents at the end of the year | 1,588,739 | 964,207 | 733,010 | 112,662 |

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with the section entitled "Selected Consolidated Financial Data" and our consolidated financial statements and the related notes included elsewhere in this prospectus. This discussion contains forward-looking statements that involve risks and uncertainties. Our actual results and the timing of selected events could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" and elsewhere in this prospectus.*

### Overview

We are an innovative market-leading online entertainment service in China. We are at the forefront of the entertainment industry in China. Our corporate DNA combines creative talent with technology, fostering an environment for the continuous innovation and production of blockbuster content. Our platform features highly popular original content, as well as a comprehensive selection of professionally-produced and partner-generated content. Through our curated premium content, we attract a massive user base with tremendous user engagement, and generate significant monetization opportunities.

We have developed multiple monetization methods to capture entertainment market opportunities in China. We generate revenues through (i) membership services, (ii) online advertising services, (iii) content distribution, and (iv) others.

We have experienced rapid growth in revenues in recent years. Our revenues increased by 111.3% from RMB5,318.6 million in 2015 to RMB11,237.4 million in 2016, and further by 54.6% from RMB11,237.4 million in 2016 to RMB17,378.4 million (US$ 2,671.0 million) in 2017. We had net losses of RMB2,575.1 million, RMB3,074.0 million, and RMB3,736.9 million (US$574.4 million) in 2015, 2016, and 2017, respectively.

### General Factors Affecting Our Results of Operations

Our business and operating results are affected by general factors affecting China's internet video industry, which include:

- China's overall economic growth and level of per capita disposable income;

- mobile internet usage and penetration rate;

- growth of online entertainment, especially internet video, and its popularity as an entertainment and advertising medium; and

- governmental policies and initiatives affecting the Chinese internet video industry.

Unfavorable changes in any of these general industry conditions could negatively affect demand for our services and materially and adversely affect our results of operations.

### Specific Factors Affecting Our Results of Operations

While our business is influenced by general factors affecting the internet video industry in China generally, we believe our results of operations are more directly affected by company specific factors, including the following major factors.

### *Our ability to maintain and expand our user base, as well as to maintain and enhance user engagement*

We have a massive and highly engaged user base, which drives our revenue growth. Our ability to continue to effectively maintain and expand our user base will affect the growth of our business and our revenues going

76

Table of Contents

forward. Furthermore, the level of user engagement affects our membership services revenues. In addition, advertisers are drawn to our platform because of the size of our user base, its attractive demographics, and the level of our user engagement. Our ability to maintain and expand our user base, as well as maintain and enhance user engagement, depends on, among other things, our ability to continuously offer popular content, recommend personalized content through technological innovation and provide a superior entertainment experience.

### *Our ability to provide innovative and effective advertising services*

We generate a majority of our revenues through the provision of online advertising services. We believe demand for our advertising services will continue to be affected by the pace of advertisement budget shift from traditional media, such as TV, to internet video advertising in China. On a more specific level, we need to provide innovative and effective advertising services to increase our existing customers' advertising spending and to attract new advertising customers. To this end, we need to continue to strengthen the innovation and effectiveness of our advertising solutions, including our precise targeting technology, creative design, results monitoring, salesforce, distribution network and customer service capabilities.

### *Our ability to increase revenues from our extensive monetization channels*

In addition to revenues from membership services and online advertising services, we generate revenues from content distribution, live broadcasting, online games, IP licensing, online literature and e-commerce. Our extensive monetization efforts are affected by (i) the demand for high-quality entertainment content, (ii) our bargaining power with content production, distribution and adaptation partners, and (iii) the availability of popular content on our platform. Our monetization channels have benefited from the recent boom in the entertainment industry in China and the resulting surge in demand for high-quality entertainment content. Furthermore, technological development has allowed us to pursue increasingly diversified monetization channels, including adapting popular content into a variety of derivative works based on our IP.

### *Our ability to produce and license premium content in a cost-effective manner*

Premium content is critical to the success of our business. We need to produce and license premium content in order to deliver a differentiated and engaging entertainment experience for our users. Content cost has historically accounted for the biggest portion of our cost of revenues, representing 69.5%, 67.1% and 72.6% of our total revenues in 2015, 2016, and 2017, respectively. Our content portfolio consists of original content, content licensed from third-party professional content producers, as well as content uploaded by professional and other users. We make content production and licensing decisions based on the quality of the content, its relevance to our users' preferences, its advertising appeal relative to its cost, as well as its potential for development into derivative entertainment products. We aim at ensuring that we realize substantial value from the content that we produce or license. Our ability to continue to manage and control our content costs while maintaining the high-quality and attractiveness of our content affects our results of operations. We expect our content cost to increase in an absolute amount as we expand our content portfolio to maintain our market leadership.

### *Effective investment in technology infrastructure*

Our technology infrastructure is critical for us to produce and offer high-quality content, as well as to retain and attract users, customers and content partners. We must continue to upgrade and expand our technology infrastructure to keep pace with the growth of our business, to further enhance our AI and big data analytical capabilities and develop new features and services for our users and members.

**Table of Contents**

**Key Components of Results of Operations**

*Total Revenues*

We derive our revenues from (i) membership services, (ii) online advertising services, (iii) content distribution and (iv) others. The following table presents our revenue lines and as percentages of our total revenues for the periods presented.

| | For the Year Ended December 31, | | | | | | |
| | 2015 | | 2016 | | 2017 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | | | (in thousands, except for percentages) | | | | |
|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | |
| Membership services | 996,682 | 18.7 | 3,762,183 | 33.5 | 6,536,028 | 1,004,569 | 37.6 |
| Online advertising services | 3,399,935 | 63.9 | 5,650,366 | 50.3 | 8,158,924 | 1,254,004 | 46.9 |
| Content distribution | 387,687 | 7.4 | 500,952 | 4.4 | 1,191,816 | 183,179 | 6.9 |
| Others | 534,280 | 10.0 | 1,323,906 | 11.8 | 1,491,582 | 229,251 | 8.6 |
| Total revenues | 5,318,584 | 100.0 | 11,237,407 | 100.0 | 17,378,350 | 2,671,003 | 100.0 |

*Membership services*

We offer membership packages to provide our members with (i) access to our premium content, (ii) certain commercial skipping and other viewing privilege, and (iii) higher community status in our iQIYI Paopao social platform. We generate a small portion of our membership services revenue from on-demand content purchase by our users.

*Online advertising services*

Our advertising revenues are recognized net of advertising agency rebates. Most of advertising services are in the form of brand advertising. An increasing portion of our advertising services are in the form of in-feed advertising, which we launched in the fourth quarter of 2016.

*Content distribution*

We distribute video content licensed from third parties by sub-licensing such content to other third-party internet video streaming platforms, and as consideration receive either cash or the right to distribute on our platform certain licensed content from such platforms. We distribute selected original content titles outside of China and to TV stations in China.

*Others*

We generate revenues from various other channels, such as live broadcasting, online games and IP licensing. We generate revenues from online games primarily by distributing third-party online games and sharing revenues with them. We generate revenues from live broadcasting through the sale and consumption of virtual items purchased by viewers of our live broadcasting shows. We generate revenues from IP licensing by licensing third parties to develop related merchandise based on our IP and by licensing to third parties our popular trademarks for use in their products. In addition, we also generate revenues from online literature and e-commerce.

*Operating Costs and Expenses*

Our operating costs and expenses consist of (i) cost of revenues, (ii) selling, general and administrative expenses and (iii) research and development expenses.

78

**Table of Contents**

*Cost of revenues*. Our cost of revenues mainly consists of content costs, bandwidth costs and others. Content costs mainly consist of expense for original content, which includes amortization of capitalized produced content and expenses recorded when production costs exceeds the total revenues to be earned; licensed content, which includes amortization and impairment of licensed copyrights; and revenue sharing cost for content uploaded by partners and cost incurred for live broadcasting hosts. Bandwidth costs are the fees we pay to telecommunications carriers and other service providers for telecommunications and other content delivery-related services. We expect that our cost of revenues will increase in the foreseeable future as we continue to produce and license premium content and our user base and level of user engagement increase over time.

*Selling, general and administrative expenses*. Our selling expenses primarily consist of promotional and marketing expenses and compensation for our sales and marketing personnel. We expect our selling and marketing expenses to increase in the foreseeable future as we plan to engage in more selling and marketing activities to attract new users and advertisers and to promote our brand recognition and content titles, as well as to grow our business.

Our general and administrative expenses consist primarily of salaries and benefits for our general and administrative personnel and fees and expenses for legal, accounting and other professional services. We expect our general and administrative expenses to increase in the foreseeable future as we grow our business and incur increased costs related to operating as a public company and complying with our reporting obligations under the U.S. securities laws.

*Research and development expenses*. Research and development expenses primarily consist of salaries and benefits for research and development personnel. We expect our research and development expenses to increase in the foreseeable future as we continue to develop new products and services to attract users and increase user engagement, and expand our monetization efforts.

### Taxation

We had income tax expense of RMB11.2 million and RMB13.1 million in 2015 and 2016, respectively, and income tax benefit of RMB7.6 million (US$1.2 million) in 2017. We are subject to various rates of income tax under different jurisdictions. The following summarizes major factors affecting our applicable tax rates in the Cayman Islands, Hong Kong and the PRC.

#### Cayman Islands

We are an exempted company incorporated in the Cayman Islands. Under the current laws of the Cayman Islands, we are not subject to income, corporation or capital gains tax in the Cayman Islands. In addition, our payment of dividends to our shareholders, if any, is not subject to withholding tax in the Cayman Islands.

#### Hong Kong

Our subsidiaries in Hong Kong are subject to the uniform tax rate of 16.5%. Under Hong Kong tax law, our subsidiaries in Hong Kong are exempted from income tax on their foreign-derived income and there is no withholding tax in Hong Kong on remittance of dividends. No provision for Hong Kong profits tax was made as we had no estimated assessable profit that was subject to Hong Kong profits tax during 2015, 2016, or 2017.

#### PRC

Generally, our PRC subsidiaries, our consolidated affiliated entities and their subsidiaries are subject to enterprise income tax on their taxable income in the PRC at a rate of 25%. The enterprise income tax is calculated based on the entity's global income as determined under PRC tax laws and accounting standards.

Table of Contents

Beijing QIYI Century, Beijing iQIYI, and Shanghai Zhong Yuan obtained High and New Technology Enterprises, or HNTE, status to enjoy a preferential tax rate of 15% from 2013 to 2018, from 2015 to 2017 and from 2013 to 2018, respectively, to the extent it has taxable income under the Enterprise Income Tax Law of the PRC, or EIT Law, as long as it maintains the HNTE qualification and duly conducts relevant EIT filing procedures with the relevant tax authority.

Our PRC subsidiaries, our consolidated affiliated entities and their subsidiaries are subject to VAT at a rate of 3%, 6%, or 17% on the services we provide and related surcharges.

If our holding company in the Cayman Islands or our subsidiary outside of the PRC were deemed to be a "resident enterprise" under the EIT Law, it would be subject to enterprise income tax on its worldwide income at a rate of 25%. See "Risk Factors—Risks Related to Doing Business in China—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

**Results of Operations**

The following table summarizes our consolidated results of operations and as percentages of our total revenues for the years presented.

| | For the Year Ended December 31, | | | | | | |
| | 2015 | | 2016 | | 2017 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| **Revenues:** | | | | | | | |
| Membership services | 996,682 | 18.7 | 3,762,183 | 33.5 | 6,536,028 | 1,004,569 | 37.6 |
| Online advertising services | 3,399,935 | 63.9 | 5,650,366 | 50.3 | 8,158,924 | 1,254,004 | 46.9 |
| Content distribution | 387,687 | 7.4 | 500,952 | 4.4 | 1,191,816 | 183,179 | 6.9 |
| Others | 534,280 | 10.0 | 1,323,906 | 11.8 | 1,491,582 | 229,251 | 8.6 |
| **Total revenues** | **5,318,584** | **100.0** | **11,237,407** | **100.0** | **17,378,350** | **2,671,003** | **100.0** |
| **Operating costs and expenses:** | | | | | | | |
| Cost of revenues[1] | (6,041,764) | (113.6) | (11,436,595) | (101.8) | (17,386,563) | (2,672,266) | (100.0) |
| Selling, general and administrative[1] | (1,204,464) | (22.6) | (1,765,824) | (15.7) | (2,674,990) | (411,138) | (15.4) |
| Research and development[1] | (499,957) | (9.4) | (824,482) | (7.3) | (1,269,806) | (195,166) | (7.3) |
| Total operating costs and expenses | (7,746,185) | (145.6) | (14,026,901) | (124.8) | (21,331,359) | (3,278,570) | (122.7) |
| **Operating loss** | **(2,427,601)** | **(45.6)** | **(2,789,494)** | **(24.8)** | **(3,953,009)** | **(607,567)** | **(22.7)** |
| Total other (expenses)/income, net | (136,345) | (2.6) | (271,440) | (2.4) | 208,512 | 32,047 | 1.2 |
| **Loss before income tax** | **(2,563,946)** | **(48.2)** | **(3,060,934)** | **(27.2)** | **(3,744,497)** | **(575,520)** | **(21.5)** |
| Income tax (expense)/benefit | (11,166) | (0.2) | (13,088) | (0.1) | 7,565 | 1,163 | 0.0 |
| **Net loss** | **(2,575,112)** | **(48.4)** | **(3,074,022)** | **(27.4)** | **(3,736,932)** | **(574,357)** | **(21.5)** |

Note:

(1)  Share-based compensation expense was allocated as follows:

| | For the Year Ended December 31, | | | |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | (in thousands) | | | |
| Cost of revenues | 5,837 | 9,479 | 34,895 | 5,363 |
| Selling, general and administrative | 21,330 | 30,447 | 130,994 | 20,133 |
| Research and development | 17,027 | 22,466 | 67,535 | 10,380 |
| Total | 44,194 | 62,392 | 233,424 | 35,876 |

80

**Table of Contents**

***Year Ended December 31, 2017 Compared with Year Ended December 31, 2016***

*Revenues*

Our revenues increased by 54.6% from RMB11,237.4 million in 2016 to RMB17,378.4 million (US$2,671.0 million) in 2017.

*Membership services.* Our membership services revenue increased by 73.7% from RMB3,762.2 million in 2016 to RMB6,536.0 million (US$1,004.6 million) in 2017, primarily driven by the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 68.4% from 30.2 million as of December 31, 2016 to 50.8 million as of December 31, 2017. "Subscribing members" refers to the individuals who purchased our monthly, quarterly or annual membership packages, including individuals with trial membership, and excluding individuals who used paid video on-demand service. The number of individuals with trial memberships has consistently accounted for less than 5% of the total number of subscribing members. Excluding individuals with trial memberships, the number of subscribing members increased by 66.8% from 30.0 million as of December 31, 2016 to 50.0 million as of December 31, 2017. Between the fourth quarters of 2016 and 2017, our average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million, and our average mobile MAUs increased by 3.9% from 405.4 million to 421.3 million. Daily average total user time spent on our iQIYI platform increased by 15.8% from 259.1 million hours in 2016 to 300.1 million hours in 2017.

*Online advertising services.* Our online advertising services revenue grew by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017, as a result of the increase of brand advertising, which is primarily due to the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, as well as the growth of our in-feed advertising service launched in the fourth quarter of 2016. Average brand advertising revenue per brand advertiser increased by 16.3% from RMB4.9 million in 2016 to RMB5.7 million (US$0.9 million) in 2017.

*Content distribution*. Our content distribution revenue increased by 137.9% from RMB501.0 million in 2016 to RMB1,191.8 million (US$183.2 million) in 2017, primarily caused by an increased amount of content titles distributed.

*Others*. Other revenues increased by 12.7% from RMB1,323.9 million in 2016 to RMB1,491.6 million (US$229.3 million) in 2017, primarily as a result of the growth in live broadcasting revenue.

*Cost of revenues*

Our cost of revenues increased by 52.0% from RMB11,436.6 million in 2016 to RMB17,386.6 million (US$2,672.3 million) in 2017.

*Content cost.* Content cost increased by 67.3% from RMB7,541.0 million in 2016 to RMB12,616.9 million (US$1,939.2 million) in 2017. The RMB5,075.9 million increase was primarily due to the increased purchase of third-party professionally-produced or partner-generated content, which increased by RMB3,633.9 million as we procured more high-quality and popular licensed content; and to a lesser extent, to the increase of RMB1,002.9 million in revenue sharing with content partners as more content was uploaded onto our platform, and to our rapid expansion of original content production, which resulted in an increase of RMB429.4 million in content cost. The increase was partially offset by a decrease of other content cost.

*Bandwidth cost.* Our bandwidth cost increased by 16.8% from RMB1,874.6 million in 2016 to RMB2,190.2 million (US$336.6 million) in 2017, primarily as a result of the increased bandwidth necessary to support the growth of our user traffic and better user experience.

81

**Table of Contents**

*Gross Loss*

As a result of the foregoing, we had gross losses of RMB199.2 million and RMB8.2 million (US$1.3 million) in 2016 and 2017, respectively. Our gross losses as a percentage of total revenues decreased between 2016 and 2017, which was primarily attributed by the decrease of bandwidth cost as a percentage of total revenues, resulting from application efficiency being improved by technology. However, content cost as a percentage of total revenues increased as we continued to produce and offer high-quality content, especially popular original content. We expect our cost of revenues to increase on an absolute basis as traffic to our platform increases, user base of our platform grows, the resolution of our videos improves and as we produce and acquire more high-quality content to enrich user experience in our diversified monetization channels. In the short run, increase of cost of revenues may still outpace revenue as we devote more resources on original content production. In the long run, however, we expect the increase of revenue will outpace cost of revenues as a result of our rapid growth and the resulting economies of scale, as well as our technological innovations with respect to content delivery and bandwidth usage. However, we cannot provide an accurate estimate as to when we will achieve gross profit. For specific factors that may constrain our ability to reverse our gross loss, see "Risk Factors—Risks Related to Our Business and Industry—We have incurred net losses since our inception and may continue to incur losses in the future."

*Selling, general and administrative expenses*

Selling expenses increased by 45.4% from RMB1,524.5 million in 2016 to RMB2,217.0 million (US$340.8 million) in 2017, primarily due to the increase in advertising expenses and the increase in sales and marketing personnel salaries and benefits. Our advertising expenses increased by 51.3% from RMB907.9 million in 2016 to RMB1,373.3 million (US$211.1 million) in 2017 as we increased our brand and content promotional spending, and our spending on user acquisition channels, including mobile device manufacturers, search engines and mobile app stores. Our sales and marketing personnel compensation expenses increased by 45.5% from RMB426.8 million in 2016 to RMB621.2 million (US$95.5 million) in 2017 primarily due to the increased headcount. Our sales and marketing personnel headcount increased from 909 as of December 31, 2016 to 1,239 as of December 31, 2017.

General and administrative expenses increased by 89.7% from RMB241.4 million in 2016 to RMB458.0 million (US$70.3 million) in 2017, primarily due to the increase in personnel compensation expenses and professional service fees. Our general and administrative personnel compensation expenses increased by 107.7% from RMB90.8 million in 2016 to RMB188.6 million (US$29.0 million) in 2017, primarily due to increased headcount and average compensation level. Our general and administrative personnel headcount increased from 255 as of December 31, 2016 to 344 as of December 31, 2017. Our professional service fees increased by 104.5% from RMB38.2 million in 2016 to RMB78.1 million (US$12.0 million) in 2017 primarily due to procurement of audit and legal services.

*Research and development expenses*

Our research and development expenses increased by 54.0% from RMB824.5 million in 2016 to RMB1,269.8 million (US$195.2 million) in 2017, primarily due to the increase in research and development personnel compensation expenses. Our research and development personnel compensation expenses increased by 58.7% from RMB704.7 million in 2016 to RMB1,118.1 million (US$171.8 million) in 2017 primarily due to the increased headcount and average compensation level. Our research and development personnel headcount increased from 1,998 as of December 31, 2016 to 2,608 as of December 31, 2017.

82

**Table of Contents**

*Income tax expense*

We had an income tax expense of RMB13.1 million in 2016, which resulted from the net profit position of certain operating entities in the PRC. In 2017, RMB7.6 million (US$1.2 million) income tax benefit was recognized, which can be carried forward to offset future tax payable.

*Net loss*

As a result of the foregoing, we had net losses of RMB3,074.0 million and RMB3,736.9 million (US$574.4 million) in 2016 and 2017, respectively.

**Year Ended December 31, 2016 Compared with Year Ended December 31, 2015**

*Revenues*

Our revenues increased by 111.3% from RMB5,318.6 million in 2015 to RMB11,237.4 million in 2016.

*Membership services*. Our membership services revenue increased by 277.5% from RMB996.7 million in 2015 to RMB3,762.2 million in 2016, primarily driven by the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 182.7% from 10.7 million as of December 31, 2015 to 30.2 million as of December 31, 2016. Excluding individuals with trial memberships, the number of subscribing members increased by 180.4% from 10.7 million as of December 31, 2015 to 30.0 million as of December 31, 2016. Between the fourth quarters of 2015 and 2016, our average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million, and our average mobile MAUs increased by 10.9% from 365.5 million to 405.4 million. Daily average total user time spent on our iQIYI platform increased by 52.5% from 169.9 million hours in 2015 to 259.1 million hours in 2016.

*Online advertising services*. Our online advertising services revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, primarily as a result of the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of our advertising services, and partially offset by the decrease in the number of brand advertisers. Average brand advertising revenue per brand advertiser increased by 80.3% from RMB2.7 million in 2015 to RMB4.9 million in 2016.

*Content distribution*. Our content distribution revenue increased by 29.2% from RMB387.7 million in 2015 to RMB501.0 million in 2016, primarily caused by an increased amount of content titles distributed.

*Others*. Other revenues increased by 147.8% from RMB534.3 million in 2015 to RMB1,323.9 million in 2016, primarily as a result of the growth in live broadcasting revenue.

*Cost of revenues*

Our cost of revenues increased by 89.3% from RMB6,041.8 million in 2015 to RMB11,436.6 million in 2016.

*Content cost*. Content cost increased by 104.1% from RMB3,694.4 million in 2015 to RMB7,541.0 million in 2016. The RMB3,846.6 million increase was primarily due to the increased purchase of third-party professionally-produced or partner-generated content, which increased by RMB1,954.6 million as we have increased procurement for high-quality and popular licensed content; and to a lesser extent, to the increase of RMB822.7 million in revenue sharing with content partners as more content was uploaded onto our platform, and to our rapid expansion of original content production, which resulted in an increase of RMB549.4 million in content cost.

*Bandwidth cost*. Our bandwidth cost increased by 60.6% from RMB1,167.0 million in 2015 to RMB1,874.6 million in 2016, primarily as a result of the increased bandwidth necessary to support the growth of our user traffic and better user experience.

83

**Table of Contents**

*Gross Loss*

As a result of the foregoing, we had gross losses of RMB723.2 million and RMB199.2 million in 2015 and 2016, respectively. Our gross losses as a percentage of total revenues significantly decreased between 2015 and 2016, which was primarily attributed by the decrease of bandwidth cost as a percentage of total revenues, resulting from application efficiency being improved by technology. However, content cost as a percentage of total revenues increased as we continued to produce and offer high-quality content, especially popular original content.

*Selling, general and administrative expenses*

Selling expenses increased by 47.7% from RMB1,032.0 million in 2015 to RMB1,524.5 million in 2016, primarily due to the increase in advertising expenses and the increase in sales and marketing personnel salaries and benefits. Our advertising expenses increased by 69.1% from RMB536.9 million in 2015 to RMB907.9 million in 2016 as we increased our brand and content promotional spending, and our spending on user acquisition channels, including mobile device manufacturers, search engines and mobile app stores. Our sales and marketing personnel compensation expenses increased by 29.8% from RMB328.9 million in 2015 to RMB426.8 million in 2016 primarily due to the increased headcount. Our sales and marketing personnel headcount increased from 698 as of December 31, 2015 to 909 as of December 31, 2016.

General and administrative expenses increased by 40.0% from RMB172.4 million in 2015 to RMB241.4 million in 2016, primarily due to the increase in professional service fees, office expenses and personnel compensation expenses. Our professional service fees increased by 61.4% from RMB23.6 million in 2015 to RMB38.2 million in 2016 primarily due to procurement of audit and legal services. Our general and administrative personnel compensation expenses increased by 29.3% from RMB70.2 million in 2015 to RMB90.8 million in 2016 primarily due to increased headcount. Our general and administrative personnel headcount increased from 222 as of December 31, 2015 to 255 as of December 31, 2016.

*Research and development expenses*

Our research and development expenses increased by 64.9% from RMB500.0 million in 2015 to RMB824.5 million in 2016, primarily due to the increase in research and development personnel compensation expenses. Our research and development personnel compensation expenses increased by 69.2% from RMB416.4 million in 2015 to RMB704.7 million in 2016 primarily due to the increased headcount and average compensation level. Our research and development personnel headcount increased from 1,345 as of December 31, 2015 to 1,998 as of December 31, 2016.

*Income tax expense*

We had an income tax expense of RMB11.2 million in 2015 and RMB13.1 million in 2016. Our income tax expense in 2015 and 2016 resulted from the net profit position of certain operating entities in the PRC.

*Net loss*

As a result of the foregoing, we had net losses of RMB2,575.1 million and RMB3,074.0 million in 2015 and 2016, respectively.

84

**Table of Contents**

**Selected Quarterly Results of Operations**

The following table sets forth our unaudited consolidated statement of operations data for each of the six quarters from July 1, 2016 to December 31, 2017. The unaudited quarterly statement of operations data set forth below have been prepared on the same basis as our audited annual consolidated financial statements and include all normal recurring adjustments that we consider necessary for a fair statement of our financial position and operating results for the periods presented. Our historical results are not necessarily indicative of the results to be expected for any future period. The following quarterly financial data for the periods indicated are qualified by reference to and should be read in conjunction with our consolidated financial statements and related notes which are included elsewhere in this prospectus.

| | For the Three Months Ended | | | | | |
| | September 30, 2016 | December 31, 2016 | March 31, 2017 | June 30, 2017 | September 30, 2017 | December 31, 2017 |
| | RMB | RMB | RMB | RMB | RMB | RMB |
| | (in thousands of RMB and unaudited) | | | | | |
| **Revenues:** | | | | | | |
| Membership services | 1,168,433 | 1,262,952 | 1,329,976 | 1,579,530 | 1,696,697 | 1,929,825 |
| Online advertising services | 1,625,802 | 1,340,261 | 1,473,445 | 1,908,453 | 2,634,187 | 2,142,839 |
| Content distribution | 118,588 | 117,835 | 196,016 | 486,263 | 276,052 | 233,485 |
| Others | 344,833 | 434,068 | 284,597 | 352,073 | 343,647 | 511,265 |
| **Total revenues** | **3,257,656** | **3,155,116** | **3,284,034** | **4,326,319** | **4,950,583** | **4,817,414** |
| **Operating costs and expenses:** | | | | | | |
| Cost of revenues[1] | (3,140,991) | (3,121,314) | (3,558,628) | (4,394,981) | (4,897,843) | (4,535,111) |
| Selling, general and administrative[1] | (465,324) | (552,369) | (496,145) | (627,623) | (777,038) | (774,184) |
| Research and development[1] | (229,972) | (243,920) | (268,880) | (294,371) | (342,328) | (364,227) |
| Total operating costs and expenses | (3,836,287) | (3,917,603) | (4,323,653) | (5,316,975) | (6,017,209) | (5,673,522) |
| **Operating loss** | **(578,631)** | **(762,487)** | **(1,039,619)** | **(990,656)** | **(1,066,626)** | **(856,108)** |
| Total other (expenses)/income, net | (49,476) | (180,817) | (79,110) | 38,191 | 15,599 | 233,832 |
| **Loss before income taxes** | **(628,107)** | **(943,304)** | **(1,118,729)** | **(952,465)** | **(1,051,027)** | **(622,276)** |
| Income tax (expense)/benefit | (2,831) | (4,139) | (840) | (705) | (786) | 9,896 |
| **Net loss** | **(630,938)** | **(947,443)** | **(1,119,569)** | **(953,170)** | **(1,051,813)** | **(612,380)** |

Note:

(1)  Share-based compensation was allocated as follows:

| | For the Three Months Ended | | | | | |
| | September 30, 2016 | December 31, 2016 | March 31, 2017 | June 30, 2017 | September 30, 2017 | December 31, 2017 |
| | RMB | RMB | RMB | RMB | RMB | RMB |
| | (in thousands of RMB and unaudited) | | | | | |
| Cost of revenues | 3,492 | 2,984 | 10,695 | 7,988 | 8,190 | 8,022 |
| Selling, general and administrative | 10,681 | 8,301 | 43,863 | 29,058 | 29,381 | 28,692 |
| Research and development | 6,537 | 5,105 | 23,075 | 14,240 | 15,255 | 14,965 |
| Total | 20,710 | 16,390 | 77,633 | 51,286 | 52,826 | 51,679 |

**Table of Contents**

Notwithstanding the fluctuations of our quarterly results of operations as discussed below, we have achieved significant revenue growth in the last six quarters. Our quarterly revenues were primarily generated from our membership services and online advertising services, and to a lesser extent, from content distribution and other revenues. We have experienced lower online advertising services revenue in the first quarter of each year in connection with the Chinese New Year holiday as advertisers limit their budget for online platforms and less blockbuster content is released during the period. We have generally achieved the fastest revenue growth in the third quarter, driven by summer holidays and more popular content titles being released on our platform, thereby providing more space for advertisements and attracting more paying members.

Our quarterly operating costs and expenses generally increased in absolute amounts during the period from July 1, 2016 to September 30, 2017, as our revenues increased and we acquired more content and used more bandwidth, expanded market promotion and recruited more experienced employees. Our quarterly operating costs and expenses decreased between the third and fourth quarters of 2017, primarily because less blockbuster content was released in the fourth quarter of 2017. Our operating loss as a percentage of revenue increased from July 1, 2016 to March 31, 2017 and decreased afterwards, primarily because of economy of scale and of our more mature technology to manage bandwidth as well as more efficient expenditure on market promotion.

**Liquidity and Capital Resources**

Prior to this offering, our principal sources of liquidity have been net cash provided by operating activities, debt financing support from Baidu, as well as private placements of preferred shares and convertible notes. As of December 31, 2017, we had RMB733.0 million (US$112.7 million) in cash and cash equivalents. Our cash and cash equivalents primarily consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased. As of December 31, 2017, we had RMB779.9 million (US$119.9 million) in short-term investments. Our short-term investments consisted of available-for-sale debt securities with maturities of less than one year purchased from commercial banks and other financial institutions.

Our total current liabilities were RMB11,625.6 million (US$1,786.8 million) as of December 31, 2017, which primarily included RMB7,041.3 million (US$1,082.2 million) in accounts payable and RMB2,511.2 million (US$386.0 million) in accrued expenses and other liabilities.

We had working capital (defined as total current assets deducted by total current liabilities) deficits as of December 31, 2016 and 2017. Historically, we have not been profitable nor generated positive net cash flows. Accounts payable amounted to RMB4,184.6 million and RMB7,041.3 million (US$1,082.2 million) as of December 31, 2016 and 2017, respectively. A substantial majority of our accounts payable is due to third party content and bandwidth providers. The increase in accounts payable was primarily a result of our continued significant investments to acquire premium licensed copyrights and expand our content offering.

The working capital deficits will restrict our liquidity position and have a negative impact on our ability to repay current liabilities.

We prudently manage our working capital to support our business and operations. In terms of financing activities, we have been actively seeking additional financings to improve our liquidity position and we have been able to raise capital through private placements to investors. We completed the US$1.53 billion convertible notes financing in 2017, which were converted to Series G preferred shares in October 2017, obtained multiple lines of credit from commercial banks and have secured from Baidu another loan of around RMB650.0 million in early 2018. In terms of business initiatives, we will (i) continue to work closely with our advertising customers and suppliers in order to optimize our payment terms, (ii) continue to pursue strategies to increase our revenues from membership services, live broadcasting services and in-feed advertising services, where customers usually prepay for our services, and (iii) continue to strengthen our content production capabilities in order to gain more pricing power over our content sourcing efforts.

86

**Table of Contents**

We believe that our current cash and cash equivalents, proceeds from this offering and our anticipated cash flows from operations will be sufficient to meet our anticipated working capital requirements and capital expenditures for the 12 months following this offering. We may, however, need additional capital in the future to fund our continued operations. The issuance and sale of additional equity would result in further dilution to our shareholders. The incurrence of indebtedness would result in increased fixed obligations and could result in operating covenants that would restrict our operations. As we will continue to invest in both original and licensed content and technology to support our growth, we may not be able to improve our working capital position or to achieve a surplus beyond the next 12 months. In the future, should we require additional liquidity and capital resources to fund our business and operations, we may need to obtain additional financing, including financing from new and/or existing shareholders, and financing generated through capital market and commercial banks. See "Risk Factors—Risks Related to Our Business and Industry—We have significant working capital requirements and have historically experienced negative working capital balances. If we continue to experience such negative working capital balances in the future, it could have a material adverse effect on our business, financial condition and results of operations."

As of December 31, 2017, 68.2% of our cash and cash equivalents and short-term investments were held in the PRC, while 62.6% of our cash and cash equivalents and short-term investments were held by our consolidated affiliated entities and their subsidiaries.

Although we consolidate the results of our consolidated affiliated entities and their subsidiaries, we only have access to the assets or earnings of our consolidated affiliated entities and their subsidiaries through our contractual arrangements with our consolidated affiliated entities and their shareholders. See "Corporate History and Structure—Contractual Arrangements with the Consolidated Affiliated Entities and Their Respective Shareholders." For restrictions and limitations on liquidity and capital resources as a result of our corporate structure, see "—Holding company structure."

In utilizing the proceeds we expect to receive from this offering, we may make additional capital contributions to our PRC subsidiaries, establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, make loans to our PRC subsidiaries, or acquire offshore entities with business operations in China in offshore transactions. However, most of these uses are subject to PRC regulations and approvals. For example:

- capital contributions to our PRC subsidiaries must be approved by or filed with the MOFCOM in its foreign investment comprehensive management information system; and

- loans by us to our PRC subsidiaries to finance their activities cannot exceed the difference between its registered capital and its total investment amount as recorded in the foreign investment comprehensive management information system or, as an alternative, only procure loans subject to the Risk-Weighted Approach and the Net Asset Limits and must be registered with SAFE or its local branches or filed with SAFE in its information system.

See "Regulation—Regulations on Foreign Exchange." There is, in effect, no statutory limit on the amount of capital contribution that we can make to our PRC subsidiaries. This is because there is no statutory limit on the amount of registered capital for our PRC subsidiaries, and we are allowed to make capital contributions to our PRC subsidiaries by subscribing for their initial registered capital and increased registered capital, provided that the PRC subsidiaries completes the relevant filing and registration procedures. With respect to loans to the PRC subsidiaries by us, (i) if the relevant PRC subsidiaries determine to adopt the traditional foreign exchange administration mechanism, or the Current Foreign Debt mechanism, the outstanding amount of the loans shall not exceed the difference between the total investment and the registered capital of the PRC subsidiaries and there is, in effect, no statutory limit on the amount of loans that we can make to our PRC subsidiaries under this circumstance since we can increase the registered capital of our PRC subsidiaries by making capital contributions to them, subject to the completion of relevant registrations, and the difference between the total investment and the registered capital will increase accordingly; and (ii) if the relevant PRC subsidiaries determine to adopt the

87

Table of Contents

foreign exchange administration mechanism as provided in the PBOC Notice No. 9, or the Notice No. 9 Foreign Debt mechanism, the risk-weighted outstanding amount of the loans, which shall be calculated based on the formula provided in the PBOC Notice No. 9, shall not exceed 200% of the net asset of the relevant PRC subsidiary. According to the PBOC Notice No. 9, after a transition period of one year since the promulgation of the PBOC Notice No. 9, the PBOC and SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of the PBOC Notice No. 9. As of the date hereof, neither PBOC nor SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by PBOC and SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries.

A majority of our future revenues are likely to continue to be in the form of Renminbi. Under existing PRC foreign exchange regulations, Renminbi may be converted into foreign exchange for current account items, including profit distributions, interest payments and trade-and service related foreign exchange transactions.

Our PRC subsidiaries may convert Renminbi amounts that they generate in their own business activities, including technical consulting and related service fees pursuant to their contracts with the consolidated affiliated entities, as well as dividends they receive from their own subsidiaries, into foreign exchange and pay them to their non-PRC parent companies in the form of dividends. However, current PRC regulations permit our PRC subsidiaries to pay dividends to us only out of their accumulated profits, if any, determined in accordance with PRC accounting standards and regulations. Each of our PRC subsidiaries is required to set aside at least 10% of its after-tax profits after making up previous years' accumulated losses each year, if any, to fund certain reserve funds until the total amount set aside reaches 50% of its registered capital. These reserves are not distributable as cash dividends. Furthermore, capital account transactions, which include foreign direct investment and loans, must be approved by and/or registered with SAFE and its local branches. The total amount of loans we can make to our PRC subsidiaries cannot exceed statutory limits and must be registered with the local counterpart of SAFE. The statutory limit for the total amount of foreign debts of a foreign-invested company is the difference between the amount of total investment as approved by the MOFCOM and the amount of registered capital of such foreign-invested company.

The following table sets forth a summary of our cash flows for the years indicated.

| | For the Year Ended December 31, | | | |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
| **Summary Consolidated Cash Flow Data:** | | | | |
| Net cash provided by operating activities | 1,070,770 | 2,612,121 | 4,011,784 | 616,594 |
| Net cash used for investing activities | (3,133,375) | (6,663,100) | (10,660,674) | (1,638,515) |
| Net cash (used in)/provided by financing activities | (131,708) | 3,411,766 | 6,561,110 | 1,008,424 |
| Effect of exchange rate changes on cash and cash equivalents | 71,951 | 14,681 | (143,417) | (22,037) |
| Net decrease in cash and cash equivalents | (2,122,362) | (624,532) | (231,197) | (35,534) |
| Cash and cash equivalents at the beginning of the year | 3,711,101 | 1,588,739 | 964,207 | 148,196 |
| Cash and cash equivalents at the end of the year | 1,588,739 | 964,207 | 733,010 | 112,662 |

*Net cash provided by operating activities*

Net cash provided by operating activities increased from RMB2,612.1 million in 2016 to RMB4,011.8 million (US$616.6 million) in 2017 primarily due to the combined effect of increase in net loss, as adjusted for

88

**Table of Contents**

non-cash items, and changes in operating assets and liabilities. Net loss increased by RMB662.9 million from RMB3,074.0 million in 2016 to RMB3,736.9 million (US$574.4 million) in 2017. A key factor that caused operating cash inflow was the increase in the amortization and impairment of licensed copyrights and produced content from RMB4,822.9 million in 2016 to RMB8,693.6 million (US$1,336.2 million) in 2017 as a result of continued expansion of our content portfolio to maintain our market leadership. Operating cash inflow was partially offset by an increase in changes in produced content of RMB1,089.8 million from RMB872.4 million in 2016 to RMB1,962.2 million (US$301.6 million) in 2017, primarily due to our increased expenditures on original content production.

Net cash provided by operating activities increased from RMB1,070.8 million in 2015 to RMB2,612.1 million in 2016 primarily due to the combined effect of increase in net loss, as adjusted for non-cash items, and changes in operating assets and liabilities. Net loss increased by RMB498.9 million from RMB2,575.1 million in 2015 to RMB3,074.0 million in 2016. Key factors that caused operating cash inflow included (i) the increase in the amortization and impairment of licensed copyrights and produced content from RMB2,525.3 million in 2015 to RMB4,822.9 million in 2016 as a result of continued expansion of our content portfolio to maintain our market leadership, and (ii) the increase of customer advances and deferred revenue of RMB237.3 million from RMB219.5 million in 2015 to RMB456.8 million in 2016, which is consistent with membership services revenue growth. Operating cash inflow was partially offset by an increase in changes in produced content of RMB534.5 million from RMB337.9 million in 2015 to RMB872.4 million in 2016, primarily due to our increased expenditures on original content production.

*Net cash used for investing activities*

Net cash used for investing activities increased from RMB6,663.1 million in 2016 to RMB10,660.7 million (US$1,638.5 million) in 2017 primarily due to (i) an increase of acquisition of licensed copyrights from RMB5,290.8 million in 2016 to RMB9,087.4 million (US$1,396.7 million) in 2017 as result of the continued expansion of our content portfolio.

Net cash used for investing activities increased from RMB3,133.4 million in 2015 to RMB6,663.1 million in 2016 primarily due to an increase of acquisition of licensed copyrights from RMB2,586.1 million in 2015 to RMB5,290.8 million in 2016 as result of the continued expansion of our content portfolio.

*Net cash (used in) / provided by financing activities*

Net cash provided by financing activities increased from RMB3,411.8 million in 2016 to RMB6,561.1 million (US$1,008.4 million) in 2017 primarily due to (i) proceeds of RMB10,528.2 million from the issuance of convertible notes in 2017, and (ii) partially offset by net proceeds from related parties of RMB3,311.8 million in 2016 to net repayments of loans to related parties of RMB4,506.0 million (US$692.6 million) in 2017.

The change in net cash provided by financing activities between 2015 and 2016 was primarily due to proceeds from loans we received from Baidu in 2016.

89

Table of Contents

**Contractual obligations**

The following table sets forth our contractual obligations by specified categories as of December 31, 2017.

| | Payment due by December 31, | | | | |
|---|---|---|---|---|---|
| | Total | 2018 | 2019 | 2020 | 2021 | 2022 and after |
| | (in RMB thousands) | | | | | |
| Operating lease obligations[1] | 1,666,718 | 1,512,618 | 124,701 | 16,764 | 10,953 | 1,682 |
| Purchase obligations[2] | 16,562,694 | 6,146,266 | 5,377,993 | 2,800,675 | 895,652 | 1,342,108 |
| Long-term debt obligations[3] | 294,000 | 10,000 | 10,000 | 274,000 | — | — |
| Non-cancelable capital lease obligations and purchase obligations for fixed assets | 32,313 | 32,313 | — | — | — | — |
| Total | 18,555,725 | 7,701,197 | 5,512,694 | 3,091,439 | 906,605 | 1,343,790 |

—————————

Notes:

(1) Operating lease obligations represent our obligations for leasing office premises and bandwidth.

(2) Purchase obligations represent our future minimum payments under non-cancelable agreements for licensed copyrights.

(3) On April 10, 2017, Shanghai iQIYI entered into a three-year loan agreement with Bank of China (Shanghai Branch), pursuant to which Shanghai iQIYI is entitled to borrow a secured RMB denominated loan of RMB299.0 million with an annual interest rate at 94% of the benchmark three-year lending rate published by the People's Bank of China. The loan is intended for the general working capital. On April 11, 2017, Shanghai iQIYI drew down RMB299.0 million with an interest rate of 4.47%. The principal shall be repaid by installments from September 21, 2017 to April 10, 2020. In September 2017, Shanghai iQIYI repaid RMB5.0 million of principal. The principal, interest, related penalties and other costs of the loan under this agreement were guaranteed by Beijing iQIYI, who is jointly and severally liable to the creditor.

In June 2017, Beijing iQIYI entered into a banking facility agreement with China Minsheng Bank (Beijing Branch), pursuant to which Beijing iQIYI is entitled to borrow a RMB denominated loan of up to RMB300.0 million (US$46.1 million) for general working capital purposes and is repayable in one year. The repayment of any loans under the banking facility agreement is guaranteed by Beijing QIYI Century. In November 2017, Beijing QIYI Century received a letter of credit from Beijing iQIYI. Beijing QIYI Century discounted the letter of credit and related receivable to China Minsheng Bank (Beijing Branch) for proceeds of RMB131.5 million (US$20.2 million) and the same amount was considered drawn down as a loan at an effective interest rate of 4.78%. Further, Beijing iQIYI drew down RMB62.2 million (US$9.6 million) at an annual interest rate of 5.00%. As the legal isolation criteria was not met, the transfer of the receivable balance did not qualify as a transfer of financial assets and is accounted for as a secured borrowing.

On August 15, 2017, Beijing iQIYI entered into a banking facility agreement with China Merchants Bank (Beijing Branch), as supplemented on September 30, 2017, pursuant to which Beijing iQIYI is entitled to borrow a RMB denominated loan of up to RMB200.0 million for general working capital purposes and is repayable in one year. The repayment of any loans under the banking facility agreement are guaranteed by Beijing QIYI Century and Shanghai iQIYI. Concurrently, Beijing QIYI Century factored a receivable due from Beijing iQIYI of RMB105.7 million to China Merchants Bank (Beijing branch) and the same amount was considered drawn down as a loan at an effective interest rate of 4.11%, or the receivable factoring transaction. As the legal isolation criteria was not met, the receivable factoring transaction did not qualify as a transfer of financial assets and is accounted for as a secured borrowing.

Other than as shown above, we did not have any significant capital and other commitments, long-term obligations or guarantees as of December 31, 2017.

**Holding company structure**

iQIYI, Inc. is a holding company with no material operations of its own. We conduct our operations primarily through our PRC subsidiaries, our consolidated affiliated entities and their subsidiaries in China. As a

90

Table of Contents

result, iQIYI, Inc.'s ability to pay dividends depends upon dividends paid by our PRC subsidiaries. If our existing PRC subsidiaries or any newly formed ones incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us. In addition, our wholly foreign-owned subsidiaries in China are permitted to pay dividends to us only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of our subsidiaries and our consolidated affiliated entities in China is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. In addition, each of our wholly foreign-owned subsidiaries in China may allocate a portion of its after-tax profits based on PRC accounting standards to enterprise expansion funds and staff bonus and welfare funds at its discretion, and our consolidated affiliated entities may allocate a portion of their after-tax profits based on PRC accounting standards to a discretionary surplus fund at its discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. Our PRC subsidiaries have not paid dividends and will not be able to pay dividends until they generate accumulated profits and meet the requirements for statutory reserve funds.

The table below sets forth the respective revenues contribution and assets of iQIYI, Inc. and our wholly-owned subsidiaries and our consolidated affiliated entities as of the dates and for the periods indicated:

| | Total revenues[1] | | | Total assets | |
|---|---|---|---|---|---|
| | For the year ended December 31, 2015 | For the year ended December 31, 2016 | For the year ended December 31, 2017 | As of December 31, 2016 | As of December 31, 2017 |
| iQIYI, Inc. and its wholly-owned subsidiaries | 6.0% | 4.3% | 5.7% | 41.0% | 40.2% |
| Consolidated affiliated entities | 94.0% | 95.7% | 94.3% | 59.0% | 59.8% |
| Total | 100% | 100% | 100% | 100% | 100% |

Note:
(1)    The percentages exclude the inter-company transactions and balances between iQIYI, Inc. and its wholly-owned subsidiaries and the consolidated affiliated entities.

**Off-Balance sheet commitments and arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. In addition, we have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or product development services with us.

**Quantitative and Qualitative Disclosures about Market Risk**

*Foreign exchange risk*

Our revenues and expenses are mainly denominated in Renminbi. Renminbi is not freely convertible into foreign currencies for capital account transactions. The value of the Renminbi against the U.S. dollar and other currencies is affected by changes in China's political and economic conditions and by China's foreign exchange policies, among other things. In July 2005, the PRC government changed its decades-old policy of pegging the value of the Renminbi to the U.S. dollar, and the Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation subsided and the exchange rate between the Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, the Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. On November 30, 2015, the Executive Board of the International Monetary Fund (IMF) completed the regular five-year review of the basket

91

Table of Contents

of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, Renminbi is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the RMB depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

To date, we have not entered into any material hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. To the extent that we need to convert U.S. dollars we received from this offering into Renminbi for our operations or capital expenditures, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

We estimate that we will receive net proceeds of approximately US$         million from this offering if the underwriters do not exercise their over-allotment option, after deducting underwriting discounts and commissions and the estimated offering expenses payable by us, based on the initial offering price of US$         per ADS (the mid-point of the estimated initial public offering price range shown on the front cover page of this prospectus). Assuming that we convert the full amount of the net proceeds from this offering into Renminbi, a 10% appreciation of the U.S. dollar against Renminbi, from a rate of RMB         to US$1.00 to a rate of RMB         to US$1.00, will result in an increase of RMB         million in our net proceeds from this offering. Conversely, a 10% depreciation of the U.S. dollar against the Renminbi, from a rate of RMB         to US$1.00 to a rate of RMB         to US$1.00, will result in a decrease of RMB         million in our net proceeds from this offering.

### Interest rate risk

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest-bearing bank deposits. Interest-earning instruments carry a degree of interest rate risk. We have not been exposed to material risks due to changes in interest rates, and we have not used any derivative financial instruments to manage our interest risk exposure. However, our future interest income may fall short of expectations due to changes in market interest rates.

### Inflation

To date, inflation in the PRC has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2015, 2016 and 2017 were increases of 1.6%, 2.1% and 1.8%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected in the future by higher rates of inflation in the PRC. For example, certain operating costs and expenses, such as employee compensation and office operating expenses may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets. We are not able to hedge our exposure to higher inflation in China.

### Critical accounting policies, judgment and estimates

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make estimates and assumptions that affect our reporting of, among other things, assets and liabilities, contingent assets and liabilities and total revenues and expenses. On an on-going basis, we evaluate our estimates based on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the

92

Table of Contents

results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Since our financial reporting process inherently relies on the use of estimates and assumptions, our actual results could differ from what we expect. This is especially true with some accounting policies that require higher degrees of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. For further information on our significant accounting policies, see Note 2 to our consolidated financial statements. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements.

### *Consolidation of Affiliated Entities*

In order to comply with PRC laws and regulations limiting foreign ownership of or imposing conditions on value-added telecommunication services, internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses, we operate our internet platform and conduct our value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses through our affiliated entities in China by means of contractual arrangements. We have entered into certain exclusive agreements with the affiliated entities through our subsidiaries, which obligate them to absorb a majority of the risk of loss and receive a majority of the residual returns from the affiliated entities' activities. In addition, we have entered into certain agreements with the affiliated entities and the nominee shareholders of affiliated entities, which enable us to direct the activities that most significantly affect the economic performance of the affiliated entities. Based on these contractual arrangements, we consolidate the affiliated entities as required by SEC Regulation SX-3A-02 and ASC topic 810, *Consolidation*, because we hold all the variable interests of the affiliated entities and are the primary beneficiary of the affiliated entities. We will reconsider the initial determination of whether a legal entity is a consolidated affiliated entity upon certain events listed in ASC 810-10-35-4 occurred. We will also continuously reconsider whether we are the primary beneficiariy of our affiliated entities as facts and circumstances change. See "Risk Factors—Risks Related to Our Corporate Structure."

### *Revenue recognition*

Our revenues are derived principally from membership services, online advertising services, and content distribution. Revenue is recognized only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed and collectability of the related fee is reasonably assured under ASC subtopic 605-10, *Revenue Recognition: Overall*, or ASC 605-10.

### *Membership services*

We offer membership services which provide subscribing members access to streaming of premium content in exchange for a non-refundable upfront membership fee. Membership periods range from one month to twelve months. The receipt of membership fees is initially recorded as deferred revenue and we recognize revenue ratably over the membership period as services are rendered.

### *Online advertising services*

We sell advertising services primarily to third-party advertising agencies and a small portion are sold directly to advertisers. Advertising contracts are signed to establish the price and advertising services to be provided. Pursuant to the advertising contracts, we provide advertisement placements on its web pages in different formats, including but not limited to video, banners, links, logos, brand placement and buttons. We perform a credit assessment of the customer to assess the collectability of the contract price prior to entering into contracts. For contracts where we provide customers with a bundle of advertising services, primarily for

93

**Table of Contents**

advertisements to be displayed in different spots, placed under different forms and occur at different time, we first determine whether each identified deliverable qualifies as a separate unit of accounting. For the arrangements with deliverables considered to be separate units of accounting, we allocate the total consideration of the arrangements based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence, or VSOE, of selling price, third-party evidence, or TPE, of selling price, or management's best estimate of the selling price, or BESP, and recognize revenue as each service deliverable is provided. We consider all reasonably available information in determining the BESP, including both market and entity-specific factors.

We provide various sales incentives to its customers, including cash incentives in the form of commissions to certain third-party advertising agencies and noncash incentives such as discounts and advertising services provided free of charge in certain bundled arrangements, which are negotiated on a contract by contract basis with customers. We have a general policy regarding the volume of advertising services to be provided free of charge which depends largely on the volume of advertising services purchased by the advertiser. We evaluate all advertising services in a bundled arrangement, whether provided for consideration or free or charge, pursuant to ASC 605-25, *Revenue Recognition: Multiple-Element Arrangements* to determine whether it qualifies as a deliverable and separate unit of accounting.

*Content distribution*

We also generate revenues from sub-licensing content licensed from third party vendors for cash or through nonmonetary exchanges with other online video broadcasting companies. The exclusive licensing agreement we enter into with the vendors has a definitive license period and gives us rights to sub-license these contents to other third parties. We enter into a non-exclusive sub-license agreement with a sub-licensee for a period that falls within the original exclusive license period. For cash sub-licensing transactions, we receive a fixed amount of the sub-license fee upfront under the sub-licensing arrangements and do not have any future obligation once we have provided the underlying content to the sub-licensee (which is provided at or before the beginning of the sub-license period). In accordance with ASC subtopic 926-605, *Entertainment-Films: Revenue Recognition*, or ASC 926-605, we recognize the amount of the sub-license fee as revenue at the beginning of the sub-license period only when we meet all the following criteria: persuasive evidence of a sub-licensing arrangement with a customer exists, the content has been delivered or is available for immediate and unconditional delivery, the sub-license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale, the arrangement fee is fixed or determinable and collection of the arrangement fee is reasonably assured.

We also enter into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights for each party to broadcast the licensed copyrights received on its own platform only. Each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. We account for these nonmonetary exchanges in accordance with ASC topic 845, *Nonmonetary Transactions*, or ASC 845, and record the transaction based on the fair value of the asset surrendered. Barter sublicensing revenues are recognized in accordance with the same ASC 926-605 criteria above and when there are no other future obligations under the agreement. We estimate the fair value of the contents surrendered based on various factors, including comparable cash sublicensing transactions and relative size, scale, and market share of counterparties to the exchange.

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926, *Entertainment—Films*, or ASC 926.

*Others*

Other revenues mainly include revenues from live broadcasting, online games and online literature.

94

**Table of Contents**

Live broadcasting

We operate a live broadcasting platform, iQIYI Show, whereby our users can follow their favorite hosts and shows in real time through live broadcasting. Our users can purchase virtual currency for usage in iQIYI Show to acquire consumable virtual gifts, which are simultaneously presented to hosts to show their support or time-based virtual items, which enables users to enjoy additional functions and privileges for a specified time period.

We derive revenues from the sale of virtual items and record revenue on a gross basis as we act as the principal in the transaction. We operate the live broadcasting platform and determine the price of virtual items sold. Costs incurred from services provided by the hosts is recognized as cost of revenues. To facilitate the sale of virtual items, we bundle special privileges and virtual items as a package at a discounted price and we allocate the arrangement consideration to the separate units of accounting based on their relative selling prices. Revenue from the sale of consumable virtual gifts is recognized when consumed by the user, or, in the case of time-based virtual items, recognized ratably over the period each virtual item is made available to the user. Virtual currency sold by us but not yet consumed by the purchasers is recorded as "Customer advances and deferred revenue".

Online games

We distribute online games operated by third-party game developers. We act as an agent while the game developer is the primary obligor in these arrangements in accordance with ASC subtopic 605-45, *Revenue Recognition, Principal Agent Considerations*, or ASC 605-45. Therefore, we recognize revenue on a net basis based on the ratios pre-determined with the online game developers when all the revenue recognition criteria set forth in ASC 605 are met, which is generally when the user purchases virtual currencies issued by the game developers.

Online literature

We distribute online literature authorized by third-party book organizations and original authors through our online platform and charge customers fees based on the number of words in chapters or a membership fee. We are acting as the primary obligor in the arrangement in accordance with ASC 605-45 and recognize revenue on a gross basis when all the revenue recognition criteria set forth in ASC 605 are met.

*Produced content, net*

We produce and contract external parties to produce films and episodic series to exhibit on our internet platform. Produced content includes direct production costs, production overhead and acquisition costs and is stated at the lower of unamortized cost or estimated fair value. Produced content also includes cash expenditures made to acquire a proportionate share of certain rights to films including profit sharing, distribution and/or other rights. Produced content exceeding the total revenues to be earned, or ultimate revenue, is expensed as cost of revenues.

We use the individual-film-forecast-computation method to amortize our produced content based on the ratio of current period actual revenue (numerator) to estimated remaining unrecognized ultimate revenue as of the beginning of the fiscal year (denominator) in accordance with ASC 926-20, *Entertainment-Films, Other Assets-Film Costs*. We periodically review our estimates of ultimate revenue estimates for our produced content and adjustments, if any, will result in prospective changes to our amortization rates. We review our unamortized produced content costs for impairment whenever events or circumstances indicate that the fair value of the produced content may be less than its unamortized cost.

*Licensed copyrights, net*

Licensed copyrights consist of professionally-produced content such as movies, television series, variety shows, sports and other video content acquired from external parties. The license fees are capitalized and, unless

95

**Table of Contents**

prepaid, a corresponding liability recorded when cost of the content is known, the content has been accepted by us in accordance with the conditions of the license agreement and the content is available for its first showing on our internet platform. Licensed copyrights are carried at the lower of unamortized cost or net realizable value. Licensed copyrights are presented on the balance sheet as current and non-current based on estimated time of usage.

We have two types of licensed copyrights, (i) non-exclusive licensed copyrights and (ii) exclusive licensed copyrights. With non-exclusive licensed copyrights, we have the right to broadcast the contents on its own internet platform. While, with exclusive licensed copyrights, in addition to the broadcasting right, we also have the right to sublicense the underlying contents to third parties.

Non-exclusive licensed copyrights, mainly comprising of newly released movies, television series and seasonal variety shows, are generally amortized using an accelerated method based on historical viewership consumption patterns. Other non-exclusive licensed copyrights, mainly comprising of library movies, television series and variety shows and certain non-episodic features, are amortized on a straight-line basis, as the consumption pattern based on historical viewing data supports this amortization method. Estimates of the consumption patterns for licensed copyrights are reviewed periodically and revised, if necessary. The major factors that impact our viewership consumption patterns include film box office, ratings for television series and variety shows, user traffic on our platforms, placement schedule, user tastes and preferences, emerging cultural trends, merchandising and marketing efforts. When the amortization pattern is revised, it is accounted for as a change in accounting estimate prospectively in accordance with ASC topic 250, *Accounting Changes and Error Corrections*, or ASC 250.

The purchase cost of exclusive licensed copyrights includes a broadcasting right and a right to sublicense to third parties, and we allocate the content cost to these two rights when the exclusive licensed copyrights are initially recognized based on the relative proportion of our estimate of the total revenues that will be generated by each right. For the broadcasting right, which is the portion of an exclusive licensed copyright that generates direct and indirect advertising and membership revenues, the content costs are amortized in accordance with ASC subtopic 920-350, *Entertainment-Broadcasters: Intangibles—Goodwill and Other*, or ASC 920-350, using the same method as non-exclusive licensed copyrights as described above. For the right to sublicense to third parties, which is the portion of an exclusive licensed copyright that generates direct revenues, the content costs are amortized in accordance with ASC 926 using an individual-film-forecast-computation method, which amortizes such costs based on the ratio of the actual sublicensing revenues generated for the current period to the total sublicensing revenues estimated to be generated by the sublicensing right. We revisit the forecasted total direct revenues on a periodic basis and any resulting changes to such estimates and the resulting amortization expense are accounted for prospectively as a change in accounting estimate in accordance with ASC 250.

On a periodic basis, we evaluate the program usefulness of the broadcasting rights of its licensed copyrights and record such rights at the lower of unamortized cost or estimated net realizable value pursuant to the guidance in ASC 920-350. When there is a change in the expected usage of licensed copyrights, we estimate net realizable value of licensed copyrights to determine if any impairment exists.

Net realizable value is determined by estimating the expected cash flows generated from provision of online advertising and membership services, less any direct costs, over the remaining useful lives of the non-exclusive licensed copyrights. We estimate advertising and membership cash flows for each category of content. Estimates that impact advertising and membership cash flows include anticipated levels of demand for our online advertising and membership services and the expected selling prices of our advertisements and membership. For the right to sublicense to third parties, we assess recoverability in accordance with ASC 926-20.

### Goodwill

Goodwill represents the excess of the purchase price over the fair value of the identifiable net assets acquired in a business combination. We assesse goodwill for impairment in accordance with ASC subtopic

96

**Table of Contents**

350-20, *Intangibles—Goodwill and Other: Goodwill*, or ASC 350-20, which requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

A reporting unit is defined as an operating segment or one level below an operating segment referred to as a component. We determine reporting units by first identifying operating segments, and then assess whether any components of these segments constituted a business for which discrete financial information is available and our chief operating decision maker, or CODM, regularly reviews the operating results of that component. We had one reporting unit because our CODM does not regularly review component financial information below the consolidated level.

We have the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. We believe, as a result of the qualitative assessment that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, we consider primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and we are not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then we must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit's goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss. Application of a goodwill impairment test requires significant management judgment and actual results may differ from those used in valuations. The judgment in estimating the fair value of the reporting unit includes estimating future cash flows, determining appropriate discount rates and making other assumptions. Changes in these estimates and assumptions could materially affect the determination of fair value for the reporting unit.

### Impairment of long-lived assets other than goodwill

We evaluate long-lived assets, such as fixed assets and purchased or acquired intangible assets with finite lives other than licensed copyrights, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC subtopic 360-10, *Property, Plant and Equipment: Overall* or ASC 360-10. When such events occur, we assess the recoverability of the long-lived assets based on the undiscounted future cash flows the long-lived assets are expected to generate at the lowest level of identifiable cash flows. We recognize an impairment loss when the estimated undiscounted future cash flow expected to result from the use of the long-lived assets plus net proceeds expected from the eventual disposition of the long-lived assets, if any, is less than their carrying values. If we identify an impairment, we reduce the carrying value of the long-lived assets to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. We use estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different.

### Income taxes

We follow the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. We record a valuation allowance to offset deferred tax assets if, based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The

**Table of Contents**

effect of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate. We have elected to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive loss.

We apply the provisions of ASC subtopic 740, *Accounting for Income Taxes,* or ASC 740, to account for uncertainty in income taxes. ASC 740 prescribes a recognition threshold a tax position is required to meet before being recognized in the financial statements. We recognize in our consolidated financial statements the benefit of a tax position if a tax return position or future tax position is "more likely than not" to be sustained under examination based solely on the technical merits of the position. Tax positions that meet the "more likely than not" recognition threshold are measured, using a cumulative probability approach, at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement. Our estimated liability for unrecognized tax benefits are periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and or developments with respect to tax audits, and the expiration of the statute of limitations. As each audit is concluded, adjustments, if any, are recorded in our financial statements. Additionally, in future periods, changes in facts and circumstances, and new information may require us to adjust the recognition and measurement estimates with regard to changes in individual tax position. Changes in recognition and measurement estimates are recognized in the period which the change occurs.

*Redeemable convertible preferred shares*

The redeemable convertible preferred shares, or Preferred Shares, are classified as mezzanine equity as they may be redeemed at the option of the holders on or after an agreed upon date outside the sole control of us or redeemable upon a deemed liquidation event. The holders of the Preferred Shares have the ability to convert the instrument into our ordinary shares. We early adopted Accounting Standards Update ("ASU") 2014-16, *Derivatives and Hedging (Topic 815): Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity*, or ASU 2014-16, for all periods presented. ASU 2014-16 requires the use of the whole instrument approach to determine whether the nature of the host contract in a hybrid instrument is more akin to debt or to equity. We evaluated the embedded conversion option in the Preferred Shares to determine if there were any embedded derivatives requiring bifurcation and to determine if there were any beneficial conversion features. The conversion option of the Preferred Shares does not qualify for bifurcation accounting because the conversion option is clearly and closely related to the host instrument and the underlying ordinary shares are not publicly traded nor readily convertible into cash. The contingent redemption options and registration rights of the Preferred Shares did not qualify for bifurcation accounting because the underlying ordinary shares were neither publicly traded nor readily convertible into cash. There were no other embedded derivatives required to be bifurcated.

Beneficial conversion features exist when the conversion price of the Preferred Shares is lower than the fair value of the ordinary shares at the commitment date, which is the issuance date in our case. When a beneficial conversion feature, or BCF, exists as of the commitment date, its intrinsic value is bifurcated from the carrying value of the Preferred Shares as a contribution to additional paid-in capital. No BCF was recognized for Preferred Shares as the fair value per ordinary share at the commitment date was less than the most favorable conversion price. We determined the fair value of our ordinary shares with the assistance of an independent third party valuation firm.

The contingent conversion price adjustment is accounted for as a contingent BCF. In accordance with ASC paragraph 470-20-35-1, changes to the conversion terms that would be triggered by future events not controlled by the issuer should be accounted as contingent conversions, and the intrinsic value of such conversion options would not be recognized until and unless a triggering event occurred. No contingent BCF was recognized for any of the Preferred Shares for the years ended December 31, 2015, 2016 and 2017, respectively.

Table of Contents

As the Preferred Shares (other than the Series A-1 Preferred Shares) will become redeemable solely based on the passage of time should the contingent events not occur, we chose to recognize changes in the redemption value over the period from the date of issuance to the earliest redemption date of the Preferred Shares using the interest method.

### Modification of redeemable convertible preferred shares

We assess whether an amendment to the terms of its redeemable convertible preferred shares is an extinguishment or a modification using the fair value model. If the change in fair value of the redeemable convertible preferred shares immediately after the amendment exceeds 10% from the fair value of the redeemable convertible preferred shares immediately before the amendment, the amendment is considered an extinguishment. An amendment that does not meet this criterion is a modification. When redeemable convertible preferred shares are extinguished, the difference between the fair value of the consideration transferred to the redeemable convertible preferred shareholders and the carrying amount of the redeemable convertible preferred shares (net of issuance costs) is treated as a deemed dividend to or contribution from the redeemable convertible preferred shareholders. When redeemable convertible preferred shares are modified, a new effective interest rate to equate the future contractual cash flows (redemption amount) to the carrying amount is determined and applied to accretion on a prospective basis by analogy to ASC 470-50.

### Share-based Compensation Expense and Valuation of Our Ordinary Shares

We account for share-based compensation in accordance with ASC topic 718, *Compensation-Stock Compensation*, or ASC 718.

We have elected to recognize share-based compensation using the straight-line method for all share-based awards granted with graded vesting based on service conditions. Forfeiture rates are estimated based on historical experience and future expectations of employee turnover rates and are periodically reviewed. If required vesting conditions are not met and the share-based awards are forfeited, previously recognized compensation expense relating to those awards are reversed. ASC 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in the subsequent period if actual forfeitures differ from initial estimates. To the extent we revise these estimates in the future, the share-based payments could be materially impacted in the period of revision, as well as in following periods. Share-based compensation expense was recorded net of estimated forfeitures such that expense was recorded only for those share-based awards that are expected to vest.

We account for share-based awards issued to non-employees in accordance with ASC subtopic 505-50, *Equity: Equity-based Payments to Non-Employees*, or ASC 505-50. The measurement date of the fair value of a share-based award issued to a non-employee is the date on which the counterparty's performance is completed as there is no associated performance commitment. The expense is recognized in the same manner as if we had paid cash for the services provided by non-emloyees.

We, with the assistance of an independent third party valuation firm, determined the fair value of share-based awards granted to employees and non-employees.

We calculated the estimated fair value of the options on the respective grant dates using a binomial option pricing model with assistance from independent valuation firms, with the following assumptions:

|  | 2016 | 2017 |
| --- | --- | --- |
| Risk-free interest rate | 2.27% | 2.27% |
| Volatility | 43.45% | 43.37% |
| Expected exercise multiple | 2.3 | 2.3 |
| Dividend yield | — | — |
| Exercise price | US$ 0.51 | US$ 0.51 |
| Fair value of option | US$ 0.49 | US$ 0.53 |

99

**Table of Contents**

Determining the fair value of the share options required us to make complex and subjective judgments, assumptions and estimates, which involved inherent uncertainty. Had we used different assumptions and estimates, the resulting fair value of the share options and the resulting share-based compensation expenses could have been different.

The following table sets forth the fair value of options and ordinary shares estimated at the dates of option and restricted share unit, or RSU, grants indicated below with the assistance from an independent valuation firm:

| Date of Options/RSUs Grant | Options/RSUs Granted | Exercise Price | Fair Value of Option/ RSU | Fair Value of Ordinary Shares | Discount for Lack of Marketability | Discount Rate | Type of Valuations |
|---|---|---|---|---|---|---|---|
| August 6, 2016 | 60,103,247 | US$0.51 | US$ 0.49 | US$ 0.82 | 12% | 17.5% | Retrospective |
| February 14, 2017 | 127,163,896 | US$0.51 | US$ 0.53 | US$ 0.89 | 9% | 17.5% | Retrospective |
| December 15, 2017 | 720,000 | — | US$ 1.92 | US$ 1.92 | 4% | 16.5% | Retrospective |

Valuations of our ordinary shares were determined in accordance with the guidelines outlined in the American Institute of Certified Public Accountants' Practice Aid, Valuation of Privately–Held Company Equity Securities Issued as Compensation, and with the assistance of an independent appraisal firm from time to time. The assumptions we use in the valuation model are based on future expectations combined with management judgment, with inputs of numerous objective and subjective factors, to determine the fair value of our ordinary shares, including the following factors:

- our operating and financial performance;

- current business conditions and projections;

- our stage of development;

- the prices, rights, preferences and privileges of our convertible preferred shares relative to our ordinary shares;

- the likelihood of achieving a liquidity event for the ordinary shares underlying these share-based awards, such as an initial public offering;

- any adjustment necessary to recognize a lack of marketability for our ordinary shares; and

- the market performance of industry peers.

In order to determine the fair value of our ordinary shares underlying each share-based award grant, we first determined our business enterprise value, or BEV, and then allocated the BEV to each element of our capital structure (convertible preferred shares and ordinary shares) using a hybrid method comprising the probability-weighted expected return method and the option pricing method. In our case, three scenarios were assumed, namely: (i) the liquidation scenario, in which the option pricing method was adopted to allocate the value between convertible preferred shares and ordinary shares, and (ii) the redemption scenario, in which the option pricing method was adopted to allocate the value between convertible preferred shares and ordinary shares, and (iii) the mandatory conversion scenario, in which equity value was allocated to convertible preferred shares and ordinary shares on an as-if converted basis. Increasing probability was assigned to the mandatory conversion scenario during fiscal year 2015 and the subsequent periods in light of preparations for our initial public offering.

In determining the fair value of our ordinary shares, we applied the income approach / discounted cash flow, or DCF, analysis based on our projected cash flow using management's best estimate as of the valuation date. The determination of the fair value of our ordinary shares requires complex and subjective judgments to be made regarding our projected financial and operating results, our unique business risks, the liquidity of our shares and our operating history and prospects at the time of valuation.

Fair value of our ordinary shares increased from US$0.82 in June 2016 to US$0.89 in February 2017 was primarily due to the decrease of the marketability discount.

100

Table of Contents

Fair value of our ordinary shares increased from US$0.89 in February 2017 to US$1.92 in December 2017 was primarily due to (i) the organic growth of our business; (ii) we became the largest internet video streaming service in China in terms of user time spent and average total MAUs in 2017, according to iResearch; (iii) the conversion of convertible notes invested by external investors in January 2017 were converted into Series G preferred shares in October 2017, which improved our financial situation; (iv) a review of our actual financial performance achieved in 2017, which made our projected financials less uncertain and decreased our discount rate from 17.5% to 16.5%; and (v) the marketability discount decreased from 9% in February 2017 to 4% in December 2017.

**Recently issued accounting pronouncements**

Please see a more detailed discussion in Note 2 to our consolidated financial statements included elsewhere in this prospectus.

Table of Contents

**INDUSTRY**

According to the iResearch Report, China has the largest internet and mobile internet user base in the world, with approximately 765 million internet users, including 752 million mobile internet users, as of December 31, 2017. China's internet and mobile internet user base is expected to reach 880 million and 870 million, respectively, as of December 31, 2022, according to the same report. Internet will continue to reshape many aspects of people's lives in China, including entertainment.

The entertainment industry in China is still at an early stage of development, compared with that of developed economies. The ratio of culture and entertainment industry GDP to total GDP was 4.1% in China in 2016, according to the National Bureau of Statistics of China, compared with 6.5% in the United States, according to the iResearch Report. As China's per capita GDP continues to grow, the culture and entertainment industry in China, propelled by rapidly improving internet infrastructure and increasing consumer demand for entertainment, is poised for sustainable and strong growth in China.

According to the iResearch Report, the market size of China's entertainment industry is expected to reach approximately RMB2,768.6 billion by 2022, representing a CAGR of 17.3% since 2016. China's entertainment industry is comprised of online and offline entertainment. Online entertainment industry in China consists of internet video, live broadcasting, short-form video, online literature, digital music and recreational internet anime and comic markets.

**Online Entertainment Industry in China**

Consistent with the global trend, people in China have been increasingly transitioning from enjoying traditional offline entertainment to online entertainment. In China, average daily time spent per user on TV has decreased from 169 minutes in 2012 to 152 minutes in 2016, while average daily time spent per mobile device on mobile internet video across all platforms has increased from 13 minutes in 2012 to 95 minutes in 2016, representing a CAGR of 63.6%, according to the iResearch Report. Furthermore, according to the same report, in 2016, daily time spent on internet video per device in China has surpassed that in the United States.

The following chart demonstrates the historical and projected market size of China online entertainment industry from 2012 to 2022.

**China online entertainment industry market size**



Source: the iResearch Report

102

Table of Contents

Internet entertainment is gaining popularity in China mainly for the following reasons:

- Internet entertainment is available anytime and anywhere, which enables users to choose entertainment according to their tastes instead of availability.

- Technology enables a variety of innovative entertainment formats, further expanding users' internet entertainment options.

- Internet entertainment platforms can leverage data analytics to personalize content delivery and enhance user experience.

- Internet entertainment enjoys greater creative flexibility and provides a broader range of choices that cater to a larger user base than traditional forms of entertainment, which are more restricted in their content and forms of distribution.

**Internet Video Industry in China**

*Rapid Growth of Internet Video Industry in China*

Video is the leading online entertainment format in China. Internet video industry in China has experienced rapid growth. According to the iResearch Report, in 2016, out of total time spent by users on online entertainment in China, over 80% was spent on internet videos. According to the same report, China's internet video users have increased from 372 million in 2012 to 545 million in 2016, and is expected to further increase to 766 million in 2022, representing 66.4%, 74.6%, and 87.0% of total internet users in China in these respective years.

The growth of internet video industry in China is driven largely by the following factors:

- Internet video platforms are increasingly functioning as key aggregators and distributors of entertainment content. Internet video platforms provide a broad range of content verticals that cater to different users, effectively competing for a greater share of users' entertainment time. Video platforms have become increasingly engaged in various stages of content production and introduced diversified, personalized video content to cater to their large user base.

- Internet video platforms, powered by AI and big data technologies, can deliver more customized entertainment experience.

- Internet video platforms enable users to conveniently post, view and share videos, providing an interactive and engaging user community.

*High-quality and Rich Content is Critical to Internet Video Platforms in China*

As Chinese users become more focused on the quality and originality of video content, having a deep collection of high-quality entertainment content and possessing related intellectual property rights is critical to the success of internet video platforms in China. As a result, China's internet video platforms focus on professionally-produced content, or PPC, to cater to viewers' demand. Internet video platforms in China typically rely on a combination of self-production and broadcasting-right-licensing models to ensure the supply of PPC on the platforms. A professional team with expertise in systematically producing, licensing and promoting of high-quality content is essential for continued success of an internet video platform in China.

Developing various forms of entertainment content based on popular IP has also become an important trend in the internet video industry in China. Derivative forms of content based on popular IP, such as drama series, films and animation, enhance users' entertainment experience. Users interested in one entertainment format are likely drawn to other works inspired by the same IP, enabling internet video platforms to achieve synergy among different content formats around the same IP.

103

Table of Contents

The internet video industry in China also benefits from a highly fragmented content production and distribution ecosystem. Whereas cable TV distributors in the United States often operate their own vertically integrated content production units, traditional TV networks in China are typically separated and distinct from content producers. According to the iResearch Report, as of December 31, 2017, China had over 2,000 TV networks and over 14,000 video content production studios that are largely independent of the TV networks. This industry landscape provides leading internet video platforms in China with greater bargaining power in procuring quality content and expanding content libraries. Additionally, content production is highly decentralized in China. In 2017, the top 50 video titles aired over the internet in China were produced or co-produced by 81 different studios, according to the iResearch Report. In contrast, internet content distribution is dominated by a few leading players in China. In 2017, the top three internet video platforms in China occupied around 73.8% of users' time spent on all internet video platforms, according to the iResearch Report.

### *Monetization Opportunities in the Internet Video Industry in China*

Internet video platforms in China currently generate revenues mainly from membership services and online advertising. Monetization through derivative works is also expected to become an increasingly important revenue source. The industry has shifted from heavy reliance on online advertising revenues to a more balanced and diversified revenue generation model.

*Membership services*. Chinese consumers are increasingly willing to pay fees to internet video platforms to access premium content and quality services. According to the iResearch Report, paying ratio of internet video users in China, as measured by number of users who pay for video content related services during the year as a percentage of total number of internet video users in the same year, has increased from approximately 1.2% in 2012 to 13.2% in 2016, and is expected to further increase to 40.0% in 2022. Membership services payments from users can be re-invested by the platforms to produce or acquire more premium content, reinforcing and augmenting the services' value proposition to consumers, thereby attracting more paying users. Additionally, users who pay in the form of membership package are likely to visit the platforms more often, increasing user stickiness and related monetization opportunities. According to the iResearch Report, Netflix's domestic paying members as of the end of 2016 represented approximately 28.1% of total internet video users in the United Stated in 2016. In terms of the average revenue per paying user, or ARPU, Netflix's U.S. domestic streaming segment's ARPU was approximately US$110.5 in 2016, according to the iResearch Report, implying significant growth potential for internet video platforms in China. We believe that the convenience and high penetration of mobile internet, online payment methods and improving IP protection are conducive to the growth of membership services market size in China.

**China internet video industry membership services market size**



| Source: | the iResearch Report |
|---|---|
| Note: | Market size of "membership services" in the above chart includes payments from users for video related services, including membership package and on-demand payments. |

**Table of Contents**

We believe that the membership services market has significant room for growth as China's internet video industry continues to develop. The membership services model is still at an early stage of development in China, relative to that in the United States. According to Motion Picture Association of America, the movie box office in the Northern America was US$11.4 billion in 2016, while the domestic membership services revenue from Netflix was approximately US$5.1 billion in the same year. In contrast, according to GAPPRFT, the movie box office in China was approximately RMB45.7 billion (US$6.9 billion) in 2016, while the membership services market size of the entire internet video industry in China was approximately RMB12.1 billion (US$1.8 billion) in the same period, according to the iResearch Report.

*Online Advertising*. Online advertising in China has experienced rapid growth and is expected to continue its growth momentum. According to the iResearch Report, China online advertising market size has increased from approximately RMB77.3 billion in 2012 to RMB290.2 billion in 2016 and is expected to reach RMB1,032.3 billion in 2022, contributing approximately 16.5%, 44.7%, and 78.5% of total advertising market size in the respective years. In particular, in-feed advertisement emerged as an innovative advertising format that enables advertisers to tailor their advertisement based on target users' profile, and is gaining increasing popularity among advertisers. According to the same report, in-feed advertising market size increased from approximately RMB2.4 billion in 2013 to RMB32.6 billion in 2016 and is expected to reach RMB360.9 billion in 2022.

Compared with traditional media, advertising on internet video platforms is gaining popularity among advertisers. The market size of traditional TV advertising as a percentage of the total advertising market size in China has decreased from approximately 22.3% in 2012 to 16.2% in 2016, and expected to further decrease to 7.1% in 2022, while market size of advertising on internet video platforms as a percentage of total advertising market size in China has increased from 1.4% in 2012 to 5.0% in 2016, and is expected to further increase to 9.6% in 2022, according to the iResearch Report. Internet video platforms appeal to advertisers because they provide a more diverse set of advertising formats, such as in-feed advertisements. Internet video platforms with a large, engaged user base and strong targeted advertising capabilities offer an especially compelling value proposition to advertisers.

**China internet video industry advertising market size**



Source:    the iResearch Report
Note:    Advertising market size in the above chart includes all advertising gross billings generated by internet video platform companies and video service segment of portal websites

*Monetization of Derivative Works*. Internet video platforms in China also generate increasing revenues from new monetization channels and opportunities, such as adapting popular entertainment content into a variety of derivative works including animation, online games, and offline merchandizing. However, this monetization

105

Table of Contents

model is still at an early stage in China, compared to the robust monetization ecosystem in developed economies such as the United States. We believe that as China's entertainment industry matures, emerging monetization models will provide internet video platforms in China with tremendous growth potential.

106

Table of Contents

Table of Contents

**BUSINESS**

**Our Mission**

We aspire to become a technology-based entertainment giant that brings fun and joy to people and their families.

**Business Overview**

iQIYI is an innovative market-leading online entertainment service in China.

We are at the forefront of the entertainment industry in China. Our corporate DNA combines creative talent with technology, fostering an environment for the continuous innovation and production of blockbuster content. Our platform features highly popular original content, as well as a comprehensive selection of professionally-produced and partner-generated content. Through our curated premium content, we attract a massive user base with tremendous user engagement, and generate significant monetization opportunities.

We are one of the largest internet companies in China in terms of user base. We have successfully built iQIYI into a widely-recognized brand among users, content partners and advertisers, and have redefined online entertainment in China. We are the largest internet video streaming service in China in terms of user time spent and average total MAUs in 2017, according to iResearch. Through our license partner, we also operate the largest smart TV video streaming service in China as measured by monthly active devices in December 2017, according to the iResearch Report. For the three months ended December 31, 2017, we had approximately 421.3 million average mobile MAUs and approximately 126.0 million average mobile DAUs, while our average PC MAUs and average PC DAUs reached 424.1 million and 53.7 million, respectively. In December 2017, our users watched a total of 9.2 billion hours of videos on our platform, and spent an average of 1.7 hours per day per user watching video content on our mobile apps. We have also built a leading entertainment-based social media platform, iQIYI Paopao, for fans to follow and interact with celebrities and the entertainment community. iQIYI Paopao had approximately 45.8 million average mobile DAUs for the three months ended December 31, 2017.

We pride ourselves in establishing a track record of producing blockbuster original content. In 2017, our original content accounted for 5 of the top 10 original internet variety shows and 6 of the top 10 original internet drama series in China based on each title's peak monthly active users, according to the iResearch Report. *The Lost Tomb* ( 盗墓笔记 ), one of the first high-budget original internet drama series in China that we released in 2015, generated more than 100 million video views within the first 24 hours of debut and over 4 billion video views in total. Since 2015, we have released several award-winning multi-genre original titles, such as *The Mystic Nine* ( 老九门 ) and *Burning Ice* ( 无证之罪 ), which two titles in aggregate have generated approximately 13 billion video views. We also pioneered and produced a number of internet variety shows that are highly popular, such as *Qipa Talk* ( 奇葩说 ), released in 2014 and currently in its fourth season*,* and *The Rap of China* ( 中国有嘻哈 ), each of which has generated over 3.0 billion video views. Leveraging on our initial success, we have extended selected popular titles into multi-season format.

Our powerful content distribution capability makes us the go-to partner in China for premium content providers. Equipped with our deep-learning predictive algorithms and massive user data, we have developed industry-leading tools to select third-party content. During 2017, iQIYI featured 42 of the top 50 most popular drama series, variety show and film titles streamed on the internet in China based on each title's peak monthly active users, according to the iResearch Report. We have also built a comprehensive content library catering to the diverse tastes of our users, and cultivated emerging content providers. Our growing network of iQIYI partner accounts provides us with high-quality partner-generated content. This network also enables thousands of content providers to distribute content effectively and monetize their followings through revenue sharing arrangements with us.

We distinguish ourselves in the online entertainment industry by our leading technology platform powered by advanced AI, big data analytics and other core proprietary technologies. Our core proprietary technologies are

107

Table of Contents

critical to producing content that caters to user tastes, delivering superior entertainment experience to our users, improving operational efficiency, and increasing return on investment for our advertisers and monetization opportunities for content providers. For example, for our highly popular original title *The Rap of China* ( 中国有嘻哈 ), we used advanced AI technology in our casting process to select the most suitable celebrities for the show as well as for real-time frame analysis to study user preferences.

We have developed a diversified monetization model to capture multiple opportunities arising from the rapid growth of the online entertainment industry in China. We generate revenues through membership services, online advertising services and a suite of IP-related monetization methods, including content distribution. We pioneered a large scale paid content subscription business in China. Our membership services revenue increased by 277.5% from RMB996.7 million in 2015 to RMB3,762.2 million, and further by 73.7% from RMB3,762.2 million in 2016 to RMB6,536.0 million (US$1,004.6 million) in 2017. Membership services revenue as a percentage of total revenues increased from 18.7% in 2015 to 33.5% in 2016, and further to 37.6% in 2017. For the foreseeable future, we expect membership services as a percentage of total revenues to remain at a similar level as that in 2017. We appeal to advertisers through broad and efficient user reach, as well as innovative and effective advertising products. Our online advertising revenue grew by 66.2% from RMB3,399.9 million in 2015 to RMB5,650.4 million in 2016, and further by 44.4% from RMB5,650.4 million in 2016 to RMB8,158.9 million (US$1,254.0 million) in 2017. We have proven capabilities of adapting a single popular work into a variety of entertainment products, creating multiple channels to amplify the popularity and monetary value of the original work. Our sophisticated monetization model fosters an environment for high-quality content production and distribution on our platform, which in turn expands our user base and increases user engagement, creating a virtuous cycle.

We enjoy significant synergies with our parent company Baidu. Baidu has provided us with technology, infrastructure and financial support. Our close cooperation in AI technology, user traffic and infrastructure sharing allows us to strengthen our respective leading market positions. We have no experience operating as a stand-alone public company. After this offering, we will face enhanced administrative and compliance requirements, which may result in substantial costs. Furthermore, upon the completion of this offering, Baidu will beneficially own all of our outstanding high voting Class B ordinary shares and continue to be our controlling shareholder. Baidu's voting control may cause transactions to occur that might not be beneficial to you as a holder of ADSs and may prevent transactions that could have been be beneficial to you. See "Risk Factors—Risks Related to Our Carve-out from Baidu and Our Relationship with Baidu—Baidu will control the outcome of shareholder actions in our company." As our business continues to grow and after we become a public company, we expect to rely less on financing support from Baidu and increasingly rely on net cash provided by operating activities, financing through capital markets and commercial banks for our liquidity needs.

We have grown rapidly with total revenues increasing by 111.3% from RMB5,318.6 million in 2015 to RMB11,237.4 million in 2016, and further by 54.6% from RMB11,237.4 million in 2016 to RMB17,378.4 million (US$2,671.0 million) in 2017. We had net losses of RMB2,575.1 million, RMB3,074.0 million, and RMB3,736.9 million (US$574.4 million) in 2015, 2016, and 2017, respectively.

## Our Competitive Strengths

We have successfully built iQIYI into a widely-recognized brand among users, content partners and advertisers, and have redefined online entertainment in China. We believe our success to date is primarily attributable to the following key competitive strengths:

### *We Have a Massive and Highly Engaged User Base*

We are one of the largest internet companies in China in terms of user base. According to iResearch, our iQIYI mobile app had the fourth largest mobile MAU base and ranked second in terms of total user time spent, in each case among all mobile apps in China in December 2017.

108

**Table of Contents**

We are the largest internet video streaming service in China in terms of user time spent and average total MAUs in 2017, according to iResearch. We are the largest internet video streaming service in China in both mobile app and PC in terms of MAUs, average DAUs and total user time spent in December 2017, according to the iResearch Report. In December 2017, among video streaming services, we had 32.8% total time spent market share on mobile app, and 31.2% total time spent market share on PC, according to the iResearch Report. We have consistently ranked No. 1 since July 2015 in terms of combined PC and mobile video streaming total time spent market share, according to iResearch. Through our license partner, we also operate the largest smart TV video streaming service in China as measured by monthly active devices in December 2017, according to the iResearch Report.

We have a highly engaged user base. In December 2017, our users spent an average of 1.7 hours per day per user watching video content on our mobile apps. In December 2017, our iQIYI mobile app ranked No. 1 in terms of average monthly time spent per user among all internet video streaming mobile apps in China, according to iResearch. We have also successfully built iQIYI Paopao as a leading entertainment-based social media platform for fans to interact with celebrities and the entertainment community. By strengthening the connection between fans, celebrities and content, our platform enhances user engagement and stickiness.

### We Produce Highly Popular, Trend-setting Original Content

Over the years, we have developed industry-leading content origination and self-production capability. We produce highly popular, trend-setting original content, which attracts a massive user base and differentiates us from competitors. In 2017, we released 5 of the top 10 original internet variety shows and 6 of the top 10 original internet drama series in China, according to the iResearch Report.

We have established a proven approach to producing original blockbuster content. We have a large pool of creative talents within our company who incubate original ideas. Our highly experienced in-house creative talents collaborate closely with IP owners, authors, screenplay writers, performers, and other partners in the content creation process. We continually release successful original titles and expand original content genres. For example, in 2017, our self-produced rap reality show, *The Rap of China* (中国有嘻哈), transformed hip-hop music from a niche entertainment format into a cultural phenomenon in China. *The Rap of China* (中国有嘻哈) has generated over 3.0 billion video views.

### We Offer Premium Third-party Content and a Vast and Diversified Content Library

Equipped with strong content distribution capability, we are the go-to internet video streaming platform in China for premium content providers. Our strong partnership with premium content providers enables us to continually curate a comprehensive repertoire of blockbuster content. Our platform featured 42 out of the top 50 most popular drama series, variety show and film titles streamed on the internet in China during 2017, according to the iResearch Report. In addition to top Chinese content providers, we collaborate with leading global premium content providers, including the "Big Six" Hollywood production studios, top TV networks in the U.S. and Netflix, which further enriches our premium content offerings.

To cater to the tastes of Chinese users across their diverse spectrum, in particular the long-tail content interests of our users that individually generate lower level of video views but collectively make up significant content demand, we license content from thousands of professional content providers and have built a vast and diversified library of professionally produced content. As of December 31, 2017, our content library included over 70,000 titles of drama series, variety shows, films, kids programs, documentaries, animations, sports programs as well as other various genres of program, covering more than 30 content categories. This vast and diversified content library has helped us attract users of different ages and backgrounds and increase user engagement.

Table of Contents

### We Cultivate a Vibrant Partner-generated-content System

China's content production industry is highly fragmented. There are thousands of domestic content production houses and emerging internet content providers that lack adequate distribution channel and monetization capability. We have partnered with content providers with proven track records or great potentials and developed iQIYI partner accounts, an internet content open platform, to cultivate a vibrant partner-generated-content system. We set industry standards for new online content formats. For example, our 60-plus-minute length standard for internet films has been widely accepted by the market.

We empower content providers to efficiently distribute content to our massive users and build their own fan base. Our big data analytics tools enable content providers to reach targeted users and improve content production quality. We help content providers to monetize their content in multiple ways, such as paid video views, virtual item rewards, and advertisements, and we strengthen our partnership through revenue sharing arrangements. As a result, content providers can effectively distribute and monetize their content on our platform, and are motivated to continually create popular content for us, which further enriches our content offerings to allow us to attract more users, creating a virtuous self-reinforcing cycle. For example, in 2017, 533 internet film production houses in China distributed over 1,300 internet films on our platform.

### We Capture Extensive Monetization Opportunities

We are the frontrunner in content monetization in China. Leveraging our industry-leading content creation and distribution capabilities, we have developed extensive monetization means that primarily generate revenues through membership services, online advertising and content distribution. We also generate revenues through a suite of IP-related monetization channels.

We reshaped the internet video streaming industry in China by successfully cultivating users' willingness to pay for content. As of December 31, 2017, we had approximately 50.8 million subscribing members, representing 68.4% year-over-year growth. Our blockbuster content and innovation in operations continually enable us to expand our member base. For example, *The Lost Tomb* ( 盗墓笔记 ), our premium original internet series, was released in June 2015. After two trial episodes, we altered the traditional weekly broadcasting schedule to release the complete season for members, which successfully attracted approximately 3.3 million new subscribing members. Our original titles have started generating meaningful revenues with efficient cost structure.

We have attracted a large base of brand advertising customers, and further expanded our online advertising customer base by rapidly ramping up our in-feed ads. Leveraging our highly popular original content, we are further improving our brand advertising pricing power and making further inroads into the traditional TV brand advertising budgets of advertisers. For example, the price for a 60-second ad spot during the season finale of *The Rap of China* ( 中国有嘻哈 ) reached a record breaking RMB45 million.

Leveraging our high-quality original content and massive user traffic, we generate revenues through a suite of IP-related monetization channels, such as content distribution, live broadcasting, online games and IP licensing. Our IP ownership of the original content gives us flexibility in derivative content adaptations. Moreover, we monetize our massive traffic by providing online games and live broadcasting services on our platform.

### We Have Developed a Robust Technology Platform

We have developed a robust technology platform that powers every major aspect of our business, including content creation, production, procurement, categorization, distribution, display, intellectual property protection and monetization, as well as customer service.

For users, our proprietary visual and audio technology allows us to deliver a reliable, immersive and rewarding entertainment experience. We have developed sophisticated big data analytics capability and built a massive user and content database, which enable us to profile our users precisely and deliver accurate and personalized content recommendation.

110

Table of Contents

For internal business operations, our technology makes us more efficient. Our AI allows us to more accurately forecast box office and internet traffic impact of new title releases, which optimizes our selection of content and improves return on investments in content acquisition. For example, powered by deep learning algorithms, our 180-day forecast model of box office receipts for 100 films achieved a statistically significant accuracy rate of above 80%. In addition, technology also plays an important role in our content creation process. We also leverage our big data technology to intelligently match suggested cast with screenplay's character settings.

For our advertising customers and content partners, our sophisticated advertising technology tailors advertisement distribution based on user behavior and content label, resulting in higher level of engagement and return-on-investment, while maintaining user experience. Our technology is also critical to increasing return on investment for our advertising customers and content partners.

### We Enjoy Significant Synergies with Baidu

We enjoy significant synergies with our parent company, Baidu. Under the master business cooperation agreement with Baidu, we carry out cooperation in many areas, including AI technology, Smart devices/DuerOS, cloud, online advertising, internet traffic, data and content. The close cooperation allows us to strengthen our respective leading positions.

Our premium and comprehensive content library has significant synergies with Baidu's massive user traffic. Our technology team regularly engages in joint developments with Baidu on advanced AI know-how. We leverage our cooperation with Baidu to form clearer content interest graphs of our users. Our access to Baidu's cloud IT infrastructure such as cloud computing and cloud storage on favorable terms provides us with advantages in performance and technology innovation. See "Our Relationship with Baidu" for a more detailed description of our cooperation with Baidu.

### We Have a Visionary Management Team

We have a visionary management team with a proven track record of entrepreneurial success, as well as solid, diverse and complementary backgrounds. Dr. Yu Gong, our chief executive officer and founder, possesses deep entrepreneurship and extensive managerial experience. Under his leadership, iQIYI has grown to become the leader in China's internet video industry. Dr. Gong is a successful serial entrepreneur and a pioneer in China's internet and entertainment industries. Before founding iQIYI, Dr. Gong founded focus.cn in 1999, the then largest real estate website in China, which was acquired by Sohu, a Nasdaq-listed company, in 2003. Dr. Gong continued to serve as Sohu's chief operating officer until 2008.

Other members of our senior management team have extensive and complementary experiences in a wide range of fields, covering technology, internet, entertainment, finance and operations. Together with Dr. Gong, they have led our company to continually drive innovation and achieve market leadership in China. We are confident that our senior management will further grow our company, strengthen our iQIYI brand, and pave the way for us to achieve our mission.

### Our Strategies

We intend to pursue the following strategies to further grow our business:

### Enrich and Expand Our Blockbuster Content

Our content production capability is vital to the quality and popularity of our original content. Such capability includes, among others, our expertise in identifying original literary titles or scripts with the most potential, nurturing promising artistic talents and executing impactful marketing campaigns. We will leverage our deep understanding of entertainment, users and content, as well as advanced technology to systematically produce phenomenal original titles. We intend to allocate approximately 25% of the net proceeds from this offering towards original content production over the next three to five years.

111

**Table of Contents**

We intend to pursue the following initiatives to strengthen our content production capability:

- *Dolphin Program*—We plan to invite renowned production companies to competitively bid for roles in producing our most popular internet drama series, and our payment to such production companies will be in the form of a guaranteed fee plus revenue sharing.

- *Young Tiger Program*—We intend to increase our financial and platform resource support to producers, directors, screenplay writers and other artists in their entrepreneurship efforts. Through such support, we plan to foster the creation of quality content and further raise our industry profile.

- *Swan Program*—To alleviate the scarcity of high-quality acting talent and reduce the high cost of engaging such talent in China, we intend to systematically discover and nurture young acting talent through training camps. We also plan to promote our trainees through acting roles in popular featured programs.

### *Broaden Our Content Offerings to Stay Abreast of Evolving User Preferences*

We intend to expand our content offerings, especially our coverage of long-tail and new media format content, and develop a diverse content universe. We intend to allocate approximately 25% of the net proceeds from this offering towards the expansion of non-original content offerings.

Among the various long-tail content verticals, we will devote more resources towards analyzing the content and entertainment consumption preferences and trends of the millennial and younger generations in China. We will remain dedicated to deploying long-tail content that is most popular among young people, such as ACGN. We plan to increase the number of iQIYI partner accounts hosted on our platform, and we will further improve their functionalities for producing, sharing and engaging with long-tail content.

We intend to dedicate more resources towards content development in new media formats, thereby driving the evolution of China's online entertainment. We believe technological revolution will lead to the bourgeoning of new media formats, which will bring about content revolution. We will continually upgrade the technological infrastructure of our platform to support the distribution of new interactive and social content, such as live broadcasting, virtual reality and augmented reality content.

### *Expand Our User Base and Strengthen Our Content Distribution Capability*

We intend to continue to expand our user base. We are dedicated to making our platform more attractive to the tastes of different age groups by offering, through both original content production and collaboration with third parties, a diverse selection of premium content. We intend to provide our users with superior and more personalized entertainment experience through technological innovations. We will continuously enhance the functions of iQIYI Paopao and enrich our library of online games, online literature, animations and comics. We plan to collaborate with a variety of participants in the internet industry, especially those with effective user acquisition channels.

We also intend to strengthen our content distribution capability. A large and diverse selection of premium content, coupled with augmented derivative products, will attract more users and incentivize users to stay longer on our platform. Consequently, high-quality content providers will have greater incentive to partner with us and distribute their content to our user base, which in turn attracts more users and enhances user engagement, creates a virtuous self-reinforcing loop.

### *Bolster Our Monetization Channels*

We plan to develop diversified monetization channels based on our premium and rich content, as well as our massive user traffic.

112

Table of Contents

In terms of membership services, we aim to further increase our paying user conversion rate and expand our paid content system from a single membership package into a multi-layer subscription system addressing diversified demands of our members, whereby members can subscribe for various paid content verticals that meet their content consumption needs. We intend to focus on content verticals with substantial monetization potential, including education, ACGN and sports, etc.

In terms of online advertising, we will provide more innovative and integrated advertising solutions to advertisers. We intend to expand our in-feed advertising service. For brand advertising, we plan to closely collaborate with Baidu to strengthen our targeting capability to increase the effectiveness and efficiency of the advertising campaigns launched on our platform. Furthermore, we plan to upgrade our advertising technology capability to drive online automated advertising service purchases by our advertising customers.

Moreover, we plan to bolster our content distribution and other monetization channels. We believe as we further expand our user base, improve our user stickiness and reinforce our entertainment ecosystem, we can achieve large-scale application of these monetization channels quickly.

### Continue Our Technological Innovations

We will continue our technological innovations and utilize the power of AI and big data technologies to better serve iQIYI's ecosystem. We intend to allocate approximately 10% of the net proceeds from this offering towards pursuing such strategy.

- *Original content production*: We will continue to guide our original content investment and production through enhanced multimedia, advanced content tagging and deep-learning technologies. During the content production process, we aim to collaborate with Baidu to leverage its AI technology to further improve our editing, tagging, auditing, as well as video description capabilities.

- *Entertainment experience*: We intend to provide enhanced entertainment experience through advanced AI technology. We plan to continue devoting resources towards development in audio, video and content delivery technologies. We will also continue to develop technologies that optimize our content display on different platforms and hardware devices.

- *Content recommendation*: We plan to further develop advanced AI and big data technologies to optimize our precise content recommendation capability. Through better content recommendation, we plan to stimulate users to engage with a broader range of content on our platform, thereby increasing user stickiness and retention.

- *Service to advertisers and content partners*: We plan to further improve our customized and scenario-based advertising technology, as well as technology for efficiently monetizing professional and user-generated content.

### Our Services

We provide our users with a variety of services encompassing internet video, live broadcasting, online games, online literature, animations, e-commerce and social media platform.

### Video

We are dedicated to producing premium original video content and distributing appealing professionally-produced content or PPC, partner-generated content, or PGC and user-generated content, or UGC. We offer a diverse collection of high-quality internet video content that appeals to users from broad demographics.

As of December 31, 2017, our comprehensive video content library included over 70,000 titles of drama series, variety shows, films, kids programs, documentaries, animations, sports programs, as well as various other genres.

113

Table of Contents

***Professionally-Produced Content, or PPC***

*iQIYI original content*

Our original content includes both content produced in-house and content produced in collaboration with quality third-party partners. As of December 31, 2017, we have released 141 titles of original internet drama series, internet movies, variety shows and other programs with over 74 billion video views.

We produce certain original content titles in-house, such as the popular variety show *The Rap of China* (中国有嘻哈). These programs are produced by iQIYI from IP incubation to distribution. See "—Case Study: *The Rap of China*" for details. Some other original content is produced in collaboration with partners, such as popular internet drama series *The Lost Tomb* (盗墓笔记), *The Mystic Nine* (老九门) and *The Ferry Man* (灵魂摆渡). iQIYI obtains the IP through production, adaptation or purchase from third party, while the partner, usually an entertainment production company, is responsible for its development and production. iQIYI maintains a high degree of control during the development and production process.

We also adapt high-quality IP into multiple entertainment products, such as online games, animations, online literature, and derivative merchandise.

*Licensed content*

In addition to original content, we also provide users with a curated selection of high-quality PPC from third parties. Leveraging our expertise in content selection, we have successfully debuted well-received titles such as the *Descendants of the Sun* (太阳的后裔) and *My Love from the Star* (来自星星的你) in China, which were released in parallel in South Korea and became highly popular among Chinese audience.

We license video content typically at fixed rates for a specified term. The average term of licenses varies depending on the type of content, with films and drama series having an average term of six years and nine years, respectively. We generally renew our licenses when they expire. Payments of licensing fees are generally made in installments throughout the duration of the licenses. We also exchange rights to distribute licensed content with other internet video streaming services to enrich our content library. In certain cases, we have the right of first refusal to purchase new content produced by the licensor.

We leverage our content procurement team's insights and our big data analytics capabilities, such as iQIYI Brain, to optimize content procurement. We have established strong partnerships with content providers to ensure access to high-quality content. These partners include leading domestic drama series production companies, film production companies and TV stations, "Big Six" Hollywood production studios, top TV networks in the U.S. and Netflix.

***Partner-Generated Content, or PGC and User-Generated Content, or UGC***

We collaborate with a large number of selected partners to supplement our video content portfolio with PGC, and incentivize them to submit high-quality content through our revenue-sharing mechanism. PGC expands our video collection to cover long-tail content and captures a broader user base. Content providers upload their videos onto their iQIYI partner accounts, a platform where content providers offer video, comics, literature, graphic and textual content. Users can subscribe for and follow their favorite iQIYI partner accounts. We have partnered with over 130,000 content providers in 2017 through iQIYI partner accounts.

We have stringent criteria for the selection of iQIYI partner accounts to ensure the quality of our video content. To apply, a registered user has to upload at least four original copyright videos, and accumulate at least 1,000 video views. Corporate applicants have to provide copies of business registration information and individual applicants have to provide copies of governmental IDs. Our operations team then evaluates the quality of uploaded videos before final approval.

114

**Table of Contents**

iQIYI partner accounts enjoy a wide array of functions on our platform, such as customization of their display pages, uploading 4K videos, and enhanced user exposure through automated recommendation system. To assist our iQIYI partner accounts' monetization efforts, we share with them marketing data, offer advertisement customization tools, and provide an expedient payment system.

Our platform also allows regular registered users to easily upload, watch and share video content generated by themselves. UGC effectively promotes our brand, diversifies content, and drives user engagement and stickiness. As of December 31, 2017, we have collected approximately 70.7 million UGC videos from approximately 7.2 million users.

**Our Membership Services**

Our membership services generally provide subscribing members with superior entertainment experience that is embodied in various membership privileges. Subscribing members have early access to certain drama series aired exclusively on iQIYI platform. Subscribing members also have access to over 10,000 films for free charge, including the vast majority of films released in theaters in China, internet films exclusively aired on iQIYI, as well as popular foreign films. Membership privileges generally include substantially ad-free streaming, 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others. Subscribing member privileges also include coupons and discounts on on-demand films, as well as special privilege in offline events, such as exclusive access to live concerts.

iQIYI is an industry pioneer in offering diversified membership privileges. For example, the members-first model of *The Lost Tomb* ( 盗墓笔记 ) enabled members to gain instant access to the entire season while non-paying users could only follow weekly updates for new episodes; the viewing model of *Descendants of the Sun* ( 太阳的后裔 ) allowed members to watch new episodes at the same time they were released overseas; and certain behind-the-scene content of *The Rap of China* ( 中国有嘻哈 ) was accessible exclusively to our members.

We primarily offer one membership package that generally grants members access through various mobile and other hardware devices. For Android users, the list price of our membership packages is RMB15 for one month, RMB45 for three months and RMB198 for twelve months. For iOS users, the list price of our membership packages is RMB19 for one month, RMB58 for three months and RMB218 for twelve months. Membership package subscriptions are automatically renewed, unless cancelled by our users. We have also started to offer membership packages for specific content genres, such as ACGN and sports. For example, we offer a membership package for premium tennis matches. For Android users, the list price is RMB27 for one month and RMB270 for twelve months. For iOS users, the list price is RMB35 for one month and RMB353 for twelve months.

Our members primarily include subscribing members and, to a lesser extent, users who gain access to our premium content library through paid video on-demand service.

**Other Services**

*iQIYI Show*

iQIYI Show is our live broadcasting service. iQIYI Show enables users to follow their favorite hosts, celebrities and shows in real time through live broadcasting. We also edit selected live broadcasting content into short-form videos to help hosts grow their fan bases. iQIYI Show has strong interactive features to enhance user interaction and engagement. For example, during the season finale of *The Rap of China* ( 中国有嘻哈 ), users could vote for their favorite contestants on iQIYI Show to influence the final results.

*Online Games, Literature and Comics*

We distribute online games featured in various formats, including webpage games, mobile games, and H5 games. In addition to third-party games, we have also launched a number of popular online games adapted from

115

Table of Contents

same-name IP content, such as literature, drama series and films. We collaborate closely with IP providers and game development and distribution partners for game distribution and operation.

Online literature and comics plays a critical role in premium IP incubation as its user base highly overlaps with that of our video content, thereby allowing us to monitor the trend of user tastes and identify the most appropriate IP for adaptation. High-quality original online literature and comics works are adapted into script for derivative entertainment products. At the same time, certain high-quality video content is also developed into online literature and comics to further drive user stickiness on our platform.

### iQIYI Headlines

iQIYI Headlines is an AI-powered feed-based service with a focus on entertainment. It enhances user engagement by capturing users' fragmented time with targeted content recommendation.

### iQIYI Mall

iQIYI Mall is an e-commerce platform with a focus on entertainment-related merchandise, such as VR glasses. iQIYI Mall also sells other consumer products, such as electronics, apparel and accessories, beauty and skin care products.

### iQIYI Paopao Social Media Platform

iQIYI Paopao is iQIYI's entertainment-based social media platform. It connects fans with celebrities and content of their interests on a platform where fans can quickly and conveniently disseminate information in various formats. By strengthening the connection among fans, celebrities and content, the platform enhances user engagement and stickiness, and turns iQIYI Paopao into a social media platform for fans.

iQIYI Paopao features a wide range of social functions. Within each topic of interest, fans can generate content by posting texts, images and videos, as well as interact with others through features such as commenting, giving likes and private messaging. By virtue of its social media nature, iQIYI Paopao serves as the base for online and offline fans activities. Moreover, we frequently organize celebrities to interact with fans on iQIYI Paopao in real-time, to attract and retain users. iQIYI Paopao also serves as a key publicity platform for our video content. We invite popular actors of our original drama series to interact with the fans in the "Celebrity is Here" section of iQIYI Paopao to boost the content's popularity.

Users on average launch the iQIYI app much more frequently and stay on for longer, after they start to use iQIYI Paopao. Through iQIYI Paopao, we can proactively launch marketing for upcoming shows and generate strong momentum to contribute to early success. We also obtain a large amount of user feedback data to empower enhanced user behavior analysis, better content procurement and personalized content recommendation.

116

**Table of Contents**

**User Experience**

We offer entertainment content across our user-friendly and feature-rich interfaces on our website, mobile app, PC client terminal, WAP, smart TV and VR device.

**Mobile**







**PC**                                                                                          **Smart TV**



Our home page is a one-stop portal for users to access both trending and recommended content. Leveraging our big data analytics, we analyze user browsing behavior to understand their tastes and preference, and dynamically update the content shown on the home page to offer users with the most desirable content.

Our interface offers comprehensive viewing functions designed to enhance user experience. We provide various picture resolution and play options. Other key functions include screenshots, VR viewing, screen mirroring and video caching.

We also offer various social elements in our video streaming interface. Users can comment on the video content, interact with other fans through iQIYI Paopao, and share video content through other popular internet social networks.

117

**Table of Contents**

**Monetization**

We generate revenues primarily through membership services, online advertising and content distribution. We also generate revenues from IP-related monetization methods, including live broadcasting, online games, IP licensing, online literature and e-commerce.

*Membership Services*

See " —Our Membership Services."

*Online Advertising*

Our value proposition to advertisers is driven by our strong brand recognition, massive and engaged user base, perceptive understanding of consumers and precise targeting enabled by big data analytics.

The prices of our advertising services depend upon various factors, including form and size of the advertising, level of sponsorship, popularity of the content or event in which the advertisements will be placed, and specific targeting requirements. Prices for the brand advertising service purchased by each advertiser or advertising agency are fixed under sales contracts. Our in-feed advertising services are competitively priced through online bidding process.

In addition to traditional pre-video and pop-up advertisements, we also launched various innovative advertising products and solutions. For example, video-in advertisement appears on the screen when the video is showing content related to the advertised product; soft product placement incorporates the advertised product into the production of our premium original content to facilitate a more natural advertisement viewing experience; and content-integrated advertisement integrate brands with content itself, such as theme songs with lyrics embedding brand names of advertisers.

*Content Distribution*

We monetize and enrich our content through content distribution. We sub-license procured third-party content within its authorized scope to other internet video streaming services. Since inception, we have licensed video content titles to third-party platforms in more than 30 countries and regions, including films, drama series, variety shows, and others. We also enter into barter agreements to exchange internet broadcasting rights of licensed content with other internet video streaming services. The barter agreement provides the licensee with the right to broadcast the licensed content, and the licensor retains the right to continue broadcasting and/or sub-licensing the exchanged content. We distribute our selected original content to regions outside of China and to TV stations in China.

**Others**

*Live Broadcasting*

We monetize live broadcasting through user purchase of virtual items on iQIYI Show, which can be used for tipping hosts. We share revenues with hosts and their agencies.

*Online Games*

For our online games business operations, we primarily distribute third-party online games. We monetize online games through users' in-app purchases of gift packages and game privileges. Leveraging our massive user base of premium video content, we are able to adapt popular IP into online games and attract a large number of users.

118

Table of Contents

*IP Licensing*

We license our proprietary IP to third parties to develop derivative merchandise products, with a focus on long-term licensing. We also license our popular trademarks to third parties for use in their products. Our IP licensing business covers consumer products, joint marketing with other brands, online games licensing, as well as licensing of offline activities. We license both our own IPs and third-party IPs to which we have agency authorization. For example, we are in the process of licensing *The Rap of China* (中国有嘻哈) to McDonald's for certain popular themed-products; we also licensed the animation *Ben and Holly's Little Kingdom*, the copyright to which is owned by a British company, for derivative merchandise development. We collaborate with our partners generally through fixed-price licensing fees and/or revenue-sharing arrangements.

*Online Literature*

We monetize our online literature through paid reading on our platform, where readers can pay to gain access to our online literary titles. We charge readers either by whole book or by a certain amount per 1,000 Chinese characters. Readers can also subscribe to memberships for various perks, such as discount on our entire literature library, thousands of free books, accelerated growth of membership privilege levels, and free access to the latest chapter updates.

*E-commerce*

We operate iQIYI Mall, an e-commerce platform where we offer products, such as VR glasses, to our users through direct sale and third-party merchants. Products offered at iQIYI Mall consist of peripheral products of films, drama series and variety shows, generating synergy with the video content on our platform. We charge third-party merchants commissions and service fees.

119

Table of Contents

**Case Study: The Rap of China ( 中国有嘻哈 )**

*The Rap of China* ( 中国有嘻哈 ) is a Chinese rap competition and reality show produced by iQIYI in 2017 and aired exclusively on iQIYI platform from June to September 2017. Since the airing of its first episode, the show quickly grew in popularity and transformed hip-hop music from a niche entertainment format into an entertainment phenomenon in China. As of the date of this prospectus, the show had generated over 3.0 billion video views. The live broadcasting of the season finale attracted a huge number of viewers to watch simultaneously on our platform.



*Production Capabilities*

The success of the show epitomized iQIYI development team's high degree of professionalism and deep understanding of the entertainment industry. We mobilized a development team of four well-recognized producers, each with a proven track record of producing phenomenal variety shows. We also gathered a large team of professionals for the show's production, including more than 100 directors who screened contestants across the country, and a post-production editing team of around 200 professionals. By combining the expertise of industry leaders, we ensured that the show is produced with a high degree of professionalism.

More importantly, our in-depth understanding of users allows us to more accurately predict the cultural trend and our user taste. We observe that hip-hop, although still a niche music genre in China, has already been integrated into mainstream pop culture through various channels, such as apparels, trending buzzwords, and related music formats. We believe our users' demands for transformative entertainment themes and hip-hop would be the next emerging cultural trend. This insight, coupled with the assistance of the technology team enabled us to pinpoint hip-hop as the theme of the show. Our in-depth knowledge of young Chinese audience enables us to place the most appealing elements into the show.

*Technologies*

Our industry-leading big data analytics technology enhanced various aspects of the show. We utilized big data analytics to select the most appropriate celebrities who represent the tastes of a wide base of viewers. We

120

Table of Contents

also leveraged our AI technology and big data analytics in the editing and post-production efforts for our original content. For example, during the show's airing, we continuously gathered and analyzed massive amounts of data to analyze viewer preferences, which provided valuable guidance for the post-production and presentation of subsequent show episodes to our users.

### Monetization

We achieved success in monetizing the show through many innovative channels to maximize its economic value. The only 60-second advertisement during the finale was sold for RMB45 million, one of the most valued single advertisements in online entertainment in China. We collaborated with the rappers to embed brand advertisers' names into rap advertisement songs, which later became one of the most searched songs on various internet music platforms. We also licensed the show's IP for various peripheral product development, such as items sold on iQIYI Mall. McDonald's, one of the show's IP licensees, launched several show-related food items and opened theme restaurants in various Chinese cities. We organized tours in Beijing, Shanghai, Guangzhou and various other cities to further amplify the influence of the show. Building on the first season's success, we have begun to accept reservations of advertisement and sponsorship for the second season of the show, which is expected to be aired in the summer of 2018, and has received substantial interest from advertisers.

### Derivative Shows

*The Rap of China* (中国有嘻哈) also augmented our brand image as an entertainment content powerhouse. The show's popularity among young viewers encouraged us to produce a number of derivative competition and reality shows which resonate with their preference. *Hot-Blood Dance Crew* (热血街舞团) further taps into our users' passion for hip-hop culture. *Idol Producer* (偶像练习生), centered on competition for spots in a new pop idol group, brings fans interactions to a new level. Users can vote on the fate of each contestant in the show and influence the plot of the show. *Clash Bots* (机器人争霸), a soon-to-be-released show on robot battles in bullet-proof glass cages, will present the cutting-edge side of tech culture to Chinese users. These shows have already amassed significant interests from our customers to reserve advertisement and sponsorship inventory.

### Technology

Technology is the bedrock of our products and services. Approximately half of our employees are engineers dedicated to technological innovation and breakthrough. We utilize AI technology to drive the entire business, including video content creation, purchase, production, tagging, distribution, monetization and customer service, to achieve automation and intelligence in the entire business process. Our advanced technologies facilitate better content production, enhanced operation efficiency and superior user experience. To maintain our industry-leading position, we have established extensive cooperation with many industry-leading research institutes.

### Technologies to enhance Content Production and Operation Efficiency

We empower content production and monetization cycle by applying various technologies. Leveraging our massive user data and big data analytics, we have developed a comprehensive system for script evaluation and role selection in order to suit users' viewing preference. Our holistic data analysis supports content investment strategy through advanced algorithms that forecast video views and film box office, which result in more monetization opportunities and higher user value. Promising monetization capabilities then encourage the generation and distribution of more high-quality content on iQIYI platform, creating a virtuous cycle.

Our technologies also enhance our efficiency. We have leveraged AI, big data, and cloud computing technologies to distribute our massive content to targeted users accurately. Our user and content tagging system precisely analyzes user profile and conduct content recommendation. We provide personalized content distribution by intelligent recommendations. We balance user experience with video monetization by utilizing personalized and automatic advertising customized to video scenarios, video-in, video-out and other ad-marketing technology. We provide timely response and feedback service through AI-based autonomous service robots and online customer service center.

121

Table of Contents

*Technologies to Enhance User Experience*

Our advanced video, audio and AI technologies provide users with superior viewing experience in a cost-effective manner. We are the only internet video streaming service in China providing concurrent 4K high-definition video quality, HDR (High Dynamic Range) imaging, Dolby Atmos audio effect and immersive experience via 360 VR for live video streaming. We provide users with clear and smooth video play through adaptive coding technology. Leveraging our big data analytics, features such as *Green Lens* and *Watch Me Only* allow users to view only the most popular segments of the video, or segments featuring particular artists. We have one of the world's largest P2P and CDN-based HCDN (hybrid content delivery network), which seamlessly distributes and transmits massive internet video with high quality and low bandwidth cost. We apply advanced deep learning technology to areas such as advanced content tagging, user profiling, developing knowledge graph and content recommendation. Users are given recommendations based on automatic classification of their tags. Our iQIYI VR app provides an immersive viewing experience via 360 VR. QiYu 4K VR HMD is one of the first 4K mobile VR devices in the world with 3D audio.

**Sales and Marketing**

*Advertising Sales*

For brand advertising, we sell our advertising services primarily through third-party advertising agencies, including members of American Association of Advertising Agencies, or 4As, and leading Chinese advertising agencies. We primarily sell our in-feed advertising service and a portion of our brand advertising services directly to advertisers. We strategically leverage advertising agencies' existing long-term relationships and network resources to increase our sales and expand our advertiser base. Depending on the type of advertiser and content, the duration of an advertising agreement is typically 12 months.

We have an experienced sales team consisting of salespeople with prior experience at Chinese internet companies, members of 4As and domestic advertising agencies. We divide our sales team by industry across the country to ensure the delivery of targeted advertising solutions. We provide regular training to our sales team to help them provide advertisers with comprehensive information about our services.

*Brand Promotion*

iQIYI's brand values are youth, vitality and positivity. We believe that our high-quality video content and services lead to strong word-of-mouth referrals, which drives customer awareness of our brand in China. Our market position benefits significantly from our large and high-quality user base and our strong brand recognition.

Leveraging our in-depth understanding of user behavior, we employ a variety of online marketing programs and promotional activities to build our brand as part of our overall market strategy, including celebrity endorsement, hot topic dissemination through different media outlets, brand value embedment in blockbuster content, marketing alliance with Baidu, as well as resource exchange with major internet media platforms.

We host many offline activities to enhance our brand recognition. To increase members' loyalty, we organize special events for members such as on-site visits during the show productions. We also host innovative offline marketing activities such as VR advertisement. For example, *The Mystic Nine* (老九门) VR vehicle, which went on a 20-day tour in three Chinese cities, reached massive targeted users directly.

We also execute marketing strategies aimed at young users to enhance user affinity. We use innovative technology to communicate with the younger generation, such as using AR to enable user interaction at bus stops. We use social media platforms to facilitate user engagement, such as allowing users to vote for contestants in variety shows. We attract young users by offering artist-fans interactions opportunities. We also collaborate with major wireless carriers to provide monthly unlimited data package for using iQIYI app on mobile devices.

122

Table of Contents

*Content promotion*

We employ a variety of traditional and internet promotional activities to promote our content. We deploy outdoor brand advertisements, such as display ads in subway stations. Our promotional efforts are also focused on brand advertisements placed on internet TV platforms and social media campaigns. Furthermore, we also organize offline promotional events attended by popular celebrities to raise the awareness of our content offerings.

*User acquisition*

We primarily rely on organic user growth through our well-established iQIYI brand and word-of-mouth referrals. In addition, we use a combination of online and offline channels for user and traffic acquisition. Our online user and traffic acquisition efforts focus on promotion through third-party Android and iOS application stores and popular search engines. We cooperate with a number of leading smart device manufacturers in China for pre-installation of our mobile applications.

**Intellectual Property and Copyright Protection**

We highly value our intellectual property rights, which are fundamental to our success and competitiveness. We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions to protect our intellectual property rights. As of December 31, 2017, we have registered 142 software copyrights, 106 patents of invention and 1,633 patents of appearance, and have applied for the registration of 3,629 patents with the PRC National Copyright Administration. We have registered 1,380 trademarks and applied for 3,238 trademarks with the Trademark Office of the State Administration for Industry & Commerce of the PRC. Our "爱奇艺" and "爱奇艺" trademarks have been recognized as well-known trademarks by the State Administration for Industry & Commerce of the PRC.

We employ a three-phase copyright protection scheme consisting of copyright management, network monitoring, and complaint or legal action. Our proprietary copyright management system registers all procured copyrights and ensures that licensed content on our platform do not exceed its scope and term of the licensing agreement. We developed a proprietary system to detect unauthorized use of iQIYI content on other websites. We also establish various other channels for copyright protection. After a user registers and before each upload, we require the user to confirm that the content to be uploaded is in compliance with the terms and conditions set forth in the user agreement, to guarantee that he or she is the copyright owner or has obtained all necessary consents and authorizations for such content. We set technical barriers to deter illegal video content extractions. We encourage our users to report pirated content, and our copyright protection team promptly removes any suspected infringing content once we receive proper notification from the legitimate copyright owner. As a major market player in the video industry, we also attach great value to industrial response and feedback. We actively liaise with other major internet video streaming services to form industry union and collectively protect copyright.

**Content Monitoring**

We implement strict monitoring procedures to remove inappropriate or illegal content, including video, online literature, animations, iQIYI Show, comment postings, and content from other services. Our content monitoring team consists of approximately 300 full-time employees as of December 31, 2017 who are responsible for monitoring and preventing the release of inappropriate or illegal content. Text, images and videos are screened by our content monitoring team, which reviews our content on a 24/7 basis. Illegal and inappropriate content can generally be identified and removed promptly after it has been uploaded.

Our content monitoring team employs systematic monitoring procedures that include machine screening and manual review based on the latest laws and regulations. Our proprietary machine identification system

123

Table of Contents

automatically screens text, picture and video content. The text identification system screens text content based on pre-set key words and anti-spam system; the picture identification system screens picture content based on optical character recognition and pornographic-content detection; and the video identification system screens video content based on similarity analysis against our video database to analyze each frame and each second of video content. The machine screening process may have three possible outcomes: blocking content identified as illegal or inappropriate, releasing content that passes the screening, or flagging for manual review when the system cannot make a judgment. The content monitoring team manually reviews flagged content to make judgment on whether to block or to release, and the machine identification system conducts auto-learning based on the judgment from manual review. The content monitoring team also conducts random screening on content that has passed the machine screening process. We regularly communicate with relevant government authorities to stay abreast of relevant laws and regulations to ensure compliance. We provide periodic and comprehensive training to our monitoring team to ensure and enhance their understanding of regulatory requirements.

We conduct thorough background checks on our content providers. We request entities to provide us with copies of registration information and organization code certificate, and individuals to provide us with copies of official governmental ID. We request individuals to provide a mobile phone number, which is registered with one's ID. We monitor all live content broadcast on our platform in real time using both machine screening and manual review.

**Competition**

We primarily compete with Tencent Video and Youku Tudou for both users and advertising customers. We also compete with other internet media and entertainment services, as well as major TV stations.

**Employee**

We had 3,491, 4,794 and 6,014 employees as of December 31, 2015, 2016 and 2017, respectively. As of December 31, 2017, we had 2,605 employees in Beijing and 3,409 employees in other cities in China. The following table sets forth the number of our employees by function as of December 31, 2017:

| | |
|---|---|
| Research and development | 2,608 |
| Content production and operation | 1,823 |
| Sales and marketing | 1,239 |
| Management and administrative | 344 |
| Total: | 6,014 |

Our success depends on our ability to attract, retain and motivate qualified employees. We offer employees competitive salaries, performance-based cash bonuses and other incentives. We believe that we maintain a good working relationship with our employees, and we have not experienced any material labor disputes. None of our employees are represented by labor unions.

As required by laws and regulations in China, we participate in various employee social benefits plans that are organized by municipal and provincial governments, including housing funds, pension, medical insurance, job-related injury insurance, maternity insurance and unemployment insurance. We are required under PRC law to make contributions to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time.

We typically enter into standard confidentiality and employment agreements with our employees. These contracts include a standard non-compete covenant that prohibits the employee from competing with us, directly or indirectly, during his or her employment as well as certain period of time after employment is terminated.

124

Table of Contents

**Facilities**

Our principal executive offices are located in Beijing, China, where we lease premises of approximately 45,900 square meters. We own office premises of approximately 17,570 square meters in Shanghai. We also lease offices in Shanghai, Chongqing and various other cities, with an aggregate area of approximately 15,687 square meters, and are negotiating an additional lease for a premise of approximately 2,070 square meters in Chengdu. We lease our premises from unrelated third parties. Below is a summary of the term of each of our current leases and we plan to renew most of these leases when they expire:

| Leased properties | Term | Area (square meters) |
|---|---|---|
| Beijing | 1, 2, 3, 4 and 20 years | 45,900 |
| Shanghai | 1, 4 and 20 years | 3,019 |
| Chongqing | 2, 3 and 5 years | 6,691 |
| Others | 1, 2, 3 and 5 years | 5,977 |
| Total | | 61,587 |

Our main IT infrastructure include internet data centers (IDC) and content delivery networks (CDN). We lease IDC facilities from China Telecom, China Unicom and China Mobile. Our bandwidth provider includes self-built CDN, cooperating bandwidth, commercial CDN and Internet Exchange.

**Legal Proceedings**

We are currently not a party to any material legal or administrative proceedings. We have in the past and may from time to time be subject to various legal or administrative claims and proceedings regarding, among other things, copyright and trademark infringement, intellectual property dispute, contract disputes and unfair competition. Our products and services may contain materials, in which others may allege to own copyrights, trademarks or image rights or which others may claim to be defamatory or objectionable.

As of December 31, 2017, 69 cases against us were pending before various courts in China. The aggregate amount of damages sought under these pending cases is approximately RMB145.7 million (US$22.4 million). We are currently unable to estimate the reasonably possible loss or a range of reasonably possible loss as the proceedings are in the early stages, or there is a lack of clear or consistent interpretation of laws. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such proceedings, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible loss cannot be made. With respect to the limited number of proceedings for which we are able to estimate the reasonably possible loss or the range of reasonably possible loss, such estimates are immaterial.

In addition, as of December 31, 2017, 355 cases brought by us against others for copyright and trademark infringement, unfair competition and other commercial disputes were pending before various courts in China. The aggregate amount of damages we are seeking under these pending cases is approximately RMB102.8 million (US$15.8 million).

125

Table of Contents

## REGULATION

This section sets forth a summary of the principal PRC laws and regulations relevant to our business and operations in China.

**Regulations on Value-added Telecommunication Services**

On September 25, 2000, the State Council promulgated the *Telecommunications Regulations of the People's Republic of China*, or the Telecom Regulations, which was amended on July 29, 2014 and February 6, 2016. The Telecom Regulations is the primary PRC law governing telecommunication services and sets out the general regulatory framework for telecommunication services provided by PRC companies. The Telecom Regulations distinguishes between "basic telecommunication services" and "value-added telecommunication services." The Telecom Regulations defines value-added telecommunications services as telecommunications and information services provided through public networks. Pursuant to the Telecom Regulations, commercial operators of value-added telecommunications services must first obtain an operating license from the MIIT, or its provincial level counterparts.

The *Catalog of Telecommunications Business*, or the Catalog, which was issued as an attachment to the Telecom Regulations and updated in February 21, 2003 and December 28, 2015, further categorizes value-added telecommunication services into two classes: Class 1 value-added telecommunication services and Class 2 value-added telecommunication services. Information services provided via cable networks, mobile networks or internet fall within Class 2 value-added telecommunications services.

On July 3, 2017, the MIIT issued the *Measures on the Administration of Telecommunications Business Operating Permits,* or the Telecom License Measures, which became effective on September 1, 2017, to supplement the Telecom Regulations. The Telecom License Measures sets forth the types of licenses required to operate value-added telecommunications services and the qualifications and procedures for obtaining such licenses. The Telecom License Measures also provides that an operator providing value-added services in multiple provinces is required to obtain an inter-regional license, whereas an operator providing value-added services in one province is required to obtain an intra-provincial license. Any telecommunication services operator must conduct its business in accordance with the specifications in its license.

We engage in business activities that are value-added telecommunications services as defined in the Telecom Regulations and the Catalog. To comply with the relevant laws and regulations, Beijing iQIYI has obtained a Value-Added Telecommunications Services Operating License for providing information services via internet, or the ICP License, which will remain effective until September 8, 2021, and Shanghai Zhong Yuan has also obtained an ICP License, which will remain effective until May 11, 2021.

**Regulations on Foreign Direct Investment in Value-Added Telecommunications Companies**

Foreign direct investment in telecommunications companies in China is governed by the *Provisions on the Administration of Foreign-Invested Telecommunications Enterprises*, which was promulgated by the State Council on December 11, 2001 and amended on September 10, 2008 and February 6, 2016. These regulations require that foreign-invested value-added telecommunications enterprises in China must be established as Sino-foreign equity joint ventures and that the foreign investors may acquire up to 50% equity interests in such joint ventures. In addition, a major foreign investor in a value-added telecommunications business in China must demonstrate a good track record and experience in operating value-added telecommunications businesses. Moreover, foreign investors that meet these requirements must obtain approvals from the MIIT and the MOFCOM, to provide value-added telecommunication services in China and the MIIT and the MOFCOM retain considerable discretion in granting such approvals.

On July 13, 2006, the *Ministry of Information Industry*, or the MII, released the *Notice on Strengthening the Administration of Foreign Investment in the Operation of Value-added Telecommunications Business*, or the MII

126

Table of Contents

Notice, pursuant to which, for any foreign investor to invest in telecommunications businesses in China, a foreign-invested telecommunications enterprise must be established and such enterprise must apply for the relevant telecommunications business operation licenses. Furthermore, under the MII Notice, domestic telecommunications enterprises may not rent, transfer or sell a telecommunications business operation license to foreign investors in any form, and they may not provide any resources, premises, facilities and other assistance in any form to foreign investors for their illegal operation of any telecommunications business in China. In addition, under the MII Notice, the internet domain names and registered trademarks used by a value-added telecommunication service operator shall be legally owned by such operator or its shareholders.

Furthermore, the *Guidance Catalog of Industries for Foreign Investment*, or the Foreign Investment Catalog, the latest version of which was promulgated jointly by MOFCOM and the National Development and Reform Commission, or the NDRC, on June 28, 2017 and became effective on July 28, 2017, classifies businesses into four categories with regard to foreign investment: (1) "encouraged," (2) "restricted," (3) "prohibited" and (4) "permitted," which includes all industries not listed under any one of the first three categories. Our business falls under value-added telecommunications services, which are under the "restricted" category in the Foreign Investment Catalog.

In view of these restrictions on foreign direct investment in value-added telecommunications services and certain other types of businesses under which our business may fall, including internet culture services, internet audio-video program services and radio/television programs production and operation business, we have established various domestic consolidated affiliated entities to engage in value-added telecommunications services. For a detailed discussion of our consolidated affiliated entities, please refer to *Contractual Arrangements with Our Consolidated Affiliated Entities* above. Due to the lack of interpretative guidance from the relevant PRC governmental authorities, there are uncertainties regarding whether PRC governmental authorities would consider our corporate structure and contractual arrangements to constitute foreign ownership of a value-added telecommunications business. See "Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations." In order to comply with PRC regulatory requirements, we operate a substantial portion of our business through our consolidated affiliated entities, which we have contractual relationships with but we do not have actual ownership interests in. If our current ownership structure is found to be in violation of current or future PRC laws, rules or regulations regarding the legality of foreign investment in value-added telecommunications services and other types of businesses on which foreign investment is restricted or prohibited, we could be subject to severe penalties.

**Regulations on Internet Content Providers**

The *Administrative Measures on Internet Information Services*, or the Internet Content Measures, which was promulgated by the State Council on September 25, 2000 and amended on January 8, 2011, set out guidelines on the provision of internet information services. The Internet Content Measures specifies that internet information services regarding news, publications, education, medical and health care, pharmacy and medical appliances, among other things, are required to be examined, approved and regulated by the relevant authorities. Internet information providers are prohibited from providing services beyond those included in the scope of their licenses or filings. Furthermore, the Internet Content Measures specifies a list of prohibited content. Internet information providers are prohibited from producing, copying, publishing or distributing information that is humiliating or defamatory to others or that infringes the legal rights of others. Internet information providers that violate such prohibition may face criminal charges or administrative sanctions. Internet information providers must monitor and control the information posted on their websites. If any prohibited content is found, they must remove the content immediately, keep a record of such content and report to the relevant authorities.

The Internet Content Measures classifies internet information services into commercial internet information services and non-commercial internet information services. Commercial internet information services refer to

127

Table of Contents

services that provide information or services to internet users with charge. A provider of commercial internet information services must obtain an ICP License. As a provider of commercial internet information services, Beijing iQIYI has obtained an ICP License which will remain effective until September 8, 2021 and Shanghai Zhong Yuan has also obtained an ICP License which will remain effective until May 11, 2021.

**Regulations on Internet Audio-video Program Services**

On December 20, 2007, the MII and the State Administration of Press, Publication, Radio, Film and Television, or the SAPPRFT, jointly issued the *Administrative Provisions for the Internet Audio-Video Program Service*, or the Audio-video Program Provisions, which came into effect on January 31, 2008 and was amended on August 28, 2015. The Audio-video Program Provisions defines "internet audio-video program services" as producing, editing and integrating of audio-video programs, supplying audio-video programs to the public via the internet, and providing audio-video programs uploading and transmission services to a third party. Entities providing internet audio-video programs services must obtain an internet audio-video program transmission license. Applicants for such licenses shall be state-owned or state-controlled entities unless an internet audio-video program transmission license has been obtained prior to the effectiveness of the Audio-video Program Provisions in accordance with the then-in-effect laws and regulations. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned services. According to the Audio-video Program Provisions and other relevant laws and regulations, audio-video programs provided by the entities supplying Internet audio-video program services shall not contain any illegal content or other content prohibited by the laws and regulations, such as any content against the basic principles in the PRC Constitution, any content that damages the sovereignty of the country or national security, and any content that disturbs social order or undermine social stability. An audio-video program that has already been broadcast shall be retained in full for at least 60 days. Movies, television programs and other media content used as Internet audio-video programs shall comply with relevant administrative regulations on programs broadcasts through radio, movie and television channels. Entities providing services related to Internet audio-video programs shall immediately delete the audio-video programs violating laws and regulations, keep relevant records, report relevant authorities and implement other regulatory requirements.

The *Categories of the Internet Audio-Video Program Services*, or the Audio-video Program Categories, promulgated by SAPPRFT on March 10, 2017, classifies internet audio/video programs into four categories: (I) Category I internet audio/video program service, which is carried out with a form of radio station or television station; (II) Category II internet audio/video program service, including (a) re-broadcasting service of current political news audio/video programs; (b) hosting, interviewing, reporting and commenting service of arts, entertainment, technology, finance and economics, sports, education and other specialized audio/video programs; (c) producing (interviewing not included) and broadcasting service of arts, entertainment, technology, finance and economics, sports, education and other specialized audio/video programs; (d) producing and broadcasting service of internet films/dramas; (e) aggregating and broadcasting service of films, television dramas and cartoons; (f) aggregating and broadcasting service of arts, entertainment, technology, finance and economics, sports, education and other specialized audio/video programs; and (g) live audio/video broadcasting service of cultural activities of common social organizations, sport events or other organization activities; and (III) Category III internet audio/video program service, including (a) aggregating service of online audio/video contents, and (b) re-broadcasting service of the audio/video programs uploaded by internet users; and (IV) Category III internet audio/video program service, including (a) re-broadcasting of the radio/television program channels; and (b) re-broadcasting of internet audio/video program channels.

On May 27, 2016, the SAPPRFT issued the *Notice on Relevant Issues concerning Implementing the Approval Works of Upgrading Mobile Internet Audio-Video Program Service*, or the Mobile Audio-Video Program Notice. The Mobile Audio-Video Program Notice provides that the mobile Internet audio-video program services shall be deemed Internet audio-video program service. Entities which have obtained the approvals to provide the Internet audio-video program services may use mobile WAP websites or mobile applications to provide audio-video program services. Entities with regulatory approvals may operate mobile

128

**Table of Contents**

applications to provide the audio-video program services The types of the programs shall be within the permitted scope as provided in the licenses and such mobile applications shall be filed with the SAPPRFT.

On November 4, 2016, the State Internet Information Office issued the *Administrative Regulations on Online Live-broadcasting Services*, or the Online Live-broadcasting Regulations, which came into effect on December 1, 2016. According to the Online Live-broadcasting Regulations, when providing internet news information services, both online live-broadcasting service providers and online live-broadcasting publishers must obtain the relevant licenses for providing internet news information service and may only carry out internet news information services within the scope of their licenses. All online live-broadcasting service providers (whether or not providing internet news information) must take certain actions to operate their services, including establishing platforms for monitoring live-broadcasting content.

Beijing iQiyi has obtained an internet audio-video program transmission license which will remain effective until October 23, 2018, covering certain audio-video program services as provided in category II and Shanghai Zhong Yuan has obtained an internet audio-video program transmission license which will remain effective until March 23, 2020, covering certain audio-video program services as provided in category II, category III and category IV.

### Regulations on Production and Operation of Radio/Television Programs

On July 19, 2004, the SAPPRFT promulgated the *Administrative Measures on the Production and Operation of Radio and Television Programs,* or the Radio and Television Program Production Measures, which came into effect on August 20, 2004 and was amended on August 28, 2015. The Radio and Television Program Production Measures provides that any business that produces or operates radio or television programs must first obtain a Radio and Television Program Production and Operation Permit. Entities holding such permits shall conduct their business within the permitted scope as provided in their permits. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned services. Each of Beijing iQIYI, Shanghai Zhong Yuan and iQIYI Pictures has obtained a Radio and Television Program Production and Operation Permit for their respective businesses.

### Regulations on Online Culture Administration

According to the *Interim Administrative Provisions on Internet Culture*, or the Internet Culture Provisions, promulgated by the Ministry of Culture, or the MOC, on February 17, 2011, and amended on December 15, 2017 internet culture activities include: (1) production, reproduction, import, release or broadcast of internet culture products (such as online music, online game, online performance and cultural products by certain technical means and copied to the internet for spreading); (2) distribution or publication of cultural products on internet; and (3) exhibitions, competitions and other similar activities concerning internet culture products. The Internet Culture Provisions further classifies internet cultural activities into commercial internet cultural activities and non-commercial internet cultural activities. Entities engaging in commercial internet cultural activities must apply to the relevant authorities for a Network Cultural Business Permit, while non-commercial cultural entities are only required to report to related culture administration authorities within 60 days of the establishment of such entity. If any entity engages in commercial internet culture activities without approval, the cultural administration authorities or other relevant government may order such entity to cease to operate Internet culture activities as well as levying penalties including administrative warning and fines up to RMB30,000. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned services except online music. Each of Beijing iQIYI and Shanghai Zhong Yuan has obtained a Network Cultural Business Permit from the relevant authorities.

### Regulations on Online Advertising Services

On April 24, 2015, the Standing Committee of the National People's Congress enacted the *Advertising Law of the People's Republic of China*, or the New Advertising Law, effective on September 1, 2015. The New

129

Table of Contents

Advertising Law increases the potential legal liability of advertising services providers and strengthens regulations of false advertising. On July 4, 2016, the State Administration for Industry and Commerce, or the SAIC, issued the *Interim Measures of the Administration of Online Advertising*, or the SAIC Interim Measures, effective on September 1, 2016. The New Advertising Law and the SAIC Interim Measures require that online advertisements may not affect users' normal internet use and internet pop-up ads must display a "close" sign prominently and ensure one-key closing of the pop-up windows. The SAIC Interim Measures provides that all online advertisements must be marked "Advertisement" so that viewers can easily identify them as such. Moreover, the SAIC Interim Measures treats paid search results as advertisements that are subject to PRC advertisement laws, and requires that paid search results be conspicuously identified on search result pages as advertisements. The New Advertising Law and SAIC Interim Measures require us to conduct more stringent examination and monitoring of our advertisers and the content of their advertisements.

**Regulations on Internet Publishing**

On February 4, 2016, the SAPPRFT and MIIT jointly issued the *Rules for the Administration for Internet Publishing Services*, or the Internet Publishing Rules, which became effective on March 10, 2016, to replace the Provisional Rules for the Administration for Internet Publishing that had been jointly issued by the SAPPRFT and the MIIT on June 27, 2002. The Internet Publishing Rules defines "internet publications" as digital works that are edited, produced, or processed to be published and provided to the public through the internet, including (a) original digital works, such as pictures, maps, games, and comics; (b) digital works with content that is consistent with the type of content that, prior to the internet age, typically was published in media such as books, newspapers, periodicals, audio-visual products, and electronic publications; (c) digital works in the form of online databases compiled by selecting, arranging, and compiling other types of digital works; and (d) other types of digital works identified by the SAPPRFT. Under the Internet Publishing Rules, internet operators distributing such publications via internet are required to apply for an internet publishing license with the relevant governmental authorities and for SAPPRFT approval before distributing internet publications. Shanghai Zhong Yuan currently holds an internet publishing license to provide the internet publications to the public through the internet, while Beijing iQIYI is in the process of applying for the internet publishing license.

**Regulations on Online Games**

In September 2009, the GAPP (currently known as the SAPPRFT), together with the National Copyright Administration, and the National Office of Combating Pornography and Illegal Publications jointly issued the *Notice on Further Strengthening on the Administration of Pre-examination and Approval of Online Game and the Examination and Approval of Imported Online Game*, or the Circular 13. The Circular 13 states that foreign investors are not permitted to invest in online game operating businesses in the PRC via wholly foreign-owned entities, Sino-foreign equity joint ventures or cooperative joint ventures or to exercise control over or participate in the operation of domestic online game businesses through indirect means, such as other joint venture companies or contractual or technical arrangements. If the our contractual arrangements were deemed under the Circular 13 to be an "indirect means" for foreign investors to exercise control over or participate in the operation of a domestic online game business, our contractual arrangements might be challenged by the SAPPRFT. We are not aware of any online game companies which use the same or similar contractual arrangements having been challenged by the SAPPRFT as using those contractual arrangements as an "indirect means" for foreign investors to exercise control over or participate in the operation of a domestic online game business or having been penalized or ordered to terminate operations since the Circular 13 became effective. However it is unclear whether and how the Circular 13 might be interpreted or implemented in the future. See "Risk Factors— If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations."

The *Interim Measures for the Administration of Online Games*, or the Online Game Measures, issued by the MOC, which took effect on August 1, 2010 and amended on December 15, 2017, regulates a broad range of

130

Table of Contents

activities related to the online games business, including the development, production and operation of online games, the issuance of virtual currencies used for online games, and the provision of virtual currency trading services. The Online Game Measures provides that any entity that is engaged in online game operations must obtain an Network Cultural Business Permit, and require the content of an imported online game to be examined and approved by the MOC prior to the game's launch and require a domestic online game to be filed with the MOC within 30 days after its launch. The *Notice of the Ministry of Culture on the Implementation of the Interim Measures for the Administration of Online Games*, which was issued by the MOC on July 29, 2010 to implement the Online Game Measures, (i) requires online game operators to protect the interests of online game users and specifies that certain terms that must be included in service agreements between online game operators and the users of their online games, (ii) requires content review of imported online games and filing procedures for domestic online games, (iii) emphasizes the protection of minors playing online games, and (iv) requests online game operators to promote real-name registration by their game users.

### Regulations on Information Security, Censorship and Privacy

The Standing Committee of the National People's Congress, China's national legislative body, enacted the *Decisions on the Maintenance of Internet Security* on December 28, 2000 that may subject persons to criminal liabilities in China for any attempt to use the internet to: (i) gain improper entry to a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information or (v) infringe upon intellectual property rights. In 1997, the Ministry of Public Security issued the *Administration Measures on the Security Protection of Computer Information Network with International Connections* which prohibits using the internet to leak state secrets or to spread socially destabilizing materials. If an ICP license holder violates these measures, the PRC government may revoke its ICP license and shut down its websites. Pursuant to the *Ninth Amendment to the Criminal Law* issued by the Standing Committee of the National People's Congress on August 29, 2015, effective on November 1, 2015, any ICP provider that fails to fulfill the obligations related to internet information security as required by applicable laws and refuses to take corrective measures, will be subject to criminal liability for (i) any large-scale dissemination of illegal information; (ii) any severe effect due to the leakage of users' personal information; (iii) any serious loss of evidence of criminal activities; or (iv) other severe situations, and any individual or entity that (i) sells or provides personal information to others unlawfully or (ii) steals or illegally obtains any personal information will be subject to criminal liability in severe situations.

The *Cybersecurity Law of the PRC*, or the Cybersecurity Law, which was promulgated on November 7, 2016 by the Standing Committee of the National People's Congress and came into effect on June 1, 2017, provides that network operators shall meet their cyber security obligations and shall take technical measures and other necessary measures to protect the safety and stability of their networks. Under the Cybersecurity Law, network operators are subject to various security protection-related obligations, including: (i) network operators shall comply with certain obligations regarding maintenance of the security of internet systems; (ii) network operators shall verify users' identities before signing agreements or providing certain services such as information publishing or real-time communication services; (iii) when collecting or using personal information, network operators shall clearly indicate the purposes, methods and scope of the information collection, the use of information collection, and obtain the consent of those from whom the information is collected; (iv) network operators shall strictly preserve the privacy of user information they collect, and establish and maintain systems to protect user privacy; (v) network operators shall strengthen management of information published by users, and when they discover information prohibited by laws and regulations from publication or dissemination, they shall immediately stop dissemination of that information, including taking measures such as deleting the information, preventing the information from spreading, saving relevant records, and reporting to the relevant governmental agencies.

To comply with these PRC laws and regulations, we have adopted internal procedures to monitor content displayed on our website and application. However, due to the large amount of user uploaded content in addition to professionally-produced content, we may not be able to identify all the videos or other content that may violate

131

**Table of Contents**

relevant laws and regulations. See "Risk Factors—Risks Related to Our Business and Industry—Videos and other content displayed on our platform may be found objectionable by PRC regulatory authorities and may subject us to penalties and other administrative actions."

**Regulations on Intellectual Property Rights**

*Regulations on copyright*

The Copyright Law of the PRC, or the Copyright Law, which took effect on June 1, 1991 and was amended in 2001 and in 2010, provides that Chinese citizens, legal persons, or other organizations shall, whether published or not, own copyright in their copyrightable works, which include, among others, works of literature, art, natural science, social science, engineering technology and computer software. Copyright owners enjoy certain legal rights, including right of publication, right of authorship and right of reproduction. The Copyright Law as revised in 2010 extends copyright protection to Internet activities, products disseminated over the Internet and software products. In addition, Copyright Law provides for a voluntary registration system administered by the China Copyright Protection Center, or the CPCC. According to the Copyright Law, an infringer of the copyrights shall be subject to various civil liabilities, which include ceasing infringement activities, apologizing to the copyright owners and compensating the loss of copyright owner. Infringers of copyright may also subject to fines and/or administrative or criminal liabilities in severe situations.

The *Computer Software Copyright Registration Measures*, or the Software Copyright Measures, promulgated by the State Council on December 20, 2001 and amended on January 30, 2013, regulates registrations of software copyright, exclusive licensing contracts for software copyright and assignment agreements. The National Copyright Administration, or the NCA administers software copyright registration and the CPCC, is designated as the software registration authority. The CPCC shall grant registration certificates to the Computer Software Copyrights applicants which meet the requirements of both the Software Copyright Measures and the *Computer Software Protection Regulations (Revised in 2013)*.

The *Provisions of the Supreme People's Court on Certain Issues Related to the Application of Law in the Trial of Civil Cases Involving Disputes on Infringement of the Information Network Dissemination Rights* specifies that disseminating works, performances or audio-video products by the internet users or the internet service providers via the internet without the permission of the copyright owners shall be deemed to have infringed the right of dissemination of the copyright owner.

The *Measures for Administrative Protection of Copyright Related to Internet*, which was jointly promulgated by the NCA and the MIIT on April 29, 2005 and became effective on May 30, 2005, provides that upon receipt of an infringement notice from a legitimate copyright holder, an ICP operator must take remedial actions immediately by removing or disabling access to the infringing content. If an ICP operator knowingly transmits infringing content or fails to take remedial actions after receipt of a notice of infringement that harms public interest, the ICP operator could be subject to administrative penalties, including an order to cease infringing activities, confiscation by the authorities of all income derived from the infringement activities, or payment of fines.

On May 18, 2006, the State Council promulgated the *Regulations on the Protection of the Right to Network Dissemination of Information* (as amended in 2013). Under these regulations, an owner of the network dissemination rights with respect to written works or audio or video recordings who believes that information storage, search or link services provided by an Internet service provider infringe his or her rights may require that the Internet service provider delete, or disconnect the links to, such works or recordings.

As of December 31, 2017, we had registered 142 software copyrights in the PRC.

*Patent law*

According to the *Patent Law of the PRC* (Revised in 2008), the State Intellectual Property Office is responsible for administering patent law in the PRC. The patent administration departments of provincial,

132

Table of Contents

autonomous region or municipal governments are responsible for administering patent law within their respective jurisdictions. The Chinese patent system adopts a first-to-file principle, which means that when more than one person file different patent applications for the same invention, only the person who files the application first is entitled to obtain a patent of the invention. To be patentable, an invention or a utility model must meet three criteria: novelty, inventiveness and practicability. A patent is valid for twenty years in the case of an invention and ten years in the case of utility models and designs. As of December 31, 2017, we had registered approximately 1,739 patents and applied for registration of 3,629 patents in the PRC.

*Trademark law*

Trademarks are protected by the *Trademark Law of the PRC* (Revised in 2013) which was adopted in 1982 and subsequently amended in 1993, 2001 and 2013 respectively as well as by the *Implementation Regulations of the PRC Trademark Law* adopted by the State Council in 2002 and as most recently amended on April 29, 2014. The Trademark Office under the SAIC handles trademark registrations. The Trademark Office grants a ten-year term to registered trademarks and the term may be renewed for another ten-year period upon request by the trademark owner. A trademark registrant may license its registered trademarks to another party by entering into trademark license agreements, which must be filed with the Trademark Office for its record. As with patents, the Trademark Law has adopted a first-to-file principle with respect to trademark registration. If a trademark applied for is identical or similar to another trademark which has already been registered or subject to a preliminary examination and approval for use on the same or similar kinds of products or services, such trademark application may be rejected. Any person applying for the registration of a trademark may not injure existing trademark rights first obtained by others, nor may any person register in advance a trademark that has already been used by another party and has already gained a "sufficient degree of reputation" through such party's use. As of December 31, 2017, we had registered 1,380 trademarks and applied for registration of 3,238 trademarks with the Trademark Office of the State Administration for Industry & Commerce of the PRC.

*Regulations on domain names*

The MIIT promulgated the *Measures on Administration of Internet Domain Names*, or the Domain Name Measures, on August 24, 2017, which took effect on November 1, 2017 and replaced the *Administrative Measures on China Internet Domain Name* promulgated by MII on November 5, 2004. According to the Domain Name Measures, the MIIT is in charge of the administration of PRC internet domain names. The domain name registration follows a first-to-file principle. Applicants for registration of domain names shall provide the true, accurate and complete information of their identities to domain name registration service institutions. The applicants will become the holder of such domain names upon the completion of the registration procedure. As of December 31, 2017, we had registered 98 domain names in the PRC.

**Regulations on Foreign Exchange**

*General administration of foreign exchange*

Under the *PRC Foreign Currency Administration Rules* promulgated on January 29, 1996 and most recently amended on August 5, 2008 and various regulations issued by the SAFE and other relevant PRC government authorities, Renminbi is convertible into other currencies for current account items, such as trade-related receipts and payments and payment of interest and dividends. The conversion of Renminbi into other currencies and remittance of the converted foreign currency outside the PRC for of capital account items, such as direct equity investments, loans and repatriation of investment, requires the prior approval from the SAFE or its local office. Payments for transactions that take place within the PRC must be made in Renminbi. Unless otherwise approved, PRC companies may not repatriate foreign currency payments received from abroad or retain the same abroad. Foreign-invested enterprises may retain foreign exchange in accounts with designated foreign exchange banks under the current account items subject to a cap set by the SAFE or its local office. Foreign exchange proceeds under the current accounts may be either retained or sold to a financial institution engaged in settlement and sale

133

**Table of Contents**

of foreign exchange pursuant to relevant SAFE rules and regulations. For foreign exchange proceeds under the capital accounts, approval from the SAFE is generally required for the retention or sale of such proceeds to a financial institution engaged in settlement and sale of foreign exchange.

Pursuant to the *Circular of the SAFE on Further Improving and Adjusting Foreign Exchange Administration Policies for Direct Investment*, or the SAFE Circular No. 59 promulgated by SAFE on November 19, 2012, which became effective on December 17, 2012 and was further amended on May 4, 2015, approval is not required for opening a foreign exchange account and depositing foreign exchange into the accounts relating to the direct investments. SAFE Circular No. 59 also simplified foreign exchange-related registration required for the foreign investors to acquire the equity interests of Chinese companies and further improve the administration on foreign exchange settlement for foreign-invested enterprises.

Pursuant to the *Circular on Further Simplifying and Improving the Foreign Currency Management Policy on Direct Investment*, or the SAFE Circular No. 13, effective from June 1, 2015, which cancels the administrative approvals of foreign exchange registration of direct domestic investment and direct overseas investment and simplifies the procedure of foreign exchange-related registration, the investors shall register with banks for direct domestic investment and direct overseas investment.

The *Circular on Reforming the Management Approach regarding the Settlement of Foreign Capital of Foreign-invested Enterprise*, or the SAFE Circular No. 19, which was promulgated by the SAFE on March 30, 2015 and became effective on June 1, 2015, provides that a foreign-invested enterprise may, according to its actual business needs, settle with a bank the portion of the foreign exchange capital in its capital account for which the relevant foreign exchange administration has confirmed monetary capital contribution rights and interests (or for which the bank has registered the injection of the monetary capital contribution into the account). Pursuant to the SAFE Circular No.19, for the time being, foreign-invested enterprises are allowed to settle 100% of their foreign exchange capitals on a discretionary basis; a foreign-invested enterprise shall truthfully use its capital for its own operational purposes within the scope of business; where an ordinary foreign-invested enterprise makes domestic equity investment with the amount of foreign exchanges settled, the invested enterprise shall first go through domestic re-investment registration and open a corresponding account for foreign exchange settlement pending payment with the foreign exchange administration or the bank at the place where it is registered.

The *Circular on Reforming and Regulating Policies on the Control over Foreign Exchange Settlement of Capital Accounts*, or the SAFE Circular No. 16, which was promulgated by the SAFE and became effective on June 9, 2016, provides that enterprises registered in the PRC may also convert their foreign debts from foreign currency into Renminbi on self-discretionary basis. The SAFE Circular No. 16 also provides an integrated standard for conversion of foreign exchange under capital account items (including but not limited to foreign currency capital and foreign debts) on self-discretionary basis, which applies to all enterprises registered in the PRC.

According to the *Interim Measures for the Administration of Establishment and Change Filings of Foreign-invested Enterprises*, which was promulgated by the MOFCOM and became effective on July 30, 2017, the *Administrative Regulations on the Company Registration*, which was promulgated by the State Council on June 24, 1994, became effective on July 1, 1994 and latest amended on February 6, 2016, and other laws and regulations governing the foreign invested enterprises and company registrations, the establishment of a foreign invested enterprise and any capital increase and other major changes in a foreign invested enterprise shall be registered with the State Administration for Industry and Commerce or its local counterparts, and shall be filed via the foreign investment comprehensive administrative system, or the FICMIS ("**MOFCOM Filing**") if such foreign invested enterprise does not involve special access administrative measures prescribed by the PRC government.

Based on SAFE Circular No.13 and other laws and regulations relating to foreign exchange, when setting up a new foreign-invested enterprise, the foreign invested enterprise shall register with the bank located at its

134

Table of Contents

registered place after obtaining the business license, and if there is any change in capital or other changes relating to the basic information of the foreign-invested enterprise, including without limitation any increase in its registered capital or total investment, the foreign invested enterprise shall register such changes with the bank located at its registered place after obtaining the approval from or completing the filing with competent authorities. Pursuant to the relevant foreign exchange laws and regulations, the above-mentioned foreign exchange registration with the banks will typically take less than four weeks upon the acceptance of the registration application.

Based on the forgoing, if we intend to provide funding to our wholly foreign owned subsidiaries through capital injection at or after their establishment, we shall register the establishment of and any follow-on capital increase in our wholly foreign owned subsidiaries with the State Administration for Industry and Commerce or its local counterparts, file such via the FICMIS and register such with the local banks for the foreign exchange related matters.

*Loans by the Foreign Companies to their PRC Subsidiaries*

A loan made by foreign investors as shareholders in a foreign invested enterprise is considered to be foreign debt in China and is regulated by various laws and regulations, including the *Regulation of the People's Republic of China on Foreign Exchange Administration*, the *Interim Provisions on the Management of Foreign Debts*, the *Statistical Monitoring of Foreign Debts Tentative Provisions*, the *Detailed Rules for the Implementation of Provisional Regulations on Statistics and Supervision of External Debt*, and the *Administrative Measures for Registration of Foreign Debts*. Under these rules and regulations, a shareholder loan in the form of foreign debt made to a PRC entity does not require the prior approval of SAFE. However, such foreign debt must be registered with and recorded by SAFE or its local branches within 15 business days after entering into the foreign debt contract. Pursuant to these rules and regulations, the balance of the foreign debts of a foreign invested enterprise shall not exceed the difference between the total investment and the registered capital of the foreign invested enterprise, or Total Investment and Registered Capital Balance.

Pursuant to the *Interim Provisions of the State Administration for Industry and Commerce on the Ratio of the Registered Capital to the Total Investment of a Sino-Foreign Equity Joint Venture Enterprise*, promulgated by SAIC on February 17, 1987 and effective on March 1, 1987, with respect to a sino-foreign equity join venture, the registered capital shall be (i) no less than 7/10 of its total investment, if the total investment is US$3 million or under US$3 million; (ii) no less than 1/2 of its total investment, if the total investment is ranging from US$3 million to US$10 million (including US$10 million), provided that the registered capital shall not be less than US$2.1 million if the total investment is less than US$4.2 million; (iii) no less than 2/5 of its total investment , if the total investment is ranging from US$10 million to US$30 million (including US$30 million), provided that the registered capital shall not be less than US$5 million if the total investment is less than US$12.5 million; and (iv) no less than 1/3 of its total investment, if the total investment exceeds US$30 million, provided that the registered capital shall not be less than US$12 million if the total investment is less than US$36 million.

On January 11, 2017, the PBOC promulgated the *Notice of the People's Bank of China on Matters concerning the Macro-Prudential Management of Full-Covered Cross-Border Financing*, or the PBOC Notice No.9. Pursuant to the PBOC Notice No. 9, within a transition period of one year from January 11, 2017, the foreign invested enterprises may adopt the currently valid foreign debt management mechanism, or Current Foreign Debt Mechanism, or the mechanism as provided in the PBOC Notice No. 9, or Notice No. 9 Foreign Debt Mechanism, at their own discretion. The PBOC Notice No. 9 provides that, enterprises may conduct independent cross-border financing in RMB or foreign currencies as required. Pursuant to the PBOC Notice No.9, the outstanding cross-border financing of an enterprise (the outstanding balance drawn, here and below) shall be calculated using a risk-weighted approach, or Risk-Weighted Approach, and shall not exceed the specified upper limit, namely: risk-weighted outstanding cross-border financing ≤ the upper limit of risk-weighted outstanding cross-border financing. Risk-weighted outstanding cross-border financing = Σ outstanding amount of RMB and foreign currency denominated cross-border financing * maturity risk conversion factor *

135

Table of Contents

type risk conversion factor + Σ outstanding foreign currency denominated cross-border financing * exchange rate risk conversion factor. Maturity risk conversion factor shall be 1 for medium- and long-term cross-border financing with a term of more than one year and 1.5 for short-term cross-border financing with a term of less than one year. Type risk conversion factor shall be 1 for on-balance-sheet financing and 1 for off-balance-sheet financing (contingent liabilities) for the time being. Exchange rate risk conversion factor shall be 0.5. The PBOC Notice No. 9 further provides that the upper limit of risk-weighted outstanding cross-border financing for enterprises shall be 200% of its net assets, or Net Asset Limits. Enterprises shall file with SAFE in its capital item information system after entering into the relevant cross-border financing contracts and prior to three business day before drawing any money from the foreign debts.

Based on the foregoing, if we provide funding to our wholly foreign owned subsidiaries through shareholder loans, the balance of such loans shall not exceed the Total Investment and Registered Capital Balance and we will need to register such loans with SAFE or its local branches in the event that the Current Foreign Debt Mechanism applies, or the balance of such loans shall be subject to the Risk-Weighted Approach and the Net Asset Limits and we will need to file the loans with SAFE in its information system in the event that the Notice No. 9 Mechanism applies. According to the PBOC Notice No. 9, after a transition period of one year from January 11, 2017, the PBOC and SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of the PBOC Notice No. 9. As of the date hereof, neither PBOC nor SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by PBOC and SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries.

*Offshore investment*

Under the *Circular of the State Administration of Foreign Exchange on Issues Concerning the Foreign Exchange Administration over the Overseas Investment and Financing and Round-trip Investment by Domestic Residents via Special Purpose Vehicles*, or the SAFE Circular 37, issued by the SAFE and effective on July 4, 2014, PRC residents are required to register with the local SAFE branch prior to the establishment or control of an offshore special purpose vehicle, or SPV, which is defined as offshore enterprises directly established or indirectly controlled by PRC residents for offshore equity financing of the enterprise assets or interests they hold in China. An amendment to registration or subsequent filing with the local SAFE branch by such PRC resident is also required if there is any change in basic information of the offshore company or any material change with respect to the capital of the offshore company. At the same time, the SAFE has issued the *Operation Guidance for the Issues Concerning Foreign Exchange Administration over Round-trip Investment* regarding the procedures for SAFE registration under the SAFE Circular 37, which became effective on July 4, 2014 as an attachment of Circular 37.

Under the relevant rules, failure to comply with the registration procedures set forth in the SAFE Circular 37 may result in bans on the foreign exchange activities of the relevant onshore company, including the payment of dividends and other distributions to its offshore parent or affiliates, and may also subject relevant PRC residents to penalties under PRC foreign exchange administration regulations.

*Regulations on dividend distribution*

The principal laws and regulations regulating the dividend distribution of dividends by foreign-invested enterprises in the PRC include the *Company Law of the PRC*, as amended in 2004, 2005 and 2013, the *Wholly Foreign-owned Enterprise Law* promulgated in 1986 and amended in 2000 and 2016 and its implementation regulations promulgated in 1990 and subsequently amended in 2001 and 2014, the *Equity Joint Venture Law of the PRC* promulgated in 1979 and subsequently amended in 1990, 2001 and 2016 and its implementation regulations promulgated in 1983 and subsequently amended in 1986, 1987, 2001, 2011 and 2014, and the *Cooperative Joint Venture Law of the PRC* promulgated in 1988 and amended in 2000 and 2016 and its implementation regulations promulgated in 1995 and amended in 2014 and 2017. Under the current regulatory

136

**Table of Contents**

regime in the PRC, foreign-invested enterprises in the PRC may pay dividends only out of their retained earnings, if any, determined in accordance with PRC accounting standards and regulations. A PRC company is required to set aside as statutory reserve funds at least 10% of its after-tax profit, until the cumulative amount of such reserve funds reaches 50% of its registered capital unless laws regarding foreign investment provide otherwise. A PRC company shall not distribute any profits until any losses from prior fiscal years have been offset. Profits retained from prior fiscal years may be distributed together with distributable profits from the current fiscal year.

As of the date of this prospectus, Beijing QIYI Century, Chongqing QIYI Tianxia Science & Technology Co., Ltd. and iQIYI New Media, our wholly foreign-owned subsidiaries are in an accumulated loss position. Beijing QIYI Century, Chongqing QIYI Tianxia Science & Technology Co., Ltd. and iQIYI New Media have not and will not be able to pay dividends to our offshore entities until they generate accumulated profits and meet the requirements for statutory reserve funds.

**Regulations on Taxation**

*Enterprise Income Tax*

On March 16, 2007, the Standing Committee of the National People's Congress promulgated the *Law of the PRC on Enterprise Income Tax* which was amended on February 24, 2017 and on December 6, 2007, the State Council enacted the *Regulations for the Implementation of the Law on Enterprise Income Tax*, or collectively, the EIT Law. The EIT Law came into effect on January 1, 2008. Under the EIT Law, both resident enterprises and non-resident enterprises are subject to tax in the PRC. Resident enterprises are defined as enterprises that are established in China in accordance with PRC laws, or that are established in accordance with the laws of foreign countries but are actually or in effect controlled from within the PRC. Non-resident enterprises are defined as enterprises that are organized under the laws of foreign countries and whose actual management is conducted outside the PRC, but have established institutions or premises in the PRC, or have no such established institutions or premises but have income generated from inside the PRC. Under the EIT Law and relevant implementing regulations, a uniform corporate income tax rate of 25% is applied. However, if non-resident enterprises have not formed permanent establishments or premises in the PRC, or if they have formed permanent establishment or premises in the PRC but there is no actual relationship between the relevant income derived in the PRC and the established institutions or premises set up by them, enterprise income tax is set at the rate of 10% with respect to their income sourced from inside the PRC.

*Value-added Tax*

The *Provisional Regulations of the PRC on Value-added Tax* were promulgated by the State Council on December 13, 1993 and came into effect on January 1, 1994 which were subsequently amended on November 10, 2008 and came into effect on January 1, 2009 and most recently amended on February 6, 2016. The *Detailed Rules for the Implementation of the Provisional Regulations of the PRC on Value-added Tax* (Revised in 2011) was promulgated by the Ministry of Finance on December 25, 1993 and subsequently amended on December 15, 2008 and October 28, 2011, or collectively, VAT Law. On November 19, 2017, the State Council promulgated The Decisions on Abolishing the Provisional Regulations of the PRC on Business Tax and Amending the Provisional Regulations of the PRC on Value-added Tax, or Order 691. According to the VAT Law and Order 691, all enterprises and individuals engaged in the sale of goods, the provision of processing, repair and replacement services, sales of services, intangible assets, real property and the importation of goods within the territory of the PRC are the taxpayers of VAT. The VAT tax rates generally applicable are simplified as 17%, 11%, 6% and 0%, and the VAT tax rate applicable to the small-scale taxpayers is 3%.

As of the date of this prospectus, our PRC subsidiaries and consolidated affiliated entities are generally subject to 3%, 6% or 17% VAT rate.

137

Table of Contents

*Dividend Withholding Tax*

The EIT Law provides that since January 1, 2008, an income tax rate of 10% will normally be applicable to dividends declared to non-PRC resident investors which do not have an establishment or place of business in the PRC, or which have such establishment or place of business but the relevant income is not effectively connected with the establishment or place of business, to the extent such dividends are derived from sources within the PRC.

Pursuant to an *Arrangement Between the Mainland of China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Incomes*, or the Double Tax Avoidance Arrangement, and other applicable PRC laws, if a Hong Kong resident enterprise is determined by the competent PRC tax authority to have satisfied the relevant conditions and requirements under such Double Tax Avoidance Arrangement and other applicable laws, the 10% withholding tax on the dividends the Hong Kong resident enterprise receives from a PRC resident enterprise may be reduced to 5%. However, based on the *Circular on Certain Issues with Respect to the Enforcement of Dividend Provisions in Tax Treaties*, or the SAT Circular 81, issued on February 20, 2009 by the State Administration of Taxation, or the SAT, if the relevant PRC tax authorities determine, in their discretion, that a company benefits from such reduced income tax rate due to a structure or arrangement that is primarily tax-driven, such PRC tax authorities may adjust the preferential tax treatment. According to the *Circular on Several Questions regarding the "Beneficial Owner" in Tax Treaties*, which was issued on February 3, 2018 by the SAT and will take effect on April 1, 2018, when determining the applicant's status of the "beneficial owner" regarding tax treatments in connection with dividends, interests or royalties in the tax treaties, several factors, including without limitation, whether the applicant is obligated to pay more than 50% of his or her income in twelve months to residents in third country or region, whether the business operated by the applicant constitutes the actual business activities, and whether the counterparty country or region to the tax treaties does not levy any tax or grant tax exemption on relevant incomes or levy tax at an extremely low rate, will be taken into account, and it will be analyzed according to the actual circumstances of the specific cases. This circular further provides that applicants who intend to prove his or her status of the "beneficial owner" shall submit the relevant documents to the relevant tax bureau according to the *Announcement on Issuing the Measures for the Administration of Non-Resident Taxpayers' Enjoyment of the Treatment under Tax Agreements*.

*Tax on Indirect Transfer*

On February 3, 2015, the SAT issued the *Circular on Issues of Enterprise Income Tax on Indirect Transfers of Assets by Non-PRC Resident Enterprises*, or Circular 7. Pursuant to Circular 7, an "indirect transfer" of assets, including equity interests in a PRC resident enterprise, by non-PRC resident enterprises, may be recharacterized and treated as a direct transfer of PRC taxable assets, if such arrangement does not have a reasonable commercial purpose and was established for the purpose of avoiding payment of PRC enterprise income tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax. When determining whether there is a "reasonable commercial purpose" of the transaction arrangement, features to be taken into consideration include, inter alia, whether the main value of the equity interest of the relevant offshore enterprise derives directly or indirectly from PRC taxable assets; whether the assets of the relevant offshore enterprise mainly consists of direct or indirect investment in China or if its income is mainly derived from China; and whether the offshore enterprise and its subsidiaries directly or indirectly holding PRC taxable assets have real commercial nature which is evidenced by their actual function and risk exposure. According to Circular 7, where the payor fails to withhold any or sufficient tax, the transferor shall declare and pay such tax to the tax authority by itself within the statutory time limit. Late payment of applicable tax will subject the transferor to default interest. Circular 7 does not apply to transactions of sale of shares by investors through a public stock exchange where such shares were acquired on a public stock exchange. On October 17, 2017, the SAT issued the *Circular on Issues of Tax Withholding regarding Non-PRC Resident Enterprise Income Tax*, or SAT Circular 37, which further elaborates the relevant implemental rules regarding the calculation, reporting and payment obligations of the withholding tax by the non-resident enterprises. Nonetheless, there remain uncertainties as to the

138

**Table of Contents**

interpretation and application of Circular 7. Circular 7 may be determined by the tax authorities to be applicable to our offshore transactions or sale of our shares or those of our offshore subsidiaries where non-resident enterprises, being the transferors, were involved.

**Regulations on Employment and Social Welfare**

*Labor Contract Law*

The *Labor Contract Law of the PRC*, or the Labor Contract Law, which was promulgated on January 1, 2008 and amended on December 28, 2012, is primarily aimed at regulating rights and obligations of employer and employee relationships, including the establishment, performance and termination of labor contracts. Pursuant to the Labor Contract Law, labor contracts shall be concluded in writing if labor relationships are to be or have been established between employers and the employees. Employers are prohibited from forcing employees to work above certain time limit and employers shall pay employees for overtime work in accordance to national regulations. In addition, employee wages shall be no lower than local standards on minimum wages and shall be paid to employees timely.

*Social Insurance and Housing Fund*

As required under the *Regulation of Insurance for Labor Injury* implemented on January 1, 2004 and amended in 2010, the *Provisional Measures for Maternity Insurance of Employees of Corporations* implemented on January 1, 1995, the *Decisions on the Establishment of a Unified Program for Old-Aged Pension Insurance of the State Council* issued on July 16, 1997, the *Decisions on the Establishment of the Medical Insurance Program for Urban Workers of the State Council* promulgated on December 14, 1998, the *Unemployment Insurance Measures* promulgated on January 22, 1999 and the *Social Insurance Law of the PRC* implemented on July 1, 2011, employers are required to provide their employees in the PRC with welfare benefits covering pension insurance, unemployment insurance, maternity insurance, labor injury insurance and medical insurance.

In accordance with the *Regulations on the Management of Housing Fund* which was promulgated by the State Council in 1999 and amended in 2002, employers must register at the designated administrative centers and open bank accounts for depositing employees' housing funds. Employer and employee are also required to pay and deposit housing funds, with an amount no less than 5% of the monthly average salary of the employee in the preceding year in full and on time. See "Risk Factors—Risks Related to Doing Business in China—The enforcement of the PRC Labor Contract Law and other labor-related regulations in the PRC may adversely affect our business and results of operations."

*Employee Stock Incentive Plan*

Pursuant to the *Notice of Issues Related to the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Listed Company*, or Circular 7, which was issued by the SAFE on February 15, 2012, employees, directors, supervisors, and other senior management who participate in any stock incentive plan of an publicly-listed overseas company and who are PRC citizens or non-PRC citizens residing in China for a continuous period of no less than one year, subject to a few exceptions, are required to register with SAFE through a qualified domestic agent, which may be a PRC subsidiary of such overseas listed company, and complete certain other procedures.

In addition, the SAT has issued certain circulars concerning employee stock options and restricted shares. Under these circulars, employees working in the PRC who exercise stock options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of an overseas listed company are required to file documents related to employee stock options and restricted shares with relevant tax authorities and to withhold individual income taxes of employees who exercise their stock option or purchase restricted shares. If the employees fail to pay or the PRC subsidiaries fail to withhold income tax in accordance with relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC governmental authorities.

139

Table of Contents

**M&A Rules and Overseas Listing**

On August 8, 2006, six PRC governmental and regulatory agencies, including MOFCOM and the China Securities Regulatory Commission, or the CSRC, promulgated the *Rules on Acquisition of Domestic Enterprises by Foreign Investors*, or the M&A Rules, governing the mergers and acquisitions of domestic enterprises by foreign investors that became effective on September 8, 2006 and was revised on June 22, 2009. The M&A Rules, among other things, requires that if an overseas company established or controlled by PRC companies or individuals, or PRC Citizens, intends to acquire equity interests or assets of any other PRC domestic company affiliated with the PRC Citizens, such acquisition must be submitted to the MOFCOM for approval. The M&A Rules also requires that an offshore special purpose vehicle formed for overseas listing purposes and controlled directly or indirectly by the PRC Citizens shall obtain the approval of the CSRC prior to overseas listing and trading of such special purpose vehicle's securities on an overseas stock exchange.

140

Table of Contents

**Table of Contents**

**MANAGEMENT**

**Directors and Executive Officers**

The following table sets forth information regarding our directors and executive officers as of the date of this prospectus.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Robin Yanhong Li | 49 | Chairman of the Board |
| Qi Lu | 56 | Director |
| Yu Gong | 49 | Chief Executive Officer and Director |
| Herman Yu | 47 | Director |
| Xuyang Ren | 43 | Director |
| Victor Zhixiang Liang | 44 | Director* |
| Chuan Wang | 48 | Director |
| Sam Hanhui Sun | 45 | Independent Director Appointee† |
| Xiaodong Wang | 43 | Chief Financial Officer |
| Xiaohui Wang | 49 | Chief Content Officer |
| Xing Tang | 42 | Chief Technology Officer |
| Xiangjun Wang | 39 | Chief Marketing Officer |
| Xianghua Yang | 41 | Senior Vice President |
| Youqiao Duan | 48 | Senior Vice President |

———————————

\*     Mr. Victor Zhixiang Liang has tendered his resignation, which will be effective immediately prior to the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.

†     Mr. Sam Hanhui Sun has accepted appointment as our independent director, effective upon the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.

*Robin Yanhong Li* has served as the chairman of our board of directors since 2009. Mr. Li is the co-founder, chairman and chief executive officer of Baidu. Prior to founding Baidu, Mr. Li worked as an engineer for Infoseek, a pioneer in the internet search engine industry, from 1997 to 1999. Mr. Li currently serves on the boards of New Oriental Education & Technology Group Inc. (NYSE: EDU) and Ctrip.com International, Ltd. (Nasdaq: CTRP). Mr. Li received a bachelor's degree in information science from Peking University in China and a master's degree in computer science from the State University of New York at Buffalo.

*Qi Lu* has served as our director since 2017. Dr. Lu is the chief operating officer of Baidu. Prior to joining Baidu in January 2017, Dr. Lu served as Microsoft's global executive vice president and led the Applications and Services Group, a role he served from 2013. Between 2009 and 2013, Dr. Lu served as the president of Microsoft's Online Services Division. Dr. Lu joined Yahoo! in 1998, later becoming senior vice president in charge of search and advertising technologies and, subsequently, executive vice president in 2007. Dr. Lu holds both bachelor's and master's degrees in computer science from Fudan University in Shanghai and a Ph.D. in computer science from Carnegie Mellon University.

*Yu Gong* is the founder, chief executive officer and director of our company, and oversees our overall strategy and business operations. Prior to founding iQIYI, Dr. Gong was the president and chief operating officer of umessage.com, a top mobile internet services solution provider in China. Prior to that, Dr. Gong served in the roles of vice president, senior vice president, and chief operating officer at Sohu.com, a Nasdaq-listed company, from 2003 to 2008. From 1999 to 2003, Dr. Gong was the founder and chief executive officer of focus.cn, the then largest real estate search website in China, which was sold to Sohu.com. (Nasdaq: SOHU) Dr. Gong received a bachelor's degree, a master's degree and a doctorate degree in automation control from Tsinghua University.

*Herman Yu* has served as our director since 2017. Mr. Yu is currently the chief financial officer of Baidu. Prior to joining Baidu in September 2017, Mr. Yu was the chief financial officer of Weibo Corp. between 2015

141

Table of Contents

and 2017. From 2004 to 2015, Mr. Yu worked at SINA Corp., serving as its chief financial officer in the last eight years. Mr. Yu began his career in the Silicon Valley, where he held various finance and accounting management positions at Adobe Systems Inc., Cadence Design Systems, Inc. and VeriFone Systems, Inc. Mr. Yu serves on the boards of 58.com Inc. (NYSE: WUBA), ZTO Express Inc. (NYSE: ZTO) and Ctrip.com International, Ltd. (Nasdaq: CTRP). Mr. Yu, a California Certified Public Accountant, holds a bachelor's degree in economics from the University of California and a master's degree in accountancy from the University of Southern California.

*Xuyang Ren* has served as our director since 2009. Mr. Ren is currently the chief executive officer of haizhi.com. Mr. Ren held various management positions at Baidu between 2001 and 2010, including vice president of business development and marketing, assistant to the president, and chief representative of Shanghai office. Mr. Ren holds a master's degree in management from Stanford University.

*Victor Zhixiang Liang* has served as our director since 2009. Mr. Liang is currently the vice president, general counsel, and executive assistant to chairman & CEO of Baidu. Prior to joining Baidu in 2005, Mr. Liang was an associate at Jun He Law Offices in Beijing from 2000 to 2003. From 1994 to 1999, Mr. Liang served as a government employee at the legislative office of the State Council. Mr. Liang holds a bachelor's degree in law from China University of Political Science and Law and an LL.M. degree from Yale University.

*Chuan Wang* has served as our director since 2014. Mr. Wang is a co-founder of Xiaomi Corporation and has served as its vice president since 2012. Mr. Wang is also a co-founder of Beijing Duokan Technology, where he served as chief executive officer since inception in 2010. From 2005 to 2011, Mr. Wang served as the general manager of Beijing Thunder Stone Century Technology Co., Ltd. Mr. Wang serves on the boards of Xunlei Limited (Nasdaq: XNET) and Zhejiang Huace Film & TV Co., Ltd. (300133: CH). Mr. Wang holds a bachelor's degree from Beijing University of Technology.

*Mr. Sam Hanhui Sun* will serve as our independent director immediately upon the effectiveness of our registration statement on Form F-1, of which this prospectus is a part. Mr. Sun has been a venture partner at Blue Lake Capital since 2016. From 2010 to 2015, Mr. Sun served various positions at Qunar Cayman Islands Limited, a Nasdaq-listed company, including Qunar's president in 2015 and its chief financial officer from 2010 to 2015. From 2007 to 2009, Mr. Sun was the chief financial officer of KongZhong Corporation, a Nasdaq-listed company. From 2004 to 2007, Mr. Sun served in several financial controller positions at Microsoft China R&D Group, Maersk China Co. Ltd., and SouFun.com. From 1995 to 2004, Mr. Sun worked in KPMG's auditing practice group. Mr. Sun currently serves as an independent director and audit committee chair of each of Yirendai Ltd. (NYSE: YRD), Fang Holdings Limited (NYSE: SFUN), CAR Inc. (SEHK: 699). Mr. Sun received a bachelor's degree in business administration from Beijing Institute of Technology in 1993. He is a Certified Public Accountant in China.

*Xiaodong Wang* has served as our chief financial officer since 2013 and is in charge of our finance and legal functions. Between 2013 and 2016, Mr. Wang served in our company on a secondment basis. Prior to officially joining iQIYI in 2017, Mr. Wang served as vice president of Baidu for financial planning and analysis, responsible for treasury, budgeting and related analysis between 2009 and 2016. From 2003 to 2009, Mr. Wang served as senior manager of General Motors in Shanghai, responsible for budgeting, cost control, pricing and other related functions. From 1998 to 2000, Mr. Wang served in Dupont China as financial specialist responsible for Dupont trading. Mr. Wang holds a bachelor's degree in economics from Tsinghua University and a master's degree in accounting and finance from The London School of Economics and Political Science.

*Xiaohui Wang* joined us in 2016 as our chief content officer. Dr. Wang is responsible for the procurement, production and operations of content business. Prior to joining iQIYI, Mr. Wang was vice president of China National Radio, where he served in various positions from 1990 to 2016, including director of news center from 2002 to 2006, director of finance office from 2006 to 2007, and vice president from 2007 to 2016. Mr. Wang holds a bachelor's degree in journalism from Jilin University, a master's degree in business administration from Cheong Kong Graduate School of Business and a Ph.D. in literature from the Communication University of China.

142

Table of Contents

*Xing Tang* joined us in 2012 and is our chief technology officer. Dr. Tang is responsible for technology, operation, product marketing and business development, and is in charge of more than two thousand engineers. Prior to joining us, Dr. Tang served as senior engineering manager from 2010 to 2012 at Google Shanghai, where he led the video research R&D in China. From 2002 to 2010, Dr. Tang was senior engineering manager at Intel Asia-Pacific R&D, where he worked on mobile, embedded and visual computing advanced technology, as well as graphics driver development for embedded system. Dr. Tang holds a bachelor's degree in mathematics and economic management, and a Ph.D. in computer graphics from the University of Science and Technology of China.

*Xiangjun Wang* joined us in 2009 and is our chief marketing officer, responsible for marketing and advertising sales. Since 2009, Ms. Wang has held various positions related to our sales and marketing functions. Prior to joining us, Ms. Wang was a sales director responsible for advertising sales at Sohu.com (Nasdaq: SOHU), where she served various positions from 2003 to 2009. Ms. Wang holds an associate's degree from Donghua University.

*Xianghua Yang* joined us in 2010 and is our senior vice president responsible for membership business. Mr. Yang led iQIYI Pictures from 2014 to 2016 and led our mobile business department from 2010 to 2014. Prior to joining iQIYI, Mr. Yang served as deputy general manager of wireless business department at Sohu.com, responsible for R&D, marketing and mobile business. Mr. Yang holds both bachelor's and master's degrees in hydraulic and hydroelectric engineering from Tsinghua University.

*Youqiao Duan* joined us in 2012 and is our senior vice president responsible for intelligent device business. Prior to joining us, Mr. Duan was senior director responsible for investment business at Skyworth Group, where he worked from 2008 to 2012. Prior to that, he served as director at Asiamedia, responsible for DVB and IPTV business. From 2002 to 2006, he worked at DTVIA where he last served as vice president of DVB business. From 1998 to 2002, he worked at focus.cn where he last served as vice president. Mr. Duan holds a bachelor's degree in automation control from Tsinghua University.

## Employment Agreements and Indemnification Agreements

We have entered into an employment agreement with each of our executive officers. Under these agreements, each of our executive officers is employed at will. We may terminate employment for cause. We may also terminate an executive officer's employment without cause upon 60-day advance written notice. In such case of termination by us, we will provide severance payments to the executive officer as agreed by us and the executive officer. The executive officer may resign at any time with a 60-day advance written notice.

Each executive officer has agreed to hold, both during and after the termination or expiry of his or her employment agreement, in strict confidence and not to use, except as required in the performance of his or her duties in connection with the employment or pursuant to applicable law, any of our confidential information or trade secrets, any confidential information or trade secrets of our customers or prospective customers, or the confidential or proprietary information of any third party received by us and for which we have confidential obligations. The executive officers have also agreed to disclose in confidence to us all inventions, designs and trade secrets which they conceive, develop or reduce to practice during the executive officer's employment with us and to assign all right, title and interest in them to us, and assist us in obtaining and enforcing patents, copyrights and other legal rights for these inventions, designs and trade secrets.

In addition, each executive officer has agreed to be bound by non-competition and non-solicitation restrictions during the term of his or her employment and typically for one year following the last date of employment. Specifically, each executive officer has agreed not to (i) approach our suppliers, clients, direct or end customers or contacts or other persons or entities introduced to the executive officer in his or her capacity as a representative of us for the purpose of doing business with such persons or entities that will harm our business relationships with these persons or entities; (ii) assume employment with or provide services to any of our

143

Table of Contents

competitors, or engage, whether as principal, partner, licensor or otherwise, any of our competitors, without our express consent; or (iii) seek directly or indirectly, to solicit the services of, or hire or engage, any person who is known to be employed or engaged by us; or (iv) otherwise interfere with our business or accounts

We have also entered into indemnification agreements with each of our directors and executive officers. Under these agreements, we agree to indemnify our directors and executive officers against liabilities and expenses incurred by such persons in connection with claims made by reason of their being a director or officer of our company.

## Board of Directors

Our board of directors will consist of            directors upon the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part. Baidu has the right to appoint a majority of our directors as long as it holds no less than 50% of the voting power of our Company. A director is not required to hold any shares in our company by way of qualification. A director may vote with respect to any contract, proposed contract or arrangement in which he is materially interested provided (i) such director, if his interest in such contract or arrangement is material, has declared the nature of his interest at the earliest meeting of the board at which it is practicable for him to do so, either specifically or by way of a general notice and (ii) if such contract or arrangement is a transaction with a related party, such transaction has been approved by the audit committee. The directors may exercise all the powers of the company to borrow money, mortgage its undertaking, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of service.

We are a "controlled company" as defined under the Nasdaq Stock Market Rules because Baidu beneficially owns more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we are permitted to elect to rely, and will rely, on certain exemptions from corporate governance rules, including:

- an exemption from the rule that a majority of our board of directors must be independent directors;

- an exemption from the rule that the compensation of our chief executive officer must be determined or recommended solely by independent directors; and

- an exemption from the rule that our director nominees must be selected or recommended solely by independent directors.

As a result, you will not have the same protection afforded to shareholders of companies that are subject to these corporate governance requirements.

## Committees of the Board of Directors

Prior to the completion of this offering, we intend to establish an audit committee and a compensation committee under the board of directors. We intend to adopt a charter for each of the two committees prior to the completion of this offering. Each committee's members and functions are described below.

*Audit Committee.* Our audit committee will consist of Sam Hanhui Sun and Herman Yu, and will be chaired by Mr. Sun. We have determined that Sam Hanhui Sun satisfies the "independence" requirements of Rule5605(a)(2) of the Listing Rules of the Nasdaq Stock Market and meet the independence standards under Rule 10A-3 under the Securities Exchange Act of 1934, as amended. We have determined that            qualifies as an "audit committee financial expert." The audit committee will oversee our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee will be responsible for, among other things:

- selecting the independent registered public accounting firm and pre-approving all auditing and non-auditing services permitted to be performed by the independent registered public accounting firm;

144

Table of Contents

- reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response;

- reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act;

- discussing the annual audited financial statements with management and the independent registered public accounting firm;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- meeting separately and periodically with management and the independent registered public accounting firm; and

- reporting regularly to the board.

*Compensation Committee.* Our compensation committee will consist of Qi Lu, Sam Hanhui Sun and Herman Yu, and will be chaired by Mr. Lu. We have determined that Sam Hanhui Sun satisfies the "independence" requirements of Rule5605(a)(2) of the Listing Rules of the Nasdaq Stock Market. The compensation committee will assist the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting during which their compensation is deliberated upon. The compensation committee will be responsible for, among other things:

- reviewing the total compensation package for our executive officers and making recommendations to the board with respect to it;

- approving and overseeing the total compensation package for our executives other than the three most senior executives;

- reviewing the compensation of our directors and making recommendations to the board with respect to it; and

- periodically reviewing and approving any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, and employee pension and welfare benefit plans.

**Duties of Directors**

Under Cayman Islands law, our directors owe fiduciary duties to our company, including a duty of loyalty, a duty to act honestly and a duty to act in what they consider in good faith to be in our best interests. Our directors must also exercise their powers only for a proper purpose. Our directors also owe to our company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association. Our company has the right to seek damages if a duty owed by our directors is breached. In limited exceptional circumstances, a shareholder may have the right to seek damages in our name if a duty owed by our directors is breached. You should refer to "Description of Share Capital—Differences in Corporate Law" for additional information on our standard of corporate governance under Cayman Islands law.

145

Table of Contents

**Terms of Directors and Officers**

Our officers are elected by and serve at the discretion of the shareholders. Our directors are not subject to a term of office and hold office until such time as they are removed from office by the shareholders. A director will be removed from office automatically if, among other things, the director (i) becomes bankrupt or makes any arrangement or composition with his creditors; or (ii) is found to be or becomes of unsound mind.

**Compensation of Directors and Executive Officers**

For the year ended December 31, 2017, we paid an aggregate of RMB25.0 million (US$3.8 million) in cash to our executive officers, and we did not pay any compensation to our non-executive directors. We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. Our PRC subsidiaries and consolidated affiliated entity are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, unemployment insurance and other statutory benefits and a housing provident fund. For share incentive grants to our officers and directors, see "—Equity Incentive Plans".

**Equity Incentive Plans**

*2010 Equity Incentive Plan*

We adopted an equity incentive plan on October 18, 2010, or the 2010 Plan, which was amended and restated on November 3, 2014 and August 6, 2016, for the purpose of granting share based compensation awards either through a proprietary interest in our long-term success, or compensation based on fulfilling certain performance goals to employees, officers, directors and consultants to incentivize their performance and promote the success of our business. Under the 2010 Plan, the maximum aggregate number of shares which may be issued pursuant to all awards is 589,729,714 shares. As of the date of this prospectus, options to purchase a total of 298,766,115 ordinary shares were outstanding under the 2010 Plan.

The following paragraphs summarize the terms of the 2010 Plan.

*Types of Awards.* The Plan permits the awards of options, share appreciation rights, share grants and restricted share units.

*Plan Administration.* A committee consisting of at least two individuals determined by our board acts as the plan administrator. The plan administrator will determine the participants who are to receive awards, the number of awards to be granted, and the terms and conditions of each award grant. The plan administrator can amend outstanding awards and interpret the terms of the 2010 Plan and any award agreement.

*Award Agreement*. Options to purchase ordinary shares granted under the 2010 Plan are evidenced by an award agreement that sets forth the terms and conditions for each grant.

*Exercise Price*. The excises price of an option or a share appreciation right will be determined by the plan administrator, but shall not be less than the fair market value on the grant date of the respective option or share appreciation right. In certain circumstances, such as a recapitalization, a spin-off, reorganization, merger, separation and split-up, the plan administrator may adjust the exercise price of outstanding options and share appreciation rights.

*Eligibility*. We may grant awards to our employees, directors or consultants or employees, directors or consultants or our affiliates.

*Term of the Awards*. The term of each option or share appreciation right granted under the 2010 Plan shall not exceed ten years from date of the grant.

146

**Table of Contents**

*Vesting Schedule*. In general, the plan administrator determines the vesting schedule, which is set forth in the award agreement.

*Acceleration of Awards upon Change in Control*. The plan administrator may determine, at the time of grant or thereafter, that an award shall become vested and exercisable, in full or in part, in the event that a change in control of our company occurs.

*Transfer Restrictions*. Awards may not be transferred in any manner by the recipient other than by will or the laws of descent and distribution, except as otherwise provided by the plan administrator.

*Termination*. The plan shall terminate on October 17, 2020 provided that our board may terminate the plan at any time and for any reason.

### 2017 Share Incentive Plan

We also adopted an equity incentive plan on November 30, 2017, or the 2017 Plan, which was further amended on December 7, 2017, for the purpose of promoting the success and enhance the value of iQIYI, Inc., by linking the personal interests of the members of the board, employees, consultants and other individuals to those of our shareholders and, by providing an incentive for outstanding performance, to generate superior returns for our shareholders. Under the 2017 Plan, the maximum aggregate number of ordinary shares which may be issued pursuant to all awards is 720,000 ordinary shares. As of the date of this prospectus, 720,000 restricted share units were outstanding under the 2017 Plan.

The following paragraphs summarize the terms of the 2017 Plan.

*Types of Awards.* The Plan permits the awards of options, restricted shares and restricted share units.

*Plan Administration.* A committee of one or more members of the board acts as the plan administrator. The plan administrator will determine the participants who are to receive awards, the type or types of awards to be granted, the number of awards to be granted, and the terms and conditions of each award grant. The plan administrator can amend outstanding awards and interpret the terms of the 2017 Plan and any award agreement.

*Award Agreement*. Awards granted under the 2017 Plan are evidenced by an award agreement that sets forth the terms and conditions for each grant.

*Exercise Price*. The excises price of an option will be determined by the plan administrator, but shall not be less than the fair market value on the grant date of the respective option or share appreciation right. In certain circumstances, such as a recapitalization, a spin-off, reorganization, merger, separation and split-up, the plan administrator may adjust the exercise price of outstanding options and share appreciation rights.

*Eligibility*. We may grant awards to our employees, consultants, and all members of the board, and other individuals.

*Term of the Awards*. The term of each option or share appreciation right granted under the 2017 Plan shall not exceed ten years from date of the grant.

*Vesting Schedule*. In general, the plan administrator determines the vesting schedule, which is set forth in the relevant award agreement.

*Transfer Restrictions*. Awards may not be transferred in any manner by the recipient other than by will or the laws of descent and distribution, except as otherwise provided by the plan administrator.

*Termination*. The plan shall terminate on November 29, 2027, provided that our board may terminate the plan at any time and for any reason.

147

**Table of Contents**

The following table summarizes, as of the date of this prospectus, the outstanding options that we granted to our directors and executive officers:

| Name | Ordinary Shares Underlying Outstanding Options | Exercise Price ($/Share) | Grant Date | Expiration Date |
|---|---|---|---|---|
| Robin Yanhong Li | — | — | — | — |
| Qi Lu | — | — | — | — |
| Yu Gong | 91,671,135 | 0.25 to 0.51 | Various dates from October 18, 2010 to February 14, 2017 | Various dates from October 17, 2020 to February 13, 2027 |
| Herman Yu | — | — | — | — |
| Xuyang Ren | — | — | — | — |
| Victor Zhixiang Liang | — | — | — | — |
| Chuan Wang | — | — | — | — |
| Xiaodong Wang | * | 0.51 | February 23, 2015 and February 14, 2017 | February 22, 2025 and February 13, 2027 |
| Xiaohui Wang | * | 0.51 | August 5, 2016 and February 14, 2017 | August 4, 2026 and February 13, 2027 |
| Xing Tang | * | 0.25 to 0.51 | Various dates from December 15, 2014 to February 14, 2017 | Various dates from December 14, 2024 to February 13, 2027 |
| Xiangjun Wang | * | 0.25 to 0.51 | Various dates from October 18, 2010 to February 14, 2017 | Various dates from October 17, 2020 to February 13, 2027 |
| Xianghua Yang | * | 0.25 to 0.51 | Various dates from October 18, 2010 to February 14, 2017 | Various dates from October 17, 2020 to February 13, 2027 |
| Youqiao Duan | * | 0.25 to 0.51 | Various dates from May 8, 2012 to February 14, 2017 | Various dates from May 7, 2022 to February 13, 2027 |
| Total | 158,371,135 | 0.25 to 0.51 | Various dates from October 18, 2010 to February 14, 2017 | Various dates from October 17, 2020 to February 13, 2027 |

———————

*     Less than 1% of our total ordinary shares outstanding assuming conversion of all preferred shares into ordinary shares.

As of the date of this prospectus, other grantees as a group (i) held options to purchase 140,394,980 Class A ordinary shares of our company, with exercise prices ranging from US$0.25 to US$0.51 per share, and (ii) 720,000 restricted share units.

148

**Table of Contents**

**PRINCIPAL SHAREHOLDERS**

The following table sets forth information concerning the beneficial ownership of our ordinary shares as of the date of this prospectus, assuming conversion of (i) all outstanding ordinary and preferred shares held by shareholders other than Baidu or its affiliates into Class A ordinary shares, and (ii) all outstanding ordinary and preferred shares held by Baidu or its affiliates into Class B ordinary shares, by:

• each of our directors and executive officers; and

• each person known to us to beneficially own more than 5% of our ordinary shares.

We will adopt a dual-class ordinary share structure (with a third class of authorized but as yet undesignated shares) which will become effective immediately prior to the completion of this offering. All ordinary and preferred shares held by shareholders other than Baidu and its affiliates will be converted into Class A ordinary shares, and all ordinary and preferred shares held by Baidu or its affiliates will be converted into Class B ordinary shares. The calculations in the table below are based on 4,078,871,988 ordinary shares on an as-converted basis outstanding as of the date of this prospectus and           ordinary shares outstanding immediately after the completion of this offering, including (i)           Class A ordinary shares to be sold by us in this offering in the form of ADSs, (ii)           Class A ordinary shares redesignated and converted from ordinary and preferred shares held by shareholders other than Baidu and its affiliates and (iii)           Class B ordinary shares redesignated and converted from outstanding ordinary shares and preferred shares held by Baidu or its affiliates, assuming that the underwriters do not exercise their option to purchase additional ADSs. The calculations in the table below does not include the 36,860,691 Class B ordinary shares that we expect to issue to Baidu Holdings no later than May 31, 2018, pursuant to a share purchase agreement we entered into with Baidu Holdings on February 12, 2018. See "Our Relationship with Baidu."

149

**Table of Contents**

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant, or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Ordinary Shares Beneficially Owned Prior to This Offering | | Class A Ordinary Shares Being Sold in This Offering | | Class A Ordinary Shares Beneficially Owned After This Offering | | Class B Ordinary Shares Beneficially Owned After This Offering | | Voting Power After This Offering |
|---|---|---|---|---|---|---|---|---|---|
| | Number | % | Number | % | Number | % | Number | % | % |
| **Directors and Executive Officers**\*\*: | | | | | | | | | |
| Robin Yanhong Li[1] | 2,839,530,705 | 69.6 | | | | | | | |
| Qi Lu | — | — | | | | | | | |
| Yu Gong[2] | 74,443,172 | 1.8 | | | | | | | |
| Herman Yu | — | — | | | | | | | |
| Xuyang Ren[3] | — | — | | | | | | | |
| Victor Zhixiang Liang | — | — | | | | | | | |
| Chuan Wang[4] | — | — | | | | | | | |
| Sam Hanhui Sun\*\*\* | — | — | | | | | | | |
| Xiaodong Wang | * | * | | | | | | | |
| Xiaohui Wang | * | * | | | | | | | |
| Xing Tang | * | * | | | | | | | |
| Xiangjun Wang | * | * | | | | | | | |
| Xianghua Yang | * | * | | | | | | | |
| Youqiao Duan | * | * | | | | | | | |
| All Directors and Executive Officers as a Group | 2,941,052,002 | 70.6 | | | | | | | |
| **Principal Shareholders**: | | | | | | | | | |
| Baidu Holdings[5] | 2,839,530,705 | 69.6 | | | | | | | |
| Xiaomi Ventures Limited[6] | 341,874,885 | 8.4 | | | | | | | |
| HH RSV-V Holdings Limited[7] | 232,060,527 | 5.7 | | | | | | | |

Notes:

\*    Less than 1%.

\*\*   Except for Xuyang Ren and Chuan Wang, the business address of our directors and executive officers is 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing 100080, China.

\*\*\*  Mr. Sam Hanhui Sun has accepted appointment as our independent director, effective upon the effectiveness of the registration statement of which this prospectus is a part.

(1)  Mr. Li has the majority voting power in Baidu and is deemed to beneficially own iQIYI's shares held by Baidu Holdings. The beneficial ownership of Mr. Robin Yanhong Li as described in this table does not include the 36,860,691 Class B ordinary shares that we expect to issue to Baidu Holdings on May 31, 2018, pursuant to a share purchase agreement we entered into with Baidu Holdings on February 12, 2018. See "Our Relationship with Baidu."

(2)  Representing (i) 60,878,747 ordinary shares that Dr. Gong may purchase upon exercise of options within 60 days of the date of this prospectus, (ii) 7,500,251 ordinary shares held by Cannes Ventures Limited and (iii) 6,064,174 ordinary shares issuable upon conversion of the same number of Series A-1 convertible junior preferred shares held by Cannes Ventures Limited, a company incorporated in the Cayman Islands. Cannes Ventures Limited is wholly-owned by Dr. Gong. The registered address of Cannes Ventures Limited is 190 Elgin Avenue, George Town, Grand Cayman, Cayman Islands.

(3)  The business address of Mr. Xuyang Ren is Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, China.

(4)  The business address of Mr. Chuan Wang is Building C, Qinghe Shunshijiaye Technology Park, No. 66 Zhufang Road, Haidian District, Beijing 100085, China.

(5)  Representing 342,548,237 ordinary shares, 200,000,000 ordinary shares issuable upon conversion of the same number of Series A convertible preferred shares, 123,103,264 ordinary shares issuable upon conversion of the same number of Series B convertible preferred shares, 302,891,196 ordinary shares issuable upon conversion of the same number of Series C convertible preferred shares, 848,682,647 ordinary shares issuable upon conversion of the same number of Series D convertible preferred shares, 686,646,383 ordinary shares issuable upon conversion of the same number of Series E convertible preferred shares, 136,749,954 ordinary shares issuable upon

150

**Table of Contents**

conversion of the same number of Series F convertible preferred shares, and 198,909,024 ordinary shares issuable upon conversion of the same number of Series G-1 convertible preferred shares, all held by Baidu Holdings, a company incorporated in British Virgin Islands. Baidu Holdings is a wholly owned subsidiary of Baidu. The registered address of Baidu Holdings is No.10 Shangdi 10th Street, Haidian District, Beijing 100085, China. The beneficial ownership of Baidu Holdings as described in this table does not include the 36,860,691 Class B ordinary shares that we expect to issue to Baidu Holdings on May 31, 2018, pursuant to a share purchase agreement we entered into with Baidu Holdings on February 12, 2018. See "Our Relationship with Baidu."

(6)   Representing 341,874,885 ordinary shares issuable upon conversion of the same number of Series F convertible preferred shares held by Xiaomi Ventures Limited, a company incorporated in British Virgin Islands. Xiaomi Ventures Limited is beneficially owned and controlled by Xiaomi Corporation. The registered address of Xiaomi Ventures Limited is P.O. Box 2221, Road Town, Tortola, British Virgin Islands.

(7)   Representing 232,060,527 ordinary shares issuable upon conversion of the same number of Series G-2 convertible preferred shares held by HH RSV-V Holdings Limited, a company incorporated in the Cayman Islands. HH RSV-V Holdings Limited is beneficially owned and controlled by Hillhouse Fund III, L.P. The registered address of HH RSV-V Holdings Limited is 89 Nexus Way, Camana Bay, P.O. Box 31106, Grand Cayman KY1-1205, Cayman Islands.

As of the date of this prospectus, other than 33,151,504 of our Series G-2 preferred shares held by one record holder in the United States, none of our issued and outstanding shares are held by record holders in the United States.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

151

**Table of Contents**

### RELATED PARTY TRANSACTIONS

**Transactions with Baidu**

For the years ended December 31, 2015, 2016 and 2017, we generated membership services revenue of RMB5.1 million, RMB3.1 million and RMB4.2 million (US$0.6 million), respectively, advertising services revenue of RMB28.3 million, RMB116.0 million and RMB18.3 million (US$2.8 million), respectively, and other revenues of RMB24.1 million, RMB6.6 million and RMB58.5 million (US$9.0 million), respectively, from Baidu.

We incurred cost of revenues for license fees in the amount of nil, RMB5.6 million and RMB8.3 million (US$1.3 million) for the years ended December 31, 2015 and 2016 and 2017, respectively. We also incurred cost of revenues for bandwidth in the amount of RMB88.9 million (US$13.7 million) for the year ended December 31, 2017. We incurred selling, general and administrative expenses for advertising services and traffic acquisition service provided by Baidu in the amount of RMB83.2 million, RMB74.2 million and RMB66.0 million (US$10.1 million) for the years ended December 31, 2015, 2016 and 2017, respectively. We incurred research and development expenses for cloud services provided by Baidu in the amount of nil, RMB0.9 million and RMB2.8 million (US$0.4 million) for the years ended December 31, 2015, 2016 and 2017, respectively. We incurred interest expenses for entrusted loans provided by Baidu and the convertible notes payable to Baidu in the amount of RMB55.1 million, RMB106.7 million and RMB168.2 million (US$25.8 million) for the years ended December 31, 2015 and 2016 and 2017, respectively.

As of December 31, 2016 and 2017, we had RMB22.4 million and RMB10.0 million (US$1.5 million), respectively, due from Baidu. The balance mainly represents amounts due from Baidu for advertising services and other services. We had loan receivable from Baidu of RMB209.4 million and nil as of December 31, 2016 and 2017, respectively, which mainly represented interest-free and uncollateralized loans provided to Baidu that were fully repaid in 2017. In April 2017, we provided an interest-free USD denominated loan of US$330.2 million to Baidu, which was fully repaid in December 2017.

As of December 31, 2016 and 2017, we had RMB236.9 million and RMB77.6 million (US$11.9 million), respectively, due to Baidu. The related party balances mainly represented a deposit, accrued expenses for advertising services and cloud services provided by Baidu as of December 31, 2016 and accrued expenses for bandwidth services provided by Baidu as of December 31, 2017. As of December 31, 2016 and 2017, we had RMB4.7 billion and RMB50.0 million (US$7.7 million), respectively, in loans due to Baidu. As of December 31, 2016 and 2017, the total outstanding balance includes an interest-free loan of RMB50.0 million, which was due on demand and the remaining outstanding balance as of December 31, 2016 was RMB denominated entrusted loans provided by Baidu with a weighted average interest rate of 4.34%, which were fully repaid in 2017. In April 2017, we borrowed a RMB denominated loan of RMB2,220.0 million (US$341.2 million) with an interest rate of 3.92% from Baidu, which was fully repaid in December 2017.

We have entered into a master business cooperation agreement and other agreements with Baidu. See "Our Relationship with Baidu."

**Contractual Arrangements with our Consolidated Affiliated Entities and Their Shareholders**

See "Corporate History and Structure."

**Private Placements**

See "Description of Share Capital—History of Securities Issuances."

**Shareholders Agreement**

See "Description of Share Capital—History of Securities Issuances."

152

Case 1:20-cv-01830-DG-TAM   Document 160-1   Filed 03/03/23   Page 161 of 1052
PageID #: 5594

**Table of Contents**

**Employment Agreements and Indemnification Agreements**

See "Management—Employment Agreements and Indemnification Agreements."

**Share Incentives**

See "Management—Equity Incentive Plans."

**Other Transactions with Related Parties**

Xiaomi Ventures Limited and its affiliates, or Xiaomi Group, ceased to be our principal owner under ASC topic 850, *Related Party Disclosures*, on October 26, 2017, hence the related party transactions with Xiaomi Group for the year ended December 31, 2017 includes transactions that occurred from January 1, 2017 to October 26, 2017.

We generate revenues from memberships sold by Xiaomi Group, through various Xiaomi products. For the years ended December 31, 2015, 2016 and 2017, we generated RMB2.1 million, RMB26.8 million and RMB81.5 million (US$12.5 million), respectively, for such membership services revenue. We also provide advertising services to Xiaomi Group, and generated revenues of nil, RMB60.8 million and RMB9.2 million (US$1.4 million) for such services for the years ended December 31, 2015, 2016 and 2017, respectively. For the years ended December 31, 2015, 2016 and 2017, we also generated other revenues of RMB10.6 million, RMB7.1 million and RMB4.6 million (US$0.7 million), respectively, from Xiaomi Group for other services. As of December 31, 2016, we had RMB41.3 million due from Xiaomi Group, arising from the aforementioned membership services revenue, advertising services and other services.

We incurred cost of revenues for commissions to Xiaomi Group for memberships and advertising services sold through or, presented by various Xiaomi products. For the year ended December 31, 2015, 2016 and 2017, we incurred such cost of revenues in the amount of RMB8.7 million, RMB18.1 million and RMB42.6 million (US$6.5 million), respectively. We also incurred expenses for advertisements of our service on Xiaomi products, such as Xiaomi smartphones and Mi Box. For the year ended December 31, 2015, 2016 and 2017, we incurred such advertising expenses in the amount of RMB10.5 million, RMB44.0 million and RMB82.8 million (US$12.7 million), respectively. As of December 31, 2016, we had RMB26.2 million due to Xiaomi Group, arising from the aforementioned commissions and advertising services provided by Xiaomi Group.

153

Table of Contents

**DESCRIPTION OF SHARE CAPITAL**

We are a Cayman Islands exempted company with limited liability and our affairs are governed by our memorandum and articles of association, as amended and restated from time to time, and the Companies Law (2016 Revision) of the Cayman Islands, which is referred to as the Companies Law below.

As of the date of this prospectus, our authorized share capital is US$137,288.235 divided into (a) 10,000,000,000 ordinary shares of a par value of US$0.00001 each, (b) 200,000,000 redeemable, convertible Series A Preferred Shares of a par value of US$0.00001 each, (c) 6,064,174 convertible Series A-1 Junior Preferred Shares of a par value of US$0.00001 each, (d) 123,103,264 redeemable, convertible Series B Preferred Shares of a par value of US$0.00001 each, (e) 302,891,196 redeemable, convertible Series C Preferred Shares of a par value of US$0.00001 each, (f) 848,682,647 redeemable, convertible Series D Preferred Shares of a par value of US$0.00001 each, (g) 686,646,383 redeemable, convertible Series E Preferred Shares of a par value of US$0.00001 each, (h) 546,999,817 redeemable, convertible Series F Preferred Shares of a par value of US$0.00001 each, (i) 215,484,776 redeemable, convertible Series G1 Preferred Shares of a par value of US$0.00001 each and (j) 798,951,243 redeemable, convertible Series G2 Preferred Shares of a par value of US$0.00001 each.

We will adopt ninth amended and restated memorandum and articles of association, which will become effective immediately upon completion of this offering and will replace our existing eighth amended and restated memorandum and articles of association in their entirety. Our post-offering amended and restated memorandum and articles of association will provide that, upon the closing of this offering, our authorized share capital will be US$1,000,000 divided into 100,000,000,000 shares comprising of (i) 94,000,000,000 Class A Ordinary Shares of a par value of US$0.00001 each, (ii) 5,000,000,000 Class B Ordinary Shares of a par value of US$0.00001 each and (iii) 1,000,000,000 shares of a par value of US$0.00001 each of such class or classes (however designated) as the board of directors may determine in accordance with the ninth amended and restated memorandum and articles of association of the Company. All outstanding ordinary shares and preferred shares held, directly or indirectly, by Baidu or its affiliates will be immediately and automatically re-designated or converted into Class B ordinary shares on a one-for-one basis, and all outstanding ordinary and preferred shares other than those held by Baidu or its affiliates will be automatically re-designated or converted into Class A ordinary shares on a one-for-one basis immediately prior to the completion of this offering. Immediately upon the completion of this offering, we will have          Class A ordinary shares and          Class B ordinary shares outstanding, assuming the underwriters do not exercise their over-allotment options. We will issue          Class A ordinary shares represented by our ADSs in this offering. All incentive shares, including options, restricted shares and restricted share units, regardless of grant dates, will entitle holders to an equivalent number of Class A ordinary shares once the vesting and exercising conditions are met. The following are summaries of material provisions of our post-offering amended and restated memorandum and articles of association and the Companies Law insofar as they relate to the material terms of our ordinary shares.

**Ordinary Shares**

*General*. All of our outstanding ordinary shares are fully paid and non-assessable. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are non-residents of the Cayman Islands may freely hold and vote their ordinary shares. Our company will issue only non-negotiable shares, and will not issue bearer or negotiable shares.

*Register of Members*. Under Cayman Islands law, we must keep a register of members and there should be entered therein:

- the names and addresses of the members, a statement of the shares held by each member, and of the amount paid or agreed to be considered as paid, on the shares of each member;

154

**Table of Contents**

- the date on which the name of any person was entered on the register as a member; and

- the date on which any person ceased to be a member.

Under Cayman Islands law, the register of members of our company is prima facie evidence of the matters set out therein (i.e. the register of members will raise a presumption of fact on the matters referred to above unless rebutted) and a member registered in the register of members is deemed as a matter of Cayman Islands law to have legal title to the shares as set against its name in the register of members. Upon the closing of this offering, the register of members will be immediately updated to record and give effect to the issue of shares by us to JPMorgan Chase Bank, N.A. (or its nominee) as the depositary. Once our register of members has been updated, the shareholders recorded in the register of members should be deemed to have legal title to the shares set against their name in the register of members.

If the name of any person is incorrectly entered in or omitted from our register of members, or if there is any default or unnecessary delay in entering on the register the fact of any person having ceased to be a member of our company, the person or member aggrieved (or any member of our company or our company itself) may apply to the Cayman Islands Grand Court for an order that the register be rectified, and the Court may either refuse such application or it may, if satisfied of the justice of the case, make an order for the rectification of the register.

*Dividends.* The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors (provided always that dividends may be declared and paid only out of funds legally available therefor, namely out of either profit, retained earnings or our share premium account, and provided further that a dividend may not be paid if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business).

*Classes of Ordinary Shares.* Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares (and a further class of authorized but undesignated shares). Except for conversion rights and voting rights, the Class A ordinary shares and Class B ordinary shares shall carry equal rights and rank pari passu with one another, including but not limited to the rights to dividends (subject to the ability of the board of directors, under our post-offering memorandum and articles of association, to determine that a dividend shall be paid wholly or partly by the distribution of specific assets (which may consist of the shares or securities of any other company) and to settle all questions concerning such distribution (including fixing the value of such assets, determining that cash payment shall be made to some shareholders in lieu of specific assets and vesting any such specific assets in trustees on such terms as the directors think fit)) and other capital distributions.

*Conversion.* Class B ordinary shares may be converted into the same number of Class A ordinary shares by the holders thereof at any time, while Class A ordinary shares cannot be converted into Class B ordinary shares under any circumstances.

*Voting Rights.* Holders of Class A ordinary shares and Class B ordinary shares shall, at all times, vote together as one class on all matters submitted to a vote by the members at any general meeting of the Company. Each Class A ordinary share shall be entitled to one vote on all matters subject to the vote at general meetings of our company, and each Class B ordinary share shall be entitled to ten votes on all matters subject to the vote at general meetings of our company. Voting at any meeting of shareholders is by show of hands unless a poll is demanded. A poll may be demanded by the chairman of such meeting or any one shareholder present in person or by proxy.

Walkers, our counsel as to Cayman Islands law, has advised that such voting structure is in compliance with current Cayman Islands law as in general terms, a company and its shareholders are free to provide in the articles of association for such rights as they consider appropriate, subject to such rights not being contrary to any provision of the Companies Law and not inconsistent with common law.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attached to the ordinary shares cast by those shareholders entitled to vote who are present in person or

155

Table of Contents

by proxy (or, in the case of corporations, by their duly authorized representatives) at a general meeting, while a special resolution requires the affirmative vote of a majority of no less than two-thirds of the votes attached to the ordinary shares cast by those shareholders who are present in person or by proxy (or, in the case of corporations, by their duly authorized representatives) at a general meeting. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Law and our memorandum and articles of association. A special resolution will be required for important matters such as a change of name or making changes to our memorandum and articles of association.

*Transfer of Ordinary Shares.* Any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

However, our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid up or on which our company has a lien. Our board of directors may also decline to register any transfer of any ordinary share unless:

- the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of shares;

- the instrument of transfer is properly stamped, if required;

- a fee of such maximum sum as the Nasdaq Global Market may determine to be payable, or such lesser sum as the board of directors may from time to time require, is paid to the Company in respect thereof; and

- in the case of a transfer to joint holders, the transfer is not to more than four joint holders.

If our directors refuse to register a transfer they are required, within three months after the date on which the instrument of transfer was lodged, to send to each of the transferor and the transferee notice of such refusal.

*Liquidation.* On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of ordinary shares or, on a winding up, with the sanction of a special resolution of the Company and any other sanction required by the Companies Law), assets available for distribution among the holders of ordinary shares will be distributed among the holders of the ordinary shares on a pro rata basis (subject to, on a winding up where the assets available for distribution amongst the shareholders of the Company shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, a deduction from ordinary shares in respect of which there are monies due of all monies payable to the Company for unpaid calls or otherwise). If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that, as nearly as may be, the losses are borne by our shareholders proportionately. We are a "limited liability" company registered under the Companies Law, and under the Companies Law, the liability of our members is limited to the amount, if any, unpaid on the shares respectively held by them. Our post-offering memorandum of association contains a declaration that the liability of our members is so limited.

*Calls on Ordinary Shares and Forfeiture of Ordinary shares.* Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their ordinary shares (together with any interests which may have accrued). The ordinary shares that have been called upon and remain unpaid are subject to forfeiture.

*Redemption, Repurchase and Surrender of Ordinary Shares.* We may issue shares on terms that such shares are subject to redemption, at our option or at the option of the holders thereof, on such terms and in such manner as may be determined, before the issue of such shares, by our board of directors or by an ordinary resolution of our shareholders. Our company may also repurchase any of our shares provided that the manner and terms of

156

Table of Contents

such purchase have been approved by our board of directors or by ordinary resolution of our shareholders, or are otherwise authorized by our memorandum and articles of association. Under the Companies Law, the redemption or repurchase of any share may be paid out of our company's profits or out of the proceeds of a fresh issue of shares made for the purpose of such redemption or repurchase, or out of capital (including share premium account and capital redemption reserve) if our company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Law no such share may be redeemed or repurchased (a) unless it is fully paid up, (b) if such redemption or repurchase would result in there being no shares outstanding other than shares held as treasury shares, or (c) if the company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

*Variations of Rights of Shares*. If at any time, our share capital is divided into different classes of shares, all or any of the attached to any such class may (subject to any rights or restrictions for the time being attached to any class of share) only be materially adversely varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by the holders of two-thirds of the issued shares of that class. The rights conferred upon the holders of the shares of any class issued with preferred or other rights will not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be materially adversely varied by the creation or issue of further shares ranking pari passu with or subsequent to such existing class of shares or the redemption or purchase of any shares of any class by the Company. The rights of the holders of shares shall not be deemed to be materially adversely varied by the creation or issue of shares with preferred or other rights including, without limitation, the creation of shares with enhanced or weighted voting rights.

*General Meetings of Shareholders and Shareholder Proposals.* As a Cayman Islands exempted company, we are not obliged by the Companies Law to call shareholders' annual general meetings. Our post-offering memorandum and articles of association provide that we may (but are not obliged to) in each year hold a general meeting as our annual general meeting in which case we shall specify the meeting as such in the notices calling it, and the annual general meeting shall be held at such time and place as may be determined by our directors.

Shareholders' annual general meetings and any other general meetings of our shareholders may be convened by a majority of our board of directors or our chairman. Advance notice of at least seven calendar days is required for the convening of our annual general shareholders' meeting and any other general meeting of our shareholders. A quorum required for a general meeting of shareholders consists of one or more shareholders present or by proxy, representing not less than one-third in nominal value of the total issued voting shares in our company.

Cayman Islands law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our post-offering memorandum and articles of association allow our shareholders holding shares representing in aggregate not less than one-third (1/3) of all votes attaching to all issued and outstanding shares of the Company that as at the date of the deposit of such requisition carry the right to vote at general meetings of the Company, to requisition an extraordinary general meeting of the shareholders, in which case our directors are obliged to call such meeting and to put the resolutions so requisitioned to a vote at such meeting; however, our post-offering memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders.

*Inspection of Books and Record*s. Holders of our ordinary shares have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. However, we intend to provide our shareholders with annual audited financial statements. See "Where You Can Find Additional Information."

157

**Table of Contents**

*Changes in Capital.* Our shareholders may from time to time by ordinary resolution:

- increase our share capital by such sum, to be divided into shares of such classes and amount, as the resolution shall prescribe;

- consolidate and divide all or any of our share capital into shares of a larger amount than our existing shares;

- sub-divide our existing shares, or any of them into shares of a smaller amount, provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in case of the share from which the reduced share is derived; or

- cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of our share capital by the amount of the shares so canceled.

Our shareholders may by special resolution, subject to confirmation by the Grand Court of the Cayman Islands on an application by our company for an order confirming such reduction, reduce our share capital or any capital redemption reserve in any manner permitted by law.

*Exempted Company.* We are an exempted company with limited liability under the Companies Law of the Cayman Islands. The Companies Law in the Cayman Islands distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary company except for the exemptions and privileges listed below:

- an exempted company does not have to file an annual return of its shareholders with the Registrar of Companies;

- an exempted company's register of members is not required to be open to inspection;

- an exempted company does not have to hold an annual general meeting;

- an exempted company may issue no par value shares;

- an exempted company may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given for 20 years in the first instance);

- an exempted company may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

- an exempted company may register as a limited duration company; and

- an exempted company may register as a segregated portfolio company.

"Limited liability" means that the liability of each shareholder is limited to the amount unpaid by the shareholder on that shareholder's shares of the company (except in exceptional circumstances, such as involving fraud, the establishment of an agency relationship or an illegal or improper purpose or other circumstances in which a court may be prepared to pierce or lift the corporate veil). Upon the closing of this offering, we will be subject to reporting and other informational requirements of the Exchange Act, as applicable to foreign private issuers. Except as otherwise disclosed in this prospectus, we currently intend to comply with the Nasdaq rules in lieu of following home country practice after the closing of this offering.

### Differences in Corporate Law

The Companies Law is derived, to a large extent, from the older Companies Acts of England but does not follow recent United Kingdom statutory enactments, and accordingly there are significant differences between

158

**Table of Contents**

the Companies Law and the current Companies Act of England. In addition, the Companies Law differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Law applicable to us and the comparable provisions of the laws applicable to companies incorporated in the United States and their shareholders.

*Mergers and Similar Arrangements*. The Companies Law permits mergers and consolidations between Cayman Islands companies and between Cayman Islands companies and non-Cayman Islands companies. For these purposes, (a) "merger" means the merging of two or more constituent companies and the vesting of their undertaking, property and liabilities in one of such companies as the surviving company and (b) a "consolidation" means the combination of two or more constituent companies into a combined company and the vesting of the undertaking, property and liabilities of such companies to the consolidated company. In order to effect such a merger or consolidation, the directors of each constituent company must approve a written plan of merger or consolidation, which must then be authorized by (a) a special resolution of the shareholders of each constituent company, and (b) such other authorization, if any, as may be specified in such constituent company's articles of association. The written plan of merger or consolidation must be filed with the Registrar of Companies together with a declaration as to the solvency of the consolidated or surviving company, a list of the assets and liabilities of each constituent company and an undertaking that a copy of the certificate of merger or consolidation will be given to the members and creditors of each constituent company and that notification of the merger or consolidation will be published in the Cayman Islands Gazette. Dissenting shareholders have the right to be paid the fair value of their shares (which, if not agreed between the parties, will be determined by the Cayman Islands court) if they follow the required procedures, subject to certain exceptions. Court approval is not required for a merger or consolidation which is effected in compliance with these statutory procedures.

In addition, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement is approved by a majority in number of each class of shareholders or creditors (representing 75% by value) with whom the arrangement is to be made and who must, in addition, represent three-fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder or creditor has the right to express to the court the view that the transaction ought not to be approved, the court would likely to approve the arrangement if it determines that:

- the statutory provisions as to the required majority vote have been met;

- the shareholders have been fairly represented at the meeting in question and the statutory majority are acting bona fide without coercion of the minority to promote interests adverse to those of the class;

- the arrangement is such that may be reasonably approved by an intelligent and honest man of that class acting in respect of his interest; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Law.

When a takeover offer is made and accepted by holders of 90% of the shares affected within four months, the offeror may, within a two-month period commencing on the expiration of such four-month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection can be made to the Grand Court of the Cayman Islands but this is unlikely to succeed in the case of an offer which has been so approved unless there is evidence of fraud, bad faith or collusion.

If an arrangement and reconstruction is thus approved, the dissenting shareholder would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of Delaware corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

159

**Table of Contents**

*Shareholders' Suits*. In principle, we will normally be the proper plaintiff and as a general rule a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, the Cayman Islands court can be expected to apply and follow the common law principles (namely the rule in Foss v. Harbottle and the exceptions thereto) which permit a minority shareholder to commence a class action against, or derivative actions in the name of, a company to challenge the following:

- an act which is illegal or ultra vires;

- an act which, although not ultra vires, could only be effected duly if authorized by a special or qualified majority vote that has not been obtained; and

- an act which constitutes a fraud on the minority where the wrongdoers are themselves in control of the company.

*Indemnification of Directors and Executive Officers and Limitation of Liability*. Cayman Islands law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. Our post-offering memorandum and articles of association provide that our directors and officers shall be indemnified against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such director or officer, other than by reason of such person's own dishonesty, willful default or fraud, in or about the conduct of our company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such director or officer in defending (whether successfully or otherwise) any civil proceedings concerning our company or its affairs in any court whether in the Cayman Islands or elsewhere. This standard of conduct is generally the same as permitted under the Delaware General Corporation Law for a Delaware corporation. In addition, we have entered into indemnification agreements with each of our directors and executive officers that will provide such persons with additional indemnification beyond that provided in our post-offering memorandum and articles of association.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers or persons controlling us under the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

*Anti-Takeover Provisions in the Memorandum and Articles of Association*. Some provisions of our post-offering memorandum and articles of association may discourage, delay or prevent a change in control of our company or management that shareholders may consider favorable, including provisions that authorize our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders.

However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under our memorandum and articles of association, as amended and restated from time to time, for a proper purpose and for what they believe in good faith to be in the best interests of our company.

*Directors' Fiduciary Duties*. Under Delaware corporate law, a director of a Delaware corporation has a fiduciary duty to the corporation and its shareholders. This duty has two components: the duty of care and the duty of loyalty. The duty of care requires that a director act in good faith, with the care that an ordinarily prudent person would exercise under similar circumstances. Under this duty, a director must inform himself of and disclose to shareholders, all material information reasonably available regarding a significant transaction. The duty of loyalty requires that a director act in a manner he or she reasonably believes to be in the best interests of

Table of Contents

the corporation. He or she must not use his or her corporate position for personal gain or advantage. This duty prohibits self-dealing by a director and mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally. In general, actions of a director are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. However, this presumption may be rebutted by evidence of a breach of one of the fiduciary duties. Should such evidence be presented concerning a transaction by a director, a director must prove the procedural fairness of the transaction and that the transaction was of fair value to the corporation.

As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore he owes the following duties to the company—a duty to act in good faith in the best interests of the company, a duty not to make a personal profit based on his or her position as director (unless the company permits him to do so), a duty not to put himself in a position where the interests of the company conflict with his or her personal interest or his or her duty to a third party and a duty to exercise powers for the purpose for which such powers were intended. A director of a Cayman Islands company owes to the company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his or her duties a greater degree of skill than may reasonably be expected from a person of his or her knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands.

*Shareholder Proposals*. Under the Delaware General Corporation Law, a shareholder has the right to put any proposal before the annual meeting of shareholders, provided it complies with the notice provisions in the governing documents. The Delaware General Corporation Law does not provide shareholders an express right to put any proposal before the annual meeting of shareholders, but in keeping with common law, Delaware corporations generally afford shareholders an opportunity to make proposals and nominations provided that they comply with the notice provisions in the certificate of incorporation or bylaws. A special meeting may be called by the board of directors or any other person authorized to do so in the governing documents, but shareholders may be precluded from calling special meetings.

Cayman Islands law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our post-offering memorandum and articles of association provides that, on the requisition of shareholders holding shares representing in aggregate not less than one-third (1/3) of all votes attaching to all issued and outstanding shares of the Company that as at the date of the deposit of such requisition carry the right to vote at general meetings of the Company, the board shall convene an extraordinary general meeting. However, our post-offering memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders. As an exempted Cayman Islands company, we are not obliged by law to call shareholders' annual general meetings.

*Cumulative Voting*. Under the Delaware General Corporation Law, cumulative voting for elections of directors is not permitted unless the corporation's certificate of incorporation specifically provides for it. Cumulative voting potentially facilitates the representation of minority shareholders on a board of directors since it permits the minority shareholder to cast all the votes to which the shareholder is entitled on a single director, which increases the shareholder's voting power with respect to electing such director. Cayman Islands law does not prohibit cumulative voting, but our post-offering articles of association do not provide for cumulative voting. As a result, our shareholders are not afforded any less protections or rights on this issue than shareholders of a Delaware corporation.

*Appointment of Directors.* For so long as Baidu Holdings and its affiliates collectively hold no less than 50% of the voting power of the Company, Baidu shall be entitled to appoint, remove and replace a majority of the directors.

161

Table of Contents

The board of directors may, by the affirmative vote of a simple majority of the remaining directors present and voting at a meeting of the board of directors, appoint any person as a director, to fill a casual vacancy on the board of directors that is not a Baidu Holdings appointed director or as an addition to the existing board of directors. A vacancy on the board of directors created by the removal of a non-Baidu Holdings appointed director may be filled by way of an ordinary resolution of the Company's shareholders or by the affirmative vote of a simple majority of the remaining directors present and voting at a meeting of the board of directors.

Each director whose term of office expires shall be eligible for re-election at a meeting of the Company's shareholders or re-appointment by the board of directors.

*Removal of Directors*. Under the Delaware General Corporation Law, a director of a corporation with a classified board may be removed only for cause with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under our post-offering memorandum and articles of association, directors not appointed by Baidu Holdings may be removed by ordinary resolution of our shareholders or pursuant to an existing written agreement between the director and the Company.

*Transactions with Interested Shareholders*. The Delaware General Corporation Law contains a business combination statute applicable to Delaware public corporations whereby, unless the corporation has specifically elected not to be governed by such statute by amendment to its certificate of incorporation or bylaws that is approved by its shareholders, it is prohibited from engaging in certain business combinations with an "interested shareholder" for three years following the date that such person becomes an interested shareholder. An interested shareholder generally is a person or a group who or which owns or owned 15% or more of the target's outstanding voting stock or who or which is an affiliate or associate of the corporation and owned 15% or more of the corporation's outstanding voting stock within the past three years. This has the effect of limiting the ability of a potential acquirer to make a two-tiered bid for the target in which all shareholders would not be treated equally. The statute does not apply if, among other things, prior to the date on which such shareholder becomes an interested shareholder, the board of directors approves either the business combination or the transaction which resulted in the person becoming an interested shareholder. This encourages any potential acquirer of a Delaware corporation to negotiate the terms of any acquisition transaction with the target's board of directors.

Cayman Islands law has no comparable statute. As a result, we cannot avail ourselves of the types of protections afforded by the Delaware business combination statute. However, although Cayman Islands law does not regulate transactions between a company and its significant shareholders, it does provide that such transactions must be entered into bona fide in the best interests of the company and for a proper corporate purpose and not with the effect of constituting a fraud on the minority shareholders.

*Dissolution; Winding Up*. Under the Delaware General Corporation Law, unless the board of directors approves the proposal to dissolve, dissolution must be approved by shareholders holding 100% of the total voting power of the corporation. Only if the dissolution is initiated by the board of directors may it be approved by a simple majority of the corporation's outstanding shares. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions initiated by the board.

Under Cayman Islands law, a company may be wound up by either an order of the courts of the Cayman Islands or by a special resolution of its members or, if the company is unable to pay its debts as they fall due, by an ordinary resolution of its members. The court has authority to order winding up in a number of specified circumstances including where it is, in the opinion of the court, just and equitable to do so.

*Variation of Rights of Shares*. Under the Delaware General Corporation Law, a corporation may vary the rights of a class of shares with the approval of a majority of the outstanding shares of such class, unless the certificate of incorporation provides otherwise. Under our post-offering articles of association, if our share capital is divided into more than one class of shares, we may only materially adversely vary the rights attached to any

162

Table of Contents

class (subject to any rights or restrictions for the time being attached to any class of share) with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by the holders of two-thirds of the issued shares of that class.

*Amendment of Governing Documents*. Under the Delaware General Corporation Law, a corporation's certificate of incorporation may be amended only if adopted and declared advisable by the board of directors and approved by a majority of the outstanding shares entitled to vote and the bylaws may be amended with the approval of a majority of the outstanding shares entitled to vote and may, if so provided in the certificate of incorporation, also be amended by the board of directors. Under the Companies Law, our memorandum and articles of association may only be amended by special resolution of our shareholders.

*Rights of Non-Resident or Foreign Shareholders*. There are no limitations imposed by our post-offering memorandum and articles of association on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our shares. In addition, there are no provisions in our post-offering memorandum and articles of association governing the ownership threshold above which shareholder ownership must be disclosed.

*Directors' Power to Issue Shares*. Under our post-offering memorandum and articles of association, our board of directors is empowered to issue or allot shares or grant options and warrants with or without preferred, deferred, qualified or other special rights or restrictions.

**History of Securities Issuances**

The following is a summary of our securities issuances in the past three years:

*Convertible Notes*

In January 2017, we issued and sold in the aggregate US$1.53 billion of convertible notes to Baidu Holdings, Harvest Rewards Fund LP, Eastone International Co., Ltd, Gorgeous Rainbow Limited, HH RSV-V Holdings Limited, Honey Best Limited, Madrone Opportunity Fund, L.P., Xiang He Fund I, L.P., VMS Video Holdings Limited, IDG Infinity Financial Limited, Run Liang Tai (Hong Kong) Investment Company Limited, SCC Growth IV Holdco A, Ltd. and Silverlink Capital LP.

**Ordinary shares**

On February 2, 2018, we issued 7,500,251 ordinary shares to Cannes Ventures Limited pursuant to the exercise of certain options, and we received an aggregate exercise price of approximately US$2.7 million.

*Preferred Shares*

In October 2017, we issued in aggregate 1,014,436,019 Series G preferred shares to Baidu Holdings, Harvest Rewards Fund LP, Eastone International Co., Ltd, Gorgeous Rainbow Limited, HH RSV-V Holdings Limited, Honey Best Limited, Madrone Opportunity Fund, L.P., Xiang He Fund I, L.P., VMS Video Holdings Limited, IDG Infinity Financial Limited, Run Liang Tai (Hong Kong) Investment Company Limited, SCC Growth IV Holdco A, Ltd. and Silverlink Capital LP upon the conversion of the convertible notes described in the preceding paragraph. Our preferred shares (other than those held by Baidu or its affiliates) will automatically convert into Class A ordinary shares immediately prior to the completion of this offering at an initial conversion ratio of 1:1 adjust for dilutive issuance, split, subdivisions, recapitalization or combination of the outstanding ordinary shares. Our preferred shares held by Baidu or its affiliates will automatically convert into Class B ordinary shares immediately prior to the completion of the offering at an initial conversion ratio of 1:1, subject to adjustment for dilutive issuance, split, subdivisions, recapitalization or combination of the outstanding ordinary shares.

163

Table of Contents

*Option and Restricted Share Unit Grants*

We have granted options to purchase our ordinary shares and restricted share units to certain of our directors, executive officer, employees and employees of Baidu under our 2010 Plan and 2017 Plan, for their past and future services. See "Management—Equity Incentive Plans."

**Shareholders Agreement**

We entered into our currently effective sixth amended and restated shareholders agreement on October 26, 2017 with our shareholders. Pursuant to this shareholders agreement, our board of directors shall consist of seven directors. The holders of a majority of the ordinary shares, voting together as a single class, are entitled to appoint one director, the holders of a majority of the preferred shares (excluding the Series G2 preferred shares), voting together as a single and separate class, are entitled to appoint three directors, Xiaomi is entitled to appoint one director on condition, and the holders of a majority of the ordinary shares and the preferred shares, voting together as a single class and on an as-converted basis, are entitled to appoint the remaining two directors, of whom one shall be the chief executive officer and the other shall be a director with relevant industry experience who is not an affiliate of any of the major shareholders, Xiaomi, Prominent TMT Limited or any Series G preferred shareholder. This shareholders agreement will terminate upon consummation of this offering other than provisions with respect to registration rights.

The shareholders agreement also provides for certain preferential rights, including right of first offer, tag-along rights and preemptive rights. Except for the registration rights, all the preferential rights, as well as the provisions governing the board of directors, will automatically terminate upon the completion of this offering.

Pursuant to our current shareholders agreement, we have granted certain registration rights to our shareholders. Set forth below is a description of the registration rights granted under the agreement.

*Demand Registration Rights.* At any time after the earlier of (i) the four-year period following the date of the shareholders agreement or (ii) 180 days after the effective date of the registration statement for a public offering, holders of at least 30% of the registrable securities then outstanding, or Existing Initiating Holders, holders of at least 30% of the registrable securities issued or issuable upon conversion of the Series F preferred shares then outstanding, or Series F Initiating Holders, and holders of at least 30% of the registrable securities issued or issuable upon conversion of the Series G preferred shares then outstanding, or Series G Initiating Holders, have the right to demand that we file a registration statement covering the registration of any registrable securities of such holders. We have the right to defer filing of a registration statement for a period of not more than 90 days after the receipt of the request of the initiating holders under certain conditions, but we cannot exercise the deferral right more than once in any twelve-month period and we cannot register any other share during such twelve-month period. We are not obligated to effect a demand registration if we have, within the six-month period prior to the date of a demand registration request, already effected a registration. We are not obligated to effect more than four demand registrations initiated by the Existing Initiating Holders, more than two demand registrations initiated by the Series F Initiating Holders, or more than two demand registrations initiated by the Series G Initiating Holders, other than demand registration to be effected pursuant to registration statement on Form F-3, for which an unlimited number of demand registrations shall be permitted.

*Piggyback Registration Rights.* If we propose to file a registration statement for a public offering of our securities, we must offer holders of our registrable securities an opportunity to include in the registration the number of registrable securities of the same class or series as those proposed to be registered. If the managing underwriters of any underwritten offering determine in its view the number of registrable securities exceeds the maximum offering size, the registrable securities shall allocate first to us, second to each of holders requesting for the inclusion of their registrable securities pursuant to the piggyback registration, and third to holders of our other securities with such priorities among them as we shall determine.

*Form F-3 Registration Rights.* Any of the Existing Initiating Holders, Series F Initiating Holders and Series G Initiating Holders may request us in writing to file an unlimited number of registration statements on

164

**Table of Contents**

Form F-3. Promptly after receiving such request, we shall give written notice of the proposed registration and within 20 days of such notice, we shall effect the registration of the securities on Form F-3.

*Expenses of Registration.* We will bear all registration expenses, other than underwriting discounts and selling commissions incurred in connection with any demand, piggyback or F-3 registration.

165

**Table of Contents**

**DESCRIPTION OF AMERICAN DEPOSITARY SHARES**

**American Depositary Receipts**

JPMorgan Chase Bank, N.A, as depositary, will issue the ADSs which you will be entitled to receive in this offering. Each ADS will represent an ownership interest in a designated number of shares which we will deposit with the custodian, as agent of the depositary, under the deposit agreement among ourselves, the depositary and yourself as an ADR holder. In the future, each ADS will also represent any securities, cash or other property deposited with by the depositary but which they have not been distributed directly to you. Unless certificated ADSs are specifically requested by you, all ADSs will be issued on the books of our depositary in book-entry form and periodic statements will be mailed to you which reflect your ownership interest in such ADSs. In our description, references to American depositary receipts or ADRs shall include the statements you will receive which reflect your ownership of ADSs.

The depositary's office is located at 4 New York Plaza, Floor 12, New York, NY, 10004.

You may hold ADSs either directly or indirectly through your broker or other financial institution. If you hold ADSs directly, by having an ADS registered in your name on the books of the depositary, you are an ADR holder. This description assumes you hold your ADSs directly. If you hold the ADSs through your broker or financial institution nominee, you must rely on the procedures of such broker or financial institution to assert the rights of an ADR holder described in this section. You should consult with your broker or financial institution to find out what those procedures are.

As an ADR holder, we will not treat you as a shareholder of ours and you will not have any shareholder rights. Cayman Islands law governs shareholder rights. Because the depositary or its nominee will be the shareholder of record for the shares represented by all outstanding ADSs, shareholder rights rest with such record holder. Your rights are those of an ADR holder. Such rights derive from the terms of the deposit agreement to be entered into among us, the depositary and all registered holders from time to time of ADSs issued under the deposit agreement. The obligations of the depositary and its agents are also set out in the deposit agreement. Because the depositary or its nominee will actually be the registered owner of the shares, you must rely on it to exercise the rights of a shareholder on your behalf. The deposit agreement and the ADSs are governed by New York law. Under the deposit agreement, as an ADR holder, you agree that any legal suit, action or proceeding against or involving us or the depositary, arising out of or based upon the deposit agreement, the ADSs or the transactions contemplated thereby, may only be instituted in a state or federal court in New York, New York, and you irrevocably waive any objection which you may have to the laying of venue of any such proceeding and irrevocably submit to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

The following is a summary of what we believe to be the material terms of the deposit agreement. Notwithstanding this, because it is a summary, it may not contain all the information that you may otherwise deem important. For more complete information, you should read the entire deposit agreement and the form of ADR which contains the terms of your ADSs. You can read a copy of the deposit agreement which is filed as an exhibit to the registration statement of which this prospectus forms apart. You may also obtain a copy of the deposit agreement at the SEC's Public Reference Room which is located at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-732-0330. You may also find the registration statement and the attached deposit agreement on the SEC's website at http://www.sec.gov.

**Dividends and Other Distributions**

*How will I receive dividends and other distributions on the shares underlying my ADSs?*

We may make various types of distributions with respect to our securities. The depositary has agreed that, to the extent practicable, it will pay to you the cash dividends or other distributions it or the custodian receives on

**Table of Contents**

shares or other deposited securities, after converting any cash received into U.S. dollars (if it determines such conversion may be made on a reasonable basis) and, in all cases, making any necessary deductions provided for in the deposit agreement. The depositary may utilize a division, branch or affiliate of JPMorgan Chase Bank, N.A. to direct, manage and/or execute any public and/or private sale of securities under the deposit agreement. Such division, branch and/or affiliate may charge the depositary a fee in connection with such sales, which fee is considered an expense of the depositary. You will receive these distributions in proportion to the number of underlying securities that your ADSs represent.

Except as stated below, the depositary will deliver such distributions to ADR holders in proportion to their interests in the following manner:

- *Cash*. The depositary will distribute any U.S. dollars available to it resulting from a cash dividend or other cash distribution or the net proceeds of sales of any other distribution or portion thereof (to the extent applicable), on an averaged or other practicable basis, subject to (i) appropriate adjustments for taxes withheld, (ii) such distribution being impermissible or impracticable with respect to certain registered ADR holders, and (iii) deduction of the depositary's and/or its agents' expenses in (1) converting any foreign currency to U.S. dollars to the extent that it determines that such conversion may be made on a reasonable basis, (2) transferring foreign currency or U.S. dollars to the United States by such means as the depositary may determine to the extent that it determines that such transfer may be made on a reasonable basis, (3) obtaining any approval or license of any governmental authority required for such conversion or transfer, which is obtainable at a reasonable cost and within a reasonable time and (4) making any sale by public or private means in any commercially reasonable manner. If exchange rates fluctuate during a time when the depositary cannot convert a foreign currency, you may lose some or all of the value of the distribution.

- *Shares*. In the case of a distribution in shares, the depositary will issue additional ADRs to evidence the number of ADSs representing such shares. Only whole ADS will be issued. Any shares which would result in fractional ADSs will be sold and the net proceeds will be distributed in the same manner as cash to the ADR holders entitled thereto.

- *Rights to Receive Additional Shares*. In the case of a distribution of rights to subscribe for additional shares or other rights, if we timely provide evidence satisfactory to the depositary that it may lawfully distribute such rights, the depositary will distribute warrants or other instruments in the discretion of the depositary representing such rights. However, if we do not timely furnish such evidence, the depositary may:

  - sell such rights if practicable and distribute the net proceeds in the same manner as cash to the ADR holders entitled thereto; or

  - if it is not practicable to sell such rights by reason of the non-transferability of the rights, limited markets therefor, their short duration or otherwise, do nothing and allow such rights to lapse, in which case ADR holders will receive nothing and the rights may lapse.

We have no obligation to file a registration statement under the Securities Act in order to make any rights available to ADR holders.

- *Other Distributions*. In the case of a distribution of securities or property other than those described above, the depositary may either (i) distribute such securities or property in any manner it deems equitable and practicable or (ii) to the extent the depositary deems distribution of such securities or property not to be equitable and practicable, sell such securities or property and distribute any net proceeds in the same way it distributes cash.

If the depositary determines in its discretion that any distribution described above is not practicable with respect to any specific registered ADR holder, the depositary may choose any method of distribution that it

167

**Table of Contents**

deems practicable for such ADR holder, including the distribution of foreign currency, securities or property, or it may retain such items, without paying interest on or investing them, on behalf of the ADR holder as deposited securities, in which case the ADSs will also represent the retained items.

Any U.S. dollars will be distributed by checks drawn on a bank in the United States for whole dollars and cents. Fractional cents will be withheld without liability and dealt with by the depositary in accordance with its then current practices.

The depositary is not responsible if it fails to determine any distribution or action that is lawful or reasonably practicable.

There can be no assurance that the depositary will be able to convert any currency at a specified exchange rate or sell any property, rights, shares or other securities at a specified price, nor that any of such transactions can be completed within a specified time period. All purchases and sales of securities will be handled by the Depositary in accordance with its then current policies, which are currently set forth in the "Depositary Receipt Sale and Purchase of Security" section of https://www.adr.com/Investors/FindOutAboutDRs, the location and contents of which the Depositary shall be solely responsible for.

**Deposit, Withdrawal and Cancelation**

*How does the depositary issue ADSs?*

The depositary will issue ADSs if you or your broker deposit shares or evidence of rights to receive shares with the custodian and pay the fees and expenses owing to the depositary in connection with such issuance. In the case of the ADSs to be issued under this prospectus, we will arrange with the underwriters named herein to deposit such shares.

Shares deposited in the future with the custodian must be accompanied by certain delivery documentation and shall, at the time of such deposit, be registered in the name of JPMorgan Chase Bank, N.A., as depositary for the benefit of holders of ADRs or in such other name as the depositary shall direct.

The custodian will hold all deposited shares (including those being deposited by or on our behalf in connection with the offering to which this prospectus relates) for the account and to the order of the depositary. ADR holders thus have no direct ownership interest in the shares and only have such rights as are contained in the deposit agreement. The custodian will also hold any additional securities, property and cash received on or in substitution for the deposited shares. The deposited shares and any such additional items are referred to as "deposited securities."

Upon each deposit of shares, receipt of related delivery documentation and compliance with the other provisions of the deposit agreement, including the payment of the fees and charges of the depositary and any taxes or other fees or charges owing, the depositary will issue an ADR or ADRs in the name or upon the order of the person entitled thereto evidencing the number of ADSs to which such person is entitled. All of the ADSs issued will, unless specifically requested to the contrary, be part of the depositary's direct registration system, and a registered holder will receive periodic statements from the depositary which will show the number of ADSs registered in such holder's name. An ADR holder can request that the ADSs not be held through the depositary's direct registration system and that a certificated ADR be issued.

*How do ADR holders cancel an ADS and obtain deposited securities?*

When you turn in your ADR certificate at the depositary's office, or when you provide proper instructions and documentation in the case of direct registration ADSs, the depositary will, upon payment of certain applicable fees, charges and taxes, deliver the underlying shares to you or upon your written order. Delivery of deposited securities in certificated form will be made at the custodian's office. At your risk, expense and request, the depositary may deliver deposited securities at such other place as you may request.

168

**Table of Contents**

The depositary may only restrict the withdrawal of deposited securities in connection with:

- temporary delays caused by closing our transfer books or those of the depositary or the deposit of shares in connection with voting at a shareholders' meeting, or the payment of dividends;

- the payment of fees, taxes and similar charges; or

- compliance with any U.S. or foreign laws or governmental regulations relating to the ADRs or to the withdrawal of deposited securities.

This right of withdrawal may not be limited by any other provision of the deposit agreement.

**Record Dates**

The depositary may, after consultation with us if practicable, fix record dates (which, to the extent applicable, shall be as near as practicable to any corresponding record dates set by us) for the determination of the registered ADR holders who will be entitled (or obligated, as the case may be):

- to receive any distribution on or in respect of deposited securities,

- to give instructions for the exercise of voting rights at a meeting of holders of shares,

- to pay the fee assessed by the depositary for administration of the ADR program and for any expenses as provided for in the ADR, or

- to receive any notice or to act in respect of other matters

all subject to the provisions of the deposit agreement.

**Voting Rights**

*How do I vote?*

If you are an ADR holder and the depositary asks you to provide it with voting instructions, you may instruct the depositary how to exercise the voting rights for the shares which underlie your ADSs. Subject to the next sentence, as soon as practicable after receiving notice from us of any meeting at which the holders of shares are entitled to vote, or of our solicitation of consents or proxies from holders of shares, the depositary shall fix the ADS record date in accordance with the provisions of the deposit agreement in respect of such meeting or solicitation of consent or proxy. The depositary shall, if we request in writing in a timely manner (the depositary having no obligation to take any further action if our request shall not have been received by the depositary at least 30 days prior to the date of such vote or meeting) and at our expense and provided that no legal prohibitions exist, distribute to the registered ADR holders a notice stating such information as is contained in the voting materials received by the depositary and describing how you may instruct or, subject to the next sentence, will be deemed to instruct, the depositary to exercise the voting rights for the shares which underlie your ADSs, including instructions for giving a discretionary proxy to a person designated by us. To the extent we have provided the depositary with at least 45 days' notice of a proposed meeting, if voting instructions are not timely received by the depositary from any holder, such holder shall be deemed, and in the deposit agreement the depositary is instructed to deem such holder, to have instructed the depositary to give a discretionary proxy to a person designated by us to vote the shares represented by their ADSs as desired, provided that no such instruction shall be deemed given and no discretionary proxy shall be given (a) if we inform the depositary in writing that (i) we do not wish such proxy to be given, (ii) substantial opposition exists with respect to any agenda item for which the proxy would be given or (iii) the agenda item in question, if approved, would materially or adversely affect the rights of holders of shares and (b) unless, with respect to such meeting, we have provided the depositary with an opinion of our counsel, in form and substance satisfactory to the depositary, to the effect that (a) the granting of such discretionary proxy does not subject the depositary to any reporting obligations in the Cayman Islands, (b) the granting of such proxy will not result in a violation of any law, rule, regulation or permit

169

**Table of Contents**

of Cayman Islands, (c) the voting arrangement and deemed instruction as contemplated herein will be given effect under Cayman Islands law, and (d) the granting of such discretionary proxy will not under any circumstances result in the shares represented by the ADSs being treated as assets of the depositary under Cayman Islands law.

Holders are strongly encouraged to forward their voting instructions to the depositary as soon as possible. For instructions to be valid, the ADR department of the depositary that is responsible for proxies and voting must receive them in the manner and on or before the time specified, notwithstanding that such instructions may have been physically received by the depositary prior to such time. The depositary will not itself exercise any voting discretion. Furthermore, neither the depositary nor its agents are responsible for any failure to carry out any voting instructions, for the manner in which any vote is cast or for the effect of any vote. Notwithstanding anything contained in the deposit agreement or any ADR, the depositary may, to the extent not prohibited by law or regulations, or by the requirements of the stock exchange on which the ADSs are listed, in lieu of distribution of the materials provided to the depositary in connection with any meeting of, or solicitation of consents or proxies from, holders of deposited securities, distribute to the registered holders of ADRs a notice that provides such holders with, or otherwise publicizes to such holders, instructions on how to retrieve such materials or receive such materials upon request (i.e., by reference to a website containing the materials for retrieval or a contact for requesting copies of the materials).

We have advised the depositary that under the Cayman Islands law and our constituent documents, each as in effect as of the date of the deposit agreement, voting at any meeting of shareholders is by show of hands unless a poll is (before or on the declaration of the results of the show of hands) demanded. In the event that voting on any resolution or matter is conducted on a show of hands basis in accordance with our constituent documents, the depositary will refrain from voting and the voting instructions received by the depositary from holders shall lapse. The depositary will not demand a poll or join in demanding a poll, whether or not requested to do so by holders of ADSs.

There is no guarantee that you will receive voting materials in time to instruct the depositary to vote and it is possible that you, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote.

**Reports and Other Communications**

*Will ADR holders be able to view our reports?*

The depositary will make available for inspection by ADR holders at the offices of the depositary and the custodian the deposit agreement, the provisions of or governing deposited securities, and any written communications from us which are both received by the custodian or its nominee as a holder of deposited securities and made generally available to the holders of deposited securities.

Additionally, if we make any written communications generally available to holders of our shares, and we furnish copies thereof (or English translations or summaries) to the depositary, it will distribute the same to registered ADR holders.

**Fees and Expenses**

*What fees and expenses will I be responsible for paying?*

The depositary may charge each person to whom ADSs are issued, including, without limitation, issuances against deposits of shares, issuances in respect of share distributions, rights and other distributions, issuances pursuant to a stock dividend or stock split declared by us or issuances pursuant to a merger, exchange of securities or any other transaction or event affecting the ADSs or deposited securities, and each person

170

**Table of Contents**

surrendering ADSs for withdrawal of deposited securities or whose ADRs are canceled or reduced for any other reason, US$5.00 for each 100 ADSs (or any portion thereof) issued, delivered, reduced, canceled or surrendered, as the case may be. The depositary may sell (by public or private sale) sufficient securities and property received in respect of a share distribution, rights and/or other distribution prior to such deposit to pay such charge.

The following additional charges shall be incurred by the ADR holders, by any party depositing or withdrawing shares or by any party surrendering ADSs and/or to whom ADSs are issued (including, without limitation, issuance pursuant to a stock dividend or stock split declared by us or an exchange of stock regarding the ADRs or the deposited securities or a distribution of ADSs), whichever is applicable:

- a fee of up to US$0.05 per ADS for any cash distribution made pursuant to the deposit agreement;

- an aggregate fee of up to US$0.05 per ADS per calendar year (or portion thereof) for services performed by the depositary in administering the ADRs (which fee may be charged on a periodic basis during each calendar year and shall be assessed against holders of ADRs as of the record date or record dates set by the depositary during each calendar year and shall be payable in the manner described in the next succeeding provision);

- a fee for reimbursement of such fees, charges and expenses as are incurred by the depositary and/or any of the depositary's agents (including, without limitation, the custodian and expenses incurred on behalf of holders in connection with compliance with foreign exchange control regulations or any law or regulation relating to foreign investment) in connection with the servicing of the shares or other deposited securities, the sale of securities (including, without limitation, deposited securities), the delivery of deposited securities or otherwise in connection with the depositary's or its custodian's compliance with applicable law, rule or regulation (which fees and charge shall be assessed on a proportionate basis against holders as of the record date or dates set by the depositary and shall be payable at the sole discretion of the depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions);

- a fee for the distribution of securities (or the sale of securities in connection with a distribution), such fee being in an amount equal to the US$0.05 per ADS issuance fee for the execution and delivery of ADSs which would have been charged as a result of the deposit of such securities (treating all such securities as if they were shares) but which securities or the net cash proceeds from the sale thereof are instead distributed by the depositary to those holders entitled thereto;

- stock transfer or other taxes and other governmental charges;

- cable, telex and facsimile transmission and delivery charges incurred at your request in connection with the deposit or delivery of shares, ADRs or deposited securities;

- transfer or registration fees for the registration of transfer of deposited securities on any applicable register in connection with the deposit or withdrawal of deposited securities; and

- in connection with the conversion of foreign currency into U.S. dollars, JPMorgan Chase Bank, N.A. shall deduct out of such foreign currency the fees, expenses and other charges charged by it and/or its agent (which may be a division, branch or affiliate) so appointed in connection with such conversion; and

- fees of any division, branch or affiliate of the depositary utilized by the depositary to direct, manage and/or execute any public and/or private sale of securities under the deposit agreement.

JPMorgan Chase Bank, N.A. and/or its agent may act as principal for such conversion of foreign currency. For further details see https://www.adr.com.

171

**Table of Contents**

We will pay all other charges and expenses of the depositary and any agent of the depositary (except the custodian) pursuant to agreements from time to time between us and the depositary. The charges described above may be amended from time to time by agreement between us and the depositary.

The depositary may make available to us a set amount or a portion of the depositary fees charged in respect of the ADR program or otherwise upon such terms and conditions as we and the depositary may agree from time to time. The depositary collects its fees for issuance and cancelation of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deduction from cash distributions, or by directly billing investors, or by charging the book-entry system accounts of participants acting for them. The depositary will generally set off the amounts owing from distributions made to holders of ADSs. If, however, no distribution exists and payment owing is not timely received by the depositary, the depositary may refuse to provide any further services to holders that have not paid those fees and expenses owing until such fees and expenses have been paid. At the discretion of the depositary, all fees and charges owing under the deposit agreement are due in advance and/or when declared owing by the depositary.

## Payment of Taxes

If any taxes or other governmental charges (including any penalties and/or interest) shall become payable by or on behalf of the custodian or the depositary with respect to any ADR, any deposited securities represented by the ADSs evidenced thereby or any distribution thereon, including, without limitation, any Chinese Enterprise Income Tax owing if the Circular Guoshuifa [2009] No. 82 issued by the Chinese State Administration of Taxation or any other circular, edict, order or ruling, as issued and as from time to time amended, is applied or otherwise, such tax or other governmental charge shall be paid by the holder thereof to the depositary. and by holding or having held an ADR the holder and all prior holders thereof, jointly and severally, agree to indemnify, defend and save harmless each of the depositary and its agents in respect thereof. If an ADR holder owes any tax or other governmental charge, the depositary may (i) deduct the amount thereof from any cash distributions, or (ii) sell deposited securities (by public or private sale) and deduct the amount owing from the net proceeds of such sale. In either case the ADR holder remains liable for any shortfall. If any tax or governmental charge is unpaid, the depositary may also refuse to effect any registration, registration of transfer, split-up or combination of deposited securities or withdrawal of deposited securities until such payment is made. If any tax or governmental charge is required to be withheld on any cash distribution, the depositary may deduct the amount required to be withheld from any cash distribution or, in the case of a non-cash distribution, sell the distributed property or securities (by public or private sale) in such amounts and in such manner as the depositary deems necessary and practicable to pay such taxes and distribute any remaining net proceeds or the balance of any such property after deduction of such taxes to the ADR holders entitled thereto.

By holding an ADR or an interest therein, you will be agreeing to indemnify us, the depositary, its custodian and any of our or their respective officers, directors, employees, agents and affiliates against, and hold each of them harmless from, any claims by any governmental authority with respect to taxes, additions to tax, penalties or interest arising out of any refund of taxes, reduced rate of withholding at source or other tax benefit obtained.

## Reclassifications, Recapitalizations and Mergers

If we take certain actions that affect the deposited securities, including (i) any change in par value, split-up, consolidation, cancelation or other reclassification of deposited securities or (ii) any distributions of shares or other property not made to holders of ADRs or (iii) any recapitalization, reorganization, merger, consolidation, liquidation, receivership, bankruptcy or sale of all or substantially all of our assets, then the depositary may choose to, and shall if reasonably requested by us:

- amend the form of ADR;

- distribute additional or amended ADRs;

172

**Table of Contents**

- distribute cash, securities or other property it has received in connection with such actions;

- sell any securities or property received and distribute the proceeds as cash; or

- none of the above.

If the depositary does not choose any of the above options, any of the cash, securities or other property it receives will constitute part of the deposited securities and each ADS will then represent a proportionate interest in such property.

**Amendment and Termination**

*How may the deposit agreement be amended?*

We may agree with the depositary to amend the deposit agreement and the ADSs without your consent for any reason. ADR holders must be given at least 30 days' notice of any amendment that imposes or increases any fees or charges (other than stock transfer or other taxes and other governmental charges, transfer or registration fees, SWIFT, cable, telex or facsimile transmission costs, delivery costs or other such expenses), or otherwise prejudices any substantial existing right of ADR holders. Such notice need not describe in detail the specific amendments effectuated thereby, but must identify to ADR holders a means to access the text of such amendment. If an ADR holder continues to hold an ADR or ADRs after being so notified, such ADR holder is deemed to agree to such amendment and to be bound by the deposit agreement as so amended. Notwithstanding the foregoing, if any governmental body or regulatory body should adopt new laws, rules or regulations which would require amendment or supplement of the deposit agreement or the form of ADR to ensure compliance therewith, we and the depositary may amend or supplement the deposit agreement and the ADR at any time in accordance with such changed laws, rules or regulations, which amendment or supplement may take effect before a notice is given or within any other period of time as required for compliance. No amendment, however, will impair your right to surrender your ADSs and receive the underlying securities, except in order to comply with mandatory provisions of applicable law.

*How may the deposit agreement be terminated?*

The depositary may, and shall at our written direction, terminate the deposit agreement and the ADRs by mailing notice of such termination to the registered holders of ADRs at least 30 days prior to the date fixed in such notice for such termination; provided, however, if the depositary shall have (i) resigned as depositary under the deposit agreement, notice of such termination by the depositary shall not be provided to registered holders unless a successor depositary shall not be operating under the deposit agreement within 60 days of the date of such resignation, and (ii) been removed as depositary under the deposit agreement, notice of such termination by the depositary shall not be provided to registered holders of ADRs unless a successor depositary shall not be operating under the deposit agreement on the 120th day after our notice of removal was first provided to the depositary. After the date so fixed for termination, (a) all direct registration ADRs shall cease to be eligible for the direct registration system and shall be considered ADRs issued on the ADR register maintained by the depositary and (b) the depositary shall use its reasonable efforts to ensure that the ADSs cease to be DTC eligible so that neither DTC nor any of its nominees shall thereafter be a registered holder of ADRs. At such time as the ADSs cease to be DTC eligible and/or neither DTC nor any of its nominees is a registered holder of ADRs, the depositary shall (a) instruct its custodian to deliver all shares to us along with a general stock power that refers to the names set forth on the ADR register maintained by the depositary and (b) provide us with a copy of the ADR register maintained by the depositary. Upon receipt of such shares and the ADR register maintained by the depositary, we have agreed to use our best efforts to issue to each registered holder a Share certificate representing the Shares represented by the ADSs reflected on the ADR register maintained by the depositary in such registered holder's name and to deliver such Share certificate to the registered holder at the address set forth on the ADR register maintained by the depositary. After providing such instruction to the custodian and delivering a copy of the ADR register to us, the depositary and its agents will perform no further acts under the deposit agreement or the ADRs and shall cease to have any obligations under the deposit agreement and/or the ADRs.

173

**Table of Contents**

**Limitations on Obligations and Liability to ADR Holders**

*Limits on our obligations and the obligations of the depositary; limits on liability to ADR holders and holders of ADSs*

Prior to the issue, registration, registration of transfer, split-up, combination, or cancelation of any ADRs, or the delivery of any distribution in respect thereof, and from time to time in the case of the production of proofs as described below, we or the depositary or its custodian may require:

- payment with respect thereto of (i) any stock transfer or other tax or other governmental charge, (ii) any stock transfer or registration fees in effect for the registration of transfers of shares or other deposited securities upon any applicable register and (iii) any applicable fees and expenses described in the deposit agreement;

- the production of proof satisfactory to it of (i) the identity of any signatory and genuineness of any signature and (ii) such other information, including without limitation, information as to citizenship, residence, exchange control approval, beneficial ownership of any securities, compliance with applicable law, regulations, provisions of or governing deposited securities and terms of the deposit agreement and the ADRs, as it may deem necessary or proper; and

- compliance with such regulations as the depositary may establish consistent with the deposit agreement.

The issuance of ADRs, the acceptance of deposits of shares, the registration, registration of transfer, split-up or combination of ADRs or the withdrawal of shares, may be suspended, generally or in particular instances, when the ADR register or any register for deposited securities is closed or when any such action is deemed advisable by the depositary; provided that the ability to withdraw shares may only be limited under the following circumstances: (i) temporary delays caused by closing transfer books of the depositary or our transfer books or the deposit of shares in connection with voting at a shareholders' meeting, or the payment of dividends, (ii) the payment of fees, taxes, and similar charges, and (iii) compliance with any laws or governmental regulations relating to ADRs or to the withdrawal of deposited securities.

The deposit agreement expressly limits the obligations and liability of the depositary, ourselves and our respective agents, provided, however, that no disclaimer of liability under the Securities Act of 1933 is intended by any of the limitations of liabilities provisions of the deposit agreement. In the deposit agreement it provides that neither. Neither we nor the depositary nor any such agent will be liable if:

- any present or future law, rule, regulation, fiat, order or decree of the United States, the Cayman Islands, the People's Republic of China (including the Hong Kong Special Administrative Region, the People's Republic of China) or any other country or jurisdiction, or of any governmental or regulatory authority or securities exchange or market or automated quotation system, the provisions of or governing any deposited securities, any present or future provision of our charter, any act of God, war, terrorism, nationalization, expropriation, currency restrictions, work stoppage, strike, civil unrest, revolutions, rebellions, explosions, computer failure or other circumstance beyond our, the depositary's or our respective agents' direct and immediate control shall prevent or delay, or shall cause any of them to be subject to any civil or criminal penalty in connection with, any act which the deposit agreement or the ADRs provide shall be done or performed by us, the depositary or our respective agents (including, without limitation, voting);

- it exercises or fails to exercise discretion under the deposit agreement or the ADRs including, without limitation, any failure to determine that any distribution or action may be lawful or reasonably practicable;

- it performs its obligations under the deposit agreement and ADRs without gross negligence or willful misconduct;

174

Table of Contents

- it takes any action or refrains from taking any action in reliance upon the advice of or information from legal counsel, accountants, any person presenting shares for deposit, any registered holder of ADRs, or any other person believed by it to be competent to give such advice or information; or

- it relies upon any written notice, request, direction, instruction or document believed by it to be genuine and to have been signed, presented or given by the proper party or parties.

Neither the depositary nor its agents have any obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or the ADRs. We and our agents shall only be obligated to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or the ADRs, which in our opinion may involve us in expense or liability, if indemnity satisfactory to us against all expense (including fees and disbursements of counsel) and liability is furnished as often as may be required. The depositary and its agents may fully respond to any and all demands or requests for information maintained by or on its behalf in connection with the deposit agreement, any registered holder or holders of ADRs, any ADRs or otherwise related to the deposit agreement or ADRs to the extent such information is requested or required by or pursuant to any lawful authority, including without limitation laws, rules, regulations, administrative or judicial process, banking, securities or other regulators. The depositary shall not be liable for the acts or omissions made by, or the insolvency of, any securities depository, clearing agency or settlement system. Furthermore, the depositary shall not be responsible for, and shall incur no liability in connection with or arising from, the insolvency of any custodian that is not a branch or affiliate of JPMorgan Chase Bank, N.A. Notwithstanding anything to the contrary contained in the deposit agreement or any ADRs, the depositary shall not be responsible for, and shall incur no liability in connection with or arising from, any act or omission to act on the part of the custodian except to the extent that the custodian has (i) committed fraud or willful misconduct in the provision of custodial services to the depositary or (ii) failed to use reasonable care in the provision of custodial services to the depositary as determined in accordance with the standards prevailing in the jurisdiction in which the custodian is located. The depositary and the custodian(s) may use third party delivery services and providers of information regarding matters such as pricing, proxy voting, corporate actions, class action litigation and other services in connection with the ADRs and the deposit agreement, and use local agents to provide extraordinary services such as attendance at annual meetings of issuers of securities. Although the depositary and the custodian will use reasonable care (and cause their agents to use reasonable care) in the selection and retention of such third party providers and local agents, they will not be responsible for any errors or omissions made by them in providing the relevant information or services.

The depositary shall not have any liability for the price received in connection with any sale of securities, the timing thereof or any delay in action or omission to act nor shall it be responsible for any error or delay in action, omission to act, default or negligence on the part of the party so retained in connection with any such sale or proposed sale.

The depositary has no obligation to inform ADR holders or other holders of an interest in any ADSs about the requirements of Cayman Islands or People's Republic of China law, rules or regulations or any changes therein or thereto.

Additionally, none of us, the depositary or the custodian shall be liable for the failure by any registered holder of ADR or beneficial owner therein to obtain the benefits of credits on the basis of non-U.S. tax paid against such holder's or beneficial owner's income tax liability. Neither we nor the depositary shall incur any liability for any tax consequences that may be incurred by registered holders or beneficial owners therein on account of their ownership of ADRs or ADSs.

Neither the depositary nor its agents will be responsible for any failure to carry out any instructions to vote any of the deposited securities, for the manner in which any such vote is cast or for the effect of any such vote. The depositary may rely upon instructions from us or our counsel in respect of any approval or license required for any currency conversion, transfer or distribution. The depositary shall not incur any liability for the content of any information submitted to it by us or on our behalf for distribution to ADR holders or for any inaccuracy of

175

Table of Contents

any translation thereof, for any investment risk associated with acquiring an interest in the deposited securities, for the validity or worth of the deposited securities, for the credit-worthiness of any third party, for allowing any rights to lapse upon the terms of the deposit agreement or for the failure or timeliness of any notice from us. The depositary shall not be liable for any acts or omissions made by a successor depositary whether in connection with a previous act or omission of the depositary or in connection with any matter arising wholly after the removal or resignation of the depositary. Neither the depositary nor any of its agents shall be liable to registered holders or beneficial owners of interests in ADSs for any indirect, special, punitive or consequential damages (including, without limitation, legal fees and expenses) or lost profits, in each case of any form incurred by any person or entity, whether or not foreseeable and regardless of the type of action in which such a claim may be brought.

In the deposit agreement each party thereto (including, for avoidance of doubt, each holder and beneficial owner and/or holder of interests in ADRs) irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any suit, action or proceeding against the depositary and/or the company directly or indirectly arising out of or relating to the shares or other deposited securities, the ADSs or the ADRs, the deposit agreement or any transaction contemplated therein, or the breach thereof (whether based on contract, tort, common law or any other theory).

The depositary and its agents may own and deal in any class of securities of our company and affiliates and in ADRs.

### Disclosure of Interest in ADSs

To the extent that the provisions of or governing any deposited securities may require disclosure of or impose limits on beneficial or other ownership of deposited securities, other shares and other securities and may provide for blocking transfer, voting or other rights to enforce such disclosure or limits, you agree to comply with all such disclosure requirements and ownership limitations and to comply with any reasonable instructions we may provide in respect thereof. We reserve the right to instruct you to deliver your ADSs for cancelation and withdrawal of the deposited securities so as to permit us to deal with you directly as a holder of shares and, by holding an ADS or an interest therein, you will be agreeing to comply with such instructions.

### Books of Depositary

The depositary or its agent will maintain a register for the registration, registration of transfer, combination and split-up of ADRs, which register shall include the depositary's direct registration system. Registered holders of ADRs may inspect such records at the depositary's office at all reasonable times, but solely for the purpose of communicating with other holders in the interest of the business of our company or a matter relating to the deposit agreement. Such register may be closed at any time or from time to time, when deemed expedient by the depositary or, in the case of the issuance book portion of the ADR register, when reasonably requested by us solely in order to enable us to comply with applicable law.

The depositary will maintain facilities for the delivery and receipt of ADRs.

### Pre-release of ADSs

In its capacity as depositary, the depositary shall not lend shares or ADSs; provided, however, that the depositary may (i) issue ADSs prior to the receipt of shares and (ii) deliver shares prior to the receipt of ADSs for withdrawal of deposited securities, including ADSs which were issued under (i) above but for which shares may not have been received, each such transaction a "Pre-release". The depositary may receive ADSs in lieu of shares under (i) above (which ADSs will promptly be canceled by the depositary upon receipt by the depositary) and receive shares in lieu of ADSs under (ii) above. Each such Pre-release will be subject to a written agreement whereby the person or entity, or Applicant, to whom ADSs or shares are to be delivered (a) represents that at the

176

Table of Contents

time of the Pre-release the Applicant or its customer owns the shares or ADSs that are to be delivered by the Applicant under such Pre-release, (b) agrees to indicate the depositary as owner of such shares or ADSs in its records and to hold such shares or ADSs in trust for the depositary until such shares or ADSs are delivered to the depositary or the custodian, (c) unconditionally guarantees to deliver to the depositary or the custodian, as applicable, such shares or ADSs, and (d) agrees to any additional restrictions or requirements that the depositary deems appropriate. Each such Pre-release will be at all times fully collateralized with cash, U.S. government securities or such other collateral as the depositary deems appropriate, terminable by the depositary on not more than five (5) business days' notice and subject to such further indemnities and credit regulations as the depositary deems appropriate. The depositary will normally limit the number of ADSs and shares involved in such Pre-release at any one time to thirty percent (30%) of the ADSs outstanding (without giving effect to ADSs outstanding under (i) above), provided, however, that the depositary reserves the right to change or disregard such limit from time to time as it deems appropriate. The depositary may also set limits with respect to the number of ADSs and shares involved in Pre-release with any one person on a case-by-case basis as it deems appropriate. The depositary may retain for its own account any compensation received by it in conjunction with the foregoing. Collateral provided in connection with Pre-release transactions, but not the earnings thereon, shall be held for the benefit of the ADR holders (other than the Applicant).

**Appointment**

In the deposit agreement, each registered holder of ADRs and each person holding an interest in ADSs, upon acceptance of any ADSs (or any interest therein) issued in accordance with the terms and conditions of the deposit agreement will be deemed for all purposes to:

- be a party to and bound by the terms of the deposit agreement and the applicable ADR or ADRs, and

- appoint the depositary its attorney-in-fact, with full power to delegate, to act on its behalf and to take any and all actions contemplated in the deposit agreement and the applicable ADR or ADRs, to adopt any and all procedures necessary to comply with applicable laws and to take such action as the depositary in its sole discretion may deem necessary or appropriate to carry out the purposes of the deposit agreement and the applicable ADR and ADRs, the taking of such actions to be the conclusive determinant of the necessity and appropriateness thereof.

**Governing Law and Jurisdiction**

The deposit agreement and the ADRs shall be governed by and construed in accordance with the laws of the State of New York. In the deposit agreement, we have submitted to the jurisdiction of the courts of the State of New York and appointed an agent for service of process on our behalf. Notwithstanding the foregoing, (i) any action based on the deposit agreement or the transactions contemplated thereby may be instituted by the depositary in any competent court in the Cayman Islands, Hong Kong, the People's Republic of China and/or the United States, (ii) the depositary may, in its sole discretion, elect to institute any action, controversy, claim or dispute directly or indirectly based on, arising out of or relating to the deposit agreement or the ADRs or the transactions contemplated thereby, including without limitation any question regarding its or their existence, validity, interpretation, performance or termination, against any other party or parties to the deposit agreement (including, without limitation, against ADR holders and owners of interests in ADSs), by having the matter referred to and finally resolved by an arbitration conducted under the terms described below, and (iii) the depositary may in its sole discretion require that any action, controversy, claim, dispute, legal suit or proceeding brought against the depositary by any party or parties to the deposit agreement (including, without limitation, by ADR holders and owners of interests in ADSs) shall be referred to and finally settled by an arbitration conducted under the terms described below. Any such arbitration shall be conducted in the English language either in New York, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association or in Hong Kong following the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

177

**Table of Contents**

By holding an ADS or an interest therein, registered holders of ADRs and owners of ADSs each irrevocably agree that any legal suit, action or proceeding against or involving us or the depositary, arising out of or based upon the deposit agreement, the ADSs or the transactions contemplated thereby, may only be instituted in a state or federal court in New York, New York, and each irrevocably waives any objection which it may have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

178

Table of Contents

## SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this offering, we will have          ADSs outstanding, representing          Class A ordinary shares or, approximately          % of our outstanding Class A and Class B ordinary shares. All of the ADSs sold in this offering will be freely transferable by persons other than our "affiliates" without restriction or further registration under the Securities Act. Sales of substantial amounts of our ADSs in the public market could adversely affect prevailing market prices of our ADSs. Prior to this offering, there has been no public market for our Class A ordinary shares or the ADSs, and while application has been made for the ADSs to be listed on the Nasdaq Global Market, we cannot assure you that a regular trading market will develop in the ADSs. We do not expect that a trading market will develop for our ordinary shares not represented by the ADSs.

### Lock-Up Agreements

[We, our directors and executive officers, our existing shareholders and certain holders of our equity awards] have agreed, subject to specified exceptions, not to directly or indirectly during the period ending 180 days after the date of this prospectus, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise transfer or dispose of, directly or indirectly, any ADSs or any securities that are substantial similar to ADSs. Furthermore, [our directors and executive officers, our existing shareholders and certain holders of our equity awards] have also agreed, subject to specified exceptions, not to (i) enter into any swap, hedge or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the ordinary shares or ADSs; (ii) file any registration statement with the SEC relating to the offering of any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for ordinary shares or ADSs; or (iii) publicly disclose the intention to make any offer, sale, pledge, disposition or filing, in each case regardless of whether any such transaction described above is to be settled by delivery of ordinary shares, ADSs, or such other securities, in cash or otherwise.

The underwriters may, in their sole discretion and at any time or from time to time before the termination of the 180-day period release all or any portion of the securities subject to lock-up agreements. There are no existing agreements between the underwriters and any of our shareholders who will execute a lock-up agreement, providing consent to the sale of ADSs prior to the expiration of the lock-up period.

In addition, through a letter agreement, we will instruct JPMorgan Chase Bank, N.A., as depositary, not to accept any deposit of any ordinary shares or issue any ADSs for 180 days after the date of this prospectus unless we consent to such deposit or issuance, and not to provide consent without the prior written consent of Goldman Sachs (Asia) L.L.C., Credit Suisse Securities (USA) LLC, and Merrill Lynch, Pierce, Fenner & Smith Incorporated. The foregoing does not affect the right of ADS holders to cancel their ADSs and withdraw the underlying Class A ordinary shares.

### Rule 144

All of our ordinary shares outstanding prior to this offering are "restricted shares" as that term is defined in Rule 144 under the Securities Act and may be sold publicly in the United States only if they are subject to an effective registration statement under the Securities Act or pursuant to an exemption from the registration requirements. Under Rule 144 as currently in effect, a person who has beneficially owned our restricted shares for at least six months is generally entitled to sell the restricted securities without registration under the Securities Act beginning 90 days after the date of this prospectus, subject to certain additional restrictions.

Our affiliates may sell within any three-month period a number of restricted shares that does not exceed the greater of the following:

- 1% of the then outstanding Class A ordinary shares, in the form of ADSs or otherwise, which will equal approximately          Class A ordinary shares immediately after this offering; or

179

**Table of Contents**

- the average weekly trading volume of our Class A ordinary shares in the form of ADSs or otherwise, on the Nasdaq Global Market, during the four calendar weeks preceding the date on which notice of the sale is filed with the SEC.

Affiliates who sell restricted securities under Rule 144 may not solicit orders or arrange for the solicitation of orders, and they are also subject to notice requirements and the availability of current public information about us.

Persons who are not our affiliates are only subject to one of these additional restrictions, the requirement of the availability of current public information about us, and this additional restriction does not apply if they have beneficially owned our restricted shares for more than one year.

**Rule 701**

In general, under Rule 701 of the Securities Act as currently in effect, each of our employees, consultants or advisors who purchases our ordinary shares from us in connection with a compensatory stock or option plan or other written agreement relating to compensation is eligible to resell such ordinary shares 90 days after we became a reporting company under the Exchange Act in reliance on Rule 144, but without compliance with some of the restrictions, including the holding period, contained in Rule 144.

**Registration Rights**

Upon completion of this offering, certain holders of our ordinary shares or their transferees will be entitled to request that we register their shares under the Securities Act, following the expiration of the lock-up agreements described above. See "Description of Share Capital—Shareholders Agreement."

Table of Contents

**TAXATION**

*The following summary of material Cayman Islands, PRC and U.S. federal income tax consequences of an investment in our ADSs or Class A ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date of this prospectus, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or Class A ordinary shares, such as the tax consequences under state, local and other tax laws.*

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us or holders of our ADSs or Class A ordinary shares levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in or, after execution, brought within the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made by or to our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Taxation**

The Enterprise Income Tax Law provides that an enterprise established under the laws of a foreign country or region but whose "de facto management body" is located in the PRC is treated as a PRC resident enterprise for PRC tax purposes and consequently subject to the PRC income tax at the rate of 25% on its global income. The implementing rules of the Enterprise Income Tax Law merely define the location of the "de facto management body" as an "organizational body which effectively manages and controls the production and business operation, personnel, an accounting, properties and other aspects of operations of an enterprise." Based on a review of surrounding facts and circumstances, we do not believe that we should be considered a PRC resident enterprise for PRC tax purposes. However, there is limited guidance and implementation history of the Enterprise Income Tax Law, and if we are treated as a PRC resident enterprise for PRC tax purposes, we will be subject to PRC tax on our global income at a uniform tax rate of 25%.

PRC income tax at the rate of 10% will apply to payments of dividends we make to investors that are "non-resident enterprises" of the PRC, if such investors do not have an establishment or place of business in the PRC, or if they have such establishment or place of business in the PRC but the relevant income is not effectively connected with such establishment or place of business, to the extent such dividends are deemed to be sourced within the PRC.

Furthermore, any gain realized on the transfer of our ADSs or Class A ordinary shares by such investors would also be subject to PRC income tax at 10% if such gain is regarded as income derived from sources within the PRC.

Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider the dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, such dividends and gains earned by non-resident individuals would be subject to the 20% PRC individual income tax.

These rates could be reduced by applicable tax treaties or similar arrangements between China and the jurisdiction of the investor. For example, for investors in Hong Kong, the tax rate is reduced to 7% for interest payments and 5% for dividends. However, it is unclear whether non-PRC shareholders would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise.

181

Table of Contents

**U.S. Federal Income Tax Considerations**

The following discussion is a summary of U.S. federal income tax considerations under present law of the ownership and disposition of the ADSs or ordinary shares. This summary applies only to investors that are U.S. Holders (as defined below) and that hold the ADSs or ordinary shares as capital assets. This discussion is based on the applicable provisions of the U.S. Internal Revenue Code of 1986, as amended, final, temporary and proposed Treasury regulations thereunder, pertinent judicial decisions, interpretive rulings of the IRS and such other authorities as we have considered relevant. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax considerations described below.

The following discussion does not deal with all the tax considerations to any particular investor or to persons in special tax situations such as:

- banks;

- financial institutions;

- insurance companies;

- broker dealers;

- persons that elect to mark their securities to market;

- tax-exempt entities;

- persons liable for the alternative minimum tax;

- regulated investment companies;

- certain expatriates or former long-term residents of the United States;

- governments or agencies or instrumentalities thereof;

- persons holding an ADS or ordinary share as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own ADSs or ordinary shares representing 10% or more of our voting power or value;

- persons whose functional currency is other than the U.S. dollar; or

- persons who acquired ADSs or ordinary shares pursuant to the exercise of any employee share option or otherwise as consideration.

*U.S. Holders are urged to consult their tax advisors about the application of the U.S. federal tax rules to their particular circumstances as well as the state, local and foreign tax consequences to them of the ownership and disposition of ADSs or ordinary shares.*

The discussion below of the U.S. federal income tax considerations will apply if you are a "U.S. Holder." You are a "U.S. Holder" if you are the beneficial owner of ADSs or Class A ordinary shares and you are, for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation (or other entity subject to tax as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any State or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (i) is subject to the supervision of a court within the United States and the control of one or more U.S. persons or (ii) has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

182

**Table of Contents**

This discussion does not consider the tax treatment of partnerships or other pass-through entities that hold the ADSs or ordinary shares, or of persons who hold the ADSs or ordinary shares through such entities. If a partnership (or other entity classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of the ADSs or Class A ordinary shares, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold ADSs, you will be treated as the holder of the underlying ordinary shares represented by those ADSs for U.S. federal income tax purposes.

This discussion does not address any aspect of U.S. federal non-income tax laws, such as gift or estate tax laws, state, local or non-U.S. tax laws or the Medicare tax on certain net investment income. We have not sought, and will not seek, a ruling from the IRS, or an opinion as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court.

### *Taxation of Dividends or Other Distribution on the ADSs or Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, the gross amount of all our distributions to you with respect to the ADSs or Class A ordinary shares will be included in your gross income as dividend income on the date of receipt by the depositary, in the case of ADSs, or by you, in the case of ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (computed under U.S. federal income tax principles). Because we do not intend to determine our earnings and profits on the basis of U.S. federal income tax principles, any distribution paid will generally be treated as a "dividend" for U.S. federal income tax purposes. Dividends paid by us will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from U.S. corporations.

With respect to individuals and other non-corporate U.S. Holders, dividends may be taxed at the lower applicable capital gains rate provided that (i) the ADSs or ordinary shares are readily tradable on an established securities market in the United States or we are eligible for the benefit of the income tax treaty between the United States and the PRC, or treaty, (ii) we are not a passive foreign investment company (as discussed below) for either our taxable year in which the dividend was paid or for the preceding taxable year, (iii) certain holding period requirements are met and (iv) such non-corporate U.S. Holders are not under an obligation to make related payments with respect to positions in substantially similar or related property. For this purpose, ADSs listed on the Nasdaq Global Market will generally be considered to be readily tradable on an established securities market in the United States. In the event that we are deemed to be a PRC resident enterprise under PRC tax law, you may be subject to PRC withholding taxes on dividends paid on our ADSs or Class A ordinary shares. If we are deemed to be a PRC resident enterprise, we may, however, be eligible for the benefits of the treaty. If we are eligible for such benefits, dividends we pay on our ordinary shares, regardless of whether such shares are represented by our ADSs, would be eligible for the reduced rates of taxation applicable to qualified dividend income, as discussed above. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

Dividend income will include any PRC tax withheld from distributions. For U.S. foreign tax credit purposes, dividends paid on the ADSs or ordinary shares generally will be treated as income from foreign sources and generally will constitute passive category income. If PRC taxes apply to dividends paid to you with respect to the ADSs or ordinary shares, you may be able to obtain a reduced rate of PRC taxes under the treaty if certain requirements are met. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends that are non-refundable under the treaty generally will be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. If you do not elect to claim a foreign tax credit, you may instead claim a deduction for U.S. federal income tax purposes in respect of such withholding, but only for a year in which you elect to do so for all creditable foreign income taxes. You should consult your tax advisor regarding the creditability of any PRC tax.

183

**Table of Contents**

*Sale or Other Disposition of the ADSs or Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, you will recognize gain or loss on any sale, exchange or other taxable disposition of an ADS or ordinary share equal to the difference between the amount realized for the ADS or ordinary share and your tax basis in the ADS or ordinary share. The gain or loss will generally be capital gain or loss. If you are an individual or other non-corporate U.S. Holder who has held the ADS or ordinary share for more than one year, you will generally be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes, which will generally limit the availability of foreign tax credits. However, in the event we are deemed to be a PRC "resident enterprise" under PRC tax law, we may be eligible for the benefits of the treaty. In such event, if PRC tax were to be imposed on any gain from the disposition of the ADSs or ordinary shares, a U.S. Holder that is eligible for the benefits of the treaty may elect to treat such gain as PRC source income. U.S. Holders should consult their tax advisors regarding the creditability of any PRC tax.

*Passive Foreign Investment Company Considerations*

A non-U.S. corporation, such as our company, is considered a passive foreign investment company, or PFIC, for any taxable year if either (i) at least 75% of its gross income is passive income, or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income, or asset test. We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the shares. Although the law in this regard is not entirely clear, we treat our consolidated affiliated entities as being owned by us for U.S. federal income tax purposes because we exercise effective control over them and we are entitled to substantially all of their economic benefits and, as a result, we consolidate their results of operations in our combined and consolidated financial statement. If it were determined, however, that we are not the owner of our consolidated affiliated entities for U.S. federal income tax purposes, we would likely be treated as a PFIC for our taxable year ended December 31, 2018 and for subsequent taxable years.

Assuming we are the owner of our consolidated affiliated entities in the PRC for U.S. federal income tax purposes, based on our current and expected income and assets and projections of the value of our ADSs following this offering, we do not presently expect to be a PFIC for the current taxable year or the foreseeable future. However, given the lack of authority and the highly factual nature of the analysis, no assurance can be given. The determination as to whether we are a PFIC must be made annually after the end of each taxable year, and consequently, our PFIC status may change. While we do not anticipate becoming a PFIC, changes in the nature of our income or assets or the value of our ADSs and ordinary shares may cause us to become a PFIC for the current or any subsequent taxable year. In particular, because the total value of our assets for purposes of the asset test may be calculated using the market price of the ADSs, our PFIC status may depend in large part on the market price of the ADSs, which may fluctuate considerably. The composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets and the cash raised in this offering. In addition, because there are uncertainties in the application of the relevant rules, it is possible that the IRS may challenge our classification of certain income and assets as non-passive or our valuation of our tangible and intangible assets, each of which may result in our becoming a PFIC for the current or subsequent taxable years. If we are a PFIC for any year during which you hold the ADSs or Class A ordinary shares, we will generally continue to be treated as a PFIC for all succeeding years during which you hold such ADSs or Class A ordinary shares. However, if we cease to be a PFIC, provided that you have not made a mark-to-market election, as described below, you may avoid some of the adverse effects of the PFIC regime by making a deemed sale election with respect to the ADSs or Class A ordinary shares, as applicable.

If we are a PFIC for any taxable year during which you hold ADSs or Class A ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize

184

**Table of Contents**

from a sale or other disposition (including a pledge) of the ADSs or Class A ordinary shares, unless you make a mark-to-market election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ADSs or Class A ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain would be allocated ratably over your holding period for the ADSs or Class A ordinary shares;

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we became a PFIC, would be treated as ordinary income; and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for you for such year and would be increased by an additional tax equal to interest on the resulting tax deemed deferred with respect to each such other taxable year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the ADSs or ordinary shares cannot be treated as capital, even if you hold the ADSs or ordinary shares as capital assets.

Alternatively, a U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock of a PFIC to elect out of the tax treatment discussed in the two preceding paragraphs. The mark-to-market election is available only for "marketable stock," which is stock that is traded in other than *de minimis* quantities on at least 15 days during each calendar quarter, or "regularly traded," on a qualified exchange or other market, as defined in applicable Treasury regulations. We expect that the ADSs will continue to be listed on the Nasdaq Global Market which is a qualified exchange for these purposes. Consequently, assuming that the ADSs are regularly traded, if you are a holder of ADSs, it is expected that the mark-to-market election would be available to you were we to become a PFIC. However, a mark-to-market election may not be made with respect to our Class A ordinary shares as they are not marketable stock. If you make a valid mark-to-market election for the ADSs, you will include in income each year an amount equal to the excess, if any, of the fair market value of the ADSs as of the close of your taxable year over your adjusted basis in such ADSs. You are allowed a deduction for the excess, if any, of the adjusted basis of the ADSs over their fair market value as of the close of the taxable year. Such deductions, however, are allowable only to the extent of any net mark-to-market gains on the ADSs included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ADSs, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ADSs, as well as to any loss realized on the actual sale or disposition of the ADSs, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ADSs. Your basis in the ADSs will be adjusted to reflect any such income or loss amounts. If you make such a mark-to-market election, tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us (except that the lower applicable capital gains rate would not apply).

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the general PFIC rules described above with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for United States federal income tax purposes.

Alternatively, a U.S. Holder may avoid the PFIC tax consequences described above in respect to its ADSs and ordinary shares by making a timely "qualified electing fund," or QEF, election. To comply with the requirements of a QEF election, a U.S. Holder must receive certain information from us. Because we do not intend to provide such information, however, such election will not be available to you with respect to the ADSs or ordinary shares.

185

**Table of Contents**

If you hold ADSs or ordinary shares in any year in which we are a PFIC, you will generally be required to file an annual information report containing such information as the U.S. Treasury may require.

You are urged to consult your tax advisor regarding the application of the PFIC rules to your investment in ADSs or ordinary shares.

186

**Table of Contents**

**UNDERWRITING**

Subject to the terms and conditions set forth in the underwriting agreement, dated            among us and the underwriters named below, for whom [Goldman Sachs (Asia) L.L.C., Credit Suisse Securities (USA) LLC, and Merrill Lynch, Pierce, Fenner & Smith Incorporated] are acting as the representatives, we have agreed to sell to the underwriters, and each of the underwriters has agreed, severally and not jointly, to purchase from us, the respective number of ADSs shown opposite its name below:

| Underwriter | Number of ADSs |
| --- | --- |
| [Goldman Sachs (Asia) L.L.C. | |
| Credit Suisse Securities (USA) LLC | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| China Renaissance Securities (Hong Kong) Limited | |
| Citigroup Global Markets Inc. | |
| UBS Securities LLC] | |
| **Total** | |

The underwriting agreement provides that the obligations of the several underwriters are subject to certain conditions precedent such as the receipt by the underwriters of officers' certificates and legal opinions and approval of certain legal matters by their counsel. The underwriting agreement provides that the underwriters will purchase all of the ADSs if any of them are purchased. [If an underwriter defaults, the underwriting agreement provides that the purchase commitments of the nondefaulting underwriters may be increased or the underwriting agreement may be terminated.] We have agreed to indemnify the underwriters and certain of their controlling persons against certain liabilities, including liabilities under the Securities Act, and to contribute to payments that the underwriters may be required to make in respect of those liabilities.

The underwriters have advised us that, following the completion of this offering, they currently intend to make a market in the ADSs as permitted by applicable laws and regulations. However, the underwriters are not obligated to do so, and the underwriters may discontinue any market-making activities at any time without notice in their sole discretion. Accordingly, no assurance can be given as to the liquidity of the trading market for the ADSs, that you will be able to sell any of the ADSs held by you at a particular time or that the prices that you receive when you sell will be favorable.

The underwriters are offering the ADSs subject to their acceptance of the ADSs from us and subject to prior sale. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

Certain of the underwriters are expected to make offers and sales both inside and outside the United States through their respective selling agents. Any offers or sales in the United States will be conducted by broker-dealers registered with the SEC. Goldman Sachs (Asia) L.L.C. will offer ADSs in the United States through its SEC-registered broker-dealer affiliate in the United States, Goldman, Sachs & Co.

The address of Goldman Sachs (Asia) L.L.C. is 68th Floor, Cheung Kong Center, 2 Queens Road, Central, Hong Kong. The address of Credit Suisse Securities (USA) LLC is Eleven Madison Avenue, New York, New York 10010, United States of America. The address of Merrill Lynch, Pierce, Fenner & Smith Incorporated is One Bryant Park, New York, NY 10036, United States of America. The address of China Renaissance Securities (Hong Kong) Limited is Unit 8107-08, Level 81, International Commerce Centre, 1 Austin Road West, Kowloon, Hong Kong. The address of Citigroup Global Markets Inc. is 388 Greenwich Street, New York, NY 10013, United States of America. The address of UBS Securities LLC is 1285 Avenue of the Americas New York, NY 10019, United States of America.

187

**Table of Contents**

**Option to Purchase Additional ADSs**

We have granted to the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase, from time to time, in whole or in part, up to an aggregate of              ADSs from us at the public offering price set forth on the cover page of this prospectus, less underwriting discounts and commissions. If the underwriters exercise this option, each underwriter will be severally and not jointly obligated, subject to specified conditions, to purchase a number of additional ADSs proportionate to that underwriter's initial purchase commitment as indicated in the table above. This option may be exercised only if the underwriters sell more ADSs than the total number set forth on the cover page of this prospectus.

**Commission and Expenses**

The underwriters have advised us that they propose to offer the ADSs to the public at the initial public offering price set forth on the cover page of this prospectus and to certain dealers, which may include the underwriters, at that price less a concession not in excess of US$              per ADS. After the offering, the initial public offering price, concession and reallowance to dealers may be varied by the underwriters. No such reduction will change the amount of proceeds to be received by us as set forth on the cover page of this prospectus.

The following table shows the public offering price, the underwriting discounts and commissions that we are to pay the underwriters and the proceeds, before expenses, to us in connection with this offering. Such amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase additional ADSs.

|  | Per ADS | | Total | |
| --- | --- | --- | --- | --- |
|  | Without Option to Purchase Additional ADSs | With Option to Purchase Additional ADSs | Without Option to Purchase Additional ADSs | With Option to Purchase Additional ADSs |
| Public offering price | US$ | US$ | US$ | US$ |
| Underwriting discounts and commissions paid by us | US$ | US$ | US$ | US$ |
| Proceeds to us, before expenses | US$ | US$ | US$ | US$ |

We estimate expenses payable by us in connection with this offering, other than the underwriting discounts and commissions referred to above, will be approximately US$              . [We have also agreed to reimburse the underwriters for expenses up to US$              relating to clearance of this offering with FINRA and certain other fees and expenses in connection with this offering.]

**Determination of Offering Price**

Prior to this offering, there has not been a public market for our ADSs. Consequently, the initial public offering price for our ADSs will be determined by negotiations between us and the representative. Among the factors to be considered in these negotiations will be prevailing market conditions, our financial information, market valuations of other companies that we and the underwriters believe to be comparable to us, estimates of our business potential, the present state of our development and other factors deemed relevant.

We offer no assurances that the initial public offering price will correspond to the price at which the ADSs will trade in the public market subsequent to the offering or that an active trading market for the ADSs will develop and continue after the offering.

**Listing**

We have applied to have our ADSs listed on Nasdaq under the trading symbol "IQ."

188

Table of Contents

**Directed Share Program**

At our request, the underwriters have reserved up to          % of the ADSs being offered by this prospectus for sale at the initial public offering price to our directors, officers, employees and other individuals associated with us and members of their families. The sales will be made by UBS Financial Services Inc., a selected dealer affiliated with UBS Securities LLC, an underwriter of this offering, through a directed share program. We do not know if these persons will choose to purchase all or any portion of these reserved ADSs, but any purchases they do make will reduce the number of ADSs available to the general public. Any ADSs sold in the directed share program to our directors, executive officers, shareholders or certain holders of equity awards shall be subject to the lock-up agreements described below.

**Stamp Taxes**

If you purchase ADSs offered in this prospectus, you may be required to pay stamp taxes and other charges under the laws and practices of the country of purchase, in addition to the offering price listed on the cover page of this prospectus.

**Lock-Up Agreements**

[We, our directors and executive officers, our existing shareholders and certain holders of our equity awards] have agreed, subject to specified exceptions, not to directly or indirectly during the period ending 180 days after the date of this prospectus, (i) issue, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of directly or indirectly, any ordinary shares or ADSs or any securities convertible into or exercisable or exchangeable for such ordinary shares or ADSs or enter into a transaction which would have the same effect; (ii) enter into any swap, hedge or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the ordinary shares or ADSs; (iii) establish or increase a put equivalent position or liquidate or decrease a call equivalent position in the ordinary shares or ADSs within the meaning of Section 16 of the Exchange Act; (iv) file any registration statement with the SEC relating to the offering of any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for ordinary shares or ADSs; or (v) publicly disclose the intention to make any offer, sale, pledge, disposition or filing, in each case regardless of whether any such transaction described above is to be settled by delivery of ordinary shares, ADSs, or such other securities, in cash or otherwise. These restrictions also apply to any ADSs acquired by our directors, executive officers, shareholders or certain holders of our equity awards in this offering pursuant to the directed share program.

The underwriters may, in their sole discretion and at any time or from time to time before the termination of the 180-day period release all or any portion of the securities subject to lock-up agreements. There are no existing agreements between the underwriters and any of our shareholders who will execute a lock-up agreement, providing consent to the sale of ADSs prior to the expiration of the lock-up period.

**Stabilization**

The underwriters have advised us that they, pursuant to Regulation M under the Securities Exchange Act of 1934, as amended, and certain persons participating in the offering may engage in short sale transactions, stabilizing transactions, syndicate covering transactions or the imposition of penalty bids in connection with this offering. These activities may have the effect of stabilizing or maintaining the market price of the ADSs at a level above that which might otherwise prevail in the open market. Establishing short sales positions may involve either "covered" short sales or "naked" short sales.

"Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional ADSs in this offering. The underwriters may close out any covered short position by either exercising their option to purchase additional ADSs or purchasing the ADSs in the open market. In determining the source of ADSs to close out the covered short position, the underwriters will consider, among other things, the price of ADSs available for purchase in the open market as compared to the price at which they may purchase ADSs through the option to purchase additional ADSs.

189

Table of Contents

"Naked" short sales are sales in excess of the option to purchase additional ADSs. The underwriters must close out any naked short position by purchasing ADSs in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the ADSs in the open market after pricing that could adversely affect investors who purchase in this offering.

A stabilizing bid is a bid for the purchase of ADSs on behalf of the underwriters for the purpose of fixing or maintaining the price of the ADSs. A syndicate covering transaction is the bid for or the purchase of ADSs on behalf of the underwriters to reduce a short position incurred by the underwriters in connection with the offering. Similar to other purchase transactions, the underwriter's purchases to cover the syndicate short sales may have the effect of raising or maintaining the market price of our ADSs or preventing or retarding a decline in the market price of our ADSs. As a result, the price of our ADSs may be higher than the price that might otherwise exist in the open market. A penalty bid is an arrangement permitting the underwriters to reclaim the selling concession otherwise accruing to a syndicate member in connection with the offering if the ADSs originally sold by such syndicate member are purchased in a syndicate covering transaction and therefore have not been effectively placed by such syndicate member.

None of we or any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the ADSs. The underwriters are not obligated to engage in these activities and, if commenced, any of the activities may be discontinued at any time.

## Discretionary Sales

The underwriters do not intend sales to discretionary accounts to exceed five percent of the total number of ADSs offered.

## Electronic Distribution

A prospectus in electronic format may be made available by e-mail or on the websites or through online services maintained by one or more of the underwriters or their affiliates. In those cases, prospective investors may view offering terms online and may be allowed to place orders online. The underwriters may agree with us to allocate a specific number of ADSs for sale to online brokerage account holders. Any such allocation for online distributions will be made by the underwriters on the same basis as other allocations. Other than the prospectus in electronic format, the information on the underwriters' websites and any information contained in any other website maintained by any of the underwriters is not part of this prospectus, has not been approved and/or endorsed by us or the underwriters and should not be relied upon by investors.

## Relationships

The underwriters and certain of their affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. The underwriters and certain of their affiliates have, from time to time, performed, and may in the future perform, various commercial and investment banking and financial advisory services for us and our affiliates, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the underwriters and certain of their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers, and such investment and securities activities may involve securities and/or instruments issued by us and our affiliates. If the underwriters or their respective affiliates have a lending relationship with us, they routinely hedge their credit exposure to us consistent with their customary risk management policies. The

190

**Table of Contents**

underwriters and their respective affiliates may hedge such exposure by entering into transactions which consist of either the purchase of credit default swaps or the creation of short positions in our securities or the securities of our affiliates, including potentially the ADSs offered hereby. Any such short positions could adversely affect future trading prices of the ADSs offered hereby. The underwriters and certain of their respective affiliates may also communicate independent investment recommendations, market color or trading ideas and/or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to customers that they acquire, long and/or short positions in such securities and instruments.

**Selling Restrictions**

No action has been taken in any jurisdiction (except in the United States) that would permit a public offering of the ADSs, or the possession, circulation or distribution of this prospectus or any other material relating to us or the ADSs in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither this prospectus nor any other material or advertisements in connection with the ADSs may be distributed or published, in or from any country or jurisdiction except in compliance with any applicable laws, rules and regulations of any such country or jurisdiction.

*Australia*

This prospectus does not constitute a product disclosure document or a prospectus under Chapter 6D.2 of the Corporations Act 2001 (Cth), or the Corporations Act, has not been, and will not be, lodged with the Australian Securities and Investments Commission, or ASIC, as a disclosure document for the purposes of the Corporations Act and does not purport to include the information required of a disclosure document under Chapter 6D.2 of the Corporations Act. It does not constitute or involve a recommendation to acquire, an offer or invitation for issue or sale, an offer or invitation to arrange the issue or sale, or an issue or sale, of interests to a "retail client" (as defined in section 761G of the Corporations Act and applicable regulations) in Australia and may only be provided in Australia to select investors who are able to demonstrate that they fall within one or more of the categories of investors, or Exempt Investors, available under section 708 of the Corporations Act as set out below. Accordingly, if you receive this prospectus in Australia:

A. You confirm and warrant that you are either:

a "sophisticated investor" under section 708(8)(a) or (b) of the Corporations Act;

a "sophisticated investor" under section 708(8)(c) or (d) of the Corporations Act and that you have provided an accountant's certificate to the Company which complies with the requirements of section 708(8)(c)(i) or (ii) of the Corporations Act and related regulations before the offer has been made;

a person associated with the Company under Section 708(12) of the Corporations Act; or

a "professional investor" within the meaning of section 708(11)(a) or (b) of the Corporations Act.

The ADSs may not be directly or indirectly offered for subscription or purchased or sold, and no invitations to subscribe for or buy the ADSs may be issued, and no draft or definitive offering memorandum, advertisement or other offering material relating to any ADSs may be distributed in Australia, except where disclosure to investors is not required under Chapter 6D of the Corporations Act or is otherwise in compliance with all applicable Australian laws and regulations. By submitting an application for the ADSs, you represent and warrant to us that you are an Exempt Investor. To the extent that you are unable to confirm or warrant that you are an exempt sophisticated investor, associated person or professional investor under the Corporations Act any offer made to you under this prospectus is void and incapable of acceptance.

B. As any offer of ADSs under this prospectus will be made without disclosure in Australia under Chapter 6D.2 of the Corporations Act, the offer of those securities for resale in Australia within 12 months may, under

191

**Table of Contents**

section 707 of the Corporations Act, require disclosure to investors under Chapter 6D.2 if none of the exemptions in section 708 applies to that resale. By applying for the ADSs, you warrant and agree that you will not offer any of the securities issued to you pursuant to this prospectus for resale in Australia within 12 months of those securities being issued unless any such resale offer is exempt from the requirement to issue a disclosure document under section 708 of the Corporations Act.

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

### Bermuda

ADSs may be offered or sold in Bermuda only in compliance with the provisions of the Investment Business Act of 2003 of Bermuda which regulates the sale of securities in Bermuda. Additionally, non-Bermudian persons (including companies) may not carry on or engage in any trade or business in Bermuda unless such persons are permitted to do so under applicable Bermuda legislation.

### British Virgin Islands

The ADSs are not being, and may not be offered to the public or to any person in the British Virgin Islands for purchase or subscription by or on behalf of the Company. The ADSs may be offered to companies incorporated under the British Virgin Islands Business Companies Act, 2004, or BVI Companies, but only where the offer will be made to, and received by, the relevant BVI Company entirely outside of the British Virgin Islands.

### Canada

The securities may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted customers, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the securities must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

### Cayman Islands

This prospectus does not constitute a public offer of the ADSs, whether by way of sale or subscription, in the Cayman Islands. Each underwriter has represented and agreed that it has not offered or sold, and will not offer or sell, directly or indirectly, any ADSs in the Cayman Islands.

192

**Table of Contents**

*European Economic Area*

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive, or each referred as a "Relevant Member State," an offer to the public of the ADSs which are the subject of the offering contemplated by this prospectus supplement and the accompanying prospectus may not be made in that Relevant Member State except that an offer to the public in that Relevant Member State of any ADSs may be made at any time under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

(a)    to any legal entity which is a "qualified investor" as defined in the Prospectus Directive;

(b)    to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the underwriters or the underwriters nominated by us for any such offer; or

(c)    in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of ADSs shall require us or any of the underwriters to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive, and each person who initially acquires any ADSs or to whom any offer is made will be deemed to have represented, acknowledged and agreed to and with each of the underwriters and us that it is a "qualified investor" within the meaning of the law in that Relevant Member State implementing Article 2(1)(e) of the Prospectus Directive.

Each person located in a Member State to whom any offer of ADSs is made or who receives any communication in respect of any offer of ordinary shares, or who initially acquires any ADSs will be deemed to have represented, warranted, acknowledged and agreed to and with each Representative and the Company that (1) it is a "qualified investor" within the meaning of the law in that Member State implementing Article 2(1)(e) of the Prospectus Directive; and (2) in the case of any ADSs acquired by it as a financial intermediary as that term is used in Article 3(2) of the Prospectus Directive, the ADSs acquired by it in the offer have not been acquired on behalf of, nor have they been acquired with a view to their offer or resale to, persons in any Member State other than qualified investors, as that term is defined in the Prospectus Directive, or in circumstances in which the prior consent of the Representative[s] has been given to the offer or resale; or where ordinary shares have been acquired by it on behalf of persons in any Member State other than qualified investors, the offer of those ordinary shares to it is not treated under the Prospectus Directive as having been made to such persons.

The Company, the Representatives and their respective affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgments and agreements.

This prospectus has been prepared on the basis that any offer of ADSs in any Member State will be made pursuant to an exemption under the Prospectus Directive from the requirement to publish a prospectus for offers of ADSs. Accordingly any person making or intending to make an offer in that Member State of ADSs which are the subject of the offering contemplated in this offering document may only do so in circumstances in which no obligation arises for the Company or any of the Representatives to publish a prospectus pursuant to Article 3 of the Prospectus Directive in relation to such offer. Neither the Company nor the Representative[s] have authorized, nor do they authorize, the making of any offer of ADSs in circumstances in which an obligation arises for the Company or the Representative[s] to publish a prospectus for such offer.

In the case of any ADSs being offered to a financial intermediary as that term is used in Article 3(2) of the Prospectus Directive, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the ADSs acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer of any ADSs to the public other than their offer or resale in a Relevant Member State to qualified

193

Table of Contents

investors as so defined or in circumstances in which the prior consent of the representatives has been obtained to each such proposed offer or resale.

For the purposes of this provision, the expression an "offer ADSs to the public" in relation to the ADSs in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the ADSs to be offered so as to enable an investor to decide to purchase or subscribe to the ADSs, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in the Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

### *Hong Kong*

No securities have been offered or sold, and no securities may be offered or sold, in Hong Kong, by means of any document, other than to ''professional investors'' as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong, or the SFO, and any rules made under that Ordinance; or in other circumstances which do not result in the document being a "prospectus" as defined in the Companies (Winding up and Miscellaneous Provisions) Ordinance (Cap. 32) of Hong Kong, or the CEO, or which do not constitute an offer or invitation to the public for the purpose of the CEO and the SFO. No document, invitation or advertisement relating to the securities has been issued or may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the content of which are likely to be accessed or read by, the public of Hong Kong (except if permitted under the securities laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the SFO and any rules made under that Ordinance.

This prospectus has not been registered with the Registrar of Companies in Hong Kong. Accordingly, this prospectus may not be issued, circulated or distributed in Hong Kong, and the securities may not be offered for subscription to members of the public in Hong Kong. Each person acquiring the securities will be required, and is deemed by the acquisition of the securities, to confirm that he is aware of the restriction on offers of the securities described in this prospectus and the relevant offering documents and that he is not acquiring, and has not been offered any securities in circumstances that contravene any such restrictions.

### *Japan*

The offering has not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948 of Japan, as amended), or FIEL, and the Initial Purchaser will not offer or sell any securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the FIEL and any other applicable laws, regulations and ministerial guidelines of Japan.

### *Kuwait*

Unless all necessary approvals from the Kuwait Ministry of Commerce and Industry required by Law No. 31/1990 "Regulating the Negotiation of Securities and Establishment of Investment Funds," its Executive Regulations and the various Ministerial Orders issued pursuant thereto or in connection therewith, have been given in relation to the marketing and sale of the ADSs, these may not be marketed, offered for sale, nor sold in the State of Kuwait. Neither this prospectus (including any related document), nor any of the information contained therein is intended to lead to the conclusion of any contract of whatsoever nature within Kuwait.

194

**Table of Contents**

*Malaysia*

No prospectus or other offering material or document in connection with the offer and sale of the ADSs has been or will be registered with the Securities Commission of Malaysia, or the Commission, for the Commission's approval pursuant to the Capital Markets and Services Act 2007. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the ADSs may not be circulated or distributed, nor may the ADSs be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Malaysia other than (i) a closed end fund approved by the Commission; (ii) a holder of a Capital Markets Services License; (iii) a person who acquires the ADSs, as principal, if the offer is on terms that the ADSs may only be acquired at a consideration of not less than RM250,000 (or its equivalent in foreign currencies) for each transaction; (iv) an individual whose total net personal assets or total net joint assets with his or her spouse exceeds RM3 million (or its equivalent in foreign currencies), excluding the value of the primary residence of the individual; (v) an individual who has a gross annual income exceeding RM300,000 (or its equivalent in foreign currencies) per annum in the preceding twelve months; (vi) an individual who, jointly with his or her spouse, has a gross annual income of RM400,000 (or its equivalent in foreign currencies), per annum in the preceding twelve months; (vii) a corporation with total net assets exceeding RM10 million (or its equivalent in a foreign currencies) based on the last audited accounts; (viii) a partnership with total net assets exceeding RM10 million (or its equivalent in foreign currencies); (ix) a bank licensee or insurance licensee as defined in the Labuan Financial Services and Securities Act 2010; (x) an Islamic bank licensee or takaful licensee as defined in the Labuan Financial Services and Securities Act 2010; and (xi) any other person as may be specified by the Commission; provided that, in the each of the preceding categories (i) to (xi), the distribution of the ADSs is made by a holder of a Capital Markets Services License who carries on the business of dealing in securities. The distribution in Malaysia of this prospectus is subject to Malaysian laws. This prospectus does not constitute and may not be used for the purpose of public offering or an issue, offer for subscription or purchase, invitation to subscribe for or purchase any securities requiring the registration of a prospectus with the Commission under the Capital Markets and Services Act 2007.

*People's Republic of China*

This prospectus may not be circulated or distributed in the PRC and the ADSs may not be offered or sold, and will not be offered or sold to any person for re-offering or resale directly or indirectly to any resident of the PRC or for the benefit of, legal or natural persons of the PRC except pursuant to applicable laws and regulations of the PRC. Further, no legal or natural persons of the PRC may directly or indirectly purchase any of the ADSs or any beneficial interest therein without obtaining all prior PRC's governmental approvals that are required, whether statutorily or otherwise. Persons who come into possession of this prospectus are required by the issuer and its representatives to observe these restrictions. For the purpose of this paragraph, PRC does not include Taiwan and the special administrative regions of Hong Kong and Macau.

*Korea*

The ADSs have not been and will not be registered under the Financial Investments Services and Capital Markets Act of Korea and the decrees and regulations thereunder, or the FSCMA. None of the ADSs may be offered, sold or delivered directly or indirectly, or offered or sold to any person for re-offering or resale, directly or indirectly, in Korea or to any resident of Korea except pursuant to the applicable laws and regulations of Korea, including the FSCMA and the Foreign Exchange Transaction Law of Korea and the decrees and regulations thereunder, or the FETL. Furthermore, the ADSs may not be resold to Korean residents unless the purchaser of the ADSs complies with all applicable regulatory requirements (including but not limited to requirements under the FETL) in connection with the purchase of the ADSs. By the purchase of the ADSs, the relevant holder thereof will be deemed to represent and warrant that if it is in Korea or is a resident of Korea, it purchased the ADSs pursuant to the applicable laws and regulations of Korea.

195

Table of Contents

*Qatar*

In the State of Qatar, the offer contained herein is made on an exclusive basis to the specifically intended recipient thereof, upon that person's request and initiative, for personal use only and shall in no way be construed as a general offer for the sale of securities to the public or an attempt to do business as a bank, an investment company or otherwise in the State of Qatar. This prospectus and the underlying securities have not been approved or licensed by the Qatar Central Bank or the Qatar Financial Center Regulatory Authority or any other regulator in the State of Qatar. The information contained in this prospectus shall only be shared with any third parties in Qatar on a need to know basis for the purpose of evaluating the contained offer. Any distribution of this prospectus by the recipient to third parties in Qatar beyond the terms hereof is not permitted and shall be at the liability of such recipient.

*Saudi Arabia*

This prospectus may not be distributed in the Kingdom of Saudi Arabia except to such persons as are permitted under the Offers of Securities Regulations issued by the Capital Market Authority pursuant to resolution number 2-11-2004 dated October 4, 2004 as amended by resolution number 1-28-2008, as amended. The Capital Market Authority does not make any representation as to the accuracy or completeness of this prospectus, and expressly disclaims any liability whatsoever for any loss arising from, or incurred in reliance upon, any part of this prospectus. Prospective purchasers of the securities offered hereby should conduct their own due diligence on the accuracy of the information relating to the securities. If you do not understand the contents of this prospectus you should consult an authorized financial adviser.

*Singapore*

This prospectus has not been and will not be lodged or registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the notes may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore, or the SFA, (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275, of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the notes are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a) a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor, securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the notes pursuant to an offer made under Section 275 of the SFA except:

    (i) to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

    (ii) where no consideration is or will be given for the transfer;

    (iii) where the transfer is by operation of law;

    (iv) as specified in Section 276(7) of the SFA; or

196

**Table of Contents**

(v) as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

In addition, investors in Singapore should note that the ADSs acquired by them are subject to resale and transfer restrictions specified under Section 276 of the SFA, and they, therefore, should seek their own legal advice before effecting any resale or transfer of their ADSs.

*Switzerland*

The securities may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange, or the SIX, or on any other stock exchange or regulated trading facility in Switzerland. This prospectus has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this prospectus nor any other offering or marketing material relating to the securities or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this prospectus nor any other offering or marketing material relating to the offering, the Company or the securities have been or will be filed with or approved by any Swiss regulatory authority. In particular, this prospectus will not be filed with, and the offer of securities will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA, and the offer of securities has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes, or the CISA. The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of securities.

*Taiwan*

The ADSs have not been and will not be registered with the Financial Supervisory Commission of Taiwan pursuant to relevant securities laws and regulations and may not be sold, issued or offered within Taiwan through a public offering or in circumstances which constitutes an offer within the meaning of the Securities and Exchange Act of Taiwan that requires a registration or approval of the Financial Supervisory Commission of Taiwan. No person or entity in Taiwan has been authorized to offer, sell, give advice regarding or otherwise intermediate the offering and sale of the ADSs in Taiwan.

*United Arab Emirates*

This prospectus is not intended to constitute an offer, sale or delivery of ADSs or other securities under the laws of the United Arab Emirates, or the UAE. The ADSs have not been and will not be registered under Federal Law No. 4 of 2000 Concerning the Emirates Securities and Commodities Authority and the Emirates Security and Commodity Exchange, or with the UAE Central Bank, the Dubai Financial Market, the Abu Dhabi Securities Market or with any other UAE exchange.

The offering, the ADSs and interests therein have not been approved or licensed by the UAE Central Bank or any other relevant licensing authorities in the UAE, and do not constitute a public offer of securities in the UAE in accordance with the Commercial Companies Law, Federal Law No. 8 of 1984 (as amended) or otherwise.

In relation to its use in the UAE, this prospectus is strictly private and confidential and is being distributed to a limited number of investors and must not be provided to any person other than the original recipient, and may not be reproduced or used for any other purpose. The interests in the ADSs may not be offered or sold directly or indirectly to the public in the UAE.

**Table of Contents**

*United Kingdom*

This prospectus is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospectus Directive that are also (i) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or the Order, and/or (ii) high net worth entities falling within Article 49(2)(a) to (d) of the Order and other persons to whom it may lawfully be communicated (each such person being referred to as a "relevant person").

This prospectus and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other persons in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this prospectus or any of its contents.

198

**Table of Contents**

**EXPENSES RELATED TO THIS OFFERING**

Set forth below is an itemization of the total expenses, excluding underwriting discounts and commissions, that we expect to incur in connection with this offering. With the exception of the SEC registration fee, the Financial Industry Regulatory Authority or FINRA, filing fee, and the Nasdaq Global Market market entry and listing fee, all amounts are estimates.

| | |
|---|---:|
| SEC Registration Fee | $ |
| FINRA Filing Fee | |
| Nasdaq Global Market Market Entry and Listing Fee | |
| Printing Expenses | |
| Legal Fees and Expenses | |
| Accounting Fees and Expenses | |
| Miscellaneous | |
| **Total** | $ |

199

**Table of Contents**

**LEGAL MATTERS**

The validity of the ADSs and certain other legal matters with respect to U.S. federal and New York State law in connection with this offering will be passed upon for us by Skadden, Arps, Slate, Meagher & Flom LLP. Certain legal matters with respect to U.S. federal and New York State law in connection with this offering will be passed upon for the underwriters by Davis Polk & Wardwell LLP. The validity of the Class A ordinary shares represented by the ADSs offered in this offering and other certain legal matters as to Cayman Islands law will be passed upon for us by Walkers. Legal matters as to PRC law will be passed upon for us by Jingtian & Gongcheng and for the underwriters by Han Kun Law Offices. Skadden, Arps, Slate, Meagher & Flom LLP may rely upon Walkers with respect to matters governed by Cayman Islands law and Jingtian & Gongcheng with respect to matters governed by PRC law. Davis Polk & Wardwell LLP may rely upon Han Kun Law Offices with respect to matters governed by PRC law.

200

Table of Contents

**EXPERTS**

The consolidated financial statements of iQIYI, Inc. at December 31, 2016 and 2017, and for each of the three years in the period ended December 31, 2017, appearing in this Prospectus and Registration Statement have been audited by Ernst & Young Hua Ming LLP, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of said firm as experts in accounting and auditing.

The offices of Ernst & Young Hua Ming LLP are located at Oriental Plaza, No. 1 East Chang An Avenue, Dong Cheng District, Beijing 100738, China.

201

**Table of Contents**

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form F-1, including relevant exhibits, under the Securities Act with respect to the underlying Class A ordinary shares represented by the ADSs to be sold in this offering. We have also filed with the SEC a related registration statement on Form F-6 to register the ADSs. This prospectus, which constitutes a part of the registration statement on Form F-1, does not contain all of the information contained in the registration statement. You should read our registration statements and their exhibits and schedules for further information with respect to us and our ADSs.

The agreements included as exhibits to the registration statement on Form F-1 contain representations and warranties by each of the parties to the applicable agreement. These representations and warranties were made solely for the benefit of the other parties to the applicable agreement and (i) were not intended to be treated as categorical statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate; (ii) may have been qualified in such agreement by disclosures that were made to the other party in connection with the negotiation of the applicable agreement; (iii) may apply contract standards of "materiality" that are different from "materiality" under the applicable securities laws; and (iv) were made only as of the date of the applicable agreement or such other date or dates as may be specified in the agreement.

Immediately upon effectiveness of the registration statement to which this prospectus is a part we will become subject to periodic reporting and other informational requirements of the Exchange Act as applicable to foreign private issuers. Accordingly, we will be required to file reports, including annual reports on Form 20-F, and other information with the SEC. As a foreign private issuer, we are exempt from the rules of the Exchange Act prescribing the furnishing and content of proxy statements to shareholders, and Section 16 short swing profit reporting for our officers and directors and for holders of more than 10% of our ordinary shares. All information filed with the SEC can be obtained over the internet at the SEC's website at *www.sec.gov* or inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549. You can request copies of these documents, upon payment of a duplicating fee, by writing to the SEC. Please call the SEC at 1-800-SEC-0330 or visit the SEC website for further information on the operation of the public reference rooms.

**Table of Contents**

**iQIYI, INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2016 and 2017 | F-3 |
| Consolidated Statements of Comprehensive Loss for the Years Ended December 31, 2015, 2016 and 2017 | F-8 |
| Consolidated Statements of Changes in Shareholders' Deficit for the Years Ended December 31, 2015, 2016 and 2017 | F-11 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2015, 2016 and 2017 | F-12 |
| Notes to Consolidated Financial Statements for the Years Ended December 31, 2015, 2016 and 2017 | F-14 |

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**To the Shareholders and the Board of Directors of iQIYI, Inc.**

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of iQIYI, Inc. (the "Company") as of December 31, 2017 and 2016, and the related consolidated statements of comprehensive loss, changes in shareholders' deficit and cash flows for each of the three years in the period ended December 31, 2017, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2017 and 2016, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with U.S. generally accepted accounting principles.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young Hua Ming LLP

We have served as the Company's auditor since 2017.
Beijing, The People's Republic of China
February 27, 2018

F-2

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2016 AND 2017**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, 2016 RMB | As of December 31, 2017 RMB | As of December 31, 2017 US$ | Pro forma shareholders' equity as of December 31, 2017 RMB | Pro forma shareholders' equity as of December 31, 2017 US$ |
|---|---|---|---|---|---|---|
| | | | | | (Unaudited) | |
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash anbd cash equivalents | | 964,207 | 733,010 | 112,662 | | |
| Short-term investments | 3 | 902,978 | 779,916 | 119,871 | | |
| Accounts receivable, net of allowance of RMB19,719 and RMB24,686 (US$3,794) as of December 31, 2016 and 2017, repectively | 5 | 1,779,659 | 2,235,384 | 343,572 | | |
| Prepayments and other assets | 6 | 737,995 | 1,123,372 | 172,659 | | |
| Amounts due from related parties | 21 | 273,023 | 9,979 | 1,534 | | |
| Licensed copyrights, net | 7 | 496,443 | 818,867 | 125,858 | | |
| **Total current assets** | | **5,154,305** | **5,700,528** | **876,156** | | |
| Non-current assets: | | | | | | |
| Fixed assets, net | 11 | 539,211 | 1,248,968 | 191,963 | | |
| Long-term investments | 4 | 183,764 | 567,887 | 87,283 | | |
| Deferred tax assets, net | 14 | 3,853 | 11,380 | 1,749 | | |
| Licensed copyrights, net | 7 | 2,446,725 | 4,558,083 | 700,565 | | |
| Intangible assets, net | 8 | 382,975 | 428,005 | 65,783 | | |
| Produced content, net | 9 | 413,506 | 1,564,279 | 240,425 | | |
| Prepayments and other assets | 6 | 1,231,190 | 2,845,662 | 437,370 | | |
| Goodwill | 10 | 3,276,107 | 3,276,107 | 503,528 | | |
| **Total non-current assets** | | **8,477,331** | **14,500,371** | **2,228,666** | | |
| **Total assets** | | **13,631,636** | **20,200,899** | **3,104,822** | | |

F-3

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, | | | Pro forma shareholders' equity as of December 31, | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2016 | 2017 | 2017 | 2017 | 2017 |
| | | RMB | RMB | US$ | RMB | US$ |
| | | | | | (Unaudited) | |
| **LIABILITIES, MEZZANINE EQUITY AND SHAREHOLDERS' DEFICIT** | | | | | | |
| **Current liabilities** (including current liabilities of the consolidated VIEs without recourse to the primary beneficiary of RMB6,887,535 and RMB8,320,537 (US$1,278,843) as of December 31, 2016 and 2017, respectively): | | | | | | |
| Accounts payable | | 4,184,558 | 7,041,304 | 1,082,229 | | |
| Amounts due to related parties | 21 | 4,946,870 | 130,099 | 19,996 | | |
| Customer advances and deferred revenue | | 796,703 | 1,633,649 | 251,087 | | |
| Short-term loans | 12 | 100,000 | 299,374 | 46,013 | | |
| Long-term loans, current portion | 12 | — | 10,000 | 1,537 | | |
| Accrued expenses and other liabilities | 13 | 1,861,722 | 2,511,186 | 385,962 | | |
| **Total current liabilities** | | **11,889,853** | **11,625,612** | **1,786,824** | | |
| **Non-current liabilities** (including non-current liabilities of the consolidated VIEs without recourse to the primary beneficiary of RMB5,705 and RMB286,854 (US$44,089) as of December 31, 2016 and 2017, respectively)**:** | | | | | | |
| Long-term loans | 12 | — | 284,000 | 43,650 | | |
| Deferred tax liabilities | 14 | 6,942 | 2,255 | 347 | | |
| Other non-current liabilities | | 347 | 6,432 | 989 | | |
| **Total non-current liabilities** | | **7,289** | **292,687** | **44,986** | | |
| **Total liabilities** | | **11,897,142** | **11,918,299** | **1,831,810** | | |
| **Commitments and contingencies** | 16 | | | | | |
| **Mezzanine equity:** | | | | | | |
| Series A redeemable convertible preferred shares (par value of US$0.00001 per share; 200,000,000 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 1,225,153 | 606,140 | 93,162 | — | — |

F-4

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, 2016 RMB | As of December 31, 2017 RMB | As of December 31, 2017 US$ | Pro forma shareholders' equity as of December 31, 2017 RMB | Pro forma shareholders' equity as of December 31, 2017 US$ |
|---|---|---|---|---|---|---|
| | | | | | (Unaudited) | |
| Series A-1 redeemable convertible preferred shares (par value of US$0.00001 per share; 6,064,174 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 6,826 | 6,826 | 1,049 | — | — |
| Series B redeemable convertible preferred shares (par value of US$0.00001 per share; 123,103,264 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 1,552,780 | 1,546,912 | 237,756 | — | — |
| Series C redeemable convertible preferred shares (par value of US$0.00001 per share; 302,891,196 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 1,793,669 | 954,544 | 146,711 | — | — |
| Series D redeemable convertible preferred shares (par value of US$0.00001 per share; 848,682,647 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 5,034,301 | 3,195,670 | 491,165 | — | — |

F-5

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, 2016 RMB | 2017 RMB | 2017 US$ | Pro forma shareholders' equity as of December 31, 2017 RMB | 2017 US$ |
|---|---|---|---|---|---|---|
| | | | | | (Unaudited) | |
| Series E redeemable convertible preferred shares (par value of US$0.00001 per share; 686,646,383 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 4,081,917 | 2,344,683 | 360,371 | — | — |
| Series F redeemable convertible preferred shares (par value of US$0.00001 per share; 546,999,817 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 3,344,521 | 3,530,583 | 542,641 | — | — |
| Series G redeemable convertible preferred shares (par value of US$0.00001 per share; nil and 1,014,436,019 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | — | 10,416,306 | 1,600,957 | | |
| **Total mezzanine equity** | | **17,039,167** | **22,601,664** | **3,473,812** | **—** | **—** |

F-6

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, | | | Pro forma shareholders' equity as of December 31, | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2016 | 2017 | 2017 | 2017 | 2017 |
| | | RMB | RMB | US$ | RMB | US$ |
| | | | | | (Unaudited) | |
| **Shareholders' (deficit)/equity:** | | | | | | |
| Ordinary shares (par value of US$0.00001 per share; 3,500,000,000 and 10,000,000,000 shares authorized; 342,548,237 shares issued and outstanding as of December 31, 2016 and 2017, respectively) | 17 | 23 | 23 | 4 | — | — |
| Class A ordinary shares (US$0.00001 par value; no shares authorized, issued, and outstanding as of December 31, 2016 and 2017, 94,000,000,000 shares authorized; 1,231,841,032 shares issued and outstanding, unaudited, pro forma) | | — | — | — | 80 | 12 |
| Class B ordinary shares (US$0.00001 par value; no shares authorized, issued, and outstanding as of December 31, 2016 and 2017, 5,000,000,000 shares authorized; 2,839,530,705 shares issued and outstanding, unaudited, pro forma) | | — | — | — | 185 | 29 |
| Additional paid-in capital | | 325,730 | 600,834 | 92,346 | 23,202,256 | 3,566,121 |
| Accumulated deficit | 18 | (15,989,796) | (15,016,867) | (2,308,050) | (15,016,867) | (2,308,050) |
| Accumulated other comprehensive income | 24 | 359,370 | 93,126 | 14,313 | 93,126 | 14,313 |
| Noncontrolling interests | | — | 3,820 | 587 | 3,820 | 587 |
| **Total shareholders' (deficit)/equity** | | **(15,304,673)** | **(14,319,064)** | **(2,200,800)** | **8,282,600** | **1,273,012** |
| **Total liabilities, mezzanine equity and shareholders' deficit** | | **13,631,636** | **20,200,899** | **3,104,822** | | |

The accompanying notes are an integral part of the consolidated financial statements.

F-7

**Table of Contents**

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS), and per share (or ADS) data)**

| | | Year ended December 31, | | | |
|---|---|---|---|---|---|
| | Note | 2015 | 2016 | 2017 | 2017 |
| | | RMB | RMB | RMB | US$ |
| **Revenues:** | | | | | |
| Membership services (including related party amounts of RMB7,178, RMB29,913 and RMB85,635 (US$13,162) for the years ended December 31, 2015, 2016 and 2017, respectively) | | 996,682 | 3,762,183 | 6,536,028 | 1,004,569 |
| Online advertising services (including related party amounts of RMB28,256, RMB176,780 and RMB27,586 (US$4,240) for the years ended December 31, 2015, 2016 and 2017, respectively) | | 3,399,935 | 5,650,366 | 8,158,924 | 1,254,004 |
| Content distribution | | 387,687 | 500,952 | 1,191,816 | 183,179 |
| Others (including related party amounts of RMB34,694 , RMB13,734 and RMB68,311 (US$10,500) for the years ended December 31, 2015, 2016 and 2017, respectively) | | 534,280 | 1,323,906 | 1,491,582 | 229,251 |
| **Total revenues** | | **5,318,584** | **11,237,407** | **17,378,350** | **2,671,003** |
| **Operating costs and expenses:** | | | | | |
| Cost of revenues (including related party amounts of RMB8,650, RMB23,662 and RMB141,642 (US$21,770) for the years ended December 31, 2015, 2016 and 2017, respectively) | | (6,041,764) | (11,436,595) | (17,386,563) | (2,672,266) |
| Selling, general and administrative (including related party amounts of RMB93,629, RMB118,229 and RMB148,918 (US$22,888) for the years ended December 31, 2015, 2016 and 2017, respectively) | | (1,204,464) | (1,765,824) | (2,674,990) | (411,138) |
| Research and development (including related party amounts of nil, RMB871 and RMB2,833 (US$435) for the years ended December 31, 2015, 2016 and 2017, respectively) | | (499,957) | (824,482) | (1,269,806) | (195,166) |
| **Total operating costs and expenses** | | **(7,746,185)** | **(14,026,901)** | **(21,331,359)** | **(3,278,570)** |
| **Operating loss** | | **(2,427,601)** | **(2,789,494)** | **(3,953,009)** | **(607,567)** |

F-8

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS), and per share (or ADS) data)**

| | Note | 2015 RMB | 2016 RMB | 2017 RMB | 2017 US$ |
|---|---|---|---|---|---|
| **Other expense** | | | | | |
| Interest income | | 5,002 | 17,009 | 83,127 | 12,776 |
| Interest expenses (including related party amounts of RMB55,113, RMB106,731 and RMB168,154 (US$25,845) for the years ended December 31, 2015, 2016 and 2017, respectively) | | (55,492) | (110,477) | (277,577) | (42,663) |
| Foreign exchange (loss)/gain, net | | (76,985) | (238,564) | 400,737 | 61,592 |
| Loss from equity method investments | | (762) | (100) | (263) | (40) |
| Other (expense)/income, net | | (8,108) | 60,692 | 2,488 | 382 |
| **Total other (expenses)/income, net** | | **(136,345)** | **(271,440)** | **208,512** | **32,047** |
| **Loss before income taxes** | | **(2,563,946)** | **(3,060,934)** | **(3,744,497)** | **(575,520)** |
| Income tax (expense)/benefit | 14 | (11,166) | (13,088) | 7,565 | 1,163 |
| **Net loss** | | **(2,575,112)** | **(3,074,022)** | **(3,736,932)** | **(574,357)** |
| Net loss attributable to noncontrolling interests | | — | — | — | — |
| **Net loss attributable to iQIYI, Inc.** | | **(2,575,112)** | **(3,074,022)** | **(3,736,932)** | **(574,357)** |
| Accretion of redeemable convertible preferred shares | 23 | (2,342,385) | (4,874,739) | 5,073,140 | 779,727 |
| Extinguishment and reissuance of Series B preferred shares | | — | — | (363,279) | (55,835) |
| **Net (loss)/income attributable to ordinary shareholders** | | **(4,917,497)** | **(7,948,761)** | **972,929** | **149,535** |
| **Net (loss)/earnings per share:** | 19 | | | | |
| Basic | | (14.36) | (23.20) | 0.30 | 0.05 |
| Diluted | | (14.36) | (23.20) | (1.15) | (0.18) |
| **Shares used in net (loss)/earnings per share computation:** | | | | | |
| Basic | 19 | 342,548,237 | 342,548,237 | 342,548,237 | 342,548,237 |
| Diluted | | 342,548,237 | 342,548,237 | 3,243,147,261 | 3,243,147,261 |
| **Pro forma net loss per share attributable to Class A and Class B ordinary shareholders (unaudited):** | | | | | |
| Basic | 19 | | | (0.89) | (0.14) |
| Diluted | | | | (0.89) | (0.14) |

F-9

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS), and per share (or ADS) data)

| | Note | Year ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 | 2017 |
| | | RMB | RMB | RMB | US$ |
| **Class A and Class B shares used in pro forma net loss per share computation (unaudited):** | 19 | | | | |
| Basic | | | | 4,071,371,737 | 4,071,371,737 |
| Diluted | | | | 4,071,371,737 | 4,071,371,737 |
| Other comprehensive income | | | | | |
| Foreign currency translation adjustments | | 151,062 | 195,255 | (264,774) | (40,695) |
| Unrealized gains/(losses) on available-for-sale debt securities | | — | 2,978 | (1,470) | (226) |
| **Total other comprehensive income/(loss), net of tax** | | **151,062** | **198,233** | **(266,244)** | **(40,921)** |
| **Comprehensive loss** | | **(2,424,050)** | **(2,875,789)** | **(4,003,176)** | **(615,278)** |
| Comprehensive loss attributable to non controlling interests | | — | — | — | — |
| **Comprehensive loss attributable to iQIYI, Inc.** | | **(2,424,050)** | **(2,875,789)** | **(4,003,176)** | **(615,278)** |

The accompanying notes are an integral part of the consolidated financial statements.

F-10

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' DEFICIT**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares)

| | Attributable to iQIYI, INC. | | | | | | |
| | Ordinary shares | | Additional paid-in capital | Accumulated other comprehensive income | Accumulated deficit | Noncontrolling interests | Total shareholders' deficit |
| | Number of shares | Amount | | | | | |
| | | RMB | RMB | RMB | RMB | RMB | RMB |
| **Balances as of January 1, 2015** | **342,548,237** | **23** | **219,144** | **10,075** | **(3,123,538)** | **—** | **(2,894,296)** |
| Net loss attributable to iQIYI, Inc. | — | — | — | — | (2,575,112) | — | (2,575,112) |
| Other comprehensive income | — | — | — | 151,062 | — | — | 151,062 |
| Accretion of redeemable convertible preferred shares | — | — | — | — | (2,342,385) | — | (2,342,385) |
| Share-based compensation | — | — | 44,194 | — | — | — | 44,194 |
| **Balances as of December 31, 2015** | **342,548,237** | **23** | **263,338** | **161,137** | **(8,041,035)** | **—** | **(7,616,537)** |
| Net loss attributable to iQIYI, Inc. | — | — | — | — | (3,074,022) | — | (3,074,022) |
| Other comprehensive income | — | — | — | 198,233 | — | — | 198,233 |
| Accretion of redeemable convertible preferred shares | — | — | — | — | (4,874,739) | — | (4,874,739) |
| Share-based compensation | — | — | 62,392 | — | — | — | 62,392 |
| **Balances as of December 31, 2016** | **342,548,237** | **23** | **325,730** | **359,370** | **(15,989,796)** | **—** | **(15,304,673)** |
| Net loss attributable to iQIYI, Inc. | — | — | — | — | (3,736,932) | — | (3,736,932) |
| Other comprehensive loss | — | — | — | (266,244) | | — | (266,244) |
| Extinguishment and reissuance of Series B preferred shares | — | — | — | — | (363,279) | — | (363,279) |
| Accretion of redeemable convertible preferred shares | — | — | — | — | 5,073,140 | — | 5,073,140 |
| Issuance of a subsidiary's equity to noncontrolling interest holders | — | — | 41,680 | — | — | 3,820 | 45,500 |
| Share-based compensation | — | — | 233,424 | — | — | — | 233,424 |
| **Balances as of December 31, 2017** | **342,548,237** | **23** | **600,834** | **93,126** | **(15,016,867)** | **3,820** | **(14,319,064)** |
| **Balances as of December 31, 2017, in US$** | | **4** | **92,346** | **14,313** | **(2,308,050)** | **587** | **(2,200,800)** |

The accompanying notes are an integral part of the consolidated financial statements.

F-11

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"))**

| | Note | Year ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 | 2017 |
| | | RMB | RMB | RMB | US$ |
| **Cash flows from operating activities:** | | | | | |
| **Net loss** | | (2,575,112) | (3,074,022) | (3,736,932) | (574,357) |
| **Adjustments to reconcile net loss to net cash provided by operating activities** | | | | | |
| Depreciation of fixed assets | | 222,195 | 306,495 | 348,921 | 53,628 |
| Amortization of intangible assets | | 172,788 | 102,242 | 112,860 | 17,346 |
| Amortization of licensed copyrights | | 2,293,735 | 4,036,121 | 7,491,955 | 1,151,492 |
| Amortization and impairment of produced content | | 231,597 | 574,530 | 811,448 | 124,717 |
| Impairment of licensed copyrights | | — | 212,219 | 390,235 | 59,978 |
| Impairment of long-term investments | | — | — | 32,938 | 5,062 |
| Provision/(reversal) for other assets | | 3,890 | 29,016 | (2,532) | (389) |
| Unrealized foreign exchange loss/(gain) | | 79,112 | 180,574 | (333,601) | (51,274) |
| (Gain)/loss on disposal of fixed assets | | (1,808) | 1,166 | 4,594 | 706 |
| Loss on disposal of intangible assets | | 4,641 | — | — | — |
| Interest expense on convertible notes | | — | — | 112,457 | 17,284 |
| Barter transaction revenue | | (349,834) | (382,478) | (762,741) | (117,231) |
| Provision for doubtful accounts | | 19,415 | 7,245 | 56,048 | 8,614 |
| Share-based compensation | | 44,194 | 62,392 | 233,424 | 35,876 |
| Losses on equity method investments | | 762 | 100 | 263 | 40 |
| Deferred income tax expense/(benefit) | | 5,201 | 478 | (12,214) | (1,877) |
| **Changes in operating assets and liabilities** | | | | | |
| Accounts receivable | | (295,007) | (322,756) | (512,060) | (78,702) |
| Amounts due from related parties | | (9,015) | (57,941) | 56,720 | 8,718 |
| Restricted cash | | 9,983 | — | — | — |
| Produced content | | (337,945) | (872,425) | (1,962,221) | (301,588) |
| Prepayments and other assets | | (350,080) | (173,417) | (549,301) | (84,426) |
| Accounts payable | | 1,040,691 | 1,076,988 | 1,050,178 | 161,409 |
| Amounts due to related parties | | 19,097 | 19,138 | (184,882) | (28,416) |
| Customer advances and deferred revenue | | 219,483 | 456,823 | 836,946 | 128,636 |
| Accrued expenses and other current liabilities | | 584,627 | 389,004 | 646,814 | 99,413 |
| Interest payables | | 43,698 | 42,943 | (123,618) | (19,000) |
| Other non-current liabilities | | (5,538) | (2,314) | 6,085 | 935 |
| **Net cash provided by operating activities** | | **1,070,770** | **2,612,121** | **4,011,784** | **616,594** |
| **Cash flows from investing activities:** | | | | | |
| Acquisition of fixed assets | | (295,448) | (399,885) | (1,022,315) | (157,127) |
| Acquisition of intangible assets | | (30,609) | (42,120) | (110,290) | (16,951) |
| Acquisition of licensed copyrights | | (2,586,086) | (5,290,838) | (9,087,438) | (1,396,714) |
| Purchase of long-term investments | | (204) | (163,990) | (553,003) | (84,995) |
| Film investment as passive investor | | (61,028) | (31,751) | (11,075) | (1,702) |
| Proceeds from film investments as passive investor | | — | 5,484 | 31,093 | 4,779 |

F-12

Table of Contents

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$")**

| | Note | Year ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | **2015** | **2016** | **2017** | **2017** |
| | | **RMB** | **RMB** | **RMB** | **US$** |
| Loans provided to related parties and third parties | | — | — | (2,279,238) | (350,312) |
| Repayment of loans provided to related parties | | — | — | 2,393,654 | 367,898 |
| Purchases of held-to-maturity investments | | — | — | (1,750,000) | (268,970) |
| Maturities of held-to-maturity investments | | — | — | 1,750,000 | 268,970 |
| Purchase of available-for-sale debt securities | | (160,000) | (4,499,000) | (13,770,043) | (2,116,417) |
| Maturity of available-for-sale debt securities | | — | 3,759,000 | 13,747,981 | 2,113,026 |
| **Net cash used for investing activities** | | **(3,133,375)** | **(6,663,100)** | **(10,660,674)** | **(1,638,515)** |
| **Cash flows from financing activities:** | | | | | |
| Proceeds from loans from related parties | | — | 4,000,000 | 2,220,000 | 341,208 |
| Repayments of loans from related parties | | (131,708) | (688,234) | (6,726,000) | (1,033,767) |
| Proceeds from short-term loans | | — | 100,000 | 299,374 | 46,013 |
| Repayments of short-term loans | | — | — | (100,000) | (15,370) |
| Proceeds from long-term loan | | — | — | 299,000 | 45,955 |
| Repayment of long-term loan | | — | — | (5,000) | (768) |
| Proceeds from issuance of a subsidiary's equity to noncontrolling interest holders | | — | — | 45,500 | 6,993 |
| Proceeds from issuance of convertible notes payable to related parties | | — | — | 2,064,360 | 317,286 |
| Proceeds from issuance of convertible notes payable | | — | — | 8,463,876 | 1,300,874 |
| **Net cash (used in)/provided by financing activities** | | **(131,708)** | **3,411,766** | **6,561,110** | **1,008,424** |
| Effect of exchange rate changes on cash and cash equivalents | | 71,951 | 14,681 | (143,417) | (22,037) |
| **Net decrease in cash and cash equivalents** | | **(2,122,362)** | **(624,532)** | **(231,197)** | **(35,534)** |
| Cash and cash equivalents at the beginning of the year | | 3,711,101 | 1,588,739 | 964,207 | 148,196 |
| Cash and cash equivalents at the end of the year | | 1,588,739 | 964,207 | 733,010 | 112,662 |
| **Supplemental disclosures of cash flow information:** | | | | | |
| Cash paid for interest | | 11,498 | 66,651 | 282,045 | 43,349 |
| Cash paid for income taxes | | — | 413 | 22,472 | 3,454 |
| Acquisition of fixed assets included in accounts payable | | 146,442 | 107,723 | 150,434 | 23,121 |
| Acquisition of licensed copyrights included in accounts payable | | 1,147,064 | 2,194,554 | 4,040,476 | 621,010 |
| Acquisition of licensed copyrights from nonmonetary content exchanges | | 291,676 | 385,318 | 781,513 | 120,116 |

The accompanying notes are an integral part of the consolidated financial statements.

F-13

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**1.     ORGANIZATION AND BASIS OF PRESENTATION**

Qiyi.com, Inc. (the "Company") was incorporated under the laws of the Cayman Islands on November 27, 2009. It was formerly known as Ding Xin, Inc. and changed its name to Qiyi.com, Inc. on August 30, 2010. On November 30, 2017, the Company revised its name from Qiyi.com, Inc. to iQIYI, Inc..

The Company, its wholly-owned subsidiaries, variable interest entities ("VIEs") and VIEs' subsidiaries are hereinafter collectively referred to as the "Group". The Group is an innovative platform in China offering a diverse collection of high-quality internet video content, including professionally-produced content licensed from professional content providers and self-produced content, on its platform. The Group provides membership services, online advertising services, content distribution services, live broadcasting services and online gaming services. The Group's principal geographic market is in the People's Republic of China ("PRC"). The Company does not conduct any substantive operations of its own but conducts its primary business operations through its wholly-owned subsidiaries, VIEs and VIEs' subsidiaries in the PRC.

As of December 31, 2017, the Company's major subsidiaries, VIEs and VIEs' subsidiaries are as follows:

| | Place of Incorporation | Date of Establishment/Acquisition | Effective interest held |
|---|---|---|---|
| **Subsidiaries:** | | | |
| Beijing QIYI Century Science & Technology Co., Ltd. ("Beijing QIYI Century") | PRC | March 8, 2010 | 100% |
| Chongqing QIYI Tianxia Science & Technology Co., Ltd. ("QIYI Tianxia") | PRC | November 3, 2010 | 100% |
| Qiyi.com HK Limited ("QIYI HK") | Hong Kong | April 14, 2011 | 100% |
| iQIYI Film Group Limited | Cayman | May 26, 2017 | 100% |
| iQIYI Media Limited | Cayman | May 26, 2017 | 100% |
| iQIYI Film Group HK Limited | Hong Kong | June 12, 2017 | 100% |
| Beijing iQIYI New Media Science & Technology Co., Ltd. ("iQIYI New Media") | PRC | July 27, 2017 | 100% |
| **VIEs:** | | | |
| Beijing iQIYI Science & Technology Co., Ltd. ("Beijing iQIYI "; formerly known as Beijing Xinlian Xinde Advertisement Media Co., Ltd.) | PRC | Acquired on November 23, 2011 | Nil |
| Shanghai iQIYI Culture Media Co., Ltd. ("Shanghai iQIYI") | PRC | December 19, 2012 | Nil |
| Shanghai Zhong Yuan Network Co., Ltd. ("Shanghai Zhong Yuan") | PRC | Acquired on May 11, 2013 | Nil |
| iQIYI Pictures (Beijing) Co., Ltd. ("iQIYI Pictures") | PRC | December 31, 2014 | Nil |
| Beijing iQIYI Cinema Management Co., Ltd.("Beijing iQIYI Cinema") | PRC | June 28, 2017 | Nil |

In March 2010, the Company established a wholly-owned PRC subsidiary, Beijing QIYI Century.

In November 2011, the Company obtained control over Beijing Xinlian Xinde Advertisement Media Co., Ltd. ("Xinlian Xinde") and renamed it to Beijing iQIYI to operate the internet video streaming services business. Beijing iQIYI holds the ICP license and other licenses and permits necessary for the Group's business operations.

F-14

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

In November 2012, Baidu Holdings Limited ("Baidu") purchased all of the Series A and Series B redeemable convertible preferred shares of the Company for a purchase price of RMB1,188,363. Together with Baidu's previously held equity investment in the Company with a fair value of RMB811,014, Baidu obtained a controlling financial interest of the Company. The Company elected the option to apply pushdown accounting in the period in which the change in control event occurred to reflect Baidu's basis of accounting in the Company's consolidated financial statements. The acquisition was accounted for in accordance with Accounting Standards Codification ("ASC") topic 805, *Business Combinations*, and the fair values of the underlying assets acquired and liabilities assumed at the acquisition date recorded by Baidu are pushed down and reflected in the Company's consolidated financial statements with an offsetting adjustment to additional paid-in capital. The adjustment to additional paid-in-capital includes the effects of the fair value of noncontrolling interests of the Company at the acquisition date.

The following table presents the allocation of the purchase price to the fair values of the assets acquired and liabilities assumed, which were determined by the Group with the assistance of an independent valuation firm. The goodwill is primarily attributable to the synergies expected to be achieved from the acquisition.

|  | RMB |
|---|---|
| Net assets acquired, excluding intangible assets and the related deferred tax liabilities | 28,386 |
| Intangible assets, net | 905,200 |
| Deferred tax liabilities, noncurrent | (78,800) |
| Goodwill | 1,475,357 |

In December 2012, Shanghai iQIYI was established as the Group's exclusive advertising agent.

On May 11, 2013, the Company acquired the online video business of PPStream, Inc. for a consideration of RMB2,169,052. Goodwill of RMB1,800,750 was recognized from the acquisition, which was primarily attributable to the synergies expected to be achieved from the acquisition. The Group primarily provides live broadcasting services through Shanghai Zhong Yuan, the former operating entity of PPStream, Inc.

iQIYI Pictures was established in December 2014 and consolidates intellectual property resources across the Group's platform for the development, promotion and distribution of films. In August 2017, the Company restructured the contractual arrangements by and among the Company, its subsidiary iQIYI New Media, Beijing iQIYI, iQIYI Pictures, and the shareholders of iQIYI Pictures, such that iQIYI Pictures, previously a subsidiary of Beijing iQIYI, became a VIE of the Group.

In May 2017, the Company established a wholly-owned Cayman Islands subsidiary, iQIYI Film Group Limited. iQIYI Film Group Limited holds 100% of the equity of iQIYI Film Group HK Limited, which in turn holds 100% of equity in iQIYI New Media. In June 2017, the Company established a new VIE, Beijing iQIYI Cinema. The Company has control and is the primary beneficiary of Beijing iQIYI Cinema through a series of contractual arrangements between the Company, its subsidiary iQIYI New Media, Beijing iQIYI Cinema and the shareholders of Beijing iQIYI Cinema.

PRC laws and regulations prohibit or restrict foreign ownership of companies that engage in value-added telecommunication services, internet audio-video program services and certain other businesses. To comply with these foreign ownership restrictions, the Group operates its websites and primarily conducts its business in the

F-15

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

PRC through the VIEs. The paid-in capital of the VIEs was mainly funded by the Company through loans extended to the authorized individuals who were the shareholders of the VIEs. The Company has entered into certain agreements with the shareholders of the VIEs through the Company or its wholly-owned subsidiaries in the PRC, including loan agreements for the paid-in capital of the VIEs and share pledge agreements for the equity interests in the VIEs held by the shareholders of the VIEs. In addition, the Group has entered into shareholder voting rights trust agreements and exclusive purchase option agreements with the VIEs and nominee shareholders of the VIEs through the Company or its wholly-owned subsidiaries in the PRC, which give the Company or its wholly-owned subsidiaries the power to direct the activities that most significantly affect the economic performance of the VIEs and to acquire the equity interests in the VIEs when permitted by the PRC laws, respectively. Commitment letters have been entered into which obligate the Company to absorb losses of the VIE that could potentially be significant to the VIEs and certain exclusive agreements have been entered into that entitle the Company or its wholly-owned subsidiaries to receive economic benefits from the VIEs that potentially could be significant to the VIEs.

Despite the lack of technical majority ownership, the Company has effective control of the VIEs through a series of contractual arrangements (the "Contractual Arrangements") and a parent-subsidiary relationship exists between the Company and the VIEs. Through the Contractual Arrangements, the shareholders of the VIEs effectively assigned all of their voting rights underlying their equity interest in the VIEs to the Company. In addition, through the other exclusive agreements, which consist of business operation agreements, business cooperating agreement, exclusive technology consulting and services agreements and trademark and software usage license agreements, the Company, through its wholly-owned subsidiaries in the PRC, have the right to receive economic benefits from the VIEs that potentially could be significant to the VIEs. Lastly, through the commitment letters, the Company has the obligation to absorb losses of the VIEs that could potentially be significant to the VIEs. Therefore, the Company is considered the primary beneficiary of the VIEs and consolidates the VIEs and their subsidiaries as required by SEC Regulation S-X Rule 3A-02 and ASC topic 810 ("ASC 810"), *Consolidation*.

The principal terms of the Contractual Agreements are further described below:

*Loan Agreements*

Pursuant to the loan agreement amongst Beijing QIYI Century and the shareholder of Beijing iQIYI, amended and restated on January 30, 2013, Beijing QIYI Century provided a RMB27 million interest-free loan to the shareholder of Beijing iQIYI solely for funds necessary for the capital injection to Beijing iQIYI. The loan can be repaid only with the proceeds from the sale of all of the equity interest in Beijing iQIYI to the Company or its designated representative(s) if permitted under PRC laws. The term of the loan agreement will expire on June 23, 2021 and can be extended upon the written notification from Beijing QIYI Century.

The loan agreement entered into between Beijing QIYI Century and the shareholders of Shanghai iQIYI dated October 25, 2013, contains terms similar to the terms described above, except that the total amount of loans extended to the shareholders of Shanghai iQIYI is RMB10 million and the term of the loan agreement will expire on October 24, 2023.

The loan agreement entered into between Beijing QIYI Century and the shareholder of Shanghai Zhong Yuan, amended on January 14, 2014, contains terms similar to the terms described above, except that the total amount of the loan to the shareholder of Shanghai Zhong Yuan is RMB20 million and the term of the loan agreement will expire on January 13, 2024.

F-16

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The loan agreement entered into between iQIYI New Media and the shareholders of iQIYI Pictures dated August 30, 2017, contains terms similar to the terms described above, except that the total amount of loans extended to the shareholders of iQIYI Pictures is RMB100 million and the term of the loan agreement will expire on August 29, 2027.

The loan agreement entered into between iQIYI New Media and the shareholders of Beijing iQIYI Cinema dated July 27, 2017, contains terms similar to the terms described above, except that the total amount of loans extended to the shareholders of Beijing iQIYI Cinema is RMB20 million and the term of the loan agreement will expire on July 26, 2027.

*Exclusive Purchase Option Agreements*

Pursuant to the exclusive purchase option agreement amongst the Company, Beijing QIYI Century, Beijing iQIYI and its shareholder, amended and restated on January 30, 2013, the shareholder granted the Company an exclusive irrevocable option to purchase, all or part of the equity interests held by its shareholder, when and to the extent permitted under PRC law, at an amount equal to the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. In addition, Beijing iQIYI's shareholder granted the Company an exclusive right to designate one or more persons to purchase all the equity interests in Beijing iQIYI. Without the prior written consent of the Company, Beijing iQIYI may not: (i) amend its articles of association, (ii) increase or decrease the registered capital, (iii) sell or otherwise dispose of its assets or beneficial interest, (iv) create or allow any encumbrance on its assets or other beneficial interests, (v) extend any loans to third parties, (vi) enter into any material contract with a value of more than RMB300 (except those contracts entered into in the ordinary course of business), (vii) merge with or acquire any other persons or make any investments or (viii) distribute dividends to its shareholders. Beijing iQIYI's shareholder also agrees that he will not dispose the equity interests in Beijing iQIYI nor create or allow any encumbrance on the equity interests and extend any loans to individuals without the prior written consent of the Company. The shareholder should remit to the Company any amount that is paid by the Company or its designated person(s) in connection with the purchased equity interest. Any and all dividends and other capital distributions from Beijing iQIYI to its shareholders should be repaid to the Company. The agreement will terminate when Beijing iQIYI's shareholder transfers all of his equity interests in Beijing iQIYI to the Company or its designated person(s) or upon expiration of the term of business of the Company or Beijing iQIYI. The term of the agreement is ten years and may be renewed at the discretion of the Company.

The exclusive purchase option agreement amongst the Company, Beijing QIYI Century, Shanghai iQIYI and its shareholders dated October 25, 2013, the exclusive purchase option agreement amongst the Company, Beijing QIYI Century, Shanghai Zhong Yuan and its shareholder, amended on January 14, 2014, the exclusive purchase option agreement amongst iQIYI New Media, iQIYI Pictures and its shareholders on August 30, 2017, and the exclusive purchase option agreement amongst iQIYI New Media, Beijing iQIYI Cinema and its shareholders on July 27, 2017, contain terms similar to the terms described above.

*Commitment Letters*

Pursuant to the commitment letter dated January 30, 2013, the Company commits to provide unlimited financial support to Beijing iQIYI, if Beijing iQIYI requires any form of reasonable financial support for its normal business operations. If Beijing iQIYI incurs any losses and as a result cannot repay its loans from the

F-17

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Company and Beijing QIYI Century, the Company and Beijing QIYI Century would unconditionally forgive their loans to Beijing iQIYI, if Beijing iQIYI provides sufficient proof for its loss and incapacity to repay.

The commitment letters executed by the Company for Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Beijing iQIYI Cinema, contain terms similar to the terms described above.

***Shareholder Voting Rights Trust Agreements and Powers of Attorney***

Pursuant to the shareholder voting rights trust agreement amongst Beijing QIYI Century and Beijing iQIYI's shareholder, amended and restated on January 30, 2013, Beijing iQIYI's shareholder agreed to entrust all the rights to exercise its voting power and any other rights as Beijing iQIYI's shareholder to the person(s) designated by Beijing QIYI Century. Beijing iQIYI's shareholder agreed to irrevocably appoint the person(s) designated by Beijing QIYI Century as his attorney-in-fact to represent him to exercise all the voting rights and other shareholders' rights on his behalf on all matters requiring shareholder approval. The agreement will remain effective for as long as the shareholder remains the shareholder of Beijing iQIYI unless Beijing QIYI Century unilaterally terminates the agreement by written notice. Pursuant to an irrevocable power of attorney, Beijing QIYI Century granted all of its rights under the shareholder voting rights trust agreement to the Company.

The shareholder voting rights trust agreement amongst Beijing QIYI Century and Shanghai iQIYI's shareholders dated October 25, 2013, and the shareholder voting rights trust agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan's shareholder, amended on January 14, 2014, contain terms similar to the terms described above except under the shareholder voting rights trust agreements, the person designated by Beijing QIYI Century as the attorney-in-fact to represent the shareholders of Shanghai iQIYI and Shanghai Zhong Yuan must be approved by the Company. The powers of attorney amongst the Company, iQIYI New Media and the shareholders of iQIYI Pictures and the powers of attorney amongst the Company, iQIYI New Media and the shareholders of Beijing iQIYI Cinema are substantially the same as the terms discussed above.

***Exclusive Technology Consulting and Services Agreements***

Pursuant to the exclusive technology consulting and services agreement amongst Beijing QIYI Century and Beijing iQIYI effective November 23, 2011, Beijing QIYI Century has the sole and exclusive right to provide to Beijing iQIYI specified technology consulting and services in return for service fees. Beijing iQIYI agrees to accept such services and, without the prior written consent of Beijing QIYI Century, may not accept the same or similar technology consulting and services provided by any third party during the term of the agreement. Beijing iQIYI agrees to pay specified service fees to Beijing QIYI Century on a quarterly basis. Beijing QIYI Century has the right to unilaterally adjust the amount of the service fee through written confirmation, without prior consent from Beijing iQIYI. All the benefits and interests generated from the agreement, including but not limited to software copyrights, intellectual property rights, know-how and trade secrets, become the sole and exclusive rights of Beijing QIYI Century. The agreement will be in effect for ten years unless Beijing QIYI Century unilaterally terminates the agreement by giving written notification at least thirty days prior to the expiration of the agreement. The agreement can also be renewed at the discretion of Beijing QIYI Century.

The exclusive technology consulting and services agreement amongst Beijing QIYI Century and Shanghai iQIYI on October 25, 2013, the exclusive technology consulting and services agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan, amended on January 14, 2014, the exclusive management consulting and

F-18

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

business cooperation agreement amongst iQIYI New Media and iQIYI Pictures on August 30, 2017 and the exclusive management consulting and business cooperation agreement amongst iQIYI New Media and Beijing iQIYI Cinema on July 27, 2017, contain terms similar to the terms described above.

*Share Pledge Agreements*

Pursuant to the share pledge agreement amongst Beijing QIYI Century and Beijing iQIYI's shareholder, amended and restated on January 30, 2013, Beijing iQIYI's shareholder has pledged all of his equity interest in Beijing iQIYI to guarantee his and Beijing iQIYI's performance of their obligations under, the exclusive technology consulting and services agreement and the amended and restated loan agreement. During the term of the share pledge agreement, Beijing QIYI Century has the right to receive all of the dividends and profits distributed on the pledged equity. If Beijing iQIYI or its shareholder breaches its respective contractual obligations, Beijing QIYI Century, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The shareholder of Beijing iQIYI agrees not to dispose of the pledged equity interests, create or allow any encumbrance on the pledged equity interests or take any actions that would prejudice Beijing QIYI Century's interest. The share pledge agreement will expire after Beijing iQIYI and its shareholder has completed all their obligations under the exclusive technology consulting and services agreement and the amended and restated loan agreement unless otherwise unilaterally terminated by Beijing QIYI Century.

The share pledge agreement amongst Beijing QIYI Century and Shanghai iQIYI's shareholders dated October 25, 2013, the share pledge agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan's shareholder, amended on January 14, 2014, the share pledge agreement amongst iQIYI New Media and iQIYI Pictures' shareholders on August 30, 2017 and the share pledge agreement amongst iQIYI New Media and Beijing iQIYI Cinema's shareholders on July 27, 2017, contain terms similar to the terms described above except that the pledged equity interest is only to guarantee performance of their obligations under the loan agreements.

*Business Operation Agreements*

Pursuant to the business operation agreement amongst Beijing QIYI Century, Beijing iQIYI and its shareholder, amended and restated on January 30, 2013, Beijing iQIYI agrees to accept the proposal provided by Beijing QIYI Century from time to time relating to employment, daily business and financial management. This agreement can only be unilaterally revoked/amended by Beijing QIYI Century. The agreement has a term of ten years and is renewable at the discretion of Beijing QIYI Century.

The business operation agreement amongst Beijing QIYI Century and Shanghai iQIYI's shareholders dated October 25, 2013, the business operation agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan's shareholder, amended on January 14, 2014, the exclusive management consulting and business cooperation agreement amongst iQIYI New Media and iQIYI Pictures on August 30, 2017 and the exclusive management consulting and business cooperation agreement amongst iQIYI New Media and Beijing iQIYI Cinema on July 27, 2017, contain terms similar to the terms described above.

*Trademark License Agreement and Software Usage License Agreement*

Pursuant to the trademark license agreement and the software usage license agreement amongst Beijing QIYI Century and Beijing iQIYI effective November 23, 2011, Beijing QIYI Century granted a non-exclusive

F-19

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

and non-transferable license, without sublicensing rights, to Beijing iQIYI to use its trademarks and software. Beijing iQIYI may only use the licenses in its own business operations. Beijing QIYI Century has the right to adjust the service fees at its sole discretion. The initial term of the two agreements is five years and the software usage license agreement may be extended upon the written consent of Beijing QIYI Century. The trademark license agreement is automatically extended for successive one-year periods after its expiration unless Beijing QIYI Century early terminates the agreement in accordance with the provisions of the agreement. The software usage license agreement was extended for another five years after its initial term.

*Business Cooperation Agreement*

Pursuant to the business cooperation agreement amongst Beijing QIYI Century and Beijing iQIYI effective November 23, 2011, Beijing iQIYI agrees to provide Beijing QIYI Century with services, including internet information services, online advertising and other services reasonably necessary within the scope of Beijing QIYI Century's business. Beijing iQIYI agrees to use, technology services provided by Beijing QIYI Century on its website, including but not limited to, P2P download and video on-demand systems. Beijing QIYI Century agrees to pay specified service fees to Beijing iQIYI as consideration for the internet information services and other services provided by Beijing iQIYI. Beijing iQIYI has the right to waive the service fees at its discretion. The term of this agreement is ten years and can be renewed at Beijing QIYI Century's discretion.

In the opinion of the Company's legal counsel, (i) the ownership structure relating to the VIEs of the Company is in compliance with existing PRC laws and regulations; and (ii) the contractual arrangements with the VIEs and their shareholders are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect.

However, uncertainties in the PRC legal system could cause the Company's current ownership structure to be found in violation of any existing and/or future PRC laws or regulations and could limit the Company's ability to enforce its rights under these contractual arrangements. Furthermore, the VIEs' shareholders may have interests that are different with those of the Company, which could potentially increase the risk that they would seek to act in contrary to the terms of the aforementioned agreements.

In addition, if the current structure or any of the contractual arrangements were found to be in violation of any existing or future PRC law, the Company may be subject to penalties, including but not be limited to: the cancelation or revocation of the Company's business and operating licenses, being required to restructure the Company's operations or discontinue the Company's operating activities. The imposition of any of these or other penalties may result in a material and adverse effect on the Company's ability to conduct its operations. As a result, the Company may not be able to operate or control the VIEs, which may result in deconsolidation of the VIEs.

F-20

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The carrying amounts of the assets, liabilities and the results of operations of the VIEs and VIEs' subsidiaries included in the Company's consolidated balance sheets and statements of comprehensive loss are as follows:

|  | As of December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2017 |
|  | RMB | RMB | US$ |
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | 718,946 | 539,383 | 82,902 |
| Short-term investments | 201,925 | 407,169 | 62,581 |
| Accounts receivable, net | 1,704,246 | 2,161,893 | 332,277 |
| Others | 876,448 | 1,242,651 | 190,992 |
| **Total current assets** | **3,501,565** | **4,351,096** | **668,752** |
| **Non-current assets:** | | | |
| Fixed assets, net | 283,908 | 821,156 | 126,209 |
| Long-term investments | 183,764 | 567,887 | 87,283 |
| Others | 4,070,375 | 6,333,338 | 973,416 |
| **Total non-current assets** | **4,538,047** | **7,722,381** | **1,186,908** |
| **Total assets** | **8,039,612** | **12,073,477** | **1,855,660** |
| **LIABILITIES** | | | |
| **Current liabilities:** | | | |
| Accounts payable | 3,053,168 | 4,275,803 | 657,179 |
| Customer advances and deferred revenue | 796,255 | 1,633,197 | 251,018 |
| Accrued expenses and other liabilities | 1,712,955 | 2,333,864 | 358,708 |
| Amounts due to the Company and its subsidiaries | 3,385,212 | 6,077,542 | 934,101 |
| Others | 1,325,157 | 77,673 | 11,938 |
| **Total current liabilities** | **10,272,747** | **14,398,079** | **2,212,944** |
| **Total non-current liabilities** | **5,705** | **286,854** | **44,089** |
| **Total liabilities** | **10,278,452** | **14,684,933** | **2,257,033** |

|  | For the year ended December 31, | | | |
|---|---|---|---|---|
|  | 2015 | 2016 | 2017 | 2017 |
|  | RMB | RMB | RMB | US$ |
| Total revenues | 4,999,561 | 10,756,372 | 16,389,778 | 2,519,063 |
| Net loss | (1,915,923) | (2,026,863) | (609,387) | (93,661) |
| Net cash provided by operating activities | 1,350,651 | 1,645,352 | 5,356,540 | 823,285 |
| Net cash used for investing activities | (1,148,425) | (2,389,511) | (4,687,804) | (720,502) |
| Net cash provided by/(used in) financing activities | — | 1,001,766 | (848,300) | (130,381) |

The revenue-producing assets that are held by the VIEs and VIEs' subsidiaries comprise mainly of operating licenses, intangible assets, licensed copyrights, produced content and fixed assets. The VIEs and VIEs' subsidiaries contributed an aggregate of 94%, 96% and 94% of the Group's consolidated revenues for the years

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

ended December 31, 2015, 2016 and 2017, respectively, after elimination of inter-company transactions. As of December 31, 2017, there was no pledge or collateralization of the VIEs and VIEs' subsidiaries' assets that can only be used to settled obligations of the VIEs and VIEs' subsidiaries, other than aforementioned share pledge agreements and business operation agreements.

The VIEs' third-party creditors did not have recourse to the general credit of the Company in normal course of business. The Company did not provide or intend to provide financial or other supports not previously contractually required to the VIEs and VIEs' subsidiaries during the years presented.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of consolidation*

The consolidated financial statements have been prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP"). The consolidated financial statements of the Group include the financial statements of the Company, its subsidiaries, VIEs and VIEs' subsidiaries in which the Company is the primary beneficiary. The results of the subsidiaries are consolidated from the date on which the Group obtained control and continues to be consolidated until the date that such control ceases. A controlling financial interest is typically determined when a company holds a majority of the voting equity interest in an entity. However, if the Company demonstrates its ability to control the VIEs through power to govern the activities which most significantly impact its economic performance and is obligated to absorb losses of the VIEs that could potentially be significant to the VIEs or the right to receive benefits from the VIEs that could potentially be significant to the VIEs, then the entity is consolidated. All significant intercompany balances and transactions between the Company, its subsidiaries, VIEs and VIEs' subsidiaries have been eliminated in consolidation.

*Use of estimates*

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Management evaluates estimates, including those related to the allowance for doubtful accounts, amortization of intangible assets, licensed copyrights and produced content, recoverability and useful lives of long-lived assets, net realizable value of licensed copyrights, recoverability of the carrying value of goodwill, fair value of share options to purchase the Company's ordinary shares, fair value of nonmonetary content exchanges, fair value of financial instruments, forfeiture rates for options granted, valuation allowances on deferred tax assets and income tax uncertainties, among others. Management bases these estimates on its historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results could differ from these estimates.

*Convenience translation*

Translations of amounts from RMB into US$ for the convenience of the reader have been calculated at the exchange rate of RMB6.5063 per US$1.00 on December 29, 2017, the last business day in fiscal year 2017, as published on the website of the United States Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted into U.S. dollars at such rate.

F-22

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Foreign currency translation and transactions*

The Company's functional currency is the US$ and its reporting currency is the RMB. The Company's subsidiaries, VIEs and subsidiaries of the VIEs determine their functional currencies based on the criteria of ASC topic 830 ("ASC 830"), *Foreign Currency Matters*. The functional currency of the subsidiaries in the Cayman Islands and Hong Kong is the U.S. dollar. The functional currencies of the subsidiaries, VIEs and VIEs' subsidiaries in Mainland China are the RMB. The Company uses the monthly average exchange rate for the year and the exchange rate at the balance sheet date to translate the operating results and financial position, respectively. Translation differences are recorded in accumulated other comprehensive income, a component of shareholders' (deficit)/equity.

Transactions denominated in foreign currencies are re-measured into the functional currency at the exchange rates prevailing on the transaction dates. Financial assets and liabilities denominated in foreign currencies are re-measured into the functional currency at the exchange rates prevailing at the balance sheet date. The foreign exchange losses included in the consolidated statements of comprehensive loss for the years ended December 31, 2015 and 2016 were RMB76,985 and RMB238,564 and the foreign exchange gain included in the consolidated statements of comprehensive loss for the year ended December 31, 2017 was RMB400,737 (US$61,592), respectively.

*Cash and cash equivalents*

Cash and cash equivalents primarily consist of cash, money market funds, investments in interest bearing demand deposit accounts, time deposits, and highly liquid investments with original maturities of three months or less from the date of purchase and are stated at cost which approximates their fair value.

*Short-term investments*

All highly liquid investments with original maturities of greater than three months, but less than twelve months, are classified as short-term investments.

Investments that are expected to be realized in cash during the next twelve months are also included in short-term investments. The Company accounts for short-term investments in accordance with ASC topic 320, *Investments—Debt and Equity Securities* ("ASC 320"). The Company classifies the short-term investments as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320.

The securities that the Company has the positive intent and the ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost.

The securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income. Realized gains or losses are included in earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities is recognized in the consolidated statements of comprehensive loss when the decline in value is determined to be other-than-temporary.

F-23

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Accounts receivable, net of allowance*

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off as incurred. The Group generally does not require collateral from its customers.

The Group maintains allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. The Group reviews the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, the Group considers many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

*Receivables from Online Payment Agencies, net of allowance*

Receivables from online payment agencies are cash due from the third-party online payment service providers for clearing transactions. The cash was paid or deposited by customers or users through these online payment agencies for services provided by the Group. The Group carefully considers and monitors the credit worthiness of the third-party payment service providers used. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Receivable balances are written off after all collection efforts have been exhausted. The balances are included in "Prepayments and other assets" on the consolidated balance sheets. As of December 31, 2016 and 2017, no allowance for doubtful accounts was provided for the receivables from online payment agencies.

*Fixed assets, net*

Fixed assets are stated at cost and are depreciated using the straight-line method over the shorter of the estimated useful lives of the assets or the term of the related lease, as follows:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Office furniture and equipment | 3 to 5 years |
| Leasehold improvements | over the shorter of lease terms or estimated useful lives of the assets |
| Office building | 43 years |
| Others | 5 years |

Repair and maintenance costs are expensed as incurred, whereas the cost of renewals and betterments that extend the useful life of the assets are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts with any resulting gain or loss reflected in the consolidated statements of comprehensive loss.

All direct and indirect costs that are related to the construction of fixed assets and incurred before the assets are ready for their intended use are capitalized as construction in progress. Construction in progress is transferred to specific fixed assets items and depreciation of these assets commences when ready for their intended use.

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Long-term investments*

The Group's long-term investments consist of cost and equity method investments. In accordance with ASC subtopic 325-20, *Investments-Other: Cost Method Investments* ("ASC 325-20"), for investments in an investee over which the Group does not have significant influence and which do not have readily determinable fair value, the Group carries the investment at cost and only adjusts for other-than-temporary declines in fair value and distributions of earnings that exceed the Group's share of earnings since its investment. Management evaluates the impairment of the cost method investments based on performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of the investment. Cost method accounting is also applied to investments that are not considered as "in-substance" common stock investments, and do not have readily determinable fair values.

Investments in entities in which the Group can exercise significant influence and holds an investment in voting common stock or in-substance common stock (or both) of the investee but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323, *Investments—Equity Method and Joint Ventures* ("ASC 323"). Under the equity method, the Group initially records its investments at cost. The Group subsequently adjusts the carrying amount of the investments to recognize the Group's proportionate share of each equity investee's net income or loss into earnings after the date of investment. The Group evaluates the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

*Produced content, net*

The Group produces and contracts external parties to produce films and episodic series to exhibit on its websites. Produced content includes direct production costs, production overhead and acquisition costs and is stated at the lower of unamortized cost or estimated fair value. Produced content also includes cash expenditures made to acquire a proportionate share of certain rights to films including profit sharing, distribution and/or other rights. Produced content exceeding the total revenues to be earned ("ultimate revenue") is expensed as cost of revenues.

The Group uses the individual-film-forecast-computation method and amortizes the produced content based on the ratio of current period actual revenue (numerator) to estimated remaining unrecognized ultimate revenue as of the beginning of the fiscal year (denominator) in accordance with ASC subtopic 926-20, *Entertainment—Films, Other Assets—Film Costs* ("ASC 926-20"). Ultimate revenue estimates for the produced content are periodically reviewed and adjustments, if any, will result in prospective changes to amortization rates. The Group reviews unamortized produced content costs for impairment whenever events or circumstances indicate that the fair value of the produced content may be less than its unamortized cost.

*Licensed copyrights, net*

Licensed copyrights consist of professionally-produced content such as movies, television series, variety shows, sports and other video content acquired from external parties. The license fees are capitalized and, unless

F-25

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

prepaid, a corresponding liability recorded when cost of the content is known, the content is accepted by the Group in accordance with the conditions of the license agreement and the content is available for its first showing on the Group's websites. Licensed copyrights are carried at the lower of unamortized cost or net realizable value. Licensed copyrights are presented on the balance sheet as current and non-current based on estimated time of usage.

The Group has two types of licensed copyrights, i) non-exclusive licensed copyrights and ii) exclusive licensed copyrights. For non-exclusive licensed copyrights, the Group has the right to broadcast the contents on its own websites. For exclusive licensed copyrights, in addition to the broadcasting right, the Group also has the right to sublicense the underlying contents to third parties.

Non-exclusive licensed copyrights, mainly comprising of newly released movies, television series and seasonal variety shows, are generally amortized using an accelerated method based on historical viewership consumption patterns. Other non-exclusive licensed copyrights, mainly comprising of library movies, television series and variety shows and certain non-episodic features, are amortized on a straight-line basis, as the consumption pattern based on historical viewing data supports this amortization method. Estimates of the consumption patterns for licensed copyrights are reviewed periodically and revised, if necessary. Revisions to the amortization pattern are accounted for as a change in accounting estimate prospectively in accordance with ASC topic 250, *Accounting Changes and Error Corrections* ("ASC 250").

The purchase cost of exclusive licensed copyrights includes a broadcasting right and a right to sublicense the content to third parties, and the Group allocates the content cost to these two rights when the exclusive licensed copyrights are initially recognized based on the relative proportion of the Group's estimate of the total revenues that will be generated by each right. For the broadcasting right, which is the portion of an exclusive licensed copyright that generates direct and indirect advertising and membership services revenues, the content costs are amortized in accordance with ASC subtopic 920-350*, Entertainment-Broadcasters: Intangibles—Goodwill and Other* ("ASC 920-350"), using the same method as non-exclusive licensed copyrights as described above. For the right to sublicense the content to third parties, which is the portion of an exclusive licensed copyright that generates direct revenues, the content costs are amortized in accordance with ASC 926-20 using the individual-film-forecast-computation method, which amortizes such costs based on the ratio of the actual sublicensing revenues generated for the current period to the total sublicensing revenues estimated to be generated by the sublicensing right. The Group revisits the forecasted total direct revenues on a periodic basis and any resulting changes to such estimates and the resulting amortization expense are accounted for prospectively as a change in accounting estimate in accordance with ASC 250.

On a periodic basis, the Group evaluates the program usefulness of the broadcasting rights of its licensed copyrights and records these rights at the lower of unamortized cost or estimated net realizable value pursuant to the guidance in ASC 920-350. When there is a change in the expected usage of licensed copyrights, the Group estimates net realizable value of licensed copyrights to determine if any impairment exists.

Net realizable value is determined by estimating the expected cash flows generated from provision of advertising and membership services, less any direct costs, over the remaining useful lives of the non-exclusive licensed copyrights. The Group estimates advertising and membership services cash flows for each category of content separately. Estimates that impact advertising and membership services cash flows include anticipated levels of demand for the Group's advertising and membership services and the expected selling prices of the

F-26

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Group's advertisements and memberships. For the right to sublicense to third parties, recoverability is assessed in accordance with ASC 926-20.

### Partner-generated content ("PGC")

The Group collaborates with a large number of selected partners to supplement its video content portfolio with PGC, and incentivizes them to submit high-quality content through the Group's revenue-sharing mechanism. Under such arrangements, the Group shares with the partners a portion of the revenues derived from either online advertising services or membership services based on various factors agreed upon. As the Group is the primary obligor of online advertising services and membership services, such revenues are recorded on a gross basis. Revenue sharing costs incurred and payable to partners are recognized as cost of revenues when the criteria of those pre-agreed factors are met.

### Goodwill and intangible assets

#### Goodwill

Goodwill represents the excess of the purchase price over the fair value of the identifiable net assets acquired in a business combination. The Group assesses goodwill for impairment in accordance with ASC subtopic 350-20, *Intangibles—Goodwill and Other: Goodwill* ("ASC 350-20"), which requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

A reporting unit is defined as an operating segment or one level below an operating segment referred to as a component. The Group determines its reporting units by first identifying its operating segments, and then assesses whether any components of these segments constituted a business for which discrete financial information is available and where the Company's chief operating decision maker ("CODM") regularly reviews the operating results of that component. The Group had one reporting unit because components below the consolidated level are not regularly reviewed by the CODM.

The Group has the option to assess qualitative factors first to determine whether it is necessary to perform the two-step quantitative impairment test in accordance with ASC 350-20. If the Group believes, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, the Group considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and the Group is not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then the Group must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

F-27

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Significant management judgment is involved in determining these estimates and assumptions, and actual results may differ from those used in valuations. Changes in these estimates and assumptions could materially affect the determination of the fair value of a reporting unit which could trigger future impairment. The judgment in estimating the fair value of a reporting unit includes forecasts of future cash flows, which are based on management's best estimate of future revenue and operating expenses growth rates, future capital expenditures and working capital levels, as well as discount rate determined by the weighted average cost of capital approach and the selection of comparable companies operating in similar businesses. The Group also reviewed marketplace data to assess the reasonableness of assumptions such as discount rate, operating margins, and working capital levels. The fair value of the reporting unit exceeded its carrying amounts as of December 31, 2016 and 2017, and therefore goodwill related to the reporting unit was not impaired and the Group was not required to perform further testing.

*Intangible assets*

Intangible assets with finite lives are carried at cost less accumulated amortization and impairment loss, if any. Intangible assets with finite lives are amortized using the straight-line method over the estimated economic lives.

Intangible assets have estimated economic lives from the date of purchase as follows:

| | |
|---|---|
| Traffic acquisition agreement | 7.3 years |
| Trademarks | 10 years |
| User list | 3 years |
| Domain names | 10 years |
| Customer relationships | 3 years |
| Others | 3 to 20 years |

**Impairment of Long-Lived Assets Other Than Goodwill**

The Group evaluates long-lived assets, such as fixed assets and purchased or acquired intangible assets with finite lives other than licensed copyrights, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC subtopic 360-10, *Property, Plant and Equipment: Overall* ("ASC 360-10"). When such events occur, the Group assesses the recoverability of the long-lived assets based on the undiscounted future cash flows the long-lived assets are expected to generate at the lowest level of identifiable cash flows. The Group recognizes an impairment loss when the estimated undiscounted future cash flow expected to result from the use of the long-lived assets plus net proceeds expected from the eventual disposition of the long-lived assets, if any, is less than their carrying values. If the Group identifies an impairment, the Group reduces the carrying value of the long-lived assets to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. The Group uses estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different.

**Modification of redeemable convertible preferred shares**

The Group assesses whether an amendment to the terms of its redeemable convertible preferred shares is an extinguishment or a modification using the fair value model. If the change in fair value of the redeemable

F-28

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

convertible preferred shares immediately after the amendment exceeds 10% from the fair value of the redeemable convertible preferred shares immediately before the amendment, the amendment is considered an extinguishment. An amendment that does not meet this criterion is a modification. When redeemable convertible preferred shares are extinguished, the difference between the fair value of the consideration transferred to the redeemable convertible preferred shareholders and the carrying amount of the redeemable convertible preferred shares (net of issuance costs) is treated as a deemed dividend to or contribution from the redeemable convertible preferred shareholders. When redeemable convertible preferred shares are modified, a new effective interest rate to equate the future contractual cash flows (redemption amount) to the carrying amount is determined and applied to accretion on a prospective basis by analogy to ASC 470-50.

*Revenue recognition*

The Group's revenues are derived principally from membership services, online advertising services and content distribution. Revenue is recognized only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed and collectability of the related fee is reasonably assured under ASC subtopic 605-10, *Revenue Recognition: Overall* ("ASC 605-10").

*Membership services*

The Group offers membership services which provides subscribing members access to streaming of premium content in exchange for a non-refundable upfront membership fee. Membership periods range from one month to twelve months. The receipt of membership fees is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered.

*Online advertising services*

The Group sells advertising services primarily to third-party advertising agencies and a small portion are sold directly to advertisers. Advertising contracts are signed to establish the price and advertising services to be provided. Pursuant to the advertising contracts, the Group provides advertisement placements on its websites in different formats, including but not limited to video, banners, links, logos, brand placement and buttons. The Group performs a credit assessment of the customer to assess the collectability of the contract price prior to entering into contracts. For contracts where the Group provides customers with a bundle of advertising services, primarily for advertisements to be displayed in different spots, placed under different forms and displayed at different times, the Group first determines whether each identified deliverable qualifies as a separate unit of accounting. For the arrangements with deliverables considered to be separate units of accounting, the Group allocates the total consideration of the arrangements based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence ("VSOE") of selling price, third-party evidence ("TPE") of selling price, or management's best estimate of the selling price ("BESP"), and recognizes revenue as each service deliverable is provided. The Company considers all reasonably available information in determining the BESP, including both market and entity-specific factors.

The Group provides various sales incentives to its customers, including cash incentives in the form of commissions to certain third-party advertising agencies (see "Note 2—Commissions to third-party advertising agencies") and noncash incentives such as discounts and advertising services provided free of charge in certain bundled arrangements, which are negotiated on a contract by contract basis with customers. The Group has a

F-29

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

general policy regarding the volume of advertising services to be provided free of charge which depends largely on the volume of advertising services purchased by the advertiser. The Group evaluates all advertising services in a bundled arrangement, whether provided for consideration or free or charge, pursuant to ASC 605-25, *Revenue Recognition: Multiple-Element Arrangements* to determine whether it qualifies as a deliverable and separate unit of accounting.

*Content distribution*

The Group generates revenues from sub-licensing content licensed from third party vendors for cash or through nonmonetary exchanges with other online video broadcasting companies. The exclusive licensing agreements the Group enters into with the vendors has a definitive license period and provides the Group rights to sub-license these contents to other third parties. The Group enters into a non-exclusive sub-license agreement with a sub-licensee for a period that falls within the original exclusive license period. For cash sub-licensing transactions, the Group receives a fixed amount of the sub-license fee upfront under the sub-licensing arrangements and does not have any future obligation once it has provided the underlying content to the sub-licensee (which is provided at or before the beginning of the sub-license period). In accordance with ASC subtopic 926-605, *Entertainment-Films: Revenue Recognition* ("ASC 926-605"), the Group recognizes the amount of the sub-license fee as revenue at the beginning of the sub-license period only when the Group meets all the following criteria: persuasive evidence of a sub-licensing arrangement with a customer exists, the content is delivered or is available for immediate and unconditional delivery, the sub-license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale, the arrangement fee is fixed or determinable and collection of the arrangement fee is reasonably assured.

The Group also enters into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights for each party to broadcast the licensed copyrights received on its own website only. Each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. The Group accounts for these nonmonetary exchanges in accordance with ASC topic 845, *Nonmonetary Transactions* ("ASC 845"), and records the transaction based on the fair value of the asset surrendered. Barter sublicensing revenues are recognized in accordance with the same ASC 926-605 criteria above and when there are no other future obligations under the agreement. The Group estimates the fair value of the contents surrendered based on various factors, including comparable cash sublicensing transactions and relative size, scale, and market share of counterparties to the exchange.

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926, *Entertainment – Films* ("ASC 926"). The Group recognized barter sublicensing revenues of RMB349,834, RMB382,478 and RMB762,741 (US$117,231) and related costs of RMB265,410, RMB362,760 and RMB650,442 (US$99,971) for the years ended December 31, 2015, 2016 and 2017, respectively.

*Others*

Other revenues mainly include revenues from live broadcasting, online games and online literature.

F-30

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Live broadcasting

The Group operates a live broadcasting platform, iQIYI Show, whereby users can follow their favorite hosts and shows in real time through live broadcasting. Users can purchase virtual currency for usage in iQIYI Show to acquire consumable virtual gifts, which are simultaneously presented to hosts to show their support or time-based virtual items, which enables users to enjoy additional functions and privileges for a specified time period.

The Group operates the live broadcasting platform and determine the price of virtual items sold. Therefore, revenues derived from the sale of virtual items are recorded on a gross basis as the Group acts as the principal in the transaction. Costs incurred from services provided by the hosts is recognized as cost of revenues. To facilitate the sale of virtual items, the Group bundles special privileges and virtual items as a package at a discounted price and the Group allocates the arrangement consideration to the separate units of accounting based on their relative selling prices. Revenue from the sale of consumable virtual gifts is recognized when consumed by the user, or, in the case of time-based virtual items, recognized ratably over the period each virtual item is made available to the user. Virtual currency sold but not yet consumed by the purchasers is recorded as "Customer advances and deferred revenue".

Online games

The Group distributes online games operated by third-party game developers. The rights and obligations of each party to the arrangement indicate that the Group is acting as an agent because the game developer is the primary obligor in the arrangement in accordance with ASC subtopic 605-45, *Revenue Recognition, Principal Agent Considerations* ("ASC 605-45"). The Group recognizes revenue on a net basis based on the ratios pre-determined with the online game developers when all the revenue recognition criteria set forth in ASC 605 are met, which is generally when the user purchases virtual currencies issued by the game developers.

Online literature

The Group distributes online literature authorized by third-party book organizations and original authors through its online platform and charges customers fees based on the number of words in chapters or a membership fee. The Group is acting as the primary obligor in the arrangement in accordance with ASC 605-45 and recognizes revenue on a gross basis when all the revenue recognition criteria set forth in ASC 605 are met.

*Commissions to third-party advertising agencies*

The Group provides cash incentives in the form of commissions to certain third-party advertising agencies based on volume and performance, and accounts for such incentives in accordance with ASC subtopic 605-50, *Revenue Recognition: Customer Payments and Incentives*. The Group accounts for cash consideration given to agencies for which it does not receive a separately identifiable benefit or cannot reasonably estimate fair value as a reduction of revenue. The Group recorded commissions to third-party advertising agencies as a reduction to online advertising revenues as follows:

|  | For the year ended December 31, | | | |
|---|---|---|---|---|
|  | 2015 | 2016 | 2017 | 2017 |
|  | RMB | RMB | RMB | US$ |
| Commissions to third-party advertising agencies | 868,461 | 1,214,634 | 1,633,820 | 251,114 |

F-31

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Cost of Revenues*

Cost of revenues consists primarily of sales taxes and surcharges, content costs, bandwidth costs and others.

The Group incurs value-added taxes ("VAT") and surcharges in the PRC in connection with the services provided, and cultural business construction fee on revenues derived from online advertising services. In accordance with ASC 605-45, the Group includes the sales tax and surcharges incurred in cost of revenues. The sales tax and surcharges in cost of revenues for the years ended December 31, 2015, 2016 and 2017 were RMB448,430, RMB823,749 and RMB1,272,295 (US$195,548), respectively.

*Advertising expenses*

Advertising expenses, primarily advertisements through media publication are included in "Selling, general and administrative" and are expensed when incurred. Advertising expenses for the years ended December 31, 2015, 2016 and 2017 were RMB536,944, RMB907,906 and RMB1,373,287 (US$211,070), respectively.

*Research and development expenses*

Research and development expenses consist primarily of personnel-related expenses (including share-based compensation cost) incurred for the development of, enhancement to, and maintenance of the Group's websites as well as costs associated with new product development and enhancement. Depreciation expenses and other operating costs are also included in research and development expenses. The Group recognizes research and development expenses costs as expense when incurred.

*Government subsidies*

Government subsidies primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. There are no defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government subsidies of non-operating nature with no further conditions to be met are recorded as non-operating income in "Other (expense)/income, net" when received. The government subsidies with certain operating conditions are recorded as liabilities when received and will be recorded as operating income when the conditions are met.

*Leases*

Leases have been classified as either capital or operating leases. Leases that transfer substantially all the benefits and risks incidental to the ownership of assets are accounted for as if there was an acquisition of an asset and incurrence of an obligation at the inception of the lease. All other leases are accounted for as operating leases wherein rental payments are expensed as incurred.

*Income taxes*

The Group follows the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of

F-32

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. The Group records a valuation allowance to offset deferred tax assets if, based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The effect of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate. The Group has elected to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive loss.

The Group applies the provisions of ASC topic 740, *Accounting for Income Taxes* ("ASC 740"), to account for uncertainty in income taxes. ASC 740 prescribes a recognition threshold a tax position is required to meet before being recognized in the financial statements. The Group recognizes in its consolidated financial statements the benefit of a tax position if a tax return position or future tax position is "more likely than not" to be sustained under examination based solely on the technical merits of the position. Tax positions that meet the "more likely than not" recognition threshold are measured, using a cumulative probability approach, at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement. The Group's estimated liability for unrecognized tax benefits are periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and or developments with respect to tax audits, and the expiration of the statute of limitations. As each audit is concluded, adjustments, if any, are recorded in the Group's consolidated financial statements. Additionally, in future periods, changes in facts and circumstances, and new information may require the Group to adjust the recognition and measurement of estimates with regards to changes in individual tax position. Changes in recognition and measurement of estimates are recognized in the period which the change occurs.

*(Loss)/earnings per share*

(Loss)/earnings per share is computed in accordance with ASC topic 260, *Earnings per Share*. The two-class method is used for computing earnings per share in the event the Group has net income available for distribution. Under the two-class method, net income is allocated between ordinary shares and participating securities based on dividends declared (or accumulated) and participating rights in undistributed earnings as if all the earnings for the reporting period had been distributed. The Company's redeemable convertible preferred shares are participating securities because they are entitled to receive dividends or distributions on an as converted basis. For the years ended December 31, 2015 and 2016, the computation of basic (loss)/earnings per share using the two-class method is not applicable as the Group is in a net loss position and net loss is not allocated to other participating securities, since these securities are not obligated to share the losses in accordance with the contractual terms. Therefore, basic (loss)/earnings per share is computed by dividing net loss attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding for the years ended December 31, 2015 and 2016, respectively.

Diluted loss per share is calculated by dividing net loss attributable to ordinary shareholders, as adjusted for the accretion related to the redeemable convertible preferred shares and extinguishment and reissuance of Series B preferred shares, by the weighted average number of ordinary and dilutive ordinary equivalent shares outstanding during the period. Ordinary equivalent shares include ordinary shares issuable upon the conversion of the redeemable convertible preferred shares using the if-converted method, and ordinary shares issuable upon the exercise of share options, using the treasury stock method. Ordinary share equivalents are excluded from the computation of diluted loss per share if their effects are anti-dilutive.

F-33

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Unaudited pro forma shareholders' equity and loss per share*

Pursuant to the Company's memorandum and articles of association, the Company's redeemable convertible preferred shares will be automatically converted into 3,728,823,500 ordinary shares upon the closing of an IPO and all outstanding ordinary shares will be re-designated into 1,231,841,032 Class A ordinary shares and 2,839,530,705 Class B ordinary shares, respectively. Unaudited pro forma shareholders' equity as of December 31, 2017, as adjusted for the reclassification of the redeemable convertible preferred shares from mezzanine equity to shareholders' equity, is shown in the unaudited pro forma consolidated balance sheet.

The unaudited pro forma loss per Class A and Class B ordinary share is computed using the weighted-average number of Class A and Class B ordinary shares outstanding as of December 31, 2017, respectively, and assumes the automatic conversion of all of the Company's convertible redeemable preferred shares into ordinary shares and re-designation to Class A and Class B ordinary shares upon the closing of the Company's IPO, as if it had occurred on January 1, 2017.

*Share-based compensation*

The Company accounts for share-based compensation in accordance with ASC topic 718, *Compensation-Stock Compensation* ("ASC 718").

The Company has elected to recognize share-based compensation using the straight-line method for all share-based awards granted with graded vesting based on service conditions. Forfeiture rates are estimated based on historical experience and future expectations of employee turnover rates and are periodically reviewed. If required vesting conditions are not met and the share-based awards are forfeited, previously recognized compensation expense relating to those awards are reversed. ASC 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in the subsequent period if actual forfeitures differ from initial estimates. To the extent the Company revises these estimates in the future, the share-based payments could be materially impacted in the period of revision, as well as in following periods. Share-based compensation expense was recorded net of estimated forfeitures such that expense was recorded only for those share-based awards that are expected to vest.

The Company accounts for share-based awards issued to non-employees in accordance with ASC subtopic 505-50, *Equity: Equity-based Payments to Non-Employees* ("ASC 505-50"). The measurement date of the fair value of a share-based award issued to a non-employee is the date on which the counterparty's performance is completed as there is no associated performance commitment. The expense is recognized in the same manner as if the Company had paid cash for the services provided by non-employees.

The Company, with the assistance of an independent third party valuation firm, determined the fair value of share-based awards granted to employees and non-employees.

*Fair Value Measurements*

Accounting guidance defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

F-34

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Accounting guidance establishes a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement. Accounting guidance establishes three levels of inputs that may be used to measure fair value:

Level 1—Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets

Level 2—Include other inputs that are directly or indirectly observable in the marketplace

Level 3—Unobservable inputs which are supported by little or no market activity

Accounting guidance also describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

Financial assets and liabilities of the Group primarily consist of cash and cash equivalents, short-term investments, accounts receivable, amounts due from related parties, accounts payable, short-term loans, current portion of long-term loan, income tax payable, amounts due to related parties, and accrued expenses and other current liabilities. The carrying amounts of these financial instruments, except for long-term cost method investments, long-term equity method investments and long-term loan, approximate their fair values because of their generally short maturities. The carrying amount of long-term loan approximates its fair values due to the fact that the related interest rates approximate rates currently offered by financial institutions for similar debt instruments of comparable maturities.

*Commitments and contingencies*

In the normal course of business, the Group is subject to contingencies, such as legal proceedings and claims arising out of its business, which cover a wide range of matters. Liabilities for contingencies are recorded when it is probable that a liability has been incurred and the amount of the assessment can be reasonably estimated.

If the assessment of a contingency indicates that it is probable that a material loss is incurred and the amount of the liability can be estimated, then the estimated liability is accrued in the Group's financial statements. If the assessment indicates that a potentially material loss contingency is not probable, but is reasonably possible, or is probable but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss, if determinable and material, would be disclosed.

Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the nature of the guarantee would be disclosed.

*Concentration of risks*

*Concentration of credit risks*

Financial instruments that potentially subject the Group to significant concentration of credit risk primarily consist of cash and cash equivalents, short-term investments and accounts receivable. The carrying amounts of

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

these assets represent the Group's maximum exposure to credit risk. As of December 31, 2017, the Group has RMB733,010 (US$112,662) in cash and cash equivalents, which is held in cash and demand deposits with several financial institutions in the PRC and Hong Kong. In the event of bankruptcy of one of these financial institutions, the Group may not be able to claim its cash and demand deposits back in full. The Group continues to monitor the financial strength of the financial institutions.

Accounts receivable are typically unsecured and denominated in RMB, derived from revenue earned from customers and agencies in the PRC, which are exposed to credit risk. The risk is mitigated by credit evaluations the Group performs on its customers and its ongoing monitoring process of outstanding balances. The Group maintains an allowance for doubtful accounts and actual losses have generally been within management's expectations. The top five customers accounted for 29% of gross accounts receivable as of December 31, 2017, with each customer representing 10%, 7%, 4%, 4% and 4% of the gross accounts receivable balance, respectively. As of December 31, 2016, the top five customers accounted for 23% of gross accounts receivable, with each customer representing 8%, 4%, 4%, 4% and 3% of the gross accounts receivable balance.

*Business and economic risks*

The Group participates in a dynamic high technology industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: changes in the overall demand for services and products; changes in business offerings; competitive pressures due to new entrants; advances and new trends in new technologies and industry standards; changes in bandwidth suppliers; changes in certain strategic relationships or customer relationships; regulatory considerations; copyright regulations; and risks associated with the Group's ability to attract and retain employees necessary to support its growth. The Group's operations could be adversely affected by significant political, economic and social uncertainties in the PRC.

*Currency convertibility risk*

Substantially all of the Group's operating activities are transacted in RMB, which is not freely convertible into foreign currencies. All foreign exchange transactions take place either through the People's Bank of China or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the People's Bank of China. Approval of foreign currency payments by the People's Bank of China or other regulatory institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

*Foreign currency exchange rate risk*

The functional currency and the reporting currency of the Company are the US$ and the RMB, respectively. The Company's exposure to foreign currency exchange rate risk primarily relates to cash and cash equivalents, short-term investments and accounts payable denominated in the U.S. dollar. On June 19, 2010, the People's Bank of China announced the end of the RMB's de facto peg to the US$, a policy which was instituted in late 2008 in the face of the global financial crisis, to further reform the RMB exchange rate regime and to enhance the RMB's exchange rate flexibility. On March 15, 2014, the People's Bank of China announced the widening of the daily trading band for RMB against US$. The depreciation of the US$ against RMB was approximately 6.29% in 2017. Most of the Company's revenues and costs are denominated in RMB, while a portion of cash and

F-36

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

cash equivalents, short-term investments, and accounts payable are denominated in U.S. dollars. Any significant revaluation of RMB may materially and adversely affect the Company's cash flows, revenues, earnings and financial position in U.S. dollars.

*Segment reporting*

In accordance with ASC subtopic 280-10, *Segment Reporting: Overall*, the Group's CODM has been identified as the Chief Executive Officer, who reviews the consolidated results of operations when making decisions about allocating resources and assessing performance of the Group as a whole; hence, the Group has only one operating segment. The Group does not distinguish between markets or segments for the purpose of internal reporting. As the Group's long-lived assets and revenue are substantially located in and derived from the PRC, no geographical segments are presented.

*Comprehensive loss*

Comprehensive loss is defined as the changes in equity of the Group during a period from transactions and other events and circumstances excluding transactions resulting from investments by owners and distributions to owners. Among other disclosures, ASC topic 220, *Comprehensive Income*, requires that all items that are required to be recognized under current accounting standards as components of comprehensive loss be reported in a financial statement that is displayed with the same prominence as other financial statements. For each of the periods presented, the Company's comprehensive loss includes net loss, foreign currency translation adjustments and unrealized gains/(losses) on available-for-sale debt securities and is presented in the consolidated statements of comprehensive loss.

*Recent accounting pronouncements*

In May 2014, the Financial Accounting Standard Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers (Topic 606)*. The guidance substantially converges final standards on revenue recognition between the FASB and the International Accounting Standards Board providing a framework on addressing revenue recognition issues and, upon its effective date, replaces almost all existing revenue recognition guidance, including industry-specific guidance, in current U.S. GAAP.

In August 2015, the FASB issued its final standard formally amending the effective date of the new revenue recognition guidance. The amendments in this ASU are effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period.

The core principle of the guidance is that an entity should recognize revenues to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve this core principle, an entity should apply the following steps:

Step 1: Identify the contract(s) with a customer.

Step 2: Identify the performance obligations in the contract.

F-37

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Step 3: Determine the transaction price.

Step 4: Allocate the transaction price to the performance obligations in the contract.

Step 5: Recognize revenues when (or as) the entity satisfies a performance obligation.

The Group has preliminary assessed the impact of the new revenue standard and identified differences which may impact on the Group's consolidated financial statements, including but not limited to presentation of sales tax. The Company will be adopting the new standard effective January 1, 2018, using the modified retrospective method. The cumulative effect of initially applying the guidance will be recognized at the date of initial application. The Company expects to present revenue net of VAT collected on behalf of third parties, which are currently presented in cost of revenues. This change in reporting will not impact earnings.

In January 2016, the FASB issued ASU No. 2016-01, *Financial Instruments—Overall (Subtopic 825-10)* ("ASU 2016-01"). The amendments require all equity investments to be measured at fair value with changes in the fair value recognized through net income (other than those accounted for under equity method of accounting or those that result in consolidation of the investee). The amendments also require an entity to present separately in other comprehensive income the portion of the total change in the fair value of a liability resulting from a change in the instruments-specific credit risk when the entity has elected to measure the liability at fair value in accordance with the fair value option for financial instruments. This updated guidance is effective for the annual period beginning after December 15, 2017, including interim periods within the year. Early adoption is permitted. The Company anticipates that the adoption of this accounting standard will increase the volatility of "Other (expense)/income, net" resulting from the re-measurement of its equity investments.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"). ASU 2016-02 modifies existing guidance for off-balance sheet treatment of a lessees' operating leases by requiring lessees to recognize lease assets and lease liabilities. Under ASU 2016-02, lessor accounting is largely unchanged. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption is permitted. The Company is currently evaluating the impact of adopting this accounting standard on its consolidated financial statements.

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments* ("ASU 2016-15"). ASU 2016-15 reduces the existing diversity in practice in financial reporting across all industries by clarifying certain existing principles in ASC topic 230, *Statement of Cash Flows* ("ASC 230"), including providing additional guidance on how and what an entity should consider in determining the classification of certain cash flows. In addition, in November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230), Restricted Cash* ("ASU 2016-18"). ASU 2016-18 clarifies certain existing principles in ASC 230, including providing additional guidance related to transfers between cash and restricted cash and how entities present, in their statement of cash flows, the cash receipts and cash payments that directly affect the restricted cash accounts. These ASUs will be effective for the Group's fiscal year beginning January 1, 2018 and subsequent interim periods. Early adoption is permitted. The adoption of ASU 2016-15 and ASU 2016-18 will modify the Group's current disclosures and classifications within the consolidated statement of cash flows but they are not expected to have a material effect on the Group's consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-01, *Business Combinations (Topic 805): Clarifying Definition of a Business* ("ASU 2017-01"). ASU 2017-01 clarifies the framework for determining whether an

F-38

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

integrated set of assets and activities meets the definition of a business. The revised framework establishes a screen for determining whether an integrated set of assets and activities is a business and narrows the definition of a business, which is expected to result in fewer transactions being accounted for as business combinations. Acquisitions of integrated sets of assets and activities that do not meet the definition of a business are accounted for as asset acquisitions. This update is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2017, with early adoption permitted for transactions that have not been reported in previously issued (or available to be issued) financial statements. The Group does not believe this standard will have a material impact on the results of operations or financial condition.

In January 2017, the FASB issued ASU 2017-04, *Simplifying the Test for Goodwill Impairment* ("ASU 2017-04"), which simplifies the accounting for goodwill impairment by eliminating Step two from the goodwill impairment test. If the carrying amount of a reporting unit exceeds its fair value, an impairment loss shall be recognized in an amount equal to that excess, versus determining an implied fair value in Step two to measure the impairment loss. The guidance is effective for annual and interim impairment tests performed in periods beginning after December 15, 2019. Early adoption is permitted for all entities for annual and interim goodwill impairment testing dates on or after January 1, 2017. The guidance should be applied on a prospective basis. The Group is still evaluating the effect that this accounting standard will have on the consolidated financial statements and related disclosures.

**3.    SHORT-TERM INVESTMENTS**

As of December 31, 2015, 2016 and 2017, the Group's short-term investments consist of available-for-sale debt securities with maturities of less than one year purchased from commercial banks and other financial institutions. During the years ended December 31, 2015, 2016 and 2017, the Company recorded interest income from short-term investments of nil, RMB8,587 and RMB65,016 (US$9,993) in the consolidated statement of comprehensive loss, respectively.

**4.    LONG-TERM INVESTMENTS**

The Group's long-term investments consist of cost method investments and equity method investments.

Cost method investments

The carrying amount of cost method investments was RMB182,194 and RMB557,524 (US$85,690) as of December 31, 2016 and 2017, respectively. The Group's investments in preferred shares of the investees are not considered in-substance common stock since these preferred shares contain terms such as substantive liquidation preferences over the ordinary shares of the investees or redemption features. In addition, the preferred shares do not have mandatory redemption features nor readily determinable fair values. As a result, these investments in preferred shares are accounted for under the cost method.

Equity method investments

As of December 31, 2016 and 2017, the Group holds equity investments in Huace iQIYI Movie (Tianjin) Co., Ltd. of 49% and Qiyi Botong Zhangjiakou Yanghe District Investment Partnership (LP) of 19.1% through its VIEs and VIEs' subsidiaries, respectively, which were accounted for using the equity method since the Group

F-39

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

can exercise significant influence but does not own a majority equity interest in or control them. The investments were not significant. The carrying amount of the Group's equity method investments was RMB1,570 and RMB10,363 (US$1,593) as of December 31, 2016 and 2017, respectively.

**5.    ACCOUNTS RECEIVABLE, NET**

|  | As of December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2017 |
|  | RMB | RMB | US$ |
| Accounts receivable | 1,799,378 | 2,260,070 | 347,366 |
| Allowance for doubtful accounts | (19,719) | (24,686) | (3,794) |
| Accounts receivable, net | 1,779,659 | 2,235,384 | 343,572 |

The following table presents movement of the allowance for doubtful accounts:

|  | As of December 31, | | | |
|---|---|---|---|---|
|  | 2015 | 2016 | 2017 | 2017 |
|  | RMB | RMB | RMB | US$ |
| Balance at the beginning of the year | 7,683 | 21,913 | 19,719 | 3,031 |
| Provisions | 19,415 | 7,245 | 56,048 | 8,614 |
| Write-offs | (5,185) | (9,439) | (51,081) | (7,851) |
| Balance at the end of the year | 21,913 | 19,719 | 24,686 | 3,794 |

**6.    PREPAYMENTS AND OTHER ASSETS**

The current and non-current portions of prepayments and other assets consist of the following:

|  | As of December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2017 |
|  | RMB | RMB | US$ |
| **Current portion:** | | | |
| Prepaid licensed copyrights | 140,495 | 132,039 | 20,294 |
| Deposits and prepaid rental fees | 56,592 | 46,033 | 7,075 |
| VAT prepayments | 379,632 | 586,242 | 90,104 |
| Others | 161,276 | 359,058 | 55,186 |
|  | 737,995 | 1,123,372 | 172,659 |

F-40

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | 2016 | 2017 | 2017 |
|  | RMB | RMB | US$ |
| **Non-current portion:** | | | |
| Prepaid licensed copyrights | 1,127,929 | 2,491,320 | 382,909 |
| Licensed copyrights prepaid assets (i) | 55,318 | 36,547 | 5,617 |
| Deposits and prepaid rental fees | — | 157,882 | 24,266 |
| Others | 47,943 | 159,913 | 24,578 |
|  | 1,231,190 | 2,845,662 | 437,370 |

(i)    Licensed copyrights prepaid assets are recognized when the Group has yet to receive the content copyrights from the counterparty under a barter transaction but the counterparty has already received the content copyrights from the Group.

7.    **LICENSED COPYRIGHTS, NET**

|  | As of December 31, 2016 | | |
| --- | --- | --- | --- |
|  | Gross carrying value | Accumulated amortization | Net carrying value |
|  | RMB | RMB | RMB |
| **Licensed copyrights** | | | |
| —Broadcasting rights | 7,771,286 | (4,877,319) | 2,893,967 |
| —Sublicensing rights | 677,371 | (628,170) | 49,201 |
|  | 8,448,657 | (5,505,489) | 2,943,168 |
| **Less: current portion:** | | | |
| —Broadcasting rights | 2,981,330 | (2,534,088) | 447,242 |
| —Sublicensing rights | 677,371 | (628,170) | 49,201 |
|  | 3,658,701 | (3,162,258) | 496,443 |
| **Licensed copyrights—non current** | | | |
| —Broadcasting rights | 4,789,956 | (2,343,231) | 2,446,725 |
| —Sublicensing rights | — | — | — |
|  | 4,789,956 | (2,343,231) | 2,446,725 |

F-41

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

| | As of December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Gross carrying value | Accumulated amortization | Net carrying value | |
| | RMB | RMB | RMB | US$ |
| **Licensed copyrights** | | | | |
| —Broadcasting rights | 14,570,030 | (9,211,779) | 5,358,251 | 823,549 |
| —Sublicensing rights | 1,599,154 | (1,580,455) | 18,699 | 2,874 |
| | 16,169,184 | (10,792,234) | 5,376,950 | 826,423 |
| **Less: current portion:** | | | | |
| —Broadcasting rights | 5,185,503 | (4,385,335) | 800,168 | 122,984 |
| —Sublicensing rights | 1,599,154 | (1,580,455) | 18,699 | 2,874 |
| | 6,784,657 | (5,965,790) | 818,867 | 125,858 |
| **Licensed copyrights—non current** | | | | |
| —Broadcasting rights | 9,384,527 | (4,826,444) | 4,558,083 | 700,565 |
| —Sublicensing rights | — | — | — | — |
| | 9,384,527 | (4,826,444) | 4,558,083 | 700,565 |

The licensed copyrights have weighted-average useful lives of 2.2 years, 3.5 years and 2.5 years for the years ended December 31, 2015, 2016 and 2017, respectively. The Group recognized impairment charges on licensed copyrights of nil, RMB212,219 and RMB390,235 (US$59,978) for the years ended December 31, 2015, 2016 and 2017, respectively.

Amortization expense of RMB2,293,735, RMB4,036,121 and RMB7,491,955 (US$1,151,492) for the years ended December 31, 2015, 2016 and 2017, respectively, was recognized as cost of revenues. Estimated amortization expense relating to the existing licensed copyrights for each of the next five years is as follows:

| | RMB | US$ |
| --- | --- | --- |
| Within 1 year | 3,182,287 | 489,109 |
| Between 1 and 2 years | 1,247,538 | 191,743 |
| Between 2 and 3 years | 694,405 | 106,728 |
| Between 3 and 4 years | 211,574 | 32,518 |
| Between 4 and 5 years | 33,075 | 5,083 |

F-42

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

8. **INTANGIBLE ASSETS, NET**

| | As of December 31, 2016 | | |
|---|---|---|---|
| | Gross carrying value | Accumulated amortization | Net carrying value |
| | RMB | RMB | RMB |
| Traffic acquisition agreement (i) | 218,500 | (122,220) | 96,280 |
| Trademarks | 158,000 | (56,617) | 101,383 |
| User list | 148,500 | (148,500) | — |
| Domain names | 140,400 | (56,864) | 83,536 |
| Customer relationships | 119,700 | (119,700) | — |
| Others | 188,547 | (86,771) | 101,776 |
| | 973,647 | (590,672) | 382,975 |

| | As of December 31, 2017 | | | |
|---|---|---|---|---|
| | Gross carrying value | Accumulated amortization | Net carrying value | Net carrying value |
| | RMB | RMB | RMB | US$ |
| Traffic acquisition agreement (i) | 218,500 | (152,152) | 66,348 | 10,198 |
| Trademarks | 158,189 | (72,434) | 85,755 | 13,180 |
| User list | 148,500 | (148,500) | — | — |
| Domain names | 140,453 | (70,943) | 69,510 | 10,683 |
| Customer relationships | 119,700 | (119,700) | — | — |
| Others | 344,308 | (137,916) | 206,392 | 31,722 |
| | 1,129,650 | (701,645) | 428,005 | 65,783 |

(i)    Pursuant to the services agreement entered into between the Company and Baidu on March 15, 2010 (amended and restated on August 15, 2010 and December 6, 2011), Baidu provides traffic acquisition services to the Group over a ten year period. Due to Baidu's acquisition of the Company in November 2012 and the Company's election to apply pushdown accounting (Note 1), a favorable contract asset with a useful life of 7.3 years was recorded.

No impairment charges were recognized on intangible assets for the years ended December 31, 2015, 2016 and 2017, respectively.

Amortization expense was RMB172,788, RMB102,242 and RMB112,860 (US$17,346) for the years ended December 31, 2015, 2016 and 2017, respectively. Estimated amortization expense relating to the existing intangible assets for each of the next five years is as follows:

| | RMB | US$ |
|---|---|---|
| Within 1 year | 86,272 | 13,260 |
| Between 1 and 2 years | 78,545 | 12,072 |
| Between 2 and 3 years | 65,943 | 10,135 |
| Between 3 and 4 years | 46,589 | 7,161 |
| Between 4 and 5 years | 40,875 | 6,282 |

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

**9.    PRODUCED CONTENT, NET**

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| Released, less amortization | 111,726 | 124,990 | 19,211 |
| In production | 259,800 | 1,310,349 | 201,397 |
| In development | 41,980 | 128,940 | 19,817 |
| | 413,506 | 1,564,279 | 240,425 |

Amortization expense was RMB231,597, RMB574,530 and RMB774,530 (US$119,043) for the years ended December 31, 2015, 2016 and 2017, respectively.

The Group expects to amortize 100% of the released produced content over the next twelve months from December 31, 2017.

**10.   GOODWILL**

The goodwill of RMB3,276,107 (US$503,528) as of December 31, 2016 and 2017 represented the goodwill of RMB1,475,357 pushed down from the acquisition of the Company by Baidu in 2012 and the goodwill of RMB1,800,750 generated from the acquisition of Shanghai Zhong Yuan by the Company in 2013 (Note 1). The business of Shanghai Zhong Yuan was integrated into the Company post acquisition.

For the years ended December 31, 2015, 2016 and 2017, the Group performed a quantitative assessment by estimating the fair value of the Group as a reporting unit based on an income approach. The fair values of the Group exceeded its carrying value as of December 31, 2016 and 2017, respectively, and therefore the Group's goodwill was not impaired.

**11.   FIXED ASSETS, NET**

Fixed assets consist of the following:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| Computer equipment | 1,155,699 | 1,519,261 | 233,506 |
| Office furniture and equipment | 28,692 | 40,634 | 6,245 |
| Leasehold improvements | 35,393 | 79,036 | 12,148 |
| Office building | — | 589,543 | 90,611 |
| Others | 8,520 | 9,729 | 1,495 |
| | 1,228,304 | 2,238,203 | 344,005 |
| Less: Accumulated depreciation | (692,937) | (996,656) | (153,183) |
| Construction in progress | 3,844 | 7,421 | 1,141 |
| | 539,211 | 1,248,968 | 191,963 |

F-44

Table of Contents

iQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

No impairment charges were recognized on fixed assets for the years ended December 31, 2015, 2016 and 2017, respectively.

Depreciation expense was RMB222,195, RMB306,495 and RMB348,921 (US$53,628) for the years ended December 31, 2015, 2016 and 2017, respectively.

### 12.    LOANS PAYABLE

*Short-term Loans*

| | As of December 31 | | |
| --- | --- | --- | --- |
| | **2016**<br>**RMB** | **2017**<br>**RMB** | **2017**<br>**US$** |
| Short-term loans guaranteed by the subsidiary and VIE within the Group | 100,000 | 299,374 | 46,013 |

In January 2016, Beijing iQIYI entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which Beijing iQIYI is entitled to borrow a RMB denominated loan of RMB200,000 with a fixed annual interest rate at 95% of the benchmark one-year lending rate published by the People's Bank of China. The loan is intended for general working capital purposes and is repayable after one year with a fixed interest rate of 4.13%. In 2016, Beijing iQIYI drew down RMB100,000 of principal. The principal, interest, related penalties and other costs of the loans under this agreement were guaranteed by Beijing QIYI Century and Shanghai iQIYI, who are jointly and severally liable to the creditor. The loan balance was fully repaid when it became due in 2017.

In June 2017, Beijing iQIYI entered into a banking facility agreement with China Minsheng Bank (Beijing Branch), pursuant to which Beijing iQIYI is entitled to borrow a RMB denominated loan of up to RMB300,000 (US$46,109) for general working capital purposes and is repayable in one year. The repayment of any loans under the banking facility agreement are guaranteed by Beijing QIYI Century. In November 2017, Beijing QIYI Century received a letter of credit from Beijing iQIYI. Beijing QIYI Century discounted the letter of credit and related receivable to China Minsheng Bank (Beijing Branch) for proceeds of RMB131,516 (US$20,214) and the same amount was considered drawn down as a loan at an effective interest rate of 4.78%. Further, Beijing iQIYI drew down RMB62,200 (US$9,560) at an annual interest rate of 5.00%. As the legal isolation criteria was not met, the transfer of the receivable balance did not qualify as a transfer of financial assets and is accounted for as a secured borrowing.

In August 2017, Beijing iQIYI entered into a banking facility agreement with China Merchants Bank (Beijing Branch), as supplemented in September 2017, pursuant to which Beijing iQIYI is entitled to borrow a RMB denominated loan of up to RMB200,000 (US$30,739) for general working capital purposes and is repayable in one year. The repayment of any loans under the banking facility agreement are guaranteed by Beijing QIYI Century and Shanghai iQIYI. Concurrently, Beijing QIYI Century factored a receivable due from Beijing iQIYI of RMB105,658 (US$16,239) to China Merchants Bank (Beijing Branch) and the same amount was considered drawn down as a loan at an effective interest rate of 4.11% ("the receivable factoring transaction"). As the legal isolation criteria was not met, the receivable factoring transaction did not qualify as a transfer of financial assets and is accounted for as a secured borrowing.

F-45

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Long-term Loans*

In April 2017, Shanghai iQIYI entered into a three-year loan agreement with Bank of China (Shanghai Branch), pursuant to which the Company is entitled to borrow a secured RMB denominated loan of RMB299,000 (US$45,955) with an annual interest rate at 94% of the benchmark three-year lending rate published by the People's Bank of China. The loan is intended for the general working capital of the Company. In April 2017, Shanghai iQIYI drew down RMB299,000 (US$45,955) with an effective interest rate of 4.47%, pursuant to the agreement, the principal shall be repaid by installments from September 2017 to April 2020. The principal, interest, related penalties and other costs of the loan under this agreement were guaranteed by Beijing iQIYI, who is jointly and severally liable to the creditor. During the year ended December, 2017, RMB5,000 (US$768) was repaid when it became due. The amount repayable within twelve months is classified as "Long-term loan, current portion".

As of December 31, 2017, aggregate loan principal payments are due according to the following schedule:

|  | As of December 31 | |
| --- | --- | --- |
|  | 2017 | 2017 |
|  | RMB | US$ |
| within 1 year | 10,000 | 1,537 |
| between 1-2 year | 10,000 | 1,537 |
| between 2-3 year | 274,000 | 42,113 |
|  | 294,000 | 45,187 |

13.  **ACCRUED EXPENSES AND OTHER LIABILITIES**

Accrued expenses and other liabilities consist of the following:

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | 2016 | 2017 | |
|  | RMB | RMB | US$ |
| Accrued agency commissions | 1,003,508 | 1,324,905 | 203,634 |
| Accrued payroll | 138,152 | 192,803 | 29,633 |
| Tax and surcharges payable | 127,166 | 116,181 | 17,857 |
| Accrued advertising and promotion expenses | 243,611 | 430,828 | 66,217 |
| Accrued professional fees | 67,876 | 112,774 | 17,333 |
| Litigation accrual (Note 16) | 21,434 | 20,531 | 3,156 |
| Deferred government grants | 20,775 | 18,645 | 2,866 |
| Accrued cost for live entertainment performers | 101,968 | 98,838 | 15,191 |
| Others | 137,232 | 195,681 | 30,075 |
|  | 1,861,722 | 2,511,186 | 385,962 |

F-46

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**14.   INCOME TAXES**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gains. Additionally, upon payment of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they may be exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

*China*

Effective from January 1, 2008, the PRC's statutory, Enterprise Income Tax ("EIT") rate is 25%. In accordance with the implementation rules of EIT Law, a qualified "High and New Technology Enterprise" ("HNTE") is eligible for a preferential tax rate of 15%. The HNTE certificate is effective for a period of three years. An entity must file required supporting documents with the tax authority and ensure fulfillment of the relevant HNTE criteria before using the preferential rate. An entity could re-apply for the HNTE certificate when the prior certificate expires.

Beijing QIYI Century and Shanghai Zhong Yuan were recognized as qualified HNTEs under the EIT Law by relevant government authorities in 2013 and were entitled to the preferential tax rate of 15% for the years 2013 to 2015. Beijing QIYI Century and Shanghai Zhong Yuan received the approval and renewed the HNTE certification during 2016, and were entitled to the preferential tax rate of 15% for the years 2016 to 2018. Beijing iQIYI was a qualified HNTE and enjoys the reduced tax rate of 15% for the years 2015 to 2017.

The other PRC subsidiaries and consolidated VIEs and VIE's subsidiaries are subject to the 25% EIT rate.

According to the current EIT Law and its implementation rules, foreign enterprises, which have no establishment or place in China but derive dividends, interest, rents, royalties and other income (including capital gains) from sources in China or which has an establishment or place in China but the aforementioned incomes are not connected with the establishment or place shall be subject to PRC withholding tax ("WHT") at 10% (a further reduced WHT rate may be available according to the applicable double tax treaty or arrangement provided that the foreign enterprise is the tax resident of the jurisdiction where it is located and it is the beneficial owner of the dividends, interest and royalties income).

Also, the current EIT Law treats enterprises established outside of China with "effective management and control" located in China as PRC resident enterprises for tax purposes. The term "effective management and control" is generally defined as exercising overall management and control over the business, personnel, accounting, properties, etc. of an enterprise. The Company, if considered a PRC resident enterprise for tax purposes, would be subject to the PRC EIT at the rate of 25% on its worldwide income. As of December 31, 2017, the Group has not accrued for PRC tax on such basis. The Group will continue to monitor its tax status.

F-47

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The Group's loss before income taxes consists of:

| | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| Non-PRC | 19,976 | (23,273) | 99,787 | 15,337 |
| PRC | (2,583,922) | (3,037,661) | (3,844,284) | (590,857) |
| | (2,563,946) | (3,060,934) | (3,744,497) | (575,520) |

Income tax expense/(benefit) for the years ended December 31, 2015, 2016 and 2017 consists of:

| | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| Current income tax expense | 5,965 | 12,610 | 4,649 | 714 |
| Deferred income tax expense/(benefit) | 5,201 | 478 | (12,214) | (1,877) |
| | 11,166 | 13,088 | (7,565) | (1,163) |

The reconciliation of total tax expense computed by applying the respective statutory income tax rate to pre-tax loss is as follows:

| | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| Income tax benefit at PRC statutory rate | (640,987) | (765,234) | (936,124) | (143,880) |
| Effect of differing tax rates in different jurisdictions | (5,346) | 5,248 | (35,888) | (5,516) |
| Non-deductible expenses | 31,717 | 69,065 | 171,784 | 26,403 |
| Deemed income | — | 230,891 | — | — |
| Research and development super-deduction | (9,630) | (10,746) | (10,746) | (1,652) |
| Tax rate differential on deferred tax items | 339,443 | 179,266 | 320,114 | 49,201 |
| Other adjustments | (939) | 17,025 | 10,393 | 1,597 |
| Change in valuation allowance | 296,908 | 287,573 | 472,902 | 72,684 |
| Income tax expense/(benefit) | 11,166 | 13,088 | (7,565) | (1,163) |

F-48

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The tax effects of temporary differences that give rise to the deferred tax balances at December 31, 2016 and 2017 are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2017** |
| | **RMB** | **RMB** | **US$** |
| Deferred tax assets: | | | |
| Accrued expenses and others | 19,766 | 40,808 | 6,272 |
| Bad debt provision | 9,893 | 5,110 | 785 |
| Net operating losses carried forward | 614,387 | 512,297 | 78,739 |
| Copyrights amortization and impairment | 399,576 | 910,153 | 139,888 |
| Fixed assets depreciation | 9,152 | 12,172 | 1,871 |
| Valuation allowance | (1,026,206) | (1,446,445) | (222,315) |
| Deferred tax assets, net | 26,568 | 34,095 | 5,240 |
| Deferred tax liabilities: | | | |
| Long-lived assets arising from acquisitions | 29,657 | 24,970 | 3,838 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2017** |
| | **RMB** | **RMB** | **US$** |
| Classification in the consolidated balance sheets: | | | |
| Deferred tax assets, net | 3,853 | 11,380 | 1,749 |
| Deferred tax liabilities | 6,942 | 2,255 | 347 |

Valuation allowances have been provided on the net deferred tax assets where, based on all available evidence, it was considered more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods. Realization of the net deferred tax assets is dependent on factors including future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing deductible temporary differences and tax loss or credit carry forwards. The Group evaluates the potential realization of deferred tax assets on an entity-by-entity basis. As of December 31, 2016 and 2017, valuation allowances were provided against deferred tax assets in entities where it was determined it was more likely than not that the benefits of the deferred tax assets will not be realized.

As of December 31, 2016 and 2017, the Group had net operating losses of RMB3,941,666 and RMB3,191,546 (US$490,532) deriving from entities in the PRC per income tax returns filed, which can be carried forward to offset future taxable income. The net operating losses will expire between 2018 and 2022 if not utilized.

The Group did not record any dividend withholding tax, as there were no taxable outside basis differences noted as of the end of the periods presented.

The Group evaluated its income tax uncertainty under ASC 740. ASC 740 clarifies the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Group elects to classify interest and penalties related to an

F-49

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive loss. As of December 31, 2016 and 2017 and for the years ended December 31, 2015, 2016 and 2017, there was no significant impact from tax uncertainties on the Group's financial position and result of operations. The Group did not record any interest and penalties related to an uncertain tax position for each of the years ended December 31, 2015, 2016 and 2017. The Group does not expect the amount of unrecognized tax benefits would increase significantly in the next 12 months. In general, the PRC tax authorities have up to five years to conduct examinations of the tax filings of the Group's PRC subsidiaries. Accordingly, the PRC subsidiaries' tax filings from 2013 through 2017 remain open to examination by the respective tax authorities. The Group may also be subject to the examinations of the tax filings in other jurisdictions, which are not material to the consolidated financial statements.

**15.    EMPLOYEE DEFINED CONTRIBUTION PLAN**

Full-time employees of the Company's subsidiaries and its VIEs in the PRC participate in a government mandated defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the subsidiaries, VIEs and VIE's subsidiaries of the Company make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Group has no legal obligation for the benefits beyond the contributions made. The total amount for such employee benefits which are expensed as incurred were RMB159,186, RMB251,536 and RMB371,622 (US$57,117) for the years ended December 31, 2015, 2016 and 2017, respectively.

**16.    COMMITMENTS AND CONTINGENCIES**

*Operating lease commitments*

The Group leases facilities in the PRC under non-cancelable operating leases expiring on different dates. Payments under operating leases are expensed on a straight-line basis over the periods of the respective leases. The Group's lease agreements are entered into with third parties and usually have a renewal option with an advance notice period of one to twelve months, and no restrictions or contingent rents. For lease agreements with escalated rental payments, they are recognized on a straight-line basis over the lease term.

Total office rental expenses under all operating leases were RMB63,651, RMB85,527 and RMB106,740 (US$16,406) for the years ended December 31, 2015, 2016 and 2017, respectively. Future minimum payments under non-cancelable operating leases for office rental consist of the following as of December 31, 2017:

|  | RMB | US$ |
|---|---|---|
| 2018 | 135,814 | 20,874 |
| 2019 | 119,878 | 18,425 |
| 2020 | 16,380 | 2,518 |
| 2021 | 10,953 | 1,683 |
| 2022 and thereafter | 1,682 | 259 |
|  | 284,707 | 43,759 |

F-50

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Future minimum payments under non-cancelable operating leases for bandwidth rental consist of the following as of December 31, 2017:

|  | RMB | US$ |
| --- | --- | --- |
| 2018 | 1,376,804 | 211,611 |
| 2019 | 4,823 | 741 |
| 2020 | 384 | 59 |
|  | 1,382,011 | 212,411 |

*Commitments for Licensed Copyrights*

Future minimum payments under non-cancelable agreements for licensed copyrights consist of the following as of December 31, 2017:

|  | RMB | US$ |
| --- | --- | --- |
| 2018 | 6,146,266 | 944,664 |
| 2019 | 5,377,993 | 826,582 |
| 2020 | 2,800,675 | 430,456 |
| 2021 | 895,652 | 137,659 |
| 2022 and thereafter | 1,342,108 | 206,278 |
|  | 16,562,694 | 2,545,639 |

*Capital commitment*

The Group has commitments for non-cancelable capital leases and the purchase of fixed assets of RMB32,313 (US$4,966) at December 31, 2017, which are scheduled to be paid within one year.

*Litigation, claims and assessments*

The Group is involved in a number of claims pending in various courts, in arbitration, or otherwise unresolved as of December 31, 2017. These claims are substantially related to alleged copyright infringement as well as routine and incidental matters to its business, among others. Adverse results in these claims may include awards of damages and may also result in, or even compel, a change in the Group's business practices, which could impact the Group's future financial results. The Group has accrued RMB20,531 (US$3,156) in "Accrued expenses and other liabilities" in the consolidated balance sheet as of December 31, 2017 and recognized losses of RMB19,012 (US$2,922) for the year ended December 31, 2017.

The Group is unable to estimate the reasonably possible loss or a range of reasonably possible losses for proceedings in the early stages or where there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. Although the results of unsettled litigations and claims cannot be predicted with certainty, the Group does not believe that, as of December 31, 2017, there was at least a reasonable possibility that the Group may have incurred a material loss, or a material loss in excess of the accrued expenses, with respect to such loss contingencies. The losses accrued include judgments made by the court and out-of-court settlements after December 31, 2017, but related to cases arising on or before December 31, 2017. The Group is in the process of appealing certain judgments for which losses have been accrued.

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**17.    ORDINARY SHARES**

As of December 31, 2016 and 2017, there were 342,548,237 ordinary shares issued and outstanding at par value of US$0.00001.

On October 26, 2017, the Company's shareholders and Board of Directors approved an increase in its authorized share capital from 3,500,000,000 to 5,000,000,000 ordinary shares.

On November 30, 2017, the Company's shareholders and Board of Directors approved a dual class voting structure whereby (i) all of the ordinary shares held by Baidu after automatic conversion of outstanding redeemable convertible preferred shares into ordinary shares upon the closing of an IPO are to be re-designated as Class B ordinary shares and (ii) all of the other ordinary shares held by others after automatic conversion of outstanding redeemable convertible preferred shares into ordinary shares upon the closing of an IPO are to be re-designated as Class A ordinary shares. Class A and Class B ordinary shares have the same rights except for voting and conversion rights. Holders of Class A ordinary shares will be entitled to one vote per share while holders of Class B ordinary shares will be entitled to ten votes per share, on corporate matters that require shareholders' vote. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Concurrently, the Company's shareholders and Board of Directors also approved an increase in its authorized share capital from 5,000,000,000 to 10,000,000,000 ordinary shares.

**18.    PROFIT APPROPRIATION AND RESTRICTED NET ASSETS**

The Company's subsidiaries, VIEs and the VIEs' subsidiaries in China are required to make appropriations to certain non-distributable reserve funds. In accordance with the laws applicable to China's WFOE, its subsidiaries have to make appropriations from its after-tax profit (as determined under Generally Accepted Accounting Principles in the PRC ("PRC GAAP") to non-distributable reserve funds including (i) general reserve fund, (ii) enterprise expansion fund and (iii) staff bonus and welfare fund. General reserve fund is at least 10% of the after-tax profits calculated in accordance with the PRC GAAP. Appropriation is not required if the reserve fund has reached 50% of the registered capital of the respective company. The appropriation of the other two reserve funds is at the Company's discretion. At the same time, the Company's VIEs, in accordance with the China Company Laws, must make appropriations from its after-tax profit (as determined under the PRC GAAP) to non-distributable reserve funds including (i) statutory surplus fund, and (ii) discretionary surplus fund. Statutory surplus fund is at least 10% of the after-tax profits calculated in accordance with the PRC GAAP. Appropriation is not required if the reserve fund has reached 50% of the registered capital of the respective company.

General reserve fund and statutory surplus fund are restricted for set off against losses, expansion of production and operation or increase in register capital of the respective company. These reserves are not transferable to the Company in the form of cash dividends, loans or advances. These reserves are therefore not available for distribution except in liquidation.

As of December 31, 2016 and 2017, no reserves were made to non-distributable reserve funds by the Company as its PRC subsidiaries, VIEs and VIEs' subsidiaries were in an accumulated deficit position.

Under the PRC laws and regulations, the subsidiaries, VIEs and the VIEs' subsidiaries incorporated in the PRC are restricted in their ability to transfer a portion of their net assets to the Group either in the form of

F-52

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

dividends, loans or advances of the combined and consolidated net assets as of December 31, 2017. Even though the Group currently does not require any such dividends, loans or advances from the PRC subsidiaries, VIEs and VIEs' subsidiaries for working capital and other funding purposes, the Company may in the future require additional cash resources from its PRC subsidiaries, VIEs and VIEs' subsidiaries due to changes in business conditions, to fund future acquisitions and development, or merely declare and pay dividends to or distribution to its shareholders. Amounts of net assets restricted include paid-in capital of the Company's PRC subsidiaries and the net assets of the VIEs and VIEs' subsidiaries in which the Company has no legal ownership, totaling RMB5,413,018 (US$831,966) as of December 31 2017.

**19.    (LOSS)/EARNINGS PER SHARE**

Basic (loss)/earnings per share is computed using the weighted average number of the ordinary shares outstanding during the period. Diluted (loss)/earnings per share is computed using the weighted average number of ordinary shares and potential ordinary shares outstanding during the period under the treasury stock method. The effects of all outstanding redeemable convertible preferred shares and share options were excluded from the computation of diluted loss per share for the years ended December 31, 2015 and 2016, as their effects would be anti-dilutive. The effect of the convertible notes, share options and restricted share units were excluded from the computation of diluted net loss per share for the year ended December 31, 2017, as its effect would be anti-dilutive.

F-53

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Basic (loss)/earnings per share for each of the years presented are calculated as follows:

|  | Year ended December 31, | | | |
|  | 2015 | 2016 | 2017 | |
|  | RMB | RMB | RMB | US$ |
|---|---|---|---|---|
| Basic net (loss)/earnings per share calculation: | | | | |
| Numerator: | | | | |
| Net loss attributable to iQIYI, Inc. | (2,575,112) | (3,074,022) | (3,736,932) | (574,357) |
| Extinguishment and reissuance of Series B preferred shares | — | — | (363,279) | (55,835) |
| Accretion of redeemable convertible preferred shares | (2,342,385) | (4,874,739) | 5,073,140 | 779,727 |
| Allocation of net income attributable to preferred shareholders | — | — | (870,166) | (133,742) |
| Numerator for computing basic net (loss)/earnings per share | (4,917,497) | (7,948,761) | 102,763 | 15,793 |
| Denominator: | | | | |
| Weighted average number of ordinary shares outstanding | 342,548,237 | 342,548,237 | 342,548,237 | 342,548,237 |
| Basic net (loss)/earnings per share | (14.36) | (23.20) | 0.30 | 0.05 |

F-54

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Diluted loss per share for each of the years presented are calculated as follows:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| Diluted net loss per share calculation: Numerator: | | | | |
| Numerator for computing basic net (loss)/earnings per share | (4,917,497) | (7,948,761) | 102,763 | 15,793 |
| Add: Extinguishment and reissuance of Series B preferred shares | — | — | 363,279 | 55,835 |
| Deduct: Accretion of redeemable convertible preferred shares | — | — | (5,073,140) | (779,727) |
| Add: Allocation of net income attributable to preferred shareholders | — | — | 870,166 | 133,742 |
| Numerator for computing diluted net loss per share | (4,917,497) | (7,948,761) | (3,736,932) | (574,357) |
| Denominator: | | | | |
| Weighted average number of ordinary shares outstanding | 342,548,237 | 342,548,237 | 342,548,237 | 342,548,237 |
| Conversion of redeemable convertible preferred shares to ordinary shares | — | — | 2,900,599,024 | 2,900,599,024 |
| Weighted average number of shares used in calculating diluted net loss per share | 342,548,237 | 342,548,237 | 3,243,147,261 | 3,243,147,261 |
| Diluted net loss per share | (14.36) | (23.20) | (1.15) | (0.18) |

The unaudited pro forma loss per ordinary share is computed using the weighted-average number of ordinary shares outstanding and assumes the automatic conversion of all of the Company's redeemable convertible preferred shares into 3,728,823,500 ordinary shares upon the closing of an IPO and all outstanding ordinary shares are re-designated into 1,231,841,032 Class A ordinary shares and 2,839,530,705 Class B ordinary shares, respectively, as if it had occurred on January 1, 2017. The Company believes the unaudited pro forma loss per share provides material information to investors, as the automatic conversion of the redeemable convertible preferred shares and the disclosure of pro forma loss per share provides an indication of loss per share that is comparable to what will be reported by the Company as a public company following the closing of an IPO.

F-55

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Basic and diluted pro forma loss per share is calculated as follows:

| | Year ended December 31, 2017 | | | |
| | Class A | | Class B | |
| | RMB | US$ | RMB | US$ |
| | (Unaudited) | | (Unaudited) | |
|---|---|---|---|---|
| **Numerator:** | | | | |
| Net income attributable to ordinary shareholders | 294,371 | 45,244 | 678,558 | 104,291 |
| Add: Interest expense on convertible notes | 34,025 | 5,230 | 78,432 | 12,054 |
| Add: Extinguishment and reissuance of Series B preferred shares | 109,914 | 16,894 | 253,365 | 38,941 |
| Deduct: Accretion of redeemable convertible preferred shares | (1,534,938) | (235,916) | (3,538,202) | (543,811) |
| Numerator for pro forma basic and diluted loss per share | (1,096,628) | (168,548) | (2,527,847) | (388,525) |
| **Denominator:** | | | | |
| Weighted average number of shares used in calculating basic loss per share | — | — | 342,548,237 | 342,548,237 |
| Add: adjustment to reflect assumed effect of automatic conversion of redeemable convertible preference shares | 1,231,841,032 | 1,231,841,032 | 2,496,982,468 | 2,496,982,468 |
| Weighted average number of shares used in calculating pro forma basic and diluted loss per share | 1,231,841,032 | 1,231,841,032 | 2,839,530,705 | 2,839,530,705 |
| Pro forma basic and diluted loss per share | (0.89) | (0.14) | (0.89) | (0.14) |

The effect of share options were excluded from the calculation of diluted pro forma loss per share for the year ended December 31, 2017 as its effect would be anti-dilutive.

**20.    SHARE-BASED COMPENSATION**

*2010 Equity Incentive Plan*

On October 18, 2010, the Company adopted its 2010 Equity Incentive Plan (the "2010 Plan"), which permits the grant of restricted shares, options and share appreciation rights to the employees, directors, officers

F-56

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

and consultants of the Company. Under the plan, a total of 58,875,478 ordinary shares were initially reserved for issuance. The 2010 Plan is valid and effective for a term of ten years commencing from its adoption. Except for service conditions, there were no other vesting conditions for all the awards under the 2010 Plan. Any unvested portion of the options will be forfeited upon the termination of the grantee's service for any reason. In the event the grantee's service is terminated for cause other than death or permanent disability, the vested portion of the options will also be forfeited upon such termination. On November 3, 2014, the shareholders and Board of Directors of the Company approved a resolution to increase the share option pool under the 2010 Plan to 225,063,170 ordinary shares. On August 6, 2016, the shareholders and Board of Directors of the Company approved a resolution to further increase the share option pool under the 2010 Plan to 589,729,714 ordinary shares.

The Company has only granted share options under the 2010 Plan to its employees and directors. All options granted vest over a four-year period, with 25% of the awards vesting on the first anniversary, and the remaining 75% of the awards vesting on a quarterly basis thereafter.

The following table sets forth the summary of employee option activity under the Company's 2010 Plan:

| | Options Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (In years) | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|
| **Outstanding, December 31, 2016** | 189,249,010 | 0.41 | | |
| Granted | 127,163,896 | 0.51 | | |
| Forfeited | (8,004,452) | 0.51 | | |
| Expired | (2,142,088) | 0.45 | | |
| **Outstanding, December 31, 2017** | 306,266,366 | 0.45 | 7.55 | 450,564 |
| Vested and expected to vest as of December 31, 2017 | 297,297,015 | 0.45 | 7.52 | 437,832 |
| Exercisable as of December 31, 2017 | 124,149,617 | 0.37 | 5.76 | 192,266 |

As of December 31, 2017, the unrecognized compensation cost, adjusted for estimated forfeitures, related to non-vested share options granted to the Group's employees and directors was RMB476,115 (US$73,178). Total unrecognized compensation cost is expected to be recognized over a weighted-average period of 2.76 years and may be adjusted for future changes in estimated forfeitures.

The weighted average grant date fair value of the share options were US$0.27, US$0.33 and US$0.44 for the years ended December 31, 2015, 2016 and 2017, respectively. The total fair value of options vested during the years ended December 31, 2015, 2016 and 2017 were RMB36,533, RMB61,993 and RMB116,811 (US$17,954), respectively.

F-57

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The Company uses the binomial tree option pricing model to estimate the fair value of share options with the assistance of an independent third party valuation firm. The assumptions used to value the share options granted to employees were as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2015** | **2016** | **2017** |
| Fair value of ordinary shares (US$) | 0.59 | 0.82 | 0.89 |
| Risk-free interest rate (%) | 2.38 | 2.27 | 2.27 |
| Expected volatility (%) | 43.8 | 43.4 | 43.4 |
| Expected dividend yield | — | — | — |
| Expected exercise multiple | 2.3 | 2.3 | 2.3 |

The estimated fair value of the Company's ordinary shares at their respective grant dates, was determined with the assistance of an independent third party valuation firm. The risk-free interest rate for periods within the contractual life of the options is based on the U.S. Treasury yield curve in effect at the time of grant for a term consistent with the contractual term of the awards. Expected volatility is estimated based on the historical volatility ordinary shares of several comparable companies in the same industry. The dividend yield is estimated based on our expected dividend policy over the expected term of the options. The expected exercise multiple is based on management's estimation, which the Company believes is representative of the future.

***2017 Share Incentive Plan***

On November 30, 2017, the Company adopted its 2017 Share Incentive Plan (the "2017 Plan"). Under the 2017 Plan, the Company is authorized to grant options, restricted shares and restricted share units to members of the board, employees, consultants and other individuals for which the maximum aggregate number of ordinary shares which may be issued pursuant to all awards is 720,000 ordinary shares. The 2017 Plan is valid and effective for a term of ten years commencing from its adoption. Except for service conditions, there are no other vesting conditions for all the awards issued under the 2017 Plan. Any unvested portion of the options will be forfeited either (i) upon the termination of the grantee's service for any reason; or (ii) upon the grantee's scope of service no longer being involved in the business of the Company. In the event the grantee's service is terminated for cause or takes place prior to an IPO other than death or permanent disability, the vested portion of the options will also be forfeited upon such termination.

In December 2017, the Company granted 720,000 restricted share units under the 2017 Plan to non-employees. All restricted shares vest over a four-year period, with 25% of the awards vesting on the first anniversary, and the remaining 75% of the awards vesting on a quarterly basis thereafter. The weighted average grant date fair value of the restricted share units was US$1.92 for the year ended December 31, 2017 and none of the restricted share units were vested as of December 31, 2017.

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The following table sets forth the amount of share-based compensation expense included in each of the relevant financial statement line items:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | **2015** | **2016** | **2017** | |
| | **RMB** | **RMB** | **RMB** | **US$** |
| Cost of revenues | 5,837 | 9,479 | 34,895 | 5,363 |
| Selling, general and administrative | 21,330 | 30,447 | 130,994 | 20,133 |
| Research and development | 17,027 | 22,466 | 67,535 | 10,380 |
| | 44,194 | 62,392 | 233,424 | 35,876 |

**21.  RELATED PARTY TRANSACTIONS**

a)  *The table below sets forth the major related parties and their relationships with the Group:*

| Name of related parties | Relationship with the Group |
|---|---|
| Baidu and its subsidiaries ("Baidu Group") | Controlling shareholder of the Company |
| Xiaomi Ventures Limited and its affiliates ("Xiaomi Group") | Principal owner of the Company |

Xiaomi Group ceased to be a principal owner of the Company under ASC topic 850, *Related Party Disclosures* on October 26, 2017, hence the related party transactions with Xiaomi Group for the year ended December 31, 2017 includes transactions that occurred from January 1, 2017 to October 26, 2017.

F-59

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

b)    *The Group had the following related party transactions with the major related parties:*

| | For the year ended December 31, | | | |
|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2017** |
| | **RMB** | **RMB** | **RMB** | **US$** |
| Membership services | | | | |
| Membership services revenue earned from memberships sold to Baidu Group | 5,089 | 3,119 | 4,185 | 643 |
| Membership services revenue earned from memberships sold by Xiaomi Group | 2,089 | 26,794 | 81,450 | 12,519 |
| Online advertising revenues | | | | |
| Advertising services provided to Baidu Group | 28,256 | 116,029 | 18,337 | 2,818 |
| Advertising services provided to Xiaomi Group | — | 60,751 | 9,249 | 1,422 |
| Other revenues | | | | |
| Other services provided to Baidu Group | 24,078 | 6,602 | 58,529 | 8,996 |
| Other services provided to Xiaomi Group | 10,616 | 7,132 | 4,625 | 711 |
| Others | — | — | 5,157 | 793 |
| | 70,128 | 220,427 | 181,532 | 27,902 |
| | | | | |
| Cost of revenues | | | | |
| License fees to Baidu Group | — | 5,554 | 8,315 | 1,278 |
| Bandwidth fee to Baidu Group | — | — | 88,945 | 13,671 |
| Commissions to Xiaomi Group | 8,650 | 18,108 | 42,565 | 6,542 |
| Others | — | — | 1,817 | 279 |
| Selling, general and administrative | | | | |
| Advertising services provided by Baidu Group | 53,223 | 44,287 | 36,074 | 5,545 |
| Traffic acquisition service provided by Baidu Group (i) | 29,932 | 29,932 | 29,932 | 4,600 |
| Advertising services provided by Xiaomi Group | 10,474 | 44,010 | 82,773 | 12,722 |
| Others | — | — | 139 | 21 |
| Research and development | | | | |
| Cloud services provided by Baidu Group | — | 871 | 2,833 | 435 |
| Interest expenses | | | | |
| Loan due to Baidu Group | 55,113 | 106,731 | 168,154 | 25,845 |
| | 157,392 | 249,493 | 461,547 | 70,938 |

(i)    As disclosed in Note 8, the services agreement whereby Baidu Group provides traffic acquisition services was recorded as a favorable contract asset and RMB29,932, RMB29,932 and RMB29,932 (US$4,600) was recognized as selling, general and administrative expense for the years ended December 31, 2015, 2016 and 2017, respectively.

F-60

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

c) *The Group had the following related party balances with the major related parties:*

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 RMB | 2017 RMB | 2017 US$ |
| **Amounts due from related parties:** | | | |
| Loans receivable from Baidu Group (i) | 209,411 | — | — |
| Due from Baidu Group (ii) | 22,360 | 9,979 | 1,534 |
| Due from Xiaomi Group (iii) | 41,252 | — | — |
| | 273,023 | 9,979 | 1,534 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 RMB | 2017 RMB | 2017 US$ |
| **Amounts due to related parties:** | | | |
| Loans due to Baidu Group (iv) | 4,681,889 | 50,000 | 7,685 |
| Due to Baidu Group (v) | 236,911 | 77,628 | 11,931 |
| Due to Xiaomi Group (vi) | 26,168 | — | — |
| Others | 1,902 | 2,471 | 380 |
| | 4,946,870 | 130,099 | 19,996 |

(i) The balance as of December 31, 2016 mainly represents RMB denominated interest-free and uncollateralized loans provided to Baidu Group which were fully repaid in 2017. In April 2017, the Company provided an interest-free USD denominated loan of US$330,154 to Baidu Group, which was fully repaid in December 2017.

(ii) The balance mainly represents amounts due from Baidu Group for advertising and other services.

(iii) The balance as of December 31, 2016 arises from advertising services, other services and membership services revenue earned from memberships sold by Xiaomi Group.

(iv) As of December 31, 2016 and 2017, the total outstanding balance includes an interest-free loan of RMB50,000, which was due on demand and the remaining outstanding balance as of December 31, 2016 are RMB denominated entrusted loans provided by Baidu Group with a weighted average interest rate of 4.34%, which were fully repaid in 2017. In April 2017, the Group borrowed a RMB denominated loan of RMB2,220,000 (US$341,208) with an interest rate of 3.92% from Baidu Group, which was fully repaid in December 2017.

(v) The balance as of December 31, 2016 represents a deposit, accrued expenses for advertising services and cloud services provided by Baidu Group. The balance as of December 31, 2017 mainly represents accrued expenses for bandwidth services provided by Baidu Group.

(vi) The balance as of December 31, 2016 arises from advertising services provided by Xiaomi Group and commissions owed to Xiaomi Group.

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**22.   FAIR VALUE MEASUREMENTS**

The following table sets forth the financial instruments measured at fair value on a recurring basis by level within the fair value hierarchy as of December 31, 2016 and 2017 and non-recurring fair value measurements as of December 31, 2017:

| | Fair Value Measurements | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Market for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total losses | |
| | RMB | RMB | RMB | RMB | US$ |
| *Recurring* | | | | | |
| **As of December 31, 2016:** | | | | | |
| Short-term investments | | | | | |
|    Available-for-sale debt securities | | 902,978 | | | |
| **As of December 31, 2017:** | | | | | |
| Short-term investments | | | | | |
|    Available-for-sale debt securities | | 779,916 | | | |
| *Non-recurring* | | | | | |
| **As of December 31, 2017:** | | | | | |
|    Long-term investments | | | — | (32,938) | (5,062) |
|    Produced content, net | | | 4,482 | (36,918) | (5,674) |

As of December 31, 2016, the Group did not identify any impairment indicators and no impairment charges were recorded.

As of December 31, 2017, a cost method investment and an equity method investment were written down from its carrying value to fair value of nil, which were measured using significant unobservable inputs (Level 3). In addition, as of December 31, 2017, certain produced content was written down to fair value, which was based on estimates of the most likely future cash inflows the Group is entitled to, less the cash outflows necessary to generate those cash inflows, if any.

**23.   REDEEMABLE CONVERTIBLE PREFERRED SHARES**

On March 15, 2010, the Company issued 200,000,000 Series A preferred shares to Providence Equity Partners VI International L.P. ("Providence Equity Partners") at US$0.25 per share for a total cash consideration of US$50,000.

On March 17, 2010, the Company issued 6,064,174 Series A-1 preferred shares to Cannes Ventures Limited (formally known as Dragon Ventures Limited), an entity wholly-owned by Dr. Yu Gong ("Founder of Qiyi") at US$0.16 per share for a total cash consideration of US$1,000.

F-62

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

On August 15, 2011, the Company issued 123,103,264 Series B preferred shares to Providence Equity Partners, Indus Asia Pacific Master Fund, Ltd., Indus Japan Master Fund, Ltd., Indus Pacific Opportunities Master Fund, Ltd., Omaha Capital China Master Fund II, L.P. and Omaha Capital Principals Limited at US$0.93 per share for a total cash consideration of US$115,000.

On November 2, 2012, pursuant to a share purchase agreement, Baidu purchased 200,000,000 Series A preferred shares and 58,875,477 Series B preferred shares from Providence Equity Partners for a total cash consideration of US$136,500. Furthermore, on January 22, 2013, pursuant to another share purchase agreement, Baidu purchased 16,056,942 Series B preferred shares from the Indus Asia Pacific Master Fund, Ltd., Indus Japan Master Fund, Ltd., Indus Pacific Opportunities Master Fund, Ltd., Omaha Capital China Master Fund II, L.P. and Omaha Capital Principals Limited, for a total cash consideration of US$15,000.

On May 23, 2013, the Company issued 302,891,196 Series C preferred shares to Baidu at US$0.37 per share through conversion of the convertible promissory notes totaling US$107,619 issued by the Company to Baidu.

On May 24, 2013, the Company issued 848,682,647 Series D preferred shares to Baidu at US$0.42 per share for a total cash consideration of US$359,300.

On September 18, 2014, the Company issued 686,646,383 Series E preferred shares to Baidu at US$0.42 per share for a total cash consideration of US$290,700.

On November 11, 2014, the Company issued 546,999,817 Series F preferred shares to Baidu, Prominent TMT Limited and Xiaomi Ventures Limited ("Xiaomi") at US$0.73 per share for a total cash consideration of $400,000.

On January 25, 2017, the Company issued US$1,530,000 of convertible notes (the "Notes") in a private placement, of which US$300,000 was purchased by Baidu and the remaining US$1,230,000 was purchased by external investors. The Notes bear interest at a coupon rate of 1.50% per annum with a maturity date of January 25, 2018, and can be converted into redeemable convertible preferred shares in a qualified financing or at the Company's election. The conversion option did not meet the definition of a derivative under ASC 815. On October 26, 2017, all outstanding Notes were converted to 215,484,776 Series G1 preferred shares and 798,951,243 Series G2 preferred shares at a conversion price of US$1.51 per share (collectively, the "Series G preferred shares").

On December 6, 2017, Baidu waived their right to adjust the conversion price of the Series B preferred shares. According to the Company's Seventh Amended and Restated Memorandum and Articles of Association, when there is a subsequent issuance of preferred shares at an issuance price less than any previously issued preferred shares, the effective conversion price of the previously issued preferred shares are adjusted downward based on a pre-determined formula. Therefore, as the issuance price of the Series B preferred shares was higher than the respective issuance prices of the Series C preferred shares, Series D preferred shares, Series E preferred shares and Series F preferred shares, the effective conversion price for the Series B preferred shares was adjusted when the respective preferred shares were issued. As a result of the waiver, the conversion price of the Series B preferred shares was adjusted back to the initial conversion price of US$0.93 per share.

F-63

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

The key terms of the Series A preferred shares, Series A-1 preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares, Series E preferred shares, Series F preferred shares, and Series G preferred shares (collectively the "Preferred Shares") are summarized below:

*Dividends*

No cash dividend should be paid on or declared and set aside for any ordinary share during any fiscal year unless and until a dividend in like amount has been paid on or declared and set aside for each outstanding preferred share, on an as if converted basis.

In the event a dividend is declared payable in securities of other parties, assets (excluding cash dividends) or options or rights to purchase any such securities or evidences of indebtedness, the holders of the Preferred Shares shall be entitled to a proportionate share of any such dividend on an as if converted basis.

In the event that dividends are declared immediately prior to, and in the event of, a conversion of the Preferred Shares, the Company will pay the full amount of any such dividends in cash to the applicable holders of the Preferred Shares subject to such conversion.

For the periods presented, no dividends were declared by the Company's Board of Directors on the Preferred Shares.

*Voting Rights*

Each preferred shareholder (excluding the Series G2 preferred shares) is entitled to the number of votes equal to the number of ordinary shares into which such holder's preferred shares could be converted. Unless otherwise disclosed elsewhere, preferred shareholders will vote together with ordinary shareholders, and not as a separate class or series, on all matters put before the shareholders. Prior to an IPO, the Series G2 preferred shares are non-voting shares and do not entitle the Series G2 preferred shares to vote unless Baidu ceases to be the largest shareholder of the Company.

*Liquidation Preference*

In the event of liquidation, dissolution or winding up of the Company or any deemed liquidation event as defined in the preferred shares agreements, the assets or surplus funds of the Company available for distribution will be distributed as follows:

- Prior to and in preference to any distribution of any of the assets or surplus funds of the Company to the holders of the Series A-1 preferred shares or the ordinary shares or any other class or series of shares by reason of their ownership of such shares, the holders of the Series A preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares, Series E preferred shares, Series F preferred shares and Series G preferred shares ("Series Preferred Shares"), ranking pari passu therewith, will be entitled to, in each case, as applicable, receive the amount equal to the greater of: (i) 150% of the original issue price for each Series A preferred share, Series B preferred share, Series C preferred share, Series D preferred share, Series E preferred share and Series F preferred share and 100% of the original issue price for each Series G preferred share then held by the preferred shareholders and in addition, an amount equal to all declared but unpaid dividends on such preferred

F-64

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

shares; and (ii) such amount per share as would have been payable had all Preferred Shares been converted into ordinary shares immediately prior to such deemed liquidation event ("Series Preferred Liquidation Preference Amount").

• If upon the occurrence of a deemed liquidation event, the assets and funds thus distributed among the holders of the Series Preferred Shares are insufficient to permit the payment to such holders of the applicable full Series Preferred Liquidation Preference Amount, then the assets and funds of the Company legally available for distribution will be first distributed ratably among the Series F preferred shareholders in proportion to the Series F liquidation preference amount that each such holder is otherwise entitled to receive. To the extent that the Company has remaining assets and funds after distribution to Series F preferred shareholders pursuant to the preceding sentence, then the assets and funds of the Company legally available for distribution will be distributed ratably and pari passu, with neither having priority over the other, among the holders of the Series A preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares and Series E preferred shares ("Existing Series Preferred Shares") in proportion to the Series Preferred Liquidation Preference Amount each such holder is otherwise entitled to receive.

• After payment has been made to holders of the Series Preferred Shares of the applicable full Series Preferred Liquidation Preference Amount, prior and in preference to any distribution of any of the remaining assets or surplus funds of the Company to the holders of the ordinary shares or any other class or series of shares by reason of their ownership of such shares, the holders of the Series A-1 preferred shares will be entitled to receive the amount equal to the greater of (i) 100% of the Series A-1 original issue price for each such series A-1 preferred shares then held by them and, in addition, an amount equal to all declared but unpaid dividends on such series A-1 preferred share, or (ii) such amount per share as would have been payable had all Preferred Shares been converted into ordinary shares immediately prior to such deemed liquidation event (the amount payable pursuant to this sentence is hereinafter referred to as the "Series A-1 Liquidation Preference Amount"). If upon the occurrence of a deemed liquidation event, the assets and funds thus distributed among the holders of the series A-1 preferred shares are insufficient to permit the payment to such holders of the full Series A-1 Liquidation Preference Amount, then the entire assets and funds of the Company legally available for distribution will be distributed ratably among the holders of the Series A-1 preferred shares in proportion to the Series A-1 Liquidation Preference Amount that each such holder is otherwise entitled to receive.

After payment is made to the holders of the Preferred Shares in accordance with the above, the remaining assets and funds of the Company available for distribution to ordinary shareholders, if any, will be distributed on a pro rata basis, based upon the number of ordinary shares held by each such holder. The liquidation preference amount for the Preferred Shares was US$3,532,157 as of December 31, 2017.

*Conversion rights*

Each holder of the Preferred Shares (excluding the Series G2 preferred shares) has the right, at each holder's sole discretion, to convert at any time and from time to time, all or any portion of the Preferred Shares into ordinary shares. The Series G2 preferred shares are not convertible into Ordinary Shares prior to an IPO unless Baidu ceases to be the largest shareholder of the Company, at which time the Series G2 preferred shares has the right, at each holders' sole discretion, to convert at any time and from time to time, all or any portion of the

F-65

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Series G2 preferred shares into ordinary shares. The initial conversion price is the stated issuance price for each series of preferred shares. The initial conversion ratio is on a one for one basis and subject to adjustments in the event that the Company issues additional ordinary shares through options or convertible instruments for a consideration per share received by the Company less than the original respective conversion prices, as the case may be, in effect on the date of and immediately prior to such issue. In such event, the respective conversion price is reduced, concurrently with such issue, to a price as adjusted according to an agreed-upon formula. The above conversion prices are also subject to adjustments on a proportional basis upon other dilution events.

The Preferred Shares are automatically converted into ordinary shares upon the earlier of (1) immediately prior to and conditioned upon the closing of an IPO; or (2) election in writing by the holders of at least two-thirds of the then outstanding Series A preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares and Series E preferred shares, voting as a class; or (3) with respect to the Series F preferred shares, at the date and time as determined by each holder of the Series F preferred shares; or (4) with respect to the Series G preferred shares, election in writing by the holders of at least two-thirds of the outstanding Series G1 preferred shares.

*Registration Rights*

The Preferred Shares also contain registration rights which: (1) allow the holders of the Preferred Shares to demand the Company to file a registration statement covering the offer and sale of the ordinary shares issuable or issued upon conversion of the Preferred Shares at any time or from time to time after the earlier of (i) the fourth anniversary after the closing of the Series G preferred shares and (ii) the 180th day following the closing of an IPO; (2) require the Company to offer preferred shareholders an opportunity to include in a registration if the Company proposes to file a registration statement for a public offering of other securities; and (3) allow the preferred shareholders to request the Company to file a registration on Form F-3 when the Company is eligible to use Form F-3. The Company is required to use its best efforts to effect the registration if requested by the preferred shareholders, but there is no requirement to pay any monetary or non-monetary consideration for non-performance. The registration rights will terminate on the later of: (i) the date that is four years from the date of closing of an IPO, (ii) the date that is eight years from the date of closing of the Series G preferred shares, and (ii) with respect to any security holder, the date on which such holder may sell all of its registrable securities under Rule 144 of the Securities Act in any three month period.

*Redemption*

Existing Series Preferred Shares are redeemable at the holders' option on December 31, 2016 and may become redeemable at the holders' option if the following event is triggered:

- The occurrence of an Adverse Legal Development, as determined by either the Board of Directors or the holders of at least a majority of the then outstanding Existing Series Preferred Shares and the Company is unable to restructure the ownership of the Company to comply with the PRC laws within six months following the occurrence of an Adverse Legal Development. An Adverse Legal Development is defined as any changes to PRC laws which results in the ownership of the Company or any of its operating subsidiaries in the PRC or any of the VIE Contractual Arrangements to become (i) unlawful or subject to material conditions or restrictions which materially impair the economic benefits that the Company expects to derive or (ii) impairs the industry in which the operating subsidiaries in the PRC and VIEs operate.

F-66

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

With respect to the Series F preferred shares, they are redeemable at the holders' option on November 11, 2018 and may become redeemable upon the occurrence of an Adverse Legal Development.

With respect to the Series G preferred shares, they are redeemable at the holders' option if an IPO does not occur five years after the Series G preferred shares are first issued.

Prior to the issuance of the Series G preferred shares, upon the Company's receipt of a written redemption notice from (i) the holders of at least two-thirds of the then outstanding Existing Series Preferred Shares, voting together as a single class on an as-converted basis; or (ii) any holder of Series F preferred shares, the Company will redeem, on a pari passu basis, at a redemption price for each Series Preferred Shares (excluding the Series G preferred shares) equal to the greater of:

- each Series Preferred Shares' (excluding the Series G preferred shares) original issue price x (115%)N; and

- the then current fair market value of such Series Preferred Shares (excluding the Series G preferred shares, as determined in good faith by the Board of Directors) on the date of the redemption notice, including all declared but unpaid dividends thereon up to the redemption date.

N = a fraction the numerator of which is the number of calendar days between the date on which any Series Preferred Shares (excluding the Series G preferred shares), as the case may be, are first issued and the redemption date and the denominator of which is 365, minus all dividends paid in cash thereon plus all declared but unpaid dividends thereon, each up to the redemption date.

Upon the issuance of the Series G preferred shares, the redemption price of the Series A preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares, Series E preferred shares, and Series F preferred shares were modified to be the same as the Series G preferred shares, which is equal to each preferred share's original issue price x (108%)N, where N = a fraction the numerator of which is the number of calendar days between the date on which any preferred share, as the case may be, are first issued and the redemption date and the denominator of which is 365, minus all dividends paid in cash thereon plus all declared but unpaid dividends thereon, each up to the redemption date.

*Accounting for Preferred Shares*

The Series Preferred Shares are classified as mezzanine equity as they may be redeemed at the option of the holders on or after an agreed upon date outside the sole control of the Company while the Series A-1 preferred shares are also classified as mezzanine equity as they may be redeemed upon a deemed liquidation event. The holders of the Preferred Shares have the ability to convert the instrument into the Company's ordinary shares. The Company early adopted ASU 2014-16, Derivatives and Hedging (Topic 815): *Determining Whether the Host Contract in a Hybrid Financial Instrument Issued in the Form of a Share Is More Akin to Debt or to Equity* ("ASU 2014-16"), for all periods presented. ASU 2014-16 requires the use of the whole instrument approach to determine whether the nature of the host contract in a hybrid instrument is more akin to debt or to equity. The Company evaluated the embedded conversion option in the Preferred Shares to determine if there were any embedded derivatives requiring bifurcation and to determine if there were any beneficial conversion features. The conversion option of the Preferred Shares does not qualify for bifurcation accounting because the conversion option is clearly and closely related to the host equity instrument and the underlying ordinary shares are not

F-67

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

publicly traded nor readily convertible into cash. The contingent redemption options and registration rights of the Preferred Shares did not qualify for bifurcation accounting because the underlying ordinary shares were neither publicly traded nor readily convertible into cash. There were no embedded derivatives that are required to be bifurcated.

Beneficial conversion features ("BCF") exist when the conversion price of the preferred shares is lower than the fair value of the ordinary shares at the commitment date, which is the issuance date of the respective series of preferred shares. When a BCF exists as of the commitment date, its intrinsic value is bifurcated from the carrying value of the preferred shares as a contribution to additional paid-in capital. On the commitment date of the Series A preferred shares, Series A-1 preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares, Series E preferred shares, Series F preferred shares and Series G preferred shares, the most favorable conversion price used to measure the beneficial conversion feature were US$0.25, US$0.16, US$0.93, US$0.37, US$0.42, US$0.42, US$0.73 and US$1.51, respectively. No beneficial conversion feature was recognized for the Series A preferred shares, Series A-1 preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares, Series E preferred shares, Series F preferred shares and Series G preferred shares as the fair value per ordinary share at the commitment date were US$0.12, US$0.12, US$0.39, US$0.25, US$0.25, US$0.33, US$0.59 and US$0.89, respectively, which was less than the most favorable conversion price. The Company determined the fair value of ordinary shares with the assistance of an independent third party valuation firm.

The contingent conversion price adjustment is accounted for as a contingent BCF. In accordance with ASC paragraph 470-20-35-1, changes to the conversion terms that would be triggered by future events not controlled by the issuer should be accounted as contingent conversions, and the intrinsic value of such conversion options would not be recognized until and unless a triggering event occurred. No contingent BCF was recognized for any of the Preferred Shares for the years ended December 31, 2015, 2016 and 2017, respectively.

As the Preferred Shares will become redeemable solely based on the passage of time should the contingent events not occur, the Company elected to recognize changes in the redemption value over the period from the date of issuance to the earliest redemption date of the Series Preferred Shares using the interest method.

On December, 31, 2016, the Existing Series Preferred Shares were currently redeemable and the carrying amounts were adjusted to its maximum redemption amount.

When the convertible notes were converted into Series G preferred shares in October 2017, the redemption price of the Series A preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares, Series E preferred shares and Series F preferred shares were modified to be the same as the Series G preferred shares. A negative accretion of RMB5,073,140 (US$779,727) was recorded as an increase to the net income attributable to ordinary shareholders for the year ended December 31, 2017 as a result of the change in redemption price. Series F preferred shares are not currently redeemable and this change in redemption price was considered a change in accounting estimate in accordance with ASC 480-10-S99-3A paragraph 15(a) and a new effective interest rate was determined and prospectively applied to accrete the carrying amount of the Series F preferred shares to the future expected contractual cash flows (the new redemption amount). The amendments to the Series A preferred shares, Series B preferred shares, Series C preferred shares, Series D preferred shares, Series E preferred shares and Series F preferred shares as a result of the issuance of Series G preferred shares is accounted for as a modification as the fair value of each related series of preferred share immediately after the amendment is not significantly different from its fair value immediately before the amendment.

F-68

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

With the assistance of an independent third party valuation firm, the Company determined that the change in fair value of a Series B preferred share immediately before and after the December 2017 amendment exceeded 10% and the modification of the Series B preferred shares was accounted for as an extinguishment. The RMB363,279 (US$55,835) difference between the fair value of the Series B preferred shares based on the amended terms and the carrying amount of the Series B preferred shares is recorded as a decrease to net income attributable to ordinary shareholders for the year ended December 31, 2017.

The movement in the carrying value of the Preferred Shares is as follows:

| Mezzanine equity | Series A RMB | Series A-1 RMB | Series B RMB | Series C RMB | Series D RMB | Series E RMB | Series F RMB | Series G RMB | Total RMB |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2014 | 645,466 | 6,826 | 1,167,980 | 862,452 | 2,759,339 | 1,883,989 | 2,495,991 | — | 9,822,043 |
| Accretion of Preferred Shares | 172,624 | — | 173,643 | 279,969 | 669,081 | 664,104 | 382,964 | — | 2,342,385 |
| Balance as of December 31, 2015 | 818,090 | 6,826 | 1,341,623 | 1,142,421 | 3,428,420 | 2,548,093 | 2,878,955 | — | 12,164,428 |
| Accretion of Preferred Shares | 407,063 | — | 211,157 | 651,248 | 1,605,881 | 1,533,824 | 465,566 | — | 4,874,739 |
| Balance as of December 31, 2016 | 1,225,153 | 6,826 | 1,552,780 | 1,793,669 | 5,034,301 | 4,081,917 | 3,344,521 | — | 17,039,167 |
| Issuance of Series G preferred shares | — | — | — | — | — | — | — | 10,272,358 | 10,272,358 |
| Accretion of Preferred Shares | (619,013) | — | (369,147) | (839,125) | (1,838,631) | (1,737,234) | 186,062 | 143,948 | (5,073,140) |
| Extinguishment and reissuance of Series B preferred shares | — | — | 363,279 | — | — | — | — | — | 363,279 |
| Balance as of December 31, 2017 | 606,140 | 6,826 | 1,546,912 | 954,544 | 3,195,670 | 2,344,683 | 3,530,583 | 10,416,306 | 22,601,664 |
| Balance as of December 31, 2017 US$) | 93,162 | 1,049 | 237,756 | 146,711 | 491,165 | 360,371 | 542,641 | 1,600,957 | 3,473,812 |

F-69

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**24.    ACCUMULATED OTHER COMPREHENSIVE INCOME**

The changes in accumulated other comprehensive income by component, net of tax, were as follows:

| | Foreign currency translation adjustment | Unrealized gain on available-for-sale debt securities | Total |
|---|---|---|---|
| | RMB | RMB | RMB |
| Balance at December 31, 2014 | 10,075 | — | 10,075 |
| Net current-period other comprehensive income | 151,062 | — | 151,062 |
| Balance at December 31, 2015 | 161,137 | — | 161,137 |
| Net current-period other comprehensive income | 195,255 | 2,978 | 198,233 |
| Balance at December 31, 2016 | 356,392 | 2,978 | 359,370 |
| Other comprehensive (loss) income before reclassification | (264,774) | 52,744 | (212,030) |
| Amounts reclassified from accumulated other comprehensive loss | — | (54,214) | (54,214) |
| Net current-period other comprehensive loss | (264,774) | (1,470) | (266,244) |
| Other comprehensive loss attributable to noncontrolling interests | — | — | — |
| Balance at December 31, 2017 | 91,618 | 1,508 | 93,126 |
| Balance at December 31, 2017 in US$ | 14,081 | 232 | 14,313 |

The amounts reclassified out of accumulated other comprehensive income represent realized gains on the available-for-sale investments upon their maturity, which were then recorded in "Interest income" in the consolidated statements of comprehensive loss. The amounts reclassified were determined on the basis of specific identification.

**25.    SUBSEQUENT EVENTS**

The subsequent events have been evaluated through February 27, 2018, the date the consolidated financial statements were issued.

In January 2018, the Company and Baidu agreed to terminate the traffic acquisition service contract in exchange for Baidu paying a fee of US$27,000 to the Company. The excess of the fee received by the Company over the book value of the recorded favorable contract asset will be accounted for as a deemed contribution from the controlling shareholder.

In January 2018, the Company entered into a master business cooperation agreement with Baidu and a loan agreement whereby Baidu provided the Company with an interest-free loan of RMB650,000 (US$99,903) that will mature in January 2023.

F-70

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

In February 2018, the Company entered into a share purchase agreement with Baidu, pursuant to which the Company will issue to Baidu an aggregate of 36,860,691 Class B ordinary shares. The transaction is expected to close no later than May 31, 2018. As consideration for the issuance of such shares and subject to the conditions set forth in the share purchase agreement, Baidu agreed to (i) undertake certain non-compete obligations towards the Company with respect to the online movie ticket and show ticket booking business of Baidu and its affiliates; (ii) direct user traffic related to such ticket business to the Company; (iii) provide the Company with technological support with respect to the Company's ticket booking business; (iv) license certain domain names and certain intellectual property rights to the Company; and (v) enter into a ticket business cooperation agreement with the Company, which has been signed concurrently.

**26.   CONDENSED FINANCIAL INFORMATION OF THE PARENT COMPANY**

**Condensed Balance Sheets**

| | Note | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2016 | 2017 | 2017 |
| | | RMB | RMB | US$ |
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 199,217 | 95,890 | 14,738 |
| Short-term Investments | | — | 372,747 | 57,290 |
| Prepayments and other assets | | — | 851 | 131 |
| Due from the entities within the Group | | 1,346,835 | 6,083,603 | 935,033 |
| Amounts due from related parties | | 209,411 | — | — |
| **Total current assets** | | **1,755,463** | **6,553,091** | **1,007,192** |
| **Non-current assets:** | | | | |
| Due from the entities within the Group | | — | 1,614,857 | 248,199 |
| Prepayments and other assets | | — | 130,116 | 19,998 |
| **Total non-current assets** | | **—** | **1,744,973** | **268,197** |
| **Total assets** | | **1,755,463** | **8,298,064** | **1,275,389** |
| **LIABILITIES, MEZZANINE EQUITY AND SHAREHOLDERS' DEFICIT** | | | | |
| **Current liabilities** | | | | |
| Accrued expenses and other liabilities | | 20,969 | 19,284 | 2,964 |
| **Total liabilities** | | **20,969** | **19,284** | **2,964** |
| **Commitments and contingencies** | 16 | | | |
| **Mezzanine equity:** | | | | |
| Series A redeemable convertible preferred shares (par value of US$0.00001 per share; 200,000,000 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 1,225,153 | 606,140 | 93,162 |
| Series A-1 redeemable convertible preferred shares (par value of US$0.00001 per share; 6,064,174 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 6,826 | 6,826 | 1,049 |

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

| | Note | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2016 | 2017 | 2017 |
| | | RMB | RMB | US$ |
| Series B redeemable convertible preferred shares (par value of US$0.00001 per share; 123,103,264 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 1,552,780 | 1,546,912 | 237,756 |
| Series C redeemable convertible preferred shares (par value of US$0.00001 per share; 302,891,196 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 1,793,669 | 954,544 | 146,711 |
| Series D redeemable convertible preferred shares (par value of US$0.00001 per share; 848,682,647 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 5,034,301 | 3,195,670 | 491,165 |
| Series E redeemable convertible preferred shares (par value of US$0.00001 per share; 686,646,383 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 4,081,917 | 2,344,683 | 360,371 |
| Series F redeemable convertible preferred shares (par value of US$0.00001 per share; 546,999,817 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | 23 | 3,344,521 | 3,530,583 | 542,641 |
| Series G redeemable convertible preferred shares (par value of US$0.00001 per share; nil and 1,014,436,019 shares authorized, issued and outstanding as of December 31, 2016 and 2017, respectively) | | — | 10,416,306 | 1,600,957 |
| **Total mezzanine equity** | | **17,039,167** | **22,601,664** | **3,473,812** |
| **Shareholders' deficit:** | | | | |
| Ordinary shares (par value of US$0.00001 per share; 3,500,000,000 and 10,000,000,000 shares authorized; 342,548,237 shares issued and outstanding as of December 31, 2016 and 2017, respectively) | 17 | 23 | 23 | 4 |
| Additional paid-in capital | | 325,730 | 600,834 | 92,346 |
| Accumulated deficit | 18 | (15,989,796) | (15,016,867) | (2,308,050) |
| Accumulated other comprehensive income | 24 | 359,370 | 93,126 | 14,313 |
| **Total shareholders' deficit** | | **(15,304,673)** | **(14,322,884)** | **(2,201,387)** |
| **Total liabilities, mezzanine equity and shareholders' deficit** | | **1,755,463** | **8,298,064** | **1,275,389** |

F-72

Table of Contents

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

**Condensed Statements of Comprehensive Loss**

|  | Year ended December 31, | | | |
|---|---|---|---|---|
|  | 2015 | 2016 | 2017 | 2017 |
|  | RMB | RMB | RMB | US$ |
| **Operating costs and expenses:** | | | | |
| Selling, general and administrative | (12,379) | (4,364) | (6,058) | (931) |
| **Operating loss** | | | | |
| Share of losses of subsidiaries, VIEs and VIEs' subsidiaries | (2,552,979) | (2,991,812) | (3,963,264) | (609,143) |
| Interest income | 4,721 | 23,759 | 101,851 | 15,654 |
| Interest expenses | (92) | (13) | (116,989) | (17,981) |
| Foreign exchange (loss)/gain, net | (14,383) | (102,066) | 247,528 | 38,044 |
| Other income, net | — | 474 | — | — |
| **Net loss** | **(2,575,112)** | **(3,074,022)** | **(3,736,932)** | **(574,357)** |
| Accretion of redeemable convertible preferred shares | (2,342,385) | (4,874,739) | 5,073,140 | 779,727 |
| Extinguishment and reissuance of Series B preferred shares | — | — | (363,279) | (55,835) |
| **Net loss attributable to ordinary shareholders** | **(4,917,497)** | **(7,948,761)** | **972,929** | **149,535** |
| **Other comprehensive income** | | | | |
| Foreign currency translation adjustments | 151,062 | 195,255 | (264,774) | (40,695) |
| Unrealized gains/(losses) on available-for-sale debt securities | — | 2,978 | (1,470) | (226) |
| **Total other comprehensive income/(loss), net of tax** | **151,062** | **198,233** | **(266,244)** | **(40,921)** |
| **Comprehensive loss** | **(2,424,050)** | **(2,875,789)** | **(4,003,176)** | **(615,278)** |

**Condensed Statements of Cash Flows**

|  | Year ended December 31, | | | |
|---|---|---|---|---|
|  | 2015 | 2016 | 2017 | 2017 |
|  | RMB | RMB | RMB | US$ |
| Net cash(used in)/provided by operating activities | (54,273) | 15,882 | 55,245 | 8,491 |
| Net cash provided by/(used for) investing activities | 1,006,149 | (859,698) | (10,468,969) | (1,609,051) |
| Net cash provided by financing activities | — | — | 10,528,236 | 1,618,160 |
| Effect of exchange rate changes on cash and cash equivalents | 471 | 2,324 | (217,839) | (33,481) |
| **Net increase/(decrease) in cash and cash equivalents** | **952,347** | **(841,492)** | **(103,327)** | **(15,881)** |
| Cash and cash equivalents at the beginning of the year | 88,362 | 1,040,709 | 199,217 | 30,619 |
| Cash and cash equivalents at the end of the year | 1,040,709 | 199,217 | 95,890 | 14,738 |

**Basis of presentation**

For the presentation of the parent company only condensed financial information, the Company records its investments in subsidiaries and VIEs under the equity method of accounting as prescribed in ASC 323,

F-73

**Table of Contents**

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 AND 2017—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Investments—Equity Method and Joint Ventures*. The subsidiaries, VIEs and VIEs' subsidiaries losses as "Share of losses of subsidiaries, VIEs and VIEs' subsidiaries" on the condensed statements of comprehensive loss. Under the equity method of accounting, the Company's carrying amount of its investment in subsidiaries for its share of the subsidiaries, VIEs and VIEs' subsidiaries cumulative losses was reduced to nil in the year ended December 31, 2015 and the carrying amount of "Due from the entities within the Group" was further adjusted as the Company committed to provide financial support to its VIEs as disclosed in note 1.

The subsidiaries did not pay any dividends to the Company for the periods presented.

The Company does not have significant commitments or long-term obligations as of the period end other than those presented.

The parent company only financial statements should be read in conjunction with the Company's consolidated financial statements.

F-74

**Table of Contents**

[Page intentionally left blank for graphics]

**Table of Contents**

Table of Contents

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

**ITEM 6.        INDEMNIFICATION OF DIRECTORS AND OFFICERS.**

Cayman Islands law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime.

The post-offering amended and restated memorandum and articles of association that we will adopt and which will become effective immediately prior to the completion of this offering provide that we shall indemnify our directors and officers (each an indemnified person) against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such indemnified person, other than by reason of such person's own dishonesty, willful default or fraud, in or about the conduct of our company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such indemnified person in defending (whether successfully or otherwise) any civil proceedings concerning our company or its affairs in any court whether in the Cayman Islands or elsewhere.

Pursuant to the indemnification agreements the form of which is filed as Exhibit 10.3 to this registration statement, we agree to indemnify each of our directors and executive officers against certain liabilities and expenses incurred by such persons in connection with claims made by reason of their being such a director or officer.

The underwriting agreement, the form of which will be filed as Exhibit 1.1 to this registration statement, will also provide for indemnification by the underwriters of us and our officers and directors for certain liabilities, including liabilities arising under the Securities Act, but only to the extent that such liabilities are caused by information relating to the underwriters furnished to us in writing expressly for use in this registration statement and certain other disclosure documents.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

**ITEM 7.        RECENT SALES OF UNREGISTERED SECURITIES.**

During the past three years, we have issued the following securities. We believe that each of the following issuances was exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act regarding transactions not involving a public offering or in reliance on Regulation S under the Securities Act regarding sales by an issuer in offshore transactions. No underwriters were involved in these issuances of securities.

| Securities/Purchaser | Date of Issuance | Number of Securities | Consideration |
|---|---|---|---|
| **Convertible notes** | | | |
| Baidu Holdings | January 25, 2017 | US$300,000,000 principal amount of G1 Note | US$300,000,000 |
| Harvest Rewards Fund LP | January 25, 2017 | US$25,000,000 principal amount of G1 Note | US$25,000,000 |

II-1

**Table of Contents**

| Securities/Purchaser | Date of Issuance | Number of Securities | Consideration |
|---|---|---|---|
| HH RSV-V Holdings Limited | January 25, 2017 | US$350,000,000 principal amount of G2 Note | US$350,000,000 |
| Gorgeous Rainbow Limited | January 25, 2017 | US$220,000,000 principal amount of G2 Note | US$220,000,000 |
| Run Liang Tai (Hong Kong) Investment Company Limited | January 25, 2017 | US$130,800,000 principal amount of G2 Note | US$130,800,000 |
| Eastone International Co., Ltd. | January 25, 2017 | US$114,200,000 principal amount of G2 Note | US$114,200,000 |
| Honey Best Limited | January 25, 2017 | US$80,000,000 principal amount of G2 Note | US$80,000,000 |
| IDG Infinity Financial Limited | January 25, 2017 | US$50,000,000 principal amount of G2 Note | US$50,000,000 |
| VMS Video Holdings Limited | January 25, 2017 | US$80,000,000 principal amount of G2 Note | US$80,000,000 |
| Madrone Opportunities Fund | January 25, 2017 | US$50,000,000 principal amount of G2 Note | US$50,000,000 |
| Silverlink Capital LP | January 25, 2017 | US$40,000,000 principal amount of G2 Note | US$40,000,000 |
| Xiang He Fund I, L.P. | January 25, 2017 | US$10,000,000 principal amount of G2 Note | US$10,000,000 |
| SCC Growth IV Holdco A, Ltd. | January 25, 2017 | US$80,000,000 principal amount of G2 Note | US$80,000,000 |
| **Ordinary shares** | | | |
| Cannes Ventures Limited | February 2, 2018 | 7,500,251 | US$2,746,624 of exercise price |
| **Preferred shares** | | | |
| Baidu Holdings | October 26, 2017 | 198,909,024 | US$300,000,000 principal amount of G1 Note |
| Harvest Rewards Fund LP | October 26, 2017 | 16,575,752 | US$25,000,000 principal amount of G1 Note |
| HH RSV-V Holdings Limited | October 26, 2017 | 232,060,527 | US$350,000,000 principal amount of G2 Note |
| Gorgeous Rainbow Limited | October 26, 2017 | 145,866,617 | US$220,000,000 principal amount of G2 Note |
| Run Liang Tai (Hong Kong) Investment Company Limited | October 26, 2017 | 86,724,334 | US$130,800,000 principal amount of G2 Note |

II-2

Table of Contents

| Securities/Purchaser | Date of Issuance | Number of Securities | Consideration |
|---|---|---|---|
| Eastone International Co., Ltd. | October 26, 2017 | 75,718,035 | US$114,200,000 principal amount of G2 Note |
| Honey Best Limited | October 26, 2017 | 53,042,406 | US$80,000,000 principal amount of G2 Note |
| IDG Infinity Financial Limited | October 26, 2017 | 33,151,504 | US$50,000,000 principal amount of G2 Note |
| VMS Video Holdings Limited | October 26, 2017 | 53,042,406 | US$80,000,000 principal amount of G2 Note |
| Madrone Opportunities Fund | October 26, 2017 | 33,151,504 | US$50,000,000 principal amount of G2 Note |
| Silverlink Capital LP | October 26, 2017 | 26,521,203 | US$40,000,000 principal amount of G2 Note |
| Xiang He Fund I, L.P. | October 26, 2017 | 6,630,301 | US$10,000,000 principal amount of G2 Note |
| SCC Growth IV Holdco A, Ltd. | October 26, 2017 | 53,042,406 | US$80,000,000 principal amount of G2 Note |
| **Options and Restricted Share Units** | | | |
| Certain directors, officers employees and employees of Baidu | December 15, 2014 to December 15, 2017 | Outstanding options to purchase 298,766,115 ordinary shares and 720,000 outstanding restricted share units | Past and future services to us |

**ITEM 8.      EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

(a)     Exhibits

See Exhibit Index beginning on page II-5 of this registration statement.

The agreements included as exhibits to this registration statement contain representations and warranties by each of the parties to the applicable agreement. These representations and warranties were made solely for the benefit of the other parties to the applicable agreement and (i) were not intended to be treated as categorical statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate; (ii) may have been qualified in such agreement by disclosure that was made to the other party in connection with the negotiation of the applicable agreement; (iii) may apply contract standards of "materiality" that are different from "materiality" under the applicable securities laws; and (iv) were made only as of the date of the applicable agreement or such other date or dates as may be specified in the agreement.

We acknowledge that, notwithstanding the inclusion of the foregoing cautionary statements, we are responsible for considering whether additional specific disclosure of material information regarding material contractual provisions is required to make the statements in this registration statement not misleading.

II-3

**Table of Contents**

(b)    Financial Statement Schedules

Schedules have been omitted because the information required to be set forth therein is not applicable or is shown in the Consolidated Financial Statements or the Notes thereto.

**ITEM 9.    UNDERTAKINGS.**

The undersigned registrant hereby undertakes to provide to the underwriter at the closing specified in the underwriting agreements, certificates in such denominations and registered in such names as required by the underwriter to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the provisions described in Item 6, or otherwise, the registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) For the purpose of determining liability under the Securities Act to any purchaser, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(4) For the purpose of determining any liability of the registrant under the Securities Act to any purchaser in the initial distribution of the securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i)    Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

II-4

**Table of Contents**

(ii)     Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii)     The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv)     Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

<div align="center">II-5</div>

Table of Contents

**iQIYI, Inc.**

**Exhibit Index**

| Exhibit Number | Description of Document |
|---|---|
| 1.1* | Form of Underwriting Agreement |
| 3.1 | Eighth Amended and Restated Memorandum and Articles of Association of the Registrant, as currently in effect |
| 3.2 | Form of Ninth Amended and Restated Memorandum and Articles of Association of the Registrant (effective immediately prior to the closing of this offering) |
| 4.1* | Registrant's Specimen American Depositary Receipt (included in Exhibit 4.3) |
| 4.2 | Registrant's Specimen Certificate for Class A Ordinary Shares |
| 4.3* | Form of Deposit Agreement, among the Registrant, the depositary and the holders and beneficial owners of American Depositary Shares issued thereunder |
| 4.4 | Shareholders Agreement between the Registrant and other parties thereto dated October 26, 2017 |
| 5.1 | Form of opinion of Walkers regarding the validity of the ordinary shares being registered and certain Cayman Islands tax matters |
| 8.1 | Form of opinion of Walkers regarding certain Cayman Islands tax matters (included in Exhibit 5.1) |
| 8.2 | Opinion of Jingtian & Gongcheng regarding certain PRC tax matters (included in Exhibit 99.2) |
| 10.1 | 2010 Equity Incentive Plan |
| 10.2 | 2017 Share Incentive Plan |
| 10.3 | Form of Indemnification Agreement between the Registrant and its directors and executive officers |
| 10.4 | Form of Employment Agreement between the Registrant and its executive officers |
| 10.5 | Master Business Cooperation Agreement between Baidu Holdings and iQIYI, Inc. dated January 19, 2018 |
| 10.6 | Note Purchase Agreement among iQIYI, Inc., Baidu Holdings and other parties thereto dated January 11, 2017 |
| 10.7 | English translation of the amended and restated Shareholder Voting Rights Trust Agreement between Beijing QIYI Century and Mr. Xiaohua Geng dated January 30, 2013 |
| 10.8 | English translation of the amended and restated Share Pledge Agreement between Beijing QIYI Century and Mr. Xiaohua Geng dated January 30, 2013 |
| 10.9 | English translation of the Commitment Letter from iQIYI, Inc. and Beijing QIYI Century to Beijing iQIYI dated January 30, 2013 |
| 10.10 | English translation of the amended and restated Exclusive Purchase Option Agreement among iQIYI, Inc., Beijing QIYI Century, Beijing iQIYI and Mr. Xiaohua Geng dated January 30, 2013 |
| 10.11 | English translation of the amended and restated Loan Agreement between Beijing QIYI Century and Mr. Xiaohua Geng dated January 30, 2013 |
| 10.12 | English translation of the amended and restated Business Operation Agreement among Beijing QIYI Century, Beijing iQIYI and Mr. Xiaohua Geng dated January 30, 2013 |

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 10.13 | English translation of Power of Attorney by Beijing QIYI Century to iQIYI, Inc. dated January 30, 2013 |
| 10.14 | English translation of Loan Agreement among Beijing QIYI Century, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 |
| 10.15 | English translation of Exclusive Purchase Option Agreement among iQIYI, Inc., Beijing QIYI Century, Shanghai iQIYI, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 |
| 10.16 | English translation of Share Pledge Agreement among Beijing QIYI Century, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 |
| 10.17 | English translation of Shareholder Voting Rights Trust Agreement among Mr. Xiaohua Geng, Dr. Yu Gong and Beijing QIYI Century dated October 25, 2013 |
| 10.18 | English translation of Business Operation Agreement among Beijing QIYI Century, Shanghai iQIYI, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 |
| 10.19 | English translation of Exclusive Technology Consulting and Service Agreement among Beijing QIYI Century and Shanghai iQIYI dated October 25, 2013 |
| 10.20 | English translation of Commitment Letter between iQIYI, Inc. and Shanghai iQIYI dated October 25, 2013 |
| 10.21 | English translation of Business Operation Agreement among Beijing QIYI Century, Shanghai Zhong Yuan and Dr. Yu Gong dated January 14, 2014 |
| 10.22 | English translation of Loan Agreement between Beijing QIYI Century and Dr. Yu Gong dated January 14, 2014 |
| 10.23 | English translation of Commitment Letter from iQIYI, Inc. to Shanghai Zhong Yuan dated January 14, 2014 |
| 10.24 | English translation of Exclusive Technology Consulting and Service Agreement between Beijing QIYI Century and Shanghai Zhong Yuan dated January 14, 2014 |
| 10.25 | English translation of Exclusive Purchase Option Agreement among iQIYI, Inc., Beijing QIYI Century, Dr. Yu Gong and Shanghai Zhong Yuan dated January 14, 2014 |
| 10.26 | English translation of Shareholder Voting Rights Trust Agreement between Beijing QIYI Century and Dr. Yu Gong dated January 14, 2014 |
| 10.27 | English translation of Share Pledge Agreement between Beijing QIYI Century and Dr. Yu Gong dated January 14, 2014 |
| 10.28 | English translation of Exclusive Management Consulting and Business Cooperation Agreement among iQIYI New Media, Beijing iQIYI Cinema, Dr. Yu Gong and Mr. Xianghua Yang dated July 27, 2017 |
| 10.29 | English translation of Exclusive Share Purchase Agreement among iQIYI New Media, Dr. Yu Gong, Mr. Xianghua Yang and Beijing iQIYI Cinema dated July 27, 2017 |
| 10.30 | English translation of Loan Agreement between iQIYI New Media and Mr. Xianghua Yang dated July 27, 2017 |
| 10.31 | English translation of Loan Agreement between iQIYI New Media and Dr. Yu Gong dated July 27, 2017 |
| 10.32 | English translation of Share Pledge Agreement among iQIYI New Media, Dr. Yu Gong and Beijing iQIYI Cinema dated July 27, 2017 |

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 10.33 | English translation of Share Pledge Agreement among iQIYI New Media, Mr. Xianghua Yang and Beijing iQIYI Cinema dated July 27, 2017 |
| 10.34 | English translation of Power of Attorney by Mr. Xianghua Yang to iQIYI New Media dated July 27, 2017 |
| 10.35 | English translation of Power of Attorney by Dr. Yu Gong to iQIYI New Media dated July 27, 2017 |
| 10.36 | English translation of Spousal Consent Letter of Ms. Congyu Lin dated July 27, 2017 |
| 10.37 | English translation of Spousal Consent Letter of Ms. Yihong Mou dated July 27, 2017 |
| 10.38 | English translation of Power of Attorney by iQIYI New Media to QIYI, Inc. dated July 27, 2017 |
| 10.39 | English translation of Commitment Letter by QIYI, Inc. to Beijing iQIYI Cinema dated July 27, 2017 |
| 10.40 | English translation of Exclusive Management Consulting and Business Cooperation Agreement among iQIYI New Media, iQIYI Pictures, Dr. Yu Gong and Mr. Ning Ya dated August 30, 2017 |
| 10.41 | English translation of Exclusive Share Purchase Agreement among iQIYI New Media, iQIYI Pictures, Dr. Yu Gong and Mr. Ning Ya dated August 30, 2017 |
| 10.42 | English translation of Loan Agreement between iQIYI New Media and Mr. Ning Ya dated August 30, 2017 |
| 10.43 | English translation of Loan Agreement between iQIYI New Media and Dr. Yu Gong dated August 30, 2017 |
| 10.44 | English translation of Share Pledge Agreement among iQIYI New Media, Mr. Ning Ya and iQIYI Pictures dated August 30, 2017 |
| 10.45 | English translation of Share Pledge Agreement among iQIYI New Media, Dr. Yu Gong and iQIYI Pictures dated August 30, 2017 |
| 10.46 | English translation of Power of Attorney by Mr. Ning Ya to iQIYI New Media dated August 30, 2017 |
| 10.47 | English translation of Power of Attorney by Dr. Yu Gong to iQIYI New Media dated August 30, 2017 |
| 10.48 | English translation of Spousal Consent Letter of Ms. Yihong Mou dated August 30, 2017 |
| 10.49 | English translation of Exclusive Technology Consulting and Service Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 |
| 10.50 | English translation of Software Licensing Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 |
| 10.51 | English translation of Trademark Licensing Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 |
| 10.52 | English translation of Business Cooperation Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 |
| 10.53 | English translation of Renminbi Entrusted Loan Agreement among Baidu Times Network Technology (Beijing) Co., Ltd, Bank of China Limited Beijing Zhongguancun Center Branch and Beijing QIYI Century dated May 13, 2016 |
| 10.54 | English translation of Renminbi Entrusted Loan Agreement among Baidu Times Network Technology (Beijing) Co., Ltd, Bank of China Limited Beijing Zhongguancun Center Branch and Beijing QIYI Century dated June 24, 2016 |
| 10.55 | English translation of China Merchants Bank Online "Corporate Bank" Entrusted Loan Agreement between China Merchants Bank Co., Ltd. Beijing Shangdi Branch and Beijing iQIYI dated August 31, 2016 |

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 10.56 | English translation of China Merchants Bank Online "Corporate Bank" Entrusted Loan Agreement between China Merchants Bank Co., Ltd. Beijing Shangdi Branch and Beijing QIYI Century dated December 12, 2016 |
| 10.57 | English translation of Working Capital Loan Agreement between Shanghai iQIYI and Bank of China Limited Shanghai Jingan Branch dated April 10, 2017 |
| 10.58 | English translation of Loan Agreement between Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing QIYI Century dated April 19, 2017 |
| 10.59 | English translation of Comprehensive Facility Contract between Beijing iQIYI and China Minsheng Banking Corporation Limited Beijing Branch dated June 12, 2017 |
| 10.60 | English translation of Credit Facility Agreement between China Merchants Bank Co., Ltd. Beijing Shangdi Branch and Beijing iQIYI dated August 15, 2017 |
| 10.61 | English translation of Supplemental Agreement among China Merchants Bank Co., Ltd. Beijing Shangdi Branch, Beijing iQIYI and Shanghai iQIYI dated September 30, 2017, with respect to the Credit Facility Agreement between China Merchants Bank Co., Ltd. Beijing Shangdi Branch and Beijing iQIYI |
| 10.62 | English translation of Supplemental Agreement among China Merchants Bank Co., Ltd. Beijing Shangdi Branch, Beijing iQIYI and Beijing QIYI Century dated September 30, 2017 with respect to the Credit Agreement between China Merchants Bank Co., Ltd. Beijing Shangdi Branch and Beijing iQIYI |
| 10.63 | English translation of Loan Agreement between Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing QIYI Century dated January 19, 2018 |
| 10.64 | Share Purchase Agreement dated February 12, 2018 by and between iQIYI, Inc. and Baidu Holdings |
| 10.65 | English translation of Ticket Business Cooperation Agreement dated February 12, 2018 by and between Baidu Holdings and iQIYI, Inc. |
| 21.1 | List of Significant Subsidiaries and Consolidated Affiliated Entities of iQIYI, Inc. |
| 23.1 | Consent of Ernst & Young Hua Ming LLP, an independent registered public accounting firm |
| 23.2 | Form of consent of Walkers (included in Exhibit 5.1) |
| 23.3 | Consent of Jingtian & Gongcheng (included in Exhibit 99.2) |
| 24.1 | Powers of Attorney (included on signature page) |
| 99.1 | Form of Code of Business Conduct and Ethics of the Registrant |
| 99.2 | Opinion of Jingtian & Gongcheng regarding certain PRC law matters |
| 99.3 | Consent of iResearch |
| 99.4 | Consent of Sam Hanhui Sun, an independent director appointee |

\*    To be filed by amendment.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F-1 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Beijing, China, on February 27, 2018.

<div align="right">

**iQIYI, INC.**

By: _____  /s/ Robin Yanhong Li
                    Name: Robin Yanhong Li
                    Title: Chairman of the Board of Directors

</div>

**POWER OF ATTORNEY**

Each person whose signature appears below constitutes and appoints each of Yu Gong and Xiaodong Wang as attorneys-in-fact with full power of substitution for him or her in any and all capacities to do any and all acts and all things and to execute any and all instruments which said attorney and agent may deem necessary or desirable to enable the registrant to comply with the Securities Act of 1933, as amended, or the Securities Act, and any rules, regulations and requirements of the Securities and Exchange Commission thereunder, in connection with the registration under the Securities Act of ordinary shares of the registrant, or the Shares, including, without limitation, the power and authority to sign the name of each of the undersigned in the capacities indicated below to the Registration Statement on Form F-1, or the Registration Statement, to be filed with the Securities and Exchange Commission with respect to such Shares, to any and all amendments or supplements to such Registration Statement, whether such amendments or supplements are filed before or after the effective date of such Registration Statement, to any related Registration Statement filed pursuant to Rule 462(b) under the Securities Act, and to any and all instruments or documents filed as part of or in connection with such Registration Statement or any and all amendments thereto, whether such amendments are filed before or after the effective date of such Registration Statement; and each of the undersigned hereby ratifies and confirms all that such attorney and agent shall do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Robin Yanhong Li<br>Robin Yanhong Li | Chairman of the Board of Directors | February 27, 2018 |
| /s/ Qi Lu<br>Qi Lu | Director | February 27, 2018 |
| /s/ Yu Gong<br>Yu Gong | Chief Executive Officer (Principal Executive Officer) and Director | February 27, 2018 |
| /s/ Xuyang Ren<br>Xuyang Ren | Director | February 27, 2018 |
| /s/ Victor Zhixiang Liang<br>Victor Zhixiang Liang | Director | February 27, 2018 |
| /s/ Chuan Wang<br>Chuan Wang | Director | February 27, 2018 |
| /s/ Xiaodong Wang<br>Xiaodong Wang | Chief Financial Officer (Principal Financial and Accounting Officer) | February 27, 2018 |

II-10

**Table of Contents**

**SIGNATURE OF AUTHORIZED REPRESENTATIVE IN THE UNITED STATES**

Pursuant to the Securities Act of 1933, the undersigned, the duly authorized representative in the United States of iQIYI, Inc. has signed this registration statement or amendment thereto in New York on February 27, 2018.

**Authorized U.S. Representative**

By: _____     /s/ Giselle Manon

Name: Giselle Manon
Title: Service of Process Officer

II-11

Exhibit 3.1

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**EIGHTH AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**OF**

**iQIYI, INC.**

**(as adopted by Special Resolution passed on November 30, 2017)**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

EIGHTH AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

iQIYI, INC.

(as adopted by Special Resolution passed on November 30, 2017)

1. The name of the Company is iQiyi, Inc. (the "**Company**").

2. The registered office of the Company will be situated at the offices of **Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands** or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$137,288.235divided into (a) 10,000,000,000 Ordinary Shares of a par value of US$0.00001 each, (b) 200,000,000 redeemable, convertible Series A Preferred Shares of a par value of US$0.00001 each, (c) 6,064,174 convertible Series A-1 Junior Preferred Shares of a par value of US$0.00001 each, (d) 123,103,264 redeemable convertible Series B Preferred Shares of a par value of US$0.00001 each, (e) 302,891,196 redeemable convertible Series C Preferred Shares of a par value of US$0.00001 each, (f) 848,682,647 redeemable convertible Series D Preferred Shares of a par value of US$0.00001 each, (g) 686,646,383 redeemable convertible Series E Preferred Shares of a par value of US$0.00001 each, (h) 546,999,817 redeemable convertible Series F Preferred Shares of a par value of US$0.00001 each, (i) 215,484,776 redeemable convertible Series G1 Preferred Shares of a par value of US$0.00001 each and (j) 798,951,243 redeemable convertible Series G2 Preferred Shares of a par value of US$0.00001 each.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

9. Capitalized terms that are not defined in this Memorandum of Association bear the same meaning as those given in the Articles of Association of the Company.

1

COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

EIGHTH AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

iQIYI, INC.

(as adopted by Special Resolution passed on November 30, 2017)

TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to iQiyi, Inc. (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

INTERPRETATION

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Absent Director**" has the meaning given in Article 124;

"**Additional Ordinary Shares**" has the meaning given in Article 23;

"**Adverse Legal Development**" has the meaning given in Article 62(b);

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time;

"**Attorney**" has the meaning given in Article 112;

"**Authorised Signatory**" has the meaning given in Article 112;

"**Available Proceeds**" has the meaning given in Article 11(e);

"**Baidu Person**" has the meaning given in Article 85(a);

"**Baidu Shareholders**" has the meaning ascribed to it under the Shareholders Agreement;

"**Beijing WFOE**" means Beijing Qiyi Century Science & Technology Co., Ltd. ("北京奇艺世纪科技有限公司"), a wholly foreign-owned enterprise established under the laws of the PRC;

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting or non-voting) of, such Person's authorized share capital or capital stock (including ordinary shares and preferred shares) and any and all rights, warrants or options exchangeable for or convertible into such share capital or capital stock;

1

"**Chongqing WFOE**" means Chongqing Qiyi Tianxia Science & Technology Co., Ltd. (" 重庆奇艺天下科技有限公司 "), a wholly foreign-owned enterprise established under the laws of the PRC;

"**Class**" or "**Classes**" means any class or classes of Share as may from time to time be issued by the Company, consisting of only two classes (the Ordinary Shares and the Preferred Shares) as at the date of adoption of the Memorandum of Association and these Articles;

"**Conversion Rights**" has the meaning given in Article 12;

"**Deemed Liquidation Event**" has the meaning given in Article 11(d);

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof;

"**Effective Conversion Price**" has the meaning given in Article 22;

"**Existing Series Preferred Shares**" means collectively, the Series A Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares, the Series D Preferred Shares and the Series E Preferred Shares;

"**Governmental Authority**" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any stock exchange or its governing body;

"**Group Entity**" means a Person (other than a natural person) (i) that is controlled by the Company or (ii) whose revenue, expenses, assets and liabilities (or portions thereof) are consolidated with those of the Company and are recorded on the books of the Company for financial reporting purposes in accordance with the US GAAP. For the avoidance of doubt, the term "**Group Entity**" includes the HK Subsidiary, the Beijing WFOE, the Chongqing WFOE, the PRC Entity 1, the PRC Entity 2, the PRC Entity 3, the PRC Entity 4 and each of their respective Subsidiaries as well as all other Subsidiaries of the Company;

"**HK Subsidiary**" means Qiyi.com HK Limited, a company limited by shares incorporated under the laws of Hong Kong;

"**Initial Public Offering**" has the meaning ascribed to it under the Shareholders Agreement;

"**Irrevocable Proxy**" means each irrevocable voting proxy and power of attorney dated as of October 26, 2017 executed and delivered to Baidu Holdings Limited by each holder of Series G2 Preferred Shares, or any other irrevocable voting proxy and power of attorney granted by a Member to a Baidu Person from time to time;

"**Law**" means the Companies Law (as amended) of the Cayman Islands;

"**Legend**" has the meaning given in Article 31;

"**Material Group Entity**" shall (i) mean any Group Entity that directly or indirectly (x) owns or controls all or substantially all of the assets of the Company and all Group Entities, taken as a whole, or (y) conducts all or substantially all of the operations of the Company and all Group Entities, taken as a whole, and (ii) include, without limitation, each of the Beijing WFOE, the PRC Entity 1, the PRC Entity 2, the PRC Entity 3 and the PRC Entity 4. For the avoidance of doubt, neither the HK Subsidiary nor the Chongqing WFOE is a Material Group Entity;

2

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time;

"**Office**" means the registered office of the Company as required by the Law;

"**Ordinary Director**" has the meaning given in Article 99;

"**Ordinary Resolution**" means a resolution:

(a)    passed by a simple majority of such Shareholders as, being entitled to do so, in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed;

"**Ordinary Share**" means an Ordinary Share of par value of US$0.00001 each in the capital of the Company;

"**Ordinary Share Equivalents**" means any security or obligation which is by its terms, directly or indirectly, convertible into or exchangeable or exercisable for Ordinary Shares, including the Series A Preferred Shares, the Series A-1 Junior Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares, the Series D Preferred Shares, the Series E Preferred Shares, the Series F Preferred Shares and the Series G Preferred Shares, and any option, warrant or other subscription or purchase right with respect to Ordinary Shares or any Ordinary Share Equivalent;

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up;

"**Person**" means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity;

"**PRC Entity 1**" means Beijing Dingxin Tianxia Science & Technology Co., Ltd. (" 北京鼎新天下科技有限公司 "), a limited liability company organized under the laws of the PRC;

"**PRC Entity 2**" means Beijing IQIYI Science & Technology Co., Ltd.(" 北京爱奇艺科技有限公司 "), a limited liability company organized under the laws of the PRC;

"**PRC Entity 3**" means Shanghai IQIYI Culture Media Co., Ltd. (" 上海爱奇艺文化传媒有限公司 "), a limited liability company organized under the laws of the PRC;

"**PRC Entity 4**" means Shanghai Zhong Yuan Network Co., Ltd. (" 上海众源网络有限公司 "), a limited liability company organized under the laws of the PRC;

"**Preferred Shares**" means, collectively, the Series A Preferred Shares, the Series A-1 Junior Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares, the Series D Preferred Shares, the Series E Preferred Shares, the Series F Preferred Shares and the Series G Preferred Shares;

3

"**Prominent**" means Prominent TMT Limited, a business company incorporated and existing under the laws of British Virgin Islands;

"**Redemption Date**" has the meaning given in Article 62(c);

"**Redemption Notice**" has the meaning given in Article 62(a);

"**Redemption Price**" has the meaning given in Article 62(a);

"**Redemption Trigger Event**" has the meaning given in Article 62(b);

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law;

"**Relevant Shares**" has the meaning given in Article 85(a);

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof;

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company;

"**Series A Conversion Price**" has the meaning given in Article 15;

"**Series A Original Issue Price**" means US$0.25 per Series A Preferred Share;

"**Series A Preferred Share**" means a redeemable, convertible Series A Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series A Preferred Shareholder**" means a Person whose name is registered in the Register as the holder of a Series A Preferred Share;

"**Series A-1 Conversion Price**" has the meaning given in Article 15;

"**Series A-1 Junior Preferred Share**" means a redeemable, convertible Series A-1 Junior Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series A-1 Liquidation Preference Amount**" has the meaning given in Article 11(b);

"**Series A-1 Original Issue Price**" means US$0.16 per Series A-1 Junior Preferred Share;

"**Series B Conversion Price**" has the meaning given in Article 15;

"**Series B Original Issue Price**" means US$0.934175 per Series B Preferred Share;

"**Series B Preferred Share**" means a redeemable, convertible Series B Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series B Preferred Shareholder**" means a Person whose name is registered in the Register as the holder of a Series B Preferred Share;

4

"**Series C Conversion Price**" has the meaning given in Article 15;

"**Series C Original Issue Price**" means US$0.36840704 per Series C Preferred Share;

"**Series C Preferred Share**" means a redeemable, convertible Series C Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series C Preferred Shareholder**" means a Person whose name is registered in the Register as the holder of a Series C Preferred Share;

"**Series D Conversion Price**" has the meaning given in Article 15;

"**Series D Original Issue Price**" means US$0.42336202 per Series D Preferred Share;

"**Series D Preferred Share**" means a redeemable, convertible Series D Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series D Preferred Shareholder**" means a Person whose name is registered in the Register as the holder of a Series D Preferred Share;

"**Series E Conversion Price**" has the meaning given in Article 15;

"**Series E Original Issue Price**" means US$0.42336202 per Series E Preferred Share;

"**Series E Preferred Share**" means a redeemable, convertible Series E Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series E Preferred Shareholder**" means a Person whose name is registered in the Register as the holder of a Series E Preferred Share;

"**Series F Conversion Price**" has the meaning given in Article 15;

"**Series F Liquidation Preference Amount**" has the meaning given in Article 11(a);

"**Series F Original Issue Price**" means US$0.73126167 per Series F Preferred Share;

"**Series F Preferred Share**" means a redeemable, convertible Series F Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series F Preferred Shareholder**" means a Person whose name is registered in the Register as the holder of a Series F Preferred Share;

"**Series G Conversion Price**" has the meaning given in Article 15;

"**Series G Liquidation Preference Amount**" has the meaning given in Article 11(a);

"**Series G Original Issue Price**" means US$1.51 per Series G Preferred Share;

"**Series G Preferred Share**" means, collectively, the Series G1 Preferred Shares and the Series G2 Preferred Shares;

"**Series G Preferred Shareholder**" means a Person whose name is registered in the Register as the holder of a Series G Preferred Share;

5

"**Series G1 Preferred Share**" means a redeemable, convertible Series G1 Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series G2 Preferred Share**" means a redeemable, convertible Series G2 Preferred Share of par value of US$0.00001 each in the capital of the Company having the rights, privileges, preference and authorities set forth in these Articles;

"**Series Preferred Director**" has the meaning given in Article 98;

"**Series Preferred Liquidation Preference Amount**" has the meaning given in Article 11(a);

"**Series Preferred Shares**" means collectively, the Series A Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares, the Series D Preferred Shares, the Series E Preferred Shares, the Series F Preferred Shares and the Series G Preferred Shares;

"**Share**" means a share in the capital of the Company and includes a fraction of a share. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include each of an Ordinary Share, a Series A Preferred Share, a Series A-1 Junior Preferred Share, a Series B Preferred Share, a Series C Preferred Share, a Series D Preferred Share, a Series E Preferred Share, a Series F Preferred Share and a Series G Preferred Share;

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber;

"**Shareholders Agreement**" means that certain Sixth Amended and Restated Shareholders Agreement dated October 26, 2017 among the Company and the parties named therein, as may be amended from time to time in accordance with the provisions thereof;

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law;

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means;

"**Significant Shareholder**" has the meaning ascribed to it under the Shareholders Agreement. For the avoidance of doubt, once Xiaomi and Prominent jointly hold less than 6.25% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis, all the rights held by the Significant Shareholder under the Memorandum of Association and these Articles (including without limitation, Articles 10 and 98) shall terminate immediately without any further action by the Company or any of the Shareholders;

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; provided that notwithstanding any other provision of these Articles, for any general meeting of the Company convened to consider a matter listed in Article 10 and which requires a Special Resolution pursuant to the Law, the quorum shall be one or more holders of at least 30% of the issued Series Preferred Shares outstanding as at the date of such meeting; or

6

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed;

"**Subsidiaries**" means, as of the relevant date of determination, with respect to any Person, any other Person of which more than 50% of the voting power of the outstanding voting securities or more than 50% of the outstanding economic equity interest or ownership is held, directly or indirectly, by such Person or any variable interest entity of such Person or such other Person;

"**US GAAP**" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, as codified and described in FASB Statement No. 168, The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles;

"**Voting Undertaking**" means each voting undertaking dated as of October 26, 2017 executed and delivered to Baidu Holdings Limited by each holder of Series G2 Preferred Shares; and

"**Xiaomi**" means Xiaomi Ventures Limited, a business company incorporated and existing under the laws of British Virgin Islands.

2.    In these Articles, save where the context requires otherwise:

(a)    words importing the singular number shall include the plural number and vice versa;

(b)    words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)    the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)    reference to a dollar or dollars (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)    reference to a statutory enactment shall include reference to any amendment or reenactment thereof for the time being in force;

(f)    reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g)    reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another; and

7

(h)   references to any Share voting on an "as if converted" or "as-converted" basis shall be construed in accordance with Article 9.

3.   Subject to the last two preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4.   The business of the Company may be commenced at any time after incorporation. The Company shall take all steps as are necessary to cause the provisions of these Articles to apply, *mutatis mutandis* and to the maximum extent possible under applicable law, to the governance of any Group Entity, including, without limitation, the composition of the board of directors for any Group Entity.

5.   The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.   The expenses incurred in the formation of the Company shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.   The Directors shall keep, or cause to be kept, the Register at such place as the Directors may from time to time determine and, in the absence of any such determination, the Register shall be kept at the Office.

## SHARES

8.   Subject to the terms and conditions of these Articles, all Shares for the time being unissued shall be under the control of the Directors who may issue, allot and dispose of the same to such Persons, in such manner and on such terms as they may from time to time determine and may grant options with respect to Shares and issue warrants or similar instruments with respect thereto provided that:

(a)   the Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason;

(b)   no Preferred Shares redeemed or repurchased by the Company (in connection with a conversion or otherwise) may be reissued; and

(c)   solely for the purpose of converting Preferred Shares in accordance with the provisions of these Articles, the Directors may at all times reserve and keep available such number of authorized but unissued Ordinary Shares as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Shares. If at any time the number of authorized but unissued Ordinary Shares shall not be sufficient to effect the conversion of all then outstanding Preferred Shares, the Shareholders shall increase the number of authorized but unissued Ordinary Shares to such number as shall be sufficient for such purpose.

8

9.   On any matter in respect of which they are entitled to vote, each Preferred Share (excluding any Preferred Shares that are non-voting Shares) shall be entitled to such number of votes as equals the whole number of Ordinary Shares into which such Preferred Share is convertible immediately after the close of business on the record date of the determination of the Shareholders entitled to vote or, if no such record date is established, at the date such vote is taken or any written resolution of the Shareholders is first solicited. Except as otherwise set forth in the Memorandum of Association or the Articles, prior to an Initial Public Offering, the Series G2 Preferred Shares shall be non-voting Shares and shall not entitle the holders of the Series G2 Preferred Shares to vote at any meeting of Shareholders or any class of Shareholders of the Company or to execute any written consent to, or dissent from, any matter in respect of which the Shareholders or any class of Shareholders of the Company are sought to express such consent or dissent without a meeting (including but not limited to the signing of resolutions in writing of the Shareholders or any class of Shareholders of the Company); provided that the foregoing restriction shall not apply if the Baidu Shareholders collectively cease to hold the largest shareholding in the Company as a result of any transfer of Shares by any Baidu Shareholders. Except as otherwise set forth in the Memorandum of Association or the Articles, or as required by applicable law, the holders of Preferred Shares (excluding any Preferred Shares that are non-voting Shares) shall vote together with the holders of Ordinary Shares as a single class, and not as a separate Class or Series, on all matters put to a vote of the Shareholders.

10.  Notwithstanding anything to the contrary set forth in the Memorandum of Association or the Articles, subject to applicable law, without first obtaining the approval (at a separate meeting or by written resolution) of the holders of (x) at least a majority of the then outstanding Series Preferred Shares (excluding the Series G2 Preferred Shares), (y) at least a majority of the then outstanding Series F Preferred Shares subject to the condition that Xiaomi and Prominent jointly continue to hold at least 6.25% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis; and; (z) at least a majority of the then outstanding Series G1 Preferred Shares subject to the condition that the Series G1 Preferred Shareholders jointly continue to hold at least 6.25% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis, the Shareholders, or the Directors on behalf of the Company (voting any shares owned by the Company in any Group Entity) shall not approve, consent to or ratify any of the following actions:

   (a)  to cease to conduct or carry on the business of the Company and/or any Group Entity substantially as now conducted or change the business activities of the Company and/or any Group Entity in material aspect;

   (b)  to pass any resolution for the winding up of the Company and/or any Group Entity or undertake any liquidation, or apply for the appointment of a receiver or judicial manager or like officer, concerning the Company and/or any Group Entity; and

   (c)  to enter into any transactions between any director or shareholder of the Company and/or any Group Entity, on the one side, and the Company and/or any Group Entity, on the other side, and any modification or amendment to terms and conditions of such transactions, including the making of any loans or advances, whether directly or indirectly, or the provision of any guarantee, indemnity or security for or in connection with any indebtedness of liabilities of any director or shareholder of the Company and/or any Group Entity, in each case that involves the payment in excess of RMB5 million in a single transaction, other than (A) the adoption or alteration of terms of any share option or incentive plan for employees, officers and directors of the Company and/or its Subsidiaries, including without limitation any transaction pursuant to such share option or incentive plan, (B) the transactions occurred during the ordinary course of business of the Company and/or any Group Entity and (C) the transactions between any of the Baidu Shareholders, on one side, and the Company and/or any Group Entity, on the other side.

9

Notwithstanding the foregoing, (i) any amendment to the terms of the Preferred Shares (other than the Series G Preferred Shares) that materially and adversely affects the rights, preferences or privileges of a holder thereof in a manner that is disproportionate to the manner in which it affects other holders (including by way of reclassification of any Preferred Shares, repurchase or redemption of any Preferred Share, share split or distribution of share dividends) shall require the prior written consent of such affected holder; and (ii) any amendment to the terms of the Series G Preferred Shares that materially and adversely affects the economic rights of the holders thereof in a manner that is disproportionate to the manner in which it affects holders of other Shares shall require the prior written consent of the holders of at least a majority of the then outstanding Series G Preferred Shares. For the avoidance of doubt, the consent requirement in the preceding sub-clause (ii) shall not be affected by the execution of the Voting Undertaking and the Irrevocable Proxy by holders of the Series G2 Preferred Shares.

Subject to the Law, prior to the Initial Public Offering, any merger, consolidation or scheme of arrangement of the Company with a controlled affiliate of Baidu, Inc. shall only be initiated based on the then fair market value of the Company to be agreed between the holders holding a majority of the then outstanding Series G Preferred Shares and Baidu, Inc.

11. In the event of any Deemed Liquidation Event, distributions to the Shareholders shall be made in the following manner:

(a) Prior and in preference to any distribution of any of the assets or surplus funds of the Company to the holders of the Series A-1 Junior Preferred Shares or the Ordinary Shares or any other Class or Series of Shares by reason of their ownership of such Shares, the holders of the Series Preferred Shares, ranking *pari passu* therewith, shall be entitled to, in each case, as applicable, receive the amount equal to the greater of:

(i) (A) with respect to Series A Preferred Shareholders, one hundred and fifty percent (150%) of the Series A Original Issue Price for each Series A Preferred Share then held by them and, in addition, an amount equal to all declared but unpaid dividends on such Series A Preferred Share, (B) with respect to Series B Preferred Shareholders, one hundred and fifty percent (150%) of the Series B Original Issue Price for each Series B Preferred Share then held by them, and, in addition, an amount equal to all declared but unpaid dividends on such Series B Preferred Share, (C) with respect to Series C Preferred Shareholders, one hundred and fifty percent (150%) of the Series C Original Issue Price for each Series C Preferred Share then held by them, and, in addition, an amount equal to all declared but unpaid dividends on such Series C Preferred Share, (D) with respect to Series D Preferred Shareholders, one hundred and fifty percent (150%) of the Series D Original Issue Price for each Series D Preferred Share then held by them, and, in addition, an amount equal to all declared but unpaid dividends on such Series D Preferred Share, (E) with respect to Series E Preferred Shareholders, one hundred and fifty percent (150%) of the Series E Original Issue Price for each Series E Preferred Share then held by them, and, in addition, an amount equal to all declared but unpaid dividends on such Series E Preferred Share, (F) with respect to Series F Preferred Shareholders, one hundred and fifty percent (150%) of the Series F Original Issue Price for each Series F Preferred Share then held by them, and, in addition, an amount equal to all declared but unpaid dividends on such Series F Preferred Share (the "**Series F Liquidation Preference Amount**"), and (G) with respect to Series G Preferred Shareholders, one hundred percent (100%) of the Series G Original Issue Price for each Series G Preferred Share then held by them, and, in addition, an amount equal to all declared but unpaid dividends on such Series G Preferred Share (the "**Series G Liquidation Preference Amount**"), or

10

(ii)    such amount per Share as would have been payable had all Preferred Shares been converted into Ordinary Shares immediately prior to such Deemed Liquidation Event (the amount payable pursuant to this clause (a) is hereinafter referred to as the "**Series Preferred Liquidation Preference Amount**").

If upon the occurrence of a Deemed Liquidation Event, the assets and funds thus distributed among the holders of the Series Preferred Shares shall be insufficient to permit the payment to such holders of the applicable full Series Preferred Liquidation Preference Amount, then the assets and funds of the Company legally available for distribution shall be first distributed ratably and *pari passu*, with neither having priority over the other, among the Series G Preferred Shareholders and the Series F Preferred Shareholders in proportion to the Series G Liquidation Preference Amount or the Series F Liquidation Preference Amount, respectively, that each such holder is otherwise entitled to receive. To the extent that the Company has remaining assets and funds after distribution to Series G Preferred Shareholders and Series F Preferred Shareholders pursuant to the preceding sentence, then the assets and funds of the Company legally available for distribution shall be distributed ratably and *pari passu*, with neither having priority over the other, among the holders of the Existing Series Preferred Shares in proportion to the Series Preferred Liquidation Preference Amount each such holder is otherwise entitled to receive.

(b)    After payment has been made to holders of Series Preferred Shares of the applicable full Series Preferred Liquidation Preference Amount due pursuant to Article 11(a) above, prior and in preference to any distribution of any of the remaining assets or surplus funds of the Company to the holders of the Ordinary Shares or any other Class or Series of Shares by reason of their ownership of such Shares, the holders of the Series A-1 Junior Preferred Shares shall be entitled to receive the amount equal to the greater of (i) one hundred percent (100%) of the Series A-1 Original Issue Price for each such Series A-1 Junior Preferred Shares then held by them and, in addition, an amount equal to all declared but unpaid dividends on such Series A-1 Junior Preferred Share, or (ii) such amount per Share as would have been payable had all Preferred Shares been converted into Ordinary Shares immediately prior to such Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Series A-1 Liquidation Preference Amount**"). If upon the occurrence of a Deemed Liquidation Event, the assets and funds thus distributed among the holders of the Series A-1 Junior Preferred Shares shall be insufficient to permit the payment to such holders of the full Series A-1 Liquidation Preference Amount, then the entire assets and funds of the Company legally available for distribution shall be distributed ratably among the holders of the Series A-1 Junior Preferred Shares in proportion to the Series A-1 Liquidation Preference Amount that each such holder is otherwise entitled to receive.

(c)    After payment has been made to (i) holders of Series Preferred Shares of the applicable full Series Preferred Liquidation Preference Amount due pursuant to Article 11(a) and (ii) holders of Series A-1 Junior Preferred Shares of the full Series A-1 Liquidation Preference Amount due pursuant to Article 11(b) above, the remaining assets of the Company available for distribution to its Shareholders, if any, shall be distributed to the holders of the Ordinary Shares on a pro rata basis, based upon the number of Ordinary Shares held by each such holder.

11

(d)     For purposes of these Articles, each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of at least two-thirds (2/3) of the then outstanding Series Preferred Shares, voting together as a single class and on an as-converted basis, elect otherwise by written notice sent to the Company prior to the effective date of any such event:

    (i)     any dissolution, liquidation or winding up (whether voluntary or involuntary) of the Company or any Material Group Entity;

    (ii)     the sale, lease, transfer, exclusive license (without retaining the right to use on its own) or other disposition, in a single transaction or series of related transactions, by the Company or any Material Group Entity of all or substantially all the assets or intellectual property of the Company or such Material Group Entity (including the sale of all or substantially all of the equity of any Material Group Entity), except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company;

    (iii)     any merger, consolidation, amalgamation or acquisition of the Company or any Material Group Entity, whereby the holders of the Company's Capital Stock immediately prior to the transaction own or control less than a majority of the as-converted voting power of the surviving entity immediately after such transaction (or, in the case of a merger or acquisition of any Material Group Entity, the Company owns or controls less than a majority of the as-converted voting power of such Material Group Entity immediately after such transaction); or

    (iv)     any other transaction or series of related transactions involving the Company or any Material Group Entity as a result of which the holders of the Company's Capital Stock immediately prior to the transaction, own or control less than a majority of the as-converted voting power of the surviving entity immediately after such transaction (or, in the case of a transaction involving any Material Group Entity, any transaction as a result of which the Company owns or controls less than a majority of the as-converted voting power of the surviving entity immediately after such transaction).

<div align="center">12</div>

(e)     The Company shall not have the power to effect a "Deemed Liquidation Event" referred to in Article 11(d) above unless the definitive agreement or plan for such transaction (to the extent applicable to such transaction) provides that the consideration payable in such transaction shall be allocated among the holders of Shares in accordance with the provisions of Articles 11(a), 11(b) and 11(c) above. In addition, in the event of a Deemed Liquidation Event referred to in Article 11(d) above that will require the winding-up of the Company in order to distribute the consideration payable in such transaction among the holders of the Shares, if the Company does not effect a winding-up of the Company within 90 days after such Deemed Liquidation Event, then (i) the Company shall send a written notice to each holder of Series Preferred Shares no later than the 90th day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause (ii) to require the redemption of all of the Series Preferred Shares held by each such holder, and (ii) if the holders of at least two-thirds (2/3) of the then outstanding Series Preferred Shares, voting as a single class, so request in a written instrument delivered to the Company not later than 120 days after such Deemed Liquidation Event, the Company shall use the consideration received by the Company in such Deemed Liquidation Event, together with any other assets of the Company legally available for distribution to its Shareholders (the "**Available Proceeds**"), to the extent legally available therefor, on the 150th day after such Deemed Liquidation Event, to redeem all of the Series Preferred Shares at an aggregate redemption price equal to the applicable Series Preferred Liquidation Preference Amount, which the Available Proceeds to be allocated, on a *pari passu* basis, among the holders of the Series Preferred Shares in accordance with the provisions of Article 11(a) above. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Available Proceeds are not sufficient to redeem all outstanding Series Preferred Shares, the Company shall, on a *pari passu* basis, redeem a pro rata portion of each holder's Series Preferred Shares to the fullest extent of such Available Proceeds, based on the respective amounts which would otherwise be payable in respect of the Shares to be redeemed if the Available Proceeds were sufficient to redeem all such Shares, and shall redeem the remaining Shares to have been redeemed as soon as practicable after the Company has funds legally available therefor. The provisions of Article 62 shall apply, with such necessary changes in the details thereof as are necessitated by the context (including to disregard the calculation of the applicable Redemption Price, as set forth in Article 62(a) thereof), to the redemption of the Series Preferred Shares pursuant to this Article 11(e). Prior to the distribution or redemption provided for in this Article 11, the Company shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event.

(f)     In the event the Company proposes to distribute assets other than cash in connection with any Deemed Liquidation Event, the value of the assets to be distributed to the holder of Preferred Shares and Ordinary Shares shall be determined in good faith by the board of Directors (including the Series Preferred Director). Any securities not subject to investment letter or similar restrictions on free marketability shall be valued as follows:

(i)     If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of such securities on such exchange over the thirty (30) day period ending one (1) day prior to the distribution;

(ii)    If traded over-the-counter, the value shall be deemed to be the average of the closing bid prices of such securities over the thirty (30) day period ending three (3) days prior to the distribution; and

(iii)   If there is no active public market, the value shall be the fair market value thereof as determined in good faith by the board of Directors.

(g)     The method of valuation of securities subject to investment letter or other restrictions on free marketability shall be adjusted to make an appropriate discount from the market value determined as above in Article 11(f)(i), (ii) or (iii) to reflect the fair market value thereof as determined in good faith by the board of Directors. The holders of at least a majority of the outstanding Series Preferred Shares, voting as a single class, shall have the right to challenge any determination by the board of Directors of fair market value pursuant to Article 11(g), in which case the determination of fair market value shall be made by (x) an internationally recognized independent appraiser selected jointly by the board of Directors and the challenging parties, or (y) if the board of Directors and the challenging parties are unable to agree on such independent appraiser within ten (10) days of the challenging parties' notice to the board of Directors, then two internationally recognized independent appraisals, one of which is selected by the board of Directors and the other of which is selected by the challenging parties. In connection with the foregoing, the independent appraiser shall be required to determine the fair market value within thirty (30) days after being notified of its selection. In the event that two independent appraisers are selected in accordance with the foregoing clause (y), if the fair market values determined by such two independent appraisers differ by an amount less than 10% of the higher value, then the fair market value will be the average of the two amounts. Otherwise, the two independent appraisers will choose a third internationally recognized independent appraiser and the fair market value will be the average of the two closest values determined by the three independent appraisers. The fees and expenses of the independent appraisers shall be borne equally by (i) the Company and (ii) the holders of the Series Preferred Shares (allocated on a pro rata basis).

13

12.    The holders of the Preferred Shares shall have conversion rights as follows (the "**Conversion Rights**"):

(a)    Each Series A Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series A Preferred Share, at the principal office of the Company or any transfer agent for such Series A Preferred Share.

(b)    Each Series A-1 Junior Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series A-1 Junior Preferred Share, at the principal office of the Company or any transfer agent for such Series A-1 Junior Preferred Share.

(c)    Each Series B Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series B Preferred Share, at the principal office of the Company or any transfer agent for such Series B Preferred Share.

(d)    Each Series C Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series C Preferred Share, at the principal office of the Company or any transfer agent for such Series C Preferred Share.

(e)    Each Series D Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series D Preferred Share, at the principal office of the Company or any transfer agent for such Series D Preferred Share.

(f)    Each Series E Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series E Preferred Share, at the principal office of the Company or any transfer agent for such Series E Preferred Share.

14

(g)   Each Series F Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series F Preferred Share, at the principal office of the Company or any transfer agent for such Series F Preferred Share.

(h)   Each Series G1 Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series G1 Preferred Share, at the principal office of the Company or any transfer agent for such Series G1 Preferred Share.

(i)   The Series G2 Preferred Shares shall not be converted into Ordinary Shares prior to the Initial Public Offering. Notwithstanding the foregoing, if the Baidu Shareholders collectively cease to hold the largest shareholding in the Company as a result of any transfer of Shares by any Baidu Shareholders, each Series G2 Preferred Share shall, at the option exercisable at the discretion of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, be convertible into Ordinary Shares at any time after the date of issuance of such Series G2 Preferred Share, at the principal office of the Company or any transfer agent for such Series G2 Preferred Share.

13.   Each Preferred Share shall automatically be converted into Ordinary Shares, without further action of the holder thereof or the Company, (i) immediately prior to and conditioned upon the closing of the Initial Public Offering or (ii) with respect to the Existing Series Preferred Shares, at the date and time specified by vote or written resolution of the holders of at least two-thirds (2/3) of the outstanding Existing Series Preferred Shares, voting together as a single class and on an as-converted basis, whichever is earlier, or (iii) with respect to Series F Preferred Shares, at the date and time as determined by each holder of the Series F Preferred Shares, or (iv) with respect to Series G Preferred Shares, at the date and time specified by vote or written resolution of the holders of at least two-thirds (2/3) of the outstanding Series G1 Preferred Shares, whichever is earlier; provided that, with respect to the Series G2 Preferred Shares, immediately prior to and as a condition to the conversion of any Series G2 Preferred Shares into Ordinary Shares, the respective Voting Undertaking and the Irrevocable Proxy shall take effect and apply to the Ordinary Shares as converted from such Series G2 Preferred Shares. It is acknowledged that the Voting Undertaking and the Irrevocable Proxy are not intended to restrict the right of any holder of Series G2 Preferred Shares to sell and transfer any voting securities of the Company after the Initial Public Offering and that transferees of the voting securities that acquire the voting securities from any holder of Series G2 Preferred Shares in the open market after the Initial Public Offering will not be subject to similar restrictions thereunder after the Initial Public Offering.

14.   The Company may effect the conversion of any Preferred Share in any manner available under applicable Law, including redeeming or repurchasing the relevant Preferred Shares and applying the proceeds thereof towards payment for the new Ordinary Shares. For purposes of the repurchase or redemption, the Company may, subject to the Company being able to pay its debts in the ordinary course of business, make payments out of its capital.

15

Except as provided in Article 13 above, before any holder of Preferred Shares shall be entitled to convert the same into Ordinary Shares, such holder shall surrender the certificate or certificates therefor, duly endorsed, at the principal office of the Company or of any transfer agent for such Preferred Shares, and shall give written notice by mail, postage prepaid, to the Company at its principal corporate office, of the election to convert the same and shall state therein the name or names in which the certificate or certificates for Ordinary Shares are to be issued. The Company shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Preferred Shares, or to the nominee or nominees of such holder, a certificate or certificates for the number of Ordinary Shares to which such holder shall be entitled as aforesaid. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the Preferred Shares to be converted, and the person or persons entitled to receive the Ordinary Shares issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Ordinary Shares as of such date. Issuance of such Ordinary Shares to a person other than the holders of such Preferred Shares shall be subject to the transfer restrictions set forth in these Articles and the Shareholders Agreement and such transferee shall be responsible for any applicable stamp duty or transfer tax.

15. Upon conversion, (i) each Series A Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series A Original Issue Price by the Series A Conversion Price (as defined below) in effect at the time of conversion, (ii) each Series A-1 Junior Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series A-1 Original Issue Price by the Series A-1 Conversion Price (as defined below) in effect at the time of conversion, (iii) each Series B Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series B Original Issue Price by the Series B Conversion Price (as defined below) in effect at the time of conversion, (iv) each Series C Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series C Original Issue Price by the Series C Conversion Price (as defined below) in effect at the time of conversion, (v) each Series D Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series D Original Issue Price by the Series D Conversion Price (as defined below) in effect at the time of conversion, (vi) each Series E Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series E Original Issue Price by the Series E Conversion Price (as defined below) in effect at the time of conversion, (vii) each Series F Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series F Original Issue Price by the Series F Conversion Price (as defined below) in effect at the time of conversion, and (viii) each Series G Preferred Share shall be exchanged for such number of fully paid and non-assessable Ordinary Shares as is determined by dividing the Series G Original Issue Price by the Series G Conversion Price (as defined below) in effect at the time of conversion. The "**Series A Conversion Price**" shall initially be equal to the Series A Original Issue Price. Such initial Series A Conversion Price, and the rate at which the Series A Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15. The "**Series A-1 Conversion Price**" shall initially be equal to the Series A-1 Original Issue Price. Such initial Series A-1 Conversion Price, and the rate at which the Series A-1 Junior Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15. The "**Series B Conversion Price**" shall initially be equal to the Series B Original Issue Price. Such initial Series B Conversion Price, and the rate at which the Series B Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15. The "**Series C Conversion Price**" shall initially be equal to the Series C Original Issue Price. Such initial Series C Conversion Price, and the rate at which the Series C Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15. The "**Series D Conversion Price**" shall initially be equal to the Series D Original Issue Price. Such initial Series D Conversion Price, and the rate at which the Series D Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15. The "**Series E Conversion Price**" shall initially be equal to the Series E Original Issue Price. Such initial Series E Conversion Price, and the rate at which the Series E Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15. The "**Series F Conversion Price**" shall initially be equal to the Series F Original Issue Price. Such initial Series F Conversion Price, and the rate at which the Series F Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15. The "**Series G Conversion Price**" shall initially be equal to the Series G Original Issue Price. Such initial Series G Conversion Price, and the rate at which the Series G Preferred Shares may be converted into Ordinary Shares, shall be subject to adjustment as provided in this Article 15.

16

(a)     The Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price and the Series G Conversion Price shall be subject to adjustment from time to time as follows:

(i)     If the Company shall at any time, or from time to time, effect a subdivision of the outstanding Ordinary Shares, the Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price and the Series G Conversion Price in effect immediately prior to such subdivision shall be proportionately decreased. Conversely, if the Company shall at any time, or from time to time, combine the outstanding Ordinary Shares into a smaller number of Shares, the Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price and the Series G Conversion Price in effect immediately prior to the combination shall be proportionately increased. Any adjustment under this paragraph shall become effective at the close of business on the date the subdivision or combination becomes effective.

(ii)    If the Company makes (or fixes a record date for the determination of Shareholders entitled to receive) a dividend or other distribution to the holders of the Ordinary Shares payable in additional Ordinary Shares, the Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price and the Series G Conversion Price shall be decreased as of the time of such issuance (or in the event such record date is fixed, as of the close of business on such record date, which adjustment shall be cancelled if such issuance is subsequently cancelled) by multiplying the Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price, as applicable, then in effect by a fraction (x) the numerator of which is the total number of Ordinary Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and (y) the denominator of which is the total number of Ordinary Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of Ordinary Shares issuable in payment of such dividend or distribution.

17

(iii) If at any time, or from time to time, any capital reorganization or reclassification of the Ordinary Shares (other than as a result of a share dividend, subdivision, split or combination otherwise treated above) occurs or the Company is consolidated or merged with or into another person, then in any such event, provision shall be made so that, upon conversion of the Preferred Shares thereafter, the holder thereof shall receive the kind and amount of Shares and other securities and property which the holder of such Preferred Shares would have received had such Preferred Shares been converted into Ordinary Shares on the date of such event, all subject to further adjustment as provided herein, or with respect to such other securities or property, in accordance with any terms applicable thereto.

16. If at any time, or from time to time, the Company shall issue or sell Additional Ordinary Shares without consideration or for a consideration per Share less than the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price in effect immediately prior to such issue, then, and in each such case, the Series A Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price, as the case may be, shall be reduced, as of the opening of business on the date of such issuance or sale, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP2 = CP1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a) "CP2" shall mean the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price, as the case may be, in effect immediately after such issue of Additional Ordinary Shares;

(b) "CP1" shall mean the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price, as the case may be, in effect immediately prior to such issue of Additional Ordinary Shares;

(c) "A" shall mean the number of Ordinary Shares outstanding immediately prior to such issue of Additional Ordinary Shares (treating for this purpose as outstanding all Ordinary Shares issuable upon exercise of all options or warrants outstanding immediately prior to such issue or upon conversion or exchange of all other Ordinary Share Equivalents (including the Preferred Shares) outstanding immediately prior to such issue);

(d) "B" shall mean the number of Ordinary Shares that would have been issued if such Additional Ordinary Shares had been issued at a price per Share equal to CP1 (determined by dividing the aggregate consideration received by the Company in respect of such issue by CP1); and

(e) "C" shall mean the number of such Additional Ordinary Shares issued in such transaction.

18

17. For the purpose of making any adjustment in the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price, or number of Ordinary Shares issuable upon conversion of the Series A Preferred Shares, Series B Preferred Shares, Series C Preferred Shares, Series D Preferred Shares, Series E Preferred Shares, Series F Preferred Shares or Series G Conversion Price as provided in these Articles:

    (a) to the extent it consists of cash, the consideration received by the Company for any issue or sale of securities shall be computed at the net amount of cash received by the Company before deduction of any expenses payable directly or indirectly by the Company and any underwriting or similar commissions, compensations, discounts or concessions paid or allowed by the Company in connection with such issue or sale;

    (b) to the extent it consists of property other than cash, consideration other than cash received by the Company for any issue or sale of securities shall be computed at the fair market value thereof, as determined in good faith by the board of Directors (including one Ordinary Director and one Series Preferred Director) as of the date of the adoption of the resolution specifically authorizing such issue or sale, irrespective of any accounting treatment of such property; and

    (c) if Additional Ordinary Shares or Ordinary Share Equivalents exercisable, convertible or exchangeable for Additional Ordinary Shares are issued or sold together with other Shares or securities or other assets of the Company for consideration which covers both, the consideration received for the Additional Ordinary Shares or Ordinary Share Equivalents shall be computed as that portion of the consideration received which is reasonably determined in good faith by the board of Directors (including one Ordinary Director and one Series Preferred Director) to be allocable to such Additional Ordinary Shares or Ordinary Share Equivalents.

18. If at any time, or from time to time, the Company issues any Ordinary Share Equivalents and the Effective Conversion Price of such Ordinary Share Equivalents is less than the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price in effect immediately prior to such issuance, then, in each such case, at the time of such issuance the Company shall be deemed to have issued the maximum number of Additional Ordinary Shares issuable upon the exercise, conversion or exchange of such Ordinary Share Equivalents and to have received in consideration for each Additional Ordinary Share deemed issued an amount equal to the Effective Conversion Price.

19. If any right to exercise, convert or exchange any Ordinary Share Equivalents shall expire without having been fully exercised, the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price , Series F Conversion Price and Series G Conversion Price as the case may be, as adjusted upon the issuance of such Ordinary Share Equivalents shall be readjusted to the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price and Series G Conversion Price as the case may be, which would have been in effect had such adjustment been made on the basis that (A) the only Additional Ordinary Shares to be issued with respect to such Ordinary Share Equivalents were such Additional Ordinary Shares, if any, as were actually issued or sold in the exercise, conversion or exchange of any part of such Ordinary Share Equivalents prior to the expiration thereof and (B) such Additional Ordinary Shares, if any, were issued or sold for (x) the consideration actually received by the Company upon such exercise, conversion or exchange, plus (y) where the Ordinary Share Equivalents consist of options, warrants or rights to purchase Ordinary Shares, the consideration, if any, actually received by the Company for the grant of such Ordinary Share Equivalents, whether or not exercised, plus (z) where the Ordinary Share Equivalents consist of Shares or securities convertible or exchangeable for Ordinary Shares, the consideration received for the issue or sale of Ordinary Share Equivalents actually converted.

19

20.  For any Ordinary Share Equivalent with respect to which the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price has been adjusted under Article 18, no further adjustment of the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price shall be made solely as a result of the issuance of Ordinary Shares upon the actual exercise or conversion of such Ordinary Share Equivalent.

21.  In the event of any increase in the number of Ordinary Shares deliverable or any reduction in consideration payable upon exercise, conversion or exchange of any Ordinary Share Equivalents where the resulting Effective Conversion Price is less than the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price at such date, including, but not limited to, a change resulting from the anti-dilution provisions thereof, the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price or Series G Conversion Price shall be recomputed to reflect such change as if, at the time of issue for such Ordinary Share Equivalent, such Effective Conversion Price applied.

22.  For purposes of these Articles, "**Effective Conversion Price**" means, with respect to any Ordinary Share Equivalent at a given time, an amount equal to the quotient of (x) the sum of any consideration, if any, received by the Company with respect to the issuance of such Ordinary Share Equivalent and the aggregate consideration receivable by the Company, if any, upon the exercise, exchange or conversion of the Ordinary Share Equivalent over (y) the number of Ordinary Shares issuable upon the exercise, conversion or exchange of the Ordinary Share Equivalent.

23.  For purposes of these Articles, "**Additional Ordinary Shares**" means any Ordinary Shares issued by the Company (or deemed issued by the Company under Article 15(a)(ii) hereof) other than:

(a)  any issuance of restricted Shares and options to purchase Ordinary Shares which may be issued pursuant to any share option or incentive plan for employees, officers, directors and consultants of the Company and/or its Subsidiaries, as approved and adopted in accordance with the Shareholders Agreement and these Articles;

(b)  as a dividend or distribution or any event for which adjustment is made pursuant to Article 15(a)(ii);

(c)  pursuant to a share split or other similar reorganization for which adjustment is made pursuant to Article 15(a)(i);

(d)  pursuant to the exercise, conversion or exchange of any Ordinary Share Equivalent;

(e)  upon conversion of any Preferred Share; or

(f)  pursuant to an Initial Public Offering.

20

24.  In case any event shall occur as to which the other provisions of Articles 15-24 are not strictly applicable but the failure to make any adjustment would not fairly protect the Conversion Rights of any Preferred Share against dilution in accordance with the essential intent and principles of Articles 15-24, then, in each such case, the Company, in good faith, shall determine the appropriate adjustment to be made, on a basis consistent with the essential intent and principles established in Articles 15-24 necessary to preserve, without dilution, the Conversion Rights of such Preferred Shares.

25.  In the case of any adjustment or readjustment of the Series A Conversion Price for the Series A Preferred Shares, the Series A-1 Conversion Price for the Series A-1 Junior Preferred Shares, the Series B Conversion Price for the Series B Preferred Shares, the Series C Conversion Price for the Series C Preferred Shares, the Series D Conversion Price for the Series D Preferred Shares, the Series E Conversion Price for the Series E Preferred Shares, the Series F Conversion Price for the Series F Preferred Shares or the Series G Conversion Price for the Series G Preferred Shares, the Company, at its sole expense, shall compute such adjustment or readjustment in accordance with the provisions hereof and prepare a certificate showing such adjustment or readjustment, and shall mail such certificate, by first class mail, postage prepaid, to each applicable registered holder of such Preferred Shares at the holder's address as shown in the Company's books. The certificate shall set forth such adjustment or readjustment, showing in detail the facts upon which such adjustment or readjustment is based, including a statement of (i) the consideration received or deemed to be received by the Company for any Additional Ordinary Shares issued or sold or deemed to have been issued or sold, (ii) the number of Additional Ordinary Shares issued or sold or deemed to be issued or sold, (iii) the Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price in effect after such adjustment or readjustment, and (iv) the number of Ordinary Shares and the type and amount, if any, of other property which would be received upon conversion of such Preferred Shares after such adjustment or readjustment.

26.  In the event the Company shall propose to take any action of the type or types requiring an adjustment to (i) the Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price, or the Series G Conversion Price; or (ii) the number or character of such applicable Preferred Shares as set forth herein, the Company shall give notice to the applicable holders of such Preferred Shares, which notice shall specify the record date, if any, with respect to any such action and the date on which such action is to take place. Such notice shall also set forth such facts with respect thereto as shall be reasonably necessary to indicate the effect of such action (to the extent such effect may be known at the date of such notice) on the Series A Conversion Price, the Series A-1 Conversion Price, the Series B Conversion Price, the Series C Conversion Price, the Series D Conversion Price, the Series E Conversion Price, the Series F Conversion Price or the Series G Conversion Price and the number, kind or Class of Shares or other securities or property which shall be deliverable upon the occurrence of such action or deliverable upon the conversion of the applicable Preferred Shares. In the case of any action which would require the fixing of a record date, such notice shall be given at least 20 days prior to the date so fixed, and in the case of all other actions, such notice shall be given at least 30 days prior to the taking of such proposed action. Any notice required by the provisions of this Article 26 to be given to the holders of Series A Preferred Shares, Series A-1 Junior Preferred Shares, Series B Preferred Shares, Series C Preferred Shares, Series D Preferred Shares, Series E Preferred Shares, Series F Preferred Shares and Series G Preferred Shares shall be deemed given if deposited in the mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Company.

21

27. No fractional Ordinary Shares shall be issued upon conversion of any Preferred Share. All Ordinary Shares (including fractions thereof) issuable upon conversion of more than one Preferred Share by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional Share. If, after such aggregation, the conversion would result in the issuance of any fractional Share, the Company shall, in lieu of issuing any fractional Share, pay cash equal to the product of such fraction multiplied by the fair market value of an Ordinary Share, as determined by the board of Directors on the date of conversion.

28. The Shareholders will not, through any reorganization, recapitalization, transfer of assets, consolidation, merger, scheme of arrangement, winding up, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of these Articles by the Company, but the Shareholders shall at all times in good faith assist in the carrying out of all the provisions of Articles 12-28 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Preferred Shares against impairment.

## MODIFICATION OF RIGHTS

29. Subject to the terms and conditions of these Articles, whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

30. Subject to the terms and conditions of these Articles, the rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

31. A Shareholder shall be entitled to a certificate evidencing all Shares registered in such Shareholder's name in the Register. Each certificate shall bear a legend ("**Legend**") in substantially following form:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED IN ANY JURISDICTION AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH. THE SALE, ASSIGNMENT, HYPOTHECATION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH A "**TRANSFER**") AND VOTING OF ANY OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED BY THE TERMS OF THE EIGHTH RESTATED ARTICLES AND A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND THE SHAREHOLDERS NAMED THEREIN, A COPY OF WHICH MAY BE INSPECTED AT THE COMPANY'S PRINCIPAL OFFICE. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT.

22

32.   If any Shareholder ceases to be subject to any and all restrictions on transfer and all other obligations set forth in the Shareholders Agreement, the Company, upon the written request of the Shareholder shall issue to such Shareholder a new certificate evidencing such Shares without the Legend.

**FRACTIONAL SHARES**

33.   The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

**LIEN**

34.   The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

35.   The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

36.   For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

37.   The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

23

**CALLS ON SHARES**

38.   The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

39.   The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

40.   If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

41.   The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

42.   The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

43.   The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

**FORFEITURE OF SHARES**

44.   If a Shareholder fails to pay any call or installment of a call in respect of partly paid Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or installment remains unpaid, serve a notice on him requiring payment of so much of the call or installment as is unpaid, together with any interest which may have accrued.

45.   The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

46.   If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

47.   A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

24

48. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

49. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

50. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

51. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

**TRANSFER OF SHARES**

52. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

53. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor provided that the Directors shall be required to register any transfer of Shares that complies with the provisions of the Shareholders Agreement and shall not register any transfer of Shares that does not comply with the provisions of the Shareholders Agreement.

54. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

55. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

**TRANSMISSION OF SHARES**

56. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only Person recognised by the Company as having any title to the Share.

25

57.  Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

58.  A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

59.  Subject to the terms and conditions of these Articles (including without limitation Article 10), the Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

60.  Subject to the terms and conditions of these Articles (including without limitation Article 10), the Company may by Ordinary Resolution:

(a)  consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)  convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)  subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)  cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

61.  Subject to the terms and conditions of these Articles, the Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION AND PURCHASE OF SHARES

62.  Subject to the Law, the Shares may be redeemed at the option of the Company or the Shareholder on the terms and in such manner as are set forth in these Articles.

(a)  Subject to the Law, the redemption of Series Preferred Shares shall be effected as follows:

at any time following the occurrence of a Redemption Trigger Event (as defined below), at the option of, and upon the receipt by the Company of a written notice (the "**Redemption Notice**") requesting redemption from, (x) the holders of at least two-thirds (2/3) of the then outstanding Existing Series Preferred Shares, voting together as a single class on an as-converted basis, (y) any holder of Series F Preferred Shares, or (z) any holder of Series G Preferred Shares, the Company shall redeem, on a *pari passu* basis, all Existing Series Preferred Shares as set forth in such Redemption Notice, all (but not less than all) Series F Preferred Shares held by such holder of Series F Preferred Shares, or all (but not less than all) Series G Preferred Shares held by such holder of Series G Preferred Shares, as applicable, out of funds legally available therefor at a redemption price for each Series Preferred Share (the "**Redemption Price**"), equal to:

26

(A) with respect to each Series A Preferred Share, the Series A Original Issue Price x $(108\%)^N$, and (B) with respect to each Series B Preferred Share, the Series B Original Issue Price x $(108\%)^N$, and (C) with respect to each Series C Preferred Share, the Series C Original Issue Price x $(108\%)^N$, and (D) with respect to each Series D Preferred Share, the Series D Original Issue Price x $(108\%)^N$, and (E) with respect to each Series E Preferred Share, the Series E Original Issue Price x $(108\%)^N$, and (F) with respect to each Series F Preferred Share, the Series F Original Issue Price x $(108\%)^N$, and(G) with respect to each Series G Preferred Share, the Series G Original Issue Price x $(108\%)^N$, where

$N$ = a fraction the numerator of which is the number of calendar days between the date on which any Series Preferred Share, as the case may be, are first issued and the Redemption Date (as defined in below) and the denominator of which is 365,

*minus* all dividends paid in cash thereon plus all declared but unpaid dividends thereon, each up to the Redemption Date (as adjusted for any share dividends, combinations, reclassifications or splits with respect to such Shares and the like).

For the avoidance of doubt, any holder of Series F Preferred Shares or Series G Preferred Shares may only request the Company redeem all but not less than all of Series F Preferred Share or Series G Preferred Share, as applicable, held by it.

(b)   For purposes of this Article 62, "**Redemption Trigger Event**" shall mean any of the following events:

(i)      with respect to any Existing Series Preferred Shares:

(x) December 31, 2016; or

(y) the occurrence of any change to any applicable law, rule, regulation, order or legal pronouncement of any regulatory body in the PRC (or any province thereof) as a result of which the ownership of the Company or any of its operating subsidiaries in the PRC or any contractual relationship among the Company and/or any of the Group Entities, pursuant to which the Company acquires control over the operating subsidiaries in the PRC, becomes unlawful or subject to material conditions or restrictions which materially impair the economic benefits that the Company expects to derive therefrom and materially impair the industry in which the Group Entities operate (an "**Adverse Legal Development**"); provided that following a determination of the occurrence of the Adverse Legal Development by either (A) the board of Directors or (B) the holders of at least a majority of the then outstanding Existing Series Preferred Shares, the Company and the shareholders, despite their reasonable best efforts, are unable to restructure the ownership of the Company or the contractual relationship among the Company and the Group Entities in order to (I) comply with any applicable legal or other regulatory requirement arising out of the Adverse Legal Development and (II) maintain such economic benefits within six (6) months following the occurrence of such Adverse Legal Development;

27

(ii)    with respect to the Series F Preferred Shares:

(x) November 11, 2018, or

(y) the occurrence of an Adverse Legal Development;

(iii)    with respect to the Series G Preferred Shares, if no Initial Public Offering shall have occurred after the fifth anniversary of the date on which any Series G Preferred Shares are first issued.

(c)    The Redemption Notice pursuant to this Article 62 shall be given by hand or by mail to the principal office of the Company at any time on or after the Redemption Trigger Event stating the date on or after the Redemption Trigger Event on which such Series Preferred Shares are to be redeemed (the "**Redemption Date**"). Upon receipt of any such request, the Company shall promptly give written notice of the redemption request to each non-requesting holder of record of the applicable Series Preferred Shares stating the existence of such request, the Redemption Price, the Redemption Date and the mechanics of redemption. In the event the Redemption Price with respect to the applicable Series Preferred Shares is not paid in full on the date as specified in the notice of redemption, then the Redemption Date (for purposes of calculating the Redemption Price in Article 62(a) above) shall be the date on which the payment of the full Redemption Price with respect to the applicable Series Preferred Shares is received by the holder of the applicable Series Preferred Shares, respectively.

(d)    Before any holder of applicable Series Preferred Shares shall be entitled to redemption under the provisions of this Article 62, such holder shall surrender his or her certificate or certificates representing such Series Preferred Shares, as applicable, to be redeemed (or otherwise provide the Company with a customary lost share affidavit and/or indemnity) to the Company in the manner and at the place reasonably designated by the Company for that purpose, and thereupon the Redemption Price shall be payable to the order of the person whose name appears on the Register as the owner of such Shares and each such certificate shall be cancelled. In the event fewer than all the Shares represented by any such certificate are redeemed, a new certificate shall be promptly issued representing the unredeemed Shares. Unless there has been a default in payment of the applicable Redemption Price, upon cancellation of the certificate representing such Series Preferred Shares to be redeemed, all dividends on such Series Preferred Shares designated for redemption on the Redemption Date shall cease to accrue and all rights of the holders thereof, except the right to receive the Redemption Price thereof (including all declared and unpaid dividends up to the Redemption Date), without interest, shall cease and terminate and such Series Preferred Shares shall cease to be issued Shares.

28

(e)    If on any date on which the Redemption Price or any installment thereof is payable, the funds of the Company legally available for redemption of the applicable Series Preferred Shares are insufficient to make such payment in full, those funds which are legally available will be used to redeem at the Redemption Price the maximum possible number of such Series Preferred Shares, ratably among the holders of such Series Preferred Shares (ranking *pari passu* therewith) to be redeemed based upon their holdings of such Series Preferred Shares, and the Series Preferred Share not redeemed shall remain issued and outstanding and entitled to all the rights, preferences and privileges provided in these Articles until the Redemption Price has been paid in full with respect to such Series Preferred Shares. At any time thereafter when additional funds of the Company are available for the payment of any Redemption Price, such funds will (to the extent permitted by law) immediately be used to redeem the balance of the Shares which the Company has become obliged to redeem on the applicable Redemption Date but which it has not redeemed.

(f)    In addition, if on any date on which the Redemption Price or any installment thereof is payable, the funds of the Company legally available for redemption of the applicable Existing Series Preferred Shares are insufficient to make such payment in full, at the option of, and upon the receipt by the Company of a written notice from the holders of at least a majority of the then outstanding Existing Series Preferred Shares, the Company shall, within twenty (20) Business Days and at its own costs, initiate (i) a process for the sale of such Existing Series Preferred Shares at a price not lower than the applicable Redemption Price or (ii) such other fundraising process that will generate proceeds sufficient for the redemption of such Existing Series Preferred Shares, and the Company shall, in each case, use its reasonable best efforts to effectuate such sale or fundraising transaction, subject to the approval of such sale or fundraising process by the holders of at least a majority of the then outstanding Existing Series Preferred Shares with respect to the terms and conditions of the sale or other fundraising transaction, as the case may be.

(g)    If the Company fails (for whatever reason) to redeem any applicable Series Preferred Shares on its due date for redemption, then, as from such date until the date on which the same are redeemed, the Company shall not declare or pay any dividend nor otherwise make any distribution of or otherwise decrease its profits available for distribution. To the extent permitted by law, the Company shall procure that the profits of each Subsidiary of the Company for the time being available for distribution shall be paid to it by way of dividend if and to the extent that, but for such payment, the Company would not itself otherwise have sufficient profits available for distribution to make any redemption of Series Preferred Shares required to be made pursuant to this Article 62.

63.    The Company may purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder. In particular, the Company may repurchase any Ordinary Shares registered in the name of any Person whose contract of employment with the Company or a Group Entity has been terminated on the terms and in such manner as are set forth in contractual arrangements between the Company and such Person provided that such contractual arrangements have been approved by the board of Directors.

64.    The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law, including out of its capital, profits or the proceeds of a fresh issue of Shares.

65.    Subject to the terms and conditions of these Articles, any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

66.    The redemption or purchase of any Share shall not be deemed to give rise to the redemption or purchase of any other Share.

29

67.   The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## GENERAL MEETINGS

68.   The Directors may, whenever they think fit, convene a general meeting of the Company.

69.   General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least 10 percent of the paid up voting share capital of the Company deposited at the Office specifying the objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

70.   If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

71.   At least seven (7) days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

72.   The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

73.   All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, the appointment and removal of Directors and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of and to attend and vote at that meeting unless notice of such special business has been given in the notice convening that meeting.

74.   No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

30

75.  If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

76.  If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

77.  The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

78.  If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

79.  The chairman may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

80.  The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason, upon notice in writing to Shareholders. A postponement may be for a stated period of any length or indefinitely as the Directors may determine.

81.  At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

82.  If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

83.  In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall not be entitled to a second or casting vote.

84.  A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

31

**OUTRIDING RIGHTS OF BAIDU AS HOLDER OF AN IRREVOCABLE PROXY**

85.    The following Articles 85(a) to 85(f) shall apply notwithstanding and shall take precedence over any other Article to the contrary.

(a)    A Member may from time to time grant to Baidu, Inc or any of its Subsidiaries or affiliates (each a "**Baidu Person**") an Irrevocable Proxy in respect of some or all of the shares in the Company held by him (the "**Relevant Shares**").

(b)    An Irrevocable Proxy shall not require the approval of the Directors as to its form.

(c)    Where a Member has granted an Irrevocable Proxy to a Baidu Person, only the Baidu Person (and neither the Member nor any other proxy of such Member) shall be entitled to cast the votes of such Member in respect of the Relevant Shares at any general meeting or class meeting of the Company (both on a show of hands and on a poll). For the avoidance of doubt, the vote of any such Member or other proxy in respect of the Relevant Shares on a show of hands or poll in such circumstances shall not be counted.

(d)    Where a Member has granted an Irrevocable Proxy to a Baidu Person, only the Baidu Person (and not such Member or any other holder of a proxy or the donee of a power of attorney of such Member) shall be entitled to sign a resolution in writing of the Members or any section of the Members. For the avoidance of doubt, the signature of any such Member or other proxy or donee of a power of attorney in respect of the Relevant Shares on such resolution in such circumstances shall not be valid.

(e)    Each Baidu Person holding an Irrevocable Proxy shall notify the Company and deliver a copy of such Irrevocable Proxy to the Company upon the grant of such Irrevocable Proxy and shall notify the Company upon any termination of such Irrevocable Proxy.

(f)    In the event of any dispute as to whether a Baidu Person is holding an Irrevocable Proxy, such matter shall be determined solely by reference to whether the Company has received notice and a copy of such Irrevocable Proxy pursuant to Article 85(e) and the Company and each Member shall be bound accordingly.

**VOTES OF SHAREHOLDERS**

86.    Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder and every Person representing a Shareholder by proxy shall have one vote for each fully-paid Share of which he or the Person represented by proxy is the holder.

87.    In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

88.    A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

32

89. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

90. On a poll votes may be given either personally or by proxy.

91. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

92. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

93. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

94. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

95. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

96. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

97. The Shareholders shall ensure that the board of Directors shall be comprised of seven (7) Directors.

98. The holders of the Series Preferred Shares (excluding the Series G2 Preferred Shares), voting together as a single and separate class, shall be entitled to appoint and remove three (3) members to the board of Directors (each a "**Series Preferred Director**") at a general or special meeting of Shareholders, or pursuant to any written resolution signed, by the holders of at least a majority of then-outstanding Series Preferred Shares (excluding the Series G2 Preferred Shares), voting together as a single class on an as-converted basis. The Significant Shareholder shall be entitled to appoint and remove one (1) member to the board of Directors at a general or special meeting of Shareholders, or pursuant to any written resolution signed, by the Significant Shareholder.

99. The holders of the outstanding Ordinary Shares, by voting as a single and separate class, shall be entitled to appoint and remove one (1) member of the board of Directors (the "**Ordinary Director**") at a general or special meeting of Shareholders, or pursuant to any written resolution signed, by the holders of at least a majority of then outstanding Ordinary Shares.

33

100. The holders of the outstanding Ordinary Shares and the Preferred Shares, by voting as a single class and on as-converted basis, shall be entitled to elect the remaining two (2) members to the board of Directors at a general or special meeting of Shareholders, or pursuant to any written resolution signed, by the holders of at least a majority of then outstanding Ordinary Shares and Preferred Shares (voting together a single class and on an as-converted basis), of which (i) one (1) Director shall be the then chief executive officer of the Company and (ii) the other Director shall be an independent director with relevant industry experience who is not an affiliate of any of the Shareholders.

101. Any Director who shall have been elected by the holders of a separate Class or Series of Shares as provided in Articles 98-100 may be removed, either with or without cause by, and only by, the affirmative vote of the holders that elected such Director at a general or special meeting of Shareholders, or pursuant to a written resolution signed, by such holders in accordance with Articles 98-100.

102. In the event of a vacancy in the office of any Director, a successor shall be elected to hold office for the unexpired term of such Director by the holders that elected such Director at a general or special meeting of Shareholders, or pursuant to a written resolution signed, by such holders in accordance with Articles 98-100.

103. [Intentionally Omitted.]

104. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

105. There shall be no shareholding qualification for Directors.

## ALTERNATE DIRECTOR OR PROXY

106. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be an officer of the Company and shall be deemed to be the agent of the Director appointing him. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

107. Any Director may appoint any Person, whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

108. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

34

109.    The Directors may from time to time appoint any natural person or corporation, whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

110.    The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

111.    The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

112.    The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

113.    The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

114.    The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

115.    The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

35

116.    Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

117.    Subject to Article 10, the Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

118.    The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

119.    The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

120.    Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

121.    Subject to these Articles, the office of Director shall be vacated, if the Director:

(a)     becomes bankrupt or makes any arrangement or composition with his creditors;

(b)     dies or is found to be or becomes of unsound mind;

(c)     resigns his office by notice in writing to the Company; or

(d)     is removed from office pursuant to any other provision of these Articles.

36

**PROCEEDINGS OF DIRECTORS**

122. Subject to the Law, these Articles and the Shareholders Agreement, the Directors may meet together (either inside or outside the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall not have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors. Not less than seven (7) day's meeting notice shall be given to all Directors; provided, however, such notice period may be reduced or waived with the written consent of all of the Directors.

123. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

124. Subject to the Law, these Articles, the quorum necessary for the transaction of the business of the Directors shall consist of (a) a majority of the members of the board of Directors, and (b) the presence of at least one Ordinary Director or one Series Preferred Director; provided, however, that if at two consecutive duly convened meetings of the board of Directors, a requisite quorum is not achieved based solely upon the consecutive failure to attend such meetings by an Ordinary Director or a Series Preferred Director, (such member of the board of Directors is referred to as the "**Absent Director**"), then at the next duly convened meeting of the board of Directors, a quorum shall only require the presence of a majority of the members of the board of Directors, without the additional requirement of the presence of the Absent Director. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

125. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

126. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

37

127. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

128. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

    (a)     all appointments of officers made by the Directors;

    (b)     the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

    (c)     all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

129. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

130. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

131. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

132. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

133. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

134. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

135. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

136.    Subject to applicable law, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor, provided that.

(a)    no dividend (other than that payable solely in Ordinary Shares or other securities and rights convertible into or entitling the holder thereof to solely receive, directly or indirectly, additional Ordinary Shares) shall be paid on or declared and set aside for any Ordinary Share during any fiscal year unless and until a dividend in like amount as is declared or paid on the Ordinary Shares has been paid on or declared and set aside for each outstanding Preferred Share, on an as if converted basis, and in such fiscal year;

(b)    in the event the Directors declare a dividend payable in securities of other Persons, assets (excluding cash dividends) or options or rights to purchase any such securities or evidences of indebtedness, then, in each such case, the holders of Preferred Shares shall be entitled to a proportionate share of any such dividend as though the holders of such Preferred Shares were the holders of the number of Ordinary Shares into which such Preferred Shares are convertible as of the record date fixed for the determination of the holders of Ordinary Shares entitled to receive such dividend; and

(c)    in the event that the Directors have declared (but not yet paid) dividends immediately prior to, and in the event of, a conversion of the Preferred Shares (as provided in Articles 12-28), the Company shall pay in cash to the applicable holder(s) of the Preferred Shares, subject to such conversion, the full amount of any such dividends.

137.    The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

138.    Subject to the mandatory provisions of these Articles, any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

139.    The Directors when paying dividends to the Shareholders shall make such payment in accordance with the foregoing provisions of these Articles.

140.    Subject to these Articles, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

141.    If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

39

142.    No dividend shall bear interest against the Company.


**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION**

143.    The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

144.    The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

145.    The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

146.    The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

147.    The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.


**CAPITALISATION OF RESERVES**

148.    Subject to the Law, the Directors may, with the authority of an Ordinary Resolution:

(a)    resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)    appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)    paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii)    paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c)    make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)    authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

40

(i) the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to the resolution.

### SHARE PREMIUM ACCOUNT

149. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

150. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

### NOTICES

151. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder or Director either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder or Director at his address as appearing in the Register or the Register of Directors of the Company, as the case may be, or by electronic mail to any electronic mail address such Shareholder or such Director may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

152. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

153. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

41

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

154. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

155. Notice of every general meeting of the Company shall be given to:

(a)     all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)     every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**INDEMNITY**

156. Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, willful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

157. No Indemnified Person shall be liable:

(a)     for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

(b)     for any loss on account of defect of title to any property of the Company; or

(c)     on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

(d)     for any loss incurred through any bank, broker or other similar Person; or

(e)     for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgment or oversight on such Indemnified Person's part; or

42

(f)      for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, willful default or fraud.

## NON-RECOGNITION OF TRUSTS

158.    Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

159.    If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any asset whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

160.    Subject to the Law and the rights attaching to the various Classes and subject to the terms and conditions of these Articles, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

161.    For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

162.    In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

43

163. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

**REGISTRATION BY WAY OF CONTINUATION**

164. Subject to the terms and conditions of these Articles, the Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**DISCLOSURE**

165. The Directors, or any service providers (including the officers, the Secretary and the registered office agent of the Company) specifically authorised by the Directors, shall be entitled to disclose to any regulatory or judicial authority any information regarding the affairs of the Company including without limitation information contained in the Register and books of the Company.

44

**TABLE OF CONTENTS**

| **Clause** | **Page** |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 8 |
| SHARES | 8 |
| MODIFICATION OF RIGHTS | 22 |
| CERTIFICATES | 22 |
| FRACTIONAL SHARES | 23 |
| LIEN | 23 |
| CALLS ON SHARES | 24 |
| FORFEITURE OF SHARES | 24 |
| TRANSFER OF SHARES | 25 |
| TRANSMISSION OF SHARES | 25 |
| ALTERATION OF SHARE CAPITAL | 26 |
| REDEMPTION AND PURCHASE OF SHARES | 26 |
| GENERAL MEETINGS | 30 |
| NOTICE OF GENERAL MEETINGS | 30 |
| PROCEEDINGS AT GENERAL MEETINGS | 30 |
| OUTRIDING RIGHTS OF BAIDU AS HOLDER OF AN IRREVOCABLE PROXY | 32 |
| VOTES OF SHAREHOLDERS | 32 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 33 |
| DIRECTORS | 33 |
| ALTERNATE DIRECTOR OR PROXY | 34 |
| POWERS AND DUTIES OF DIRECTORS | 34 |
| BORROWING POWERS OF DIRECTORS | 36 |
| THE SEAL | 36 |
| DISQUALIFICATION OF DIRECTORS | 36 |
| PROCEEDINGS OF DIRECTORS | 37 |
| DIVIDENDS | 39 |
| ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION | 40 |
| CAPITALISATION OF RESERVES | 40 |
| SHARE PREMIUM ACCOUNT | 41 |
| NOTICES | 41 |
| INDEMNITY | 42 |

**TABLE OF CONTENTS**
**(continued)**

| | Page |
|---|---|
| NON-RECOGNITION OF TRUSTS | 43 |
| WINDING UP | 43 |
| AMENDMENT OF ARTICLES OF ASSOCIATION | 43 |
| CLOSING OF REGISTER OR FIXING RECORD DATE | 43 |
| REGISTRATION BY WAY OF CONTINUATION | 44 |
| DISCLOSURE | 44 |

ii

**Exhibit 3.2**

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**NINTH AMENDED AND RESTATED
MEMORANDUM OF ASSOCIATION**

**OF**

**IQIYI, INC.**

(adopted by a Special Resolution passed on            , 2018 and effective immediately prior to the completion of the initial public offering of the Company's American Depositary Shares representing its Class A Ordinary Shares)

1.   The name of the Company is iQIYI, Inc.

2.   The Registered Office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands, or at such other location within the Cayman Islands as the Directors may from time to time determine.

3.   The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the Companies Law or any other law of the Cayman Islands.

4.   The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by the Companies Law.

5.   The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.   The liability of each Shareholder is limited to the amount, if any, unpaid on the Shares held by such Shareholder.

7.   The authorised share capital of the Company is US$1,000,000 divided into 100,000,000,000 shares comprising of (i) 94,000,000,000 Class A Ordinary Shares of a par value of US$0.00001 each, (ii) 5,000,000,000 Class B Ordinary Shares of a par value of US$0.00001 each and (iii) 1,000,000,000 shares of a par value of US$0.00001 each of such class or classes (however designated) as the board of directors may determine in accordance with Article 9 of the Articles. Subject to the Companies Law and the Articles, the Company shall have power to redeem or purchase any of its Shares and to increase or reduce its authorised share capital and to sub-divide or consolidate the said Shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.    The Company has the power contained in the Companies Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

9.    Capitalised terms that are not defined in this Memorandum of Association bear the same meanings as those given in the Articles of Association of the Company.

2

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**NINTH AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**OF**

**IQIYI, INC.**

(adopted by a Special Resolution passed on            , 2018 and effective immediately prior to the completion of the initial public offering of the Company's American Depositary Shares representing its Class A Ordinary Shares)

**TABLE A**

The regulations contained or incorporated in Table 'A' in the First Schedule of the Companies Law shall not apply to the Company and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

**"ADS"**                     means an American Depositary Share representing Class A Ordinary Shares;

**"Affiliate"**              means in respect of a Person, any other Person that, directly or indirectly, through (1) one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and (i) in the case of a natural person, shall include, without limitation, such person's spouse, parents, children, siblings, mother-in-law, father-in-law, brothers-in-law and sisters-in-law, a trust for the benefit of any of the foregoing, and a corporation, partnership or any other entity wholly or jointly owned by any of the foregoing, and (ii) in the case of an entity, shall include a partnership, a corporation or any other entity or any natural person which directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such entity. The term "control" shall mean the ownership, directly or indirectly, of shares possessing more than fifty per cent (50%) of the voting power of the corporation, partnership or other entity (other than, in the case of a corporation, securities having such power only by reason of the happening of a contingency), or having the power to control the management or elect a majority of members to the board of directors or equivalent decision-making body of such corporation, partnership or other entity;

3

| | |
|---|---|
| **"Articles"** | means these articles of association of the Company, as amended or substituted from time to time; |
| **"Baidu"** | means Baidu Holdings Limited; |
| **"Board"** and **"Board of Directors"** and **"Directors"** | means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof; |
| **"Chairman"** | means the chairman of the Board of Directors; |
| **"Class"** or **"Classes"** | means any class or classes of Shares as may from time to time be issued by the Company; |
| **"Class A Ordinary Share"** | means an Ordinary Share of a par value of US$0.00001 in the capital of the Company, designated as a Class A Ordinary Share and having the rights provided for in these Articles; |
| **"Class B Ordinary Share"** | means an Ordinary Share of a par value of US$0.00001 in the capital of the Company, designated as a Class B Ordinary Share and having the rights provided for in these Articles; |
| **"Commission"** | means the Securities and Exchange Commission of the United States of America or any other federal agency for the time being administering the Securities Act; |
| **"Company"** | means iQIYI, Inc., a Cayman Islands exempted company; |
| **"Companies Law"** | means the Companies Law (2016 revision) of the Cayman Islands and any statutory amendment or re-enactment thereof; |
| **"Company's Website"** | means the main corporate/investor relations website of the Company, the address or domain name of which has been notified to Shareholders; |
| **"Designated Stock Exchange"** | means the stock exchange in the United States on which any Shares and ADSs are listed for trading; |
| **"Designated Stock Exchange Rules"** | means the relevant code, rules and regulations, as amended, from time to time, applicable as a result of the original and continued listing of any Shares or ADSs on the Designated Stock Exchange; |
| **"electronic"** | has the meaning given to it in the Electronic Transactions Law and any amendment thereto or re-enactments thereof for the time being in force and includes every other law incorporated therewith or substituted therefor; |
| **"electronic communication"** | means electronic posting to the Company's Website, transmission to any number, address or internet website or other electronic delivery methods as otherwise decided and approved by not less than a majority of the vote of the Board; |

4

| | |
|---|---|
| **"Electronic Transactions Law"** | means the Electronic Transactions Law (2003 Revision) of the Cayman Islands and any statutory amendment or re-enactment thereof; |
| **"electronic record"** | has the meaning given to it in the Electronic Transactions Law and any amendment thereto or re-enactments thereof for the time being in force and includes every other law incorporated therewith or substituted therefor; |
| **"Law"** | means the Companies Law and every other law and regulation of the Cayman Islands for the time being in force concerning companies and affecting the Company; |
| **"Memorandum of Association"** | means the memorandum of association of the Company, as amended or substituted from time to time; |
| **"Ordinary Resolution"** | means a resolution: |

"Ordinary Resolution" means a resolution:

(a)  passed by a simple majority of the votes cast by such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy or, in the case of corporations, by their duly authorised representatives, at a general meeting of the Company held in accordance with these Articles; or

(b)  approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed;

| | |
|---|---|
| **"Ordinary Share"** | means a Class A Ordinary Share or a Class B Ordinary Share; |
| **"paid up"** | means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up; |
| **"Person"** | means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires; |
| **"Register"** | means the register of Members of the Company maintained in accordance with the Companies Law; |
| **"Registered Office"** | means the registered office of the Company as required by the Companies Law; |
| **"Seal"** | means the common seal of the Company (if adopted) including any facsimile thereof; |

5

| | |
|---|---|
| **"Secretary"** | means any Person appointed by the Directors to perform any of the duties of the secretary of the Company; |
| **"Securities Act"** | means the Securities Act of 1933 of the United States of America, as amended, or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time; |
| **"Share"** | means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share; |
| **"Shareholder" or "Member"** | means a Person who is registered as the holder of one or more Shares in the Register; |
| **"Share Premium Account"** | means the share premium account established in accordance with these Articles and the Companies Law; |
| **"signed"** | means bearing a signature or representation of a signature affixed by mechanical means or an electronic symbol or process attached to or logically associated with an electronic communication and executed or adopted by a person with the intent to sign the electronic communication; |
| **"Special Resolution"** | means a special resolution of the Company passed in accordance with the Law, being a resolution: |

    (a) passed by not less than two-thirds of the votes cast by such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy or, in the case of corporations, by their duly authorised representatives, at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given; or

    (b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed;

| | |
|---|---|
| **"Treasury Share"** | means a Share held in the name of the Company as a treasury share in accordance with the Companies Law; and |
| **"United States"** | means the United States of America, its territories, its possessions and all areas subject to its jurisdiction. |

6

2.    In these Articles, save where the context requires otherwise:

(a)    words importing the singular number shall include the plural number and vice versa;

(b)    words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)    the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)    reference to a dollar or dollars (or US$) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)    reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f)    reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g)    reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing including in the form of an electronic record or partly one and partly another;

(h)    any requirements as to delivery under the Articles include delivery in the form of an electronic record or an electronic communication;

(i)    any requirements as to execution or signature under the Articles, including the execution of the Articles themselves, can be satisfied in the form of an electronic signature as defined in the Electronic Transaction Law; and

(j)    Sections 8 and 19(3) of the Electronic Transactions Law shall not apply.

3.    Subject to the last two preceding Articles, any words defined in the Companies Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

4.    The business of the Company may be conducted as the Directors see fit.

5.    The Registered Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.    The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7

7.   The Directors shall keep, or cause to be kept, the Register at such place as the Directors may from time to time determine and, in the absence of any such determination, the Register shall be kept at the Registered Office.

## SHARES

8.   Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may, in their absolute discretion and without the approval of the Members, cause the Company to:

   (a)   issue, allot and dispose of Shares (including, without limitation, preferred shares) (whether in certificated form or non-certificated form) to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   (b)   grant rights over Shares or other securities to be issued in one or more classes or series as they deem necessary or appropriate and determine the designations, powers, preferences, privileges and other rights attaching to such Shares or securities, including dividend rights, voting rights, conversion rights, terms of redemption and liquidation preferences, any or all of which may be greater than the powers, preferences, privileges and rights associated with the then issued and outstanding Shares, at such times and on such other terms as they think proper; and

   (c)   grant options with respect to Shares and issue warrants or similar instruments with respect thereto.

9.   The Directors may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or by a resolution passed by not less than two-thirds of the votes cast by such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy or, in the case of corporations, by their duly authorised representatives, at a general meeting of the Company of which notice specifying the intention to propose the resolution as a Special Resolution has been duly given, or by the consent in writing of the holders of two-thirds of all the issued and outstanding Shares. The Directors may issue Shares with such preferred or other rights, all or any of which may be greater than the rights of Ordinary Shares, at such time and on such terms as they may think appropriate. Notwithstanding Article 17, the Directors may issue from time to time, out of the authorised share capital of the Company (other than the authorised but unissued Ordinary Shares), series of preferred shares in their absolute discretion and without approval of the Members; provided, however, before any preferred shares of any such series are issued, the Directors shall by resolution of Directors determine, with respect to any series of preferred shares, the terms and rights of that series, including:

   (a)   the designation of such series, the number of preferred shares to constitute such series and the subscription price thereof if different from the par value thereof;

8

(b)  whether the preferred shares of such series shall have voting rights, in addition to any voting rights provided by law, and, if so, the terms of such voting rights, which may be general or limited;

(c)  the dividends, if any, payable on such series, whether any such dividends shall be cumulative, and, if so, from what dates, the conditions and dates upon which such dividends shall be payable, and the preference or relation which such dividends shall bear to the dividends payable on any shares of any other class or any other series of shares;

(d)  whether the preferred shares of such series shall be subject to redemption by the Company, and, if so, the times, prices and other conditions of such redemption;

(e)  whether the preferred shares of such series shall have any rights to receive any part of the assets available for distribution amongst the Members upon the liquidation of the Company, and, if so, the terms of such liquidation preference, and the relation which such liquidation preference shall bear to the entitlements of the holders of shares of any other class or any other series of shares;

(f)  whether the preferred shares of such series shall be subject to the operation of a retirement or sinking fund and, if so, the extent to and manner in which any such retirement or sinking fund shall be applied to the purchase or redemption of the preferred shares of such series for retirement or other corporate purposes and the terms and provisions relative to the operation thereof;

(g)  whether the preferred shares of such series shall be convertible into, or exchangeable for, shares of any other class or any other series of preferred shares or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

(h)  the limitations and restrictions, if any, to be effective while any preferred shares of such series are outstanding upon the payment of dividends or the making of other distributions on, and upon the purchase, redemption or other acquisition by the Company of, the existing shares or shares of any other class of shares or any other series of preferred shares;

(i)  the conditions or restrictions, if any, upon the creation of indebtedness of the Company or upon the issue of any additional shares, including additional shares of such series or of any other class of shares or any other series of preferred shares; and

(j)  any other powers, preferences and relative, participating, optional and other special rights, and any qualifications, limitations and restrictions thereof;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. The Company shall not issue Shares to bearer.

9

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**CLASS A ORDINARY SHARES AND CLASS B ORDINARY SHARES**

12. Holders of Class A Ordinary Shares and Class B Ordinary Shares shall at all times vote together as one class on all resolutions submitted to a vote by the Members. Each Class A Ordinary Share shall entitle the holder thereof to one (1) vote on all matters subject to vote at general meetings of the Company, and each Class B ordinary share shall entitle the holder thereof to ten (10) votes on all matters subject to vote at general meetings of the Company.

13. Each Class B Ordinary Share is convertible into one (1) Class A Ordinary Share at any time at the option of the holder thereof. The right to convert shall be exercisable by the holder of the Class B Ordinary Share delivering a written notice to the Company that such holder elects to convert a specified number of Class B Ordinary Shares into Class A Ordinary Shares. In no event shall Class A Ordinary Shares be convertible into Class B Ordinary Shares.

14. Any conversion of Class B Ordinary Shares into Class A Ordinary Shares pursuant to these Articles shall be effected by redeeming the relevant Class B Ordinary Shares and in consideration therefor issuing fully-paid Class A Ordinary Shares in equal number. Such conversion shall become effective forthwith upon entries being made in the Register of Members to record the conversion of the relevant Class B Ordinary Shares as Class A Ordinary Shares.

15. Upon any sale, transfer, assignment or disposition of any Class B Ordinary Share by Baidu to any person who is not an Affiliate of Baidu, or upon a change of ultimate beneficial ownership of any Class B Ordinary Share from Baidu to any Person who is not an Affiliate of Baidu, such Class B Ordinary Share shall be automatically and immediately converted into one Class A Ordinary Share. For the avoidance of doubt, (i) a sale, transfer, assignment or disposition shall be effective upon the Company's registration of such sale, transfer, assignment or disposition in its Register of Members; and (ii) the creation of any pledge, charge, encumbrance or other third party right of whatever description on any Class B Ordinary Shares to secure a holder's contractual or legal obligations shall not be deemed as a sale, transfer, assignment or disposition unless and until any such pledge, charge, encumbrance or other third party right is enforced and results in the third party holding legal title to the relevant Class B Ordinary Shares, in which case all the related Class B Ordinary Shares shall be automatically converted into the same number of Class A Ordinary Shares. For purpose of this Article 15, beneficial ownership shall have the meaning set forth in Rule 13d-3 under the United States Securities Exchange Act of 1934, as amended.

10

16.   Save and except for voting rights and conversion rights as set out in Articles 12 to 15 (inclusive), the Class A Ordinary Shares and the Class B Ordinary Shares shall rank *pari passu* with one another and shall have the same rights, preferences, privileges and restrictions.

## MODIFICATION OF RIGHTS

17.   Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied with the consent in writing of the holders of two-thirds of the issued Shares of that Class or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of that Class by the holders of two-thirds of the issued Shares of that Class. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, mutatis mutandis, apply, except that the necessary quorum shall be one or more Persons holding or representing by proxy at least one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

18.   The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied by, inter alia, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company. The rights of the holders of Shares shall not be deemed to be materially adversely varied by the creation or issue of Shares with preferred or other rights including, without limitation, the creation of Shares with enhanced or weighted voting rights.

## CERTIFICATES

19.   Every Person whose name is entered as a Member in the Register may, without payment and upon its written request, request a certificate within two calendar months after allotment or lodgement of transfer (or within such other period as the conditions of issue shall provide) in the form determined by the Directors. All certificates shall specify the Share or Shares held by that Person, provided that in respect of a Share or Shares held jointly by several persons the Company shall not be bound to issue more than one certificate, and delivery of a certificate for a Share to one of several joint holders shall be sufficient delivery to all. All certificates for Shares shall be delivered personally or sent through the post addressed to the Member entitled thereto at the Member's registered address as appearing in the Register.

20.   Every share certificate of the Company shall bear legends required under the applicable laws, including the Securities Act.

11

21. Any two or more certificates representing Shares of any one Class held by any Member may at the Member's request be cancelled and a single new certificate for such Shares issued in lieu on payment (if the Directors shall so require) of one dollar (US$1.00) or such smaller sum as the Directors shall determine.

22. If a share certificate shall be damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same Shares may be issued to the relevant Member upon request, subject to delivery up of the old certificate or (if alleged to have been lost, stolen or destroyed) compliance with such conditions as to evidence and indemnity and the payment of out-of-pocket expenses of the Company in connection with the request as the Directors may think fit.

23. In the event that Shares are held jointly by several persons, any request may be made by any one of the joint holders and if so made shall be binding on all of the joint holders.

## FRACTIONAL SHARES

24. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## LIEN

25. The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it, including but not limited to dividends.

26. The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen calendar days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

27. For giving effect to any such sale the Directors may authorise a Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

12

28. The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

## CALLS ON SHARES

29. Subject to the terms of the allotment, the Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen calendar days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares. A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

30. The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

31. If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

32. The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

33. The Directors may make arrangements with respect to the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

34. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors. No such sum paid in advance of calls shall entitle the Member paying such sum to any portion of a dividend declared in respect of any period prior to the date upon which such sum would, but for such payment, become presently payable.

13

**FORFEITURE OF SHARES**

35.    If a Shareholder fails to pay any call or instalment of a call in respect of partly paid Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

36.    The notice shall name a further day (not earlier than the expiration of fourteen calendar days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed, the Shares in respect of which the call was made will be liable to be forfeited.

37.    If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

38.    A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

39.    A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

40.    A certificate in writing under the hand of a Director of the Company that a Share has been duly forfeited on a date stated in the certificate shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

41.    The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

42.    The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

**TRANSFER OF SHARES**

43.    The instrument of transfer of any Share shall be in writing and in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

14

44. (a) The Directors may in their absolute discretion decline to register any transfer of Shares which is not fully paid up or on which the Company has a lien.

(b) The Directors may also decline to register any transfer of any Share unless:

(i) the instrument of transfer is lodged with the Company, accompanied by the certificate for the Shares to which it relates and such other evidence as the Board may reasonably require to show the right of the transferor to make the transfer;

(ii) the instrument of transfer is in respect of only one Class of Shares;

(iii) the instrument of transfer is properly stamped, if required;

(iv) in the case of a transfer to joint holders, the number of joint holders to whom the Share is to be transferred does not exceed four; and

(v) a fee of such maximum sum as the Designated Stock Exchange may determine to be payable, or such lesser sum as the Board of Directors may from time to time require, is paid to the Company in respect thereof.

45. The registration of transfers may, on ten calendar days' notice being given by advertisement in such one or more newspapers, by electronic means or by any other means in accordance with the Designated Stock Exchange Rules, be suspended and the Register closed at such times and for such periods as the Directors may, in their absolute discretion, from time to time determine, provided always that such registration of transfer shall not be suspended nor the Register of Members closed for more than thirty calendar days in any calendar year.

46. All instruments of transfer that are registered shall be retained by the Company. If the Directors refuse to register a transfer of any Shares, they shall within three calendar months after the date on which the transfer was lodged with the Company send notice of the refusal to each of the transferor and the transferee.

## TRANSMISSION OF SHARES

47. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only Person recognised by the Company as having any title to the Share.

48. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall, upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

15

49.   A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company, provided however, that the Directors may at any time give notice requiring any such person to elect either to be registered himself or to transfer the Share, and if the notice is not complied with within ninety calendar days, the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## REGISTRATION OF EMPOWERING INSTRUMENTS

50.   The Company shall be entitled to charge a fee not exceeding one dollar (US$1.00) on the registration of every probate, letters of administration, certificate of death or marriage, power of attorney, notice in lieu of distringas, or other instrument.

## ALTERATION OF SHARE CAPITAL

51.   The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

52.   The Company may by Ordinary Resolution:

   (a)   increase its share capital by new Shares of such amount as it thinks expedient;

   (b)   consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

   (c)   subdivide its Shares, or any of them, into Shares of an amount smaller than that fixed by the Memorandum, provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

   (d)   cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

53.   The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

16

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

54.    Subject to the provisions of the Companies Law and these Articles, the Company may:

(a)    issue Shares that are to be redeemed or are liable to be redeemed at the option of the Shareholder or the Company. The redemption of Shares shall be effected in such manner and upon such terms as may be determined, before the issue of such Shares, by either the Board or by the Shareholders by Ordinary Resolution;

(b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner and terms as have been approved by the Board or by the Members by Ordinary Resolution, or are otherwise authorised by these Articles; and

(c)    make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Companies Law, including out of capital.

55.    The purchase of any Share shall not oblige the Company to purchase any other Share other than as may be required pursuant to applicable law and any other contractual obligations of the Company.

56.    The holder of the Shares being purchased shall be bound to deliver up to the Company the certificate(s) (if any) thereof for cancellation and thereupon the Company shall pay to him the purchase or redemption monies or consideration in respect thereof.

57.    The Directors may accept the surrender for no consideration of any fully paid Share.

**TREASURY SHARES**

58.    The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

59.    The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

**GENERAL MEETINGS**

60.    All general meetings other than annual general meetings shall be called extraordinary general meetings.

61.    (a)    The Company may (but shall not be obliged to) in each calendar year hold a general meeting as its annual general meeting and shall specify the meeting as such in the notices calling it. The annual general meeting shall be held at such time and place as may be determined by the Directors.

(b)    At these meetings the report of the Directors (if any) shall be presented.

17

62. (a)    The Chairman or a majority of the Directors may call general meetings, and they shall on a Shareholders' requisition forthwith proceed to convene an extraordinary general meeting of the Company.

(b)    A Shareholders' requisition is a requisition of Members holding at the date of deposit of the requisition Shares which carry in aggregate not less than one-third (1/3) of all votes attaching to all issued and outstanding Shares of the Company that as at the date of the deposit carry the right to vote at general meetings of the Company.

(c)    The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more requisitionists.

(d)    If the Directors do not within twenty-one calendar days from the date of the deposit of the requisition duly proceed to convene a general meeting to be held within a further twenty-one calendar days, the requisitionists, or any of them representing more than one-half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three calendar months after the expiration of the said twenty-one calendar days.

(e)    A general meeting convened as aforesaid by requisitionists shall be convened in the same manner as nearly as possible as that in which general meetings are to be convened by Directors.

## NOTICE OF GENERAL MEETINGS

63.    At least seven (7) calendar days' notice shall be given for any general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day for which it is given and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)    in the case of an annual general meeting, by all the Shareholders (or their proxies) entitled to attend and vote thereat; and

(b)    in the case of an extraordinary general meeting, by two-thirds (2/3rd) of the Shareholders having a right to attend and vote at the meeting, present in person or by proxy or, in the case of a corporation or other non-natural person, by its duly authorised representative or proxy.

64.    The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

18

## PROCEEDINGS AT GENERAL MEETINGS

65.    No business except for the appointment of a chairman for the meeting shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. One or more holders holding Shares which carry in aggregate (or representing by proxy) not less than one-third (1/3) of all votes attaching to all Shares in issue and entitled to vote at such general meeting, present in person or by proxy or, if a corporation or other non-natural person, by its duly authorised representative, shall be a quorum for all purposes.

66.    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting shall be dissolved.

67.    If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

68.    The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

69.    If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman of that meeting, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

70.    The chairman may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen calendar days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

71.    The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason, upon notice in writing to Shareholders. A postponement may be for a stated period of any length or indefinitely as the Directors may determine.

72.    At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or any Shareholder present in person or by proxy, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

19

73.    If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

74.    All questions submitted to a meeting shall be decided by an Ordinary Resolution except where a greater majority is required by these Articles or by the Law. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

75.    A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

76.    Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person or by proxy (or, if a corporation or other non-natural person, by its duly authorised representative or proxy) shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder present in person or by proxy (or, if a corporation or other non-natural person, by its duly authorised representative or proxy) shall have one vote for each Class A Ordinary Share and ten votes for each Class B Ordinary Share of which he is the holder.

77.    In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy (or, if a corporation or other non-natural person, by its duly authorised representative or proxy) shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

78.    Shares carrying the right to vote that are held by a Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may be voted, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person may vote in respect of such Shares by proxy.

79.    No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

80.    On a poll votes may be given either personally or by proxy.

81.    Each Shareholder, other than a recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)), may only appoint one proxy on a show of hand. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

20

82. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

83. The instrument appointing a proxy shall be deposited at the Registered Office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company:

   (a) not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote; or

   (b) in the case of a poll taken more than 48 hours after it is demanded, be deposited as aforesaid after the poll has been demanded and not less than 24 hours before the time appointed for the taking of the poll; or

   (c) where the poll is not taken forthwith but is taken not more than 48 hours after it was demanded be delivered at the meeting at which the poll was demanded to the chairman or to the secretary or to any director;

   provided that the Directors may in the notice convening the meeting, or in an instrument of proxy sent out by the Company, direct that the instrument appointing a proxy may be deposited at such other time (no later than the time for holding the meeting or adjourned meeting) at the Registered Office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company. The Chairman may in any event at his discretion direct that an instrument of proxy shall be deemed to have been duly deposited. An instrument of proxy that is not deposited in the manner permitted shall be invalid.

84. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

85. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

86. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

21

**DEPOSITARY AND CLEARING HOUSES**

87.    If a recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) is a Member of the Company it may, by resolution of its directors or other governing body or by power of attorney, authorise such Person(s) as it thinks fit to act as its representative(s) at any general meeting of the Company or of any Class of Shareholders provided that, if more than one Person is so authorised, the authorisation shall specify the number and Class of Shares in respect of which each such Person is so authorised. A Person so authorised pursuant to this Article shall be entitled to exercise the same powers on behalf of the recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) which he represents as that recognised clearing house (or its nominee(s)) or depositary (or its nominee(s)) could exercise if it were an individual Member holding the number and Class of Shares specified in such authorisation, including the right to vote individually on a show of hands.

**DIRECTORS**

88.    (a)    Unless otherwise determined by the Company in general meeting, the number of Directors shall not be less than three (3) Directors, the exact number of Directors to be determined from time to time by the Board of Directors.

       (b)    The Board of Directors shall have a Chairman elected and appointed by a majority of the Directors then in office. The period for which the Chairman will hold office will also be determined by a majority of all of the Directors then in office. The Chairman shall preside as chairman at every meeting of the Board of Directors. To the extent the Chairman is not present at a meeting of the Board of Directors within fifteen minutes after the time appointed for holding the same, the attending Directors may choose one of their number to be the chairman of the meeting.

       (c)    For so long as Baidu and its Affiliates collectively hold no less than 50% of the voting power of the Company, Baidu shall be entitled to appoint, remove and replace a majority of the Directors by delivering a written notice to the Company, and such appointment, removal or replacement as specified therein shall be valid and effective automatically and forthwith upon delivery of such written notice to the Company (without the requirement for any further approval or action on the part of the Members or the Directors).

       (d)    The Board may, by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting, appoint any person as a Director, to fill a casual vacancy on the Board that is not a Baidu appointed Director or as an addition to the existing Board.

       (e)    An appointment of a Director may be on terms that the Director shall automatically retire from office (unless he has sooner vacated office) at the next or a subsequent annual general meeting or upon any specified event or after any specified period in a written agreement between the Company and the Director, if any; but no such term shall be implied in the absence of express provision. Each Director whose term of office expires shall be eligible for re-election at a meeting of the Shareholders or re-appointment by the Board.

22

89. A Director that is not a Baidu appointed Director may be removed from office pursuant to an existing written agreement between the Director and the Company, if any, or by Ordinary Resolution of the Company, notwithstanding anything in these Articles or in any agreement between the Company and such Director (but without prejudice to any claim for damages under such agreement). A vacancy on the Board created by the removal of a Director under the previous sentence may be filled by Ordinary Resolution or by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting. The notice of any meeting at which a resolution to remove a Director shall be proposed or voted upon must contain a statement of the intention to remove that Director and such notice must be served on that Director not less than ten (10) calendar days before the meeting. Such Director is entitled to attend the meeting and be heard on the motion for his removal.

90. The Board may, from time to time, and except as required by applicable law or Designated Stock Exchange Rules, adopt, institute, amend, modify or revoke the corporate governance policies or initiatives of the Company and determine on various corporate governance related matters of the Company as the Board shall determine by resolution of Directors from time to time.

91. A Director shall not be required to hold any Shares in the Company by way of qualification. A Director who is not a Member of the Company shall nevertheless be entitled to attend and speak at general meetings.

92. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

93. The Directors shall be entitled to be paid their travelling, hotel and other expenses properly incurred by them in going to, attending and returning from meetings of the Directors, or any committee of the Directors, or general meetings of the Company, or otherwise in connection with the business of the Company, or to receive such fixed allowance in respect thereof as may be determined by the Directors from time to time, or a combination partly of one such method and partly the other.

## ALTERNATE DIRECTOR OR PROXY

94. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing director, and to act in such Director's place at any meeting of the Directors at which the appointing Director is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall be deemed for all purposes to be a Director of the Company and shall not be deemed to be the agent of the Director appointing him. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

23

95.   Any Director may appoint any Person, whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

96.   Subject to the Companies Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

97.   Subject to these Articles, the Directors may from time to time appoint any natural person or corporation, whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, chief executive officer, one or more other executive officers, president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto terminate if any managing director ceases for any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

98.   The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

99.   The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

100.  The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "Attorney" or "Authorised Signatory", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

24

101. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

102. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

103. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

104. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

105. The Directors may from time to time at their discretion exercise all the powers of the Company to raise or borrow money and to mortgage or charge its undertaking, property and assets (present and future) and uncalled capital or any part thereof, to issue debentures, debenture stock, bonds and other securities, whether outright or as collateral security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

106. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

107. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

25

108. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

<div align="center">

**DISQUALIFICATION OF DIRECTORS**

</div>

109. The office of Director shall be vacated, if the Director:

 (a)   becomes bankrupt or makes any arrangement or composition with his creditors;

 (b)   dies or is found to be or becomes of unsound mind;

 (c)   resigns his office by notice in writing to the Company;

 (d)   without special leave of absence from the Board, is absent from meetings of the Board for three consecutive meetings and the Board resolves that his office be vacated; or

 (e)   is removed from office pursuant to any other provision of these Articles.

<div align="center">

**PROCEEDINGS OF DIRECTORS**

</div>

110. The Directors may meet together (either within or outside of the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. At any meeting of the Directors, each Director present in person or represented by his proxy or alternate shall be entitled to one vote. In case of an equality of votes the Chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

111. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

112. The quorum necessary for the transaction of the business of the Board may be fixed by the Directors, and unless so fixed, the quorum shall be a majority of Directors then in office and a majority of the Directors appointed by Baidu. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

<div align="center">26</div>

113. A Director who is in any way, whether directly or indirectly, interested in a contract or transaction or proposed contract or transaction with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract or transaction which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made or transaction so consummated. Subject to the Designated Stock Exchange Rules and disqualification by the chairman of the relevant Board meeting, a Director may vote in respect of any contract or transaction or proposed contract or transaction notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or transaction or proposed contract or transaction shall come before the meeting for consideration.

114. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

115. Any Director may act by himself or through his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

116. The Directors shall cause minutes to be made for the purpose of recording:

(a)     all appointments of officers made by the Directors;

(b)     the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c)     all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

117. When the chairman of a meeting of the Directors signs the minutes of such meeting, the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

27

118. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

119. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

120. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their members to be chairman of the meeting.

121. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

122. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## PRESUMPTION OF ASSENT

123. A Director of the Company who is present at a meeting of the Board of Directors at which an action on any Company matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the chairman or secretary of the meeting before the adjournment thereof or shall forward such dissent by registered post to such person immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

## DIVIDENDS

124. Subject to any rights and restrictions for the time being attached to any Shares, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

28

125. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

126. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors, be applicable for meeting contingencies or for equalising dividends or for any other purpose to which those funds may be properly applied, and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments (other than Shares of the Company) as the Directors may from time to time think fit.

127. Any dividend payable in cash to the holder of Shares may be paid in any manner determined by the Directors. If paid by cheque it will be sent by mail addressed to the holder at his address in the Register, or addressed to such person and at such addresses as the holder may direct. Every such cheque or warrant shall, unless the holder or joint holders otherwise direct, be made payable to the order of the holder or, in the case of joint holders, to the order of the holder whose name stands first on the Register in respect of such Shares, and shall be sent at his or their risk and payment of the cheque or warrant by the bank on which it is drawn shall constitute a good discharge to the Company.

128. The Directors may determine that a dividend shall be paid wholly or partly by the distribution of specific assets (which may consist of the shares or securities of any other company) and may settle all questions concerning such distribution. Without limiting the generality of the foregoing, the Directors may fix the value of such specific assets, may determine that cash payment shall be made to some Shareholders in lieu of specific assets and may vest any such specific assets in trustees on such terms as the Directors think fit.

129. Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares. No amount paid on a Share in advance of calls shall, while carrying interest, be treated for the purposes of this Article as paid on the Share.

130. If several Persons are registered as joint holders of any Share, any of them may give effective receipts for any dividend or other moneys payable on or in respect of the Share.

131. No dividend shall bear interest against the Company.

132. Any dividend unclaimed after a period of six calendar years from the date of declaration of such dividend may be forfeited by the Board of Directors and, if so forfeited, shall revert to the Company.

29

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION**

133. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

134. The books of account shall be kept at the Registered Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

135. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

136. The accounts relating to the Company's affairs shall be audited in such manner and with such financial year end as may be determined from time to time by the Directors or failing any determination as aforesaid shall not be audited.

137. The Directors may appoint an auditor of the Company who shall hold office until removed from office by a resolution of the Directors and may fix his or their remuneration.

138. Every auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the auditors.

139. The auditors shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment, and at any time during their term of office, upon request of the Directors or any general meeting of the Members.

140. The Directors in each calendar year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Companies Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

141. Subject to the Companies Law, the Directors may, with the authority of an Ordinary Resolution:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), which is available for distribution;

30

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii) paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to the resolution.

142. Notwithstanding any provisions in these Articles, the Directors may resolve to capitalise an amount standing to the credit of reserves (including the share premium account, capital redemption reserve and profit and loss account) or otherwise available for distribution by applying such sum in paying up in full unissued Shares to be allotted and issued to:

(a) employees (including Directors) or service providers of the Company or its Affiliates upon exercise or vesting of any options or awards granted under any share incentive scheme or employee benefit scheme or other arrangement which relates to such persons that has been adopted or approved by the Directors or the Members;

(b) any trustee of any trust or administrator of any share incentive scheme or employee benefit scheme to whom shares are to be allotted and issued by the Company in connection with the operation of any share incentive scheme or employee benefit scheme or other arrangement which relates to such persons that has been adopted or approved by the Directors or Members; or

31

(c)     any depository of the Company for the purposes of the issue, allotment and delivery by the depositary of ADSs to employees (including Directors) or service providers of the Company or its Affiliates upon exercise or vesting of any options or awards granted under any share incentive scheme or employee benefit scheme or other arrangement which relates to such persons that has been adopted or approved by the Directors or the Members.

## SHARE PREMIUM ACCOUNT

143.   The Directors shall in accordance with the Companies Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

144.   There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Companies Law, out of capital.

## NOTICES

145.   Except as otherwise provided in these Articles, any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder or Director either personally, or by posting it by airmail or air courier service in a prepaid letter addressed to such Shareholder or Director at his address as appearing in the Register or the Register of Directors of the Company, as the case may be, or by electronic mail to any electronic mail address such Shareholder or Director may have specified in writing for the purpose of such service of notices, or by facsimile or by placing it on the Company's Website should the Directors deem it appropriate provided that the Company shall notify the Shareholders of the placement of such notice by any of the means set out above. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

146.   Notices posted to addresses outside the Cayman Islands shall be forwarded by prepaid airmail.

147.   Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where required, of the purposes for which such meeting was convened.

148.   Any notice or other document, if served by:

(a)     post, shall be deemed to have been served five calendar days after the time when the letter containing the same is posted;

(b)     facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

32

(c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

149.    Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

150.    Notice of every general meeting of the Company shall be given to:

(a)    all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)    every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

## INFORMATION

151.    No Member shall be entitled to require discovery of any information in respect of any detail of the Company's trading or any information which is or may be in the nature of a trade secret or secret process which may relate to the conduct of the business of the Company and which in the opinion of the Board would not be in the interests of the Members of the Company to communicate to the public.

152.    The Board shall be entitled to release or disclose any information in its possession, custody or control regarding the Company or its affairs to any of its Members including, without limitation, information contained in the Register and transfer books of the Company.

## INDEMNITY

153.    Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "Indemnified Person") shall be indemnified and secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

33

154. No Indemnified Person shall be liable:

   (a)   for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

   (b)   for any loss on account of defect of title to any property of the Company; or

   (c)   on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

   (d)   for any loss incurred through any bank, broker or other similar Person; or

   (e)   for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

   (f)   for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

   unless the same shall happen through such Indemnified Person's own dishonesty, willful default or fraud.

## FINANCIAL YEAR

155. Unless the Directors otherwise prescribe, the financial year of the Company shall end on December 31st in each calendar year and shall begin on January 1st in each calendar year.

## NON-RECOGNITION OF TRUSTS

156. No Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Companies Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register.

## WINDING UP

157. If the Company shall be wound up the liquidator may, with the sanction of a Special Resolution of the Company and any other sanction required by the Companies Law, divide amongst the Members in specie or in kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for that purpose value any assets and determine how the division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Members as the liquidator, with the like sanction, shall think fit, but so that no Member shall be compelled to accept any asset upon which there is a liability.

34

158. If the Company shall be wound up, and the assets available for distribution amongst the Members shall be insufficient to repay the whole of the share capital, such assets shall be distributed so that, as nearly as may be, the losses shall be borne by the Members in proportion to the par value of the Shares held by them. If in a winding up the assets available for distribution amongst the Members shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, the surplus shall be distributed amongst the Members in proportion to the par value of the Shares held by them at the commencement of the winding up subject to a deduction from those Shares in respect of which there are monies due, of all monies payable to the Company for unpaid calls or otherwise. This Article is without prejudice to the rights of the holders of Shares issued upon special terms and conditions.

### AMENDMENT OF ARTICLES OF ASSOCIATION

159. Subject to the Companies Law, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

### CLOSING OF REGISTER OR FIXING RECORD DATE

160. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case thirty calendar days in any calendar year. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

161. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within ninety calendar days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

162. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

35

**REGISTRATION BY WAY OF CONTINUATION**

163. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**DISCLOSURE**

164. The Directors, or any service providers (including the officers, the Secretary and the registered office agent of the Company) specifically authorised by the Directors, shall be entitled to disclose to any regulatory or judicial authority or to any stock exchange on which securities of the Company may from time to time be listed any information regarding the affairs of the Company including without limitation information contained in the Register and books of the Company.

36

Exhibit 4.2



**Certificate Number**

-[   ]-

**iQIYI, Inc.**
**(the "Company")**
INCORPORATED IN THE CAYMAN ISLANDS UNDER THE COMPANIES LAW
(AS AMENDED OR REVISED FROM TIME TO TIME)

**Amount of Shares**

[   ]

US$1,000,000 divided into 100,000,000,000 shares comprising
of (i) 94,000,000,000 Class A Ordinary Shares of a par value of
US$0.00001 each, (ii) 5,000,000,000 Class B Ordinary Shares
of a par value of US$0.00001 each and (iii) 1,000,000,000
shares of a par value of US$0.00001 each

THIS CERTIFIES THAT **[NAME]** of **[ADDRESS]** is the registered holder of **CLASS A ORDINARY** Share(s) of par value **USD0.00001** each subject to the Memorandum and Articles of Association of the Company, and transferable only on the book of the Company by the holder hereof in person or by Attorney in accordance with the Memorandum and the Articles of Association of the Company and upon surrender of this certificate to the Company.

EXECUTED on behalf of the Company this _____ day of _____ 2018.

_____
Director/Secretary

**Exhibit 4.4**

**Execution Version**

**SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT**

This SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "Agreement") dated as of October 26, 2017, is entered into by and among:

1. Qiyi.com, Inc., a company organized under the laws of the Cayman Islands (the "Company"),

2. Qiyi.com HK Limited, a company limited by shares incorporated under the laws of Hong Kong (the "HK Subsidiary"),

3. Beijing Qiyi Century Science & Technology Co, Ltd. (" 北京奇艺世纪科技有限公司 "), a wholly foreign-owned enterprise established under the laws of the PRC (the "Beijing WFOE"),

4. Chongqing Qiyi Tianxia Science & Technology Co, Ltd. (" 重庆奇艺天下科技有限公司 "), a wholly foreign-owned enterprise established under the laws of the PRC (the "Chongqing WFOE"),

5. Beijing Dingxin Tianxia Science & Technology Co. Ltd. (" 北京鼎新天下科技有限公司 "), a limited liability company organized under the laws of the PRC (the "PRC Entity 1"),

6. Beijing IQIYI Science & Technology Co., Ltd. (" 北京爱奇艺科技有限公司 "), a limited liability company organized under the laws of the PRC (the "PRC Entity 2"),

7. Shanghai IQIYI Culture Media Co., Ltd. (" 上海爱奇艺文化传媒有限公司 "), a limited liability company organized under the laws of the PRC (the "PRC Entity 3"),

8. Shanghai Zhong Yuan Network Co., Ltd. (" 上海众源网络有限公司 "), a limited liability company organized under the laws of the PRC (the "PRC Entity 4"),

9. Gong Yu, a citizen of the People's Republic of China, with PRC ID number of *** (the "Founder"), and

10. the parties listed on Schedule 1 attached hereto.

WHEREAS, pursuant to a Note Purchase Agreement (the "Note Purchase Agreement"), dated as of January 11, 2017, by and among the Company and certain investors (the "Series G Investors"), such Series G Investors purchased certain convertible promissory notes (the "Notes") from the Company;

WHEREAS, the Company has delivered a conversion notice to the Series G Investors to convert all of the principal amounts of such Series G Investors' Notes into Series G1 Preferred Shares or Series G2 Preferred Shares (each as defined below), as applicable, and each Series G Investor has agreed to such conversion;

WHEREAS, pursuant to the Note Purchase Agreement and the Notes, the Company and the Series G Investors shall enter into an amended and restated shareholders agreement incorporating certain terms prescribed in the Note Purchase Agreement;

WHEREAS, all consents under the Fifth Amended and Restated Shareholders Agreement (the "Prior Agreement"), dated as of November 11, 2014, required for the amendment of the Prior Agreement have been duly obtained; and

WHEREAS, the parties hereto desire to enter into this Agreement for the purpose of (i) properly amending and restating in its entirety the Prior Agreement and (ii) regulating certain aspects of their relationship with regard to the Company and the Group Entities (as defined herein) on and after the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1 Definitions. As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings indicated

"Absent Director" has the meaning set forth in Section 6.4(b) of this Agreement.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or under common control with, the Person specified, including, in the case of any Shareholder that is a fund or any entity controlled by such fund, any investment capital fund now or hereafter existing which is controlled by, or under the common control of, substantially the same principal(s) that control such Shareholder.

"Agreement" means this Agreement as the same may be amended, supplemented or modified in accordance with the terms hereof.

"Assets" means all assets, rights and privileges of any nature and all goodwill associated therewith, including all rights in respect of Contractual Obligations, all Intellectual Property and Equipment.

"Associate" means, with respect to any Person, any other Person (together with any individual, firm, corporation, partnership, trust and incorporated or unincorporated association controlling it, controlled by it or under the same control with it) which, directly or indirectly, through voting securities or contractual arrangements or otherwise, (i) holds or has the right to acquire 25% or more of the Capital Stock, either in terms of economic interests or voting power, of the Person specified; (ii) is the single largest shareholder of the Person specified, or (iii) has the power to appoint or nominate or designate at least one-third of the members of the board of directors (or other equivalent authority, as applicable) or one-third or more of the senior executive officers of the Person specified.

"Baidu Shareholders" means Baidu Holdings Limited, a company organized under the laws of the British Virgin Islands, any Subsequent Baidu Purchaser and any Permitted Transferee thereof to whom Shares are Transferred in accordance with Section 2.2 of this Agreement, and the term "Baidu Shareholder" means any such Person.

"Beijing WFOE" has the meaning set forth in the preamble to this Agreement.

2

"Big Four" means the four internationally recognized accounting firms, Deloitte & Touche, Ernst & Young, KPMG and PricewaterhouseCoopers.

"Board of Directors" means the board of directors of the Company.

"Budget" has the meaning set forth in Section 7.3.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, Hong Kong or the PRC are authorized or required by law or executive order to close.

"Cannes" means Cannes Ventures Limited, an exempted company incorporated and existing under the laws of the Cayman Islands.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting or non-voting) of, such Person's authorized share capital or capital stock (including ordinary shares and preferred shares) and any and all rights, warrants or options exchangeable for or convertible into such share capital or capital stock.

"Centre" has the meaning set forth in Section 10.8(b) of this Agreement.

"CEO Director" has the meaning set forth in Section 6.3(a) of this Agreement.

"Chief Executive Officer" means the chief executive officer of the Company.

"Chongqing WFOE" has the meaning set forth in the preamble to this Agreement.

"Circular 37" means Circular 37 issued by SAFE on July 14, 2014, including any amendment, implementing rules, or official interpretation thereof, and any other rules and circulars issued by SAFE regulating filings or registrations of round-trip investment.

"Company" has the meaning set forth in the preamble to this Agreement.

"Company's Core Business" means (i) exhibition, broadcasting, performance and/or distribution of online audio/video (including without limitation movies, television shows, variety shows, webisodes and user generated contents) via any mobile-based, IP-based and/or Internet based method that is now known or hereafter available, (ii) original in-house content and original broadband content production, (iii) online games (including without limitation, client-based games, webgames and mobile games), (iv) production, promotion, marketing and distribution of movies, motion pictures and animated movies and investment in this sector, (v) merchandising and licensing of the Intellectual Property of the Company and/or any Group Entity, manufacturing, sales, promotion, marketing, franchising of merchandised goods, (vi) any services, business or operation associated with each of the foregoing businesses in a material aspect, and (vii) any other business or operation which is material to the Company and/or the Group Entities.

"Confidentiality Affiliates" has the meaning set forth in Section 7.9(a).

"Confidential Information" has the meaning set forth in Section 7.9(a).

"Contract Date" has the meaning set forth in Section 3.1(d) of this Agreement.

3

"Contractual Obligations" means, as to any Person, any provision of any security or financial instrument issued by such Person or of any agreement, undertaking, contract, license, engagement, lease, indenture, mortgage, deed of trust, purchase order, commitment or other instrument or contractual arrangement to which such Person is a party or by which it or any of its property is bound.

"control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person (including without limitation, the power to determine or cause the determination of equity investment), whether through the ownership of voting securities, by contract or otherwise.

"Copyrights" means any copyright registrations and applications for registration thereof in the United States, the PRC or any other jurisdiction, and any non-registered copyrights.

"Direct Competitor" has the meaning set forth in Section 2.5(b) of this Agreement.

"Equipment" means all the plant and machinery, tools and equipment, vehicles and office furniture, computer equipment and accessories and other tangible Assets.

"Excess New Securities" has the meaning set forth in Section 4.2(a) of this Agreement.

"Excess Offered Securities" has the meaning set forth in Section 3.1(b)(i) of this Agreement.

"Founder" has the meaning set forth in the preamble to this Agreement.

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any stock exchange or its governing body.

"Group Entity" means a Person (other than a natural person) (i) that is controlled by the Company or (ii) whose revenue, expenses, assets, and liabilities are consolidated with those of the Company and are recorded on the books of the Company for financial reporting purposes in accordance with US GAAP. For the avoidance of doubt, the term "Group Entity" includes the HK Subsidiary, the Beijing WFOE, the Chongqing WFOE, the PRC Entity 1, the PRC Entity 2, the PRC Entity 3, the PRC Entity 4, and each of their respective Subsidiaries as well as all other Subsidiaries of the Company.

"HK Subsidiary" has the meaning set forth in the preamble to this Agreement.

"Indemnified Liabilities" has the meaning set forth in Section 10.12.

"Indemnitees" has the meaning set forth in Section 10.12.

"Initial Public Offering" means the first bona fide firm commitment underwritten public offering of Ordinary Shares which is approved in accordance with the terms of this Agreement and the Seventh Restated Articles and in which the underwriting is lead managed by an internationally recognized investment banking firm and the Ordinary Shares are listed on The NASDAQ Stock Market, the New York Stock Exchange, the Hong Kong Stock Exchange, or such other internationally recognized stock exchange outside of the PRC as mutually agreed upon by the Major Shareholders and the Significant Shareholder.

4

"Intellectual Property" means, collectively, Copyrights, Patents, Trade Secrets, Trademarks, Internet Assets, Software and other proprietary rights.

"Internet Assets" means any Internet domain names and other computer user identifiers and any rights in and to sites on the worldwide web, including rights in and to any text, graphics, audio and video files and html or other code incorporated in such sites.

"Irrevocable Proxy" has the meaning set forth in Section 2.1(a) of this Agreement.

"Key Officers" means the chief executive officer, the chief financial officer and the chief operation officer (or their function equivalent) of the Company.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other) or preference, priority, right, charge or other security interest or preferential arrangement of any kind or nature whatsoever.

"Major Shareholder" means any Shareholder holding at least 30% of the voting power of the outstanding Series Preferred Shares (excluding the Series G2 Preferred Shares).

"New Issuance Notice" has the meaning set forth in Section 4.1 of this Agreement.

"New Securities" has the meaning set forth in Section 4.1 of this Agreement.

"Notes" has the meaning set forth in the recitals to this Agreement.

"Note Purchase Agreement" has the meaning set forth in the recitals to this Agreement.

"Offer Price" has the meaning set forth in Section 3.1(a) of this Agreement.

"Offered Securities" has the meaning set forth in Section 3.1(a) of this Agreement.

"Offering Notice" has the meaning set forth in Section 3.1(a) of this Agreement.

"Option Plan" has the meaning set forth in Section 7.6(a).

"Ordinary Share Equivalents" means any security or obligation which is by its terms, directly or indirectly, convertible into or exchangeable or exercisable for Ordinary Shares, including the Series A Preferred Shares, the Series A-1 Junior Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares, the Series D Preferred Shares, the Series E Preferred Shares, the Series F Preferred Shares, the Series G Preferred Shares, and any option, warrant or other subscription or purchase right with respect to Ordinary Shares.

"Ordinary Shares" means the ordinary shares, par value US$0.00001 per share, of the Company or any other Capital Stock of the Company into which such share capital is reclassified or reconstituted.

5

"Patents" means any patents and patent applications issued by or made in the PRC, the United States or any other jurisdiction, including any divisions, continuations, continuations-in-part, substitutions or reissues thereof, whether or not patents are issued on such applications and whether or not such applications are modified, withdrawn or resubmitted.

"Permitted Transferee" means, (i) with respect to each of the Baidu Shareholders, any Person that is, directly or indirectly, a wholly-owned Subsidiary of Baidu, Inc.; (ii) with respect to Xiaomi, any Person that is, directly or indirectly, a wholly-owned Subsidiary of Xiaomi Corporation; (iii) with respect to Prominent, its Affiliates under the same control of Shunwei China Internet Opportunity Fund, L.P., (iv) with respect to each of the Series G Preferred Shareholders (other than Baidu Shareholders and Harvest Rewards Fund LP), its Affiliates incorporated in the form of a fund that are under the control of the same general partner as such Shareholder, and any holding vehicles wholly owned by such Affiliates; (v) with respect to Harvest Rewards Fund LP, its wholly-owned Subsidiaries and Baidu Shareholders; and (vi) with respect to each of the other Shareholders who is an individual or that is an entity owned by an individual (and in the latter case, solely for purposes of this clause (vi), the individual shall be deemed to be a Shareholder), (x) any executor, administrator or trustee of such Shareholder's estate if such Shareholder dies, (y) any transferee receiving the Shares owned by such Shareholder by will, intestacy laws or the laws of descent or survivorship, and (z) any trustee of a trust, created for bona fide estate planning purposes, of which there are no beneficiaries other than such Shareholder or one more lineal descendants, siblings or parents of such Shareholder.

"Person" means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"PRC Entity 1" has the meaning set forth in the preamble to this Agreement.

"PRC Entity 2" has the meaning set forth in the preamble to this Agreement.

"PRC Entity 3" has the meaning set forth in the preamble to this Agreement.

"PRC Entity 4" has the meaning set forth in the preamble to this Agreement.

"PRC GAAP" means generally accepted accounting principles of the PRC.

"PRC" means the People's Republic of China, for the purpose of this Agreement, excluding Hong Kong, Macau and Taiwan.

"Preemptive Rightholder(s)" has the meaning set forth in Section 4.1 of this Agreement.

"Preferred Shares" means, collectively, the Series A Preferred Shares, the Series A-1 Junior Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares, the Series D Preferred Shares, the Series E Preferred Shares, the Series F Preferred Shares and the Series G Preferred Shares.

"Prior Agreement" has the meaning set forth in the recitals to this Agreement.

"Prominent" means Prominent TMT Limited, a business company incorporated and existing under the laws of British Virgin Islands.

6

"Proportionate Percentage" has the meaning set forth in Section 4.2(a) of this Agreement.

"Proposed Price" has the meaning set forth in Section 4.1 of this Agreement.

"Qualified IPO" means an Initial Public Offering with a pre-offering valuation of the Company of at least US$3,000,000,000.

"Requirements of Law" means, as to any Person, any law, statute, treaty, rule, regulation, right, privilege, qualification, license or franchise or determination of an arbitrator or a court or other Governmental Authority, in each case applicable or binding upon such Person or any of its property or to which such Person or any of its property is subject or pertaining to any or all of the transactions contemplated or referred to herein.

"Rightholder Excess Option Period" has the meaning set forth in Section 3.1(b)(i) of this Agreement.

"Rightholder Option Period" has the meaning set forth in Section 3.1(b)(i) of this Agreement.

"Rightholder(s)" has the respective meanings set forth in Section 3.1(a) of this Agreement.

"RMB" means the lawfully currency in the PRC.

"SAFE" means the State Administration of Foreign Exchange of the PRC.

"Sale Transaction" means (a) (i) the merger or consolidation of the Company or a Group Entity into or with one or more Persons, (ii) the merger or consolidation of one or more Persons into or with the Company or a Group Entity or (iii) a tender offer or other business combination involving the Company or a Group Entity if, in the case of (i), (ii) or (iii), the shareholders of the Company prior to such merger or consolidation of the Company do not retain at least a majority of the voting power of the surviving Person (or, in the case of a merger or consolidation or tender offer or other business combination involving a Group Entity, the Company does not retain at least a majority of the voting power of such Group Entity after such transaction), or (b) the voluntary sale, conveyance, exchange, exclusive license (without retaining right to use on its own) or transfer to another Person of (i) the voting Capital Stock of the Company or a Group Entity, as applicable, if, after such sale, conveyance, exchange or transfer, the shareholders of the Company prior to such sale, conveyance, exchange or transfer do not retain at least a majority of the voting power of the Company (or, in the case of a sale, conveyance, exchange or transfer involving a Group Entity, the Company does not retain at least a majority of the voting power of such Group Entity after such transaction), or (ii) all or substantially all of the Assets of the Company or a Group Entity.

"Selling Shareholder" means (i) a Shareholder holding Ordinary Shares, Series A-1 Preferred Shares or Series G Preferred Shares, or (ii) Xiaomi or Prominent.

"Series A Preferred Shares" means the Series A convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series A-1 Preferred Shares" means the Series A-1 junior convertible preferred shares, par value $0.00001 each, of the Company.

7

"Series B Preferred Shares" means the Series B convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series C Preferred Shares" means the Series C convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series D Preferred Shares" means the Series D convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series E Preferred Shares" means the Series E convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series F Preferred Shares" means the Series F convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series F Director" has the meaning set forth in Section 6.3(a) of this Agreement.

"Series G Investors" has the meaning set forth in the recitals to this Agreement.

"Series G Preferred Shareholder" has the meaning set forth in Section 2.1(a) of this Agreement.

"Series G Preferred Shares" means, collectively, the Series G1 Preferred Shares and the Series G2 Preferred Shares.

"Series G1 Preferred Shares" means the Series G1 convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series G2 Preferred Shares" means the Series G2 convertible redeemable preferred shares, par value $0.00001 each, of the Company.

"Series Preferred Directors" has the meaning set forth in Section 6.3(a) of this Agreement.

"Series Preferred Shares" means the Series A Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares, the Series D Preferred Shares, Series E Preferred Shares, Series F Preferred Shares and Series G Preferred Shares.

"Shareholders" means (a) the parties listed on Schedule 1 attached hereto, (b) any Permitted Transferee thereof who has agreed to be bound by the terms and conditions of this Agreement in accordance with Section 2.4, and (c) any Person who acquires Shares and has agreed to be bound by the terms and conditions of this Agreement in accordance with Section 5.2, and the term "Shareholder" means any such Person.

"Shares" means, with respect to each Shareholder, Ordinary Shares, Preferred Shares and any other Ordinary Share Equivalents, whether now owned or hereafter acquired; provided that for the purposes of any computation of the number of Shares pursuant to Sections 2, 3, 4.1, 4.2 and 6, all outstanding Ordinary Share Equivalents shall be deemed converted, exercised or exchanged as applicable and the Ordinary Shares issuable upon such conversion, exercise or exchange shall be deemed outstanding, whether or not such conversion, exercise or exchange has actually been effected.

8

"Significant Shareholder" means Xiaomi, subject to the condition that Xiaomi and Prominent jointly continue to hold at least 6.25% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis. For the avoidance of doubt, once Xiaomi and Prominent jointly hold less than 6.25% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis, all the rights held by the Significant Shareholder under this Agreement (including without limitation, Sections 2.3, 6.3, 6.6, 7.2 and 7.4) shall terminate immediately without any further action by any of the parties hereto.

"Seventh Restated Articles" means, collectively, the Seventh Amended and Restated Memorandum and Articles of Association of the Company as in effect on the date hereof, copies of which are attached hereto as Exhibit A, as may be subsequently amended or restated from time to time.

"Software" means any computer software programs, source code, object code, data and documentation, including any computer software programs that incorporate and run the Company's or any of its Subsidiaries' pricing models, formulae and algorithms.

"Subject Purchaser" has the meaning set forth in Section 4.1 of this Agreement.

"Subsequent Baidu Purchaser" means any, direct or indirect, wholly-owned Subsidiary of Baidu, Inc. that, after the date hereof, acquires Shares.

"Subsidiaries" means, as of the relevant date of determination, with respect to any Person, any other Person of which more than 50% of the voting power of the outstanding voting securities or more than 50% of the outstanding economic equity interest or ownership is held, directly or indirectly, by such Person.

"Tag-Along Rightholder" means (i) with respect to a Transfer of any Ordinary Shares, each holder of the Series Preferred Shares, who is not a Selling Shareholder or Affiliates of such Selling Shareholder and who does not exercise the rights to purchase any Offered Securities pursuant to Section 3.1(a)-(c); (ii) with respect to a Transfer of any Series A-1 Preferred Shares, each holder of the Series Preferred Shares (other than Xiaomi, Prominent and the Series G Preferred Shareholders) who does not exercise the rights to purchase any Offered Securities pursuant to Section 3.1(a)-(c); and (iii) with respect to any Baidu Shareholder's Transfer of any Series Preferred Shares referenced in sub-clause (B) in Section 3.1(e)(i), each Series G Preferred Shareholder who is not a Baidu Shareholder or Affiliate of any Baidu Shareholder and who does not exercise the rights to purchase any Offered Securities pursuant to Section 3.1(a)-(c).

"Tag Notice" has the meaning set forth in Section 3.1(e)(iii) of this Agreement.

"Third Party Purchaser" has the meaning set forth in Section 3.1(a) of this Agreement.

"Trade Secrets" means any trade secrets, research records, processes, procedures, manufacturing formulae, technical know-how, technology, blue prints, designs, plans, inventions (whether patentable and whether reduced to practice), invention disclosures and improvements thereto, in each case, the value of which is contingent upon the maintenance of confidentiality thereof.

9

"Trademarks" means any trademarks, service marks, trade names or product or service identifiers, whether registered or unregistered, and all registrations and applications for registration thereof.

"Transfer" means, with respect to any Shares, (i) when used as a verb, to sell, assign, dispose of, exchange, charge (whether legal or equitable), encumber, hypothecate or otherwise transfer such Shares or any participation or interest therein (including by swap or similar arrangement), whether directly or indirectly, or agree or commit to do any of the foregoing, and (ii) when used as a noun, a direct or indirect sale, assignment, disposition, exchange, charge (whether legal or equitable), encumbrance, hypothecation, or other transfer of such Shares or any participation or interest therein (including by swap or similar arrangement) or any agreement or commitment to do any of the foregoing. For avoidance of doubt, a sale, assignment, disposition, exchange, charge (whether legal or equitable), encumbrance, hypothecation, or other transfer of an interest in any Shareholder, or direct or indirect parent thereof, or any direct or indirect holding company holding any interest in any Shareholder (but excluding the Capital Stock of Baidu, Inc.), shall constitute a Transfer of Shares for purposes of this Agreement.

"Unwinding Event" has the meaning set forth in Section 2.3(b).

"US GAAP" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, as codified and described in FASB Statement No. 168, The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles.

"Voting Holder" has the meaning set forth in Section 6.1.

"Voting Undertaking" has the meaning set forth in Section 2.1(a) of this Agreement.

"Xiaomi" means Xiaomi Ventures Limited, a business company incorporated and existing under the laws of British Virgin Islands.

1.2 Rules of Construction.

Interpretation of this Agreement shall be governed by the following rules of construction: (i) the words such as "herein," "hereinafter," "hereof," "hereby," "hereto," "hereunder" and derivative or similar words refer to this entire Agreement, including any Schedules or Exhibits hereto, as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (ii) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (iii) references to the terms Article, Section, Schedule and Exhibit are references to the Articles, Sections, Schedules and Exhibits to this Agreement, unless otherwise specified; (iv) references to "$" mean U.S. dollars; (v) the word "including" and words of similar import when used in this Agreement mean "including without limitation," unless otherwise specified; (vi) the word "or" shall not be exclusive; (vii) references to "written" or "in writing" include in electronic form; (viii) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (ix) the parties hereto have each participated in the negotiation and drafting of this Agreement and if any ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any party by virtue of the authorship of any of the provisions in this Agreement or any interim drafts thereof; (x) a reference to any Person includes such Person's successors and permitted assigns; (xi) any reference to "days" means calendar days unless Business Days are expressly specified; and (xii) when calculating the period of time before which, within which or following which any act is to be done or any step is taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

10

**ARTICLE II.**
**RESTRICTIONS ON TRANSFER OF SHARES.**

2.1 <u>Limitation on Transfer</u>.

(a) Notwithstanding anything to the contrary contained in this Agreement, (i) each Shareholder hereby agrees that prior to the Initial Public Offering, without the approval of the Board of Directors, such Shareholder shall not Transfer any Ordinary Shares and/or Series A-1 Preferred Shares; (ii) each of Xiaomi and Prominent hereby agrees that prior to the Initial Public Offering, without the approval of the Board of Directors, such Shareholder shall not Transfer any Series F Preferred Shares, in each case other than (A) Transfers by any Shareholder to its Permitted Transferees in accordance with <u>Section 2.2</u>, (B) Transfers by any Shareholder in connection with an Initial Public Offering (to the extent such Shares are to be sold as part of such Initial Public Offering), or (C) Transfers by any Shareholder in connection with the sale of the Preferred Shares in accordance with <u>Section 7.7</u>; and (iii) each Shareholder holding Series G Preferred Shares ("<u>Series G Preferred Shareholder</u>") agrees that prior to the earlier of (A) the Initial Public Offering and (B) the second anniversary of the date hereof, without the approval of the Board of Directors, each Series G Preferred Shareholder shall not Transfer any Series G Preferred Shares other than (A) Transfers by any Series G Preferred Shareholder to its Permitted Transferees, or (B) Transfers by any Series G Preferred Shareholder in connection with an Initial Public Offering (to the extent such Shares are to be sold as part of such Initial Public Offering); <u>provided</u>, that any Transfer by the Founder prior to the Initial Public Offering requires the affirmative approval of at least two-third majority of the members of the Board of Directors, which shall include the affirmative approval from the Series F Director. In the event that any Series G Preferred Shares are Transferred to any Person prior to the Initial Public Offering, such Transfer shall be conditioned on the transferee being subject to all restrictions applicable to the transferor in connection with the Transferred Series G Preferred Shares (including without limitation, in the case of any Transfer of Series G2 Preferred Shares, the obligation to execute and deliver to Baidu Holdings Limited an irrevocable voting undertaking (the "<u>Voting Undertaking</u>") and an irrevocable voting proxy and power of attorney (the "<u>Irrevocable Proxy</u>") in the forms attached as <u>Exhibit C</u> hereto prior to such Transfer).

(b) Any attempt to Transfer any Shares, or any rights thereunder in violation of this Agreement shall be null and void *ab initio*. Any Transfer not made in compliance with this Agreement shall not be recorded in the books of the Company and shall not be recognized by the Company.

2.2 <u>Permitted Transfers.</u>

Subject to compliance with <u>Sections 2.3</u>, 2.4 and 2.5, each of the Shareholders may Transfer all or a portion of its Shares to any of its respective Permitted Transferees. In addition, a Permitted Transferee of Shares pursuant to this <u>Section 2.2</u> may Transfer its Shares pursuant to this <u>Section 2.2</u> only to the initial transferring Shareholder or to a Person that is another Permitted Transferee of such initial transferring Shareholder. No Shareholder shall avoid the provisions of this Agreement by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee, and any Transfer or attempted Transfer in violation of this covenant shall be null and void *ab initio*.

11

2.3 <u>Permitted Transfer Procedures</u>.

(a) If any Shareholder wishes to Transfer its Shares to a Permitted Transferee pursuant to <u>Section 2.2</u>, such Shareholder shall give notice to the Company of its intention to make such a Transfer not less than ten (10) Business Days prior to effecting such Transfer, which notice shall state the name and address of each Permitted Transferee to whom such Transfer is proposed, the relationship of such Permitted Transferee to such transferring Shareholder, and the number of Shares proposed to be Transferred to such Permitted Transferee.

(b) In the event that a Permitted Transferee holding any Shares ceases to qualify, or expects to cease to qualify, as a Permitted Transferee in relation to the initial transferring Shareholder from whom or which such Permitted Transferee or any previous Permitted Transferee of such initial transferring Shareholder received such Shares, as the case may be (an "<u>Unwinding Event</u>"):

(i) the relevant initial transferring Shareholder shall promptly notify the Company and the Major Shareholders and the Significant Shareholder of the occurrence, or expected occurrence, of such Unwinding Event; and

(ii) prior to such Unwinding Event, such initial transferring Shareholder shall, and shall cause the relevant Permitted Transferee to, take all actions necessary to effect a Transfer of the Shares held by the relevant Permitted Transferee back to such Shareholder or to another Person that qualifies as a Permitted Transferee of such initial transferring Shareholder.

2.4 <u>Transfers in Compliance with Law</u>.

Notwithstanding any other provision of this Agreement, no Transfer may be made pursuant to this Section 2 or Section 3 of this Agreement unless (i) the transferee has agreed in writing to be bound by the terms and conditions of this Agreement pursuant to an instrument substantially in the form attached hereto as <u>Exhibit B-1</u>, (ii) the Transfer complies in all respects with the applicable provisions of this Agreement, (iii) the Transfer complies in all respects with applicable securities laws, and (iv) the Transfer complies in all respects with Circular 37 (if applicable) and any related Requirements of Law (and the transferee has provided evidence of such compliance satisfactory to the Company).

2.5 <u>Transfers to Direct Competitors</u>.

(a) Notwithstanding any other provision of this Agreement, no Shareholder (other than Baidu Shareholders) shall Transfer any Shares to a Direct Competitor (as defined below). For the avoidance of doubt, the foregoing sentence does not prohibit any bona fide open-market sale and purchase of Shares to a Direct Competitor after the Initial Public Offering.

(b) For purposes of this <u>Section 2.5</u>, a "<u>Direct Competitor</u>" means (i) any entity listed in <u>Schedule 2</u> attached hereto, and (ii) any other Person, whose business and operations compete directly with the Company's Core Business. The Company is entitled to amend the definition of Direct Competitor, including without limitation the entities listed in <u>Schedule 2</u>, every six (6) months after January 25, 2017, the date on which the Notes are issued.

12

## ARTICLE III.
## RIGHT OF FIRST OFFER, TAG-ALONG RIGHTS.

3.1 <u>Proposed Voluntary Transfers</u>.

(a) Offering Notice.

Subject to Section 2, if a Selling Shareholder wishes to Transfer all or any portion of its, her or his Ordinary Shares or Series A-1 Preferred Shares, Series F Preferred Shares or Series G Preferred Shares to any Person (other than to a Permitted Transferee of such Selling Shareholder) (a "<u>Third Party Purchaser</u>"), such Selling Shareholder shall offer such Shares first (i) with respect to any Transfer of Ordinary Shares, to holders of Series Preferred Shares who are not Affiliates of such Selling Shareholder, and (ii) with respect to any Transfer of Series A-1 Preferred Shares, Series F Preferred Shares held by Xiaomi or Prominent or Series G Preferred Shares, to holders of the Series Preferred Shares (other than Xiaomi, Prominent and Series G Preferred Shareholders) (for the purpose of <u>Section 3.1</u>, each offeree as specified in subsection (i) and (ii) above, a "<u>Rightholder</u>" and collectively, the "<u>Rightholders</u>"), by sending written notice (an "<u>Offering Notice</u>") to the Rightholders and to the Company, which written notice shall state (A) the number of Shares proposed to be Transferred (the "<u>Offered Securities</u>"), (B) the purchase price per Share for the Offered Securities that the Selling Shareholder is prepared to accept for the Offered Securities (the "<u>Offer Price</u>"), and (C) the other terms and conditions of the proposed Transfer. Upon delivery of the Offering Notice, such offer shall be irrevocable unless and until the rights of first offer provided for herein shall have been waived or shall have expired.

(b) Rightholder Option; Exercise.

(i) For a period of twenty (20) days after the giving of the Offering Notice pursuant to <u>Section 3.1(a)</u> (the "<u>Rightholder Option Period</u>"), the Rightholders shall have the right to purchase all, but not less than all, of the Offered Securities at a purchase price equal to the Offer Price and upon the terms and conditions set forth in the Offering Notice. Each Rightholder shall have the right to purchase that percentage of the Offered Securities determined by dividing (i) the total number of Series Preferred Shares (as the case may be) then owned by such Rightholder (on as-if converted basis) by (ii) the total number of Series Preferred Shares (as the case may be) then owned by all such Rightholders (on as-if converted basis). If any Rightholder does not fully subscribe for the number or amount of Offered Securities it is entitled to purchase within such twenty (20) days period, then each participating Rightholder who fully subscribed for the number of Offered Securities to which such Rightholder is entitled to under the second sentence of this <u>Section 3.1(b)(i)</u> and has indicated its willingness to purchase an additional amount within five (5) days following the expiration of the Rightholder Option Period (such five (5) days period, the "<u>Rightholder Excess Option Period</u>") shall have the right to purchase that percentage of the Offered Securities not so subscribed for (for the purposes of this <u>Section 3.1(b)</u>, the "<u>Excess Offered Securities</u>") determined by dividing (x) the total number of Series Preferred Shares (as the case may be) then owned by such fully exercising Rightholder (on as-if converted basis) by (y) the total number of Series Preferred Shares (as the case may be) then owned by all such fully exercising Rightholders (on as-if converted basis) who elected to purchase Excess Offered Securities, but shall not be required to purchase more than the additional amount it has indicated as willing to purchase. The Company shall make the allocation among such participating Rightholders in accordance with the preceding sentence.

13

(ii) The right of each Rightholder to purchase all of the Offered Securities or Excess Offered Securities under subsection (i) above shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the Rightholder Option Period or Rightholder Excess Option Period, as applicable, to the Selling Shareholder with a copy to the Company. Each such notice shall state (A) the number of Series Preferred Shares held by such Rightholder and (B) the number of Shares that such Rightholder is willing to purchase pursuant to this Section 3.1(b). The failure of a Rightholder to respond within the Rightholder Option Period or the Rightholder Excess Option Period, as applicable, to the Selling Shareholder shall be deemed to be a waiver of such Rightholder's rights under subsection (i) above, provided that each Rightholder may waive its rights under subsection (i) above prior to the expiration of the Rightholder Option Period or Rightholder Excess Option Period, as applicable, by giving written notice to the Selling Shareholder, with a copy to the Company. Any of the holders of the Series Preferred Shares may assign to any of its Affiliates all or any portion of its rights as a Rightholder under this Section 3.1(b). If the Rightholders do not elect to purchase all of the Offered Securities prior to the expiration of the Rightholder Option Period or Rightholder Excess Option Period, as applicable, pursuant to Section 3.1(b), then the Selling Shareholder will not be required to sell the Offered Securities to any Rightholders and may, subject to Section 3.1(e), sell all of the Offered Securities to a Third Party Purchaser in accordance with Section 3.1(d).

(c) Closing.

The closing of the purchases of Offered Securities subscribed for by the Rightholders under Section 3.1(b) shall be held at the executive office of the Company at 11:00 a.m., local time, on the forty-fifth (45th) day after the giving of the Offering Notice pursuant to Section 3.1 (a) or at such other time and place as the parties to the transaction may agree in writing. At such closing, the Selling Shareholder shall deliver a duly executed share transfer form together with the certificates representing the Offered Securities purchased by the Rightholders, and such Offered Securities shall be free and clear of any Liens (other than those arising hereunder and those attributable to actions by the purchasers thereof) and the Selling Shareholder shall so represent and warrant, and shall further represent and warrant that (i) it is the sole beneficial and legal owner of such Offered Securities and (ii) it has full authority and obtained all necessary consents to transfer such Offer Securities. Each Rightholder purchasing Offered Securities shall deliver at the closing payment in full in immediately available funds for the Offered Securities purchased by it or him. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate and the register of members of the Company shall be updated to reflect such Transfer.

(d) Sale to a Third Party Purchaser.

The Selling Shareholder may, subject to Section 3.1(e), sell all, but not less than all of the Offered Securities to a Third Party Purchaser on terms and conditions no more favorable than those set forth in the Offering Notice; provided, however, that such sale is bona fide and made pursuant to a contract entered into within ninety (90) days after the earlier to occur of (i) the exercise or waiver by all of the Rightholders of their options to purchase the Offered Securities and (ii) the expiration of the Rightholder Option Period or the Rightholder Excess Option Period, as applicable (the "Contract Date"); and provided further, that such sale shall not be consummated unless and until (x) such Third Party Purchaser shall represent in writing to the Company and each Rightholder that it is aware of the rights and obligations of the Company and the Shareholders contained in this Agreement and (y) prior to the purchase by such Third Party Purchaser of any of such Offered Securities, such Third Party Purchaser shall become a party to this Agreement and shall agree to be bound by the terms and conditions hereof in accordance with Section 2.4 hereof. If such sale is not consummated within twenty (20) days after the Contract Date, then the restrictions provided for herein shall again become effective, and no transfer of such Offered Securities may be made thereafter by the Selling Shareholder without again offering the same to the Rightholders in accordance with this Section 3.1.

14

(e) Tag-Along Rights.

(i) If (A) a Selling Shareholder is Transferring Ordinary Shares or Series A-1 Preferred Shares to a Third Party Purchaser pursuant to Section 3.1(d), or (B) any Baidu Shareholder is Transferring Series Preferred Shares to a Third Party Purchaser prior to an Initial Public Offering, upon the consummation of which (1) the Baidu Shareholders collectively cease to hold the largest shareholding in the Company or (2) all Baidu Shareholders' aggregate shareholding in the Company is below (x) 35% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis in the case of a Transfer to a strategic investor (which shall be determined in good faith by the Board of Directors and for the avoidance of doubt shall not include any investment fund or similar financial institution) or (y) 50% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis in the case of any other Transfer, then each Tag-Along Rightholder shall have the right to sell to such Third Party Purchaser, upon the terms set forth in the Tag Notice (as defined below), that number of Shares held by such Tag-Along Rightholder that is equal to the percentage of the Offered Securities proposed to be sold by the Selling Shareholder as determined by dividing (A) the total number of Series Preferred Shares (as the case may be) then owned by such Tag-Along Rightholder exercising its right pursuant to this Section 3.1(e) by (B) the sum of (1) the total number of Series Preferred Shares then owned by all such Tag-Along Rightholders exercising their rights pursuant to this Section 3.1(e) and (2) the total number of Shares then owned by the Selling Shareholders (each determined on an as-converted basis). For purposes of Sections 3.1(e)(ii) to 3.1(e)(iv), "Selling Shareholders" shall include any Baidu Shareholder that proposes to Transfer any Series Preferred Shares pursuant to Section 3.1(e)(i) and "Offered Securities" shall include such Series Preferred Shares.

(ii) The Selling Shareholder and the Tag-Along Rightholder(s) exercising their rights pursuant to this Section 3.1(e) shall effect the sale of the Offered Securities and such Tag-Along Rightholder(s) shall sell the number of Offered Securities elected to be sold by such Tag-Along Rightholder(s) pursuant to this Section 3.1(e), and the number of Offered Securities to be sold to such Third Party Purchaser by the Selling Shareholder shall be reduced accordingly.

(iii) The Selling Shareholder shall give written notice (the "Tag Notice") to each Tag-Along Rightholder of each proposed sale by it of Offered Securities which gives rise to the rights of the Tag-Along Rightholders set forth in this Section 3.1(e), at least fifteen (15) Business Days prior to the proposed consummation of such sale, setting forth the name of such Selling Shareholder, the number of Offered Securities to be Transferred to the Third Party Purchaser, the total number of Shares held by such Selling Shareholder, the name and address of the proposed Third Party Purchaser, the proposed amount and form of consideration and any other material terms and conditions of payment offered by such Third Party Purchaser, the number of Shares that such Tag-Along Rightholder may sell to such Third Party Purchaser (determined in accordance with Section 3.1(e)(i)), and a representation that such Third Party Purchaser has been informed of the "tag-along" rights provided for in this Section 3.1(e) and has agreed to purchase Shares in accordance with the terms hereof. The tag-along rights provided by this Section 3.1(e) must be exercised by any Tag-Along Rightholder wishing to sell its Shares within ten (10) Business Days following receipt of the notice required by the preceding sentence, by delivery of a written notice to the Selling Shareholder indicating such Tag-Along Rightholder's wish to exercise its rights and specifying the number of Shares (up to the maximum number of Shares owned by such Tag-Along Rightholder required to be purchased by such Third Party Purchaser) it wishes to sell, provided that any Tag-Along Rightholder may waive its rights under this Section 3.1(e) prior to the expiration of such ten (10) Business Day period by giving written notice to the Selling Shareholder, with a copy to the Company. The failure of a Tag-Along Rightholder to respond within such ten (10) Business Day period shall be deemed to be a waiver of such Tag-Along Rightholder's rights under this Section 3.1(e). If a Third Party Purchaser fails to purchase Shares from any Tag-Along Rightholder that has properly exercised its tag-along rights pursuant to this Section 3.1(e), then the Selling Shareholder shall not be permitted to consummate the proposed sale of the Offered Securities, and any such attempted sale shall be null and void *ab initio*.

15

(iv) The closing of any sale of Shares under this Section 3.1(e) shall take place at the same time and place as the closing of the sale of Shares by the Selling Shareholder to the Third Party Purchaser pursuant to Section 3.1(d) or at such other time and place as the parties to the transaction may agree in writing. At such closing, if required by the definitive agreements governing such sale, the Tag-Along Rightholder shall deliver a duly executed share transfer form together with the share certificates representing the Shares being sold, and such Shares shall be free and clear of any Liens (other than those arising hereunder and those attributable to actions by the Third Party Purchaser) and the Tag-Along Rightholder shall so represent and warrant, and shall further represent and warrant that it is the sole beneficial and legal owner of such Shares. At the closing, the Third Party Purchaser or a paying agent (if so provided in the definitive agreements governing such sale) shall deliver to the Tag-Along Rightholder payment in full in immediately available funds for the Shares purchased by the Third Party Purchaser. In order to be entitled to exercise its rights pursuant to this Section 3.1(e), each electing Tag-Along Rightholder shall make substantially the same representations, warranties and indemnities as the Selling Shareholder makes in connection with its Transfer of Offered Securities; provided, however, that no Tag-Along Rightholder exercising its rights pursuant to this Section 3.1(e) shall become obligated or liable to any Person in connection with such Transfer, in excess of the lesser of (x) its pro rata share of such liability (vis-a-vis the Selling Shareholder) and (y) the gross proceeds realized by such Tag-Along Rightholder in such sale. The consideration paid to the Tag-Along Rightholder shall be in the same form, proportion (if the consideration is a combination of both cash and securities) and amount per Share and have the same rights as the consideration paid by the Third Party Purchaser to the Selling Shareholder, unless such sale of Shares is pursuant to a Sale Transaction, in which case, (A) the consideration paid with respect to any Series Preferred Shares, as the case may be, shall be in the form and amount per Share determined and calculated based upon the rights and preferences of such Series Preferred Shares in the event of a Sale Transaction as set forth in the Seventh Restated Articles, and nothing in this Agreement shall in any way limit or derogate from the rights and preferences of the Series Preferred Shares in connection with a Sale Transaction and (B) as a result of rights and preferences of the Series Preferred Shares in the event of a Sale Transaction as set forth in the Seventh Restated Articles, the consideration paid with respect to such Series Preferred Shares, may have rights superior to the rights of the consideration paid by the Third Party Purchaser with respect to other Capital Stock of the Company.

16

**ARTICLE IV.**
**FUTURE ISSUANCE OF SHARES; PREEMPTIVE RIGHTS.**

4.1 Offering Notice.

Prior to the conversion of the Preferred Shares pursuant to the terms and conditions of the Seventh Restated Articles, except for (a) any issuance of Shares and options to purchase Ordinary Shares which may be issued pursuant to any share option or incentive plan for employees, officers and directors of the Company and/or its Subsidiaries, as approved and adopted in accordance with the terms of this Agreement and the Seventh Restated Articles, (b) any issuance of Capital Stock of the Company: (i) issued in connection with any share dividend, subdivision, combination or reclassification of Capital Stock in which all holders of Series Preferred Shares are entitled to participate on a pro rata basis with the Shareholders of other classes of Capital Stock or (ii) upon exercise, conversion or exchange of any Ordinary Share Equivalent (x) then outstanding or (y) issued in accordance with the terms of this Agreement and the Seventh Restated Articles, (c) any issuance of Ordinary Shares upon the conversion of the Preferred Shares, (d) any issuance of Capital Stock of the Company in consideration of an acquisition or merger, as approved by the Board of Directors in accordance with the terms of this Agreement and the Seventh Restated Articles, by the Company or any of its Subsidiaries of another Person or any Assets of another Person, and (e) Ordinary Shares issued in an Initial Public Offering, if the Company wishes to issue any Capital Stock or Ordinary Share Equivalents (collectively, "New Securities") to any Person (the "Subject Purchaser"), then subject to Section 4.5, the Company shall offer such New Securities first to each of the Major Shareholders, the holders of Series F Preferred Shares and the Series G Preferred Shareholders (each, a "Preemptive Rightholder" and collectively, the "Preemptive Rightholders") by sending written notice (the "New Issuance Notice") to the Preemptive Rightholders, which New Issuance Notice shall state (1) the number of New Securities proposed to be issued and (2) the proposed purchase price per security of the New Securities (the "Proposed Price") and the terms upon which such New Securities are proposed to be issued. Upon delivery of the New Issuance Notice, such offer to the Preemptive Rightholders shall be irrevocable unless and until the rights provided for in Section 4.2 shall have been waived or shall have expired.

4.2 Preemptive Rights; Exercise.

(a) Subject to Section 4.5, for a period of ten (10) Business Days after the delivery of the New Issuance Notice pursuant to Section 4.1, each of the Preemptive Rightholders shall have the right to purchase up to its Proportionate Percentage (as defined below) of the New Securities at a purchase price equal to the Proposed Price and upon the same terms and conditions set forth in the New Issuance Notice. Each Preemptive Rightholder shall have the right to purchase that percentage of the New Securities determined by dividing (x) the total number of Shares then owned by such Preemptive Rightholder exercising its rights under this Section 4.2 by (y) the total number of Shares then owned by all Shareholders (each determined on a fully-diluted and as-converted basis) (the "Proportionate Percentage"). If any Preemptive Rightholder does not fully subscribe for the number or amount of New Securities that it or he is entitled to purchase pursuant to the preceding sentence, then each Preemptive Rightholder which elected to purchase 100% of the New Securities to which such Preemptive Rightholder was entitled to purchase shall have the right to purchase that percentage of the remaining New Securities not so subscribed for (for the purposes of this Section 4.2(a), the "Excess New Securities") determined by dividing (x) the total number of Shares then owned by such fully participating Preemptive Rightholder by (y) the total number of Shares then owned by all fully participating Preemptive Rightholders who elected to purchase Excess New Securities.

(b) The right of each Preemptive Rightholder to purchase the New Securities under subsection (a) above shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the ten (10) Business Day period referred to in Section 4.2(a) above, to the Company, which notice shall state the amount of New Securities that such Preemptive Rightholder elects to purchase pursuant to Section 4.2(a). The failure of a Preemptive Rightholder to respond within such ten (10) Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's rights under Section 4.2(a), provided that each Preemptive Rightholder may waive its rights under Section 4.2(a) prior to the expiration of such ten (10) Business Day period by giving written notice to the Company or pursuant to Section 4.5 hereof. Immediately following the expiration of such ten (10) Business Day period, the Company shall notify the Preemptive Rightholders who have exercised their initial right to purchase any New Securities in accordance with Section 4.2(a) as to the amount of Excess New Securities available for purchase by such Preemptive Rightholders. The right of each such Preemptive Rightholder to purchase the Excess New Securities under subsection (a) above shall be exercisable by delivering written notice of the exercise thereof, within five (5) Business Day following receipt of the Company's notice in respect of the Excess New Securities, to the Company, which notice shall state the amount of Excess New Securities that such Preemptive Rightholder elects to purchase pursuant to Section 4.2(a). The failure of a Preemptive Rightholder to respond within such five (5) Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's rights to purchase any Excess New Securities under Section 4.2(a), provided that each Preemptive Rightholder may waive its rights under Section 4.2(a) prior to the expiration of such five (5) Business Day period by giving written notice to the Company or pursuant to Section 4.5 hereof.

17

4.3 <u>Closing</u>.

The closing of the purchase of New Securities subscribed for by the Preemptive Rightholders under <u>Section 4.2</u> shall be held at the executive offices of the Company at 11:00 a.m., local time, on (a) the thirtieth (30th) Business Day after the giving of the New Issuance Notice pursuant to <u>Section 4.1</u>, if the Preemptive Rightholders elect to purchase all of the New Securities under <u>Section 4.2</u>, (b) the date of the closing of the sale to the Subject Purchaser made pursuant to <u>Section 4.4</u> if the Preemptive Rightholders elect to purchase some, but not all, of the New Securities under <u>Section 4.2</u> or (c) at such other time and place as the parties to the transaction may agree in writing. At such closing, the Company shall deliver a copy of the register of members of the Company updated to reflect the New Securities issued, together with the share certificates representing the New Securities, and such New Securities shall be issued free and clear of all Liens (other than those arising hereunder and those attributable to actions by the purchasers thereof) and the Company shall so represent and warrant, and further represent and warrant that such New Securities shall be, after payment therefor and upon issuance thereof to the Preemptive Rightholders, duly authorized, validly issued, fully paid and non-assessable. Each Preemptive Rightholder purchasing the New Securities shall deliver at the closing payment in full in immediately available funds for the New Securities purchased by him or it. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

4.4 <u>Sale to Subject Purchaser</u>.

The Company may sell to the Subject Purchaser all of the New Securities not purchased by the Preemptive Rightholders pursuant to <u>Section 4.2</u> on terms and conditions that are no more favorable than those set forth in the New Issuance Notice; <u>provided</u>, <u>however</u>, that such sale is bona fide and made pursuant to a contract entered into within sixty (60) Business Days following the earlier to occur of (i) the waiver by the Preemptive Rightholders of their option to purchase New Securities pursuant to <u>Section 4.2</u>, and (ii) the expiration of the ten (10) Business Day period referred to in <u>Section 4.2</u>. If such sale is not consummated within such sixty (60) Business Day period for any reason, then the restrictions provided for herein shall again become effective, and no issuance and sale of New Securities may be made thereafter by the Company without again offering the same in accordance with this <u>Section 4</u>. The closing of any issuance and purchase pursuant to this <u>Section 4.4</u> shall be held at a time and place as the parties to the transaction may agree within such sixty (60) Business Day period.

4.5 <u>Waiver of Preemptive Rights</u>.

18

The right of the Preemptive Rightholders to purchase the New Securities pursuant to Section 4.2 above may be waived (either generally or in a particular instance and either retroactively or prospectively) with respect to any given issuance of New Securities (i) as to each Preemptive Rightholder who waives in writing its right to purchase its Proportionate Percentage of any issue of New Securities, or (ii) on behalf of all Preemptive Rightholders by the affirmative vote or written consent of Shareholders holding at least two-thirds (2/3) of the then outstanding Series Preferred Shares, voting together as a single and separate class, on an as-converted basis.

## ARTICLE V.
### AFTER-ACQUIRED SECURITIES; AGREEMENT TO BE BOUND.

5.1 After-Acquired Securities.

All of the provisions of this Agreement shall apply to all of the Shares and Ordinary Share Equivalents now owned or which may be issued or transferred hereafter to a Shareholder in consequence of any additional issuance, purchase, exchange or reclassification of any such Shares or Ordinary Share Equivalents, corporate reorganization, or any other form of recapitalization, consolidation, merger, share split or share dividend, or which are acquired by a Shareholder in any other manner.

5.2 Agreement to be Bound.

The Company shall not issue any shares of Capital Stock or any Ordinary Share Equivalents to any Person not a party to this Agreement, unless such Person has (i) provided evidence satisfactory to the Company that it has complied with all applicable requirements of Circular 37 (if applicable) and any related Requirements of Law with respect to such issuance and (ii) has agreed in writing to be bound by the terms and conditions of this Agreement pursuant to an instrument substantially in the form attached hereto as Exhibit B-1 or Exhibit B-2, as applicable; provided, however, that notwithstanding the foregoing, Persons who are issued Ordinary Shares Equivalents pursuant to the terms and conditions of the Option Plan (as defined below) shall not be required to become a party to this Agreement if the Ordinary Share Equivalents issued to such Person under the Option Plan (together with any other Ordinary Share Equivalents then held by such Person) represents less than one percent (1%) of the Company's outstanding Shares, on a fully-diluted and as-converted basis.

## ARTICLE VI.
### CORPORATE GOVERNANCE.

6.1 General.

At any regular or special meeting of shareholders of the Company or any Group Entity, or in any written consent executed in lieu of such a meeting of shareholders (a) each party hereto shall, in its capacity as a shareholder of the Company or any Group Entity, as applicable (the "Voting Holder"), vote its shares in the Company or any Group Entity, as applicable, and each Voting Holder and the Company or Group Entity (as applicable) shall take all other actions necessary, to give effect to the provisions of this Agreement (including Sections 6.3 and 6.6 hereof) and to ensure that the charter documents of the Company and/or the Group Entities (including the Seventh Restated Articles) do not, at any time hereafter, conflict in any respect with the provisions of this Agreement; (b) each Voting Holder shall vote his, her or its shares in the Company or any Group Entity (as applicable), upon any matter submitted for action by the shareholders or with respect to which such Voting Holder may vote or act by written consent executed in lieu of such a meeting of shareholders, in conformity with the specific terms and provisions of this Agreement and the Seventh Restated Articles; and (c) no Voting Holder shall vote his, her or its shares in the Company or any Group Entity in favor of any amendment of the charter documents of the Company or any Group Entity (including the Seventh Restated Articles) which would conflict with, or purport to amend or supersede, any of the provisions of this Agreement (including Sections 6.3 and 6.6 hereof).

19

6.2 <u>Shareholder Actions</u>.

In order to effectuate the provisions of this Agreement, each Voting Holder (a) hereby agrees that when any action or vote is required to be taken by such Voting Holder pursuant to this Agreement, such Voting Holder shall use his, her or its reasonable best efforts to call, or cause the appropriate officers and directors of the Company or the Group Entity, as applicable, to call, a meeting of the shareholders, or to execute or cause to be executed a written consent of the shareholders in lieu of such a meeting of shareholders to effectuate such shareholder action, (b) shall use his, her or its reasonable best efforts to cause the Board of Directors or board of directors of the Group Entities, as applicable, to adopt, either at a meeting of the board of directors or by unanimous written consent of the board of directors, all the resolutions necessary to effectuate the provisions of this Agreement, and (c) shall use his, her or its reasonable best efforts to cause the Board of Directors or board of directors of the Group Entities, as applicable, to cause the appropriate officers of the Company or the Group Entities, as applicable, not to record any vote or consent contrary to the terms of this Agreement.

6.3 <u>Board Representation</u>.

(a) Board of Directors.

The Seventh Restated Articles shall provide that the Board of Directors shall consist of seven (7) members, which number of members shall not be changed except pursuant to an amendment to the Seventh Restated Articles. In addition, the Seventh Restated Article shall provide that (i) the holders of a majority of the Ordinary Shares, voting together as a single class, shall be entitled to appoint and remove one (1) member of the Board of Directors, (the "<u>Ordinary Director</u>"); (ii) the holders of a majority of the Series Preferred Shares (excluding the Series G2 Preferred Shares), voting together as a single and separate class, shall be entitled to appoint and remove three (3) members of the Board of Directors (the "<u>Series Preferred Directors</u>"), (iii) the Significant Shareholder shall be entitled to appoint and remove one (1) member of the Board of Directors (the "<u>Series F Director</u>"), and (iv) the holders of a majority of the Ordinary Shares and the Preferred Shares, voting together as a single class and on an as-converted basis, shall be entitled to appoint and remove the remaining two (2) members of the Board of Director, of whom (x) one member shall be the Chief Executive Officer (the "<u>CEO Director</u>"), and (y) the other member shall be an independent director with relevant industry experience who is not an Affiliate of any of the Major Shareholders, Xiaomi, Prominent or any Series G Preferred Shareholder (the "<u>Independent Director</u>").

Each Shareholder shall, at any time it is entitled to vote for the election of the members of the Board of Directors, vote all of its Shares that are entitled to vote or execute proxies or written consents, as the case may be, at any regular or special meeting of shareholders (or by written consent) and take any and all other necessary action (including causing the Company to call a special meeting) in order to elect persons to the Board of Directors in accordance with <u>Section 6.3</u> and as follows:

(v) the Ordinary Director shall be designated in writing by the Baidu Shareholders and such Ordinary Director shall initially, as of the date hereof, be Zhixiang Liang;

20

(vi) the Series Preferred Directors shall initially be designated by the Baidu Shareholders and such Series Preferred Directors shall initially, as of the date hereof, be Qi Lu, Dongmin Ma, Yanhong Li;

(vii) the Series F Director shall be designated by Xiaomi and shall initially, as of the date hereof, be Chuan Wang;

(viii) the CEO Director shall, as of the date hereof, be Mr. Yu Gong; and

(ix) the Independent Director shall be designated by the Baidu Shareholders and such Independent Director shall initially, as of the date hereof, be Mr. Xuyang Ren.

(b) Removal; Vacancy.

Each Shareholder shall, at any time it is entitled to vote for the election of the members of the Board of Directors, vote all of its Shares that are entitled to vote or execute proxies or written consents, as the case may be, at any regular or special meeting of shareholders (or by written consent) and take any and all other necessary action (including causing the Company to call a special meeting) in order to ensure that:

(i) the Ordinary Director elected pursuant to Section 6.3(a) may not be removed from office unless such removal is directed in writing in accordance with Section 6.3(a);

(ii) no Series Preferred Directors elected pursuant to Section 6.3(a) may be removed from office unless such removal is directed in writing in accordance with Section 6.3(a);

(iii) the Series F Director elected pursuant to Section 6.3(a) may not be removed from office unless such removal is directed in writing in accordance with Section 6.3(a); and

(iv) any vacancies created by the resignation, removal or death of any member of the Board of Directors elected pursuant to Section 6.3(a) shall be promptly filled pursuant to the provisions thereof.

In addition, if the CEO Director is no longer Chief Executive Officer, then such CEO Director shall be deemed to have automatically resigned from the Board of Directors immediately upon ceasing to be Chief Executive Officer without taking further actions and the vacancy created thereby shall be filled by the newly-appointed Chief Executive Officer.

(c) Committees of the Board.

The composition of any and all committees of the Board of Directors (whether currently in existence or those that may be formed and established in the future) shall include at least one Ordinary Director and one Series Preferred Director, unless such Ordinary Director or Series Preferred Director, as applicable, affirmatively declines to be a member of such committee.

6.4 Board Meetings.

21

(a) The Company and the parties hereto shall take all steps necessary to ensure that the Board of Directors shall meet or convene at least once a year. Prior to a meeting of the Board of Directors, the Company shall send all notices of such meeting of the Board of Directors, copies of agenda and any materials to be presented at such meeting of the Board of Directors (if any), to each Director to his or her contact address such Director has notified the Company in writing.

(b) A quorum of the Board of Directors shall consist of (i) a majority of the members of the Board of Directors, and (ii) the presence of at least one Ordinary Director or one Series Preferred Director; provided, however, that if at two consecutive duly convened meetings of the Board of Directors, a requisite quorum is not achieved based solely upon the consecutive failure to attend such meetings by an Ordinary Director or a Series Preferred Director, (such member of the Board of Directors is referred to as the "Absent Director"), then at the next duly convened meeting of the Board of Directors, a quorum shall only require the presence of a majority of the members of the Board of Directors, without the additional requirement of the presence of the Absent Director.

(c) Any material action of the Company or any Group Entity in connection with the following matters shall be submitted to the Board of Directors for review and discussion pursuant to this Section 6.4(c). Neither the Company nor any Group Entity shall take any of the following actions without the affirmative approval of at least two-thirds of the members of the Board of Directors at a duly convened meeting at which a quorum is present:

(i) to sell or dispose of the whole or a substantial part of the Assets of the Company and the Group Entities, taken as a whole;

(ii) to increase, reduce or cancel the authorized or issued Shares or issue, allot, purchase or redeem any Capital Stock convertible into or carrying a right of subscription in respect of Shares or grant or issue any options or warrants or which may require the issue of Shares in the future by the Company or do any act which has the effect of diluting or reducing the then effective shareholding of the Shareholders, other than issuance of Ordinary Shares upon conversion of the Preferred Shares or exercise of outstanding options or warrants, issuance under the Option Plan, redemption of any Share exercised by holders of the Preferred Shares, repurchase of any Share from terminated employees, officers or consultants;

(iii) to make any distribution of profits amongst the Shareholders by way of dividend, (interim and final) capitalization of reserves or otherwise, other than any such distribution by any Group Entity to the Company;

(iv) to appoint or settle the terms of appointment of each Key Officer;

(v) to adopt or alter the terms of any Option Plan;

(vi) to adopt any material change of the accounting policies previously adopted or change the financial year of the Company;

(vii) to appoint or change the auditors of the Company and/or any Group Entity;

(viii) to acquire or make any investment or incur any commitment in connection therewith in excess of US$3 million in a single transaction by the Company and/or any Group Entity;

22

(ix) to borrow any money or obtain any financial facilities in excess of US$3 million in a single transaction except pursuant to facilities obtained from banks or other financial institutions in the ordinary course of business;

(x) to create, allow to arise or issue any debenture constituting a pledge, lien or charge (whether by way of fixed or floating charge, mortgage, encumbrance or other security) on all or any of the Assets of the Company and/or any Group Entity, except for the purpose of securing borrowings from banks or other financial institutions in the ordinary course of business not exceeding RMB500,000 (or its equivalent in other currency or currencies) or in excess of RMB2 million at any time in any financial year;

(xi) to make any material amendment to the Seventh Restated Articles; and

(xii) to dispose the Company's interest, directly or indirectly, in any Group Entity for consideration in excess of RMB5 million in a single transaction.

(d) Subject to the provisions of Sections 6.4(c) and 6.6, any other action or decision of the Board of Directors requires the affirmative approval of a majority of the members of the Board of Directors present at a duly convened meeting at which a quorum is present, including the affirmative approval of at least one Ordinary Director or one Series Preferred Director.

(e) The Company shall reimburse the members of the Board of Director for all reasonable expenses (including airfare, transportation, meals and lodging) incurred in connection with attending any meetings of the Board of Directors and all committees thereof.

6.5 Director Liability; D&O Insurance; Key-Person Insurance.

(a) The Seventh Restated Articles shall at all times provide for the indemnification of the members of the Board of Directors as applicable to the maximum extent provided by law.

(b) The Company shall, if and when determined by the Board of Directors, obtain and maintain a directors' liability insurance policy.

(c) The Company shall, if and when determined by the Board of Directors, obtain and maintain "key-person" life insurance policy on the Chief Executive Officer.

6.6 Material Actions; Series Preferred Protective Provisions.

(a) The parties acknowledge and agree that all of the following material actions of, or relating to, the Company or any Group Entity shall be submitted to the Shareholders for their review and discussion pursuant this Section 6.6(a). In addition, neither the Company nor any of the Group Entities shall take any of the following actions without the prior written consent of the holders of (x) at least a majority of the then outstanding Series Preferred Shares (excluding the Series G2 Preferred Shares); (y) at least a majority of the then outstanding Series F Preferred Shares subject to the condition that Xiaomi and Prominent jointly continue to hold at least 6.25% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis; and (z) at least a majority of the then outstanding Series G1 Preferred Shares subject to the condition that the Series G1 Preferred Shareholders jointly continue to hold at least 6.25% of the then outstanding Capital Stock of the Company on a fully-diluted and as-converted basis:

23

(i) to cease to conduct or carry on the business of the Company and/or any Group Entity substantially as now conducted or change the business activities of the Company and/or any Group Entity in material aspect;

(ii) to pass any resolution for the winding up of the Company and/or any Group Entity or undertake any liquidation, or apply for the appointment of a receiver or judicial manager or like officer, concerning the Company and/or any Group Entity; and

(iii) to enter into any transactions between any director or shareholder of the Company and/or any Group Entity, on the one side, and the Company and/or any Group Entity, on the other side, and any modification or amendment to terms and conditions of such transactions, including the making of any loans or advances, whether directly or indirectly, or the provision of any guarantee, indemnity or security for or in connection with any indebtedness of liabilities of any director or shareholder of the Company and/or any Group Entity, in each case that involves the payment in excess of RMB5 million in a single transaction, other than (A) the adoption or alteration of terms of any share option or incentive plan for employees, officers and directors of the Company and/or its Subsidiaries, including without limitation any transaction pursuant to such share option or incentive plan, (B) the transactions occurred during the ordinary course of business of the Company and/or any Group Entity and (C) the transactions between any of the Baidu Shareholders, on one side, and the Company and/or any Group Entity, on the other side.

(b) Notwithstanding the foregoing, (i) any amendment to the terms of the Preferred Shares (other than the Series G Preferred Shares) that materially and adversely affects the rights, preferences or privileges of a holder thereof in a manner that is disproportionate to the manner in which it affects other holders (including by way of reclassification of any Preferred Shares, repurchase or redemption of any Preferred Share, share split or distribution of share dividends) shall require the prior written consent of such affected holder; and (ii) any amendment to the terms of the Series G Preferred Shares that materially and adversely affects the economic rights of the holders thereof in a manner that is disproportionate to the manner in which it affects holders of other Shares shall require the prior written consent of the holders of at least a majority of the then outstanding Series G Preferred Shares. For the avoidance of doubt, the consent requirement in the preceding sub-clause (ii) shall not be affected by the execution of the Voting Undertaking and the Irrevocable Proxy by holders of the Series G2 Preferred Shares.

(c) Prior to the Initial Public Offering, any merger, consolidation or scheme of arrangement of the Company with a controlled Affiliate of Baidu, Inc. shall only be initiated based on the then fair market value of the Company to be agreed between the holders holding a majority of the then outstanding Series G Preferred Shares and Baidu, Inc.

6.7 <u>Authority of the Board of Directors</u>.

Subject to <u>Section 6.6</u> of this Agreement, the provisions of the Seventh Restated Articles and any applicable Requirement of Law, the Board of Directors shall have the ultimate responsibility for the management and control of the Company and the Group Entities (through the Company's control of the Group Entities), and the Board of Directors shall be required to make all material decisions of the Company and the Group Entities (through the Company's control of the Group Entities), and all decisions that are outside the ordinary course of business. All matters in respect of such decisions must be referred to the Board of Directors (or the designated committee thereof), and no Shareholder or officer shall take any actions purporting to commit the Company in relation to any such matters without the approval of the Board of Directors (or the designated committee thereof).

24

6.8 <u>Material Actions and each Group Entity</u>.

The Company covenants and agrees that it shall procure that, and each of the Voting Holders covenants and agrees that it will cause the Company and each Group Entity to procure that, none of the Company, any Group Entity, or any of their respective officers, directors, employees, agents or representatives takes any action described in <u>Section 6.6</u> in relation to any Group Entity, whether by way of shareholder approval, consent, ratification or otherwise, without the requisite written consents as provided in <u>Section 6.6</u>.

6.9 <u>Discrepancies</u>.

If there is any discrepancy between any provision of this Agreement and any provision of the Seventh Restated Articles or the charter documents of any Group Entity, the provisions of this Agreement shall prevail only as between the Shareholders in relation to the Company, and the parties shall procure that the Seventh Restated Articles or the charter documents of the relevant Group Entity, as the case may be, are promptly amended, to the maximum extent permitted by the applicable law, in order to conform with this Agreement; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall limit or reduce, or authorize the limitation, change or reduction of the rights of the Preferred Shares as set forth in the Seventh Restated Articles.

**ARTICLE VII.**
**AFFIRMATIVE COVENANTS.**

The covenants as set forth below in this Article VII are hereby made and agreed to:

7.1 <u>Books and Records</u>.

The Company shall, and the parties hereto shall cause the Group Entities to, keep proper books of records and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Company and the Group Entities in accordance with US GAAP or with respect to the Group Entities established under the laws of the PRC, PRC GAAP, in each case, consistently applied.

7.2 <u>Financial Information</u>.

The Company will furnish the following information as set forth in (a) to (f) to each Major Shareholder, and will furnish the following information as set forth in (a) to (c) to the Significant Shareholder:

(a) As soon as practicable after the end of each fiscal year, and in any event within ninety (90) days thereafter, a consolidated balance sheet of the Company and the Group Entities, as of the end of such fiscal year, and consolidated statements of income and cash flows of the Company and the Group Entities, for such year, prepared in English in accordance with US GAAP and setting forth in each case in comparative form the applicable figures from the Company's operating plan for such year and the figures for the previous fiscal year, all in reasonable detail and audited by one of the Big Four which is registered with the Public Company Accounting Oversight Board and selected by the Company in accordance with the terms of this Agreement and the Seventh Restated Articles;

25

(b) As soon as practicable after the end of each fiscal year, and in any event within ninety (90) days thereafter, the Budget of the next fiscal year;

(c) As soon as practicable after the end of each fiscal quarter, and in any event within forty-five (45) days thereafter, a consolidated balance sheet of the Company and the Group Entities as of the end of such fiscal quarter, and consolidated statements of income and cash flows for such period, prepared in English in accordance with US GAAP, and quarterly management accounts containing key operating indicators and setting forth in comparative form the figures from the Company's operating plan for the corresponding period;

(d) As soon as practicable after the end of each calendar month, and in any event within twenty (20) days thereafter, a consolidated balance sheet of the Company and the Group Entities as of the end of such calendar month, and consolidated statements of income and cash flows for such period, prepared in English in accordance with US GAAP and setting forth in each case in comparative form the figures from the Company's operating plan for the corresponding period;

(e) As soon as practicable, but in any event within five (5) Business Days after the filing or submission of any material reports or other material documents by the Company or any Group Entity with any Governmental Authority or securities exchange, copies of any such reports or documents so filed or submitted; and

(f) As soon as practicable, but in any event within three (3) Business Days after providing such information to all holders of Capital Stock of a Group Entity, as applicable, copies of all such documents or other information sent to such holders.

Notwithstanding the foregoing, the Series G Preferred Shareholders acknowledge that the Company is a material Subsidiary of Baidu, Inc. whose financial statements are consolidated with those of Baidu, Inc. and that the material financial and business conditions of the Company are disclosed in the annual reports of Baidu, Inc. The Series G Preferred Shareholders shall have the right to obtain such information with respect to the Company as disclosed in the annual reports of Baidu, Inc. In the event that any Series G Preferred Shareholder requests from the Company any information that is not disclosed in the annual reports of Baidu, Inc., the Company shall not be obligated to furnish such information to such Series G Preferred Shareholder if the Company determines in good faith that such information is confidential or proprietary or is not otherwise suitable for disclosure to such Series G Preferred Shareholder.

7.3 Operating Plan and Budget.

On or prior to the date which is ninety (90) days after the end of each fiscal year, the CEO Director shall present to the Board of Directors for its review and approval in accordance with Section 6.4(d), a detailed operating budget of the Company and the Group Entities (the "Budget") for the following fiscal year.

7.4 Inspection.

26

Each of the Company and the Group Entities shall (a) afford the officers, employees, auditors and other agents of each of the Major Shareholder and the Significant Shareholder (provided, that the Board of Directors has not reasonably determined that such Major Shareholders or the Significant Shareholder is a Direct Competitor), during normal business hours and upon reasonable notice, reasonable access and consultation rights at all reasonable times to its officers, employees, auditors, legal counsel, properties, offices and other facilities and to all books and records (and make copies and take extracts therefrom), and (b) afford such Major Shareholder and the Significant Shareholder the opportunity to discuss the affairs, finances and accounts of the Company and the Group Entities with their respective officers from time to time as each such Major Shareholder or the Significant Shareholder may reasonably request; provided, however, that the Company and the Group Entities shall not be obligated pursuant to this Section 7.4 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or the disclosure of which would adversely affect the attorney-client privilege between the Company/Group Entities and its counsel.

7.5 Proprietary Information and Inventions Assignment Agreements.

All existing and future officers and key employees of the Company or any Group Entities shall enter into a proprietary information and inventions assignment agreement, and non-competition/non-solicitation agreement, each in form and substance reasonably acceptable to the Series Preferred Directors.

7.6 Employee Stock Options.

(a) The Company has previously reserved for issuance 589,729,714 Ordinary Shares which currently represents approximately 12.65% of the Company's outstanding Shares, on a fully-diluted and as-converted basis as of the date hereof for issuance to employees, officers, directors or consultants of the Company or any Group Entity pursuant to a duly adopted equity incentive plan (the "Option Plan"). Any Ordinary Shares or Ordinary Share Equivalents to be issued pursuant to the Option Plan shall have an exercise price that is no less than the then current fair market value, unless otherwise approved by the Board of Director pursuant to Section 6.4(c).

(b) Unless otherwise approved by the Board of Directors, any Ordinary Shares or Ordinary Share Equivalents to be issued pursuant to the Option Plan shall be subject to (i) customary 4-year vesting provisions (including a first year cliff vesting provision and subsequent monthly, quarterly, semi-annual or annual vesting thereafter, as determined by the Board of Directors) and (ii) customary transfer restrictions on such Ordinary Shares or Ordinary Share Equivalents (whether vested or unvested) prior to the Initial Public Offering.

7.7 Certain Obligations relating to the Redemption of the Series Preferred Shares.

In accordance with the Seventh Restated Articles, if (i) on any date on which the "Redemption Price" (as such term is defined in the Seventh Restated Articles) with respect to the Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares) or any installment thereof is payable, and (ii) the funds of the Company legally available for redemption of the Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares) are insufficient to make such payment in full, then, at the option of, and upon the receipt by the Company of a written request notice from the holders of at least a majority of the then outstanding Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares), the Company shall, within twenty (20) Business Days of its receipt of such notice and at its own costs, initiate (i) a process for the sale of such Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares) at a price not lower than the Redemption Price or (ii) such other fundraising process that will generate proceeds sufficient for the redemption of such Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares), and the Company shall, in each case, use its reasonable best efforts to effectuate such sale or fundraising transaction, subject to the prior approval by the holders of at least a majority of the then outstanding Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares) with respect to the terms and conditions of the sale or other fundraising transaction, as the case may be. In connection with the foregoing, each of the Shareholders shall take any and all necessary actions, as reasonably requested in writing by the Company or the holders of a majority of the then outstanding Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares), to permit the Company to effect such sale or other fundraising transaction to redeem the Series Preferred Shares (excluding Series F Preferred Shares and Series G Preferred Shares) in accordance with foregoing and the terms of the Seventh Restated Articles.

27

7.8 <u>Initial Public Offering</u>.

Each of the Company, the Group Entities and the Founder hereby undertakes to the Shareholders (other than Cannes) that he/it shall use reasonable best efforts to achieve a Qualified IPO.

7.9 <u>Confidentiality</u>.

(a) Each of the Shareholders agrees that it shall (and shall cause its Affiliates and its and their officers, directors, employees, partners, legal counsel, agents and representatives (collectively, the "<u>Confidentiality Affiliates</u>") to) (i) hold confidential and not disclose (other than by a Shareholder to its Confidentiality Affiliates having a reasonable need to know in connection with the permitted purposes hereunder), without the prior written consent of (x) the Company and (y) the Major Shareholders, all confidential or proprietary written, recorded or oral information or data (including research, developmental, engineering, manufacturing, technical, marketing, sales, financial, operating, performance, cost, business and process information or data, know-how and computer programming and other software techniques) provided or developed by the Company, any of the Group Entities, another Shareholder or its Confidentiality Affiliates in connection herewith or with the business of the Company or any Group Entity, whether such confidentiality or proprietary status is indicated orally or in writing or in a context in which the Company or the disclosing Shareholder or its Confidentiality Affiliates reasonably communicated, or the receiving Shareholder or its Confidentiality Affiliates should reasonably have understood, that the information should be treated as confidential, whether or not the specific words "<u>confidential</u>" or "<u>proprietary</u>" are used (the "<u>Confidential Information</u>") and (ii) use such Confidential Information only for the purposes of performing its obligations hereunder to which it is a Shareholder and carrying on the business of the Company and monitoring its investment in the Company; <u>provided</u>, <u>however</u>, that a Shareholder hereto may disclose any such Confidential Information on a confidential basis to current and prospective lenders in connection with a loan or prospective loan to such Shareholder and to prospective purchasers of the securities of such Shareholder, as well as to their legal counsel, auditors, agents and representatives. Notwithstanding the foregoing, a Shareholder may disclose any such Confidential Information on a confidential basis to limited partners or prospective limited partners or investors of such Shareholder or its Confidentiality Affiliates.

(b) The obligations contained in <u>Section 7.9(a)</u> shall not apply, or shall cease to apply, to Confidential Information if or when, and to the extent that, such Confidential Information (i) was, or becomes through no breach of the receiving Shareholder's obligations hereunder, known to the public, (ii) becomes known to the receiving Shareholder or its Confidentiality Affiliates from other sources under circumstances not involving any breach of any confidentiality obligation between such source and the Company or any Group Entity or between such source and the disclosing Shareholder's or discloser's Confidentiality Affiliates or a third party, (iii) is independently developed by the receiving Shareholder or its Confidentiality Affiliates, or (iv) is required to be disclosed by any Requirement of Law.

28

(c) Except as required by any Requirement of Law, each of the Shareholders agrees that it will not issue or release for external publication any article or advertising or publicity matter relating to the Company or its business without the prior unanimous consent of the Board of Directors; provided that none of the Shareholders shall issue or release for external publication any article or advertising or publicity matter relating to the Company or its business referencing or mentioning another Shareholder or its Affiliates without first obtaining the written consent of such other Shareholder.

## ARTICLE VIII.
## SAFE CIRCULAR 37 AND LEGENDS

8.1 Compliance with Circular 37.

Each Shareholder, to the extent it is subject to or under the jurisdiction of Circular 37, hereby covenants to the Company that it shall fully comply in all material respects with Circular 37. If requested by the Company, an opinion of PRC counsel to any Shareholder acquiring or disposing of ownership or control of any Shares shall be delivered to the Company prior to such transaction at such acquiring or disposing Shareholder's expense, to the effect that such transaction (including the disposition of any proceeds therefrom) complies with Circular 37 and that all registrations, approvals or other governmental procedures required thereunder to be completed in connection with such transaction have been completed.

8.2 Share Certificate Legend.

(a) A copy of this Agreement shall be filed with the Secretary of the Company and kept with the records of the Company. Each certificate representing Shares now held or hereafter acquired by any Shareholder shall for as long as this Agreement is effective bear legends substantially in the following forms:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED IN ANY JURISDICTION AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH. THE SALE, ASSIGNMENT, HYPOTHECATION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH A "TRANSFER") AND VOTING OF ANY OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED BY THE TERMS OF THE SEVENTH RESTATED ARTICLES AND A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND THE SHAREHOLDERS NAMED THEREIN. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT.

(b) If any Shares cease to be subject to any and all restrictions on Transfer and all other obligations set forth in the Seventh Restated Articles and this Agreement, the Company, upon the written request from the holders of such Shares, shall issue to such Shares a new certificate evidencing such Shares without the legend required by this Section 8.2 endorsed thereon.

## ARTICLE IX.
## REGISTRATION RIGHTS.

9.1 Applicability of Rights.

29

Each of the Major Shareholders, the holders of the Series F Preferred Shares and the Series G Preferred Shareholders shall be entitled to the following rights with respect to any potential public offering of the Company's Ordinary Shares in the United States and shall be entitled to reasonably analogous or equivalent rights with respect to any other offering of the Company's securities in any other jurisdiction in which the Company undertakes to publicly offer or list such securities for trading on a recognized securities exchange. The parties hereto recognize, however, the likelihood that there may be one or more registrations or an analogous procedure such as the application for listing accompanied by the issue of a prospectus or equivalent listing particulars in a jurisdiction other than the United States. It is, accordingly, their intention that whenever any provision in this Article IX refers to a law or institution of the United States but the parties hereto wish to effectuate a registration or an analogous procedure such as the application for listing accompanied by the issue of a prospectus or equivalent listing particulars in a different jurisdiction, reference in this Article IX to the laws or institutions of the United States shall be read as referring, *mutatis mutandis*, to the comparable laws or institutions of the jurisdiction in question and registration shall be construed, as appropriate, to include an application for listing of the Ordinary Shares on a recognized stock exchange accompanied by the issue of a prospectus or equivalent listing particulars.

9.2 Definitions.

For purposes of this Article IX:

(a) "Exchange Act" means the United States Securities Exchange Act of 1934, as amended, and any successor statute.

(b) "Existing Initiating Holder" means a Holder or Holders of at least thirty percent (30%) of the Registrable Securities Then Outstanding.

(c) "Form F-3" means such respective form under the Securities Act or any successor registration form under the Securities Act subsequently adopted by the SEC which permits inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

(d) "Holder" means any person owning or having the rights to acquire Registrable Securities or any permitted assignee of record of such Registrable Securities to whom rights under this Article IX have been duly assigned in accordance with this Agreement.

(e) "Initiating Holders" means the Existing Initiating Holder(s), the Series F Initiating Holder(s) and the Series G Initiating Holder(s).

(f) "Registration" means a registration effected by filing a registration statement which is in a form which complies with, and is declared effective by the SEC in accordance with the Securities Act. The terms "register" and "registered" shall have correlative meanings.

(g) "Registrable Securities" means: (i) any Ordinary Shares acquired by the Major Shareholders from time to time, (ii) any Ordinary Shares issued or issuable to the Shareholders (A) pursuant to conversion of any Preferred Shares, or (B) pursuant to the preemptive right provided under Article IV hereof, (iii) any Ordinary Shares issued (or issuable upon the conversion or exercise of any warrant, right or other security which is issued) as a dividend or other distribution with respect to, or in exchange for or in replacement of, any securities of the Company described in clauses (i) and (ii) of this subsection (g), and (iv) any other Ordinary Shares of the Company issued or issuable to the Shareholders with respect to the securities of the Company described in clauses (i) and (ii) of this subsection (g) by way of share dividend or share split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or otherwise; excluding any Shares sold in a registered public offering under the Securities Act or analogous statute of another jurisdiction, or pursuant to Rule 144 promulgated under the Securities Act or analogous rule of another jurisdiction.

30

(h) "Registrable Securities Then Outstanding" means Ordinary Shares that are Registrable Securities and are then issued and outstanding, issuable upon conversion of the Preferred Shares then issued and outstanding or issuable upon conversion or exercise of any warrant, right or other security then outstanding.

(i) "Registration Expenses" means all expenses incurred by the Company in complying with Sections 9.3, 9.4 and 9.5 hereof, including all registration and filing fees, printing expenses, fees, and disbursements of counsel for the Company, reasonable fees and disbursements of one special counsel for the Holders, "blue sky" fees and expenses and the expense of any special audits incident to or required by any such registration (but excluding the compensation of regular employees of the Company which shall be paid in any event by the Company).

(j) "Request Notice" has the meaning set forth in Section 9.3(a).

(k) "SEC" means the U.S. Securities and Exchange Commission, and its successor.

(l) "Securities Act" means the United States Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

(m) "Selling Expenses" means all underwriting discounts and selling commissions applicable to the sale of Registrable Securities pursuant to Sections 9.3, 9.4 or 9.5 hereof.

(n) "Series F Initiating Holder" means a Holder or Holders of at least thirty percent (30%) of the Registrable Securities issued or issuable upon conversion of the Series F Preferred Shares then outstanding.

(o) "Series G Initiating Holder" means a Holder or Holders of at least thirty percent (30%) of the Registrable Securities issued or issuable upon conversion of the Series G Preferred Shares then outstanding.

(p) "Violation" has the meaning set forth in Section 9.9(a).

9.3 Demand Registration.

(a) Request by Holders.

31

If at any time after the earlier of the expiry of (i) the four (4)-year period following the date of this Agreement and (ii) the one hundred eighty (180) day period following the effective date of the registration statement for the Initial Public Offering, the Company receives a request from the Initiating Holders that the Company file a registration statement under the Securities Act covering the Registrable Securities pursuant to this Section 9.3, then the Company shall, within ten (10) Business Days following the receipt of such written request, give written notice of such request (the "Request Notice") to all Holders, and use its reasonable best efforts to effect, as soon as practicable, the registration under the Securities Act of all Registrable Securities that the Holders request to be registered and included in such registration by written notice given by such Holders to the Company within twenty (20) days after receipt of the Request Notice, subject only to the limitations of this Section 9.3; provided that the Company shall not be obligated to effect any such registration if the Company has, within the six (6)-month period prior to the date of such request, already effected a Registration pursuant to this Section 9.3 or Section 9.5 (provided, that the Company is actively employing in good faith reasonable best efforts to cause such registration statement to become effective) or in which the Holders had an opportunity to participate pursuant to the provisions of Section 9.4, other than a Registration from which the Registrable Securities of the Holders have been excluded (with respect to all or any portion of the Registrable Securities the Holders requested be included in such Registration) pursuant to the provisions of Section 9.4(a), provided, further that the Holders, together with the holders of any other securities of the Company entitled to inclusion in such Registration, propose to sell Registrable Securities and such other securities (if any) at an aggregate price to the public of no less than US$50,000,000. For purposes of this Agreement, at the election of the Initiating Holders in connection with the exercise of any registration right in this Agreement, reference to Registration shall be deemed to mean the equivalent registration in a jurisdiction other than the United States as designated by such Initiating Holders, it being understood and agreed that in each such case all references in this Agreement to the Securities Act, the Exchange Act and rules, forms of registration statements and registration of securities thereunder, U.S. law and the SEC, shall be deemed to refer, to the equivalent statutes, rules, forms of registration statements, registration of securities and laws of and equivalent government authority in the applicable non-U.S. jurisdiction.

(b) Underwriting.

If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, then they shall so advise the Company as a part of their request made pursuant to this Section 9.3 and the Company shall include such information in the Request Notice. In such event, the right of any Holder to include its Registrable Securities in such Registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Holders of a majority of the Registrable Securities being registered and reasonably acceptable to the Company. Notwithstanding any other provision of this Section 9.3, if the underwriter(s) advise(s) the Company in writing that marketing factors require a limitation of the number of securities to be underwritten, then the Company shall so advise all Holders of Registrable Securities which would otherwise be registered and underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be reduced as required by the underwriter(s) and allocated among the Holders of Registrable Securities on a pro rata basis according to the number of Registrable Securities Then Outstanding held by each Holder requesting registration (including the Initiating Holders); provided, however, that (i) the number of Registrable Securities included in any such Registration is not reduced below thirty percent (30%) of the aggregate number of shares of Registrable Securities for which inclusion has been requested by the Series F Initiating Holders or the Series G Initiating Holders (unless such offering is the Initial Public Offering in which case the Registrable Securities may be excluded beyond this amount if the managing underwriter(s) make the determination described above and no other shareholder's securities are included in such offering); and (ii) the number of shares of Registrable Securities to be included in such underwriting and Registration shall not be reduced unless all other securities are first entirely excluded from the underwriting and Registration including all shares that are not Registrable Securities and are held by any other person, including any person who is an employee, officer or director of the Company or any Subsidiary of the Company. If any Holder disapproves the terms of any such underwriting, such Holder may elect to withdraw therefrom by written notice to the Company and the underwriter(s), delivered at least ten (10) Business Days prior to the effective date of the registration statement. Any Registrable Securities excluded or withdrawn from such underwriting shall be excluded and withdrawn from the Registration.

32

(c) Maximum Number of Demand Registrations.

The Company shall not be obligated to effect more than four (4) such demand Registrations initiated by the Existing Initiating Holders, more than two (2) such demand Registrations initiated by the Series F Initiating Holders, or more than two (2) such demand Registrations initiated by the Series G Initiating Holders, pursuant to this Section 9.3.

(d) Deferral.

Notwithstanding the foregoing, if the Company shall furnish to Holders requesting Registration pursuant to this Section 9.3, a certificate signed by the Chief Executive Officer stating that in the good faith judgment of the Board of Directors, it would be materially detrimental to the Company and its Shareholders for such registration statement to be filed at such time, then the Company shall have the right to defer such filing for a period of not more than ninety (90) days after receipt of the request of the Initiating Holders; provided, however, that the Company may not utilize this right more than once in any twelve (12)-month period; provided further, that the Company shall not Register any other of its shares during such twelve (12)-month period. A demand right shall not be deemed to have been exercised until such deferred Registration shall have been effected.

9.4 Piggyback Registrations.

(a) Notification.

The Company shall notify all Holders of Registrable Securities in writing at least thirty (30) days prior to filing any registration statement under the Securities Act for purposes of effecting a public offering of securities of the Company (including, but not limited to, registration statements relating to secondary offerings of securities of the Company, but excluding registration statements relating to any Registration under Section 9.3 or Section 9.5 of this Agreement or to any employee benefit plan or a corporate reorganization, exchange offer or offering of securities solely to the Company's existing shareholders), and shall, subject to Section 9.4(c), afford each such Holder an opportunity to include in such registration statement all or any part of the Registrable Securities then held by such Holder. Each Holder desiring to include in any such registration statement all or any part of the Registrable Securities held by it shall within twenty (20) days after receipt of the above-described notice from the Company, so notify the Company in writing, and in such notice shall inform the Company of the number of Registrable Securities such Holder wishes to include in such registration statement. If a Holder decides not to include all of its Registrable Securities in any registration statement thereafter filed by the Company, such Holder shall nevertheless continue to have the right to include any Registrable Securities in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth herein.

33

(b) Underwriting.

If a registration statement under which the Company gives notice under this Section 9.4 is for an underwritten offering, then the Company shall so advise the Holders of Registrable Securities. In such event, the right of any such Holder's Registrable Securities to be included in a Registration pursuant to this Section 9.4 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their Registrable Securities through such underwriting shall enter into an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting. Notwithstanding any other provision of this Agreement but subject to Section 9.12, if the managing underwriter(s) determine(s) in good faith that marketing factors require a limitation of the number of shares to be underwritten, then the managing underwriter(s) may exclude shares from the registration and the underwriting, and the number of shares that may be included in the registration and the underwriting shall be allocated, first, to the Company for its own account, second, to each of the Holders requesting inclusion of their Registrable Securities in such registration statement on a pro rata basis based on the total number of shares of Registrable Securities then held by each such Holder, and third, to holders of other securities of the Company with registration rights; provided, however, that the right of the underwriter(s) to exclude shares (including Registrable Securities) from the registration and underwriting as described above shall be restricted so that (i) the number of Registrable Securities included in any such Registration is not reduced below thirty percent (30%) of the aggregate number of shares of Registrable Securities for which inclusion has been requested (unless such offering is the Initial Public Offering in which case the Registrable Securities may be excluded beyond this amount if the managing underwriter(s) make the determination described above and no other shareholder's securities are included in such offering); and (ii) all shares that are not Registrable Securities and are held by any other person, including any person who is an employee, officer or director of the Company (or any Subsidiary of the Company) shall first be excluded from such Registration and underwriting before any Registrable Securities are so excluded. If any Holder disapproves of the terms of any such underwriting, such Holder may elect to withdraw therefrom by written notice to the Company and the underwriter(s), delivered at least ten (10) Business Days prior to the effective date of the registration statement. Any Registrable Securities excluded or withdrawn from such underwriting shall be excluded and withdrawn from the Registration.

(c) Not Demand Registration.

Registration pursuant to this Section 9.4 shall not be deemed to be a demand Registration as described in Section 9.3 above. There shall be no limit on the number of times the Holders may request Registration of Registrable Securities under this Section 9.4.

9.5 Form F-3 Registration.

In case the Company shall receive from any of the Initiating Holders a written request or requests that the Company effect a Registration on Form F-3 and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, then the Company will:

(a) Notice.

Promptly give written notice of the proposed Registration and the Holder's or Holders' request therefor, and any related qualification or compliance, to all other Holders of Registrable Securities; and

34

(b) Registration.

As soon as practicable, effect such Registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Holders or Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holder or Holders joining in such request as are specified in a written request given within twenty (20) days after the Company provides the notice contemplated by Section 9.5(a); provided, however, that the Company shall not be obligated to effect any such Registration, qualification or compliance pursuant to this Section 9.5:

(i) if Form F-3 is not available for such offering by the Holders;

(ii) if the Holders, together with the holders of any other securities of the Company entitled to inclusion in such Registration, propose to sell Registrable Securities and such other securities (if any) at an aggregate price to the public of less than US$5,000,000;

(iii) if the Company shall furnish to the Holders a certificate signed by the Chief Executive Officer stating that in the good faith judgment of the Board of Directors, it would be materially detrimental to the Company and its shareholders for such Form F-3 Registration to be effected at such time, in which event the Company shall have the right to defer the filing of the Form F-3 registration statement no more than once during any twelve (12)-month period for a period of not more than ninety (90) days after receipt of the request of the Holder or Holders under this Section 9.5; provided that the Company shall not Register any of its other shares during such ninety (90)-day period.

(iv) if the Company has, within the six (6)-month period preceding the date of such request, already effected a Registration under the Securities Act other than a Registration from which the Registrable Securities of Holders have been excluded (with respect to all or any portion of the Registrable Securities the Holders requested be included in such Registration) pursuant to the provisions of Sections 9.3(b) and 9.4(a); or

(v) in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such Registration, qualification or compliance.

Subject to the foregoing, the Company shall file a Form F-3 registration statement covering the Registrable Securities and other securities so requested to be registered as soon as practicable after receipt of the request or requests of the Holders.

(c) Not Demand Registration.

Form F-3 Registrations shall not be deemed to be demand Registrations as described in Section 9.3 above. Except as otherwise provided herein, there shall be no limit on the number of times the Holders may request Registration of Registrable Securities under this Section 9.5.

9.6 Expenses.

35

All Registration Expenses incurred in connection with any Registration pursuant to Section 9.3, 9.4 or 9.5 (but excluding the Selling Expenses) shall be borne by the Company. Each Holder participating in a Registration pursuant to Section 9.3, 9.4 or 9.5 shall bear such Holder's proportionate share (based on the total number of shares sold in such registration other than for the account of the Company) of all Selling Expenses or other amounts payable to underwriter(s) or brokers, in connection with such offering by the Holders. Notwithstanding the foregoing, the Company shall not be required to pay for any expenses of any Registration proceeding begun pursuant to Section 9.3 if the Registration request is subsequently withdrawn at the request of the Initiating Holders requesting such Registration unless one of the groups of Holders specified in Section 9.3(c) agrees that such Registration constitutes the use by such Holders of one (1) of their remaining demand Registrations pursuant to Section 9.3(c) (in which case such Registration shall also constitute the use by such Holders of one (1) such demand Registration); provided further, however, that if at the time of such withdrawal, the Holders have learned of a material adverse change in the condition, business, or prospects of the Company not known to the Holders at the time of their request for such Registration and have withdrawn their request for Registration with reasonable promptness after learning of such material adverse change, then the Holders shall not be required to pay any of such expenses and such Registration shall not constitute the use of a demand Registration pursuant to Section 9.3.

9.7 Obligations of the Company.

Whenever required to effect the Registration of any Registrable Securities under this Agreement the Company shall, as expeditiously as reasonably possible:

(a) Registration Statement.

Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective, and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to one hundred twenty (120) days; provided, however, that (i) such one hundred twenty (120) day period shall be extended for a period of time equal to the period any Holder refrains from selling any securities included in such Registration at the request of the underwriter(s), and (ii) in the case of any Registration of Registrable Securities on Form F-3 which are intended to be offered on a continuous or delayed basis, such to compliance with applicable SEC rules, such one hundred twenty (120)-day period shall be extended, if necessary, to keep the registration statement effective until all such Registrable Securities are sold.

(b) Amendments and Supplements.

Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(c) Prospectuses.

Furnish to the Holders such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of the Registrable Securities owned by them that are included in such Registration.

(d) Blue Sky.

Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or "blue sky" laws of such jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act.

36

(e) Underwriting.

In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement in usual and customary form, with the managing underwriter(s) of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f) Notification.

Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of (i) the issuance of any stop order by the SEC in respect of such registration statement, or (ii) the occurrence of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(g) Opinion and Comfort Letter.

Furnish, at the request of any Holder requesting registration of Registrable Securities, on the date that such Registrable Securities are delivered to the underwriter(s) for sale, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such Registration, in form and substance as is customarily given to underwriters in an underwritten public offering and reasonably satisfactory to a majority in interest of the Holders requesting Registration, addressed to the underwriters, if any, and to the Holders requesting Registration of Registrable Securities and (ii) letters dated as of (x) the effective date of the registration statement covering such Registrable Securities and (y) the closing date of the offering, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering and reasonably satisfactory to a majority in interest of the Holders requesting Registration, addressed to the underwriters, if any, and to the Holders requesting Registration of Registrable Securities.

9.8 Furnish Information.

It shall be a condition precedent to the obligations of the Company to take any action pursuant to Section 9.3, 9.4 or 9.5 that the selling Holders shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities and updates thereof as shall be required to timely effect the Registration of their Registrable Securities.

9.9 Indemnification.

In the event any Registrable Securities are included in a registration statement under Section 9.3, 9.4 or 9.5:

(a) By the Company.

To the extent permitted by law, the Company will indemnify and hold harmless each Holder, its partners, officers, directors, legal counsel, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act, or other United States federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations (each, a "Violation"):

37

(i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto;

(ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or

(iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any United States federal or state securities law, or any rule or regulation promulgated under the Securities Act, the Exchange Act, or any United States federal or state securities law in connection with the offering covered by such registration statement;

and the Company will reimburse each such Holder, its partner, officer, director, legal counsel, underwriter or controlling person for any legal or other expenses reasonably incurred by them, as such expenses are incurred, in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this Section 9.9(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld), nor shall the Company be liable in any such case for any such loss, claim, damage, liability or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such Registration by such Holder, partner, officer, director, legal counsel, underwriter or controlling person of such Holder.

(b) By Selling Holders.

To the extent permitted by law, each selling Holder will, if Registrable Securities held by such Holder are included in the securities as to which such Registration qualifications or compliance is being effected, indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement, each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter and any other Holder selling securities under such registration statement or any of such other Holder's partners, directors, officers, legal counsel or any person who controls such Holder within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages or liabilities (joint or several) to which the Company or any such director, officer, legal counsel, controlling person, underwriter or other such Holder, partner or director, officer or controlling person of such other Holder may become subject under the Securities Act, the Exchange Act or other United States federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Holder expressly for use in connection with such Registration; and each such Holder will reimburse any legal or other expenses reasonably incurred by the Company or any such director, officer, controlling person, underwriter or other Holder, partner, officer, director or controlling person of such other Holder in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this Section 9.9(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; and provided, further, that in no event shall any indemnity under this Section 9.9(b) exceed the net proceeds received by such Holder in the registered offering out of which the applicable Violation arises.

38

(c) Notice.

Promptly after receipt by an indemnified party under this Section 9.9 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 9.9, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential conflict of interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of liability to the indemnified party under this Section 9.9 to the extent the indemnifying party is prejudiced as a result thereof, but the omission to so deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 9.9.

(d) Contribution.

In order to provide for just and equitable contribution to joint liability under the Securities Act in any case in which either (i) any indemnified party makes a claim for indemnification pursuant to this Section 9.9 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 9.9 provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any indemnified party in circumstances for which indemnification is provided under this Section 9.9; then, and in each such case, the indemnified party and the indemnifying party will contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that a Holder (together with its related persons) is responsible for the portion represented by the percentage that the public offering price of its Registrable Securities offered by and sold under the registration statement bears to the public offering price of all securities offered by and sold under such registration statement, and the Company and other selling Holders are responsible for the remaining portion. The relative fault of the indemnifying party and of the indemnified party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; provided, however, that, in any such case: (A) no Holder will be required to contribute any amount in excess of the net proceeds to such Holder from the sale of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement; and (B) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

(e) Survival; Consents to Judgments and Settlements.

39

The obligations of the Company and Holders under this Section 9.9 shall survive the completion of any offering of Registrable Securities in a registration statement, regardless of the expiration of any statutes of limitation or extensions of such statutes. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

9.10 No Registration Rights to Third Parties.

Without the prior written consent of the holders holding at least a two-thirds (2/3) majority of the Registrable Securities Then Outstanding, the Company shall not grant, or cause or permit to be created, for the benefit of any person or entity any Registration rights of any kind (whether similar to the demand, "piggyback" or Form F-3 Registration rights described in this Article IX, or otherwise) relating to any securities of the Company which are senior to, or on a parity with, those granted to the Holders of Registrable Securities.

9.11 Market Stand-Off.

Each Shareholder agrees that, so long as it holds any voting securities of the Company, upon request by the Company or the underwriters managing the Initial Public Offering of the Company's securities, it will not sell or otherwise transfer or dispose of any securities of the Company (other than those permitted to be included in the Registration and other transfers to Affiliates permitted by law) without the prior written consent of the Company or such underwriters, as the case may be, for a period of time as may be requested by the underwriters not to exceed one hundred and eighty (180) days from the effective date of the registration statement (or its equivalent), or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (a) the publication or other distribution of research reports and (b) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA Rule 2711(f)(4) or NYSE Rule 472 (f)(4), or any successor provisions or amendments thereto) covering such Initial Public Offering or the pricing date of such offering as may be requested by the underwriters. The foregoing provision of this Section 9.11 shall not apply to the sale of any securities of the Company to an underwriter pursuant to any underwriting agreement, and shall only be applicable to the Holders if (i) all officers, directors and all holders of any Ordinary Shares enter into similar agreements, (ii) in the event that the Company or any underwriter releases any other holder of Shares from his or her sale restrictions so undertaken, then each Holder shall be notified prior to such release and shall itself be simultaneously released to the same proportional extent, and (iii) the market stand-off agreement contemplated permits the transfer of securities of the Company by the Shareholders to their respective Affiliates or other transferees so long as such Affiliates or transferees are required to enter into the same market stand-off agreement. The Company shall require all future acquirers of the Company's securities to execute prior to an Initial Public Offering a market stand-off agreement containing substantially similar provisions as those contained in this Section 9.11.

9.12 Rule 144 Reporting.

With a view to making available to the Holders the benefits of certain rules and regulations of the SEC which may at any time permit the sale of the Registrable Securities to the public without Registration or pursuant to a Registration on Form F-3, after such time as a public market exists for the Ordinary Shares, the Company agrees to:

(a) Make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after the effective date of the first Registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(b) File with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

(c) So long as a Holder owns any Registrable Securities, to furnish to such Holder forthwith upon request (i) a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time after ninety (90) days after the effective date of the Initial Public Offering), the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or its qualification as a registrant whose securities may be resold pursuant to Form F-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company, and (iii) such other reports and documents of the Company as a Holder may reasonably request in availing itself of any rule or regulation of the SEC that permits the selling of any such securities without Registration or pursuant to Form F-3.

9.13 Termination of the Company's Obligations.

The Company shall have no obligations pursuant to Sections 9.3, 9.4 and 9.5 with respect to any Registrable Securities proposed to be sold by a Holder in a Registration pursuant to Section 9.3, 9.4 or 9.5 upon the latest to occur of (i) the expiration of the four (4)-year period following the Initial Public Offering, (ii) the expiration of the eight (8)-year period following the date hereof, and (iii) such time as Rule 144 or another similar exemption under the Securities Act is available for the sale of all of such Holder's shares without limitation during a three-month period without Registration.

9.14 Delay of Registration.

No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such Registration as the result of any controversy (except for fraud or willful misconduct) that might arise with respect to the interpretation or implementation of this Article IX.

**ARTICLE X.**
**MISCELLANEOUS.**

10.1 Notices.

(a) Any party hereto giving any notice or making any other communication pursuant to this Agreement shall give such notice or make such other communication in writing and shall use one of the following methods of delivery: personal delivery, courier with all fees prepaid or facsimile. A notice or other communication is effective only if the party hereto giving the notice or making the other communication has complied with the preceding sentence and if the addressee has received the notice or other communication; provided that a notice or other communication is deemed to have been received as follows:

(i) if a notice or other communication is delivered in person, or sent by courier, upon receipt by the party hereto to whom the notice or other communication is addressed as indicated by the date on a signed receipt for such notice or other communication signed for or on behalf of such party; and

41

(ii) if a notice or other communication is sent by facsimile, upon receipt by the party hereto giving or making the notice or other communication of an acknowledgement or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the addressee's facsimile number.

(b) Any notice or other communication to a party hereto pursuant to this Agreement shall use the following address and facsimile number for such party (or such other address or facsimile number as such party may have specified by notice given to the other parties hereto pursuant to this provision):

if to the Company or any of the Group Entities :

Qiyi.com, Inc.
17/F, Capital Development Tower
No.2, Haidian North 1st Street
Haidian District, Beijing, 100080, PRC
Fax: 86-10-6267 7000
Attn: Wang Shuwen

if to a Shareholder:

to its address and facsimile number as set forth on Schedule 1 attached hereto;

(c) A failure to deliver an informational copy of a notice or other communication to the applicable Person set forth in this Section 10.1 above does not affect the effectiveness of a notice or other communication that is otherwise given in accordance with this Section 10.1.

(d) In the event that an addressee of a notice or communication rejects or otherwise refuses to accept a notice or other communication delivered or sent in accordance with this Section 10.1, or if the notice or other communication cannot be delivered because of a change in address for which no notice was given, then such notice or other communication is deemed to have been received upon such rejection, refusal or inability to deliver.

(e) Any party may by notice given in accordance with this Section 10.1 designate another address or Person for receipt of notices hereunder.

10.2 Successors and Assigns; Third Party Beneficiary.

This Agreement shall inure to the benefit of and be binding upon successors and permitted assigns of the parties hereto. This Agreement is not assignable except in connection with a transfer of Shares in accordance with this Agreement, provided that, with respect to any Transfer by any Shareholder (other than Baidu Shareholders and Cannes) to any transferee that is not a party to this Agreement in accordance with the provisions of this Agreement, such transferee shall be subject to the same restrictions as specified in this Agreement as such Shareholder. No person other than the parties hereto and their successors and permitted assigns is intended to be a beneficiary of this Agreement.

10.3 <u>Amendment and Waiver</u>.

No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the parties hereto at law, in equity or otherwise.

Subject to <u>Section 6.6(b)</u> and except as otherwise provided herein, any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure by any party from the terms of any provision of this Agreement, shall be effective only if it is made or given in writing and signed by (i) the Company and (ii) the Shareholders holding no less than two-thirds (2/3) of the voting power of the Series Preferred Shares (excluding the Series G2 Preferred Shares) then outstanding, and (iii) the other Shareholders holding no less than two-thirds (2/3) of the Ordinary Shares then outstanding, <u>provided</u>, <u>however</u>, that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. Any such amendment, supplement, modification, waiver or consent shall be binding upon the Company and all of the Shareholders. Notwithstanding the first sentence of this paragraph, Company, without the consent of any other party hereto, may amend this Agreement to add any Permitted Transferee as a party to the Agreement as a Shareholder hereunder.

Notwithstanding the foregoing, this Agreement may not be amended or terminated and the observance of any term hereof may not be waived with respect to any Major Shareholder without the written consent of such Major Shareholder, unless such amendment, termination, or waiver applies to all Shareholders in the same fashion (it being agreed that a waiver of the provisions of <u>Article IV</u> with respect to a particular transaction shall be deemed to apply to all Shareholders in the same fashion if such waiver does so by its terms, notwithstanding the fact that certain Shareholders may nonetheless, by agreement with the Company, purchase securities in such transaction).

10.4 <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be as effective as delivery of a manually executed counterpart of a signature page of this Agreement.

10.5 <u>Specific Performance</u>.

The parties hereto intend that each of the parties have the right to seek damages or specific performance in the event that any other party hereto fails to perform such party's obligations hereunder. Therefore, if any party shall institute any action or proceeding to enforce the provisions hereof, any party against whom such action or proceeding is brought hereby waives any claim or defense therein that the plaintiff party has an adequate remedy at law.

10.6 <u>Headings</u>.

The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

10.7 <u>Governing Law</u>.

43

The laws of the State of New York (without giving effect to its conflicts of law principles) govern this Agreement and all matters arising out of or relating to this Agreement and any of the transactions contemplated hereby, including (a) its negotiation, execution, validity, interpretation, construction, performance and enforcement and (b) the rights and duties of the parties in whole or in part.

10.8 Dispute Resolution.

(a) Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination or validity hereof, shall be resolved through consultation. Such consultation shall begin immediately after one party hereto has delivered to the other parties hereto a written request for such consultation. If within thirty (30) days following the date on which such notice is given the dispute cannot be resolved, the dispute shall be submitted to arbitration upon the request of any party with notice to the other parties.

(b) The arbitration shall be conducted in Hong Kong under the auspices of the Hong Kong International Arbitration Centre (the "Centre"). There shall be three (3) arbitrators. Each opposing party to a dispute shall be entitled to appoint one arbitrator, and the third arbitrator shall be jointly appointed by the disputing parties or, failing such agreement by thirty (30) days after the appointment by each party of its arbitrator, the appointment of the third arbitrator shall be made by the Secretary General of the Centre.

(c) The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the Arbitration Rules of the United Nations Commission on International Trade Law, as in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this Section 10.8(c), including the provisions concerning the appointment of arbitrators, the provisions of this Section 10.8(c) shall prevail.

(d) The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of New York and shall not apply any other substantive law.

(e) Each party to an arbitration hereunder shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(f) The award of the arbitration tribunal shall be final and binding upon the disputing parties, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award. In the event of any failure of a party to this Agreement to comply with the award of the arbitration tribunal, the non-complying party shall be liable to the other parties for all reasonable costs and expenses of such enforcement.

(g) Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitration tribunal.

(h) The costs of arbitration shall be borne by the losing party, unless otherwise determined by the arbitration tribunal.

44

10.9 Severability.

If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

10.10 Entire Agreement.

This Agreement, together with the Schedules and Exhibits hereto, is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. There are no restrictions, promises, representations, warranties or undertakings, other than those set forth or referred to herein or therein. This Agreement, together with the Schedules and Exhibits hereto, supersede all prior agreements and understandings among the parties with respect to such subject matter (including the Prior Agreement).

10.11 Term of Agreement.

Except as may be otherwise provided herein with respect to specific rights and obligations set forth hereunder, this Agreement shall become effective upon the execution hereof and shall terminate upon the earlier of (a) the consummation of the Initial Public Offering, and (b) a "Deemed Liquidation Event" (as defined in the Seventh Restated Articles); provided, however, that the provisions of Articles IX and X shall survive the termination of this Agreement.

10.12 Indemnity and Liability.

The Company indemnifies, exonerates and holds each of the Shareholders, and each of their respective partners, shareholders, members, Affiliates, directors, officers, fiduciaries, managers, controlling Persons, employees and agents (collectively, the "Indemnitees") free and harmless from and against any and all actions, causes of action, suits, claims, liabilities, losses, damages and costs and out-of-pocket expenses in connection therewith (including reasonable attorneys' fees and expenses) incurred by the Indemnitees or any of them before, on or after the date of this Agreement (collectively, the "Indemnified Liabilities"), as a result of, arising out of, or in any way relating to (i) this Agreement and the transactions contemplated hereby (other than any such Indemnified Liabilities to the extent that such Indemnified Liabilities arise out of any breach by such Indemnitee or its associated or affiliated Indemnitees or other related Persons as determined by a court of competent jurisdiction in a final nonappealable judgment of this Agreement), (ii) the Indemnitee's status as a shareholder of the Company, or (iii) operations of, or services provided by any of the Indemnitees to, the Company or any Group Entity from time to time; provided that the foregoing indemnification rights shall not be available to the extent that any such Indemnified Liabilities arose on account of such Indemnitee's gross negligence or willful misconduct, and further provided that, if and to the extent that the foregoing undertaking may be unavailable or unenforceable for any reason, the Company hereby agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. The rights of any Indemnitee to indemnification hereunder will be in addition to any other rights any such Person may have under any other agreement or instrument referenced above or any other agreement or instrument to which such Indemnitee is or becomes a party or is or otherwise becomes a beneficiary or under law or regulation.

45

10.13 <u>Consultation With Counsel</u>.

Each party hereto warrants that each of them has been represented and advised by legal counsel or has had full opportunity to be represented and advised by legal counsel with respect to this Agreement and all matters covered by it. Each of them represents and agrees that if it has elected not to be represented by legal counsel in the negotiation, preparation or execution of this Agreement, such election was made freely and voluntarily with full awareness of the consequences of the decision and that it is fully aware of the content and legal effect of this Agreement, and has executed or will execute this Agreement after independent investigation and without fraud, duress or undue influence.

10.14 <u>Aggregation of Shares</u>.

All Ordinary Shares and Preferred Shares (whether now outstanding or hereafter issued in any context) held or acquired by any Affiliate of a Shareholder shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

[Remainder of page intentionally left blank]

46

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

*For and on behalf of*
QIYI.COM, INC.

By:            /s/ Yu Gong
Name:  Yu Gong
Title:  Director

**HK SUBSIDIARY:**

QIYI.COM HK LIMITED

By:            /s/ Yu Gong
Name:  Yu Gong
Title:  Director

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**BEIJING WFOE:**

BEIJING QIYI CENTURY SCIENCE & TECHNOLOGY CO., LTD.

By: _____ /s/ Company Seal

Name:  Yu Gong

Title:    Legal Representative

**CHONGQING WFOE:**

CHONGQING QIYI TIANXIA SCIENCE & TECHNOLOGY CO., LTD.

By: _____ /s/ Company Seal

Name:  Yu Gong

Title:    Legal Representative

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

<div align="right">

**PRC ENTITY 1:**

BEIJING DINGXIN TIANXIA SCIENCE & TECHNOLOGY CO., LTD.

By: _____ /s/ Company Seal

Name: Yu Gong

Title:    Legal Representative

**PRC ENTITY 2:**

BEIJING IQIYI SCIENCE & TECHNOLOGY CO., LTD.

By: _____ /s/ Company Seal

Name: Xiaohua Geng

Title:    Legal Representative

**PRC ENTITY 3:**

SHANGHAI IQIYI CULTURE MEDIA CO., LTD.

By: _____ /s/ Company Seal

Name: Yu Gong

Title:    Legal Representative

**PRC ENTITY 4:**

SHANGHAI ZHONG YUAN NETWORK CO., LTD.

By: _____ /s/ Company Seal

Name: Yu Gong

Title:    Legal Representative

**FOUNDER:**

Yu Gong

By: _____ /s/ Yu Gong

</div>

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**CANNES VENTURES LIMITED**

By: _____  /s/ Yu Gong

Name:  Yu Gong

Title:

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**BAIDU HOLDINGS LIMITED**

By:                 /s/ Robin Yanhong Li

Name:  Robin Yanhong Li

Title:    Director

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**XIAOMI VENTURES LIMITED**

By: _____  /s/ Authorized Signatory

Name:

Title:

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**PROMINENT TMT LIMITED**

By: _____ /s/ Koh Tuck Lye

Name: Koh Tuck Lye

Title: Director

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**HARVEST REWARDS FUND LP**

By: _____ /s/ Chiangqi LU

Name:  Chiangqi LU

Title:    Director

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**MADRONE OPPORTUNITY FUND, L.P.**

By: _____    /s/ Greg Penner

Name:  Greg Penner

Title:    Managing Member

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**XIANG HE FUND I, L.P.**

By: Xiang He Partners I, L.P., its General partner
By: Xiang He I GP, LTD, its General Partner

By: _____ /s/ Authorized Signatory
Name:
Title:

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**VMS VIDEO HOLDINGS LIMITED**

By:             /s/ CHOW Siu Lui
                     Name:   CHOW Siu Lui
                     Title:     Authorized Signatory

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**EASTONE INTERNATIONAL CO., LTD**

By:                 /s/ Authorized Signatory

Name:

Title:

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**GORGEOUS RAINBOW LIMITED**

By: _____ /s/ Khalid Iton

Name: Khalid Iton

Title: Director

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**HH RSV-V HOLDINGS LIMITED**

By: _____     /s/ Colm O' Connell

Name:   Colm O' Connell

Title:    Director

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**HONEY BEST LIMITED**

By: _____    /s/ Yuhan Sun

Name:  Yuhan Sun

Title:    Director

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**IDG INFINITY FINANCIAL LIMITED**

By: _____ /s/ Chi Sing Ho

Name:    Chi Sing Ho

Title:    Authorized Signatory

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**RUN LIANG TAI (HONG KONG) INVESTMENT COMPANY LIMITED**

By: _____ /s/ Authorized Signatory

Name:

Title:

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**SCC GROWTH IV HOLDCO A, LTD.**

By: _____  /s/ Ip Siu Wai Eva

Name:   Ip Siu Wai Eva

Title:    Authorized Signatory

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Sixth Amended and Restated Shareholders Agreement as of the date first written above.

**SILVERLINK CAPITAL LP**

By: _____ /s/ Andrew Tsuei

Name:   Andrew Tsuei

Title:   Managing Director of Silverlink Holdings Limited
as General Partner

SIGNATURE PAGE TO QIYI.COM, INC. SIXTH AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

Schedule 1

Schedule 2

Exhibit A

Exhibit B-1

Exhibit B-2

**Exhibit 5.1**

2018                                                               Our Ref: AMH/WL/Q0149-H16028

iQIYI, Inc.
Intertrust Corporate Services (Cayman) Limited,
190 Elgin Avenue, George Town,
Grand Cayman KY1-9005,
Cayman Islands

Dear Sirs

**iQIYI, Inc.**

We have acted as Cayman Islands legal advisers to iQIYI, Inc. (the "**Company**") in connection with the Company's registration statement on Form F-1, including all amendments or supplements thereto (the "**Registration Statement**"), filed with the Securities and Exchange Commission pursuant to Rule 462(b) under the U.S. Securities Act of 1933, as amended, relating to the offering by the Company of American Depositary Shares representing the Company's Class A Ordinary Shares of a par value of US$0.00001 each (the "**Class A Ordinary Shares**"). We are furnishing this opinion as exhibit 5.1 to the Registration Statement.

For the purposes of giving this opinion, we have examined and relied upon the originals, copies or translations of the documents listed in Schedule 1.

In giving this opinion we have relied upon the assumptions set out in Schedule 2, which we have not independently verified.

We are Cayman Islands Attorneys at Law and express no opinion as to any laws other than the laws of the Cayman Islands in force and as interpreted at the date of this opinion. We have not, for the purposes of this opinion, made any investigation of the laws, rules or regulations of any other jurisdiction. Except as explicitly stated herein, we express no opinion in relation to any representation or warranty contained in any of the documents cited in this opinion nor upon matters of fact or the commercial terms of the transactions the subject of this opinion.

Based upon the foregoing examinations and assumptions and upon such searches as we have conducted and having regard to legal considerations which we consider relevant, and under the laws of the Cayman Islands, we give the following opinions in relation to the matters set out below.

1.     The Company is an exempted company duly incorporated with limited liability, validly existing under the laws of the Cayman Islands.

**WALKERS**                                                                                                            Page 2

2.    The authorised share capital of the Company is currently US$137,288.235 divided into (a) 10,000,000,000 ordinary shares of a par value of US$0.00001 each, (b) 200,000,000 redeemable, convertible Series A Preferred Shares of a par value of US$0.00001 each, (c) 6,064,174 convertible Series A-1 Junior Preferred Shares of a par value of US$0.00001 each, (d) 123,103,264 redeemable convertible Series B Preferred Shares of a par value of US$0.00001 each, (e) 302,891,196 redeemable convertible Series C Preferred Shares of a par value of US$0.00001 each, (f) 848,682,647 redeemable convertible Series D Preferred Shares of a par value of US$0.00001 each, (g) 686,646,383 redeemable convertible Series E Preferred Shares of a par value of US$0.00001 each, (h) 546,999,817 redeemable convertible Series F Preferred Shares of a par value of US$0.00001 each, (i) 215,484,776 redeemable convertible Series G1 Preferred Shares of a par value of US$0.00001 each and (j) 798,951,243 redeemable convertible Series G2 Preferred Shares of a par value of US$0.00001 each, and from the time the Amended and Restated M&A (as defined in Schedule 1) become effective, will be US$1,000,000 divided into 100,000,000,000 shares comprising of (i) 94,000,000,000 Class A Ordinary Shares of a par value of US$0.00001 each, (ii) 5,000,000,000 Class B Ordinary Shares of a par value of US$0.00001 each and (iii) 1,000,000,000 shares of a par value of US$0.00001 each of such class or classes (however designated) as the board of directors may determine in accordance with the Amended and Restated M&A.

3.    The issue and allotment of the Class A Ordinary Shares pursuant to the Registration Statement has been duly authorised. When allotted, issued and fully paid for as contemplated in the Registration Statement and when appropriate entries have been made in the Register of Members of the Company, the Class A Ordinary Shares to be issued by the Company will be validly issued, allotted and fully paid, and there will be no further obligation on the holder of any of the Class A Ordinary Shares to make any further payment to the Company in respect of such Class A Ordinary Shares.

4.    The statements under the caption "Taxation" in the prospectus forming part of the Registration Statement, to the extent that they constitute statements of Cayman Islands law, are accurate in all material respects. Such statements constitute our opinion.

We hereby consent to the use of this opinion in, and the filing hereof, as an exhibit to the Registration Statement and to the reference to our firm under the headings "Enforceability of Civil Liabilities", "Description of Share Capital", "Legal Matters" and elsewhere in the prospectus included in the Registration Statement. In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the U.S. Securities Act of 1933, as amended, or the Rules and Regulations of the Commission thereunder.

This opinion is limited to the matters referred to herein and shall not be construed as extending to any other matter or document not referred to herein.

This opinion shall be construed in accordance with the laws of the Cayman Islands.

**WALKERS**

Page 3

Yours faithfully

**WALKERS**

**WALKERS**                                                                                                    Page 4

## SCHEDULE 1

### LIST OF DOCUMENTS EXAMINED

1.      The Certificate of Incorporation dated 27 November 2009, the Certificate of Incorporation on Change of Name dated 13 September 2010, the Certificate of Incorporation on Change of Name dated 5 December 2017, the Eighth Amended and Restated Memorandum and Articles of Association as adopted by Special Resolution passed on 30 November 2017(the "**Memorandum and Articles**"), the Ninth Amended and Restated Memorandum and Articles of Association as conditionally adopted by special resolution on            2018 and effective immediately prior to the completion of the initial public offering of the Company's American Depositary Shares representing its Class A Ordinary Shares (the "**Amended and Restated M&A**"), Register of Members and Register of Directors of the Company, copies of which have been provided to us by the Company's registered office (together, the "**Company Records**").

2.      A copy of executed written resolutions of the members of the Company dated 30 November 2017, a copy of executed written resolutions of the Board of Directors of the Company dated            2018 (the "**Resolutions**").

3.      A certificate from a director of the Company dated            2018, a copy of which is attached hereto (the "**Director's Certificate**").

4.      The Registration Statement.

**WALKERS**                                                                                            Page 5

## SCHEDULE 2

### ASSUMPTIONS

1. The originals of all documents examined in connection with this opinion are authentic. All documents purporting to be sealed have been so sealed. All copies are complete and conform to their originals.

2. The Company Records are complete and accurate and all matters required by law and the Memorandum and Articles to be recorded therein are completely and accurately so recorded.

3. The Director's Certificate is true and correct as of the date hereof.

4. The conversion of any shares in the capital of the Company will be effected via legally available means under Cayman law.

**WALKERS**
Page 6

**iQIYI, Inc.**
Intertrust Corporate Services (Cayman) Limited,
190 Elgin Avenue, George Town,
Grand Cayman KY1-9005,
Cayman Islands

2018

Walkers
15th Floor, Alexandra House
18 Chater Road, Central
Hong Kong

Dear Sirs,

**iQIYI, Inc. (the "Company") – Director's Certificate**

I,         , being a director of the Company, am aware that you are being asked to provide a legal opinion (the "**Opinion**") in relation to certain aspects of Cayman Islands law. Capitalised terms used in this certificate have the meaning given to them in the Opinion. I hereby certify that:

1.    the Memorandum and Articles remain in full force and effect and are otherwise unamended;

2.    the written resolutions of the shareholders of the Company dated 30 November 2017 were executed (and where by a corporate entity such execution has been duly authorised if so required) by and on behalf of all shareholders in the manner prescribed in the articles of association of the Company, the signatures and initials thereon are those of a person or persons in whose name the resolutions have been expressed to be signed, are in full force and effect at the date hereof and have not been amended, varied or revoked in any respect;

3.    the resolutions referred to in the minutes of a meeting of the board of directors of the Company dated              2018 setting out the resolutions adopted at such meeting were duly adopted at a duly convened meeting of the board of directors of the Company in the manner prescribed in the articles of association of the Company, are in full force and effect at the date hereof and have not been amended, varied or revoked in any respect, and such meeting was held and conducted in accordance with the articles of association of the Company;

4.    the resolutions referred to in the minutes of a meeting of the shareholders of the Company dated              2018 setting out the resolutions adopted at such meeting were duly adopted at a duly convened meeting of the shareholders of the Company in the manner prescribed in the articles of association of the Company, are in full force and effect at the date hereof and have not been amended, varied or revoked in any respect, and such meeting was held and conducted in accordance with the articles of association of the Company; and

**WALKERS**                                                                                    Page 7

5.     there is no contractual or other prohibition (other than as arising under Cayman Islands law) binding on the Company prohibiting it from issuing and allotting the Class A Ordinary Shares.

I confirm that you may continue to rely on this Certificate as being true and correct on the day that you issue the Opinion unless I have previously notified you personally to the contrary.

*[Signature Page to Follow]*

**WALKERS**                                                                                Page 8

Signature: _____
Director

**Exhibit 10.1**

**Execution Copy**

**QIYI.COM, INC.**
**2010 EQUITY INCENTIVE PLAN**

**Article 1.    Establishment & Purpose**

**1.1 Establishment**. Qiyi.com, Inc., an exempted company incorporated under the laws of the Cayman Islands (the "Company"), hereby establishes the 2010 Equity Incentive Plan (this "Plan") as set forth herein.

**1.2 Purpose of this Plan**. The purpose of this Plan is to attract, retain and motivate the officers, directors, employees and consultants of the Company and its Subsidiaries and Affiliates, and to promote the success of the Company's business by providing them with appropriate incentives and rewards either through a proprietary interest in the long-term success of the Company or compensation based on fulfilling certain performance goals.

**Article 2.    Definitions**

Capitalized terms used and not otherwise defined herein shall have the meanings set forth below.

**2.1** "**Affiliate**" means any entity that the Company, either directly or indirectly, is in common control with, is controlled by or controls or any entity in which the Company has a substantial direct or indirect equity interest, as determined by the Board.

**2.2** "**Award**" means any Option, Stock Appreciation Right, Restricted Stock, or Other Stock-Based Award that is granted under this Plan.

**2.3** "**Award Agreement**" means either (a) a written agreement entered into by the Company and a Participant setting forth the terms and provisions applicable to an Award granted under this Plan, or (b) a written statement signed by an authorized officer of the Company to a Participant describing the terms and provisions of the actual grant of such Award.

**2.4** "**Board**" means the Board of Directors of the Company.

**2.5** "**Change of Control**" unless otherwise specified in the Award Agreement, means an event or series of events that results in any of the following:

(a)    **Change in Ownership of the Company**. A change in the ownership of the Company occurs on the date that any one Person or more than one Person acting as a group, other than a Subsidiary, acquires ownership of stock of the Company that, together with stock held by such Person or group, constitutes more than fifty percent (50%) of the total voting power of stock of the Company. However, if any one Person (or more than one Person acting as a group) is considered to own more than fifty percent (50%) of the total fair market value or total voting power of the Company's stock prior to the acquisition, any acquisition of additional stock by the same Person or Persons is not considered to cause a change in the ownership of the Company;

(b)    **Change in Ownership of a Substantial Portion of the Company's Assets**. A change in the ownership of a substantial portion of the Company's assets occurs on the date that any one Person, or more than one Person acting as a group, other than any Subsidiary, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such Person or Persons) assets from the Company that have a total gross fair market value of more than fifty percent (50%) of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions. For this purpose, gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined in good faith by the Board without regard to any liabilities associated with such assets; or

(c)    **Change in Board of Directors of the Company**. A change in the effective control of the Company occurs on the date a majority of the individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board") is replaced for any reason during any twelve month period, provided, however, that if the election, or nomination for election by the Company's shareholders, of any new director was approved by a vote of at least a majority of the Incumbent Board, such new director shall be considered a member of the Incumbent Board, and provided further that any reductions in the size of the Board that are instituted voluntarily by the Incumbent Board shall not constitute a "Change of Control", and after any such reduction the "Incumbent Board" shall mean the Board as so reduced.

**Change in State of Incorporation or Creation of a Holding Company**. Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially similar proportions by the Persons who hold the Company's securities immediately before such transaction.

**2.6** "**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

**2.7** "**Committee**" means the Board, or any committee designated by the Board to administer this Plan in accordance with Article 3 of this Plan.

**2.8** "**Consultant**" means any natural person who provides bona fide services to the Company or any Affiliate or Subsidiary as a consultant or advisor, excluding any Employee or Director.

**2.9** "**Director**" means a member of the Board who is not an Employee.

**2.10** "**Effective Date**" means the date on which the Plan is adopted and approved by the Board.

**2.11** "**Employee**" means an officer or other employee of the Company or any Subsidiary or Affiliate, including a member of the Board who is such an employee.

**2.12** "**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

**2.13** "**Fair Market Value**" means, as of any date, the per Share value determined as follows:

(a)    if the Shares are listed on any established stock exchange or a national market system, the per Share Fair Market Value shall be the closing sales price (or the closing bid, if no sales were reported) on the date of determination (or, if no closing sales price or closing bid was reported on that date, as applicable, on the last trading date such closing sales price or closing bid was reported), as reported in The Wall Street Journal or such other source as the Committee deems reliable;

2

(b)    if the Shares are regularly quoted on an automated quotation system (including the OTC Bulletin Board and the "Pink Sheets" published by the National Quotation Bureau, Inc.) or by a recognized securities dealer, but selling prices are not reported, the per Share Fair Market Value shall be the mean between the high bid and low asked prices for a Share on the date of determination (or, if no such prices were reported on that date, on the last date such prices were reported), as reported in The Wall Street Journal or such other source as the Committee deems reliable;

(c)    in the absence of an established market for the Shares, the per Share Fair Market Value thereof, disregarding any discount for minority interest, shall be determined in good faith by the Board.

**2.14** "**Incentive Stock Option**" means an Option intended to meet the requirements of an incentive stock option as defined in Section 422 of the Code and designated as an Incentive Stock Option in accordance with Article 6 of this Plan.

**2.15** "**Nonqualified Stock Option**" means an Option that is not an Incentive Stock Option.

**2.16** "**Option**" means any Option granted from time to time under Article 6 of this Plan.

**2.17** "**Option Price**" means the purchase price per Share subject to an Option, as determined pursuant to Section 6.2 of this Plan.

**2.18** "**Other Stock-Based Award**" means any right granted under Article 9 of this Plan.

**2.19** "**Participant**" means any eligible person as set forth in Section 4.1 to whom an Award is granted.

**2.20** "**Person**" means any natural person, sole proprietorship, general partnership, limited partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, governmental authority, or any other organization, irrespective of whether it is a legal entity and includes any successor (by merger or otherwise) of such entity.

**2.21** "**Restricted Stock**" means any Award granted under Article 8 of this Plan.

**2.22** "**Restriction Period**" means the period during which Restricted Stock awarded under Article 8 of this Plan is restricted.

**2.23** "**Service**" means service as an Employee, Director or Consultant. Service shall be deemed to continue while a Participant is on a bona fide leave of absence, if such leave was approved by the Company in writing or if continued crediting of Service for such purpose is required by applicable law (as determined by the Company).

**2.24** "**Share**" means an ordinary share of the Company, par value $0.00001 per share, or such other class or kind of shares or other securities resulting from the application of Section 10.1 of this Plan.

**2.25** "**Stock Appreciation Right**" means any right granted under Article 7 of the Plan

3

**2.26** "**Subsidiary**" means any corporation, partnership, limited liability company or other legal entity of which the Company, directly or indirectly, owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock or other equity interests. For purposes of this Plan, Subsidiaries also include any consolidated variable interest entity of the Company.

**2.27** "**Ten Percent Shareholder**" means a person who on any given date owns, either directly or indirectly (taking into account the attribution rules contained in Section 424(d) of the Code), stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or a Subsidiary or Affiliate.

**Article 3.  Administration**

**3.1 Authority of the Committee**. This Plan shall be administered by the Committee, which shall have full power to interpret and administer this Plan and full authority to select the Directors, Employees and Consultants to whom Awards will be granted and determine the type and amount of Awards to be granted to each such Director, Employee or consultant, the terms and conditions of Awards granted under this Plan and the terms of Award Agreements to be entered into with Participants. Without limiting the generality of the foregoing, the Committee may, in its sole discretion, interpret, clarify, construe or resolve any ambiguity in any provision of this Plan or any Award Agreement, accelerate or waive vesting of Awards and exercisability of Awards, extend the term or period of exercisability of any Awards, modify the purchase price under any Award, or waive any terms or conditions applicable to any Award, subject to the limitations set forth in Section 11.2 of this Plan. Awards may, in the discretion of the Committee, be made under this Plan in assumption of, or in substitution for, outstanding awards previously granted by the Company or an Affiliate or a company acquired by the Company or with which the Company combines. The Committee shall have full and exclusive discretionary power to adopt rules, forms, instruments and guidelines for administering this Plan as the Committee deems necessary or proper. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Participants, the Company and all other interested individuals.

**3.2 Delegation**. The Committee may delegate to one or more of its members, one or more officers of the Company or any Subsidiary, and one or more agents or advisors such administrative duties or powers as it may deem advisable.

**Article 4.  Eligibility and Participation**

**4.1 Eligibility**. Participants will consist of such Employees, Directors and Consultants as the Committee in its sole discretion determines and whom the Committee may designate from time to time to receive Awards under this Plan. Designation of a Participant in any year shall not require the Committee to designate such person to receive an Award in any other year or, once designated, to receive the same type or amount of Award as granted to the Participant in any other year.

**4.2 Type of Award**. Awards under this Plan may be granted in any one or a combination of: (a) Options; (b) Stock Appreciation Rights; (c) Restricted Stock; and (d) Other Stock-Based Awards. Awards granted under this Plan shall be evidenced by Award Agreements (which need not be identical) that provide additional terms and conditions associated with such Awards, as determined by the Committee in its sole discretion; provided, however, that in the event of any conflict between the provisions of this Plan and any such Award Agreement, the provisions of this Plan shall prevail.

4

**Article 5.    Shares Subject to this Plan and Maximum Awards**

**5.1 Number of Shares Available for Awards**.

(a)    **Shares**. Subject to adjustment as provided in this Article 5 and Article 10 of the Plan, the maximum number of Shares available for issuance to Participants pursuant to Awards under the Plan shall be 589,729,714 Shares. The number of Shares available for granting Incentive Stock Options under the Plan shall not exceed 589,729,714 Shares, subject to Article 10 hereof and the provisions of Sections 422 and 424 of the Code and any successor provisions. The Shares available for issuance under the Plan may consist, in whole or in part, of authorized and unissued Shares. Any Shares delivered to the Company as part or full payment for the purchase price of an Award granted under this Plan shall again be available for Awards under this Plan.

(b)    **Additional Shares**. In the event that any outstanding Award expires, is forfeited, cancelled or otherwise terminated without consideration (i.e., Shares or cash) therefor, the Shares subject to such Award, to the extent of any such forfeiture, cancellation, expiration, termination or settlement for cash, shall again be available for Awards under this Plan. If the Committee authorizes the assumption under this Plan, in connection with any merger, consolidation, acquisition of property or stock, or reorganization, of awards granted under another plan, such assumption shall not reduce the maximum number of Shares available for issuance under this Plan.

**Article 6.    Options**

**6.1 Grant of Options**. The Committee is hereby authorized to grant Options to Participants. Each Option shall permit a Participant to purchase from the Company a stated number of Shares at an Option Price established by the Committee, subject to the terms and conditions described in this Article 6 and to such additional terms and conditions, as established by the Committee, in its sole discretion, that are consistent with the provisions of the Plan. Options shall be designated as either Incentive Stock Options or Nonqualified Stock Options, provided, that, Options granted to Directors shall be Nonqualified Stock Options. An Option granted as an Incentive Stock Option shall, to the extent it fails to qualify as an Incentive Stock Option, be treated as a Nonqualified Stock Option. Neither the Committee nor the Company or any of its Affiliates shall be liable to any Participant or to any other Person if it is determined that an Option intended to be an Incentive Stock Option does not qualify as an Incentive Stock Option. Each option shall be evidenced by an Award Agreement which shall state the number of Shares covered by such Option. Such agreements shall conform to the requirements of the Plan, and may contain such other provisions, as the Committee shall deem advisable.

**6.2 Terms of Option Grant**. The Option Price shall be determined by the Committee at the time of grant, and, unless otherwise determined by the Board, shall not be less than one-hundred percent (100%) of the Fair Market Value of a Share on the date of grant. In the case of any Incentive Stock Option granted to a Ten Percent Shareholder, unless otherwise determined by the Board, the Option Price shall not be less than one-hundred-ten percent (110%) of the Fair Market Value of a Share on the date of grant.

**6.3 Option Term**. The term of each Option shall be determined by the Committee at the time of grant and shall be stated in the Award Agreement, but in no event shall such term be greater than ten (10) years (or, in the case on an Incentive Stock Option granted to a Ten Percent Shareholder, five (5) years).

5

**6.4 Time of Exercise**. Options granted under this <u>Article 6</u> shall be exercisable at such times and be subject to such restrictions and conditions as the Committee shall in each instance approve, which terms and restrictions need not be the same for each grant or for each Participant.

**6.5 Method of Exercise**. Except as otherwise provided in the Plan or in an Award Agreement, an Option may be exercised for all, or from time to time any part, of the Shares for which it is then exercisable. For purposes of this <u>Article 6</u>, the exercise date of an Option shall be the later of the date a notice of exercise is received by the Company and, if applicable, the date full payment is received by the Company pursuant to clauses (a), (b), (c), (d), or (e) of the following sentence (including the applicable tax withholding pursuant to <u>Section 12.3</u> of the Plan). The aggregate Option Price for the Shares as to which an Option is exercised shall be paid to the Company at the election of the Participant: (a) in cash or its equivalent (e.g., by cashier's check); (b) to the extent permitted by the Committee, in Shares (whether or not previously owned by the Participant) having a Fair Market Value equal to the aggregate Option Price for the Shares being purchased and satisfying such other requirements as may be imposed by the Committee; (c) partly in cash and, to the extent permitted by the Committee, partly in such Shares (as described in (b) above); (d) to the extent permitted by the Committee, by reducing the number of Shares otherwise deliverable upon the exercise of the Option by the number of Shares having a Fair Market Value equal to the Option Price; or (e) if there is a public market for the Shares at such time, subject to such requirements as may be imposed by the Committee, through the delivery of irrevocable instructions to a broker to sell Shares obtained upon the exercise of the Option and to deliver promptly to the Company an amount out of the proceeds of such sale equal to the aggregate Option Price for the Shares being purchased. The Committee may prescribe any other method of payment (including in respect of the applicable cash currency) that it determines to be consistent with applicable law and the purpose of the Plan. In furtherance of the foregoing, the Committee may also require the Participant to provide evidence that the funds were taken out of the People's Republic of China in accordance with applicable foreign exchange control laws and regulations.

**6.6 Limitations on Incentive Stock Options.** Incentive Stock Options may be granted only to employees of the Company or of a "parent corporation" or "subsidiary corporation" (as such terms are defined in Section 424 of the Code) at the date of grant. The aggregate Fair Market Value (generally determined as of the time the Option is granted) of the Shares with respect to which Incentive Stock Options are exercisable for the first time by a Participant during any calendar year under all plans of the Company and of any "parent corporation" or "subsidiary corporation" shall not exceed one hundred thousand dollars ($100,000), or the Option shall be treated as a Nonqualified Stock Option. For purposes of the preceding sentence, Incentive Stock Options will be taken into account generally in the order in which they are granted. Each provision of the Plan and each Award Agreement relating to an Incentive Stock Option shall be construed so that each Incentive Stock Option shall be an incentive stock option as defined in Section 422 of the Code, and any provisions of the Award Agreement thereof that cannot be so construed shall be disregarded.

### Article 7. Stock Appreciation Rights

**7.1 Grant of Stock Appreciation Rights.** The Committee is hereby authorized to grant Stock Appreciation Rights to Participants. Stock Appreciation Rights shall be evidenced by Award Agreements that shall conform to the requirements of the Plan and may contain such other provisions, as the Committee shall deem advisable. Subject to the terms of the Plan and any applicable Award Agreement, a Stock Appreciation Right granted under the Plan shall confer on the holder thereof a right to receive, upon exercise thereof, the excess of: (a) the Fair Market Value of a specified number of Shares on the date of exercise over; (b) the grant price of the right as specified by the Committee on the date of the grant. Such payment may be in the form of cash, Shares, other property or any combination thereof, as the Committee shall determine in its sole discretion (including in respect of the applicable cash currency payable to the Participant).

6

**7.2 Terms of Stock Appreciation Right.** Each Stock Appreciation Right grant shall be evidenced by an Award Agreement which shall state the grant price (which shall not be less than one-hundred percent (100%) of the Fair Market Value of a Share on the date of grant), term, methods of exercise, methods of settlement, and such other provisions as the Committee shall determine. No Stock Appreciation Right shall have a term of more than ten (10) years from the date of grant.

## Article 8.   Restricted Shares

**8.1 Grant of Restricted Stock.** The Committee is hereby authorized to grant Restricted Stock to Participants. An Award of Restricted Stock is a grant by the Committee of a specified number of Shares to the Participant, which Shares are subject to forfeiture upon the occurrence of specified events. Participants shall be awarded Restricted Stock in exchange for consideration not less than the minimum consideration required by applicable law. Restricted Stock shall be evidenced by an Award Agreement, which shall conform to the requirements of the Plan and may contain such other provisions, as the Committee shall deem advisable.

**8.2 Terms of Restricted Stock Awards.** Each Award Agreement evidencing a Restricted Stock grant shall specify the Restriction Period(s), the number of Shares of Restricted Stock subject to the Award, the purchase price, if any, of the Restricted Stock, the performance, employment, or other conditions (including the termination of a Participant's Service whether due to death, disability or other reason) under which the Restricted Stock may be forfeited to the Company and such other provisions as the Committee shall determine. Any Restricted Stock granted under the Plan shall be evidenced in such manner as the Committee may deem appropriate, including book-entry registration or issuance of a stock certificate or certificates (in which case, the certificate(s) representing such Shares shall be legended as to sale, transfer, assignment, pledge or other encumbrances during the Restriction Period and deposited by the Participant, together with a stock power endorsed in blank, with the Company, to be held in escrow during the Restriction Period). At the end of the Restriction Period, the restrictions imposed hereunder and under the Award Agreement shall lapse with respect to the number of Shares of Restricted Stock as determined by the Committee, and the legend shall be removed and such number of Shares delivered to the Participant (or, where appropriate, the Participant's legal representative).

**8.3 Voting and Dividend Rights.** The Committee shall determine and set forth in a Participant's Award Agreement whether or not a Participant holding Restricted Stock granted hereunder shall have the right to exercise voting rights with respect to the Restricted Stock during the Restriction Period (the Committee may require a Participant to grant an irrevocable proxy and power of substitution) and/or have the right to receive dividends on the Restricted Stock during the Restriction Period (and, if so, on what terms).

**8.4 Performance Goals.** The Committee may condition the grant of Restricted Stock or the expiration of the Restriction Period upon the Participant's achievement of one or more performance goal(s) specified in the Award Agreement. If the Participant fails to achieve the specified performance goal(s), the Committee shall not grant the Restricted Stock to such Participant or the Participant shall forfeit the Award of Restricted Stock to the Company, as applicable.

7

**8.5 Section 83(b) Election.** If a Participant makes an election pursuant to Section 83(b) of the Code concerning Restricted Stock, the Participant shall be required to file promptly a copy of such election with the Company.

### Article 9.   Other Stock-Based Awards

The Committee, in its sole discretion, may grant Awards of Shares and Awards that are valued, in whole or in part, by reference to, or are otherwise based on the Fair Market Value of, Shares (the "Other Stock-Based Awards"), including without limitation, restricted stock units, dividend equivalent rights, and other phantom awards. Such Other Stock-Based Awards shall be in such form, and dependent on such conditions, as the Committee shall determine, including, without limitation, the right to receive one or more Shares (or the equivalent cash value of such Shares) upon the completion of a specified period of Service, the occurrence of an event, and/or the attainment of performance objectives. Subject to the provisions of the Plan, the Committee shall determine to whom and when Other Stock-Based Awards will be made, the number of Shares to be awarded under (or otherwise related to) such Other Stock-Based Awards, whether such Other Stock-Based Awards shall be settled in cash, Shares or a combination of cash and Shares, and all other terms and conditions of such Awards (including, without limitation, the vesting provisions thereof and provisions ensuring that all Shares so awarded and issued shall be fully paid and non-assessable). Each Other Stock-Based Award grant shall be evidenced by an Award Agreement, which shall conform to the requirements of the Plan.

### Article 10. Adjustments

**10.1 Adjustments in Authorized Shares**. In the event of any corporate event or transaction involving the Company, a Subsidiary and/or an Affiliate (including, but not limited to, a change in the Shares of the Company or the capitalization of the Company) such as a merger, consolidation, reorganization, recapitalization, separation, stock dividend, stock split, reverse stock split, split up, spin-off, combination of Shares, exchange of Shares, dividend in kind, extraordinary cash dividend, amalgamation, or other like change in capital structure (other than normal cash dividends to shareholders of the Company), or any similar corporate event or transaction, the Committee, to prevent dilution or enlargement of Participants' rights under the Plan, shall substitute or adjust, in its sole discretion, the number and kind of Shares or other property that may be issued under the Plan or under particular forms of Awards, the number and kind of Shares or other property subject to outstanding Awards, the Option Price, grant price or purchase price applicable to outstanding Awards, the annual award limits, and/or other value determinations (including performance conditions) applicable to the Plan or outstanding Awards.

**10.2 Change of Control**. Upon the occurrence of a Change of Control after the Effective Date, unless otherwise specifically prohibited under applicable laws or by the rules and regulations of any governing governmental agencies or national securities exchanges, or unless the Committee shall determine otherwise in the Award Agreement, the Committee is authorized (but not obligated) to make adjustments in the terms and conditions of outstanding Awards, including without limitation the following (or any combination thereof), provided, that, the Committee's decision shall be fair and equitable to each Participant:

    (a)    continuation or assumption of such outstanding Awards under the Plan by the Company (if it is the surviving company or corporation) or by the surviving company or corporation or its parent;

8

(b)     substitution by the surviving company or corporation or its parent of awards with substantially the same terms for outstanding Awards (excluding the consideration payable upon settlement of the Awards);

(c)     accelerated exercisability, vesting and/or lapse of restrictions under outstanding Awards immediately prior to the occurrence of such event;

(d)     upon written notice, provide that any outstanding Awards must be exercised, to the extent then exercisable, during a reasonable period of time immediately prior to the scheduled consummation of the event or such other period as determined by the Committee (contingent upon the consummation of the event), and at the end of such period, such Awards shall terminate to the extent not so exercised within the relevant period; and

(e)     cancellation of all or any portion of outstanding Awards for fair value (in the form of cash, Shares, other property or any combination thereof) as determined in the sole discretion of the Committee and which value may be zero, provided, that, in the case of Options and Stock Appreciation Rights or similar Awards, the fair value may equal the excess, if any, of the value of the consideration to be paid in the Change of Control transaction to holders of the same number of Shares subject to such Awards (or, if no such consideration is paid, Fair Market Value of the Shares subject to such outstanding Awards or portion thereof being cancelled) over the aggregate Option Price or grant price, as applicable, with respect to such Awards or portion thereof being cancelled.

## Article 11. Duration; Amendment, Modification, Suspension and Termination

**11.1 Duration of Plan**. Unless sooner terminated as provided in Section 11.2, this Plan shall terminate on the tenth anniversary of the Effective Date.

**11.2 Amendment, Modification, Suspension and Termination of Plan**. Subject to the terms of the Plan, the Committee may amend, alter, suspend, discontinue or terminate this Plan or any portion thereof or any Award (or Award Agreement) hereunder at any time, in its sole discretion, provided, that, no action taken by the Committee shall adversely affect in any material respect the rights granted to any Participant under any outstanding Awards (other than pursuant to Article 10) without the Participant's written consent.

## Article 12. General Provisions

**12.1 No Right to Service or Award**. The granting of an Award under the Plan shall impose no obligation on the Company, any Subsidiary or any Affiliate to continue the service of a Participant and shall not lessen or affect any right that the Company, any Subsidiary or any Affiliate may have to terminate the service of such Participant. No Participant or other Person shall have any claim to be granted any Award, and there is no obligation for uniformity of treatment of Participants, or holders or beneficiaries of Awards. The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant (whether or not such Participants are similarly situated).

**12.2 Settlement of Awards**. Each Award Agreement shall establish the form in which the Award shall be settled. The Committee shall determine whether cash, Awards, other securities or other property shall be issued or paid in lieu of fractional Shares or whether such fractional Shares or any rights thereto shall be issued, rounded, forfeited, or otherwise eliminated.

9

**12.3 Tax Withholding**. The Company shall have the power and the right to deduct or withhold automatically from any amount deliverable under the Award or otherwise, or require a Participant to remit to the Company (or its Subsidiary or Affiliate, as applicable), the minimum statutory amount to satisfy foreign, federal, state, and/or local taxes, required by law or regulation to be withheld with respect to any taxable event arising as a result of the Plan, including without limitation, the applicable tax laws and regulations of the People's Republic of China. With respect to any required withholdings, Participants may elect (subject to the Company's automatic withholding right set out above), subject to the approval of the Committee and compliance with applicable laws, to satisfy the withholding requirement, in whole or in part, by having the Company withhold Shares having a Fair Market Value on the date the tax is to be determined equal to the minimum statutory total tax that could be imposed on the transaction.

**12.4 No Guarantees Regarding Tax Treatment**. Participants (or their beneficiaries) shall be responsible for all taxes with respect to any Awards under the Plan. The Committee and the Company make no guarantees to any Person regarding the tax treatment of Awards or payments made under the Plan.

**12.5 Non-Transferability of Awards**. Unless otherwise determined by the Committee, an Award shall not be transferable or assignable by the Participant except in the event of his death (subject to the applicable laws of descent and distribution) and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Affiliate. No transfer shall be permitted for value or consideration. An award exercisable after the death of a Participant may be exercised by the legatees, personal representatives or distributees of the Participant. Any permitted transfer of the Awards to heirs or legatees of the Participant shall not be effective to bind the Company unless the Committee shall have been furnished with written notice thereof and a copy of such evidence as the Committee may deem necessary to establish the validity of the transfer and the acceptance by the transferee or transferees of the terms and conditions hereof.

**12.6 Conditions and Restrictions on Shares**. The Committee may impose such other conditions or restrictions on any Shares received in connection with an Award as it may deem advisable or desirable. These restrictions may include, but shall not be limited to, requirements that the Participant: (a) become a signatory to the Company's then-existing shareholders agreement; (b) hold the Shares received for a specified period of time; or (c) represent and warrant in writing that the Participant is acquiring the Shares for investment and without any present intention to sell or distribute such Shares. The certificates for Shares may include any legend which the Committee deems appropriate to reflect any conditions and restrictions applicable to such Shares.

**12.7 Shares Not Registered**. Shares and Awards shall not be issued under this Plan unless the issuance and delivery of such Shares and any Awards comply with (or are exempt from) all applicable requirements of law, including, without limitation, the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded. The Company shall not be obligated to file any registration statement under any applicable securities laws to permit the purchase or issuance of any Shares or any Awards under this Plan, and accordingly any certificates for Shares or documents granting Awards may have an appropriate legend or statement of applicable restrictions endorsed thereon. If the Company deems it necessary to ensure that the issuance of securities under this Plan is not required to be registered under any applicable securities laws, each Participant to whom such security would be purchased or issued shall deliver to the Company an agreement or certificate containing such representations, warranties and covenants as the Company reasonably requires.

10

**12.8 Compliance with Applicable Laws**. To comply with applicable laws in countries in which the Company or any Subsidiary or Affiliate operates or has Employees, Directors or Consultants, the Committee, in its sole discretion, shall have the power and authority to: (a) determine which Subsidiaries or Affiliates shall be covered by the Plan; (b) determine which Employees, Directors or Consultants are eligible to participate in the Plan; (c) modify the terms and conditions of any Award granted to Employees, Directors or Consultants to comply with applicable laws; (d) take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local government regulatory exemptions or approvals; and (e) establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable.

**12.9 Rights as a Shareholder**. Except as otherwise provided herein or in the applicable Award Agreement, a Participant shall have none of the rights of a shareholder with respect to Shares covered by any Award until the Participant becomes the record holder of such Shares.

**12.10 Severability**. If any provision of the Plan or any Award is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction, or as to any Person or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to applicable laws, or if it cannot be so construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, Person, or Award, and the remainder of the Plan and any such Award shall remain in full force and effect.

**12.11 Unfunded Plan**. Participants shall have no right, title, or interest whatsoever in or to any investments that the Company or any of its Subsidiaries or Affiliates may make to aid it in meeting its obligations under the Plan. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Company and any Participant, beneficiary, legal representative, or any other Person. To the extent that any Person acquires a right to receive payments from the Company under the Plan, such right shall be no greater than the right of an unsecured general creditor of the Company. All payments to be made hereunder shall be paid from the general funds of the Company and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of such amounts. The Plan is not subject to the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time.

**12.12 No Constraint on Corporate Action**. Nothing in the Plan shall be construed to: (a) limit, impair, or otherwise affect the Company's right or power to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure, or to merge or consolidate, or dissolve, liquidate, sell, or transfer all or any part of its business or assets; or (b) limit the right or power of the Company to take any action which such entity deems to be necessary or appropriate.

**12.13 Successors**. All obligations of the Company under the Plan with respect to Awards granted hereunder shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business or assets of the Company.

**12.14 Governing Law**. This Plan and each Award Agreement and all claims or causes of action or other matters (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Plan or any Award Agreement or the negotiation, execution or performance of this Plan or any Award Agreement shall be governed by and construed in accordance with the laws of the Cayman Islands, excluding any conflict or choice of law rule or principle that might otherwise refer construction or interpretation of this Plan to the substantive law of another jurisdiction.

11

**12.15 Effective Date**. The Plan shall become effective as of the Effective Date.

**12.16 Shareholder Approval**. The Plan will be submitted for approval by the shareholders of the Company at an annual meeting or any special meeting of shareholders of the Company within 12 months of the Effective Date. Any Awards granted under the Plan prior to such approval of shareholders shall be effective as of the date of grant, but no such Award may be exercised or settled and no restrictions relating to any Award may lapse prior to such shareholder approval, and if shareholders fail to approve the Plan as specified hereunder, the Plan and any Award shall be terminated and cancelled without consideration.

*        *        *

This Plan was duly adopted and approved by the Board of Directors of the Company on Oct 18th, 2010 and was amended and restated on November 3, 2014 and further amended and restated on August 6, 2016.

12

**Exhibit 10.2**

**QIYI.COM, INC.**

**2017 SHARE INCENTIVE PLAN**

**ARTICLE 1**

**PURPOSE**

The purpose of the Qiyi.com, Inc. 2017 Share Incentive Plan (the "Plan") is to promote the success and enhance the value of Qiyi.com, Inc., a company formed under the laws of the Cayman Islands (the "Company"), by linking the personal interests of the members of the Board, Employees, Consultants and other individuals as the Committee may authorize and approve, to those of the Company's shareholders and, by providing such individuals with an incentive for outstanding performance, to generate superior returns to the Company's shareholders. The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract, and retain the services of recipients of share incentives hereunder upon whose judgment, interest, and special effort the successful conduct of the Company's operation is largely dependent.

**ARTICLE 2**

**DEFINITIONS AND CONSTRUCTION**

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

2.1 "Applicable Laws" means the legal requirements relating to the Plan and the Awards under applicable provisions of the corporate, securities, tax and other laws, rules, regulations and government orders, and the rules of any applicable stock exchange or national market system, of any jurisdiction applicable to Awards granted to residents therein.

2.2 "Award" means an Option, Restricted Share or Restricted Share Unit award granted to a Participant pursuant to the Plan.

2.3 "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award, including through electronic medium.

2.4 "Award Pool" shall have the meaning set forth in Section 3.1(a).

2.5 "Board" means the Board of Directors of the Company.

2.6 "Cause" with respect to a Participant means (unless otherwise expressly provided in the applicable Award Agreement, or another applicable contract with the Participant that defines such term for purposes of determining the effect that a "for cause" termination has on the Participant's Awards) a termination of employment or service based upon a finding by the Service Recipient, acting in good faith and based on its reasonable belief at the time, that the Participant:

(a) has been negligent in the discharge of his or her duties to the Service Recipient, has refused to perform stated or assigned duties or is incompetent in or (other than by reason of a disability or analogous condition) incapable of performing those duties;

(b) has been dishonest or committed or engaged in an act of theft, embezzlement or fraud, a breach of confidentiality, an unauthorized disclosure or use of inside information, customer lists, trade secrets or other confidential information;

(c) has breached a fiduciary duty, or willfully and materially violated any other duty, law, rule, regulation or policy of the Service Recipient; or has been convicted of, or plead guilty or nolo contendere to, a felony or misdemeanor (other than minor traffic violations or similar offenses);

(d) has materially breached any of the provisions of any agreement with the Service Recipient;

(e) has engaged in unfair competition with, or otherwise acted intentionally in a manner injurious to the reputation, business or assets of, the Service Recipient; or

(f) has improperly induced a vendor or customer to break or terminate any contract with the Service Recipient or induced a principal for whom the Service Recipient acts as agent to terminate such agency relationship.

A termination for Cause shall be deemed to occur (subject to reinstatement upon a contrary final determination by the Committee) on the date on which the Service Recipient first delivers written notice to the Participant of a finding of termination for Cause.

2.7 "Code" means the Internal Revenue Code of 1986 of the United States, as amended.

2.8 "Committee" means the Board or a committee of the Board described in ARTICLE 10.

2.9 "Consultant" means any consultant or adviser if: (a) the consultant or adviser renders bona fide services to a Service Recipient; (b) the services rendered by the consultant or adviser are not in connection with the offer or sale of securities in a capital-raising transaction and do not directly or indirectly promote or maintain a market for the Company's securities; and (c) the consultant or adviser is a natural person who has contracted directly with the Service Recipient to render such services.

2.10 "Corporate Transaction", unless otherwise defined in an Award Agreement, means any of the following transactions, provided, however, that the Committee shall determine under (d) and (e) whether multiple transactions are related, and its determination shall be final, binding and conclusive:

(a) an amalgamation, arrangement or consolidation or scheme of arrangement (i) in which the Company is not the surviving entity, except for a transaction the principal purpose of which is to change the jurisdiction in which the Company is incorporated or (ii) following which the holders of the voting securities of the Company do not continue to hold more than 50% of the combined voting power of the voting securities of the surviving entity;

2

(b) the sale, transfer or other disposition of all or substantially all of the assets of the Company;

(c) the complete liquidation or dissolution of the Company;

(d) any reverse takeover or series of related transactions culminating in a reverse takeover (including, but not limited to, a tender offer followed by a reverse takeover) in which the Company is the surviving entity but (A) the Company's equity securities outstanding immediately prior to such takeover are converted or exchanged by virtue of the takeover into other property, whether in the form of securities, cash or otherwise, or (B) in which securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities are transferred to a person or persons different from those who held such securities immediately prior to such takeover or the initial transaction culminating in such takeover, but excluding any such transaction or series of related transactions that the Committee determines shall not be a Corporate Transaction; or

(e) acquisition in a single or series of related transactions by any person or related group of persons (other than the Company or by a Company-sponsored employee benefit plan) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Company's outstanding securities but excluding any such transaction or series of related transactions that the Committee determines shall not be a Corporate Transaction.

2.11 "Disability", unless otherwise defined in an Award Agreement, means that the Participant qualifies to receive long-term disability payments under the Service Recipient's long-term disability insurance program, as it may be amended from time to time, to which the Participant provides services regardless of whether the Participant is covered by such policy. If the Service Recipient to which the Participant provides service does not have a long-term disability plan in place, "Disability" means that a Participant is unable to carry out the responsibilities and functions of the position held by the Participant by reason of any medically determinable physical or mental impairment for a period of not less than ninety (90) consecutive days. A Participant will not be considered to have incurred a Disability unless he or she furnishes proof of such impairment sufficient to satisfy the Committee in its discretion.

2.12 "Effective Date" shall have the meaning set forth in Section 11.1.

2.13 "Employee" means any person, including an officer or a member of the Board of the Company or any Parent or Subsidiary of the Company or any Subsidiary of the Parent of the Company, who is in the employment of a Service Recipient, subject to the control and direction of the Service Recipient as to both the work to be performed and the manner and method of performance. The payment of a director's fee by a Service Recipient shall not be sufficient to constitute "employment" by the Service Recipient.

2.14 "Exchange Act" means the Securities Exchange Act of 1934 of the United States, as amended.

2.15 "Fair Market Value" means, as of any date, the value of Shares determined as follows:

(a) If the Shares are listed on one or more established stock exchanges or national market systems, including without limitation, The New York Stock Exchange and The Nasdaq Stock Market, its Fair Market Value shall be the closing sales price for such shares (or the closing bid, if no sales were reported) as quoted on the principal exchange or system on which the Shares are listed (as determined by the Committee) on the date of determination (or, if no closing sales price or closing bid was reported on that date, as applicable, on the last trading date such closing sales price or closing bid was reported), as reported in The Wall Street Journal or such other source as the Committee deems reliable;

3

(b) If the Shares are regularly quoted on an automated quotation system (including the OTC Bulletin Board) or by a recognized securities dealer, its Fair Market Value shall be the closing sales price for such shares as quoted on such system or by such securities dealer on the date of determination, but if selling prices are not reported, the Fair Market Value of a Share shall be the mean between the high bid and low asked prices for the Shares on the date of determination (or, if no such prices were reported on that date, on the last date such prices were reported), as reported in The Wall Street Journal or such other source as the Committee deems reliable; or

(c) In the absence of an established market for the Shares of the type described in (a) and (b), above, the Fair Market Value thereof shall be determined by the Committee in good faith and in its discretion by reference to (i) the placing price of the latest private placement of the Shares and the development of the Company's business operations and the general economic and market conditions since such latest private placement, (ii) other third party transactions involving the Shares and the development of the Company's business operation and the general economic and market conditions since such sale, (iii) an independent valuation of the Shares, or (iv) such other methodologies or information as the Committee determines to be indicative of Fair Market Value and relevant.

2.16 "Incentive Share Option" means an Option that is intended to meet the requirements of Section 422 of the Code or any successor provision thereto.

2.17 "Independent Director" means (i) before the Shares or other securities representing the Shares are listed on a stock exchange, a member of the Board who is a Non-Employee Director; and (ii) after the Shares or other securities representing the Shares are listed on a stock exchange, a member of the Board who meets the independence standards under the applicable corporate governance rules of the stock exchange.

2.18 "Non-Employee Director" means a member of the Board who qualifies as a "Non-Employee Director" as defined in Rule 16b-3(b)(3) of the Exchange Act, or any successor definition adopted by the Board.

2.19 "Non-Qualified Share Option" means an Option that is not intended to be an Incentive Share Option.

2.20 "Option" means a right granted to a Participant pursuant to ARTICLE 5 of the Plan to purchase a specified number of Shares at a specified price during specified time periods. An Option may be either an Incentive Share Option or a Non-Qualified Share Option.

2.21 "Participant" means a person who, as a member of the Board, Consultant or Employee, or other individuals as the Committee may authorize and approve, has been granted an Award pursuant to the Plan.

2.22 "Parent" means a parent corporation under Section 424(e) of the Code.

4

2.23 "Plan" means this Qiyi.com, Inc. 2017 Share Incentive Plan, as it may be amended from time to time.

2.24 "Related Entity" means any business, corporation, partnership, limited liability company or other entity in which the Company, a Parent or Subsidiary of the Company holds a substantial ownership interest, directly or indirectly, but which is not a Subsidiary and which the Board designates as a Related Entity for purposes of the Plan.

2.25 "Restricted Share" means a Share awarded to a Participant pursuant to ARTICLE 6 that is subject to certain restrictions and may be subject to risk of forfeiture.

2.26 "Restricted Share Unit" means the right granted to a Participant pursuant to ARTICLE 7 to receive a Share at a future date.

2.27 "Securities Act" means the Securities Act of 1933 of the United States, as amended.

2.28 "Service Recipient" means the Company, any Parent or Subsidiary of the Company, any Subsidiary of the Parent of the Company and any Related Entity to which a Participant provides services as an Employee, a Consultant, or a Director.

2.29 "Share" means ordinary shares of the Company, par value US$0.00001 per share, and such other securities of the Company that may be substituted for Shares pursuant to ARTICLE 9.

2.30 "Subsidiary" means, with respect to any person, any corporation or other entity of which a majority of the outstanding voting shares or voting power is beneficially owned or controlled directly or indirectly by such person, including any consolidated affiliated entity.

2.31 "Trading Date" means the closing of the first sale to the general public of the Shares pursuant to a registration statement filed with and declared effective by the U.S. Securities and Exchange Commission under the Securities Act.

## ARTICLE 3

### SHARES SUBJECT TO THE PLAN

3.1 Number of Shares.

(a) Subject to the provisions of ARTICLE 9 and Section 3.1(b), the maximum aggregate number of Shares which may be issued pursuant to all Awards (including Incentive Share Options) shall initially be 720,000 Shares.

(b) To the extent that an Award terminates, expires, or lapses for any reason, any Shares subject to the Award shall again be available for the grant of an Award pursuant to the Plan. To the extent permitted by Applicable Laws, Shares issued in assumption of, or in substitution for, any outstanding awards of any entity acquired in any form or combination by the Company or any Parent or Subsidiary of the Company shall not be counted against Shares available for grant pursuant to the Plan. Shares delivered by the Participant or withheld by the Company upon the exercise of any Award under the Plan, in payment of the exercise price thereof or tax withholding thereon, may again be optioned, granted or awarded hereunder, subject to the limitations of Section 3.1(a). If any Restricted Shares are forfeited by the Participant or repurchased by the Company, such Shares may again be optioned, granted or awarded hereunder, subject to the limitations of Section 3.1(a). Notwithstanding the provisions of this Section 3.1(b), no Shares may again be optioned, granted or awarded if such action would cause an Incentive Share Option to fail to qualify as an Incentive Share Option under Section 422 of the Code.

5

3.2 <u>Shares Distributed</u>. Any Shares distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Shares, treasury shares (subject to Applicable Laws) or Shares purchased on the open market. Additionally, in the discretion of the Committee, American Depository Shares in an amount equal to the number of Shares which otherwise would be distributed pursuant to an Award may be distributed in lieu of Shares in settlement of any Award. If the number of Shares represented by an American Depository Share is other than on a one-to-one basis, the limitations of Section 3.1 shall be adjusted to reflect the distribution of American Depository Shares in lieu of Shares.

## ARTICLE 4

### ELIGIBILITY AND PARTICIPATION

4.1 <u>Eligibility</u>. Those eligible to participate in this Plan include Employees, Consultants, and all members of the Board, and other individuals, as determined, authorized and approved by the Committee.

4.2 <u>Participation</u>. Subject to the provisions of the Plan, the Committee may, from time to time, select from among all eligible individuals, those to whom Awards shall be granted and shall determine the nature and amount of each Award. No individual shall have any right to be granted an Award pursuant to this Plan.

4.3 <u>Jurisdictions</u>. In order to assure the viability of Awards granted to Participants in various jurisdictions, the Committee may provide for such special terms as it may consider necessary or appropriate to accommodate differences in local law, tax policy, or custom applicable in the jurisdiction in which the Participant resides, is employed, operates or is incorporated. Moreover, the Committee may approve such supplements to, or amendments, restatements, or alternative versions of, the Plan as it may consider necessary or appropriate for such purposes without thereby affecting the terms of the Plan as in effect for any other purpose; *provided, however*, that no such supplements, amendments, restatements, or alternative versions shall increase the share limitations contained in Section 3.1 of the Plan. Notwithstanding the foregoing, the Committee may not take any actions hereunder, and no Awards shall be granted, that would violate any Applicable Laws.

## ARTICLE 5

### OPTIONS

5.1 <u>General</u>. The Committee is authorized to grant Options to Participants on the following terms and conditions:

(a) <u>Exercise Price</u>. The exercise price per Share subject to an Option shall be determined by the Committee and set forth in the Award Agreement which may be a fixed or variable price related to the Fair Market Value of the Shares. The exercise price per Share subject to an Option may be amended or adjusted in the absolute discretion of the Committee, the determination of which shall be final, binding and conclusive. For the avoidance of doubt, to the extent not prohibited by Applicable Laws or any exchange rule, a downward adjustment of the exercise prices of Options mentioned in the preceding sentence shall be effective without the approval of the Company's shareholders or the approval of the affected Participants.

(b) <u>Time and Conditions of Exercise</u>. The Committee shall determine the time or times at which an Option may be exercised in whole or in part, including exercise prior to vesting; *provided* that the term of any Option granted under the Plan shall not exceed ten years, except as provided in Section 12.1. The Committee shall also determine any conditions, if any, that must be satisfied before all or part of an Option may be exercised.

(c) <u>Payment</u>. The Committee shall determine the methods by which the exercise price of an Option may be paid, the form of payment, including, without limitation (i) cash or check denominated in U.S. Dollars, (ii) to the extent permissible under the Applicable Laws, cash or check in Chinese Renminbi, (iii) cash or check denominated in any other local currency as approved by the Committee, (iv) Shares held for such period of time as may be required by the Committee in order to avoid adverse financial accounting consequences and having a Fair Market Value on the date of delivery equal to the aggregate exercise price of the Option or exercised portion thereof, (v) after the Trading Date the delivery of a notice that the Participant has placed a market sell order with a broker with respect to Shares then issuable upon exercise of the Option, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the Option exercise price; *provided* that payment of such proceeds is then made to the Company upon settlement of such sale, (vi) other property acceptable to the Committee with a Fair Market Value equal to the exercise price, or (vii) any combination of the foregoing. Notwithstanding any other provision of the Plan to the contrary, no Participant who is a member of the Board or an "executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to pay the exercise price of an Option in any method which would violate Section 13(k) of the Exchange Act.

(d) <u>Evidence of Grant</u>. All Options shall be evidenced by an Award Agreement between the Company and the Participant. The Award Agreement shall include such additional provisions as may be specified by the Committee.

(e) <u>Effects of Termination of Employment or Service on Options</u>. Termination of employment or service shall have the following effects on Options granted to the Participants:

(i) <u>Dismissal for Cause</u>. Unless otherwise provided in the Award Agreement, if a Participant's employment by or service to the Service Recipient is terminated by the Service Recipient for Cause, the Participant's Options will terminate upon such termination, whether or not the Option is then vested and/or exercisable;

(ii) <u>Death or Disability</u>. Unless otherwise provided in the Award Agreement, if a Participant's employment by or service to the Service Recipient terminates as a result of the Participant's death or Disability:

(a)    the Participant (or his or her legal representative or beneficiary, in the case of the Participant's Disability or death, respectively), will have until the date that is 12 months after the Participant's termination of Employment to exercise the Participant's Options (or portion thereof) to the extent that such Options were vested and exercisable on the date of the Participant's termination of Employment on account of death or Disability;

7

(b)   the Options, to the extent not vested and exercisable on the date of the Participant's termination of Employment or service, shall terminate upon the Participant's termination of Employment or service on account of death or Disability; and

(c)   the Options, to the extent exercisable for the 12-month period following the Participant's termination of Employment or service and not exercised during such period, shall terminate at the close of business on the last day of the 12-month period.

(iii) Other Terminations of Employment or Service. Unless otherwise provided in the Award Agreement, if a Participant's employment by or service to the Service Recipient terminates for any reason other than a termination by the Service Recipient for Cause or because of the Participant's death or Disability:

(a)   the Participant will have until the date that is 90 days after the Participant's termination of Employment or service to exercise his or her Options (or portion thereof) to the extent that such Options were vested and exercisable on the date of the Participant's termination of Employment or service;

(b)   the Options, to the extent not vested and exercisable on the date of the Participant's termination of Employment or service, shall terminate upon the Participant's termination of Employment or service; and

(c)   the Options, to the extent exercisable for the 90-day period following the Participant's termination of Employment or service and not exercised during such period, shall terminate at the close of business on the last day of the 90-day period.

5.2 Incentive Share Options. Incentive Share Options may be granted to Employees of the Company, a Parent or Subsidiary of the Company. Incentive Share Options may not be granted to Employees of a Related Entity or to Independent Directors or Consultants. The terms of any Incentive Share Options granted pursuant to the Plan, in addition to the requirements of Section 5.1, must comply with the following additional provisions of this Section 5.2:

(a) Individual Dollar Limitation. The aggregate Fair Market Value (determined as of the time the Option is granted) of all Shares with respect to which Incentive Share Options are first exercisable by a Participant in any calendar year may not exceed $100,000 or such other limitation as imposed by Section 422(d) of the Code, or any successor provision. To the extent that Incentive Share Options are first exercisable by a Participant in excess of such limitation, the excess shall be considered Non-Qualified Share Options.

8

(b) Exercise Price. The exercise price of an Incentive Share Option shall be equal to the Fair Market Value on the date of grant. However, the exercise price of any Incentive Share Option granted to any individual who, at the date of grant, owns Shares possessing more than ten percent of the total combined voting power of all classes of shares of the Company may not be less than 110% of Fair Market Value on the date of grant and such Option may not be exercisable for more than five years from the date of grant.

(c) Transfer Restriction. The Participant shall give the Company prompt notice of any disposition of Shares acquired by exercise of an Incentive Share Option within (i) two years from the date of grant of such Incentive Share Option or (ii) one year after the transfer of such Shares to the Participant.

(d) Expiration of Incentive Share Options. No Award of an Incentive Share Option may be made pursuant to this Plan after the tenth anniversary of the Effective Date.

(e) Right to Exercise. During a Participant's lifetime, an Incentive Share Option may be exercised only by the Participant.

## ARTICLE 6

### RESTRICTED SHARES

6.1 Grant of Restricted Shares. The Committee, at any time and from time to time, may grant Restricted Shares to Participants as the Committee, in its sole discretion, shall determine. The Committee, in its sole discretion, shall determine the number of Restricted Shares to be granted to each Participant.

6.2 Restricted Shares Award Agreement. Each Award of Restricted Shares shall be evidenced by an Award Agreement that shall specify the period of restriction, the number of Restricted Shares granted, and such other terms and conditions as the Committee, in its sole discretion, shall determine. Unless the Committee determines otherwise, Restricted Shares shall be held by the Company as escrow agent until the restrictions on such Restricted Shares have lapsed.

6.3 Issuance and Restrictions. Restricted Shares shall be subject to such restrictions on transferability and other restrictions as the Committee may impose (including, without limitation, limitations on the right to vote Restricted Shares or the right to receive dividends on the Restricted Share). These restrictions may lapse separately or in combination at such times, pursuant to such circumstances, in such installments, or otherwise, as the Committee determines at the time of the grant of the Award or thereafter.

6.4 Forfeiture/Repurchase. Except as otherwise determined by the Committee at the time of the grant of the Award or thereafter, upon termination of employment or service during the applicable restriction period, Restricted Shares that are at that time subject to restrictions shall be forfeited or repurchased in accordance with the Award Agreement; *provided, however*, the Committee may (a) provide in any Restricted Share Award Agreement that restrictions or forfeiture and repurchase conditions relating to Restricted Shares will be waived in whole or in part in the event of terminations resulting from specified causes, and (b) in other cases waive in whole or in part restrictions or forfeiture and repurchase conditions relating to Restricted Shares.

9

6.5 <u>Certificates for Restricted Shares</u>. Restricted Shares granted pursuant to the Plan may be evidenced in such manner as the Committee shall determine. If certificates representing Restricted Shares are registered in the name of the Participant, certificates must bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Shares, and the Company may, at its discretion, retain physical possession of the certificate until such time as all applicable restrictions lapse.

6.6 <u>Removal of Restrictions</u>. Except as otherwise provided in this ARTICLE 6, Restricted Shares granted under the Plan shall be released from escrow as soon as practicable after the last day of the period of restriction. The Committee, in its discretion, may accelerate the time at which any restrictions shall lapse or be removed. After the restrictions have lapsed, the Participant shall be entitled to have any legend or legends under Section 6.5 removed from his or her Share certificate, and the Shares shall be freely transferable by the Participant, subject to applicable legal restrictions. The Committee (in its discretion) may establish procedures regarding the release of Shares from escrow and the removal of legends, as necessary or appropriate to minimize administrative burdens on the Company.

<div align="center">

**ARTICLE 7**

**RESTRICTED SHARE UNITS**

</div>

7.1 <u>Grant of Restricted Share Units</u>. The Committee, at any time and from time to time, may grant Restricted Share Units to Participants as the Committee, in its sole discretion, shall determine. The Committee, in its sole discretion, shall determine the number of Restricted Share Units to be granted to each Participant.

7.2 <u>Restricted Share Units Award Agreement</u>. Each Award of Restricted Share Units shall be evidenced by an Award Agreement that shall specify any vesting conditions, the number of Restricted Share Units granted, and such other terms and conditions as the Committee, in its sole discretion, shall determine.

7.3 <u>Performance Objectives and Other Terms</u>. The Committee, in its discretion, may set performance objectives or other vesting criteria which, depending on the extent to which they are met, will determine the number or value of Restricted Share Units that will be paid out to the Participants.

7.4 <u>Form and Timing of Payment of Restricted Share Units</u>. At the time of grant, the Committee shall specify the date or dates on which the Restricted Share Units shall become fully vested and nonforfeitable. Upon vesting, the Committee, in its sole discretion, may pay Restricted Share Units in the form of cash, in Shares or in a combination thereof.

7.5 <u>Forfeiture/Repurchase</u>. Except as otherwise determined by the Committee at the time of the grant of the Award or thereafter, upon termination of employment or service during the applicable restriction period, Restricted Share Units that are at that time unvested shall be forfeited or repurchased in accordance with the Award Agreement; *provided, however*, the Committee may (a) provide in any Restricted Share Unit Award Agreement that restrictions or forfeiture and repurchase conditions relating to Restricted Share Units will be waived in whole or in part in the event of terminations resulting from specified causes, and (b) in other cases waive in whole or in part restrictions or forfeiture and repurchase conditions relating to Restricted Share Units.

<div align="center">10</div>

**ARTICLE 8**

**PROVISIONS APPLICABLE TO AWARDS**

8.1 Award Agreement. Awards under the Plan shall be evidenced by Award Agreements that set forth the terms, conditions and limitations for each Award which may include the term of an Award, the provisions applicable in the event the Participant's employment or service terminates, and the Company's authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an Award.

8.2 No Transferability; Limited Exception to Transfer Restrictions.

8.2.1 Limits on Transfer. Unless otherwise expressly provided in (or pursuant to) this Section 8.2, by applicable law and by the Award Agreement, as the same may be amended:

(a)    all Awards are non-transferable and will not be subject in any manner to sale, transfer, anticipation, alienation, assignment, pledge, encumbrance or charge;

(b)    Awards will be exercised only by the Participant; and

(c)    amounts payable or shares issuable pursuant to an Award will be delivered only to (or for the account of), and, in the case of Shares, registered in the name of, the Participant.

In addition, the shares shall be subject to the restrictions set forth in the applicable Award Agreement.

8.2.2 Further Exceptions to Limits on Transfer. The exercise and transfer restrictions in Section 8.2.1 will not apply to:

(a)    transfers to the Company or a Subsidiary;

(b)    transfers by gift to "immediate family" as that term is defined in SEC Rule 16a-1(e) promulgated under the Exchange Act;

(c)    the designation of a beneficiary to receive benefits if the Participant dies or, if the Participant has died, transfers to or exercises by the Participant's beneficiary, or, in the absence of a validly designated beneficiary, transfers by will or the laws of descent and distribution; or

(d)    if the Participant has suffered a disability, permitted transfers or exercises on behalf of the Participant by the Participant's duly authorized legal representative; or

11

(e)    subject to the prior approval of the Committee or an executive officer or director of the Company authorized by the Committee, transfer to one or more natural persons who are the Participant's family members or entities owned and controlled by the Participant and/or the Participant's family members, including but not limited to trusts or other entities whose beneficiaries or beneficial owners are the Participant and/or the Participant's family members, or to such other persons or entities as may be expressly approved by the Committee, pursuant to such conditions and procedures as the Committee or may establish. Any permitted transfer shall be subject to the condition that the Committee receives evidence satisfactory to it that the transfer is being made for estate and/or tax planning purposes and on a basis consistent with the Company's lawful issue of securities.

Notwithstanding anything else in this Section 8.2.2 to the contrary, but subject to compliance with all Applicable Laws, Incentive Share Options, Restricted Shares and Restricted Share Units will be subject to any and all transfer restrictions under the Code applicable to such Awards or necessary to maintain the intended tax consequences of such Awards. Notwithstanding clause (b) above but subject to compliance with all Applicable Laws, any contemplated transfer by gift to "immediate family" as referenced in clause (b) above is subject to the condition precedent that the transfer be approved by the Administrator in order for it to be effective.

8.3 Beneficiaries. Notwithstanding Section 8.2, a Participant may, in the manner determined by the Committee, designate a beneficiary to exercise the rights of the Participant and to receive any distribution with respect to any Award upon the Participant's death. A beneficiary, legal guardian, legal representative, or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Award Agreement applicable to the Participant, except to the extent the Plan and Award Agreement otherwise provide, and to any additional restrictions deemed necessary or appropriate by the Committee. If the Participant is married and resides in a community property state, a designation of a person other than the Participant's spouse as his or her beneficiary with respect to more than 50% of the Participant's interest in the Award shall not be effective without the prior written consent of the Participant's spouse. If no beneficiary has been designated or survives the Participant, payment shall be made to the person entitled thereto pursuant to the Participant's will or the laws of descent and distribution. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time provided the change or revocation is filed with the Committee.

8.4 Share Certificates. Notwithstanding anything herein to the contrary, the Company shall not be required to issue or deliver any certificates evidencing the Shares pursuant to the exercise of any Award, unless and until the Committee has determined, with advice of counsel, that the issuance and delivery of such certificates is in compliance with all Applicable Laws, regulations of governmental authorities and, if applicable, the requirements of any exchange on which the Shares are listed or traded. All Share certificates delivered pursuant to the Plan are subject to any stop-transfer orders and other restrictions as the Committee deems necessary or advisable to comply with all Applicable Laws, and the rules of any national securities exchange or automated quotation system on which the Shares are listed, quoted, or traded. The Committee may place legends on any Share certificate to reference restrictions applicable to the Shares. In addition to the terms and conditions provided herein, the Committee may require that a Participant make such reasonable covenants, agreements, and representations as the Committee, in its discretion, deems advisable in order to comply with any such laws, regulations, or requirements. The Committee shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement or exercise of any Award, including a window-period limitation, as may be imposed in the discretion of the Committee.

12

8.5 <u>Paperless Administration</u>. Subject to Applicable Laws, the Committee may make Awards, provide applicable disclosure and procedures for exercise of Awards by an internet website or interactive voice response system for the paperless administration of Awards.

8.6 <u>Foreign Currency</u>. A Participant may be required to provide evidence that any currency used to pay the exercise price of any Award were acquired and taken out of the jurisdiction in which the Participant resides in accordance with Applicable Laws, including foreign exchange control laws and regulations. In the event the exercise price for an Award is paid in Chinese Renminbi or other foreign currency, as permitted by the Committee, the amount payable will be determined by conversion from U.S. dollars at the official rate promulgated by the People's Bank of China for Chinese Renminbi, or for jurisdictions other than the Peoples Republic of China, the exchange rate as selected by the Committee on the date of exercise.

## ARTICLE 9

### CHANGES IN CAPITAL STRUCTURE

9.1 <u>Adjustments</u>. In the event of any dividend, share split, combination or exchange of Shares, amalgamation, arrangement or consolidation, spin-off, recapitalization or other distribution (other than normal cash dividends) of Company assets to its shareholders, or any other change affecting the shares of Shares or the share price of a Share, the Committee shall make such proportionate adjustments, if any, as the Committee in its discretion may deem appropriate to reflect such change with respect to (a) the aggregate number and type of shares that may be issued under the Plan (including, but not limited to, adjustments of the limitations in Section 3.1); (b) the terms and conditions of any outstanding Awards (including, without limitation, any applicable performance targets or criteria with respect thereto); and (c) the grant or exercise price per share for any outstanding Awards under the Plan.

9.2 <u>Corporate Transactions</u>. Except as may otherwise be provided in any Award Agreement or any other written agreement entered into by and between the Company and a Participant, if the Committee anticipates the occurrence, or upon the occurrence, of a Corporate Transaction, the Committee may, in its sole discretion, provide for (i) any and all Awards outstanding hereunder to terminate at a specific time in the future and shall give each Participant the right to exercise the vested portion of such Awards during a period of time as the Committee shall determine, or (ii) the purchase of any Award for an amount of cash equal to the amount that could have been attained upon the exercise of such Award (and, for the avoidance of doubt, if as of such date the Committee determines in good faith that no amount would have been attained upon the exercise of such Award, then such Award may be terminated by the Company without payment), or (iii) the replacement of such Award with other rights or property selected by the Committee in its sole discretion or the assumption of or substitution of such Award by the successor or surviving corporation, or a Parent or Subsidiary thereof, with appropriate adjustments as to the number and kind of Shares and prices, or (iv) payment of Award in cash based on the value of Shares on the date of the Corporate Transaction plus reasonable interest on the Award through the date when such Award would otherwise be vested or have been paid in accordance with its original terms, if necessary to comply with Section 409A of the Code.

13

9.3 <u>Outstanding Awards – Other Changes</u>. In the event of any other change in the capitalization of the Company or corporate change other than those specifically referred to in this ARTICLE 9, the Committee may, in its absolute discretion, make such adjustments in the number and class of shares subject to Awards outstanding on the date on which such change occurs and in the per share grant or exercise price of each Award as the Committee may consider appropriate to prevent dilution or enlargement of rights.

9.4 <u>No Other Rights</u>. Except as expressly provided in the Plan, no Participant shall have any rights by reason of any subdivision or consolidation of Shares of any class, the payment of any dividend, any increase or decrease in the number of shares of any class or any dissolution, liquidation, merger, or consolidation of the Company or any other corporation. Except as expressly provided in the Plan or pursuant to action of the Committee under the Plan, no issuance by the Company of shares of any class, or securities convertible into shares of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of shares subject to an Award or the grant or exercise price of any Award.

## ARTICLE 10

## ADMINISTRATION

10.1 <u>Committee</u>. The Plan shall be administered by the Board or a committee of one or more members of the Board to whom the Board shall delegate the authority to grant or amend Awards to Participants other than any of the Committee members. Any grant or amendment of Awards to any Committee member shall then require an affirmative vote of a majority of the Board members who are not on the Committee.

10.2 <u>Action by the Committee</u>. A majority of the Committee shall constitute a quorum. The acts of a majority of the members of the Committee present at any meeting at which a quorum is present, and acts approved in writing by a majority of the Committee in lieu of a meeting, shall be deemed the acts of the Committee. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of the Company or any Subsidiary, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan.

10.3 <u>Authority of the Committee</u>. Subject to any specific designation in the Plan, the Committee has the exclusive power, authority and discretion to:

  (a) designate Participants to receive Awards;

  (b) determine the type or types of Awards to be granted to each Participant;

  (c) determine the number of Awards to be granted and the number of Shares to which an Award will relate;

14

(d) determine the terms and conditions of any Award granted pursuant to the Plan, including, but not limited to, the exercise price, grant price, or purchase price, any restrictions or limitations on the Award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, any provisions related to non-competition and recapture of gain on an Award, based in each case on such considerations as the Committee in its sole discretion determines;

(e) determine whether, to what extent, and pursuant to what circumstances an Award may be settled in, or the exercise price of an Award may be paid in, cash, Shares, other Awards, or other property, or an Award may be canceled, forfeited, or surrendered;

(f) prescribe the form of each Award Agreement, which need not be identical for each Participant;

(g) decide all other matters that must be determined in connection with an Award;

(h) establish, adopt, or revise any rules and regulations as it may deem necessary or advisable to administer the Plan;

(i) interpret the terms of, and any matter arising pursuant to, the Plan or any Award Agreement; and

(j) make all other decisions and determinations that may be required pursuant to the Plan or as the Committee deems necessary or advisable to administer the Plan.

10.4 <u>Decisions Binding</u>. The Committee's interpretation of the Plan, any Awards granted pursuant to the Plan, any Award Agreement and all decisions and determinations by the Committee with respect to the Plan are final, binding, and conclusive on all parties.

## ARTICLE 11

### EFFECTIVE AND EXPIRATION DATE

11.1 <u>Effective Date</u>. This Plan shall become effective on the date of its adoption by the Board or a committee of the Board duly authorized by the Board (the "<u>Effective Date</u>").

11.2 <u>Expiration Date</u>. The Plan will expire on, and no Award may be granted pursuant to the Plan after, the tenth anniversary of the Effective Date. Any Awards that are outstanding on the tenth anniversary of the Effective Date shall remain in force according to the terms of the Plan and the applicable Award Agreement.

## ARTICLE 12

### AMENDMENT, MODIFICATION, AND TERMINATION

12.1 <u>Amendment, Modification, And Termination</u>. At any time and from time to time, the Board or the Committee may terminate, amend or modify the Plan; *provided, however*, that to the extent necessary to comply with Applicable Laws, the Company shall obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required, including (a) to increases the number of Shares available under the Plan (other than any adjustment as provided by ARTICLE 9), or (b) to permits the Committee to extend the term of the Plan or the exercise period for an Option beyond ten years from the date of grant; *provided, further*, that to the extent permissible under the Applicable Laws, the Board may decide to follow home country practice not to seek the shareholder approval for any amendment or modification of the Plan.

15

12.2 <u>Awards Previously Granted</u>. Except with respect to amendments made pursuant to Section 12.1, no termination, amendment, or modification of the Plan shall adversely affect in any material way any Award previously granted pursuant to the Plan without the prior written consent of the Participant.

## ARTICLE 13

### GENERAL PROVISIONS

13.1 <u>No Rights to Awards</u>. No Participant, employee, or other person shall have any claim to be granted any Award pursuant to the Plan, and neither the Company nor the Committee is obligated to treat Participants, employees, and other persons uniformly.

13.2 <u>No Shareholders Rights</u>. No Award gives the Participant any of the rights of a Shareholder of the Company unless and until Shares are in fact issued to such person in connection with such Award.

13.3 <u>Taxes</u>. No Shares shall be delivered under the Plan to any Participant until such Participant has made arrangements acceptable to the Committee for the satisfaction of any income and employment tax withholding obligations under Applicable Laws. The Company or any Subsidiary shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy all applicable taxes (including the Participant's payroll tax obligations) required or permitted by Applicable Laws to be withheld with respect to any taxable event concerning a Participant arising as a result of this Plan. The Committee may in its discretion and in satisfaction of the foregoing requirement allow a Participant to elect to have the Company withhold Shares otherwise issuable under an Award (or allow the return of Shares) having a Fair Market Value equal to the sums required to be withheld. Notwithstanding any other provision of the Plan, the number of Shares which may be withheld with respect to the issuance, vesting, exercise or payment of any Award (or which may be repurchased from the Participant of such Award after such Shares were acquired by the Participant from the Company) in order to satisfy any income and payroll tax liabilities applicable to the Participant with respect to the issuance, vesting, exercise or payment of the Award shall, unless specifically approved by the Committee, be limited to the number of Shares which have a Fair Market Value on the date of withholding or repurchase equal to the aggregate amount of such liabilities based on the minimum statutory withholding rates for the applicable income and payroll tax purposes that are applicable to such supplemental taxable income.

13.4 <u>No Right to Employment or Services</u>. Nothing in the Plan or any Award Agreement shall interfere with or limit in any way the right of the Service Recipient to terminate any Participant's employment or services at any time, nor confer upon any Participant any right to continue in the employment or services of any Service Recipient.

13.5 <u>Unfunded Status of Awards</u>. The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the Company or any Subsidiary.

16

13.6 <u>Indemnification</u>. To the extent allowable pursuant to Applicable Laws, each member of the Committee or of the Board shall be indemnified and held harmless by the Company from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action or failure to act pursuant to the Plan and against and from any and all amounts paid by him or her in satisfaction of judgment in such action, suit, or proceeding against him or her; *provided* he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled pursuant to the Company's Memorandum of Association and Articles of Association, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

13.7 <u>Relationship to other Benefits</u>. No payment pursuant to the Plan shall be taken into account in determining any benefits pursuant to any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Subsidiary except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

13.8 <u>Expenses</u>. The expenses of administering the Plan shall be borne by the Company and its Subsidiaries.

13.9 <u>Titles and Headings</u>. The titles and headings of the Sections in the Plan are for convenience of reference only and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

13.10 <u>Fractional Shares</u>. No fractional Shares shall be issued and the Committee shall determine, in its discretion, whether cash shall be given in lieu of fractional Shares or whether such fractional Shares shall be eliminated by rounding up or down as appropriate.

13.11 <u>Limitations Applicable to Section 16 Persons</u>. Notwithstanding any other provision of the Plan, the Plan, and any Award granted or awarded to any Participant who is then subject to Section 16 of the Exchange Act, shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by the Applicable Laws, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

13.12 <u>Government and Other Regulations</u>. The obligation of the Company to make payment of awards in Shares or otherwise shall be subject to all Applicable Laws, and to such approvals by government agencies as may be required. The Company shall be under no obligation to register any of the Shares paid pursuant to the Plan under the Securities Act or any other similar law in any applicable jurisdiction. If the Shares paid pursuant to the Plan may in certain circumstances be exempt from registration pursuant to the Securities Act or other Applicable Laws, the Company may restrict the transfer of such Shares in such manner as it deems advisable to ensure the availability of any such exemption.

17

13.13 <u>Governing Law</u>. The Plan and all Award Agreements shall be construed in accordance with and governed by the laws of the Cayman Islands.

13.14 <u>Section 409A</u>. To the extent that the Committee determines that any Award granted under the Plan is or may become subject to Section 409A of the Code, the Award Agreement evidencing such Award shall incorporate the terms and conditions required by Section 409A of the Code. To the extent applicable, the Plan and the Award Agreements shall be interpreted in accordance with Section 409A of the Code and the U.S. Department of Treasury regulations and other interpretative guidance issued thereunder, including without limitation any such regulation or other guidance that may be issued after the Effective Date. Notwithstanding any provision of the Plan to the contrary, in the event that following the Effective Date the Committee determines that any Award may be subject to Section 409A of the Code and related Department of Treasury guidance (including such Department of Treasury guidance as may be issued after the Effective Date), the Committee may adopt such amendments to the Plan and the applicable Award agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Committee determines are necessary or appropriate to (a) exempt the Award from Section 409A of the Code and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the requirements of Section 409A of the Code and related U.S. Department of Treasury guidance.

13.15 <u>Appendices</u>. The Committee may approve such supplements, amendments or appendices to the Plan as it may consider necessary or appropriate for purposes of compliance with Applicable Laws or otherwise and such supplements, amendments or appendices shall be considered a part of the Plan; provided, however, that no such supplements shall increase the share limitation contained in Section 3.1 of the Plan without the approval of the Board.

**Exhibit 10.3**

**INDEMNIFICATION AGREEMENT**

THIS INDEMNIFICATION AGREEMENT (this "<u>Agreement</u>") is made as of           , 201    by and between iQIYI, Inc., an exempted company with limited liability incorporated and existing under the laws of the Cayman Islands (the "<u>Company</u>"), and                ([Passport/ID] Number           ) (the "<u>Indemnitee</u>").

WHEREAS, the Indemnitee has agreed to serve as a director or executive officer of the Company and in such capacity will render valuable services to the Company; and

WHEREAS, in order to induce and encourage highly experienced and capable persons such as the Indemnitee to render valuable services to the Company, the board of directors of the Company (the "<u>Board of Directors</u>") has determined that this Agreement is not only reasonable and prudent, but necessary to promote and ensure the best interests of the Company and its shareholders;

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter set forth, and other good and valuable consideration, including, without limitation, the service of the Indemnitee, the receipt of which hereby is acknowledged, and in order to induce the Indemnitee to render valuable services the Company, the Company and the Indemnitee hereby agree as follows:

1. <u>Definitions.</u> As used in this Agreement:

(a) "<u>Change in Control</u>" shall mean a change in control of the Company of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or in response to any similar item on any similar or successor schedule or form) promulgated under the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (collectively, the "<u>Act</u>"), whether or not the Company is then subject to such reporting requirement; provided, however, that, without limitation, such a Change in Control shall be deemed to have occurred (irrespective of the applicability of the initial clause of this definition) if (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Act, but excluding any trustee or other fiduciary holding securities pursuant to an employee benefit or welfare plan or employee share plan of the Company or any subsidiary or affiliate of the Company, or any entity organized, appointed, established or holding securities of the Company with voting power for or pursuant to the terms of any such plan) becomes the "beneficial owner" (as defined in Rule 13d-3 under the Act), directly or indirectly, of securities of the Company representing 30% or more of the combined voting power of the Company's then outstanding securities without the prior approval of at least two-thirds of the Continuing Directors (as defined below) in office immediately prior to such person's attaining such interest; (ii) the Company is a party to a merger, consolidation, scheme of arrangement, sale of assets or other reorganization, or a proxy contest, as a consequence of which Continuing Directors in office immediately prior to such transaction or event constitute less than a majority of the Board of Directors of the Company (or any successor entity) thereafter; or (iii) during any period of two (2) consecutive years, Continuing Directors cease for any reason to constitute at least a majority of the Board of Directors of the Company.

(b) "Continuing Director" shall mean an individual (i) who served on the Board of Directors of the Company at the effective date of the Company's registration statement on Form F-1 relating to the Company's initial public offering; or (ii) whose election or nomination for election by the Company's shareholders was approved by a vote of at least two-thirds of the Continuing Directors then in office.

(c) "Disinterested Director" with respect to any request by the Indemnitee for indemnification or advancement of expenses hereunder shall mean a director of the Company who neither is nor was a party to the Proceeding (as defined below) in respect of which indemnification or advancement is being sought by the Indemnitee.

(d) The term "Expenses" shall mean, without limitation, expenses of Proceedings, including attorneys' fees, disbursements and retainers, accounting and witness fees, expenses related to preparation for service as a witness and to service as a witness, travel and deposition costs, expenses of investigations, judicial or administrative proceedings and appeals, amounts paid in settlement of a Proceeding by or on behalf of the Indemnitee, costs of attachment or similar bonds, any expenses of attempting to establish or establishing a right to indemnification or advancement of expenses, under this Agreement, the Company's Memorandum of Association and Articles of Association as currently in effect (the "Articles"), applicable law or otherwise, and reasonable compensation for time spent by the Indemnitee in connection with the investigation, defense or appeal of a Proceeding or action for indemnification for which the Indemnitee is not otherwise compensated by the Company or any third party. The term "Expenses" shall not include the amount of judgments, fines, interest or penalties, which are actually levied against or sustained by the Indemnitee to the extent sustained after final adjudication.

(e) The term "Independent Legal Counsel" shall mean any firm of attorneys reasonably selected by the Board of Directors of the Company, so long as such firm has not represented the Company, the Company's subsidiaries or affiliates, the Indemnitee, any entity controlled by the Indemnitee, or any party adverse to the Company, within the preceding five (5) years. Notwithstanding the foregoing, the term "Independent Legal Counsel" shall not include any person who, under applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or the Indemnitee in an action to determine the Indemnitee's right to indemnification or advancement of expenses under this Agreement, the Company's Articles, applicable law or otherwise.

(f) The term "Proceeding" shall mean any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, or other proceeding (including, without limitation, an appeal therefrom), formal or informal, whether brought in the name of the Company or otherwise, whether of a civil, criminal, administrative or investigative nature, and whether by, in or involving a court or an administrative, other governmental or private entity or body (including, without limitation, an investigation by the Company or its Board of Directors), by reason of (i) the fact that the Indemnitee is or was a director or officer of the Company, or is or was serving at the request of the Company as an agent of another enterprise, whether or not the Indemnitee is serving in such capacity at the time any liability or expense is incurred for which indemnification or reimbursement is to be provided under this Agreement, (ii) any actual or alleged act or omission or neglect or breach of duty, including, without limitation, any actual or alleged error or misstatement or misleading statement, which the Indemnitee commits or suffers while acting in any such capacity, or (iii) the Indemnitee attempting to establish or establishing a right to indemnification or advancement of expenses pursuant to this Agreement, the Company's Articles, applicable law or otherwise.

- 2 -

(g) The phrase "serving at the request of the Company as an agent of another enterprise" or any similar terminology shall mean, unless the context otherwise requires, serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, limited liability company, trust, employee benefit or welfare plan or other enterprise, foreign or domestic. The phrase "serving at the request of the Company" shall include, without limitation, any service as a director/an executive officer of the Company which imposes duties on, or involves services by, such director/executive officer with respect to the Company or any of the Company's subsidiaries, affiliates, employee benefit or welfare plans, such plan's participants or beneficiaries or any other enterprise, foreign or domestic. In the event that the Indemnitee shall be a director, officer, employee or agent of another corporation, partnership, joint venture, limited liability company, trust, employee benefit or welfare plan or other enterprise, foreign or domestic, 50% or more of the ordinary shares, combined voting power or total equity interest of which is owned by the Company or any subsidiary or affiliate thereof, then it shall be presumed conclusively that the Indemnitee is so acting at the request of the Company.

2. <u>Services by the Indemnitee</u>. The Indemnitee agrees to serve as a director or officer of the Company under the terms of the Indemnitee's agreement with the Company for so long as the Indemnitee is duly elected or appointed or until such time as the Indemnitee tenders a resignation in writing or is removed from the Indemnitee's position; provided, however, that the Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or other obligation imposed by operation of law).

3. <u>Proceedings by or in the Right of the Company</u>. The Company shall indemnify the Indemnitee if the Indemnitee is a party to or threatened to be made a party to or is otherwise involved in any Proceeding by or in the right of the Company to procure a judgment in its favor by reason of the fact that the Indemnitee is or was a director or officer of the Company, or is or was serving at the request of the Company as an agent of another enterprise, against all Expenses, judgments, fines, interest or penalties, which are actually and reasonably incurred by the Indemnitee in connection with the defense or settlement of such a Proceeding, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Company; <u>except</u> that no indemnification under this section shall be made in respect of any claim, issue or matter as to which such person shall have been adjudicated by final judgment by a court of competent jurisdiction to be liable to the Company for willful misconduct in the performance of his/her duty to the Company, unless and only to the extent that the court in which such Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such amounts which such other court shall deem proper.

- 3 -

4. <u>Proceeding Other Than a Proceeding by or in the Right of the Company</u>. The Company shall indemnify the Indemnitee if the Indemnitee is a party to or threatened to be made a party to or is otherwise involved in any Proceeding (other than a Proceeding by or in the right of the Company) by reason of the fact that the Indemnitee is or was a director or officer of the Company, or is or was serving at the request of the Company as an agent of another enterprise, against all Expenses, judgments, fines, interest or penalties, which are actually and reasonably incurred by the Indemnitee in connection with such a Proceeding, to the fullest extent permitted by applicable law; provided, however, that any settlement of a Proceeding must be approved in advance in writing by the Company (which approval shall not be unreasonably withheld).

5. <u>Indemnification for Costs, Charges and Expenses of Witness or Successful Party</u>. Notwithstanding any other provision of this Agreement (except as set forth in subparagraph 9(a) hereof), and without a requirement for determination as required by Paragraph 8 hereof, to the extent that the Indemnitee (a) has prepared to serve or has served as a witness in any Proceeding in any way relating to (i) the Company or any of the Company's subsidiaries, affiliates, employee benefit or welfare plans or such plan's participants or beneficiaries or (ii) anything done or not done by the Indemnitee as a director or officer of the Company or in connection with serving at the request of the Company as an agent of another enterprise, or (b) has been successful in defense of any Proceeding or in defense of any claim, issue or matter therein, on the merits or otherwise, including the dismissal of a Proceeding without prejudice or the settlement of a Proceeding without an admission of liability, the Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by the Indemnitee in connection therewith to the fullest extent permitted by applicable law.

6. <u>Partial Indemnification</u>. If the Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of the Expenses, judgments, fines, interest or penalties, which are actually and reasonably incurred by the Indemnitee in the investigation, defense, appeal or settlement of any Proceeding, but not, however, for the total amount of the Indemnitee's Expenses, judgments, fines, interest or penalties, then the Company shall nevertheless indemnify the Indemnitee for the portion of such Expenses, judgments, fines, interest or penalties to which the Indemnitee is entitled.

7. <u>Advancement of Expenses</u>. The Expenses incurred by the Indemnitee in any Proceeding shall be paid promptly by the Company in advance of the final disposition of the Proceeding at the written request of the Indemnitee, to the fullest extent permitted by applicable law; provided, however, that the Indemnitee shall set forth in such request reasonable evidence that such Expenses have been incurred by the Indemnitee in connection with such Proceeding, a statement that such Expenses do not relate to any matter described in subparagraph 9(a) of this Agreement, and an undertaking in writing to repay any advances if it is ultimately determined as provided in subparagraph 8(b) of this Agreement that the Indemnitee is not entitled to indemnification under this Agreement.

8. <u>Indemnification Procedure; Determination of Right to Indemnification</u>.

(a) Promptly after receipt by the Indemnitee of notice of the commencement of any Proceeding, the Indemnitee shall, if a claim for indemnification or advancement of Expenses in respect thereof is to be made against the Company under this Agreement, notify the Company of the commencement thereof in writing. The failure and delay to so notify the Company will not relieve the Company from any liability which the Company may have to the Indemnitee under this Agreement unless the Company shall have lost significant substantive or procedural rights with respect to the defense of any Proceeding as a result of such omission to so notify.

- 4 -

(b) The Indemnitee shall be conclusively presumed to have met the relevant standards of conduct, if any, as defined by applicable law, for indemnification pursuant to this Agreement and shall be absolutely entitled to such indemnification, unless a determination is made that the Indemnitee has not met such standards by (i) the Board of Directors by a majority vote of a quorum thereof consisting of Disinterested Directors, (ii) the shareholders of the Company by majority vote of a quorum thereof consisting of shareholders who are not parties to the Proceeding due to which a claim for indemnification is made under this Agreement, (iii) Independent Legal Counsel as set forth in a written opinion (it being understood that such Independent Legal Counsel shall make such determination only if the quorum of Disinterested Directors referred to in clause (i) of this subparagraph 8(b) is not obtainable or if the Board of Directors of the Company by a majority vote of a quorum thereof consisting of Disinterested Directors so directs), or (iv) a court of competent jurisdiction; provided, however, that if a Change in Control shall have occurred and the Indemnitee so requests in writing, such determination shall be made only by a court of competent jurisdiction.

(c) If a claim for indemnification or advancement of Expenses under this Agreement is not paid by the Company within thirty (30) days after receipt by the Company of written notice thereof, the rights provided by this Agreement shall be enforceable by the Indemnitee in any court of competent jurisdiction. Such judicial proceeding shall be made de novo. The burden of proving that indemnification or advances are not appropriate shall be on the Company. Neither the failure of the directors or shareholders of the Company or Independent Legal Counsel to have made a determination prior to the commencement of such action that indemnification or advancement of Expenses is proper in the circumstances because the Indemnitee has met the applicable standard of conduct, if any, nor an actual determination by the directors or shareholders of the Company or Independent Legal Counsel that the Indemnitee has not met the applicable standard of conduct shall be a defense to an action by the Indemnitee or create a presumption for the purpose of such an action that the Indemnitee has not met the applicable standard of conduct. The termination of any Proceeding by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself (i) create a presumption that the Indemnitee did not act in good faith and in a manner which he reasonably believed to be in the best interests of the Company and/or its shareholders, and, with respect to any criminal Proceeding, that the Indemnitee had reasonable cause to believe that his conduct was unlawful or (ii) otherwise adversely affect the rights of the Indemnitee to indemnification or advancement of Expenses under this Agreement, except as may be provided herein.

(d) If a court of competent jurisdiction shall determine that the Indemnitee is entitled to any indemnification or advancement of Expenses hereunder, the Company shall pay all Expenses actually and reasonably incurred by the Indemnitee in connection with such adjudication (including, but not limited to, any appellate proceedings).

- 5 -

(e) With respect to any Proceeding for which indemnification or advancement of Expenses is requested, the Company will be entitled to participate therein at its own expense and, except as otherwise provided below, to the extent that it may wish, the Company may assume the defense thereof, with counsel reasonably satisfactory to the Indemnitee. After notice from the Company to the Indemnitee of its election to assume the defense of a Proceeding, the Company will not be liable to the Indemnitee under this Agreement for any Expenses subsequently incurred by the Indemnitee in connection with the defense thereof, other than as provided below. The Company shall not settle any Proceeding in any manner which would impose any penalty or limitation on the Indemnitee without the Indemnitee's written consent. The Indemnitee shall have the right to employ his/her own counsel in any Proceeding, but the fees and expenses of such counsel incurred after notice from the Company of its assumption of the defense of the Proceeding shall be at the expense of the Indemnitee, unless (i) the employment of counsel by the Indemnitee has been authorized by the Company, (ii) the Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and the Indemnitee in the conduct of the defense of a Proceeding, or (iii) the Company shall not in fact have employed counsel to assume the defense of a proceeding, in each of which cases the fees and expenses of the Indemnitee's counsel shall be advanced by the Company. The Company shall not be entitled to assume the defense of any Proceeding brought by or on behalf of the Company or as to which the Indemnitee has reasonably concluded that there may be a conflict of interest between the Company and the Indemnitee.

9. <u>Limitations on Indemnification</u>. No payments pursuant to this Agreement shall be made by the Company:

(a) To indemnify or advance funds to the Indemnitee for Expenses with respect to (i) Proceedings initiated or brought voluntarily by the Indemnitee and not by way of defense, except with respect to Proceedings brought to establish or enforce a right to indemnification under this Agreement or any other statute or law or otherwise as required under applicable law or (ii) Expenses incurred by the Indemnitee in connection with preparing to serve or serving as a witness in cooperation with any party or entity who or which has threatened or commenced any action or proceeding against the Company, or any director, officer, employee, trustee, agent, representative, subsidiary, parent corporation or affiliate of the Company, but such indemnification or advancement of Expenses in each such case may be provided by the Company if the Board of Directors finds it to be appropriate;

(b) To indemnify the Indemnitee for any Expenses, judgments, fines, interest or penalties sustained in any Proceeding for which payment is actually made to the Indemnitee under a valid and collectible insurance policy, except in respect of any excess beyond the amount of payment under such insurance;

(c) To indemnify the Indemnitee for any Expenses, judgments, fines, interest or penalties sustained in any Proceeding for an accounting of profits made from the purchase or sale by the Indemnitee of securities of the Company pursuant to the provisions of Section 16(b) of the Act or similar provisions of any foreign or United States federal, state or local statute or regulation;

- 6 -

(d) To indemnify the Indemnitee for any Expenses, judgments, fines, interest or penalties for which the Indemnitee is indemnified by the Company otherwise than pursuant to this Agreement;

(e) To indemnify the Indemnitee for any Expenses (including without limitation any Expenses relating to a Proceeding attempting to enforce this Agreement), judgments, fines, interest or penalties on account of the Indemnitee's conduct if such conduct shall be finally adjudged to have been knowingly fraudulent or deliberately dishonest or to have constituted willful misconduct, including, without limitation, breach of the duty of loyalty;

(f) If a court of competent jurisdiction finally determines that any indemnification hereunder is unlawful. In this respect, the Company and the Indemnitee have been advised that the Securities and Exchange Commission takes the position that indemnification for liabilities arising under securities laws is against public policy and is, therefore, unenforceable;

(g) To indemnify the Indemnitee in connection with Indemnitee's personal tax matter; or

(h) To indemnify the Indemnitee with respect to any claim related to any dispute or breach arising under any contract or similar obligation between the Company or any of its subsidiaries or affiliates and such Indemnitee.

10. Continuation of Indemnification. All agreements and obligations of the Company contained herein shall continue during the period that the Indemnitee is a director or officer of the Company (or is or was serving at the request of the Company as an agent of another enterprise, foreign or domestic) and shall continue thereafter so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that the Indemnitee was a director or officer of the Company or serving in any other capacity referred to in this Paragraph 10.

11. Indemnification Hereunder Not Exclusive. The indemnification provided by this Agreement shall not be deemed to be exclusive of any other rights to which the Indemnitee may be entitled under the Company's Articles, any agreement, vote of shareholders or vote of Disinterested Directors, provisions of applicable law, or otherwise, both as to action or omission in the Indemnitee's official capacity and as to action or omission in another capacity on behalf of the Company while holding such office.

12. Successors and Assigns.

(a) This Agreement shall be binding upon the Indemnitee, and shall inure to the benefit of, the Indemnitee and the Indemnitee's heirs, executors, administrators and assigns, whether or not the Indemnitee has ceased to be a director or officer, and the Company and its successors and assigns. Upon the sale of all or substantially all of the business, assets or share capital of the Company to, or upon the merger of the Company into or with, any corporation, partnership, joint venture, trust or other person, this Agreement shall inure to the benefit of and be binding upon both the Indemnitee and such purchaser or successor person. Subject to the foregoing, this Agreement may not be assigned by either party without the prior written consent of the other party hereto.

- 7 -

(b) If the Indemnitee is deceased and is entitled to indemnification under any provision of this Agreement, the Company shall indemnify the Indemnitee's estate and the Indemnitee's spouse, heirs, executors, administrators and assigns against, and the Company shall, and does hereby agree to assume, any and all Expenses actually and reasonably incurred by or for the Indemnitee or the Indemnitee's estate, in connection with the investigation, defense, appeal or settlement of any Proceeding. Further, when requested in writing by the spouse of the Indemnitee, and/or the Indemnitee's heirs, executors, administrators and assigns, the Company shall provide appropriate evidence of the Company's agreement set out herein to indemnify the Indemnitee against and to itself assume such Expenses.

13. Subrogation. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnitee, who shall execute all documents required and shall do all acts that may be necessary to secure such rights and to enable the Company effectively to bring suit to enforce such rights.

14. Severability. Each and every paragraph, sentence, term and provision of this Agreement is separate and distinct so that if any paragraph, sentence, term or provision thereof shall be held to be invalid, unlawful or unenforceable for any reason, such invalidity, unlawfulness or unenforceability shall not affect the validity, unlawfulness or enforceability of any other paragraph, sentence, term or provision hereof. To the extent required, any paragraph, sentence, term or provision of this Agreement may be modified by a court of competent jurisdiction to preserve its validity and to provide the Indemnitee with the broadest possible indemnification permitted under applicable law. The Company's inability, pursuant to a court order or decision, to perform its obligations under this Agreement shall not constitute a breach of this Agreement.

15. Savings Clause. If this Agreement or any paragraph, sentence, term or provision hereof is invalidated on any ground by any court of competent jurisdiction, the Company shall nevertheless indemnify the Indemnitee as to any Expenses, judgments, fines, interest or penalties, which are incurred with respect to any Proceeding to the fullest extent permitted by any (a) applicable paragraph, sentence, term or provision of this Agreement that has not been invalidated or (b) applicable law.

16. Interpretation; Governing Law. This Agreement shall be construed as a whole and in accordance with its fair meaning and any ambiguities shall not be construed for or against either party. Headings are for convenience only and shall not be used in construing meaning. This Agreement shall be governed and interpreted in accordance with the laws of the State of New York.

17. Amendments. No amendment, waiver, modification, termination or cancellation of this Agreement shall be effective unless in writing signed by the party against whom enforcement is sought. The indemnification rights afforded to the Indemnitee hereby are contract rights and may not be diminished, eliminated or otherwise affected by amendments to the Company's Articles, or by other agreements, including directors' and officers' liability insurance policies, of the Company.

- 8 -

18. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each party and delivered to the other.

19. <u>Notices</u>. Any notice required to be given under this Agreement shall be directed to the Chief Financial Officer of the Company at 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing 100080, People's Republic of China, and to the Indemnitee at or to such other address as either shall designate to the other in writing.

*[The remainder of this page is intentionally left blank.]*

- 9 -

IN WITNESS WHEREOF, the parties have executed this Indemnification Agreement as of the date first written above.

**INDEMNITEE**

_____

Name:

**iQIYI, INC.**

By: _____

Name:

Title:

[*Signature Page to Indemnification Agreement*]

**Exhibit 10.4**

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "**Agreement**") is entered into as of            , 20    by and between iQIYI, Inc., an exempted company incorporated and existing under the laws of the Cayman Islands (the "**Company**") and               , an individual with                [passport/ID number]            (the "**Executive**").

### RECITALS

WHEREAS, the Company desires to employ the Executive and to assure itself of the services of the Executive during the term of Employment (as defined below) and under the terms and conditions of the Agreement;

WHEREAS, the Executive desires to be employed by the Company during the term of Employment and under the terms and conditions of the Agreement;

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the Company and the Executive agree as follows:

1.    **EMPLOYMENT**

The Company hereby agrees to employ the Executive and the Executive hereby accepts such employment, on the terms and conditions hereinafter set forth (the "**Employment**").

2.    **TERM**

Subject to the terms and conditions of the Agreement, the initial term of the Employment shall be      years, commencing on          , 20    (the "**Effective Date**") and ending on          , 20    (the "**Initial Term**"), unless terminated earlier pursuant to the terms of the Agreement. Upon expiration of the Initial Term of the Employment, the Employment shall be automatically extended for successive periods of      months each (each, an "**Extension Period**") unless either party shall have given 60 days advance written notice to the other party, in the manner set forth in Section 19 below, prior to the end of the Extension Period in question, that the term of this Agreement that is in effect at the time such written notice is given is not to be extended or further extended, as the case may be (the period during which this Agreement is effective being referred to hereafter as the "**Term**").

3.    **POSITION AND DUTIES**

(a)    During the Term, the Executive shall serve as               of the Company or in such other position or positions with a level of duties and responsibilities consistent with the foregoing with the Company and/or its subsidiaries and affiliated entities as the board of directors of the Company (the "**Board**") may specify from time to time and shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the position or positions in which the Executive serves hereunder and as assigned by the Board, or with the Board's authorization, by the Company's Chief Executive Officer.

(b)     The Executive agrees to serve without additional compensation, if elected or appointed thereto, as a director of the Company or any subsidiaries or affiliated entities of the Company (collectively, the "**Group**") and as a member of any committees of the board of directors of any such entity, provided that the Executive is indemnified for serving in any and all such capacities on a basis no less favorable than is currently provided to any other director of any member of the Group.

(c)     The Executive agrees to devote all of his/her working time and efforts to the performance of his/her duties for the Company and to faithfully and diligently serve the Company in accordance with the Agreement and the guidelines, policies and procedures of the Company approved from time to time by the Board.

**4.     NO BREACH OF CONTRACT**

The Executive hereby represents to the Company that: (i) the execution and delivery of the Agreement by the Executive and the performance by the Executive of the Executive's duties hereunder shall not constitute a breach of, or otherwise contravene, the terms of any other agreement or policy to which the Executive is a party or by which the Executive is otherwise bound, except that the Executive does not make any representation with respect to agreements required to be entered into by and between the Executive and any member of the Group pursuant to the applicable law of the jurisdiction in which the Executive is based, if any; (ii) that the Executive is not in possession of any information (including, without limitation, confidential information and trade secrets) the knowledge of which would prevent the Executive from freely entering into the Agreement and carrying out his/her duties hereunder; and (iii) that the Executive is not bound by any confidentiality, trade secret or similar agreement with any person or entity other than any member of the Group.

**5.     LOCATION**

The Executive will be based in              or any other location as requested by the Company during the Term.

**6.     COMPENSATION AND BENEFITS**

(a)     Cash Compensation. As compensation for the performance by the Executive of his/her obligations hereunder, during the Term, the Company shall pay the Executive cash compensation (inclusive of the statutory benefit contributions that the Company is required to set aside for the Executive under applicable law) pursuant to Schedule A hereto, subject to annual review and adjustment by the Board or any committee designated by the Board.

2

(b)  Equity Incentives. During the Term, the Executive shall be eligible to participate, at a level comparable to similarly situated executives of the Company, in such long-term compensation arrangements as may be authorized from time to time by the Board, including any share incentive plan the Company may adopt from time to time in its sole discretion.

(c)  Benefits. During the Term, the Executive shall be entitled to participate in all of the employee benefit plans and arrangements made available by the Company to its similarly situated executives, including, but not limited to, any retirement plan, medical insurance plan and travel/holiday policy, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements.

## 7.  TERMINATION OF THE AGREEMENT

The Employment may be terminated as follows:

(a)  Death. The Employment shall terminate upon the Executive's death.

(b)  Disability. The Employment shall terminate if the Executive has a disability, including any physical or mental impairment which, as reasonably determined by the Board, renders the Executive unable to perform the essential functions of his/her position at the Company, even with reasonable accommodation that does not impose an undue burden on the Company, for more than 180 days in any 12-month period, unless a longer period is required by applicable law, in which case that longer period shall apply.

(c)  Cause. The Company may terminate the Executive's employment hereunder for Cause. The occurrence of any of the following, as reasonably determined by the Company, shall be a reason for Cause, provided that, if the Company determines that the circumstances constituting Cause are curable, then such circumstances shall not constitute Cause unless and until the Executive has been informed by the Company of the existence of Cause and given an opportunity of ten business days to cure, and such Cause remains uncured at the end of such ten-day period:

   (1)  continued failure by the Executive to satisfactorily perform his/her duties;

   (2)  willful misconduct or gross negligence by the Executive in the performance of his/her duties hereunder, including insubordination;

   (3)  the Executive's conviction or entry of a guilty or *nolo contendere* plea of any felony or any misdemeanor involving moral turpitude;

   (4)  the Executive's commission of any act involving dishonesty that results in material financial, reputational or other harm, monetary or otherwise, to any member of the Group, including but not limited to an act constituting misappropriation or embezzlement of the property of any member of the Group as determined in good faith by the Board; or

3

(5)     any material breach by the Executive of this Agreement.

(d)    Good Reason. The Executive may terminate his/her employment hereunder for "Good Reason" upon the occurrence, without the written consent of the Executive, of an event constituting a material breach of this Agreement by the Company that has not been fully cured within ten business days after written notice thereof has been given by the Executive to the Company setting forth in sufficient detail the conduct or activities the Executive believes constitute grounds for Good Reason, including but not limited to: the failure by the Company to pay to the Executive any portion of the Executive's current compensation or to pay to the Executive any portion of an installment of deferred compensation under any deferred compensation program of the Company, within twenty business days of the date such compensation is due.

(e)    Without Cause by the Company; Without Good Reason by the Executive. The Company may terminate the Executive's employment hereunder at any time without Cause upon 60-day prior written notice to the Executive. The Executive may terminate the Executive's employment voluntarily for any reason or no reason at any time by giving 60-day prior written notice to the Company.

(f)    Notice of Termination. Any termination of the Executive's employment under the Agreement shall be communicated by written notice of termination ("**Notice of Termination**") from the terminating party to the other party. The notice of termination shall indicate the specific provision(s) of the Agreement relied upon in effecting the termination.

(g)    Date of Termination. The "**Date of Termination**" shall mean (i) the date specified in the Notice of Termination, or (ii) if the Executive's employment is terminated by the Executive's death, the date of his/her death.

(h)    Compensation upon Termination.

(1)    Death. If the Executive's employment is terminated by reason of the Executive's death, the Company shall have no further obligations to the Executive under this Agreement and the Executive's benefits shall be determined under the Company's retirement, insurance and other benefit and compensation plans or programs then in effect in accordance with the terms of such plans and programs.

(2)    By Company without Cause or by the Executive for Good Reason. If the Executive's employment is terminated by the Company other than for Cause or by the Executive for Good Reason, the Company shall (i) continue to pay and otherwise provide to the Executive, during any notice period, all compensation, base salary and previously earned but unpaid incentive compensation, if any, and shall continue to allow the Executive to participate in any benefit plans in accordance with the terms of such plans during such notice period; and (ii) pay to the Executive, in lieu of benefits under any severance plan or policy of the Company, any such amount as may be agreed between the Company and the Executive.

4

(3) <u>By Company for Cause or by the Executive other than for Good Reason</u>. If the Executive's employment shall be terminated by the Company for Cause or by the Executive other than for Good Reason, the Company shall pay the Executive his/her base salary at the rate in effect at the time Notice of Termination is given through the Date of Termination, and the Company shall have no additional obligations to the Executive under this Agreement.

(i) <u>Return of Company Property</u>. The Executive agrees that following the termination of the Executive's employment for any reason, or at any time prior to the Executive's termination upon the request of the Company, he/she shall return all property of the Group that is then in or thereafter comes into his/her possession, including, but not limited to, any Confidential Information (as defined below) or Intellectual Property (as defined below), or any other documents, contracts, agreements, plans, photographs, projections, books, notes, records, electronically stored data and all copies, excerpts or summaries of the foregoing, as well as any automobile or other materials or equipment supplied by the Group to the Executive, if any.

(j) <u>Requirement for a Release</u>. Notwithstanding the foregoing, the Company's obligations to pay or provide any benefits shall (1) cease as of the date the Executive breaches any of the provisions of Sections 8, 9 and 11 hereof, and (2) be conditioned on the Executive signing the Company's customary release of claims in favor of the Group and the expiration of any revocation period provided for in such release.

## 8. CONFIDENTIALITY AND NONDISCLOSURE

(a) <u>Confidentiality and Non-Disclosure</u>.

(1) The Executive acknowledges and agrees that: (A) the Executive holds a position of trust and confidence with the Company and that his/her employment by the Company will require that the Executive have access to and knowledge of valuable and sensitive information, material, and devices relating to the Company and/or its business, activities, products, services, customers and vendors, including, but not limited to, the following, regardless of the form in which the same is accessed, maintained or stored: the identity of the Company's actual and prospective customers and, as applicable, their representatives; prior, current or future research or development activities of the Company; the products and services provided or offered by the Company to customers or potential customers and the manner in which such services are performed or to be performed; the product and/or service needs of actual or prospective customers; pricing and cost information; information concerning the development, engineering, design, specifications, acquisition or disposition of products and/or services of the Company; user base personal data, programs, software and source codes, licensing information, personnel information, advertising client information, vendor information, marketing plans and techniques, forecasts, and other trade secrets ("**Confidential Information**"); and (B) the direct and indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business.

5

(2)    During the Term and at all times thereafter, the Executive shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, consultant, principal or agent of any business, or in any other capacity, publish or make known, disclose, furnish, reproduce, make available, or utilize any of the Confidential Information without the prior express written approval of the Company, other than in the proper performance of the duties contemplated herein, unless and until such Confidential Information is or shall become general public knowledge through no fault of the Executive.

(3)    In the event that the Executive is required by law to disclose any Confidential Information, the Executive agrees to give the Company prompt advance written notice thereof and to provide the Company with reasonable assistance in obtaining an order to protect the Confidential Information from public disclosure.

(4)    The failure to mark any Confidential Information as confidential shall not affect its status as Confidential Information under this Agreement.

(b)    Third Party Information in the Executive's Possession. The Executive agrees that he/she shall not, during the Term, (i) improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity with which the Executive has an agreement or duty to keep in confidence information acquired by Executive, if any, or (ii) bring into the premises of Company any document or confidential or proprietary information belonging to such former employer, person or entity unless consented to in writing by such former employer, person or entity. The Executive will indemnify the Company and hold it harmless from and against all claims, liabilities, damages and expenses, including reasonable attorneys' fees and costs of litigation, arising out of or in connection with any violation of the foregoing.

6

(c)     <u>Third Party Information in the Company's Possession</u>. The Executive recognizes that the Company may have received, and in the future may receive, from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. The Executive agrees that the Executive owes the Company and such third parties, during the Term and thereafter, a duty to hold all such confidential or proprietary information in strict confidence and not to disclose such information to any person or firm, or otherwise use such information, in a manner inconsistent with the limited purposes permitted by the Company's agreement with such third party.

This Section 8 shall survive the termination of the Agreement for any reason. In the event the Executive breaches this Section 8, the Company shall have right to seek remedies permissible under applicable law.

**9.     INTELLECTUAL PROPERTY**

(a)     <u>Prior Inventions</u>. The Executive has attached hereto, as <u>Schedule B</u>, a list describing all inventions, ideas, improvements, designs and discoveries, whether or not patentable and whether or not reduced to practice, original works of authorship and trade secrets made or conceived by or belonging to the Executive (whether made solely by the Executive or jointly with others) that (i) were developed by Executive prior to the Executive's employment by the Company (collectively, "**Prior Inventions**"), (ii) relate to the Company' actual or proposed business, products or research and development, and (iii) are not assigned to the Company hereunder; or, if no such list is attached, the Executive represents that there are no such Prior Inventions. Except to the extent set forth in <u>Schedule B</u>, the Executive hereby acknowledges that, if in the course of his/her service for the Company, the Executive incorporates into a Company product, process or machine a Prior Invention owned by the Executive or in which he/she has an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide right and license (which may be freely transferred by the Company to any other person or entity) to make, have made, modify, use, sell, sublicense and otherwise distribute such Prior Invention as part of or in connection with such product, process or machine.

7

(b)    <u>Assignment of Intellectual Property</u>. The Executive hereby assigns to the Company or its designees, without further consideration and free and clear of any lien or encumbrance, the Executive's entire right, title and interest (within the United States and all foreign jurisdictions) to any and all inventions, discoveries, improvements, developments, works of authorship, concepts, ideas, plans, specifications, software, formulas, databases, designees, processes and contributions to Confidential Information created, conceived, developed or reduced to practice by the Executive (alone or with others) during the Term which (i) are related to the Company's current or anticipated business, activities, products, or services, (ii) result from any work performed by Executive for the Company, or (iii) are created, conceived, developed or reduced to practice with the use of Company property, including any and all Intellectual Property Rights (as defined below) therein ("**Work Product**"). Any Work Product which falls within the definition of "work made for hire", as such term is defined in the U.S. Copyright Act, shall be considered a "work made for hire", the copyright in which vests initially and exclusively in the Company. The Executive waives any rights to be attributed as the author of any Work Product and any "droit morale" (moral rights) in Work Product. The Executive agrees to immediately disclose to the Company all Work Product. For purposes of this Agreement, "**Intellectual Property**" shall mean any patent, copyright, trademark or service mark, trade secret, or any other proprietary rights protection legally available.

(c)    <u>Patent and Copyright Registration</u>. The Executive agrees to execute and deliver any instruments or documents and to do all other things reasonably requested by the Company in order to more fully vest the Company with all ownership rights in the Work Product. If any Work Product is deemed by the Company to be patentable or otherwise registrable, the Executive shall assist the Company (at the Company's expense) in obtaining letters of patent or other applicable registration therein and shall execute all documents and do all things, including testifying (at the Company's expense) as necessary or appropriate to apply for, prosecute, obtain, or enforce any Intellectual Property right relating to any Work Product. Should the Company be unable to secure the Executive's signature on any document deemed necessary to accomplish the foregoing, whether due to the Executive's disability or other reason, the Executive hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as the Executive's agent and attorney-in-fact to act for and on the Executive's behalf and stead to take any of the actions required of Executive under the previous sentence, with the same effect as if executed and delivered by the Executive, such appointment being coupled with an interest.

This Section 9 shall survive the termination of the Agreement for any reason. In the event the Executive breaches this Section 9, the Company shall have right to seek remedies permissible under applicable law.

**10.    CONFLICTING EMPLOYMENT.**

The Executive hereby agrees that, during the Term, he/she will not engage in any other employment, occupation, consulting or other business activity related to the business in which the Company is now involved or becomes involved during the Term, nor will the Executive engage in any other activities that conflict with his/her obligations to the Company without the prior written consent of the Company.

8

**11.   NON-COMPETITION AND NON-SOLICITATION**

(a)   <u>Non-Competition</u>. In consideration of the compensation provided to the Executive by the Company hereunder, the adequacy of which is hereby acknowledged by the parties hereto, the Executive agree that during the Term and for a period of one year following the termination of the Employment for whatever reason, the Executive shall not engage in Competition (as defined below) with the Group. For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of, any other business or organization which competes, directly or indirectly, with the Group in the Business; <u>provided</u>, <u>however</u>, it shall not be a violation of this Section 11(a) for the Executive to become the registered or beneficial owner of up to five percent (5%) of any class of the capital stock of a publicly traded corporation in Competition with the Group, provided that the Executive does not otherwise participate in the business of such corporation.

For purposes of this Agreement, "**Business**" means internet entertainment services, and any other business which the Group engages in, or is preparing to become engaged in, during the Term.

(b)   <u>Non-Solicitation; Non-Interference</u>. During the Term and for a period of one year following the termination of the Executive's employment for any reason, the Executive agrees that he/she will not, directly or indirectly, for the Executive's benefit or for the benefit of any other person or entity, do any of the following:

(1)   approach the suppliers, clients, direct or end customers or contacts or other persons or entities introduced to the Executive in his/her capacity as a representative of the Group for the purpose of doing business of the same or of a similar nature to the Business or doing business that will harm the business relationships of the Group with the foregoing persons or entities;

(2)   assume employment with or provide services to any competitors of the Group, or engage, whether as principal, partner, licensor or otherwise, any of the Group's competitors, without the Group's express consent; or

(3)   seek, directly or indirectly, to solicit the services of, or hire or engage, any person who is known to be employed or engaged by the Group; or

(4)   otherwise interfere with the business or accounts of the Group.

9

(c)   <u>Injunctive Relief; Indemnity of Company</u>. The Executive agrees that any breach or threatened breach of subsections (a) and (b) of this Section 11 would result in irreparable injury and damage to the Company for which an award of money to the Company would not be an adequate remedy. The Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to seek an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive. The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages. The Executive and the Company further agree that the provisions of this Section 11 are reasonable. The Executive agrees to indemnify and hold harmless the Company from and against all reasonable expenses (including reasonable fees and disbursements of counsel) which may be incurred by the Company in connection with, or arising out of, any violation of this Agreement by the Executive. This Section 11 shall survive the termination of the Agreement for any reason.

## 12.   WITHHOLDING TAXES

Notwithstanding anything else herein to the contrary, the Company may withhold (or cause there to be withheld, as the case may be) from any amounts otherwise due or payable under or pursuant to the Agreement such national, state, provincial, local or any other income, employment, or other taxes as may be required to be withheld pursuant to any applicable law or regulation.

## 13.   ASSIGNMENT

The Agreement is personal in its nature and neither of the parties hereto shall, without the consent of the other, assign or transfer the Agreement or any rights or obligations hereunder; provided, however, that the Company may assign or transfer the Agreement or any rights or obligations hereunder to any member of the Group without such consent. If the Executive should die while any amounts would still be payable to the Executive hereunder if the Executive had continued to live, all such amounts unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, if there be no such designee, to the Executive's estate. The Company will require any and all successors (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. Failure of the Company to obtain such assumption and agreement prior to the effectiveness of any such succession shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Company had terminated the Executive's employment other than for Cause, except that for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination. As used in this Section, "**Company**" shall mean the Company as herein before defined and any successor to its business and/or assets as aforesaid which executes and delivers the agreement provided for in this Section 13 or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

**14.  SEVERABILITY**

If any provision of the Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or applications and to this end the provisions of the Agreement are declared to be severable.

**15.  ENTIRE AGREEMENT**

The Agreement constitutes the entire agreement and understanding between the Executive and the Company regarding the terms of the Employment and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter. The Executive acknowledges that he/she has not entered into the Agreement in reliance upon any representation, warranty or undertaking which is not set forth in the Agreement.

**16.  GOVERNING LAW**

The Agreement shall be governed by and construed in accordance with the law of the State of New York.

**17.  AMENDMENT**

The Agreement may not be amended, modified or changed (in whole or in part), except by a formal, definitive written agreement expressly referring to the Agreement, which agreement is executed by both of the parties hereto.

**18.  WAIVER**

Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under the Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

**19.  NOTICES**

All notices, requests, demands and other communications required or permitted under the Agreement shall be in writing and shall be deemed to have been duly given and made if (i) delivered by hand, (ii) otherwise delivered against receipt therefor, (iii) sent by a recognized courier with next-day or second-day delivery to the last known address of the other party; or (iv) sent by e-mail with confirmation of receipt.

11

20.  **COUNTERPARTS**

The Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against any party whose signature appears thereon, and all of which together shall constitute one and the same instrument. The Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories. Photographic copies of such signed counterparts may be used in lieu of the originals for any purpose.

21.  **NO INTERPRETATION AGAINST DRAFTER**

Each party recognizes that the Agreement is a legally binding contract and acknowledges that such party has had the opportunity to consult with legal counsel of choice. In any construction of the terms of the Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such terms.

[*Remainder of the page intentionally left blank.*]

12

**IN WITNESS WHEREOF,** the Agreement has been executed as of the date first written above.

COMPANY:                                           **iQIYI, Inc.**
                                                   a Cayman Islands exempted company

                                                   By:    _____
                                                   Name:
                                                   Title:

EXECUTIVE:

                                                   _____
                                                   Name:
                                                   Address:

13

**<u>SCHEDULE A</u>**

**Cash Compensation**

14

## SCHEDULE B

**Prior Inventions**

15

**Exhibit 10.5**

**Master Business Cooperation Agreement**

This Master Business Cooperation Agreement (this "**Agreement**"), dated as of January 19, 2018 (the "**Signing Date**"), is entered into by and between:

(1)    **Baidu Holdings Limited,** a company organized under the laws of the British Virgin Islands **("Baidu")**, and

(2)    **iQIYI, Inc.,** a company organized under the laws of the Cayman Islands ("**iQIYI**").

In this Agreement, Baidu and iQIYI shall be collectively referred to as the "**Parties**" and individually referred to as a "**Party**"; when the "**Party**" and the "**Other Party**" are used in this Agreement, Baidu and iQIYI shall respectively be the counterparty to each other.

**WHEREAS:**

(1)    Baidu and its Affiliates are leading Chinese language internet search providers, providing various internet services and products including such services carried through Baidu Properties or DuerOS, artificial intelligence technologies and products, communities, self-driving technologies, e-commerce, Baidu Smart Devices etc. (collectively referred to as "**Baidu Business**");

(2)    iQIYI and its Affiliates are PRC-based, high-quality video entertainment service providers, providing users with professional video experience that is rich, high-definition and smooth; iQIYI and its Affiliates have established a video business ecosystem containing e-commerce, games and movie tickets that connects people and services (collectively referred to as "**iQIYI Business**");

(3)    The Parties intend to establish comprehensive and in-depth business cooperation between Baidu Business and iQIYI Business and to enter into this Agreement to set forth the principles and scope of such business cooperation**.**

**NOW, THEREFORE**, the Parties hereby agree as follows:

**1.    Definition and Interpretation**

In this Agreement, unless otherwise provided, capitalized terms used herein shall have the meanings as indicated in this Section 1:

1.1    "**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or under common Control with, such Person, provided that, for purposes of this Agreement, Affiliates of Baidu shall not include iQIYI or any entity Controlled by iQIYI, and Affiliates of iQIYI shall only include the entities Controlled by iQIYI.

1.2    "**Baidu Cloud**" means the public cloud service platform provided by Baidu (website: cloud.baidu.com), through which Baidu Cloud provides public cloud services including cloud computing, big data and artificial intelligence technologies to enterprise customers and developers.

1.3    "**Baidu Smart Devices**" means the smart device products which are developed, produced or distributed by Baidu or any other entities of which Baidu directly or indirectly holds investment interests, including but not limited to those products developed, produced or distributed by Raven Technology (Beijing) Co., Ltd. and its Affiliates. Baidu may inform iQIYI about the scope of the Baidu Smart Devices by e-mail from time to time.

1

1.4 "**Baidu Properties**" means any and all websites (including without limitation (www.baidu.com)), search engines, interfaces and applications owned, operated and/or hosted by Baidu, including sub-domains or underlying paths of websites and upgrades, derivatives and modifications of such interfaces and applications, in each case, whether accessed through a web browser or a mobile application.

1.5 "**Beijing Xiaodu**" means Beijing Xiaodu Interactive Entertainment Science and Technology Co., Ltd. (北京小度互娱科技有限公司) and all its Controlled entities; and the entities established, formed or survived as a result of any merger, consolidation, spin-off or other reorganization transaction of the foregoing.

1.6 "**Long-form Video Business**" means long-form video content services currently provided by iQIYI, such long-form video content includes but not limited to movies, TV series, network series, cartoons, variety shows, documentaries, etc.

1.7 "**Control**" (including the terms "Controlling" "Controlled by" and "under common Control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. The existence of any of the following situations shall constitute Control (without limitation to the following situations): (i) directly or indirectly holding more than 50% of a Person's issued shares or other equity interests; (ii) having the power to directly or indirectly determine the appointment or removal of more than half of the members of a Person's board of directors or similar decision–making bodies; (iii) having the power to actually control a Person's financial and operation decisions through contracts or other arrangements; or (iv) otherwise being able to consolidate a Person's revenue, expenses, assets, and liabilities in its own financial reports in accordance with the United States generally accepted accounting principles.

1.8 "**DuerOS**" means the dialog-type artificial intelligence system and open platform developed by Baidu. With Baidu's information and services, DuerOS possesses substantial amounts of data and can complete operation and dialog exchange of devices through natural language, providing users with a complete service chain.

1.9 "**Person**" means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, governmental authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

1.10 "**PRC**" means the People's Republic of China, but for the purpose of this Agreement, does not include the Hong Kong Special Administrative Region, the Macau Special Administrative Region and the territory of Taiwan.

1.11 "**Relevant Cooperation Fields**" means the business cooperation fields as provided in Article 3 of this Agreement including artificial intelligence technology, smart devices/DuerOS, infrastructure and cloud service, advertisement, traffic, data and content, operation and other business fields as agreed by the Parties from time to time.

1.12 Unless otherwise expressly defined in Section 1 of this Agreement, references to products of Baidu, iQIYI and/or any third party in this Agreement shall mean the relevant products as referred to in such party's business operation and as generally understood in the market.

2

1.13  Unless otherwise expressly defined in Section 1 of this Agreement, references to relevant technologies and/or industry terms shall have the relevant meanings as generally understood in the Internet, electronic information and/or communication industries.

**2.    Principles of the Business Cooperation**

2.1    The Parties acknowledge and agree that the in-depth cooperation between Baidu Business and iQIYI Business in the Relevant Cooperation Fields is in the common interests and pursuits of the Parties, and the Parties shall treat each other as their respective top strategic preferred business partner in the Relevant Cooperation Fields to the maximum extent permitted by the applicable laws. The Parties shall use their best commercially reasonable efforts to facilitate a comprehensive and in-depth cooperation in the Relevant Cooperation Fields under this Agreement.

2.2    To ensure smooth implementation and achieve expected result of the cooperation in the Relevant Cooperation Fields, the Parties agree that each Party shall designate its relevant personnel to form a joint coordination team. During the Cooperation Term, members of the joint coordination team shall convene regular or extraordinary meetings to review and discuss the progress, results and potential issues of the cooperation in the Relevant Cooperation Fields. Such meetings may be held in person, via telephone or video conference, network communication or through other means as agreed by the Parties.

2.3    Each Party shall be entitled to designate its Affiliates to carry out the cooperation with the Other Party in the Relevant Cooperation Fields, and the Parties will or will designate their respective Affiliates to enter into specific business cooperation agreements (the "**Specific Business Cooperation Agreements**") with respect to specific cooperation in the Relevant Cooperation Fields in accordance with the principles set forth in this Agreement. Each Party shall ensure that its designated Affiliates have the necessary conditions, resources and capabilities to carry out the relevant cooperation under this Agreement and/or the Specific Business Cooperation Agreements. The Parties further agree that the obligations or restrictions imposed on any Party under this Agreement shall also be applicable to the Affiliates of such Party, and reference to Baidu or iQIYI shall also include their respective Affiliates to the extent applicable. Each Party shall procure that its Affiliates comply with this Agreement and assume full responsibility for the performance of and compliance with the obligations under this Agreement by its Affiliates.

**3.    Relevant Cooperation Fields**

The Parties agree to cooperate in fields that include but not limited to artificial intelligence technology, smart devices/DuerOS, infrastructure and cloud service, advertisement, traffic, data and contents, and operation under this Agreement. The Parties further agree to set forth the principles and key matters of the cooperation with respect to each field of the Relevant Cooperation Fields in Section 3 of this Agreement, and further negotiations and execution of each Specific Business Cooperation Agreement and implementation by the Parties of each cooperation in the Relevant Cooperation Fields shall be carried out in accordance with the principles set forth in Section 3 of this Agreement.

3.1    **Artificial Intelligence Technology Cooperation**

The Parties agree to carry out technological cooperation in video artificial intelligence pursuant to the Parties' business cooperation or respective business needs. The Parties shall carry out technical exchanges regarding application of artificial intelligence technology in the field of video through the mechanism as provided in Section 2.2 of this Agreement.

3

3.2 **Smart Devices/DuerOS Related Cooperation**

Subject to the compliance with applicable laws and non-infringement of the legitimate rights of any third party, the Parties shall mutually share their resources of content and channel, and use their reasonable best efforts to facilitate the promotion of DuerOS and the increase of market share of iQIYI's content; and the Parties shall grant each other the most favored treatment with respect to the cooperation as specified in this Section 3.2.

3.3 **Infrastructure and Cloud Service Cooperation**

Baidu agrees to fully support iQIYI in its needs of cloud computing infrastructure. Baidu will treat iQIYI as a highest priority cooperation partner with respect to Baidu Cloud, and shall provide cloud computing infrastructure services to iQIYI with the most favored treatment. iQIYI will use its best commercially reasonable efforts to work with Baidu to enable Baidu's cloud computing support. The Parties may discuss and set forth certain restrictive requirements for iQIYI's procurement of Infrastructure and Cloud Service, and iQIYI shall comply with such requirements.

3.4 **Advertisement Cooperation**

Baidu and iQIYI shall establish in-depth cooperation with respect to advertisement. The Parties agree to mutually recommend each other's advertising products, to explore the value of their advertising products and provide advertisers with more options. Baidu agrees to grant iQIYI priority to advertise on Baidu platform.

3.5 **Traffic Cooperation**

Baidu and iQIYI shall establish a strategic cooperation relationship with respect to traffic, and the Parties shall make full use of their respective product lines to mutually direct traffic to each other, give full play to their respective advantages and strive for maximum synergy.

3.6 **Data and Content Cooperation**

Subject to the compliance with applicable laws and non-infringement of the legitimate rights of any third party, the Parties shall actively explore in-depth cooperation with respect to data and content based on the Parties' business needs, including without limitation, realizing the connection of user accounts and content generator accounts.

3.7 **Operation Cooperation**

The Parties shall use their best commercially reasonable efforts to (a) jointly cooperate with telecommunication carriers (including China Mobile, China Telecom and China Unicom, etc.) to launch service specified cellular data cards and data plan products; and (b) conduct cross-promotion of products, including but not limited to membership, devices, self-produced and exclusive broadcasting video content.

3.8 **Baidu Providing Loan to iQIYI**

After the execution of this Agreement, Baidu will designate an Affiliate of Baidu established in the PRC to provide to an Affiliate of iQIYI established in the PRC and designated by iQIYI a RMB loan in an amount of RMB650,000,000 with a term of 5 years.

4

**4.    Non-compete**

4.1    Baidu shall not engage in the business of providing video content services that are the same with or substantially similar to the Long-form Video Business currently provided by iQIYI. Whether any service is the same with or substantially similar to the Long-form Video Business shall be determined by the Parties in a commercially reasonable manner (for the avoidance of doubt, the businesses carried out by those entities not Controlled by Baidu shall not be subject to the restrictions in this Section 4.1; and the businesses currently carried out by Baidu and its Affiliates and the businesses carried out by Beijing Xiaodu shall not be subject to the restrictions in this Section 4.1).

4.2    iQIYI shall not engage in any business that is the same or substantially similar with part or all of Baidu's core business. Whether any service is Baidu's core business or is the same with or substantially similar to Baidu's core business shall be determined by the Parties in a commercially reasonable manner (for the avoidance of doubt, the businesses carried out by those entities not Controlled by iQIYI shall not be subject to the restrictions in this Section 4.2; and the businesses currently carried out by iQIYI and its Affiliates shall not be subject to the restrictions in this Section 4.2).

4.3    The Parties acknowledge that this Section 4 shall not be deemed as improper restriction on either Party's innovative business; if any conflict arises during the implementation of this Section 4, including but not limited to the conflict in the understanding of "improper restriction", the Parties shall negotiate and resolve the relevant matters in good faith.

**5.    Cooperation Term and Termination**

5.1.    The Parties agree that subject to Section 5.2 of this Agreement and unless (i) the Parties otherwise agree to terminate this Agreement prior to expiration of the Cooperation Term; or (ii) the term of relevant cooperation has been otherwise specifically set forth in a Specific Business Cooperation Agreement based on the nature of the cooperation in the Relevant Cooperation Fields, the cooperation term of Relevant Cooperation Fields under this Agreement shall be 8 years commencing from the Signing Date (the "**Cooperation Term**"), subject to extension of another term of 8 years if mutually agreed by the Parties.

5.2.    Upon occurrence of any of the following events, any Party shall be entitled to terminate or suspend the business cooperation in the Relevant Cooperation Fields that results in the occurrence of such event by written notice to the Other Party at any time:

(1)    The cooperation in the Relevant Cooperation Fields fails to comply with applicable laws or governmental regulatory policies; or

(2)    The cooperation in the Relevant Cooperation Fields has an adverse effect on such Party's data safety or reputation.

For the avoidance of doubt, the termination or suspension of the business cooperation in the Relevant Cooperation Fields by any Party pursuant to this Section 5.2 shall only be limited to the cooperation field that results in the occurrence of any of the events specified in this Section 5.2 and shall in no event affect the Parties' cooperation in the Relevant Cooperation Fields in other aspects; and upon such termination or suspension, the terminating or suspending Party shall continue to cooperate with the Other Party for a reasonable transition period in order to maintain business stability and smooth transition.

5.3.    If iQIYI is no longer Controlled by Baidu, Inc., each Party shall be entitled to terminate this Agreement and/or all/part of the business cooperation under the Specific Business Cooperation Agreement(s) entered into according to this Agreement by delivering written notice to the Other Party, provided that under such circumstance, the terminating Party shall continue to cooperate with the other Party for a reasonable transition period in order to maintain business stability and smooth transition.

## 6.    Intellectual Property

6.1    The ownership of any materials, information and intellectual property respectively provided by the Parties for the purpose of this Agreement shall not be changed as a result of the cooperation under this Agreement. Each Party undertakes to respect and protect the intellectual property of the Other Party and shall in no event conduct any reverse engineering on the equipment and software, etc. of the Other Party.

6.2    Each Party shall not use the intellectual property of the Other Party unless within the authorized scope set forth in this Agreement or Specific Business Cooperation Agreement(s) entered into pursuant to this Agreement. Each Party undertakes not to, under any circumstances, perform any act that could infringe the intellectual property rights or other property rights of the Other Party. Each Party undertakes not to, in any event, jointly with any third party, or assist or allow any third party to, engage in any actions that would infringe the intellectual property rights or other property rights of the Other Party, .

6.3    Unless expressly agreed in this Agreement, neither Party shall use or reproduce the trademarks, logos, business information, technologies and other data of the Other Party without the prior written consent of the rights holder.

6.4    Each Party hereby agrees to indemnify the Other Party from and against any and all losses resulting from the infringement of any third party's intellectual property rights or other legal rights (i) in the performance by such Party of its obligations under this Agreement, or (ii) in connection with the products, services or materials provided by such Party.

## 7.    Confidentiality

7.1    Each Party hereby acknowledges and agrees that any oral or written information exchanged in connection with this Agreement shall be treated as confidential information. Each Party shall hold such information in strict confidence and, without the prior written consent of the Other Party, not disclose any of the confidential information to any third party, except to the extent such information: (i) has been in the public domain through no breach of the confidentiality obligations by such Party; (ii) is required to be disclosed according to applicable laws, regulations, or requirements of any stock exchange; or (iii) is disclosed by a Party to its counsels or financial advisers to the extent necessary for the performance of this Agreement so long as such persons are under equal nondisclosure obligations. The disclosure of information by any employee or professional advisors of any Party shall be deemed as the disclosure of information by such Party, and such Party shall bear the liabilities for breach of contract.

7.2    This Section shall remain in force in the event any other provisions are held to be invalid, unenforceable, revised, removed or terminated for any reasons.

## 8.    Tax Payment

The Parties shall pay their respective taxes in connection with the performance of this Agreement to the relevant tax authorities in accordance with the applicable laws, regulations, and policies.

6

**9.    Representations, Warranties and Covenants**

The Parties hereby represent and warrant to each other that as of the date hereof and at any time within the term of this Agreement:

9.1    It is a company or partnership duly established, validly existing and in good standing;

9.2    It has all requisite power and authority to execute this Agreement; and its authorized representative has been duly and fully authorized to execute this Agreement on its behalf;

9.3    It has the requisite corporate power and authority to perform its obligations under this Agreement; and such performance shall not violate, or be in conflict with, any applicable laws, regulations, its articles of associations and other charter documents, or any other legally binding document.

**10.    Force Majeure**

10.1    "**Force Majeure**" in this Agreement means any objective events which are unforeseeable as of the date hereof, unavoidable and the consequences of which are unable to be overcome by the Parties, with such objective events including without limitation: flood, fire, wars, national policies, government mandates or intervention, restrictions of laws.

10.2    If either Party is prevented from performing any of its obligations due to an event of Force Majeure, it shall inform the Other Party in writing within three (3) days and provide the Other Party written proof with legal effect issued by the relevant institution within fourteen (14) days.

10.3    If an event of Force Majeure results in the failure of performance of the obligations under this Agreement or the termination of this Agreement, neither Party shall be deemed to have breached this Agreement.

**11.    Governing Law and Dispute Resolution**

11.1    The execution, interpretation, construction, performance and enforcement of this Agreement and the resolution of dispute(s) arising out of this Agreement shall be governed by and construed in accordance with the laws of the PRC without regard to principles of conflict of laws thereunder.

11.2    Any dispute arising out of or relating to the interpretation or performance of this Agreement shall be resolved through negotiation in good faith. If such dispute cannot be resolved by negotiation, the dispute shall be submitted to the China International Economic and Trade Arbitration Commission for arbitration in Beijing in accordance with its arbitration rules in effect by then. The award of the arbitration shall be final and binding upon the Parties. During the dispute settlement period, the Parties shall continue to perform the other articles of this Agreement except for the dispute matters.

**12.    Liability for Breach of Contract**

12.1    If any Party materially breaches any of its representations, warranties, covenants and/or fails to use the intellectual property of the Other Party in accordance with the terms of this Agreement, such Party shall be deemed to be in breach of this Agreement and shall assume liabilities for breach of contract.

7

12.2 The breaching Party shall indemnify the non-breaching Party against any and all losses incurred by the non-breaching Party in relation to breach by the breaching Party. The amount of damages paid by the breaching Party to the non-breaching Party for the breach shall be the actual losses incurred by the non-breaching Party as a result of such breach.

12.3 The Parties agree that if any provision of this Agreement were not performed in accordance with the terms thereof or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and the Parties shall be entitled to specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled pursuant to this Agreement or applicable laws; provided that such specific performance shall not be applicable if the breaching Party is objectively incapable to specifically perform such provisions.

12.4 If cessation of certain cooperation hereunder by either Party results from violations of applicable laws or national policies, such Party shall be entitled to terminate the relevant cooperation as set forth in this Agreement and neither Party shall have any liability to the Other Party in connection with such termination. For the avoidance of doubt, either Party's right to terminate the cooperation under this Section 12.4 shall only be limited to the part in violation of applicable laws or national policies and shall in no event affect the other parts of this Agreement.

**13.   Miscellaneous**

13.1 This Agreement may not be amended or modified except by an instrument in writing signed by the Parties. The amendment and modification of this Agreement duly executed by the Parties shall constitute an integral part of this Agreement with the same legal effect.

13.2 This Agreement shall become effective upon execution by the authorized representatives of the Parties as of the date first above written, and will be automatically terminated upon expiration or termination of the Cooperation Term (including the extended term) set forth in Section 5 of this Agreement.

13.3 No failure on the part of any Party to exercise, and no delay on its part in exercising any right or remedy under this Agreement shall operate as a waiver thereof, nor shall preclude any further exercise of such right or remedy by such Party.

13.4 If any provision in this Agreement is held invalid or unenforceable, such invalidity or unenforceability will not affect the validity and enforceability of the other provisions. Under such circumstances, the Parties shall negotiate in good faith to agree on a provision which comes closest to the original intent of the Parties and to the satisfaction of both Parties to replace the invalid, illegal or unenforceable provision.

13.5 The headings in this Agreement are for convenience of reference only and shall not be used to construe or interpret this Agreement.

13.6 This Agreement shall be executed in two counterparts, and both shall have equal validity and legal effect. This Agreement shall be executed in English and Chinese, and the English version shall prevail in the event of any inconsistency between the two versions.

[Remainder of page intentionally left blank]

8

IN WITNESS WHEREOF, the Parties hereto have caused their respective duly authorized representatives to execute this Agreement as of the date first written above.

Baidu Holdings Limited

By:     /s/ Robin Yanhong Li
Name:   Robin Yanhong Li
Title:

[Signature Page to Master Business Cooperation Agreement]

IN WITNESS WHEREOF, the Parties hereto have caused their respective duly authorized representatives to execute this Agreement as of the date first written above.

iQIYI, Inc.

By:    /s/ Yu Gong
Name:  Yu Gong
Title:

[Signature Page to Master Business Cooperation Agreement]

**Exhibit 10.6**

**Execution Version**

**NOTE PURCHASE AGREEMENT**

This NOTE PURCHASE AGREEMENT, dated as of January 11, 2017 (this "Agreement"), is entered into by and among Qiyi.com, Inc., an exempted company incorporated under the laws of the Cayman Islands (the "Company") and the parties listed on Schedule 1 attached hereto (each party listed on Part A of Schedule 1, a "G1 Investor", and collectively, the "G1 Investors"; each party listed on Part B of Schedule 1, a "G2 Investor", and collectively, the "G2 Investors"; and the G1 Investors and G2 Investors collectively, the "Investors").

**RECITALS**

WHEREAS, subject to the terms and conditions set forth herein, (i) the Company desires to issue and sell to each G1 Investor, and each G1 Investor, severally and not jointly, desires to purchase from the Company, certain convertible promissory note(s) in substantially the form attached hereto as Exhibit A-1 (each, a "G1 Note", and collectively, the "G1 Notes") in the principal amount(s) set forth opposite such G1 Investor's name on Schedule 1, which shall be convertible into certain shares of the Company (the "G1 Conversion Shares"), and (ii) the Company desires to issue and sell to each G2 Investor, and each G2 Investor, severally and not jointly, desires to purchase from the Company, certain convertible promissory note(s) in substantially the form attached hereto as Exhibit A-2 (each, a "G2 Note", and collectively, the "G2 Notes"; the G1 Notes and G2 Notes collectively, the "Notes"), which shall be convertible into certain shares of the Company (the "G2 Conversion Shares", and collectively with the G1 Conversion Shares, the "Conversion Shares") at the per share conversion price and on the other terms stated therein.

NOW, THEREFORE, in consideration of the above premises and the agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I.**
**DEFINITIONS**

1.1 Definitions. As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings indicated:

"Adverse Legal Development" has the meaning set forth in the Sixth Restated Articles.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or under common control with, the Person specified, including, in the case of the Investors, any investment capital fund now or hereafter existing which is controlled by, or under the common control of, substantially the same principal(s) that control the Investors. Notwithstanding the foregoing, the parties acknowledge and agree that (a) the name "Sequoia Capital" is commonly used to describe a variety of entities (collectively, the "Sequoia Entities") that are affiliated by ownership or operational relationship and engaged in a broad range of activities related to investing and securities trading and (b) notwithstanding any other provision of the Transaction Documents to the contrary, the Transaction Documents shall not be binding on, or restrict the activities of, any Sequoia Entity outside of the Sequoia China Sector Group. For purposes of the foregoing, the "Sequoia China Sector Group" means all Sequoia Entities (whether currently existing or formed in the future) that are principally focused on companies located in, or with connections to, the PRC.

"Agreement" has the meaning set forth in the preamble, as amended, supplemented or modified from time to time in accordance with the terms hereof.

"Baidu" means Baidu Holdings Limited, a company incorporated under the laws of the British Virgin Islands.

"Basket" has the meaning set forth in Section 8.4 of this Agreement.

"Beijing WFOE" means Beijing Qiyi Century Science & Technology Co., Ltd. (" 北京奇艺世纪科技有限公司 "), a wholly foreign-owned enterprise established under the laws of the PRC.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, Hong Kong or the PRC are authorized or required by law or executive order to close.

"Centre" has the meaning set forth in Section 10.9(b).

"Chongqing WFOE" means Chongqing Qiyi Tianxia Science & Technology Co., Ltd. (" 重庆奇艺天下科技有限公司 "), a wholly foreign-owned enterprise established under the laws of the PRC.

"Circular 37" means Circular 37 issued by SAFE on July 14, 2014, including any amendment, implementing rules, or official interpretation thereof, and any other rules and circulars issued by SAFE regulating filings or registrations of round-trip investment.

"Closing" has the meaning set forth in Section 2.2 of this Agreement.

"Closing Date" has the meaning set forth in Section 2.2 of this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement.

"Consideration" has the meaning set forth in Section 2.1 of this Agreement.

"Contractual Obligations" means, as to any Person, any provision of any security or financial instrument, issued by such Person or of any agreement, undertaking, contract, license, engagement, lease, indenture, mortgage, deed of trust, purchase order, commitment or other instrument or contractual arrangement, to which such Person is a party or by which it or any of its property is bound.

"Control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person (including without limitation, the power to determine or cause the determination of equity investment), whether through the ownership of voting securities, by contract or otherwise.

2

"Control Documents" means the exclusive technology consulting and service agreements ( 独家技术咨询和服务协议 ), business operation agreements ( 业务经营协议 ), business cooperation agreements ( 业务合作协议 ), software license contracts ( 软件使用许可 合同 ), trademark license agreements ( 商标许可协议 ), exclusive option agreements ( 独家购 买权合同 ), voting rights proxy agreements ( 股东表决权委托行使协议 ), loan agreements ( 借款协议 ), and equity pledge agreements ( 股权质押协议 ) entered into between the Beijing WFOE, on one hand, and the applicable Domestic Enterprises and/or their shareholders, on the other hand, for the purpose of consolidating the financial statements of the Domestic Enterprises by the Company in accordance with the US GAAP.

"Conversion Shares" has the meaning set forth in the recitals of this Agreement.

"Disclosure Schedule" means the schedule to be provided to the Investors by the Company attached hereto as Exhibit B.

"Domestic Enterprise" means each of (i) Beijing Dingxin Tianxia Science & Technology Co., Ltd. (" 北京鼎新天下科技有限公司 "), a limited liability company organized under the laws of the PRC, (ii) Beijing IQIYI Science & Technology Co., Ltd. (" 北 京爱奇艺科技有限公司 "), a limited liability company organized under the laws of the PRC, (iii) Shanghai IQIYI Culture Media Co., Ltd. (" 上海爱奇艺文化传媒有限公司 "), a limited liability company organized under the laws of the PRC and (iv) Shanghai Zhong Yuan Network Co., Ltd. (" 上海众源网络有限公司 "), a limited liability company organized under the laws of the PRC, and collectively, the "Domestic Enterprises".

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interest (whether or not issued by such Person).

"Financial Statements" has the meaning set forth in Section 6(a) of Schedule 2.

"G1 Conversion Shares" has the meaning set forth in the recitals of this Agreement.

"G1 Investors" has the meaning set forth in the preamble to this Agreement.

"G1 Notes" has the meaning set forth in the recitals of this Agreement.

"G2 Conversion Shares" has the meaning set forth in the recitals of this Agreement.

"G2 Investors" has the meaning set forth in the preamble to this Agreement.

"G2 Notes" has the meaning set forth in the recitals of this Agreement.

3

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any stock exchange or its governing body.

"Group Company" means each of the Company, the HK Subsidiary, the PRC Entities, together with their respective Subsidiaries, and "Group" refers to all of Group Companies collectively.

"HK Subsidiary" means Qiyi.com HK Limited, a company limited by shares incorporated under the laws of Hong Kong.

"Hong Kong" means the Hong Kong Special Administration Region of the PRC.

"Indemnified Party" has the meaning set forth in Section 8.1 of this Agreement.

"Indemnifying Party" has the meaning set forth in Section 8.1 of this Agreement.

"Initial Public Offering" means an initial public offering of any Equity Securities of the Company on New York Stock Exchange, NASDAQ Stock Market, the Hong Kong Stock Exchange or such other stock exchange approved by the Board of Directors.

"Investors" has the meaning set forth in the preamble to this Agreement.

"Key Employee" means each person listed in Schedule 4 attached hereto.

"Litigation" has the meaning set forth in Section 9(a) of Schedule 2 attached hereto.

"Long Stop Date" has the meaning set forth in Section 9.1 of this Agreement.

"Losses" has the meaning set forth in Section 8.1 of this Agreement.

"Material Adverse Effect" means any change, event, circumstance or effect, individually or when taken together with all other changes, events, circumstances, or effects that have occurred prior to the date of determination of the occurrence of the Material Adverse Effect, that (i) is, or would reasonably be expected to be, materially adverse to the business, operations, assets (including intangible assets), liabilities, condition (financial or otherwise), property, results of operations of the Group Companies, as a whole, or (ii) is or would reasonably be expected to materially impair the validity or enforceability of this Agreement or any of the other Transaction Documents against the Company or (iii) is or would reasonably be expected to materially and adversely affect the Company's ability to perform its material obligations under this Agreement, or any other Transaction Document, or in connection with the transactions contemplated hereunder or thereunder; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute a Material Adverse Effect, nor shall any change, event or circumstance relating to or resulting from any of the following be taken into account in determining whether a Material Adverse Effect has occurred or would result: (i) general economic conditions in global or Chinese markets (including financial, banking, credit, currency and capital markets); (ii) fluctuations in currency exchange rates; (iii) conditions generally affecting the industry in which the Group Companies operate (but excluding any changes in applicable Requirements of Law or US GAAP that would, or would reasonably be expected to, result in a "Redemption Trigger Event" (as defined in the Sixth Restated Articles)); (iv) the commencement or material worsening of a war or armed hostilities or other national or international calamity, or the occurrence of any military or terrorist attack; (v) acts of God or natural disasters; and (vi) any actions taken, or failures to take action pursuant to or in accordance with this Agreement or at the request of the Investors or any change, event or circumstance solely resulting from such actions or failures to take action; which, in the case of any of the foregoing clauses (i) through (v) does not disproportionately affect the Group Companies, taken as a whole, relative to other comparable companies in the industries in which they operate.

4

"Notes" has the meaning set forth in the recitals of this Agreement.

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Ordinary Shares" means the ordinary shares of the Company with a par value of US$0.00001 each.

"Person" means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"Permitted Liens" means (i) liens disclosed on the Financial Statements, (ii) liens for taxes not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Financial Statements), or (iii) liens which do not materially detract from the value or materially interfere with any present or intended use of any property or assets of the Company and/or the Group Companies.

"PRC" means the People's Republic of China excluding, for the purpose of this Agreement, Hong Kong, Macau and Taiwan.

"PRC Entities" means the Beijing WFOE, the Chongqing WFOE, the Domestic Enterprises and each of their respective Subsidiaries.

"Qualified Financing" means the Company's next preferred shares financing transaction on or before the first anniversary of the Closing Date, either (i) with a total investment amount or subscription price in such next preferred shares financing transaction of no less than US$100,000,000, which for the avoidance of doubt shall not include the principal amount of the Notes, or (ii) with the number of shares newly issued in such next preferred shares financing transaction constituting no less than 5% of the Company's total issued and outstanding share capital immediately prior to the consummation of such transaction, which for the avoidance of doubt shall not include the Conversion Shares.

"Requirements of Law" means, as to any Person, any law, statute, treaty, rule, regulation, order, right, privilege, qualification, license or franchise or determination of an arbitrator or a court or other Governmental Authority or stock exchange, in each case applicable or binding upon such Person or any of its property or to which such Person or any of its property is subject or pertaining to any or all of the transactions contemplated or referred to herein.

5

"SAFE" means the State Administration of Foreign Exchange of the PRC.

"Series A Preferred Shares" means the series A preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series A-1 Junior Preferred Shares" means the series A-1 junior preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series B Preferred Shares" means the series B preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series C Preferred Shares" means the series C preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series D Preferred Shares" means the series D preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series E Preferred Shares" means the series E preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series F Preferred Shares" means the series F preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series G Preferred Shares" means, collectively, the Series G1 Preferred Shares and the Series G2 Preferred Shares.

"Series G1 Preferred Shares" means the series G1 preferred shares of the Company with a par value of US$0.00001 each, to be issued by the Company to the G1 Investors upon conversion of the G1 Notes at the election of the Company in accordance with the terms and conditions of the G1 Notes and containing the terms set forth in the Terms of Series G.

"Series G2 Preferred Shares" means the series G2 preferred shares of the Company with a par value of US$0.00001 each, to be issued by the Company to the G2 Investors upon conversion of the G2 Notes at the election of the Company in accordance with the terms and conditions of the G2 Notes and containing the terms set forth in the Terms of Series G.

"Shareholders Agreement" means the Fifth Amended and Restated Shareholders Agreement dated November 11, 2014 between the Company and the parties named therein.

6

"Sixth Restated Articles" means the Sixth Amended and Restated Memorandum and Articles of Association of the Company as adopted on, and effective as of, November 11, 2014.

"Subsidiaries" means, as of the relevant date of determination, (i) with respect to any Person, any other Person of which more than 50% of the voting power of the outstanding voting securities or more than 50% of the outstanding economic equity interest or ownership is held, directly or indirectly, by such Person and (ii) with respect to any Group Company, any other Person of which actual or *de facto* Control is held, directly or indirectly, by the applicable Group Company. Unless otherwise qualified, or the context otherwise requires, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of any of the Group Company.

"Tax" means all forms of taxation, estate, duties, deductions, withholdings, duties, imposts, levies, fees, charges, social security contributions and rates imposed, levied, collected, withheld or assessed by any local, municipal, regional, urban, state, federal or other governmental body in the PRC or any other jurisdiction and any interest, additional taxation, penalty, surcharge or fine in connection therewith.

"Terms of Investor Rights" means the terms and conditions of certain rights and provisions of the Investors upon conversion of the Notes at the election of the Company in the form attached hereto as Exhibit D.

"Terms of Series G" means the terms and conditions in respect of the Series G Preferred Shares in the form attached hereto as Exhibit C.

"Terms of Irrevocable Voting Undertaking and Proxy" means the terms and conditions of certain irrevocable voting undertaking and proxy and power of attorney in the form attached hereto as Exhibit E to be entered into by the G2 Investors holding G2 Conversion Shares immediately prior to and as a condition to the conversion of such G2 Notes into G2 Conversion Shares.

"Transaction Documents" means, collectively, this Agreement and the Notes.

"US GAAP" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, as codified and described in FASB Statement No. 168, The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles.

"US$" means the United States Dollar, the law currency of the United States of America.

1.2 Rules of Construction.

7

Interpretation of this Agreement shall be governed by the following rules of construction: (i) the words such as "herein," "hereinafter," "hereof," "hereby," "hereto," "hereunder" and derivative or similar words refer to this entire Agreement, including any Schedules or Exhibits hereto, as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (ii) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (iii) references to the terms Article, Section, Schedule and Exhibit are references to the Articles, Sections, Schedules and Exhibits to this Agreement, unless otherwise specified; (iv) references to "US$" shall mean U.S. dollars; (v) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (vi) the word "or" shall not be exclusive; (vii) references to "written" or "in writing" include in electronic form; (viii) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (ix) the parties hereto have each participated in the negotiation and drafting of this Agreement and if any ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any party by virtue of the authorship of any of the provisions in this Agreement or any interim drafts thereof; (x) a reference to any Person includes such Person's successors and permitted assigns; (xi) any reference to "days" means calendar days unless Business Days are expressly specified; and (xii) when calculating the period of time before which, within which or following which any act is to be done or any step is taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

## ARTICLE II.
## PURCHASE AND SALE OF NOTES

2.1 Purchase and Sale of Notes.

Subject to the terms and conditions set forth herein and in the G1 Notes and G2 Notes, as applicable, (i) the Company agrees to issue and sell to each G1 Investor, and each G1 Investor, severally but not jointly, agrees to purchase from the Company, at the Closing, certain G1 Note (s) in the principal amount(s) set forth opposite such G1 Investor's name on Part A of Schedule 1, and (ii) the Company agrees to issue and sell to each G2 Investor, and each G2 Investor, severally but not jointly, agrees to purchase from the Company, at the Closing, certain G2 Note(s) in the principal amount(s) set forth opposite such G2 Investor's name on Part B of Schedule 1, in each case, for the amount of cash set forth opposite such Investor's name on Schedule 1 (the "Consideration").

2.2 Closing; Delivery.

(a) Unless this Agreement shall have terminated pursuant to Article IX, and subject to the satisfaction or waiver of the conditions set forth in Articles V and VI, the closing of the sale and purchase of the Notes (the "Closing,") shall take place remotely via the exchange of documents and signatures, as soon as practicable (but not later than the tenth (10th) Business Day) following the date upon which the conditions set forth in Articles V and VI shall be satisfied or waived in accordance with this Agreement, or at such other time and place that the Company and the Investors may agree in writing (the "Closing Date").

(b) On the Closing Date:

8

(i) each Investor shall deliver to the Company the Consideration as set forth opposite its name on <u>Schedule 1</u>, by wire transfer of immediately available funds to an account designated by the Company (which shall be provided to such Investor in writing at least five (5) Business Days prior to the Closing);

(ii) each Investor shall deliver to the Company the applicable Note(s) counter-signed by such Investor, agreeing to be bound by the terms and conditions of such Note(s); and

(iii) the Company shall issue and deliver to such Investor the applicable Note(s) as set forth opposite such Investor's name on <u>Schedule 1</u>.

2.3 <u>Use of Proceeds</u>.

The proceeds from the sale of the Notes to the Investors shall be used for general working capital purposes and capital expenditures of the Group Companies, subject to the approval by the Board of Directors in accordance with the Shareholders Agreement and the Sixth Restated Articles.

2.4 <u>Terms of Conversion Shares</u>.

(a) In the event that the Notes are converted upon the closing of the Qualified Financing in accordance with the terms and conditions of the Notes, the Conversion Shares will be subject to the same general terms and conditions applicable to the Equity Securities of the Company issued in the Qualified Financing, <u>provided</u> that, prior to the Initial Public Offering, the G2 Conversion Shares shall be non-voting shares and shall not entitle the holders of such G2 Conversion Shares to vote at any meeting of shareholders or any class of shareholders of the Company or to execute any written consent to, or dissent from, any matter in respect of which the shareholders or any class of shareholders of the Company are sought to express such consent or dissent without a meeting (including but not limited to the signing of resolutions in writing of the shareholders or any class of shareholders of the Company). Notwithstanding the foregoing, if the terms and conditions applicable to the Equity Securities issued in the Qualified Financing are less favorable than those contained in the Terms of Series G and the Terms of Investor Rights as set forth in <u>Exhibit C</u> and <u>Exhibit D,</u> respectively, the Investor holding the applicable Note(s) shall have the right to elect that the Terms of Series G and the Terms of Investor Rights shall instead apply to the conversion of such Note upon the closing of the Qualified Financing.

(b) In the event that the Notes are converted at the election of the Company in accordance with the terms and conditions of the Notes, (i) the Company agrees that, immediately prior to such conversion of the Notes, it will take all reasonable actions to adopt an amended and restated memorandum and articles of association of the Company, authorizing the issuance of Series G Preferred Shares and incorporating the Terms of Series G; and (ii) the Company and each Investor agrees that, upon such conversion of the Notes, the Company and each Investor shall enter into an amended and restated shareholders agreement, in a form to be agreed between the Company and the Investors and incorporating the Terms of Investor Rights.

2.5 <u>Dual-class Share Structure</u>.

9

In the event that the Notes are converted into Conversion Shares, each of the Investors hereby agree that the Company shall adopt a dual class ordinary share structure immediately prior to the completion of the Initial Public Offering, to the extent permitted by Laws applicable in the jurisdiction where the Company seeks to conduct the Initial Public Offering, such that (i) the Ordinary Shares will consist of Class A ordinary shares and Class B ordinary shares, with holders of Class A ordinary shares being entitled to one vote per share in respect of matters requiring the votes of shareholders while holders of Class B ordinary shares being entitled to more than one vote per share, (ii) Baidu and its Affiliates shall hold Class B ordinary shares and all other shareholders shall hold Class A ordinary shares, and (iii) Class A ordinary shares or the depositary shares representing Class A ordinary shares shall be listed on a stock exchange in the jurisdiction where the Company conducts the Initial Public Offering and tradable subject to restrictions under applicable Laws. Each of the Investors agrees that the number of votes represented by each Class B ordinary shares shall be fixed by Baidu in its discretion to ensure that the voting power held by Baidu and its Affiliates represent more than 50% of the total voting power of the Company immediately after the Initial Public Offering. Each of the Investors agrees and undertakes to take all necessary actions, including by means of voting at each meeting of shareholders of the Company or in lieu of any such meeting giving its written consent with respect to, as the case may be, all of its voting securities of the Company as may be necessary, to support and adopt the dual class ordinary share structure as described above in this paragraph.

### ARTICLE III.
### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to each Investor that, except as set forth in the Disclosure Schedule, the representations and warranties set forth in Schedule 2 are true and correct as of the date hereof and the Closing Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date) and acknowledges that each Investor in entering into this Agreement is relying on such representations and warranties.

### ARTICLE IV.
### REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each of the Investors hereby, severally but not jointly, represents and warrants to the Company that the representations and warranties set forth in Schedule 3 are true and correct as of the date hereof and the Closing Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date) and acknowledges that the Company in entering into this Agreement is relying on such representations and warranties.

### ARTICLE V.
### CONDITIONS TO THE OBLIGATION OF THE INVESTORS TO CLOSE

The obligation of each of the Investors to purchase the Notes and to pay the Consideration therefor, severally but not jointly, at the Closing shall be subject to the satisfaction as determined by, or waiver in writing by, such Investor of the following conditions on or before the Closing Date.

10

5.1 <u>Representation and Warranties</u>. Each of the representations and warranties of the Company contained in <u>Article III</u> hereof (a) that are qualified by materiality or Material Adverse Effect shall be true and correct as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date), and (b) that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date); <u>provided</u>, <u>however</u>, that in the event of a breach of a representation or warranty (other than those set forth in <u>Section 1</u> (Corporate Matters), <u>Section 2</u> (Authorization and Validity of Transactions), and <u>Section 3</u> (Legal Compliance) of <u>Schedule 2</u> hereto), the condition set forth in this <u>Section 5.1</u> shall be deemed satisfied, unless the effect of all such breaches of representations and warranties taken as a whole result in a Material Adverse Effect.

5.2 <u>Compliance with Agreement</u>s. The Company shall have performed and complied in all material respects with all of its agreements, obligations and conditions set forth in this Agreement that are required to be performed or complied with by it on or before the Closing Date.

5.3 <u>Compliance Certificate.</u> At the Closing, the Company shall have delivered a written certification dated the Closing Date in form and substance reasonably satisfactory to the Investors certifying that the conditions specified in <u>Section 5.1</u> and <u>Section 5.2</u> have been satisfied.

5.4 <u>Legal Opinion.</u> Such Investor shall have received a legal opinion issued by Walkers, the Company's Cayman counsel, addressed to such Investor and dated as of the Closing Date.

5.5 <u>No Material Adverse Change and Adverse Legal Development</u>. Since the date hereof, there shall have been no event or circumstances having a Material Adverse Effect and there shall have been no Adverse Legal Development.

5.6 <u>Consents and Approvals</u>. All consents, exemptions, authorizations, or other actions by, or notice to, or filings with, Governmental Authorities and other Persons in respect of all Requirements of Law and with respect to Contractual Obligations of the Company which are necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Company of this Agreement and each of the other Transaction Documents shall have been obtained and be in full force and effect, and any notice or other similar periods in connection with any regulatory actions of Governmental Authorities shall have expired without any action being taken or threatened.

5.7 <u>No Material Judgment or Order</u>. There shall not be on the Closing Date any Order of a court of competent jurisdiction or any ruling of any Governmental Authority or any condition imposed under any Requirement of Law which would (a) prohibit or restrict (i) the purchase and sale of the Notes or (ii) the consummation of the transactions contemplated by this Agreement or any other Transaction Document, or (b) materially restrict the operation of the business of any of the Group Companies as conducted on the date hereof.

5.8 <u>No Litigation</u>. No action, suit, proceeding, claim or dispute shall have been brought or otherwise arisen at law, in equity, in arbitration or before any Governmental Authority against any of the Group Companies which could, if adversely determined, have a Material Adverse Effect on the Group, taken as a whole.

11

5.9 <u>Proceedings and Documents.</u> All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions (including corporate resolutions and good standing certificate dated no earlier than ten (10) Business Days prior to the Closing) shall be reasonably satisfactory in substance and form to such Investor, and such Investor shall have received all such counterpart originals or certified or other copies of such documents as it may reasonably request.

## <u>ARTICLE VI.</u>

### <u>CONDITIONS TO THE OBLIGATION OF THE COMPANY TO CLOSE</u>

The obligation of the Company to issue and sell the Notes to each of the Investors at the Closing shall be subject to the satisfaction or waiver of the following conditions on or before the Closing Date:

6.1 <u>Representation and Warranties.</u> Each of the representations and warranties of such Investor contained in Article IV hereof shall be true and correct in all material respects as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date).

6.2 <u>Compliance with this Agreement</u>. Such Investor shall have performed and complied in all material respects with all of its agreements, obligations and conditions set forth herein that are required to be performed or complied with by such Investor on or before the Closing Date.

6.3 <u>Compliance Certificate.</u> At the Closing, such Investor shall have delivered a written certification dated the Closing Date in form and substance reasonably satisfactory to the Company certifying that the conditions specified in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied.

6.4 <u>Payment of Consideration</u>. Each Investor shall have paid the applicable Consideration for the Notes to be purchased by such Investor at the Closing.

6.5 <u>Consents and Approvals.</u> All consents, exemptions, authorizations, or other actions by, or notice to, or filings with, Governmental Authorities and other Persons in respect of all Requirements of Law in connection with the execution, delivery or performance by, or enforcement against, such Investor of this Agreement and each of the other Transaction Documents shall have been obtained and be in full force and effect, and any notice or other similar periods in connection with any regulatory actions of Governmental Authorities applicable to such Investor shall have expired without any action being taken or threatened.

6.6 <u>No Material Judgment or Order</u>. There shall not be on the Closing Date any Order of a court of competent jurisdiction or any ruling of any Governmental Authority or any condition imposed under any Requirement of Law which would (a) prohibit or restrict (i) the issuance and sale of the Notes or (ii) the consummation of the transactions contemplated by this Agreement or any other Transaction Document, or (b) materially restrict the operation of the business of any of the Group Companies as conducted on the date hereof.

12

## ARTICLE VII.

## COVENANTS

7.1 Further Assurances. Each party hereto shall execute such documents and perform such further acts (including obtaining any consents, exemptions, authorizations or other actions by, or giving any notices to, or making any filings with, any Governmental Authority or any other Person) as may be reasonably required to carry out or to perform the provisions of this Agreement and to give effect to the terms and intent of this Agreement, including the satisfaction of all conditions set forth in Article V and Article VI above.

7.2 Information. From the date hereof until the earlier of the Closing or the termination pursuant to Section 9.1, (a) the Company shall promptly notify the Investors of any Litigation commenced or threatened in writing against any Group Company, and (b) each party hereto shall promptly notify other parties hereto of any breach, violation or non-compliance of any of its representations, warranties or covenants hereunder by such party.

7.3 Completion of SAFE Registration. Each of the Investors shall use their respective best efforts to complete their respective registration or filing as required by Circular 37.

7.4 Voting Undertaking and Proxy. In the event that any G2 Notes shall have been converted into G2 Conversion Shares, each G2 Investor holding such G2 Conversion Shares shall, immediately prior to and as a condition to such conversion, execute and deliver to Baidu an irrevocable voting undertaking and an irrevocable voting proxy and power of attorney incorporating the Terms of Irrevocable Voting Undertaking and Proxy.

7.5 Compliance with Laws. The Company shall, and shall procure each of the Group Companies to, use its commercially reasonable efforts to comply with applicable laws of the jurisdiction of its incorporation as well as applicable requirements of the competent Governmental Authorities that are necessary for operation of its business.

## ARTICLE VIII.

## INDEMNIFICATION

8.1 Indemnification. Except as otherwise provided in this Article VIII, (a) the Company, on the one hand, and (b) each Investor, severally but not jointly, on the other hand, (each, an "Indemnifying Party") agree to indemnify, defend and hold harmless each member of the other group and their respective Affiliates and the respective officers, directors, agents, employees, partners, members and Controlling persons of such member and its Affiliates (each, an "Indemnified Party") to the fullest extent permitted by law from and against any and all losses, Litigation, or written threats thereof (including any Litigation by a third party), damages, expenses (including reasonable fees, disbursements and other charges of counsel incurred by the Indemnified Party in any action between the Indemnifying Party and the Indemnified Party or between the Indemnified Party and any third party or otherwise) or other liabilities (collectively, "Losses") resulting from or arising out of any breach of any representation or warranty, covenant or agreement in this Agreement by the Indemnifying Party.

13

8.2    <u>Notification of Third Party Claim</u>. Each Indemnified Party under this <u>Article VIII</u> shall, promptly after the receipt of notice of the commencement of any Litigation by a third party against such Indemnified Party in respect of which indemnity may be sought from the Indemnifying Party under this <u>Article VIII</u>, notify the Indemnifying Party in writing of the commencement thereof. The omission of any Indemnified Party to so notify the Indemnifying Party of any such action shall not relieve the Indemnifying Party from any liability which it may have to such Indemnified Party (a) other than pursuant to this <u>Article VIII</u> or (b) under this <u>Article VIII</u> unless, and only to the extent that, such omission results in the Indemnifying Party's forfeiture of substantive rights or defenses which are material. In case any such Litigation shall be brought against any Indemnified Party, and it shall notify the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to assume the defense thereof at its own expense, with counsel satisfactory to such Indemnified Party in its reasonable judgment; <u>provided</u>, <u>however</u>, that any Indemnified Party may, at its own expense, retain separate counsel to participate in such defense at its own expense. Notwithstanding the foregoing, in any Litigation in which both the Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, are, or are reasonably likely to become, a party, such Indemnified Party shall have the right to employ separate counsel at the Indemnifying Party's expense and to control its own defense of such Litigation if, in the reasonable opinion of counsel to such Indemnified Party, either (x) one or more defenses are available to the Indemnified Party that are not available to the Indemnifying Party or (y) a conflict or potential conflict exists between the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, that would make such separate representation advisable; <u>provided</u>, <u>however</u>, that the Indemnifying Party (i) shall not be liable for the fees and expenses of more than one counsel to all Indemnified Parties and (ii) shall reimburse the Indemnified Parties for all of such fees and expenses of such counsel incurred in any action between the Indemnified Parties and any third party, as such expenses are incurred. The Indemnifying Party agrees that it will not, without the prior written consent of each Indemnified Party, settle, compromise or consent to the entry of any judgment in any pending or threatened Litigation relating to the matters contemplated hereby (if such Indemnified Party is a party thereto or has been actually threatened to be made a party thereto) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising or that may arise out of such Litigation. The Indemnifying Party shall not be liable for any settlement of any Litigation effected against an Indemnified Party without its written consent, which shall not be unreasonably withheld. The rights accorded to an Indemnified Party hereunder shall be in addition to any rights that any Indemnified Party may have at common law, by separate agreement or otherwise; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing in this <u>Article VIII</u> shall restrict or limit any rights that any Indemnified Party may have to seek equitable relief.

14

8.3 <u>Contribution</u>. If the indemnification provided for in this <u>Article VIII</u> from the Indemnifying Party is unavailable to an Indemnified Party in respect of any Losses, the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Losses, as well as any other relevant equitable considerations. The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the Losses referred to above shall be deemed to include, subject to the limitations set forth in <u>Sections 8.1</u> and <u>8.2</u>, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding.

8.4 <u>Limitation of Liability</u>. An Indemnifying Party shall not have liability for any breach of any representation or warranty unless the aggregate amount of Losses incurred by the Indemnified Party and indemnifiable thereunder based upon, attributable to or resulting from the failure of any of the representations or warranties to be true and correct exceeds US$3,000,000 (the "<u>Basket</u>"), and, in such event, the Indemnifying Party shall be required to indemnify the entire amount of all such Losses; <u>provided</u>, <u>however</u>, that the foregoing Basket shall not apply to any Losses related to the failure to be true and correct of any of the representations and warranties set forth in <u>Section 1</u> (Corporate Matters) and <u>Section 2</u> (Authorization and Validity of Transactions) of <u>Schedule 2</u> hereto. The aggregate liability of the Indemnifying Party hereunder to each Indemnified Party for any breach of any representation or warranty shall not exceed the aggregate Consideration for the purchase of the applicable Notes. None of the parties shall have any liability for speculative, indirect, punitive, unforeseeable or consequential damages or lost profits resulting from any legal action or claim arising out of or relating to this Agreement.

<div align="center">

**ARTICLE IX.**
**TERMINATION OF AGREEMENT**

</div>

9.1 <u>Termination</u>. This Agreement may be terminated prior to the Closing:

(a) at any time on or prior to the Closing, by mutual written consent of the Company and the Investors;

(b) at the election of the Company or the Investors by written notice to the other parties hereto at any time after September 30, 2017, if the Closing shall not have occurred by such date (the "<u>Long Stop Date</u>"), unless such date is extended by the mutual written consent of the Company and the Investors; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 9.1(b)</u> shall not be available to any party whose breach of any representation, warranty, covenant or agreement under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c) at the election of the Investors, if there has been a material breach of any representation, warranty, covenant or agreement on the part of the Company contained in this Agreement, which breach has not been cured within twenty (20) Business Days after delivery of written notice to the Company of such breach; or

(d) at the election of the Company, with respect to any Investor, if there has been a material breach of any representation, warranty, covenant or agreement on the part of such Investor contained in this Agreement, which breach has not been cured within twenty (20) Business Days after delivery of written notice to such Investor of such breach.

<div align="center">15</div>

If this Agreement so terminates, it shall become null and void and have no further force or effect, except as otherwise provided in Section 9.2.

9.2 Survival. If this Agreement is terminated pursuant to Section 9.1, (a) this Agreement shall become void and of no further force and effect, except for the provisions of Sections 10.2 (Notices), 10.7 (Expenses), 10.8 (Governing Law), 10.9 (Dispute Resolution) and 10.12 (Publicity; Confidentiality), which shall survive the termination of this Agreement indefinitely or until the latest date permitted by law, (b) none of the parties hereto shall have any liability in respect of a termination of this Agreement pursuant to Section 9.1(a) or Section 9.1(b) (other than the party whose breach of a representation, warranty, covenant or agreement under this Agreement precipitated a termination pursuant to Section 9.1 (b)), (c) nothing shall relieve any of the parties from liability for Losses resulting from the termination of this Agreement pursuant to Section 9.1(c) or Section 9.1(d), and (d) none of the parties hereto shall have any liability for speculative, indirect, punitive, unforeseeable or consequential damages or lost profits resulting from any legal action relating to the termination of this Agreement.

9.3 Termination Fee. If this Agreement is terminated (i) by the Company with respect to any Investor pursuant to Section 9.1(d) or (ii) by either the Company or any Investor pursuant to Section 9.1(b) as a result of (x) the failure by such Investor to fulfill the conditions set forth in Section 6.5 or (y) any other reason that is attributable to such Investor to consummate the Closing prior to the Long Stop Date, such Investor shall pay to the Company in immediately available funds an amount equal to 5% of such Investor's Consideration within three (3) Business Days after such termination.

## ARTICLE X.

## MISCELLANEOUS

10.1 Survival of Representations and Warranties. The representations and warranties made by each party hereto shall survive the Closing for a period of two (2) years (except for the Company's representations and warranties set forth in Section 7 (Taxes) of Schedule 2, which shall survive the Closing for a period of five (5) years) and shall terminate and be of no further force and effect thereafter, provide that if a claim is made by any party hereto to another party against whom such indemnity is sought with respect to any breach of a representation or warranty giving rise to the right of indemnity as set forth in Article VIII before the expiration of the applicable survival period, such representation or warranty, as applicable, shall survive the time at which it would otherwise terminate until such claim is solved or settled.

10.2 Notices.

(a) Any party hereto giving any notice or making any other communication pursuant to this Agreement shall give such notice or make such other communication in writing and shall use one of the following methods of delivery: personal delivery, courier with all fees prepaid or facsimile. A notice or other communication is effective only if the party hereto giving the notice or making the other communication has complied with the preceding sentence and if the addressee has received the notice or other communication; provided, that, a notice or other communication is deemed to have been received:

16

(i)    if a notice or other communication is delivered in person, or sent by courier, upon receipt by the party hereto to whom the notice or other communication is addressed as indicated by the date on a signed receipt for such notice or other communication signed for or on behalf of such party; or

(ii)    if a notice or other communication is sent by facsimile, upon receipt by the party hereto giving or making the notice or other communication of an acknowledgement or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the addressee's facsimile number.

(b)    Any notice or other communication to a party hereto pursuant to this Agreement shall use the following address and facsimile number for such party (or such other address or facsimile number as such party may have notified to the other parties hereto pursuant to this Section 10.2):

if to the Company:

Qiyi.com, Inc.
17/F, Capital Development Tower
No.2, Haidian North 1st Street
Haidian District, Beijing 100080, PRC
Fax: 86-10-6267 7000
Attn: Wang Shuwen

if to an Investor, at the address or facsimile number as set forth in Schedule 1.

(c)    A failure to deliver an informational copy of a notice or other communication to the applicable Person set forth in Section 10.2(b) above does not affect the effectiveness of a notice or other communication that is otherwise given in accordance with this Section.

(d)    In the event that an addressee of a notice or communication rejects or otherwise refuses to accept a notice or other communication delivered or sent in accordance with this Section 10.2, or if the notice or other communication cannot be delivered because of a change in address for which no notice was given, then such notice or other communication is deemed to have been received upon such rejection, refusal or inability to deliver.

(e)    Any party may by notice given in accordance with this Section 10.2 designate another address or Person for receipt of notices hereunder.

10.3    Successors and Assigns; Third Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto. Neither the Company on the one hand, nor the Investors on the other hand, shall assign any of its rights or delegate or transfer any of its obligations under this Agreement without the written consent of the other side Except as otherwise provided herein, no Person other than the parties hereto and their successors and permitted assigns is intended to be a beneficiary of this Agreement.

17

10.4    Amendment and Waiver.

(a)    No failure or delay on any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the party hereto at law, in equity or otherwise.

(b)    Except as otherwise expressly specified in this Agreement, any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure by the parties hereto from the terms of any provision of this Agreement, shall be effective and binding on the parties hereto (i) only if it is made or given in writing and signed by all of the parties hereto and (ii) only in the specific instance and for the specific purpose for which made or given.

10.5    Counterparts. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be as effective as delivery of a manually executed counterpart of a signature page of this Agreement.

10.6    Specific Performance. The parties hereto intend that each of the parties have the right to seek damages or specific performance in the event that any other party hereto fails to perform such party's obligations hereunder. Therefore, if any party shall institute any action or proceeding to enforce the provisions hereof, any party against whom such action or proceeding is brought hereby waives any claim or defense therein that the plaintiff party has an adequate remedy at law.

10.7    Expenses. All costs and expenses (including taxes, if any) incurred in connection with this Agreement, the other Transaction Documents and any transaction contemplated hereby and thereby shall be paid by the party incurring such cost or expense.

10.8    Governing Law. The laws of the State of New York (without giving effect to its conflicts of law principles) govern this Agreement and all matters arising out of or relating to this Agreement and any of the transactions contemplated hereby, including (a) its negotiation, execution, validity, interpretation, construction, performance and enforcement and (b) the rights and duties of the parties in whole or in part.

10.9    Dispute Resolution.

(a)    Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination or validity hereof, shall be resolved through consultation. Such consultation shall begin immediately after one party hereto has delivered to the other parties hereto a written request for such consultation. If within thirty (30) days following the date on which such notice is given the dispute cannot be resolved, the dispute shall be submitted to arbitration upon the request of any party with notice to the other parties.

18

(b)    The arbitration shall be conducted in Hong Kong under the auspices of the Hong Kong International Arbitration Centre (the "Centre"). There shall be three (3) arbitrators. Each opposing party to a dispute shall be entitled to appoint one arbitrator (where there are more than one party to one side of the dispute, the parties whose interests are aligned shall jointly appoint one arbitrator), and the third arbitrator shall be jointly appointed by the disputing parties or, failing such agreement by thirty (30) days after the appointment by each party of its arbitrator, the appointment of the third arbitrator shall be made by the Secretary General of the Centre.

(c)    The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the Arbitration Rules of the United Nations Commission on International Trade Law, as in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this Section 10.9, including the provisions concerning the appointment of arbitrators, the provisions of this Section 10.9 shall prevail.

(d)    The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of the State of New York and shall not apply any other substantive law.

(e)    Each party to an arbitration hereunder shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(f)    The award of the arbitration tribunal shall be final and binding upon the disputing parties, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award. In the event of any failure of a party to this Agreement to comply with the award of the arbitration tribunal, the non-complying party shall be liable to the other parties for all reasonable costs and expenses of such enforcement.

(g)    Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal, but such relief shall only be sought on the ground that the award to which the party may be entitled would be ineffectual without interim relief.

(h)    The costs of arbitration shall be borne by the losing party(ies), unless otherwise determined by the arbitration tribunal.

10.10   Severability. If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

19

10.11   Entire Agreement. This Agreement, together with the exhibits and schedules hereto, and the other Transaction Documents are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. There are no restrictions, promises, representations, warranties or undertakings, other than those set forth or referred to herein or therein. This Agreement, together with the exhibits and schedules hereto, and the other Transaction Documents supersede all prior agreements and understandings between the parties with respect to such subject matter.

10.12   Publicity; Confidentiality. None of the parties hereto shall issue a press release or public announcement or otherwise make any disclosure concerning (i) the provisions of this Agreement, the other Transactions Documents or the transactions contemplated hereby or thereby, (ii) the negotiations relating to this Agreement or the other Transaction Documents, or (iii) the information of the other parties received during the negotiations and execution of this Agreement and the other Transaction Documents without prior written approval by the Company and the Investors; provided, however, that nothing in this Agreement shall restrict any party from disclosing information (a) that is already publicly available and not as a result of a breach of this Section 10.12, (b) that may be required by applicable Requirements of Law, provided that such party will use reasonable efforts to (i) notify the other party in advance of such disclosure so as to permit the other party to seek a protective order or otherwise contest such disclosure, and such party will use reasonable efforts to cooperate, at the expense of the other party, with the other party in pursuing any such protective order, and/or (ii) to obtain confidential treatment of any information so disclosed, (c) to such party's officers, directors, shareholders, investors, advisors, employees, members, partners, Controlling persons, auditors or counsel (as well as bona fide prospective lenders, investors, partners and advisors as long as such parties are subject to appropriate nondisclosure obligations) as may be reasonably required, or (d) to Persons from whom releases, consents or approvals are required, or to whom notice is required to be provided, pursuant to the transactions contemplated by the Transaction Documents or any Requirement of Law.

10.13   Consultation With Counsel. Each party hereto warrants that each of them has been represented and advised by legal counsel or has had full opportunity to be represented and advised by legal counsel with respect to this Agreement and all matters covered by it. Each of them represents and agrees that if it has elected not to be represented by legal counsel in the negotiation, preparation or execution of this Agreement, such election was made freely and voluntarily with full awareness of the consequences of the decision and that it is fully aware of the content and legal effect of this Agreement, and has executed or will execute this Agreement after independent investigation and without fraud, duress or undue influence.

[Signature Pages Follow]

20

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**COMPANY:**

**QIYI.COM, INC.**

By:      _____    /s/ Yu Gong

Name: Yu Gong

Title: Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**INVESTOR:**

**BAIDU HOLDINGS LIMITED**

By: _____    /s/ Robin Yanhong Li
                                         Name: Robin Yanhong Li
                                         Title: Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G1 INVESTOR:**

**BCCF CAPITAL LIMITED PARTNERSHIP**

By: _____ /s/ Authorized Signatory

Name:

Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G1 INVESTOR:**

**HARVEST REWARDS FUND LP**

By: _____ /s/ Authorized Signatory

Name:

Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**MADRONE OPPORTUNITY FUND, L.P.**

By: Madrone Capital Partners, LLC,
Its General Partner

By: _____  /s/ Greg Penner
Name: Greg Penner
Title: Manager

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**Xiang He Fund I, L.P.**

By: _____   /s/ Authorized Signatory

Name:

Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**CMC CUE HOLDINGS LIMITED**

By: _____    /s/ Xian Chen
                                                                 Name: Xian Chen
                                                                 Title: Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**INVESTOR:**

**EASTONE INTERNATIONAL CO., LTD**

By:                         /s/ Authorized Signatory

Name:

Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**GORGEOUS RAINBOW LIMITED**

By: _____ /s/ Khalid Iton
Name: Khalid Iton
Title: Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**HH RSV-V HOLDINGS LIMITED**

By: _____  /s/ Jennifer Neo

Name: Jennifer Neo

Title: Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**HONEY BEST LIMITED**

By:                                    /s/ JIN ZHENG

Name: JIN ZHENG

Title: Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**IDG INFINITY FINANCIAL LIMITED**

By: _____ /s/ Yihong Guo
Name: Yihong Guo
Title: Authorized Signatory

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**RUN LIANG TAI (HONG KONG) INVESTMENT COMPANY LIMITED**

By: _____ /s/ YANG YUXIANG

Name:                                  YANG YUXIANG

Title:                                         Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**SCC GROWTH IV HOLDCO A, LTD.**

By:                                    /s/ Ip Siu Wai Eva

Name:                   Ip Siu Wai Eva

Title:               Authorized Signatory

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**SILVERLINK CAPITAL LP**

By: _____    /s/ Andrew Tsuei

Name:                                    Andrew Tsuei

Title:          Managing Director of Silverlink Holdings
                                    Limited as General Partner

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

Schedule 1

Part A

G1 Investors

| Name and Address of Investors | Principal Amount of G1 Note | | Consideration |
|---|---|---:|---|
| **Baidu Holdings Limited** | US$ | 300,000,000 | US$300,000,000 |
| Address:<br>No.10 Shangdi 10th Street,<br>Haidian District,<br>Beijing,100085, PRC<br>Fax: (86) 10 5992 0000 | | | |
| **BCCF Capital Limited Partnership** | US$ | 80,000,000 | US$  80,000,000 |
| Address:<br>20/F, UNO Center Office,<br>No.2A, Jiangtai Road, Chaoyang District,<br>Beijing 100016, P.R. China<br>Attn: LI Ji<br>E-mail: ji.li@bccf.com.cn<br>Tel: (86) 10 5682 6952<br>Fax: (86) 10 5682 6998 | | | |
| **Harvest Rewards Fund LP** | US$ | 25,000,000 | US$  25,000,000 |
| Address:<br>31/F, One Exchange Square, 8<br>Connaught Place, Central, Hong Kong<br>Attn: 任剑璟<br>E-mail: renjianqiong@ample-harvest.com<br>Tel: (86) 18612205601<br>Fax: (852) 3921 8900 | | | |
| **G1 TOTAL** | US$ | 405,000,000 | US$405,000,000 |

SCHEDULE 1-1

Part B

G2 Investors

| Name and Address of Investors | Principal Amount of G2 Note | Consideration |
|---|---|---|
| **Madrone Opportunity Fund, L.P.** | US$ 50,000,000 | US$ 50,000,000 |
| Attn: Greg Penner<br>E-mail: greg@madronecap.com | | |
| **Xiang He Fund I, L.P.** | US$ 10,000,000 | US$ 10,000,000 |
| Address:<br>PO Box 309, Ugland House,<br>Grand Cayman, KY1-1104,<br>Cayman Islands<br>Attn: Hesong Tang / Eva Wang<br>E-mail: htang@xianghecap.com /<br>ewang@xianghecap.com<br>Tel: (1) 650 666 7287 / (1) 650 319 5662 | | |
| **CMC CUE HOLDINGS LIMITED** | US$ 80,000,000 | US$ 80,000,000 |
| Address:<br>Unit 2208, North Building, Kerry Centre<br>1 Guanghua Road, Chaoyang District<br>Beijing, China<br>Attn: CHEN Xian<br>E-mail: alex.chen@cmccap.com<br>Fax: (86) 10 6561 1002 | | |
| **Eastone International Co., Ltd** | US$ 114,200,000 | US$114,200,000 |
| Address:<br>24/F, Building A, 4 Xing Gong Street,<br>Sha He Kou District<br>Dalian, Liaoning, China<br>Attn: Weifen Xu<br>E-mail: xuweifen1210@163.com<br>Tel: (86) 411 8889 1311; (86) 15998598082 | | |
| **Gorgeous Rainbow Limited** | US$ 220,000,000 | US$220,000,000 |
| Address:<br>Suite 1508, 15/F, Hutchison House,<br>10 Harcourt Road,<br>Central, Hong Kong<br>Attn: Joey CHEN<br>E-mail: jchen@boyucapital.com<br>Fax: (852) 3987 1711 | | |

SCHEDULE 1-2

**HH RSV-V Holdings Limited**                                    US$350,000,000          US$350,000,000

Address:
Floor 28, Building B, PingAn
International Financial Center,
No. 1-3, Xinyuan South Road,
Chaoyang District, Beijing
100027 PRC
Attn: Paul Ma
E-mail: yma@hillhousecap.com;
with a copy to
Legal@hillhousecap.com
Fax: (86) 10 5952 0882

**Honey Best Limited**                                          US$ 80,000,000          US$ 80,000,000

Address:
Room904, Tower E1, Oriental
Plaza, No.1 East Chang'an
Avenue, Dongcheng District,
Beijing, PRC
Attn: CHAI Hua
E-mail: hua.chai@everbright-idg.com
Fax: (86) 10 8518 8718

**IDG Infinity Financial Limited**                              US$ 50,000,000          US$ 50,000,000

Address:
c/o IDG Capital Management (HK) Ltd.
Unit 5505, 55/F., The Center
99 Queen's Road
Central, Hong Kong
Attn: Chi Sing HO
Fax: (852) 2529 1619

With a copy to:
Address: c/o IDG Capital
Investment Consultancy
(Beijing) Co., Ltd.
Floor 6, Tower A, COFCO Plaza,
8 Jianguomennei Dajie
Beijing, 100005, P.R. China
Attn: Mr. GUO Rui
Fax: (86) 10 8512 0225

<div align="center">SCHEDULE 1-3</div>

| | | | |
|---|---|---|---|
| **Run Liang Tai (Hong Kong) Investment Company Limited** | | US$ 130,800,000 | US$ 130,800,000 |

Address:
9/F AMTEL BLDG 148 DES
VOEUX RD CENTRAL
CENTRAL HONG KONG
Attn: Meng Xiang Yun
Office Address:
SCG Parkside , 1006-1008 868
Yinghua Rd, Pudong Shanghai,
China
E-mail: xmeng@boliucapital.com
Fax: (86) 021 2612 0960-716

**SCC Growth IV Holdco A, Ltd.**    US$ 80,000,000    US$ 80,000,000

Address:
Suite 3613, 36/F, Two Pacific
Place, 88 Queensway
Hong Kong
Attn: Ip Siu Wai Eva
E-mail: eip@sequoiacap.com
Fax: (852) 2501 5249

**Silverlink Capital LP**    US$ 40,000,000    US$ 40,000,000

Address:
Suite 1502, 15F, Beautiful Group
Tower 74-77 Connaught Road
Central
Central, HK
Attn: Theresa Teng
E-mail: theresa@silverlinkcapital.com

**G2 TOTAL**    US$1,205,000,000    US$1,205,000,000

SCHEDULE 1-4

Schedule 2

Representations and Warranties of the Company

**Definitions**

In this Schedule 2, in addition to the capitalized terms defined in Article I of this Agreement, the following terms have the meanings as follows:

"Assets" means all assets, rights and privileges of any nature and all goodwill associated therewith, including all rights in respect of Contractual Obligations, all Intellectual Property, Technology and Equipment.

"Charter" means memorandum of association, articles of association, by-laws or other corporate constituting documents (including the business license for any entity organized under the laws of the PRC).

"Contingent Obligation" means, with respect to any Person, any agreement by such Person with respect to any Indebtedness (the "primary obligation") of another Person (the "primary obligor"), whether or not contingent, (a) to purchase, repurchase or otherwise acquire such primary obligations, (b) to advance or provide funds (i) for the payment or discharge of any such primary obligation, or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet item, level of income or financial condition of the primary obligor as required by or as a condition of any such primary obligation, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss or failure or inability by the primary obligor to perform any primary obligation. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.

"Copyrights" means copyrights, mask work rights, database rights and design rights, whether or not registered, published or unpublished, and all registrations and applications for registration thereof, and all rights therein, whether provided by international treaties or conventions or otherwise.

"Environmental Laws" means laws, regulations and codes of the PRC or any other jurisdiction, as well as orders, decrees, judgments or injunctions, issued, promulgated, approved or entered thereunder relating to pollution, protection of the environment or public health and safety.

"Equipment" means all plant and machinery, tools and equipment, vehicles and office furniture, computer equipment and accessories and other tangible Assets.

"Financial Statements" has the meaning set forth in Section 6(a) of this Schedule 2.

SCHEDULE 2-1

"Indebtedness" means, as to any Person, without duplication, (a) all obligations of such Person for borrowed money (including, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured), (b) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable and accrued commercial or trade liabilities arising in the ordinary course of business, (c) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person under leases which have been or should be, in accordance with the US GAAP, recorded as capital leases, (f) all indebtedness described in the foregoing clauses secured by any Lien (other than Liens in favor of lessors under leases other than leases included in clause (e)) on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person, and (g) any Contingent Obligation of such Person.

"Intellectual Property" means rights relating to all of the following, whether protected, created or arising under the laws of PRC or any other foreign jurisdiction: (a) Patents, (b) Copyrights, (c) Trade Secrets, (d) Trademarks, (e) Internet Assets, and (f) all applications and registrations relating to any of the rights set forth in the foregoing clauses (a) to (e).

"Internet Assets" means all rights arising from, in, or in respect of any Internet domain names and other computer user identifiers and any rights in and to sites on the worldwide web, including rights in and to any text, graphics, audio and video files and html or other code incorporated in such sites.

"knowledge", with respect to the Company, means the Company's actual knowledge that has been brought to the attention of the Key Employees and/or director(s) of the Company.

"Land Use Rights" means with respect to the land on which the facilities of any Group Company are located, the land use rights granted in relation thereto under the relevant land use right certificates and real estate certificates.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), preemptive right, right of first refusal, or preference, priority, right or other security interest or preferential arrangement of any kind or nature whatsoever.

"Litigation" has the meaning set forth in Section 9(a) of this Schedule 2.

"Material Contracts" has the meaning set forth in Section 5(a) of this Schedule 2.

"Patents" means any patents and patent applications issued by any Governmental Authority or made in any jurisdiction, including any statutory invention registrations, divisions, continuations, continuations-in-part, substitutions thereof, whether or not patents are issued on such applications and whether or not such applications are modified, withdrawn or resubmitted, and any extensions, reissues, restorations and reexaminations of the foregoing.

"Plan" means any employee benefit plan, arrangement, policy, program, agreement or commitment, including any employment, consulting or deferred compensation agreement, executive compensation, bonus, incentive, pension, profit-sharing, savings, retirement, stock option, stock purchase or severance pay plan, any life, health, disability or accident insurance plan, whether oral or written, as to which any Group Company has or in the future could have any, direct or indirect, actual or contingent liability.

<div align="center">SCHEDULE 2-2</div>

"Related Party", with respect to the Group Companies, means (i) any shareholder of the Company or any Subsidiary, (ii) any director of the Company or any Subsidiary, (iii) any Key Employee, (iv) any Relative of a director of the Company or any Subsidiary, and (v) any Person in which any shareholder or director of the Company or any Subsidiary or any Key Employee, has a majority equity interest.

"Relative" of a natural person means her/his spouse, parents, children, grandparents, grandchildren and siblings.

"Software" means any computer software programs, source code, object code, data and documentation, including any computer software programs that incorporate and run any Group Company's pricing models, formulae and algorithms.

"Technology" means, collectively, all designs, formulas, algorithms, procedures, techniques, ideas, know-how, Software, programs, models, routines, databases, tools, inventions, creations, improvements, works of authorship, recordings, graphs, drawings, reports, analyses, and other writings, and any other embodiment of the above, in any form, whether or not specifically listed herein.

"Trade Secrets" means any trade secrets, research records, processes, procedures, manufacturing formulae, technical know-how, proprietary technology, blue prints, designs, plans, inventions (whether patentable and whether reduced to practice), invention disclosures and improvements thereto, in each case, the value of which is contingent upon the maintenance of confidentiality thereof.

"Trademarks" means any trademarks, service marks, trade names, service names, trade dress, logos, and other product or service identifiers or identifiers of source, whether registered or unregistered, including all goodwill associated therewith and all common law rights, registrations and applications for registration thereof in any jurisdiction, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

### The Warranties

**1.    CORPORATE MATTERS**

(a)    <u>Organization, Good Standing and Qualification</u>. Each of the Group Companies has been duly incorporated and organized under the laws of the jurisdiction of its incorporation, and is validly existing and in compliance with all registration and approval requirements relating to its establishment as a company under the laws of the jurisdiction of its incorporation. Each of the Group Companies has the corporate power and authority to own and operate its Assets and properties and to carry on its business as currently conducted. Each of the Group Companies is qualified to do business and is in good standing (or equivalent status in the relevant jurisdiction) in each jurisdiction, except to the extent that the failure to be so qualified or be in good standing would not have, a Material Adverse Effect. Each PRC Entity has a valid business license issued by the State Administration for Industry and Commerce or its local branch, and has, since its establishment, carried on its business materially in compliance with the business scope set forth in its business license.

<div align="center">SCHEDULE 2-3</div>

(b)     <u>Charter Documents</u>. All legal and procedural requirements and other formalities concerning such Charter and the arrangements set forth therein have been duly and properly complied with in all material respects.

(c)     <u>Capitalization</u>.

    (i)     <u>Ordinary Shares</u>. As of the date hereof, the Company has authorized 3,500,000,000 Ordinary Shares, of which 342,548,237 are currently issued and outstanding. As of the Closing Date, the Company will have reserved 589,729,714 Ordinary Shares for issuance to officers, directors, employees and other service providers of the Company pursuant to (i) the employment agreement with the chief executive officer of the Company, and (ii) an equity incentive plan duly adopted by the Board of Directors and approved by the Company's shareholders (as amended from time to time, collectively the "<u>Share Option Reserve</u>").

    (ii)     <u>Preferred Shares</u>. As of the date hereof, the Company has authorized 2,714,387,481 Preferred Shares: (i) 200,000,000 of which are designated as Series A Preferred Shares, all of which are issued and outstanding; (ii) 6,064,174 of which are designated as Series A-1 Junior Preferred Shares, all of which are issued and outstanding; (iii) 123,103,264 of which are designated as Series B Preferred Shares, all of which are issued and outstanding; (iv) 302,891,196 of which are designated as Series C Preferred Shares, all of which are issued and outstanding; (v) 848,682,647 of which are designated as Series D Preferred Shares, all of which are issued and outstanding, (vi) 686,646,383 of which are designated as Series E Preferred Shares, all of which are issued and outstanding, and (vii) 546,999,817 of which are designated as Series F Preferred Shares, all of which are issued and outstanding.

    (iii)     <u>HK Subsidiary</u>. The authorized share capital of the HK Subsidiary on the date hereof is HK$10,000 divided into 10,000 shares with a par value of HK$1.00 each, one (1) share of which is issued and outstanding and held by the Company.

    (iv)     <u>PRC Entities</u>. The registered capital of each of the PRC Entities on the date hereof is set forth opposite its name on <u>Section 1(c)</u> of the Disclosure Schedule, together with an accurate list of the registered shareholders of such registered capital.

<div align="center">SCHEDULE 2-4</div>

(v)     Except for (i) the Transaction Documents, (ii) the Share Option Reserve, and (iii) the option to purchase the equity interest of the Domestic Enterprises as set forth in the Control Documents, there are no options, warrants, conversion privileges, subscription or purchase rights or other rights presently outstanding to purchase or otherwise acquire (i) any Equity Securities of the Group Companies or (ii) any other securities of the Group Companies and there are no commitments, contracts, agreements, arrangements or understandings by the Group Companies to issue any shares, capital stock or any Equity Securities or other securities of the Group Companies. The Conversion Shares, when issued to the Investors upon the conversion of the Notes, will be duly authorized, validly issued, fully paid and non-assessable, will be issued in compliance with the registration and qualification requirements of all applicable securities laws (assuming the accuracy of the representations and warranties of the Investors set forth in Article IV) and will be free and clear of all Liens, other than the pledge created under the Control Documents with respect to the equity interest of the Domestic Enterprises and except as set forth in the amended and restated shareholders agreement to be entered into upon the conversion of the Notes. All of the issued Equity Securities of the Group Companies are validly issued, fully paid and non-assessable, and were issued in compliance with the registration and qualification requirements of all applicable securities laws. The registered capital of each of the PRC Entities were timely contributed and such registered capital is nonassessable. All of the issued Equity Securities of the Group Companies are free and clear of any Lien (except as set forth in the Control Documents, the Shareholders Agreement and Requirements of Law).

(d)    Corporate Structure; Subsidiaries. Section 1(d) of the Disclosure Schedule sets forth a complete structure chart showing Group Companies, and indicating the ownership and Control relationships among all Group Companies and the jurisdiction in which each Group Company was organized. No Group Company owns or Controls, directly or indirectly, any Equity Security in any other Person except as disclosed in Section 1(d) of the Disclosure Schedule.

2.    **AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

(a)    Authorization. The Company has the power and authority to execute and deliver the Transaction Documents and the other agreements to which it is a party and the execution of which is contemplated hereunder as well as to perform its respective obligations thereunder. Except for such corporate actions on the part of the Company in connection with the conversion of the Notes, all corporate actions on the part of the Company necessary for the authorization, execution and delivery of, and the performance of all of its respective obligations under, the Transaction Documents have been taken or will be taken prior to the Closing Date.

(b)    Enforceability. This Agreement and each other Transaction Document will be, when executed, a valid and binding obligation of and enforceable against the Company, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) laws relating to the availability of specific performance or injunctive relief.

(c)    Consents and Approvals. Except for such Consents (as defined below) that will need to be made or obtained in connection with or as a result of the conversion of the Notes, all consents, licenses, permits, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filing with, any Governmental Authority or any other third party ("Consents") which are required to be made or obtained by the Company in connection with the consummation of the transactions contemplated under this Agreement have been or will be obtained or made prior to and are effective as of the Closing.

SCHEDULE 2-5

(d)  <u>No IP Litigation</u>. To the knowledge of the Company, except as disclosed in Section 2(d) of the Disclosure Schedule, none of the Group Companies has pending material Litigation in which the right of any Group Company to use, sell or license out its Intellectual Property or Technology has been contested.

(e)  <u>No Breach</u>. The execution and delivery by the Company of each Transaction Document and the performance by the Company of its obligations under such documents do not:

    (i)  breach or constitute a default under (with or without notice, lapse of time or both) any Charter document of the Company;

    (ii)  result in a material breach of, or constitute a material default under (with or without notice, lapse of time or both), or give rise to a right of termination or cancellation with respect to any material Contractual Obligation to which the Company is a party or by which the Company or its material property or Assets is bound or result in the acceleration of any material obligation under any Contractual Obligation;

    (iii)  result in a material violation or breach of or default under (with or without notice, lapse of time or both) any Requirements of Law or of any order, writ, injunction, judgment or decree of any Governmental Authority by which such Person or its property of Assets is bound.

(f)  <u>No Brokerage Fees</u>. No Person is entitled to receive from the Company or any of its Affiliates any finder's fee, brokerage or commission in connection with this Agreement and each other Transaction Document or the transactions contemplated hereby or thereby.

**3.**    **LEGAL COMPLIANCE**

(a)  <u>Compliance with Laws</u>.

    (i)  Each of the Group Companies is, and has been (including without limitation, with respect to the carrying on of its business or the ownership of its properties), in compliance in all material respects with all applicable Requirements of Law. None of the Group Companies nor, to the knowledge of the Company, any of its directors, officers or senior management staff, has committed any criminal offence that could result in arrest or that carries a penalty that could include imprisonment, or any tort or any breach of any Requirements of Law, in either case relating to the carrying on of the business of any Group Companies. None of the equity holders of any of the Group Companies is or has at any time committed any criminal offence or been in violation of any applicable Requirements of Law relating to the carrying on of the business of any Group Company.

    (ii)  There are no Contractual Obligations or concerted practices to which any of the Group Companies is a party or by which any of the Group Companies is bound which are illegal or which contravene any applicable Requirements of Law in any material respects.

<div align="center">SCHEDULE 2-6</div>

(iii)   Assuming the accuracy of the representations and warranties of the Investors set forth in <u>Article IV</u>, the offer, sale and issuance of the Notes and the issuance of the Conversion Shares upon the conversion of the Notes in conformity with the terms of this Agreement are exempt from the registration and prospectus delivery requirements of the United States Securities Act of 1933, as amended, and each other analogous provision of any other applicable body of securities law.

(b)   <u>Permits</u>. Each of the Group Companies has all material permits, approvals, authorizations, franchises and licenses necessary for the conduct of its business as currently conducted. None of the Group Companies is in breach of or default under any such permit, approval, authorization, franchise or license. All such permits approvals, authorizations, franchises and licenses will remain in full force and effect notwithstanding any transaction contemplated in connection with any Transaction Document. None of the Group Companies is in receipt of any letter or notice from any relevant Governmental Authority notifying revocation of any such permits or licenses issued to it for noncompliance or the need for compliance or remedial actions in respect of the activities carried out directly or indirectly by it. Each of the PRC Entities has been conducting their respective business activities within their respective permitted scopes of business or are otherwise operating their respective businesses in material compliance with all Requirements of Law and with all requisite licenses, permits and approvals granted by competent PRC Governmental Authorities. In respect of approvals, licenses or permits requisite for the conduct of any part of the business of any of the Group Companies which are subject to periodic renewal, none of the Group Companies has any reason to believe that such requisite renewals will not be timely granted by the relevant Governmental Authorities.

(c)   <u>Governmental Authority</u>. (i) There is no Governmental Authority or other Person that has:

(x)   instituted or, to the knowledge of the Company, threatened any action or investigation to restrain, prohibit or otherwise challenge the acquisition of the Notes by the Investors or any of the transactions contemplated in connection with the Transaction Documents; or

(y)   to the knowledge of the Company, proposed or adopted any Requirements of Law which would prohibit, materially restrict the operations of any of the Group Companies as currently conducted or currently proposed to be conducted.

(ii)   None of the information requested by any Governmental Authority in relation to the transactions contemplated by this Agreement is, in the reasonable opinion of the Company, unusual or otherwise outside the ordinary course.

(d)   <u>Compliance with Other Instruments</u>. None of the Group Companies is in, nor shall the conduct of its business as currently result in, a violation, breach or default of any term of the Charter documents of the Company or the PRC Entity (as the case may be), or in any material respect of any term or provision of any mortgage, indenture, contract, agreement or instrument to which the Company or the PRC Entity is a party or by which it or its property may be bound, or in any material respect of any provision of any judgment, decree, order, statute, rule or regulation applicable to or binding upon any of the Group Companies. None of the activities, agreements, commitments or rights of any of the Group Companies is ultra vires or unauthorized.

<div align="center">SCHEDULE 2-7</div>

**4.   ASSETS**

(a)   <u>Title to Assets</u>. The Group Companies have good title to (free and clear of any Lien, except for Permitted Liens), or in the case of leased property and assets, have valid leasehold interests in, all its properties and assets (whether real, personal, tangible or intangible) reflected on the Financial Statements or acquired after June 30, 2016 except for properties and assets sold since June 30, 2016 in the ordinary course of business consistent with past practice or where the failure to have such good title or valid leasehold interests would not have a Material Adverse Effect. The foregoing properties and assets collectively represent in all material respects all properties and assets necessary for the conduct of the business of the Group Companies as presently conducted.

(b)   <u>Land Use Rights</u>. None of the Group Companies has at any time had any Land Use Rights or otherwise holds any title or other ownership interest to any real property.

(c)   <u>Leased Properties.</u> <u>Section 4 (c)</u> of the Disclosure Schedule lists all real property leased or subleased by the Group Companies. With respect to each lease and sublease in connection with all real property leased or subleased by the Group Companies:

(i) such lease or sublease is in full force and effect in all material respects, assuming the respective lessor holds valid title or land use rights to such properties;

(ii) (A) none of the Group Companies is, and to the knowledge of the Company, no other party to the lease or sublease is, in material default with respect to such lease or sublease, or (B) none of the Group Companies has received a written notice of default with respect to such lease or sublease;

(iii) there is no pending, or to the knowledge of the Company, threatened condemnation, confiscation or eminent domain proceeding by any Governmental Authority with respect to the leased properties of the Group Companies which could cause a Material Adverse Effect on the Group Companies.

SCHEDULE 2-8

**5.   CONTRACTS AND TRANSACTIONS**

(a)   <u>Material Contracts</u>. With respect to each of the Contractual Obligations to which any of the Group Companies is a party (but excluding any Contractual Obligations that have been fully performed by all parties thereto, with no continuing obligations whatsoever by any party thereto), or by which it is bound, that: (i) was entered into outside of its ordinary course of business, (ii) involves total payments (contingent or otherwise) or revenues in excess of RMB400,000,000 individually with respect to each Contractual Obligation, (iii) involves any Related Party, (iv) extend for more than one year beyond the date of this Agreement, (v) are not terminable upon notice of thirty (30) days or less without incurring any penalty or obligation, (vi) contain exclusivity, non-competition, or similar clauses that impair, restrict or impose conditions on any of the Group Companies' right to offer or sell products or services in specified areas, during specified periods, or otherwise, other than those Contractual Obligations entered into by any Group Company during its ordinary course of business, (vii) transfer or license any Intellectual Property to or from the Group Companies (other than licenses granted in the ordinary course of business that also does not fall into any type from (ii) to (vi) and (viii), licenses from commercially readily available "off the shelf" computer software or licenses on the standard form of license agreement of the Group Companies), (viii) the termination of which would be reasonably likely to have a Material Adverse Effect or (ix) is otherwise material to the Group Companies (collectively, "<u>Material Contracts</u>"), the applicable Group Company is not in default (to the knowledge of the Company, nor with the giving of notice or passage of time, would be in default) in any material respect in the performance, observance or fulfillment of any of its obligations or covenants contained in any such Material Contract, and to the knowledge of the Company, none of the parties to any such Material Contract has indicated any intention to terminate, rescind, avoid or repudiate such Material Contract prior to the expiration of its term. Each Material Contract to which any of the Group Companies is a party has been duly authorized, executed and delivered by the applicable Group Company and, to the knowledge of the Company, by each other party thereto and constitutes the valid and binding obligation of the applicable Group Company and, to the knowledge of the Company, of each other party thereto, enforceable against the Group Companies and, to the knowledge of the Company, against each other party thereto, in accordance with its terms, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) laws relating to the availability of specific performance or injunctive relief.

(b)   <u>Performance</u>. To the knowledge of the Company, there does not exist any fact, condition or circumstance which would render any material obligation under any Material Contract incapable of being performed.

**6.   FINANCIAL MATTERS**

(a)   <u>Financial Statements</u>. The Company has delivered or caused to be delivered to each Investor or its advisor (i) the unaudited and consolidated income statement for the six-month period ended June 30, 2016, and (ii) the unaudited consolidated balance sheet as of June 30, 2016 (collectively, the "<u>Financial Statements</u>"). The Financial Statements (x) are true, correct and complete in all material aspects and present fairly in all material aspects the financial condition of the Group Companies at the date or dates therein indicated and the results of operations for the period or periods therein specified, subject in the case of the unaudited Financial Statements to normal year-end audit adjustments, and (y) have been prepared in all material aspects in accordance with the US GAAP applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by US GAAP.

(b)   <u>No Material Liabilities</u>. Since June 30, 2016, neither the Company nor any PRC Entity has incurred any material liability or obligation, absolute or contingent (individually or in the aggregate) other than (i) in ordinary course of business, or (ii) duly approved by the Board of Directors pursuant to the then-existing Charter of the Company. Since June 30, 2016, except for any of the followings that would not have a Material Adverse Effect and other than those incurred in the ordinary course of business and those as contemplated by the Transaction Documents, none of the Group Companies has:

SCHEDULE 2-9

(i)      purchased, acquired, sold, transferred, leased or otherwise disposed of any material assets;

(ii)     created, assumed or discharged any material Lien (other than Permitted Liens); and

(iii)    commenced or settled any material Litigation.

(c)    <u>Financial Obligations</u>. There is no Indebtedness made, given, assumed, guaranteed, entered into or incurred, directly or indirectly, by or on behalf of any of the Group Companies; and there are no Liens (except Permitted Liens) on the Assets of any of the Group Companies or any part thereof, in each case except as set forth in the Control Documents, or as reflected on Financial Statements. None of the Group Companies has entered into any financing or "off balance sheet" arrangements.

7.    **TAXES**

(a)    There are no material Taxes due and payable by any of the Group Companies which have not been timely paid or withheld. There are no accrued and unpaid material Taxes of any of the Group Companies which are due, whether or not disputed.

(b)    Each of the Group Companies has timely filed or caused to be filed all returns for Taxes that it is required to file (including all applicable extensions), and all such Tax returns are accurate and complete in all material aspects. No Group Company has received any written claim made by a Tax Governmental Authority having jurisdiction over such Group Company claiming such Group Company fails to file returns for Taxes that such Group Company is subject to taxation by that jurisdiction.

(c)    With respect to all such Tax returns of any of the Group Companies, (i) there is no unassessed Tax deficiency proposed or, to the knowledge of the Company, threatened against any of the Group Companies and (ii) no audit is in progress with respect to any return for Taxes, no extension of time is in force with respect to any date on which any return for Taxes was or is to be filed and no waiver or agreement is in force for the extension of time for the assessment or payment of any Tax.

(d)    With respect to each Group Company, there is no pending investigation conducted by a Tax Governmental Authority having jurisdiction over such Group Company regarding its payment or withholding of Taxes.

(e)    There are no Liens (except Permitted Liens) for Taxes on the Assets of any of the Group Companies.

SCHEDULE 2-10

8.   **INSURANCE**

(a)   All of the insurance policies held by or on behalf of any of the Group Companies are valid and enforceable in accordance with their terms and are in full force and effect and cover risks associated with the Company's or applicable PRC Entity's business that are customarily insured against for companies similarly situated and in such amounts as are customarily insured against for companies similarly situated. None of such policies will be affected by, or terminate or lapse by reason of, any transaction contemplated in the Transaction Documents.

9.   **CLAIMS AND PROCEEDINGS**

(a)   No Litigation. Except as disclosed in Section 9(a) of the Disclosure Schedule, none of the Group Companies and any officer or director of any of the Group Companies (in his or her capacity as an officer or director) is engaged in, has pending or has been notified that it is the subject of any material action, suit, preceding, complaint, investigation, inquiry, claim, litigation, arbitration or administrative or criminal proceedings (collectively, "Litigation"), whether as plaintiff, defendant or otherwise. To the knowledge of the Company, there are no facts or circumstances likely to give rise to any material Litigation against any of the Group Companies or any officer or director thereof (in his or her capacity as an officer or director).

(b)   No Threatened Proceedings. To the knowledge of the Company, there is no threatened Litigation against any of the Group Companies or any officer or director thereof (in his or her capacity as an officer or director).

(c)   Environmental Matters. Each of the Group Companies is in compliance in all material respects with all applicable Environmental Laws, no material expenditures are or, to the knowledge of the Company, will be required in order to comply with any such laws.

10.   **EMPLOYMENT AND LABOR RELATIONS**

(a)   Compliance with Law. Each of the Group Companies has complied in all material respects with all applicable employment and labor laws, including laws and regulations pertaining to welfare funds, social benefits, medical benefits, insurance, retirement benefits, and pensions.

(b)   Employee Benefit Plans. Each of the Group Companies has made all social security contributions (or similar contributions) in respect of or on behalf of all its employees in accordance with Requirements of Law in all material respects. Other than such social security contributions, none of the Group Companies maintains, or contributes to, or has any liability under, any Plan.

(c)   Key Employees. Each Key Employee has entered into an employment agreement and other ancillary agreement(s) on confidentiality and proprietary information, intellectual property right of the Group Companies as well as such Key Employees' obligations of non-competition and non-solicitation.

SCHEDULE 2-11

(d)     Labor Relations. (i) The Group Companies' labor practice are in compliance with the applicable Requirements of Law in all material aspects; (ii) there is (A) no grievance or arbitration proceeding arising out of or under collective bargaining agreements pending or, to the knowledge of the Company, threatened against any of the Group Companies, and (B) no strike, labor dispute, slowdown or stoppage pending or, to the knowledge of the Company, threatened against any of the Group Companies. To the knowledge of the Company, none of the Key Employees intends to terminate his/her employment with the Group Companies, as applicable. None of the Group Companies has discussed or taken any steps to terminate the employment of any Key Employee. To the knowledge of the Company, each Key Employee spends all, or substantially all, of his/her business time on the business of the Group Companies.

## 11.   INTELLECTUAL PROPERTY

(a)     The Company and/or an applicable Group Company is the owner of, or, to the knowledge of the Company, has the valid and subsisting license or right to use, all of the Intellectual Property (including the Internet websites) and Technology necessary to operate its existing business.

(b)     Section 11(b) of the Disclosure Schedule lists all material Intellectual Property license agreements which grant Intellectual Property to the Group Companies. Each of the Group Companies has performed in all material aspects, obligations imposed upon it thereunder, and is not, nor to the knowledge of the Company, is any other party thereto, in breach of or default thereunder in any material respect, nor is there any event which with notice or lapse of time or both would constitute a default in any material respect thereunder. To the knowledge of the Company, all of such Intellectual Property license agreements listed on Section 11(b) of the Disclosure Schedule are valid, enforceable and in full force and effect, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting the enforcement of creditors' rights generally and except for the termination or expiration pursuant to the terms and provisions thereof.

(c)     None of the Intellectual Property or Technology used, developed, sold, licensed or otherwise exploited by any of the Group Companies, or to the knowledge of the Company, made for, or sold or licensed to any of the Group Companies by any Person infringes upon or otherwise violates any Intellectual Property rights of any third Person, except to the extent that any such infringement or violation, individually or in the aggregate, would not have a Material Adverse Effect.

(d)     To the knowledge of the Company, no Person is infringing upon or otherwise violating the Intellectual Property rights of the Group Companies.

(e)     No employee or any former employee of the Group Companies has made a claim against the Group Companies that any of the Group Companies is utilizing Intellectual Property owned by such employee or former employee.

(f)     None of the Group Companies is a party to or bound by any license or other agreement requiring the payment by any of the Group Companies of any material royalty payment, excluding such agreements relating to Software licensed for use solely on the computers of any of the Group Companies, intra-company license agreements or video-contents related license agreements relating to the ordinary course of business of the Group Companies.

<div align="center">SCHEDULE 2-12</div>

(g)     To the knowledge of the Company, no employee of any of the Group Companies is in material violation of any term of any Patent or invention disclosure agreement, any Patent or invention disclosure provisions in any employment agreement, confidentiality agreement, or any other contract or agreement. To the knowledge of the Company, none of the Key Employees is in material violation of any employment agreement or other employment-related agreement with any of the Group Companies, as applicable.

(h)     None of the Trade Secrets that are material to the business of the Group Companies, wherever located, the value of which is contingent upon maintenance of confidentiality thereof, has been disclosed to any Person other than the shareholders and employees of any of the Group Companies, except: (i) as required pursuant to the filing of a Patent application by the Group Companies or (ii) where such disclosure was properly made in the ordinary course of its business or for financing purposes or as required under the Control Documents, in either case subject to an agreement under which the recipient is obliged to maintain the confidentiality of such Trade Secrets and is restrained from further disclosing it or using it other than for the purposes for which it was disclosed by the Group Companies. None of the Group Companies is in material breach of any Contractual Obligations under which confidential information belonging to any Person is made available to the Group Companies.

(i)     It is not necessary for the business of any of the Group Companies as currently conducted to use any Intellectual Property or Technology owned by any director, officer, employee or consultant of any of the Group Companies (or persons the Group Companies presently intends to hire). To the knowledge of the Company, at no time during the conception or reduction to practice of any of the Intellectual Property or Technology of any of the Group Companies was any developer, inventor or other contributor to such Intellectual Property or Technology operating under any grants from any Governmental Authority or subject to any employment agreement, invention assignment, nondisclosure agreement or other Contractual Obligations with any Person other than the Group Companies that could adversely affect the rights of any of the Group Companies to its Intellectual Property or Technology.

(j)     All present and former employees and officers of each of the Group Companies have executed and delivered employment contracts containing proprietary invention provisions with the Group Companies, and are obligated under the terms thereof to assign all inventions made by them during the course of employment that relate to any work assigned and are developed using the financial support, supplies and facilities provided by the Group Companies to the Group Companies. No such employee of any of the Group Companies has excluded works or inventions made prior to his employment with or work for the Group Companies from his assignment of inventions pursuant to such proprietary invention agreements.

(k)     <u>Network Redundancy and Computer Back-up</u>.

    (i)     The server hardware and supporting equipment (including communications equipment, terminals and hook-ups that interface with third party computer systems) used in the Company's and each PRC Entity's services network provide redundancy and meet industry standards relating to high availability; and

SCHEDULE 2-13

    (ii)        Each of the Group Companies has made back-up copies of all material computer Software and databases utilized by it and maintain such Software and databases at a secure off-site location.

**12.   RELATED PARTY TRANSACTIONS**

(a)   All the transactions between any Group Company and the Related Party have been, in all material respects, entered into on an arm's length basis, in accordance with all the related party transaction decision-making formalities (if any and applicable) and not against the normal and reasonable interest of the Group Companies.

**13.   DISCLOSURE**

(a)   <u>No Misrepresentation</u>. No disclosure made against a representation or warranty by the Company in this Agreement (including exhibits and/or schedules thereto) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in light of the circumstances under which they were made, not misleading.

(b)   <u>Full Disclosure</u>. The Company has fully provided the Investors with all material information that the Investors have reasonably requested for deciding whether to purchase the Notes.

<div align="center">SCHEDULE 2-14</div>

Schedule 3

Representations and Warranties of the Investors

In this Schedule 3, capitalized terms not otherwise defined have the meanings specified in Schedule 2 to this Agreement, and if not defined therein, have the meanings set forth in Article I of this Agreement.

1.    Such Investor is a limited partnership or limited liability company duly organized and validly existing in good standing under the laws of the jurisdiction of its formation.

2.    Such Investor has the full power and authority to enter into, execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations contemplated hereby or thereby. The execution and delivery by such Investor of this Agreement and the other Transaction Documents to which it is a party and the performance by such Investor of its obligations contemplated hereby or thereby have been duly authorized by all necessary corporate actions of such Investor. This Agreement is and each of the other Transaction Documents to which it is a party, when executed by such Investor, will be a legal, valid and binding obligation of such Investor, enforceable against such Investor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

3.    Such Investor has had an opportunity to discuss the Group Companies' business, management, financial affairs and the terms and conditions of the offering of the Notes with the management of the Group Companies and has had an opportunity to review the Group Companies' facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in Article III of this Agreement or the right of such Investor to rely thereon.

4.    Such Investor is either (i) an "accredited investor" within the meaning of Securities and Exchange Commission Rule 501 of Regulation D, as presently in effect, under the Securities Act, or (ii) not a "U.S. person" as defined in Rule 902 of Regulation S of the Securities Act. Such Investor has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Notes and is capable of bearing the economic risks of such investment.

5.    The Notes to be acquired by such Investor pursuant to this Agreement are being or will be acquired for its own account and with no intention of distributing or reselling the Notes or any part thereof. If such Investor should in the future decide to dispose of any of such Notes, such Investor understands and agrees that it may do so only in compliance with the applicable securities laws, as then in effect, and the provisions in the Notes. Such Investor holds its interest in the Notes for itself beneficially and does not have any contract, undertaking, agreement, or arrangement with any Person to sell or transfer to any third party its interest (including beneficiary interest) in the Notes and is not acting as nominee or trustee or otherwise on behalf of any Person. Such Investor agrees to the imprinting, so long as required by law and to the extent applicable, of a legend on certificates representing all of its Notes and the Conversion Shares issuable upon conversion of its Notes to the following effect:

THE SECURITIES REPRESENTED BY THIS [CERTIFICATE][INSTRUMENT] HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED OR IN ANY JURISDICTION, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR OTHERWISE IN COMPLIANCE THEREWITH. THE SALE, ASSIGNMENT, HYPOTHECATION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH A "TRANSFER") AND VOTING OF ANY OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED BY THE TERMS OF A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND THE SHAREHOLDERS NAMED THEREIN, A COPY OF WHICH MAY BE INSPECTED AT THE COMPANY'S PRINCIPAL OFFICE. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT.

6.    Such Investor understands that no public market now exists for the Notes or Conversion Shares, and that the Company has not made any assurances that a public market will ever exist for the Notes or Conversion Shares.

7.    Such Investor acknowledges that it is not relying upon any Person other than the Company, its officers and directors, in making its investment or decision to invest in the Notes. Such Investor agrees that no Investor or the respective Controlling persons, officers, directors, partners, agents, or employees of any Investor shall be liable to any other Investor for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Notes.

SCHEDULE 3-2

Schedule 4

Exhibit A-1

Exhibit A-2

Exhibit B

Case 1:20-cv-01830-DG-TAM     Document 160-1     Filed 03/03/23     Page 583 of 1052
PageID #: 6016

Exhibit C

Exhibit D

Exhibit E

**Exhibit 10.7**

**Amended and Restated Shareholder Voting Rights Trust Agreement**

This agreement is executed by the following parties in Beijing on January 30, 2013:

Geng Xiaohua: a shareholder of Beijing iQIYI Science & Technology Co., Ltd., holding 100% of the shares;

Beijing QIYI Century Science & Technology Co., Ltd.: a foreign invested limited liability company incorporated and validly existing according to the laws of China ("**QIYI Century**")

Whereas,

Geng Xiaohua and QIYI Century entered into the Shareholder Voting Rights Trust Agreement dated December 1, 2011 on February 15, 2012, whereby Geng Xiaohua irrevocably entrusts the persons designated by QIYI Century to represent him to exercise the shareholder voting rights and all the shareholder rights he enjoys provided by the law and the articles of association at the shareholders' meetings of Beijing iQIYI Science & Technology Co., Ltd. (previously known as Beijing Xinlian Xinde Advertisement Media Co., Ltd.).

Therefore, the parties reach the following contract for their observation upon consensus through negotiation:

Article 1

Geng Xiaohua agrees to irrevocably entrust the persons designated by QIYI Century to represent him to exercise at the shareholders' meetings of Beijing iQIYI Science & Technology Co., Ltd. the shareholder voting rights and all the shareholder rights he enjoys provided by the law and the articles of association, including but not limited to: sale or transfer of the equity held by Geng Xiaohua in Beijing iQIYI Science & Technology Co., Ltd. in whole or in part, convening, attending and chairing the shareholders' meetings as a proxy of the shareholder of Beijing iQIYI Science & Technology Co., Ltd. at the shareholders' meetings, electing and replacing executive directors, supervisors, or managers, deliberating on and approving the company's plans for profit distribution and loss recovery, making resolutions on the company's merger, division, liquidation or change of corporate form, determining the company's plan for operation and investment, as well as amending the company's articles of association.

Article 2

QIYI Century agrees to designate relevant persons to accept the entrustment granted by Geng Xiaohua according to Article 1 hereof and to exercise on its behalf the voting rights and other shareholder's rights according to the provisions hereof.

Article 3

Geng Xiaohua hereby confirms the sub-authorization by QIYI Century, and that he shall entrust the persons designated by QIYI Century to exercise all of his shareholder voting rights and other shareholder rights, regardless of what changes occur to his equity in Beijing iQIYI Science & Technology Co., Ltd.

Article 4

Geng Xiaohua hereby confirms that, if QIYI Century cancels the designation of relevant persons, he will immediately revoke the entrustment and authorization to such persons, and will authorize other person designated by QIYI Century according to the designation of QIYI Century to exercise all of Geng Xiaohua's shareholder voting right and other shareholder rights at the shareholders' meetings of Beijing iQIYI Science & Technology Co., Ltd.

Article 5

This Agreement shall become effective on November 23, 2012.

Article 6

During the period in which Geng Xiaohua holds equity in Beijing iQIYI Science & Technology Co., Ltd, unless this Agreement provides otherwise, this Agreement is irrevocable and remains effective, as from November 23, 2012.

Article 7

This Agreement is irrevocable, and its amendment and/or rescission shall be subject to the unilateral written consent of QIYI Century.

[the remainder of this page is intentionally left blank]

2

[Signature Page]

**Geng Xiaohua**

Signature: /s/ Geng Xiaohua_____

**Beijing QIYI Century Science & Technology Co., Ltd.**

*[Company seal is affixed]*

Authorized Representative: Gong Yu

Signature: /s/ Gong Yu_____

Agree and accept this Agreement:

**Beijing iQIYI Science & Technology Co., Ltd.**

*[Company seal is affixed]*

Authorized Representative:

Signature: /s/ Geng Xiaohua_____

3

**Exhibit 10.8**

Beijing QIYI Century Science & Technology Co., Ltd.

(as Pledgee)

and

GENG Xiaohua

(as Pledgor)

Regarding 100% of the shares in Beijing iQIYI Science & Technology Co., Ltd.

**Amended and Restated SHARE PLEDGE AGREEMENT**

January 30, 2013

**Amended And Restated Share Pledge Agreement**

This amended and restated Share Pledge Agreement (this "Agreement") is exectued by the following parties in Beijing on January 30, 2013:

**Pledgee:**
**Party A: Beijing QIYI Century Science & Technology Co., Ltd.**
Registered address: Floor 10 & 11, 2 Haidian North First Street, Haidian District, Beijing

**Pledgor:**
**Party B: GENG Xiaohua**
Domicile: ******

Whereas,

1.    Party A is a wholly foreign owned enterprise incorporated in Beijing, the People's Republic of China ("**China**").

2.    Party B is a citizen of China, holding 100% of the shares in Beijing iQIYI Science & Technology Co., Ltd. ("**IQIYI**") (former Beijing Xinlian Xinde Advertisement Media Co., Ltd.). IQIYI is a limited liability company incorporated in Beijing, China.

3.    Party A and Party B entered into an Amended and Restated Loan Agreement ("**Loan Agreement**") on January 30, 2013 whereby Party A has provided Party B with an interest-free loan of RMB twenty seven million (RMB 27,000,000.00) (the "**Loan**"), and Party B has received payment of the Loan and has obtained 100% of the shares in IQIYI;

4.    Party A and IQIYI entered into the Exclusive Technology Consulting and Service Agreement dated December 1, 2011 ("**Service Agreement**") on February 15, 2012, the term of which is ten years. According to the Service Agreement, IQIYI shall pay Party A technology consulting and service fee ("**Service Fee**") for the service provided by Party A.

5.    Party A and Party BDefault Notice entered into the Share Pledge Agreement dated December 1, 2011 ("**Original Share Pledge Agreement**") on February 15, 2012;

6.    To guarantee Party B's performance of his/her obligations under the entrusted loan arrangement(s), and guarantee that Party A will receive payment of Service Fee from IQIYI owned by Party B, Party B is willing to pledge his/her shares in IQIYI to secure payment of the Loan and Service Fee. The Pledgee and the Pledgor intend to amend and restate the Original Share Pledge Agreement.

Therefore, the Pledgor and Pledgee enter into this Agreement according to the following provisions upon consensus through friendly negotiation.

1.    Definitions

Unless this Agreement provides otherwise, the following terms shall have meaning below:

1.1      "Pledge" means the content set forth in Article 2 hereof.

1.2      "Shares" means all the shares held by the Pledgor legally in IQIYI.

1.3      "Pledge Ratio" means the ratio between the value of the Pledge hereunder and the total of the Service Fee and the Loan.

1.4      "Pledge Term" means the period set forth in Article 3.2 hereof.

1.5      "Principal Agreements" means the Service Agreement and the agreement(s) under the entrusted loan arrangement(s).

1.6      "Default Event" means any circumstances set forth in Article 7.1 hereof.

1.7      "Default Notice" means the notice sent by the Pledgee according hereto to announce any Default Event.

2.    Pledge

The Pledgor creates a pledge over all his/her shares in IQIYI in favor of the Pledgee, to secure performance of (i) all debts under the entrusted loan arrangement(s), and (ii) all debts under the Service Agreement. "Pledge Right" means the right enjoyed by the Pledgee to convert the Shares into money, auction or sell the Shares and to have priority in payment from the proceeds obtained from disposal of the Shares.

3.    Pledge Ratio and Pledge Term

3.1      Pledge Ratio

The pledge ratio of the Pledge is 100%.

3.2      Creation and Term of the Pledge

3.2.1    The Pledge hereunder is created when it is recorded in the register of members of IQIYI, and registered with the competent industrial and commercial administrative authority.

3.2.2    The pledge term hereunder expires when all the debts under the Principal Agreements become due, then Party A shall have the right to rescind or terminate this Agreement.

3.2.3    During the Pledge Term, if the Pledgor fails to perform any obligation under the entrusted loan arrangement(s) or fails to pay any Service Fee under the Service Agreement, the Pledgee has the right to dispose of the Pledge Right according to this Agreement.

4.    Custody of Pledge Certificate

4.1    During the pledge term hereunder, the Pledgor shall deliver the capital contribution certificate regarding the shares in IQIYI to the Pledgee for the custody within one (1) week after execution of this Agreement.

4.2    The Pledgee has the right to collect dividends of the Shares during the term of this Agreement.

5.    Representations and Warranties of the Pledgor

5.1    The Pledgor is the legal owner of the Shares, and he/she has duly approved the share pledge hereunder through a resolution of shareholders' meeting (see Schedule 2).

5.2    The Pledgor has not created any other pledge or right over the Shares other than the Pledge created in favor of the Pledgee.

6.    Representations and Warranties of the Pledgee

6.1    During the existence of this Agreement, the Pledgor undertakes that in the interest of the Pledgee, he/she will

6.1.1    not transfer his/her Shares or create or permit existence of any pledge that may affect the Pledgee's right or interest, without prior written consent of the Pledgee;

6.1.2    comply with and perform the provisions of all the laws and regulations relating to rights pledge, and will present any notice, order or advice issued or made by any competent authority to the Pledgee within five (5) days after receiving such notice, order or advice, and shall follow such notice, order or advice, or raise objection or statement on the above matter at reasonable request of the Pledgee or with consent of the Pledgee;

6.1.3    promptly notify the Pledgee of any event or notice that may affect the Pledgor's Shares or other right, or any event or notice received that may change any security or obligation created hereunder or have other effect.

6.2    The Pledgor agrees that the Pledgee's exercise of the pledge right hereunder according to the provisions hereof shall not be interrupted or prevented by the Pledgor or his/her successors or principals or other persons through any legal procedure.

6.3    The Pledgor warrants to the Pledgee that to protect or perfect the security hereunder for the obligations of repaying the Loan and paying Service Fee, he/she will execute and procure other parties interested in the pledge right to execute any right certificates or deeds, and/or conduct and procure other parties interested to conduct any acts, in good faith, which are required by the Pledgee, and shall provide convenience for the exercise of rights or authorities granted by this Agreement to the Pledgee.

6.4 The Pledgor undertakes to the Pledgee that he/she will sign any change document of Shares certificate (if applicable and necessary) with the Pledgee or its designated person (natural person or legal person), and provide the Pledgee with all notices, orders and decisions regarding the Pledge it deems necessary.

6.5 The Pledgor undertakes to the Pledgee that he/she will comply with and perform all warranties, covenants, agreements, representations and conditions in the interest of the Pledgee. If the Pledgor fails to perform the warranties, covenants, agreements, representations and conditions in whole or in part, it shall compensate the Pledgee for all losses thus caused.

6.6 During the term of this Agreement, the Pledgor will not carry out any act or forbearance that may affect value of the pledged Shares, and shall maintain and increase such value. If any event occurs which may reduce the value of the pledged Shares or affect the Pledgor's performance of any obligation hereunder, the Pledgor shall promptly notify the Pledgee, and at the request of the Pledgee provide other property security satisfactory to the Pledgee regarding the reduced amount of the pledged Shares.

6.7 Subject to applicable laws and regulations, the Pledgor shall carry out, and use the best efforts to actively cooperate with the Pledgee to carry out all registrations, filings and other procedures with respect to the Share Pledge required by the laws and regulations.

7. Default Events

7.1 The following events shall be deemed Default Events:

7.1.1 The Pledgor fails to perform any obligation under the entrusted loan arrangement(s) or the supplemental agreement(s);

7.1.2 IQIYI fails to fully pay any Service Fee under the Service Agreement or perform other related obligation;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof is materially misleading or wrong, and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches any covenants in Article 6 hereof;

7.1.5 The Pledgor breaches any other provisions hereof;

7.1.6 The Pledgor abandons the pledged shares, or without written consent of the Pledgee transfers the pledged Shares;

7.1.7    Any loan, security, indemnity, covenant or other repayment liability of the Pledgor to others (1) is requested to be repaid or performed early for any breach; or (2) becomes due but is unable to be repaid or performed, and thus causes the Pledgee to believe that the Pledgor's ability to perform its obligations hereunder has been impaired;

7.1.8    IQIYI fails to repay any general debt or other indebtedness;

7.1.9    This Agreement becomes illegal, or the Pledgor cannot perform any obligation hereunder for any reason other than force majeure;

7.1.10    Any adverse change occurs to any property owned by the Pledgor, which causes the Pledgee to believe that the Pledgor's ability to perform its obligations hereunder has been impaired;

7.1.11    IQIYI's successor or administrator can perform only part of the payment obligation under the Service Agreement or refuses to perform the payment obligation;

7.1.12    Default caused by the breach of this Agreement by any act or forbearance of the Pledgor.

7.2    If the Pledgor knows or finds that any event set forth in Article 7.1 or any matter that may cause such event to have occurred, he/she shall immediately notify the Pledgee in writing.

7.3    Unless the Default Event set forth in Article 7.1 has been resolved satisfactory to the Pledgee, the Pledgee may send notice of default to the Pledgor in writing at any time on or after occurrence of the Default Event, requesting the pledger to immediately pay any outstanding amount or other payable amount under the Service Agreement or the entrusted loan arrangement(s), or dispose of the Pledge according to Article 8 hereof.

8.    Exercise of Pledge Right

8.1    Before the Service Fee under the Service Agreement is fully paid, or before the obligations under the entrusted loan arrangement(s) and the supplemental agreement(s) are fully performed, whichever is later, the Pledgor may not transfer the pledged Shares without written consent of the Pledgee.

8.2    When exercising the pledge right, the Pledgee shall issue a Default Notice to the Pledgor.

8.3    Subject to the provisions of Article 7.3, the Pledgee may exercise its right to dispose of the pledge right when or after the default notice is sent according to Article 7.3

8.4    The Pledgee has the right to convert the Shares into money, auction or sell the Shares and to have priority in payment from the proceeds obtained from disposal of the Shares, until the Service Fee under the Service Agreement and the outstanding amount or other payable amount owed by the Pledgor under the entrusted loan arrangement(s) are fully paid.

8.5    When the Pledgee disposes of the pledge right according to this Agreement, the Pledgor may not set any obstacle, and shall provide necessary assistant to realize the pledge right.

9.    Transfer

9.1    The Pledgor has no right to gift or transfer any rights or obligations hereunder without the Pledgee's prior written consent.

9.2    This Agreement shall bind the Pledgor and its successor or heir, and inure to the benefit of the Pledgee and its successor, heir or permitted assigns.

9.3    The Pledgee may transfer all or any rights and obligations under the Service Agreement, the entrusted loan arrangement(s) and the supplemental agreement(s) to its designated person (natural or legal person) at any time to the extent permitted by laws. In such case, the transferee shall enjoy and assume such rights and obligations enjoyed and assumed by the Pledgee hereunder, as if it is a party to this Agreement. When the Pledgee transfers any rights and obligations under the Service Agreement, the entrusted loan arrangement(s) and the supplemental agreement(s), it only needs to send written notice to the Pledgor, and the Pledgor shall sign relevant agreement and/or document relating to the transfer at the request of the Pledgee.

9.4    When the Pledgee is changed owing to transfer, the new parties to the pledge shall sign another pledge contract.

10.    Effectiveness and Term

This Share Pledge Agreement becomes effective on the date first written above on which the pledge should be recorded in the shareholder's register of the company. This Agreement once effective shall replace the Original Share Pledge Agreement entered into by both parties.

11.    Termination

The pledge hereunder shall expire when all the debts under the Principal Contract become due, at that time Party A shall have the right to rescind or terminate this Agreement. When this Agreement is terminated, the Pledgee shall cancel or rescind this Agreement as soon as reasonably practicable.

12.    Formality Fee and Other Expenses

12.1    All the costs and expenses relating to this Agreement, including but not limited to legal costs, cost of production, stamp duty and other taxes and expenses, shall be borne by the Pledgor. If the Pledgee is required to pay relevant taxes and expenses according to law, the Pledgor shall indemnify fully the taxes and expenses paid by the Pledgee.

12.2     If the Pledgor fails to pay any taxes or expenses according hereto, if the Pledgee recovers any taxes or expenses from the Pledgor by any means or in any ways for other reason, the Pledgor shall assume all costs thus caused, including but not limited to various taxes, formality fees, management fees, litigation costs, attorney's fees and various insurance premiums for handling the pledge right.

13.    Force Majeure

13.1     "Force Majeure" means any events that are beyond the reasonable control of either party and are unavoidable event the affected party takes reasonable care, including but not limited to government acts, change of laws, Acts of God, fire, explosion, storm, flood, earthquake, tide, lightening, or war. However, insufficiency of creditworthiness, fund or financing shall not be deemed an event beyond either party's reasonable control. The party affected by force majeure event shall notify promptly the other party of such event.

13.2     When performance of this Agreement is delayed or prevented by any Force Majeure event defined in the above paragraph, the party affected by the event is not required to assume any liability hereunder to the extent of such delay and prevention. The affected party shall take appropriate measures to mitigate or eliminate the effect of the event, and shall try to resume performance of the obligation delayed or prevented by the event. Once the effect of the force majeure event is eliminated, the parties agree to use their best efforts to resume performance of this Agreement.

14.    Confidentiality

The parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other party, except (a) Any information that has been known or will be known to the public (not through any disclosure of the receiving party to the public); (b) Any information disclosed according to the requirements of applicable laws and stock exchange rules; or (c) Any information disclosed to either party's legal or financial consultant with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein. Any disclosure by any employee or engaged institution of either party shall be deemed disclosure by such party, and such party shall assume the liability for breach of contract according to this Agreement.

15.    Dispute Resolution

15.1     This Agreement shall be governed by and interpreted according to the laws of China.

15.2    When the parties have any dispute relating to interpretation or performance of any provision hereof, they shall negotiate in good faith to resolve such dispute. If the parties fail to reach an agreement, either party may submit the dispute to China International Economic and Trade Arbitration Commission to arbitrate according to the arbitration rules then in effect. The place of arbitration shall be Beijing; the language used in the arbitration shall be Chinese. The arbitration award is final and has binding force upon the parties.

16.    Notice

Any notice of each party hereto for exercise and performance of rights and obligations hereunder shall be made in writing and sent to the following addresses. If the notice is sent by personal delivery, it shall be deemed served when it is actually delivered. If the notice is sent by telex or fax, it shall be deemed served when it is sent; if it is not sent on a business day or in business hours, it shall be deemed served on the next business day. The addresses shall be those set forth on the first page hereof or other addresses notified by the parties in writing from time to time. "Writing" includes fax and telex.

Party A: Beijing QIYI Century Science & Technology Co., Ltd.
Address: Floor 10 & 11, 2 Haidian North First Street, Haidian District, Beijing
Fax:
Tel:

Party B: GENG Xiaohua
Address: ******
Fax:
Tel:

17.    Entire Contract

Notwithstanding Article 10 hereof, the parties acknowledge that this Agreement once effective shall constitute the entire agreement and understanding between them with respect to the subject matter hereof, and shall replace all oral and/or written agreements and understandings concluded by the parties with respect to the subject matter hereof.

18.    Severability

If any provision hereof is decided invalid, or unenforceable for violating any laws, the provision shall be deemed in valid in the jurisdiction where the laws are applied, and shall not affect the legal validity of other provisions hereof.

19.    Schedules

The schedules hereto are an integral part hereof.

20.    Amendment and Supplementation

20.1    The parties shall amend or supplement this Agreement in writing. Any amendment to or supplemental agreement(s) of this Agreement duly signed by the parties constitute a part of this Agreement, and have the same legal force as this Agreement.

20.2    Any amendment to, supplementation of or modification of this Agreement shall be made in writing and become effective after the parties sign and seal.

21.    Counterparts

This Agreement is written in Chinese in four counterparts. Each party shall hold one counterpart, and the other two counterparts will be used for Share Pledge registration. All counterparts have equal legal force.

[The remainder of this page is intentionally left blank.]

[Signature Page]

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

Pledgee: Beijing QIYI Century Science &Technology Co., Ltd.

[*Company seal is affixed*]

Legal/Authorized Representative: /s/ Gong Yu

Pledgor:    Geng Xiaohua

By:   /s/ Geng Xiaohua

Schedules:

1.      Register of Members of Beijing iQIYI Science & Technology Co., Ltd.;

2.      Shareholders' resolution of Beijing iQIYi Science & Technology Co., Ltd..

**Schedule 1**

**Beijing iQIYI Science & Technology Co., Ltd.**

**Register of Members**

January 30, 2013

| Name of shareholder | Contribution amount; shareholding percentage | Information of shareholder | remarks |
|---|---|---|---|
| GENG Xiaohua | RMB 27 million<br><br>100% | Nationality: China<br><br>ID No.: ***<br><br>Address: ***<br><br>Contact information: | The shareholder pledges all his/her shares in the company in favor of Beijing QIYI Century Science &Technology Co., Ltd., effective from November 23, 2012, until the all the debts under the Principal Agreements become due. |

**Schedule 2**

**Beijing iQIYI Science & Technology Co., Ltd.**

**Shareholder's Resolution**

In connection with the Amended and Restated Share Pledge Agreement entered into between the shareholder of the Beijing iQIYI Science & Technology Co., Ltd. (the "Company") and Beijing QIYI Century Science &Technology Co., Ltd. on January 30, 2013, the shareholders' meeting of the Company resolves as follows:

Approve the shareholder of the Company pledge his/her Shares in the Company in favor of Beijing QIYI Century Science &Technology Co., Ltd..

This resolution is signed and delivered by the following shareholder on January 30, 2013.

Shareholder: GENG Xiaohua

/s/ GENG Xiaohua

**Exhibit 10.9**

**Commitment Letter**

To: Beijing iQIYI Science & Technology Co., Ltd.

Whereas, your company is a company of which the financial statements are consolidated with Qiyi.com, Inc. and Beijing QIYI Century Science & Technology Co., Ltd. under US GAAP. To normal operation of your company and to promote the development of business, Qiyi.com, Inc. and Beijing QIYI Century Science & Technology Co., Ltd. hereby undertake as follows:

If your company suffers any loss before issuance of this letter, Beijing QIYI Century Science & Technology Co., Ltd. undertakes to provide financial aid free of charge to you to the extent permitted by law. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. Your company are not required to repay the financial aid provided by Beijing QIYI Century Science & Technology Co., Ltd. according to this letter.

If your company suffers loss in any year after issuance of this letter, Qiyi.com, Inc. will provide financial aid free of charge to your company through Beijing QIYI Century Science & Technology Co., Ltd. to the extent permitted by law in the next year. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. Your company are not required to repay the financial aid provided by Qiyi.com, Inc. through Beijing QIYI Century Science & Technology Co., Ltd. according to this letter.

The above undertakings are conditioned on that (1) your company is a company of which the financial statements are consolidated with Qiyi.com, Inc. and Beijing QIYI Century Science & Technology Co., Ltd. under US GAAP; (2) the Amended and Restated Loan Agreement, the Amended and Restated Share Pledge Agreement, the Amended and Restated Exclusive Purchase Option Agreement, the Amended and Restated Business Operation Agreement, the Amended and Restated Shareholder Voting Rights Trust Agreement, the Power of Attorney and the Confirmation Letter entered into by your company, your shareholders and relevant entities on January 30, 2013 and any amendments to the above documents with consents of the signing parties shall remain effective.

Undertaking Party: Qiyi.com, Inc.
[*Company Seal is affixed*]
Authorised Signatory: /s/ GONG Yu

Undertaking Party: Beijing QIYI Century Science & Technology Co., Ltd.
[*Company Seal is affixed*]
/s/ Beijing QIYI Century Science & Technology Co., Ltd.
January 30, 2013

**Exhibit 10.10**

**Amended and Restated Exclusive Purchase Option Agreement**

This Amended and Restated Exclusive Purchase Option Agreement (this "**Agreement**") is made by the following parties in Beijing on January 30, 2013:

**(1)**    **Qiyi.com, Inc.**

Address: Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands ("**Qiyi Cayman**")

**(2)**    **Beijing QIYI Century Science & Technology Co., Ltd. ("Party A")**

Address: Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing

**(3)**    **Geng Xiaohua ("Party B")**

Address: ***

**(4)**    **Beijing iQIYI Science & Technology Co., Ltd.** (formerly known as Beijing Xinlian Xinde Advertisement Media Co., Ltd., **"Party C"**)

Address: Room 1101, 2 Haidian North First Street, Haidian District, Beijing

In this Agreement, each of Qiyi Cayman, Party A, Party B and Party C shall be referred to as a "Party", and collectively as the "Parties".

Whereas,

1.    Qiyi Cayman is a company incorporated in Cayman Islands and holds 100% shares in Party A ("**Shares**");

2.    Party A is a wholly foreign owned enterprise established in the People's Republic of China ("**China**") in accordance with the laws of China, has the expertise and practicing experience in computer software development and design, and has rich experience and professional personnel in IT technology and service;

3.    Party C is a limited liability company incorporated in Beijing, China, and provides internet information service and other value-added telecommunication services;

4.    Party B is the shareholder of Party C, and holds 100% shares in Party C;

5.    Party A and Gong Yu entered into the Loan Agreement on April 15, 2011; Party A, Party B, Gong Yu and Party C entered into the Loan Succession and Share Transfer Agreement on July 15, 2011; subsequently, Party A and Party B entered into the Loan Agreement on July 15, 2011 (the above three agreements referred to as "**Original Loan Agreements**"). Party A and Party B entered into the Amended and Restated Loan Agreement on January 30, 2013 providing that Party A would provide Party B another loan of RMB nineteen million (19,000,000.00).

6.    Party A and Party C entered into a series of agreements, including the Exclusive Technology Consulting and Service Agreement dated December 1, 2011 ("**Service Agreement**"), on February 15, 2012.

1

7.  Party A and Party B entered into the Share Pledge Agreement dated December 1, 2011 ("**Share Pledge Agreement**") on February 15, 2012; Party A and Party B entered into the Amended and Restated Share Pledge Agreement on January 30, 2013.

8.  Party A, Party B and Party C entered into the Exclusive Option Agreement dated December 1, 2011 ("**Original Exclusive Option Agreement**") on February 15, 2012; the Parties intend to amend and restate the Original Exclusive Option Agreement contemplated herein.

Therefore, the Parties reach the following contract through negotiations and intend to be bound hereby:

**1.    Purchase and Sale of Share**

1.1.    Grant of Rights

Party B hereby irrevocably grants Qiyi Cayman or one or more persons nominated by Qiyi Cayman (the "**Nominees**") an option to purchase, to the extent permitted under the laws of China and at the price set forth under Article 1.3, all or any part of the Share held by the selling Party at any time and in any manner decided by Qiyi Cayman at its discretion ("**Share Purchase Option**"). Except for Qiyi Cayman and/or the Nominees, no third person shall have the Share Purchase Option. Party C hereby agrees that Party B may grant the Share Purchase Option to Qiyi Cayman and/or the Nominees. For purpose of this Article 1.1 and this Agreement, "person" includes individuals, companies, joint ventures, partnerships, enterprises, trusts and unincorporated associations.

1.2.    Exercise Steps

Subject to compliance with Laws and regulations of China and obtaining all approvals required, Qiyi Cayman and/or the Nominees may exercise the Share Purchase Option after sending written notice to the Share Selling Party ("**Share Purchase Notice**") setting forth the number of shares it will purchase from the Share Selling Party ("**Purchased Shares**") and the way of purchase to exercise the Share Purchase Option.

1.3.    Purchase Price

1.3.1    When Qiyi Cayman exercises the Share Purchase Option, unless the then applicable laws and regulations of China require evaluation of the shares or any restrictions on the share purchase price, the price for the Purchased Share ("Purchase Price") shall be equivalent to the amount of capital contribution actually paid by the Share Selling Party for the Purchased Shares.

1.3.2    If the applicable laws and regulations of China require evaluation of the shares or any restrictions on the share purchase price when Qiyi Cayman exercises the Share Purchase Option, the Parties agree that the Purchase Price shall be the minimum price permitted by applicable laws.

1.4.    Transfer of the Purchased Shares

When exercising the Share Purchase Option,

2

1.4.1    The Share Selling Party and Qiyi Cayman and/or the Nominees (as applicable) shall enter into an share transfer contract in the substance and form satisfactory to Qiyi Cayman for each transfer of shares in accordance with this Agreement and the Share Purchase Notice of the Purchased Shares;

1.4.2    The Share Selling Party shall sign all necessary contracts, agreements or documents, obtain all necessary governmental approvals and consents, and take all necessary actions to transfer the title to the Purchased Shares to Qiyi Cayman and/or the Nominees without any security interest or condition, and procure Qiyi Cayman and/or the Nominees to be registered as shareholder of the Purchased Shares. For purpose of this Article 1.4.2 and this Agreement, "security interest" includes but not limited to guarantee, mortgage, pledge, any third party right or interest, any option, acquisition right, right of first refusal, right of offsetting, title retention or other security arrangement, excluding any security interest arising under the Share Pledge Agreement.

1.4.3    For the avoidance of any doubt, exercise of the Share Purchase Option by Qiyi Cayman and/or the Nominees shall be at the discretion of Qiyi Cayman.

1.5.    Payment

The payment method of the Purchase Price shall be determined by Qiyi Cayman and/or the Nominees and the Selling Party through negotiations in accordance with the laws then applicable upon exercising the Share Purchase Option. The Parties hereby agree that the amount paid by Qiyi Cayman and/or the Nominees to the Share Selling Party for the Purchased Shares shall be returned to Qiyi Cayman subject to compliance with applicable laws (provided that any taxes and expenses, if any, incurred by the Share Selling Party for the transaction contemplated in the Transfer Contract may be deducted from such amount), to repay the principal of the entrusted loan, or any interest or funding commitment cost permitted by laws.

**2.    Covenants Relating to Shares**

2.1    Covenants regarding Party C

Party B and Party C hereby covenant that in respect of Party C,

2.1.1    they will not supplement, modify or amend Party C's articles of association in whatever forms, or increase or reduce Party C's registered capital, or otherwise change Party C's register capital structure without Qiyi Cayman's prior written consent;

2.1.2    they will maintain their existence in line with sound financial and business standards and practices, and prudentially and validly operate their business and handle their matters;

2.1.3    they will not sell, transfer, mortgage or otherwise dispose of any legal or beneficial interest in Party C's assets, business or revenue, or permit any other security interest to be created over such interest at any time after execution of this Agreement without Qiyi Cayman's prior written consent;

3

2.1.4    they will not incur, succeed, guarantee or permit existence of any debts without Qiyi Cayman's prior written consent, except for (i) any debts other than loans incurred in daily or normal business course; and (ii) any debts disclosed to and consented by Qiyi Cayman in writing;

2.1.5    they are always operating all business in normal business course to maintain the value of Party C's assets, and will not make any action or omission that may affect their operational condition and value of assets;

2.1.6    they will not sign any material contract without prior written consent of Qiyi Cayman, except for the contract entered into in normal business course (for purpose of this Article 2.1.6, a contract at an amount of more than RMB three hundred thousand (300,000.00) shall be deed as material contract);

2.1.7    they will not provide any loan or credit to any person without the prior written consent of Qiyi Cayman;

2.1.8    they will provide Qiyi Cayman with the information of Party C's operation and financial conditions at the request of Qiyi Cayman;

2.1.9    they will purchase and maintain insurances from the insurer acceptable to Qiyi Cayman, the insurance amount and coverage of which should be same as those of the companies at the place of Party C who operate similar business or own similar properties or assets;

2.1.10   they will not merge or consolidate with others or purchase or invest in any person without prior written consent of Qiyi Cayman;

2.1.11   they will immediately notify Qiyi Cayman of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to Party C's assets, business or revenue;

2.1.12   they will sign all necessary or desirable documents, take all necessary or desirable actions, and make all necessary or desirable claims and defenses to maintain Party C's title to its assets;

2.1.13   Party C may not distribute dividends in whatever forms to its shareholders without prior written consent of Qiyi Cayman, provided however that, if Qiyi Cayman requests, Party C shall immediately distribute the distributable profits to its shareholders in whole or in part. The shareholders shall remit such dividends distributed by Party C or other revenue distributed by Party C in other forms to Qiyi Cayman in a way permitted by laws.

2.1.14   They will appoint the persons nominated by Qiyi Cayman as directors of Party C at the request of Qiyi Cayman;

2.2    Covenants regarding Share Selling Party

Party B hereby covenants that:

4

2.2.1    It will not sell, transfer, mortgage or otherwise dispose of any legal or beneficial interest in any share, or permit any other security interest to be created over such interest at any time after execution of this Agreement without Qiyi Cayman's prior written consent, except for the pledge created over the shares owned by the Share Selling Party under the Share Pledge Agreement;

2.2.2    Without prior written consent of Qiyi Cayman, It will not vote for or support or sign any resolutions at the shareholder's meeting of Party C to approve sale, transfer, mortgage or other disposal of any legal or beneficial interest in any share, or permit any other security interest to be created over such interest, except for those created in favor of Qiyi Cayman or any persons designated by Qiyi Cayman;

2.2.3    without prior written consent of Qiyi Cayman, it will not vote for or support or sign any resolutions at the shareholder's meeting of Party C to approve the merger or consolidation of Party C with others, or Party C's purchase or investment in any other person;

2.2.4    It will immediately notify Qiyi Cayman of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to its shares;

2.2.5    It will sign all necessary or desirable documents, take all necessary or desirable actions, and make all necessary or desirable claims and defenses to maintain its title to the shares;

2.2.6    It will appoint the persons nominated by Qiyi Cayman as directors of Party C at the request of Qiyi Cayman;

2.2.7    It will transfer its shares unconditionally to the representative designated by Qiyi Cayman at any time Qiyi Cayman requests, and waive its right of first refusal in connection with transfer of shares by the other shareholder ;

2.2.8    It will strictly comply with any provisions of this Agreement and any other contract signed by the Share Selling Party, Party C and Qiyi Cayman jointly or separately, carefully perform various obligations hereunder and thereunder, and will not make any action or omission which may affect the validity or enforceability of this Agreement or other contracts.

2.2.9    It will not sign any material contract without prior written consent of Qiyi Cayman, except for the contract entered into in normal business course (for purpose of this Article 2.2.9, a contract in an amount of more than RMB three hundred thousand (300,000.00) shall be deed as material contract);

2.2.10    It will not provide any loan or credit to any person without prior written consent of Qiyi Cayman;

2.2.11    Party C may not distribute dividends in whatever forms to its shareholders without prior written consent of Qiyi Cayman, provided however that, if Qiyi Cayman requests, Party C shall immediately distribute the distributable profits to its shareholders in whole or in part;

5

2.2.12    Party C's shareholders shall remit such dividends distributed by Party C or other revenue distributed by Party C in other forms to Qiyi Cayman in a way permitted by laws.

2.3    Covenants regarding Qiyi Cayman

2.3.1    Qiyi Cayman hereby covenants that to meet cash needs of Party C during operation of business or to cover any loss incurred by Party C during operation of business, if Party C needs any loan or other financial support, Qiyi Cayman will provide Party C with the financial support unconditionally and without restrictions in a way permitted by law, regardless whether Party C has incurred the above operation loss or not;

2.3.2    Qiyi Cayman may provide such financial support by entrusted bank loan or company loan to the extent permitted by laws. The contract of entrusted bank loan or the company loan shall be executed separately.

2.3.3    If Party C incurs any operation loss and is unable to repay the loan or financial support provided by Qiyi Cayman under Article 2.3.1, with sufficient evidence to prove such inability, Qiyi Cayman agrees to waive unconditionally the right of requesting Party C to repay such loan or financial support.


**3.    Representations and Warranties**

The Share Selling Party and Party C hereby represent and warrant to Qiyi Cayman as of the date hereof and each transfer date that:

3.1    It has the power to execute and deliver this Agreement and any share transfer contract ("Transfer Contract") entered into by it for each transfer of the Purchased Shares, and to perform its obligations hereunder and thereunder. This Agreement and the Transfer Contract to which it is a party, once executed, shall constitute legal, valid and binding obligations upon it, and may be enforced under the terms hereof and thereof;

3.2    Neither execution and delivery of this Agreement or any Transfer Contract, nor performance hereof or thereof will: (i) result in violation of any China laws or regulations; (ii) conflict with its articles of association or other organizational document; (iii) result in breach of any contract or instrument to which it is a party, or constitute breach under such contract or instrument to which it is a party or which has binding force upon it; (iv) result in breach of any conditions for any permit or approval to be issued to it or to remain effective; or (v) cause suspension or cancellation of or imposition of condition on any permit or approval issued to it;

3.3    Party C has sound and marketable title to its assets, and has not created any security interest over such assets;

3.4    Party C has no outstanding debts, except for (i) any debts incurred in normal business course; and (ii) any debts disclosed to and consented by Qiyi Cayman in writing;

3.5    There is no outstanding, pending or threatened litigation, arbitration or administrative procedure relating to the Shares, Party C's assets or the Company; and

6

3.6    The Share Selling Party has sound and marketable title to its shares, and has not created any security interest over such shares, except the security interest under the Share Pledge Agreement and the restrictions hereunder.

**4.    Assignment of Contract**

4.1    Party B and Party C may not assign any of their respective rights or obligations hereunder to any third party without prior written consent of Qiyi Cayman.

4.2    Party B and Party C hereby agree that Qiyi Cayman shall have the right to assign its rights and obligations hereunder to any third party when necessary. Qiyi Cayman only needs to notify Party B and Party C in writing when assigning its rights and obligations, and is not required to obtain consents of Party B and Party C.

**5.    Effectiveness and Term**

5.1    This contract shall become effective on November 23, 2012, and shall replace the Original Exclusive Option Agreement entered into by the Parties once it becomes effective.

5.2    Unless this Agreement is terminated early under its terms or any other agreement entered into by the Parties separately, this Agreement shall remain effective for ten (10) years. Party B and Party C hereby confirm that this Agreement is renewable with written confirmation of Qiyi Cayman before it expires, without consents of Party A, Party B or Party C.

5.3    If the business period of Qiyi Cayman or Party C (including any extension) expires or terminates for other reason during the period set forth in Article 5.2, this Agreement shall terminate when Qiyi Cayman or Party C is terminated, except that Qiyi Cayman has transferred its rights and obligations according to Article 4.2 hereof.

**6.    Applicable Law and Dispute Resolution**

6.1    Applicable Law

The execution, validity, interpretation and performance hereof and the resolution of any dispute hereunder shall be protected and governed by China laws.

6.2    Dispute Resolution

When the Parties have any dispute relating to interpretation or performance of any provision hereof, they shall negotiate in good faith to resolve such dispute. If the Parties fail to reach an agreement within thirty days after either Party proposes to resolve any dispute through negotiation, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with the arbitration rules then in effect. The arbitration shall be conducted in Beijing in Chinese. The arbitration award is final and has binding force upon the Parties.

7

**7.    Taxes and Expenses**

Each Party shall be responsible for any and all taxes for transfer and registration, costs and expenses incurred by or imposed upon it from preparation and execution of this Agreement and each Trans Contract and consummation of the transactions hereunder and thereunder.

**8.    Notice**

Any notice or other communication required to be sent by either Party hereunder shall be written in Chinese, and send by personal delivery, letter or fax to the following addresses of the other Parties or to other addresses designated by the other Parties by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the tenth (10th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

Qiyi.com, Inc.
Address: 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands

Party A: Beijing QIYI Century Science & Technology Co., Ltd.
Address: Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing
Fax:
Tel:

Party B: Geng Xiaohua
Address: ***
Fax:
Tel:

Party C: Beijing iQIYI Science & Technology Co., Ltd.
Address: Room 1101, 2 Haidian North First Street, Haidian District, Beijing
Fax:
Tel:

**9.    Confidentiality**

The Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other Parties, except:

a.    Any information that has been known or will be known to the public (not through any disclosure of the receiving Party to the public);

b.    Any information disclosed pursuant to the requirements of applicable laws and stock exchange rules; or

8

c.      Any information disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein.

Any disclosure by any employee of or any intermediary engaged by either Party shall be deemed disclosure by such Party, and such Party shall assume the liability for breach of contract under this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

**10.      Further Assurance**

The Parties agree to promptly sign any documents and take actions required or desirable for performance of the provisions hereof or achieving the purpose hereof.

**11.      Miscellaneous**

11.1      Amendment, Modification and Supplementation

Any amendment to and/or rescission of this Agreement shall be subject to unilateral written consent of Qiyi Cayman.

11.2      Entire Contract

Notwithstanding Article 5 hereof, the Parties acknowledge that this Agreement, once effective, shall constitute the entire agreement and understanding between them with respect to the subject matter hereof, and shall replace all oral and/or written agreements and understandings concluded by the Parties with respect to the subject matter hereof.

11.3      Severability

If one or more provisions hereof are held as invalid, illegal or unenforceable under any laws or regulations, the validity, legality or enforceability of the remaining provisions hereof shall not be affected or impaired. The Parties shall strive to replace such invalid, illegal or unenforceable provisions with valid provisions, and ensure the economic effect of the valid provisions to be similar to those invalid, illegal or unenforceable provisions as much as possible.

11.4      Headings

The headings herein are for convenience only, and may not be used to interpret, explain or affect the meaning of any provisions hereof.

11.5      Language and Counterparts

This Agreement is written in Chinese, and may be translated into English when necessary, provided that the Chinese version shall prevail. This Agreement is made in four counterparts, and each Party holds one thereof. All counterparts have equal legal force.

11.6      Successors

This Agreement shall bind upon and inure to the benefit of each Party and its successors or heirs or permitted assigns.

9

11.7     Survival

Any obligation accrued or due before expiration or early termination hereof shall remain effective after the expiration and early termination hereof. The provisions of Articles 6, 8, 9 and 11.7 hereof shall survive the termination of this Agreement.

[The remainder of this page is intentionally left blank.]

10

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

**Qiyi.com, Inc.**
[*Company seal is affixed*]
By:  /s/ Gong Yu
Title:   Authorized Signatory

**Party A:   Beijing QIYI Century Science &Technology Co., Ltd.**
[*Company seal is affixed*]
Legal Representative / Authorized Representative: /s/ Gong Yu

**Party B:   Geng Xiaohua**
By:  /s/ Geng Xiaohua

**Party C:   Beijing iQIYI Science & Technology Co., Ltd.**
[*Company seal is affixed*]
Legal Representative / Authorized Representative: /s/ Geng Xiaohua

11

**Exhibit 10.11**

**Beijing QIYI Century Science & Technology Co., Ltd.**
(as Lender)


and


**GENG Xiaohua**
(as Borrower)

**AMENDED AND RESTATED LOAN AGREEMENT**


January 30, 2013

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "**Agreement**") is executed by and between the following two parties in Beijing, the People's Republic of China ("**China**") on January 30, 2013:

**Party A:** Beijing QIYI Century Science & Technology Co., Ltd., its registered address is Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing, its legal representative is GONG Yu (龚宇) ; and

**Party B**: Geng Xiaohua (耿晓华) , address: \*\*\* ID Card No. \*\*\*

In this Agreement, Party A and Party B are collectively referred to as "both Parties" / "the two Parties" and separately referred to as "one Party" or "the other Party".

Whereas,

1. Beijing Xinlian Xinde Advertisement Media Co., Ltd. is renamed as Beijing iQIYI Science & Technology Co., Ltd. on May 31, 2012 (hereinafter referred to as "**IQIYI**");

2. Party A is a wholly foreign owned enterprise legally established and validly existing in China according to the laws of China;

3. Party B is a citizen of China, and as a shareholder of IQIYI, holds 100% of the shares in IQIYI in total.

4. Party A and GONG Yu entered into a Loan Agreement on April 15, 2011; Party A, Party B, GONG Yu and IQIYI entered into a Loan Succession and Share Transfer Agreement on July 15, 2011; thereafter, Party A and Party B entered into a Loan Agreement on July 15, 2011 (the abovementioned three agreements are collectively referred to as the "**Original Loan Agreements**"). According to the Original Loan Agreements, Party B agreed to inherit the interest-free loan of RMB 8 million (RMB 8,000,000.00) lent by GONG Yu from Party A.

5. The two Parties hereby amend and restate the terms of the Original Loan Agreements by this Agreement.

Therefore, the two Parties reach the following agreement through friendly negotiation to specify their rights and obligations:

**1.   Loan**

1.1. In accordance with the terms and conditions provided in the Original Loan Agreements, Party A agrees that Party B inherits the interest-free loan of RMB 8 million (RMB 8,000,000.00) lent by GONG Yu under the Original Loan Agreements, and Party B agrees to accept the aforesaid loan. As the consideration to the aforesaid loan, Party B has been assigned the 100% equity in IQIYI by GONG Yu.

2

1.2.   Through the friendly negotiation between Party A and Party B, Party A lent to Party B another loan of RMB Nineteen Million (RMB 19,000,000), to be used to increase IQIYI's registered capital to RMB 30,000,000.

1.3.   Where there is no additional explanation, Party B's loan in this Agreement shall always include the RMB 8,000,000 Party B inherited from GONG Yu and the additional RMB 19,000,000 lent from Party A. The aggregate amount of the two loans is RMB 27,000,000.

**2.     Term of the Loan**

2.1     Under this Agreement:

2.1.1 Party B inherits the interest-free loan of RMB 8 million (RMB 8,000,000.00) lent by GONG Yu, the term of this loan shall be from June 24, 2011 to June 23, 2021.

2.1.2 Party B lends from Party A RMB 19,000,000, the term of this loan shall be from July 7, 2012 to June 23, 2021. Where there is no additional explanation, the "**Term of the Loan**" below shall always refer to the terms of the two above-mentioned loans. The Term of the Loan is immediately extendable upon Party A's written confirmation; the extended term shall be determined by Party A.

2.2     During the Term of the Loan or any extended Term of the Loan, in the event that any of the following events occurs, Party A shall be entitled to decide, in the manner of written notice, that the loan hereunder becomes due immediately, and demand Party B to repay the loan in the manner provided by the provisions hereof:

(1)     Party B resigns from or is dismissed by Party A or its affiliated company;

(2)     Party B dies or loses capacity for civil conduct, or his/her capacity for civil conduct becomes limited;

(3)     Party B commits or is involved in any crime;

(4)     any third party claims against Party B damages exceeding one hundred thousand (RMB 100,000.00);

(5)     any representation or warranty by Party B herein is proven to be untrue or inaccurate in any material aspect at the time when it is made; or Party B breaches any obligation hereof;

(6)     to the extent permitted by the laws of China, in the event that Party A or its designated person may invest in IQIYI's internet information service and other value-added telecommunication businesses and other businesses, and Party A, in accordance with the provisions of the Exclusive Purchase Option Agreement that it entered into with Party B (the "**Exclusive Purchase Option Agreement**"), has issued a written notice to Party B to purchase the shares in IQIYI held by Party B and exercise such option.

3

**3.    Repayment of the Loan**

3.1    Both Parties hereby agree and confirm that Party B must and may only repay the loan in the manner as follows: when the loan hereof becomes due, Party B (or his/her successors, heirs or assigns) shall at the request of the written notice by Party A, subject to the provisions of the laws of China, transfer all his/her shares in IQIYI to Qiyi Cayman, and repay the loan hereunder by the proceeds received from the transfer.

3.2    Party B may not repay the loan in whole or in part without prior written consent of Party A.

3.3    Both Parties agree that the share transfer hereunder shall be deemed completed when the formalities for the change of shareholder with the relevant industrial and administrative authorities are completed and Party A or its designated persons have become the legal proprietors of the aforementioned target shares.

**4.    Interest of the Loan**

Both Parties hereby agree and acknowledge that unless this Agreement provides otherwise, the loan hereunder shall bear no interest. However, when the loan becomes due and Party B transfers his/her shares to Party A or its designated persons in the manner of repayment provided by this Agreement, if the actual price for share transfer is higher than the principal of the loan to Party B because of the requirements of the laws or other reasons, the difference between the transfer price and the principal shall be deemed interest or capital occupation expense, and shall be paid to Party A together with the principal.

**5.    Representations, Warranties and Undertakings of Party B**

5.1    Party B shall respectively provide copy of his/her capital contribution certificate as to 100% of the shares in IQIYI to Party A.

5.2    To secure repayment of the loan, Party B agrees to pledge all his/her shares in IQIYI with Party A, and grant an option to purchase the abovementioned shares to Party A. Party B agrees to execute the Amended and Restated Share Pledge Agreement at Party A's request.

5.3    Party B undertakes not to request IQIYI to distribute dividend or profit to him/her, and not to pass any resolution as the shareholder of IQIYI to distribute dividend or profit to shareholders.

4

5.4    Party B shall maintain IQIYI's existence and prudentially and validly operate the business and handle the matters of IQIYI, following sound financial and business standards and practices. Upon the Party A's request, Party B shall provide Party A with all the materials relating to operation and financial condition of IQIYI. Party B shall operate all businesses of IQIYI in the normal course of business to maintain the value of IQIYI's assets.

5.5    To keep his/her title of the shares in IQIYI, he/she shall execute all the necessary or appropriate documents, take all the necessary or appropriate actions, make all the necessary or appropriate accusations, and raise all necessary or appropriate defenses against all claims; Party B shall immediately notify Party A of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to IQIYI.

5.6    Party B shall strictly comply with the provisions hereof and duly perform his/her obligations hereunder, and shall not conduct any act or omission that may affect the validity and enforceability of this Agreement

5.7    Both Parties agree and confirm that the Party A's "written consent" mentioned in this Agreement means that the matter is subject to the approval of Party A's board of directors. If such matter is only approved by Party B, the approval shall not constitute the Party A's "written consent".

## 6.    Taxes and Expenses

Unless this Agreement provides otherwise, both Parties shall respectively pay their respective taxes and expenses regarding this Agreement pursuant to relevant laws and regulations. All the other taxes and reasonable expenses relating to the loan shall be borne by Party A.

## 7.    Effectiveness and Termination of this Agreement

7.1    Both Parties agree that the terms and conditions of this Agreement shall become effective on November 23, 2012; upon becoming effective, this Agreement shall immediately replace the Original Loan Agreements executed by the two Parties.

7.2    Both Parties agree and confirm that this Agreement shall terminate when both Parties fully perform their respective obligations hereunder. Both Parties agree and confirm that Party B's obligations hereunder shall only be deemed fully performed when all of the following conditions are met:

(1)    Party B has transferred all his/her shares in IQIYI to Party A and/or its designated persons; and

(2)    Party B has repaid all the proceeds received from the transfer hereunder or the proceeds specified in the Amended and Restate Exclusive Purchase Option Agreement to Party A, Party A shall repay the proceeds to Qiyi Cayman under the premise that the laws and regulations of China are complied with and all the approval formalities have been completed.

5

7.3 Unless (1) Party A commits gross negligence, fraud or other serious illegal acts; or (2) Party A is terminated for bankruptcy, dissolution or order to close, Party B shall not unilaterally revoke or terminate this Agreement in any circumstance.

## 8. Breaching Liabilities

8.1 In the event that either Party ("**Breaching Party**") breaches any provision hereof, and thus causes any damage to the other Party ("**Non-breaching Party**"), the Non-breaching Party may send a written notice to the Breaching Party, requesting the Breaching Party to immediately correct and remedy its breach. If the Breaching Party fails to take measures satisfactory to the Non-breaching Party to remedy and correct its breach within fifteen (15) days after the Non-breaching Party receives the abovementioned written notice, the Non-breaching Party may immediately take other remedial measures according to the provision hereof or through legal means.

8.2 In the event that Party B fails to repay the loan to Party A according hereto, Party B shall pay to Party A the liquidated damages for late payment at the daily rate of 0.02% over the outstanding amount (counted from the date requested by Party A for repayment of the loan), and shall compensate Party A for any direct economic loss caused by Party B's breach (including but not limited to the market value of the shares held by Party B in IQIYI which is not transferred, or the outstanding loan amount, whichever is higher).

## 9. Confidentiality

9.1 Both Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consent by the other Party, except:

(1) Any information that has been known or will be known to the public (not through any disclosure by the receiving Party to the public without the other Party's consent);

(2) Any information disclosed according to the requirements of applicable laws and stock exchange rules; or

(3) In case that any information is disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, such legal or financial consultant is obliged to perform similar obligations of confidentiality to those specified herein. Any disclosure by any employee of or institution engaged by either Party shall be deemed disclosure by such Party, and such Party shall be liable for breach of contract according to this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

**10.    Notice**

Any notice or other communication sent by either Party hereunder shall be made in writing, and sent by personal delivery, letter or fax to the following address of the other Party or to other addresses designated by the other Party by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the seventh (7th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

Party A: Beijing QIYI Century Science & Technology Co., Ltd.
Address: Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing
Postal code:
Tel:
Fax:

Party B: GENG Xiaohua
Address: ***
Postal code:
Tel:
Fax:

**11.    Applicable Law and Dispute Resolution**

11.1.   The execution, validity, performance and interpretation of and the dispute resolution regarding this Agreement shall be governed by the laws of China.

11.2.   Any dispute arising from performance hereof or relating to this Agreement shall be resolved by the Parties through friendly negotiation.

11.3.   If no dispute resolution agreement is reached within thirty (30) days after one Party brings up the request to resolve the dispute(s) through negotiation, either Party may submit the relevant dispute(s) to Beijing Arbitration Commission for arbitration in Beijing, pursuant to the arbitral rules then effective. The arbitration award shall be final and shall have binding force upon all the parties. When any dispute occurs or any dispute is under arbitration proceeding, except for the part submitted to arbitration, both Parties may still exercise other rights hereunder and shall still perform other obligations hereunder.

**12.    Miscellaneous**

12.1    The headings herein are for convenience only, and may not be used to interpret, explain or affect in other aspects the meaning of any provisions hereof.

12.2    Both Parties confirm that this Agreement once effective shall constitute the entire agreement and consensus between them with respect to the subject matters hereof, and shall replace all the oral and/or written agreements and consensuses reached by the Parties with respect to the subject matters hereof.

12.3   This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors, heirs or permitted assigns, and be executed only for the benefit of the above persons. Party B may not assign, pledge or otherwise transfer in other manners any right, interest or obligation hereunder to others without prior written consent of Party A.

12.4   Party B hereby agrees that (i) if Party B dies, Party B agrees to immediately assign the rights and obligations hereunder to the entity designated by Party A; (ii) Party A may assign its rights and obligations hereunder to any third party when necessary. Party A only needs to send a written notice to Party B when the such assignment occurs, and is not required to obtain Party B's consent on such assignment.

12.5   Either Party's failure to exercise promptly any right hereunder shall not be deemed waiver of such right, nor shall it affect the Party's future exercise thereof.

12.6   If any provision hereof is decided by any competent court or arbitral institution as invalid, void or unenforceable, it shall not affect or impair the validity or enforceability of other provisions hereof. The Parties shall stop performance of such invalid, void or unenforceable provision, and shall amend it so that the original intention will be achieved as much as possible and the provision becomes valid and effective only to the extent of relevant fact and circumstance.

12.7   The Parties shall negotiate to decide any matter not covered herein. The Parties shall amend or supplement this Agreement through written agreements. The written amendments and supplemental agreements duly signed by both Parties are an integral part hereof, and have same legal force as this Agreement.

12.8   This Agreement is made in four (4) counterparts, and each Party holds two (2). All counterparts have equal legal force.

In witness whereof, this Agreement is entered into by both Parties or their legal representatives or authorized representatives on the date first written above.

[The remainder of this page is intentionally left blank.]

8

[Signature page for the Amended and Restated Loan Agreement]

**Lender: Beijing QIYI Century Science & Technology Co., Ltd.(seal)**
*[Company seal is affixed]*

Signature:    /s/ GONG Yu_____
Legal Representative / Authorized Representative: GONG Yu
Position:

**Borrower: GENG Xiaohua** (耿晓华)

Signature:    /s/ GENG Xiaohua_____

9

**Exhibit 10.12**

**Amended and Restated Business Operation Agreement**

This amended and restated Business Operation Agreement (this "**Agreement**") is made by the following parties in Beijing on January 30, 2013:

(1)      Beijing QIYI Century Science & Technology Co., Ltd. ("**Party A**")

      Address: Floor 10 & 11, 2 Haidian North First Street, Haidian District, Beijing

(2)      Beijing iQIYI Science & Technology Co., Ltd. ("**Party B**")

      Address: Room 1101, 2 Haidian North First Street, Haidian District, Beijing

(3)      GENG Xiaohua ("**Party C**")

      Address: ******

Whereas,

1.      Party A is a wholly foreign owned enterprise duly established and validly existing according to the laws of the People's Republic of China ("**China**"), who has the expertise and practicing experience in computer software development and design, and has rich experience and professional personnel in IT technology and service;

2.      Party B is a limited liability company incorporated and validly existing in China;

3.      Party C is the shareholder of Party B, and holds 100% equity in Party B;

4.      Party A and Party B have established business relationship through execution of the Exclusive Technology Consulting and Service Agreement ("**Service Agreement**"), the Business Cooperation Agreement, the Software Licensing Agreement, the Trademark Licensing Agreement and other agreements;

5.      According to the abovementioned agreements entered into by Party A and Party B, Party B shall pay certain price to Party A, and Party B's daily operation will have material effect on its ability to pay the price to Party A.

Therefore, the Parties reach the following agreement for their observation upon consensus through negotiation:

1.      Party A agrees that subject to that Party B complies with the following provisions hereof, it will guarantee Party B's performance of any contract, agreement or transaction entered into by Party B and any third party with respect to Party B's business operation, and to provide full security for Party B's performance of such contract, agreement or transaction. As counter-security, Party B agrees to pledge the accounts receivable in its operation and mortgage the company's assets in favor of Party A. Party B needs to obtain registration of the above pledge or mortgage only when Party A so requests in writing. According to the above performance security arrangement, when necessary Party A is willing to act as the performance guarantor for Party B and enter into written security contract(s) with the counterparties of Party B to assume the liability of security. In this regard, Party B and Party C will take all the necessary actions (including but not limited to execution of relevant documents and obtaining of relevant registrations) to implement the counter-security arrangement for Party A.

2. To ensure performance of various business agreements between Party A and Party B, and payment of any amount owed by Party B to Party A, Party B and its shareholder, Party C, hereby agree to accept the advice, suggestion and guideline provided by Party A from time to time with respect to employment or dismissal of Party B's employees, the company's daily operation and management and the company's financial management system.

3. If any agreement between Party A and Party B terminates or expires, Party A has the right (but not have the obligation) to terminate all agreements between Party A and Party B.

4. Any amendment or supplementation to this Agreement shall be made in writing. The amendment and supplementation to this Agreement duly signed by the Parties are an integral part hereof, and have the same legal force as this Agreement.

5. If any provision hereof is invalid or unenforceable for violation of any laws, it will be deemed invalid only to the extent of jurisdiction of such relevant laws, and will not affect or impair the legal force of other provisions hereof.

6. Party B and Party C may not transfer any rights or obligations hereunder to any third party without Party A's prior written consent. Party B and Party C hereby agree that Party A may transfer its rights or obligations hereunder to any third party when necessary. Party A only needs to send a written notice to Party B when such transfer occurs, and is not required to obtain consent of Party B or Party C.

7. The Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consents of the other Party, except (a) any information that has been known or will be known to the public (not through any disclosure of the receiving Party to the public); (b) any information disclosed according to the requirements of applicable laws and stock exchange rules; or (c) any information disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein. Any disclosure by any employee or engaged institution of either Party shall be deemed disclosure by such Party, and such Party shall assume the liability for breach of contract according to this Agreement. This Article 7 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

8. This Agreement shall be governed by and interpreted according to the laws of China.

9. Any dispute arising from interpretation or performance hereof shall be resolved by the Parties through negotiation in good faith. If negotiation fails, either Party may submit the dispute to China International Economic and Trade Arbitration Commission to arbitrate according to the arbitration rules of the Commission then in effect. The place arbitration shall be Beijing; the language used shall be Chinese. The arbitration award shall be final and shall have binding force upon both Parties.

10.   This Agreement is executed by the authorized representatives of the Parties and effective on the date first written above.

11.   This Agreement once effective shall constitute the entire agreement and understanding between the Parties with respect to the subject matter hereof, and shall replace the prior oral and written agreements and understanding between the Parties with respect to the subject matter hereof.

12.   This Agreement shall remain effective for ten (10) years, unless it is early terminated according hereto or according other relevant agreement entered into between the Parties. This Agreement may be renewed only upon Party A's written confirmation before it expires. The renewed period shall be decided by Party A unilaterally in writing. If during the above periods the business period of Party A or Party B (including any extension) expires or terminates for other reason, this Agreement shall terminate simultaneously, unless any Party hereto has transferred its rights and obligations under Article 9 hereof.

13.   This Agreement shall terminate when it expires unless it is renewed according to its terms. Party B may not terminate this Agreement early during the term hereof. Notwithstanding the above provisions, Party A has the right to send a 30-day written notice to Party B at any time to terminate this Agreement.

This Agreement is made in three counterparts, and each Party holds one. All counterparts have equal legal force.

[the remainder of this page is intentionally left blank]

[Signature Page]

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

**Party A: Beijing QIYI Century Science &Technology Co., Ltd.**
[*Company seal is affixed*]
Legal/Authorized Representative: /s/ Gong Yu_____

**Party B: Beijing iQIYI Science & Technology Co., Ltd.**
[*Company seal is affixed*]
Legal / Authorized Representative: /s/ Geng Xiaohua_____

**Party C: Geng Xiaohua**
By:   /s/ Geng Xiaohua_____

**Exhibit 10.13**

**Power of Attorney**

Pursuant to the Amended and Restated Voting Rights Trust Agreement entered into on January 30, 2013 ("**Voting Trust Agreement**"), Beijing QIYI Century Science & Technology Co., Ltd. (the "**Company**") has the right to exercise all shareholder voting rights ("**Voting Rights in Target Company**") at the shareholder's meeting of Beijing iQIYI Science & Technology Co., Ltd. ("**Target Company**").

In respect of the Voting Rights in Target Company, the Company hereby irrevocably authorizes Qiyi.com, Inc. ("**Qiyi Cayman**") or any Chinese company or individual it designates to the extent permitted by relevant laws to exercise the Voting Rights in Target Company specified in the Voting Trust Agreement during the term of this Power of Attorney. Qiyi Cayman may delegate this right to any third person it designates without prior written notice to the Company.

This Power of Attorney shall be effective retroactively as of November 23, 2012 until expiry or termination of Voting Trust Agreement. During the term hereof, the Company hereby waives all right granted to Qiyi Cayman hereunder, and will not exercise such right by itself. This Power of Attorney is irrevocable, and may not be amended unless by Qiyi Cayman at its discretion.

Beijing QIYI Century Science &Technology Co., Ltd.

[*Company seal is affixed*]
/s/ Beijing QIYI Century Science & Technology Co., Ltd.

January 30, 2013

**Exhibit 10.14**

**Beijing QIYI Century Science & Technology Co., Ltd.**
(as Lender)


and


**GENG Xiaohua**
**&**
**GONG Yu**
(together as Borrowers)

**LOAN AGREEMENT**

**Loan Agreement**

This Loan Agreement (this "**Agreement**") is executed by and between the following parties in Beijing, the People's Republic of China ("**China**") on October 25, 2013:

**Lender:** Beijing QIYI Century Science & Technology Co., Ltd., its registered address is Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing, its legal representative is GONG Yu (龚宇) ; and

**Borrowers**:

GENG Xiaohua (耿晓华) , address: \*\*\* ID Card No. \*\*\*

GONG Yu (龚宇) , address: \*\*\* ID Card No. \*\*\*

In this Agreement, the Lender and the Borrowers are collectively referred to as "the Parties" and separately referred to as "one Party" or "the other Party".

Whereas,

1.      The Lender is a wholly foreign owned enterprise legally established and validly existing in China according to the laws of China;

2.      The Borrowers are both citizens of China, and as a shareholder of Shanghai iQIYI Culture Media Co., Ltd. ("**iQiyi**"), holds 100% of the shares in iQiyi in total, among them, GENG Xiaohua holds 50% of the shares in iQiyi and GONG Yu holds 50% of the shares in iQiyi;

3.      The Lender agrees to lend RMB 10 million (RMB 10,000,000.00) interest-free to the Borrowers. Out of the loan, RMB 5 million (RMB 5,000,000.00) is lent to GENG Xiaohua and RMB 5 million (RMB 5,000,000.00) is lent to GONG Yu.

Therefore, the two Parties reach the following agreement through friendly negotiation to specify their rights and obligations:

**1.      Loan**

In accordance with the terms and conditions provided in this Agreement, the Lender agrees to lend the Borrowers with an interest-free loan amounting to RMB 10 million (RMB 10,000,000.00); out of the loan, RMB 5 million (RMB 5,000,000.00) is lent to GENG Xiaohua and RMB 5 million (RMB 5,000,000.00) is lent to GONG Yu; the Borrowers agree to accept the aforesaid loan.

**2.      Term of the Loan**

2.1     The term of the loan under this Agreement shall begin from December 12, 2012 to ten (10) years after the execution of this Agreement ("**Term of the Loan**"); the Term of the Loan may be extended upon the Lender's written confirmation; the extended term shall be determined by the Lender.

2

2.2 During the Term of the Loan or any extended Term of the Loan, in the event that any of the following events occur as to any of the Borrowers, the lender shall be entitled to decide, in the manner of written notice, that the loan hereunder becomes due immediately, and demand such Borrower to repay the loan in the manner provided by the provisions hereof:

(1) the Borrower resigns from or is dismissed by the Lender or its affiliated company (refers to all the companies which have affiliated relations with the Lender during the term of this Agreement);

(2) the Borrower dies or loses capacity for civil conduct, or his/her capacity for civil conduct becomes limited;

(3) the Borrower commits or is involved in any crime;

(4) any third party claims against the Borrower damages exceeding one hundred thousand (RMB 100,000.00);

(5) any representation or warranty by the Borrower herein is proven to be untrue or inaccurate in any material aspect at the time when it is made; or the Borrower breaches any obligation hereof;

(6) to the extent permitted by the laws of China, in the event that the Lender or its designated person may invest in the business of designing, making, handling and publishing advertisements and other businesses conducted by iQiyi, and Qiyi.com, Inc., in accordance with the provisions of the Exclusive Purchase Option Agreement that it entered into with the Borrower on October 25, 2013 (the "**Exclusive Purchase Option Agreement**"), has issued a written notice to the Borrower to purchase the shares in iQiyi held by the Borrower and has exercised such option.

**3.   Repayment of the Loan**

3.1 The Parties hereby agree and confirm that the Borrower must and may only repay the loan in the manner as follows: when the loan hereof becomes due, the Borrower (or his/her successors, heirs or assigns) shall at the request of the written notice by the Lender, subject to the provisions of the laws of China, transfer all his/her shares in iQiyi to the Lender and/or its designated persons, and repay the loan hereunder by the proceeds received from the transfer.

3.2 The Borrower may not repay the loan in whole or in part without prior written consent of Party A.

3.3 The Parties agree that the share transfer hereunder shall be deemed completed when the formalities for the change of shareholder with the relevant industry and administrative authorities are completed and the Lender or its designated persons have become the legal holders of the aforementioned target shares.

3

**4.**     **Interest of the Loan**

The Parties hereby agree and acknowledge that unless this Agreement provides otherwise, the loan hereunder shall bear no interest. However, when the loan becomes due and the Borrower transfers his/her shares to the Lender or its designated persons in the manner of repayment provided by this Agreement, if the actual price for share transfer is higher than the principal of the loan to the Borrower because of the requirements of the laws or other reasons, the difference between the transfer price and the principal shall be deemed interest or capital occupation expense, and shall be paid to the Lender together with the principal.

**5.**     **Representations, Warranties and Undertakings of the Borrower**

5.1     Each Borrower shall each provide copy of his/her capital contribution certificate as to 50% of the shares in iQiyi to the Lender.

5.2     To secure repayment of the loan, each Borrower agrees to pledge all his/her shares in iQiyi with the Lender, and grant an option to purchase the abovementioned shares to the Lender. Each Borrower agrees to execute the Share Pledge Agreement at the Lender's request.

5.3     Each Borrower undertakes not to request iQiyi to distribute dividend or profit to him/her, and not to pass any resolution as the shareholder of iQiyi to distribute dividend or profit to shareholders.

5.4     Each Borrower shall maintain iQiyi's existence and prudentially and validly operate the business and handle the matters of iQiyi, following sound financial and business standards and practices. Upon the Lender's request, each Borrower shall provide the Lender with all the materials relating to operation and financial condition of iQiyi. Each Borrower shall operate all businesses of iQiyi in the normal course of business to maintain the value of iQiyi's assets.

5.5     To keep his/her title of the shares in iQiyi, he/she shall execute all the necessary or appropriate documents, take all the necessary or appropriate actions, make all the necessary or appropriate accusations, and raise all necessary or appropriate defenses against all claims; each Borrower shall immediately notify the Lender of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to iQiyi.

5.6     Each Borrower shall strictly comply with the provisions hereof and duly perform his/her obligations hereunder, and shall not conduct any act or omission that may affect the validity and enforceability of this Agreement.

4

**6.    Taxes and Expenses**

Unless this Agreement provides otherwise, the Parties shall respectively pay their respective taxes and expenses regarding this Agreement pursuant to relevant laws and regulations. All the other taxes and reasonable expenses relating to the loan shall be borne by the Lender.

**7.    Effectiveness and Termination of this Agreement**

7.1    The Parties agree and confirm that this Agreement shall become effective from December 12, 2012.

7.2    The Parties agree and confirm that this Agreement shall terminate when the Parties fully perform their respective obligations hereunder. The Parties agree and confirm that the Borrowers' obligations hereunder shall only be deemed fully performed when all of the following conditions are met:

(1)    the Borrowers have transferred all their shares in iQiyi to the Lender and/or its designated persons; and

(2)    the Borrowers have repaid all the proceeds received from the transfer hereunder or the proceeds specified in the Exclusive Purchase Option Agreement to the Lender, and the Lender shall repay the proceeds to Qiyi.com, Inc. under the premise that the laws and regulations of China are complied with and all the necessary approvals are obtained.

7.3    Unless (1) the Lender commits gross negligence, fraud or other serious illegal acts; or (2) the Lender is terminated for bankruptcy, dissolution or order to close, the Borrowers shall not unilaterally revoke or terminate this Agreement in any circumstance.

**8.    Breaching Liabilities**

8.1    In the event that either Party ("**Breaching Party**") breaches any provision hereof, and thus causes any damage to the other Party ("**Non-breaching Party**"), the Non-breaching Party may send a written notice to the Breaching Party, requesting the Breaching Party to immediately correct and remedy its breach. If the Breaching Party fails to take measures satisfactory to the Non-breaching Party to remedy and correct its breach within fifteen (15) days after the Non-breaching Party receives the abovementioned written notice, the Non-breaching Party may immediately take other remedial measures according to the provision hereof or through legal means.

8.2    In the event that the Borrowers fail to repay the loan to the Lender according hereto, the Borrowers shall pay to the Lender the liquidated damages for late payment at the daily rate of 0.02% over the outstanding amount (counted from the date requested by the Lender for repayment of the loan), and shall compensate the Lender for any direct economic loss caused by the Borrowers' breach (including but not limited to the market value of the shares held by the Borrower in iQiyi which is not transferred, or the outstanding loan amount, whichever is higher).

5

**9.** **Confidentiality**

9.1 The Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consent by the other Party, except:

(1)      Any information that has been known or will be known to the public (not through any disclosure by the receiving Party to the public without the other Party's consent);

(2)      Any information disclosed according to the requirements of applicable laws and stock exchange rules; or

(3)      In case that any information is disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, such legal or financial consultant is obliged to perform similar obligations of confidentiality to those specified herein. Any disclosure by any employee of or institution engaged by either Party shall be deemed disclosure by such Party, and such Party shall be liable for breach of contract according to this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

**10.** **Notice**

Any notice or other communication sent by either Party hereunder shall be made in writing, and sent by personal delivery, letter or fax to the following address of the other Party or to other addresses designated by the other Party by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the seventh (7th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

the Lender: Beijing QIYI Century Science & Technology Co., Ltd.
Address: 10th and 11th Floor, No. 2 Haidian North First Street, Haidian District, Beijing
Postal code: 100080
Tel:
Fax:

the Borrowers:
GENG Xiaohua （耿晓华）
Address: ***
Postal code:
Tel:
Fax:

6

GONG Yu (龚宇)
Address: ***
Postal code:
Tel:
Fax:


**11.    Applicable Law and Dispute Resolution**

11.1.    The execution, validity, performance and interpretation of and the dispute resolution regarding this Agreement shall be governed by the laws of China.

11.2.    Any dispute arising from performance hereof or relating to this Agreement shall be resolved by the Parties through friendly negotiation.

11.3.    If no dispute resolution agreement is reached within thirty (30) days after one Party brings up the request to resolve the dispute (s) through negotiation, either Party may submit the relevant dispute(s) to Beijing Arbitration Commission for arbitration in Beijing, pursuant to the arbitral rules then effective. The arbitration award shall be final and shall have binding force upon all the parties. When any dispute occurs or any dispute is under arbitration proceeding, except for the part submitted to arbitration, the Parties may still exercise other rights hereunder and shall still perform other obligations hereunder.


**12.    Miscellaneous**

12.1    The Parties agree and confirm that the Lender's "written consent" mentioned in this Agreement means that the matter is subject to the approval of the Lender's board of directors. If such matter is only approved by the Borrowers, the approval shall not constitute the Lender's "written consent" hereunder.

12.2    The headings herein are for convenience only, and may not be used to interpret, explain or affect in other aspects the meaning of any provisions hereof.

12.3    The Parties confirm that this Agreement once effective shall constitute the entire agreement and consensus between them with respect to the subject matters hereof, and shall replace all the oral and/or written agreements and consensuses reached by the Parties with respect to the subject matters hereof.

12.4    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, heirs or permitted assigns, and be executed only for the benefit of the above persons. The Borrowers may not assign, pledge or otherwise transfer in other manners any right, interest or obligation hereunder to others without prior written consent of the Lender.

7

12.5    the Borrowers hereby agree that (i) if any Borrower dies, the Borrowers agree to immediately assign the rights and obligations hereunder to the entity designated by the Lender; (ii) the Lender may assign its rights and obligations hereunder to any third party when necessary. The Lender only needs to send a written notice to the Borrowers when the such assignment occurs, and is not required to obtain the Borrowers' consent on such assignment.

12.6    Either Party's failure to exercise promptly any right hereunder shall not be deemed waiver of such right, nor shall it affect the Party's future exercise thereof.

12.7    If any provision hereof is decided by any competent court or arbitral institution as invalid, void or unenforceable, it shall not affect or impair the validity or enforceability of other provisions hereof. The Parties shall stop performance of such invalid, void or unenforceable provision, and shall amend it so that the original intention will be achieved as much as possible and the provision becomes valid and effective only to the extent of relevant fact and circumstance.

12.8    The Parties shall negotiate to decide any matter not covered herein. The Parties shall amend or supplement this Agreement through written agreements. The written amendments and supplemental agreements duly signed by the Parties are an integral part hereof, and have same legal force as this Agreement.

12.9    This Agreement is made in six (6) counterparts, and each Party holds two (2). All counterparts have equal legal force.

In witness whereof, this Agreement is entered into by the Parties or their legal representatives or authorized representatives on the date first written above.

[The remainder of this page is intentionally left blank.]

8

[Signature page for the Loan Agreement]

**Lender: Beijing QIYI Century Science & Technology Co., Ltd.(seal)**
[*Company seal is affixed*]

Signature:    /s/ GONG Yu
Legal Representative / Authorized Representative: GONG Yu
Position:

**Borrowers:**
**GENG Xiaohua** (耿晓华)

Signature:    /s/ GENG Xiaohua

**GONG Yu** (龚宇)

Signature:    /s/ GONG Yu

9

**Exhibit 10.15**

**Exclusive Purchase Option Agreement**

This Amended and Restated Exclusive Purchase Option Agreement (this "**Agreement**") is made by the following parties in Beijing on October 25, 2013:

**(1)**　　**Qiyi.com, Inc.**

　　Address: Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands ("**Qiyi Cayman**")

**(2)**　　**Beijing QIYI Century Science & Technology Co., Ltd. ("Party A")**

　　Address: Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing

**(3)**　　**Geng Xiaohua**

　　Address: ***

　　and

　　**Gong Yu**

　　Address: ***

　　(Gong Yu and Geng Xiaohua are collectively referred to as "**Party B**")

**(4)**　　**Shanghai iQIYI Culture Media Co., Ltd. ("Party C")**

　　Address: Room 1016, Building 3, 1630 Yecheng Road, Jiadian Industrial District

In this Agreement, each of Qiyi Cayman, Party A, Party B and Party C shall be referred to as a "Party", and collectively as the "Parties".

Whereas,

1.　　Qiyi Cayman is a company incorporated in Cayman Islands and holds 100% shares in Party A ("**Shares**");

2.　　Party A is a wholly foreign owned enterprise established in the People's Republic of China ("**China**") in accordance with the laws of China, has the expertise and practicing experience in computer software development and design, and has rich experience and professional personnel in IT technology and service;

3.　　Party C is a limited liability company incorporated in Shanghai, China, conducting business of designing, making, handling and publishing various advertisements;

4.　　Party B is the shareholder of Party C, and collectively holds 100% shares in Party C, among Party B, Geng Xiaohua holds 50% of the shares in Party C and Gong Yu holds 50% of the shares in Party C;

5.　　Party A and Party B entered into the Loan Agreement on October 21, 2013; Party B borrowed from Party A an interest-free loan of RMB ten million (10,000,000) (among Party B, Geng Xiaohua and Gongyu each borrowed RMB five million (5,000,000)) to be used for establishing Party C and acquiring 100% of the shares in Party C.

1

6.      Party A and Party B entered into the Share Pledge Agreement on October 21, 2013 ("**Share Pledge Agreement**").

Therefore, the Parties reach the following contract through negotiations and intend to be bound hereby:

**1.      Purchase and Sale of Share**

1.1.    Grant of Rights

Party B hereby irrevocably grants Qiyi Cayman or one or more persons nominated by Qiyi Cayman (including but not limited to Party A) (the "**Nominees**") an option to purchase, to the extent permitted under the laws of China and at the price set forth under Article 1.3, all or any part of the Share held by the selling Party at any time and in any manner decided by Qiyi Cayman at its discretion ("**Share Purchase Option**"). Except for Qiyi Cayman and/or the Nominees, no third person shall have the Share Purchase Option. Party C hereby agrees that Party B may grant the Share Purchase Option to Qiyi Cayman and/or the Nominees. For purpose of this Article 1.1 and this Agreement, "person" includes individuals, companies, joint ventures, partnerships, enterprises, trusts and unincorporated associations.

1.2.    Exercise Steps

Subject to compliance with Laws and regulations of China and obtaining all approvals required, Qiyi Cayman and/or the Nominees may exercise the Share Purchase Option after sending written notice to the Party B ("**Share Purchase Notice**") setting forth the number of shares it will purchase from Party B ("**Purchased Shares**") and the way of purchase to exercise the Share Purchase Option.

1.3.    Purchase Price

1.3.1    When Qiyi Cayman and/or the Nominees exercise the Share Purchase Option, unless the then applicable laws and regulations of China require evaluation of the shares or any restrictions on the share purchase price, the price for the Purchased Share ("Purchase Price") shall be equivalent to the amount of capital contribution actually paid by Party B for the Purchased Shares.

1.3.2    If the applicable laws and regulations of China require evaluation of the shares or any restrictions on the share purchase price when Qiyi Cayman and/or the Nominees exercise the Share Purchase Option, the Parties agree that the Purchase Price shall be the minimum price permitted by applicable laws.

1.4.    Transfer of the Purchased Shares

When exercising the Share Purchase Option,

1.4.1    Party B and Qiyi Cayman and/or the Nominees (as applicable) shall enter into an share transfer contract in the substance and form satisfactory to Qiyi Cayman for each transfer of shares in accordance with this Agreement and the Share Purchase Notice of the Purchased Shares;

2

1.4.2   Party B shall sign all necessary contracts, agreements or documents, obtain all necessary governmental approvals and consents, and take all necessary actions to transfer the title to the Purchased Shares to Qiyi Cayman and/or the Nominees without any security interest or condition, and procure Qiyi Cayman and/or the Nominees to be registered as shareholder of the Purchased Shares. For purpose of this Article 1.4.2 and this Agreement, "security interest" includes but not limited to guarantee, mortgage, pledge, any third party right or interest, any option, acquisition right, right of first refusal, right of offsetting, title retention or other security arrangement, excluding any security interest arising under the Share Pledge Agreement.

1.4.3   For the avoidance of any doubt, exercise of the Share Purchase Option by Qiyi Cayman and/or the Nominees shall be at the discretion of Qiyi Cayman.

1.5.   Payment

The payment method of the Purchase Price shall be determined by Qiyi Cayman and/or the Nominees and the Selling Party through negotiations in accordance with the laws then applicable upon exercising the Share Purchase Option. The Parties hereby agree that the amount paid by Qiyi Cayman and/or the Nominees to Party B for the Purchased Shares shall be returned to Qiyi Cayman subject to compliance with applicable laws (provided that any taxes and expenses, if any, incurred by Party B for the transaction contemplated in the Transfer Contract may be deducted from such amount), to repay the principal of the entrusted loan, or any interest or funding commitment cost permitted by laws.

**2.      Covenants Relating to Shares**

2.1    Covenants regarding Party C

Party B and Party C hereby covenant that in respect of Party C,

2.1.1    they will not supplement, modify or amend Party C's articles of association in whatever forms, or increase or reduce Party C's registered capital, or otherwise change Party C's register capital structure without Qiyi Cayman's prior written consent;

2.1.2    they will maintain their existence in line with sound financial and business standards and practices, and prudentially and validly operate their business and handle their matters;

2.1.3    they will not sell, transfer, mortgage or otherwise dispose of any legal or beneficial interest in Party C's assets, business or revenue, or permit any other security interest to be created over such interest at any time after execution of this Agreement without Qiyi Cayman's prior written consent;

2.1.4    they will not incur, succeed, guarantee or permit existence of any debts without Qiyi Cayman's prior written consent, except for (i) any debts other than loans incurred in daily or normal business course; and (ii) any debts disclosed to and consented by Qiyi Cayman in writing;

3

2.1.5  they are always operating all business in normal business course to maintain the value of Party C's assets, and will not make any action or omission that may affect their operational condition and value of assets;

2.1.6  they will not sign any material contract without prior written consent of Qiyi Cayman, except for the contract entered into in normal business course (for purpose of this Article 2.1.6, a contract at an amount of more than RMB three hundred thousand (300,000.00) shall be deed as material contract);

2.1.7  they will not provide any loan or credit to any person without the prior written consent of Qiyi Cayman;

2.1.8  they will provide Qiyi Cayman with the information of Party C's operation and financial conditions at the request of Qiyi Cayman;

2.1.9  they will purchase and maintain insurances from the insurer acceptable to Qiyi Cayman, the insurance amount and coverage of which should be same as those of the companies at the place of Party C who operate similar business or own similar properties or assets;

2.1.10  they will not merge or consolidate with others or purchase or invest in any person without prior written consent of Qiyi Cayman;

2.1.11  they will immediately notify Qiyi Cayman of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to Party C's assets, business or revenue;

2.1.12  they will sign all necessary or desirable documents, take all necessary or desirable actions, and make all necessary or desirable claims and defenses to maintain Party C's title to its assets;

2.1.13  Party C may not distribute dividends in whatever forms to its shareholders without prior written consent of Qiyi Cayman, provided however that, if Qiyi Cayman requests, Party C shall immediately distribute the distributable profits to its shareholders in whole or in part. The shareholders shall remit such dividends distributed by Party C or other revenue distributed by Party C in other forms to Qiyi Cayman in a way permitted by laws.

2.1.14  They will appoint the persons nominated by Qiyi Cayman as directors of Party C at the request of Qiyi Cayman;

2.2  Covenants regarding Party B

Party B hereby covenants that:

2.2.1  It will not sell, transfer, mortgage or otherwise dispose of any legal or beneficial interest in any share, or permit any other security interest to be created over such interest at any time after execution of this Agreement without Qiyi Cayman's prior written consent, except for the pledge created over the shares owned by Party B under the Share Pledge Agreement;

4

2.2.2    Without prior written consent of Qiyi Cayman, It will not vote for or support or sign any resolutions at the shareholder's meeting of Party C to approve sale, transfer, mortgage or other disposal of any legal or beneficial interest in any share, or permit any other security interest to be created over such interest, except for those created in favor of Qiyi Cayman or any persons designated by Qiyi Cayman;

2.2.3    without prior written consent of Qiyi Cayman, it will not vote for or support or sign any resolutions at the shareholder's meeting of Party C to approve the merger or consolidation of Party C with others, or Party C's purchase or investment in any other person;

2.2.4    It will immediately notify Qiyi Cayman of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to its shares;

2.2.5    It will sign all necessary or desirable documents, take all necessary or desirable actions, and make all necessary or desirable claims and defenses to maintain its title to the shares;

2.2.6    It will appoint the persons nominated by Qiyi Cayman as directors of Party C at the request of Qiyi Cayman;

2.2.7    It will transfer its shares unconditionally to the representative designated by Qiyi Cayman at any time Qiyi Cayman requests, and waive its right of first refusal in connection with transfer of shares by the other shareholder ;

2.2.8    It will strictly comply with any provisions of this Agreement and any other contract signed by Party B, Party C and Qiyi Cayman jointly or separately, carefully perform various obligations hereunder and thereunder, and will not make any action or omission which may affect the validity or enforceability of this Agreement or other contracts.

2.2.9    It will not cause Party C to sign any material contract without prior written consent of Qiyi Cayman, except for the contract entered into in normal business course (for purpose of this Article 2.2.9, a contract in an amount of more than RMB three hundred thousand (300,000.00) shall be deed as material contract);

2.2.10    It will not cause Party C to provide any loan or credit to any person without prior written consent of Qiyi Cayman;

2.2.11    It will not cause Party C to distribute dividends in whatever forms to its shareholders without prior written consent of Qiyi Cayman, provided however that, if Qiyi Cayman requests, it shall immediately cause Party C to distribute the distributable profits to its shareholders in whole or in part;

2.2.12    Party C's shareholders shall remit such dividends distributed by Party C or other revenue distributed by Party C in other forms to Qiyi Cayman in a way permitted by laws.

5

2.3     Covenants regarding Qiyi Cayman

    2.3.1    Qiyi Cayman hereby covenants that to meet cash needs of Party C during operation of business or to cover any loss incurred by Party C during operation of business, if Party C needs any loan or other financial support, Qiyi Cayman will provide through Party A or other domestic entities to Party C the financial support for free in a way permitted by law, regardless whether Party C has incurred the above operation loss or not;

    2.3.2    Qiyi Cayman may provide such financial support by entrusted bank loan or company loan to the extent permitted by laws. The contract of entrusted bank loan or the company loan shall be executed separately.

    2.3.3    If Party C incurs any operation loss and is unable to repay the loan or financial support provided by Qiyi Cayman under Article 2.3.1, with sufficient evidence to prove such inability, Qiyi Cayman agrees to waive unconditionally the right of requesting Party C to repay such loan or financial support.

**3.      Representations and Warranties**

Party B and Party C hereby represent and warrant to Qiyi Cayman as of the date hereof and each transfer date that:

3.1     It has the power to execute and deliver this Agreement and any share transfer contract ("Transfer Contract") entered into by it for each transfer of the Purchased Shares, and to perform its obligations hereunder and thereunder. This Agreement and the Transfer Contract to which it is a party, once executed, shall constitute legal, valid and binding obligations upon it, and may be enforced under the terms hereof and thereof;

3.2     Neither execution and delivery of this Agreement or any Transfer Contract, nor performance hereof or thereof will: (i) result in violation of any China laws or regulations; (ii) conflict with its articles of association or other organizational document; (iii) result in breach of any contract or instrument to which it is a party, or constitute breach under such contract or instrument to which it is a party or which has binding force upon it; (iv) result in breach of any conditions for any permit or approval to be issued to it or to remain effective; or (v) cause suspension or cancellation of or imposition of condition on any permit or approval issued to it;

3.3     Party C has sound and marketable title to its assets, and has not created any security interest over such assets;

3.4     Party C has no outstanding debts, except for (i) any debts incurred in normal business course; and (ii) any debts disclosed to and consented by Qiyi Cayman in writing;

3.5     There is no outstanding, pending or threatened litigation, arbitration or administrative procedure relating to the Shares, Party C's assets or the Company; and

3.6     Party B has sound and marketable title to its shares, and has not created any security interest over such shares, except the security interest under the Share Pledge Agreement and the restrictions hereunder.

6

**4.    Assignment of Contract**

4.1    Party B and Party C may not assign any of their respective rights or obligations hereunder to any third party without prior written consent of Qiyi Cayman.

4.2    Party B and Party C hereby agree that Qiyi Cayman shall have the right to assign its rights and obligations hereunder to any third party when necessary. Qiyi Cayman only needs to notify Party B and Party C in writing when assigning its rights and obligations, and is not required to obtain consents of Party B and Party C.

**5.    Effectiveness and Term**

5.1    This contract shall become effective on December 19, 2012.

5.2    Unless this Agreement is terminated early under its terms or any other agreement entered into by the Parties separately, this Agreement shall remain effective for ten (10) years. Party B and Party C hereby confirm that this Agreement is renewable with written confirmation of Qiyi Cayman unilaterally before it expires, without consents of Party A, Party B or Party C.

5.3    If the business period of Qiyi Cayman or Party C (including any extension) expires or terminates for other reason during the period set forth in Article 5.2, this Agreement shall terminate when Qiyi Cayman or Party C is terminated, except that Qiyi Cayman has transferred its rights and obligations according to Article 4.2 hereof.

**6.    Applicable Law and Dispute Resolution**

6.1    Applicable Law

The execution, validity, interpretation and performance hereof and the resolution of any dispute hereunder shall be protected and governed by China laws.

6.2    Dispute Resolution

When the Parties have any dispute relating to interpretation or performance of any provision hereof, they shall negotiate in good faith to resolve such dispute. If the Parties fail to reach an agreement within thirty days after either Party proposes to resolve any dispute through negotiation, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with the arbitration rules then in effect. The arbitration shall be conducted in Beijing in Chinese. The arbitration award is final and has binding force upon the Parties.

**7.    Taxes and Expenses**

Each Party shall be responsible for any and all taxes for transfer and registration, costs and expenses incurred by or imposed upon it from preparation and execution of this Agreement and each Trans Contract and consummation of the transactions hereunder and thereunder.

7

**8.    Notice**

Any notice or other communication required to be sent by either Party hereunder shall be written in Chinese, and send by personal delivery, letter or fax to the following addresses of the other Parties or to other addresses designated by the other Parties by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the tenth (10th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

Qiyi.com, Inc.
Address: 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands

Party A: Beijing QIYI Century Science & Technology Co., Ltd.
Address: Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing
Fax:
Tel:

Party B:
Geng Xiaohua
Address: ***
Fax:
Tel:

Gong Yu
Address: ***
Fax:
Tel:

Party C: Shanghai iQIYI Culture Media Co., Ltd.
Address: Room 1016, Building 3, 1630 Yecheng Road, Jiadian Industrial District
Fax:
Tel:

**9.    Confidentiality**

The Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other Parties, except:

a.    Any information that has been known or will be known to the public (not through any disclosure of the receiving Party to the public);

b.    Any information disclosed pursuant to the requirements of applicable laws and stock exchange rules; or

8

c.      Any information disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein.

Any disclosure by any employee of or any intermediary engaged by either Party shall be deemed disclosure by such Party, and such Party shall assume the liability for breach of contract under this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

**10.      Further Assurance**

The Parties agree to promptly sign any documents and take actions required or desirable for performance of the provisions hereof or achieving the purpose hereof.

**11.      Miscellaneous**

11.1      Amendment, Modification and Supplementation

Any amendment to and/or rescission of this Agreement shall be subject to unilateral written consent of Qiyi Cayman.

11.2      Entire Contract

Notwithstanding Article 5 hereof, the Parties acknowledge that this Agreement, once effective, shall constitute the entire agreement and understanding between them with respect to the subject matter hereof, and shall replace all oral and/or written agreements and understandings concluded by the Parties with respect to the subject matter hereof.

11.3      Severability

If one or more provisions hereof are held as invalid, illegal or unenforceable under any laws or regulations, the validity, legality or enforceability of the remaining provisions hereof shall not be affected or impaired. The Parties shall strive to replace such invalid, illegal or unenforceable provisions with valid provisions, and ensure the economic effect of the valid provisions to be similar to those invalid, illegal or unenforceable provisions as much as possible.

11.4      Headings

The headings herein are for convenience only, and may not be used to interpret, explain or affect the meaning of any provisions hereof.

11.5      Language and Counterparts

This Agreement is written in Chinese, and may be translated into English when necessary, provided that the Chinese version shall prevail. This Agreement is made in four counterparts, and each Party holds one thereof. All counterparts have equal legal force.

11.6      Successors

This Agreement shall bind upon and inure to the benefit of each Party and its successors or heirs or permitted assigns.

11.7     Survival

Any obligation accrued or due before expiration or early termination hereof shall remain effective after the expiration and early termination hereof. The provisions of Articles 6, 8, 9 and 11.7 hereof shall survive the termination of this Agreement.

[The remainder of this page is intentionally left blank.]

10

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

**Qiyi.com, Inc.**
[*Company seal is affixed*]
By:  /s/ Gong Yu
Title:   Authorized Signatory


**Party A:   Beijing QIYI Century Science &Technology Co., Ltd.**
[*Company seal is affixed*]
Legal Representative / Authorized Representative: /s/ Gong Yu


**Party B:**
**Geng Xiaohua**
By:  /s/ Geng Xiaohua


**Gong Yu**
By:  /s/ Gong Yu


**Party C:   Shanghai iQIYI Culture Media Co., Ltd.**
[*Company seal is affixed*]
Legal Representative / Authorized Representative: /s/ Geng Xiaohua

11

**Exhibit 10.16**

Beijing QIYI Century Science & Technology Co., Ltd.

(as Pledgee)

and

GENG Xiaohua

&

GONG Yu

(as Pledgors)

Regarding 100% of the shares in Shanghai iQIYI Culture Media Co., Ltd.

**SHARE PLEDGE AGREEMENT**

October 25, 2013

### Share Pledge Agreement

This Share Pledge Agreement (this "Agreement") is exectued by the following parties in Beijing on October 25, 2013:

**Pledgee:**
**Beijing QIYI Century Science & Technology Co., Ltd.**
Registered address: Floor 10 & 11, 2 Haidian North First Street, Haidian District, Beijing

**Pledgors:**
**GENG Xiaohua**
Domicile: ******

**GONG Yu**
Domicile: ******

Whereas,

1. the Pledgee is a wholly foreign owned enterprise incorporated in Beijing, the People's Republic of China ("**China**").

2. the Pledgors are both citizens of China, together holding 100% of the shares in Shanghai iQIYI Culture Media Co., Ltd. ("**IQIYI**"), a limited liability company incorporated in Shanghai, China. Among the Pledgors, GENG Xiaohua holds 50% of the shares in IQIYI, and GONG Yu holds the other 50% of the shares in IQIYI.

3. the Pledgee and the Pledgors entered into a Loan Agreement ("**Loan Agreement**") on October 21, 2013 whereby the Pledgee has provided the Pledgors with an interest-free loan of RMB ten million (RMB 10,000,000.00) (the "**Loan**"). Among that, the Pledgee has lent RMB 5,000,000 to GENG Xiaohua and RMB 5,000,000 to GONG Yu, and the Pledgors have both received such loans;

4. To guarantee the Pledgors' performance of their obligations under the Loan Agreement the Pledgors are willing to pledge their shares in IQIYI to secure payment of the Loan.

Therefore, the Pledgors and Pledgee enter into this Agreement according to the following provisions upon consensus through friendly negotiation.

**Article 1 Definitions**

Unless this Agreement provides otherwise, the following terms shall have meaning below:

1.1 "Pledge" means the content set forth in Article 2 hereof.

1.2 "Shares" means all the shares held by the Pledgors legally in IQIYI.

1.3    "Pledge Ratio" means the ratio between the value of the Pledge hereunder and the total of the Service Fee and the Loan.

1.4    "Pledge Term" means the period set forth in Article 3.2 hereof.

1.5    "Default Event" means any circumstances set forth in Article 7.1 hereof.

1.6    "Default Notice" means the notice sent by the Pledgee according hereto to announce any Default Event.

**Article 2 Pledge**

The Pledgors create a pledge over all their shares in IQIYI in favor of the Pledgee, to secure performance of all debts under the Loan Agreement. "Pledge Right" means the right enjoyed by the Pledgee to convert the Shares into money, auction or sell the Shares and to have priority in payment from the proceeds obtained from disposal of the Shares.

**Article 3 Pledge Ratio and Pledge Term**

3.1    Pledge Ratio

The pledge ratio of the Pledge is 100%. Among that, GENG Xiaohua pledges value of 5 million for the loan of 5 million, GONG Yu pledges value of 5 million for the loan of 5 million.

3.2    Creation and Term of the Pledge

3.2.1    The Pledge hereunder is created when it is recorded in the register of members of IQIYI, and registered with the competent industrial and commercial administrative authority.

3.2.2    The pledge term hereunder expires when all the debts under the Loan Agreement become due, then the Pledgee shall have the right to rescind or terminate this Agreement.

3.2.3    During the Pledge Term, if the Pledgors fail to perform any obligation under the Loan Agreement, the Pledgee has the right to dispose of the Pledge Right according to this Agreement.

**Article 4 Custody of Pledge Certificate**

4.1    During the pledge term hereunder, the Pledgors shall deliver the capital contribution certificate regarding the shares in IQIYI to the Pledgee for the custody within one (1) week after execution of this Agreement.

4.2    The Pledgee has the right to collect dividends of the Shares during the term of this Agreement.

**Article 5 Representations and Warranties of the Pledgors**

5.1    The Pledgors is the legal owner of the Shares, and they has duly approved the share pledge hereunder through a resolution of shareholders' meeting (see Schedule 2).

5.2    The Pledgors has not created any other pledge or right over the Shares other than the Pledge created in favor of the Pledgee.

5.3    The dividends produced during the term of this Agreement shall belong to the Pledgee.

**Article 6 Representations and Warranties of the Pledgee**

6.1.    During the existence of this Agreement, the Pledgors undertakes that in the interest of the Pledgee, they will

6.1.1.    not transfer their Shares or create or permit existence of any pledge or any other security interests that may affect the Pledgee's right or interest, without prior written consent of the Pledgee;

6.1.2.    comply with and perform the provisions of all the laws and regulations relating to rights pledge, and will present any notice, order or advice issued or made by any competent authority to the Pledgee within five (5) days after receiving such notice, order or advice, and shall follow such notice, order or advice, or raise objection or statement on the above matter at reasonable request of the Pledgee or with consent of the Pledgee;

6.1.3.    promptly notify the Pledgee of any event or notice that may affect the Pledgors's Shares or other right, or any event or notice received that may change any security or obligation created hereunder or have other effect.

6.2.    The Pledgors agree that the Pledgee's exercise of the pledge right hereunder according to the provisions hereof shall not be interrupted or prevented by the Pledgors or their successors or principals or other persons through any legal procedure.

6.3.    The Pledgors warrant to the Pledgee that to protect or perfect the security hereunder for the obligations of repaying the Loan, they will execute and procure other parties interested in the pledge right to execute any right certificates or deeds, and/or conduct and procure other parties interested to conduct any acts, in good faith, which are required by the Pledgee, and shall provide convenience for the exercise of rights or authorities granted by this Agreement to the Pledgee.

6.4.    The Pledgors undertake to the Pledgee that they will sign any change document of Shares certificate (if applicable and necessary) with the Pledgee or its designated person (natural person or legal person), and provide the Pledgee with all notices, orders and decisions regarding the Pledge it deems necessary.

6.5.   The Pledgors undertake to the Pledgee that they will comply with and perform all warranties, covenants, agreements, representations and conditions in the interest of the Pledgee. If the Pledgors fails to perform the warranties, covenants, agreements, representations and conditions in whole or in part, it shall compensate the Pledgee for all losses thus caused.

6.6.   During the term of this Agreement, the Pledgors will not carry out any act or forbearance that may affect value of the pledged Shares, and shall maintain and increase such value. If any event occurs which may reduce the value of the pledged Shares or affect the Pledgors' performance of any obligation hereunder, the Pledgors shall promptly notify the Pledgee, and at the request of the Pledgee provide other property security satisfactory to the Pledgee regarding the reduced amount of the pledged Shares.

6.7.   Subject to applicable laws and regulations, the Pledgors shall carry out, and use the best efforts to actively cooperate with the Pledgee to carry out all registrations, filings and other procedures with respect to the Share Pledge required by the laws and regulations.

**Article 7 Default Events**

7.1.   The following events shall be deemed Default Events:

7.1.1.   The Pledgors fails to perform any obligation under the Loan Agreement and supplemental agreement(s);

7.1.2.   IQIYI fails to completely perform other obligations on time;

7.1.3.   Any representation or warranty made by the Pledgors in Article 5 hereof is materially misleading or wrong, and/or the Pledgors breaches any warranty in Article 5 hereof;

7.1.4.   The Pledgors breaches any covenants in Article 6 hereof;

7.1.5.   The Pledgors breaches any other provisions hereof;

7.1.6.   The Pledgors abandons the pledged shares, or without written consent of the Pledgee transfers the pledged Shares;

7.1.7.   Any loan, security, indemnity, covenant or other repayment liability of the Pledgors to others (1) is requested to be repaid or performed early for any breach; or (2) becomes due but is unable to be repaid or performed, and thus causes the Pledgee to believe that the Pledgors's ability to perform its obligations hereunder has been impaired;

7.1.8.   IQIYI fails to repay any general debt or other indebtedness;

7.1.9.   This Agreement becomes illegal, or the Pledgors cannot perform any obligation hereunder for any reason other than force majeure;

7.1.10.    Any adverse change occurs to any property owned by the Pledgors, which causes the Pledgee to believe that the Pledgors's ability to perform its obligations hereunder has been impaired; default caused by the breach of this Agreement by any act or forbearance of the Pledgors.

7.2.    If the Pledgors knows or finds that any event set forth in Article 7.1 or any matter that may cause such event to have occurred, they shall immediately notify the Pledgee in writing.

7.3.    Unless the Default Event set forth in Article 7.1 has been resolved satisfactory to the Pledgee, the Pledgee may send notice of default to the Pledgors in writing at any time on or after occurrence of the Default Event, requesting the pledger to immediately pay any outstanding amount or other amount payable under the Loan Agreement, or dispose of the Pledge according to Article 8 hereof.

**Article 8 Exercise of Pledge Right**

8.1.    Before the obligations under the Loan Agreement and the supplemental agreement(s) are fully performed, whichever is later, the Pledgors may not transfer the pledged Shares without written consent of the Pledgee.

8.2.    When exercising the pledge right, the Pledgee shall issue a Default Notice to the Pledgors.

8.3.    Subject to the provisions of Article 7.3, the Pledgee may exercise its right to dispose of the pledge right when or after the Default Notice is sent according to Article 7.3

8.4.    The Pledgee has the right to convert the Shares into money, auction or sell the Shares and to have priority in payment from the proceeds obtained from disposal of the Shares, until the loan or all the other amount payable owed by the Pledgors under the Loan Agreement are fully paid.

8.5.    When the Pledgee disposes of the pledge right according to this Agreement, the Pledgors may not set any obstacle, and shall provide necessary assistant to realize the pledge right.

**Article 9 Transfer**

9.1.    The Pledgors has no right to gift or transfer any rights or obligations hereunder without the Pledgee's prior written consent.

9.2.    This Agreement shall bind the Pledgors and its successor or heir, and inure to the benefit of the Pledgee and its successor, heir or permitted assigns.

9.3. The Pledgee may transfer all or any rights and obligations under the Loan Agreement and the supplemental agreement(s) to its designated person (natural or legal person) at any time to the extent permitted by laws. In such case, the transferee shall enjoy and assume such rights and obligations enjoyed and assumed by the Pledgee hereunder, as if it is a party to this Agreement. When the Pledgee transfers any rights and obligations under the Loan Agreement and the supplemental agreement(s), it only needs to send written notice to the Pledgors, and the Pledgors shall sign relevant agreement and/or document relating to the transfer at the request of the Pledgee.

9.4. When the Pledgee is changed owing to transfer, the new parties to the pledge shall sign another pledge contract.

**Article 10 Effectiveness and Term**

This Agreement shall become effective on December 19, 2012.

**Article 11 Termination**

The pledge hereunder shall expire when all the debts under the Loan Agreement become due, only Party A, i.e. the Pledgee, shall have the right to unilaterally rescind or terminate this Agreement.

**Article 12 Formality Fee and Other Expenses**

12.1. All the costs and expenses relating to this Agreement, including but not limited to legal costs, cost of production, stamp duty and other taxes and expenses, shall be borne by the Pledgors. If the Pledgee is required to pay relevant taxes and expenses according to law, the Pledgors shall indemnify fully the taxes and expenses paid by the Pledgee.

12.2. If the Pledgors fails to pay any taxes or expenses according hereto, if the Pledgee recovers any taxes or expenses from the Pledgors by any means or in any ways for other reason, the Pledgors shall assume all costs thus caused, including but not limited to various taxes, formality fees, management fees, litigation costs, attorney's fees and various insurance premiums for handling the pledge right.

**Article 13 Force Majeure**

13.1. "Force Majeure" means any events that are beyond the reasonable control of either party and are unavoidable event the affected party takes reasonable care, including but not limited to government acts, change of laws, Acts of God, fire, explosion, storm, flood, earthquake, tide, lightening, or war. However, insufficiency of creditworthiness, fund or financing shall not be deemed an event beyond either party's reasonable control. The party affected by force majeure event shall notify promptly the other party of such event.

13.2.  When performance of this Agreement is delayed or prevented by any Force Majeure event defined in the above paragraph, the party affected by the event is not required to assume any liability hereunder to the extent of such delay and prevention. The affected party shall take appropriate measures to mitigate or eliminate the effect of the event, and shall try to resume performance of the obligation delayed or prevented by the event. Once the effect of the force majeure event is eliminated, the parties agree to use their best efforts to resume performance of this Agreement.

## Article 14 Confidentiality

The parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other party, except (a) Any information that has been known or will be known to the public (not through any disclosure of the receiving party to the public); (b) Any information disclosed according to the requirements of applicable laws and stock exchange rules; or (c) Any information disclosed to either party's legal or financial consultant with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein. Any disclosure by any employee or engaged institution of either party shall be deemed disclosure by such party, and such party shall assume the liability for breach of contract according to this Agreement.

## Article 15 Dispute Resolution

15.1.  This Agreement shall be governed by and interpreted according to the laws of China.

15.2.  When the parties have any dispute relating to interpretation or performance of any provision hereof, they shall negotiate in good faith to resolve such dispute. If the parties fail to reach an agreement, either party may submit the dispute to China International Economic and Trade Arbitration Commission to arbitrate according to the arbitration rules then in effect. The place of arbitration shall be Beijing; the language used in the arbitration shall be Chinese. The arbitration award is final and has binding force upon the parties.

## Article 16 Notice

Any notice of each party hereto for exercise and performance of rights and obligations hereunder shall be made in writing and sent to the following addresses. If the notice is sent by personal delivery, it shall be deemed served when it is actually delivered. If the notice is sent by telex or fax, it shall be deemed served when it is sent; if it is not sent on a business day or in business hours, it shall be deemed served on the next business day. The addresses shall be those set forth on the first page hereof or other addresses notified by the parties in writing from time to time. "Writing" includes fax and telex.

**the Pledgee:** Beijing QIYI Century Science & Technology Co., Ltd.Address: Floor 10 & 11, 2 Haidian North First Street, Haidian District, Beijing

Fax:

Tel:

**the Pledgors:**

GENG Xiaohua
Address: \*\*\*\*\*\*
Fax:
Tel:

GONG Yu
Address: \*\*\*\*\*\*
Fax:
Tel:

## Article 17 Entire Contract

Notwithstanding Article 10 hereof, the parties acknowledge that this Agreement once effective shall constitute the entire agreement and understanding between them with respect to the subject matter hereof, and shall replace all oral and/or written agreements and understandings concluded by the parties with respect to the subject matter hereof.

## Article 18 Severability

If any provision hereof is decided invalid, or unenforceable for violating any laws, the provision shall be deemed in valid in the jurisdiction where the laws are applied, and shall not affect the legal validity of other provisions hereof.

## Article 19 Schedules

The schedules hereto are an integral part hereof.

## Article 20 Amendment and Supplementation

20.1. Only Party A, i.e. the Pledgee, has the right to unilaterally amend this Agreement, and shall amend or supplement this Agreement in writing. Any amendment to or supplemental agreement(s) of this Agreement duly signed by the Pledgee's legal representative or authorized signatory constitute a part of this Agreement, and have the same legal force as this Agreement.

20.2. Any amendment to, supplementation of or modification of this Agreement shall be made in writing and become effective after executed by the Pledgee's legal representative or authorized signatory.

**Article 21 Counterparts**

This Agreement is written in Chinese in five counterparts. Each party shall hold one counterpart, and the other two counterparts will be used for Share Pledge registration. All counterparts have equal legal force.

[The remainder of this page is intentionally left blank.]

[Signature Page]

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

Pledgee: Beijing QIYI Century Science &Technology Co., Ltd.
[*Company seal is affixed*]
Legal/Authorized Representative: /s/ Gong Yu

Pledgors:

Geng Xiaohua
By:  /s/ Geng Xiaohua

GONG Yu
By:  /s/ GONG Yu

Schedules:

1.  Register of Members of Shanghai iQIYI Culture Media Co., Ltd.;

2.  Shareholders' resolution of Shanghai iQIYI Culture Media Co., Ltd..

**Schedule 1**

**Shanghai iQIYI Culture Media Co., Ltd.**

**Register of Members**

October 25, 2013

| Name of shareholder | Contribution amount; shareholding percentage | Information of shareholder | remarks |
|---|---|---|---|
| GENG Xiaohua | RMB 5 million<br><br>50% | Nationality: China<br><br>ID No.: ***<br><br>Address: ***<br><br>Contact information: | This shareholder pledges all his/her shares in the company in favor of Beijing QIYI Century Science &Technology Co., Ltd., effective from October 25, 2013, until the all the debts under the Loan Agreement become due. |
| GONG Yu | RMB 5 million<br><br>50% | Nationality: China<br><br>ID No.: ***<br><br>Address: ***<br><br>Contact information: | This shareholder pledges all his/her shares in the company in favor of Beijing QIYI Century Science &Technology Co., Ltd., effective from October 25, 2013, until the all the debts under the Loan Agreement become due. |

**Schedule 2**

**Shanghai iQIYI Culture Media Co., Ltd.**

**Shareholder's Resolution**

In connection with the Amended and Restated Share Pledge Agreement entered into between the shareholder of the Shanghai iQIYI Culture Media Co., Ltd. (the "Company") and Beijing QIYI Century Science &Technology Co., Ltd. on October 25, 2013, the shareholders' meeting of the Company resolves as follows:

Approve the shareholder of the Company pledge their Shares in the Company in favor of Beijing QIYI Century Science &Technology Co., Ltd..

This resolution is signed and delivered by the following shareholder on October 25, 2013.

Shareholder: GENG Xiaohua

/s/ GENG Xiaohua

**Exhibit 10.17**

**Shareholder Voting Rights Trust Agreement**

This agreement is executed by the following parties in Beijing on October 25, 2013:

Geng Xiaohua: a shareholder of Shanghai iQIYI Culture Media Co., Ltd., holding 50% of the shares;

Gong Yu: a shareholder of Shanghai iQIYI Culture Media Co., Ltd., holding 50% of the shares;

Beijing QIYI Century Science & Technology Co., Ltd.: a foreign invested limited liability company incorporated and validly existing according to the laws of China ("**Qiyi Century**")

Whereas,

Geng Xiaohua & Gong Yu and Qiyi Century entered into a "Business Operation Agreement" on October 25, 2013, pursuant to which Geng Xiaohua & Gong Yu shall execute with Qiyi Century a "Shareholder Voting Rights Trust Agreement", to irrevocably entrust the persons designated by Qiyi Century to represent Qiyi Century to exercise the shareholder voting rights and all the shareholder rights they enjoy provided by the law and the articles of association at the shareholders' meetings of Shanghai iQIYI Culture Media Co., Ltd. ("**Shanghai iQIYI**").

Therefore, the parties reach the following agreement for their observation upon consensus through negotiation:

Article 1

Geng Xiaohua & Gong Yu agree to irrevocably entrust the persons designated by Qiyi Century to represent them to exercise at the shareholders' meetings of Shanghai iQIYI the shareholder voting rights and all the shareholder rights they enjoy provided by the law and the articles of association, including but not limited to: sale or transfer of the equity held by Geng Xiaohua/ Gong Yu in Shanghai iQIYI in whole or in part, convening, attending and chairing the shareholders' meetings as a proxy of the shareholders of Shanghai iQIYI at the shareholders' meetings, electing and replacing executive directors, supervisors, or managers, deliberating on and approving the company's plans for profit distribution and loss recovery, making resolutions on Shanghai iQIYI's merger, division, liquidation or change of corporate form, determining the Shanghai iQIYI's plan for operation and investment, as well as amending Shanghai iQIYI's articles of association.

Article 2

Qiyi Century agrees to designate relevant persons to accept the entrustment granted by Geng Xiaohua and Gong Yu according to Article 1 hereof and to exercise on its behalf the voting rights and other shareholder's rights according to the provisions hereof. Qiyi Century agree that such designated persons shall obtain consent from its shareholder, Qiyi.com, Inc. (a company incorporated in Cayman Islands, holding 100% equity in Qiyi Century).

Article 3

Geng Xiaohua and Gong Yu hereby confirm that Qiyi Century is entitled to sub-entrust to any third party the entrustment it obtains according to Article 1 hereof, without any requirement of notifying Geng Xiaohua or Gong Yu or obtaining their consent. Geng Xiaohua and Gong Yu hereby acknowledge the sub-authorization by Qiyi Century, and confirm that they shall entrust the persons designated by Qiyi Century to exercise all of their shareholder voting rights and other shareholder rights, regardless of what changes occur to their equity in Shanghai iQIYI.

Article 4

Geng Xiaohua and Gong Yu hereby confirm that, if Qiyi Century cancels the designation of relevant persons, they will immediately revoke the entrustment and authorization to such persons, and will authorize other person designated by Qiyi Century according to the designation of Qiyi Century to exercise all of Geng Xiaohua's and Gong Yu's shareholder voting right and other shareholder rights at the shareholders' meetings of Shanghai iQIYI.

Article 5

This Agreement shall become effective on December 19, 2012.

Article 6

During the period in which Geng Xiaohua and Gong Yu hold equity in Shanghai iQIYI, unless this Agreement provides otherwise, this Agreement is irrevocable and remains effective, as from December 19, 2012.

Article 7

This Agreement is irrevocable, and its amendment and/or rescission shall be subject to the unilateral written consent of Qiyi Century.

[ the remainder of this page is intentionally left blank]

2

[Signature Page]

**Geng Xiaohua**

Signature: /s/ Geng Xiaohua

**Gong Yu**

Signature: /s/ Gong Yu

**Beijing QIYI Century Science & Technology Co., Ltd.**

*[Company seal is affixed]*

Authorized Representative: Gong Yu

Signature: /s/ Gong Yu

Agree and accept this Agreement:

**Shanghai iQIYI Culture Media Co., Ltd.**

*[Company seal is affixed]*

Authorized Representative:

Signature: /s/ Gong Yu

3

**Exhibit 10.18**

Beijing QIYI Century Science & Technology Co., Ltd.

and

Shanghai iQIYI Culture Media Co., Ltd.

and

GENG Xiaohua

&

GONG Yu

**BUSINESS OPERATION AGREEMENT**

1

**Business Operating Agreement**

This Business Operating Agreement (hereinafter referred to as this "Agreement") is executed by and among the following parties on October 25, 2013 in Beijing:

(1)    Beijing QIYI Century Science & Technology Co., Ltd. (hereinafter referred to as "Party A")

Address: F10\11, No.2 Haidian North First Street, Haidian District, Beijing

(2)    Shanghai iQIYI Culture Media Co., Ltd. (hereinafter referred to as "Party B")

Address: Room 1016, Building 3, 1630 Yecheng Road, Jiading Industrial District

(3)    GENG Xiaohua

Address: ******

(4)    Gong Yu (together with GENG Xiaohua, collectively referred as "Party C")

Address: ******

WHEREAS,

1.    Party A, a wholly foreign-owned enterprise incorporated and validly existing under the law of the People's Republic of China ("PRC"), specializes and is practically experienced in software development and design, and it also has rich experience and professional staff in information technology and service;

2.    Party B is a limited liability company incorporated and validly existing in PRC;

3.    Party C are shareholders of Party B and hold 100% of the shares in Party B in total, among them, GENG Xiaohua and Gong Yu each holds 50% of the shares.

4.    According to the *Exclusive Technology Consulting and Service Agreement* entered into by and between Party A and Party B, Party B shall pay a certain amount to Party A, but the day-to-day operation of Party B will have a substantial impact on the ability of Party B to pay Party A the amounts payable.

THEREFORE, NOW, all Parties hereto, through mutual consultation, reach the following agreement upon consensus:

1.    In order to ensure performance of all business agreements entered into by and between Party A and Party B, including but not limited to *Exclusive Technology Consultation and Service Agreement*, and payment of all amounts payable by Party B to Party A, Party B and shareholders of Party B (Party C) hereby covenant that, unless consented by Party A in writing in advance, Party B will not conduct any transaction that may substantially affect its assets, obligations, rights, or company management, including but not limited to:

2

1.1    Occurrence of, inheritance of, guarantee for, or tolerance of existence of any liability, except (i) liabilities incurred during normal or day-to-day business course rather than from loans; and (ii) liabilities that have been disclosed to Party A and for which Party A has given its written consent;

1.2    Conclusion of any material contract, except the contracts concluded during normal business management (for the purpose of this provision, a contract of which the value exceeds RMB one hundred thousand yuan only (in figure RMB 100,000.00) is defined as a material contract);

1.3    Sales of any asset, or grant or transfer of any right to any third party;

1.4    Provision of loan or guarantee in any form to any third party;

1.5    Transfer of its business agreements to any third party.

2.    Party C further covenant to Party A that:

2.1    Without the written consent of Party A, Party C shall not sell, transfer, mortgage, or otherwise dispose the legal or beneficial interest of any stock right or agree to the above disposal methods at shareholders' meetings of Party B, or allow placement of any other encumbrance on such stock rights, except for selling, transferring, or mortgaging such interests to Party A and/or its designated persons;

2.2    Without the written consent of Party A, Party C shall not make any shareholders' resolution that will cause Party B to be merged or allied with any person, to acquire any person, to invest in any person, or to be acquired by any person, except for acquisition by Party A or its designated persons;

2.3    Without the written consent of Party A, Party C shall not conduct any act and/or omission that may have major impact on the assets, businesses, and liabilities of Party B; without the written consent of Party A in advance, Party C shall not sell, transfer, mortgage, or otherwise dispose the legal or beneficial interests of any assets, business, or income of Party B or allow placement of any encumbrance on such assets, businesses, and incomes at any time after the execution date of this Agreement;

2.4    In order to retain their stock rights in Party B, Party C shall execute all necessary or proper documents, take all necessary or proper actions and make all necessary or proper claims, or file necessary or proper pleas against all claims;

2.5    Without the written consent of Party A, Party C shall not require Party B to or agree at shareholders' meetings to distribute dividends or profits to shareholders;

3

2.6 Without the written consent of Party A, Party C shall not supplement, change, or amend the articles of association of Party C in any form, increase or decrease the registered capital of Party B, or change the registered capital structure of Party B in any form;

2.7 Party C agrees to execute a shareholder voting rights trust agreement according to the requirements of Party A on the date of execution of this Agreement and within the term of this Agreement;

2.8 Party C, only under the special written authorization of Party A and according to the requirements of Party A, shall exercise their rights as shareholders of Party A.

3. Where Party B needs any performance guarantee or guarantee for working capital loan during its business management, Party B will first request Party A to provide such guarantee for it. Under such circumstance, Party A has the right but is not obliged to provide proper guarantee to Party B at its own discretion. Where Party A decides not to provide such guarantee, it shall timely notify Party B in writing and Party B may request other third parties agreed by Party A in writing to provide the aforesaid guarantee.

4. In order to ensure performance of all business agreements entered into by and between Party A and Party B and payment of all amounts payable to Party A by Party B, Party B and its shareholders (Party C) hereby agree to accept the suggestions and guidelines proposed by Party A from time to time on company policies regarding employment and dismissal of Party B's employees, day-to-day operation and management, and financial management system of the company.

5. Party B and Party C hereby agree that, Party C will appoint the candidates recommended by Party A to be directors of Party B and Party B will appoint the senior executives employed and recommended by Party A to be its General Manager, CFO, and other senior executives. The aforesaid senior executives of Party A will become disqualified for any position in Party B when they resign from or are dismissed by Party A. Under such circumstance, Party B will appoint other senior executives who are employed and recommended by Party A to take the posts. The candidates recommended by Party A to Party B according to this provision shall be agreed to by Qiyi.com, Inc. and shall be qualified for directors, general manager, chief financial officer, or other senior executives according to the legal job qualifications as provided in applicable laws.

6. Party A may, at any time, require Party B to transfer its intellectual properties to Party A and/or its designated persons. Transfer price will be determined by Party A and Party B through negotiation at that time.

7. When any of the agreements entered into by and between Party A and Party B is terminated or expires, Party A will have the right but not be obliged to terminate all agreements entered by and between Party A and Party B.

4

8. Amendments and supplementation to this Agreement shall be made in writing. Amended agreements and supplemental agreements relating to this Agreement, upon execution by legal representatives or authorized representatives of all Parties hereto, shall constitute an integral part of this Agreement and shall have the same legal effect as this Agreement.

9. If any provision hereunder becomes ineffective, invalid, or unenforceable due to its inconsistency with applicable laws, such provision shall be deemed ineffective to the extent governed by applicable laws and will not affect the legal effect of other provisions hereof.

10. Party B and Party C shall not transfer their rights or obligations hereunder to any third party, unless consented by Party B in writing in advance; Party B and Party C hereby agree that, Party A may transfer its rights and obligations hereunder to other third parties when necessary and Party A only needs to notify Party B in writing at the time of such transfer, without the consent of Party B or Party C in this regard.

11. All Parties acknowledge and confirm that any oral or written material relating to this Agreement communicated among them is confidential. They shall keep such materials confidential and shall not disclose any of such materials to any third party without the written consent of the other Parties, except that: (a) such materials have become or will become known to the public (not disclosed by receiving parties without consent); (b) such materials are required to be disclosed according to applicable laws or rules or regulations of stock exchanges; or (c) any Party needs to disclose such materials to its legal or financial advisers with respect to the transactions as stated in this Agreement and such legal or financial advisers shall be bound by similar confidentiality responsibilities to those hereunder. Disclosure by the employee or engaged agencies of any Party shall be deemed as disclosure by such Party and it shall be liable for breach of contract according to this Agreement. This provision will survive whether this Agreement is invalidated, modified, rescinded, terminated, or inoperable for any reason.

12. This Agreement shall be governed by and construed according to the laws of PRC.

13. Any dispute arising out of, or relating to, the construal or performance of the provisions hereunder shall be settled by the Parties hereto through amicable negotiation. Where such negotiation fails, any Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration according to the arbitration rules effective at the time. The place of arbitration shall be Beijing and the language of arbitration shall be Chinese. The award of arbitration shall be final and binding on all Parties.

14. This Agreement becomes effective on December 19, 2012.

15. Once this Agreement becomes effective, it constitutes the entire agreement and consensus reached by all Parties hereto with respect to the contents herein and supersedes all agreements and consensus, either oral or written, reached by the Parties with respect to the contents herein before this Agreement.

5

16. Unless this Agreement is terminated early according to this Agreement or applicable provisions in related agreements otherwise entered into by and among the Parties, the term of this Agreement shall be ten (10) years; this Agreement can be renewed upon written confirmation of Party A before its expiration and the term of the renewal shall be unilaterally determined by Party A in writing. If the term of operation (including any renewal) of Party A or Party B expires or is terminated for any reason before the expiry of this Agreement, this Agreement will be terminated with termination of Party A or Party B, unless they transfer their rights and obligations according to Article 9 of this Agreement.

17. Unless this Agreement is renewed according to applicable provisions herein, this Agreement will be terminated on the expiry date. During the term of this Agreement, Party B and Party C shall not terminate this Agreement early. Notwithstanding the aforesaid agreement, Party A has the right to terminate this Agreement at any time by notifying Party B and Party C in writing thirty (30) days in advance.

This Agreement is made in four counterparts, with each party holding one counterpart. All counterparts shall have the same legal effect.

[The remainder of this page is intentionally left blank.]

6

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

**Party A:    Beijing QIYI Century Science &Technology Co., Ltd.**
*[Company seal is affixed]*
Legal / Authorized Representative: /s/ Gong Yu

**Party B:    Shanghai iQIYI Culture Media Co., Ltd.**
*[Company seal is affixed]*
Legal / Authorized Representative: /s/ Gong Yu

**Party C:**
**GENG Xiaohua**
By:  /s/ GENG Xiaohua

**Gong Yu**
By:  /s/ Gong Yu

7

**Exhibit 10.19**

**Exclusive Technology Consulting and Service Agreement**

This Exclusive Technology Consulting and Service Agreement (this "**Agreement**") is entered into by and between the parties in Beijing, China on October 25, 2013.

Party A:    Beijing QIYI Century Science & Technology Co., Ltd.
Address:    Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing

Party B:    Shanghai iQIYI Culture Media Co., Ltd.
Address:    Room 1016, Building 3, 1630 Yecheng Road, Jiading Industrial District

Whereas:

(1) Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (hereinafter referred to as "**China**") with technology expertise and practical experience in development and design of computer software as well as a wealth of experience and professionals in information technology and services.

(2) Party B is a limited liability company incorporated in Shanghai, China and engaged in business of designing, making, handling and publishing various advertisements and other businesses.

(3) Party A intends to provide Party B with exclusive technology consulting and related services. Party B also intends to accept such services. Both parties hope to continue their cooperation and are willing to sign a written agreement to clarify their rights and obligations.

Therefore, the Parties reached the following agreement upon consultations:

1.    Exclusive Consulting and Services; Exclusive Rights and Interests

    1.1    During the term of this Agreement, Party A agrees to, as the exclusive technology consulting and service provider of Party B globally, provide Party B with relevant technology consulting and services on an exclusive basis in accordance with the terms and conditions under this Agreement (see Schedule 1 for details).

    1.2    Party B agrees to accept the technology consulting and services provided by Party A. Party B further agrees that it will not accept the technology consulting and services provided by any third party for the above business during the period of this Agreement unless Party A agrees in writing beforehand.

1

2.  Calculation, Payment and Guarantee of the Technology Consulting and Service Fees (Hereinafter Referred to as the "**Consulting Service Fees**")

2.1  Both Parties agree that the Consulting Service Fees under this Agreement shall be calculated and paid in the manner set out in Schedule 2. Party A has the right to adjust the calculation and payment method in Schedule 2 at any time, such adjustment shall become effective upon Party A's written confirmation, and Party B's consent is not required.

2.2  With respect to the Consulting Service Fees payable by Party B under this Agreement, the shareholders of Party B will provide pledge guarantee to Party A with all of Party B' equity held by the shareholders of Party B.

3.  Intellectual Property Rights

3.1  Party A owns the copyright of the software designed by Party A and other related software, as well as the intellectual property rights of all R&D results obtained by Party A for fulfilling this Agreement and/or through R&D as a result of other agreements signed by both Parties and any rights derived from them. Such rights include, but are not limited to, patent application right, software and technology documents as carrier, copyrights or other intellectual property rights of technology materials, right to license others to use the above intellectual property rights or transfer the above intellectual property rights.

3.2  During the implementation of this Agreement, if Party B needs to use Party A's software programs or systems, the Parties will agree on the scope, manner and licensing fees of the software licenses by agreement.

4.  Representations and Warranties

4.1  Party A's representations and warranties are as follows:

4.1.1  Party A is a wholly foreign-owned enterprise legally registered and effectively existing in accordance with the laws of China.

4.1.2  Party A shall sign and execute this Agreement within the scope of its power and business scope. Party A has taken appropriate corporate actions, made proper authorization and has obtained necessary consent and approval of any third party, government or relevant authority. Party A does not violate the laws and contracts that are binding or affecting it.

4.1.3  The execution of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party A in accordance with the terms of this Agreement.

2

4.2     Party B's representations and warranties are as follows:

    4.2.1   Party B is a limited liability company legally registered and effectively existing in accordance with the laws of China.

    4.2.2   Party B shall sign and execute this Agreement within the scope of its power and business scope. Party B has taken appropriate corporate actions, made proper authorization and has obtained necessary consent and approval of any third party, government or relevant authority. Party B does not violate the laws and contracts that are binding or affecting it.

    4.2.3   The signing of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party B in accordance with the terms of this Agreement.

5.    Confidentiality

5.1     Party B agrees to try its best to take all reasonable confidentiality measures to keep confidential any confidential materials and information (hereinafter referred to as the "**Confidential Information**") of Party A which Party B understands or comes into contact with because of its acceptance of the exclusive consulting and services from Party A. Party B shall not disclose, give or transfer such confidential information to any third party without the written consent of Party A. Once the Agreement is terminated, Party B shall return any documents, materials and software with confidential information to Party A as required by Party A or destroy such documents, materials and software, shall delete any confidential information from any relevant memory device, and shall not continuously use such confidential information.

5.2     The Parties to this Agreement acknowledge and confirm that any oral or written information exchanged between the Parties for the purpose of this Agreement is confidential. Both Parties shall keep all such information in confidential and shall not disclose any relevant information to any third party without the written consent of the other Party, except for: (a) the information that is or will be known to the public (but the information is not disclosed to the public by the Party receiving the information without authorization); (b) the information required to be disclosed by applicable law or stock exchange rules or regulations; or (c) the information required to be disclosed by either Party to its legal or financial adviser for the transaction under this Agreement and the legal or financial adviser also obliges to comply with the confidentiality obligations similar to this term. The leakage of confidential information by any staff member or employing agency of either Party shall be deemed that such Party divulges the confidential information. Such party shall be liable for breach of contract.

3

5.3   Both Parties agree that this Article 5 will continue to be valid irrespective of whether the Agreement is invalid, altered, canceled, terminated or not executable.

6.   Indemnity

Party B shall be responsible for any losses, damages, obligations and expenses incurred to Party A in any action, claim or other request against Party A arising from or as a result of the contents of consulting and services requested by Party B and hold harmless Party A from and against any damages.

7.   Effectiveness and Period of Validity

7.1   This Agreement shall become effective on December 19, 2012.

7.2   This Agreement is valid for a period of ten (10) years unless terminated earlier under this Agreement or a separate agreement between the Parties.

7.3   Before expiration of the Agreement, the period of validity can be extended with Party A's written confirmation.

7.4   If the operation term (including any extension of the period) of any Party expires or terminates for any other reason during the period specified in Article 7.2 and Article 7.3, the Agreement terminates upon termination of such Party, unless such Party has transferred its rights and obligations pursuant to Article 13 of this Agreement.

8.   Termination

8.1   Expiry on the expiry date. Unless renewed in accordance with the terms of this Agreement, this Agreement shall terminate on the expiry date.

8.2   Early termination. During the period of this Agreement, Party B shall not terminate this Agreement beforehand unless Party A commits any gross negligence, fraud, other illegal act or bankruptcy. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time by giving written notice to Party B thirty (30) days in advance. If Party B violates this Agreement during the period of this Agreement and fails to correct the default upon receipt of Party A's written notice of default within fourteen (14) days, Party A may notify Party B in writing to terminate this Agreement.

8.3   Survival. After the termination of this Agreement, the rights and obligations of the parties under Article 5, Article 10 and Article 12 will remain in effect.

4

9.   Applicable Law

The performance, interpretation and enforcement of this Agreement shall be governed by the law of China.

10.   Resolution of Disputes

In the event of a dispute between the parties concerning the interpretation and performance of the provisions of this Agreement, both Parties shall negotiate and resolve the dispute in good faith. If the parties have not reached an agreement on the resolution of the dispute within thirty (30) days after either Party requests resolution of the dispute through negotiations, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with the then effective arbitration rules. The place of arbitration shall be Beijing. The language of arbitration shall be Chinese. The arbitration award shall be final and binding on both Parties.

11.   Force Majeure

11.1   A "**Force Majeure Event**" means any event that is beyond the reasonable control of a Party and is still unavoidable even the affected party takes reasonable care, including but not limited to government acts, legal changes, natural forces, fires, explosions, storms, flooding, earthquakes, tides, lightning or war. However, lack of creditworthiness, funding or financing must not be considered as something beyond one's reasonable control. Either Party affected by any Force Majeure Event and seeking to waive performance of its obligations under this Agreement or under any terms of this Agreement shall, as soon as possible, inform the other Party in writing of this liability exemption matter.

11.2   When performance of this Agreement is delayed or obstructed by a Force Majeure Event, the Party affected by the Force Majeure Event shall not be liable for any obligations under this Agreement to the extent it is delayed or obstructed. The affected Party shall take appropriate measures to reduce or eliminate the effects of force majeure and shall endeavor to restore the performance of its obligations that are delayed or obstructed by Force Majeure Event. Once the effect of the Force Majeure Event is eliminated, the Parties agree to use their best efforts to restore performance under this Agreement.

5

12.    Notice

Any notice or other communication by either Party in accordance with the provisions of this Agreement shall be in Chinese or English and may be sent by personal delivery, registered mail, postage prepaid mail, or authorized courier service or fax to the following address of one or both of the Parties or other address noticed by either Party to the other Party from time to time or the address of any other person designated by such Party. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of a letter, on the tenth (10) day after the registered mail is sent out (marked on the postmark) or the fourth day after it is posted with an internationally recognized courier service organization; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

Party A:      Beijing QIYI Century Science & Technology Co., Ltd.
Address:      Floor 10 and 11, 2 Haidian East Third Street, Haidian District, Beijing
Contact:      Gong Yu
Fax:
Tel:

Party B:      Shanghai iQIYI Culture Media Co., Ltd.
Address:      Room 1016, Building 3, 1630 Yecheng Road, Jiading Industrial District
Contact:      Gong Yu
Fax:
Tel:

13.    Assignment of the Agreement

13.1    Party B shall not assign its rights and obligations under this Agreement to any third party unless prior written consent of Party A is obtained.

13.2    Party B hereby agrees that Party A may assign its rights and obligations under this Agreement to other third parties when it is required. Party A shall only give written notice to Party B at the time of the assignment and there is no need to obtain the consent of Party B on such assignment.

14.    Entire Agreement

The Parties acknowledge that this Agreement, once effective, shall constitute the entire agreement and understanding between them with respect to the content hereof, and shall replace all oral and/or written agreements and understandings concluded by the Parties with respect to the content hereof.

15.    Severability

If any provision hereof is held invalid, or unenforceable for violating any laws, the provision shall be deemed invalid in the jurisdiction where the laws are applied, and shall not affect the legal validity of other provisions hereof.

16.    Amendment and Supplementation

The Parties shall amend or supplement this Agreement in writing. Any amendment to or supplemental agreement of this Agreement duly signed by legal or authorized representatives of the Parties constitute a part of this Agreement, and have the same legal force as this Agreement.

17.    Counterparts

The Agreement is made in duplicate, with each party holding one. Each counterpart has the same legal force.

7

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

Party A:   Beijing QIYI Century Science &Technology Co., Ltd.

[*Company seal is affixed*]

By:   /s/ Gong Yu
Title:   legal/authorized representative

Party B:   Shanghai iQIYI Culture Media Co., Ltd.

[*Company seal is affixed*]

By:   /s/ Gong Yu
Title:   legal/authorized representative

8

**Schedule 1: List of the Content of Technology Consulting and Services**

(1)    Server maintenance and support services for network platform management;

(2)    Development, update and upgrade of server applications and the application on any website owned or operated by Party B;

(3)    E-commerce technology services, including but not limited to the design and maintenance of e-commerce platforms;

(4)    Provide design schemes, software design, page production, technology support and other technology services, and provide management consulting on advertising business operations, Internet information services and other value-added telecommunications business that Party B may be involved;

(5)    Provide labor support according to Party B's request, including but not limited to lending or dispatching relevant personnel (provided that Party B shall bear related service expenditure at its own expense);

(6)    Technical and operational staff training;

(7)    Analysis of website traffic statistics;

(8)    Sales data processing;

(9)    Technical support for platform user interaction;

(10)    Advertising schedule release; and

(11)    Other services approved by both Parties.

9

**Schedule 2: Calculation and Payment Methods for Technology Consulting and Service Fees**

Both parties agree that the technology consulting and service fees under this Agreement shall be calculated and paid on a quarterly basis. Party A shall inform Party B of the Consulting Service Fees incurred in the previous quarter at the end of each quarter and provide the corresponding expense details. Party B shall pay the Consulting Service Fees according to the amount given by Party A.

10

**Exhibit 10.20**

**Commitment Letter**

To: Shanghai iQIYI Culture Media Co., Ltd.

To ensure normal operation of your company and to promote business development, Qiyi.com, Inc. hereby undertake as follows:

If your company suffer any loss before issuance of this letter, Qiyi.com, Inc. undertakes to provide financial aid free of charge through Beijing QIYI Century Science & Technology Co., Ltd. to you to the extent permitted by law. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. Your company are not required to repay the financial aid provided by Qiyi.com, Inc. through Beijing QIYI Century Science & Technology Co., Ltd. according to this letter.

If your company suffer any loss in any year after issuance of this letter, Qiyi.com, Inc. will provide financial aid free of charge to your company through Beijing QIYI Century Science & Technology Co., Ltd. to the extent permitted by law in the next year. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. Your company are not required to repay the financial aid provided by Qiyi.com, Inc. through Beijing QIYI Century Science & Technology Co., Ltd. according to this letter.

The above undertakings are conditioned on that the Loan Agreement, the Share Pledge Agreement, the Exclusive Purchase Option Agreement, the Business Operation Agreement, and the Shareholder Voting Rights Trust Agreement entered into by your company, your shareholders and relevant entities on October 25, 2013 and any amendments to the above documents with consents of the signing parties shall remain effective.

Undertaker: Qiyi.com, Inc.
[*Company seal is affixed*]
/s/ GONG Yu
October 25, 2013

**Exhibit 10.21**

**Beijing QIYI Century Science & Technology Co., Ltd.**

and

Shanghai Zhong Yuan Network Co., Ltd.

and

GONG Yu

**BUSINESS OPERATION AGREEMENT**

1

**Business Operating Agreement**

This Business Operating Agreement (hereinafter referred to as this "Agreement") is executed by and among the following parties on January 14, 2014 in Beijing:

(1)     Beijing QIYI Century Science & Technology Co., Ltd. (hereinafter referred to as "Party A")

        Address: F10\11, No.2 Haidian North First Street, Haidian District, Beijing

(2)     Shanghai Zhong Yuan Network Co., Ltd. (hereinafter referred to as "Party B")

        Address: Room 701, Building 3, No. 33 Leshan Road, Xuhui District, Shanghai

(3)     Gong Yu (hereinafter referred as "Party C")

        Address: ******

WHEREAS,

1.      Party A, a wholly foreign-owned enterprise incorporated and validly existing under the law of the People's Republic of China ("PRC"), specializes and is practically experienced in software development and design, and it also has rich experience and professional staff in information technology and service;

2.      Party B is a limited liability company incorporated and validly existing in PRC;

3.      Party C is shareholder of Party B and holds 100% of the shares in Party B in total.

4.      According to the *Exclusive Technology Consulting and Service Agreement* entered into by and between Party A and Party B, Party B shall pay a certain amount to Party A, but the day-to-day operation of Party B will have a substantial impact on the ability of Party B to pay Party A the amounts payable.

THEREFORE, NOW, all Parties hereto, through mutual consultation, reach the following agreement upon consensus:

1.      In order to ensure performance of all business agreements entered into by and between Party A and Party B, including but not limited to *Exclusive Technology Consultation and Service Agreement*, and payment of all amounts payable by Party B to Party A, Party B and shareholder of Party B (Party C) hereby covenant that, unless consented by Party A in writing in advance, Party B will not conduct any transaction that may substantially affect its assets, obligations, rights, or company management, including but not limited to:

        1.1     Occurrence of, inheritance of, guarantee for, or tolerance of existence of any liability, except (i) liabilities incurred during normal or day-to-day business course rather than from loans; and (ii) liabilities that have been disclosed to Party A and for which Party A has given its written consent;

2

1.2    Conclusion of any material contract, except the contracts concluded during normal business management (for the purpose of this provision, a contract of which the value exceeds RMB one hundred thousand yuan only (in figure RMB 100,000.00) is defined as a material contract);

1.3    Sales of any asset, or grant or transfer of any right to any third party;

1.4    Provision of loan or guarantee in any form to any third party;

1.5    Transfer of its business agreements to any third party.

2.    Party C further covenants to Party A that:

2.1    Without the written consent of Party A, Party C shall not sell, transfer, mortgage, or otherwise dispose the legal or beneficial interest of any stock right or agree to the above disposal methods at shareholders' meetings of Party B, or allow placement of any other encumbrance on such stock rights, except for selling, transferring, or mortgaging such interests to Party A and/or its designated persons;

2.2    Without the written consent of Party A, Party C shall not make any shareholders' resolution that will cause Party B to be merged or allied with any person, to acquire any person, to invest in any person, or to be acquired by any person, except for acquisition by Party A or its designated persons;

2.3    Without the written consent of Party A, Party C shall not conduct any act and/or omission that may have major impact on the assets, businesses, and liabilities of Party B; without the written consent of Party A in advance, Party C shall not sell, transfer, mortgage, or otherwise dispose the legal or beneficial interests of any assets, business, or income of Party B or allow placement of any encumbrance on such assets, businesses, and incomes at any time after the execution date of this Agreement;

2.4    In order to retain their stock rights in Party B, Party C shall execute all necessary or proper documents, take all necessary or proper actions and make all necessary or proper claims, or file necessary or proper pleas against all claims;

2.5    Without the written consent of Party A, Party C shall not require Party B to or agree at shareholders' meetings to distribute dividends or profits to shareholders;

2.6    Without the written consent of Party A, Party C shall not supplement, change, or amend the articles of association of Party C in any form, increase or decrease the registered capital of Party B, or change the registered capital structure of Party B in any form;

3

2.7 Party C agrees to execute a shareholder voting rights trust agreement according to the requirements of Party A on the date of execution of this Agreement and within the term of this Agreement;

2.8 Party C, only under the special written authorization of Party A and according to the requirements of Party A, shall exercise their rights as shareholders of Party A.

3. Where Party B needs any performance guarantee or guarantee for working capital loan during its business management, Party B will first request Party A to provide such guarantee for it. Under such circumstance, Party A has the right but is not obliged to provide proper guarantee to Party B at its own discretion. Where Party A decides not to provide such guarantee, it shall timely notify Party B in writing and Party B may request other third parties agreed by Party A in writing to provide the aforesaid guarantee.

4. In order to ensure performance of all business agreements entered into by and between Party A and Party B and payment of all amounts payable to Party A by Party B, Party B and its shareholders (Party C) hereby agree to accept the suggestions and guidelines proposed by Party A from time to time on company policies regarding employment and dismissal of Party B's employees, day-to-day operation and management, and financial management system of the company.

5. Party B and Party C hereby agree that, Party C will appoint the candidates recommended by Party A to be directors of Party B and Party B will appoint the senior executives employed and recommended by Party A to be its General Manager, CFO, and other senior executives. The aforesaid senior executives of Party A will become disqualified for any position in Party B when they resign from or are dismissed by Party A. Under such circumstance, Party B will appoint other senior executives who are employed and recommended by Party A to take the posts. The candidates recommended by Party A to Party B according to this provision shall be agreed to by Qiyi.com, Inc. and shall be qualified for directors, general manager, chief financial officer, or other senior executives according to the legal job qualifications as provided in applicable laws.

6. Party A may, at any time, require Party B to transfer its intellectual properties to Party A and/or its designated persons. Transfer price will be determined by Party A and Party B through negotiation at that time.

7. When any of the agreements entered into by and between Party A and Party B is terminated or expires, Party A will have the right but not be obliged to terminate all agreements entered by and between Party A and Party B.

8. Amendments and supplementation to this Agreement shall be made in writing. Amended agreements and supplemental agreements relating to this Agreement, upon execution by legal representatives or authorized representatives of all Parties hereto, shall constitute an integral part of this Agreement and shall have the same legal effect as this Agreement.

4

9.	If any provision hereunder becomes ineffective, invalid, or unenforceable due to its inconsistency with applicable laws, such provision shall be deemed ineffective to the extent governed by applicable laws and will not affect the legal effect of other provisions hereof.

10.	Party B and Party C shall not transfer their rights or obligations hereunder to any third party, unless consented by Party B in writing in advance; Party B and Party C hereby agree that, Party A may transfer its rights and obligations hereunder to other third parties when necessary and Party A only needs to notify Party B in writing at the time of such transfer, without the consent of Party B or Party C in this regard.

11.	All Parties acknowledge and confirm that any oral or written material relating to this Agreement communicated among them is confidential. They shall keep such materials confidential and shall not disclose any of such materials to any third party without the written consent of the other Parties, except that: (a) such materials have become or will become known to the public (not disclosed by receiving parties without consent); (b) such materials are required to be disclosed according to applicable laws or rules or regulations of stock exchanges; or (c) any Party needs to disclose such materials to its legal or financial advisers with respect to the transactions as stated in this Agreement and such legal or financial advisers shall be bound by similar confidentiality responsibilities to those hereunder. Disclosure by the employee or engaged agencies of any Party shall be deemed as disclosure by such Party and it shall be liable for breach of contract according to this Agreement. This provision will survive whether this Agreement is invalidated, modified, rescinded, terminated, or inoperable for any reason.

12.	This Agreement shall be governed by and construed according to the laws of PRC.

13.	Any dispute arising out of, or relating to, the construal or performance of the provisions hereunder shall be settled by the Parties hereto through amicable negotiation. Where such negotiation fails, any Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration according to the arbitration rules effective at the time. The place of arbitration shall be Beijing and the language of arbitration shall be Chinese. The award of arbitration shall be final and binding on all Parties.

14.	This Agreement becomes effective on January 14, 2014.

15.	Once this Agreement becomes effective, it constitutes the entire agreement and consensus reached by all Parties hereto with respect to the contents herein and supersedes all agreements and consensus, either oral or written, reached by the Parties with respect to the contents herein before this Agreement.

16.	Unless this Agreement is terminated early according to this Agreement or applicable provisions in related agreements otherwise entered into by and among the Parties, the term of this Agreement shall be ten (10) years; this Agreement can be renewed upon written confirmation of Party A before its expiration and the term of the renewal shall be unilaterally determined by Party A in writing. If the term of operation (including any renewal) of Party A or Party B expires or is terminated for any reason before the expiry of this Agreement, this Agreement will be terminated with termination of Party A or Party B, unless they transfer their rights and obligations according to Article 9 of this Agreement.

5

17.    Unless this Agreement is renewed according to applicable provisions herein, this Agreement will be terminated on the expiry date. During the term of this Agreement, Party B and Party C shall not terminate this Agreement early. Notwithstanding the aforesaid agreement, Party A has the right to terminate this Agreement at any time by notifying Party B and Party C in writing thirty (30) days in advance.

This Agreement is made in four counterparts, with each party holding one counterpart. All counterparts shall have the same legal effect.

[The remainder of this page is intentionally left blank.]

6

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

**Party A:    Beijing QIYI Century Science &Technology Co., Ltd.**
[*Company seal is affixed*]
Legal / Authorized Representative: /s/ Gong Yu

**Party B:    Shanghai Zhong Yuan Network Co., Ltd.**
[*Company seal is affixed*]
Legal / Authorized Representative: /s/ Gong Yu

**Party C:    Gong Yu**
By:        /s/ Gong Yu

7

**Exhibit 10.22**

**Beijing QIYI Century Science & Technology Co., Ltd.**
(as Lender)

and

**GONG Yu**
(as Borrower)

**LOAN AGREEMENT**

**Loan Agreement**

This Loan Agreement (this "**Agreement**") is executed by and between the following two parties in Beijing, the People's Republic of China ("**China**") on January 14, 2014:

**Lender:** Beijing QIYI Century Science & Technology Co., Ltd., its registered address is Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing, its legal representative is GONG Yu (龚宇) ; and

**Borrower**: GONG Yu (龚宇) , address: *** ID Card No. ***

Whereas,

1.    The Lender is a wholly foreign owned enterprise legally established and validly existing in China according to the laws of China;

2.    The Borrower is a citizen of China, and as a shareholder of Shanghai Zhong Yuan Network Co., Ltd. ("**Zhong Yuan**"), holds 100% of the shares in Zhong Yuan in total.

3.    The Lender agrees to lend RMB 20 million (RMB 20,000,000.00) interest-free to the Borrower.

Therefore, the two Parties reach the following agreement through friendly negotiation to specify their rights and obligations:

1.    **Loan**

In accordance with the terms and conditions provided in this Agreement, the Lender agrees to lend the Borrower with an interest-free loan amounting to RMB 20 million (RMB 20,000,000.00), and the Borrower agrees to accept the aforesaid loan.

2.    **Term of the Loan**

2.1    The term of the loan under this Agreement shall begin from January 14, 2014 to ten (10) years after the execution of this Agreement ("**Term of the Loan**"); the Term of the Loan may be extended upon the Lender's written confirmation; the extended term shall be determined by the Lender.

2.2    During the Term of the Loan or any extended Term of the Loan, in the event that any of the following events occur as to any of the Borrowers, the lender shall be entitled to decide, in the manner of written notice, that the loan hereunder becomes due immediately, and demand the Borrower to repay the loan in the manner provided by the provisions hereof:

(1)    the Borrower resigns from or is dismissed by the Lender or its affiliated company (refers to all the companies which have affiliated relations with the Lender during the term of this Agreement);

2

(2)    the Borrower dies or loses capacity for civil conduct, or his/her capacity for civil conduct becomes limited;

(3)    the Borrower commits or is involved in any crime;

(4)    any third party claims against the Borrower damages exceeding one hundred thousand (RMB 100,000.00);

(5)    any representation or warranty by the Borrower herein is proven to be untrue or inaccurate in any material aspect at the time when it is made; or the Borrower breaches any obligation hereof;

(6)    to the extent permitted by the laws of China, in the event that the Lender or its designated person may invest in the business of designing, making, handling and publishing advertisements and other businesses conducted by Zhong Yuan, and Qiyi.com, Inc., in accordance with the provisions of the Exclusive Purchase Option Agreement that it entered into with the Borrower on January 14, 2014 (the "**Exclusive Purchase Option Agreement**"), has issued a written notice to the Borrower to purchase the shares in Zhong Yuan held by the Borrower and has exercised such option.

**3.    Repayment of the Loan**

3.1    Both Parties hereby agree and confirm that the Borrower must and may only repay the loan in the manner as follows: when the loan hereof becomes due, the Borrower (or his/her successors, heirs or assigns) shall at the request of the written notice by the Lender, subject to the provisions of the laws of China, transfer all his/her shares in Zhong Yuan to the Lender and/or its designated persons, and repay the loan hereunder by the proceeds received from the transfer.

3.2    The Borrower may not repay the loan in whole or in part without prior written consent of Party A.

3.3    Both Parties agree that the share transfer hereunder shall be deemed completed when the formalities for the change of shareholder with the relevant industry and administrative authorities are completed and the Lender or its designated persons have become the legal holders of the aforementioned target shares.

**4.    Interest of the Loan**

Both Parties hereby agree and acknowledge that unless this Agreement provides otherwise, the loan hereunder shall bear no interest. However, when the loan becomes due and the Borrower transfers his/her shares to the Lender or its designated persons in the manner of repayment provided by this Agreement, if the actual price for share transfer is higher than the principal of the loan to the Borrower because of the requirements of the laws or other reasons, the difference between the transfer price and the principal shall be deemed interest or capital occupation expense, and shall be paid to the Lender together with the principal.

3

**5.** **Representations, Warranties and Undertakings of the Borrower**

5.1    the Borrower shall respectively provide copy of his/her capital contribution certificate as to 100% of the shares in Zhong Yuan to the Lender.

5.2    To secure repayment of the loan, the Borrower agrees to pledge all his/her shares in Zhong Yuan with the Lender, and grant an option to purchase the abovementioned shares to the Lender. The Borrower agrees to execute the Share Pledge Agreement at the Lender's request.

5.3    the Borrower undertakes not to request Zhong Yuan to distribute dividend or profit to him/her, and not to pass any resolution as the shareholder of Zhong Yuan to distribute dividend or profit to shareholders.

5.4    the Borrower shall maintain Zhong Yuan's existence and prudentially and validly operate the business and handle the matters of Zhong Yuan, following sound financial and business standards and practices. Upon the Lender's request, the Borrower shall provide the Lender with all the materials relating to operation and financial condition of Zhong Yuan. The Borrower shall operate all businesses of Zhong Yuan in the normal course of business to maintain the value of Zhong Yuan's assets.

5.5    To keep his/her title of the shares in Zhong Yuan, he/she shall execute all the necessary or appropriate documents, take all the necessary or appropriate actions, make all the necessary or appropriate accusations, and raise all necessary or appropriate defenses against all claims; the Borrower shall immediately notify the Lender of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to Zhong Yuan.

5.6    the Borrower shall strictly comply with the provisions hereof and duly perform his/her obligations hereunder, and shall not conduct any act or omission that may affect the validity and enforceability of this Agreement.

**6.** **Taxes and Expense**s

Unless this Agreement provides otherwise, both Parties shall respectively pay their respective taxes and expenses regarding this Agreement pursuant to relevant laws and regulations. All the other taxes and reasonable expenses relating to the loan shall be borne by the Lender.

**7.** **Effectiveness and Termination of this Agreement**

7.1    Both Parties agree and confirm that this Agreement shall become effective from January 14, 2014.

7.2    Both Parties agree and confirm that this Agreement shall terminate when both Parties fully perform their respective obligations hereunder. Both Parties agree and confirm that the Borrower's obligations hereunder shall only be deemed fullyperformed when all of the following conditions are met:

4

(1)      the Borrower has transferred all his/her shares in Zhong Yuan to the Lender and/or its designated persons; and

(2)      the Borrower has repaid all the proceeds received from the transfer hereunder or the proceeds specified in the Exclusive Purchase Option Agreement to the Lender, and the Lender shall repay the proceeds to Qiyi.com, Inc. under the premise that the laws and regulations of China are complied with and all the necessary approvals are obtained.

7.3      Unless (1) the Lender commits gross negligence, fraud or other serious illegal acts; or (2) the Lender is terminated for bankruptcy, dissolution or order to close, the Borrower shall not unilaterally revoke or terminate this Agreement in any circumstance.

## 8.   Breaching Liabilities

8.1      In the event that either Party ("**Breaching Party**") breaches any provision hereof, and thus causes any damage to the other Party ("**Non-breaching Party**"), the Non-breaching Party may send a written notice to the Breaching Party, requesting the Breaching Party to immediately correct and remedy its breach. If the Breaching Party fails to take measures satisfactory to the Non-breaching Party to remedy and correct its breach within fifteen (15) days after the Non-breaching Party receives the abovementioned written notice, the Non-breaching Party may immediately take other remedial measures according to the provision hereof or through legal means.

8.2      In the event that the Borrower fails to repay the loan to the Lender according hereto, the Borrower shall pay to the Lender the liquidated damages for late payment at the daily rate of 0.02% over the outstanding amount (counted from the date requested by the Lender for repayment of the loan), and shall compensate the Lender for any direct economic loss caused by the Borrower's breach (including but not limited to the market value of the shares held by the Borrower in Zhong Yuan which is not transferred, or the outstanding loan amount, whichever is higher).

## 9.   Confidentiality

9.1 Both Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consent by the other Party, except:

(1)      Any information that has been known or will be known to the public (not through any disclosure by the receiving Party to the public without the other Party's consent);

5

(2) Any information disclosed according to the requirements of applicable laws and stock exchange rules; or

(3) In case that any information is disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, such legal or financial consultant is obliged to perform similar obligations of confidentiality to those specified herein. Any disclosure by any employee of or institution engaged by either Party shall be deemed disclosure by such Party, and such Party shall be liable for breach of contract according to this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

**10.    Notice**

Any notice or other communication sent by either Party hereunder shall be made in writing, and sent by personal delivery, letter or fax to the following address of the other Party or to other addresses designated by the other Party by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the seventh (7th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

the Lender: Beijing QIYI Century Science & Technology Co., Ltd.
Address: 10th and 11th Floor, No. 2 Haidian North First Street, Haidian District, Beijing
Postal code: 100080
Tel: 010-62677171
Fax:

the Borrower: GONG Yu (龚宇)
Address: ***
Postal code:
Tel:
Fax:

**11.    Applicable Law and Dispute Resolution**

11.1. The execution, validity, performance and interpretation of and the dispute resolution regarding this Agreement shall be governed by the laws of China.

11.2. Any dispute arising from performance hereof or relating to this Agreement shall be resolved by the Parties through friendly negotiation.

6

11.3.   If no dispute resolution agreement is reached within thirty (30) days after one Party brings up the request to resolve the dispute(s) through negotiation, either Party may submit the relevant dispute(s) to Beijing Arbitration Commission for arbitration in Beijing, pursuant to the arbitral rules then effective. The arbitration award shall be final and shall have binding force upon all the parties. When any dispute occurs or any dispute is under arbitration proceeding, except for the part submitted to arbitration, both Parties may still exercise other rights hereunder and shall still perform other obligations hereunder.

**12.    Miscellaneous**

12.1    Both Parties agree and confirm that the Lender's "written consent" mentioned in this Agreement means that the matter is subject to the approval of the Lender's board of directors. If such matter is only approved by the Borrower, the approval shall not constitute the Lender's "written consent" hereunder.

12.2    The headings herein are for convenience only, and may not be used to interpret, explain or affect in other aspects the meaning of any provisions hereof.

12.3    Both Parties confirm that this Agreement once effective shall constitute the entire agreement and consensus between them with respect to the subject matters hereof, and shall replace all the oral and/or written agreements and consensuses reached by the Parties with respect to the subject matters hereof.

12.4    This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors, heirs or permitted assigns, and be executed only for the benefit of the above persons. The Borrower may not assign, pledge or otherwise transfer in other manners any right, interest or obligation hereunder to others without prior written consent of the Lender.

12.5    the Borrower hereby agrees that (i) if the Borrower dies, the Borrower agrees to immediately assign the rights and obligations hereunder to the entity designated by the Lender; (ii) the Lender may assign its rights and obligations hereunder to any third party when necessary. The Lender only needs to send a written notice to the Borrower when the such assignment occurs, and is not required to obtain the Borrower's consent on such assignment.

12.6    Either Party's failure to exercise promptly any right hereunder shall not be deemed waiver of such right, nor shall it affect the Party's future exercise thereof.

12.7    If any provision hereof is decided by any competent court or arbitral institution as invalid, void or unenforceable, it shall not affect or impair the validity or enforceability of other provisions hereof. The Parties shall stop performance of such invalid, void or unenforceable provision, and shall amend it so that the original intention will be achieved as much as possible and the provision becomes valid and effective only to the extent of relevant fact and circumstance.

12.8    The Parties shall negotiate to decide any matter not covered herein. The Parties shall amend or supplement this Agreement through written agreements. The written amendments and supplemental agreements duly signed by both Parties are an integral part hereof, and have same legal force as this Agreement.

7

12.9     This Agreement is made in four (4) counterparts, and each Party holds two (2). All counterparts have equal legal force.

In witness whereof, this Agreement is entered into by both Parties or their legal representatives or authorized representatives on the date first written above.

[The remainder of this page is intentionally left blank.]

8

[Signature page for the Loan Agreement]

**Lender: Beijing QIYI Century Science & Technology Co., Ltd.(seal)**
[*Company seal is affixed*]

Signature:    /s/ GONG Yu
Legal Representative / Authorized Representative: GONG Yu
Position:

**Borrower: GONG Yu** (龚宇)

Signature:    /s/ GONG Yu

9

**Exhibit 10.23**

**Commitment Letter**

To: Shanghai Zhong Yuan Network Co., Ltd.

To ensure normal operation of your company and to promote business development, Qiyi.com, Inc. hereby undertake as follows:

If your company suffer any loss before issuance of this letter, Qiyi.com, Inc. undertakes to provide financial aid free of charge through Beijing QIYI Century Science & Technology Co., Ltd. to you to the extent permitted by law. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. Your company are not required to repay the financial aid provided by Qiyi.com, Inc. through Beijing QIYI Century Science & Technology Co., Ltd. according to this letter.

If your company suffer any loss in any year after issuance of this letter, Qiyi.com, Inc. will provide financial aid free of charge to your company through Beijing QIYI Century Science & Technology Co., Ltd. to the extent permitted by law in the next year. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. Your company are not required to repay the financial aid provided by Qiyi.com, Inc. through Beijing QIYI Century Science & Technology Co., Ltd. according to this letter.

The above undertakings are conditioned on that the Loan Agreement, the Share Pledge Agreement, the Exclusive Purchase Option Agreement, the Business Operation Agreement and the Shareholder Voting Rights Trust Agreement entered into by your company, your shareholders and relevant entities on January 14, 2014 and any amendments to the above documents with consents of the signing parties shall remain effective.

Undertaker: Qiyi.com, Inc.
[*Company seal is affixed*]
/s/ GONG Yu
_____
January 14, 2014

**Exhibit 10.24**

**Exclusive Technology Consulting and Service Agreement**

This Exclusive Technology Consulting and Service Agreement (the "**Agreement**") is entered into by and between the parties in Beijing, China on January 14, 2014.

Party A:    Beijing QIYI Century Science & Technology Co., Ltd.
Address:    Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing

Party B:    Shanghai Zhong Yuan Network Co., Ltd.
Address:    Room 701, Building 3, 33 Leshan Road, Xuhui District, Shanghai

Whereas:

(1) Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (hereinafter referred to as "**China**") with technology expertise and practical experience in development and design of computer software as well as a wealth of experience and professionals in information technology and services.

(2) Party B is a limited liability company incorporated in Shanghai, China and engaged in business of designing, making, handling and publishing various advertisements and other businesses.

(3) Party A intends to provide Party B with exclusive technology consulting and related services. Party B also intends to accept such services. Both parties hope to continue their cooperation and are willing to sign a written agreement to clarify their rights and obligations.

Therefore, the Parties reached the following agreement upon consultations:

1.    Exclusive Consulting and Services; Exclusive Rights and Interests

    1.1    During the term of this Agreement, Party A agrees to, as the exclusive technology consulting and service provider of Party B globally, provide Party B with relevant technology consulting and services on an exclusive basis in accordance with the terms and conditions under this Agreement (see Schedule 1 for details).

    1.2    Party B agrees to accept the technology consulting and services provided by Party A. Party B further agrees that it will not accept the technology consulting and services provided by any third party for the above business during the period of this Agreement unless Party A agrees in writing beforehand.

1

2.  Calculation, Payment and Guarantee of the Technology Consulting and Service Fees (Hereinafter Referred to as the "**Consulting Service Fees**")

    2.1  Both Parties agree that the Consulting Service Fees under this Agreement shall be calculated and paid in the manner set out in Schedule 2. Party A has the right to adjust the calculation and payment method in Schedule 2 at any time, such adjustment shall become effective upon Party A's written confirmation, and Party B's consent is not required.

    2.2  With respect to the Consulting Service Fees payable by Party B under this Agreement, the shareholders of Party B will provide pledge guarantee to Party A with all of Party B' equity held by the shareholders of Party B.

3.  Intellectual Property Rights

    3.1  Party A owns the copyright of the software designed by Party A and other related software, as well as the intellectual property rights of all R&D results obtained by Party A for fulfilling this Agreement and/or through R&D as a result of other agreements signed by both Parties and any rights derived from them. Such rights include, but are not limited to, patent application right, software and technology documents as carrier, copyrights or other intellectual property rights of technology materials, right to license others to use the above intellectual property rights or transfer the above intellectual property rights.

    3.2  During the implementation of this Agreement, if Party B needs to use Party A's software programs or systems, the Parties will agree on the scope, manner and licensing fees of the software licenses by agreement.

4.  Representations and Warranties

    4.1  Party A's representations and warranties are as follows:

        4.1.1  Party A is a wholly foreign-owned enterprise legally registered and effectively existing in accordance with the laws of China.

        4.1.2  Party A shall sign and execute this Agreement within the scope of its power and business scope. Party A has taken appropriate corporate actions, made proper authorization and has obtained necessary consent and approval of any third party, government or relevant authority. Party A does not violate the laws and contracts that are binding or affecting it.

        4.1.3  The execution of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party A in accordance with the terms of this Agreement.

2

4.2    Party B's representations and warranties are as follows:

    4.2.1    Party B is a limited liability company legally registered and effectively existing in accordance with the laws of China.

    4.2.2    Party B shall sign and execute this Agreement within the scope of its power and business scope. Party B has taken appropriate corporate actions, made proper authorization and has obtained necessary consent and approval of any third party, government or relevant authority. Party B does not violate the laws and contracts that are binding or affecting it.

    4.2.3    The signing of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party B in accordance with the terms of this Agreement.

5.    Confidentiality

5.1    Party B agrees to try its best to take all reasonable confidentiality measures to keep confidential any confidential materials and information (hereinafter referred to as the "**Confidential Information**") of Party A which Party B understands or comes into contact with because of its acceptance of the exclusive consulting and services from Party A. Party B shall not disclose, give or transfer such confidential information to any third party without the written consent of Party A. Once the Agreement is terminated, Party B shall return any documents, materials and software with confidential information to Party A as required by Party A or destroy such documents, materials and software, shall delete any confidential information from any relevant memory device, and shall not continuously use such confidential information.

5.2    The Parties to this Agreement acknowledge and confirm that any oral or written information exchanged between the Parties for the purpose of this Agreement is confidential. Both Parties shall keep all such information in confidential and shall not disclose any relevant information to any third party without the written consent of the other Party, except for: (a) the information that is or will be known to the public (but the information is not disclosed to the public by the Party receiving the information without authorization); (b) the information required to be disclosed by applicable law or stock exchange rules or regulations; or (c) the information required to be disclosed by either Party to its legal or financial adviser for the transaction under this Agreement and the legal or financial adviser also obliges to comply with the confidentiality obligations similar to this term. The leakage of confidential information by any staff member or employing agency of either Party shall be deemed that such Party divulges the confidential information. Such party shall be liable for breach of contract.

3

5.3     Both Parties agree that this Article 5 will continue to be valid irrespective of whether the Agreement is invalid, altered, canceled, terminated or not executable.

6.    Indemnity

Party B shall be responsible for any losses, damages, obligations and expenses incurred to Party A in any action, claim or other request against Party A arising from or as a result of the contents of consulting and services requested by Party B and hold harmless Party A from and against any damages.

7.    Effectiveness and Period of Validity

7.1     This Agreement shall become effective on January 14, 2014.

7.2     This Agreement is valid for a period of ten (10) years unless terminated earlier under this Agreement or a separate agreement between the Parties.

7.3     Before expiration of the Agreement, the period of validity can be extended with Party A's written confirmation.

7.4     If the operation term (including any extension of the period) of any Party expires or terminates for any other reason during the period specified in Article 7.2 and Article 7.3, the Agreement terminates upon termination of such Party, unless such Party has transferred its rights and obligations pursuant to Article 13 of this Agreement.

8.    Termination

8.1     Expiry on the expiry date. Unless renewed in accordance with the terms of this Agreement, this Agreement shall terminate on the expiry date.

8.2     Early termination. During the period of this Agreement, Party B shall not terminate this Agreement beforehand unless Party A commits any gross negligence, fraud, other illegal act or bankruptcy. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time by giving written notice to Party B thirty (30) days in advance. If Party B violates this Agreement during the period of this Agreement and fails to correct the default upon receipt of Party A's written notice of default within fourteen (14) days, Party A may notify Party B in writing to terminate this Agreement.

4

8.3　　　Survival. After the termination of this Agreement, the rights and obligations of the parties under Article 5, Article 10 and Article 12 will remain in effect.

9.　　Applicable Law

The performance, interpretation and enforcement of this Agreement shall be governed by the law of China.

10.　　Resolution of Disputes

In the event of a dispute between the parties concerning the interpretation and performance of the provisions of this Agreement, both Parties shall negotiate and resolve the dispute in good faith. If the parties have not reached an agreement on the resolution of the dispute within thirty (30) days after either Party requests resolution of the dispute through negotiations, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with the then effective arbitration rules. The place of arbitration shall be Beijing. The language of arbitration shall be Chinese. The arbitration award shall be final and binding on both Parties.

11.　　Force Majeure

11.1　　　A "**Force Majeure Event**" means any event that is beyond the reasonable control of a Party and is still unavoidable even the affected party takes reasonable care, including but not limited to government acts, legal changes, natural forces, fires, explosions, storms, flooding, earthquakes, tides, lightning or war. However, lack of creditworthiness, funding or financing must not be considered as something beyond one's reasonable control. Either Party affected by any Force Majeure Event and seeking to waive performance of its obligations under this Agreement or under any terms of this Agreement shall, as soon as possible, inform the other Party in writing of this liability exemption matter.

11.2　　　When performance of this Agreement is delayed or obstructed by a Force Majeure Event, the Party affected by the Force Majeure Event shall not be liable for any obligations under this Agreement to the extent it is delayed or obstructed. The affected Party shall take appropriate measures to reduce or eliminate the effects of force majeure and shall endeavor to restore the performance of its obligations that are delayed or obstructed by Force Majeure Event. Once the effect of the Force Majeure Event is eliminated, the Parties agree to use their best efforts to restore performance under this Agreement.

5

12. Notice

Any notice or other communication by either Party in accordance with the provisions of this Agreement shall be in Chinese or English and may be sent by personal delivery, registered mail, postage prepaid mail, or authorized courier service or fax to the following address of one or both of the Parties or other address noticed by either Party to the other Party from time to time or the address of any other person designated by such Party. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of a letter, on the tenth (10) day after the registered mail is sent out (marked on the postmark) or the fourth day after it is posted with an internationally recognized courier service organization; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

| | |
|---|---|
| Party A: | Beijing QIYI Century Science & Technology Co., Ltd. |
| Address: | Floor 10 and 11, 2 Haidian East Third Street, Haidian District, Beijing |
| Contact: | Gong Yu |
| | Fax: |
| | Tel: |

| | |
|---|---|
| Party B: | Shanghai Zhong Yuan Network Co., Ltd. |
| Address: | Floor 5, Minrun Building, 1388 Yishan Road, Xuhui District, Shanghai |
| Contact: | Gong Yu |
| | Fax: |
| | Tel: |

13. Assignment of the Agreement

13.1 Party B shall not assign its rights and obligations under this Agreement to any third party unless prior written consent of Party A is obtained.

13.2 Party B hereby agrees that Party A may assign its rights and obligations under this Agreement to other third parties when it is required. Party A shall only give written notice to Party B at the time of the assignment and there is no need to obtain the consent of Party B on such assignment.

14. Entire Agreement

The Parties acknowledge that this Agreement, once effective, shall constitute the entire agreement and understanding between them with respect to the content hereof, and shall replace all oral and/or written agreements and understandings concluded by the Parties with respect to the content hereof.

6

15.    Severability

If any provision hereof is held invalid, or unenforceable for violating any laws, the provision shall be deemed invalid in the jurisdiction where the laws are applied, and shall not affect the legal validity of other provisions hereof.

16.    Amendment and Supplementation

The Parties shall amend or supplement this Agreement in writing. Any amendment to or supplemental agreement of this Agreement duly signed by legal or authorized representatives of the Parties constitute a part of this Agreement, and have the same legal force as this Agreement.

17.    Counterparts

The Agreement is made in duplicate, with each party holding one. Each counterpart has the same legal force.

7

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

Party A:    Beijing QIYI Century Science &Technology Co., Ltd.

[*Company seal is affixed*]

By:    /s/ Gong Yu
Title:    legal/authorized representative

Party B:    Shanghai Zhong Yuan Network Co., Ltd.

[*Company seal is affixed*]

By:    /s/ Gong Yu
Title:    legal/authorized representative

8

**Schedule 1: List of the Content of Technology Consulting and Services**

(1)    Server maintenance and support services for network platform management;

(2)    Development, update and upgrade of server applications and the application on any website owned or operated by Party B;

(3)    E-commerce technology services, including but not limited to the design and maintenance of e-commerce platforms;

(4)    Provide design schemes, software design, page production, technology support and other technology services, and provide management consulting on advertising business operations, Internet information services and other value-added telecommunications business that Party B may be involved;

(5)    Provide labor support according to Party B's request, including but not limited to lending or dispatching relevant personnel (provided that Party B shall bear related service expenditure at its own expense);

(6)    Technical and operational staff training;

(7)    Analysis of website traffic statistics;

(8)    Sales data processing;

(9)    Technical support for platform user interaction;

(10)    Advertising schedule release; and

(11)    Other services approved by both Parties.

9

**Schedule 2: Calculation and Payment Methods for Technology Consulting and Service Fees**

Both parties agree that the technology consulting and service fees under this Agreement shall be calculated and paid on a quarterly basis. Party A shall inform Party B of the Consulting Service Fees incurred in the previous quarter at the end of each quarter and provide the corresponding expense details. Party B shall pay the Consulting Service Fees according to the amount given by Party A.

10

**Exhibit 10.25**

### Exclusive Purchase Option Agreement

This Exclusive Purchase Option Agreement (this "**Agreement**") is made by the following parties in Beijing on January 14, 2014:

**(1)**    **Qiyi.com, Inc.**

Address: Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands ("**Qiyi Cayman**")

**(2)**    **Beijing QIYI Century Science & Technology Co., Ltd. ("Party A")**

Address: Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing

**(3)**    **Gong Yu ("Party B")**

Address: \*\*\*

**(4)**    **Shanghai Zhong Yuan Network Co., Ltd. ("Party C")**

Address: Room 701, Building 3, 33 Leshan Road, Xuhui District, Shanghai

In this Agreement, each of Qiyi Cayman, Party A, Party B and Party C shall be referred to as a "Party", and collectively as the "Parties".

Whereas,

1.    Qiyi Cayman is a company incorporated in Cayman Islands and holds 100% shares in Party A ("**Shares**");

2.    Party A is a wholly foreign owned enterprise established in the People's Republic of China ("**China**") in accordance with the laws of China, has the expertise and practicing experience in computer software development and design, and has rich experience and professional personnel in IT technology and service;

3.    Party C is a limited liability company incorporated in Shanghai, China, conducting business of designing, making, handling and publishing various advertisements;

4.    Party B is the shareholder of Party C, and holds 100% shares in Party C;

5.    Party A and Party B entered into the Loan Agreement on January 14, 2014; Party B borrowed from Party A an interest-free loan of RMB twenty million (20,000,000) to be used for establishing Party C and acquiring 100% of the shares in Party C.

6.    Party A and Party B entered into the Share Pledge Agreement on January 14, 2014 ("**Share Pledge Agreement**").

1

Therefore, the Parties reach the following contract through negotiations and intend to be bound hereby:

**1.       Purchase and Sale of Share**

1.1.    Grant of Rights

Party B hereby irrevocably grants Qiyi Cayman or one or more persons nominated by Qiyi Cayman (including but not limited to Party A) (the "**Nominees**") an option to purchase, to the extent permitted under the laws of China and at the price set forth under Article 1.3, all or any part of the Share held by the selling Party at any time and in any manner decided by Qiyi Cayman at its discretion ("**Share Purchase Option**"). Except for Qiyi Cayman and/or the Nominees, no third person shall have the Share Purchase Option. Party C hereby agrees that Party B may grant the Share Purchase Option to Qiyi Cayman and/or the Nominees. For purpose of this Article 1.1 and this Agreement, "person" includes individuals, companies, joint ventures, partnerships, enterprises, trusts and unincorporated associations.

1.2.    Exercise Steps

Subject to compliance with Laws and regulations of China and obtaining all approvals required, Qiyi Cayman and/or the Nominees may exercise the Share Purchase Option after sending written notice to the Party B ("**Share Purchase Notice**") setting forth the number of shares it will purchase from Party B ("**Purchased Shares**") and the way of purchase to exercise the Share Purchase Option.

1.3.    Purchase Price

1.3.1    When Qiyi Cayman and/or the Nominees exercise the Share Purchase Option, unless the then applicable laws and regulations of China require evaluation of the shares or any restrictions on the share purchase price, the price for the Purchased Share ("Purchase Price") shall be equivalent to the amount of capital contribution actually paid by Party B for the Purchased Shares.

1.3.2    If the applicable laws and regulations of China require evaluation of the shares or any restrictions on the share purchase price when Qiyi Cayman and/or the Nominees exercise the Share Purchase Option, the Parties agree that the Purchase Price shall be the minimum price permitted by applicable laws.

1.4.    Transfer of the Purchased Shares

When exercising the Share Purchase Option,

1.4.1    Party B and Qiyi Cayman and/or the Nominees (as applicable) shall enter into an share transfer contract in the substance and form satisfactory to Qiyi Cayman for each transfer of shares in accordance with this Agreement and the Share Purchase Notice of the Purchased Shares;

1.4.2    Party B shall sign all necessary contracts, agreements or documents, obtain all necessary governmental approvals and consents, and take all necessary actions to transfer the title to the Purchased Shares to Qiyi Cayman and/or the Nominees without any security interest or condition, and procure Qiyi Cayman and/or the Nominees to be registered as shareholder of the Purchased Shares. For purpose of this Article 1.4.2 and this Agreement, "security interest" includes but not limited to guarantee, mortgage, pledge, any third party right or interest, any option, acquisition right, right of first refusal, right of offsetting, title retention or other security arrangement, excluding any security interest arising under the Share Pledge Agreement.

2

1.4.3    For the avoidance of any doubt, exercise of the Share Purchase Option by Qiyi Cayman and/or the Nominees shall be at the discretion of Qiyi Cayman.

1.5.    Payment

The payment method of the Purchase Price shall be determined by Qiyi Cayman and/or the Nominees and the Selling Party through negotiations in accordance with the laws then applicable upon exercising the Share Purchase Option. The Parties hereby agree that the amount paid by Qiyi Cayman and/or the Nominees to Party B for the Purchased Shares shall be returned to Qiyi Cayman subject to compliance with applicable laws (provided that any taxes and expenses, if any, incurred by Party B for the transaction contemplated in the Transfer Contract may be deducted from such amount), to repay the principal of the entrusted loan, or any interest or funding commitment cost permitted by laws.

**2.    Covenants Relating to Shares**

2.1    Covenants regarding Party C

Party B and Party C hereby covenant that in respect of Party C,

2.1.1    they will not supplement, modify or amend Party C's articles of association in whatever forms, or increase or reduce Party C's registered capital, or otherwise change Party C's registered capital structure without Qiyi Cayman's prior written consent;

2.1.2    they will maintain their existence in line with sound financial and business standards and practices, and prudentially and validly operate their business and handle their matters;

2.1.3    they will not sell, transfer, mortgage or otherwise dispose of any legal or beneficial interest in Party C's assets, business or revenue, or permit any other security interest to be created over such interest at any time after execution of this Agreement without Qiyi Cayman's prior written consent;

2.1.4    they will not incur, succeed, guarantee or permit existence of any debts without Qiyi Cayman's prior written consent, except for (i) any debts incurred in daily or normal business course; and (ii) any debts disclosed to and consented by Qiyi Cayman in writing;

2.1.5    they are always operating all business in normal business course to maintain the value of Party C's assets, and will not make any action or omission that may affect their operational condition and value of assets;

2.1.6    they will not sign any material contract without prior written consent of Qiyi Cayman, except for the contract entered into in normal business course (for purpose of this Article 2.1.6, a contract at an amount of more than RMB three hundred thousand (300,000.00) shall be deed as material contract);

3

2.1.7 they will not provide any loan or credit to any person without the prior written consent of Qiyi Cayman;

2.1.8 they will provide Qiyi Cayman with the information of Party C's operation and financial conditions at the request of Qiyi Cayman;

2.1.9 they will purchase and maintain insurances from the insurer acceptable to Qiyi Cayman, the insurance amount and coverage of which should be same as those of the companies at the place of Party C who operate similar business or own similar properties or assets;

2.1.10 they will not merge or consolidate with others or purchase or invest in any person without prior written consent of Qiyi Cayman;

2.1.11 they will immediately notify Qiyi Cayman of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to Party C's assets, business or revenue;

2.1.12 they will sign all necessary or desirable documents, take all necessary or desirable actions, and make all necessary or desirable claims and defenses to maintain Party C's title to its assets;

2.1.13 Party C may not distribute dividends in whatever forms to its shareholders without prior written consent of Qiyi Cayman, provided however that, if Qiyi Cayman requests, Party C shall immediately distribute the distributable profits to its shareholders in whole or in part. The shareholders shall remit such dividends distributed by Party C or other revenue distributed by Party C in other forms to Qiyi Cayman in a way permitted by laws.

2.1.14 They will appoint the persons nominated by Qiyi Cayman as directors of Party C at the request of Qiyi Cayman;

2.2 Covenants regarding Party B

Party B hereby covenants that:

2.2.1 It will not sell, transfer, mortgage or otherwise dispose of any legal or beneficial interest in any share, or permit any other security interest to be created over such interest at any time after execution of this Agreement without Qiyi Cayman's prior written consent, except for the pledge created over the shares owned by Party B under the Share Pledge Agreement;

2.2.2 Without prior written consent of Qiyi Cayman, It will not vote for or support or sign any resolutions at the shareholder's meeting of Party C to approve sale, transfer, mortgage or other disposal of any legal or beneficial interest in any share, or permit any other security interest to be created over such interest, except for those created in favor of Qiyi Cayman or any persons designated by Qiyi Cayman;

2.2.3 without prior written consent of Qiyi Cayman, it will not vote for or support or sign any resolutions at the shareholder's meeting of Party C to approve the merger or consolidation of Party C with others, or Party C's purchase or investment in any other person;

4

2.2.4    It will immediately notify Qiyi Cayman of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to its shares;

2.2.5    It will sign all necessary or desirable documents, take all necessary or desirable actions, and make all necessary or desirable claims and defenses to maintain its title to the shares;

2.2.6    It will appoint the persons nominated by Qiyi Cayman as directors of Party C at the request of Qiyi Cayman;

2.2.7    It will transfer its shares unconditionally to the representative designated by Qiyi Cayman at any time Qiyi Cayman requests, and waive its right of first refusal in connection with transfer of shares by the other shareholder ;

2.2.8    It will strictly comply with any provisions of this Agreement and any other contract signed by Party B, Party C and Qiyi Cayman jointly or separately, carefully perform various obligations hereunder and thereunder, and will not make any action or omission which may affect the validity or enforceability of this Agreement or other contracts.

2.2.9    It will not cause Party C to sign any material contract without prior written consent of Qiyi Cayman, except for the contract entered into in normal business course (for purpose of this Article 2.2.9, a contract in an amount of more than RMB three hundred thousand (300,000.00) shall be deed as material contract);

2.2.10    It will not cause Party C to provide any loan or credit to any person without prior written consent of Qiyi Cayman;

2.2.11    It will not cause Party C to distribute dividends in whatever forms to its shareholders without prior written consent of Qiyi Cayman, provided however that, if Qiyi Cayman requests, it shall immediately cause Party C to distribute the distributable profits to its shareholders in whole or in part;

2.2.12    Party C's shareholders shall remit such dividends distributed by Party C or other revenue distributed by Party C in other forms to Qiyi Cayman in a way permitted by laws.

2.3    Covenants regarding Qiyi Cayman

2.3.1    Qiyi Cayman hereby covenants that to meet cash needs of Party C during operation of business or to cover any loss incurred by Party C during operation of business, if Party C needs any loan or other financial support, Qiyi Cayman will provide through Party A or other domestic entities to Party C the financial support for free in a way permitted by law, regardless whether Party C has incurred the above operation loss or not;

5

2.3.2   Qiyi Cayman may provide such financial support by entrusted bank loan or company loan to the extent permitted by laws. The contract of entrusted bank loan or the company loan shall be executed separately.

2.3.3   If Party C incurs any operation loss and is unable to repay the loan or financial support provided by Qiyi Cayman under Article 2.3.1, with sufficient evidence to prove such inability, Qiyi Cayman agrees to waive unconditionally the right of requesting Party C to repay such loan or financial support.

## 3.  Representations and Warranties

Party B and Party C hereby represent and warrant to Qiyi Cayman as of the date hereof and each transfer date that:

3.1   It has the power to execute and deliver this Agreement and any share transfer contract ("Transfer Contract") entered into by it for each transfer of the Purchased Shares, and to perform its obligations hereunder and thereunder. This Agreement and the Transfer Contract to which it is a party, once executed, shall constitute legal, valid and binding obligations upon it, and may be enforced under the terms hereof and thereof;

3.2   Neither execution and delivery of this Agreement or any Transfer Contract, nor performance hereof or thereof will: (i) result in violation of any China laws or regulations; (ii) conflict with its articles of association or other organizational document; (iii) result in breach of any contract or instrument to which it is a party, or constitute breach under such contract or instrument to which it is a party or which has binding force upon it; (iv) result in breach of any conditions for any permit or approval to be issued to it or to remain effective; or (v) cause suspension or cancellation of or imposition of condition on any permit or approval issued to it;

3.3   Party C has sound and marketable title to its assets, and has not created any security interest over such assets;

3.4   Party C has no outstanding debts, except for (i) any debts incurred in normal business course; and (ii) any debts disclosed to and consented by Qiyi Cayman in writing;

3.5   There is no outstanding, pending or threatened litigation, arbitration or administrative procedure relating to the Shares, Party C's assets or the Company; and

3.6   Party B has sound and marketable title to its shares, and has not created any security interest over such shares, except the security interest under the Share Pledge Agreement and the restrictions hereunder.

## 4.  Assignment of Contract

4.1   Party B and Party C may not assign any of their respective rights or obligations hereunder to any third party without prior written consent of Qiyi Cayman.

4.2   Party B and Party C hereby agree that Qiyi Cayman shall have the right to assign its rights and obligations hereunder to any third party when necessary. Qiyi Cayman only needs to notify Party B and Party C in writing when assigning its rights and obligations, and is not required to obtain consents of Party B and Party C.

6

**5.      Effectiveness and Term**

5.1      This contract shall become effective on January 14, 2014.

5.2      Unless this Agreement is terminated early under its terms or any other agreement entered into by the Parties separately, this Agreement shall remain effective for ten (10) years. Party B and Party C hereby confirm that this Agreement is renewable with written confirmation of Qiyi Cayman unilaterally before it expires, without consents of Party A, Party B or Party C.

5.3      If the business period of Qiyi Cayman or Party C (including any extension) expires or terminates for other reason during the period set forth in Article 5.2, this Agreement shall terminate when Qiyi Cayman or Party C is terminated, except that Qiyi Cayman has transferred its rights and obligations according to Article 4.2 hereof.

**6.      Applicable Law and Dispute Resolution**

6.1      Applicable Law

The execution, validity, interpretation and performance hereof and the resolution of any dispute hereunder shall be protected and governed by China laws.

6.2      Dispute Resolution

When the Parties have any dispute relating to interpretation or performance of any provision hereof, they shall negotiate in good faith to resolve such dispute. If the Parties fail to reach an agreement within thirty days after either Party proposes to resolve any dispute through negotiation, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with the arbitration rules then in effect. The arbitration shall be conducted in Beijing in Chinese. The arbitration award is final and has binding force upon the Parties.

**7.      Taxes and Expenses**

Each Party shall be responsible for any and all taxes for transfer and registration, costs and expenses incurred by or imposed upon it from preparation and execution of this Agreement and each Trans Contract and consummation of the transactions hereunder and thereunder.

**8.      Notice**

Any notice or other communication required to be sent by either Party hereunder shall be written in Chinese, and send by personal delivery, letter or fax to the following addresses of the other Parties or to other addresses designated by the other Parties by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the tenth (10th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

7

Qiyi.com, Inc.
Address: 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands

Party A: Beijing QIYI Century Science & Technology Co., Ltd.
Address: Floor 10 and 11, 2 Haidian North First Street, Haidian District, Beijing
Fax:
Tel:

Party B:
Gong Yu
Address: ***
Fax:
Tel:

Party C: Shanghai Zhong Yuan Network Co., Ltd.
Address: Room 701, Building 3, 33 Leshan Road, Xuhui District, Shanghai
Fax:
Tel:

9.      **Confidentiality**

The Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other Parties, except:

a.      Any information that has been known or will be known to the public (not through any disclosure of the receiving Party to the public);

b.      Any information disclosed pursuant to the requirements of applicable laws and stock exchange rules; or

c.      Any information disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein.

Any disclosure by any employee of or any intermediary engaged by either Party shall be deemed disclosure by such Party, and such Party shall assume the liability for breach of contract under this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

10.     **Further Assurance**

The Parties agree to promptly sign any documents and take actions required or desirable for performance of the provisions hereof or achieving the purpose hereof.

8

**11.    Miscellaneous**

11.1    Amendment, Modification and Supplementation

Any amendment to and/or rescission of this Agreement shall be subject to unilateral written consent of Qiyi Cayman.

11.2    Entire Contract

Notwithstanding Article 5 hereof, the Parties acknowledge that this Agreement, once effective, shall constitute the entire agreement and understanding between them with respect to the subject matter hereof, and shall replace all oral and/or written agreements and understandings concluded by the Parties with respect to the subject matter hereof.

11.3    Severability

If one or more provisions hereof are held as invalid, illegal or unenforceable under any laws or regulations, the validity, legality or enforceability of the remaining provisions hereof shall not be affected or impaired. The Parties shall strive to replace such invalid, illegal or unenforceable provisions with valid provisions, and ensure the economic effect of the valid provisions to be similar to those invalid, illegal or unenforceable provisions as much as possible.

11.4    Headings

The headings herein are for convenience only, and may not be used to interpret, explain or affect the meaning of any provisions hereof.

11.5    Language and Counterparts

This Agreement is written in Chinese, and may be translated into English when necessary, provided that the Chinese version shall prevail. This Agreement is made in four counterparts, and each Party holds one thereof. All counterparts have equal legal force.

11.6    Successors

This Agreement shall bind upon and inure to the benefit of each Party and its successors or heirs or permitted assigns.

11.7    Survival

Any obligation accrued or due before expiration or early termination hereof shall remain effective after the expiration and early termination hereof. The provisions of Articles 6, 8, 9 and 11.7 hereof shall survive the termination of this Agreement.

[The remainder of this page is intentionally left blank.]

9

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

**Qiyi.com, Inc.**
[*Company seal is affixed*]
By:      /s/ Gong Yu
Title:     Authorized Signatory

**Party A:     Beijing QIYI Century Science &Technology Co., Ltd.**
[*Company seal is affixed*]
Legal Representative / Authorized Representative: /s/ Gong Yu

**Party B:     Gong Yu**
By:      /s/ Gong Yu

**Party C:     Shanghai Zhong Yuan Network Co., Ltd.**
[*Company seal is affixed*]
Legal Representative / Authorized Representative: /s/ Gong Yu

10

**Exhibit 10.26**

**Shareholder Voting Rights Trust Agreement**

This agreement is executed by the following parties in Beijing on January 14, 2014:

Gong Yu: a shareholder of Shanghai Zhong Yuan Network Co., Ltd., holding 100% of the shares;

Beijing QIYI Century Science & Technology Co., Ltd.: a foreign invested limited liability company incorporated and validly existing according to the laws of China ("**QIYI Century**")

Whereas,

Gong Yu and QIYI Century entered into a "Business Operation Agreement" on January 14, 2014, pursuant to which Gong Yu shall execute with QIYI Century a "Shareholder Voting Rights Trust Agreement", to irrevocably entrust the persons designated by QIYI Century to represent QIYI Century to exercise the shareholder voting rights and all the shareholder rights he enjoys provided by the law and the articles of association at the shareholders' meetings of Shanghai Zhong Yuan Network Co., Ltd. ("**Shanghai Zhong Yuan**")

Therefore, the parties reach the following agreement for their observation upon consensus through negotiation:

Article 1

Gong Yu agrees to irrevocably entrust the persons designated by QIYI Century to represent him to exercise at the shareholders' meetings of Shanghai Zhong Yuan the shareholder voting rights and all the shareholder rights he enjoys provided by the law and the articles of association, including but not limited to: sale or transfer of the equity held by Gong Yu in Shanghai Zhong Yuan in whole or in part, convening, attending and chairing the shareholders' meetings as a proxy of the shareholder of Shanghai Zhong Yuan at the shareholders' meetings, electing and replacing executive directors, supervisors, or managers, deliberating on and approving Shanghai Zhong Yuan's plans for profit distribution and loss recovery, making resolutions on the company's merger, division, liquidation or change of corporate form, determining Shanghai Zhong Yuan's plan for operation and investment, as well as amending the company's articles of association.

Article 2

QIYI Century agrees to designate relevant persons to accept the entrustment granted by Gong Yu according to Article 1 hereof and to exercise on its behalf the voting rights and other shareholder's rights according to the provisions hereof.

Article 3

Gong Yu hereby confirms that QIYI Century is entitled to sub-entrust to any third party the entrustment it obtains according to Article 1 hereof, without any requirement of notifying Gong Yu or obtaining his consent. Gong Yu hereby acknowledges the sub-authorization by QIYI Century, and confirms that he shall entrust the persons designated by QIYI Century to exercise all of their shareholder voting rights and other shareholder rights, regardless of what changes occur to their equity in Shanghai Zhong Yuan.

Article 4

Gong Yu hereby confirms that, if QIYI Century cancels the designation of relevant persons, he will immediately revoke the entrustment and authorization to such persons, and will authorize other person designated by QIYI Century according to the designation of QIYI Century to exercise all of Gong Yu's shareholder voting right and other shareholder rights at the shareholders' meetings of Shanghai Zhong Yuan.

Article 5

This Agreement shall become effective on January 14, 2014.

Article 6

During the period in which Gong Yu holds equity in Shanghai Zhong Yuan, unless this Agreement provides otherwise, this Agreement is irrevocable and remains effective, as from January 14, 2014.

Article 7

This Agreement is irrevocable, and its amendment and/or rescission shall be subject to the unilateral written consent of QIYI Century.

[the remainder of this page is intentionally left blank]

2

[Signature Page]

**Gong Yu**

Signature: /s/ Gong Yu

**Beijing QIYI Century Science & Technology Co., Ltd.**

*[Company seal is affixed]*

Authorized Representative: Gong Yu

Signature: /s/ Gong Yu

Agree and accept this Agreement:

**Shanghai Zhong Yuan.**

*[Company seal is affixed]*

Authorized Representative:

Signature: /s/ Gong Yu

3

**Exhibit 10.27**

Beijing QIYI Century Science & Technology Co., Ltd
(as Pledgee)

and

GONG Yu
(as Pledgor)

Regarding 100% of the shares in Shanghai Zhong Yuan Network Co., Ltd.

**SHARE PLEDGE AGREEMENT**

**Equity Pledge Agreement**

This equity pledge agreement (this "Agreement") is made by the following parties in Beijing on January 14, 2014:

**Pledgee:**

Beijing QIYI Century Science & Technology Co., Ltd

Registered address: F10\11, No.2, North 1 Street, Haidian District, Beijing

**Pledgor:**

GONG Yu

Domicile: ******

Whereas,

1.      The Pledgee is a wholly foreign invested enterprise established in Beijing, the People's Republic of China ("China").

2.      The Pledgor is a citizen of China, holding 100% of the shares in Shanghai Zhong Yuan Network Co., Ltd. (referred to as "Zhong Yuan").

3.      the Pledgee and the Pledgor entered into an Loan Agreement ("Loan Agreement") on January 14, 2014 whereby the Pledgee has provided the Pledgor with a loan of RMB Twenty million (RMB 20,000,000.00) bearing no interest ("Loan"), and the Pledgor has received payment of the Loan;

4.      To guarantee the Pledgor's performance of its obligations under the loan agreement, the Pledgor is willing to use its equity in Zhong Yuan as a pledge to secure payment of the Loan.

Therefore, the Pledgor and the Pledgee enter into this Agreement according to the following provisions upon consensus through friendly negotiation.

1.      Definitions

Unless this Agreement provides otherwise, the following terms shall have meaning below:

1.1      "Pledge Rights" means the content set forth in Article 2 hereof.

1.2      "Shares" means the equity held by the Pledgor legally in Zhong Yuan.

1.3     "Pledge Ratio" means the ratio between the value of the Pledge hereunder and the total of the Loan.

1.4     "Pledge Term" means the period set forth in Article 3.2 hereof.

1.5     "Default Event" means any circumstances set forth in Article 7.1 hereof.

1.6     "Default Notice" means the notice sent by the Pledgee according hereto to announce any Default Event.

2.     Pledge

The Pledgor creates a pledge over its equity in Zhong Yuan in favor of the Pledgee, to secure performance of all debts under the Loan Agreement. "Pledge Rights" means the rights enjoyed by the Pledgee to convert the equity into money, auction or sell the equity and to have priority in payment from the proceeds obtained from disposal of the equity.

3.     Pledge Ratio and Pledge Term

3.1     Pledge Ratio

The pledge ratio of the Pledge is 100%. The amount of debt being secured by the pledge is RMB 20 million.

3.2     Creation and Term of the Pledge

3.2.1     The Pledge hereunder is created when it is recorded in the shareholder's register of Zhong Yuan, and registered with the competent administration for industry and commerce.

3.2.2     The pledge term hereunder expires when all debts under the Principal Agreement expire, in which time the Pledgee has the right to rescind or terminate this Agreement.

3.2.3     During the pledge term, if the Pledgor fails to perform any obligation under the Loan Agreement, the Pledgee has the right to dispose of the Pledge Rights according to this Agreement.

4.     Custody of Pledge Certificate

4.1     During the pledge period herein, the Pledgor shall deliver the contribution certification issued by Zhong Yuan to the Pledgee for the custody within one (1) week after execution of this Agreement.

4.2     The Pledgee has the right to collect dividends of the equity subject the Pledge during the term of this Agreement.

5.     Representations and Warranties of the Pledgor

5.1    The Pledgor is the legal owner of the equity, and it has duly approved the equity pledge hereunder through a resolution of shareholder's meeting (see Schedule 2).

5.2    The Pledgor has not created any other pledge or right over the equity other than the Pledge created in favor of the Pledgee.

5.3    During the existence of this Agreement, the interests of the equity belongs to the Pledgee.

6.    Representations and Warranties of the Pledgee

6.1    During the existence of this Agreement, the Pledgor undertakes that in the interest of the Pledgee, it will

6.1.1    not transfer its equity or create or permit existence of any pledge that may affect the Pledgee's right or interest, without prior written consent of the Pledgee;

6.1.2    comply with and perform all laws and regulations relating to pledge over right, and will present any notice, order or advice issued or made by any competent authority to the Pledgee within five (5) days after receiving such notice, order or advice, and shall follow notice, order or advice, or raise objection or statement on the above matter at reasonable request of the Pledgee or with consent of the Pledgee;

6.1.3    promptly notify the Pledgee of any event or notice that may affect the Pledgor's equity or other right, or any event or notice received that may change any security or obligation created hereunder or have other effect.

6.2    The Pledgor agrees that the Pledgee's exercise of the Pledge Rights hereunder according to the provisions hereof shall not be interrupted or prevented by the Pledgor or its successors or principals or other persons through any legal procedure.

6.3    The Pledgor warrants to the Pledgee that to protect or perfect the security hereunder of the obligations of repaying the Loan, it will execute and procure other parties interested in the pledge right to execute any right certificates or deeds, and/or conduct and procure other parties interested to conduct any acts, in good faith, which are required by the Pledgee, and shall provide convenience for the exercise of rights or authorities granted by this Agreement to the Pledgee.

6.4    The Pledgor undertakes to the Pledgee that it will sign any change document of equity certificate (if applicable and necessary) with the Pledgee or its designated person (natural person or legal person), and provide the Pledgee with all notices, orders and decisions regarding the Pledge it deems necessary.

6.5 The Pledgor undertakes to the Pledgee that it will comply with and perform all warranties, covenants, agreements, representations and conditions in the interest of the Pledgee. If the Pledgor fails to perform the warranties, covenants, agreements, representations and conditions in whole or in part, it shall compensate the Pledgee for all losses thus caused.

6.6 During the term of this Agreement, the Pledgor will not carry out any act or forbearance that may affect value of the pledged Shares, and shall maintain and increase such value. If any event occurs which may reduce the value of the pledged Shares or affect the Pledgor's performance of any obligation hereunder, the Pledgor shall promptly notify the Pledgee, and at the request of the Pledgee provide other property security satisfactory to the Pledgee for the reduced amount of the pledged Shares.

6.7 Subject to applicable laws and regulations, the Pledgor shall carry out, and use best efforts to actively cooperate with the Pledgee to carry out all registrations, filings and other procedures with respect to the equity pledge required by laws and regulations.

7. Default Events

7.1 The following events shall be deemed Default Events:

7.1.1 The Pledgor fails to perform any obligation under the Loan Agreement;

7.1.2 Zhong Yuan fails to fully perform other related obligation;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof is materially misleading or wrong, and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches any covenants in Article 6 hereof;

7.1.5 The Pledgor breaches any other provisions hereof;

7.1.6 The Pledgor abandons the pledged Shares, or without written consent of the Pledgee transfers the pledged Shares;

7.1.7 Any loan, security, indemnity, covenant or other repayment liability of the Pledgor to others (1) is requested to be repaid or performed early for any breach; or (2) becomes due but is unable to be repaid or performed, and thus causes the Pledgee to believe that the Pledgor's ability to perform its obligations hereunder has been impaired;

7.1.8 Zhong Yuan fails to repay any general debt or other indebtedness;

7.1.9 This Agreement becomes illegal, or the Pledgor cannot perform any obligation hereunder for any reason other than force majeure;

7.1.10 Any adverse change occurs to any property owned by the Pledgor, which causes the Pledgee to believe that the Pledgor's ability to perform its obligations hereunder has been impaired;

7.2     If the Pledgor knows or finds that any event set forth in Article 7.1 or any matter that may cause such event has occurred, it shall immediately notify the Pledgee in writing.

7.3     Unless the Default Event set forth in Article 7.1 has been resolved satisfactory to the Pledgee, the Pledgee may send notice of default to the Pledgor in writing at any time on or after occurrence of the Default Event, requesting the pledger to immediately pay any outstanding amount or other payable amount under the Loan Agreement, or dispose of the Pledge according to Article 8 hereof.

8.      Exercise of Pledge Right

8.1     Before the obligations under the Loan Agreement is fully paid, or before the obligations under the supplement of the loan agreement are fully performed, whichever is later, the Pledgor may not transfer the pledged Shares without written consent of the Pledgee.

8.2     When exercising the pledge right, the Pledgee shall issue a default notice to the Pledgor.

8.3     Subject to the provisions of Article 7.3, the Pledgee may exercise its right to dispose of the pledge right when or after the default notice is sent according to Article 7.3

8.4     The Pledgee has the right to convert the Shares into money, auction or sell the Shares and to have priority in payment from the proceeds obtained from disposal of the Shares, until the loan or all the other amount payable owed by the Pledgors under the Loan Agreement are fully paid.

8.5     When the Pledgee disposes of the pledge right according to this Agreement, the Pledgor may not set any obstacle, and shall provide necessary assistant to realize the pledge right.

9.      Transfer

9.1     The Pledgor has no right to gift or transfer any rights or obligations hereunder without the Pledgee's prior written consent.

9.2     This Agreement shall bind the Pledgor and its successor or heir, and inure to the benefit of the Pledgee and its successor, heir or permitted assigns.

9.3     The Pledgee may transfer all or any rights and obligations under the Loan Agreement and the supplemental agreement(s) to its designated person (natural or legal person) at any time to the extent permitted by laws. In such case, the transferee shall enjoy and assume such rights and obligations enjoyed and assumed by the Pledgee hereunder, as if it is a party to this Agreement. When the Pledgee transfers any rights and obligations under the Loan Agreement and the supplemental agreement(s), it only needs to send written notice to the Pledgors, and the Pledgors shall sign relevant agreement and/or document relating to the transfer at the request of the Pledgee.

9.4     When the Pledgee is changed owing to transfer, the new parties to the pledge shall sign another pledge contract.

10.   Effectiveness and Term

This Equity Pledge Agreement becomes effective on the date of January 14, 2014.

11.   Termination

The pledge hereunder shall expire when all the debts under the Loan Agreement become due, only Party A, i.e. the Pledgee, shall have the right to unilaterally rescind or terminate this Agreement.

12.   Formality Fee and Other Expenses

12.1    All costs and expenses relating to this Agreement, including but not limited to legal costs, cost of production, stamp duty and other taxes and expenses, shall be borne by the Pledgor. If the Pledgee is required to pay relevant taxes and expenses according to law, the Pledgor shall indemnify fully the taxes and expenses paid by the Pledgee.

12.2    If the Pledgor fails to pay any taxes or expenses according hereto, if the Pledgee recovers any taxes or expenses from the Pledgor by any means or in any ways for other reason, the Pledgor shall assume all costs thus caused, including but not limited to various taxes, formality fees, management fees, litigation costs, attorney's fees and various insurance premiums for handling the pledge right.

13.   Force Majeure

13.1    "Force Majeure" means any events that are beyond the reasonable control of either Pledge end are unavoidable event the affected party takes reasonable care, including but not limited to government acts, change of laws, Acts of God, fire, explosion, storm, flood, earthquake, tide, lightening, or war. However, insufficiency of creditworthiness, fund or financing shall not be deemed an event beyond either party's reasonable control. The Pledge effected by force majeure event shall notify promptly the other party of such event.

13.2    When performance of this Agreement is delayed or prevented by any force majeure event defined in the above paragraph, the Pledge effected by the event is not required to assume any liability hereunder to the extent of such delay and prevention. The affected party shall take appropriate measures to mitigate or eliminate the effect of the event, and shall try to resume performance of the obligation delayed or prevented by the event. Once the effect of the force majeure event is eliminated, the parties agree to use their best efforts to resume performance of this Agreement.

14.     Confidentiality

The parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other party, except (a) Any information that has been known or will be known to the public (not through any disclosure of the receiving party to the public); (b) Any information disclosed according to the requirements of applicable laws and stock exchange rules; or (c) Any information disclosed to either party's legal or financial consultant with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein. Any disclosure by any employee or engaged institution of either party shall be deemed disclosure by such party, and such party shall assume the liability for breach of contract according to this Agreement.

15.     Dispute Resolution

15.1     This Agreement shall be governed by and interpreted according to the laws of China.

15.2     When the parties have any dispute relating to interpretation or performance of any provision hereof, they shall negotiate in good faith to resolve such dispute. If the parties fail to reach an agreement, either party may submit the dispute to China International Economic and Trade Arbitration Commission to arbitrate according to the arbitration rules then in effect. The place of arbitration shall be Beijing; the language used in the arbitration shall be Chinese. The arbitration award is final and has binding force upon the parties.

16.     Notice

Any notice of each party hereto for exercise and performance of rights and obligations hereunder shall be made in writing and sent to the following addresses. If the notice is sent by personal delivery, it shall be deemed served when it is actually delivered. If the notice is sent by telex or fax, it shall be deemed served when it is sent; if it is not sent on a business day or in business hours, it shall be deemed served on the next business day. The addresses shall be those set forth on the first page hereof or other addresses notified by the parties in writing from time to time. "Writing" includes fax and telex.

**the Pledgee:** Beijing QIYI Century Science & Technology Co., Ltd.
Address: Floor 10 & 11, 2 Haidian North First Street, Haidian District, Beijing
Fax:
Tel:

**the Pledgor:** GONG Yu
Address: ******
Fax:
Tel:

17.    Entire Agreement

Notwithstanding Article 10 hereof, the parties acknowledge that this Agreement once effective shall constitute the entire agreement and understanding between them with respect to the subject matter hereof, and shall replace all oral and/or written agreements and understandings concluded by the parties with respect to the subject matter hereof.

18.    Severability

If any provision hereof is decided invalid, or unenforceable for violating any laws, the provision shall be deemed in valid in the jurisdiction where the laws are applied, and shall not affect the legal validity of other provisions hereof.

19.    Schedules

The schedules hereto are an integral part hereof.

20.    Amendment and Supplementation

20.1.    Only Party A, i.e. the Pledgee, has the right to unilaterally amend this Agreement, and shall amend or supplement this Agreement in writing. Any amendment to or supplemental agreement(s) of this Agreement duly signed by the Pledgee's legal representative or authorized signatory constitute a part of this Agreement, and have the same legal force as this Agreement.

20.2.    Any amendment to, supplementation of or modification of this Agreement shall be made in writing and become effective after executed by the Pledgee's legal representative or authorized signatory.

21.    Counterparts

This Agreement is written in Chinese in five counterparts. Each party shall hold one counterpart, and the other two counterparts will be used for equity pledge registration. All counterparts have equal legal force.

[The remainder of this page is intentionally left blank.]

[Signature Page]

IN WITNESS WHEREOF, the Parties have signed or caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

Pledgee: Beijing QIYI Century Science &Technology Co., Ltd.
[*Company seal is affixed*]
Legal/Authorized Representative: /s/ Gong Yu

Pledgor:     GONG Yu

By:   /s/ GONG Yu

Schedules:

1.     Register of Members of Shanghai Zhong Yuan Network Co., Ltd.;

2.     Shareholder's resolution of Shanghai Zhong Yuan Network Co., Ltd.

**Schedule 1**

**Shanghai Zhong Yuan Network Co., Ltd**

**Shareholder's Register**

October 30, 2013

| Name of shareholder | Contribution amount; shareholding percentage | Information of shareholder | remarks |
|---|---|---|---|
| GONG Yu | RMB 20 million<br><br>100% | Nationality: China<br><br>ID No.: ***<br><br>Address: ***<br><br>Contact information: | The shareholder pledges his/her equity in the company in favor of Beijing QIYI century, effective from January 14, 2014 until the performance period of all debts under the Loan Agreement expires. |

**Schedule 2**

**Shanghai Zhong Yuan Network Co., Ltd.**

**Shareholder's Resolution**

In connection with the Share Pledge Agreement entered into between the shareholder of the Shanghai Zhong Yuan Network Co., Ltd. (the "Company") and Beijing QIYI Century Science & Technology Co., Ltd on January 14, 2014, the shareholders' meeting of the Company resolves as follows:

Approve the shareholder of the Company pledge his/her equity in the Company in favor of Beijing QIYI Century Science & Technology Co., Ltd.

This resolution is signed and delivered by the following shareholder on January 14, 2014.

Shareholder:

/s/ GONG Yu

**Exhibit 10.28**

**Exclusive Management Consulting and Business Cooperation Agreement**

This exclusive management consulting and business cooperation agreement (this "**Agreement**") is made by the following parties in the People's Republic of China ("**China**") on July 27, 2017:

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd..

Party B: Beijing iQIYI Cinema Management Co., Ltd..

Party C:
Party C1: GONG Yu ( 龚宇 ), with the ID Card No. ***;
Party C2: YANG Xianghua ( 杨向华 ), with the ID Card No. ***;

Each of Party A, Party B and Party C are individually referred to as a "**Party**", and collectively as the "**Parties**".

Whereas,

(1)    Party A is a wholly foreign owned enterprise duly established and validly existing according to the laws of China, whose principal business is computer hardware and software technology development, technology consulting, technology services, technology transfer and computer systems services, etc. and who owns the resources necessary for providing services of system software technical support, and technology and enterprise management consulting services;

(2)    Party B is a limited liability company duly incorporated and validly existing according to the laws of China, whose principal business is screening movie, and who conducts screening movie and relevant business directly and/or through Party B's Subordinate Entities;

(3)    GONG Yu( 龚宇 ) and YANG Xianghua( 杨向华 ) are shareholders of Party B, and hold 50% and 50% equity in Party B respectively and 100% equity in Party B in aggregate;

(4)    Party A agrees to use its advantage of technology, personnel and information to provide enterprise management consulting, licensing, technology and business support to Party B and its Subordinate Entities (refers to entities invested in and controlled by Party B, including but not limited to companies and relevant entities of which 50% or more of the shares are owned by Party B directly or indirectly) on an exclusive basis. The Parties agree to the above cooperation and desire to execute this Agreement to specify the main terms and conditions of cooperation.

Therefore, the Parties reach the following agreement upon consensus through negotiation:

**1. Provision of Services**

1.1 According to the terms and conditions hereof, Party B and Party C hereby entrust Party A to provide, as the exclusive service provider of Party B during the term of this Agreement, Party B and Party B's Subordinate Entities with comprehensive enterprise management consulting, IP licensing, technology support and business support, as detailed in Schedule 1 hereto.

Party B shall and shall procure its Subordinate Entities to determine the services with Party A or any entity designated by Party A within the business scope set forth in Schedule 1 based on its business needs.

1.2 Party B (also representing Party B's Subordinate Entities, the same applies below) and Party C further agree that except with prior written consent of Party A, during the term hereof, Party B, Party B's Subordinate Entities and Party C shall not, and shall procure their relevant entities not to, directly or indirectly obtain any service same as or similar to the services and supports set forth herein from any third party, or establish any similar cooperation relation with any third party with respect to the subject matter hereof.

1.3 Notwithstanding any other provisions hereof, Party A has the right to designate any third party to provide any or all services hereof, or perform any obligation hereunder for Party A. Party B and its Subordinate Entities hereby agree that Party A has the right to assign its rights and obligations hereunder to any third party.

1.4 To ensure normal operation of the daily business of Party B and its Subordinate Entities, Party A may (but not obligated to), on its own judgment and as permitted by laws and regulations of China, act as a securing party or guarantor under any other contracts or agreements entered into by Party B and its Subordinate Entities with any third party relating to their business, and provide security for performance of such contracts and agreements. Party B and its Subordinate Entities and Party C hereby agree and acknowledge that if any security is required for the performance by Party B and its Subordinate Entities of any contract or loan in the business course, they shall first request Party A to act as the securing party and/or guarantor.

**2. Service Price and Payment Method**

2.1 Based on the content and recipient of the services, relevant Parties shall negotiate fair service price and appropriate payment method by reference to the revenue of the service recipient in a specified period. The specific calculation and payment methods of service price are set forth in Schedule 2.

2.2 If Party A believes that the mechanism to determine the service price specified herein cannot be applied and requires adjustment for certain reason, Party A has the right to adjust the calculation and payment method of Schedule 2 at any time. The adjustment of Party A shall be bona fide and reasonable; such adjustment shall take effect upon the written notification from Party A to Party B without the consent of Party B.

2

**3.    Intellectual Property Rights**

3.1    The intellectual property rights in any results obtained from performance of this Agreement, including but not limited to copyrights, patents and claims of patent application, know-how, and business secrets, shall be owned by Party A. Party B or its Subordinate Entities or Party C may not enjoy any other rights than those specified herein, except under Party A's licensing, and shall actively cooperate with Party A to take all necessary measures to ensure Party A or Party A's oversea affiliates to obtain such intellectual property rights. The Parties agree that this Article 3.1 shall survive the modification, rescission or termination of this Agreement. For the avoidance of any doubt, in respect of the intellectual property rights held by Party B or its Subordinate Entities and in application by Party B or its Subordinate Entities to relevant authorities as of execution date hereof, other than those required for normal operation of business of Party B or its Subordinate Entities upon Party A's confirmation or required by relevant domestic laws and regulations to be held by Party B and its Subordinate Entities, the holders or applicants shall transfer such intellectual property rights to Party A or its oversea affiliates at the request of Party A, and Party B or its Subordinate Entities shall enter into relevant intellectual property rights transfer agreement with Party A or its oversea affiliates.

3.2    If any development is made by Party A based on any intellectual property rights owned by Party B or its Subordinate Entities, Party B or its Subordinate Entities shall warrant that such intellectual property rights are free of any defect, and, if any loss is caused to Party A from any defect in such intellectual property rights, shall compensate for such loss. If Party A is therefore liable to compensation to any third party, Party A, after making such compensation, has the right to recover such loss against Party B and/or its Subordinate Entities.

**4.    Control and Management by Party A over Party B and Its Affiliated Entities**

4.1    In connection with the provisions of Article 1 hereof, to specify the rights and obligations of the Parties and guarantee Party A's performance of the management consulting services to Party B and its Subordinate Entities, and to guarantee performance of various business service agreements between Party A and Party B or its Subordinate Entities and payment of various amounts owed by Party B or its Subordinate Entities to Party A, Party B, its Subordinate Entities and Party C hereby agree that Party B and its Subordinate Entities shall not, without Party A's prior written consent, carry out any transaction that may materially affect their respective assets, obligations, rights or operation, including but not limited to:

(1)    any activity outside of their normal business scopes, or any business inconsistent with the past practice and way of operation;

3

(2)   change or dismissal of any directors, or removal of any officers;

(3)   borrowing from or assuming debts to any third party;

(4)   selling, acquiring or otherwise disposing of any asset or right in an amount more than RMB 100,000 to or from any third party, including but not limited to any intellectual property rights and any business contracts;

(5)   providing security or guarantee in favor of any third party, including any security created over their assets or interests;

(6)   increasing or decreasing the registered capitals, amending the articles of association or changing the business scopes;

(7)   changing the normal business procedures, or amending any major internal rule and regulation;

(8)   material adjustment to its business operation mode, marketing strategy, operation policy or customer relations;

(9)   distribution of dividends or profits in whatever forms;

(10)   liquidating and distributing the residual assets;

(11)   assigning any rights or obligations hereunder to any third party;

(12)   actions and / or omissions that have a material adverse effect on the assets, business, responsibilities and financial position of Party C, including but not limited to the creation of a mortgage, pledge or other encumbrance on any of Party C's assets, businesses, income or income interests.

Further, when any circumstance occurs which has or may have material adverse effect upon the business, operation or production of Party B and/or Party B's Subordinate Entities, Party B and Party C shall promptly notify Party A thereof and use their best efforts to prevent occurrence of and/or mitigate the loss of such circumstances.

4.2   To guarantee performance of various management consulting services between Party A and Party B or its Subordinate Entities, and payment of various amounts owed by Party B and its Subordinate Entities to Party A,

(1)   Party B and its Subordinate Entities and Party C hereby agree to accept any advice or requirement made by Party A to Party B and its Subordinate Entities with respect to employment and dismissal of employees, daily operation and management and financial management system, and shall strictly comply with and implement such advice or requirement;

4

(2)   Party B and its affiliates and Party C hereby agree that they shall elect the persons designated by Party A as directors of Party B and its Subordinate Entities according to laws, regulations and articles of association, and procure such elected directors to elect the persons recommended by Party A as the chairmen of the boards of directors, and appoint the persons designated by Party A as the general managers, financial controllers, and other officers (including but not limited to the heads of various businesses, the financial managers, the financial and supervisory personnel and the accounting personnel). Party A shall bona fide recommend qualified persons pursuant to applicable laws to Party B and its Subordinate Entities. If the above officers recommended by Party A resign from Party A or its shareholders (whether direct or indirect) (as applicable), whether voluntarily or dismissed by Party A, they shall lose the qualification to take any office in Party B and its Subordinate Entities. In such case, Party B and its Subordinate Entities shall appoint other officers employed by Party A or its shareholders (whether direct or indirect) (as applicable), to take such office. Party C and Party B and its Subordinate Entities shall take all necessary internal and external procedures to complete the above termination and appointment according to laws, articles of association and this Agreement.

(3)   Party A has the right to inspect the accounts of Party B and its Subordinate Entities periodically and at any time. Party B and its Subordinate Entities shall keep accounts promptly and accurately, and provide the accounts at the request of Party A. During the term hereof, subject to any applicable laws, Party B and its Subordinate Entities agree to cooperate with any audit (including but not limited to related transaction audit and other audits) carried out by Party A and its (whether indirect or indirect) shareholders, and provide Party A, Party A's shareholders and/or the auditor entrusted by Party A with relevant information and documents relating to the operations, businesses, clients, finance and employees of Party B and its Subordinate Entities, and agree that Party A's shareholders may disclose such information and documents to meet any requirement of the securities regulation of the jurisdiction where the listing occurs.

(4)   Party B and its Subordinate Entities and Party C hereby agree that once Party A requests in writing, they shall use all of their accounts receivable and/or other assets they legally own and may dispose of to secure payment of the service fees set forth in Article 2.1 hereof in any way permitted by laws then in effect.

4.3   Party B and its Subordinate Entities and Party C hereby agree that Party B and its Subordinate Entities shall maintain all the business licenses required for their operation during the term hereof, and the rights and qualifications required for its conducting of the business it operates now in China.

4.4   Party B and its Subordinate Entities may not carry out any contracting operation, lease operation, merger, division, association, shareholding reform or other change of operation method and arrangement of ownership structure, or dispose of all or substantial part of assets or interests of Party B or its Subordinate Entities by transfer, sale, conversion into equity in others, or other means, without prior written consent of Party A.

5

4.5   When Party B or its Subordinate Entities become liquidated or dissolved for any reason, Party C, Party B and its Subordinate Entities shall appoint the persons recommended by Party A to constitute the liquidation group to the extent permitted by the laws of China to manage the properties of Party B and its Subordinate Entities. Party C and Party B acknowledge that when Party B or its Subordinate Entities become liquidated or dissolved, whether or not the provision above in this Article 4.5 is performed, Party C and Party B agree to deliver all residue properties obtained from liquidation of Party B or its Subordinate Entities to Party A, pursuant to the laws and regulations of China.

4.6   Party C hereby agrees to issue Party A the Power of Attorney in the substance and form satisfactory to Party A on the execution date of this Agreement, and to fully, properly and completely perform the provisions of such Power of Attorney, including but not limited to unconditionally and irrevocably authorizing Party A or any person designated by Party A ("**Agent**") according to the Power of Attorney to exercise the shareholder's rights of Party B and its Subordinate Entities on behalf of Party C in its sole discretion. Any resolution or document requiring Party B's signature as a shareholder due to industrial and commerce registration, etc. shall be signed only with Party A's consent and authorization and following Party A's instruction.

4.7   Party C acknowledges that it has had full and clear understanding of the obligations of Party B and its Subordinate Entities hereunder when it enters into this Agreement, and agrees to pledge the 100% shares in Party B it owns with Party A to secure performance of obligations of Party B and its Subordinate Entities hereunder. The Parties shall enter into agreement separately with respect to the equity pledge.

4.8   Party B and its Subordinate Entities and Party C hereby agree that without Party A's written consent they shall not enter into any agreement or arrangement that conflict with this Agreement or may infringe Party A's interests hereunder.


**5.    Term**

5.1   This Agreement is executed and effective on the date first written above.

5.2   Unless the Parties agree to terminate this Agreement early, this Agreement shall remain effective during the business terms (including extended terms) of Party A, Party B and Party B's Subordinate Entities (including successors of their respective rights and obligations). In the event that the business terms (including extended terms) of Party B or any of Party B's Subordinate Entities expires before Party A's business term expires, the legal effects of this Agreement on Party B and its other Subordinate Entities shall not be affected.

6

**6.    Confidentiality**

6.1    All provisions of this Agreement and this Agreement itself are confidential information, and the Parties shall not disclosed them to any third party other than any officers, directors, employees, agents or professional consultants relating to this project who assume the obligation of confidentiality to the disclosing Party, except that the Parties disclose any information relating to this Agreement to any government, the public or the shareholders as required by law, or file this Agreement to any authority for recording.

6.2    This Article 6 shall survive the modification, termination or rescission of this Agreement.

**7.    Breaching Liabilities**

If any Party fails to perform any obligation hereunder, or if such Party's representation or warranty hereunder is untrue or inaccurate, such Party breaches this Agreement, and shall compensate for all losses of the other Parties or pay liquidated damages to the other Parties according to the agreement otherwise reached by relevant Parties.

**8.    Force Majeure**

If the performance of this Agreement is affected by any force majeure event, the affected Party shall immediately notify the other Parties by telegraph, fax or other electronic means, and provide written proof of the force majeure within fifteen (15) working days. The parties shall decide whether to rescind this Agreement, exempt performance of this Agreement in part, or delay the performance of this Agreement, depending on the effect of the force majeure event on the performance.

**9.    Addition and Change of the Parties**

9.1    Party B's Subordinate Entities. At the same time as or before executing this agreement, Party B and Party C shall procure Party B's Subordinate Entities to sign any letter of assumption of rights and obligations or other legal documents permitted or required by any other law of China to make the Party B's Subordinate Entities acknowledge this Agreement, and fully assume the obligations on Party B's Subordinated Entities hereunder, and the Party B's such Subordinate Entities shall be deemed parties to this Agreement. The other Parties hereby agree to fully accept the above arrangement.

9.2    Addition of Party B's Subordinate Entities. If Party B comes to have any new affiliated entity at any time after this Agreement becomes effective, Party B and Party C shall procure such new affiliated entity to immediately sign any letter of assumption of rights and obligations or other legal documents permitted or required by any other laws of China to make the new affiliated entity acknowledge this Agreement, and fully assume the obligations on Party B's Subordinated Entities hereunder. From execution of such letter of assumption and other legal documents, the new affiliated entity shall be deemed a party to this Agreement. The other Parties hereby agree to fully accept the above arrangement.

7

9.3     Without Party A's prior written consent, Party B and Party B's Subordinate Entities shall not assign their rights and obligations under this Agreement to any third party. In addition, Party B agrees that, after Party A's notifying Party B in writing in advance, Party A may, at necessary times, assign its rights and obligations under this Agreement to its bona fide selected third party, and need not obtain Party B's consent in respect of such transfer.

9.4     The rights and obligations hereunder shall have binding force upon the Parties' assignees of rights and obligations and successors (regardless whether such assignments of rights and obligations are caused by acquisition, reorganization, succession, assignment or other reasons).

**10.    Miscellaneous**

10.1    This Agreement is governed by the laws of China. Any dispute arising from the performance hereof shall be resolved by the Parties through amicable negotiation. If negotiation fails, the dispute shall be submitted to China International Economic and Trade Arbitration Commission for arbitration according to the arbitration rules of the Commission then in effect. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon the Parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of China, the arbitrator or arbitrators may issue injunction orders over the shares, interests or assets of Party B and Party B's Subordinate Entities (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party B and Party B's Subordinate Entities through arbitration. The Parties agree that, subject to the laws of China, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party B, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding. This Article 10.1 shall survive the modification, rescission or termination of this Agreement.

8

10.2    The Parties acknowledge that this Agreement shall be enforced to the extent permitted by law. If any provision hereof or if any part of any provision is decided by any competent authority or court to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect other provisions hereof or other parts of the provision. Such other provisions or other parts of the provision shall remain completely effective. The Parties shall use their best efforts to amend such illegal, invalid or unenforceable provisions to effect the purpose of the original provisions.

10.4    The schedules hereto constitute an integral part hereof, and have the same legal force as other parts of this Agreement.

10.5    This Agreement is made in Chinese. The copies of this Agreement shall be corresponding to the number of the Parties hereto. Each of the signatories holds one copy and each has the same legal effect.

9

(signature page for the Exclusive Management Consulting and Business Cooperation Agreement)

**Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.(seal)**

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: /s/ GONG Yu_____


**Party B: Beijing iQIYI Cinema Management Co., Ltd. (seal)**

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: /s/YANG Xianghua____

10

(signature page for the Exclusive Management Consulting and Business Cooperation Agreement)

Party C:

Party C1: GONG Yu( 龚宇 )
Signature: /s/ GONG Yu

Party C2: YANG Xianghua( 杨向华 )
Signature: /s/ YANG Xianghua

11

**Schedule 1 Service Contents**

1. Providing advice and suggestion on assets and business operation;

2. Providing advice and suggestion on disposal of creditor's rights and debts;

3. Providing advice and suggestion on negotiation, execution and performance of material contracts;

4. Providing advice and suggestion on merger and acquisition;

5. Providing services on software development and research;

6. Providing pre-job and in-service management training;

7. Providing the services of technology development, technology transfer and technology consulting;

8. Providing public relation services;

9. Providing market survey, research and consulting services;

10. Providing short-and-medium-term market development and market planning services;

11. Providing human resources management and internal information management services;

12. Providing the service of development, upgrade and daily maintenance of website;

13. Providing the service of sale of self-made products;

14. License of software, trademark, domain, know-how and other intellectual property rights; and/or

15. Other services negotiated and specified by Party A and the service recipient based on the business needs and the capability of providing services.

12

**Schedule 2 Calculation and Payment Methods of Service Fees**

1. The amount of service fee shall be determined by Party A according to the actual conditions of the service provided, and by service fee bills to the service recipients, expense details or other ways in writing. The service recipients shall pay according to the service fee amount notified by Party A.

2. Party A shall summarize the service fees regularly (the specified period to be determined by Party A) and send service fee bills to the recipients on a regular basis and notify the recipients. The service recipients shall pay such service fee to the bank account designated by Party A according to the time and amount required by Party A.

13

**Exhibit 10.29**

<div align="center">

**Exclusive Share Purchase Agreement**

</div>

This Exclusive Share Purchase Agreement (this "**Agreement**") is signed by the following parties on July 27, 2017:

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B:

Party B1: GONG Yu ( 龚宇 )
ID No.: ***

Party B2: YANG Xianghua ( 杨向华 )
ID No.: ***

Party C: Beijing iQIYI Cinema Management Co., Ltd.

The parties above, upon friendly negotiation, with respect to the matter that Party A or any third party designated by Party A purchase the shareholdings held by Party B in Party C, reach an agreement as follows, for the parties to observe:

**1. Exclusive Share Option**

1.1    From the execution date of this Agreement, Party A has the right to demand Party B (subject to the specific requirements imposed by Party A) to transfer all or part of the 100% shares in Party C held by Party B (hereinafter referred to as the "**Target Shares**") at any time under the following circumstances. Party B shall transfer the Target Shares to Party A or any third party designated by Party A according to Party A's requirements:

      (1)    The laws and regulations of PRC permit Party A or a third party designated by Party A to hold all or part of the Target Shares; or

      (2)    Other circumstances which are permitted by Chinese laws and regulations and are deemed by Party A as appropriate or necessary.

    The share option obtained by Party A hereunder is exclusive, unconditional and irrevocable.

1.2    All the parties agree that, subject to the terms and conditions herein, and provided that laws of PRC are not violated, Party A shall have the right, at its own discretion, to exercise the entire or part of the exclusive share option, and obtain all or part of the Target Shares. All the parties further agree that the time, manner, amount and frequency of Party A's exercise of the exclusive share option shall not be subject to any limitation.

1.3    All parties agree that, subject to the terms and conditions herein, and provided that laws of PRC are not violated, Party A may designate any third party to be transferred all or part of the Target Shares. Except in the circumstances expressly prohibited by laws of PRC, Party B shall not refuse to transfer all or part of the Target Shares to such designated third party.

1.4   Prior to the transfer of all the Target Shares to Party A or the third party designated by Party A in accordance with the provisions of this Agreement, i.e. prior to the time that Party B no longer holds any share in Party C, without prior written consent of Party A, Party B shall not transfer the Target Shares to any third party, and shall not pledge the Target Shares with any third party or create any encumbrance thereupon, except under the Share Pledge Agreement otherwise entered into by Party A and Party C.

1.5   Party B agrees that, as a shareholder of Party C, prior to transfer of the Target Shares in Party C owned by Party B to Party A, in the events that Party B receives dividend, bonus or residue asset, provided that relevant laws and regulations of PRC are complied with and after the taxes and expenses required by relevant laws and regulations are paid, Party B shall deliver all the proceeds to Party A or the third party designated by Party A immediately upon obtaining such proceeds.

## 2. Procedure

2.1   In the event that Party A decides to exercise the exclusive share option pursuant to the provision of the Article 1.1 above, Party A shall send to Party B a written notice (see Schedule III of this Agreement for the format), and shall state in the notice the proportion or amount, and the name of identity of the transferee. Party B and Party C shall provide all the necessary materials and documents for the share transfer within seven (7) days from the date of notice by Party A, including the Share Transfer Contract and the Letter of Consent executed in the format prescribed by the appendixes to this Agreement.

2.2   Except the notice provided in the Article 2.1 above herein, no other condition exists prerequisite or incidental to the exercise by Party A to purchase the Target Shares.

2.3   Party B shall provide Party C necessary and timely cooperation to assist Party C in completing the review and approval procedures at the review and approval authorities (as required by law) and completing share transfer procedures at the industrial and commerce administrative bureaus.

2.4   The date on which the transfer formalities of the entire 100% shares in Party C are completed in accordance with this Exclusive Share Purchase Agreement shall be the date on which the exercise of the exclusive share option is completed.

## 3. Transfer Price

3.1   All parties confirm that, subject to compliance with the laws and regulations of PRC, the Target Shares shall be transferred for free or at the lowest price permitted by the laws and regulations of PRC. If the Target Shares are transferred in installments, the correspondence transfer prices and amounts shall be determined according to the specific transfer time and the proportion of the Target Shares transferred.

3.2   The parties shall assume, pursuant to law, their respective portions of the taxes and expenses arising from the transfer of the Target Shares.

2

3.3    In the event that the Target Shares are not transferred for free, Party B agrees that, when Party A or the third party designated by Party A exercises the exclusive share option, subject to laws and regulations of PRC, Party B shall refund all the proceeds it therefore received to Party A or the third party designated by Party A, for repayment of the loan principal, interest, or capital occupation expenses which Party A provides to Party B.

**4. Warranties and Undertakings**

4.1    Each party hereby represents and warrants to the other parties as follows:

(1)    The party has all the necessary rights, capabilities and authorizations to execute this Agreement and perform all the duties and obligation under this Agreement;

(2)    The party has passed all the necessary internal procedures for executing this Agreement, and has obtained all the necessary internal and external authorizations and approvals; and

(3)    The execution and performance of this Agreement do not breach any material contract or agreement which binds such party or restricts its assets.

4.2    Party B and Party C further jointly and severally represent, warrant and undertake to Party A as follows:

(1)    On the date this Agreement becomes effective, both GONG Yu ( 龚宇 ) and YANG Xianghua ( 杨向华 ) are Chinese citizens, legally hold all the shares in Party C, and have complete and valid disposition rights over such shares. Party C's registered capital has been fully paid. Except the pledge created in accordance with the Share Pledge Agreement executed by all the parties and other rights Party A agrees to in writing, no mortgage, pledge, guarantee or other third party rights have been created upon the shares in Party C owned by Party B, and such shares are free from recourse by third parties; No third party shall have the rights to demand allotment, issuance, sale, transfer or conversion of any share in Party C pursuant to any option, conversion option, preemptive right or other agreement.

(2)    During the term of this Agreement, except according to the pledge created in accordance with the Share Pledge Agreement executed by all the parties, without prior written consent by Party A, Party B shall not transfer, sell, assign as gift or dispose by other ways any share in Party C to any third party, or create any mortgage, pledge or security interest in other forms or other third party right thereupon, and warrant no recourse from the third parties.

(3)    During the term of this Agreement, without prior written consent by Party A, Party B shall not cause Party C to merge or consolidate with any person, divide, dissolve, change the company form, or decrease the registered capital, or make any other act with material effect on the existence or existence status of Party C, and shall not change Party C's registered capital structure in other manner.

3

(4)     Subject to relevant laws and regulations of PRC, Party B and Party C shall, according to the term during which Party A is permitted to operate, extend Party C's business term at the appropriate time, and therefore make it equal to Party A's business term, or determine and adjust Party C's business term according to Party A's requirement and pursuant to the provisions of the laws of PRC.

(5)     During the term of this Agreement, Party B and Party C shall take their best endeavor to maintain and increase the value of Party C's assets, shall not carry out any act or omission which may have material adverse effect on Party B's assets and business. Except with the prior written consent by Party A, Party B and Party C shall not transfer or dispose in other manners Party C's assets terminate any material contract for which Party C is a party, or enter into any agreement which would affect Party C's assets and financial position.

(6)     In the event Party C is liquidated or dissolved for any reason out of Party B's control during the term of this Agreement, subject to the permission by the laws and regulations of PRC, Party B and Party C shall appoint persons recommended by Party A to form a liquidation team to manage Party C's assets. Party B confirms, in the event that Party C is liquidated or dissolved, whether the above provision of this Article 4(6) is performed or not, Party B agrees to deliver to Party A or the third party designated by Party A all the remaining assets Party B receives in the liquidation of Party C pursuant to laws and regulations of PRC.

(7)     All the parties understand and confirm that, with the occurrence of the circumstances provided by Article 1.1 herein as the premise, Party A's exercise of the exclusive share option hereunder may also be effected by the way that Party B and Party C transfer the 100% shares they then hold in Party C's subsidiaries to Party A or the third party designated by Party A, and Party B and Party C unconditionally cooperate in the execution of relevant legal documents by Party A or the third party designated by Party A, and completion of the relevant procedures for the change of shareholdings of Party C's subsidiaries.

## 5. Appendixes

The appendixes shall form an integral part of this Agreement and have the same legal force as the other parts of this Agreement.

## 6. Confidentiality

All provisions hereof and this Agreement itself are confidential information. Each party shall not disclose the confidential information to any third party other than the senior staff members, directors, employees, agents and professional consultants relating to this project who assume the obligation of confidentiality; except the circumstances that the parties, pursuant to the provisions of law, are required to disclose the information relevant to this document to governments, the public or shareholders or submit this document to relevant authorities for record.

4

This Article 6 shall survive the modification, termination or rescission of this Agreement.

### 7. Breaching Liabilities

In the event that one party fails to perform any obligation hereunder, or any representation or warranty of the Party hereunder is materially untrue or inaccurate, the party breaches this Agreement, and shall compensate for all losses of the other parties.

### 8. Force Majeure

An force majeure event refer to any event unforeseeable by anyone of the parties and the occurrence of such event is unavoidable, uncontrollable and insurmountable to such party at the execution date of this Agreement (including but not limited to earthquake, typhoon, flood, fire, strike, war or riot).

Where a force majeure event affects the performance of the Agreement, the party which encounters the force majeure shall immediately: (i) notify the other parties by way of telegraph, fax or other electronic means, and provide a written proof of the force majeure within fifteen (15) working days; (ii) take all reasonable and possible measures to eliminate or mitigate the impact of the force majeure event, and resume the performance of its relevant obligations upon elimination or mitigation of the impact of the force majeure event. Depending on the extent of the impact on the performance of this Agreement, all parties shall, by consultation, decide whether to terminate the Agreement or whether to partially exempt the performance obligations of this Agreement or whether to delay the performance of the Agreement.

### 9. Supplementary Provisions

9.1    This Agreement shall be governed by the laws of PRC. The parties shall resolve through amicable negotiation all disputes arising from the performance of this Agreement; in the event that the negotiation fails, the disputes shall be submitted to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of PRC, the arbitrator or arbitrators may issue injunction orders over the shares in or assets of Party C (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party C through arbitration. The parties agree that, subject to the laws of PRC, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party C, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding.

9.2    This Agreement shall become effective at the date all the parties execute this Agreement, and terminate at the time either when Party A or the third party designated by Party A exercise the option in accordance with the provisions hereof and acquire the 100% shares in Party C, or when all the parties reach any agreement to terminate this Agreement. Except as otherwise agreed, the rights and obligations hereunder shall have binding force upon the parties' assignees of rights and obligations and successors (regardless whether such assignments of rights and obligations are caused by acquisition, reorganization, succession, assignment or other reasons).

9.3    The parties acknowledge that this Agreement shall be enforced to the extent permitted by law. If any provision hereof or if any part of any provision is decided by any competent authority or court to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect other provisions hereof or other parts of the provision. Such other provisions or other parts of the provision shall remain completely effective. The Parties shall use their best efforts to amend such illegal, invalid or unenforceable provisions to effect the purpose of the original provisions.

9.4    This Agreement is written in Chinese and in four (4) original copies with Party A, Gong Yu, Yang Xianghua and Party C respectively holding one.

9.5    This Agreement and its appendixes constitute the entire agreement for the transaction under this Agreement and shall replace any and all oral or written communications, undertakings, memoranda or any other discussions previously made by the parties with respect to the subject matter of this Agreement.

9.6    Any modification or supplement to this Agreement shall be made in writing and shall take effect only after all parties to this Agreement duly sign it.

(The remainder of this page is intentionally left blank)

6

(signature page for the Exclusive Share Purchase Agreement)

Party A:
Beijing iQIYI New Media Science and Technology Co., Ltd. (Seal)
[*Company seal is affixed*]
Signature by Legal Representative / Authorized Representative: /s/ GONG Yu


Party B:
Party B1:     GONG Yu ( 龚宇 )
Signature:    /s/ GONG Yu


Party B2:     YANG Xianghua ( 杨向华 )
Signature:    /s/ YANG Xianghua


Party C:
Beijing iQIYI Cinema Management Co., Ltd. (Seal)
[*Company seal is affixed*]
Signature by Legal Representative / Authorized Representative: /s/ YANG Xianghua

7

*Appendix 1:*

**Share Transfer Contract**

This Share Transfer Contract (hereinafter referred to as this "**Contract**") was entered into by the following two parties in [          ], China on [ dd/mm/yy ].

Transferor: [    ], ID No. [              ]

Transferee: [    ]

The above two parties reach by friendly negotiation an agreement on share transfer as follows:

1.  The Transferor agrees to transfer [    ]% shares held by him/her/it in Beijing iQIYI Cinema Management Co., Ltd. (the "**Target Shares**") to the Transferee for RMB [    ]. The Transferee agrees to accept such Target Shares.

2.  After completion of the transfer of the Target Shares, the Transferor no longer enjoys the shareholders' rights or undertakes the shareholders' obligations attached to the Target Shares. The Transferee shall enjoy the shareholders' rights and undertake the shareholders' obligations attached to the Target Shares.

3.  Both parties may sign supplementary agreements regarding the matters not covered by this Contract.

4.  This Contract shall come into effect from the date of executing this Contract by both parties.

5.  This Contract is made in quadruplicate, with each party holding one and others for registration of alteration with industry and commerce administrative authorities.

Transferor: [              ]

Signature:

Transferee: [              ]

Signature:

8

*Appendix II*

## Letter of Consent

To: Beijing iQIYI New Media Science and Technology Co., Ltd.

As a shareholder of Beijing iQIYI Cinema Management Co., Ltd. (the "**Company**"), I hereby agree and confirm as follows:

1.  I agree and accept all the terms and conditions of the Exclusive Share Purchase Agreement executed by me and the Company and Beijing iQIYI New Media Science and Technology Co., Ltd. (the "**WFOE**") on [ dd/mm/yy ], and will take every action to assist the WFOE in handling the transfer procedures for relevant shares in accordance with the provisions of this Agreement when exercising its exclusive option to purchase the shares in the Company.

2.  I agree that when other shareholders of the Company transfer their shares to Beijing iQIYI New Media Science and Technology Co., Ltd. Company or its designated third party, I will give up the preemptive right.

3.  I agree to execute or provide necessary documents for handling the transfer procedures for relevant shares when other shareholders transfer their shares in the Company to Beijing iQIYI New Media Science and Technology Co., Ltd. Company or its designated third party.

GONG Yu ( 龚宇 ) /YANG Xianghua ( 杨向华 )
Signature:

9

*Appendix III:*

**Exercise Notice**

To:    All shareholders of Beijing iQIYI Cinema Management Co., Ltd.; and / or
       Beijing iQIYI Cinema Management Co., Ltd.

Whereas our company executed the Exclusive Share Purchase Agreement with you on [ dd/mm/yy ] and agreed that you shall, according to our company's requirement, sell to our company or the transferee designated by our company the shares you hold in Beijing iQIYI Cinema Management Co., Ltd., subject to the conditions permitted by relevant laws and regulations of PRC.

Therefore, our company hereby gives you this notice as follows:

We hereby demand the exercise of the option under the Exclusive Share Purchase Agreement through the purchase of the shares you hold, which represents [    ]% of the registered capital of Beijing iQIYI Cinema Management Co., Ltd. ("**Shares to Be Transferred**"), by our company or the transferee designated by our company, for the price of RMB[    ]. Please, upon receipt of this Notice, immediately handle necessary formalities for selling all the Shares to Be Transferred to our company / the transferee designated by our company in accordance with the Exclusive Share Purchase Agreement.

Beijing iQIYI New Media Science and Technology Co., Ltd. (Seal)

By:    _____
Name:
Position:
Date:

10

**Exhibit 10.30**

**Loan Agreement**

This loan agreement (this "**Agreement**") is executed by and between the following parties in Beijing, the People's Republic of China ("**China**") on July 27, 2017:

Party A (the "**Lender**"): Beijing iQIYI New Media Science and Technology Co., Ltd.; and

Party B (the "**Borrower**"): YANG Xianghua ( 杨向华 ), ID Card No. ***

Whereas,

1.  The Lender is a wholly foreign owned enterprise legally established and validly existing in China according to the laws of China;

2.  The Borrower is a citizen of China, and as a shareholder of Beijing iQIYI Cinema Management Co., Ltd (the "**Cinema Company**"), holds 50% of the shares in the Cinema Company in total.

3.  The Lender agrees to lend RMB 10 million (RMB 10,000,000.00) interest-free to the Borrower.

Therefore, the two parties reach the following agreement through friendly negotiation to specify their rights and obligations:

**1. Loan**

In accordance with the terms and conditions provided in this agreement, the Lender agrees to lend the Borrower with an interest-free loan amounting to RMB 10 million (RMB 10,000,000.00), and the Borrower agrees to accept the aforesaid loan.

**2. Term of the Loan**

2.1   The term of the loan under this Agreement shall begin from July 27, 2017 to ten years after the execution of this Agreement ("**Term of the Loan**"); the Term of the Loan may be extended upon the Lender's written confirmation; the extended term shall be determined by the Lender.

2.2   During the Term of the Loan or any extended Term of the Loan, in the event that any of the following events occur as to any of the borrowers, the lender shall be entitled to decide, in the manner of written notice, that the loan hereunder becomes due immediately, and demand the Borrower to repay the loan in the manner provided by the provisions hereof:

(1)   the Borrower resigns from or is dismissed by the Lender or its affiliated company (refers to all the companies which have affiliated relations with the Lender during the term of this Agreement);

(2)    the Borrower dies or loses capacity for civil conduct, or his/her capacity for civil conduct becomes limited;

(3)    the Borrower commits or is involved in any crime;

(4)    any third party claims against the Borrower damages exceeding one hundred thousand (RMB 100,000.00);

(5)    any representation or warranty by the Borrower herein is proven to be untrue or inaccurate in any material aspect at the time when it is made; or the Borrower breaches any obligation hereof;

(6)    to the extent permitted by the laws of China, in the event that the Lender or its designated person may invest in the Cinema Company's businesses and the Lender, in accordance with the provisions of the Exclusive Share Purchase Agreement executed by the Lender and the Borrower on July 27, 2017 (the "**Exclusive Share Purchase Agreement**"), has issued a written notice to the Borrower to purchase the shares in the Cinema Company held by the Borrower and has exercised such option (such acts are not deemed to be completed until relevant registrations with the industry and commerce administrative authorities are completed).

**3.    Repayment of the Loan**

3.1    Both Parties hereby agree and confirm that the Borrower must and may only repay the loan in the manner as follows: when the loan hereof becomes due or any event under Article 2.2 of this Agreement occurs, the Borrower (or his/her successors, heirs or assigns) shall at the request of the written notice by the Lender, subject to the provisions of the laws of China, transfer all his/her shares in the Cinema Company to the Lender and/or its designated entities, and repay the loan hereunder by the proceeds received from the transfer.

3.2    The Borrower may not repay the loan in whole or in part without prior written consent of Party A.

3.3    Both Parties agree that the share transfer hereunder shall be deemed completed when the formalities for the change of shareholder with the relevant industry and administrative authorities are completed and the Lender or its designated entities have become the legal holders of the aforementioned target shares.

**4.    Interest of the Loan**

Both Parties hereby agree and acknowledge that unless this Agreement provides otherwise, the loan hereunder shall bear no interest. However, when the loan becomes due and the Borrower transfers his/her shares to the Lender or its designated entities in the manner of repayment provided by this Agreement, if the actual price for share transfer is higher than the principal of the loan to the Borrower because of the requirements of the laws or other reasons, the difference between the transfer price and the principal shall be deemed interest or capital occupation expense, and shall be paid to the Lender together with the principal.

2

**5.** **Representations, Warranties and Undertakings of the Borrower**

5.1 the Borrower shall provide copy of his/her capital contribution certificate as to 50% of the shares in the Cinema Company to the Lender.

5.2 To secure repayment of the loan, the Borrower agrees to pledge all his/her shares in the Cinema Company with the Lender, and grant an option to purchase the abovementioned shares to the Lender. The Borrower agrees to execute the Share Pledge Agreement at the Lender's request.

5.3 the Borrower undertakes not to request the Cinema Company to distribute dividend or profit to him/her, and not to pass any resolution as the shareholder of the Cinema Company to distribute dividend or profit to shareholders.

5.4 the Borrower shall maintain the Cinema Company's existence and prudentially and validly operate the business and handle the matters of the Cinema Company, following sound financial and business standards and practices. Upon the Lender's request, the Borrower shall provide the Lender with all the materials relating to operation and financial condition of the Cinema Company. The Borrower shall operate all businesses of the Cinema Company in the normal course of business to maintain the value of the Cinema Company's assets.

5.5 To keep his/her title of the shares in the Cinema Company, he/she shall execute all the necessary or appropriate documents, take all the necessary or appropriate actions, make all the necessary or appropriate accusations, and raise all necessary or appropriate defenses against all claims; the Borrower shall immediately notify the Lender of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to the Cinema Company.

5.6 the Borrower shall strictly comply with the provisions hereof and duly perform his/her obligations hereunder, and shall not conduct any act or omission that may affect the validity and enforceability of this Agreement.

**6.** **Taxes and Expenses**

Unless this Agreement provides otherwise, both Parties shall respectively pay their respective taxes and expenses regarding this Agreement pursuant to relevant laws and regulations. All the other taxes and reasonable expenses relating to the loan shall be borne by the Lender.

**7.** **Effectiveness and Termination of this Agreement**

7.1 Both Parties agree and confirm that this Agreement shall become effective from July 27, 2017.

3

7.2   Both Parties agree and confirm that this Agreement shall terminate when both Parties fully perform their respective obligations hereunder. Both Parties agree and confirm that the Borrower's obligations hereunder shall only be deemed fully performed when all of the following conditions are met:

(1)   the Borrower has transferred all his/her shares in the Cinema Company to the Lender and/or its designated entities; and

(2)   the Borrower has repaid all the proceeds received from the transfer hereunder to the Lender according to the provisions hereof and of the Exclusive Share Purchase Agreement.

7.3   Unless (1) the Lender commits gross negligence, fraud or other serious illegal acts; or (2) the Lender is terminated for bankruptcy, dissolution or order to close, the Borrower shall not unilaterally revoke or terminate this Agreement in any circumstance.

8.   Breaching Liabilities

8.1   In the event that either Party ("**Breaching Party**") breaches any provision hereof, and thus causes any damage to the other Party ("**Non-breaching Party**"), the Non-breaching Party may send a written notice to the Breaching Party, requesting the Breaching Party to immediately correct and remedy its breach. If the Breaching Party fails to take measures satisfactory to the Non-breaching Party to remedy and correct its breach within fifteen (15) days after the Non-breaching Party receives the abovementioned written notice, the Non-breaching Party may immediately take other remedial measures according to the provision hereof or through legal means.

8.2   In the event that the Borrower fails to repay the loan to the Lender according hereto, the Borrower shall pay to the Lender the liquidated damages for late payment at the daily rate of 0.02% over the outstanding amount (counted from the date requested by the Lender for repayment of the loan), and shall compensate the Lender for any direct economic loss caused by the Borrower's breach (including but not limited to the market value of the shares held by the Borrower in the Cinema Company which is not transferred, or the outstanding loan amount, whichever is higher).

9.   Confidentiality

9.1 Both Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consent by the other Party, except:

(1)   Any information that has been known or will be known to the public (not through any disclosure by the receiving Party to the public without the other Party's consent);

4

(2)  Any information disclosed according to the requirements of applicable laws and stock exchange rules; or

(3)  In case that any information is disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, such legal or financial consultant is obliged to perform similar obligations of confidentiality to those specified herein. Any disclosure by any employee of or institution engaged by either Party shall be deemed disclosure by such Party, and such Party shall be liable for breach of contract according to this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

10.  Notice

Any notice or other communication sent by either Party hereunder shall be made in writing, and sent by personal delivery, letter or fax to the following address of the other Party or to other addresses designated by the other Party by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the seventh (7th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

the Lender: Beijing iQIYI New Media Science and Technology Co., Ltd.
Address: 10th and 11th Floor, No. 2 Haidian North First Street, Haidian District, Beijing
Postal code: 100080
Tel: 010-62677171
Fax:

the Borrower: YANG Xianghua ( 杨向华 )
Address: ***
Postal code: ***
Tel:
Fax:

11.  Applicable Law and Dispute Resolution

The execution, validity, performance and interpretation of and the dispute resolution regarding this Agreement shall be governed by the laws of China. Any dispute arising from performance hereof or relating to this Agreement shall be resolved by the Parties through friendly negotiation. If the dispute fails to be resolved through negotiation, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. The effectiveness of this article is not affected by any change, rescission or termination of this Agreement.

5

12.    Miscellaneous

12.1    Both Parties agree and confirm that the Lender's "written consent" mentioned in this Agreement means that the matter is subject to the approval of the Lender's board of directors. If such matter is only approved by the Borrower, the approval shall not constitute the Lender's "written consent".

12.2    The headings herein are for convenience only, and may not be used to interpret, explain or affect in other aspects the meaning of any provisions hereof.

12.3    Both Parties confirm that this Agreement once effective shall constitute the entire agreement and consensus between them with respect to the subject matters hereof, and shall replace all the oral and/or written agreements and consensuses reached by the Parties with respect to the subject matters hereof.

12.4    This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors, heirs or permitted assigns, and be executed only for the benefit of the above persons. The Borrower may not assign, pledge or otherwise transfer in other manners any right, interest or obligation hereunder to others without prior written consent of the Lender.

12.5    the Borrower hereby agrees that (i) if the Borrower dies, the Borrower agrees to immediately assign the rights and obligations hereunder to the entity designated by the Lender; (ii) the Lender may assign its rights and obligations hereunder to any third party when necessary. The Lender only needs to send a written notice to the Borrower when the such assignment occurs, and is not required to obtain the Borrower's consent on such assignment.

12.6    Either Party's failure to exercise promptly any right hereunder shall not be deemed waiver of such right, nor shall it affect the Party's future exercise thereof.

12.7    If any provision hereof is decided by any competent court or arbitral institution as invalid, void or unenforceable, it shall not affect or impair the validity or enforceability of other provisions hereof. The Parties shall stop performance of such invalid, void or unenforceable provision, and shall amend it so that the original intention will be achieved as much as possible and the provision becomes valid and effective only to the extent of relevant fact and circumstance.

12.8    The Parties shall negotiate to decide any matter not covered herein. The Parties shall amend or supplement this Agreement through written agreements. The written amendments and supplemental agreements duly signed by both Parties are an integral part hereof, and have same legal force as this Agreement.

12.9    This Agreement is made in four (4) counterparts, and each Party holds one (1), the remaining copies are held by the Lender. All counterparts have equal legal force.

6

In witness whereof, this Agreement is entered into by both Parties or their legal representatives or authorized representatives on the date first written above.

[The remainder of this page is intentionally left blank.]

7

[Signature page for the Loan Agreement]

**Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.(seal)**
[*Company seal is affixed*]
Signature by Legal Representative / Authorized Representative: /s/ GONG Yu_____


**Party B: YANG Xianghua(** 杨向华 **)**
Signature: /s/ YANG Xianghua_____

8

<div align="right">**Exhibit 10.31**</div>

<div align="center">**Loan Agreement**</div>

This Loan Agreement (this "**Agreement**") is executed by and between the following parties in Beijing, the People's Republic of China ("**China**") on July 27, 2017:

Party A (the "**Lender**"): Beijing iQIYI New Media Science and Technology Co., Ltd.; and

Party B (the "**Borrower**"): GONG Yu ( 龚宇 ), ID Card No. \*\*\*

Whereas,

1.  The Lender is a wholly foreign owned enterprise legally established and validly existing in China according to the laws of China;

2.  The Borrower is a citizen of China, and as a shareholder of Beijing iQIYI Cinema Management Co., Ltd (the "**Cinema Company**"), holds 50% of the shares in the Cinema Company in total.

3.  The Lender agrees to lend RMB 10 million (RMB 10,000,000.00) interest-free to the Borrower.

Therefore, the two Parties reach the following agreement through friendly negotiation to specify their rights and obligations:

**1.   Loan**

In accordance with the terms and conditions provided in this Agreement, the Lender agrees to lend the Borrower with an interest-free loan amounting to RMB 10 million (RMB 10,000,000.00), and the Borrower agrees to accept the aforesaid loan.

**2.   Term of the Loan**

2.1   The term of the loan under this Agreement shall begin from July 27, 2017 to ten years after the execution of this Agreement ("**Term of the Loan**"); the Term of the Loan may be extended upon the Lender's written confirmation; the extended term shall be determined by the Lender.

2.2   During the Term of the Loan or any extended Term of the Loan, in the event that any of the following events occur as to any of the borrowers, the lender shall be entitled to decide, in the manner of written notice, that the loan hereunder becomes due immediately, and demand the Borrower to repay the loan in the manner provided by the provisions hereof:

(1)   the Borrower resigns from or is dismissed by the Lender or its affiliated company (refers to all the companies which have affiliated relations with the Lender during the term of this Agreement);

(2)    the Borrower dies or loses capacity for civil conduct, or his/her capacity for civil conduct becomes limited;

(3)    the Borrower commits or is involved in any crime;

(4)    any third party claims against the Borrower damages exceeding one hundred thousand (RMB 100,000.00);

(5)    any representation or warranty by the Borrower herein is proven to be untrue or inaccurate in any material aspect at the time when it is made; or the Borrower breaches any obligation hereof;

(6)    to the extent permitted by the laws of China, in the event that the Lender or its designated person may invest in the Cinema Company's businesses and the Lender, in accordance with the provisions of the Exclusive Share Purchase Agreement executed by the Lender and the Borrower on July 27, 2017 (the "**Exclusive Share Purchase Agreement**"), has issued a written notice to the Borrower to purchase the shares in the Cinema Company held by the Borrower and has exercised such option (such acts are not deemed to be completed until relevant registrations with the industry and commerce administrative authorities are completed).

**3.    Repayment of the Loan**

3.1    Both Parties hereby agree and confirm that the Borrower must and may only repay the loan in the manner as follows: when the loan hereof becomes due or any event under Article 2.2 of this Agreement occurs, the Borrower (or his/her successors, heirs or assigns) shall at the request of the written notice by the Lender, subject to the provisions of the laws of China, transfer all his/her shares in the Cinema Company to the Lender and/or its designated entities, and repay the loan hereunder by the proceeds received from the transfer.

3.2    The Borrower may not repay the loan in whole or in part without prior written consent of Party A.

3.3    Both Parties agree that the share transfer hereunder shall be deemed completed when the formalities for the change of shareholder with the relevant industry and administrative authorities are completed and the Lender or its designated entities have become the legal holders of the aforementioned target shares.

**4.    Interest of the Loan**

Both Parties hereby agree and acknowledge that unless this Agreement provides otherwise, the loan hereunder shall bear no interest. However, when the loan becomes due and the Borrower transfers his/her shares to the Lender or its designated entities in the manner of repayment provided by this Agreement, if the actual price for share transfer is higher than the principal of the loan to the Borrower because of the requirements of the laws or other reasons, the difference between the transfer price and the principal shall be deemed interest or capital occupation expense, and shall be paid to the Lender together with the principal.

2

**5.    Representations, Warranties and Undertakings of the Borrower**

5.1    the Borrower shall provide copy of his/her capital contribution certificate as to 50% of the shares in the Cinema Company to the Lender.

5.2    To secure repayment of the loan, the Borrower agrees to pledge all his/her shares in the Cinema Company with the Lender, and grant an option to purchase the abovementioned shares to the Lender. The Borrower agrees to execute the Share Pledge Agreement at the Lender's request.

5.3    the Borrower undertakes not to request the Cinema Company to distribute dividend or profit to him/her, and not to pass any resolution as the shareholder of the Cinema Company to distribute dividend or profit to shareholders.

5.4    the Borrower shall maintain the Cinema Company's existence and prudentially and validly operate the business and handle the matters of the Cinema Company, following sound financial and business standards and practices. Upon the Lender's request, the Borrower shall provide the Lender with all the materials relating to operation and financial condition of the Cinema Company. The Borrower shall operate all businesses of the Cinema Company in the normal course of business to maintain the value of the Cinema Company's assets.

5.5    To keep his/her title of the shares in the Cinema Company, he/she shall execute all the necessary or appropriate documents, take all the necessary or appropriate actions, make all the necessary or appropriate accusations, and raise all necessary or appropriate defenses against all claims; the Borrower shall immediately notify the Lender of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to the Cinema Company.

5.6    the Borrower shall strictly comply with the provisions hereof and duly perform his/her obligations hereunder, and shall not conduct any act or omission that may affect the validity and enforceability of this Agreement.

**6.    Taxes and Expenses**

Unless this Agreement provides otherwise, both Parties shall respectively pay their respective taxes and expenses regarding this Agreement pursuant to relevant laws and regulations. All the other taxes and reasonable expenses relating to the loan shall be borne by the Lender.

**7.    Effectiveness and Termination of this Agreement**

7.1    Both Parties agree and confirm that this Agreement shall become effective from July 27, 2017.

3

7.2    Both Parties agree and confirm that this Agreement shall terminate when both Parties fully perform their respective obligations hereunder. Both Parties agree and confirm that the Borrower's obligations hereunder shall only be deemed fully performed when all of the following conditions are met:

(1)    the Borrower has transferred all his/her shares in the Cinema Company to the Lender and/or its designated entities; and

(2)    the Borrower has repaid all the proceeds received from the transfer hereunder to the Lender according to the provisions hereof and of the Exclusive Share Purchase Agreement.

7.3    Unless (1) the Lender commits gross negligence, fraud or other serious illegal acts; or (2) the Lender is terminated for bankruptcy, dissolution or order to close, the Borrower shall not unilaterally revoke or terminate this Agreement in any circumstance.

**8.    Breaching Liabilities**

8.1    In the event that either Party ("**Breaching Party**") breaches any provision hereof, and thus causes any damage to the other Party ("**Non-breaching Party**"), the Non-breaching Party may send a written notice to the Breaching Party, requesting the Breaching Party to immediately correct and remedy its breach. If the Breaching Party fails to take measures satisfactory to the Non-breaching Party to remedy and correct its breach within fifteen (15) days after the Non-breaching Party receives the abovementioned written notice, the Non-breaching Party may immediately take other remedial measures according to the provision hereof or through legal means.

8.2    In the event that the Borrower fails to repay the loan to the Lender according hereto, the Borrower shall pay to the Lender the liquidated damages for late payment at the daily rate of 0.02% over the outstanding amount (counted from the date requested by the Lender for repayment of the loan), and shall compensate the Lender for any direct economic loss caused by the Borrower's breach (including but not limited to the market value of the shares held by the Borrower in the Cinema Company which is not transferred, or the outstanding loan amount, whichever is higher).

**9.    Confidentiality**

9.1    Both Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consent by the other Party, except:

(1)    Any information that has been known or will be known to the public (not through any disclosure by the receiving Party to the public without the other Party's consent);

4

(2)    Any information disclosed according to the requirements of applicable laws and stock exchange rules; or

(3)    In case that any information is disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, such legal or financial consultant is obliged to perform similar obligations of confidentiality to those specified herein. Any disclosure by any employee of or institution engaged by either Party shall be deemed disclosure by such Party, and such Party shall be liable for breach of contract according to this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

## 10.    Notice

Any notice or other communication sent by either Party hereunder shall be made in writing, and sent by personal delivery, letter or fax to the following address of the other Party or to other addresses designated by the other Party by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the seventh (7th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

the Lender: Beijing iQIYI New Media Science and Technology Co., Ltd.
Address: 10th and 11th Floor, No. 2 Haidian North First Street, Haidian District, Beijing
Postal code: 100080
Tel: 010-62677171
Fax:

the Borrower: GONG Yu ( 龚宇 )
Address: ***
Postal code:
Tel:
Fax:

## 11.    Applicable Law and Dispute Resolution

The execution, validity, performance and interpretation of and the dispute resolution regarding this Agreement shall be governed by the laws of China. Any dispute arising from performance hereof or relating to this Agreement shall be resolved by the Parties through friendly negotiation. If the dispute fails to be resolved through negotiation, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. The effectiveness of this article is not affected by any change, rescission or termination of this Agreement.

5

## 12.   Miscellaneous

12.1   Both Parties agree and confirm that the Lender's "written consent" mentioned in this Agreement means that the matter is subject to the approval of the Lender's board of directors. If such matter is only approved by the Borrower, the approval shall not constitute the Lender's "written consent".

12.2   The headings herein are for convenience only, and may not be used to interpret, explain or affect in other aspects the meaning of any provisions hereof.

12.3   Both Parties confirm that this Agreement once effective shall constitute the entire agreement and consensus between them with respect to the subject matters hereof, and shall replace all the oral and/or written agreements and consensuses reached by the Parties with respect to the subject matters hereof.

12.4   This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors, heirs or permitted assigns, and be executed only for the benefit of the above persons. The Borrower may not assign, pledge or otherwise transfer in other manners any right, interest or obligation hereunder to others without prior written consent of the Lender.

12.5   the Borrower hereby agrees that (i) if the Borrower dies, the Borrower agrees to immediately assign the rights and obligations hereunder to the entity designated by the Lender; (ii) the Lender may assign its rights and obligations hereunder to any third party when necessary. The Lender only needs to send a written notice to the Borrower when the such assignment occurs, and is not required to obtain the Borrower's consent on such assignment.

12.6   Either Party's failure to exercise promptly any right hereunder shall not be deemed waiver of such right, nor shall it affect the Party's future exercise thereof.

12.7   If any provision hereof is decided by any competent court or arbitral institution as invalid, void or unenforceable, it shall not affect or impair the validity or enforceability of other provisions hereof. The Parties shall stop performance of such invalid, void or unenforceable provision, and shall amend it so that the original intention will be achieved as much as possible and the provision becomes valid and effective only to the extent of relevant fact and circumstance.

12.8   The Parties shall negotiate to decide any matter not covered herein. The Parties shall amend or supplement this Agreement through written agreements. The written amendments and supplemental agreements duly signed by both Parties are an integral part hereof, and have same legal force as this Agreement.

12.9   This Agreement is made in four (4) counterparts, and each Party holds one (1), the remaining copies are held by the Lender. All counterparts have equal legal force.

6

In witness whereof, this Agreement is entered into by both Parties or their legal representatives or authorized representatives on the date first written above.

[The remainder of this page is intentionally left blank.]

7

[Signature page for the Loan Agreement]

**Party A: Beijing iQIYI New Media Science and Technology Co., Ltd. (seal)**
[*Company seal is affixed*]
Signature by Legal Representative / Authorized Representative: /s/ GONG Yu


**Party B: GONG Yu ( 龚宇 )**
Signature:   /s/ GONG Yu

8

**Exhibit 10.32**

**Share Pledge Agreement**

This Share Pledge Agreement (this "**Agreement**") is made by and between the following parties in Beijing, China on July 27, 2017:

Party A ("**Pledgee**"): Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B ("**Pledgor**"): GONG Yu ( 龚宇 ) (ID Card No.: ***)

Party C: Beijing iQIYI Cinema Management Co., Ltd.

Whereas,

(1)    Party A, Party B and Party C and Party C's subordinate companies and entities ("**Subordinate Entities**") have respectively executed the agreements set forth in Schedule 1 hereto (collectively referred to as "**Principal Contracts**");

(2)    Party B holds 50% shares in Party C. Party B intends to pledge such shares it holds in Party C with Party A to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities; Party A agrees to accept the above security interest.

Therefore, Party A, Party B and Party C reach the agreement as follows upon friendly negotiation for all the parties to observe:

**1.    Pledge**

Party B agrees to unconditionally and irrevocably pledge the 50% shares in Party C it holds (the "**Pledged Shares**") with Party A, to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities.

**2.    Scope of Security**

The scope of security of the Pledged Shares hereunder covers all obligations or debts of Party B and/or Party C and Party C's Subordinate Entities arising out of the Principal Contracts, including but not limited to the management and consulting service fees, interests, damages, compensation, costs for realizing the creditors' rights, and damages and all the other payable incurred by Party A because of breaches by Party B and/or Party C and Party C's Subordinate Entities, which arise out of the Principal Contracts and shall be paid to Party A by Party B and/or Party C and Party C's Subordinate Entities. The scope of security hereunder shall be limited to the above creditors' rights secured.

The parties confirm that, in the event that relevant industry and commerce authority requires clarification of the amount of creditors' rights covered by the scope of security during the process of share pledge registration, only for the purpose of such registration, the parties agree to register the amount of the creditors' rights hereunder as composed of the principal of RMB 10 million and the amount of all and any default liability and the amount of damages under relevant contracts.

The parties further confirm that the clarification of the above clarification for purpose of share pledge registration shall not impair or limit Party A's rights or interests enjoyed as guarantee in accordance with relevant Principal Contracts and this Agreement.

**3.    Share Pledge Period and Pledge Rights**

The share pledge under this Agreement shall become effective upon registration with the industry and commerce administrative authority of Party C, and remain effective until all the Principal Contracts are completely performed, expire or are terminated (whichever is later). During the term of the Pledge, in the event that Party B, Party C or any Subordinate Entity fails to perform any obligation under any Principal Contract, Party A has the right to dispose of the Pledged Shares in accordance with this Agreement.

**4.    Share Pledge Registration**

Party B and Party C undertake to Party A that they shall record the share pledge on Party C's register of members on the execution date of this Agreement. Party B and Party C shall deliver the share capital contribution certificate of Party B in Party C and the register of members to Party A for custody on the execution date of this Agreement. Party B and Party C further undertake to Party A that they shall complete the registration of the share pledge hereunder with the corresponding industry and commerce administrative authority and provide Party A with correspondence proof documents within thirty (30) days (or as soon as practicable) from the execution date of this Agreement (or the date when the relevant industry and commerce administrative authority begins to formally process the application for the share pledge registration, whichever is later).

**5.    Exercise and Enforcement of Pledge**

5.1    If any of the following events ("**Exercise Events**") occurs, Party A may elect to demand Party B or Party C to immediately and fully perform all the obligations hereunder, and the Pledge created hereunder may be exercised immediately:

(1)    Any representations, warranties or statements made by Party B, Party C or any Subordinate Entity hereunder or under any Principal Contracts are inconsistent, incorrect, untrue, or no longer correct or true; or Party B, Party C or any Subordinate Entity breaches or fails to comply with any obligation assumed or any undertaking or warranty made hereunder or under any Principal Contract; or

(2)    One or more obligations of Party B, Party C or any Subordinate Entity hereunder or under any Principal Contract are deemed illegal or invalid transaction; or

2

    (3)    Party B or Party C materially breaches its obligations hereunder.

5.2    If any of the above Exercise Events occurs, Party A or the third party designated by Party A may exercise the Pledge through purchasing at a discount, designating other parties to purchase at a discount, auction of or sale of the Pledged Shares. Party A may exercise the Pledge hereunder without first exercising other security or rights, or taking other measures or procedures against Party B and/or Party C or any other person.

## 6.    Undertaking and Warranties of Party B and Party C

6.1    During the term of this Agreement, Party B and Party C hereby undertake and warrant to Party A jointly and severally that:

    (1)    Party B is the legal owner of the Pledged Shares which are free of any ownership dispute that has occurred or is likely to occur. Party B is entitled to dispose of the Pledged Shares or any part of them, and such disposal right is not under any third party restriction. Except by the provisions hereof, Party B has not created any other pledge or third party interest over the Pledged Shares.

    (2)    Unless with Party A's prior written consent, Party B and Party C shall not transfer the Pledged Shares, or create or allow the existence of any security interest over the Pledged Shares, except that otherwise agreed by all the parties.

    (3)    Party B and Party C shall comply with and follow the provisions of all the laws and regulations relating to pledge of rights, shall within five (5) days after receiving notice, direction or suggestion about the Pledge from relevant supervisory authorities, present Party A such notice, direction or suggestion. They shall follow such notice, direction or suggestion, or make objections and statements regarding the above matters according to Party A's reasonable demand or with Party A's consent.

    (4)    Before having Party A's prior written consent, Party B and Party C will not conduct, and will not cause or allow the Subordinate Entities to conduct, acts that may impair or harm or in other manners prejudice the value of the Pledged Shares or Party A's Pledge, including:

        (i)    Providing loans to any third party or assuming any debt;

        (ii)    Transferring, selling or otherwise disposing of any asset or right to any third party, or appropriating or transferring any asset or fund of Party C or the Subordinate Entities;

        (iii)    Providing security over their assets in favor of any third party;

        (iv)    Assigning any right or obligation under any agreement they have or will have entered into to any third party;

3

    (v)    Leasing, renting or disposing of any business license they have or will have obtained.

Party B and Party C shall notify Party A in writing of any event or act that may affect the value of the Pledged Shares or Party A's Pledge within five (5) working days after they know such events or acts. Party A shall not be responsible for the reduction of value of the Pledged Shares, and Party B and Party C shall not make any claim or request against Party A for such reduction of value.

6.2    Subject to the provisions of relevant laws and regulations of PRC, the share pledge hereunder is continuous and shall remain effective during the term of this Agreement. Even in the event that Party B or Party C becomes insolvent, is liquidated, loses capacity for conduct, or undergoes any change of organization or status, or any capital offset occurs among the parties, or any other event occurs, the share pledge hereunder shall not be affected.

6.3    Party B agrees that, for the performance of this Agreement Party, Party A is entitled to dispose of the Pledge in the manner prescribed herein, and the exercise of Party A's right over the Pledge in accordance with the provisions hereof shall not be interrupted or interfered with, through any legal procedure, by Party B or through Party B's successors or principals or any other person.

6.4    Party B and Party C warrant to Party A that, to protect or perfect the security hereunder for the debts under the Principal Contracts, they will honestly execute and cause other parties interested in the Pledge to execute all the rights certificates and deeds relating to the performance of this agreement, and/or cause other interested parties to conduct the acts demanded by Party A and relevant to the performance of this Agreement, and provide convenience for the exercise of the rights and authorities granted by this Agreement to Party A.

6.5    Party B and Party C warrant to Party A that, to protect Party A's interest, Party B shall comply with and perform all the warranties, undertakings, agreements, representations and conditions. In the event that Party B and/or Party C fail to perform their respective warranties, undertakings, agreements, representations and conditions, Party B and/or Party C shall indemnify all the losses therefore suffered by Party A.

6.6    During the term of this Agreement, in the event that Party B subscribes for any new registered capital in Party C (including the increased registered capital converted from the reserved or undistributed profits) (the "**New Shares**"), such New Shares shall automatically become the Pledged Shares hereunder, and Party B shall complete or cause to complete, within ten (10) working days after obtaining such New Shares, all the formalities necessary for creating pledge over such New Shares. In the event that Party B fail to complete the relevant formalities according to the preceding provisions, Party A shall have the right to immediately exercise the relevant pledge pursuant to the provisions of Article 5 herein.

4

**7.    Assignment**

7.1    Party B has no right to gift or assign any right or obligation hereunder without Party A's prior written consent.

7.2    This Agreement shall be binding upon Party B and its successors, and shall be effective to Party A and its successors and assigns.

7.3    Party A may assign all or any rights and obligations under the provisions of the Principal Contracts to any person (natural person/legal person) designated by it at any time. In such case, the assignee shall enjoy and assume such rights and obligations enjoyed and assumed by Party A hereunder, as if the assignee shall enjoy and assume as a party to this Agreement. When Party A assigns the rights and obligations under the provisions of the Principal Contracts, upon Party A's request, Party B shall execute relevant agreements and/or documents regarding such assignment.

7.4    When Party A is changed because of any assignment, the new parties to the Pledge shall execute a new pledge agreement, and conduct registration with the corresponding industry and commerce administrative authorities.

**8.    Confidentiality**

All provisions hereof and this Agreement itself are confidential information. Each party shall not disclose the confidential information to any third party other than the senior staff members, directors, employees, agents and professional consultants relating to this project; except the circumstances that the parties, pursuant to the provisions of law, are required to disclose the information relevant to this document to governments, the public or shareholders or submit this document to relevant authorities for record.

This Article 6 shall survive the modification, termination or rescission of this Agreement.

**9.    Breaching Liabilities**

In the event that one party fails to perform any obligation hereunder, or any representation or warranty of the Party hereunder is materially untrue or inaccurate, the party breaches this Agreement, and shall compensate for all losses of the other parties.

**10.    Force Majeure**

Where a force majeure event affects the performance of the Agreement, the party which encounters the force majeure shall immediately notify the other parties by way of telegraph, fax or other electronic means, and provide a written proof of the force majeure within fifteen (15) working days. Depending on the extent of the impact on the performance of this Agreement, all parties shall, by consultation, decide whether to terminate the Agreement or whether to partially exempt the performance obligations of this Agreement or whether to delay the performance of the Agreement.

5

**11.    Miscellaneous**

11.1    This Agreement shall be governed by the laws of PRC. The parties shall resolve through amicable negotiation all disputes arising from the performance of this Agreement; in the event that the negotiation fails, the disputes shall be submitted to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of PRC, the arbitrator or arbitrators may issue injunction orders over the shares in or assets of Party C (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party C through arbitration. The parties agree that, subject to the laws of PRC, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party C, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding.

11.2    This Agreement shall become effective when the parties sign and seal on the date first written above, and terminate when the obligations under the Principal Contracts are fully performed or discharged for whatever reason.

11.3    This Agreement is made in Chinese. The number of copies is determined according to the number of the parties. Each party shall hold one copy, and the remaining copy shall be used for registration with the industry and commerce administrative authorities.

6

(signature page for the Share Pledge Agreement)

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B: GONG Yu ( 龚宇 )
Signature: /s/ GONG Yu

Party C: Beijing iQIYI Cinema Management Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ Beijing iQIYI Cinema Management Co., Ltd.

7

**Schedule 1**

## List of Principal Contracts

1.    The Exclusive Management Consulting and Business Cooperation Agreement entered into by Party A, Party B, Party C and Party C's Subordinate Entities on July 27, 2017.

2.    The Exclusive Share Purchase Agreement entered into by Party A, Party B, and Party C on July 27, 2017.

3.    The Power of Attorney executed by Party B on July 27, 2017.

4.    The Loan Agreement entered into by Party A and Party B on July 27, 2017.

8

**Exhibit 10.33**

**Share Pledge Agreement**

This Share Pledge Agreement (this "**Agreement**") is made by and between the following parties in Beijing, China on July 27, 2017:

Party A ("**Pledgee**"): Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B ("**Pledgor**"): YANG Xianghua ( 杨向华 ) (ID Card No.: *** )

Party C: Beijing iQIYI Cinema Management Co., Ltd.

Whereas,

(1) Party A, Party B and Party C and Party C's subordinate companies and entities ("**Subordinate Entities**") have respectively executed the agreements set forth in Schedule 1 hereto (collectively referred to as "**Principal Contracts**");

(2) Party B holds 50% shares in Party C. Party B intends to pledge such shares it holds in Party C with Party A to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities; Party A agrees to accept the above security interest.

Therefore, Party A, Party B and Party C reach the agreement as follows upon friendly negotiation for all the parties to observe:

**1.    Pledge**

Party B agrees to unconditionally and irrevocably pledge the 50% shares in Party C it holds (the "**Pledged Shares**") with Party A, to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities.

**2.    Scope of Security**

The scope of security of the Pledged Shares hereunder covers all obligations or debts of Party B and/or Party C and Party C's Subordinate Entities arising out of the Principal Contracts, including but not limited to the management and consulting service fees, interests, damages, compensation, costs for realizing the creditors' rights, and damages and all the other payable incurred by Party A because of breaches by Party B and/or Party C and Party C's Subordinate Entities, which arise out of the Principal Contracts and shall be paid to Party A by Party B and/or Party C and Party C's Subordinate Entities. The scope of security hereunder shall be limited to the above creditors' rights secured.

The parties confirm that, in the event that relevant industry and commerce authority requires clarification of the amount of creditors' rights covered by the scope of security during the process of share pledge registration, only for the purpose of such registration, the parties agree to register the amount of the creditors' rights hereunder as composed of the principal of RMB 10 million and the amount of all and any default liability and the amount of damages under relevant contracts.

The parties further confirm that the clarification of the above clarification for purpose of share pledge registration shall not impair or limit Party A's rights or interests enjoyed as guarantee in accordance with relevant Principal Contracts and this Agreement.

**3.      Share Pledge Period and Pledge Rights**

The share pledge under this Agreement shall become effective upon registration with the industry and commerce administrative authority of Party C, and remain effective until all the Principal Contracts are completely performed, expire or are terminated (whichever is later). During the term of the Pledge, in the event that Party B, Party C or any Subordinate Entity fails to perform any obligation under any Principal Contract, Party A has the right to dispose of the Pledged Shares in accordance with this Agreement.

**4.      Share Pledge Registration**

Party B and Party C undertake to Party A that they shall record the share pledge on Party C's register of members on the execution date of this Agreement. Party B and Party C shall deliver the share capital contribution certificate of Party B in Party C and the register of members to Party A for custody on the execution date of this Agreement. Party B and Party C further undertake to Party A that they shall complete the registration of the share pledge hereunder with the corresponding industry and commerce administrative authority and provide Party A with correspondence proof documents within thirty (30) days (or as soon as practicable) from the execution date of this Agreement (or the date when the relevant industry and commerce administrative authority begins to formally process the application for the share pledge registration, whichever is later).

**5.      Exercise and Enforcement of Pledge**

5.1    If any of the following events ("**Exercise Events**") occurs, Party A may elect to demand Party B or Party C to immediately and fully perform all the obligations hereunder, and the Pledge created hereunder may be exercised immediately:

(1)    Any representations, warranties or statements made by Party B, Party C or any Subordinate Entity hereunder or under any Principal Contracts are inconsistent, incorrect, untrue, or no longer correct or true; or Party B, Party C or any Subordinate Entity breaches or fails to comply with any obligation assumed or any undertaking or warranty made hereunder or under any Principal Contract; or

(2)    One or more obligations of Party B, Party C or any Subordinate Entity hereunder or under any Principal Contract are deemed illegal or invalid transaction; or

2

(3)   Party B or Party C materially breaches its obligations hereunder.

5.2   If any of the above Exercise Events occurs, Party A or the third party designated by Party A may exercise the Pledge through purchasing at a discount, designating other parties to purchase at a discount, auction of or sale of the Pledged Shares. Party A may exercise the Pledge hereunder without first exercising other security or rights, or taking other measures or procedures against Party B and/or Party C or any other person.

6.   **Undertaking and Warranties of Party B and Party C**

6.1   During the term of this Agreement, Party B and Party C hereby undertake and warrant to Party A jointly and severally that:

(1)   Party B is the legal owner of the Pledged Shares which are free of any ownership dispute that has occurred or is likely to occur. Party B is entitled to dispose of the Pledged Shares or any part of them, and such disposal right is not under any third party restriction. Except by the provisions hereof, Party B has not created any other pledge or third party interest over the Pledged Shares.

(2)   Unless with Party A's prior written consent, Party B and Party C shall not transfer the Pledged Shares, or create or allow the existence of any security interest over the Pledged Shares, except that otherwise agreed by all the parties.

(3)   Party B and Party C shall comply with and follow the provisions of all the laws and regulations relating to pledge of rights, shall within five (5) days after receiving notice, direction or suggestion about the Pledge from relevant supervisory authorities, present Party A such notice, direction or suggestion. They shall follow such notice, direction or suggestion, or make objections and statements regarding the above matters according to Party A's reasonable demand or with Party A's consent.

(4)   Before having Party A's prior written consent, Party B and Party C will not conduct, and will not cause or allow the Subordinate Entities to conduct, acts that may impair or harm or in other manners prejudice the value of the Pledged Shares or Party A's Pledge, including:

(i)   Providing loans to any third party or assuming any debt;

(ii)   Transferring, selling or otherwise disposing of any asset or right to any third party, or appropriating or transferring any asset or fund of Party C or the Subordinate Entities;

(iii)   Providing security over their assets in favor of any third party;

(iv)   Assigning any right or obligation under any agreement they have or will have entered into to any third party;

3

(v)    Leasing, renting or disposing of any business license they have or will have obtained.

Party B and Party C shall notify Party A in writing of any event or act that may affect the value of the Pledged Shares or Party A's Pledge within five (5) working days after they know such events or acts. Party A shall not be responsible for the reduction of value of the Pledged Shares, and Party B and Party C shall not make any claim or request against Party A for such reduction of value.

6.2    Subject to the provisions of relevant laws and regulations of PRC, the share pledge hereunder is continuous and shall remain effective during the term of this Agreement. Even in the event that Party B or Party C becomes insolvent, is liquidated, loses capacity for conduct, or undergoes any change of organization or status, or any capital offset occurs among the parties, or any other event occurs, the share pledge hereunder shall not be affected.

6.3    Party B agrees that, for the performance of this Agreement Party, Party A is entitled to dispose of the Pledge in the manner prescribed herein, and the exercise of Party A's right over the Pledge in accordance with the provisions hereof shall not be interrupted or interfered with, through any legal procedure, by Party B or through Party B's successors or principals or any other person.

6.4    Party B and Party C warrant to Party A that, to protect or perfect the security hereunder for the debts under the Principal Contracts, they will honestly execute and cause other parties interested in the Pledge to execute all the rights certificates and deeds relating to the performance of this agreement, and/or cause other interested parties to conduct the acts demanded by Party A and relevant to the performance of this Agreement, and provide convenience for the exercise of the rights and authorities granted by this Agreement to Party A.

6.5    Party B and Party C warrant to Party A that, to protect Party A's interest, Party B shall comply with and perform all the warranties, undertakings, agreements, representations and conditions. In the event that Party B and/or Party C fail to perform their respective warranties, undertakings, agreements, representations and conditions, Party B and/or Party C shall indemnify all the losses therefore suffered by Party A.

6.6    During the term of this Agreement, in the event that Party B subscribes for any new registered capital in Party C (including the increased registered capital converted from the reserved or undistributed profits) (the "**New Shares**"), such New Shares shall automatically become the Pledged Shares hereunder, and Party B shall complete or cause to complete, within ten (10) working days after obtaining such New Shares, all the formalities necessary for creating pledge over such New Shares. In the event that Party B fail to complete the relevant formalities according to the preceding provisions, Party A shall have the right to immediately exercise the relevant pledge pursuant to the provisions of Article 5 herein.

4

**7.    Assignment**

7.1    Party B has no right to gift or assign any right or obligation hereunder without Party A's prior written consent.

7.2    This Agreement shall be binding upon Party B and its successors, and shall be effective to Party A and its successors and assigns.

7.3    Party A may assign all or any rights and obligations under the provisions of the Principal Contracts to any person (natural person/legal person) designated by it at any time. In such case, the assignee shall enjoy and assume such rights and obligations enjoyed and assumed by Party A hereunder, as if the assignee shall enjoy and assume as a party to this Agreement. When Party A assigns the rights and obligations under the provisions of the Principal Contracts, upon Party A's request, Party B shall execute relevant agreements and/or documents regarding such assignment.

7.4    When Party A is changed because of any assignment, the new parties to the Pledge shall execute a new pledge agreement, and conduct registration with the corresponding industry and commerce administrative authorities.


**8.    Confidentiality**

All provisions hereof and this Agreement itself are confidential information. Each party shall not disclose the confidential information to any third party other than the senior staff members, directors, employees, agents and professional consultants relating to this project; except the circumstances that the parties, pursuant to the provisions of law, are required to disclose the information relevant to this document to governments, the public or shareholders or submit this document to relevant authorities for record.

This Article 6 shall survive the modification, termination or rescission of this Agreement.


**9.    Breaching Liabilities**

In the event that one party fails to perform any obligation hereunder, or any representation or warranty of the Party hereunder is materially untrue or inaccurate, the party breaches this Agreement, and shall compensate for all losses of the other parties.


**10.    Force Majeure**

Where a force majeure event affects the performance of the Agreement, the party which encounters the force majeure shall immediately notify the other parties by way of telegraph, fax or other electronic means, and provide a written proof of the force majeure within fifteen (15) working days. Depending on the extent of the impact on the performance of this Agreement, all parties shall, by consultation, decide whether to terminate the Agreement or whether to partially exempt the performance obligations of this Agreement or whether to delay the performance of the Agreement.

5

**11.    Miscellaneous**

11.1    This Agreement shall be governed by the laws of PRC. The parties shall resolve through amicable negotiation all disputes arising from the performance of this Agreement; in the event that the negotiation fails, the disputes shall be submitted to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of PRC, the arbitrator or arbitrators may issue injunction orders over the shares in or assets of Party C (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party C through arbitration. The parties agree that, subject to the laws of PRC, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party C, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding.

11.2    This Agreement shall become effective when the parties sign and seal on the date first written above, and terminate when the obligations under the Principal Contracts are fully performed or discharged for whatever reason.

11.3    This Agreement is made in Chinese. The number of copies is determined according to the number of the parties. Each party shall hold one copy, and the remaining copy shall be used for registration with the industry and commerce administrative authorities.

6

(signature page for the Share Pledge Agreement)

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B: YANG Xianghua( 杨向华 )
Signature: /s/YANG Xianghua

Party C: Beijing iQIYI Cinema Management Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ Beijing iQIYI Cinema Management Co., Ltd.

7

**Schedule 1**

**List of Principal Contracts**

1.    The Exclusive Management Consulting and Business Cooperation Agreement entered into by Party A, Party B, Party C and Party C's Subordinate Entities on July 27, 2017.

2.    The Exclusive Share Purchase Agreement entered into by Party A, Party B, and Party C on July 27, 2017.

3.    The Power of Attorney executed by Party B on July 27, 2017.

4.    The Loan Agreement entered into by Party A and Party B on July 27, 2017.

8

**Exhibit 10.34**

## Power of Attorney

I, YANG Xianghua ( 杨向华 ) , a citizen of the People's Republic of China, with ID Card No. ***, hold 50% shares in Beijing iQIYI Cinema Management Co., Ltd. (the "**Company**") at present. Subject to the laws and regulations of PRC, I hereby irrevocably authorize Beijing iQIYI New Media Science and Technology Co., Ltd. (the "**WFOE**") to exercise the following rights regarding the aforementioned shares during the term of this Power of Attorney:

The WFOE or any person(s) designated by the WFOE (the "**Agent(s)**") are exclusively authorized to exercise on behalf of me and in its own name the rights including but not limited to the follows:

(1) Proposing to convene a shareholders' meeting according to the articles of association of the Company, and attend the meeting and execute relevant resolutions of the meeting;

(2) Exercising at the shareholders' meetings of the Company all the shareholder rights I have under the law and the articles of association of the Company, including but not limited to voting rights, nomination rights and appointment rights;

(3) Submitting to relevant government supervisory authorities any documents the Company's shareholders are required to submit;

(4) Exercising the right to dividend, the right to sell, transfer, pledge or dispose of the shares in the Company I hold in whole or in part, or the right to distribution of the residual assets after liquidation of the Company under the law and the articles of association of the Company;

(5) When the Company is liquidated or dissolved, forming the liquidation group and exercising the group's powers during the liquidation according to the law, including but not limited to management of the Company's assets; and

(6) Other rights enjoyed by me as a shareholder of the Company.

Without restricting the authorization herein, the Agent(s) has the right to, within the scope of my authorization and on my behalf, execute and perform the Share Transfer Contract contemplated in the Exclusive Share Purchase Agreement to which I am a party, and execute and perform on time the Share Pledge Agreement and the Exclusive Share Purchase Agreement and the supplemental agreements thereto to which I am a party.

During the term of this Power of Attorney and subject to the laws of PRC, I undertake that, as soon as possible and within three (3) days after receiving any dividend, bonus or asset distributed by the Company, I will deliver such dividend, bonus or asset free of charge to the WFOE or its designated third party.

During the period I am the Company's shareholder, regardless of any change of the percentage of the shares in the Company I hold, this Power of Attorney shall be irrevocable and continuously effective since the date of execution; when and only when the WFOE sends a written notice to me requesting replacement of the Agent(s), I shall immediately appoint another person(s) designated by the WFOE to exercise the entrusted rights under this Power of Attorney, and the new authorization and entrustment once made shall immediately replace the original; except for this, I will not revoke the entrustment and authorization made to the Agent(s). During the term of this Power of Attorney, I hereby waive all the rights entrusted to the Agent(s) through this Power of Attorney, and will no longer exercise such rights by myself. When I become a person with no or limited capacity for civil conduct owing to death or illness, my successor, guardian or administrator may not succeed or manage the rights I have as a shareholder of the Company until he/she/it undertake to continue to comply with this Power of Attorney.

I will acknowledge and assume the corresponding liabilities from any legal consequence arising out of the exercise of the entrusted rights above by the Agent(s). I hereby confirm that, under any circumstance, the Agent(s) shall not be required to assume any liability or make any economic compensation regarding the exercise of the entrusted rights above. I agree to indemnify the WFOE for all the losses it suffers or may suffer because of the designation of the Agent(s) to exercise the entrusted rights and hold the WFOE harmless, including but not limited to any loss arising out of any litigation, recovery, arbitration or claim of damages brought by any third party against the WFOE, or any administrative investigation or penalty.

I will provide sufficient assistance for the Agent(s) to exercise the entrusted rights above, and cause the Company to provide sufficient assistance, including prompt execution of the resolutions of shareholders' meetings made by the Agent(s) or any other relevant legal documents and granting the Agent(s) the access to various relevant information about the Company's operation, business, clients, finance and employees, etc. and enabling the Agent(s) to consult the Company's relevant documents, when necessary (for example, to meet the requirements by governmental authorities for review and approval, registration and filing).

In the event that the grant or exercise of the entrusted rights above become impossible for any reason (except for my breach of the provisions of this Power of Attorney) at any time during the term of this Power of Attorney, all the parties shall immediately seek for the alternative solution closest to the unrealizable provision, and when necessary, execute supplemental agreements and amend or adjust the provisions of this Power of Attorney, to ensure the continuance of realization of the purpose of this Power of Attorney.

This Power of Attorney becomes effective upon execution. Upon execution, this Power of Attorney shall replace any undertaking, memorandum of understanding, agreement or any other document (if applicable) previously made regarding the subject matter of this Power of Attorney, and shall remain effective during the term of the Agreement on Exclusive Management Consulting and Business Cooperation entered into by the WFOE, the Company, me and other relevant party.

2

YANG Xianghua ( 杨向华 )

Signature:    /s/ YANG Xianghua

Date:          July 27th, 2017

3

**Exhibit 10.35**

**Power of Attorney**

I, GONG Yu ( 龚宇 ) , a citizen of the People's Republic of China, with ID Card No. ***, hold 50% shares in Beijing iQIYI Cinema Management Co., Ltd. (the "**Company**") at present. Subject to the laws and regulations of PRC, I hereby irrevocably authorize Beijing iQIYI New Media Science and Technology Co., Ltd. (the "**WFOE**") to exercise the following rights regarding the above aforementioned shares during the term of this Power of Attorney:

The WFOE or any person(s) designated by the WFOE (the "**Agent(s)**") are exclusively authorized to exercise on behalf of me and in its own name the rights including but not limited to the follows:

(1)     Proposing to convene a shareholders' meeting according to the articles of association of the Company, and attend the meeting and execute relevant resolutions of the meeting;

(2)     Exercising at the shareholders' meetings of the Company all the shareholder rights I have under the law and the articles of association of the Company, including but not limited to voting rights, nomination rights and appointment rights;

(3)     Submitting to relevant government supervisory authorities any documents the Company's shareholders are required to submit;

(4)     Exercising the right to dividend, the right to sell, transfer, pledge or dispose of the shares in the Company I hold in whole or in part, or the right to distribution of the residual assets after liquidation of the Company under the law and the articles of association of the Company;

(5)     When the Company is liquidated or dissolved, forming the liquidation group and exercising the group's powers during the liquidation according to the law, including but not limited to management of the Company's assets; and

(6)     Other rights enjoyed by me as a shareholder of the Company.

Without restricting the authorization herein, the Agent(s) has the right to, within the scope of my authorization and on my behalf, execute and perform the Share Transfer Contract contemplated in the Exclusive Share Purchase Agreement to which I am a party, and execute and perform on time the Share Pledge Agreement and the Exclusive Share Purchase Agreement and the supplemental agreements thereto to which I am a party.

During the term of this Power of Attorney and subject to the laws of PRC, I undertake that, as soon as possible and within three (3) days after receiving any dividend, bonus or asset distributed by the Company, I will deliver such dividend, bonus or asset free of charge to the WFOE or its designated third party.

During the period I am the Company's shareholder, regardless of any change of the percentage of the shares in the Company I hold, this Power of Attorney shall be irrevocable and continuously effective since the date of execution; when and only when the WFOE sends a written notice to me requesting replacement of the Agent(s), I shall immediately appoint another person(s) designated by the WFOE to exercise the entrusted rights under this Power of Attorney, and the new authorization and entrustment once made shall immediately replace the original; except for this, I will not revoke the entrustment and authorization made to the Agent(s). During the term of this Power of Attorney, I hereby waive all the rights entrusted to the Agent(s) through this Power of Attorney, and will no longer exercise such rights by myself. When I become a person with no or limited capacity for civil conduct owing to death or illness, my successor, guardian or administrator may not succeed or manage the rights I have as a shareholder of the Company until he/she/it undertake to continue to comply with this Power of Attorney.

I will acknowledge and assume the corresponding liabilities from any legal consequence arising out of the exercise of the entrusted rights above by the Agent(s). I hereby confirm that, under any circumstance, the Agent(s) shall not be required to assume any liability or make any economic compensation regarding the exercise of the entrusted rights above. I agree to indemnify the WFOE for all the losses it suffers or may suffer because of the designation of the Agent(s) to exercise the entrusted rights and hold the WFOE harmless, including but not limited to any loss arising out of any litigation, recovery, arbitration or claim of damages brought by any third party against the WFOE, or any administrative investigation or penalty.

I will provide sufficient assistance for the Agent(s) to exercise the entrusted rights above, and cause the Company to provide sufficient assistance, including prompt execution of the resolutions of shareholders' meetings made by the Agent(s) or any other relevant legal documents and granting the Agent(s) the access to various relevant information about the Company's operation, business, clients, finance and employees, etc. and enabling the Agent(s) to consult the Company's relevant documents, when necessary (for example, to meet the requirements by governmental authorities for review and approval, registration and filing).

In the event that the grant or exercise of the entrusted rights above become impossible for any reason (except for my breach of the provisions of this Power of Attorney) at any time during the term of this Power of Attorney, all the parties shall immediately seek for the alternative solution closest to the unrealizable provision, and when necessary, execute supplemental agreements and amend or adjust the provisions of this Power of Attorney, to ensure the continuance of realization of the purpose of this Power of Attorney.

This Power of Attorney becomes effective upon execution. Upon execution, this Power of Attorney shall replace any undertaking, memorandum of understanding, agreement or any other document (if applicable) previously made regarding the subject matter of this Power of Attorney, and shall remain effective during the term of the Agreement on Exclusive Management Consulting and Business Cooperation entered into by the WFOE, the Company, me and other relevant party.

2

GONG Yu ( 龚宇 )

Signature:   /s/ GONG Yu

Date:         July 27th, 2017

3

**Exhibit 10.36**

**Spousal Consent Letter**

I, LIN Congyu ( 林蔥郁 ) (ID Card No.: ***), spouse of YANG Xianghua ( 杨向华 ) (ID Card No.: ***), hereby issue this consent letter unconditionally and irrevocably with respect to the shares held by YANG Xianghua in Beijing iQIYI Cinema Management Co., Ltd. (the "Cinema Company") as follows:

I understand that:

(1)    All the shares held by YANG Xianghua in the Cinema Company shall be disposed of according to the Exclusive Share Purchase Agreement entered into by and between Yang Xianghua and Beijing iQIYI New Media Science and Technology Co., Ltd. ("WFOE") on July 27, 2017, and the shares are under control by WFOE and/or its subsidiaries through a series of agreements;

(2)    Yang Xianghua and WFOE executed the Loan Agreement on July 27, 2017, the entire loan WFOE provides to YANG Xianghua pursuant to the Loan Agreement will be used by YANG Xianghua to pay for the amount of contribution;

(3)    All the shares Yang Xianghua holds in the Cinema Company will be disposed of pursuant to the Share Pledge Agreement executed by Yang Xianghua, WFOE and the Cinema Company on July 27, 2017;

(4)    All the shares Yang Xianghua holds in the Cinema Company will be disposed of pursuant to the Exclusive Management Consulting and Business Cooperation Agreement executed by Yang Xianghua, WFOE and the Cinema Company on July 27, 2017;

(5)    All the shares Yang Xianghua holds in the Cinema Company will be disposed of pursuant to the Power of Attorney issued by Yang Xianghua to WFOE on July 27, 2017.

I confirm that I know and agree with Yang Xianghua's execution of the abovementioned Exclusive Share Purchase Agreement, Loan Agreement, Share Pledge Agreement, Exclusive Management Consulting and Business Cooperation Agreement, and Power of Attorney (collectively referred to as "Transaction Documents" hereinafter), and his disposal of the relevant shares in the Cinema Company pursuant to the provisions of the Transaction Documents. I will not, at any time, take conduct any act to interfere with the disposal of the abovementioned shares or claim any right or interest over them, including but not limited to claiming that the abovementioned shares in the Cinema Company belong to the matrimonial community property jointly owned by me and YANG Xianghua. I further confirm that, my separate authorization and consent are not needed for YANG Xianghua's performance of the abovementioned Transaction Documents and further amendment or termination of any of the Transaction Documents.

I undertake to execute all the necessary documents, and conduct all the necessary acts, to ensure the proper performance of the Transaction Documents (as amended from time to time).

I hereby further acknowledge, confirm and unconditionally and irrevocably agree that, if the marital relation between YANG Xianghua and me is dissolved, then (1) to the extent permitted by applicable laws, the shares Yang Xianghua holds in the Cinema Company is personal property of exclusive nature and such property shall not be determined as the matrimonial community property and shall not be divided; (2) in the event that the first provision of this paragraph contravenes applicable laws and I acquire any of the abovementioned shares ("**Spousal Interests**") in the form of matrimonial community property or other matrimonial property rights, YANG Xianghua shall be entitled to purchase from me the shares in whole or in part ("**Special Option**"). A written notice shall be delivered to me when exercising the Special Option ("**Exercise Notice**"). The Exercise Notice shall state the fair value of the Spousal Interests to be purchased. If I object the fair value of the Spousal Interests stated in the Exercise Notice, I shall inform YANG Xianghua in writing on the same date I receive the Exercise Notice. In the case I send a written notice, the fair value of such Spousal Interests shall be determined by a qualified appraiser jointly selected by YANG Xianghua and me. In the event that YANG Xianghua and I fail to reach an agreement on selection of the appraiser within ten (10) days after the execution date of the Exercise Notice, the two parties shall each select a qualified appraiser and the two appraisers shall a qualified third-party appraiser to determine the final fair value. The costs of the appraisers shall be borne by me. The closing shall occur on the tenth (10th) day after the appraisal completes.

I agree and undertake that, in the event I acquire any share in the Cinema Company for whatever reason (including reasons such as that YANG Xianghua does not exercise the Special Option), I shall be subject to the restrictions by the Transaction Documents (as amended from time to time) and shall comply with the obligations of a shareholder of the Cinema Company under the Transaction Documents (as amended from time to time). For this purpose, once WFOE requests, I will execute a series of documents of which the formats and contents are fundamentally the same as the Transaction Documents (as amended from time to time).

I further agree and undertake that, I will not in any circumstance conduct any act, bring any claim or initiate any litigation for any purpose in conflict with the arrangements above, whether directly or indirectly, and whether actively or passively.

This Spousal Consent Letter is governed by and interpreted according to the laws of PRC, and the principles in conflicts of laws shall not be considered. I hereby agree to keep confidential the existence and content of this Spousal Content Letter. I acknowledge that I have been advised to engage an independent consultant for preparation of this Spousal Consent Letter and have expressly rejected that advice.

Signature: _____   /s/ Lin Congyu

July 27th, 2017

2

**Exhibit 10.37**

**Spousal Consent Letter**

I, MOU Yihong ( 牟一红 ) (ID Card No.:***), spouse of GONG Yu( 龚宇 ) (ID Card No.: ***), hereby issue this consent letter unconditionally and irrevocably with respect to the shares held by GONG Yu in Beijing iQIYI Cinema Management Co., Ltd. (the "**Cinema Company**") as follows:

I understand that:

(1)   All the shares held by GONG Yu in the Cinema Company shall be disposed of according to the Exclusive Share Purchase Agreement entered into by and between GONG Yu and Beijing iQIYI New Media Science and Technology Co., Ltd. ("**WFOE**") on July 27, 2017, and the shares are under control by WFOE and/or its subsidiaries through a series of agreements;

(2)   GONG Yu and WFOE executed the Loan Agreement on July 27, 2017, the entire loan WFOE provides to GONG Yu pursuant to the Loan Agreement will be used by GONG Yu to pay for the amount of contribution;

(3)   All the shares GONG Yu holds in the Cinema Company will be disposed of pursuant to the Share Pledge Agreement executed by GONG Yu, WFOE and the Cinema Company on July 27, 2017;

(4)   All the shares GONG Yu holds in the Cinema Company will be disposed of pursuant to the Exclusive Management Consulting and Business Cooperation Agreement executed by GONG Yu, WFOE and the Cinema Company on July 27, 2017;

(5)   All the shares GONG Yu holds in the Cinema Company will be disposed of pursuant to the Power of Attorney issued by GONG Yu to WFOE on July 27, 2017.

I confirm that I know and agree with GONG Yu's execution of the abovementioned Exclusive Share Purchase Agreement, Loan Agreement, Share Pledge Agreement, Exclusive Management Consulting and Business Cooperation Agreement, and Power of Attorney (collectively referred to as "**Transaction Documents**" hereinafter), and his disposal of the relevant shares in the Cinema Company pursuant to the provisions of the Transaction Documents. I will not, at any time, take conduct any act to interfere with the disposal of the abovementioned shares or claim any right or interest over them, including but not limited to claiming that the abovementioned shares in the Cinema Company belong to the matrimonial community property jointly owned by me and GONG Yu. I further confirm that, my separate authorization and consent are not needed for GONG Yu's performance of the abovementioned Transaction Documents and further amendment or termination of any of the Transaction Documents.

I undertake to execute all the necessary documents, and conduct all the necessary acts, to ensure the proper performance of the Transaction Documents (as amended from time to time).

I hereby further acknowledge, confirm and unconditionally and irrevocably agree that, if the marital relation between GONG Yu and me is dissolved, then (1) to the extent permitted by applicable laws, the shares GONG Yu holds in the Cinema Company is personal property of exclusive nature and such property shall not be determined as the matrimonial community property and shall not be divided; (2) in the event that the first provision of this paragraph contravenes applicable laws and I acquire any of the abovementioned shares ("**Spousal Interests**") in the form of matrimonial community property or other matrimonial property rights, GONG Yu shall be entitled to purchase from me the shares in whole or in part ("**Special Option**"). A written notice shall be delivered to me when exercising the Special Option ("**Exercise Notice**"). The Exercise Notice shall state the fair value of the Spousal Interests to be purchased. If I object the fair value of the Spousal Interests stated in the Exercise Notice, I shall inform GONG Yu in writing on the same date I receive the Exercise Notice. In the case I send a written notice, the fair value of such Spousal Interests shall be determined by a qualified appraiser jointly selected by GONG Yu and me. In the event that GONG Yu and I fail to reach an agreement on selection of the appraiser within ten (10) days after the execution date of the Exercise Notice, the two parties shall each select a qualified appraiser and the two appraisers shall a qualified third-party appraiser to determine the final fair value. The costs of the appraisers shall be borne by me. The closing shall occur on the tenth (10th) day after the appraisal completes.

I agree and undertake that, in the event I acquire any share in the Cinema Company for whatever reason (including reasons such as that GONG Yu does not exercise the Special Option), I shall be subject to the restrictions by the Transaction Documents (as amended from time to time) and shall comply with the obligations of a shareholder of the Cinema Company under the Transaction Documents (as amended from time to time). For this purpose, once WFOE requests, I will execute a series of documents of which the formats and contents are fundamentally the same as the Transaction Documents (as amended from time to time).

I further agree and undertake that, I will not in any circumstance conduct any act, bring any claim or initiate any litigation for any purpose in conflict with the arrangements above, whether directly or indirectly, and whether actively or passively.

This Spousal Consent Letter is governed by and interpreted according to the laws of PRC, and the principles in conflicts of laws shall not be considered. I hereby agree to keep confidential the existence and content of this Spousal Content Letter. I acknowledge that I have been advised to engage an independent consultant for preparation of this Spousal Consent Letter and have expressly rejected that advice.

Signature: _____ /s/ MOU Yihong

July 27th, 2017

2

Exhibit 10.38

**Power of Attorney**

Pursuant to the Power of Attorney ("**POA**") entered into by GONG Yu ( 龚宇 ) and YANG Xianghua ( 杨向华 ) on July 27, 2017, Our Company, i.e. Beijing iQIYI New Media Science and Technology Co., Ltd., enjoys all the shareholder voting rights at shareholders' meetings of Beijing iQIYI Cinema Management Co., Ltd. according to the law and the articles of association ("**Target Company Voting Rights**").

With respect to the Target Company Voting Rights, Our Company hereby irrevocably authorizes Qiyi.com, Inc. ("**Qiyi Cayman**") or any company or individual it designated within the extent permitted by the law to exercise the Target Company Voting Rights during the term of this Power of Attorney. Qiyi Cayman may delegate such voting rights to any third party it designates, without any requirement of prior written notice to Our Company.

This Power of Attorney shall become effective from July 27, 2017 and expires when the Voting Right Entrustment Agreement terminates. During the term hereof, Our Company hereby waives all the rights granted to Qiyi.com, Inc. according hereto, and will no longer exercise such rights on ourselves. This Power of Attorney is irrevocable, and may be amended by Qiyi Cayman unilaterally.

<div align="right">

Beijing iQIYI New Media Science and Technology Co., Ltd.

[*Company seal is affixed*]
/s/ Beijing iQIYI New Media Science and Technology Co., Ltd.

July 27, 2017

</div>

**Exhibit 10.39**

**Commitment Letter**

To: Beijing iQIYI Cinema Management Co., Ltd.

To ensure your normal operation and to faciliate the development of your business, Qiyi.com, Inc. ("**Qiyi Cayman**") hereby undertakes as follows:

If you incur any loss before the issuance of this undertaking letter, in case that Qiyi Cayman holds 100% equity interests in Beijing iQIYI New Media Science and Technology Co., Ltd. ("**iQIYI New Media Tech**"), Qiyi Cayman undertakes to provide financial aid free of charge to you to the extent permitted by law through Beijing iQIYI New Media Tech. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. You are not required to repay the financial aid provided by Qiyi Cayman through Beijing iQIYI New Media Tech according to this letter.

If you suffer any loss in any year after the issuance of this letter, in case that Qiyi Cayman holds 100% equity interests in Beijing iQIYI New Media Tech, Qiyi Cayman will provide financial aid free of charge to you to the extent permitted by law through Beijing iQIYI New Media Tech in the next year. The amount of such financial aid shall not be less than your loss, so that your operation will not be affected by such financial loss. You are not required to repay the financial aid provided by Qiyi Cayman through Beijing iQIYI New Media Tech according to this letter.

The abovementioned undertakings are conditioned on that: the Exclusive Consulting and Business Cooperation Agreement, the Exclusive Share Purchase Agreement, the Loan Agreement, the Share Pledge Agreement and the Power of Attorney entered into by and between you, your shareholders and relevant entities on July 27, 2017 and any amendments to the above documents with consents of the signing parties all remain effective.

For and on behalf of

Qiyi.com, Inc.

/s/ GONG Yu

July 27th, 2017

**Exhibit 10.40**

**Exclusive Management Consulting and Business
Cooperation Agreement**

This exclusive management consulting and business cooperation agreement (this "**Agreement**") is made by the following parties in the People's Republic of China ("**China**") on August 30, 2017:

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B: iQIYI Pictures (Beijing) Co., Ltd.

Party C:
Party C1: GONG Yu ( 龚宇 ), with the ID Card No. ***;
Party C2: YA Ning ( 亚宁 ), with the ID Card No. ***;

Each of Party A, Party B and Party C are individually referred to as a "**Party**", and collectively as the "**Parties**".

Whereas,

(1) Party A is a wholly foreign owned enterprise duly established and validly existing according to the laws of China, whose principal business is computer hardware and software technology development, technology consulting, technology services, technology transfer and computer systems services, etc. and who owns the resources necessary for providing services of system software technical support, and technology and enterprise management consulting services;

(2) Party B is a limited liability company duly incorporated and validly existing according to the laws of China, whose principal business is movie making and publication, and/or through Party B's Subordinate Entities, conducting movie making, publication and other businesses;

(3) GONG Yu( 龚宇 ) and YA Ning ( 亚宁 ) are shareholders of Party B, and hold 50% and 50% equity in Party B respectively and 100% equity in Party B in aggregate;

(4) Party A agrees to use its advantage of technology, personnel and information to provide enterprise management consulting, licensing, technology and business support to Party B and its Subordinate Entities (refers to entities invested in and controlled by Party B, including but not limited to companies and relevant entities of which 50% or more of the shares are owned by Party B directly or indirectly) on an exclusive basis. The Parties agree to the above cooperation and desire to execute this Agreement to specify the main terms and conditions of cooperation.

Therefore, the Parties reach the following agreement upon consensus through negotiation:

**1.    Provision of Services**

    1.1    According to the terms and conditions hereof, Party B and Party C hereby entrust Party A to provide, as the exclusive service provider of Party B during the term of this Agreement, Party B and Party B's Subordinate Entities with comprehensive enterprise management consulting, IP licensing, technology support and business support, as detailed in <u>Schedule 1</u> hereto.

Party B shall and shall procure its Subordinate Entities to determine the services with Party A or any entity designated by Party A within the business scope set forth in Schedule 1 based on its business needs.

1.2     Party B (also representing Party B's Subordinate Entities, the same applies below) and Party C further agree that except with prior written consent of Party A, during the term hereof, Party B, Party B's Subordinate Entities and Party C shall not, and shall procure their relevant entities not to, directly or indirectly obtain any service same as or similar to the services and supports set forth herein from any third party, or establish any similar cooperation relation with any third party with respect to the subject matter hereof.

1.3     Notwithstanding any other provisions hereof, Party A has the right to designate any third party to provide any or all services hereof, or perform any obligation hereunder for Party A. Party B and its Subordinate Entities hereby agree that Party A has the right to assign its rights and obligations hereunder to any third party.

1.4     To ensure normal operation of the daily business of Party B and its Subordinate Entities, Party A may (but not obligated to), on its own judgment and as permitted by laws and regulations of China, act as a securing party or guarantor under any other contracts or agreements entered into by Party B and its Subordinate Entities with any third party relating to their business, and provide security for performance of such contracts and agreements. Party B and its Subordinate Entities and Party C hereby agree and acknowledge that if any security is required for the performance by Party B and its Subordinate Entities of any contract or loan in the business course, they shall first request Party A to act as the securing party and/or guarantor.

**2.     Service Price and Payment Method**

2.1     Based on the content and recipient of the services, relevant Parties shall negotiate fair service price and appropriate payment method by reference to the revenue of the service recipient in a specified period. The specific calculation and payment methods of service price are set forth in Schedule 2.

2.2     If Party A believes that the mechanism to determine the service price specified herein cannot be applied and requires adjustment for certain reason, Party A has the right to adjust the calculation and payment method of Schedule 2 at any time. The adjustment of Party A shall be bona fide and reasonable; such adjustment shall take effect upon the written notification from Party A to Party B without the consent of Party B.

2

**3.    Intellectual Property Rights**

3.1    The intellectual property rights in any results obtained from performance of this Agreement, including but not limited to copyrights, patents and claims of patent application, know-how, and business secrets, shall be owned by Party A. Party B or its Subordinate Entities or Party C may not enjoy any other rights than those specified herein, except under Party A's licensing, and shall actively cooperate with Party A to take all necessary measures to ensure Party A or Party A's oversea affiliates to obtain such intellectual property rights. The Parties agree that this Article 3.1 shall survive the modification, rescission or termination of this Agreement. For the avoidance of any doubt, in respect of the intellectual property rights held by Party B or its Subordinate Entities and in application by Party B or its Subordinate Entities to relevant authorities as of execution date hereof, other than those required for normal operation of business of Party B or its Subordinate Entities upon Party A's confirmation or required by relevant domestic laws and regulations to be held by Party B and its Subordinate Entities, the holders or applicants shall transfer such intellectual property rights to Party A or its oversea affiliates at the request of Party A, and Party B or its Subordinate Entities shall enter into relevant intellectual property rights transfer agreement with Party A or its oversea affiliates.

3.2    If any development is made by Party A based on any intellectual property rights owned by Party B or its Subordinate Entities, Party B or its Subordinate Entities shall warrant that such intellectual property rights are free of any defect, and, if any loss is caused to Party A from any defect in such intellectual property rights, shall compensate for such loss. If Party A is therefore liable to compensation to any third party, Party A, after making such compensation, has the right to recover such loss against Party B and/or its Subordinate Entities.

**4.    Control and Management by Party A over Party B and Its Affiliated Entities**

4.1    In connection with the provisions of Article 1 hereof, to specify the rights and obligations of the Parties and guarantee Party A's performance of the management consulting services to Party B and its Subordinate Entities, and to guarantee performance of various business service agreements between Party A and Party B or its Subordinate Entities and payment of various amounts owed by Party B or its Subordinate Entities to Party A, Party B, its Subordinate Entities and Party C hereby agree that Party B and its Subordinate Entities shall not, without Party A's prior written consent, carry out any transaction that may materially affect their respective assets, obligations, rights or operation, including but not limited to:

3

(1) any activity outside of their normal business scopes, or any business inconsistent with the past practice and way of operation;

(2) change or dismissal of any directors, or removal of any officers;

(3) borrowing from or assuming debts to any third party;

(4) selling, acquiring or otherwise disposing of any asset or right in an amount more than RMB 100,000 to or from any third party, including but not limited to any intellectual property rights and any business contracts;

(5) providing security or guarantee in favor of any third party, including any security created over their assets or interests;

(6) increasing or decreasing the registered capitals, amending the articles of association or changing the business scopes;

(7) changing the normal business procedures, or amending any major internal rule and regulation;

(8) material adjustment to its business operation mode, marketing strategy, operation policy or customer relations;

(9) distribution of dividends or profits in whatever forms;

(10) liquidating and distributing the residual assets;

(11) assigning any rights or obligations hereunder to any third party;

(12) actions and / or omissions that have a material adverse effect on the assets, business, responsibilities and financial position of Party C, including but not limited to the creation of a mortgage, pledge or other encumbrance on any of Party C's assets, businesses, income or income interests.

Further, when any circumstance occurs which has or may have material adverse effect upon the business, operation or production of Party B and/or Party B's Subordinate Entities, Party B and Party C shall promptly notify Party A thereof and use their best efforts to prevent occurrence of and/or mitigate the loss of such circumstances.

4.2 To guarantee performance of various management consulting services between Party A and Party B or its Subordinate Entities, and payment of various amounts owed by Party B and its Subordinate Entities to Party A,

(1) Party B and its Subordinate Entities and Party C hereby agree to accept any advice or requirement made by Party A to Party B and its Subordinate Entities with respect to employment and dismissal of employees, daily operation and management and financial management system, and shall strictly comply with and implement such advice or requirement;

(2) Party B and its affiliates and Party C hereby agree that they shall elect the persons designated by Party A as directors of Party B and its Subordinate Entities according to laws, regulations and articles of association, and procure such elected directors to elect the persons recommended by Party A as the chairmen of the boards of directors, and appoint the persons designated by Party A as the general managers, financial controllers, and other officers (including but not limited to the heads of various businesses, the financial managers, the financial and supervisory personnel and

4

the accounting personnel). Party A shall bona fide recommend qualified persons pursuant to applicable laws to Party B and its Subordinate Entities. If the above officers recommended by Party A resign from Party A or its shareholders (whether direct or indirect) (as applicable), whether voluntarily or dismissed by Party A, they shall lose the qualification to take any office in Party B and its Subordinate Entities. In such case, Party B and its Subordinate Entities shall appoint other officers employed by Party A or its shareholders (whether direct or indirect) (as applicable), to take such office. Party C and Party B and its Subordinate Entities shall take all necessary internal and external procedures to complete the above termination and appointment according to laws, articles of association and this Agreement.

(3)     Party A has the right to inspect the accounts of Party B and its Subordinate Entities periodically and at any time. Party B and its Subordinate Entities shall keep accounts promptly and accurately, and provide the accounts at the request of Party A. During the term hereof, subject to any applicable laws, Party B and its Subordinate Entities agree to cooperate with any audit (including but not limited to related transaction audit and other audits) carried out by Party A and its (whether indirect or indirect) shareholders, and provide Party A, Party A's shareholders and/or the auditor entrusted by Party A with relevant information and documents relating to the operations, businesses, clients, finance and employees of Party B and its Subordinate Entities, and agree that Party A's shareholders may disclose such information and documents to meet any requirement of the securities regulation of the jurisdiction where the listing occurs.

(4)     Party B and its Subordinate Entities and Party C hereby agree that once Party A requests in writing, they shall use all of their accounts receivable and/or other assets they legally own and may dispose of to secure payment of the service fees set forth in Article 2.1 hereof in any way permitted by laws then in effect.

4.3     Party B and its Subordinate Entities and Party C hereby agree that Party B and its Subordinate Entities shall maintain all the business licenses required for their operation during the term hereof, and the rights and qualifications required for its conducting of the business it operates now in China.

4.4     Party B and its Subordinate Entities may not carry out any contracting operation, lease operation, merger, division, association, shareholding reform or other change of operation method and arrangement of ownership structure, or dispose of all or substantial part of assets or interests of Party B or its Subordinate Entities by transfer, sale, conversion into equity in others, or other means, without prior written consent of Party A.

5

4.5    When Party B or its Subordinate Entities become liquidated or dissolved for any reason, Party C, Party B and its Subordinate Entities shall appoint the persons recommended by Party A to constitute the liquidation group to the extent permitted by the laws of China to manage the properties of Party B and its Subordinate Entities. Party C and Party B acknowledge that when Party B or its Subordinate Entities become liquidated or dissolved, whether or not the provision above in this Article 4.5 is performed, Party C and Party B agree to deliver all residue properties obtained from liquidation of Party B or its Subordinate Entities to Party A, pursuant to the laws and regulations of China.

4.6    Party C hereby agrees to issue Party A the Power of Attorney in the substance and form satisfactory to Party A on the execution date of this Agreement, and to fully, properly and completely perform the provisions of such Power of Attorney, including but not limited to unconditionally and irrevocably authorizing Party A or any person designated by Party A ("**Agent**") according to the Power of Attorney to exercise the shareholder's rights of Party B and its Subordinate Entities on behalf of Party C in its sole discretion. Any resolution or document requiring Party B's signature as a shareholder due to industrial and commerce registration, etc. shall be signed only with Party A's consent and authorization and following Party A's instruction.

4.7    Party C acknowledges that it has had full and clear understanding of the obligations of Party B and its Subordinate Entities hereunder when it enters into this Agreement, and agrees to pledge the 100% shares in Party B it owns with Party A to secure performance of obligations of Party B and its Subordinate Entities hereunder. The Parties shall enter into agreement separately with respect to the equity pledge.

4.8    Party B and its Subordinate Entities and Party C hereby agree that without Party A's written consent they shall not enter into any agreement or arrangement that conflict with this Agreement or may infringe Party A's interests hereunder.

5. **Term**

5.1    This Agreement is executed and effective on the date first written above.

5.2    Unless the Parties agree to terminate this Agreement early, this Agreement shall remain effective during the business terms (including extended terms) of Party A, Party B and Party B's Subordinate Entities (including successors of their respective rights and obligations). In the event that the business terms (including extended terms) of Party B or any of Party B's Subordinate Entities expires before Party A's business term expires, the legal effects of this Agreement on Party B and its other Subordinate Entities shall not be affected.

6

**6.    Confidentiality**

6.1    All provisions of this Agreement and this Agreement itself are confidential information, and the Parties shall not disclosed them to any third party other than any officers, directors, employees, agents or professional consultants relating to this project who assume the obligation of confidentiality to the disclosing Party, except that the Parties disclose any information relating to this Agreement to any government, the public or the shareholders as required by law, or file this Agreement to any authority for recording.

6.2    This Article 6 shall survive the modification, termination or rescission of this Agreement.

**7.    Breaching Liabilities**

If any Party fails to perform any obligation hereunder, or if such Party's representation or warranty hereunder is untrue or inaccurate, such Party breaches this Agreement, and shall compensate for all losses of the other Parties or pay liquidated damages to the other Parties according to the agreement otherwise reached by relevant Parties.

**8.    Force Majeure**

If the performance of this Agreement is affected by any force majeure event, the affected Party shall immediately notify the other Parties by telegraph, fax or other electronic means, and provide written proof of the force majeure within fifteen (15) working days. The parties shall decide whether to rescind this Agreement, exempt performance of this Agreement in part, or delay the performance of this Agreement, depending on the effect of the force majeure event on the performance.

**9.    Addition and Change of the Parties**

9.1    Party B's Subordinate Entities. At the same time as or before executing this agreement, Party B and Party C shall procure Party B's Subordinate Entities to sign any letter of assumption of rights and obligations or other legal documents permitted or required by any other law of China to make the Party B's Subordinate Entities acknowledge this Agreement, and fully assume the obligations on Party B's Subordinated Entities hereunder, and the Party B's such Subordinate Entities shall be deemed parties to this Agreement. The other Parties hereby agree to fully accept the above arrangement.

9.2    Addition of Party B's Subordinate Entities. If Party B comes to have any new affiliated entity at any time after this Agreement becomes effective, Party B and Party C shall procure such new affiliated entity to immediately sign any letter of assumption of rights and obligations or other legal documents permitted or required by any other laws of China to make the new affiliated entity acknowledge this Agreement, and fully assume the obligations on Party B's Subordinated Entities hereunder. From execution of such letter of assumption and other legal documents, the new affiliated entity shall be deemed a party to this Agreement. The other Parties hereby agree to fully accept the above arrangement.

7

9.3    Without Party A's prior written consent, Party B and Party B's Subordinate Entities shall not assign their rights and obligations under this Agreement to any third party. In addition, Party B agrees that, after Party A's notifying Party B in writing in advance, Party A may, at necessary times, assign its rights and obligations under this Agreement to its bona fide selected third party, and need not obtain Party B's consent in respect of such transfer.

9.4    The rights and obligations hereunder shall have binding force upon the Parties' assignees of rights and obligations and successors (regardless whether such assignments of rights and obligations are caused by acquisition, reorganization, succession, assignment or other reasons).

**10.  Miscellaneous**

10.1    This Agreement is governed by the laws of China. Any dispute arising from the performance hereof shall be resolved by the Parties through amicable negotiation. If negotiation fails, the dispute shall be submitted to China International Economic and Trade Arbitration Commission for arbitration according to the arbitration rules of the Commission then in effect. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon the Parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of China, the arbitrator or arbitrators may issue injunction orders over the shares, interests or assets of Party B and Party B's Subordinate Entities (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party B and Party B's Subordinate Entities through arbitration. The Parties agree that, subject to the laws of China, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party B, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding. This Article 10.1 shall survive the modification, rescission or termination of this Agreement.

8

10.2 The Parties acknowledge that this Agreement shall be enforced to the extent permitted by law. If any provision hereof or if any part of any provision is decided by any competent authority or court to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect other provisions hereof or other parts of the provision. Such other provisions or other parts of the provision shall remain completely effective. The Parties shall use their best efforts to amend such illegal, invalid or unenforceable provisions to effect the purpose of the original provisions.

10.4 The schedules hereto constitute an integral part hereof, and have the same legal force as other parts of this Agreement.

10.5 This Agreement is made in Chinese. The copies of this Agreement shall be corresponding to the number of the Parties hereto. Each of the signatories holds one copy and each has the same legal effect.

9

(signature page for the Exclusive Management Consulting and Business Cooperation Agreement)

**Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.(seal)**

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: /s/ Authorized Signatory

**Party B: iQIYI Pictures (Beijing) Co., Ltd. (seal)**

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: /s/ Authorized Signatory

10

(signature page for the Exclusive Management Consulting and Business Cooperation Agreement)

Party C:

Party C1: GONG Yu ( 龚宇 )

Signature: /s/ GONG Yu

Party C2: YA Ning ( 亚宁 )

Signature: /s/ YA Ning

11

**Schedule 1 Service Contents**

1.   Providing advice and suggestion on assets and business operation;
2.   Providing advice and suggestion on disposal of creditor's rights and debts;
3.   Providing advice and suggestion on negotiation, execution and performance of material contracts;
4.   Providing advice and suggestion on merger and acquisition;
5.   Providing services on software development and research;
6.   Providing pre-job and in-service management training;
7.   Providing the services of technology development, technology transfer and technology consulting;
8.   Providing public relation services;
9.   Providing market survey, research and consulting services;
10.  Providing short-and-medium-term market development and market planning services;
11.  Providing human resources management and internal information management services;
12.  Providing the service of development, upgrade and daily maintenance of website;
13.  Providing the service of sale of self-made products;
14.  License of software, trademark, domain, know-how and other intellectual property rights; and/or
15.  Other services negotiated and specified by Party A and the service recipient based on the business needs and the capability of providing services.

12

**Schedule2 Calculation and Payment Methods of Service Fees**

1. The amount of service fee shall be determined by Party A according to the actual conditions of the service provided, and by service fee bills to the service recipients, expense details or other ways in writing. The service recipients shall pay according to the service fee amount notified by Party A.

2. Party A shall summarize the service fees regularly (the specified period to be determined by Party A) and send service fee bills to the recipients on a regular basis and notify the recipients. The service recipients shall pay such service fee to the bank account designated by Party A according to the time and amount required by Party A.

13

**Exhibit 10.41**

# Exclusive Share Purchase Agreement

This Exclusive Share Purchase Agreement (this "**Agreement**") is signed by the following parties on August 30, 2017:

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B:

Party B1: GONG Yu ( 龚宇 )
ID No.: ***

Party B2: YA Ning ( 亚宁 )
ID No.: ***

Party C: iQIYI Pictures (Beijing) Co., Ltd.

The parties above, upon friendly negotiation, with respect to the matter that Party A or any third party designated by Party A purchase the shareholdings held by Party B in Party C, reach an agreement as follows, for the parties to observe:

## 1. Exclusive Share Option

1.1   From the execution date of this Agreement, Party A has the right to demand Party B (subject to the specific requirements imposed by Party A) to transfer all or part of the 100% shares in Party C held by Party B (hereinafter referred to as the "**Target Shares**") at any time under the following circumstances. Party B shall transfer the Target Shares to Party A or any third party designated by Party A according to Party A's requirements:

(1)   The laws and regulations of PRC permit Party A or a third party designated by Party A to hold all or part of the Target Shares; or

(2)   Other circumstances which are permitted by Chinese laws and regulations and are deemed by Party A as appropriate or necessary.

The share option obtained by Party A hereunder is exclusive, unconditional and irrevocable.

1.2   All the parties agree that, subject to the terms and conditions herein, and provided that laws of PRC are not violated, Party A shall have the right, at its own discretion, to exercise the entire or part of the exclusive share option, and obtain all or part of the Target Shares. All the parties further agree that the time, manner, amount and frequency of Party A's exercise of the exclusive share option shall not be subject to any limitation.

1.3   All parties agree that, subject to the terms and conditions herein, and provided that laws of PRC are not violated, Party A may designate any third party to be transferred all or part of the Target Shares. Except in the circumstances expressly prohibited by laws of PRC, Party B shall not refuse to transfer all or part of the Target Shares to such designated third party.

1.4    Prior to the transfer of all the Target Shares to Party A or the third party designated by Party A in accordance with the provisions of this Agreement, i.e. prior to the time that Party B no longer holds any share in Party C, without prior written consent of Party A, Party B shall not transfer the Target Shares to any third party, and shall not pledge the Target Shares with any third party or create any encumbrance thereupon, except under the Share Pledge Agreement otherwise entered into by Party A and Party C.

1.5    Party B agrees that, as a shareholder of Party C, prior to transfer of the Target Shares in Party C owned by Party B to Party A, in the events that Party B receives dividend, bonus or residue asset, provided that relevant laws and regulations of PRC are complied with and after the taxes and expenses required by relevant laws and regulations are paid, Party B shall deliver all the proceeds to Party A or the third party designated by Party A immediately upon obtaining such proceeds.

## 2. Procedure

2.1    In the event that Party A decides to exercise the exclusive share option pursuant to the provision of the Article 1.1 above, Party A shall send to Party B a written notice (see Schedule III of this Agreement for the format), and shall state in the notice the proportion or amount, and the name of identity of the transferee. Party B and Party C shall provide all the necessary materials and documents for the share transfer within seven (7) days from the date of notice by Party A, including the Share Transfer Contract and the Letter of Consent executed in the format prescribed by the appendixes to this Agreement.

2.2    Except the notice provided in the Article 2.1 above herein, no other condition exists prerequisite or incidental to the exercise by Party A to purchase the Target Shares.

2.3    Party B shall provide Party C necessary and timely cooperation to assist Party C in completing the review and approval procedures at the review and approval authorities (as required by law) and completing share transfer procedures at the industrial and commerce administrative bureaus.

2.4    The date on which the transfer formalities of the entire 100% shares in Party C are completed in accordance with this Exclusive Share Purchase Agreement shall be the date on which the exercise of the exclusive share option is completed.

## 3. Transfer Price

3.1    All parties confirm that, subject to compliance with the laws and regulations of PRC, the Target Shares shall be transferred for free or at the lowest price permitted by the laws and regulations of PRC. If the Target Shares are transferred in installments, the correspondence transfer prices and amounts shall be determined according to the specific transfer time and the proportion of the Target Shares transferred.

3.2    The parties shall assume, pursuant to law, their respective portions of the taxes and expenses arising from the transfer of the Target Shares.

2

3.3     In the event that the Target Shares are not transferred for free, Party B agrees that, when Party A or the third party designated by Party A exercises the exclusive share option, subject to laws and regulations of PRC, Party B shall refund all the proceeds it therefore received to Party A or the third party designated by Party A, for repayment of the loan principal, interest, or capital occupation expenses which Party A provides to Party B.

**4. Warranties and Undertakings**

4.1     Each party hereby represents and warrants to the other parties as follows:

    (1)     The party has all the necessary rights, capabilities and authorizations to execute this Agreement and perform all the duties and obligation under this Agreement;

    (2)     The party has passed all the necessary internal procedures for executing this Agreement, and has obtained all the necessary internal and external authorizations and approvals; and

    (3)     The execution and performance of this Agreement do not breach any material contract or agreement which binds such party or restricts its assets.

4.2     Party B and Party C further jointly and severally represent, warrant and undertake to Party A as follows:

    (1)     On the date this Agreement becomes effective, both GONG Yu ( 龚宇 ) and YA Ning ( 亚宁 ) are Chinese citizens, legally hold all the shares in Party C, and have complete and valid disposition rights over such shares. Party C's registered capital has been fully paid. Except the pledge created in accordance with the Share Pledge Agreement executed by all the parties and other rights Party A agrees to in writing, no mortgage, pledge, guarantee or other third party rights have been created upon the shares in Party C owned by Party B, and such shares are free from recourse by third parties; No third party shall have the rights to demand allotment, issuance, sale, transfer or conversion of any share in Party C pursuant to any option, conversion option, preemptive right or other agreement.

    (2)     During the term of this Agreement, except according to the pledge created in accordance with the Share Pledge Agreement executed by all the parties, without prior written consent by Party A, Party B shall not transfer, sell, assign as gift or dispose by other ways any share in Party C to any third party, or create any mortgage, pledge or security interest in other forms or other third party right thereupon, and warrant no recourse from the third parties.

    (3)     During the term of this Agreement, without prior written consent by Party A, Party B shall not cause Party C to merge or consolidate with any person, divide, dissolve, change the company form, or decrease the registered capital, or make any other act with material effect on the existence or existence status of Party C, and shall not change Party C's registered capital structure in other manner.

3

(4)    Subject to relevant laws and regulations of PRC, Party B and Party C shall, according to the term during which Party A is permitted to operate, extend Party C's business term at the appropriate time, and therefore make it equal to Party A's business term, or determine and adjust Party C's business term according to Party A's requirement and pursuant to the provisions of the laws of PRC.

(5)    During the term of this Agreement, Party B and Party C shall take their best endeavor to maintain and increase the value of Party C's assets, shall not carry out any act or omission which may have material adverse effect on Party B's assets and business. Except with the prior written consent by Party A, Party B and Party C shall not transfer or dispose in other manners Party C's assets terminate any material contract for which Party C is a party, or enter into any agreement which would affect Party C's assets and financial position.

(6)    In the event Party C is liquidated or dissolved for any reason out of Party B's control during the term of this Agreement, subject to the permission by the laws and regulations of PRC, Party B and Party C shall appoint persons recommended by Party A to form a liquidation team to manage Party C's assets. Party B confirms, in the event that Party C is liquidated or dissolved, whether the above provision of this Article 4(6) is performed or not, Party B agrees to deliver to Party A or the third party designated by Party A all the remaining assets Party B receives in the liquidation of Party C pursuant to laws and regulations of PRC.

(7)    All the parties understand and confirm that, with the occurrence of the circumstances provided by Article 1.1 herein as the premise, Party A's exercise of the exclusive share option hereunder may also be effected by the way that Party B and Party C transfer the 100% shares they then hold in Party C's subsidiaries to Party A or the third party designated by Party A, and Party B and Party C unconditionally cooperate in the execution of relevant legal documents by Party A or the third party designated by Party A, and completion of the relevant procedures for the change of shareholdings of Party C's subsidiaries.

**5. Appendixes**

The appendixes shall form an integral part of this Agreement and have the same legal force as the other parts of this Agreement.

**6. Confidentiality**

All provisions hereof and this Agreement itself are confidential information. Each party shall not disclose the confidential information to any third party other than the senior staff members, directors, employees, agents and professional consultants relating to this project who assume the obligation of confidentiality; except the circumstances that the parties, pursuant to the provisions of law, are required to disclose the information relevant to this document to governments, the public or shareholders or submit this document to relevant authorities for record.

4

This Article 6 shall survive the modification, termination or rescission of this Agreement.

## 7. Breaching Liabilities

In the event that one party fails to perform any obligation hereunder, or any representation or warranty of the Party hereunder is materially untrue or inaccurate, the party breaches this Agreement, and shall compensate for all losses of the other parties.

## 8. Force Majeure

An force majeure event refer to any event unforeseeable by anyone of the parties and the occurrence of such event is unavoidable, uncontrollable and insurmountable to such party at the execution date of this Agreement (including but not limited to earthquake, typhoon, flood, fire, strike, war or riot).

Where a force majeure event affects the performance of the Agreement, the party which encounters the force majeure shall immediately: (i) notify the other parties by way of telegraph, fax or other electronic means, and provide a written proof of the force majeure within fifteen (15) working days; (ii) take all reasonable and possible measures to eliminate or mitigate the impact of the force majeure event, and resume the performance of its relevant obligations upon elimination or mitigation of the impact of the force majeure event. Depending on the extent of the impact on the performance of this Agreement, all parties shall, by consultation, decide whether to terminate the Agreement or whether to partially exempt the performance obligations of this Agreement or whether to delay the performance of the Agreement.

## 9. Supplementary Provisions

9.1    This Agreement shall be governed by the laws of PRC. The parties shall resolve through amicable negotiation all disputes arising from the performance of this Agreement; in the event that the negotiation fails, the disputes shall be submitted to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of PRC, the arbitrator or arbitrators may issue injunction orders over the shares in or assets of Party C (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party C through arbitration. The parties agree that, subject to the laws of PRC, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party C, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding.

5

9.2    This Agreement shall become effective at the date all the parties execute this Agreement, and terminate at the time either when Party A or the third party designated by Party A exercise the option in accordance with the provisions hereof and acquire the 100% shares in Party C, or when all the parties reach any agreement to terminate this Agreement. Except as otherwise agreed, the rights and obligations hereunder shall have binding force upon the parties' assignees of rights and obligations and successors (regardless whether such assignments of rights and obligations are caused by acquisition, reorganization, succession, assignment or other reasons).

9.3    The parties acknowledge that this Agreement shall be enforced to the extent permitted by law. If any provision hereof or if any part of any provision is decided by any competent authority or court to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect other provisions hereof or other parts of the provision. Such other provisions or other parts of the provision shall remain completely effective. The Parties shall use their best efforts to amend such illegal, invalid or unenforceable provisions to effect the purpose of the original provisions.

9.4    This Agreement is written in Chinese and in four (4) original copies with Party A, Gong Yu, Ya Ning and Party C respectively holding one.

9.5    This Agreement and its appendixes constitute the entire agreement for the transaction under this Agreement and shall replace any and all oral or written communications, undertakings, memoranda or any other discussions previously made by the parties with respect to the subject matter of this Agreement.

9.6    Any modification or supplement to this Agreement shall be made in writing and shall take effect only after all parties to this Agreement duly sign it.

(The remainder of this page is intentionally left blank)

6

(signature page for the Exclusive Share Purchase Agreement)

Party A:
Beijing iQIYI New Media Science and Technology Co., Ltd. (Seal)

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: /s/ GONG Yu_____

Party B:

Party B1: GONG Yu ( 龚宇 )

Signature: /s/ GONG Yu_____

Party B2: YA Ning ( 亚宁 )

Signature: /s/ YA Ning_____

Party C:
iQIYI Pictures (Beijing) Co., Ltd. (Seal)

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: /s/ GONG Yu_____

7

*Appendix 1:*

**Share Transfer Contract**

This Share Transfer Contract (hereinafter referred to as this "**Contract**") was entered into by the following two parties in [          ], China on [ dd/mm/yy ].

Transferor: [     ], ID No. [              ]

Transferee: [     ]

The above two parties reach by friendly negotiation an agreement on share transfer as follows:

1.  The Transferor agrees to transfer [     ]% shares held by him/her/it in iQIYI Pictures (Beijing) Co., Ltd. (the "**Target Shares**") to the Transferee for RMB [     ]. The Transferee agrees to accept such Target Shares.

2.  After completion of the transfer of the Target Shares, the Transferor no longer enjoys the shareholders' rights or undertakes the shareholders' obligations attached to the Target Shares. The Transferee shall enjoy the shareholders' rights and undertake the shareholders' obligations attached to the Target Shares.

3.  Both parties may sign supplementary agreements regarding the matters not covered by this Contract.

4.  This Contract shall come into effect from the date of executing this Contract by both parties.

5.  This Contract is made in quadruplicate, with each party holding one and others for registration of alteration with industry and commerce administrative authorities.

Transferor: [              ]

Signature:

Transferee: [              ]

Signature:

8

*Appendix II*

# Letter of Consent

To: Beijing iQIYI New Media Science and Technology Co., Ltd.

As a shareholder of iQIYI Pictures (Beijing) Co., Ltd. (the "**Company**"), I hereby agree and confirm as follows:

1. I agree and accept all the terms and conditions of the Exclusive Share Purchase Agreement executed by me and the Company and Beijing iQIYI New Media Science and Technology Co., Ltd. (the "**WFOE**") on [ dd/mm/yy ], and will take every action to assist the WFOE in handling the transfer procedures for relevant shares in accordance with the provisions of this Agreement when exercising its exclusive option to purchase the shares in the Company.

2. I agree that when other shareholders of the Company transfer their shares to Beijing iQIYI New Media Science and Technology Co., Ltd. Company or its designated third party, I will give up the preemptive right.

3. I agree to execute or provide necessary documents for handling the transfer procedures for relevant shares when other shareholders transfer their shares in the Company to Beijing iQIYI New Media Science and Technology Co., Ltd. Company or its designated third party.

GONG Yu ( 龚宇 ) /YA Ning ( 亚宁 )
  Signature:

9

*Appendix III:*

# Exercise Notice

To:    All shareholders of iQIYI Pictures (Beijing) Co., Ltd.; and / or

       iQIYI Pictures (Beijing) Co., Ltd.

Whereas our company executed the Exclusive Share Purchase Agreement with you on [ dd/mm/yy ] and agreed that you shall, according to our company's requirement, sell to our company or the transferee designated by our company the shares you hold in iQIYI Pictures (Beijing) Co., Ltd., subject to the conditions permitted by relevant laws and regulations of PRC.

Therefore, our company hereby gives you this notice as follows:

We hereby demand the exercise of the option under the Exclusive Share Purchase Agreement through the purchase of the shares you hold, which represents [ ]% of the registered capital of iQIYI Pictures (Beijing) Co., Ltd. ("**Shares to Be Transferred**"), by our company or the transferee designated by our company, for the price of RMB[ ]. Please, upon receipt of this Notice, immediately handle necessary formalities for selling all the Shares to Be Transferred to our company / the transferee designated by our company in accordance with the Exclusive Share Purchase Agreement.

Beijing iQIYI New Media Science and Technology Co., Ltd. (Seal)

By: _____
Name:
Position:
Date:

10

**Exhibit 10.42**

**Loan Agreement**

This Loan Agreement (this "**Agreement**") is executed by and between the following parties in Beijing, the People's Republic of China ("**China**") on August 30, 2017:

Party A (the "**Lender**"): Beijing iQIYI New Media Science and Technology Co., Ltd.; and

Party B (the "**Borrower**"): YA Ning ( 亚宁 ), ID Card No. \*\*\*

Whereas,

1.    The Lender is a wholly foreign owned enterprise legally established and validly existing in China according to the laws of China;

2.    The Borrower is a citizen of China, and as a shareholder of iQIYI Pictures (Beijing) Co., Ltd. (the "**Pictures Company**"),, holds 50% of the shares in the Pictures Company in total.

3.    The Lender agrees to lend RMB 10 million (RMB 10,000,000.00) interest-free to the Borrower.

Therefore, the two Parties reach the following agreement through friendly negotiation to specify their rights and obligations:

**1.    Loan**

In accordance with the terms and conditions provided in this Agreement, the Lender agrees to lend the Borrower with an interest-free loan amounting to RMB 10 million (RMB 10,000,000.00), and the Borrower agrees to accept the aforesaid loan.

**2.    Term of the Loan**

2.1    The term of the loan under this Agreement shall begin from August 30, 2017 to ten years after the execution of this Agreement ("**Term of the Loan**"); the Term of the Loan may be extended upon the Lender's written confirmation; the extended term shall be determined by the Lender.

2.2    During the Term of the Loan or any extended Term of the Loan, in the event that any of the following events occur as to any of the Borrowers, the lender shall be entitled to decide, in the manner of written notice, that the loan hereunder becomes due immediately, and demand the Borrower to repay the loan in the manner provided by the provisions hereof:

(1)    the Borrower resigns from or is dismissed by the Lender or its affiliated company (refers to all the companies which have affiliated relations with the Lender during the term of this Agreement);

(2)     the Borrower dies or loses capacity for civil conduct, or his/her capacity for civil conduct becomes limited;

(3)     the Borrower commits or is involved in any crime;

(4)     any third party claims against the Borrower damages exceeding one hundred thousand (RMB 100,000.00);

(5)     any representation or warranty by the Borrower herein is proven to be untrue or inaccurate in any material aspect at the time when it is made; or the Borrower breaches any obligation hereof;

(6)     to the extent permitted by the laws of China, in the event that the Lender or its designated person may invest in the Pictures Company's businesses and the Lender, in accordance with the provisions of the Exclusive Share Purchase Agreement executed by the Lender and the Borrower on August 30, 2017 (the "**Exclusive Share Purchase Agreement**"), has issued a written notice to the Borrower to purchase the shares in the Pictures Company held by the Borrower and has exercised such option (such acts are not deemed to be completed until relevant registrations with the industry and commerce administrative authorities are completed).

**3.     Repayment of the Loan**

3.1     Both Parties hereby agree and confirm that the Borrower must and may only repay the loan in the manner as follows: when the loan hereof becomes due or any event under Article 2.2 of this Agreement occurs, the Borrower (or his/her successors, heirs or assigns) shall at the request of the written notice by the Lender, subject to the provisions of the laws of China, transfer all his/her shares in the Pictures Company to the Lender and/or its designated entities, and repay the loan hereunder by the proceeds received from the transfer.

3.2     The Borrower may not repay the loan in whole or in part without prior written consent of Party A.

3.3     Both Parties agree that the share transfer hereunder shall be deemed completed when the formalities for the change of shareholder with the relevant industry and administrative authorities are completed and the Lender or its designated entities have become the legal holders of the aforementioned target shares.

**4.     Interest of the Loan**

Both Parties hereby agree and acknowledge that unless this Agreement provides otherwise, the loan hereunder shall bear no interest. However, when the loan becomes due and the Borrower transfers his/her shares to the Lender or its designated entities in the manner of repayment provided by this Agreement, if the actual price for share transfer is higher than the principal of the loan to the Borrower because of the requirements of the laws or other reasons, the difference between the transfer price and the principal shall be deemed interest or capital occupation expense, and shall be paid to the Lender together with the principal.

2

**5.    Representations, Warranties and Undertakings of the Borrower**

5.1    the Borrower shall provide copy of his/her capital contribution certificate as to 50% of the shares in the Pictures Company to the Lender.

5.2    To secure repayment of the loan, the Borrower agrees to pledge all his/her shares in the Pictures Company with the Lender, and grant an option to purchase the abovementioned shares to the Lender. The Borrower agrees to execute the Share Pledge Agreement at the Lender's request.

5.3    the Borrower undertakes not to request the Pictures Company to distribute dividend or profit to him/her, and not to pass any resolution as the shareholder of the Pictures Company to distribute dividend or profit to shareholders.

5.4    the Borrower shall maintain the Pictures Company's existence and prudentially and validly operate the business and handle the matters of the Pictures Company, following sound financial and business standards and practices. Upon the Lender's request, the Borrower shall provide the Lender with all the materials relating to operation and financial condition of the Pictures Company. The Borrower shall operate all businesses of the Pictures Company in the normal course of business to maintain the value of the Pictures Company's assets.

5.5    To keep his/her title of the shares in the Pictures Company, he/she shall execute all the necessary or appropriate documents, take all the necessary or appropriate actions, make all the necessary or appropriate accusations, and raise all necessary or appropriate defenses against all claims; the Borrower shall immediately notify the Lender of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to the Pictures Company.

5.6    the Borrower shall strictly comply with the provisions hereof and duly perform his/her obligations hereunder, and shall not conduct any act or omission that may affect the validity and enforceability of this Agreement.

**6.    Taxes and Expenses**

Unless this Agreement provides otherwise, both Parties shall respectively pay their respective taxes and expenses regarding this Agreement pursuant to relevant laws and regulations. All the other taxes and reasonable expenses relating to the loan shall be borne by the Lender.

**7.    Effectiveness and Termination of this Agreement**

7.1    Both Parties agree and confirm that this Agreement shall become effective from August 30, 2017.

3

7.2   Both Parties agree and confirm that this Agreement shall terminate when both Parties fully perform their respective obligations hereunder. Both Parties agree and confirm that the Borrower's obligations hereunder shall only be deemed fully performed when all of the following conditions are met:

    (1)   the Borrower has transferred all his/her shares in the Pictures Company to the Lender and/or its designated entities; and

    (2)   the Borrower has repaid all the proceeds received from the transfer hereunder to the Lender according to the provisions hereof and of the Exclusive Share Purchase Agreement.

7.3   Unless (1) the Lender commits gross negligence, fraud or other serious illegal acts; or (2) the Lender is terminated for bankruptcy, dissolution or order to close, the Borrower shall not unilaterally revoke or terminate this Agreement in any circumstance.

## 8.   Breaching Liabilities

8.1   In the event that either Party ("**Breaching Party**") breaches any provision hereof, and thus causes any damage to the other Party ("**Non-breaching Party**"), the Non-breaching Party may send a written notice to the Breaching Party, requesting the Breaching Party to immediately correct and remedy its breach. If the Breaching Party fails to take measures satisfactory to the Non-breaching Party to remedy and correct its breach within fifteen (15) days after the Non-breaching Party receives the abovementioned written notice, the Non-breaching Party may immediately take other remedial measures according to the provision hereof or through legal means.

8.2   In the event that the Borrower fails to repay the loan to the Lender according hereto, the Borrower shall pay to the Lender the liquidated damages for late payment at the daily rate of 0.02% over the outstanding amount (counted from the date requested by the Lender for repayment of the loan), and shall compensate the Lender for any direct economic loss caused by the Borrower's breach (including but not limited to the market value of the shares held by the Borrower in the Pictures Company which is not transferred, or the outstanding loan amount, whichever is higher).

## 9.   Confidentiality

9.1 Both Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consent by the other Party, except:

(1)   Any information that has been known or will be known to the public (not through any disclosure by the receiving Party to the public without the other Party's consent);

4

(2)  Any information disclosed according to the requirements of applicable laws and stock exchange rules; or

(3)  In case that any information is disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, such legal or financial consultant is obliged to perform similar obligations of confidentiality to those specified herein. Any disclosure by any employee of or institution engaged by either Party shall be deemed disclosure by such Party, and such Party shall be liable for breach of contract according to this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

**10.  Notice**

Any notice or other communication sent by either Party hereunder shall be made in writing, and sent by personal delivery, letter or fax to the following address of the other Party or to other addresses designated by the other Party by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the seventh (7th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

the Lender: Beijing iQIYI New Media Science and Technology Co., Ltd.
Address: 10th and 11th Floor, No. 2 Haidian North First Street, Haidian District, Beijing
Postal code: 100080
Tel: 010-62677171
Fax:

the Borrower: YA Ning ( 亚宁 )
Address: ***
Postal code: ***
Tel:
Fax:

**11.  Applicable Law and Dispute Resolution**

The execution, validity, performance and interpretation of and the dispute resolution regarding this Agreement shall be governed by the laws of China. Any dispute arising from performance hereof or relating to this Agreement shall be resolved by the Parties through friendly negotiation. If the dispute fails to be resolved through negotiation, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. The effectiveness of this article is not affected by any change, rescission or termination of this Agreement.

5

**12.   Miscellaneous**

12.1   Both Parties agree and confirm that the Lender's "written consent" mentioned in this Agreement means that the matter is subject to the approval of the Lender's board of directors. If such matter is only approved by the Borrower, the approval shall not constitute the Lender's "written consent".

12.2   The headings herein are for convenience only, and may not be used to interpret, explain or affect in other aspects the meaning of any provisions hereof.

12.3   Both Parties confirm that this Agreement once effective shall constitute the entire agreement and consensus between them with respect to the subject matters hereof, and shall replace all the oral and/or written agreements and consensuses reached by the Parties with respect to the subject matters hereof.

12.4   This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors, heirs or permitted assigns, and be executed only for the benefit of the above persons. The Borrower may not assign, pledge or otherwise transfer in other manners any right, interest or obligation hereunder to others without prior written consent of the Lender.

12.5   the Borrower hereby agrees that (i) if the Borrower dies, the Borrower agrees to immediately assign the rights and obligations hereunder to the entity designated by the Lender; (ii) the Lender may assign its rights and obligations hereunder to any third party when necessary. The Lender only needs to send a written notice to the Borrower when the such assignment occurs, and is not required to obtain the Borrower's consent on such assignment.

12.6   Either Party's failure to exercise promptly any right hereunder shall not be deemed waiver of such right, nor shall it affect the Party's future exercise thereof.

12.7   If any provision hereof is decided by any competent court or arbitral institution as invalid, void or unenforceable, it shall not affect or impair the validity or enforceability of other provisions hereof. The Parties shall stop performance of such invalid, void or unenforceable provision, and shall amend it so that the original intention will be achieved as much as possible and the provision becomes valid and effective only to the extent of relevant fact and circumstance.

12.8   The Parties shall negotiate to decide any matter not covered herein. The Parties shall amend or supplement this Agreement through written agreements. The written amendments and supplemental agreements duly signed by both Parties are an integral part hereof, and have same legal force as this Agreement.

12.9   This Agreement is made in four (4) counterparts, and each Party holds one (1), the remaining copies are held by the Lender. All counterparts have equal legal force.

6

In witness whereof, this Agreement is entered into by both Parties or their legal representatives or authorized representatives on the date first written above.

[The remainder of this page is intentionally left blank.]

7

[Signature page for the Loan Agreement]

**Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.(seal)**

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: <u>/s/ GONG Yu</u>

**Party B: YA Ning**( 亚宁 )

Signature:    <u>/s/ YA Ning                                    </u>

8

**Exhibit 10.43**

**Loan Agreement**

This Loan Agreement (this "**Agreement**") is executed by and between the following parties in Beijing, the People's Republic of China ("**China**") on August 30, 2017:

Party A (the "**Lender**"): Beijing iQIYI New Media Science and Technology Co., Ltd. ; and

Party B (the "**Borrower**"): GONG Yu ( 龚宇 ), ID Card No. \*\*\*

Whereas,

1. The Lender is a wholly foreign owned enterprise legally established and validly existing in China according to the laws of China;

2. The Borrower is a citizen of China, and as a shareholder of iQIYI Pictures (Beijing) Co., Ltd. (the "**Pictures Company**"), holds 50% of the shares in the Pictures Company in total.

3. The Lender agrees to lend RMB 50 million (RMB 50,000,000.00) interest-free to the Borrower.

Therefore, the two Parties reach the following agreement through friendly negotiation to specify their rights and obligations:

**1. Loan**

In accordance with the terms and conditions provided in this Agreement, the Lender agrees to lend the Borrower with an interest-free loan amounting to RMB 50 million (RMB 50,000,000.00), and the Borrower agrees to accept the aforesaid loan.

**2. Term of the Loan**

2.1 The term of the loan under this Agreement shall begin from August 30, 2017 to ten years after the execution of this Agreement ("**Term of the Loan**"); the Term of the Loan may be extended upon the Lender's written confirmation; the extended term shall be determined by the Lender.

2.2 During the Term of the Loan or any extended Term of the Loan, in the event that any of the following events occur as to any of the Borrowers, the lender shall be entitled to decide, in the manner of written notice, that the loan hereunder becomes due immediately, and demand the Borrower to repay the loan in the manner provided by the provisions hereof:

(1) the Borrower resigns from or is dismissed by the Lender or its affiliated company (refers to all the companies which have affiliated relations with the Lender during the term of this Agreement);

(2)      the Borrower dies or loses capacity for civil conduct, or his/her capacity for civil conduct becomes limited;

(3)      the Borrower commits or is involved in any crime;

(4)      any third party claims against the Borrower damages exceeding one hundred thousand (RMB 100,000.00);

(5)      any representation or warranty by the Borrower herein is proven to be untrue or inaccurate in any material aspect at the time when it is made; or the Borrower breaches any obligation hereof;

(6)      to the extent permitted by the laws of China, in the event that the Lender or its designated person may invest in the Pictures Company's businesses and the Lender, in accordance with the provisions of the Exclusive Share Purchase Agreement executed by the Lender and the Borrower on August 30, 2017 (the "**Exclusive Share Purchase Agreement**"), has issued a written notice to the Borrower to purchase the shares in the Pictures Company held by the Borrower and has exercised such option (such acts are not deemed to be completed until relevant registrations with the industry and commerce administrative authorities are completed).

## 3.    Repayment of the Loan

3.1    Both Parties hereby agree and confirm that the Borrower must and may only repay the loan in the manner as follows: when the loan hereof becomes due or any event under Article 2.2 of this Agreement occurs, the Borrower (or his/her successors, heirs or assigns) shall at the request of the written notice by the Lender, subject to the provisions of the laws of China, transfer all his/her shares in the Pictures Company to the Lender and/or its designated entities, and repay the loan hereunder by the proceeds received from the transfer.

3.2    The Borrower may not repay the loan in whole or in part without prior written consent of Party A.

3.3    Both Parties agree that the share transfer hereunder shall be deemed completed when the formalities for the change of shareholder with the relevant industry and administrative authorities are completed and the Lender or its designated entities have become the legal holders of the aforementioned target shares.

## 4.    Interest of the Loan

Both Parties hereby agree and acknowledge that unless this Agreement provides otherwise, the loan hereunder shall bear no interest. However, when the loan becomes due and the Borrower transfers his/her shares to the Lender or its designated entities in the manner of repayment provided by this Agreement, if the actual price for share transfer is higher than the principal of the loan to the Borrower because of the requirements of the laws or other reasons, the difference between the transfer price and the principal shall be deemed interest or capital occupation expense, and shall be paid to the Lender together with the principal.

2

**5.    Representations, Warranties and Undertakings of the Borrower**

5.1    the Borrower shall provide copy of his/her capital contribution certificate as to 50% of the shares in the Pictures Company to the Lender.

5.2    To secure repayment of the loan, the Borrower agrees to pledge all his/her shares in the Pictures Company with the Lender, and grant an option to purchase the abovementioned shares to the Lender. The Borrower agrees to execute the Share Pledge Agreement at the Lender's request.

5.3    the Borrower undertakes not to request the Pictures Company to distribute dividend or profit to him/her, and not to pass any resolution as the shareholder of the Pictures Company to distribute dividend or profit to shareholders.

5.4    the Borrower shall maintain the Pictures Company's existence and prudentially and validly operate the business and handle the matters of the Pictures Company, following sound financial and business standards and practices. Upon the Lender's request, the Borrower shall provide the Lender with all the materials relating to operation and financial condition of the Pictures Company. The Borrower shall operate all businesses of the Pictures Company in the normal course of business to maintain the value of the Pictures Company's assets.

5.5    To keep his/her title of the shares in the Pictures Company, he/she shall execute all the necessary or appropriate documents, take all the necessary or appropriate actions, make all the necessary or appropriate accusations, and raise all necessary or appropriate defenses against all claims; the Borrower shall immediately notify the Lender of any litigation, arbitration or administrative procedure that has occurred or may occur with respect to the Pictures Company.

5.6    the Borrower shall strictly comply with the provisions hereof and duly perform his/her obligations hereunder, and shall not conduct any act or omission that may affect the validity and enforceability of this Agreement.

**6.    Taxes and Expenses**

Unless this Agreement provides otherwise, both Parties shall respectively pay their respective taxes and expenses regarding this Agreement pursuant to relevant laws and regulations. All the other taxes and reasonable expenses relating to the loan shall be borne by the Lender.

**7.    Effectiveness and Termination of this Agreement**

7.1    Both Parties agree and confirm that this Agreement shall become effective from August 30, 2017.

3

7.2   Both Parties agree and confirm that this Agreement shall terminate when both Parties fully perform their respective obligations hereunder. Both Parties agree and confirm that the Borrower's obligations hereunder shall only be deemed fully performed when all of the following conditions are met:

(1)   the Borrower has transferred all his/her shares in the Pictures Company to the Lender and/or its designated entities; and

(2)   the Borrower has repaid all the proceeds received from the transfer hereunder to the Lender according to the provisions hereof and of the Exclusive Share Purchase Agreement.

7.3   Unless (1) the Lender commits gross negligence, fraud or other serious illegal acts; or (2) the Lender is terminated for bankruptcy, dissolution or order to close, the Borrower shall not unilaterally revoke or terminate this Agreement in any circumstance.

## 8.   Breaching Liabilities

8.1   In the event that either Party ("**Breaching Party**") breaches any provision hereof, and thus causes any damage to the other Party ("**Non-breaching Party**"), the Non-breaching Party may send a written notice to the Breaching Party, requesting the Breaching Party to immediately correct and remedy its breach. If the Breaching Party fails to take measures satisfactory to the Non-breaching Party to remedy and correct its breach within fifteen (15) days after the Non-breaching Party receives the abovementioned written notice, the Non-breaching Party may immediately take other remedial measures according to the provision hereof or through legal means.

8.2   In the event that the Borrower fails to repay the loan to the Lender according hereto, the Borrower shall pay to the Lender the liquidated damages for late payment at the daily rate of 0.02% over the outstanding amount (counted from the date requested by the Lender for repayment of the loan), and shall compensate the Lender for any direct economic loss caused by the Borrower's breach (including but not limited to the market value of the shares held by the Borrower in the Pictures Company which is not transferred, or the outstanding loan amount, whichever is higher).

## 9.   Confidentiality

9.1 Both Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third party without written consent by the other Party, except:

(1)   Any information that has been known or will be known to the public (not through any disclosure by the receiving Party to the public without the other Party's consent);

4

(2)    Any information disclosed according to the requirements of applicable laws and stock exchange rules; or

(3)    In case that any information is disclosed to either Party's legal or financial consultant with respect to the transaction contemplated hereunder, such legal or financial consultant is obliged to perform similar obligations of confidentiality to those specified herein. Any disclosure by any employee of or institution engaged by either Party shall be deemed disclosure by such Party, and such Party shall be liable for breach of contract according to this Agreement. This Article 9 shall survive the invalidity, rescission, termination or unenforceability of this Agreement for whatever reasons.

**10.    Notice**

Any notice or other communication sent by either Party hereunder shall be made in writing, and sent by personal delivery, letter or fax to the following address of the other Party or to other addresses designated by the other Party by notice from time to time. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of letter, on the seventh (7th) day after it is mailed by the airmail with postage paid, or on the fourth (4th) day after it is posted with the express delivery recognized internationally; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

the Lender: Beijing iQIYI New Media Science and Technology Co., Ltd.
Address: 10th and 11th Floor, No. 2 Haidian North First Street, Haidian District, Beijing
Postal code: 100080
Tel: 010-62677171
Fax:

the Borrower: GONG Yu ( 龚宇 )
Address: ***
Postal code:
Tel:
Fax:

**11.    Applicable Law and Dispute Resolution**

The execution, validity, performance and interpretation of and the dispute resolution regarding this Agreement shall be governed by the laws of China. Any dispute arising from performance hereof or relating to this Agreement shall be resolved by the Parties through friendly negotiation. If the dispute fails to be resolved through negotiation, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. The effectiveness of this article is not affected by any change, rescission or termination of this Agreement.

5

**12.    Miscellaneous**

12.1    Both Parties agree and confirm that the Lender's "written consent" mentioned in this Agreement means that the matter is subject to the approval of the Lender's board of directors. If such matter is only approved by the Borrower, the approval shall not constitute the Lender's "written consent".

12.2    The headings herein are for convenience only, and may not be used to interpret, explain or affect in other aspects the meaning of any provisions hereof.

12.3    Both Parties confirm that this Agreement once effective shall constitute the entire agreement and consensus between them with respect to the subject matters hereof, and shall replace all the oral and/or written agreements and consensuses reached by the Parties with respect to the subject matters hereof.

12.4    This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors, heirs or permitted assigns, and be executed only for the benefit of the above persons. The Borrower may not assign, pledge or otherwise transfer in other manners any right, interest or obligation hereunder to others without prior written consent of the Lender.

12.5    the Borrower hereby agrees that (i) if the Borrower dies, the Borrower agrees to immediately assign the rights and obligations hereunder to the entity designated by the Lender; (ii) the Lender may assign its rights and obligations hereunder to any third party when necessary. The Lender only needs to send a written notice to the Borrower when the such assignment occurs, and is not required to obtain the Borrower's consent on such assignment.

12.6    Either Party's failure to exercise promptly any right hereunder shall not be deemed waiver of such right, nor shall it affect the Party's future exercise thereof.

12.7    If any provision hereof is decided by any competent court or arbitral institution as invalid, void or unenforceable, it shall not affect or impair the validity or enforceability of other provisions hereof. The Parties shall stop performance of such invalid, void or unenforceable provision, and shall amend it so that the original intention will be achieved as much as possible and the provision becomes valid and effective only to the extent of relevant fact and circumstance.

12.8    The Parties shall negotiate to decide any matter not covered herein. The Parties shall amend or supplement this Agreement through written agreements. The written amendments and supplemental agreements duly signed by both Parties are an integral part hereof, and have same legal force as this Agreement.

12.9    This Agreement is made in four (4) counterparts, and each Party holds one (1), the remaining copies are held by the Lender. All counterparts have equal legal force.

6

In witness whereof, this Agreement is entered into by both Parties or their legal representatives or authorized representatives on the date first written above.

[The remainder of this page is intentionally left blank.]

7

[Signature page for the Loan Agreement]

**Party A: Beijing iQIYI New Media Science and Technology Co., Ltd.(seal)**

[*Company seal is affixed*]

Signature by Legal Representative / Authorized Representative: /s/ GONG Yu

**Party B: GONG Yu**( 龚宇 )

Signature: /s/ GONG Yu

8

**Exhibit 10.44**

# Share Pledge Agreement

This Share Pledge Agreement (this "**Agreement**") is made by and between the following parties in Beijing, China on August 30, 2017:

Party A ("**Pledgee**"): Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B ("**Pledgor**"): YA Ning ( 亚宁 ) (ID Card No.: ***)

Party C: iQIYI Pictures (Beijing) Co., Ltd.

Whereas,

(1)   Party A, Party B and Party C and Party C's subordinate companies and entities ("**Subordinate Entities**") have respectively executed the agreements set forth in Schedule 1 hereto (collectively referred to as "**Principal Contracts**");

(2)   Party B holds 50% shares in Party C. Party B intends to pledge such shares it holds in Party C with Party A to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities; Party A agrees to accept the above security interest.

Therefore, Party A, Party B and Party C reach the agreement as follows upon friendly negotiation for all the parties to observe:

**1.    Pledge**

Party B agrees to unconditionally and irrevocably pledge the 50% shares in Party C it holds (the "**Pledged Shares**") with Party A, to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities.

**2.    Scope of Security**

The scope of security of the Pledged Shares hereunder covers all obligations or debts of Party B and/or Party C and Party C's Subordinate Entities arising out of the Principal Contracts, including but not limited to the management and consulting service fees, interests, damages, compensation, costs for realizing the creditors' rights, and damages and all the other payable incurred by Party A because of breaches by Party B and/or Party C and Party C's Subordinate Entities, which arise out of the Principal Contracts and shall be paid to Party A by Party B and/or Party C and Party C's Subordinate Entities. The scope of security hereunder shall be limited to the above creditors' rights secured.

1

The parties confirm that, in the event that relevant industry and commerce authority requires clarification of the amount of creditors' rights covered by the scope of security during the process of share pledge registration, only for the purpose of such registration, the parties agree to register the amount of the creditors' rights hereunder as composed of the principal of RMB 10 million and the amount of all and any default liability and the amount of damages under relevant contracts.

The parties further confirm that the clarification of the above clarification for purpose of share pledge registration shall not impair or limit Party A's rights or interests enjoyed as guarantee in accordance with relevant Principal Contracts and this Agreement.

**3.    Share Pledge Period and Pledge Rights**

The share pledge under this Agreement shall become effective upon registration with the industry and commerce administrative authority of Party C, and remain effective until all the Principal Contracts are completely performed, expire or are terminated (whichever is later). During the term of the Pledge, in the event that Party B, Party C or any Subordinate Entity fails to perform any obligation under any Principal Contract, Party A has the right to dispose of the Pledged Shares in accordance with this Agreement.

**4.    Share Pledge Registration**

Party B and Party C undertake to Party A that they shall record the share pledge on Party C's register of members on the execution date of this Agreement. Party B and Party C shall deliver the share capital contribution certificate of Party B in Party C and the register of members to Party A for custody on the execution date of this Agreement. Party B and Party C further undertake to Party A that they shall complete the registration of the share pledge hereunder with the corresponding industry and commerce administrative authority and provide Party A with correspondence proof documents within thirty (30) days (or as soon as practicable) from the execution date of this Agreement (or the date when the relevant industry and commerce administrative authority begins to formally process the application for the share pledge registration, whichever is later).

**5.    Exercise and Enforcement of Pledge**

5.1    If any of the following events ("**Exercise Events**") occurs, Party A may elect to demand Party B or Party C to immediately and fully perform all the obligations hereunder, and the Pledge created hereunder may be exercised immediately:

(1)    Any representations, warranties or statements made by Party B, Party C or any Subordinate Entity hereunder or under any Principal Contracts are inconsistent, incorrect, untrue, or no longer correct or true; or Party B, Party C or any Subordinate Entity breaches or fails to comply with any obligation assumed or any undertaking or warranty made hereunder or under any Principal Contract; or

(2)    One or more obligations of Party B, Party C or any Subordinate Entity hereunder or under any Principal Contract are deemed illegal or invalid transaction; or

2

(3)     Party B or Party C materially breaches its obligations hereunder.

5.2   If any of the above Exercise Events occurs, Party A or the third party designated by Party A may exercise the Pledge through purchasing at a discount, designating other parties to purchase at a discount, auction of or sale of the Pledged Shares. Party A may exercise the Pledge hereunder without first exercising other security or rights, or taking other measures or procedures against Party B and/or Party C or any other person.

## 6.   Undertaking and Warranties of Party B and Party C

6.1   During the term of this Agreement, Party B and Party C hereby undertake and warrant to Party A jointly and severally that:

(1)     Party B is the legal owner of the Pledged Shares which are free of any ownership dispute that has occurred or is likely to occur. Party B is entitled to dispose of the Pledged Shares or any part of them, and such disposal right is not under any third party restriction. Except by the provisions hereof, Party B has not created any other pledge or third party interest over the Pledged Shares.

(2)     Unless with Party A's prior written consent, Party B and Party C shall not transfer the Pledged Shares, or create or allow the existence of any security interest over the Pledged Shares, except that otherwise agreed by all the parties.

(3)     Party B and Party C shall comply with and follow the provisions of all the laws and regulations relating to pledge of rights, shall within five (5) days after receiving notice, direction or suggestion about the Pledge from relevant supervisory authorities, present Party A such notice, direction or suggestion. They shall follow such notice, direction or suggestion, or make objections and statements regarding the above matters according to Party A's reasonable demand or with Party A's consent.

(4)     Before having Party A's prior written consent, Party B and Party C will not conduct, and will not cause or allow the Subordinate Entities to conduct, acts that may impair or harm or in other manners prejudice the value of the Pledged Shares or Party A's Pledge, including:

   (i)     Providing loans to any third party or assuming any debt;
   (ii)    Transferring, selling or otherwise disposing of any asset or right to any third party, or appropriating or transferring any asset or fund of Party C or the Subordinate Entities;
   (iii)   Providing security over their assets in favor of any third party;
   (iv)    Assigning any right or obligation under any agreement they have or will have entered into to any third party;

3

(v)    Leasing, renting or disposing of any business license they have or will have obtained.

Party B and Party C shall notify Party A in writing of any event or act that may affect the value of the Pledged Shares or Party A's Pledge within five (5) working days after they know such events or acts. Party A shall not be responsible for the reduction of value of the Pledged Shares, and Party B and Party C shall not make any claim or request against Party A for such reduction of value.

6.2    Subject to the provisions of relevant laws and regulations of PRC, the share pledge hereunder is continuous and shall remain effective during the term of this Agreement. Even in the event that Party B or Party C becomes insolvent, is liquidated, loses capacity for conduct, or undergoes any change of organization or status, or any capital offset occurs among the parties, or any other event occurs, the share pledge hereunder shall not be affected.

6.3    Party B agrees that, for the performance of this Agreement Party, Party A is entitled to dispose of the Pledge in the manner prescribed herein, and the exercise of Party A's right over the Pledge in accordance with the provisions hereof shall not be interrupted or interfered with, through any legal procedure, by Party B or through Party B's successors or principals or any other person.

6.4    Party B and Party C warrant to Party A that, to protect or perfect the security hereunder for the debts under the Principal Contracts, they will honestly execute and cause other parties interested in the Pledge to execute all the rights certificates and deeds relating to the performance of this agreement, and/or cause other interested parties to conduct the acts demanded by Party A and relevant to the performance of this Agreement, and provide convenience for the exercise of the rights and authorities granted by this Agreement to Party A.

6.5    Party B and Party C warrant to Party A that, to protect Party A's interest, Party B shall comply with and perform all the warranties, undertakings, agreements, representations and conditions. In the event that Party B and/or Party C fail to perform their respective warranties, undertakings, agreements, representations and conditions, Party B and/or Party C shall indemnify all the losses therefore suffered by Party A.

6.6    During the term of this Agreement, in the event that Party B subscribes for any new registered capital in Party C (including the increased registered capital converted from the reserved or undistributed profits) (the "**New Shares**"), such New Shares shall automatically become the Pledged Shares hereunder, and Party B shall complete or cause to complete, within ten (10) working days after obtaining such New Shares, all the formalities necessary for creating pledge over such New Shares. In the event that Party B fail to complete the relevant formalities according to the preceding provisions, Party A shall have the right to immediately exercise the relevant pledge pursuant to the provisions of Article 5 herein.

4

**7.    Assignment**

    7.1    Party B has no right to gift or assign any right or obligation hereunder without Party A's prior written consent.

    7.2    This Agreement shall be binding upon Party B and its successors, and shall be effective to Party A and its successors and assigns.

    7.3    Party A may assign all or any rights and obligations under the provisions of the Principal Contracts to any person (natural person/legal person) designated by it at any time. In such case, the assignee shall enjoy and assume such rights and obligations enjoyed and assumed by Party A hereunder, as if the assignee shall enjoy and assume as a party to this Agreement. When Party A assigns the rights and obligations under the provisions of the Principal Contracts, upon Party A's request, Party B shall execute relevant agreements and/or documents regarding such assignment.

    7.4    When Party A is changed because of any assignment, the new parties to the Pledge shall execute a new pledge agreement, and conduct registration with the corresponding industry and commerce administrative authorities.

**8.    Confidentiality**

All provisions hereof and this Agreement itself are confidential information. Each party shall not disclose the confidential information to any third party other than the senior staff members, directors, employees, agents and professional consultants relating to this project; except the circumstances that the parties, pursuant to the provisions of law, are required to disclose the information relevant to this document to governments, the public or shareholders or submit this document to relevant authorities for record.

This Article 6 shall survive the modification, termination or rescission of this Agreement.

**9.    Breaching Liabilities**

In the event that one party fails to perform any obligation hereunder, or any representation or warranty of the Party hereunder is materially untrue or inaccurate, the party breaches this Agreement, and shall compensate for all losses of the other parties.

**10.    Force Majeure**

Where a force majeure event affects the performance of the Agreement, the party which encounters the force majeure shall immediately notify the other parties by way of telegraph, fax or other electronic means, and provide a written proof of the force majeure within fifteen (15) working days. Depending on the extent of the impact on the performance of this Agreement, all parties shall, by consultation, decide whether to terminate the Agreement or whether to partially exempt the performance obligations of this Agreement or whether to delay the performance of the Agreement.

**11.  Miscellaneous**

11.1  This Agreement shall be governed by the laws of PRC. The parties shall resolve through amicable negotiation all disputes arising from the performance of this Agreement; in the event that the negotiation fails, the disputes shall be submitted to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of PRC, the arbitrator or arbitrators may issue injunction orders over the shares in or assets of Party C (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party C through arbitration. The parties agree that, subject to the laws of PRC, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party C, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding.

11.2  This Agreement shall become effective when the parties sign and seal on the date first written above, and terminate when the obligations under the Principal Contracts are fully performed or discharged for whatever reason.

11.3  This Agreement is made in Chinese. The number of copies is determined according to the number of the parties. Each party shall hold one copy, and the remaining copy shall be used for registration with the industry and commerce administrative authorities.

6

(signature page for the Share Pledge Agreement)

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ Beijing iQIYI New Media Science and Technology Co., Ltd.


Party B: YA Ning ( 亚宁 )


Signature: /s/ YA Ning_____


Party C: iQIYI Pictures (Beijing) Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ iQIYI Pictures (Beijing) Co., Ltd.

7

**Schedule 1**

# List of Principal Contracts

1.  The Exclusive Management Consulting and Business Cooperation Agreement entered into by Party A, Party B, Party C and Party C's Subordinate Entities on August 30, 2017.

2.  The Exclusive Share Purchase Agreement entered into by Party A, Party B, and Party C on August 30, 2017.

3.  The Power of Attorney executed by Party B on August 30, 2017.

4.  The Loan Agreement entered into by Party A and Party B on August 30, 2017.

8

**Exhibit 10.45**

**Share Pledge Agreement**

This Share Pledge Agreement (this "**Agreement**") is made by and between the following parties in Beijing, China on August 30, 2017:

Party A ("**Pledgee**"): Beijing iQIYI New Media Science and Technology Co., Ltd.

Party B ("**Pledgor**"): GONG Yu ( 龚宇 ) (ID Card No.: ***)

Party C: iQIYI Pictures (Beijing) Co., Ltd.

Whereas,

(1)  Party A, Party B and Party C and Party C's subordinate companies and entities ("**Subordinate Entities**") have respectively executed the agreements set forth in Schedule 1 hereto (collectively referred to as "**Principal Contracts**");

(2)  Party B holds 50% shares in Party C. Party B intends to pledge such shares it holds in Party C with Party A to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities; Party A agrees to accept the above security interest.

Therefore, Party A, Party B and Party C reach the agreement as follows upon friendly negotiation for all the parties to observe:

**1. Pledge**

Party B agrees to unconditionally and irrevocably pledge the 50% shares in Party C it holds (the "**Pledged Shares**") with Party A, to secure the performance of all the obligations under the Principal Contracts by Party B, Party C and Party C's Subordinate Entities.

**2. Scope of Security**

The scope of security of the Pledged Shares hereunder covers all obligations or debts of Party B and/or Party C and Party C's Subordinate Entities arising out of the Principal Contracts, including but not limited to the management and consulting service fees, interests, damages, compensation, costs for realizing the creditors' rights, and damages and all the other payable incurred by Party A because of breaches by Party B and/or Party C and Party C's Subordinate Entities, which arise out of the Principal Contracts and shall be paid to Party A by Party B and/or Party C and Party C's Subordinate Entities. The scope of security hereunder shall be limited to the above creditors' rights secured.

1

The parties confirm that, in the event that relevant industry and commerce authority requires clarification of the amount of creditors' rights covered by the scope of security during the process of share pledge registration, only for the purpose of such registration, the parties agree to register the amount of the creditors' rights hereunder as composed of the principal of RMB 10 million and the amount of all and any default liability and the amount of damages under relevant contracts.

The parties further confirm that the clarification of the above clarification for purpose of share pledge registration shall not impair or limit Party A's rights or interests enjoyed as guarantee in accordance with relevant Principal Contracts and this Agreement.

**3. Share Pledge Period and Pledge Rights**

The share pledge under this Agreement shall become effective upon registration with the industry and commerce administrative authority of Party C, and remain effective until all the Principal Contracts are completely performed, expire or are terminated (whichever is later). During the term of the Pledge, in the event that Party B, Party C or any Subordinate Entity fails to perform any obligation under any Principal Contract, Party A has the right to dispose of the Pledged Shares in accordance with this Agreement.

**4. Share Pledge Registration**

Party B and Party C undertake to Party A that they shall record the share pledge on Party C's register of members on the execution date of this Agreement. Party B and Party C shall deliver the share capital contribution certificate of Party B in Party C and the register of members to Party A for custody on the execution date of this Agreement. Party B and Party C further undertake to Party A that they shall complete the registration of the share pledge hereunder with the corresponding industry and commerce administrative authority and provide Party A with correspondence proof documents within thirty (30) days (or as soon as practicable) from the execution date of this Agreement (or the date when the relevant industry and commerce administrative authority begins to formally process the application for the share pledge registration, whichever is later).

**5. Exercise and Enforcement of Pledge**

5.1    If any of the following events ("**Exercise Events**") occurs, Party A may elect to demand Party B or Party C to immediately and fully perform all the obligations hereunder, and the Pledge created hereunder may be exercised immediately:

(1)    Any representations, warranties or statements made by Party B, Party C or any Subordinate Entity hereunder or under any Principal Contracts are inconsistent, incorrect, untrue, or no longer correct or true; or Party B, Party C or any Subordinate Entity breaches or fails to comply with any obligation assumed or any undertaking or warranty made hereunder or under any Principal Contract; or

(2)    One or more obligations of Party B, Party C or any Subordinate Entity hereunder or under any Principal Contract are deemed illegal or invalid transaction; or

2

(3)     Party B or Party C materially breaches its obligations hereunder.

5.2    If any of the above Exercise Events occurs, Party A or the third party designated by Party A may exercise the Pledge through purchasing at a discount, designating other parties to purchase at a discount, auction of or sale of the Pledged Shares. Party A may exercise the Pledge hereunder without first exercising other security or rights, or taking other measures or procedures against Party B and/or Party C or any other person.

**6. Undertaking and Warranties of Party B and Party C**

6.1    During the term of this Agreement, Party B and Party C hereby undertake and warrant to Party A jointly and severally that:

(1)     Party B is the legal owner of the Pledged Shares which are free of any ownership dispute that has occurred or is likely to occur. Party B is entitled to dispose of the Pledged Shares or any part of them, and such disposal right is not under any third party restriction. Except by the provisions hereof, Party B has not created any other pledge or third party interest over the Pledged Shares.

(2)     Unless with Party A's prior written consent, Party B and Party C shall not transfer the Pledged Shares, or create or allow the existence of any security interest over the Pledged Shares, except that otherwise agreed by all the parties.

(3)     Party B and Party C shall comply with and follow the provisions of all the laws and regulations relating to pledge of rights, shall within five (5) days after receiving notice, direction or suggestion about the Pledge from relevant supervisory authorities, present Party A such notice, direction or suggestion. They shall follow such notice, direction or suggestion, or make objections and statements regarding the above matters according to Party A's reasonable demand or with Party A's consent.

(4)     Before having Party A's prior written consent, Party B and Party C will not conduct, and will not cause or allow the Subordinate Entities to conduct, acts that may impair or harm or in other manners prejudice the value of the Pledged Shares or Party A's Pledge, including:

(i)     Providing loans to any third party or assuming any debt;

(ii)     Transferring, selling or otherwise disposing of any asset or right to any third party, or appropriating or transferring any asset or fund of Party C or the Subordinate Entities;

(iii)     Providing security over their assets in favor of any third party;

(iv)     Assigning any right or obligation under any agreement they have or will have entered into to any third party;

(v)     Leasing, renting or disposing of any business license they have or will have obtained.

3

Party B and Party C shall notify Party A in writing of any event or act that may affect the value of the Pledged Shares or Party A's Pledge within five (5) working days after they know such events or acts. Party A shall not be responsible for the reduction of value of the Pledged Shares, and Party B and Party C shall not make any claim or request against Party A for such reduction of value.

6.2 Subject to the provisions of relevant laws and regulations of PRC, the share pledge hereunder is continuous and shall remain effective during the term of this Agreement. Even in the event that Party B or Party C becomes insolvent, is liquidated, loses capacity for conduct, or undergoes any change of organization or status, or any capital offset occurs among the parties, or any other event occurs, the share pledge hereunder shall not be affected.

6.3 Party B agrees that, for the performance of this Agreement Party, Party A is entitled to dispose of the Pledge in the manner prescribed herein, and the exercise of Party A's right over the Pledge in accordance with the provisions hereof shall not be interrupted or interfered with, through any legal procedure, by Party B or through Party B's successors or principals or any other person.

6.4 Party B and Party C warrant to Party A that, to protect or perfect the security hereunder for the debts under the Principal Contracts, they will honestly execute and cause other parties interested in the Pledge to execute all the rights certificates and deeds relating to the performance of this agreement, and/or cause other interested parties to conduct the acts demanded by Party A and relevant to the performance of this Agreement, and provide convenience for the exercise of the rights and authorities granted by this Agreement to Party A.

6.5 Party B and Party C warrant to Party A that, to protect Party A's interest, Party B shall comply with and perform all the warranties, undertakings, agreements, representations and conditions. In the event that Party B and/or Party C fail to perform their respective warranties, undertakings, agreements, representations and conditions, Party B and/or Party C shall indemnify all the losses therefore suffered by Party A.

6.6 During the term of this Agreement, in the event that Party B subscribes for any new registered capital in Party C (including the increased registered capital converted from the reserved or undistributed profits) (the "**New Shares**"), such New Shares shall automatically become the Pledged Shares hereunder, and Party B shall complete or cause to complete, within ten (10) working days after obtaining such New Shares, all the formalities necessary for creating pledge over such New Shares. In the event that Party B fail to complete the relevant formalities according to the preceding provisions, Party A shall have the right to immediately exercise the relevant pledge pursuant to the provisions of Article 5 herein.

4

**7. Assignment**

    7.1    Party B has no right to gift or assign any right or obligation hereunder without Party A's prior written consent.

    7.2    This Agreement shall be binding upon Party B and its successors, and shall be effective to Party A and its successors and assigns.

    7.3    Party A may assign all or any rights and obligations under the provisions of the Principal Contracts to any person (natural person/legal person) designated by it at any time. In such case, the assignee shall enjoy and assume such rights and obligations enjoyed and assumed by Party A hereunder, as if the assignee shall enjoy and assume as a party to this Agreement. When Party A assigns the rights and obligations under the provisions of the Principal Contracts, upon Party A's request, Party B shall execute relevant agreements and/or documents regarding such assignment.

    7.4    When Party A is changed because of any assignment, the new parties to the Pledge shall execute a new pledge agreement, and conduct registration with the corresponding industry and commerce administrative authorities.

**8. Confidentiality**

All provisions hereof and this Agreement itself are confidential information. Each party shall not disclose the confidential information to any third party other than the senior staff members, directors, employees, agents and professional consultants relating to this project; except the circumstances that the parties, pursuant to the provisions of law, are required to disclose the information relevant to this document to governments, the public or shareholders or submit this document to relevant authorities for record.

This Article 6 shall survive the modification, termination or rescission of this Agreement.

**9. Breaching Liabilities**

In the event that one party fails to perform any obligation hereunder, or any representation or warranty of the Party hereunder is materially untrue or inaccurate, the party breaches this Agreement, and shall compensate for all losses of the other parties.

**10. Force Majeure**

Where a force majeure event affects the performance of the Agreement, the party which encounters the force majeure shall immediately notify the other parties by way of telegraph, fax or other electronic means, and provide a written proof of the force majeure within fifteen (15) working days. Depending on the extent of the impact on the performance of this Agreement, all parties shall, by consultation, decide whether to terminate the Agreement or whether to partially exempt the performance obligations of this Agreement or whether to delay the performance of the Agreement.

5

**11. Miscellaneous**

11.1 This Agreement shall be governed by the laws of PRC. The parties shall resolve through amicable negotiation all disputes arising from the performance of this Agreement; in the event that the negotiation fails, the disputes shall be submitted to China International Economic and Trade Arbitration Commission for arbitration pursuant to the arbitral rules then effective of such arbitration institution. The place of arbitration shall be Beijing, the language of arbitration shall be Chinese, and the arbitration award shall be final and shall have binding force upon all the parties. Except for the part submitted to arbitration, the other parts of this Agreement shall remain effective. Subject to the provisions of the laws of PRC, the arbitrator or arbitrators may issue injunction orders over the shares in or assets of Party C (such as conducting of business or mandatory transfer of assets) or order other temporary remedies, or order the conduction of liquidation of Party C through arbitration. The parties agree that, subject to the laws of PRC, when waiting for the composition of the arbitral tribunal or in appropriate circumstances, courts with jurisdiction (including the courts in Hong Kong, at the place of registration and establishment of the company affiliated to Party A and proposed to be listed, at the place of registration of Party C, and at the places where the main assets of the company proposed to be listed or Party C are located) has the power to issue temporary measures to support the arbitral proceeding.

11.2 This Agreement shall become effective when the parties sign and seal on the date first written above, and terminate when the obligations under the Principal Contracts are fully performed or discharged for whatever reason.

11.3 This Agreement is made in Chinese. The number of copies is determined according to the number of the parties. Each party shall hold one copy, and the remaining copy shall be used for registration with the industry and commerce administrative authorities.

6

(signature page for the Share Pledge Agreement)

Party A: Beijing iQIYI New Media Science and Technology Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ Beijing iQIYI New Media Science and Technology Co., Ltd.


Party B: GONG Yu ( 龚宇 )


Signature:   /s/ GONG Yu


Party C: iQIYI Pictures (Beijing) Co., Ltd. (seal)
[*Company seal is affixed*]
/s/ iQIYI Pictures (Beijing) Co., Ltd.

7

**Schedule 1**

### List of Principal Contracts

1.  The Exclusive Management Consulting and Business Cooperation Agreement entered into by Party A, Party B, Party C and Party C's Subordinate Entities on August 30, 2017.

2.  The Exclusive Share Purchase Agreement entered into by Party A, Party B, and Party C on August 30, 2017.

3.  The Power of Attorney executed by Party B on August 30, 2017.

4.  The Loan Agreement entered into by Party A and Party B on August 30, 2017.

8

**Exhibit 10.46**

**Power of Attorney**

I, YA Ning ( 亚宁 ) , a citizen of the People's Republic of China, with ID Card No. ***, hold 50% shares in iQIYI Pictures (Beijing) Co., Ltd. (the "**Company**") at present. Subject to the laws and regulations of PRC, I hereby irrevocably authorize Beijing iQIYI New Media Science and Technology Co., Ltd. (the "**WFOE**") to exercise the following rights regarding the above aforementioned shares during the term of this Power of Attorney:

The WFOE or any person(s) designated by the WFOE (the "**Agent(s)**") are exclusively authorized to exercise on behalf of me and in its own name the rights including but not limited to the follows:

(1)     Proposing to convene a shareholders' meeting according to the articles of association of the Company, and attend the meeting and execute relevant resolutions of the meeting;

(2)     Exercising at the shareholders' meetings of the Company all the shareholder rights I have under the law and the articles of association of the Company, including but not limited to voting rights, nomination rights and appointment rights;

(3)     Submitting to relevant government supervisory authorities any documents the Company's shareholders are required to submit;

(4)     Exercising the right to dividend, the right to sell, transfer, pledge or dispose of the shares in the Company I hold in whole or in part, or the right to distribution of the residual assets after liquidation of the Company under the law and the articles of association of the Company;

(5)     When the Company is liquidated or dissolved, forming the liquidation group and exercising the group's powers during the liquidation according to the law, including but not limited to management of the Company's assets; and

(6)     Other rights enjoyed by me as a shareholder of the Company.

Without restricting the authorization herein, the Agent(s) has the right to, within the scope of my authorization and on my behalf, execute and perform the Share Transfer Contract contemplated in the Exclusive Share Purchase Agreement to which I am a party, and execute and perform on time the Share Pledge Agreement and the Exclusive Share Purchase Agreement and the supplemental agreements thereto to which I am a party.

During the term of this Power of Attorney and subject to the laws of PRC, I undertake that, as soon as possible and within three (3) days after receiving any dividend, bonus or asset distributed by the Company, I will deliver such dividend, bonus or asset free of charge to the WFOE or its designated third party.

During the period I am the Company's shareholder, regardless of any change of the percentage of the shares in the Company I hold, this Power of Attorney shall be irrevocable and continuously effective since the date of execution; when and only when the WFOE sends a written notice to me requesting replacement of the Agent(s), I shall immediately appoint another person(s) designated by the WFOE to exercise the entrusted rights under this Power of Attorney, and the new authorization and entrustment once made shall immediately replace the original; except for this, I will not revoke the entrustment and authorization made to the Agent(s). During the term of this Power of Attorney, I hereby waive all the rights entrusted to the Agent(s) through this Power of Attorney, and will no longer exercise such rights by myself. When I become a person with no or limited capacity for civil conduct owing to death or illness, my successor, guardian or administrator may not succeed or manage the rights I have as a shareholder of the Company until he/she/it undertake to continue to comply with this Power of Attorney.

I will acknowledge and assume the corresponding liabilities from any legal consequence arising out of the exercise of the entrusted rights above by the Agent(s). I hereby confirm that, under any circumstance, the Agent(s) shall not be required to assume any liability or make any economic compensation regarding the exercise of the entrusted rights above. I agree to indemnify the WFOE for all the losses it suffers or may suffer because of the designation of the Agent(s) to exercise the entrusted rights and hold the WFOE harmless, including but not limited to any loss arising out of any litigation, recovery, arbitration or claim of damages brought by any third party against the WFOE, or any administrative investigation or penalty.

I will provide sufficient assistance for the Agent(s) to exercise the entrusted rights above, and cause the Company to provide sufficient assistance, including prompt execution of the resolutions of shareholders' meetings made by the Agent(s) or any other relevant legal documents and granting the Agent(s) the access to various relevant information about the Company's operation, business, clients, finance and employees, etc. and enabling the Agent(s) to consult the Company's relevant documents, when necessary (for example, to meet the requirements by governmental authorities for review and approval, registration and filing).

In the event that the grant or exercise of the entrusted rights above become impossible for any reason (except for my breach of the provisions of this Power of Attorney) at any time during the term of this Power of Attorney, all the parties shall immediately seek for the alternative solution closest to the unrealizable provision, and when necessary, execute supplemental agreements and amend or adjust the provisions of this Power of Attorney, to ensure the continuance of realization of the purpose of this Power of Attorney.

This Power of Attorney becomes effective upon execution. Upon execution, this Power of Attorney shall replace any undertaking, memorandum of understanding, agreement or any other document (if applicable) previously made regarding the subject matter of this Power of Attorney, and shall remain effective during the term of the Agreement on Exclusive Management Consulting and Business Cooperation entered into by the WFOE, the Company, me and other relevant party.

2

YA Ning ( 亚宁 )

Signature:   /s/ YA Ning

Date: August 30, 2017

3

**Exhibit 10.47**

**Power of Attorney**

I, GONG Yu ( 龚宇 ), a citizen of the People's Republic of China, with ID Card No. ***, hold 50% shares in iQIYI Pictures (Beijing) Co., Ltd. (the "**Company**") at present. Subject to the laws and regulations of PRC, I hereby irrevocably authorize Beijing iQIYI New Media Science and Technology Co., Ltd. (the "**WFOE**") to exercise the following rights regarding the above aforementioned shares during the term of this Power of Attorney:

The WFOE or any person(s) designated by the WFOE (the "**Agent(s)**") are exclusively authorized to exercise on behalf of me and in its own name the rights including but not limited to the follows:

(1) Proposing to convene a shareholders' meeting according to the articles of association of the Company, and attend the meeting and execute relevant resolutions of the meeting;

(2) Exercising at the shareholders' meetings of the Company all the shareholder rights I have under the law and the articles of association of the Company, including but not limited to voting rights, nomination rights and appointment rights;

(3) Submitting to relevant government supervisory authorities any documents the Company's shareholders are required to submit;

(4) Exercising the right to dividend, the right to sell, transfer, pledge or dispose of the shares in the Company I hold in whole or in part, or the right to distribution of the residual assets after liquidation of the Company under the law and the articles of association of the Company;

(5) When the Company is liquidated or dissolved, forming the liquidation group and exercising the group's powers during the liquidation according to the law, including but not limited to management of the Company's assets; and

(6) Other rights enjoyed by me as a shareholder of the Company.

Without restricting the authorization herein, the Agent(s) has the right to, within the scope of my authorization and on my behalf, execute and perform the Share Transfer Contract contemplated in the Exclusive Share Purchase Agreement to which I am a party, and execute and perform on time the Share Pledge Agreement and the Exclusive Share Purchase Agreement and the supplemental agreements thereto to which I am a party.

During the term of this Power of Attorney and subject to the laws of PRC, I undertake that, as soon as possible and within three (3) days after receiving any dividend, bonus or asset distributed by the Company, I will deliver such dividend, bonus or asset free of charge to the WFOE or its designated third party.

During the period I am the Company's shareholder, regardless of any change of the percentage of the shares in the Company I hold, this Power of Attorney shall be irrevocable and continuously effective since the date of execution; when and only when the WFOE sends a written notice to me requesting replacement of the Agent(s), I shall immediately appoint another person(s) designated by the WFOE to exercise the entrusted rights under this Power of Attorney, and the new authorization and entrustment once made shall immediately replace the original; except for this, I will not revoke the entrustment and authorization made to the Agent(s). During the term of this Power of Attorney, I hereby waive all the rights entrusted to the Agent(s) through this Power of Attorney, and will no longer exercise such rights by myself. When I become a person with no or limited capacity for civil conduct owing to death or illness, my successor, guardian or administrator may not succeed or manage the rights I have as a shareholder of the Company until he/she/it undertake to continue to comply with this Power of Attorney.

I will acknowledge and assume the corresponding liabilities from any legal consequence arising out of the exercise of the entrusted rights above by the Agent(s). I hereby confirm that, under any circumstance, the Agent(s) shall not be required to assume any liability or make any economic compensation regarding the exercise of the entrusted rights above. I agree to indemnify the WFOE for all the losses it suffers or may suffer because of the designation of the Agent(s) to exercise the entrusted rights and hold the WFOE harmless, including but not limited to any loss arising out of any litigation, recovery, arbitration or claim of damages brought by any third party against the WFOE, or any administrative investigation or penalty.

I will provide sufficient assistance for the Agent(s) to exercise the entrusted rights above, and cause the Company to provide sufficient assistance, including prompt execution of the resolutions of shareholders' meetings made by the Agent(s) or any other relevant legal documents and granting the Agent(s) the access to various relevant information about the Company's operation, business, clients, finance and employees, etc. and enabling the Agent(s) to consult the Company's relevant documents, when necessary (for example, to meet the requirements by governmental authorities for review and approval, registration and filing).

In the event that the grant or exercise of the entrusted rights above become impossible for any reason (except for my breach of the provisions of this Power of Attorney) at any time during the term of this Power of Attorney, all the parties shall immediately seek for the alternative solution closest to the unrealizable provision, and when necessary, execute supplemental agreements and amend or adjust the provisions of this Power of Attorney, to ensure the continuance of realization of the purpose of this Power of Attorney.

This Power of Attorney becomes effective upon execution. Upon execution, this Power of Attorney shall replace any undertaking, memorandum of understanding, agreement or any other document (if applicable) previously made regarding the subject matter of this Power of Attorney, and shall remain effective during the term of the Agreement on Exclusive Management Consulting and Business Cooperation entered into by the WFOE, the Company, me and other relevant party.

2

GONG Yu ( 龚宇 )

Signature:  /s/ GONG Yu
Date:       August 30, 2017

3

**Exhibit 10.48**

**Spousal Consent Letter**

I, MOU Yihong ( 牟一红 ) (ID Card No.:***), spouse of GONG Yu ( 龚宇 ) (ID Card No.:***), hereby issue this consent letter unconditionally and irrevocably with respect to the shares held by GONG Yu in iQIYI Pictures (Beijing) Co., Ltd. (the "**Pictures Company**")as follows:

I understand that:

(1)   All the shares held by GONG Yu in the Pictures Company shall be disposed of according to the Exclusive Share Purchase Agreement entered into by and between GONG Yu and Beijing iQIYI New Media Science and Technology Co., Ltd. ("**WFOE**") on August 30, 2017, and the shares are under control by WFOE and/or its subsidiaries through a series of agreements;

(2)   GONG Yu and WFOE executed the Loan Agreement on August 30, 2017, the entire loan WFOE provides to GONG Yu pursuant to the Loan Agreement will be used by GONG Yu to pay for the amount of contribution;

(3)   All the shares GONG Yu holds in the Pictures Company will be disposed of pursuant to the Share Pledge Agreement executed by GONG Yu, WFOE and the Pictures Company on August 30, 2017;

(4)   All the shares GONG Yu holds in the Pictures Company will be disposed of pursuant to the Exclusive Management Consulting and Business Cooperation Agreement executed by GONG Yu, WFOE and the Pictures Company on August 30, 2017;

(5)   All the shares GONG Yu holds in the Pictures Company will be disposed of pursuant to the Power of Attorney issued by GONG Yu to WFOE on August 30, 2017.

I confirm that I know and agree with GONG Yu's execution of the abovementioned Exclusive Share Purchase Agreement, Loan Agreement, Share Pledge Agreement, Exclusive Management Consulting and Business Cooperation Agreement, and Power of Attorney (collectively referred to as "**Transaction Documents**" hereinafter), and his disposal of the relevant shares in the Pictures Company pursuant to the provisions of the Transaction Documents. I will not, at any time, take conduct any act to interfere with the disposal of the abovementioned shares or claim any right or interest over them, including but not limited to claiming that the abovementioned shares in the Pictures Company belong to the matrimonial community property jointly owned by me and GONG Yu. I further confirm that, my separate authorization and consent are not needed for GONG Yu's performance of the abovementioned Transaction Documents and further amendment or termination of any of the Transaction Documents.

I undertake to execute all the necessary documents, and conduct all the necessary acts, to ensure the proper performance of the Transaction Documents (as amended from time to time).

I hereby further acknowledge, confirm and unconditionally and irrevocably agree that, if the marital relation between GONG Yu and me is dissolved, then (1) to the extent permitted by applicable laws, the shares GONG Yu holds in the Pictures Company is personal property of exclusive nature and such property shall not be determined as the matrimonial community property and shall not be divided; (2) in the event that the first provision of this paragraph contravenes applicable laws and I acquire any of the abovementioned shares ("**Spousal Interests**") in the form of matrimonial community property or other matrimonial property rights, GONG Yu shall be entitled to purchase from me the shares in whole or in part ("**Special Option**"). A written notice shall be delivered to me when exercising the Special Option ("**Exercise Notice**"). The Exercise Notice shall state the fair value of the Spousal Interests to be purchased. If I object the fair value of the Spousal Interests stated in the Exercise Notice, I shall inform GONG Yu in writing on the same date I receive the Exercise Notice. In the case I send a written notice, the fair value of such Spousal Interests shall be determined by a qualified appraiser jointly selected by GONG Yu and me. In the event that GONG Yu and I fail to reach an agreement on selection of the appraiser within ten (10) days after the execution date of the Exercise Notice, the two parties shall each select a qualified appraiser and the two appraisers shall a qualified third-party appraiser to determine the final fair value. The costs of the appraisers shall be borne by me. The closing shall occur on the tenth (10th) day after the appraisal completes.

I agree and undertake that, in the event I acquire any share in the Pictures Company for whatever reason (including reasons such as that GONG Yu does not exercise the Special Option), I shall be subject to the restrictions by the Transaction Documents (as amended from time to time) and shall comply with the obligations of a shareholder of the Pictures Company under the Transaction Documents (as amended from time to time). For this purpose, once WFOE requests, I will execute a series of documents of which the formats and contents are fundamentally the same as the Transaction Documents (as amended from time to time).

I further agree and undertake that, I will not in any circumstance conduct any act, bring any claim or initiate any litigation for any purpose in conflict with the arrangements above, whether directly or indirectly, and whether actively or passively.

This Spousal Consent Letter is governed by and interpreted according to the laws of PRC, and the principles in conflicts of laws shall not be considered. I hereby agree to keep confidential the existence and content of this Spousal Content Letter. I acknowledge that I have been advised to engage an independent consultant for preparation of this Spousal Consent Letter and have expressly rejected that advice.

Signature:                              /s/ MOU Yihong

August 30th, 2017

2

**Exhibit 10.49**

**Exclusive Technology Consulting and Service Agreement**

This Exclusive Technology Consulting and Service Agreement (the "**Agreement**") is entered into by and between the parties in Beijing, China on December 1, 2011.

Party A:    Beijing QIYI Century Science & Technology Co., Ltd.
Address:    Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing

Party B:    Beijing Xinlian Xinde Advertising Media Co., Ltd.
Address:    Room 2108, 9 North Fourth Ring Third Street, Haidian District, Beijing

Whereas:

(1) Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (hereinafter referred to as "**China**") with technology expertise and practical experience in development and design of computer software as well as a wealth of experience and professionals in information technology and services.

(2) Party B is a limited liability company incorporated in Beijing, China and engaged in value-added telecommunications services such as Internet information services.

(3) Party A intends to provide Party B with exclusive technology consulting and related services. Party B also intends to accept such services. Both parties hope to continue their cooperation and are willing to sign a written agreement to clarify their rights and obligations.

Therefore, the Parties reached the following agreement upon consultations:

1.    Exclusive Consulting and Services; Exclusive Rights and Interests

    1.1    During the term of this Agreement, Party A agrees to, as the exclusive technology consulting and service provider of Party B globally, provide Party B with relevant technology consulting and services on an exclusive basis in accordance with the terms and conditions under this Agreement (see Schedule 1 for details).

    1.2    Party B agrees to accept the technology consulting and services provided by Party A. Party B further agrees that it will not accept the technology consulting and services provided by any third party for the above business during the period of this Agreement unless Party A agrees in writing beforehand.

2. Calculation, Payment and Guarantee of the Technology Consulting and Service Fees (Hereinafter Referred to as the "**Consulting Service Fees**")

2.1 Both Parties agree that the Consulting Service Fees under this Agreement shall be calculated and paid in the manner set out in Schedule 2. Party A has the right to, at any time after its written confirmation, adjust the calculation and payment method in Schedule 2, without Party B's consent.

2.2 With respect to the Consulting Service Fees payable by Party B under this Agreement, the shareholders of Party B will provide pledge guarantee to Party A with Party B' equity held by the shareholders of Party B.

3. Intellectual Property Rights

3.1 Party A owns the copyright of the software designed by Party A and other related software, as well as the intellectual property rights of all R&D results obtained by Party A for fulfilling this Agreement and/or through R&D as a result of other agreements signed by both Parties and any rights derived from them. Such rights include, but are not limited to, patent application right, software and technology documents as carrier, copyrights or other intellectual property rights of technology materials, right to license others to use the above intellectual property rights or transfer the above intellectual property rights.

3.2 During the implementation of this Agreement, if Party B needs to use Party A's software programs or systems, the Parties will agree on the scope, manner and licensing fees of the software licenses by agreement.

4. Representations and Warranties

4.1 Party A's representations and warranties are as follows:

4.1.1 Party A is a wholly foreign-owned enterprise legally registered and effectively existing in accordance with the laws of China.

4.1.2 Party A shall sign and execute this Agreement within the scope of its power and business scope. Party A has taken appropriate corporate actions, made proper authorization and has obtained necessary consent and approval of any third party or government. Party A does not violate the laws and contracts that are binding or affecting it.

4.1.3 The signing of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party A in accordance with the terms of this Agreement.

2

4.2     Party B's representations and warranties are as follows:

    4.2.1     Party B is a limited liability company legally registered and effectively existing in accordance with the laws of China.

    4.2.2     Party B shall sign and execute this Agreement within the scope of its power and business scope. Party B has taken appropriate corporate actions, made proper authorization and has obtained necessary consent and approval of any third party or government. Party B does not violate the laws and contracts that are binding or affecting it.

    4.2.3     The signing of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party B in accordance with the terms of this Agreement.

5.     Confidentiality

5.1     Party B agrees to try its best to take all reasonable confidentiality measures to keep confidential any confidential materials and information (hereinafter referred to as the **"Confidential Information"**) of Party A which Party B understands or comes into contact with because of its acceptance of the exclusive consulting and services from Party A. Party B shall not disclose, give or transfer such confidential information to any third party without the written consent of Party A. Once the Agreement is terminated, Party B shall return any documents, materials and software with confidential information to Party A as required by Party A or destroy such documents, materials and software, shall delete any confidential information from any relevant memory device, and shall not continuously use such confidential information.

5.2     The Parties to this Agreement acknowledge and confirm that any oral or written information exchanged between the Parties for the purpose of this Agreement is confidential. Both Parties shall keep all such information in confidential and shall not disclose any relevant information to any third party without the written consent of the other Party, except for: (a) the information that is or will be known to the public (but the information is not disclosed to the public by the Party receiving the information without authorization); (b) the information required to be disclosed by applicable law or stock exchange rules or regulations; or (c) the information required to be disclosed by either Party to its legal or financial adviser for the transaction under this Agreement and the legal or financial adviser also obliges to comply with the confidentiality obligations similar to this term. The leakage of confidential information by any staff member or employing agency of either Party shall be deemed that such Party divulges the confidential information. Such party shall be liable for breach of contract.

3

5.3    Both Parties agree that this Article 5 will continue to be valid irrespective of whether the Agreement is invalid, altered, canceled, terminated or not executable.

6.    Indemnity

Party B shall be responsible for any losses, damages, obligations and expenses incurred to Party A in any action, claim or other request against Party A arising from or as a result of the contents of consulting and services requested by Party B and hold harmless Party A from and against any damages.

7.    Effectiveness and Period of Validity

7.1    This Agreement is signed on the date first above written and takes effect at the same time.

7.2    This Agreement is valid for a period of ten (10) years unless terminated earlier under this Agreement or a separate agreement between the Parties.

7.3    Before expiration of the Agreement, the period of validity can be extended with Party A's written confirmation.

7.4    If the operation term (including any extension of the period) of any Party expires or terminates for any other reason during the period specified in Article 7.2 and Article 7.3, the Agreement terminates upon termination of such Party, unless such Party has transferred its rights and obligations pursuant to Article 13 of this Agreement.

8.    Termination

8.1    Expiry on the expiry date. Unless renewed in accordance with the terms of this Agreement, this Agreement shall terminate on the expiry date.

8.2    Early termination. During the period of this Agreement, Party B shall not terminate this Agreement beforehand unless Party A commits any gross negligence, fraud, other illegal act or bankruptcy. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time by giving written notice to Party B thirty (30) days in advance. If Party B violates this Agreement during the period of this Agreement and fails to correct the default upon receipt of Party A's written notice of default within fourteen (14) days, Party A may notify Party B in writing to terminate this Agreement.

8.3    Survival. After the termination of this Agreement, the rights and obligations of the parties under Article 5, Article 10 and Article 12 will remain in effect.

4

9.     Applicable Law

The performance, interpretation and enforcement of this Agreement shall be governed by the law of China.

10.     Resolution of Disputes

In the event of a dispute between the parties concerning the interpretation and performance of the provisions of this Agreement, both Parties shall negotiate and resolve the dispute in good faith. If the parties have not reached an agreement on the resolution of the dispute within thirty (30) days after either Party requests resolution of the dispute through negotiations, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with the then effective arbitration rules. The place of arbitration shall be Beijing. The language of arbitration shall be Chinese. The arbitration award shall be final and binding on both Parties.

11.     Force Majeure

11.1     A "**Force Majeure Event**" means any event that is beyond the reasonable control of a Party and is still unavoidable even the affected party takes reasonable care, including but not limited to government acts, legal changes, natural forces, fires, explosions, storms, flooding, earthquakes, tides, lightning or war. However, lack of creditworthiness, funding or financing must not be considered as something beyond one's reasonable control. Either Party affected by any Force Majeure Event and seeking to waive performance of its obligations under this Agreement or under any terms of this Agreement shall, as soon as possible, inform the other Party in writing of this liability exemption matter.

11.2     When performance of this Agreement is delayed or obstructed by a Force Majeure Event, the Party affected by the Force Majeure Event shall not be liable for any obligations under this Agreement to the extent it is delayed or obstructed. The affected Party shall take appropriate measures to reduce or eliminate the effects of force majeure and shall endeavor to restore the performance of its obligations that are delayed or obstructed by Force Majeure Event. Once the effect of the Force Majeure Event is eliminated, the Parties agree to use their best efforts to restore performance under this Agreement.

12.     Notice

Any notice or other communication by either Party in accordance with the provisions of this Agreement shall be in Chinese or English and may be sent by personal delivery, registered mail, postage prepaid mail, or authorized courier service or fax to the following address of one or both of the Parties or other address noticed by either Party to the other Party from time to time or the address of any other person designated by such Party. The notice shall be deemed serviced (a) in case of personal delivery, when it is delivered; (b) in case of a letter, on the tenth (10) day after the registered mail is sent out (marked on the postmark) or the fourth day after it is posted with an internationally recognized courier service organization; and (c) in case of fax, at the time shown on the transmission confirmation of relevant documents.

Party A:     Beijing QIYI Century Science & Technology Co., Ltd.
Address:     Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing
Contact:     Gong Yu
Fax:
Tel:

Party B:     Beijing Xinlian Xinde Advertising Media Co., Ltd.
Address:     Room 2108, 9 North Fourth Ring Third Street, Haidian District, Beijing
Contact:     Geng Xiaohua
Fax:
Tel:

13.    Assignment of the Agreement

13.1    Party B shall not assign its rights and obligations under this Agreement to any third party unless prior written consent of Party A is obtained.

13.2    Party B hereby agrees that Party A may assign its rights and obligations under this Agreement to other third parties when it is required. Party A shall only give written notice to Party B at the time of the assignment and there is no need to obtain the consent of Party B on such assignment.

14.    Entire Agreement

Notwithstanding Article 7.1 hereof, the Parties acknowledge that this Agreement, once effective, shall constitute the entire agreement and understanding between them with respect to the content hereof, and shall replace all oral and/or written agreements and understandings concluded by the Parties with respect to the content hereof.

15.    Severability

If any provision hereof is held invalid, or unenforceable for violating any laws, the provision shall be deemed invalid in the jurisdiction where the laws are applied, and shall not affect the legal validity of other provisions hereof.

6

16.    Amendment and Supplementation

The Parties shall amend or supplement this Agreement in writing. Any amendment to or supplemental agreement of this Agreement duly signed by the Parties constitute a part of this Agreement, and have the same legal force as this Agreement.

17.    Counterparts

The Agreement is made in duplicate, with each party holding one. Each counterpart has the same legal force.

7

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

Party A:  Beijing QIYI Century Science &
          Technology Co., Ltd.

[*Company seal is affixed*]

By:       /s/ Gong Yu
Title:    legal/authorized representative


Party B:  Beijing Xinlian
          Xinde Advertising Media Co., Ltd.

[*Company seal is affixed*]

By:       /s/ Geng Xiaohua
Title:    legal/authorized representative

8

**Schedule 1: List of the Content of Technology Consulting and Services**

(1)    Server maintenance and support services for network platform management;

(2)    Development, update and upgrade of server applications and the application on any website owned or operated by Party B;

(3)    Development, update and upgrade of online user application software;

(4)    E-commerce technology services, including but not limited to the design and maintenance of e-commerce platforms;

(5)    Download software, P2P and other related technologies, and on-demand system-related technology services;

(6)    Provide design schemes, software design, page production, technology support and other technology services, and provide management consulting on advertising business operations, Internet information services and other value-added telecommunications business that Party B may be involved;

(7)    Provide labor support according to Party B's request, including but not limited to lending or dispatching relevant personnel (provided that Party B shall bear related service expenditure at its own expense);

(8)    Technical and operational staff training;

(9)    Analysis of website traffic statistics;

(10)   Sales data processing;

(11)   Technical support for platform user interaction;

(12)   Client player;

(13)   Advertising schedule release; and

(14)   Other services approved by both Parties.

9

**Schedule 2: Calculation and Payment Methods for Technology Consulting and
Service Fees**

Both parties agree that the technology consulting and service fees under this Agreement shall be calculated and paid on a quarterly basis. Party A shall inform Party B of the Consulting Service Fees incurred in the previous quarter at the end of each quarter and provide the corresponding expense details. Party B shall pay the Consulting Service Fees according to the amount given by Party A.

10

**Exhibit 10.50**

**Software Licensing Agreement**

This Software Licensing Agreement (this "Agreement") is entered into by and between the parties in Beijing, China on December 1, 2011.

Party A:       Beijing QIYI Century Science & Technology Co., Ltd.
Address:       Room 801, Floor 8, 2 Haidian East Third Street, Haidian District, Beijing

Party B:       Beijing Xinlian Xinde Advertising & Media Co., Ltd.
Address:       Room 2108, 9 North Fourth Ring West Road, Haidian District, Beijing

Whereas:

(1) Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (hereinafter referred to as "**China**") and owns the copyright in the software system (the "**Software**") listed in Appendix 1;

(2) Party B is a limited liability company incorporated in Beijing, China and engaged in value-added telecommunications services such as internet information services.

(3) Party A agrees to grant Party B a non-exclusive right to use the Software under this Agreement in accordance with the terms and conditions of this Agreement, and Party B agrees to accept such license to use the Software under the same conditions and terms.

In view of the above, the parties reached the following contract upon consultations:

1.    License

    1.1    Software

        1.1.1    Party A agrees to grant Party B and Party B agrees to accept the right to use the Software in China in accordance with the terms and conditions of this Agreement. The license under this Agreement is non-exclusive and may not be sub-licensed or transferred.

        1.1.2    Party A shall have the sole and exclusive right to the Software, including its improved version, updated version and derivative works, regardless of whether Party A or Party B create the above works. The rights and obligations under this Article 1.1.2 will remain in force after the termination of this Agreement.

    1.2    Scope

        1.2.1    The Software granted to Party B in this Agreement may only be used for the operation of Party B's internal data in the system designated by Party A. When the system designated cannot be operated, the Software can be used on the standby system. Without the consent of Party A, Party B cannot re-license the Software to others or for the training, commercial sharing and renting of third parties except as otherwise provided in this Agreement.

<div align="center">1</div>

1.2.2    The right to use the Software granted to Party B in this Agreement is valid in China only. Party B agrees not to directly or indirectly use or authorize the use of the Software in other regions.

2.    Payment Method

Party B agrees to pay Party A software royalties (hereinafter referred to as the "**Royalties**"). The calculation method and payment method of the Royalties are shown in Appendix 2. Party A has the right to decide based on actual situation to cancel the obligation of Party B to pay the Royalties or to adjust the amount of the Royalties prescribed in Appendix 2 at any time.

3.    Party A's Rights and Rights Protection

3.1    Party B agrees not to challenge the copyright or other rights enjoyed by Party A with respect to the above Software within the valid period or after the expiration of the Agreement, not to challenge the validity of this Agreement and not to implement any act that Party A considers harmful to its rights and licensed act.

3.2    Party B agrees to provide Party A necessary assistance to protect Party A's rights to the Software. In the event of any infringement claim from any third party against Party A's Software, Party A may, based on its own will, respond to the claim for compensation in its own name or in the name of Party B or the Parties. In the event of any infringement by any third party of such Software, Party B shall promptly inform Party A in writing of such infringement of the Software by any third party as much as it knows. Only Party A shall have the right to decide whether to take any action against such infringement.

3.3    Party B agrees to use the Software solely in accordance with this Agreement and shall not use the Software in such a way that Party A deems it fraudulent, misleading or otherwise detrimental to the Software or Party A's reputation.

4.    Confidentiality

4.1    Party B shall keep confidential any confidential materials and information (hereinafter referred to as "**Confidential Information**") of Party A which Party B understands or has access to because of its acceptance of the Software license; and at the termination of this Agreement, Party B shall return any documents and materials with confidential information to Party A as required by Party A or destroy such documents and materials, shall delete any confidential information from any relevant memory device, and shall not continuously use such confidential information. Party B shall not disclose, give or transfer such confidential information to any third party without the written consent of Party A.

2

4.2 Both Parties agree that this Article 4 will continue to be valid irrespective of whether the Agreement is invalid, altered, canceled, terminated or not executable.

5. Representations and Warranties

5.1 Party A's representations and warranties are as follows:

5.1.1 Party A is a wholly foreign-owned enterprise legally registered and effectively existing in accordance with the laws of China.

5.1.2 Party A shall sign and execute this Agreement within the scope of its power and business scope. Party A has taken appropriate corporate actions, made proper authorization and has obtained (if necessary) the consent and approval of any third party or government. Party A does not violate the laws and company restrictions that are binding or affecting it.

5.1.3 The signing of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party A in accordance with the terms of this Agreement.

5.1.4 Party A has the copyright to the Software.

5.2 Party B's representations and warranties are as follows:

5.2.1 Party B is a company legally registered and effectively existing in accordance with the laws of China.

5.2.2 Party B shall sign and execute this Agreement within the scope of its power and business scope. Party B has taken appropriate corporate actions, made proper authorization and has obtained (if necessary) the consent and approval of any third party or government. Party B does not violate the laws and company restrictions that are binding or affecting it.

5.2.3 The signing of this Agreement constitutes a legal, effective, binding and enforceable obligation to Party B in accordance with the terms of this Agreement.

6. Effectiveness and Period of Validity

6.1 This Agreement is signed on the date first above written and takes effect at the same time. Unless terminated early in accordance with this Agreement, the Agreement is valid for five years. Party A and Party B shall review the content of this Agreement every six (6) months after signing of the Agreement, in order to decide whether any amendment or supplement is needed based on the circumstances then applicable.

3

6.2    After its expiration, the Agreement can be postponed with Party A's written confirmation and without the consent of Party B.

7.    Termination

7.1    Early Termination

Without prejudice to any right or remedy enjoyed by the Party requesting early termination of the Agreement under law or for any other reason, either Party may immediately terminate this Agreement by giving written notice to the other Party if the other Party commits any material breach of Agreement, including but not limited to a breach of an obligation under Article 3 of this Agreement, and such Party fails to correct the breach within 30 days upon receipt by the non-defaulting Party of the notification of occurrence and existence of any breach of contract. During the validity of this Agreement, Party A may terminate this Agreement at any time by giving written notice to Party B 30 days in advance.

7.2    The effect of termination or expiration of the Agreement

After the Agreement is terminated or expired, Party B no longer has all the rights granted to it in this Agreement. Party B shall not use the Software either directly or indirectly.

8.    Force Majeure

8.1    A "**Force Majeure Event**" means any event that is beyond the reasonable control of a Party and is still unavoidable even the affected Party takes reasonable care, including but not limited to government acts, legal changes, natural forces, fires, explosions, storms, flooding, earthquakes, tides, lightning or war. However, lack of credit, funding or financing must not be considered as something beyond one's reasonable control. Either Party affected by an Force Majeure Event and seeking to waive a performance of its obligations under this Agreement or under any terms of this Agreement shall, as soon as possible, inform the other Party in writing of this liability exemption matter.

8.2    When performance of this Agreement is delayed or obstructed due to a Force Majeure Event, the Party affected by the Force Majeure Event will be not be held liable under this Agreement; provided, however,that the affected Party may be exempt from performance of the obligation to the extent that is delayed or obstructed by the Force Majeure Event only if it makes all reasonable and practicable efforts to fulfill the Agreement. Once the cause for such exemption from liability is corrected and remedied, the Parties agree to use their best efforts to restore performance of this Agreement.

4

9.   Resolution of Disputes

In the event of a dispute between the Parties concerning the interpretation and performance of the provisions of this Agreement, both Parties shall negotiate and resolve the dispute in good faith. If the Parties have not reached an agreement on the resolution of the dispute within 30 days after either Party requests resolution of the dispute through negotiations, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with the then effective arbitration rules. The place of arbitration is in Beijing. The language of arbitration is Chinese. The arbitration award shall be final and binding on both Parties.

10.  Notice

Any notice or other communication by either Party in accordance with the provisions of this Agreement shall be in Chinese and may be sent by hand delivery, registered mail, postage prepaid mail, or authorized courier service or fax to the following address of one or both of the Parties or other address noticed by either Party to the other Party from time to time or the address of any other person designated by such Party. The date on which a notice is deemed to be actually served shall be determined as follows: (a) for a notice sent by hand delivery, the day of delivery shall be deemed to have been actually served; (b) for a notice sent by letter, the tenth (10) day after the registered mail is sent out (marked on the postmark) or the fourth day after it is sent to an internationally recognized courier service organization shall be deemed to have been actually served; and (c) for a notice sent by facsimile, the time of receipt shown on the delivery confirmation sheet of relevant documents shall be deemed to have been actually served.

Party A:      Beijing QIYI Century Science & Technology Co., Ltd.
Address:      Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing
Fax:
Tel.:

Party B:      Beijing Xinlian Xinde Advertising & Media Co., Ltd.
Address:      Room 2108, 9 North Fourth Ring West Road, Haidian District, Beijing
Fax:
Tel.:

11.  Re-Transfer; Sub-License

Party B shall not transfer, pledge or sub-license this Agreement and the rights and obligations of Party B under this Agreement without Party A's written consent.

12.  Applicable Law

The validity, performance and interpretation of this Agreement shall be governed by the law of China.

5

13.  Amendment and Supplementation

Both Parties shall make changes and supplements to this Agreement in the form of written contracts. The amendment contracts and supplementary contracts related to the Agreement and signed by the Parties are an integral part of this Agreement and have the same legal effect as the Agreement.

14.  Severability

If any of the terms under the Agreement is invalid or unenforceable due to inconsistency with the law, such term is void or unenforceable only within the jurisdiction of the law and shall not affect the legal effect of other terms of the Agreement.

15.  Schedules

Any schedule/appendix to this Agreement is an integral part of this Agreement and has the same legal effect as this Agreement.

[The remainder of this page is intentionally left blank.]

6

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective legal or authorized representatives on the first date written above.

Party A: Beijing QIYI Century Science &Technology Co., Ltd.

[*Company seal is affixed*]

By:    /s/ Gong Yu
Title:   legal/authorized representative

Party B: Beijing Xinlian Xinde Advertising & Media Co., Ltd.

[*Company seal is affixed*]

By:    /s/ Geng Xiaohua
Title:   legal/authorized representative

7

**Schedule 1**

**Specific Content of the Software**

8

**Schedule 2**

**Calculation Method and Payment Method of Software Royalties**

Party A enjoys the right to unilaterally decide the Software royalties and the calculation method for the Software royalties. Party A will notify Party B of specific costs and calculation method. The Parties may negotiate to determine the payment method.

9

**Exhibit 10.51**

**Trademark Licensing Agreement**

This Trademark Licensing Agreement (hereinafter referred to as "**this Agreement**") is made by and between the following parties on December 1, 2011 in Beijing.

Licensor: Beijing QIYI Century Science & Technology Co., Ltd.
Address: Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing

Licensee: Beijing Xinlian Xinde Advertising Media Co., Ltd.
Address: Room 2108, 9 North Fourth Ring Third Street, Haidian District, Beijing

Whereas,

1.  The Licensor is a wholly foreign-owned enterprise incorporated in Beijing, the People's Republic of China ("**China**"). It owns the right to use the trademarks that are shown in Schedule I and is under registration application and has the right to license the use of such trademark to a third party;

2.  The Licensee is a limited liability company incorporated in Beijing, China; and

3.  The Licensor agrees to grant the Licensee the right to use the aforesaid trademarks in accordance with the terms and conditions of this Agreement, and the Licensee agrees to accept such license in accordance with the same terms and conditions.

NOW, THEREFORE, the Parties, through negotiation, mutually reach this Agreement as follows:

1.  Granting of License

1.1  Trademark licensing

Subject to the terms of this Agreement, the Licensor agrees to grant the Licensee the exclusive right and the Licensee agrees to accept such exclusive right granted by the Licensor to use all or any part of the trademarks as shown in Schedule I or to display any graphic, text, label, or mark of any part of the aforesaid trademarks (hereinafter collectively referred to as "**Trademarks**"). Without the consent of the Licensee, the Licensor shall not grant other third parties the right to use of the Trademarks.

1.2  Scope

1.2.1  The right to use of the Trademarks granted to the Licensee hereunder applies only to websites operated by the Licensee, namely, www.iqiyi.com (related connect domains include qiyi.com, qiyi.cn, qiyi.mobi, qiyi.tv, qiyi.asia, qiyi.tel, and qiyi.hk, movie.baidu.com, and v.baidu.com (hereinafter collectively referred to as "**IQIYI**"). The Licensee agrees not to directly or indirectly use the Trademarks or license others to use the Trademarks in any other way, unless otherwise specified herein.

1.2.2  The license granted to the Licensee under this Agreement is only effective in China. The Licensee agrees not to directly or indirectly use the Trademarks or license others to use the Trademarks in other regions.

2. Terms of Payment

The Licensee agrees to pay the Licensor licensing fee. See Schedule II to this Agreement for calculation method of licensing fee and terms of payment.

3. Reputation

The Licensee recognizes the value of reputation in relation to the Trademarks, acknowledges that the Trademarks and its related rights and the reputation in relation to the Trademarks belong to the Licensor. The Trademarks have the secondary meaning in public impression.

4. Intellectual Properties and Non-disclosure Provisions

4.1 The Licensee, through due and reasonable efforts, shall ensure to keep confidential all or any part of the information of the Licensor that is marked "classified" or for which the Licensee is advised of its confidentiality ("**Confidential Information**"); when this Agreement is terminated, the Licensee shall return any document, data, or software that contain the Confidential Information to Licensor at its request or destroy such documents, data, or software by itself, delete any Confidential Information from any related memory devices, and cease to use the Confidential Information. Without the consent of the Licensor, the Licensee shall not disclose, give, or transfer such Confidential Information to any third party.

4.2 Both Parties agree that this Article 4 will survive regardless of whether this Agreement is amended, rescinded, or terminated.

5. Representations and Warranties

5.1 The Licensor represents and warrants that:

5.1.1 The Licensor is a company that is duly incorporated and existing under laws of China in Beijing.

5.1.2 The Licensor executes and fulfills this Agreement within its corporate power and scope of business and has taken necessary corporate actions to duly grant the license and obtain the consents and approvals of third parties and government authorities; and it does not violate any binding or affecting legal or corporate restrictions.

5.1.3 This Agreement, upon execution, will constitute a legal, effective, and binding obligation that is enforceable against it according to the terms of this Agreement.

5.1.4 The Licensor owns the right to use of the Trademarks and has the right to license the Licensee to use the Trademarks.

5.2 The Licensee represents and warrants that:

5.2.1    The Licensee is a company that is duly incorporated and existing under the laws of China in Beijing.

5.2.2    The Licensee executes and fulfills this Agreement within its corporate power and scope of business and has taken necessary corporate actions to duly accept the license and obtain the consents and approvals of third parties and government authorities; and it does not violate any binding or affecting legal or corporate restrictions.

5.2.3    This Agreement, upon execution, will constitute a legal, effective, and binding obligation that is enforceable against it according to the terms of this Agreement.

6.    The Licensor's Right to Use and Protection of Licensor's Rights

6.1    The Licensee agrees that, during and after the term of this Agreement, it will not challenge the right to use or other rights that the Licensor is entitled to in respect of the Trademarks, challenge the effectiveness of this Agreement, or conduct any behavior that the Licensor will deem prejudicial to these rights and licensing.

6.2    The Licensee agrees to provide the Licensor necessary assistance to protect the rights owned by the Licensor in respect of the Trademarks. In case that any third party files claims in respect of the Trademarks, the Licensor, at its own discretion, may appear and defend against the claim in its own name, in the Licensee's name, or in both Parties' name. In case of any infringement of the Trademarks by any third party, the Licensee shall immediately notify the Licensor in writing of such infringement of the Trademarks to the extent of its knowledge. Only the Licensor has the right to decide whether it will take action against such infringement.

6.3    The Licensee agrees to use the Trademarks only in accordance with this Agreement and that it will not use the Trademarks in such a way that the Licensor may deem fraudulent, misleading, or otherwise prejudicial to the reputation of the Trademarks or the Licensor.

7.    Quality of IQIYI

The Licensee shall do its utmost to improve the quality of IQIYI, to protect and enhance the reputation represented by the Trademarks.

8.    Promotion Materials

8.1    Under any circumstance, where the Licensee expects to produce any publicity material containing the Trademarks, the Licensee shall be responsible for the costs and time for production of such publicity materials. The Licensor has sole and exclusive right to the ownership of the publicity materials that involve the Trademarks hereunder or its duplicates, including all intellectual properties, no matter whether such publicity materials are invented or used by the Licensor or the Licensee.

8.2     The Licensee agrees that, without written approval of the Licensor in advance, it will not publicize or broadcast the Trademarks hereunder on broadcast, TV, newspapers, magazines, internet (except the website specified in Clause 1.2.1), or other media.

9.      Competing Websites

If the Trademarks and the trademarks of the Licensor or the affiliates of its parent company are in conflict with the trademarks in current or future use, the Licensee has the right to terminate this Agreement by sending a written notice to the Licensee thirty (30) days in advance.

10.     Effectiveness and Term of this Agreement

10.1    This Agreement will be executed and become effective on the date first stated above. Unless this Agreement is terminated early, the term of this Agreement shall be five (5) years.

10.2    Unless the Licensor notifies in writing before expiration of non-renewal of this Agreement, this Agreement shall be automatically extended for one (1) year upon expiration (including expiration of any renewal).

11.     Termination

11.1    Upon the Licensor's written notification of non-renewal of this Agreement, this Agreement will be terminated on the date of expiration or expiration of renewal.

11.2    Without prejudice to the rights or remedies that the Party terminating this Agreement is entitled to due to legal or other reasons, any Party may immediately terminate this Agreement by sending a notice to the other Party when the other Party materially breaches this Agreement, including but not limited to breach of the obligations under Clauses 6.1, 6.2, and 6.3 hereunder, and it fails to rectify such breach within thirty (30) days after the other Party receives the notification of occurrence and existence of the breach from the non-defaulting Party. The Licensor may terminate this Agreement by notifying the Licensee in writing at any time during the term of this Agreement. The termination notification will take effect thirty (30) days after service.

11.3    Clauses 3, 4, 6, and 16 will survive the termination of this Agreement.

12.     Effect of Termination or Expiration of this Agreement

When this Agreement terminates or expires, all rights granted to the Licensee shall be immediately returned to the Licensor. The Licensor may freely transfer the right to use of the Trademarks to other persons. The Licensee shall no longer use the Trademarks, either directly or indirectly.

13.     Force Majeure

13.1    "**Force Majeure event**" refers to any event that is beyond the reasonable control of any Party and is unavoidable despite reasonable care of the affected Party. It includes but is not limited to government actions, change in law, act of god, fire, explosion, geologic changes, storm, flood, earthquake, tides, lightning, or war. Credit, funds, or financing constraints shall not be deemed beyond the reasonable control of one Party. The Party that is affected by Force Majeure events and seeks exemption from liabilities under this Agreement or any provision of this Agreement shall notify the other Party of such exemption of liabilities as soon as possible.

13.2    When the performance of this Agreement is delayed or impeded by the Force Majeure events as defined above, the Party affected shall not assume any liability under this Agreement in respect of the part whose performance is delayed or impeded. The Party seeking exemption of liability, however, can be exempted from performance of the liability in respect of the part whose performance is delayed or impeded, provided that the Party affected makes reasonable and practical efforts to fulfill this Agreement. Once the causes to such exemption of liability is rectified or remedied, both Parties agree to resume performance of liabilities hereunder with their best efforts.

14.    Notice

Notices or other communications that are given by any Party under this Agreement shall be written in Chinese and shall be deemed served when they are sent to the address(es) of the related Party or both Parties by means of courier, registered air mail, prepaid air mail, or accepted express delivery service, or facsimile (the Party sending the notice by facsimile shall send the photocopy of the documents to be faxed afterwards for confirmation).

Licensor: Beijing QIYI Century Science & Technology Co., Ltd.
Recipient: Gong Yu
Tel:
Fax:

Licensee: Beijing Xinlian Xinde Advertising Media Co., Ltd.
Recipient: Geng Xiaohua
Tel:
Fax:

15.    Transfer and Sub-licensing

15.1    This Agreement and the rights and obligations that the Licensor grants to the Licensee under this Agreement shall not be transferred, pledged, or sub-licensed without the written consent of the Licensor.

15.2    The Licensee hereby agrees that, the Licensor may transfer its rights and obligations hereunder to other third parties when necessary, the Licensor needs to notify the Licensee in writing upon the occurrence of such transfer, and the Licensor does not need to obtain the consent of the Licensee in respect of such transfer.

16.    Dispute Resolution

Where any dispute arises between the Parties in respect of interpretation and fulfillment of the clauses hereunder, they shall resolve the dispute through consultation with good faith. If the Parties do not reach an agreement on settlement of dispute within thirty (30) days after one Party requires resolution of the dispute through consultation, any Party may submit the dispute to China International Economic and Trade Arbitration Commission. The arbitration award shall be final and binding on both Parties.

17.    Governing Law

The performance, interpretation, and enforcement of this Agreement shall be governed by the laws of the People's Republic of China.

18.    Amendment and Supplementation of this Agreement

Both Parties may amend and supplement this Agreement by a written agreement. Amendments and supplemental agreements in relation to this Agreement duly signed by both Parties shall constitute an integral part of this Agreement and shall have the same legal force as this Agreement.

19.    Severability of this Agreement

If any of the provisions of this Agreement becomes invalid or unenforceable because of inconsistency of related laws, this provision shall only be held invalid to the extent governed by related laws and shall not affect the validity of other provisions hereunder.

20.    Schedules to this Agreement

Any Schedule to this Agreement shall be an integral part of this Agreement and shall have the same legal effect as this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective authorized representatives on the first date written above.

Licensor: Beijing QIYI Century Science &Technology Co., Ltd.

[*Company seal is affixed*]

By:     /s/ Gong Yu
Title:   Executive Director

Licensee: Beijing Xinlian Xinde Advertising Media Co., Ltd.

[*Company seal is affixed*]

By:     /s/ Geng Xiaohua
Title:   Executive Director

Schedule I

List of Trademarks

Schedule II

Calculation Methods of Licensing Fee and Terms of Payment

Party A has the right to unilaterally decide the licensing fee and calculation method of such fee. Party A will otherwise notify Party B of the specific amount and calculation method of the licensing fee. The Parties may determine the terms of payment through consultation.

**Exhibit 10.52**

**Business Cooperation Agreement**

This Business Cooperation Agreement (hereinafter referred to as "**this Agreement**") is made by and between the following parties in Beijing on December 1, 2011:

Party A: Beijing QIYI Century Science &Technology Co., Ltd.
Address: Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing

Party B: Beijing Xinlian Xinde Advertising Media Co., Ltd.
Address: Room 2108, 9 North Fourth Ring Third Street, Haidian District, Beijing

Whereas,

1. Party A is a wholly foreign-owned enterprise that is duly incorporated and validly existing under the laws of the People's Republic of China ("China"). It owns abundant experience and professional staff in software design, research & development, information technology, and services and possesses certain customer resources;

2. Party B is a limited liability company that is duly incorporated and validly exists in Beijing, China, and is engaged in internet information service and other value-added telecommunication services. Party B now operates the websites of www.iqiyi.com (whose related connect domains include qiyi.com, qiyi.cn, qiyi.mobi, qiyi.tv, qiyi.asia, qiyi.tel, and qiyi.hk) (hereinafter collectively referred to as "IQIYI"); and

3. Party A and Party B intend to cooperate closely and jointly develop network resources, to develop a long-term mutually-complementing and friendly partnership and provide customers with best internet information services.

NOW, THEREFORE, Party A and Party B, in the principle of equality and free will, reach the following cooperation agreement through friendly negotiation:

1. Rights and Obligations of the Parties

    1.1 Party A agrees that, internet information services (including but not limited to network information issuing and network information retrieval), online advertising, and other related services required during its business operation (including but not limited to information technology services) (and that may be involved during Party A's provision of services or products to its customers) shall be supplied by Party B; Party B agrees to use P2P download, video-on-demand system, and other technological services supplied by Party A on its IQIYI website and to supply the said internet information service and related services.

    1.2 Party A authorizes Party B to use application software systems owned by Party A, including but not limited to Baidu Download software, P2P download technology, and video-on-demand system, on IQIYI website. The Parties will otherwise agree on the scope of software licensing, licensing methods, and licensing fees.

2.    Payment and Settlement

2.1    In consideration of internet information service and other related services supplied by Party B, Party A agrees to pay Party B for the information and related services. Service charges shall be collected based on the rates specified in Annex I and be subject to adjustment by both Parties in line with the actual situation.

2.2    The Parties hereby acknowledge that, in respect of the internet information service and related services that Party B supplies to Party A prior to execution of this Agreement, Party A has paid all service charges in full by covering operation costs and other means.

3.    Representations and Warranties

3.1    Party A hereby represents and warrants that:

3.1.1    Party A is a wholly foreign-owned enterprise that is duly incorporated and validly exists under the laws of China;

3.1.2    Party A executes and performs this Agreement within its corporate power and scope of business and has taken necessary corporate actions, granted proper authorization, and obtained necessary consents and approvals from third parties and government authorities; and it does not violate any binding or affecting legal or corporate restrictions; and

3.1.3    This Agreement, upon execution, will constitute a legal, effective, and binding obligation that is enforceable against Party A under the provisions of this Agreement.

3.2    Party B hereby represents and warrants that:

3.2.1    Party B is a limited liability company that is duly incorporated and validly existing under the laws of China and intends to be engaged in internet information service and other value-added telecommunication businesses;

3.2.2    Party B executes and performs this Agreement within its corporate power and scope of business and has taken necessary corporate actions, granted proper authorization, and obtained necessary consents and approvals from third parties and government authorities; and it does not violate any binding or affecting legal or corporate restrictions;

3.2.3    This Agreement, upon execution, will constitute a legal, effective, and binding obligation that is enforceable against Party B under the provisions of this Agreement.

4.    Effectiveness and Term

   4.1    This Agreement is executed and effective on the date first written above.

   4.2    Unless this Agreement is terminated early under the provisions of this Agreement or related agreements otherwise made between the Parties, the term of this Agreement shall be [ten (10)] years. If, however, any Party's term of business (including any renewal) expires or is terminated for other reasons during the said term of this Agreement, this Agreement shall be terminated upon such expiration or termination, unless the Party has transferred its rights and obligations under Clause 9 of this Agreement.

   4.3    This Agreement, before expiration, will be renewed upon written confirmation of Party A and the term of such renewal shall be determined by Party A in writing.

5.    Confidentiality

The Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The Parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other Party, except for (a) any information that has been known or will be known to the public (not disclosed by the receiving party to the public without consent); (b) any information disclosed as required by applicable laws and stock exchange rules; or (c) any information disclosed to either Party's legal or financial advisor with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein. Any disclosure by any employee of or any intermediary engaged by either Party shall be deemed a disclosure by such Party, and such Party shall assume the liability for breach of contract under this Agreement. No matter whether this Agreement becomes invalid, rescinded, altered, terminated, or inoperable, this provision will survive.

6.    Force Majeure

   6.1    A "**Force Majeure Event**" means any event that is beyond the reasonable control of either Party and are unavoidable despite reasonable care by the affected Party, including but not limited to government acts, change of laws, Acts of God, fire, explosion, storm, flood, earthquake, tide, lightening, or war. Insufficiency of creditworthiness, fund, or financing, however, shall not be deemed an event beyond either Party's reasonable control. The Party affected by a Force Majeure Event and seeking exemption of liabilities hereunder shall promptly notify the other Party of such event and steps to be taken to perform this Agreement.

   6.2    When performance of this Agreement is delayed or prevented by any Force Majeure Event, the Party affected by the event shall not be held liable hereunder to the extent of such delay and prevention. The affected Party shall take appropriate measures to mitigate or eliminate the effect of the event, and shall try to resume performance of the obligation delayed or prevented by the event. Once the effect of the Force Majeure Event is eliminated, the Parties agree to use their best efforts to resume performance of this Agreement.

7.    Dispute Resolution

7.1    This Agreement shall be governed by and interpreted in accordance with the laws of China.

7.2    When the Parties have any dispute regarding interpretation or performance of any provision hereof, they shall negotiate in good faith to resolve such dispute. If the Parties fail to reach an agreement, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration shall be conducted in Beijing and the language of arbitration shall be Chinese. The arbitration award shall be final and binding on the Parties.

8.    Notice and Service

Any notice or other communication given by either Party hereunder shall be made Chinese or English and be sent to the following address (es) of the other Party or both Parties by courier, registered mail, prepaid mail, or accepted express delivery service , or fax.

Party A: Beijing QIYI Century Science &Technology Co., Ltd.Address: Room 1001, Floor 10, 2 Haidian East Third Street, Haidian District, Beijing
Fax:
Tel:

Party B: Beijing Xinlian Xinde Advertising Media Co., Ltd.Address: Room 2108, 9 North Fourth Ring Third Street, Haidian District, Beijing
Fax:
Tel:

9.    Transfer

Party B shall not transfer its rights and obligations hereunder to any third party, unless consented by Party A in writing in advance. Party B hereby agrees that, Party A may transfer its rights and obligations hereunder to other third parties when it requires. Party A only needs to notify Party B in writing of occurrence of such transfer, without consent of Party B in respect of such transfer.

10.    Amendments and Supplements

The Parties shall make amendments and supplements to this Agreement by written agreement. Amended agreements and supplemental agreements in relation to this Agreement duly signed by the Parties shall constitute an integral part of this Agreement and shall have the same legal effect of this Agreement.

11.    Severability

If any of the provisions hereof becomes invalid or unenforceable because of inconsistency of applicable laws, this provision shall only be held invalid to the extent governed by applicable laws and shall not affect the validity or enforceability of other provisions hereof.

12.    Entire Agreement

This Agreement constitutes the complete agreement and understanding reached by the Parties hereto in respect of the subject matter hereof and shall supersede all oral and written agreements and consensus reached between the Parties in respect of the subject matter hereof prior to this Agreement.

13.    Counterparts

This Agreement is written in Chinese. It is made in two counterparts, with each Party holding one. All counterparts shall have the same legal effect.

IN WITNESS WHEREOF, the Parties have had their legal representatives or their authorized representatives to execute this Agreement on the date first written above.

[The remainder of this page is intentionally left blank.]

Party A: Beijing QIYI Century Science &Technology Co., Ltd. (seal)

By:      /s/ Gong Yu
Title:    legal/authorized representative

Party B: Beijing Xinlian Xinde Advertising Media Co., Ltd. (seal)

By:      /s/ Geng Xiaohua
Title:    legal/authorized representative

**Schedule I: Rates of Service Charges**

The rates of service charges shall be otherwise agreed by the Parties through negotiation. Party B has the right to decide whether to exempt Party A from related service charges or not.

**Exhibit 10.53**

**Renminbi Entrusted Loan Agreement**

Trustor: <u>Baidu Times Network Technology (Beijing) Co., Ltd</u>

Business License No.: <u>******</u>

Legal Representative/Responsible Person: <u>Hailong Xiang</u>

Address: <u>Tower A, Yuan Zhong Yue Lai, No. 15 Haidian Middle Street, Haidian District, Beijing</u>        Zip Code: <u>100080</u>

Beneficiary Bank and Bank Account: <u>******</u>

Telephone: <u>******</u>        Fax: <u>******</u>

Trustee: <u>Bank of China Limited Beijing Zhongguancun Center Branch</u>

Legal Representative/Responsible Person: <u>Meng Duan</u>

Address: <u>12/F, Block A, Zhonggang International Plaza, No. 8 Haidian Street, Haidian District, Beijing</u>        Zip Code: <u>100080</u>

Telephone: <u>******</u>        Fax: <u>_____</u>

Borrower: <u>Beijing QIYI Century Science & Technology Co., Ltd.</u>

Business License No.: <u>******</u>

Legal Representative/Responsible Person: <u>Yu Gong</u>

Address: <u>10/F, No. 2 Haidian Beiyi Street, Haidian District, Beijing</u>        Zip Code: <u>_____</u>

Beneficiary Bank and Bank Account: <u>******</u>

Telephone: <u>******</u>        Fax: <u>******</u>

In order to utilize funds more efficiently, the Trustor hereby entrusts the Trustee to provide entrusted loan to the Borrower. Therefore, the parties agree as follows:

**Article 1    General Provisions**

The Trustor entrusts the Trustee with the Trustor's fund to provide loan to the Borrower and to collect the principal and interests according to the agreed deadlines.

The Trustor shall independently review the credit of the Borrower, supervise the use of the loan as well as the timely repayment of principal and interests, deal with the relevant loan formalities, and assume the risks of the loan hereunder.

The Trustee's obligations hereunder shall be limited to providing loan to the Borrower, assisting the Trustor issue and mail the interest schedules and repayment notices, which shall be issued five Business Days (defined herein as the days on which banks are open for business) before the interest payment date and the Loan Repayment Date, respectively.

The Trustee assumes no risks with respect to any loan or loss hereunder, and no liabilities for any disputes arising from or in connection with this Agreement between the Trustor and the Borrower.

The entry into this Agreement by the Trustee shall not be deemed as repayment guaranty on the part of the Trustee for the Borrower.

**Article 2    Currency, Amount and Period of the Entrusted Loan**

The currency of the loan hereunder shall be Renminbi.

The amount of the loan hereunder shall not exceed Renminbi one billion.

The term of the loan hereunder shall be six months as of the drawdown date. The sixth anniversary of the drawdown date shall be the "Loan Repayment Date." If the parties agree to a specified drawdown period rather than a drawdown date, the drawdown date shall be the start date of such drawdown period.

**Article 3    Purpose of the Loan**

The loan shall be used for working capital purposes.

Unless otherwise consented by the Trustor in writing, the Borrower shall not use the loan in ways other than stated above. The Trustor and the Borrower shall not agree and the Borrower shall not use the loan as follows: invest in stocks or other securities; invest in prohibited or unapproved projects under relevant laws, regulations, rules and relevant policies; and invest in projects or uses that are prohibited for bank loans and entrusted loans.

**Article 4    Interest of the Entrusted Loan and Calculation Method**

1. The interest rate for the entrusted loan shall be 4.35% per annum, which shall remain unchanged during the term of this Agreement.

2. Calculation method: Interest shall accrue for the total amount of drawdown from the first drawdown date until the corresponding repayment date. The calculation basis is 360 days per year.

3. Interest Payment: The Borrower shall pay interest in a lump sum amount on the Loan Repayment Date or any date prior to such repayment date. If the last repayment date for principal is not an interest payment date, the Borrower shall pay all of the due and payable interest on the last repayment date. The Borrower shall pay interest on each interest payment date.

**Article 5    Term of Entrusted Loan Service**

The term of entrusted loan service provided by the Trustee shall be from the date hereof until the Loan Repayment Date. The Trustee is released from all obligations hereunder upon expiry of such term.

**Article 6    Fees of Entrusted Loan Service**

1.    The Trustor shall pay the Trustee a total amount of renminbi fifty thousand as fees of entrusted loan service.

2.    The Trustor shall pay the above fees within three days of the date hereof.

3.    If the Trustor fails to pay the above fees in time, the Trustee has the right to deduct such fees and damages from (i) the Trustor's account with the Bank of China, (ii) any amount of principal and interested collected by the Trustee on behalf of the Trustor, or (iii) other payments due from the Trustor to the Trustee.

**Article 7    Trustor's Account**

The Trustor shall open an entrusted loan settlement account with the Trustee or the entity designated by the Trustee within three days as of the date hereof.

The Trustor shall deposit the full amount of the entrusted loan into the entrusted loan settlement account as of the date hereof.

In any event, each drawdown amount by the Borrower shall not exceed the balance of the Trustor account.

The Trustee shall transfer the full amount of the principal or interest (and penalty interest) received (or deducted) each time to the entrusted loan fund account.

**Article 8    Borrower's Account**

After this Agreement goes into effect, the Borrower shall open an loan account with the Trustee or the entity designated by the Trustee for making drawdown and repaying principal and interest.

**Article 9    Drawdown Schedule**

1.    The Borrower shall drawdown the full amount of the loan hereunder on . The Borrower may not drawdown the loan prior to such date without the consent of the Trustor and the Trustee.

2.    Any amount not drawn before the deadline shall not be drawn without the consent of the Trustor and written notice by the Trustor to the Trustee. Trustee may charge penalty on the undrawn amount at the rate of $\%_{000}$ per day according to the actual number of deferred days.

3.    If the Borrower is unable to drawdown the full amount of the loan due to failure by the Trustor to deposit the full amount of the loan into the entrusted loan account, the Trustor shall pay a penalty to the Borrower on the amount that should have been available for drawdown at the rate of $\%_{000}$ per day according to the actual number of deferred days.

3

**Article 10   Conditions Precedent**

The Borrower may make a drawdown upon satisfaction of all of the following conditions:

1.   The Trustor has opened an entrusted loan account with the Trustee or its designated branch, and deposited the full amount of the entrusted loan into such account.

2.   The Borrower has opened a loan account with the Trustee or its designated branch.

3.   This Agreement and its appendix goes into effect.

4.   The Borrower has provided to the Trustee a list of persons authorized to execute this Agreement and documents relating to this Agreement as well as their respective specimen signatures.

5.   The Trustee has received the Entrusted Loan Drawdown Application from the Borrower.

6.   Other conditions agreed among the parties hereto for drawdown.

**Article 11 Repayment Schedule and Conditions for Early Repayment**

Borrower shall repay the full amount of the loan hereunder (including principal and interest) on the Loan Repayment Date, provided that the Borrower shall make written application for any adjustment to the repayment schedule three days prior to the deadline and obtain the Trustor's written consent. The Trustor shall notify the Trustee in writing of its consent to any adjustment of repayment schedule.

With Trustor's consent, the early repayment shall be used to repay the last due amount in reverse order.

In the event that (i) Qiyi.com, Inc., a Cayman Islands company and an affiliate of the Borrower (hereinafter "Qiyi"), and its subsidiaries as well as controlled affiliates (together with Qiyi, hereinafter "Qiyi Group") has a change of control, including but not limited to, loss of control of Qiyi Group by Baidu Holdings Limited, a British Virgin Islands company and an affiliate of the Trustor (hereinafter "Baidu") ("control" being (a) ownership of 50% or more of, whether through investment relationship, agreements or other arrangements, directly or indirectly, the total voting power of Qiyi, (b) the right to appoint half or more of the directors of Qiyi, or (c) the right to acquire 50% or more of the assets of Qiyi Group); or (ii) the closing of the next funding round of the Borrower, Qiyi or its subsidiaries and controlled affiliates, whichever of (i) and (ii) occurs first, the Trustor has the right to immediately demand repayment of the principal and interest hereunder by the Borrower. The Borrower, upon receipt of such demand from the Trustor, shall repay the principal and interest hereunder within 30 Business Days.

For the amount early repaid with the Trustor's consent, the Borrower shall not request to drawdown for a second time, unless the Trustor and the Borrower otherwise agree and the Trustor notifies the Trustee of such agreement in writing.

The Borrower shall deposit sufficient funds into the following account no later than three Business Days before the Loan Repayment Date.

Account Name: Beijing QIYI Century Science & Technology Co., Ltd.

Beneficiary Bank: ****** Account Number: ******

4

**Article 12    Overdue Interest and Misappropriation**

If the Borrower fails to make repayment on schedule and no agreement is entered with respect to repayment extension, then such unpaid amount (including principal and interest) shall be overdue amount. The Trustor may charge interest on such overdue amount at the rate of $\%_{000}$ per day.

If the Borrower uses the loan in ways other than those provided herein, the Trustor may charge penalty interest on the misappropriated amount at the rate of $\%_{000}$ per day.

The Trustee shall be deemed to have been authorized by the Trustor upon the execution of this Agreement and may collect the above penalty interest on behalf of the Trustor with Trustor's notice.

**Article 13 Borrower's Representations and Warranties**

1.   **The Borrower makes the following representations:**

(1)    The Borrower is an enterprise legal person duly registered under PRC laws and regulations, with all necessary rights and authorizations to conduct business activities in its own name or become a party to any legal action, and has lawful right to dispose the assets it manages.

(2)    The Borrower's execution and performance of this Agreement is made on a voluntary basis with necessary authorization. Such authorization and the execution and performance do not violate the Articles of Association of the Borrower or any other regulations or contracts binding on the Borrower. All the formalities required for the execution and performance of this Agreement by the Borrower have been duly completed.

(3)    All the documents, statements and certificates provided by the Borrower to the Trustor and Trustee for the loan hereunder are accurate, true, complete and valid.

(4)    The purpose of the loan is compliant with relevant PRC laws, regulations, rules and policies.

(5)    The business for which the Borrower intends to apply the loan hereunder is genuine, legitimate and not related to illegal purposes such as money laundering.

2.   **The Borrower makes the following warranties:**

(1)    The Borrower will provide its most updated financial statements as requested by the Trustor.

(2)    The Borrower will not reduce its registered capital by means whatsoever and will not significantly change its properties right or adjust its operational mode without written notice to the Trustor and Trustee.

(3)    The Borrower warrants that it will notify the Trustor and the Trustee immediately in case of:

a.    any breach of this Agreement or of any other agreement signed between the Borrower and the Trustee;

b.    severe difficulties in the Borrower's operation and a deteriorated financial condition;

5

**Article 14 Trustor's Representations and Warranties**

1. **The Trustor makes the following representations:**

(1) The Trustor is an enterprise legal person duly registered under PRC laws and regulations, with all necessary rights and authorizations to conduct business activities in its own name or become a party to any legal action, and has lawful right to dispose the assets it manages.

(2) The Trustor's execution and performance of this Agreement is made on a voluntary basis with necessary authorization. Such authorization and the execution and performance do not violate the Articles of Association of the Trustor or any other regulations or contracts binding on the Borrower. All the formalities required for the execution and performance of this Agreement by the Borrower have been duly completed.

(3) All the documents, statements and certificates provided by the Trustor to the Trustee for the loan hereunder are accurate, true, complete and valid.

(4) The Trustor decides the Borrower, purpose of loans, interest rate and loan term hereunder on its own determination and in compliance with relevant PRC laws, regulations, rules and policies.

(6) The loan funds provided by the Trustor is lawful and under the Trustor's ownership, control and disposal. There exists no circumstances that would restrict or prohibit the provision of entrusted loan hereunder. The business for the loan hereunder is genuine, legitimate and not related to illegal purposes such as money laundering.

2. **The Trustor makes the following warranties:**

(1) The Trustor will deposit self-owned funds in the account for the funds of entrusted loan in accordance with this Agreement, and undertakes that the amount of the funds in such account will be no less than the amount of the funds to be withdrawn by the Borrower in accordance with this Agreement.

(2) The Trustor will pay for the handling fee of the entrusted loan to the Trustee in accordance with this Agreement.

(3) The Trustor will hold the Trustee harmless against all damages, claims lawsuits and related loss, expenses, compensation and liabilities incurred by the Borrower as a result of negligence or fault on the part of the Trustor. If the Trustee suffers any actual loss (including but not limited to litigation costs, arbitration fees and attorney's fees) as a result of claims brought by the Borrower against the Trustor or the Trustee, the Trustor shall reimburse the Trustee in full.

**Article 15    Events of Default and Default Liabilities**

1. **Events of Default by the Borrower and Consequences Thereof**

The occurrence of any of the following events will constitute a default by the Borrower under this Agreement:

6

(1)    The Borrower has not utilized the loan for the purposes as stipulated by this Agreement;

(2)    The Borrower has failed to repay the principle due or pay the interest, the expenses or other payables due in accordance with this Agreement;

(3)    The warranties and representations by the Borrower set forth in this Agreement is untrue;

(4)    The Borrower has breached any other provision of this Agreement regarding its obligations; and

(5)    The Borrower ceases operation or enter into liquidation, administration or bankruptcy.

In case any of the above events of default has occurred, the Trustor, or the Trustee with the consent by the Trustor, is entitled to take the following actions separately or concurrently:

(1)    To request the Borrower to rectify the default within a time limit;

(2)    To terminate or cancel the loan facility that has not been withdrawn by the Borrower; or

(3)    To declare that all the principle and interest thereof under this Agreement become due immediately, and request the Borrower to repay immediately all the principle and interest of the loan facility and the relevant expenses unconditionally.

**2.    Events of Default by Trustee and Consequences Thereof**

Occurrence of the following event will constitute a default by the Trustee under this Agreement: The Trustee unreasonably rejects a withdrawal by the Borrower that is made in accordance with this Agreement; If such default event by the Trustee has occurred, the Trustor is entitled to separately or concurrently take the followings actions:

(i)    To request the Trustee to rectify the default within a prescribed time limit;

(ii)    The Trustor is entitled to change the Trustee.

**3.    Events of Default by Trustor and Consequences Thereof**

Occurrence of any of the following events will constitute a default by the Trustor under this Agreement:

(1)    No adequate funds has been deposited in (remitted to) the Trustor's account opened with the Trustee in accordance with this Agreement;

(2)    The Trustor has failed to pay the Trustee the handing fee for the entrusted loan in accordance with the Contract;

(3)    The warranties and representations by the Trustor set forth in this Agreement is untrue; and

(4)    The Trustor has breached any other provision of this Agreement regarding its obligations.

If any of the above defaults has occurred, the Trustee or the Borrower is entitled to take the following actions separately or concurrently:

(1)    The Trustee or the Borrower is entitled to request the Trustor to rectify the above default within a prescribed time limit;

(2)    The Trustee is entitled to refuse to conduct the business of entrusted loan for the Trustor;

(3)    If the Trustee or the Borrower has incurred any loss as a consequence, they are entitled to claim for damages to the Trustor.

7

**4.    Special Agreement**

The Trustor and the Borrower agree that the Trustee is entitled to immediately refuse to conduct the business of entrusted loan for the Trustor and unilaterally terminate this Agreement if (i) the source of fund, purpose of loan and transaction background is in violation of relevant PRC laws, regulations, rules and policies, or (ii) the Borrower invest the funds of the loan in stocks or other securities, in prohibited or unapproved projects; or in projects or uses that are prohibited for bank loans and entrusted loans.

## Article 16    Expenses

All expenses (including but not limited to attorneys' fees and certification fee) in connection with this Agreement shall be borne by the Borrower unless stipulated by the law or the parties agree otherwise. Each party is responsible for its own taxes.

## Article 17    Assignment

The Borrower shall not assign its obligations hereunder to a third party without the written consent by the Trustee and the Trustor.

## Article 18    Amendment and Termination

This Agreement may be amended, supplemented upon written agreement by all parties. Any amendment or supplement to this Agreement shall constitute an integrated part of this Agreement. Unless laws and regulations otherwise specify or the parties otherwise agree, the rights and obligations under this Agreement shall not terminate until they have been fully performed.

Unless laws and regulations otherwise specify or the parties otherwise agree, the invalidity of any provision hereunder shall have no effect on the validity of any other provision in this Agreement.

## Articles 19    Governing Law; Dispute Resolution

This Agreement shall all be governed by the law of the People's Republic of China.

Any dispute or controversy arising out of or in respect of this Agreement shall be resolved through friendly consultations by the parties. In case the consultation has failed, any party is entitled to directly bring a lawsuit before the people's court in the place where the Trustee is domiciled.

During the period of dispute resolution, the parties shall continue to perform all the provisions hereunder unless their performance are affected by the dispute. In case of a breach of this Agreement by the Borrower, the Trustor is entitled to bring a lawsuit/arbitration directly against the Borrower. If the Trustee, at the Trustor's request or the court/arbitral tribunal's notice, cooperates with or participates in such lawsuit/arbitration, the Trustor shall bear all expenses (including but not limited to litigation costs, arbitration fees and attorney's fees) incurred by the Trustee as a result of such lawsuit/arbitration

8

**Article 20    Miscellaneous**

1.  Records kept by the Trustee as a result of drawdown, repayment and payment of interest by the Borrower are effective evidence for the debt relationship between the Trustor and the Borrower.

2.  Under this Agreement, the Borrower shall pay in full amount of all the items due, and shall not claim for set-off or counterclaim or attach any condition to the payment.

3.  The obligations of the Borrower under this Agreement shall be independent without being affected by the relationship between any party to this Agreement and the third party, unless it is provided otherwise in this Agreement.

4.  Any tolerance, indulgence, favorite or delayed exercise of any right under this Agreement rendered by the Trustor to the Borrower shall not affect, infringe upon or limit any right or interest of the Trustor under this Agreement and the laws and regulations, and shall not be regarded as a waiver by the Trustor and the Trustee of its rights and interests under this Agreement.

**Article 21    Notice**

Any notice, payment requirements and other communication hereunder shall be delivered or transmitted to the other party, addressed as follows:

| To: | Trustor: | Baidu Times Network Technology (Beijing) Co., Ltd |
| | Address: | Tower A, Yuan Zhong Yue Lai, No. 15 Haidian Middle Street, Haidian District, Beijing |
| | Zip Code: | 100080 |
| | Fax: | ****** |
| | Attention: | ****** |
| To: | Trustee: | Bank of China Limited Beijing Zhongguancun Center Branch |
| | Address: | 12/F, Block A, Zhonggang International Plaza, No. 8 Haidian Street, Haidian District, Beijing |
| | Zip Code: | 100080 |
| | Fax: | ****** |
| | Attention: | ****** |
| To: | Borrower: | Beijing QIYI Century Science & Technology Co., Ltd. |
| | Address: | 10/F, No. 2 Haidian Beiyi Street, Haidian District, Beijing |
| | Zip Code: | 100085 |
| | Fax: | ****** |
| | Attention: | ****** |

Any party hereto shall notify the other two parties in case of any change to the abovementioned addresses:

9

**Article 22   Appendices**

Following appendices are integral parts hereof:

1. _____
2. _____

**Article 23   Effectiveness**

This Agreement shall become effective upon duly execution by the legal representatives or authorized signatory of the parties and affixed with their respective corporate seals.

This Agreement shall be made in three originals, each party holding one, and all of these three originals shall have the same effect.

Trustor (Seal): Baidu Times Network Technology (Beijing) Co., Ltd

*[Company seal is affixed]*

Authorized Signatory: /s/ Authorized Signatory

May 13, 2016

Trustee (Seal): Bank of China Limited Beijing Zhongguancun Center Branch

*[Company seal is affixed]*

Authorized Signatory: /s/ Authorized Signatory

May 13, 2016

Borrower (Seal): Beijing QIYI Century Science & Technology Co., Ltd.

*[Company seal is affixed]*

Authorized Signatory: /s/ Yu Gong

May 13, 2016

10

**Exhibit 10.54**

**Renminbi Entrusted Loan Agreement**

Trustor: <u>Baidu Times Network Technology (Beijing) Co., Ltd</u>

Business License No.: <u>\*\*\*\*\*\*</u>

Legal Representative/Responsible Person: <u>Hailong Xiang</u>

Address: <u>Tower A, Yuan Zhong Yue Lai, No. 15 Haidian Middle Street, Haidian District, Beijing</u>      Zip Code: <u>100080</u>

Beneficiary Bank and Bank Account: <u>\*\*\*\*\*\*</u>

Telephone: <u>\*\*\*\*\*\*</u>        Fax: <u>\*\*\*\*\*\*</u>

Trustee: <u>Bank of China Limited Beijing Zhongguancun Center Branch</u>

Legal Representative/Responsible Person: <u>Meng Duan</u>

Address: <u>12/F, Block A, Zhonggang International Plaza, No. 8 Haidian Street, Haidian District, Beijing</u>      Zip Code: <u>100080</u>

Telephone: <u>\*\*\*\*\*\*</u>        Fax: <u>\*\*\*\*\*\*</u>

Borrower: <u>Beijing QIYI Century Science & Technology Co., Ltd.</u>

Business License No.: <u>\*\*\*\*\*\*</u>

Legal Representative/Responsible Person: <u>Yu Gong</u>

Address: <u>10/F, No. 2 Haidian Beiyi Street, Haidian District, Beijing</u>        Zip Code: <u>100080</u>

Beneficiary Bank and Bank Account: <u>\*\*\*\*\*\*</u>

Telephone: <u>\*\*\*\*\*\*</u>        Fax: <u>\*\*\*\*\*\*</u>

In order to utilize funds more efficiently, the Trustor hereby entrusts the Trustee to provide entrusted loan to the Borrower. Therefore, the parties agree as follows:

**Article 1    General Provisions**

The Trustor entrusts the Trustee with the Trustor's fund to provide loan to the Borrower and to collect the principal and interests according to the agreed deadlines.

The Trustor shall independently review the credit of the Borrower, supervise the use of the loan as well as the timely repayment of principal and interests, deal with the relevant loan formalities, and assume the risks of the loan hereunder.

The Trustee's obligations hereunder shall be limited to providing loan to the Borrower, assisting the Trustor issue and mail the interest schedules and repayment notices, which shall be issued five Business Days (defined herein as the days on which banks are open for business) before the interest payment date and the Loan Repayment Date, respectively.

The Trustee assumes no risks with respect to any loan or loss hereunder, and no liabilities for any disputes arising from or in connection with this Agreement between the Trustor and the Borrower.

The entry into this Agreement by the Trustee shall not be deemed as repayment guaranty on the part of the Trustee for the Borrower.

**Article 2    Currency, Amount and Period of the Entrusted Loan**

The currency of the loan hereunder shall be Renminbi.

The amount of the loan hereunder shall not exceed Renminbi one billion.

The term of the loan hereunder shall be six months as of the drawdown date. The sixth anniversary of the drawdown date shall be the "Loan Repayment Date." If the parties agree to a specified drawdown period rather than a drawdown date, the drawdown date shall be the start date of such drawdown period.

**Article 3    Purpose of the Loan**

The loan shall be used for working capital purposes.

Unless otherwise consented by the Trustor in writing, the Borrower shall not use the loan in ways other than stated above. The Trustor and the Borrower shall not agree and the Borrower shall not use the loan as follows: invest in stocks or other securities; invest in prohibited or unapproved projects under relevant laws, regulations, rules and relevant policies; and invest in projects or uses that are prohibited for bank loans and entrusted loans.

**Article 4    Interest of the Entrusted Loan and Calculation Method**

1. The interest rate for the entrusted loan shall be 4.35% per annum, which shall remain unchanged during the term of this Agreement.

2. Calculation method: Interest shall accrue for the total amount of drawdown from the first drawdown date until the corresponding repayment date. The calculation basis is 360 days per year.

3. Interest Payment: The Borrower shall pay interest in a lump sum amount on the Loan Repayment Date or any date prior to such repayment date. If the last repayment date for principal is not an interest payment date, the Borrower shall pay all of the due and payable interest on the last repayment date. The Borrower shall pay interest on each interest payment date.

**Article 5    Term of Entrusted Loan Service**

The term of entrusted loan service provided by the Trustee shall be from the date hereof until the Loan Repayment Date. The Trustee is released from all obligations hereunder upon expiry of such term.

2

**Article 6    Fees of Entrusted Loan Service**

1. The Trustor shall pay the Trustee a total amount of renminbi fifty thousand as fees of entrusted loan service.

2. The Trustor shall pay the above fees within three days of the date hereof.

3. If the Trustor fails to pay the above fees in time, the Trustee has the right to deduct such fees and damages from (i) the Trustor's account with the Bank of China, (ii) any amount of principal and interested collected by the Trustee on behalf of the Trustor, or (iii) other payments due from the Trustor to the Trustee.

**Article 7    Trustor's Account**

The Trustor shall open an entrusted loan settlement account with the Trustee or the entity designated by the Trustee within three days as of the date hereof.

The Trustor shall deposit the full amount of the entrusted loan into the entrusted loan settlement account as of the date hereof.

In any event, each drawdown amount by the Borrower shall not exceed the balance of the Trustor account.

The Trustee shall transfer the full amount of the principal or interest (and penalty interest) received (or deducted) each time to the entrusted loan fund account.

**Article 8    Borrower's Account**

After this Agreement goes into effect, the Borrower shall open an loan account with the Trustee or the entity designated by the Trustee for making drawdown and repaying principal and interest.

**Article 9    Drawdown Schedule**

The Borrower shall drawdown the full amount of the loan hereunder on _____. The Borrower may not drawdown the loan prior to such date without the consent of the Trustor and the Trustee.

Any amount not drawn before the deadline shall not be drawn without the consent of the Trustor and written notice by the Trustor to the Trustee. Trustee may charge penalty on the undrawn amount at the rate of $^0\!/_{000}$ per day according to the actual number of deferred days.

If the Borrower is unable to drawdown the full amount of the loan due to failure by the Trustor to deposit the full amount of the loan into the entrusted loan account, the Trustor shall pay a penalty to the Borrower on the amount that should have been available for drawdown at the rate of $^0\!/_{000}$ per day according to the actual number of deferred days.

3

**Article 10    Conditions Precedent**

The Borrower may make a drawdown upon satisfaction of all of the following conditions:

1.  The Trustor has opened an entrusted loan account with the Trustee or its designated branch, and deposited the full amount of the entrusted loan into such account.

2.  The Borrower has opened a loan account with the Trustee or its designated branch.

3.  This Agreement and its appendix goes into effect.

4.  The Borrower has provided to the Trustee a list of persons authorized to execute this Agreement and documents relating to this Agreement as well as their respective specimen signatures.

5.  The Trustee has received the Entrusted Loan Drawdown Application from the Borrower.

6.  Other conditions agreed among the parties hereto for drawdown.

**Article 11 Repayment Schedule and Conditions for Early Repayment**

Borrower shall repay the full amount of the loan hereunder (including principal and interest) on the Loan Repayment Date, provided that the Borrower shall make written application for any adjustment to the repayment schedule three days prior to the deadline and obtain the Trustor's written consent. The Trustor shall notify the Trustee in writing of its consent to any adjustment of repayment schedule.

With Trustor's consent, the early repayment shall be used to repay the last due amount in reverse order.

In the event that (i) Qiyi.com, Inc., a Cayman Islands company and an affiliate of the Borrower (hereinafter "Qiyi"), and its subsidiaries as well as controlled affiliates (together with Qiyi, hereinafter "Qiyi Group") has a change of control, including but not limited to, loss of control of Qiyi Group by Baidu Holdings Limited, a British Virgin Islands company and an affiliate of the Trustor (hereinafter "Baidu") ("control" being (a) ownership of 50% or more of, whether through investment relationship, agreements or other arrangements, directly or indirectly, the total voting power of Qiyi, (b) the right to appoint half or more of the directors of Qiyi, or (c) the right to acquire 50% or more of the assets of Qiyi Group); or (ii) the closing of the next funding round of the Borrower, Qiyi or its subsidiaries and controlled affiliates, whichever of (i) and (ii) occurs first, the Trustor has the right to immediately demand repayment of the principal and interest hereunder by the Borrower. The Borrower, upon receipt of such demand from the Trustor, shall repay the principal and interest hereunder within 30 Business Days.

For the amount early repaid with the Trustor's consent, the Borrower shall not request to drawdown for a second time, unless the Trustor and the Borrower otherwise agree and the Trustor notifies the Trustee of such agreement in writing.

The Borrower shall deposit sufficient funds into the following account no later than three Business Days before the Loan Repayment Date.

Account Name: Beijing QIYI Century Science & Technology Co., Ltd.

Beneficiary Bank: ****** Account Number: ******

4

**Article 12    Overdue Interest and Misappropriation**

If the Borrower fails to make repayment on schedule and no agreement is entered with respect to repayment extension, then such unpaid amount (including principal and interest) shall be overdue amount. The Trustor may charge interest on such overdue amount at the rate of $\%_{000}$ per day.

If the Borrower uses the loan in ways other than those provided herein, the Trustor may charge penalty interest on the misappropriated amount at the rate of $\%_{000}$ per day.

The Trustee shall be deemed to have been authorized by the Trustor upon the execution of this Agreement and may collect the above penalty interest on behalf of the Trustor with Trustor's notice.

**Article 13 Borrower's Representations and Warranties**

**1.    The Borrower makes the following representations:**

(1)    The Borrower is an enterprise legal person duly registered under PRC laws and regulations, with all necessary rights and authorizations to conduct business activities in its own name or become a party to any legal action, and has lawful right to dispose the assets it manages.

(2)    The Borrower's execution and performance of this Agreement is made on a voluntary basis with necessary authorization. Such authorization and the execution and performance do not violate the Articles of Association of the Borrower or any other regulations or contracts binding on the Borrower. All the formalities required for the execution and performance of this Agreement by the Borrower have been duly completed.

(3)    All the documents, statements and certificates provided by the Borrower to the Trustor and Trustee for the loan hereunder are accurate, true, complete and valid.

(4)    The purpose of the loan is compliant with relevant PRC laws, regulations, rules and policies.

(5)    The business for which the Borrower intends to apply the loan hereunder is genuine, legitimate and not related to illegal purposes such as money laundering.

**2.    The Borrower makes the following warranties:**

(1)    The Borrower will provide its most updated financial statements as requested by the Trustor.

(2)    The Borrower will not reduce its registered capital by means whatsoever and will not significantly change its properties right or adjust its operational mode without written notice to the Trustor and Trustee.

(3)    The Borrower warrants that it will notify the Trustor and the Trustee immediately in case of:

any breach of this Agreement or of any other agreement signed between the Borrower and the Trustee;

severe difficulties in the Borrower's operation and a deteriorated financial condition;

5

**Article 14 Trustor's Representations and Warranties**

**1.    The Trustor makes the following representations:**

(1)    The Trustor is an enterprise legal person duly registered under PRC laws and regulations, with all necessary rights and authorizations to conduct business activities in its own name or become a party to any legal action, and has lawful right to dispose the assets it manages.

(2)    The Trustor's execution and performance of this Agreement is made on a voluntary basis with necessary authorization. Such authorization and the execution and performance do not violate the Articles of Association of the Trustor or any other regulations or contracts binding on the Borrower. All the formalities required for the execution and performance of this Agreement by the Borrower have been duly completed.

(3)    All the documents, statements and certificates provided by the Trustor to the Trustee for the loan hereunder are accurate, true, complete and valid.

(4)    The Trustor decides the Borrower, purpose of loans, interest rate and loan term hereunder on its own determination and in compliance with relevant PRC laws, regulations, rules and policies.

(6)    The loan funds provided by the Trustor is lawful and under the Trustor's ownership, control and disposal. There exists no circumstances that would restrict or prohibit the provision of entrusted loan hereunder. The business for the loan hereunder is genuine, legitimate and not related to illegal purposes such as money laundering.

**2.    The Trustor makes the following warranties:**

(1)    The Trustor will deposit self-owned funds in the account for the funds of entrusted loan in accordance with this Agreement, and undertakes that the amount of the funds in such account will be no less than the amount of the funds to be withdrawn by the Borrower in accordance with this Agreement.

(2)    The Trustor will pay for the handling fee of the entrusted loan to the Trustee in accordance with this Agreement.

(3)    The Trustor will hold the Trustee harmless against all damages, claims lawsuits and related loss, expenses, compensation and liabilities incurred by the Borrower as a result of negligence or fault on the part of the Trustor. If the Trustee suffers any actual loss (including but not limited to litigation costs, arbitration fees and attorney's fees) as a result of claims brought by the Borrower against the Trustor or the Trustee, the Trustor shall reimburse the Trustee in full.

**Article 15    Events of Default and Default Liabilities**

**1.    Events of Default by the Borrower and Consequences Thereof**

The occurrence of any of the following events will constitute a default by the Borrower under this Agreement:

(1)    The Borrower has not utilized the loan for the purposes as stipulated by this Agreement;

(2)    The Borrower has failed to repay the principle due or pay the interest, the expenses or other payables due in accordance with this Agreement;

6

(3) The warranties and representations by the Borrower set forth in this Agreement is untrue;

(4) The Borrower has breached any other provision of this Agreement regarding its obligations; and

(5) The Borrower ceases operation or enter into liquidation, administration or bankruptcy.

In case any of the above events of default has occurred, the Trustor, or the Trustee with the consent by the Trustor, is entitled to take the following actions separately or concurrently:

(1) To request the Borrower to rectify the default within a time limit;

(2) To terminate or cancel the loan facility that has not been withdrawn by the Borrower; or

(3) To declare that all the principle and interest thereof under this Agreement become due immediately, and request the Borrower to repay immediately all the principle and interest of the loan facility and the relevant expenses unconditionally.

**2. Events of Default by Trustee and Consequences Thereof**

Occurrence of the following event will constitute a default by the Trustee under this Agreement: The Trustee unreasonably rejects a withdrawal by the Borrower that is made in accordance with this Agreement; If such default event by the Trustee has occurred, the Trustor is entitled to separately or concurrently take the followings actions:

(i) To request the Trustee to rectify the default within a prescribed time limit;

(ii) The Trustor is entitled to change the Trustee.

**3. Events of Default by Trustor and Consequences Thereof**

Occurrence of any of the following events will constitute a default by the Trustor under this Agreement:

(1) No adequate funds has been deposited in (remitted to) the Trustor's account opened with the Trustee in accordance with this Agreement;

(2) The Trustor has failed to pay the Trustee the handing fee for the entrusted loan in accordance with the Contract;

(3) The warranties and representations by the Trustor set forth in this Agreement is untrue; and

(4) The Trustor has breached any other provision of this Agreement regarding its obligations.

If any of the above defaults has occurred, the Trustee or the Borrower is entitled to take the following actions separately or concurrently:

(1) The Trustee or the Borrower is entitled to request the Trustor to rectify the above default within a prescribed time limit;

(2) The Trustee is entitled to refuse to conduct the business of entrusted loan for the Trustor;

(3) If the Trustee or the Borrower has incurred any loss as a consequence, they are entitled to claim for damages to the Trustor.

7

**4.     Special Agreement**

The Trustor and the Borrower agree that the Trustee is entitled to immediately refuse to conduct the business of entrusted loan for the Trustor and unilaterally terminate this Agreement if (i) the source of fund, purpose of loan and transaction background is in violation of relevant PRC laws, regulations, rules and policies, or (ii) the Borrower invest the funds of the loan in stocks or other securities, in prohibited or unapproved projects; or in projects or uses that are prohibited for bank loans and entrusted loans.

## Article 16    Expenses

All expenses (including but not limited to attorneys' fees and certification fee) in connection with this Agreement shall be borne by the Borrower unless stipulated by the law or the parties agree otherwise. Each party is responsible for its own taxes.

## Article 17    Assignment

The Borrower shall not assign its obligations hereunder to a third party without the written consent by the Trustee and the Trustor.

## Article 18    Amendment and Termination

This Agreement may be amended, supplemented upon written agreement by all parties. Any amendment or supplement to this Agreement shall constitute an integrated part of this Agreement. Unless laws and regulations otherwise specify or the parties otherwise agree, the rights and obligations under this Agreement shall not terminate until they have been fully performed.

Unless laws and regulations otherwise specify or the parties otherwise agree, the invalidity of any provision hereunder shall have no effect on the validity of any other provision in this Agreement.

## Articles 19    Governing Law; Dispute Resolution

This Agreement shall all be governed by the law of the People's Republic of China.

Any dispute or controversy arising out of or in respect of this Agreement shall be resolved through friendly consultations by the parties. In case the consultation has failed, any party is entitled to directly bring a lawsuit before the people's court in the place where the Trustee is domiciled.

During the period of dispute resolution, the parties shall continue to perform all the provisions hereunder unless their performance are affected by the dispute. In case of a breach of this Agreement by the Borrower, the Trustor is entitled to bring a lawsuit/arbitration directly against the Borrower. If the Trustee, at the Trustor's request or the court/arbitral tribunal's notice, cooperates with or participates in such lawsuit/arbitration, the Trustor shall bear all expenses (including but not limited to litigation costs, arbitration fees and attorney's fees) incurred by the Trustee as a result of such lawsuit/arbitration

8

**Article 20    Miscellaneous**

1. Records kept by the Trustee as a result of drawdown, repayment and payment of interest by the Borrower are effective evidence for the debt relationship between the Trustor and the Borrower.

2. Under this Agreement, the Borrower shall pay in full amount of all the items due, and shall not claim for set-off or counterclaim or attach any condition to the payment.

3. The obligations of the Borrower under this Agreement shall be independent without being affected by the relationship between any party to this Agreement and the third party, unless it is provided otherwise in this Agreement.

4. Any tolerance, indulgence, favorite or delayed exercise of any right under this Agreement rendered by the Trustor to the Borrower shall not affect, infringe upon or limit any right or interest of the Trustor under this Agreement and the laws and regulations, and shall not be regarded as a waiver by the Trustor and the Trustee of its rights and interests under this Agreement.

**Article 21    Notice**

Any notice, payment requirements and other communication hereunder shall be delivered or transmitted to the other party, addressed as follows:

| To: | Trustor: | Baidu Times Network Technology (Beijing) Co., Ltd |
| | Address: | Tower A, Yuan Zhong Yue Lai, No. 15 Haidian Middle Street, Haidian District, Beijing |
| | Zip Code: | 100080 |
| | Fax: | ****** |
| | Attention: | ****** |
| To: | Trustee: | Bank of China Limited Beijing Zhongguancun Center Branch |
| | Address: | 12/F, Block A, Zhonggang International Plaza, No. 8 Haidian Street, Haidian District, Beijing |
| | Zip Code: | 100080 |
| | Fax: | ****** |
| | Attention: | ****** |
| To: | Borrower: | Beijing QIYI Century Science & Technology Co., Ltd. |
| | Address: | 10/F, No. 2 Haidian Beiyi Street, Haidian District, Beijing |
| | Zip Code: | 100085 |
| | Fax: | ****** |
| | Attention: | ****** |

Any party hereto shall notify the other two parties in case of any change to the abovementioned addresses:

9

**Article 22    Appendices**

Following appendices are integral parts hereof:

1.    _____

2.    _____

**Article 23    Effectiveness**

This Agreement shall become effective upon duly execution by the legal representatives or authorized signatory of the parties and affixed with their respective corporate seals.

This Agreement shall be made in three originals, each party holding one, and all of these three originals shall have the same effect.

Trustor (Seal): Baidu Times Network Technology (Beijing) Co., Ltd

[*Company seal is affixed*]

Authorized Signatory: /s/ Authorized Signatory

June 24, 2016

Trustee (Seal): Bank of China Limited Beijing Zhongguancun Center Branch

[*Company seal is affixed*]

Authorized Signatory: /s/ Authorized Signatory

June 24, 2016

Borrower (Seal): /s/ Beijing QIYI Century Science & Technology Co., Ltd.

[*Company seal is affixed*]

Authorized Signatory: /s/ Yu Gong

June 24, 2016

10

**Exhibit 10.55**

Schedule 9

### China Merchants Bank Online "Corporate Bank" Entrusted Loan Agreement

Lender (hereinafter referred to as "Party A"): China Merchants Bank Company Limited, Beijing Shangdi Branch
Address: Block 2B, Guiguliangcheng, No.1 Nongda Road South, Haidian, Beijing
Legal representative (principal): Lan Yang
Tel.: ******                         Fax: ******
Postcode: 100084

Borrower (hereinafter referred to as "Party B"): Beijing iQIYI Science & Technology Co., Ltd.
Address: Floor 11, No.2 Haidian North Street, Haidian District, Beijing
Legal representative (principal): GONG YU（龚宇）
Tel.: ******                         Fax: ******
Postcode: 100089

Party A accepts the entrustment by Baidu Online Network Technology (Beijing) Co., Ltd. (the "Entrusting Party") and issues entrusted loans in RMB to Party B. In accordance with the terms of the Agreement on Entrusting Cooperation of Online Entrusted Loans of Zhao Shang Wei No.001 in 2016, the Entrusting Party agrees to provide Party B with an online entrusted loan quota of not more than RMB one billion. Now Party A and Party B agree on the following terms and enter into this Agreement in accordance with relevant laws and regulations after full consultation.

**Article 1** Online entrusted loan quota refers to the maximum limit balance of online entrusted loans provided by the Entrusting Party to Party B during the entrusting cooperation according to the Agreement on Entrusting Cooperation of Online Entrusted Loans. The quota does not mean that Party A has to provide Party B with entrusted loans. Whether Party A gives out entrusted loans to Party B depends on whether the Entrusting Party has deposited sufficient entrusted funds during the period of entrusting cooperation and whether it has sent a letter of entrusted loan to Party A.

The period of entrusting cooperation is one year, that is, from August 31, 2016 to August 30, 2017. The Entrusting Party will deposit full amount in the account opened in Party A and send a letter of entrusted loan to Party A during the period of entrusting cooperation. Party A accordingly provides the loan to the Borrower.

**Article 2** The amount, purpose, term and interest rate of each entrusted loan within the loan quota shall be determined by the Entrusting Party in an entrusted loan notice sent to Party A through the online "Corporate Bank" in accordance with relevant state policies and laws, and shall be subject to relevant online documents printed out by Party A.

**Article 3** When Party B withdraws any loan or repay any loan through the Internet, Party A shall confirm the Entrusting Party's entrusted loan notice through its online "Corporate Bank". Party B shall take the digital signature generated by digital certificate as the valid signature for withdrawing any loan and returning any loan through the Internet. Party B grants Party A the right to deduct the principal and interest of any loan in its relevant settlement account and prepare any loan voucher and repayment voucher according to the loan amount.

**Article 4** The actual occurrence and return of each loan under the entrusted loans shall be based on any receipt for a loan, customer statements and other business records filled in or printed out by Party A. The business records kept in Party A's "Corporate Bank" system and the business records filled in or printed out accordingly by Party A are an integral part of this Agreement and have the same legal force as this Agreement. Party B shall confirm the accuracy, authenticity and validity of Party A's business records.

**Article 5** Party B undertakes to repay the principal and interest of any loan under this Agreement with the following funds.

1. Own funds

2. /

3./

**Article 6** Party B shall repay the principal and interest of any loan according to the specific term of each loan. Party B shall negotiate with the Entrusting Party for any early loan repayment and handle the early loan repayment after Panty A obtains relevant early loan repayment notice from the Entrusting Party.

**Article 7** Interest and Service Charge

The interest of any loan under this Agreement shall be calculated according to the interest rate determined by the Entrusting Party and based on the actual occupancy days of the loan from the day when the loan is allocated by Party A. The principal and interest shall be repaid at one time when the loan is due.

If interest rates are adjusted by the state during the validity period of this Agreement or the Entrusting Party requests to make corresponding adjustment, Party A may, in accordance with the provisions of interest rate adjustment of the state or the Entrusting Party's written entrustment, adjust the loan interest rates under the Agreement upon written consent of the Entrusting Party and Party B. The interest will be charged at the new interest rate from the date of adjustment.

Party A shall collect the service charge from Party B based on ___/___ (annual rate) of the balance of a loan and collect the service charge for one time before Party A provides the loan. Party A and Party B confirm that the specific way and time for Party A to collect the service charge for entrusted loans shall be based on ___/___.

**Article 8** The loans under this Agreement shall be guaranteed by the guarantor who has obtained the approval of the Entrusting Party in the form of guarantee or (and) property mortgage (pledge) or by the way of signing a guarantee contract or mortgage (pledge) contract as an accessory contract of this Agreement.

**Article 9** Party A has the right to check the use of loans during the term of this Agreement. Party B shall truthfully provide Party A with status and information as requested by Party A.

**Article 10** During the validity period of this Agreement, Party A shall have the right to request Party B to sign the receipt for receiving the statements with loan business records, and Party B is obliged to cooperate with it. However, no matter whether Party B signs the receipt, it will not affect the validity of the items recorded in the statements.

**Article 11** Change and Termination of the Agreement

Where either Party A or Party B needs to change the terms of this Agreement or terminate this Agreement upon entry into force of this Agreement, Party A and Party B shall reach a mutual agreement and obtain the consent of the Entrusting Party. In addition, Party A, Party B and the Entrusting Party shall accordingly enter into a written agreement.

**Article 12** Liability for Breach of Contract

1. Where Party A fails to release any loan according to the date and amount agreed in any entrusted loan notice, it shall pay liquidated damages of one ten thousandth of the amount of the liquidated damages for each day to Party B according to the actual number of days of default, except that Party A    releases any loan in full and in time due to Party B's violation of the provisions of this Agreement or the Entrusting Party's failure to deposit funds into its account opened in Party A in time and in full.

2. Where Party B fails to use any loan for the purpose as stipulated in this Agreement, Party A has the right to stop issuing the loan, to recover part or all of the loans already granted in advance, and to impose a penalty on the default part based on one ten thousandth of the default part for each default day.

3. Where Party B returns the loan in advance without authorization, Party A shall have the right to request Party B to pay liquidated damages of one ten thousandth of the amount repaid ahead of schedule for each day when Party A does not receive any advance prepayment notice from the Entrusting Party.

4. During the period of validity of this Agreement, Party A shall have the right to stop issuing loans and recover the principal and interest of entrusted loans released and all other relevant expenses in advance upon any of the following conditions: (1) Party B violates any obligation term of this Agreement (2) The operating condition of Party B is seriously deteriorated; (3) The operation condition of the guarantor is seriously deteriorated; (4) The damage or loss of the mortgaged property endangers the safety of the loans; (5) Party A has the right to recover the loans in advance according to the laws, regulations and financial regulations.

5. The method to pay the liquidated damages stipulated in this Article is agreed as follows:   __/____

**Article 13** Dispute Settlement

Any dispute between Party A and Party B in the performance of this Agreement shall be settled through negotiation between both parties. Where the negotiation fails, the dispute can be solved through the following methods (only one of them):

(1) Sue to the people's court where Party A is located;

(2) Apply to the Arbitration Commission for arbitration:

(3) Submit to China International Economic and Trade Arbitration Commission/its branch for Arbitration in accordance with the Arbitration Rules for Financial Disputes.

**Article 14** For any matter uncovered in this Agreement, both parties can separately negotiate and signed a supplementary agreement.

**Article 15** This Agreement shall enter into force after the legal representative/principal or the authorized agent of Party A and Party B sign it and affix it with their official seal and shall expire after all principal and interest of the loans under the Agreement and all other related expenses are fully paid off.

**Article 16** For the convenience of Party A's operation, relevant contents of this Agreement are summarized as follows:

| | | | |
|---|---|---|---|
| Name of Party B | Beijing QIYI Century Science & Technology Co., Ltd. | Account No. | ****** |
| Bank | ****** | Corporate Bank No. | |
| Use Method | ☒U-Bank      ☐Direct connection between banks and enterprises | | |

**Article 17** This Agreement is made in triplicate with Party A holding one and Party B holding two.

**All the terms of this Agreement are fully negotiated by the parties. Party A has already brought Party B's special attention to the provisions on exempting or limiting Party A's responsibilities, certain rights owned by Party A, increasing Party B's responsibilities or restricting Party B's rights and to fully and accurately understanding such terms. Party A has made corresponding explanation to the above terms at the request of Party B. The parties to the Agreement have fully consistent understanding of the terms of this Agreement.**

Party A: China Merchants Bank Company Limited, Beijing Shangdi Branch (Official Seal)
[Company seal is affixed]
Legal Representative/Principal or Authorized Agent
(Signature/Name Seal):   /s/ Authorized Signatory
Date: August 31, 2016

Party B: Beijing iQIYI Science & Technology Co., Ltd. (Official Seal)
[Company seal is affixed]
Legal Representative/Principal or Authorized Agent
(Signature/Name Seal):   /s/ GENG Xiaohua
Date: August 31, 2016

**Exhibit 10.56**

Schedule 9

### China Merchants Bank Online "Corporate Bank" Entrusted Loan Agreement

Lender (hereinafter referred to as "Party A"): China Merchants Bank Company Limited, Beijing Shangdi Branch
Address: Block 2B, Guiguliangcheng, No.1 Nongda Road South, Haidian, Beijing
Legal representative (principal): Yang Lan
Tel.: 010-62667349          Fax: 010-62667344
Postcode: 100084

Borrower (hereinafter referred to as "Party B"): Beijing QIYI Century Science & Technology Co., Ltd.
Address: Floor 11, No.2 Haidian North Street, Haidian District, Beijing
Legal representative (principal): Yu Gong ( 龚宇 )
Tel.: 010-62676934          Fax: 010-62677000
Postcode: 100089

Party A accepts the entrustment by Baidu Online Network Technology (Beijing) Co., Ltd. (the "Entrusting Party") and issues entrusted loans in RMB to Party B. In accordance with the terms of the Agreement on Entrusting Cooperation of Online Entrusted Loans of Zhao Shang Wei No.004 in 2016, the Entrusting Party agrees to provide Party B with an online entrusted loan quota of not more than RMB one billion. Now Party A and Party B agree on the following terms and enter into this Agreement in accordance with relevant laws and regulations after full consultation.

**Article 1** Online entrusted loan quota refers to the maximum limit balance of online entrusted loans provided by the Entrusting Party to Party B during the entrusting cooperation according to the Agreement on Entrusting Cooperation of Online Entrusted Loans. The quota does not mean that Party A has to provide Party B with entrusted loans. Whether Party A gives out entrusted loans to Party B depends on whether the Entrusting Party has deposited sufficient entrusted funds during the period of entrusting cooperation and whether it has sent a letter of entrusted loan to Party A.

The period of entrusting cooperation is one year, that is, from December 12, 2016 to December 11, 2017. The Entrusting Party will deposit full amount in the account opened in Party A and send a letter of entrusted loan to Party A during the period of entrusting cooperation. Party A accordingly provides the loan to the Borrower.

**Article 2** The amount, purpose, term and interest rate of each entrusted loan within the loan quota shall be determined by the Entrusting Party in an entrusted loan notice sent to Party A through the online "Corporate Bank" in accordance with relevant state policies and laws, and shall be subject to relevant online documents printed out by Party A.

**Article 3** When Party B withdraws any loan or repay any loan through the Internet, Party A shall confirm the Entrusting Party's entrusted loan notice through its online "Corporate Bank". Party B shall take the digital signature generated by digital certificate as the valid signature for withdrawing any loan and returning any loan through the Internet. Party B grants Party A the right to deduct the principal and interest of any loan in its relevant settlement account and prepare any loan voucher and repayment voucher according to the loan amount.

**Article 4** The actual occurrence and return of each loan under the entrusted loans shall be based on any receipt for a loan, customer statements and other business records filled in or printed out by Party A. The business records kept in Party A's "Corporate Bank" system and the business records filled in or printed out accordingly by Party A are an integral part of this Agreement and have the same legal force as this Agreement. Party B shall confirm the accuracy, authenticity and validity of Party A's business records.

**Article 5** Party B undertakes to repay the principal and interest of any loan under this Agreement with the following funds.

1. Own funds

2. /

3./

**Article 6** Party B shall repay the principal and interest of any loan according to the specific term of each loan. Party B shall negotiate with the Entrusting Party for any early loan repayment and handle the early loan repayment after Panty A obtains relevant early loan repayment notice from the Entrusting Party.

**Article 7** Interest and Service Charge

The interest of any loan under this Agreement shall be calculated according to the interest rate determined by the Entrusting Party and based on the actual occupancy days of the loan from the day when the loan is allocated by Party A. The principal and interest shall be repaid at one time when the loan is due.

If interest rates are adjusted by the state during the validity period of this Agreement or the Entrusting Party requests to make corresponding adjustment, Party A may, in accordance with the provisions of interest rate adjustment of the state or the Entrusting Party's written entrustment, adjust the loan interest rates under the Agreement upon written consent of the Entrusting Party and Party B. The interest will be charged at the new interest rate from the date of adjustment.

Party A shall collect the service charge from Party B based on ∕  (annual rate) of the balance of a loan and collect the service charge for one time before Party A provides the loan. Party A and Party B confirm that the specific way and time for Party A to collect the service charge for entrusted loans shall be based on ∕  .

**Article 8** The loans under this Agreement shall be guaranteed by the guarantor who has obtained the approval of the Entrusting Party in the form of guarantee or (and) property mortgage (pledge) or by the way of signing a guarantee contract or mortgage (pledge) contract as an accessory contract of this Agreement.

**Article 9** Party A has the right to check the use of loans during the term of this Agreement. Party B shall truthfully provide Party A with status and information as requested by Party A.

**Article 10** During the validity period of this Agreement, Party A shall have the right to request Party B to sign the receipt for receiving the statements with loan business records, and Party B is obliged to cooperate with it. However, no matter whether Party B signs the receipt, it will not affect the validity of the items recorded in the statements.

**Article 11** Change and Termination of the Agreement

Where either Party A or Party B needs to change the terms of this Agreement or terminate this Agreement upon entry into force of this Agreement, Party A and Party B shall reach a mutual agreement and obtain the consent of the Entrusting Party. In addition, Party A, Party B and the Entrusting Party shall accordingly enter into a written agreement.

**Article 12** Liability for Breach of Contract

1. Where Party A fails to release any loan according to the date and amount agreed in any entrusted loan notice, it shall pay liquidated damages of one ten thousandth of the amount of the liquidated damages for each day to Party B according to the actual number of days of default, except that Party A  releases any loan in full and in time due to Party B's violation of the provisions of this Agreement or the Entrusting Party's failure to deposit funds into its account opened in Party A in time and in full.

2. Where Party B fails to use any loan for the purpose as stipulated in this Agreement, Party A has the right to stop issuing the loan, to recover part or all of the loans already granted in advance, and to impose a penalty on the default part based on one ten thousandth of the default part for each default day.

3. Where Party B returns the loan in advance without authorization, Party A shall have the right to request Party B to pay liquidated damages of one ten thousandth of the amount repaid ahead of schedule for each day when Party A does not receive any advance prepayment notice from the Entrusting Party.

4. During the period of validity of this Agreement, Party A shall have the right to stop issuing loans and recover the principal and interest of entrusted loans released and all other relevant expenses in advance upon any of the following conditions: (1) Party B violates any obligation term of this Agreement (2) The operating condition of Party B is seriously deteriorated; (3) The operation condition of the guarantor is seriously deteriorated; (4) The damage or loss of the mortgaged property endangers the safety of the loans; (5) Party A has the right to recover the loans in advance according to the laws, regulations and financial regulations.

5. The method to pay the liquidated damages stipulated in this Article is agreed as follows:    /

**Article 13** Dispute Settlement

Any dispute between Party A and Party B in the performance of this Agreement shall be settled through negotiation between both parties. Where the negotiation fails, the dispute can be solved through the following methods (only one of them):

(1) Sue to the people's court where Party A is located;

(2) Apply to the Arbitration Commission for arbitration:

(3) Submit to China International Economic and Trade Arbitration Commission/its branch for Arbitration in accordance with the Arbitration Rules for Financial Disputes.

**Article 14** For any matter uncovered in this Agreement, both parties can separately negotiate and signed a supplementary agreement.

**Article 15** This Agreement shall enter into force after the legal representative/principal or the authorized agent of Party A and Party B sign it and affix it with their official seal and shall expire after all principal and interest of the loans under the Agreement and all other related expenses are fully paid off.

**Article 16** For the convenience of Party A's operation, relevant contents of this Agreement are summarized as follows:

| | | | |
|---|---|---|---|
| Name of Party B | Beijing QIYI Century Science & Technology Co., Ltd. | Account No. | ****** |
| Bank | China Merchants Bank Company Limited, Beijing Shangdi Branch | Corporate Bank No. | |
| Use Method | ☒ U-Bank ☐ Direct connection between banks and enterprises | | |

**Article 17** This Agreement is made in triplicate with Party A holding one and Party B holding two.

**All the terms of this Agreement are fully negotiated by the parties. Party A has already brought Party B's special attention to the provisions on exempting or limiting Party A's responsibilities, certain rights owned by Party A, increasing Party B's responsibilities or restricting Party B's rights and to fully and accurately understanding such terms. Party A has made corresponding explanation to the above terms at the request of Party B. The parties to the Agreement have fully consistent understanding of the terms of this Agreement.**

Party A: China Merchants Bank Company Limited, Beijing Branch (Official Seal)

[*Company seal is affixed*]

Legal Representative/Principal or Authorized Agent

(Signature/Name Seal):          /s/ Authorized Signatory

Date: December 12, 2016

Party B: Beijing QIYI Century Science & Technology Co., Ltd. (Official Seal)

[*Company seal is affixed*]

Legal Representative/Principal or Authorized Agent

(Signature/Name Seal):          /s/ Yu Gong

Date: December 12, 2016

Exhibit 10.57

**Working Capital Loan Agreement**

Borrower: Shanghai iQIYI Culture Media Co., Ltd.
Business License No.: 91310114059347674B
Legal Representative / Person in Charge: Yu Gong ( 龚宇 )
Domicile: ******
Postal Code: 201800
Bank of Deposit and Account No.:
Tel: ***
Fax:


Lender: Bank of China Limited Shanghai Jing'an Branch
Legal Representative / Person in Charge: Zuyuan Weng
Domicile: 22/F, No. 1515 Nanjing Road West, Shanghai
Postal Code: 200041
Tel: 021-52986668
Fax: 021-52986036

The Borrower and the Lender, through equal negotiation, reach agreements on the Lender's granting working capital loan to the Borrower and hereby enter into this Agreement.


**Article 1 Amount of Loan**

Currency: RMB.
Amount: (in word) two hundred ninety-nine million only;
         (in figure) ¥299,000,000.00.


**Article 2 Life of Loan**

The life of the loan is thirty-six (36) months, from the date of actual drawdown. Where there is more than one drawdown, the life of loan will commence from the initial drawdown date.

The Borrower shall make drawdown strictly according to the agreed drawdown schedule. Where the date of actual drawdown is behind schedule, the Borrower still shall repay the loan on the repayment date as agreed herein.


**Article 3 Purpose of Loan**

Purpose: the loan will be used for payment of advertising agency fees and other daily operating expenditures.

Without written consent of the Lender, the Borrower shall not use the loan for other purposes, including but not limited to investment in fixed assets, equity, etc., or for the fields or purposes which are prohibited from production or management by the state government.

**Article 4 Interest Rate and Interest Calculation and Settlement**

1.    Interest rate

With respect to the interest rate, the following Para. (2) shall apply:

(1)    Fixed interest rate. The interest rate shall be    /    % per annum and shall remain unchanged within the term of the Agreement.

(2)    Floating interest rate. The interest rate is subject to adjustment and repricing every    /    month(s) / one year(s) ("Repricing Period") commencing from the date of actual drawdown (or the initial drawdown date if there is more than one drawdown). The next repricing period will commence from the repricing date, namely, the initial day of the next repricing period shall be the corresponding date of the month of repricing. Where there is no corresponding date of the month, the initial day shall be the last date of the month.

With respect to each drawdown:

▪ Floating interest rate of RMB loan (priced on the basis of the benchmark interest rate for loan as announced by the People's Bank of China)

A.    The initial (from the date of actual drawdown to the expiry date of current repricing period) interest rate shall be the benchmark interest rate for 3-years loan as announced by the People's Bank of China on the date of actual drawdown ☐ plus / ▪ minus 6 % ;

B.    On the repricing date, the interest rate shall be repriced according to the benchmark interest rate for loan of the same grade as announced by the People's Bank of China on this day ☐ plus / ▪ minus 6 % and the repriced rate shall apply in current repricing period.

2.    Interest calculation

The interest shall be calculated from the date of actual drawdown made by the Borrower according to the actual amount of drawdown and utilization days.

Interest calculation formula: interest = principal × actual days × daily interest rate.

The calculation base of the daily interest rate shall be 360 days per annum. Calculation formula: daily interest rate = annual interest rate/360.

3.    Interest settlement method

The Borrower shall settle the interest by the following Method 1;

(1)    Quarterly settlement. Interest shall be settled on the twentieth day and paid on the twenty-first day of the last month of each quarter.

(2)    Monthly settlement. Interest shall be settled on the twentieth day and paid on the twenty-first day of every month.

Where the repayment date for the last installment of the loan principal does not coincide with the interest payment date, such repayment date shall be the interest payment date on which the Borrower shall pay up all interests payable.

4.    Penalty interest

(1)    Where the loan is overdue or is not used for purposes as agreed herein, penalty interest will be imposed on the part of loan overdue or used for other purposes at the penalty interest rate as agreed herein from the date on which the loan becomes overdue or is misappropriated, till both the principal and interests are paid up.

Where the loan is overdue and misappropriated at the same time, penalty interest will be imposed at a higher penalty interest rate.

(2)    Where the Borrower fails to pay the interest and penalty interest on time, the interest settlement method as agreed in Para. 3 herein shall apply, and compound interest will be calculated and collected at the penalty interest rate as agreed herein.

(3)    Penalty interest rate

▪ Penalty interest rate for floating rate loan

A.  Penalty interest rate shall be subject to repricing according to the repricing periods as agreed in Para. 1 herein from the day on which the loan becomes overdue or is misappropriated. The penalty interest rate repricing day shall be the corresponding day of the day on which the loan becomes overdue or is misappropriated in the reppricing month. Where there is no corresponding day, the last day of the month shall be the penalty interest rate repricing day.

B.  The penalty interest rate for overdue loan shall be 150 % of the basic penalty interest rate as determined in Item C herein, and that for misappropriated loan shall be 200 % of the basic penalty interest rate as determined in Item C herein.

C.  In the initial repricing period, the basic penalty interest rate shall be the interest rate for loan applicable in the current period of overdue or misappropriated loan. When each repricing period expires, the basic penalty interest rate of the next period shall be repriced on the repricing day by the method as agreed in Para. 1 herein.

**Article 5 Drawdown Conditions**

The Borrower can make utilization of the loan provided that:

1.  This Agreement and its annexes have become effective;

2.  The Borrower has provided guarantee as required by the Lender, and the guarantee contract has become effective and legal formalities regarding its approval, registration, or recording have been completed;

3.  The Borrower has provided the Lender with Borrower's documents, receipts, specimen seal impressions, staff list, and specimen signatures in relation to conclusion and performance of this Agreement, and has completed related documents;

4.  The Borrower has opened an account required for performance of this Agreement as per the requirements of the Lender;

5.  The Borrower submitted written utilization requests and related proof documents regarding the purpose of loan to the Lender three (3) business days before the drawdown and handled related drawdown formalities;

6.  The Borrower has submitted the resolution and power of attorney of its board of directors and responsible departments for consenting to entering into and performance of this Agreement;

7.  The Borrower shall obtain the certificate of property ownership and properly handle property mortgage formalities, make sure that the Lender is the only mortgagee of the collateral, buy mortgage insurance and transfer insurance interest to the Lender, and obtain official collateral evaluation report by the end of 2017. The mortgage rate shall not be more than 50%;

8.  The Borrower shall properly provide joint liability guarantee of Beijing iQIYI Science & Technology Co., Ltd. and conclude a guarantee contract;

9.  The Borrower shall provide advertising agency service contracts or orders with authentic background for drawdown of loan and shall entrust the Lender to make payments trade by trade;

10. The Borrower shall repay no less than RMB 10,000,000 in the first year, no less than RMB 10,000,000 in the second year, and RMB 279,000,000 in the third year. Principal shall be repaid biannually, namely, at least once every six months. Interests shall be paid on a quarterly basis;

11. The Borrower shall undertake the following in writing:

(1) During the existence of credit, the balance in the account that the Borrower opens at the Lender shall not be less than two times of the due interest payable of current period;

(2) During the existence of credit, at least 30% of the settlement shall be carried out by the Lender;

(3) Profits of the Borrower shall not be distributed before the loan is repaid to the Lender;

12. After Baidu Group has given its reply regarding the overall loan scheme, where the amount or requirements given in the reply of the Borrower is inconsistent with such overall scheme, the stricter ones shall apply;

13. During the life of loan, it shall be ensured that the credit conditions are no inferior to those of other banks;

14. Other drawdown conditions as stipulated by laws and agreed between the Parties    /  .

Where the Borrower fails to meet the above drawdown conditions, the Lender has the right to reject the utilization requests of the Borrower, unless the Lender agrees to grant the loan.

**Article 6 Drawdown Schedule and Methods**

1. The Borrower shall make drawdown of the loan at such time and by such method as provided in the following Para. 1:

(1) Drawdown in lump sum on April 11 , 2017.

(2) Drawdown within [   ] from            .

(3) Drawdown according to the following schedule:

| Time | Amount |
|---|---|
| / | / |
| / | / |
| / | / |

2. Where the loan is not utilized beyond the schedule above, the Lender has the right to reject the utilization request made by the Borrower.

**Article 7 Payment of Loan Capital**

1. Account for loan granting

The Borrower shall open an account as follows with the Lender for loan granting. Loan granting and payment shall be made through such account.

Name of the Account: Shanghai iQIYI Culture Media Co., Ltd.
Account No.:    ******

2. Payment method of loan capital

(1) Loan capital shall be paid according to laws and regulations, regulatory rules, and agreements herein. The loan capital payment method for each drawdown shall be confirmed in utilization request. Where the Lender deems the loan capital payment method chosen in the utilization request is non-conforming, it has the right to change the payment method or suspend granting and payment of loan capital.

(2) The Lender makes payments under entrustment, namely, the Lender will pay the loan capital to counterparties of the Borrower for the purpose as agreed herein according to the utilization requests and payment orders. According to the rules of China Banking Regulatory Commission and internal administrative provisions of the Lender, loan capital payment that meets one of the following conditions shall be made by the Lender under entrustment:

A.    The Lender and the Borrower enter into a new credit relationship and the credit rating of the Borrower fails to meet the internal requirement of the Lender;

B.    The payee is specified (with a specific account) and the single drawdown is more than RMB 0 (excluding, for payment in foreign currency shall be translated according to the exchange rate of   /   as announced on the date of actual drawdown);

C.    Other circumstances as provided by the Lender or agreed with the lender:        /    .

(3)    The Borrower directly makes the payment, namely, the Lender deposits the loan capital in the account of the Borrower according to the utilization request made by the Borrower and the Borrower directly makes payments to its trading counterparties for purposes as agreed herein. Except for the circumstances under which entrusted payment by the Lender shall apply as agreed in the preceding paragraph, other loan capital can be directly paid by the Borrower.

(4)    Change of payment methods. Where there is any change of the Borrower's payments and credit rating after the utilization request is submitted and the loan capital subject to direct payment meets the conditions as agreed in Item (2) of Para. 2, the loan capital payment method shall be changed. Where the payment method is changed or there is change of payment amount, payee, and purposes of loan under entrusted payment, the Borrower shall submit request change description in writing to the Lender and submit a new utilization request and related trading materials that prove the purpose of the capital.

3.    Specific requirements for entrusted payment of loan capital

(1)    Payment entrustment. Where the payments conform to the entrusted payment conditions of the Lender, the Borrower shall specifically entrust the Borrower to make the payment in the utilization request, that is, the Borrower authorizes and entrusts the Lender to directly deposit the loan capital in the bank account of the counterparty designated by the Borrower for the purpose as agreed herein after the loan deposit is deposited in the designated bank account of the Borrower, and the Borrower shall provide necessary payment information including the name of the payee, its bank account, and payment amount.

(2)    Provision of trading materials. Where the payments meets the conditions of entrusted payment of the Lender, the Borrower, at each drawdown, shall provide the Lender the payer's account, account information of the counterparty, and the proof that this drawdown is made for the purpose as agreed herein. The Borrower shall warrant that all information provided to the Lender is authentic, complete, and effective. Where the Lender fails to timely fulfill its obligation of entrusted payment because the trading information provided by the Borrower is not authentic, accurate, or complete, the Lender will not assume any responsibilities and repayment obligations of the Borrower that have occurred hereunder will not be affected.

(3)    Fulfillment of entrusted payment obligation by the Lender

A.    Where payment is made by the Lender under entrustment, the Lender shall pay the loan capital to the counterparty of the Borrower through the Borrower's bank account after the Borrower submits payment entrustment and related trade information and the Lender reviews the materials and gives consents.

B.    Where the Lender reviews and finds that the proof of purpose and related trade materials submitted by the Borrower do not conform to the agreement of this Agreement or are otherwise flawed, the Lender has the right to request the Borrower to supplement, replace, specify, or submit new materials. Before the Borrower submits trade information that the Lender deems conforming, the Lender has the right to refuse granting or payment of the loan capital.

C.  Where the loan capital is returned by the deposit bank of the counterparty and consequently the Lender fails to timely pay the loan capital to the Borrower's counterparty according to its payment entrustment, the Lender will not assume any responsibility and repayment obligations of the Borrower that have occurred hereunder will not be affected. In respect of the amount returned by the deposit bank of the counterparty, the Borrower hereby authorize the Lender to freeze the amount. Under this circumstance, the Borrower shall submit the payment entrustment, proof of purpose, and related trade materials again.

(4)  The Borrower shall not avoid entrusted payment by the Lender by split-up method.

4.  When the loan capital is granted, the Borrower shall timely provide records of and information regarding the use of the loan capital upon the request of the Lender. The aforesaid materials to be provided includes but are not limited to          /_____.

5.  Under any of the following circumstances, the Lender has the right to re-determine the conditions for loan granting and payment or suspend granting and payment of loan capital:

(1)  The Borrower breaches this Agreement and avoids entrusted payment by the Lender by split-up method;

(2)  The Borrower's rating is downgraded or its main business is less profitable;

(3)  There is abnormality in use of loan capital;

(4)  The Borrower fails to timely provide loan capital use records and materials according to the requirements of the Lender;

(5)  The Borrower breaches the agreement herein and pays the loan capital.

**Article 8 Repayment**

1.  The Borrower shall designate the following account to be the returned fund account and all returned funds shall be deposited in this account. The Borrower shall timely provide the information of capital flows into and from this account. The Lender has the right to require that the Borrower explain abnormal flow of capital in large amount into and from the returned fund account and to supervise this account.

Name of Account: Shanghai iQIYI Culture Media Co., Ltd.
Account No.: ******

2.  Unless otherwise agreed between the Parties, the Lender shall repay the loan hereunder according to the repayment schedule as provided in Para. 2:

(1)  Repayment of loan principal hereunder in full amount at the expiry of the loan.

(2)  Repayment of loan hereunder according to the repayment schedule below:

| Repayment time | Repayment amount |
|---|---|
| Sep-21-2017 | ¥     5,000,000.00 |
| Mar-21-2018 | ¥     5,000,000.00 |
| Sep-21-2018 | ¥     5,000,000.00 |
| Mar-21-2018 | ¥     5,000,000.00 |
| Sep-21-2018 | ¥     5,000,000.00 |
| Apr-10-2020 | ¥ 274,000,000.00 |

(3)  Other repayment schedule:          /          .

Where the Borrower needs to change the above repayment schedule, it shall apply to the Lender in writing     thirty (30)     business days before the maturity of the loan. Any change of the repayment schedule shall be made upon the written confirmation of both Parties.

3.  Unless otherwise agreed between the Parties, under the circumstance that the Borrower makes repayment of loan principal and interest in arrears, the Lender has the right to determine the sequence for repayment of principal and interests. Under the circumstance of repayment by installment, where there is more than one mature drawdown or overdue drawdown under this Agreement, the Lender has the right to determine the repayment sequence of the drawdown; where more than one loan contract entered into by and between the Borrower and the Lender becomes mature, the Lender has the right to determine the repayment sequence for the contracts fulfilled.

4.  Unless otherwise agreed between the Parties, the Borrower may repay the loan early but shall notify the Lender in writing ten (10) business days in advance. The amount of early repayment shall be used for repayment of the last mature loan first and repayment will be made in an inverted order.

The Lender has the right to calculate and collect the charge for trouble at 1% with respect to the early repayment.

5.  The Borrower shall repay the loan by the following method 1.

(1)  The Borrower shall deposit sufficient amount in the following repayment account no later than three (3) business days prior to the maturity of each drawdown principal and interest and the Lender has the right to actively deduct the principal and interest from the account on each maturity date.

Name of the repayment account: Shanghai iQIYI Culture Media Co., Ltd.
Account No.: ***

(2)  Other repayment methods as agreed between the Parties:          /          .

**Article 9 Guarantee**

1.  The loan hereunder shall be guaranteed by the following method:

This Agreement constitutes the master contract under the Guarantee Agreement, whose number is [2017] Bao Zi No. 004 and which is entered into by and between the Guarantor Beijing iQIYI Science & Technology Co., Ltd. and the Lender, and the Guarantor will provide the guarantee of maximum amount.

Shanghai iQIYI Culture Media Co., Ltd. will provide property mortgage guarantee, for which corresponding mortgage guarantee contract was entered into by the end of 2017.

2.  Where any event occurs to the Borrower or the Guarantor, which the Lender believes may affect their contractual capacity, the guarantee contract becomes ineffective, rescinded, or cancelled, the financial status of the Borrower or the Guarantor worsens or the Borrower or the Guarantor is involved in major litigation or arbitration cases, the Borrower's or the Guarantor's contractual capacity is affected by other reasons, the Guarantee breaches the guarantee contract or other contracts entered into between the Guarantor and the Lender, or the value of the collateral is reduced or lost because the collateral becomes depreciated, destroyed, lost, or seized, the Lender has the right to require and the Borrower is obliged to provide new collaterals and replace the guarantee to provide guarantee for the debt hereunder.

**Article 10 Representations and Warranties**

1.   The Borrower represents that:

(1)   The Borrower is legally incorporated and exists and has full capacity for civil conduct and disposing capacity required for entering into and performing this Agreement;

(2)   Execution and performance of this Agreement present the turn intention of the Borrower and the Borrower has obtained legal and effective authorization according to the requirements of its bylaws or other internal administration documents. Such execution and performance will not cause breach of any agreement, contract, or other legal documents binding on the Borrower; the Borrower has obtained or will obtain all approvals, permits, recording, or registration required for entering into and performing this Agreement;

(3)   All documents, financial statements, invoices, and other materials that the Borrower provides to the Lender hereunder are authentic, complete, accurate, and effective;

(4)   The trade background based on which the Borrower applies to the Lender for additional businesses is authentic and legal and is not used for illegal purposes such as money laundry;

(5)   The Borrower withholds from the Lender the events that may affect the Borrower's and the Guarantor's financial status and contractual capacity;

(6)   The Borrower and its projects meet national standards for environmental protection and are not heavy energy-consuming enterprises and projects with serious pollution problems but insufficient rectifications as announced and determined by the competent government authority.

(7)   Other representations made by the Borrower:          /          .

2.   The Borrower warrants that:

(1)   The Borrower, as required by the Lender, will regularly or timely submit its financial statements (including but not limited to annual reports, quarterly reports, and monthly reports) and other related materials to the Lender; if the sales revenue or net profit of the current year is 10% lower than that of the previous year year-on-year, the Lender has the right to suspend the credit granting; if the sales revenue or net profit is 20% lower, the Lender has the right to reclaim the credit early.

(2)   If the Borrower has entered or will enter into a counter guarantee agreement or like agreements with the Guarantee hereunder with respect to its guarantee obligations, such agreements will not cause prejudice to any right of the Lender hereunder;

(3)   The Borrower will be subject to the credit inspection and supervision of the Lender and provide sufficient assistance and cooperation; where direct payment is made by the Borrower, the Borrower shall regularly summarize and report loan capital payment and usage as required by the Lender. The specific report time shall be:          /          ;

(4)   Where the Lender is consolidated or divided, decreases its capital, transfers its equity, invests in other companies, substantially increases its debt financing, transfers major assets and creditor's right, or have other matters that have adverse impact on the debt paying ability of the Borrower, the Borrower shall obtain written consent from the Lender in advance;

Under the following circumstances, the Borrower shall timely notify the Lender:

A.   Change of the bylaws, scopes of businesses, registered capitals, and legal representatives of the Borrower or the Guarantor;

B.   Change of the modes of operation, including joint operation in any form, joint venture with foreign investors, cooperation, contracted management, reorganization, restructuring, and IPO;

C. Involvement in major lawsuit or arbitration case, seizure, retention, or custody of properties or collaterals; or placement of new encumbrance on the collaterals;

D. Close-down, dissolution, liquidation, winding-up, revocation or withdrawal of business license, or petition for bankruptcy;

E. Shareholders, directors, and senior management in service being suspected of being involved in major cases or economic disputes;

F. The Borrower's breach of other agreements hereunder;

G. Operation difficulties and worsening of financial status;

(5) The Borrower's repayment of loan to the Lender takes precedence over the borrowing made by the shareholders of the Borrower but shall not be inferior to like debts to other creditors;

(6) The Borrower shall not distribute dividends or bonus to shareholders in any form from the effectiveness of this Agreement to full repayment of the principal and related expenses of the loan hereunder;

(7) The Borrower shall not dispose its assets in any means that may compromise its debt paying ability. It covenants that the total amount of guarantee it provides to others shall not be higher than / times of its own net assets and the total amount of guarantee provided to other companies and the amount of single guarantee shall not exceed the limits provided in the bylaw;

(8) Except for the purposes as agreed herein or consented by the Lender, the Borrower shall not transfer the loan capital hereunder to the account of same name or the account of its affiliates.

Where the Borrower transfers loan capital to another account of the Borrower or the account of its affiliates, the Borrower shall provide corresponding proof materials;

(9) The Lender has the right to reclaim the loan early according to the returned funds of the Borrower;

(10) During the credit period, the actual controlling position of Baidu Holdings Limited remains the same. As soon as there is any change to such position, the credit granted by the Lender will be suspended and the Lender has the right to announce immediate maturity of the existing loan.

(11) Other covenants made by the Borrower: / .

**Article 11 Disclosure of Related-party Transactions inside the Parent Group of the Borrower**

The Parties agree that the following Paragraph 2 shall apply:

1. The Borrower is not a group client as defined by the Lender according to Guidelines on Management of Risks of Credits Granted by Commercial Banks to Group Clients ("Guidelines").

2. The Borrower is a group client as defined by the Lender according to Guidelines on Management of Risks of Credits Granted by Commercial Banks to Group Clients ("Guidelines"). The Borrower shall timely report related-party transactions whose amounts are more than 10% of its net assets to the Lender, including the association relations of all parties to the transaction, items and nature of the transaction, amount or corresponding proportion of the transaction, and pricing policy (including transactions with no value or only nominal value).

Under any of the following circumstances, the Lender has the right to unilaterally suspend payment of unused loan to the Borrower and early reclaim a part or all of the principal and interest of the loan: the Borrower applies to the bank for discount or pledge with false contracts entered into with its affiliates and creditor's rights including notes receivable and accounts receivable without actual trade background, to obtain bank financing or credit; the Borrower has major merger, acquisition, or reorganization that the Lender may deem to have adverse impact on loan safety; the Borrower intentionally avoid bank loan through related-party transactions; and the Borrower has other circumstances as provided in Article 18 of the Guidelines.

Article 12 Events of Default and Handling

Any of the following events will constitute or be deemed as a breach of the contract by the Borrower:

1.  The Borrower fails to fulfill its obligation to repay and pay up the Lender as agreed herein;

2.  The Borrower fails to utilize the loan capital by the methods agree herein or use the loan capital granted for purposes agreed herein;

3.  Representations made by the Borrower in this Agreement are not faithful or violate the covenants it makes herein;

4.  The Lender deems that the financial status and contractual capacity of the Borrower or the Guarantor may be affected under the circumstances as provided in Item (4) Para. 2 of Article 10 hereof but the Borrower does not provide new guarantee or replace the Guarantor;

5.  The credit status of the Borrower is downgraded or financial indicators of the Borrower, including profitability, debt paying ability, operation capacity, and cash flow, deteriorate beyond the constraints or other financial agreements as agreed herein;

6.  The Borrower breaches other contracts entered into with the Lender or other organs of Bank of China Limited; the Borrower breaches the credit facility contracts entered into with other financial institutes;

7.  The Guarantor breaches the agreements under the guarantee contract or breaches the agreements under other contracts entered into with the Lender or other organs of Bank of China Limited;

8.  The Borrower closes down or is dissolved, cancelled, or bankrupt;

9.  The Borrower is involved or may be involved in major economic disputes, lawsuits, or arbitration, its assets are seized, detained, or enforced against, or it is subject to investigation or penalty by the judiciary authority or administrative authorities including tax bureau and industry and commerce administrations, which have or may affect the Borrower's performance of its obligations hereunder;

10. There are abnormal changes to major investors and key executives of the Borrower or they are lost or under investigation or held in custody by the judiciary authorities, which have affected or may affect the Borrower's performance of obligations hereunder;

11. The Lender finds existence of situations that may affect the financial status and contractual capacity of the Borrower or the Guarantor during its annual (namely every anniversary of the Agreement) review of the Borrower's financial status and contractual capacity;

12. There is abnormal capital flow in large amount into or from the designated returned fund account and the Borrower fails to provide explanations acceptable to the Lender;

13. The Borrower breaches other agreements herein regarding the rights and obligations of the parties hereto.

In the case of the aforesaid events of default, the Lender has the right to separately or simultaneously take the following actions depending on the specific circumstances:

1. Request the Borrower and the Guarantor to redress the breach within given period of time;

2. Reduce, suspend or cancel, or terminate a part of all of the loan granted to the Borrower;

3. Suspend or stop acceptance of all or a part of the Borrower's utilization requests under this Agreement or other contracts between the Borrower and the Lender; for the loan amount yet to be granted and trade financing yet to be handled, fully or partially suspend or cancel, or terminate loan granting and payment and procedure handling;

4. Declare immediate maturity of all or a part of principals and interests and other amounts payable of outstanding loans/trade financing items under this Agreement or other contracts between the Borrower and the Lender;

5. Terminate or rescind this Agreement and fully or partially terminate or rescind other contracts between the Borrower and the Lender;

6. Claim indemnity for losses incurred to the Lender by breach of the Agreement against the Borrower, including but not limited to litigation fees, attorney's fees, notary fees, execution fees, and other expense losses incurred for realization of claims;

7. Deduct the balance from the accounts that the Borrower opens with the Lender and other branches of Bank of China Limited for repayment of all or a part of the loan that the Borrower borrows from the Lender hereunder. Immature amounts in the accounts will be deemed mature early. Where the currency of the account is different from the business settlement currency of the Lender, the amount will be translated at the applicable exchange quotation of the Lender at the time of deduction.

8. Exercise security interest;

9. Request the Guarantor to assume guarantee liability;

10. Other actions that the Lender deems necessary and feasible.

Article 13 Reservation of Rights

One Party's failure to exercise a part of or all rights hereunder or request the other Party to fulfill or undertake a part of or all obligations and responsibilities does not constitute waiver of such rights or exemption from such obligations and responsibilities.

One Party's tolerance for, extension of, or forbearance of the other Party's exercise of rights hereunder will not affect any right to which one Party it entitled according to this Agreement, laws, and regulations or be deemed its waiver of such rights.

Article 14 Modifications, Amendments, and Termination

This Agreement shall be subject to modifications or amendments in writing upon the consensus of the Parties and any modification or amendment shall constitute an integral part of this Agreement.

Unless otherwise stipulated by laws and regulations or agreed between the Parties, this Agreement shall not terminate until all rights and obligations hereunder are fulfilled.

Unless otherwise stipulated by laws and regulations or agreed between the Parties, ineffectiveness of any provision of this Agreement will not affect the legal effect of other provisions herein.

Article 14 Applicable Laws and Dispute Resolution

This Agreement is governed by laws of the People's Republic of China.

When this Agreement becomes effective, all disputes arising out of, or relating to, entering into and performance of this Agreement shall be settled by the Parties through consultation. Where such consultation fails, any Party may resolve the dispute by the following Method 2:

1.  To submit the dispute to         /         Arbitration Committee for arbitration according to the arbitration rules effective at the time of application, and the place of arbitration shall be    /    .

2.  To bring the dispute before the people's court of the place where the Lender or other branches of Bank of China Limited exercising rights and obligations under this Agreement or individual agreements is domiciled.

3.  To bring the dispute before the people's court that has jurisdiction over the dispute.

During the resolution of dispute, if such dispute does not affect performance of other provisions herein, such provisions will continue to be performed.


Article 16 Annexes

The following annex and other annexes upon the mutual recognition of the Parties will constitute an integral part of this Agreement and shall have the same legal effect as this Agreement.

1.  Utilization request (format);


Article 17 Miscellaneous

1.  Without the written consent of the Lender, the Borrower shall not transfer any right or obligation hereunder to a third person.

2.  Where the Lender needs to entrust other branches of Bank of China Limited to fulfill its rights and obligations hereunder or hand over the loan business hereunder to other branches of Bank of China Limited because of business needs, the Borrower hereby accept such entrustment or handover. Other branches of Bank of China Limited authorized by the Lender or other branches of Bank of China Limited taking over the loan business hereunder have the right to exercise all rights hereunder and to bring any dispute hereunder before the court, submit it to an arbitration committee for arbitration, or apply for enforcement in the name of such branches.

3.  Without prejudice to other agreements herein, this Agreement is binding on the Parties and their respective successors and assignees appointed according to law.

4.  Unless otherwise agreed, the domiciles designated by the Parties herein will serve as the correspondence addresses and the Parties undertake to timely notify each other in writing of any change of such correspondence addresses.

5.  Transactions hereunder are conducted based on separate interests of the Parties. If other parties to the transactions constitute affiliates or related persons of the Lender according to applicable laws, regulations, and regulatory requirements, all parties will not seek utilization of such association relation to affect fairness of such transactions.

6.  Headings and business names used herein are for the convenience of reference only and shall not be used for interpretation of the provisions or rights and obligations of the parties concerned.

7.  The Lender, according to applicable laws and regulations and regulatory rules, has the right to provide the information relating to this Agreement and other information relating to the Borrower to the credit reference system of the People's Republic of China and other credit information databases established according to laws, for legal inquiry and use of competent institutions or individuals. The Lender also has the right to inquire the information relating to the Borrower through the credit reference system of the People's Republic of China and other credit information databases established according to laws.

8.  Where the drawdown dates and repayment dates coincide with statutory holidays, the drawdown or repayment will be postponed to the first business day after the holiday.

9.  Where the Lender fails to perform this Agreement or fulfill its obligations as agree in this Agreement according to the changes of applicable laws and regulations and regulatory rules or requirements of the regulatory authority, the Lender has the right to terminate or perform this Agreement and individual agreements hereunder according to such changes applicable laws and regulations and regulatory rules or requirements of the regulatory authority. Where this Agreement is terminated or changed for the aforesaid reasons and the Lender is unable to perform this Agreement or fulfill its obligations as agreed herein, the Lender shall be exempted from its responsibilities.

Article 18 Effectiveness of this Agreement

This Agreement shall become effective on the date of signature and affixation of official seals by the legal representatives (persons in charge) or their authorized signatories of the Borrower and the Lender.

This Agreement is made in three counterparts, with the Borrower holding one counterpart and the Lender holding two counterparts. All counterparts shall have the same legal effect.

Borrower: Shanghai iQIYI Culture Media Co., Ltd.

[*Company seal is affixed*]

Authorized Signatory:    /s/ Yu Gong

Date: April 10, 2017


Lender: Bank of China Limited Shanghai Jing'an Branch

[*Company seal is affixed*]

Authorized Signatory:    /s/ Zuyuan Weng

Date: April 10, 2017

**Exhibit 10.58**

**Loan Agreement**

This Agreement is made and entered into by and between the following parties on April 19, 2017.

Party A:

Baidu Online Network Technology (Beijing) Co., Ltd., a limited liability company established under the laws of the PRC and domiciled in Baidu Building floor 3, 10 Shangdi Tenth Street, Haidian, Beijing ("Lender").

Party B:

Beijing QIYI Century Science & Technology Co., Ltd., a limited liability company established under the laws of the PRC and domiciled in Floor 10 & 11, 2 Haidian North First Street, Haidian, Beijing ("Borrower").

According to the terms and conditions of this Agreement, the Lender agrees to provide and the Borrower agrees to accept the loan under the Agreement. The parties reach an agreement as follows:

**Article 1 The Lender agrees to issue the following loan to the Borrower**

1. Type of loan: working capital loan

2. Purpose of the loan: daily management

3. Amount of the loan: (in words) RMB Two billion two hundred and twenty two million

(in figure) ¥ 2,220,000,000.00

4. Borrowing and repayment term:

    (1) Borrowing and repayment term is as follows:

| Borrowing | | | | Repayment | | | |
|---|---|---|---|---|---|---|---|
| Year | Month | Day | Amount | Year | Month | Day | Amount |
| 2017 | | | ¥2,220,000,000.00 | 2018 | | | ¥2,220,000,000.00 |

    (2) If the Borrower repays the loan in advance, it shall submit a written application to the Lender and obtain the consent of the Lender. The interest rate will not change upon early repayment.

5. Calculation and payment of the interest:

(1) The loan interest rate under this Agreement is: at 3.915% as the annual interest (simple interest) rate. In case of adjustment of the interest rate by the state, the interest rate agreed in this Agreement shall not be changed.

(2) Interest settlement method: Interest and principal shall be repaid at the same time.

**Article 2 Rights and Obligations of the Lender**

1. The Lender has the right to understand the Borrower's status of production and operation, financial activities, material inventory and the use of loans etc. and require the Borrower to provide financial statements and other documents, materials and information on schedule.

2. The Lender shall provide the loan to the Borrower in full and on schedule provided that the Borrower fulfills its obligations under this Agreement.

3. The Lender shall provide value added tax invoices in line with tax provisions for loan interest.

**Article 3 Rights and Obligations of the Borrower**

1. The Borrower has the right to obtain and use the loan on time according to the Agreement.

2. The Borrower shall repay the loan principal on schedule. If the Borrower cannot repay the loan on the due date and need to extend the loan term in special circumstances, the Borrower shall submit a written extension application to the Lender fifteen (15) days before the loan expires and signs a loan extension agreement upon consent of the Lender.

3. The Borrower shall pay the interest payable to the Lender as agreed.

4. The Borrower shall use the loan according to the purpose stipulated in this Agreement and shall not occupy and misappropriate the loan.

**Article 4 Liability for Breach of Agreement**

1. Where the Borrower violates the provisions of this Agreement, the Lender has the right to stop issuing the loan, early withdraw the principal and interest of the loan already provided or take other assets preservation measures.

2. If the Borrower fails to repay the principal of the loan within the time limit as stipulated in the Agreement and the extension application is not approved, the Borrower shall pay the penalty interest at the rate of one ten thousandth of the overdue part of the loan from the overdue date.

3. If the Borrower fails to use the loan according to the purpose of this Agreement, it shall be treated as occupation and misappropriation and shall pay the default interest at the rate of one ten thousandth of the occupation and misappropriation part per day.

4. For unpaid interest, the Lender has the right to calculate and receive compound interest at the exercise rate.

5. Where the Lender takes legal proceedings to achieve the creditor's rights due to default of the Borrower, the Borrower shall bear the lawyer's fee, travel expenses and other expenses to achieve the creditor's rights that are paid by the Lender thereby.

**Article 5 Dispute Settlement**

Any dispute arising from the performance of this Agreement may be settled through negotiation between both parties. If the negotiation fails, either party may submit it to China International Economic and Trade Arbitration Commission in Beijing for arbitration. The language of arbitration is Chinese.

**Article 6 Entry into Force of the Agreement**

This Agreement shall take effect as of the date of signature or seal by both parties.

**Article 7 Counterparts**

The Agreement is made in duplicate, with each party holding one (1). All the counterparts have the same effect.

**Article 8 Note**

The Lender has drawn the attention of the Borrower to a comprehensive and accurate understanding of the terms and conditions of the Agreement and has provided corresponding explanation on the terms and conditions at the request of the Borrower. Both parties to the Agreement have the same understanding of the meaning of this Agreement.

[The remainder of this page is intentionally left blank.]

[Signature Page of Loan Agreement]

Party A (Lender):

Baidu Online Network Technology (Beijing) Co., Ltd. (seal)

[*Company seal is affixed*]

Legal representative:     /seal/ XIANG Hailong

[Signature Page of Loan Agreement]

Party B (Borrower):

Beijing QIYI Century Science & Technology Co., Ltd. (seal)

[*Company seal is affixed*]

Legal representative:    /seal/ Yu Gong

**Exhibit 10.59**

**Comprehensive Facility Contract**

(Applicable to Facility to Entities)

CHINA MINSHENG BANKING CORPORATION LIMITED

**Comprehensive Facility Contract**

Borrower: Beijing iQIYI Science & Technology Co., Ltd. ("Party A")
Residence:          ***
Postcode:           ***
Legal representative:        ***
Telephone:          ***
Fax:                ***
Account bank:       ***
Account number:        ***

Lender: China Minsheng Banking Corporation Limited, Beijing Branch ("Party B")
Residence:          ***
Postcode:           ***
Legal representative:        ***
Telephone:          ***
Fax:                ***
Account bank:       ***
Account number:        ***

Party A and Party B agree as follows and intend to be bound hereby through negotiations in the principles of good faith and equity in accordance with the Contract Law, the Commercial Banking Law and any other applicable laws and regulations of the PRC.

### Chapter 1    Comprehensive Facility Amount and Type

**Article 1** The maximum facility amount available to Party B from Party A under the Contract shall be RMB300,000,000.

The facility made available hereunder shall be used by Party A.

For purpose of this Contract, the facility amount shall be net of any deposit, which means any amount of finance available to Party A or any third party as a result of its payment of equal deposit shall not be counted toward the facility amount hereunder.

**Article 2** The maximum facility amount provided hereunder may be made available for the types of facilities listed below:

RMB:
- short-term working capital loan
- banker's acceptance bill
- non-financing letter of guaranty
- issuing domestic letter of credit

Trade Finance:
- issuing letter of credit

Others:
- wealth management

### Chapter 2    Term of Facility

**Article 3** The term of the maximum facility amount provided under Article 1 shall be one year, commencing as of June 12, 2017 and ending as of June 11, 2018.

**Article 4** Party B may, at its sole discretion, inspect utilization of the facility made available hereunder from time to time and, upon finding any event described under Article 7, make any adjustment to the term provided under Article 3.

**Chapter 3    Security**

**Article 5** Any claim created hereunder shall be enforceable by the security provided under the Contract of Maximum Amount Guarantee (NO. GONGGAOBAOZI1700000060016) made between Beijing Qiyi Century Science & Technology Co, Ltd. and Party B.

**Article 6** Party B shall have the right to request any other security from Party A in addition to those provided under Article 5 in connection with any specific business contract made on reliance of this Contract.

**Chapter 4    Utilization of Facility**

**Article 7** During the term hereof and within the maximum facility amount provided hereunder, Party A may use the facility amount in lump sum or installments. Party B shall enter into specific facility contract or agreement (the "specific business contract") with Party A upon inspection to its satisfaction that such utilization of the facility is in compliance with the terms of this Agreement.

**Article 8** During the term hereof, the aggregate outstanding amount of the facilities used by Party A hereunder shall be no more than the maximum facility amount provided hereunder, any facility paid up by Party A may be used on revolving basis, and any un-used facility shall be withdrawn automatically by the end of the term hereof.

   During the term hereof, Party B may discontinue providing any remaining facility to Party A if Party A fails to perform any of its obligations provided under this Contract or any specific business contract.

**Article 9** Party A shall apply for use of the facility within the term provided under Article 3, and the date of commencement to use such facility shall be no later than the end date of the term provided hereunder, subject to any adjustment of the term and in such circumstance, it shall be no later than the end date of term so adjusted.

**Article 10** Party B shall have the right not to enter into any specific business contract with Party A unless all of the following conditions are satisfied:

   10.1    Party A has provided at the request of Party B its documents including without limitation the duly inspected business license, the organization code and tax registration certificate, then current articles of association, and documents evidencing the identity of its legal representative including a copy of his/her ID;

   10.2    Any document necessary for the security provided hereunder has become effective, and the mortgage/pledge provided therein has been created;

   10.3    Party A is in no current or ongoing default or, if it has been in any default, such default has been resolved to the satisfaction of Party B or waived by Party B;

   10.4    All of the covenants made by Party A under Chapter 5 have been observed as of the date of applicable disbursement; and

   10.5    Party A's financial conditions have no material change between the date hereof and the date of its application for use of the facility.

**Article 11** Any fee, discount, interest collectable by Party B or any rate applicable thereto in connection with any note, guarantee or trade finance shall be agreed by the Parties in the applicable specific business contract.

**Article 12** If there is any discrepancy between any specific business contract and this Contract, the specific business contract shall prevail.

**Chapter 5    Party A's Covenants**

**Article 13** Party A's use of the facility shall be in compliance with applicable laws, regulations and the provisions under this Contract and the applicable specific business contract, and Party B may conduct inspection of the applicable specific business from time to time.

**Article 14** As long as Party A is in use of the facility (which means the period from the date hereof until discharge of the entire claims entitled to Party A), Party A shall at the request of Party B provide its financial statements and the information regarding its account bank and number, balance of deposits and loans, and any other particulars.

**Article 15** Party A may not provide security for the debt of any third party unless such provision has been notified to Party B in advance and will not have any effect upon any specific business contract made by the Parties.

**Article 16** As long as Party A is in use of the facility, Party A shall notify Party B no less than 30 days in advance and discharge or cause to discharge all claims entitled to Party B prior to any merger, acquisition, consolidation, division, contract, lease, restructuring, reorganization, sale or transfer or any other disposition of any material assets or equities, or any material investment.

**Article 17** Party A shall notify Party B in writing immediately upon occurrence of any event which pose serious threat to Party A's ordinary course of business or its performance of its payment obligations hereunder (including without limitation any event set forth under Article 10.3).

**Article 18** Party A shall notify Party B within seven days upon any change of its legal or business address, capital increase or reduction, or its legal representative or any of its senior management.

**Article 19** Party A shall make due payment of any principal or interest, or fees or expenses accrued upon any specific business to which the facility provided hereunder is applied.

**Article 20** Not Applicable

**Chapter 6    Party B's Covenants**

**Article 21** Party B shall approve application from Party A to use the facility provided hereunder subject to the terms hereof and duly perform any specific business contract.

**Article 22** Unless otherwise provided under Chapter 7, Party B may not make any adjustment to the term and maximum amount of the facility provided hereunder which is adverse to Party A at its own discretion.

**Chapter 7    Facility Adjustment and Acceleration**

**Article 23** During performance of this Contract, Party B shall have the right to adjust or withdraw the facility provided hereunder and request accelerated payment of all outstanding amount payable by Party A hereunder if:

23.1    Party A's business operations deteriorate or experience material difficulty;

23.2    The conditions of the market in which Party A conducts its business experience material change;

23.3    Any related state policy is materially modified;

23.4    Party A is in violation of any contract or agreement to which it is a party or any covenant or warranty made by it, which constitutes breach of contract or makes any other creditor capable to accelerate or potentially accelerate payment of any debt owed to it;

23.5    The security provided hereunder is insufficient, or the party providing the security is in breach of the applicable security contract or any of its covenants, or the assets secured or pledged hereunder are destructed or materially impaired and Party A fails to provide any additional security requested by Party B.

23.6    During the term of this Contract, Party A indicates expressly or by its act that it is unable or fails to perform any of its obligations provided under this Contract or any specific business contract or any of its covenants.

23.7    The balance sheet, profits statement or any other material information provided by Party A to Party B contains false information or any material omission, or Party A rejects any supervision from Party B upon its use of the facility provided hereunder or any of its production, operation or financial activities.

23.8    Party A transfers any of its assets or funds illegally, or avoid payment of any debts due and payable by it, or conducts any activity which is prejudicial to the interests of Party B.

23.9    Party A's financial conditions experience material change, or is involved in any lawsuit, arbitration, administrative or other proceedings, which may have adverse effect upon its performance of this Contract.

23.10    There is any other occurrence under which Party A is or could be incapable to perform its obligations hereunder; or

23.11    Party A is in violation of any of its covenants under Chapter 5 or fails to perform any of its obligations provided under this Contract or any specific business contract.

## Chapter 8    Effectiveness

**Article 24** This Contract shall be effective upon signature or affixture of seal by respective legal or authorized representative/principal of the Parties and affixture of their respective corporate/contractual seal.

## Chapter 9    Dispute Resolution

**Article 25** Any dispute arising from this Contract and/or any specific business contract shall be subject to jurisdiction of the court in the place of residence of Party B, unless otherwise expressly provided under the applicable specific business contract.

## Chapter 10    Miscellaneous

**Article 26** Any specific business contract made by Party A or any of its subsidiaries listed in Schedule I attached hereto and Party B shall be an integral part to and constitute one and same document with this Contract.

**Article 27** This Contract is in four originals with two originals to be held by each of the Parties. Each original shall have the same effect.

**Article 28** Upon execution of this Contract, Party B has made detailed descriptions and explanations regarding all of the terms under this Contract to Party A, and each of the Parties has no doubt regarding any of the terms hereunder and understands accurately the legal interpretation of its rights, obligations, restrictions or waivers hereunder.

**Article 29** Additional Agreements

1    The facility provided hereunder may be used for day-to-day operations of Party A, any letter of guaranty issued on reliance of the facility provided hereunder shall be in the form acceptable to Party B, and any wealth management business transacted on reliance of the facility provided hereunder shall approved by Party B on case-by-case basis.

2   Use of the facility provided hereunder in excess of RMB200,000,000 is subject to additional approval from Party B.

3   The facility provided hereunder shall not constitute an obligation of Party B and Party B shall have sole discretion to grant such facility or not based on its applicable policies and management requirements. The details regarding use of such facility shall be set forth under the applicable specific business contract between Party B and the user of such facility.

4   All disputes arising from this Contract shall be subject to jurisdiction of the court in the place of execution of this Contract. This provision shall prevail over any other term hereof. This Contract is executed by the Parties in Haidian District, Beijing.

5   The address of each of the Parties is as follows:

Party A:   ***

Party B:   ***

The addresses set forth above shall be applied in connection with service of any notices, agreements, documents, or any other instruments regarding this Contract or any dispute arising therefrom, including any arbitration, lawsuit or action.

It is agreed that any change to the address set forth above shall be made in writing and notified pursuant to this Contract, and any such change made during any arbitration or lawsuit shall be duly notified to the competent arbitration agency or court.

If either Party fails to perform the notice obligation provided in the preceding paragraph, service to the address set forth above shall be deemed duly served. If any process is not served due to inaccurate address, change of address or refusal by the receiving party, such process shall be deemed duly served, if delivery by mail, upon the date on which it is returned; if delivery by person, upon the date on which the delivering person signs on the spot of the delivery. Any changed address shall not be valid address for service under this Contract unless such change is duly notified hereunder.

6   The Parties agree and irrevocably authorizes Party B to submit to the basic financial credit information database maintained by the government the name, registered address, business operations in connection herewith, historical transactions, and track records of previous performances and non-performances of Party A (including non-performance under this Contract, rulings or awards enforcing performance by Party A, and any other non-performing information of Party A).

This Contract is made by Party A and Party B in Haidian District, Beijing.

Party A:    Beijing iQIYI Science & Technology Co., Ltd. (seal)

[*Company seal is affixed*]

By:            /s/ Geng Xiaohua
Title:          legal representative/principal
Date:          May 16, 2017

Party B:    China Minsheng Banking Corporation Limited, Beijing Branch (seal)

[*Company seal is affixed*]

By:            /s/ Du Pengzhi
Title:          legal representative/principal
Date:          June 12, 2017

**Exhibit 10.60**

**Credit Facility Agreement**
(Applicable to working capital loans without signing a loan contract)

Facility grantor: China Merchants Bank Company Limited, Beijing Shangdi Branch ("Party A")
Principal: Yang Lan

Facility applicant: Beijing iQIYI Science & Technology Co., Ltd. ("Party B")
Legal representative/ principal: Xiaohua Geng

Upon Party B's application, Party A agrees to grant line of credit to Party B for the latter's use. Party A and Party B hereby conclude the following terms and execute this agreement upon full negotiation according to relevant laws.

1.    Line of credit

1.1    Party A will provide Party B with a line of credit of <u>RMB 200 million</u> (including other currencies of equivalent value, the exchange rate subject to the exchange quotation published by Party A when any specific business occurs). Among others, (please mark with ✓):

☒ revolving line of credit of RMB 200 million;

☐ one lump-sum line of credit of.

Revolving line of credit means the maximum limit of the principal balances of any loans, trade financing, discount of bills, acceptance of commercial drafts, letters of guarantee, corporation overdraft, domestic factoring,        ,        or other facilities provided by Party A to Party B, which are continuous and revolving.

One lump-sum line of credit means that the aggregate amount of the multiple facility business applied by Party B to Party A during the term of the credit facility hereunder may not exceed the amount of the lump-sum line of credit.

"Trade financing" includes opening of letter of credit, import bill advance, delivery guarantee, import collection bill advance, packing credit, export bill advance, export collection bill advance, import/export remittance financing, import factoring, export factoring (double-factoring without recourse, except for the double-factoring without recourse in Party A's system, same below),        ,        and other business types.

1.2    If Party A extends any import factoring or domestic factoring without recourse business to Party B, the account receivable received by Party A against Party B in such business shall use the above line of credit. If Party B applies to Party A for domestic factoring with recourse or export factoring business, the basic purchase price (basic buying price) provided by Party A to Party B in such business shall use the above line of credit.

1.3    If Party A entrusts other branches of China Merchants Bank to open any overriding letter of credit to the beneficiary upon opening of the letter of credit based on the needs of its internal process, the opening and the import bill advance and delivery guarantee business occurred thereunder will use the above line of credit.

1

Beijing Branch January 2016 Version

1.4    The above line of credit excludes any bond provided by Party B or any third party for any specific single business hereunder, or any amount of facility corresponding to any pledge of deposit receipt. The foregoing sentence shall apply in the following provisions.

1.5    Party A and Party B entered into a credit facility agreement (No.          ). If there is any outstanding amount in any specific business contemplated thereunder from effectiveness of this agreement, such amount shall be incorporated in this agreement automatically, and use the line of credit hereunder. (Please mark by "✓", if applicable).

2.    Term of facility

The term of facility hereunder is 12 months, starting from August 15, 2017, ending on July 26, 2018 (expiration date). Party B shall apply to use the line of credit during such term. Party A will not accept any application for use of line of credit made by Party B after the above expiration date, unless this agreement provides otherwise.

3.    Use of line of credit

3.1    Type and scope

The above line of credit is (choose one by marking "✓" below):

[✓] 3.1.1 Comprehensive line of credit, including specifically the following business (please fill out truthfully):

Working capital loans, bank acceptance of bills, domestic letter of credit, domestic buyer's factoring (limited to paying agency), trade financing, domestic or foreign non-financing letter of guarantee, financing guarantee, line of credit of derivative transactions

Meanwhile, Party B          (may or may not) use the above lines of credit interchangeably, and (mark by "✓" below):

☐ all business types may be used interchangeably;

☐ Part of the business types may be used interchangeably, that is,          and          ;

( ) 3.1.2          single line of credit.

3.1.3 If Party B has any other business needs than the types of line of credit specified in Clauses 3.1.1 and 3.1.2 during the term of facility, Party B may submit its application to Party A one by one. Upon Party A's consent, both parties will sign the specific business application, the business contract (including certificate of loan), and business agreement to confirm. The above facility business approved and consented by Party A will directly use the line of credit hereunder, without any supplemental agreement between both parties.

3.2    The revolving line of credit may be used by Party B in a revolving manner during the term of facility. The one lump-sum line of credit may not be used in a revolving manner. Party B shall apply the line of credit on a case-by-case basis, and Party A will approve the application on a case-by-case basis.

2

Beijing Branch January 2016 Version

3.2.1   Where Party B applies for any working capital loan within the line of credit, both parties are not required to sign the Loan Contract on a case-by-case basis, provided that when Party B applies for use of loan, it shall submit on a case-by-case basis the Draw-down Application, the certificate of loan, and other documents required by Party A according to the requirements of self-payment or entrusted payment. Party A will examine, approve and decide whether to allow the drawdown of loan on a case-by-case basis. The actual amount, starting and ending dates, purpose and interest rate of each drawdown shall be subject to the certificate of loan, or if the certificate of loan does not provide, subject to this agreement.

Both parties agree that Party B may affix the seal the sample of which is reserved with Party A to the Drawdown Application and the certificate of loan, and both parties approve the validity of such seal.

The Drawdown Application and the certificate of loan are an integral part hereof.

3.2.2   If Party B applies for other types of facility other than working capital loan, and Party A examines and approves, the amount, term, purpose and other matters shall be specified by the business contract (including the certificate of loan) or agreement entered into by both parties, or by relevant business application submitted by Party B and accepted by Party A.

The above business contract, agreement and business application are collectively referred to as "Specific Contracts".

3.2.3   In case of domestic factoring without recourse, when Party A sends the Notice of Transfer of Accounts Receivable to Party B and Party B confirms in the way approved by Party A, it will be deemed that a "Specific Contract" has been reached between both parties.

3.3   The use period of each loan or other facility within the line of credit shall be determined specifically according to the operating needs of Party B and the business management rules of Party A. The expiration date of each of the above business may be later than the expiration date of the facility term.

4.   Interest rate

4.1   Interest rate and interest accrual rules of working capital loan

4.1.1   Working capital loan will adopt fixed or floating interest rate.

4.1.2   Determination of interest rate (mark "✓" in the box below, if applicable):

4.1.2.1   In case of RMB loan,

☐ the benchmark rate shall be the RMB benchmark lending rate of financial institutions published by the People's Bank of China for _____ months/ _____ years on the pricing date, or

☐ the benchmark rate shall be the loan prime rate (LPR) for one-year loan published by National Inter-bank Funding Center 1 working day before the pricing date, or

☐ the benchmark rate shall be _____,

☐ plus / ☐ minus _____ basis points (BPs), or ☐ plus / ☐ minus _____ %.

3

4.1.2.2    In case of foreign currency loan, the benchmark rate shall be           for ☐        months/☐        days which is of the same currency as the loan on the pricing date or 1 or 2 working days before the pricing date, ☐ plus / ☐ minus        basis points (BPs). Party A will decide whether the interest rate is determined on the pricing date or on 1 or 2 working days before the pricing date by reference to international practices.

4.1.2.3    "Pricing date" means the date on which the benchmark rate is determined during the loan term or the floating period. Where the loan adopts a fixed rate, the pricing date shall be the date when the loan is actually paid. Where the loan adopts a floating rate, the pricing date shall be governed by the provisions of Clause 4.1.3.

4.1.3    If the loan adopts a floating rate, the rate will be floated based on the floating period of        month/        day. The benchmark rate applied in each floating period will be determined according to the provisions of Clause 4.1.2.

The date when the loan is paid is the pricing date of the first floating period. Subsequently, the first date of each floating period shall be the pricing date of such period.

4.1.4    Party A has the right to adjust the floating percentage and/or basis point of the working capital loan regularly or irregularly according to the change of relevant national policies, the domestic credit market price or its own credit policy. Once Party A decides to so adjust, it shall give 5 working days written notice to Party B. If the percentage after adjustment is higher than the original one, it will apply only to the future loans of Party B, and will not apply to any effected loans.

If this Clause 4.1.4 contradicts to or is inconsistent with any other provision hereof, this Clause 4.1.4 shall prevail.

4.1.5    If Party B fails to use the loan according to the purpose agreed herein, for the part it fails to use as agreed, the interest will be charged based on the original rate plus 100% from the date when the purpose is changed.

If Party B fails to repay the loan in a timely manner, the interest will be charged based on the original rate plus 50% for the amount not repaid from the date of delay.

"Original rate" means the interest rate applied before the expiration of the loan (including the early expiration date) (or, in case of floating rate, the last floating period before the expiration date of the loan (including the early expiration date)).

If the repayment of any loan is delayed and the loan is not used according to the agreed purpose, the higher amount of the above provisions shall apply to calculate the interest.

4.1.6    If the People's Bank of China adjusts relevant provisions of its lending rate during the term of loan, such provisions shall apply.

4.1.7    Interest accrual: The interest shall be calculated according to the actual drawdown amount and the number of actual use from the loan enters Party B's account, and shall accrue on a quarterly basis. The interest accrual date is the 20th day of the last month of each quarter. The calculation of daily rate shall be governed by relevant provisions of the People's Bank of China or relevant international practices.

4

Beijing Branch January 2016 Version

4.1.8    Payment of interest: Party B shall pay interest on each interest accrual date. Party A may directly deduct relevant interest from Party B's bank account. When Party B fails to pay interest, Party A has the right to charge compound interest on the unpaid interest at the lending rate of the same period.

4.2    The financing rate of other facilities within the line of credit shall be subject to the Specific Contracts.

5.    Security

5.1    In respect of the debts owed by Party B to Party A hereunder, Beijing QIYI Century Science & Technology Co., Ltd. and Shanghai iQIYI Culture Media Co., Ltd. shall act as guarantors to take joint liabilities with Party B. They have issued the Irrevocable Maximum Amount Letter of Guarantee (2017 Zhao Shang Shou Zi No. 006) for Party A. and/or

5.2    In respect of the debts owed by Party B to Party A hereunder,          /          shall provide mortgage or pledge, and has entered into the Maximum Amount Mortgage Contract/ Maximum Amount Pledge Contract (No.          ) with Party A.

5.3    When any securing party provides mortgage over real estate for all debts owed by Party B to Party A hereunder, to avoid any damage to Party A's creditor's rights that may result from demolition, expropriation or risks of demolition, expropriation of the collateral, both parties specially agree as follows upon consensus through negotiation:

5.3.1    When Party B knows that the collateral has been or may be included in any government's plan of demolition or expropriation, it shall immediately notify Party A, and shall procure the securing party to use the compensation provided by the demolishing party to provide security and promptly complete relevant security formality according to relevant provisions of the Maximum Amount Mortgage Contract, or provide other securities approved by Party A at the request of Party A.

If Party B, in violation of the above provisions, fails to perform the obligation of notification and/or fails to complete relevant security formality/ provide other securities within the time specified by Party A, it shall pay liquidated damages at          % of the line of credit hereunder. If Party A suffers any economic loss therefrom, Party B shall fully compensate such loss.

5.3.2    If the above security is required to be created again or other securities are required to be provided because any circumstances above-mentioned occur to the collateral, relevant costs shall be borne by the securing party, and Party B shall take joint and several liability therefor. Party A has the right to deduct such costs directly from Party B's account.

5.3.3    When Party A knows any of the above circumstances under Clause 5.3.1 occurring to the collateral from other sources, it has the right to act according to the provisions of Clauses 5.3.1 and 5.3.2.

5

Beijing Branch January 2016 Version

6.      Party B's rights and obligations

6.1     Party B has the rights to

6.1.1   request Party A to provide loans or other facilities within the line of credit upon the conditions specified herein;

6.1.2   use the line of credit according hereto;

6.1.3   request Party A to keep confidential such information as production, operation, property and account, except as provided by laws or regulations or required by any regulators;

6.1.4   transfer its debts to any third person upon consent of Party A.

6.2     Party B has the obligations to

6.2.1   provide truthfully the documents and information that can reasonably prove its operational condition (including but not limited to correct financial statements and annual financial reports, any decision or change in production, operation or management that may affect repayment of loans), and cooperate Party A with any investigation, audit or inspection;

6.2.2   accept Party A's supervision on its use of facility funds and its production, operation and financial activities;

6.2.3   use the loan and/or other facilities according to this agreement and other Specific Contracts and/or promised purpose, and comply with Party A's requirements on payment management of loan funds;

6.2.4   repay the principal and interest of any loan, advance or other debts promptly and fully according to the provisions of this agreement and any Specific Contracts;

6.2.5   obtain Party A's written consent when it intends to transfer its debts to any third person in whole or in part;

6.2.6   immediately notify Party A when any of the following circumstances occurs, and actively cooperate with Party A to implement any security measures to ensure safely repayment of principal and interest of any loan, advance and other facility debts and all relevant costs and expenses:

6.2.6.1 Party B suffers any material financial loss, asset loss or other financial crisis;

6.2.6.2 Party B provides loan, guarantee or security for any third party, or creates mortgage or pledge over its property or right;

6.2.6.3 Party B's credit standing deteriorates, or the profitability of its principal business reduces;

6.2.6.4 Party B stops business, its business license is cancelled, or Party B applies or is applied for bankruptcy or dissolution;

6.2.6.5 Party B's controlling shareholder or other affiliated company suffers any material risk in operational or financial aspects, and thus affects its normal operation;

6.2.6.6 Party B enters into any material related-party transactions with its controlling shareholder or other affiliated company, and thus affects its normal operation;

6

6.2.6.7 Any litigation, arbitration or criminal or administrative penalty occurs which may have material adverse effect upon Party B's operation or property;

6.2.6.8 Party B's legal representative, director or key officer changes, or his/her personal freedom is restricted by competent national authority for violation of laws or disciplines, which may affect its normal operation;

6.2.6.9 Other significant matters occur that may affect its ability to repay debts.

6.2.7 Not to be negligent in management or collection of its due debts, or not to dispose of its main property for no consideration or otherwise inappropriately.

6.2.8 Obtain Party A's prior consent before it is merged, divided or reorganized, transfers equity, enter into joint venture or cooperation, transfers property, carries out shareholding reform, invests in others, materially increase debt financing or carries out other material matters;

6.2.9 Party B shall at the request of Party A (mark "✓" in the boxes below):

☐ take out insurances for its core assets, and designate Party A as the first rank beneficiary;

☐ not sell or mortgage the asset of _____ designated by Party A before full repayment of the facility hereunder;

☐ restrict the distribution of dividends to its shareholders during the term of facility according to the requirements of Party A as follows: _____

☐ others: _____ _____

7. Party A's rights and obligations

7.1 Party A has the right to

7.1.1 request Party B to promptly and fully repay the principal and interest of any loan, advance and other facility debts hereunder according to the provisions of this agreement and the Specific Contracts;

7.1.2 request Party B to provide relevant information relating to use of its line of credit;

7.1.3 understand Party B's production, operation and financial activities;

7.1.4 supervise Party B's use of loan and/or other facility hereunder according to this agreement and the Specific Contracts;

7.1.5 entrust other branches of China Merchants Bank at the place of the beneficiary to open any letter of credit to the beneficiary when it accepts the application of Party B to open letter of credit based on the needs of its internal process;

7.1.6 deduct amount directly from Party B's account to repay any debts owed by Party B hereunder and under any Specific Contracts;

7.1.7 transfer its creditor's rights against Party B, and take other measures it deems appropriate, including but not limited to notifying Party B thereof and demanding Party B to repay by fax, mail, personal delivery, and announcement at public media;

7.1.8   supervise Party B's account and entrusts other branches of China Merchants Bank to supervise such account, and control payment of loan funds according to the loan purpose and payment scope agreed by both parties;

7.1.9   exercise other rights specified herein.

7.2   Party A has the obligations to

7.2.1   pay loans or provide other facilities within the line of credit upon the conditions specified in this agreement or the Specific Contracts;

7.2.2   keep confidential Party B's assets, finance, production and operation, except as otherwise provided by laws and regulations, or otherwise required by any regulators.

8.   Party B's representations and warranties

8.1   Party B is an entity of legal personality who is duly established and validly existing according to China laws, and has full civil capacity to enter into and perform this agreement;

8.2   Party B has obtained full authority from its board of directors or other governing body to enter into and perform this agreement;

8.3   Where Party B applies for working capital loan, the loan project and other loan matters comply with requirements of laws and regulations, and Party B will not use the loan for investment in fixed assets or equity, or to speculate in negotiable securities, futures or real estate, to lend to others to gain illegal income, or to invest in any production or operation area or purpose prohibited by the state, or for other purposes that those specified herein;

8.4   Where the loan funds are paid by the borrower itself, Party B shall regularly (at least on a monthly basis) to report to Party A the payment information. Party A has the right to check whether the payment conforms to the agreed purpose through analysis of account, inspection of vouchers and filed investigation;

8.5   Where Party B needs to pay loan funds by e-bank upon consent of Party A, Party B is obligated to accept the restrictive measures of Party B on e-bank, including pre-set list of payees, limit of a single payment, and limit of payments for certain stage;

8.6   The documents, information and certificates of Party B, any guarantor, mortgagor, pledger, or collateral provided by Party B are true, accurate, complete and valid, and free of any significant error inconsistent with facts or omission of material facts;

8.7   Party B shall strictly comply with laws and regulations of the state during its operation, carry out business according to the business scope set forth in its business license or specified by law, and go through the annual registration inspection formality in a timely manner;

8.8   Party B shall maintain or enhance the existing level of operation and management, and preserve and improve value of existing assets, and will not waive any due claims or dispose of any principal property for no consideration or in any inappropriate way;

8

Beijing Branch January 2016 Version

8.9     Party B may not prepay nay other long-term debts or          without permission of Party A;

8.10    Party B shall ensure the financial indicators of Party B during the working capital loan term shall not be less than the following requirements:

8.11    No material events have occurred to Party B when entering into this agreement, which may affect Party B's performance of obligations hereunder.

9.      Special provisions relating to working capital loan

9.1     Drawdown and use of loan

        Party B may use the working capital loan hereunder through self-payment or entrusted payment.

9.1.1   Self-payment

        Self-payment means after Party A pays the loan amounts to Party B's account according to the drawdown application of Party B, Party B pays the amount to its counter-party through self-payment according to the purpose specified herein.

9.1.2   Entrusted payment

        Entrusted payment means Party A pays the loan amount to Party B's counter-party meeting the purpose specified herein through Party B's account according to Party B's drawdown application and payment entrustment. Party B authorizes Party A to pay the loan funds adopting entrusted payment to Party B's counter-party through Party B's account on the date when the loan funds are issued (or the working day after the issuance).

9.1.3   Party B shall apply entrusted payment to the full amount of the loan funds unconditionally according to the provisions of Clause 9.1.2 in any of the following circumstances:

9.1.3.1 Party B's single drawdown exceeds RMB [    ] (inclusive, or equivalent foreign currency);

9.1.3.2 Party A requests Party B to adopt entrusted payment according to regulatory requirements or risk control requirements.

9.1.4   When entrusted payment is adopted, Party A's approval will be required before paying the loan funds to others after the funds are issued. Party B may not avoid Party A's supervision by means of e-bank, back-drafting of check, or breaking up the whole into parts or by other means.

9.2     Prepayment

        Where Party B prepays, the original interest rate specified herein shall remain applied, and the payable interest shall be calculated based on the actual loan term.

9

9.3    Loan extension

Where Party B is unable to repay loans hereunder and needs extension, it shall submit a written application to Party A one month before expiration hereof. If Party A examines and approves the extension, both parties will sign an extension agreement. If Party A does not approve the extension, this agreement shall remain effective. The loans used and interest payable by Party B shall be repaid according to this agreement.

9.4    [✓] Special loan account (please mark "✓" in the box if applicable)

9.4.1    The issuance and payment of all loan funds hereunder shall be made through the following account:

Account name: Beijing iQIYI Science & Technology Co., Ltd.

Account No.: ******

Bank: <u>China Merchants Bank Company Limited, Beijing Shangdi Branch</u>

9.4.2    When the entrusted payment is adopted, Party A has the right to restrict the payment and cashing functions by means of e-bank, telephone bank or other non-counter channels when it is necessary.

9.5    Supervision of Party B's fund withdrawal account

9.5.1    Party A and Party B agree to designate the following account as Party B's account for fund return before Party B repays all working capital loans hereunder.

Account name: _____
Account No.: _____
Bank: _____

9.5.2    The requirements for supervising the above account are as follows:        .

Party A has the right to recover loans early based on Party B's return of funds, which means when any fund is returned to the above account, the loan amount corresponding to such returned fund may be deemed due early, and Party A has the right to deduct directly the amount from the account to repay such loan amount;

9.5.3    When the entrusted payment is adopted, Party A has the right to restrict the payment and cashing functions by means of e-bank, telephone bank or other non-counter channels when it is necessary.

9.5.4    Party B shall provide funds-in and funds-out information of the above account on a quarterly basis, and cooperate Party A to supervise relevant account and the return of funds.

10.    Breaching event and treatment

10.1    The breaching event shall be deemed occurred when any of the following circumstances occurs to Party B:

10.1.1 Party B, in violation of Clause 5.3 hereof, fails to perform the obligation of notification and/or to complete relevant security formality or provide other securities within the time limit specified by Party A, and/or to repay relevant costs for re-creating security or providing other securities;

10.1.2 Party B breaches obligations under Clause 6.2.1 hereof to provide false information to or conceal important truth from Party A, or fail to provide Party A with investigation, audit or inspection;

10.1.3 Party B breaches obligations under Clause 6.2.2 hereof to reject or avoid Party A's supervision on its use of credit funds, or on its production, operation, or financial activities;

10.1.4 Party B breaches obligations under Clause 6.2.3 hereof and fails to use loan and/or other facilities according to the agreed purpose hereof according to this agreement or the Specific Contract, or fails to comply with Party A's requirements on fund payment management and reporting;

10.1.5 Party B breaches obligations under Clause 6.2.4 hereof and fails to repay promptly or fully any principal or interest of any loan, advance or other facility debts under this agreement and/or any Specific Contract;

10.1.6 Party B breaches obligations under Clause 6.2.5 hereof and transfers any debts hereunder to any third party without consent of Party A, or breaches obligations under Clause 6.2.7 hereof and is negligent in managing or recovering its due claims or disposes its main property for no consideration or in other inappropriate way;

10.1.7 Party B breaches obligations under Clause 6.2.6 hereof, and when any circumstance specified therein occurs, fails to notify Party A promptly, or fails to cooperate when Party A knows any circumstance therein occurs to Party B and requests Party B to increase any security for repayment of debts hereunder;

10.1.8 Party B breaches obligations under Clause 6.2.8 hereof and fails to obtain consent of Party A before any major matter set forth therein occurs;

10.1.9 Party B breaches materially any of its representations or warranties herein, and fails to correct its breach within any grace period granted by Party A (if any);

10.1.10 Party B fails to drawdown or use loan funds according hereto, or fails to use any fund in the fund return account as requested by Party A, or fails to accept Party A's supervision, and fails to correct the above failures at the request of Party A;

10.1.11 Party B commits any material breach under any contracts entered into with other creditors, and such breach is not resolved satisfactorily within three months after occurrence thereof.

The above "material breach" means any breach for which Party B's creditor has the right to claim damages in an amount of RMB [ ] or more.

10.1.12 Party B fails to renew / extend its business period during the facility term, and thus causes its business period expires before the facility term hereof expires.

11

Beijing Branch January 2016 Version

10.1.13   Other circumstances occur, which Party A deems damaging its legitimate interest.

10.2   A breach event shall be deemed occurred if any of the following circumstances occurs to the guarantor, and Party A believes that such circumstance may affect the guarantor's ability of guarantee and requests the guarantor to eliminate any adverse effect thus occurred, or requests Party B to increase or replace security conditions, and the guarantor or Party B fails to cooperate:

10.2.1   Any circumstance similar to those set forth in Clauses 6.2.6 or 6.2.8 occurs;

10.2.2   When issuing an irrevocable letter of guarantee, the guarantor conceals its ability to assume guarantee liability or fails to obtain authorization from any competent authority;

10.2.3   The annual registration formality is not completed in a timely manner;

10.2.4   The guarantor or Party B is negligent in managing or recovering its due claims, or disposes of its main property for no consideration or in other in appropriate way;

10.3   A breach event shall be deemed occurred if any of the following circumstances occurs to the mortgagor or the pledger, and Party A believes that the circumstances may cause the mortgageor pledge to fail or cause the collateral's value insufficient, and requests the mortgagor or pledger to eliminate any adverse effect thus caused, or requests Party B to increase or replace security conditions, and the mortgagor or pledger or Party B fails to cooperate:

10.3.1   The mortgagor or pledger has no ownership or disposal power over the collateral, or the title to the collateral is in dispute;

10.3.2   The collateral has been leased, sealed-up, attached, controlled, or imposed of any liens (including but not limited to lien on construction project payment), and/or the occurrence of such circumstance is concealed;

10.3.3   The mortgagor transfers, leases, re-mortgages or otherwise disposes of inappropriately any collateral without Party A's written consent, or fails to repay the debts owed by Party B to Party A by using the proceeds obtained from disposal upon written consent of Party A;

10.3.4   The mortgagor fails to keep, maintain or repair the collateral properly, and causes value of the collateral to deteriorate obviously; or the mortgagor's act directly damages the collateral, and reduces value of the collateral; or the mortgagor fails to take out insurance for the collateral according to Party A's requirements during the mortgage terms;

10.3.5   Where the collateral has or may have the risk of being expropriated or demolished, the mortgagor fails to perform relevant obligations according to the Maximum Amount Mortgage Contract.

10.4   Where any breach in Clauses 10.1, 10.2 or 10.3 occurs, Party A has the right to take any or all of the following measures:

12

10.4.1   reducing the line of credit hereunder, or stopping the use of the remaining line of credit;

10.4.2   early recovery of the principal and interest of any loan issued within the line of credit and relevant costs;

10.4.3   In respect of any bill of exchange accepted or letter of credit, letter of guarantee, and letter of delivery security opened (including opened through entrustment) by Party A during the facility term, regardless whether Party A has advanced the payment, Party A may request Party B to add deposit or transfer any fund in other accounts opened by Party B with Party A to the deposit account as deposit to repay Party A's subsequent advanced payment hereunder, or lodge the funds with any third party as the deposit to repay the above advanced payment;

10.4.4   In respect of the outstanding accounts receivable obtained by Party A from Party B under any domestic factoring with recourse or export factoring, Party A has the right to request Party B to immediately to repurchase such accounts receivable. In respect of the outstanding accounts receivable obtained by Party A from Party B under any domestic factoring without recourse or import factoring, Party A has the right to immediately recourse against Party B;

10.4.5   Party A may directly deduct any deposit in Party B's settlement account and/or other account to repay all debts under this agreement and any Specific Contracts. The repayment shall be made in the order of costs, liquidated damages, compound interests, penalty interests, interests, and principals of credit facility, until all principals, interests and other relevant costs and expenses are fully repaid. If any principal or interest is delayed in payment for 90 days or more, the order of repayment is as follows: principals, costs, liquidated damages, compound interests, penalty interests and interests.

10.4.6   Party A may change the conditions for entrusted payment of the loan funds, and cancel Party B's use of loan funds through "self-payment";

10.4.7   Party A may recourse according to Clause 13 hereof;

10.4.8   Party A may take industrial right protection measures, including but not limited to internal notification, public exposure, stop by all members of Beijing Bankers Association of financing business for Party B and its shareholders, legal representative or other responsible person (including stop of providing new facility, discounting, acceptance, letter of credit, letter of guarantee and other financing business; or stop of providing new personal loan and new credit card for Party B's principal individual shareholders, legal representative and principal), stop of opening new bank account, stop of payment functions of the bank account opened, joint right protection measures carried out through notification to China Bankers Association and the bankers association of other provinces and cities, proposal to any legislative, administrative or judicial authorities, and stop of infringement through administrative and judicial measures etc.

13

Beijing Branch January 2016 Version

11.     Costs and expenses

11.1    Where this agreement involves notarization (except for mandatory notarization) or other services of any third party, relevant costs and expenses shall be borne by the principal. If both parties act as the principal, they shall share the costs and expenses equally.

11.2    If Party B is unable to repay debts owed to Party A hereunder in a timely manner, the attorney's fee, and the costs for litigation, travel, announcement and delivery incurred by Party A for realization of the debts shall be borne by Party B fully, and Party B authorizes Party A to directly deduct such amounts from its bank account opened with Party A. If the deducted amounts are insufficient to cover the above debts, Party B undertakes to repay the difference after receiving Party A's notice, without providing any evidence by Party A.

12.     General

12.1    Change of circumstances and force majeure

12.1.1  If any change of laws or policies causes any facility provided by Party A hereunder to be illegal, Party A has the right to terminate this agreement and declare the provided facility/ issued loan becomes due early, and Party B shall repay the facility or loan immediately at the request of Party A.

12.1.2  If any change of laws or policies causes any new cost for Party A's performance of any obligation hereunder, Party B shall compensate Party A' new cost at the request of Party A.

12.1.3  If either party or both parties encounter any force majeure event during performance hereof, the affected party or parties are not required to be liable to compensate the other party's loss, but have the obligation to notify the other party and take reasonable measures to mitigate the loss. Otherwise, the affected party or parties shall be liable to the other party for the enlarged loss.

12.2    Reservation of rights

If Party A grants any grace or extension or delays in exercise of any rights or interests hereof for any breach or delay of Party B during the term of this agreement, it will not prejudice, affect or limit Party A's any right or interest as a creditor under relevant laws, regulations and this agreement, nor constitute any permission or approval by Party A of any breach of this agreement, nor will be deemed waiver by Party A of any existing or future breach of Party B.

12.3    Partial invalidity

If this agreement becomes invalid in whole or in part for whatever reason, Party B shall remain liable for repaying all debts owed to Party A hereunder. If the above circumstance occurs, Party A has the right to terminate this agreement and immediately recover all debts owed hereunder by Party B.

12.4    Notice

Any notice or request of Party A and Party B under or relating to this agreement shall be sent in writing to the following addresses.

Party A's address: Beijing Nong Da South Road on the 1st Silicon Valley Liangcheng China Merchants Bank, Haidian District;

14

Party B's address: Beijing Haidian North Street on the 2nd 1101, Haidian District, .

If the notice or request is sent by personal delivery, it will be deemed served when the recipient signs to acknowledge receipt thereof (or when the recipient refuses to take the delivery). If the notice or request is sent by postal mail, it will be deemed served seven days after mailing. If the notice or request is sent by fax, it will be deemed served when the recipient's fax system receives the fax.

If Party A notifies Party A of any transfer of creditor's right or demands Party B to repay debts through announcement on any public media, the notice shall be deemed served on the date of announcement.

If either party changes its address, it shall promptly notify the other party. Otherwise, it shall assume any loss thus caused.

12.5    Both parties agree that Party B may affix the seal the specimen of which is reserved with Party A on the business applications for trade financing. Both parties acknowledge the validity of the seal.

12.6    This agreement may be amended or rescinded by a written agreement reached between both parties upon consensus through negotiation. This agreement shall remain effective before reaching the written agreement. Neither party may amend, revise or rescind this agreement without consent of the other party.

Any written supplemental agreements reached by both parties with respect to any matter not covered herein or any amendments, as well as any Specific Contracts hereunder, shall constitute the schedules of this agreement, and constitute an integral part of this agreement.

12.7    □The Bank Acceptance Cooperation Agreement (No.           ) entered into between both parties shall constitute an integral part hereof. The foregoing agreement is a framework agreement between both parties with respect to cooperation on bank acceptance business, and shall remain effective during the cooperation of both parties. The Bank Acceptance Cooperation Agreement shall not be terminate because of termination of this agreement, unless one party terminates the Bank Acceptance Cooperation Agreement according hereto during the cooperation of both parties. (please mark "✓" if applicable)

12.8    Party A and Party B acknowledge that Clause 8.9 hereof shall not apply.

13.    Applicable Law and Dispute Resolution

13.1    The execution, interpretation and dispute resolution of this agreement shall be governed by the laws of the People's Republic of China. The interest of both parties shall be protected by the laws of the People's Republic of China.

13.2    If any dispute arises from performance by both parties hereof, and both parties fail to resolve the dispute through negotiation, either party may (choose one by mark "✓"):

13.2.1    ☒ file a lawsuit to the people's court at the place of Party A;

13.2.2    □ apply to            (arbitration commission) for arbitration according to the arbitration rules then in effect.

15

13.3   When and after this agreement and any Specific Contracts go through the notarization of enforcement effect, Party A may directly apply to the competent people's court for enforcement to recover any debts owed by Party B under this agreement and the Specific Contracts.

14.   Effectiveness

This agreement shall become effective when both parties sign, and terminate automatically when the facility term expires or when all debts and other relevant costs and expenses owed by Party B to Party A hereunder are fully discharged, whichever is later.

15.   Miscellaneous

This agreement is made in four counterparts. Each of Party A, Party B, and the securing party shall hold one counterpart. All counterparts have equal legal force.

Special notes:

1.   The parties have fully negotiated on all provisions hereof. The bank has reminded the other parties to note any provisions that exempt or limit the bank's liability, that provide the bank's rights, that increase the other party's liability or restrict the other party's right, and to fully and accurately understand all provisions hereof. The bank has made explanations upon request of the other parties. The parties hereto have consistent understanding of the provisions hereof.

2.   To facility business, the operations of the bank for the transactions (including but not limited to acceptance of application, review of documents, issuance of funds, opening of letter or notes, confirmation of trade, deduction of amount, enquiry, printing of receipt, collection, deduction of deposit and other various notices) may be dealt with by any outlet of the bank within its jurisdiction, and relevant letters may be generated, issued or provided by such outlet. The operations of the outlet and the issuance of letters by the outlet shall be deemed acts of the bank, and have binding force upon the bank and its clients.

16

Party A may not directly or indirectly pay any commission, remuneration or kickback, or provide any equity award or other gift, negotiable securities or things of value to any employee, officer or staff of Party B and its affiliated companies and any third party in cooperation with Party A, or their close relatives, or any entity or organization established by them. Where Party A violates the above provisions, it will be deemed in breach of this agreement if the circumstances are serious. In such case, Party B has the right to notify Party A in writing to terminate this agreement, and reserve the right to take any further legal measures. Party A shall assume any actual loss incurred by Party B or its affiliated companies.

If any violation of the above integrity and fair trading principles are identified during cooperation, you can reflect to Party B through the following channels:

Report to Party B: telephone No. 010-62677193,

Email for outsiders to report:jubao@qiyi.com.

17

Beijing Branch January 2016 Version

[Signature Page]

Party A: China Merchants Bank Company Limited, Beijing Shangdi Branch

[*Company seal is affixed*]

Principal or Authorized Agent:

Signature/Seal: /s/ Authorized Signatory

Party B: Facility applicant: Beijing iQIYI Science & Technology Co., Ltd.

[*Company seal is affixed*]

Principal or Authorized Agent: Xiaoha Geng

Signature/Seal: /s/ Xiaohua Geng

Signature Date: August 15, 2017

18

Beijing Branch January 2016 Version

**Explanations of Certain Provisions of the Facility Cooperation between**

**Beijing iQIYI Science & Technology Co., Ltd. and the Bank**

To Beijing iQIYI Science & Technology Co., Ltd.

Adhering to the idea of cooperation and win-win, we interpret and explain certain provisions of the credit facility cooperation as follows:

6.2.8 Obtain Party A's prior consent before it is merged, divided or reorganized, transfers equity, enter into joint venture or cooperation, transfers property, carries out shareholding reform, invests in others, materially increase debt financing or carries out other material matters;

Explanation: Party B is required to notify Party A only before it carries out the above matters. If Party A has any objection, both parties shall negotiate and deal with it amicably based on the actual situation.

China Merchants Bank, Beijing Shangdi Branch (seal)
/s/ China Merchants Bank, Beijing Shangdi Branch

July 3, 2017

19

**Exhibit 10.61**

### Supplemental Agreement

(For Buyer Factoring Business Only)

Facility grantor: China Merchants Bank Company Limited, Beijing Shangdi Branch ("Party A")

Facility applicant: Beijing iQIYI Science & Technology Co., Ltd. ("Party B")

Guarantor: Shanghai iQIYI Culture Media Co., Ltd. ("Party C")

Whereas:

1. Party A and Party B entered into Credit Facility Agreement numbered 2017 Zhao Shang Shou Zi No. 006. According to the Credit Facility Agreement, Party A grants a line of credit of RMB 200 million (including foreign currency of equivalent value) to Party B during the term of the facility;

2. Party C, as guarantor, issued to Party A Maximum Amount Irrevocable Certificate of Guarantee numbered 2017 Zhao Shang Shou Zi No. 006, and promised to provide irrevocable joint liability guarantee regarding the debt Party B owes to Party A under the Credit Facility Agreement;

Now Party B apply to Party A for factoring business within the abovementioned line of the credit facility, upon negotiation, all the parties reach consensus regarding relevant matters and enter into this Agreement.

### Article 1 Definition

1. "Buyer Factoring Business" refers to the business that Party A, as the factor, after being assigned by the seller the accounts receivable of which Party B is debtor under commercial contracts, provides the sellers with comprehensive management services including payment checking, and collection and management of accounts receivable. Under the Buyer Factoring Business, if Party B encounters credit risk, Party A shall assume the responsibility of approving the payment to the sellers; in the event that any dispute arises during the performance of the commercial contract, then Party A shall have the right to reversely transfer the accounts receivable back to the sellers.

2. "Seller Factoring Agent" refers to the party who enters into domestic factoring agreement with goods or service providers (creditor of accounts receivable) under commercial contracts, who is assigned the accounts receivable by the creditors. "Buyer Factoring Agent" refers to the party who is assigned the accounts receivable by the Seller Factoring Agent. In this Agreement, Party A is a Buyer Factoring Agent.

3. "Buyer's Credit Risk" refers to the risk that the debtor of the receivables refuses to or is not able to fully or partially realize the creditors' rights of the accounts receivable due to the buyer's own financial condition and ability to pay.

Party B under this agreement is the debtor of accounts receivable.

4. "Dispute" refers to the case that a dispute or disputes arise between creditors of accounts receivable and Party B over the goods or invoices, etc., resulting in Party B's bringing defenses, counterclaims or offset claim or similar activities; in any event that the accounts receivable which Party A is assigned cannot be fully or partially realized for reasons other than Buyer's Credit Risk, a Dispute is deemed to occur.

5. "Commercial Contract": refers to transaction agreement entered into by Party B and creditor(s) of accounts receivable, with the purpose of trade of goods and/or services and with sale on credit as the settlement method.

6. "Approved Payment" / "Guaranteed Payment" refers to the case that after Buyer's Credit Risk occurs to Party B, Party A shall pay the corresponding amount to the Seller Factoring Agent in a certain time limit after the accounts receivable become due. It will be always referred to as "Approved Payment" hereinafter.

**Article 2**

Upon Party B's application, Party A agrees to provide Party B with factoring service within the credit line mentioned above. Party B understands and agrees that Party A shall enjoy the legal claims of accounts receivable upon receipt of the accounts receivable. The accounts receivable Party A is assigned shall be deducted from and shall occupy the credit amount for Party B under the Credit Facility Agreement. The accounts receivable Party A is assigned shall be subject to the Credit Assignment Notice issued by Party A to Party B.

1. Party B further confirmed that, as long as Party A is assigned accounts receivable during the term of the credit facility, even if Party A fulfills the Approved Payment obligations after the term of the credit facility ends, Party A shall still have the right of recourse against Party B in accordance with the provisions of the Credit Facility Agreement, this Agreement and Commercial Contracts.

2. Party B agrees that Party A's payment to Seller Factoring Agent for fulfilling the Approved Payment obligations shall be regarded as Party A's financing to Party B under the Credit Facility Agreement and this Agreement, and Party A shall have the right of recourse against Party B.

**Article 3**

Party A's provision of Approved Payment factoring services based on the Buyer Factoring Business shall be limited to the circumstances that Buyer's Credit Risk arises during performance of Commercial Contract(s). Regarding Dispute(s) arising out of performance of Commercial Contracts, Party B:

☑ give up its right to bring up Dispute(s);

☐ retain its right to bring up Dispute(s).

1. If Party B retains its right to bring up Dispute(s), Party B shall inform Party A within [    ] days after Dispute(s) occur, and cooperate with Party a to handle the formalities for reverse-assignment of accounts receivable. During the period between occurrence and resolution of the Dispute(s), Party A shall have right not to release the occupied credit amount.

2. Under the circumstances that Party B chooses to give up its right to bring up Disputes, if Party B fails to perform obligation of payment in accordance with the Commercial Contract(s), Buyer's Creditor Risk shall be deemed to occur to Party B, and Party A shall assume the Approved Payment obligations.

2

**Article 4**

Party C understands and confirms that the debt owed by Party B to Party A, within the credit line, generated by the Buyer Factoring Business conducted by Party A and Party B according to the provisions herein shall be in the scope Party C provides guarantee for, and undertakes to assume guarantee obligation for Party B's aforementioned debts, in accordance with the provisions of Maximum Amount Irrevocable Certificate of Guarantee, Maximum Amount Mortgage Contract and/or Maximum Amount Pledge Contract (in the event that the Maximum Amount Mortgage Contract and the Maximum Amount Pledge Contract are executed by Party B and Party A, Party B shall also make the aforementioned undertaking in this Article).

Party C further confirms that, as long as Party A is assigned accounts receivable during the term of the credit facility, even if Party A fulfills the Approved Payment obligations after the term of the credit facility ends, Party A's payment to Seller Factoring Agent for fulfilling the Approved Payment obligations shall still be regarded as Party A's financing to Party B under the Credit Facility Agreement and this Agreement, the debts so generated owed by Party B to Party A shall be in the scope Party C provides guarantee for. Party C undertakes to continue to assume guarantee obligation for Party B's aforementioned debts, in accordance with the provisions of Maximum Amount Irrevocable Certificate of Guarantee, Maximum Amount Mortgage Contract and/or Maximum Amount Pledge Contract (in the event that the Maximum Amount Mortgage Contract and the Maximum Amount Pledge Contract are executed by Party B and Party A, Party B shall also make the aforementioned undertaking in this Article).

**Article 5**

This Agreement shall constitutes an integral part of the Credit Facility Agreement; the matters not covered by this Agreement shall follow the Credit Facility Agreement; in case of discrepancy or conflict between this Agreement and the Credit Facility Agreement, this Agreement shall prevail. Disputes arising during the performance of this Agreement shall be resolved through negotiation in the manner agreed in the Credit Facility Agreement.

**Article 6**

This Agreement shall become effective upon signature or seal by authorized signatories of all the parties, and shall expire automatically when all the debts owed by Party B to Party A under the Credit Facility Agreement and this Agreement are fully repaid.

**Article 7**

This Agreement shall have three copies, each party shall hold one copy, with the same legal force.

**Special Note: All terms of this agreement have been fully negotiated by all parties. The bank has drawn special attention to all parties concerned with regard to the clauses relating to exemption or limitation of the bank's responsibilities, certain rights unilaterally owned by the bank, the increase of liabilities of other parties or the limitation of the rights of other parties, and the bank has provided comprehensive and accurate explanation. The bank has made the corresponding explanation of the above clauses at the request of the parties. All the parties to the agreement have the completely same understanding of the clauses of this Agreement.**

3

Party A (Seal):

[*Company seal is affixed*]

Authorized Signatory (Signature/Seal): /s/ Yang Lan

September 30, 2017

Party B (Seal):

[*Company seal is affixed*]

Authorized Signatory (Signature/Seal): /s/ Xiaoha Geng

September 30, 2017

Party C (Seal):

[*Company seal is affixed*]

Authorized Signatory (Signature/Seal): /s/ Yu Gong

September 30, 2017

4

**Exhibit 10.62**

**Supplemental Agreement**

(For Buyer Factoring Business Only)

No.: 2017 Zhao Shang Shou Zi No. 006

Facility grantor: China Merchants Bank Company Limited, Beijing Shangdi Branch ("Party A")

Facility applicant: Beijing iQIYI Science & Technology Co., Ltd. ("Party B")

Guarantor: Beijing QIYI Century Science & Technology Co., Ltd. ("Party C")

Whereas:

1. Party A and Party B entered into Credit Facility Agreement numbered 2017 Zhao Shang Shou Zi No. 006. According to the Credit Facility Agreement, Party A grants a line of credit of RMB 200 million (including foreign currency of equivalent value) to Party B during the term of the facility;

2. Party C, as guarantor, issued to Party A Maximum Amount Irrevocable Certificate of Guarantee numbered 2017 Zhao Shang Shou Zi No. 006, and promised to provide irrevocable joint liability guarantee regarding the debt Party B owes to Party A under the Credit Facility Agreement;

Now Party B apply to Party A for factoring business within the abovementioned line of the credit facility, upon negotiation, all the parties reach consensus regarding relevant matters and enter into this Agreement.

**Article 1 Definition**

1. "Buyer Factoring Business" refers to the business that Party A, as the factor, after being assigned by the seller the accounts receivable of which Party B is debtor under commercial contracts, provides the sellers with comprehensive management services including payment checking, and collection and management of accounts receivable. Under the Buyer Factoring Business, if Party B encounters credit risk, Party A shall assume the responsibility of approving the payment to the sellers; in the event that any dispute arises during the performance of the commercial contract, then Party A shall have the right to reversely transfer the accounts receivable back to the sellers.

2. "Seller Factoring Agent" refers to the party who enters into domestic factoring agreement with goods or service providers (creditor of accounts receivable) under commercial contracts, who is assigned the accounts receivable by the creditors. "Buyer Factoring Agent" refers to the party who is assigned the accounts receivable by the Seller Factoring Agent. In this Agreement, Party A is a Buyer Factoring Agent.

3. "Buyer's Credit Risk" refers to the risk that the debtor of the receivables refuses to or is not able to fully or partially realize the creditors' rights of the accounts receivable due to the buyer's own financial condition and ability to pay.

Party B under this agreement is the debtor of accounts receivable.

4. "Dispute" refers to the case that a dispute or disputes arise between creditors of accounts receivable and Party B over the goods or invoices, etc., resulting in Party B's bringing defenses, counterclaims or offset claim or similar activities; in any event that the accounts receivable which Party A is assigned cannot be fully or partially realized for reasons other than Buyer's Credit Risk, a Dispute is deemed to occur.

5. "Commercial Contract": refers to transaction agreement entered into by Party B and creditor(s) of accounts receivable, with the purpose of trade of goods and/or services and with sale on credit as the settlement method.

6. "Approved Payment" / "Guaranteed Payment" refers to the case that after Buyer's Credit Risk occurs to Party B, Party A shall pay the corresponding amount to the Seller Factoring Agent in a certain time limit after the accounts receivable become due. It will be always referred to as "Approved Payment" hereinafter.

### Article 2

Upon Party B's application, Party A agrees to provide Party B with factoring service within the credit line mentioned above. Party B understands and agrees that Party A shall enjoy the legal claims of accounts receivable upon receipt of the accounts receivable. The accounts receivable Party A is assigned shall be deducted from and shall occupy the credit amount for Party B under the Credit Facility Agreement. The accounts receivable Party A is assigned shall be subject to the Credit Assignment Notice issued by Party A to Party B.

1. Party B further confirmed that, as long as Party A is assigned accounts receivable during the term of the credit facility, even if Party A fulfills the Approved Payment obligations after the term of the credit facility ends, Party A shall still have the right of recourse against Party B in accordance with the provisions of the Credit Facility Agreement, this Agreement and Commercial Contracts.

2. Party B agrees that Party A's payment to Seller Factoring Agent for fulfilling the Approved Payment obligations shall be regarded as Party A's financing to Party B under the Credit Facility Agreement and this Agreement, and Party A shall have the right of recourse against Party B.

### Article 3

Party A's provision of Approved Payment factoring services based on the Buyer Factoring Business shall be limited to the circumstances that Buyer's Credit Risk arises during performance of Commercial Contract(s). Regarding Dispute(s) arising out of performance of Commercial Contracts, Party B:

☑ give up its right to bring up Dispute(s);

☐ retain its right to bring up Dispute(s).

1. If Party B retains its right to bring up Dispute(s), Party B shall inform Party A within [    ] days after Dispute(s) occur, and cooperate with Party a to handle the formalities for reverse-assignment of accounts receivable. During the period between occurrence and resolution of the Dispute(s), Party A shall have right not to release the occupied credit amount.

2. Under the circumstances that Party B chooses to give up its right to bring up Disputes, if Party B fails to perform obligation of payment in accordance with the Commercial Contract(s), Buyer's Creditor Risk shall be deemed to occur to Party B, and Party A shall assume the Approved Payment obligations.

2

**Article 4**

Party C understands and confirms that the debt owed by Party B to Party A, within the credit line, generated by the Buyer Factoring Business conducted by Party A and Party B according to the provisions herein shall be in the scope Party C provides guarantee for, and undertakes to assume guarantee obligation for Party B's aforementioned debts, in accordance with the provisions of Maximum Amount Irrevocable Certificate of Guarantee, Maximum Amount Mortgage Contract and/or Maximum Amount Pledge Contract (in the event that the Maximum Amount Mortgage Contract and the Maximum Amount Pledge Contract are executed by Party B and Party A, Party B shall also make the aforementioned undertaking in this Article).

Party C further confirms that, as long as Party A is assigned accounts receivable during the term of the credit facility, even if Party A fulfills the Approved Payment obligations after the term of the credit facility ends, Party A's payment to Seller Factoring Agent for fulfilling the Approved Payment obligations shall still be regarded as Party A's financing to Party B under the Credit Facility Agreement and this Agreement, the debts so generated owed by Party B to Party A shall be in the scope Party C provides guarantee for. Party C undertakes to continue to assume guarantee obligation for Party B's aforementioned debts, in accordance with the provisions of Maximum Amount Irrevocable Certificate of Guarantee, Maximum Amount Mortgage Contract and/or Maximum Amount Pledge Contract (in the event that the Maximum Amount Mortgage Contract and the Maximum Amount Pledge Contract are executed by Party B and Party A, Party B shall also make the aforementioned undertaking in this Article).

**Article 5**

This Agreement shall constitutes an integral part of the Credit Facility Agreement; the matters not covered by this Agreement shall follow the Credit Facility Agreement; in case of discrepancy or conflict between this Agreement and the Credit Facility Agreement, this Agreement shall prevail. Disputes arising during the performance of this Agreement shall be resolved through negotiation in the manner agreed in the Credit Facility Agreement.

**Article 6**

This Agreement shall become effective upon signature or seal by authorized signatories of all the parties, and shall expire automatically when all the debts owed by Party B to Party A under the Credit Facility Agreement and this Agreement are fully repaid.

**Article 7**

This Agreement shall have three copies, each party shall hold one copy, with the same legal force.

**Special Note: All terms of this agreement have been fully negotiated by all parties. The bank has drawn special attention to all parties concerned with regard to the clauses relating to exemption or limitation of the bank's responsibilities, certain rights unilaterally owned by the bank, the increase of liabilities of other parties or the limitation of the rights of other parties, and the bank has provided comprehensive and accurate explanation. The bank has made the corresponding explanation of the above clauses at the request of the parties. All the parties to the agreement have the completely same understanding of the clauses of this Agreement.**

3

Party A (Seal):

[*Company seal is affixed*]

Authorized Signatory (Signature/Seal): /s/ Yang Lan

September 30, 2017

Party B (Seal):

[*Company seal is affixed*]

Authorized Signatory (Signature/Seal): /s/ Xiaoha Geng

September 30, 2017

Party C (Seal):

[*Company seal is affixed*]

Authorized Signatory (Signature/Seal): /s/ Yu Gong

September 30, 2017

4

**Exhibit 10.63**

**Loan Agreement**

This Agreement is executed by and between the following two parties on January 19, 2018:

Party A:

Baidu Online Network Technology (Beijing) Co., Ltd., a limited liability company established according to the laws of China, the address is: Floor 3, Baidu Building, No. 10 Shangdi Tenth Street, Haidian District, Beijing. (the "**Lender**")

Party B:

Beijing QIYI Century Science & Technology Co., Ltd., a limited liability company established according to the laws of China, the address is: Floor 10 & 11, No. 2 Haidian North First Street, Haidian District, Beijing. (the "**Borrower**")

Pursuant to the terms and conditions provided by this Agreement, the Lender agrees to provide and the Borrower agrees to accept the loan specified under this Agreement, and the two parties reach the agreement as follows:

**Article 1 The Lender Agree to Provide the Borrower with the Loan of Features as Follows**

1. Loan type: working capital loan;

2. Loan usage: for daily operation and repayment of borrowings of the affiliated companies;

3. Loan amount: RMB Six Hundred and Fifty Million, RMB650,000,000

4. Term of borrowing and repayment:

    (1) The term of borrowing and repayment is as follows:

| Borrowing | | | | Repayment | | | |
|---|---|---|---|---|---|---|---|
| Year | Month | Day | Amount | Year | Month | Day | Amount |
| 2018 | Jan | | RMB650,000,000 | 2023 | Jan | | RMB650,000,000 |

    (2) The Parties may negotiate that the Borrower may repay in advance the loan hereunder in whole or in part.

5. Interest Payment: the loan hereunder shall be subject to the interest rate agreed by the Parties. In the event of adjustment of national interest rates, the interest rate under this Agreement shall not be affected.

**Article 2 Rights and Obligations of the Lender**

1. The Lender shall have the right to know the Borrower's production and operation, financial activities, inventory of materials and use of loans, etc. and to require the Borrower to provide documents, materials and information including financial statements on schedule.

2. Provided the Borrower performs the obligations provided hereunder, the Lender shall provide the loan in full and on schedule.

3. The Lender shall provide, regarding interest of the loan, value-added tax invoices in accordance with tax regulations.

**Article 3 Rights and Obligations of the Borrower**

1. The Borrower shall have the right to acquire on schedule and use the loan according to the provisions hereof.

2. The Borrower shall repay the principal of the loan on the repayment date provided by Article 1(4)(1) hereof or on the early repayment date agreed by both Parties under Article 1(4)(2) hereof.

3. The Borrower shall use the loan for the usage provided hereunder and shall not divert or misappropriate the loan.

**Article 4 Breaching Liabilities**

1. In the event that the Borrower breaches any provision of this Agreement, or the Borrower goes into liquidation, dissolution, insolvency or bankruptcy reorganization, or becomes unable to repay any due debt, etc., the Lender shall have the right to stop providing the loan, demand early repayment of the loan principal which has been already provided, or take other asset preservation measures.

2. In the event that the Borrower's breach causes the Lender to realize the creditor's rights through litigation, the Borrower shall be liable for the lawyer's expenses, travel expenses and other expenses which the Lender spend for realizing the creditor's rights.

**Article 5 Dispute Resolution**

In the event any dispute arises out of performance of this Agreement, the Parties may negotiate for resolution; if the negotiation fails, any Party may submit the dispute to the China International Economic and Trade Arbitration Commission located in Beijing for resolution by arbitration, and the language of arbitration shall be Chinese.

**Article 6 The Entry into Force**

This Agreement shall become effective upon execution or seal by both the Lender and the Borrower.

2

**Article 7 Copies**

This Agreement shall be made in two (2) copies, the Lender and the Borrower shall each hold one (1), both copies shall have equal legal force.

**Article 8 Reminder**

The Lender has requested the Borrower's attention to have full and comprehensive understanding of all the provisions of this Agreement, and has made corresponding explanation upon the Borrower's request. The Parties' understandings of the meaning of this Agreement are consistent.

[The remainder of this page is intentionally left blank.]

3

[Signature page for the Loan Agreement]

Party A (the Lender):

Baidu Online Network Technology (Beijing) Co., Ltd. (Seal)

*[Company chop is affixed]*

Legal Representative: /s/ Authorized Signatory

4

[Signature page for the Loan Agreement]

Party B (the Borrower):

Beijing QIYI Century Science & Technology Co., Ltd. (Seal)

*[Company chop is affixed]*

Legal Representative:  /s/ Authorized Signatory

5

**Exhibit 10.64**

**SHARE PURCHASE AGREEMENT**

This SHARE PURCHASE AGREEMENT, dated as of February 12, 2018 (this "<u>Agreement</u>"), is entered into by and between iQIYI, Inc., an exempted company incorporated under the laws of the Cayman Islands (the "<u>Company</u>") and Baidu Holdings Limited, a company incorporated under the Laws of the British Virgin Islands (the "<u>Investor</u>").

**RECITALS**

WHEREAS, subject to the terms and conditions set forth herein, the Company desires to issue and allot to the Investor, and the Investor desires to subscribe for and purchase from the Company, the Target Shares (as defined below) of the Company.

NOW, THEREFORE, in consideration of the above premises and the agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I.
DEFINITIONS**

1.1    <u>Definitions</u>. As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings indicated:

"<u>Adverse Legal Development</u>" has the meaning set forth in the currently effective M&AA.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or under common control with, the Person specified, including, in the case of the Investor, any investment capital fund now or hereafter existing which is controlled by, or under the common control of, substantially the same principal(s) that control the Investor.

"<u>Agreement</u>" has the meaning set forth in the preamble, as amended, supplemented or modified from time to time in accordance with the terms hereof.

"<u>Ancillary Agreements</u>" means such ancillary agreements that may be entered into by and between the applicable Affiliates of the Company and the Investor, containing the key terms of the Master Cooperation Agreement, as of the Closing Date.

"<u>Basket</u>" has the meaning set forth in <u>Section 8.4</u> of this Agreement.

"<u>Beijing QIYI Century</u>" means Beijing Qiyi Century Science & Technology Co., Ltd. ("北京奇艺世纪科技有限公司"), a wholly foreign-owned enterprise established under the laws of the PRC.

"<u>Board of Directors</u>" means the board of directors of the Company.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, Hong Kong or the PRC are authorized or required by law or executive order to close.

"Centre" has the meaning set forth in Section 10.9(b).

"Chongqing WFOE" means Chongqing Qiyi Tianxia Science & Technology Co., Ltd. ("重庆奇艺天下科技有限公司"), a wholly foreign-owned enterprise established under the laws of the PRC.

"Circular 37" means Circular 37 issued by SAFE on July 14, 2014, including any amendment, implementing rules, or official interpretation thereof, and any other rules and circulars issued by SAFE regulating filings or registrations of round-trip investment.

"Class B Ordinary Shares" means the Class B ordinary shares of the Company to be sold by the Company following the IPO Completion Date, with the rights and preferences set forth in the Post-IPO M&AA, which shall provide, among other things, that each Class B Ordinary Shares shall be entitled to ten votes on all matters subject to the vote at general meeting of the Company.

"Closing Date" has the meaning set forth in Section 2.3 of this Agreement.

"Closing" has the meaning set forth in Section 2.3 of this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement.

"Contractual Obligations" means, as to any Person, any provision of any security or financial instrument, issued by such Person or of any agreement, undertaking, contract, license, engagement, lease, indenture, mortgage, deed of trust, purchase order, commitment or other instrument or contractual arrangement, to which such Person is a party or by which it or any of its property is bound.

"Control Documents" means the exclusive technology consulting and services agreements (独家技术咨询和服务协议), business operation agreements (业务经营协议), business cooperation agreements (业务合作协议), software usage license contracts (软件使用许可合同), trademark license agreements (商标许可协议), exclusive purchase option agreements (独家购买权合同), shareholder voting rights trust agreements (股东表决权委托行使协议), loan agreements (借款协议), share pledge agreements (股权质押协议), commitment letters (承诺函), power of attorney (授权委托书) and spousal consent letters (配偶同意函) entered into by and among Beijing QIYI Century, iQIYI New Media, the applicable Domestic Enterprises and/or their shareholders, for the purpose of consolidating the financial statements of the Domestic Enterprises by the Company in accordance with the US GAAP.

"Control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person (including without limitation, the power to determine or cause the determination of equity investment), whether through the ownership of voting securities, by contract or otherwise.

"Cooperation Agreements" means, collectively, the Master Cooperation Agreement and Ancillary Agreements.

2

"Cooperation Period" means a period of four (4) years commencing from the date on which the Preparation Period ends.

"Currently Effective M&AA" means the Company's memorandum and articles of association effective as of the date hereof.

"Domestic Enterprise" means each of (i) Beijing iQIYI Cinema Management Co., Ltd. ("北京爱奇艺电影院线管理公司"), a limited liability company organized under the laws of the PRC, (ii) iQIYI Pictures (Beijing) Co., Ltd. ("爱奇艺影业（北京）有限公司"), a limited liability company organized under the laws of the PRC, (iii) Shanghai iQIYI Culture Media Co., Ltd. ("上海爱奇艺文化传媒有限公司"), a limited liability company organized under the laws of the PRC, (iv) Beijing iQIYI Science & Technology Co., Ltd. ("北京爱奇艺科技有限公司"), a limited liability company organized under the laws of the PRC, and (v) Shanghai Zhong Yuan Network Co., Ltd. ("上海众源网络有限公司"), a limited liability company organized under the laws of the PRC, and collectively, the "Domestic Enterprises".

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interest (whether or not issued by such Person).

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any stock exchange or its governing body.

"Group Company" means each of the Company, IQIYI Film, IQIYI Media, the HK Subsidiary 1, the HK Subsidiary 2, the PRC Entities, together with their respective Subsidiaries, and "Group" refers to all of Group Companies collectively.

"HK Subsidiary 1" means Qiyi.com HK Limited, a company limited by shares incorporated under the laws of Hong Kong.

"HK Subsidiary 2" means IQIYI Film Group HK Limited, a company limited by shares incorporated under the laws of Hong Kong.

"Hong Kong" means the Hong Kong Special Administration Region of the PRC.

"Indemnified Party" has the meaning set forth in Section 8.1 of this Agreement.

"Indemnifying Party" has the meaning set forth in Section 8.1 of this Agreement.

"Intellectual Property and Domain Name License Agreement" means the intellectual property and domain name license agreement dated as of the Closing Date, to be entered into by and between the applicable affiliates of the Company and the Investor containing the key terms under the Master Cooperation Agreement.

3

"Investor" has the meaning set forth in the preamble to this Agreement.

"IPO Completion Date" means the date on which the United States Securities and Exchange Commission declares effectiveness the Company's registration statement on Form F-1.

"IQIYI Film" means IQIYI Film Group Limited, an exempted company incorporated under the laws of the Cayman Islands.

"IQIYI Media" means IQIYI Media Limited, an exempted company incorporated under the laws of the Cayman Islands.

"iQIYI New Media" means Beijing iQIYI New Media Science & Technology Co., Ltd. (" 北京爱奇艺新媒体科技有限公司 "), a wholly foreign-owned enterprise established under the laws of the PRC.

"Key Employee" means each person listed in Schedule 4 attached hereto.

"Litigation" has the meaning set forth in Section 9(a) of Schedule 1 attached hereto.

"Long Stop Date" has the meaning set forth in Section 9.1 of this Agreement.

"Losses" has the meaning set forth in Section 8.1 of this Agreement.

"Master Cooperation Agreement" means the master cooperation agreement in relation to the Ticket Business, dated as of the date hereof, entered into by and between the Company and the Investor in a mutually agreed form.

"Material Adverse Effect" means any change, event, circumstance or effect, individually or when taken together with all other changes, events, circumstances, or effects that have occurred prior to the date of determination of the occurrence of the Material Adverse Effect, that (i) is, or would reasonably be expected to be, materially adverse to the business, operations, assets (including intangible assets), liabilities, condition (financial or otherwise), property, results of operations of the Group Companies, as a whole, or (ii) is or would reasonably be expected to materially impair the validity or enforceability of this Agreement or any of the other Transaction Documents against the Company or (iii) is or would reasonably be expected to materially and adversely affect the Company's ability to perform its material obligations under this Agreement, or any other Transaction Document, or in connection with the transactions contemplated hereby or thereby; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute a Material Adverse Effect, nor shall any change, event or circumstance relating to or resulting from any of the following be taken into account in determining whether a Material Adverse Effect has occurred or would result: (i) general economic conditions in global or Chinese markets (including financial, banking, credit, currency and capital markets); (ii) fluctuations in currency exchange rates; (iii) conditions generally affecting the industry in which the Group Companies operate (but excluding any changes in applicable Requirements of Law or US GAAP that would, or would reasonably be expected to, result in a "Redemption Trigger Event" (as defined in the Sixth Restated Articles)); (iv) the commencement or material worsening of a war or armed hostilities or other national or international calamity, or the occurrence of any military or terrorist attack; (v) acts of God or natural disasters; and (vi) any actions taken, or failures to take action pursuant to or in accordance with this Agreement or at the request of the Investor or any change, event or circumstance solely resulting from such actions or failures to take action; which, in the case of any of the foregoing clauses (i) through (v) does not disproportionately affect the Group Companies, taken as a whole, relative to other comparable companies in the industries in which they operate.

4

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Ordinary Shares" means the ordinary shares of the Company with a par value of US$0.00001 each.

"Permitted Liens" means (i) liens disclosed on the Company's financial statements, (ii) liens for taxes not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Company's financial statements), or (iii) liens which do not materially detract from the value or materially interfere with any present or intended use of any property or assets of the Company and/or the Group Companies.

"Person" means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"Post-IPO M&AA" means the Company's memorandum and articles of association effective following the IPO Completion Date.

"PRC Entities" means Beijing QIYI Century, iQIYI New Media, the Chongqing WFOE, the Domestic Enterprises and each of their respective Subsidiaries.

"PRC" means the People's Republic of China excluding, for the purpose of this Agreement, Hong Kong, Macau and Taiwan.

"Preparation Period" means a period of three (3) months commencing from the date hereof or such longer period as agreed between the parties hereto.

"Requirements of Law" means, as to any Person, any law, statute, treaty, rule, regulation, order, right, privilege, qualification, license or franchise or determination of an arbitrator or a court or other Governmental Authority or stock exchange, in each case applicable or binding upon such Person or any of its property or to which such Person or any of its property is subject or pertaining to any or all of the transactions contemplated or referred to herein.

"SAFE" means the State Administration of Foreign Exchange of the PRC.

"Series A Preferred Shares" means the series A preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

5

"Series A-1 Junior Preferred Shares" means the series A-1 junior preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Series B Preferred Shares" means the series B preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Series C Preferred Shares" means the series C preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Series D Preferred Shares" means the series D preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Series E Preferred Shares" means the series E preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Series F Preferred Shares" means the series F preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Series G Preferred Shares" means, collectively, the Series G1 Preferred Shares and the Series G2 Preferred Shares.

"Series G1 Preferred Shares" means the series G1 preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Series G2 Preferred Shares" means the series G2 preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Currently Effective M&AA.

"Shareholders Agreement" means the Company's shareholders agreement effective as of the date hereof.

"Subsidiaries" means, as of the relevant date of determination, (i) with respect to any Person, any other Person of which more than 50% of the voting power of the outstanding voting securities or more than 50% of the outstanding economic equity interest or ownership is held, directly or indirectly, by such Person and (ii) with respect to any Group Company, any other Person of which actual or *de facto* Control is held, directly or indirectly, by the applicable Group Company. Unless otherwise qualified, or the context otherwise requires, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of any of the Group Company.

"Target Shares" has the meaning set forth in Section 2.2.

"Tax" means all forms of taxation, estate, duties, deductions, withholdings, duties, imposts, levies, fees, charges, social security contributions and rates imposed, levied, collected, withheld or assessed by any local, municipal, regional, urban, state, federal or other governmental body in the PRC or any other jurisdiction and any interest, additional taxation, penalty, surcharge or fine in connection therewith.

6

"Ticket Business" means the business of online movie ticket and show ticket booking, together with the businesses directly related thereto, including but not limited to ticket membership card, VIP card, sale of box office products and film and show derivative products ( 电影票和演出票的在线售卖业务，也包括与前述业务直接关联的业务，包括 但不限于票务会员卡/权益卡、电影院卖品及电影和演出衍生品出售等业务).

"Transaction Documents" means, collectively, this Agreement, the Cooperation Agreements and the Intellectual Property and Domain Name License Agreement.

"US GAAP" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, as codified and described in FASB Statement No. 168, The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles.

"US$" means the United States Dollar, the law currency of the United States of America.

    1.2   Rules of Construction.

Interpretation of this Agreement shall be governed by the following rules of construction: (i) the words such as "herein," "hereinafter," "hereof," "hereby," "hereto," "hereunder" and derivative or similar words refer to this entire Agreement, including any Schedules or Exhibits hereto, as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (ii) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (iii) references to the terms Article, Section, Schedule and Exhibit are references to the Articles, Sections, Schedules and Exhibits to this Agreement, unless otherwise specified; (iv) references to "US$" shall mean U.S. dollars; (v) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (vi) the word "or" shall not be exclusive; (vii) references to "written" or "in writing" include in electronic form; (viii) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (ix) the parties hereto have each participated in the negotiation and drafting of this Agreement and if any ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any party by virtue of the authorship of any of the provisions in this Agreement or any interim drafts thereof; (x) a reference to any Person includes such Person's successors and permitted assigns; (xi) any reference to "days" means calendar days unless Business Days are expressly specified; and (xii) when calculating the period of time before which, within which or following which any act is to be done or any step is taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

## ARTICLE II.
## PURCHASE AND SALE OF SHARES

2.1    <u>Authorization</u>. As of the Closing, the Company will have authorized the issuance, pursuant to the terms and conditions of this Agreement, of the Target Shares, having the respective rights and restrictions as set forth in the Company's Currently Effective M&AA or Post-IPO M&AA, as applicable.

2.2    <u>Purchase and Sale of Ordinary Shares</u>.

Subject to the terms and conditions set forth herein, the Company agrees to issue and allot to the Investor, and the Investor agrees to purchase from the Company, at the Closing, an aggregate of 36,860,691 Ordinary Shares, in the event that the Closing Date is earlier than the IPO Completion Date, or 36,860,691 Class B Ordinary Shares, in the event that the Closing Date is later than the IPO Completion Date (the "<u>Target Shares</u>"), in consideration for execution, delivery and performance of the Master Cooperation Agreement by the Investor.

2.3    <u>Closing; Delivery</u>.

(a)    Unless this Agreement shall have terminated pursuant to <u>Article IX</u>, and subject to the satisfaction or waiver of the conditions set forth in <u>Articles V</u> and <u>VI</u>, the closing of the sale and purchase of the Target Shares (the "<u>Closing</u>") shall take place remotely via the exchange of documents and signatures, as soon as practicable (but not later than the fifth (5th) Business Day) following the date upon which the conditions set forth in <u>Articles V</u> and <u>VI</u> shall be satisfied or waived in accordance with this Agreement, or at such other time and place that the Company and the Investor may agree in writing (the "<u>Closing Date</u>"), which shall occur on the date on which the Preparation Period ends, which shall in no event be later than May 31, 2018.

(b)    On the Closing Date, the Company shall, in consideration for the execution and delivery of the Master Cooperation Agreement by the Investor, allot and issue the Target Shares to the Investor at the Closing.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to the Investor that the representations and warranties set forth in <u>Schedule 1</u> are true and correct as of the date hereof and the Closing Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date) and acknowledges that the Investor in entering into this Agreement is relying on such representations and warranties.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE INVESTOR

The Investor hereby represents and warrants to the Company that the representations and warranties set forth in <u>Schedule 2</u> are true and correct as of the date hereof and the Closing Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date) and acknowledges that the Company in entering into this Agreement is relying on such representations and warranties.

8

**ARTICLE V.**
**CONDITIONS TO THE OBLIGATION OF THE INVESTOR TO CLOSE**

The obligation of the Investor to purchase the Target Shares at the Closing shall be subject to the satisfaction as determined by, or waiver in writing by, the Investor of the following conditions on or before the Closing Date.

5.1    Representation and Warranties. Each of the representations and warranties of the Company contained in Article III hereof (a) that are qualified by materiality or Material Adverse Effect shall be true and correct as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date), and (b) that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date).

5.2    Compliance with Agreements. The Company shall have performed and complied in all material respects with all of its agreements, obligations and conditions set forth in this Agreement that are required to be performed or complied with by it on or before the Closing Date.

5.3    Compliance Certificate. At the Closing, the Company shall have delivered a written certification dated the Closing Date in form and substance reasonably satisfactory to the Investor certifying that the conditions specified in Section 5.1 and Section 5.2 have been satisfied.

5.4    Share Certificate. At the Closing, the Company shall have delivered to the Investor a copy of certificate in definitive form representing the Target Shares, registered in the name of the Investor.

5.5    Register of Members. At the Closing, the Investor shall have received a copy of the Company's register of members, certified by the registered office service provider of the Company as true and complete as of the Closing Date, updated to show the Investor as the holder of the Target Shares.

5.6    No Material Adverse Change and Adverse Legal Development. Since the date hereof, there shall have been no event or circumstances having a Material Adverse Effect and there shall have been no Adverse Legal Development.

5.7    Consents and Approvals. All consents, exemptions, authorizations, or other actions by, or notice to, or filings with, Governmental Authorities and other Persons in respect of all Requirements of Law and with respect to Contractual Obligations of the Company which are necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Company of this Agreement and the Master Cooperation Agreement shall have been obtained and be in full force and effect, and any notice or other similar periods in connection with any regulatory actions of Governmental Authorities shall have expired without any action being taken or threatened.

9

5.8    No Material Judgment or Order. There shall not be on the Closing Date any Order of a court of competent jurisdiction or any ruling of any Governmental Authority or any condition imposed under any Requirement of Law which would (a) prohibit or restrict (i) the purchase and sale of the Target Shares or (ii) the consummation of the transactions contemplated by this Agreement or any other Transaction Document, or (b) materially restrict the operation of the business of any of the Group Companies as conducted on the date hereof.

5.9    No Litigation. No action, suit, proceeding, claim or dispute shall have been brought or otherwise arisen at law, in equity, in arbitration or before any Governmental Authority against any of the Group Companies which could, if adversely determined, have a Material Adverse Effect on the Group, taken as a whole.

5.10    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions (including corporate resolutions and good standing certificate dated no earlier than ten (10) Business Days prior to the Closing) shall be reasonably satisfactory in substance and form to the Investor, and the Investor shall have received all such counterpart originals or certified or other copies of such documents as it may reasonably request.

**ARTICLE VI.**
**CONDITIONS TO THE OBLIGATION OF THE COMPANY TO CLOSE**

The obligation of the Company to issue and sell the Target Shares to the Investor at the Closing shall be subject to the satisfaction or waiver of the following conditions on or before the Closing Date:

6.1    Representation and Warranties. Each of the representations and warranties of the Investor contained in Article IV hereof shall be true and correct in all material respects as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date).

6.2    Compliance with this Agreement. The Investor shall have performed and complied in all material respects with all of its agreements, obligations and conditions set forth herein that are required to be performed or complied with by the Investor on or before the Closing Date.

6.3    Compliance Certificate. At the Closing, the Investor shall have delivered a written certification dated the Closing Date in form and substance reasonably satisfactory to the Company certifying that the conditions specified in Section 6.1 and Section 6.2 have been satisfied.

6.4    Consents and Approvals. All consents, exemptions, authorizations, or other actions by, or notice to, or filings with, Governmental Authorities and other Persons in respect of all Requirements of Law in connection with the execution, delivery or performance by, or enforcement against, the Investor of this Agreement and the Master Cooperation Agreement shall have been obtained and be in full force and effect, and any notice or other similar periods in connection with any regulatory actions of Governmental Authorities applicable to the Investor shall have expired without any action being taken or threatened.

10

6.5    No Material Judgment or Order. There shall not be on the Closing Date any Order of a court of competent jurisdiction or any ruling of any Governmental Authority or any condition imposed under any Requirement of Law which would (a) prohibit or restrict (i) the issuance and sale of the Target Shares or (ii) the consummation of the transactions contemplated by this Agreement or any other Transaction Document, or (b) materially restrict the operation of the business of any of the Group Companies as conducted on the date hereof.

**ARTICLE VII.**
**COVENANTS**

7.1    Further Assurances. Each party hereto shall execute such documents and perform such further acts (including obtaining any consents, exemptions, authorizations or other actions by, or giving any notices to, or making any filings with, any Governmental Authority or any other Person) as may be reasonably required to carry out or to perform the provisions of this Agreement and to give effect to the terms and intent of this Agreement, including the satisfaction of all conditions set forth in Article V and Article VI above.

7.2    Information. From the date hereof until the earlier of the Closing or the termination pursuant to Section 9.1, (a) the Company shall promptly notify the Investor of any Litigation commenced or threatened in writing against any Group Company, and (b) each party hereto shall promptly notify other parties hereto of any breach, violation or non-compliance of any of its representations, warranties or covenants hereunder by such party.

7.3    Completion of SAFE Registration. The Investor shall use its best efforts to complete registration or filing as required by Circular 37.

7.4    Compliance with Laws. The Company shall, and shall procure each of the Group Companies to, use its commercially reasonable efforts to comply with applicable laws of the jurisdiction of its incorporation as well as applicable requirements of the competent Governmental Authorities that are necessary for operation of its business.

7.5    Ancillary Documents and Intellectual Property and Domain Name License Agreement. The Investor and the Company shall use their respective commercially reasonable efforts to and cause their respective Affiliates to enter into the Ancillary Documents and the Intellectual Property and Domain Name License Agreement on the Closing Date.

7.6    Non-Compete of the Investor. The Investor covenants that during the Preparation Period, it shall only conduct its Ticket Business to the extent necessary to maintain the Ticket Business as currently conducted. Following the end of the Preparation Period, the Investor shall immediately terminate all of its Ticket Business. Other than the services provided by the Investor during the Preparation Period, for a period commencing from the date hereof to the expiration date of the Cooperation Period, the Investor shall and shall cause its Affiliates not to engage in the Ticket Business, or make any new investment in which the investor acquires a beneficial ownership of over ten percent (10%) of the capital stock in any entity (a specific list of which will be separately negotiated and agreed by the Company and the Investor), whether in corporate, proprietorship or partnership form or otherwise, that operates the ticket business, which shall mean any entity with ticket business as its major business, and revenues generated from the ticket business shall constitute no less than 50% of such entity's total revenues.

11

7.7   Traffic Direction.

(a)   To the extent under the Investor's control, the Investor shall ensure that during the Cooperation Period, the traffic entrance through which the Investor currently directs to its Ticket Business from Baidu products (i.e. Baidu Web Search, Mobile Baidu, Baidu Nuomi and Baidu Maps) shall be reserved and the corresponding landing page services shall be provided to the Company's Ticket Business, provided that the Company shall ensure that (a) the user experience available to users of the Company's Ticket Business shall be of good quality and the level of services provided by the Company shall be no less favorable than that provided by the Investor as of the date hereof, (b) the user experience available to users of the Company's Ticket Business shall be of good quality and shall at a standard no less than the average industry standard, (c) the landing page to get access to the Ticket Business from Baidu products (i.e. Baidu Web Search, Mobile Baidu, Baidu Nuomi and Baidu Maps) shall meet the Investor's general product specification, (d) the Company shall provide service maintenance to links and interfaces of the Ticket Business, including without limitation the application components and H5 interface of the Ticket Business that are redirected from the Baidu product entrances.

(b)   The Investor and the Company hereby agree and confirm that the provisions under the Master Cooperation Agreement shall not restrict the Investor's rights to adjust, revise and/or update the webpages, interfaces or relevant applications of any products developed and/or operated by the Investor and/or its Affiliates, including without limitation to Baidu products, Baidu feed stream and Baidu Baike.

7.8   Technical Services. During the Preparation Period, the Investor shall assist the Company to improve and perfect the Company's business relationships and service capabilities in the Ticket Business in respect of relevant areas such as technology, business and products, and use its commercially reasonable efforts to improve and perfect the Company's current ticket business system.

**ARTICLE VIII.**
**INDEMNIFICATION**

8.1   Indemnification. Except as otherwise provided in this Article VIII, (a) the Company, on the one hand, and (b) the Investor, on the other hand, (each, an "Indemnifying Party") agree to indemnify, defend and hold harmless each member of the other group and their respective Affiliates and the respective officers, directors, agents, employees, partners, members and Controlling persons of such member and its Affiliates (each, an "Indemnified Party") to the fullest extent permitted by law from and against any and all losses, Litigation, or written threats thereof (including any Litigation by a third party), damages, expenses (including reasonable fees, disbursements and other charges of counsel incurred by the Indemnified Party in any action between the Indemnifying Party and the Indemnified Party or between the Indemnified Party and any third party or otherwise) or other liabilities (collectively, "Losses") resulting from or arising out of any breach of any representation or warranty, covenant or agreement in this Agreement by the Indemnifying Party.

12

8.2    Notification of Third Party Claim. Each Indemnified Party under this Article VIII shall, promptly after the receipt of notice of the commencement of any Litigation by a third party against such Indemnified Party in respect of which indemnity may be sought from the Indemnifying Party under this Article VIII, notify the Indemnifying Party in writing of the commencement thereof. The omission of any Indemnified Party to so notify the Indemnifying Party of any such action shall not relieve the Indemnifying Party from any liability which it may have to such Indemnified Party (a) other than pursuant to this Article VIII or (b) under this Article VIII unless, and only to the extent that, such omission results in the Indemnifying Party's forfeiture of substantive rights or defenses which are material. In case any such Litigation shall be brought against any Indemnified Party, and it shall notify the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to assume the defense thereof at its own expense, with counsel satisfactory to such Indemnified Party in its reasonable judgment; provided, however, that any Indemnified Party may, at its own expense, retain separate counsel to participate in such defense at its own expense. Notwithstanding the foregoing, in any Litigation in which both the Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, are, or are reasonably likely to become, a party, such Indemnified Party shall have the right to employ separate counsel at the Indemnifying Party's expense and to control its own defense of such Litigation if, in the reasonable opinion of counsel to such Indemnified Party, either (x) one or more defenses are available to the Indemnified Party that are not available to the Indemnifying Party or (y) a conflict or potential conflict exists between the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, that would make such separate representation advisable; provided, however, that the Indemnifying Party (i) shall not be liable for the fees and expenses of more than one counsel to all Indemnified Parties and (ii) shall reimburse the Indemnified Parties for all of such fees and expenses of such counsel incurred in any action between the Indemnified Parties and any third party, as such expenses are incurred. The Indemnifying Party agrees that it will not, without the prior written consent of each Indemnified Party, settle, compromise or consent to the entry of any judgment in any pending or threatened Litigation relating to the matters contemplated hereby (if such Indemnified Party is a party thereto or has been actually threatened to be made a party thereto) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising or that may arise out of such Litigation. The Indemnifying Party shall not be liable for any settlement of any Litigation effected against an Indemnified Party without its written consent, which shall not be unreasonably withheld. The rights accorded to an Indemnified Party hereunder shall be in addition to any rights that any Indemnified Party may have at common law, by separate agreement or otherwise; provided, however, that notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing in this Article VIII shall restrict or limit any rights that any Indemnified Party may have to seek equitable relief.

8.3    Contribution. If the indemnification provided for in this Article VIII from the Indemnifying Party is unavailable to an Indemnified Party in respect of any Losses, the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Losses, as well as any other relevant equitable considerations. The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the Losses referred to above shall be deemed to include, subject to the limitations set forth in Sections 8.1 and 8.2, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding.

13

8.4    Limitation of Liability. An Indemnifying Party shall not have liability for any breach of any representation or warranty unless the aggregate amount of Losses incurred by the Indemnified Party and indemnifiable thereunder based upon, attributable to or resulting from the failure of any of the representations or warranties to be true and correct exceeds US$3,000,000 (the "Basket"), and, in such event, the Indemnifying Party shall be required to indemnify the entire amount of all such Losses; provided, however, that the foregoing Basket shall not apply to any Losses related to the failure to be true and correct of any of the representations and warranties set forth in Section 1 (Corporate Matters) and Section 2 (Authorization and Validity of Transactions) of Schedule 1 hereto. None of the parties shall have any liability for speculative, indirect, punitive, unforeseeable or consequential damages or lost profits resulting from any legal action or claim arising out of or relating to this Agreement.

**ARTICLE IX.**
**TERMINATION OF AGREEMENT**

9.1    Termination. This Agreement may be terminated prior to the Closing:

(a)    at any time on or prior to the Closing, by mutual written consent of the Company and the Investor;

(b)    at the election of the Company or the Investor by written notice to the other party hereto at any time after September 30, 2018, if the Closing shall not have occurred by such date (the "Long Stop Date"), unless such date is extended by the mutual written consent of the Company and the Investor; provided, however, that the right to terminate this Agreement under this Section 9.1(b) shall not be available to any party whose breach of any representation, warranty, covenant or agreement under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c)    at the election of the Investor, if there has been a material breach of any representation, warranty, covenant or agreement on the part of the Company contained in this Agreement, which breach has not been cured within twenty (20) Business Days after delivery of written notice to the Company of such breach; or

(d)    at the election of the Company, if there has been a material breach of any representation, warranty, covenant or agreement on the part of the Investor contained in this Agreement, which breach has not been cured within twenty (20) Business Days after delivery of written notice to the Investor of such breach.

If this Agreement so terminates, it shall become null and void and have no further force or effect, except as otherwise provided in Section 9.2.

14

9.2    Survival. If this Agreement is terminated pursuant to Section 9.1, (a) this Agreement shall become void and of no further force and effect, except for the provisions of Sections 10.2 (Notices), 10.7 (Expenses), 10.8 (Governing Law), 10.9 (Dispute Resolution) and 10.12 (Publicity; Confidentiality), which shall survive the termination of this Agreement indefinitely or until the latest date permitted by law, (b) none of the parties hereto shall have any liability in respect of a termination of this Agreement pursuant to Section 9.1(a) or Section 9.1(b) (other than the party whose breach of a representation, warranty, covenant or agreement under this Agreement precipitated a termination pursuant to Section 9.1 (b)), (c) nothing shall relieve any of the parties from liability for Losses resulting from the termination of this Agreement pursuant to Section 9.1(c) or Section 9.1(d), and (d) none of the parties hereto shall have any liability for speculative, indirect, punitive, unforeseeable or consequential damages or lost profits resulting from any legal action relating to the termination of this Agreement.

**ARTICLE X.**
**MISCELLANEOUS**

10.1    Survival of Representations and Warranties. The representations and warranties made by each party hereto shall survive the Closing for a period of two (2) years (except for the Company's representations and warranties set forth in Section 7 (Taxes) of Schedule 1, which shall survive the Closing for a period of five (5) years) and shall terminate and be of no further force and effect thereafter, provide that if a claim is made by any party hereto to another party against whom such indemnity is sought with respect to any breach of a representation or warranty giving rise to the right of indemnity as set forth in Article VIII before the expiration of the applicable survival period, such representation or warranty, as applicable, shall survive the time at which it would otherwise terminate until such claim is solved or settled.

10.2    Notices.

(a)    Any party hereto giving any notice or making any other communication pursuant to this Agreement shall give such notice or make such other communication in writing and shall use one of the following methods of delivery: personal delivery, courier with all fees prepaid or facsimile. A notice or other communication is effective only if the party hereto giving the notice or making the other communication has complied with the preceding sentence and if the addressee has received the notice or other communication; provided, that, a notice or other communication is deemed to have been received:

(i)    if a notice or other communication is delivered in person, or sent by courier, upon receipt by the party hereto to whom the notice or other communication is addressed as indicated by the date on a signed receipt for such notice or other communication signed for or on behalf of such party; or

(ii)    if a notice or other communication is sent by facsimile, upon receipt by the party hereto giving or making the notice or other communication of an acknowledgement or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the addressee's facsimile number.

15

(b)    Any notice or other communication to a party hereto pursuant to this Agreement shall use the following address and facsimile number for such party (or such other address or facsimile number as such party may have notified to the other parties hereto pursuant to this Section 10.2):

if to the Company:

iQIYI, Inc.
9/F, iQIYI Innovation Building
No.2, Haidian North 1st Street
Haidian District, Beijing 100080, PRC
Fax: 86-10-6267 7000
Attn: Xiaodong Wang

if to the Investor:

No.10 Shangdi 10th Street, Haidian District
Beijing,100085, PRC
Fax: 86-10-5992-0000
Attn: Ying Wu

(c)    A failure to deliver an informational copy of a notice or other communication to the applicable Person set forth in Section 10.2(b) above does not affect the effectiveness of a notice or other communication that is otherwise given in accordance with this Section.

(d)    In the event that an addressee of a notice or communication rejects or otherwise refuses to accept a notice or other communication delivered or sent in accordance with this Section 10.2, or if the notice or other communication cannot be delivered because of a change in address for which no notice was given, then such notice or other communication is deemed to have been received upon such rejection, refusal or inability to deliver.

(e)    Any party may by notice given in accordance with this Section 10.2 designate another address or Person for receipt of notices hereunder.

10.3    Successors and Assigns; Third Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto. Neither the Company on the one hand, nor the Investor on the other hand, shall assign any of its rights or delegate or transfer any of its obligations under this Agreement without the written consent of the other side. Except as otherwise provided herein, no Person other than the parties hereto and their successors and permitted assigns is intended to be a beneficiary of this Agreement.

10.4    Amendment and Waiver.

(a)    No failure or delay on any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the party hereto at law, in equity or otherwise.

16

(b)    Except as otherwise expressly specified in this Agreement, any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure by the parties hereto from the terms of any provision of this Agreement, shall be effective and binding on the parties hereto (i) only if it is made or given in writing and signed by all of the parties hereto and (ii) only in the specific instance and for the specific purpose for which made or given.

10.5    Counterparts. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be as effective as delivery of a manually executed counterpart of a signature page of this Agreement.

10.6    Specific Performance. The parties hereto intend that each of the parties have the right to seek damages or specific performance in the event that any other party hereto fails to perform such party's obligations hereunder. Therefore, if any party shall institute any action or proceeding to enforce the provisions hereof, any party against whom such action or proceeding is brought hereby waives any claim or defense therein that the plaintiff party has an adequate remedy at law.

10.7    Expenses. All costs and expenses (including taxes, if any) incurred in connection with this Agreement, the other Transaction Documents and any transaction contemplated hereby and thereby shall be paid by the party incurring such cost or expense (including taxes, if any); provided that the legal fees and appraisal fees incurred in connection with the Transaction Documents and the transactions contemplated thereunder shall be borne equally by the Investor and the Company.

10.8    Governing Law. The laws of the State of New York (without giving effect to its conflicts of law principles) govern this Agreement and all matters arising out of or relating to this Agreement and any of the transactions contemplated hereby, including (a) its negotiation, execution, validity, interpretation, construction, performance and enforcement and (b) the rights and duties of the parties in whole or in part.

10.9    Dispute Resolution.

(a)    Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination or validity hereof, shall be resolved through consultation. Such consultation shall begin immediately after one party hereto has delivered to the other parties hereto a written request for such consultation. If within thirty (30) days following the date on which such notice is given the dispute cannot be resolved, the dispute shall be submitted to arbitration upon the request of any party with notice to the other parties.

(b)    The arbitration shall be conducted in Hong Kong under the auspices of the Hong Kong International Arbitration Centre (the "Centre"). There shall be three (3) arbitrators. Each opposing party to a dispute shall be entitled to appoint one arbitrator (where there are more than one party to one side of the dispute, the parties whose interests are aligned shall jointly appoint one arbitrator), and the third arbitrator shall be jointly appointed by the disputing parties or, failing such agreement by thirty (30) days after the appointment by each party of its arbitrator, the appointment of the third arbitrator shall be made by the Secretary General of the Centre.

17

(c)    The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the Arbitration Rules of the United Nations Commission on International Trade Law, as in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this Section 10.9, including the provisions concerning the appointment of arbitrators, the provisions of this Section 10.9 shall prevail.

(d)    The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of the State of New York and shall not apply any other substantive law.

(e)    Each party to an arbitration hereunder shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(f)    The award of the arbitration tribunal shall be final and binding upon the disputing parties, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award. In the event of any failure of a party to this Agreement to comply with the award of the arbitration tribunal, the non-complying party shall be liable to the other parties for all reasonable costs and expenses of such enforcement.

(g)    Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal, but such relief shall only be sought on the ground that the award to which the party may be entitled would be ineffectual without interim relief.

(h)    The costs of arbitration shall be borne by the losing party(ies), unless otherwise determined by the arbitration tribunal.

10.10    Severability. If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

10.11    Entire Agreement. This Agreement, together with the exhibits and schedules hereto, and the other Transaction Documents are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. There are no restrictions, promises, representations, warranties or undertakings, other than those set forth or referred to herein or therein. This Agreement, together with the exhibits and schedules hereto, and the other Transaction Documents supersede all prior agreements and understandings between the parties with respect to such subject matter.

18

10.12    Publicity; Confidentiality. None of the parties hereto shall issue a press release or public announcement or otherwise make any disclosure concerning (i) the provisions of this Agreement, the other Transactions Documents or the transactions contemplated hereby or thereby, (ii) the negotiations relating to this Agreement or the other Transaction Documents, or (iii) the information of the other parties received during the negotiations and execution of this Agreement and the other Transaction Documents without prior written approval by the Company and the Investor; provided, however, that nothing in this Agreement shall restrict any party from disclosing information (a) that is already publicly available and not as a result of a breach of this Section 10.12, (b) that may be required by applicable Requirements of Law, provided that such party will use reasonable efforts to (i) notify the other party in advance of such disclosure so as to permit the other party to seek a protective order or otherwise contest such disclosure, and such party will use reasonable efforts to cooperate, at the expense of the other party, with the other party in pursuing any such protective order, and/or (ii) to obtain confidential treatment of any information so disclosed, (c) to such party's officers, directors, shareholders, investors, advisors, employees, members, partners, Controlling persons, auditors or counsel (as well as bona fide prospective lenders, investors, partners and advisors as long as such parties are subject to appropriate nondisclosure obligations) as may be reasonably required, or (d) to Persons from whom releases, consents or approvals are required, or to whom notice is required to be provided, pursuant to the transactions contemplated by the Transaction Documents or any Requirement of Law.

10.13    Consultation With Counsel. Each party hereto warrants that each of them has been represented and advised by legal counsel or has had full opportunity to be represented and advised by legal counsel with respect to this Agreement and all matters covered by it. Each of them represents and agrees that if it has elected not to be represented by legal counsel in the negotiation, preparation or execution of this Agreement, such election was made freely and voluntarily with full awareness of the consequences of the decision and that it is fully aware of the content and legal effect of this Agreement, and has executed or will execute this Agreement after independent investigation and without fraud, duress or undue influence.

[Signature Pages Follow]

19

[SIGNATURE PAGE TO IQIYI, INC. SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Share Purchase Agreement as of the date first written above.

**COMPANY:**

**IQIYI, INC.**
*[Company seal is affixed]*

By:                                         /s/ Yu Gong
Name: Yu Gong
Title: Director

[SIGNATURE PAGE TO IQIYI, INC. SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Share Purchase Agreement as of the date first written above.

**INVESTOR:**

**BAIDU HOLDINGS LIMITED**

By: _____  /s/ Robin Yanhong Li

Name: Robin Yanhong Li
Title: Director

Schedule 1

Representations and Warranties of the Company

**Definitions**

In this Schedule 1, in addition to the capitalized terms defined in Article I of this Agreement, the following terms have the meanings as follows:

"Assets" means all assets, rights and privileges of any nature and all goodwill associated therewith, including all rights in respect of Contractual Obligations, all Intellectual Property, Technology and Equipment.

"Charter" means memorandum of association, articles of association, by-laws or other corporate constituting documents (including the business license for any entity organized under the laws of the PRC).

"Contingent Obligation" means, with respect to any Person, any agreement by such Person with respect to any Indebtedness (the "primary obligation") of another Person (the "primary obligor"), whether or not contingent, (a) to purchase, repurchase or otherwise acquire such primary obligations, (b) to advance or provide funds (i) for the payment or discharge of any such primary obligation, or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet item, level of income or financial condition of the primary obligor as required by or as a condition of any such primary obligation, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss or failure or inability by the primary obligor to perform any primary obligation. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.

"Copyrights" means copyrights, mask work rights, database rights and design rights, whether or not registered, published or unpublished, and all registrations and applications for registration thereof, and all rights therein, whether provided by international treaties or conventions or otherwise.

"Equipment" means all plant and machinery, tools and equipment, vehicles and office furniture, computer equipment and accessories and other tangible Assets.

"Indebtedness" means, as to any Person, without duplication, (a) all obligations of such Person for borrowed money (including, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured), (b) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable and accrued commercial or trade liabilities arising in the ordinary course of business, (c) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person under leases which have been or should be, in accordance with the US GAAP, recorded as capital leases, (f) all indebtedness described in the foregoing clauses secured by any Lien (other than Liens in favor of lessors under leases other than leases included in clause (e)) on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person, and (g) any Contingent Obligation of such Person.

SCHEDULE 1-1

"Intellectual Property" means rights relating to all of the following, whether protected, created or arising under the laws of PRC or any other foreign jurisdiction: (a) Patents, (b) Copyrights, (c) Trade Secrets, (d) Trademarks, (e) Internet Assets, and (f) all applications and registrations relating to any of the rights set forth in the foregoing clauses (a) to (e).

"Internet Assets" means all rights arising from, in, or in respect of any Internet domain names and other computer user identifiers and any rights in and to sites on the worldwide web, including rights in and to any text, graphics, audio and video files and html or other code incorporated in such sites.

"knowledge", with respect to the Company, means the Company's actual knowledge that has been brought to the attention of the Key Employees and/or director(s) of the Company.

"Land Use Rights" means with respect to the land on which the facilities of any Group Company are located, the land use rights granted in relation thereto under the relevant land use right certificates and real estate certificates.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), preemptive right, right of first refusal, or preference, priority, right or other security interest or preferential arrangement of any kind or nature whatsoever.

"Litigation" has the meaning set forth in Section 9(a) of this Schedule 1.

"Material Contracts" has the meaning set forth in Section 5(a) of this Schedule 1.

"Patents" means any patents and patent applications issued by any Governmental Authority or made in any jurisdiction, including any statutory invention registrations, divisions, continuations, continuations-in-part, substitutions thereof, whether or not patents are issued on such applications and whether or not such applications are modified, withdrawn or resubmitted, and any extensions, reissues, restorations and reexaminations of the foregoing.

"Plan" means any employee benefit plan, arrangement, policy, program, agreement or commitment, including any employment, consulting or deferred compensation agreement, executive compensation, bonus, incentive, pension, profit-sharing, savings, retirement, stock option, stock purchase or severance pay plan, any life, health, disability or accident insurance plan, whether oral or written, as to which any Group Company has or in the future could have any, direct or indirect, actual or contingent liability.

<div align="center">SCHEDULE 1-2</div>

"Related Party", with respect to the Group Companies, means (i) any shareholder of the Company or any Subsidiary, (ii) any director of the Company or any Subsidiary, (iii) any Key Employee, (iv) any Relative of a director of the Company or any Subsidiary, and (v) any Person in which any shareholder or director of the Company or any Subsidiary or any Key Employee, has a majority equity interest.

"Relative" of a natural person means her/his spouse, parents, children, grandparents, grandchildren and siblings.

"Software" means any computer software programs, source code, object code, data and documentation, including any computer software programs that incorporate and run any Group Company's pricing models, formulae and algorithms.

"Technology" means, collectively, all designs, formulas, algorithms, procedures, techniques, ideas, know-how, Software, programs, models, routines, databases, tools, inventions, creations, improvements, works of authorship, recordings, graphs, drawings, reports, analyses, and other writings, and any other embodiment of the above, in any form, whether or not specifically listed herein.

"Trade Secrets" means any trade secrets, research records, processes, procedures, manufacturing formulae, technical know-how, proprietary technology, blue prints, designs, plans, inventions (whether patentable and whether reduced to practice), invention disclosures and improvements thereto, in each case, the value of which is contingent upon the maintenance of confidentiality thereof.

"Trademarks" means any trademarks, service marks, trade names, service names, trade dress, logos, and other product or service identifiers or identifiers of source, whether registered or unregistered, including all goodwill associated therewith and all common law rights, registrations and applications for registration thereof in any jurisdiction, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

**The Warranties**

1.  **CORPORATE MATTERS**

    (a)  <u>Organization, Good Standing and Qualification</u>. Each of the Group Companies has been duly incorporated and organized under the laws of the jurisdiction of its incorporation, and is validly existing and in compliance with all registration and approval requirements relating to its establishment as a company under the laws of the jurisdiction of its incorporation. Each of the Group Companies has the corporate power and authority to own and operate its Assets and properties and to carry on its business as currently conducted. Each of the Group Companies is qualified to do business and is in good standing (or equivalent status in the relevant jurisdiction) in each jurisdiction, except to the extent that the failure to be so qualified or be in good standing would not have, a Material Adverse Effect. Each PRC Entity has a valid business license issued by the State Administration for Industry and Commerce or its local branch, and has, since its establishment, carried on its business materially in compliance with the business scope set forth in its business license.

SCHEDULE 1-3

(b)  <u>Charter Documents</u>. All legal and procedural requirements and other formalities concerning such Charter and the arrangements set forth therein have been duly and properly complied with in all material respects.

(c)  <u>Capitalization</u>.

    (i)  <u>Ordinary Shares</u>. As of the date hereof, the Company has authorized 10,000,000,000 Ordinary Shares, of which 350,048,488 are currently issued and outstanding. As of the date hereof, the Company has reserved 582,949,463 Ordinary Shares for issuance to officers, directors, employees and other service providers of the Company pursuant to (i) the employment agreement with the chief executive officer of the Company, and (ii) equity incentive plans duly adopted by the Board of Directors and approved by the Company's shareholders (as amended from time to time, collectively the "<u>Share Option Reserve</u>").

    (ii)  <u>Preferred Shares</u>. As of the date hereof, the Company has authorized 2,714,387,481 Preferred Shares: (i) 200,000,000 of which are designated as Series A Preferred Shares, all of which are issued and outstanding; (ii) 6,064,174 of which are designated as Series A-1 Junior Preferred Shares, all of which are issued and outstanding; (iii) 123,103,264 of which are designated as Series B Preferred Shares, all of which are issued and outstanding; (iv) 302,891,196 of which are designated as Series C Preferred Shares, all of which are issued and outstanding; (v) 848,682,647 of which are designated as Series D Preferred Shares, all of which are issued and outstanding, (vi) 686,646,383 of which are designated as Series E Preferred Shares, all of which are issued and outstanding, (vii) 546,999,817 of which are designated as Series F Preferred Shares, all of which are issued and outstanding, (viii) 215,484,776 of which are designated as Series G1 Preferred Shares, all of which are issued and outstanding, and (ix) 798,951,243 of which are designated as Series G2 Preferred Shares, all of which are issued and outstanding.

    (iii)  <u>IQIYI Film</u>. The authorized share capital of IQIYI Film on the date hereof is US$50,000 divided into 50,000 shares with a par value of US$1.00 each, one (1) share of which is issued and outstanding and held by the Company.

    (iv)  <u>IQIYI Media</u>. The authorized share capital of IQIYI Media on the date hereof is US$50,000 divided into 50,000 shares with a par value of US$1.00 each, one (1) share of which is issued and outstanding and held by the Company.

    (v)  <u>HK Subsidiary 1</u>. The authorized share capital of the HK Subsidiary 1 on the date hereof is HK$10,000 divided into 10,000 shares with a par value of HK$1.00 each, one (1) share of which is issued and outstanding and held by the Company.

    (vi)  <u>HK Subsidiary 2</u>. The capital of the HK Subsidiary 2 on the date hereof is US$50,000 divided into 50,000 shares with a par value of US$1.00 each, one (1) share of which is issued and outstanding and held by IQIYI Film.

<div align="center">SCHEDULE 1-4</div>

(vii)    Except for (i) the Transaction Documents, (ii) the Share Option Reserve, and (iii) the option to purchase the equity interest of the Domestic Enterprises as set forth in the Control Documents, there are no options, warrants, conversion privileges, subscription or purchase rights or other rights presently outstanding to purchase or otherwise acquire (i) any Equity Securities of the Group Companies or (ii) any other securities of the Group Companies and there are no commitments, contracts, agreements, arrangements or understandings by the Group Companies to issue any shares, capital stock or any Equity Securities or other securities of the Group Companies, as of the date hereof. As of the date hereof, all of the issued Equity Securities of the Group Companies are validly issued, fully paid and non-assessable, and were issued in compliance with the registration and qualification requirements of all applicable securities laws. The registered capital of each of the PRC Entities were timely contributed and such registered capital is non-assessable. All of the issued Equity Securities of the Group Companies are free and clear of any Lien (except as set forth in the Control Documents, the Shareholders Agreement and Requirements of Law).

**2.    AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

(a)    <u>Authorization</u>. The Company has the power and authority to execute and deliver the Transaction Documents and the other agreements to which it is a party and the execution of which is contemplated hereunder as well as to perform its respective obligations thereunder. All corporate actions on the part of the Company necessary for the authorization, execution and delivery of, and the performance of all of its respective obligations under, the Transaction Documents have been taken or will be taken prior to the Closing Date.

(b)    <u>Enforceability</u>. This Agreement and each other Transaction Document will be, when executed, a valid and binding obligation of and enforceable against the Company, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) laws relating to the availability of specific performance or injunctive relief.

(c)    <u>Consents and Approvals</u>. All consents, licenses, permits, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filing with, any Governmental Authority or any other third party ("<u>Consents</u>") which are required to be made or obtained by the Company in connection with the consummation of the transactions contemplated under this Agreement have been or will be obtained or made prior to and are effective as of the Closing, except the updating of the register of members of the Company to reflect the Investor as the holder of the Target Shares, which update shall be made on the Closing Date.

(d)    <u>No Breach</u>. The execution and delivery by the Company of each Transaction Document and the performance by the Company of its obligations under such documents do not:

(i)    breach or constitute a default under (with or without notice, lapse of time or both) the Company's Charter;

(ii)    result in a material breach of, or constitute a material default under (with or without notice, lapse of time or both), or give rise to a right of termination or cancellation with respect to any material Contractual Obligation to which the Company is a party or by which the Company or its material property or Assets is bound or result in the acceleration of any material obligation under any Contractual Obligation;

SCHEDULE 1-5

(iii)    result in a material violation or breach of or default under (with or without notice, lapse of time or both) any Requirements of Law or of any order, writ, injunction, judgment or decree of any Governmental Authority by which such Person or its property of Assets is bound.

(e)    <u>No Brokerage Fees</u>. No Person is entitled to receive from the Company or any of its Affiliates any finder's fee, brokerage or commission in connection with this Agreement and each other Transaction Document or the transactions contemplated hereby or thereby.

## 3.    LEGAL COMPLIANCE

(a)    <u>Compliance with Laws</u>.

(i)    Each of the Group Companies is, and has been (including without limitation, with respect to the carrying on of its business or the ownership of its properties), in compliance in all material respects with all applicable Requirements of Law. None of the Group Companies nor, to the knowledge of the Company, any of its directors, officers or senior management staff, has committed any criminal offence that could result in arrest or that carries a penalty that could include imprisonment, or any tort or any breach of any Requirements of Law, in either case relating to the carrying on of the business of any Group Companies. None of the equity holders of any of the Group Companies is or has at any time committed any criminal offence or been in violation of any applicable Requirements of Law relating to the carrying on of the business of any Group Company.

(ii)    There are no Contractual Obligations or concerted practices to which any of the Group Companies is a party or by which any of the Group Companies is bound which are illegal or which contravene any applicable Requirements of Law in any material respects.

(iii)    Assuming the accuracy of the representations and warranties of the Investor set forth in <u>Article IV</u>, the offer, sale and issuance of the Target Shares in conformity with the terms of this Agreement are exempt from the registration and prospectus delivery requirements of the United States Securities Act of 1933, as amended, and each other analogous provision of any other applicable body of securities law.

(b)    <u>Permits</u>. Each of the Group Companies has all material permits, approvals, authorizations, franchises and licenses necessary for the conduct of its business as currently conducted. None of the Group Companies is in breach of or default under any such permit, approval, authorization, franchise or license. All such permits approvals, authorizations, franchises and licenses will remain in full force and effect notwithstanding any transaction contemplated in connection with any Transaction Document. None of the Group Companies is in receipt of any letter or notice from any relevant Governmental Authority notifying revocation of any such permits or licenses issued to it for noncompliance or the need for compliance or remedial actions in respect of the activities carried out directly or indirectly by it. Each of the PRC Entities has been conducting their respective business activities within their respective permitted scopes of business or are otherwise operating their respective businesses in material compliance with all Requirements of Law and with all requisite licenses, permits and approvals granted by competent PRC Governmental Authorities. In respect of approvals, licenses or permits requisite for the conduct of any part of the business of any of the Group Companies which are subject to periodic renewal, none of the Group Companies has any reason to believe that such requisite renewals will not be timely granted by the relevant Governmental Authorities.

<div align="center">SCHEDULE 1-6</div>

(c)   <u>Governmental Authority</u>. (i) There is no Governmental Authority or other Person that has:

    (x)   instituted or, to the knowledge of the Company, threatened any action or investigation to restrain, prohibit or otherwise challenge the acquisition of the Target Shares by the Investor or any of the transactions contemplated in connection with the Transaction Documents; or

    (y)   to the knowledge of the Company, proposed or adopted any Requirements of Law which would prohibit, materially restrict the operations of any of the Group Companies as currently conducted or currently proposed to be conducted.

    (ii)   None of the information requested by any Governmental Authority in relation to the transactions contemplated by this Agreement is, in the reasonable opinion of the Company, unusual or otherwise outside the ordinary course.

(d)   <u>Compliance with Other Instruments</u>. None of the Group Companies is in, nor shall the conduct of its business as currently conducted has resulted in, a violation, breach or default of any term of the Charter of such Group Company (as the case may be), or in any material respect of any term or provision of any mortgage, indenture, contract, agreement or instrument to which such Group Company is a party or by which it or its property may be bound, or in any material respect of any provision of any judgment, decree, order, statute, rule or regulation applicable to or binding upon any of the Group Companies. None of the activities, agreements, commitments or rights of any of the Group Companies is ultra vires or unauthorized.

## 4.   ASSETS

(a)   <u>Title to Assets</u>. The Group Companies have good title to (free and clear of any Lien, except for Permitted Liens) properties and assets (whether real, personal, tangible or intangible) necessary for the conduct of the business of the Group Companies as presently conducted in all material respects.

<div align="center">SCHEDULE 1-7</div>

**7.    TAXES**

(a)    There are no material Taxes due and payable by any of the Group Companies which have not been timely paid or withheld. There are no accrued and unpaid material Taxes of any of the Group Companies which are due, whether or not disputed.

(b)    Each of the Group Companies has timely filed or caused to be filed all returns for Taxes that it is required to file (including all applicable extensions), and all such Tax returns are accurate and complete in all material aspects.

(c)    With respect to all such Tax returns of any of the Group Companies, (i) there is no unassessed Tax deficiency proposed or, to the knowledge of the Company, threatened against any of the Group Companies and (ii) no audit is in progress with respect to any return for Taxes, no extension of time is in force with respect to any date on which any return for Taxes was or is to be filed and no waiver or agreement is in force for the extension of time for the assessment or payment of any Tax.

(d)    With respect to each Group Company, there is no pending investigation conducted by a Tax Governmental Authority having jurisdiction over such Group Company regarding its payment or withholding of Taxes.

(e)    There are no Liens (except Permitted Liens) for Taxes on the Assets of any of the Group Companies.

**9.    CLAIMS AND PROCEEDINGS**

(a)    <u>No Litigation</u>. None of the officer or director of any of the Group Companies (in his or her capacity as an officer or director) is engaged in, has pending or has been notified that it is the subject of any material action, suit, preceding, complaint, investigation, inquiry, claim, litigation, arbitration or administrative or criminal proceedings (collectively, "<u>Litigation</u>"), whether as plaintiff, defendant or otherwise. To the knowledge of the Company, there are no facts or circumstances likely to give rise to any material Litigation against any of the Group Companies or any officer or director thereof (in his or her capacity as an officer or director).

(b)    <u>No Threatened Proceedings</u>. To the knowledge of the Company, there is no threatened Litigation against any of the officer or director thereof (in his or her capacity as an officer or director).

**10.    EMPLOYMENT AND LABOR RELATIONS**

(a)    <u>Compliance with Law</u>. Each of the Group Companies has complied in all material respects with all applicable employment and labor laws, including laws and regulations pertaining to welfare funds, social benefits, medical benefits, insurance, retirement benefits, and pensions.

(b)    <u>Employee Benefit Plans</u>. Each of the Group Companies has made all social security contributions (or similar contributions) in respect of or on behalf of all its employees in accordance with Requirements of Law in all material respects. Other than such social security contributions, none of the Group Companies maintains, or contributes to, or has any liability under, any Plan.

(c)    <u>Key Employees</u>. Each Key Employee has entered into an employment agreement and other ancillary agreement(s) on confidentiality and proprietary information, intellectual property right of the Group Companies as well as such Key Employees' obligations of non-competition and non-solicitation.

<div align="center">SCHEDULE 1-8</div>

(d)  Labor Relations. (i) The Group Companies' labor practice are in compliance with the applicable Requirements of Law in all material aspects; (ii) there is (A) no grievance or arbitration proceeding arising out of or under collective bargaining agreements pending or, to the knowledge of the Company, threatened against any of the Group Companies, and (B) no strike, slowdown or stoppage pending or, to the knowledge of the Company, threatened against any of the Group Companies. To the knowledge of the Company, none of the Key Employees intends to terminate his/her employment with the Group Companies, as applicable. None of the Group Companies has discussed or taken any steps to terminate the employment of any Key Employee. To the knowledge of the Company, each Key Employee spends all, or substantially all, of his/her business time on the business of the Group Companies.

13.  **DISCLOSURE**

(a)  No Misrepresentation. No disclosure made against a representation or warranty by the Company in this Agreement (including exhibits and/or schedules thereto) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in light of the circumstances under which they were made, not misleading.

(b)  Full Disclosure. The Company has fully provided the Investor with all material information that the Investor has reasonably requested for deciding whether to purchase the Target Shares.

SCHEDULE 1-9

Schedule 2

Representations and Warranties of the Investor

In this Schedule 2, capitalized terms not otherwise defined have the meanings specified in Schedule 1 to this Agreement, and if not defined therein, have the meanings set forth in Article I of this Agreement.

1.    The Investor is a limited liability company duly organized and validly existing in good standing under the laws of the jurisdiction of its formation.

2.    The Investor has the full power and authority to enter into, execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations contemplated hereby or thereby. The execution and delivery by the Investor of this Agreement and the other Transaction Documents to which it is a party and the performance by the Investor of its obligations contemplated hereby or thereby have been duly authorized by all necessary corporate actions of the Investor. This Agreement is and each of the other Transaction Documents to which it is a party, when executed by the Investor, will be a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

3.    The execution and delivery by the Investor of each Transaction Document and the performance by the Investor of its obligations thereunder do not:

(a)    breach or constitute a default under (with or without notice, lapse of time or both) the Investor's Charter;

(b)    result in a material breach of, or constitute a material default under (with or without notice, lapse of time or both), or give rise to a right of termination or cancellation with respect to any material Contractual Obligation to which the Investor is a party or by which the Company or its material property or Assets is bound or result in the acceleration of any material obligation under any Contractual Obligation;

(c)    result in a material violation or breach of or default under (with or without notice, lapse of time or both) any Requirements of Law or of any order, writ, injunction, judgment or decree of any Governmental Authority by which such Person or its property of Assets is bound;

(d)    infringe upon or otherwise violate the rights of any third Person.

3.    The Investor has had an opportunity to discuss the Group Companies' business, management, financial affairs and the terms and conditions of the offering of the Target Shares with the management of the Group Companies and has had an opportunity to review the Group Companies' facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in Article III of this Agreement or the right of the Investor to rely thereon.

4.    The Investor is either (i) an "accredited investor" within the meaning of Securities and Exchange Commission Rule 501 of Regulation D, as presently in effect, under the Securities Act, or (ii) not a "U.S. person" as defined in Rule 902 of Regulation S of the Securities Act. The Investor has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Target Shares and is capable of bearing the economic risks of such investment.

SCHEDULE 2-1

5.    The Target Shares to be acquired by the Investor pursuant to this Agreement are being or will be acquired for its own account and with no intention of distributing or reselling the Target Shares or any part thereof. If the Investor should in the future decide to dispose of any of such Target Shares, the Investor understands and agrees that it may do so only in compliance with the applicable securities laws, as then in effect. The Investor holds its interest in the Target Shares for itself beneficially and does not have any contract, undertaking, agreement, or arrangement with any Person to sell or transfer to any third party its interest (including beneficiary interest) in the Target Shares and is not acting as nominee or trustee or otherwise on behalf of any Person. The Investor agrees to the imprinting, so long as required by law and to the extent applicable, of a legend on certificates representing all of its Target Shares and Ordinary Shares issuable upon conversion of the Target Shares to the following effect:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED OR IN ANY JURISDICTION, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR OTHERWISE IN COMPLIANCE THEREWITH. THE SALE, ASSIGNMENT, HYPOTHECATION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH A "TRANSFER") AND VOTING OF ANY OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED BY THE TERMS OF A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND THE SHAREHOLDERS NAMED THEREIN, A COPY OF WHICH MAY BE INSPECTED AT THE COMPANY'S PRINCIPAL OFFICE. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT.

6.    The Investor understands that no public market now exists for the Target Shares, and that the Company has not made any assurances that a public market will ever exist for the Target Shares.

7.    The Investor acknowledges that it is not relying upon any Person other than the Company, its officers and directors, in making its investment or decision to invest in the Target Shares.

SCHEDULE 2-2

Schedule 3

Exhibit 10.65

**Baidu Holdings Limited**

**and**

**iQIYI, Inc.**

**TICKET BUSINESS COOPERATION AGREEMENT**

February 12, 2018

This Ticket Business Cooperation Agreement (this "**Agreement**") is entered into by the two parties on February 12, 2018 ("**Execution Date**"):

(1) Baidu Holdings Limited (it and its affiliates are collectively referred to as "**Baidu**"), a company established under the laws of British Virgin Islands;

(2) iQIYI, Inc. (it and its affiliates under its control are collectively referred to as "**IQIYI**"), a company incorporated under the laws of Cayman Islands.

In this Agreement, Baidu and IQIYI are collectively referred to as "**both Parties**"/"**the two Parties**", and individually referred to as "**one Party**". When "**one Party**" and "**the other Party**" are used in this Agreement, Baidu and IQIYI are respectively the corresponding one party and the other party.

Whereas:

1. Baidu Holdings Limited and iQIYI, Inc. entered into Share Purchase Agreement on February 12, 2018 ("**Share Purchase Agreement**"), agreeing that iQIYI, Inc. shall, at the settlement of the Share Purchase Agreement, issue to Baidu Holdings Limited 36,860,691 common shares of iQIYI, Inc.; as a consideration, Baidu Holdings Limited shall execute this Agreement with iQIYI, Inc..

2. By executing this Agreement, Baidu promises to provide its full support to the development of IQIYI's ticket business and to make every reasonable business effort to assist IQIYI to complete its existing ticket business system (including perfecting the back-office system of IQIYI's ticket business to make it achieve equivalent capability with Baidu's Oscar business management system (cinema, movie, customer service, settlement, reconciliation, marketing, membership card, mall, etc.), performance ticket management system, sales management system, data BI system, etc.) ("**Fundamental Cooperation Objectives**"), and provide diversion support for the development of IQYI's ticket business.

In view of this, both Parties reach the agreement as follows upon consensus:

<div align="center">

**Article 1 Definition**

</div>

1.1.  **Force Majeure**: any event which occurs after the effective date of this Agreement, which prevents either party from performing this Agreement in whole or in part, which both Parties to this Agreement cannot control, cannot avoid, cannot overcome, cannot overcome and cannot solve, and which cannot be predicted at the time of executing this Agreement. Such events include, but are not limited to, earthquakes, typhoons, floods, wars, disruptions to international or domestic traffic, acts of government agencies, etc. For the avoidance of doubt, such events constitute force majeure only if they are beyond both Parties' control, cannot be avoided, insurmountable or cannot be resolved by both parties to this Agreement.

<div align="center">2</div>

1.2.  **Affiliate**: for any entity, "affiliate" refers to the entity under its control, or which control it, or under the same third party control as it. "Control" means that one entity holds shares/interests of more than 50% of the voting rights of another entity or has the right to designate more than half of the directors or members of other similar management organs of another entity, or have actual decision power or control power of such entity's operation by agreements or other means. For the purpose of this Agreement, Baidu's affiliates shall not include IQIYI or any entity it controls; IQIYI's affiliates only include the entities under IQIYI's control.

1.3.  **Ticket Business**: refers to the business of online sale of movie tickets and performance tickets, as well as the sale of ticket membership/entitlement cards, cinema goods, movie and performance derivative products, which are directly related to aforesaid business.

1.4.  **License Term**: see Article 3.4 hereof.

1.5.  **Business Cooperation Term**: see Article 2.1 hereof.

1.6.  **China**: refers to People's Republic of China. For the purpose of this Agreement, it shall include Taiwan, Hong Kong SAR, Macao SAR.

1.7.  **Preparation Period**: see Article 2.1 hereof.

1.8.  Except for those expressly set forth in this Agreement, any Party's products mentioned in this Agreement shall be relevant products with the corresponding business operation names and relevant products the market generally understand to be referred to by the corresponding names; Regarding relevant technology and industry terms mentioned in this Agreement shall have the meaning the internet industry, the electronic information industry and/or the telecommunication industry understand to be referred to by such names.

**Article 2 Cooperation Content Introduction and Non-Competition**

2.1.  The cooperation between the two Parties hereunder mainly consists of two stages:

(1)  **Cooperation during Preparation Period**: from the effective date hereof to 3 months from the effective data ("**Preparation Period**"), Baidu shall assist IQIYI to perfect the business relation and service capabilities of its ticket business in relevant aspects including technology, business and product, and shall make every reasonable effort in business to achieve Fundamental Cooperation Objectives. Specific forms of support shall be negotiated separately by the two Parties.

Business maintenance requirements: as part of the cooperation during the Preparation Period, except for those explicitly agreed otherwise upon by both Parties, Baidu shall maintain the status quo of the operation of its ticket business during the Preparation Period, including but not limited to, according to the status quo, maintaining user experience of its ticket business, maintaining diversion to its ticket business, making every reasonable business effort to maintain good business relation with agencies and cooperative partners.

(2)  **Subsequent Cooperation**: provided that IQIYI satisfies the following conditions, Baidu shall ensure that within four (4) years after the end of the Preparation Period ("**Business Cooperation Term**"), regarding the entrance of internet traffic that Baidu products (i.e. Baidu search on PCs, Baidu search on mobile phones, Baidu Nuomi and Baidu Map and other Baidu products otherwise determined by the two Parties) divert to its ticket business, under the premise of Baidu's control, the maintaining party of the original landing pages shall be changed to IQIYI ticket business: 1) IQIYI ticket business provides its users with good user experience, not worse than the current service quality of Baidu's ticket business; 2) IQIYI ticket business provides its users with good user experience, not worse than the third-party average standard of the industry; 3) the landing pages which serve as the entrance from Baidu products (i.e. Baidu search on PCs, Baidu search on mobile phones, Baidu Nuomi and Baidu Map) to the ticket business satisfy Baidu's common product specifications; and 4) IQIYI provides service maintenance to those to which the traffic is transferred from Baidu products, including but not limited to the components / H5 pages.

3

(3) During the Business Cooperation Term, Baidu provides support to ticket business in the aspects of Baidu feed stream and Baidu Baike, including:

    a. IQIYI shall cause the ticket business to provide content that meets the requirements of Baidu products, such content can be accessed and distributed through Baidu feed stream interface;

    b. Baidu exclusively provides the ticket business with movie entrance of wise Baike movie entries, IQIYI ticket business provides Baidu Baike with movie evaluation data on real-time basis.

(4) Notwithstanding the foregoing provisions, both Parties agree and acknowledge that no provision hereunder shall in any manner limit the rights that Baidu adjusts, modifies and / or updates, for reasonable business needs, the websites, interfaces or relevant applications of any product developed and / or operated by Baidu (including but not limited to Baidu products, Baidu fee stream and Baidu Baike).

2.2. **Non-competition Undertaking**. Baidu undertakes: from the effective date hereof to the expiration of the Preparation Period, Baidu's ticket business shall operate to the necessary extent to the necessary maintenance of business, but after the Preparation Period ends, Baidu shall immediately terminate all of its current ticket business; Except for the preparation period, from the effective date hereof to the end of the Business Cooperation Term, Baidu shall not conduct its own ticket business, and shall not invest in new company which conducts ticket business or hold more than 10% equity interests in any such company (for avoidance of doubt, for the purpose of this Article, "conducting ticket business" means that the ticket business is the main business, which account for 50% or more of the company's total revenue), the specific list of such companies are otherwise negotiate separately by the two Parties.

**Article 3 License of Intangible Assets**

3.1.    Baidu shall grant IQIYI the right to use the trademarks related to Baidu's ticket business (the scope of the trademarks shall be separately negotiated by the two Parites, such trademarks are referred to as the "**Licensed Trademarks**"), the relevant terms and conditions are as follows:

(1)    Licensed area: Mainland China (excluding Hong Kong, Taiwan and Macao, the same below);

(2)    Scope of License: IQIYI may only use the Licensed Trademarks in its ticket business for the purposes of this Agreement and in accordance with this Agreement;

(3)    Manner of License: this license is an exclusive license, that is, within the License Term (defined below), except IQIYI, Baidu shall not license any third party to use the Licensed Trademarks, but Baidu may use the Licensed Trademarks by itself.

3.2.    Baidu shall grant IQIYI the right to use the domain name related to Baidu's ticket business (the list of domain names shall be separately negotiated by the two Parites, such domain names are referred to as the "**Licensed Domain Names**"), the relevant terms and conditions are as follows:

(1)    Scope of License: IQIYI may only use the Licensed Domain Names in its ticket business for the purposes of this Agreement and in accordance with this Agreement;

(2)    Manner of License: this license is an exclusive license, that is, within the License Term, except IQIYI, Baidu shall not license any third party to use the Licensed Domain Names, but Baidu may use the Licensed Domain Names by itself.

3.3.    Baidu shall grant IQIYI the right to use the patents related to Baidu's ticket business (the list of the patents shall be separately negotiated by the two Parites, such patents are referred to as the "**Licensed Patents**", together with the Licensed Trademarks and License Domain Names, are collectively referred to as "**Licensed Intellectual Property**"), the relevant terms and conditions are as follows:

(1)    Licensed area: Mainland China;

(2)    Scope of License: IQIYI may only use the Licensed Patents in its ticket business for the purposes of this Agreement and in accordance with this Agreement;

(3)    Manner of License: this license is an exclusive license, that is, within the License Term (defined below), except IQIYI, Baidu shall not license any third party to use the Licensed Patents, but Baidu may use the Licensed Patents by itself.

3.4.    License Term: the license term under Article 3.1 to Article 3.3 shall be twenty-four (24) months since the effective date of this Agreement ("**License Term**").

5

3.5.    Within the License Term, IQIYI has the right to authorize its affiliates to use the licensed intellectual property without the need to obtain Baidu's consent, provided that such affiliates must obey the terms and conditions herein which apply to IQIYI when using the licensed intellectual property, and the term of sublicensing shall not be longer than the License Term. IQIYI shall be responsible for all its affiliates' use of licensed intellectual property rights. If such affiliates of IQIYI are no longer IQIYI's affiliates, then the sublicensing to the former affiliates shall terminate immediately and IQIYI shall notify such former affiliates to stop the use.

### Article 4 Force Majeure

In the event the performance of the obligations hereunder is delayed for Force Majeure, neither Party shall therefore be deemed to breach this Agreement, and neither Party shall be liable for the damages therefore arising, provided that such Party makes efforts to eliminate the cause of delay, make its best endeavor in eliminating the damages (including but not limited to seeking for and using alternative tools or methods) and inform the other Party such Force Majeure and the damages so caused within fifteen days after the Force Majeure disappears (excluding that date). During the delay of performance, the Party encountering the Force Majeure shall implement reasonable alternative(s) to substitute or use other commercially reasonable means to facilitate the performance of its obligations hereunder, until the delay is eliminated.

### Article 5 Confidentiality

The two Parties acknowledge and confirm that any oral or written information communicated with each other regarding this Agreement is confidential information. The two Parties shall keep such information confidential, and may not disclose such information to any third person without written consents of the other Party, except for (a) any information that has been known or will be known to the public (not disclosed by the receiving party to the public without consent); (b) any information disclosed as required by applicable laws, supervisory government departments, supervisory stock exchange, and relevant stock exchange rules; or (c) any information disclosed to either Party's legal or financial advisor with respect to the transaction contemplated hereunder, who is required to perform similar obligation of confidentiality to those specified herein. Both Parties further undertake to use the aforementioned confidential information provided by the other Party only with regard to relevant matters provided by this Agreement, and shall destroy or return such confidential information upon the other party's request after termination of this Agreement. Any breach of this Article 5 by any employee of or any intermediary engaged by either Party shall be deemed breach by such Party, and such Party shall assume the liability for breach of contract under this Agreement. No matter whether this Agreement becomes invalid, rescinded, altered, terminated, or inoperable, this provision will survive.

### Article 6 Tax

Both Parties to the Agreement shall pay taxes to the relevant tax authorities in accordance with relevant laws, regulations and national policies and shall cause their Affiliates to pay taxes to the relevant tax authorities in accordance with the provisions of this Agreement in accordance with the relevant laws, regulations and national policies.

**Article 7 Representations and Warranties**

7.1.    Each of the two Parties represents and warranties to the other Party as follows: it is a company duly incorporated and validly existing; its execution, delivery and performance of this Agreement requires no filing with or notice to any government authority, and no license, permit, consent or any other approval from any government authority or other person; and it is capable to perform its obligations under this Agreement and such performance will not violate its article of associations or any other organizational documents.

7.2.    If there is any conflict between this Agreement and any other legal document signed by it prior to the date hereof, it shall notify the other Party promptly in writing in good faith and the two Parties shall resolve such conflict through negotiations. Either Party shall be held liable for any loss incurred by the other Party due to any conflict between this Agreement and any other legal document signed by it prior to the date hereof.

7.3.    If either Party becomes aware that its performance of its obligations under this Agreement require any permit, consent or approval from any third party during such performance, it shall make its best efforts to obtain such permit, consent or approval; if it is impossible to obtain such permit, consent or approval within a reasonable period of time, it shall provide an alternative solution acceptable to the other Party for the applicable matter.

**Article 8 Notice and Delivery**

8.1.    All notices and other communications required or made under this Agreement shall be delivered to the applicable following address by hand, registered mail, mail with pre-paid postage or commercial courier services, or facsimile or electronic mail, and shall be deemed duly delivered:

(1)    If delivered by hand, registered mail, mail with pre-paid postage or commercial courier services, on the day when such notice is received or rejected at the applicable following address; or

(2)    If delivered by facsimile or electronic mail, on the day when the transmission is successful (as confirmed by automatically generated transmission report).

8.2.    For purpose of notice under this Agreement, the address of each of the two Parties is as follows:

**To Baidu:**
Address:         ***
Attention:       ***
Telephone:       ***
E-mail:          ***

**To iQIYI:**
Address:         ***
Attention:       ***
Telephone:       ***
E-mail:          ***

7

Either Party may change its address of notice under this Agreement at any time with a notice to the other Party under this Article 8.

## Article 9 Breach Liabilities

9.1.    Each of the two Parties shall be held liable for any loss actually incurred by the other Party due to its breach of this Agreement.

9.2.    Each of the two Parties understands and agrees that its execution of this Agreement is made on behalf of itself and any of its affiliates and it is obligated to cause its affiliates to comply and perform this Agreement.

9.3.    If either Party (the "**Non-breaching Party**") is subject to any direct or indirect loss, claim, litigation or investigation or liability (including without limitation any civil liability asserted by any third party or any administrative or criminal liability asserted by any competent government or judicial authority) due to breach of this Agreement or any legal requirements of the other Party (the "**Breaching Party**") after this Agreement becomes effective, the Breaching Party shall be liable for any and all of the direct or indirect loss, costs and expenses incurred by the Non-breaching Party arising therefrom.

## Article 10 Governing Law and Dispute Resolution

10.1.    The formation, validity, interpretation, performance, amendment of this Agreement, and resolution of any dispute arising from or in connection with this Agreement, shall be governed by the laws of New York State.

10.2.    Any dispute arising from interpretation or performance of this Agreement shall be resolved by the two Parties through negotiations and, if such negotiations fail, submitted by either Party to China International Economic and Trade Arbitration Commission for resolution in accordance with its arbitration rules then in effect. The arbitration shall be conducted in Beijing and its language shall be in Chinese. The arbitrary award shall be conclusive and binding upon each of the two Parties.

10.3.    As long as any dispute arising from interpretation or performance of this Agreement exists or is under arbitration, each of the two Parties shall continue to perform its rights and obligations under this Agreement other than those under dispute.

## Article 11 Miscellaneous

11.1.    This Agreement shall be effective as of the date on which it is duly signed by the two Parties (the "**Effective Date**"). Termination of this Agreement shall not release any liability for breach of this Agreement occurred prior to such termination. Articles 5, 8, 9, 10 and 11.1 of this Agreement shall survive termination of this Agreement.

8

11.2.   Any amendment and supplement to this Agreement shall be made in writing. Any amendment and supplement hereto duly signed by the two Parties shall be an integral part of and have the same effect with this Agreement.

11.3.   Unless with prior written consent of the other Party, neither Party may transfer any of its rights or obligations under this Agreement to any third Party; provided, however, that it may designate its appropriate affiliate to perform any cooperation matter when it is necessary to do so.

11.4.   This Agreement, once effective, shall constitute all agreements and understanding between the two Parties regarding the subject matter of this Agreement, and supersede all prior agreements and understanding, written or oral, between the two Parties regarding the subject matter hereof.

11.5.   If any term of this Agreement is held invalid, illegal or unenforceable, it will not affect validity, legality or enforceability of the remaining terms of this Agreement. The two Parties shall deal with such invalid, illegal or unenforceable term in good faith to achieve its intended business purpose as much as possible.

11.6.   The Chinese version of this Agreement shall prevail. This Agreement is made in two originals with each Party holding one original. Each of the originals has the same effect.

(No text below)

9

IN WITNESS WHEREOF, the two Parties have caused their respective duly authorized representative to execute this Agreement as of the date first written above.

**Baidu Holdings Limited**

By: _____ /s/ Robin Yanhong Li

Name: Robin Yanhong Li

Title:

10

IN WITNESS WHEREOF, the two Parties have caused their respective duly authorized representative to execute this Agreement as of the date first written above.

**iQIYI, Inc.**
[*Company seal is affixed*]

By: _____ /s/ Yu Gong

Name: Yu Gong

Title:

11

**Exhibit 21.1**

**List of Significant Subsidiaries and Consolidated Affiliated Entities of iQIYI, Inc.**

| **Subsidiaries** | **Place of Incorporation** |
| --- | --- |
| Beijing QIYI Century Science & Technology Co., Ltd. | PRC |
| Chongqing QIYI Tianxia Science & Technology Co., Ltd. | PRC |
| Beijing iQIYI New Media Science & Technology Co., Ltd. | PRC |
| Qiyi.com HK Limited | Hong Kong |
| IQIYI Film Group HK Limited | Hong Kong |
| IQIYI Media Limited | Cayman Islands |
| IQIYI Film Group Limited | Cayman Islands |

| **Consolidated Affiliated Entities** | **Place of Incorporation** |
| --- | --- |
| Beijing iQIYI Science & Technology Co., Ltd. | PRC |
| Shanghai iQIYI Culture Media Co., Ltd. | PRC |
| Shanghai Zhong Yuan Network Co., Ltd. | PRC |
| iQIYI Pictures (Beijing) Co., Ltd. | PRC |
| Beijing iQIYI Cinema Management Co., Ltd. | PRC |

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated February 27, 2018, in the Registration Statement (Form F-1) and related Prospectus of iQIYI, Inc. dated February 27, 2018.

/s/ Ernst & Young Hua Ming LLP

Beijing, the People's Republic of China
February 27, 2018

Exhibit 99.1

**IQIYI, INC.**

**CODE OF BUSINESS CONDUCT AND ETHICS**

**(Adopted by the Board of Directors of iQIYI, Inc. on          , 2018, effective upon the effectiveness of its registration statement on Form F-1 relating to its initial public offering)**

---

## I.    PURPOSE

This Code of Business Conduct and Ethics (the "**Code**") contains general guidelines for conducting the business of iQIYI, Inc. and its subsidiaries and affiliates (collectively, the "**Company**") consistent with the highest standards of business ethics, and is intended to qualify as a "code of ethics" within the meaning of Section 406 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

This Code is designed to deter wrongdoing and to promote:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission (the "**SEC**") and in other public communications made by the Company;

- compliance with applicable laws, rules and regulations;

- prompt internal reporting of violations of the Code; and

- accountability for adherence to the Code.

## II.    APPLICABILITY

This Code applies to all directors, officers and employees of the Company, whether they work for the Company on a full-time, part-time, consultative or temporary basis (each, an "**employee**" and collectively, the "**employees**"). Certain provisions of the Code apply specifically to our chief executive officer, chief financial officer, other chief officers, senior financial officer, controller, senior vice presidents, vice presidents and any other persons who perform similar functions for the Company (each, a "**senior officer**," and collectively, the "**senior officers**").

The Board of Directors of iQIYI, Inc. (the "**Board**") has appointed the head of the Legal Department of iQIYI, Inc. as the Compliance Officer for the Company (the "**Compliance Officer**"). If you have any questions regarding the Code or would like to report any violation of the Code, please contact the Compliance Officer.

This Code has been adopted by the Board and shall become effective (the "**Effective Time**") upon the effectiveness of the Company's registration statement on Form F-1 filed by the Company with the SEC relating to the Company's initial public offering.

### III.   CONFLICTS OF INTEREST

*Identifying Conflicts of Interest*

A conflict of interest occurs when an employee's private interest interferes, or appears to interfere, in any way with the interests of the Company as a whole. An employee should actively avoid any private interest that may impact such employee's ability to act in the interests of the Company or that may make it difficult to perform the employee's work objectively and effectively. In general, the following should be considered conflicts of interest:

- Competing Business. No employee may be employed by a business that competes with the Company or deprives it of any business.

- Corporate Opportunity. No employee should use corporate property, information or his/her position with the Company to secure a business opportunity that would otherwise be available to the Company. If an employee discovers a business opportunity that is in the Company's line of business through the use of the Company's property, information or position, the employee must first present the business opportunity to the Company before pursuing the opportunity in his/her individual capacity.

- Financial Interests.

    (i)     No employee may have any financial interest (ownership or otherwise), either directly or indirectly through a spouse or other family member, in any other business or entity if such interest adversely affects the employee's performance of duties or responsibilities to the Company, or requires the employee to devote time to it during such employee's working hours at the Company;

    (ii)    No employee may hold any ownership interest in a privately held company that is in competition with the Company;

    (iii)   An employee may hold less than 5% ownership interest in a publicly traded company that is in competition with the Company; provided that if the employee's ownership interest in such publicly traded company increases to 5% or more, the employee must immediately report such ownership to the Compliance Officer;

    (iv)    Unless pre-approved by the Compliance Officer, no employee may hold any ownership interest in a company that has a business relationship with the Company if such employee's duties at the Company include managing or supervising the Company's business relations with that company; and

    (v)     Notwithstanding the other provisions of this Code,

(a) a director or any family member of such director (collectively, "**Director Affiliates**") or a senior officer or any family member of such senior officer (collectively, "**Officer Affiliates**") may continue to hold his/her investment or other financial interest in a business or entity (an "**Interested Business**") that:

(1) was made or obtained either (x) before the Company invested in or otherwise became interested in such business or entity; or (y) before the director or senior officer joined the Company (for the avoidance of doubt, regardless of whether the Company had or had not already invested in or otherwise become interested in such business or entity at the time the director or senior officer joined the Company); or

(2) may in the future be made or obtained by the director or senior officer, provided that at the time such investment or other financial interest is made or obtained, the Company has not yet invested in or otherwise become interested in such business or entity;

provided that such director or senior officer shall disclose such investment or other financial interest to the Board;

(b) an interested director or senior officer shall refrain from participating in any discussion among senior officers of the Company relating to an Interested Business and shall not be involved in any proposed transaction between the Company and an Interested Business; and

(c) before any Director Affiliate or Officer Affiliate (i) invests, or otherwise acquires any equity or other financial interest, in a business or entity that is in competition with the Company; or (ii) enters into any transaction with the Company, the related director or senior officer shall obtain prior approval from the Audit Committee of the Board.

For purposes of this Code, a company or other entity is deemed to be "in competition with the Company" if it competes with the Company's internet entertainment services and any other business in which the Company engages in.

- Loans or Other Financial Transactions. No employee may obtain loans or guarantees of personal obligations from, or enter into any other personal financial transaction with, any company that is a material customer, supplier or competitor of the Company. This guideline does not prohibit arms-length transactions with recognized banks or other financial institutions.

- Service on Boards and Committees. No employee shall serve on a board of directors or trustees or on a committee of any entity (whether profit or not-for-profit) whose interests could reasonably be expected to conflict with those of the Company. Employees must obtain prior approval from the Board before accepting any such board or committee position. The Company may revisit its approval of any such position at any time to determine whether an employee's service in such position is still appropriate.

The above is in no way a complete list of situations where conflicts of interest may arise. The following questions might serve as a useful guide in assessing a potential conflict of interest situation not specifically addressed above:

- Is the action to be taken legal?

- Is it honest and fair?

- Is it in the best interests of the Company?

### *Disclosure of Conflicts of Interest*

The Company requires that employees fully disclose any situations that could reasonably be expected to give rise to a conflict of interest. If an employee suspects that he/she has a conflict of interest, or a situation that others could reasonably perceive as a conflict of interest, the employee must report it immediately to the Compliance Officer. Conflicts of interest may only be waived by the Board, or the appropriate committee of the Board, and will be promptly disclosed to the public to the extent required by law and applicable rules of the applicable stock exchange.

### *Family Members and Work*

The actions of family members outside the workplace may also give rise to conflicts of interest because they may influence an employee's objectivity in making decisions on behalf of the Company. If a member of an employee's family is interested in doing business with the Company, the criteria as to whether to enter into or continue the business relationship and the terms and conditions of the relationship must be no less favorable to the Company compared with those that would apply to an unrelated party seeking to do business with the Company under similar circumstances.

Employees should report any situation involving family members that could reasonably be expected to give rise to a conflict of interest to their supervisor or the Compliance Officer. For purposes of this Code, "family members" or "members of employee's family" include an employee's spouse, parents, children and siblings, whether by blood, marriage or adoption or anyone residing in such employee's home.

### IV.    GIFTS AND ENTERTAINMENT

The giving and receiving of appropriate gifts may be considered common business practice. Appropriate business gifts and entertainment are welcome courtesies designed to build relationships and understanding among business partners. However, gifts and entertainment should never compromise, or appear to compromise, an employee's ability to make objective and fair business decisions.

It is the responsibility of employees to use good judgment in this area. As a general rule, employees may give or receive gifts or entertainment to or from customers or suppliers only if the gift or entertainment is in compliance with applicable law, insignificant in amount and not given in consideration or expectation of any action by the recipient. All gifts and entertainment expenses made on behalf of the Company must be properly accounted for on expense reports.

We encourage employees to submit gifts received to the Company. While it is not mandatory to submit small gifts, gifts of over RMB200 must be submitted immediately to the human resources department of the Company.

Bribes and kickbacks are criminal acts, strictly prohibited by law. An employee must not offer, give, solicit or receive any form of bribe or kickback anywhere in the world.

## V.    FCPA COMPLIANCE

The U.S. Foreign Corrupt Practices Act ("**FCPA**") prohibits giving anything of value, directly or indirectly, to officials of foreign governments or foreign political candidates in order to obtain or retain business. A violation of FCPA does not only violate the Company's policy but also constitute a civil or criminal offense under FCPA which the Company is subject to after the Effective Time. No employee shall give or authorize directly or indirectly any illegal payments to government officials of any country. While the FCPA does, in certain limited circumstances, allow nominal "facilitating payments" to be made, any such payment must be discussed with and approved by an employee's supervisor in advance before it can be made.

## VI.    PROTECTION AND USE OF COMPANY ASSETS

Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only. Theft, carelessness and waste have a direct impact on the Company's profitability. Any use of the funds or assets of the Company, whether for personal gain or not, for any unlawful or improper purpose is strictly prohibited.

To ensure the protection and proper use of the Company's assets, each employee should:

- Exercise reasonable care to prevent theft, damage or misuse of Company property;

- Promptly report any actual or suspected theft, damage or misuse of Company property;

- Safeguard all electronic programs, data, communications and written materials from unauthorized access; and

- Use Company property only for legitimate business purposes.

Except as approved in advance by the Chief Executive Officer or Chief Financial Officer of the Company, the Company prohibits political contributions (directly or through trade associations) by any employee on behalf of the Company. Prohibited political contributions include:

- any contributions of the Company's funds or other assets for political purposes;

- encouraging individual employees to make any such contribution; and

- reimbursing an employee for any political contribution.

**VII.   INTELLECTUAL PROPERTY AND CONFIDENTIALITY**

Employees should abide by the Company's rules and policies in protecting the intellectual property and confidential information, including the following:

- All inventions, creative works, computer software, and technical or trade secrets developed by an employee in the course of performing the employee's duties or primarily through the use of the Company's assets or resources while working at the Company shall be the property of the Company.

- Employees should maintain the confidentiality of information entrusted to them by the Company or entities with which the Company has business relations, except when disclosure is authorized or legally mandated. Confidential information includes all non-public information that might be of use to competitors, or harmful to the company or its business associates, if disclosed.

- The Company maintains a strict confidentiality policy. During an employee's term of employment with the Company, the employee shall comply with any and all written or unwritten rules and policies concerning confidentiality and shall fulfill the duties and responsibilities concerning confidentiality applicable to the employee.

- In addition to fulfilling the responsibilities associated with his/her position in the Company, an employee shall not, without obtaining prior approval from the Company, disclose, announce or publish trade secrets or other confidential business information of the Company, nor shall an employee use such confidential information outside the course of his/her duties to the Company.

- Even outside the work environment, an employee must maintain vigilance and refrain from disclosing important information regarding the Company or its business, business associates or employees.

- An employee's duty of confidentiality with respect to the confidential information of the Company survives the termination of such employee's employment with the Company for any reason until such time as the Company discloses such information publicly or the information otherwise becomes available in the public sphere through no fault of the employee.

- Upon termination of employment, or at such time as the Company requests, an employee must return to the Company all of its property without exception, including all forms of medium containing confidential information, and may not retain duplicate materials.

**VIII.    ACCURACY OF FINANCIAL REPORTS AND OTHER PUBLIC COMMUNICATIONS**

Upon the Effective Time, the Company will be required to report its financial results and other material information about its business to the public and the SEC. It is the Company's policy to promptly disclose accurate and complete information regarding its business, financial condition and results of operations. Employees must strictly comply with all applicable standards, laws, regulations and policies for accounting and financial reporting of transactions, estimates and forecasts. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

Employees should be on guard for, and promptly report, any possibility of inaccurate or incomplete financial reporting. Particular attention should be paid to:

- Financial results that seem inconsistent with the performance of the underlying business;

- Transactions that do not seem to have an obvious business purpose; and

- Requests to circumvent ordinary review and approval procedures.

The Company's senior financial officers and other employees working in the finance department have a special responsibility to ensure that all of the Company's financial disclosures are full, fair, accurate, timely and understandable. Any practice or situation that might undermine this objective should be reported to the Compliance Officer.

Employees are prohibited from directly or indirectly taking any action to coerce, manipulate, mislead or fraudulently influence the Company's independent auditors for the purpose of rendering the financial statements of the Company materially misleading. Prohibited actions include but are not limited to:

- issuing or reissuing a report on the Company's financial statements that is not warranted in the circumstances (due to material violations of U.S. GAAP, generally accepted auditing standards or other professional or regulatory standards);

- not performing audit, review or other procedures required by generally accepted auditing standards or other professional standards;

- not withdrawing an issued report when withdrawal is warranted under the circumstances; or

- not communicating matters required to be communicated to the Company's Audit Committee.

## IX.   COMPANY RECORDS

Accurate and reliable records are crucial to the Company's business and form the basis of its earnings statements, financial reports and other disclosures to the public. The Company's records are a source of essential data that guides business decision-making and strategic planning. Company records include, but are not limited to, booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of business.

All Company records must be complete, accurate and reliable in all material respects. There is never an acceptable reason to make false or misleading entries. Undisclosed or unrecorded funds, payments or receipts are strictly prohibited. An employee is responsible for understanding and complying with the Company's recordkeeping policy. An employee should contact the Compliance Officer if he/she has any questions regarding the recordkeeping policy.

## X.   COMPLIANCE WITH LAWS AND REGULATIONS

Each employee has an obligation to comply with the laws of the cities, provinces, regions and countries in which the Company operates. This includes, without limitation, laws covering commercial bribery and kickbacks, patent, copyrights, trademarks and trade secrets, information privacy, insider trading, offering or receiving gratuities, employment harassment, environmental protection, occupational health and safety, false or misleading financial information, misuse of corporate assets and foreign currency exchange activities. Employees are expected to understand and comply with all laws, rules and regulations that apply to their positions at the Company. If any doubt exists about whether a course of action is lawful, the employee should seek advice immediately from the Compliance Officer.

## XI.   DISCRIMINATION AND HARASSMENT

The Company is firmly committed to providing equal opportunity in all aspects of employment and will not tolerate any illegal discrimination or harassment based on race, ethnicity, religion, gender, age, national origin or any other protected class. For further information, employees should consult the Compliance Officer.

## XII.   FAIR DEALING

Each employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. None should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

**XIII.    HEALTH AND SAFETY**

The Company strives to provide employees with a safe and healthy work environment. Each employee has responsibility for maintaining a safe and healthy workplace for other employees by following environmental, safety and health rules and practices and reporting accidents, injuries and unsafe equipment, practices or conditions. Violence or threats of violence are not permitted.

Each employee is expected to perform his/her duty to the Company in a safe manner, not under the influence of alcohol, illegal drugs or other controlled substances. The use of illegal drugs or other controlled substances in the workplace is prohibited.

**XIV.    VIOLATIONS OF THE CODE**

All employees have a duty to report any known or suspected violation of this Code, including any violation of laws, rules, regulations or policies that apply to the Company. Reporting a known or suspected violation of this Code by others will not be considered an act of disloyalty, but an action to safeguard the reputation and integrity of the Company and its employees.

If an employee knows of or suspects a violation of this Code, it is such employee's responsibility to immediately report the violation to the Compliance Officer, who will work with the employee to investigate his/her concern. All questions and reports of known or suspected violations of this Code will be treated with sensitivity and discretion. The Compliance Officer and the Company will protect the employee's confidentiality to the extent possible, consistent with the law and the Company's need to investigate the employee's concern.

It is the Company's policy that any employee who violates this Code will be subject to appropriate discipline, including termination of employment, based upon the facts and circumstances of each particular situation. An employee's conduct, if it does not comply with the law or with this Code, can result in serious consequences for both the employee and the Company.

The Company strictly prohibits retaliation against an employee who, in good faith, seeks help or reports known or suspected violations. An employee inflicting reprisal or retaliation against another employee for reporting a known or suspected violation will be subject to disciplinary action, including termination of employment.

**XV.    WAIVERS OF THE CODE**

Waivers of this Code will be granted on a case-by-case basis and only in extraordinary circumstances. Waivers of this Code may be made only by the Board, or the appropriate committee of the Board, and may be promptly disclosed to the public if so required by applicable laws and regulations and rules of the applicable stock exchange.

## XVI.    CONCLUSION

This Code contains general guidelines for conducting the business of the Company consistent with the highest standards of business ethics. If employees have any questions about these guidelines, they should contact the Compliance Officer. The Company expects all employees to adhere to these standards. Each employee is separately responsible for his/her actions. Conduct that violates the law or this Code cannot be justified by claiming that it was ordered by a supervisor or someone in higher management positions. If an employee engages in conduct prohibited by the law or this Code, such employee will be deemed to have acted outside the scope of his/her employment. The prohibited conduct will subject the employee to disciplinary action, including termination of employment.

* * * * * * * * * * * *

Exhibit 99.2

竞 天 公 诚 律 师 事 务 所
JINGTIAN & GONGCHENG

34/F, Tower 3, China Central Place, 77 Jianguo Road, Beijing 100025, China
Telephone: (86-10) 5809-1000    Facsimile: (86-10) 5809-1100

February 27, 2018

To: iQIYI, Inc.

**Re: Certain PRC Law Matters of iQIYI, Inc. (the "Company")**

Dear Sir/Madam,

We are qualified lawyers of the People's Republic of China (the "**PRC**", for the purpose of issuing this opinion, excluding Hong Kong Special Administration Region, Macau Special Administration Region and Taiwan) and as such are qualified to issue this opinion with respect to all laws, regulations, statutes, rules, decrees, guidelines, notices, and judicial interpretations and other legislations of the PRC currently in force and publicly available as of the date hereof (hereinafter referred to as the "**PRC Laws**").

We are acting as your PRC legal counsel in connection with (a) the proposed initial public offering (the "**Offering**") of certain number of American depositary shares (the "**ADSs**"), each representing certain number of ordinary shares of the Company (the "**Ordinary Shares**"), by the Company as set forth in the Company's registration statement on Form F-1, including all amendments or supplements thereto (the "**Registration Statement**"), filed by the Company with the Securities and Exchange Commission (the "**SEC**") in relation to the Offering, and (b) the proposed listing and trading of the Company's ADSs on the NASDAQ Global Market.

The following terms as used in this opinion are defined as follows.

"**M&A Rules**" means the Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, which was issued by six PRC regulatory agencies, namely, the Ministry of Commerce, the State-owned Assets Supervision and Administration Commission, the State Administration for Taxation, the State Administration for Industry and Commerce, China Securities Regulatory Commission (the "**CSRC**") and the State Administration for Foreign Exchange, on August 8, 2006 and became effective on September 8, 2006, as amended by the Ministry of Commerce on June 22, 2009.

"**PRC Entities**" means the PRC Subsidiaries and the Consolidated Affiliated Entities collectively.

"**PRC Subsidiaries**" means Beijing Qiyi Century Science & Technology Co., Ltd. and Beijing iQiyi New Media Science and Technology Co., Ltd, each a wholly foreign-owned enterprise.

"**Consolidated Affiliated Entities**" means Beijing iQiyi Science & Technology Co., Ltd., Shanghai iQiyi Culture Media Co., Ltd., Shanghai Zhong Yuan Network Co., Ltd., iQiyi Pictures (Beijing) Co., Ltd., and Beijing iQiyi Cinema Management Co., Ltd..

For the purpose of giving this opinion, we have examined the originals or copies, certified or otherwise identified to our satisfaction, of corporate records, agreements, documents and other instruments provided to us and such other documents or certificates issued by governmental authorities or representations made by officials of government authorities or other public organizations and by officers or representatives of the Company as we have deemed necessary and appropriate as a basis for the opinions hereinafter set forth.

In rendering the opinions expressed below, we have assumed:

(a)    the authenticity of the documents submitted to us as originals and the conformity to the originals of the documents submitted to us as copies;

(b)    the truthfulness, accuracy and completeness of all corporate minutes, resolutions and documents of or in connection with the PRC Entities as they were presented to us;

(c)    that the documents and the corporate minutes and resolutions which have been presented to us remain in full force and effect as of the date hereof and have not been revoked, amended, varied or supplemented, except as noted therein;

(d)    in response to our due diligence inquiries, requests and investigation for the purpose of this opinion, all the relevant information and materials that have been provided to us by the Company and the PRC Entities, including all factual statements in the documents and all other factual information provided to us by the Company and the PRC Entities, and the statements made by the Company, the PRC Entities and relevant government officials, are true, accurate, complete and not misleading, and that the Company has not withheld anything that, if disclosed to us, would reasonably cause us to alter this opinion in whole or in part. Where important facts were not independently established to us, we have relied upon certificates issued by governmental authorities and appropriate representatives of the Company and/or other relevant entities and/or upon representations made by such persons in the course of our inquiry and consultation;

(e)     that all parties to the documents provided to us in connection with this opinion, other than the PRC Entities, have the requisite power and authority to enter into, and have duly executed, delivered and/or issued those documents to which they are parties, and have the requisite power and authority to perform their obligations thereunder; and

(f)     with respect to all parties, the due compliance with, and the legality, validity, effectiveness and enforceability under, all laws other than the laws of the PRC.

We do not purport to be experts on and do not purport to be generally familiar with or qualified to express legal opinions on any laws other than the laws of the PRC and accordingly express no legal opinion herein on any laws of any jurisdiction other than the PRC.

Based on the foregoing and subject to the qualifications set out below, we are of the opinion that, as of the date hereof, so far as PRC Laws are concerned:

1.     Based on our understanding of the current PRC Laws, (i) the ownership structures of the Consolidated Affiliated Entities and the PRC Subsidiaries, both currently and immediately after giving effect to the Offering, do not and will not contravene any applicable PRC Laws currently in effect; and (ii) the contractual arrangements among the PRC Subsidiaries, the Consolidated Affiliated Entities and their respective shareholder(s) governed by PRC Laws are valid and binding upon each party to such arrangements and enforceable against each party thereto in accordance with their terms and applicable PRC Laws currently in effect, and will not contravene any PRC Laws currently in effect. However, there are substantial uncertainties regarding the interpretation and application of PRC Laws and future PRC laws and regulations, and there can be no assurance that the PRC regulatory authorities will not take a view that is contrary to or otherwise different from our opinion stated above.

2.     The M&A Rules, among other things, purport to require that an offshore special purpose vehicle controlled directly or indirectly by PRC domestic companies or individuals and formed for purposes of overseas listing through acquisition of PRC domestic interests held by such PRC companies or individuals obtain the approval of the CSRC prior to the listing and trading of such special purpose vehicle's securities on an overseas stock exchange. The CSRC has not issued any definitive rules or interpretations concerning whether offerings such as the Offering are subject to the CSRC approval procedures under the M&A Rules. Based on our understanding of the current PRC Laws, a prior approval from the CSRC is not required under the M&A Rules for the Offering and listing and trading of the ADSs on the NASDAQ Global Market, because, among other things, (i) the PRC Subsidiaries were established by foreign direct investment, rather than through a merger or acquisition of a domestic company as defined under the M&A Rules; and (ii) no explicit provision in the M&A Rules classifies the respective contractual arrangements among the PRC Subsidiaries, the Consolidated Affiliated Entities and their shareholders as a type of acquisition transaction falling under the M&A Rules. However, uncertainties still exist as to how the M&A Rules will be interpreted and implemented and our opinion stated above is subject to any new laws, rules and regulations or detailed implementations and interpretations in any form relating to the M&A Rules.

3. The recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedures Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of PRC Civil Procedures Law based either on treaties between China and the jurisdiction where the judgment is made or on principles of reciprocity between jurisdictions. China does not have any treaties or other form of reciprocity with the United States or the Cayman Islands that provide for the reciprocal recognition and enforcement of foreign judgments. In addition, according to the PRC Civil Procedures Law, courts in the PRC will not enforce a foreign judgment against a company or its directors and officers if they decide that the judgment violates the basic principles of PRC law or national sovereignty, security or public interest. As a result, it is uncertain whether and on what basis a PRC court would enforce a judgment rendered by a court in the United States or the Cayman Islands.

4. The statements made in the Registration Statement under the caption "Taxation—People's Republic of China Taxation," with respect to the PRC tax laws and regulations or interpretations, constitute true and accurate descriptions of the matters described therein in all material aspects and such statements represent our opinion.

5. To the best of our knowledge after due and reasonable inquiry, the statements set forth in the Registration Statement under the captions "Prospectus Summary," "Risk Factors," "Use of Proceeds," "Dividend Policy," "Enforceability of Civil Liabilities," "Corporate History and Structure," "Business," "Regulation," and "Taxation", in each case insofar as such statements describe or summarize PRC legal or regulatory matters, are true and accurate in all material aspects, and correctly set forth therein, and nothing has come to our attention, insofar as the PRC Laws are concerned, that causes us to believe that there is any omission which will cause such statements misleading in any material respect.

The foregoing opinion is further subject to the following qualifications:

(a) we express no opinion as to any Laws other than the PRC Laws in force on the date of this opinion;

(b) the PRC Laws referred to herein are Laws currently in force and there is no guarantee that any of such Laws, or the interpretation thereof or enforcement therefore, will not be changed, amended or replaced in the immediate future or in the longer term with or without retrospective effect;

(c)     this opinion is intended to be used in the context which is specifically referred to herein and each section should be looked on as a whole regarding the same subject matter; and

(d)     this opinion is subject to the effects of (i) certain legal or statutory principles affecting the validity and enforceability of contractual rights generally under the concepts of public interest, social ethics, national security, good faith, fair dealing, and applicable statutes of limitation; (ii) any circumstance in connection with formulation, execution or performance of any legal documents that would be deemed materially mistaken, clearly unconscionable, fraudulent, coercionary or concealing illegal intentions with a lawful form; (iii) judicial discretion with respect to the availability of indemnifications, remedies or defenses, the calculation of damages, the entitlement to attorney's fees and other costs, and the waiver of immunity from jurisdiction of any court or from legal process; and (iv) the discretion of any competent PRC legislative, administrative or judicial bodies in exercising their authority in the PRC.

This opinion is delivered in our capacity as the Company's PRC legal counsel solely for the purpose of the Registration Statement publicly submitted to the SEC on the date of this opinion and may not be used for any other purpose without our prior written consent.

We hereby consent to the use of this opinion in, and the filing hereof as an exhibit to, the Registration Statement, and to the reference to our name in such Registration Statement. We do not thereby admit that we fall within the category of the persons whose consent is required under Section 7 of the U.S. Securities Act of 1933, as amended, or the regulations promulgated thereunder.

Yours faithfully,
/s/ Jingtian & Gongcheng

Jingtian & Gongcheng

**Exhibit 99.3**

December 29, 2017

iQIYI, Inc.
9/F, iQIYI Innovation Building
No.2 Haidian North First Street, Haidian District, Beijing 100080
People's Republic of China

Re: Consent of iResearch Consulting Group

Ladies and Gentlemen,

We understand that iQIYI, Inc. (the "Company") plans to file a registration statement on Form F-1 (the "Registration Statement") with the United States Securities and Exchange Commission (the "SEC") in connection with its proposed initial public offering (the "Proposed IPO").

We hereby consent to the references to our name and the inclusion of information, data and statements from our research reports and amendments thereto, including but not limited to the Chinese version and the English translation of the industry research reports titled "Project Star Industry Report" (collectively, the "Reports"), and any subsequent amendments to the Reports, as well as the citation of our research reports and amendments thereto, (i) in the Registration Statement and any amendments thereto, (ii) in any written correspondences with the SEC, (iii) in any other future filings with the SEC by the Company, including, without limitation, filings on Form 20-F, Form 6-K or other SEC filings (collectively, the "SEC Filings"), (iv) on the websites of the Company and its subsidiaries and affiliates, (v) in institutional and retail road shows and other activities in connection with the Proposed IPO, and (vi) in other publicity materials in connection with the Proposed IPO.

We further hereby consent to the filing of this letter as an exhibit to the Registration Statement and any amendments thereto and as an exhibit to any other SEC Filings.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the U.S. Securities Act of 1933, as amended, or the rules and regulations of the SEC thereunder.

For and on behalf of Shanghai iResearch Co., Ltd., China

/s/ Shanghai iResearch Co., Ltd.

**Exhibit 99.4**

February 27, 2018

**iQIYI, Inc. (the "Company")**
9/F, iQIYI Innovation Building
No. 2, Haidian North 1st Street
Haidian District, Beijing 100080, PRC
Fax: 86-10-6267 7000
+(86) 10 6267 7171

Ladies and Gentlemen:

Pursuant to Rule 438 under the Securities Act of 1933, as amended, I hereby consent to the reference of my name as a director of the Company, effective immediately upon the effectiveness of the Company's registration statement on Form F-1 initially filed by the Company on February 27, 2018 with the U.S. Securities and Exchange Commission.

Sincerely yours,

/s/ Sam Hanhui Sun
Name: Sam Hanhui Sun