# Exhibit R

Case 1:20-cv-01830-DG-TAM    Document 160-18    Filed 03/03/23    Page 2 of 487 PageID #: 7832

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
## Form 20-F

(Mark One)

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**or**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015.**

**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**or**

☐    **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report**

Commission file number: 000-51469

# Baidu, Inc.
**(Exact name of Registrant as specified in its charter)**

**N/A**
**(Translation of Registrant's name into English)**

**Cayman Islands**
**(Jurisdiction of incorporation or organization)**

**Baidu Campus**
**No. 10 Shangdi 10th Street**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Address of principal executive offices)**

**Jennifer Xinzhe Li, Chief Financial Officer**
**Telephone: +(86 10) 5992-8888**
**Email: ir@baidu.com**
**Facsimile: +(86 10) 5992-0000**
**Baidu Campus**
**No. 10 Shangdi 10th Street,**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)**

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American depositary shares (ten American depositary shares representing one Class A ordinary share, par value US$0.00005 per share) | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |
| Class A ordinary shares, par value US$0.00005 per share* | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |

\*    Not for trading, but only in connection with the listing on The NASDAQ Global Select Market of American depositary shares.

Securities registered or to be registered pursuant to Section 12(g) of the Act:
**None**
**(Title of Class)**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
**None**
**(Title of Class)**

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**27,113, 541 Class A ordinary shares and 7,492,921 Class B ordinary shares, par value US$0.00005 per share, as of December 31, 2015.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    Yes ☐    No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒     International Financial Reporting Standards as issued by the International Accounting Standards Board ☐     Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐

Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.    Yes ☐    No ☐

**TABLE OF CONTENTS**

| | Page |
|---|---|
| INTRODUCTION | 1 |
| FORWARD-LOOKING INFORMATION | 1 |
| PART I | 2 |
|   Item 1.   Identity of Directors, Senior Management and Advisers | 2 |
|   Item 2.   Offer Statistics and Expected Timetable | 2 |
|   Item 3.   Key Information | 2 |
|   Item 4.   Information on the Company | 40 |
|   Item 4A.   Unresolved Staff Comments | 74 |
|   Item 5.   Operating and Financial Review and Prospects | 74 |
|   Item 6.   Directors, Senior Management and Employees | 103 |
|   Item 7.   Major Shareholders and Related Party Transactions | 112 |
|   Item 8.   Financial Information | 113 |
|   Item 9.   The Offer and Listing | 114 |
|   Item 10.   Additional Information | 116 |
|   Item 11.   Quantitative and Qualitative Disclosures about Market Risk | 124 |
|   Item 12.   Description of Securities Other than Equity Securities | 125 |
| PART II | 127 |
|   Item 13.   Defaults, Dividend Arrearages and Delinquencies | 127 |
|   Item 14.   Material Modifications to the Rights of Security Holders and Use of Proceeds | 127 |
|   Item 15.   Controls and Procedures | 127 |
|   Item 16A.   Audit Committee Financial Expert | 127 |
|   Item 16B.   Code of Ethics | 128 |
|   Item 16C.   Principal Accountant Fees and Services | 128 |
|   Item 16D.   Exemptions from the Listing Standards for Audit Committees | 128 |
|   Item 16E.   Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 129 |
|   Item 16F.   Change in Registrant's Certifying Accountant | 129 |
|   Item 16G.   Corporate Governance | 129 |
|   Item 16H.   Mine Safety Disclosure | 129 |
| PART III | 130 |
|   Item 17.   Financial Statements | 130 |
|   Item 18.   Financial Statements | 130 |
|   Item 19.   Exhibits | 130 |
| SIGNATURES | 137 |

## INTRODUCTION

In this annual report, except where the context otherwise requires and for purposes of this annual report only:

- "we," "us," "our company," "our," or "Baidu" refers to Baidu, Inc., its subsidiaries, and, in the context of describing our operations and consolidated financial information, our consolidated affiliated entities in China, including but not limited to Beijing Baidu Netcom Science Technology Co., Ltd., or Baidu Netcom;

- "user traffic" or "traffic" refers generally to page views and the reach of a website, with "page views" measuring the number of web pages viewed by internet users over a specified period of time except that multiple page views of the same page viewed by the same user on the same day are counted only once, and "reach" measuring the number of internet users and typically expressed as the percentage of all internet users who visit a given website;

- "China" or "PRC" refers to the People's Republic of China, and solely for the purpose of this annual report, excluding Taiwan, Hong Kong and Macau;

- "shares" or "ordinary shares" refers to our ordinary shares, which include both Class A ordinary shares and Class B ordinary shares;

- "ADSs" refers to our American depositary shares, and we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share on May 12, 2010, which has the same effect as a 10-for-1 ADS split;

- "U.S. GAAP" refers to generally accepted accounting principles in the United States;

- "RMB" or "Renminbi" refers to the legal currency of China;

- "$," "dollars," "US$" or "U.S. dollars" refers to the legal currency of the United States; and

- all discrepancies in any table between the amounts identified as total amounts and the sum of the amounts listed therein are due to rounding.


## FORWARD-LOOKING INFORMATION

This annual report on Form 20-F contains forward-looking statements that reflect our current expectations and views of future events. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. You can identify these forward-looking statements by terminology such as "may," "will," "expect," "anticipate," "future," "intend," "plan," "believe," "estimate," "is/are likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to:

- our growth strategies;

- our future business development, results of operations and financial condition;

- our ability to attract and retain users and customers and generate revenue and profit from our customers;

- our ability to retain key personnel and attract new talent;

- competition in the internet search, online marketing and other businesses in which we engage;

- the outcome of ongoing or any future litigation, including those relating to intellectual property rights; and

1

- PRC governmental regulations and policies relating to the internet and internet search providers and to the implementation of a corporate structure involving variable interest entities in China.

We would like to caution you not to place undue reliance on these forward-looking statements and you should read these statements in conjunction with the risk factors disclosed in "Item 3D. Key Information—Risk Factors." Those risks are not exhaustive. We operate in a rapidly evolving environment. New risks emerge from time to time and it is impossible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ from those contained in any forward-looking statement. We do not undertake any obligation to update or revise the forward-looking statements except as required under applicable law.

## PART I

### Item 1.    Identity of Directors, Senior Management and Advisers

Not applicable.

### Item 2.    Offer Statistics and Expected Timetable

Not applicable.

### Item 3.    Key Information

#### A.    Selected Financial Data

The following table presents the selected consolidated financial information for our company. The selected consolidated statements of comprehensive income data for the three years ended December 31, 2013, 2014 and 2015 and the consolidated balance sheets data as of December 31, 2014 and 2015 have been derived from our audited consolidated financial statements, which are included in this annual report beginning on page F-1. The selected consolidated statements of comprehensive income data for the years ended December 31, 2011 and 2012 and the selected consolidated balance sheets data as of December 31, 2011, 2012 and 2013 have been derived from our audited consolidated financial statements for the years ended December 31, 2011, 2012 and 2013, which are not included in this annual report, with certain adjustment being made to the selected consolidated balance sheet data as of December 31, 2013 as a result of our exchange of shares in Qunar Cayman Islands Limited, or Qunar, with Ctrip.com International, Ltd., or Ctrip. Our historical results do not necessarily indicate results expected for any future periods. The selected consolidated financial data should be read in conjunction with, and are qualified in their entirety by reference to, our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" below. Our audited consolidated financial statements are prepared and presented in accordance with U.S. GAAP.

| | **2011** | **2012** | **2013** | **2014** | **2015** | |
|---|---|---|---|---|---|---|
| | | | | | **For the Years Ended December 31,** | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | | | (In thousands except per share and per ADS data) | | | |
| **Consolidated Statements of Comprehensive Income Data** | | | | | | |
| Revenues: | | | | | | |
| Online marketing services ...... | 14,489,767 | 22,245,643 | 31,802,219 | 48,495,215 | 64,037,006 | 9,885,610 |
| Others ..................... | 11,019 | 60,383 | 141,705 | 557,103 | 2,344,723 | 361,963 |
| Total revenues ................... | 14,500,786 | 22,306,026 | 31,943,924 | 49,052,318 | 66,381,729 | 10,247,573 |
| Operating costs and expenses: | | | | | | |
| Cost of revenues ............. | (3,896,883) | (6,448,545) | (11,471,839) | (18,885,450) | (27,458,030) | (4,238,789) |
| Selling, general and administrative ............. | (1,692,810) | (2,501,336) | (5,173,533) | (10,382,142) | (17,076,383) | (2,636,139) |
| Research and development ..... | (1,334,434) | (2,304,825) | (4,106,832) | (6,980,962) | (10,175,762) | (1,570,867) |
| Total operating costs and expenses ... | (6,924,127) | (11,254,706) | (20,752,204) | (36,248,554) | (54,710,175) | (8,445,795) |
| Operating profit ................. | 7,576,659 | 11,051,320 | 11,191,720 | 12,803,764 | 11,671,554 | 1,801,778 |
| Interest income ................. | 418,201 | 866,465 | 1,308,542 | 1,992,818 | 2,362,632 | 364,728 |
| Interest expense ................. | (82,551) | (107,857) | (447,084) | (628,571) | (1,041,394) | (160,764) |
| Income (loss) from equity method investments .................. | (179,408) | (294,229) | 22,578 | (19,943) | 3,867 | 597 |
| Other income, net, including exchange gains or losses ................ | 76,278 | 449,738 | 140,951 | 336,338 | 24,909,964 | 3,845,435 |
| Income before income taxes ........ | 7,809,179 | 11,965,437 | 12,216,707 | 14,484,406 | 37,906,623 | 5,851,774 |
| Income taxes .................... | (1,188,861) | (1,574,159) | (1,828,930) | (2,231,172) | (5,474,377) | (845,098) |
| Net income ..................... | 6,620,318 | 10,391,278 | 10,387,777 | 12,253,234 | 32,432,246 | 5,006,676 |
| Less: Net loss attributable to non-controlling interests ............. | (18,319) | (64,750) | (162,880) | (943,698) | (1,231,927) | (190,177) |
| Net income attributable to Baidu, Inc. ......................... | 6,638,637 | 10,456,028 | 10,550,657 | 13,196,932 | 33,664,173 | 5,196,853 |
| Earnings per share for Class A and Class B ordinary shares[1] | | | | | | |
| Basic ......................... | 190.27 | 298.62 | 300.66 | 374.88 | 954.56 | 147.36 |
| Diluted ........................ | 189.88 | 298.29 | 300.23 | 373.43 | 951.49 | 146.88 |
| Earnings per ADS (1 Class A ordinary share is represented by 10 ADSs) | | | | | | |
| Basic ......................... | 19.03 | 29.86 | 30.07 | 37.49 | 95.46 | 14.74 |
| Diluted ........................ | 18.99 | 29.83 | 30.02 | 37.34 | 95.15 | 14.69 |

(1)  As holders of Class A and Class B ordinary shares have the same dividend right and the same participation right in our undistributed earnings, the basic and diluted net income per Class A ordinary share and Class B ordinary share are the same for all the periods presented during which there were two classes of ordinary shares. The weighted average number of ordinary shares represents the sum of the weighted average number of Class A and Class B ordinary shares. Please see "Earnings Per Share" under Note 17 to our audited consolidated financial statements included in this annual report for additional information regarding the computation of the per share amounts and the weighted average numbers of Class A and Class B ordinary shares.

|  | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2011** | **2012** | **2013** | **2014** | **2015** | |
|  | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
|  | | | (In thousands) | | | |
| **Consolidated Balance Sheets Data:** | | | | | | |
| Cash and cash equivalents | 4,127,482 | 11,880,632 | 9,691,797 | 13,852,725 | 9,959,932 | 1,537,549 |
| Restricted cash | 483,387 | 395,029 | 259,533 | 413,010 | 95,997 | 14,819 |
| Short-term investments | 10,051,578 | 20,604,223 | 27,481,642 | 42,698,831 | 57,969,242 | 8,948,909 |
| Goodwill | 2,419,542 | 3,877,564 | 16,864,350 | 17,418,895 | 15,395,573 | 2,376,667 |
| Long-term investments, net | 734,360 | 803,499 | 1,259,473 | 3,544,923 | 37,958,591 | 5,859,797 |
| Total assets | 23,340,541 | 45,668,890 | 70,357,365 | 99,118,062 | 147,853,308 | 22,824,616 |
| Total liabilities | 7,015,028 | 18,453,765 | 30,320,538 | 45,065,679 | 63,637,592 | 9,823,952 |
| Total Baidu, Inc. shareholders' equity | 15,291,716 | 26,055,229 | 37,796,492 | 51,072,424 | 80,255,663 | 12,389,338 |
| Total equity | 15,389,535 | 26,181,842 | 40,036,827 | 52,157,881 | 80,267,837 | 12,391,217 |

### Exchange Rate Information

Our business is primarily conducted in China and almost all of our revenues are denominated in RMB. However, periodic reports made to shareholders will include current period amounts translated into U.S. dollars using the then current exchange rates, for the convenience of the readers. The conversion of RMB into U.S. dollars in this annual report is based on the noon buying rate in New York City for cable transfers in RMB as certified for customs purposes by the Federal Reserve Board. Unless otherwise noted, all translations from RMB to U.S. dollars and from U.S. dollars to RMB in this annual report were made at a rate of RMB6.4778 to US$1.00, the noon buying rate in effect as of December 31, 2015. We make no representation that any RMB or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or RMB, as the case may be, at any particular rate, or at all. The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of RMB into foreign exchange and through restrictions on foreign trade. On April 1, 2016, the noon buying rate was RMB6.4776 to US$1.00.

The following table sets forth information concerning exchange rates between the RMB and the U.S. dollar for the periods indicated.

|  | Noon Buying Rate | | | |
|---|---|---|---|---|
| **Period** | **Period-End** | **Average** | **Low** | **High** |
|  | (RMB per U.S. Dollar) | | | |
| 2011 | 6.2939 | 6.4475 | 6.6364 | 6.2939 |
| 2012 | 6.2301 | 6.2990 | 6.3879 | 6.2221 |
| 2013 | 6.0537 | 6.1412 | 6.2438 | 6.0537 |
| 2014 | 6.2046 | 6.1704 | 6.2591 | 6.0402 |
| 2015 | 6.4778 | 6.2869 | 6.4896 | 6.1870 |
| October | 6.3180 | 6.3505 | 6.3591 | 6.3180 |
| November | 6.3883 | 6.3640 | 6.3945 | 6.3180 |
| December | 6.4778 | 6.4491 | 6.4896 | 6.3883 |
| 2016 | | | | |
| January | 6.5752 | 6.5726 | 6.5932 | 6.5219 |
| February | 6.5525 | 6.5501 | 6.5795 | 6.5154 |
| March | 6.4480 | 6.5027 | 6.5500 | 6.4480 |
| April (through April 1, 2016) | 6.4776 | 6.4776 | 6.4776 | 6.4776 |

Source: Federal Reserve Statistical Release

(1)  Annual averages are calculated using the average of month-end rates of the relevant year. Monthly averages are calculated using the average of the daily rates during the relevant period.

**B.    Capitalization and Indebtedness**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds**

Not applicable.

**D.    Risk Factors**

**Risks Related to Our Business**

*If we fail to retain existing customers or attract new customers for our online marketing services, our business, results of operations and growth prospects could be seriously harmed.*

We generate substantially all of our revenues from online marketing services, a substantial majority of which are derived from our pay-for-performance, or P4P, services. Our online marketing customers will not continue to do business with us if their investment does not generate sales leads and ultimately consumers, or if we do not deliver their web pages in an appropriate and effective manner. Our P4P customers may choose to discontinue their business with us, which are not subject to fixed-term contracts. We have in the past removed, and may in the future again remove, questionable paid search listings of some customers to ensure the quality and reliability of our search results. Such removal, whether temporary or permanent, may cause the affected customers to discontinue their business with us. In addition, third parties may develop and use certain technologies to block the display of our customers' advertisements and other marketing products on our *Baidu.com* website, which may in turn cause us to lose customers and adversely affect our results of operations. Furthermore, we adjust prices for some of our online marketing services from time to time. We may lose customers who decide not to pay for our increased prices. Failure to retain our existing customers or attract new customers for our online marketing services could seriously harm our business, results of operations and growth prospects.

In recent years, we have generated an increasing amount of online marketing revenues from online advertising. We believe our large user base and traffic provide advertisers with a broad reach and optimal monetization results. However, we cannot assure you that we will be able to continue to attract new advertisers or retain our existing advertisers. If our advertisers determine that their expenditures on our websites do not generate expected returns, they may allocate a portion or all of their advertising budgets to other advertising channels such as television and outdoor media and reduce or discontinue business with us. Since most of our advertisers are not bound by long-term contracts, they may amend or terminate advertising arrangements with us easily without incurring liabilities. Failure to retain existing advertisers or attract new ones to advertise on our websites may materially and adversely affect our business, financial condition, results of operations and prospects.

*If online marketing does not further grow in China, our ability to increase revenue and profitability could be materially and adversely affected.*

The use of the internet as a marketing channel is at a developing stage in China. Internet penetration rate in China is relatively low as compared to that in most developed countries. Many of our current and potential customers have limited experience with the internet as a marketing channel, and historically have not devoted a significant portion of their marketing budgets to online marketing and promotion. As a result, they may not consider the internet to be an effective channel to promote their products and services as compared to traditional print and broadcast media. Our ability to increase revenue and profitability from online marketing on PC and mobile internet may be adversely impacted by a number of factors, many of which are beyond our control, including:

- difficulties associated with developing a larger user base with demographic characteristics attractive to online marketing customers;

- increased competition and potential downward pressure on online marketing prices;

- higher customer acquisition costs due in part to the limited experience of small to medium-sized enterprises, or SMEs, with the internet as a marketing channel;

- failure to develop an independent and reliable means of verifying online traffic;

- ineffectiveness of our online marketing delivery, tracking and reporting systems; and

- decreased use of internet or online marketing in China.

***Our business depends on a strong brand, and if we are not able to maintain and enhance our brand, our business and results of operations may be harmed.***

We believe that our brand "Baidu" has contributed significantly to the success of our business. We also believe that maintaining and enhancing the "Baidu" brand is critical to increasing the number of our users, customers and Baidu Union members. We have conducted various marketing and brand promotion activities, but we cannot assure you that these activities will achieve the brand promotion effect expected by us. If we fail to maintain and further promote the "Baidu" brand, or if we incur excessive expenses in this effort, our business and results of operations may be materially and adversely affected.

In addition, any negative publicity about our company, our products and services, our employees, our business practices, or our search results or the websites to which our search results link, regardless of its veracity, could harm our brand image and in turn adversely affect our business and results of operations. We cannot assure you that we will be able to defuse negative publicity to the satisfaction of our investors, users, customers and business partners. From time to time, there have been negative publicities about our company and our business practice, which adversely affected our public image and reputation during the period of certain intense negative publicities. Intense negative publicities may divert our management's attention and may adversely impact our business, and we cannot assure you that our brand, public image and reputation will not be materially and adversely affected.

***We face significant competition and may suffer from loss of users and customers as a result.***

We face significant competition in almost every aspect of our business, including competition from other companies that seek to provide internet search services to users and provide online marketing services to customers, as well as other companies that provide transaction or internet video services. In the Chinese internet market, our main competitors include China-based internet companies, such as Tencent, Alibaba and Qihoo 360. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance), safety and user experience of the search results, availability and ease of use of products and services, the number of customers, distribution channels and the number of associated third-party websites/wapsites. For transaction services, our primary competitors include China-based internet companies such as Meituan-Dianping and Koubei. For iQiyi, our primary competitors include companies that operate online video websites in China, such as Youku-Tudou and Tencent Video. Some of our competitors have significant financial resources, long operating histories and are experienced in attracting and retaining users and managing customers. They may use their experience and resources to compete with us in a variety of ways, including by competing more heavily for users, customers, distributors, merchants, content, strategic partners and networks of third-party websites/wapsites, investing more heavily in research and development and making acquisitions. If any of our competitors provides comparable or better Chinese language search experience, transaction services or internet video services, our user traffic could decline significantly. Additionally, if the channels that we use to distribute services or products to our users and customers are no longer available to us, we may experience a decline in user traffic. Any such decline in traffic could weaken our brand and result in loss of users and customers, which would have a material and adverse effect on our results of operations.

We also face competition from other types of advertising media, such as newspapers, magazines, yellow pages, billboards, other forms of outdoor media, television, radio and mobile applications. Large companies in

China generally allocate, and may continue to allocate, most of their marketing budgets to traditional advertising media and only a limited portion of their budgets to online marketing and other forms of advertising media. If these companies do not devote a larger portion of their marketing budgets to online marketing services provided by us, or if our existing customers reduce the amount they spend on online marketing, our results of operations and growth prospects could be adversely affected.

***If our expansions into new internet businesses are not successful, our future results of operations and growth prospects may be materially and adversely affected.***

As part of our growth strategy, we enter into new internet businesses from time to time by leveraging our large internet user base to generate additional revenue streams and through our development of new business lines or strategic investments in or acquisitions of other businesses. Expansions into new businesses may present operating and marketing challenges that are different from those that we currently encounter. For each new business we enter into, we face competition from existing leading players in that business. If we cannot successfully activate our user base by addressing the new challenges and providing service of exceptional quality, we may not be able to compete effectively against the existing leading players, recover costs incurred for investing in, developing and marketing new businesses, and eventually achieve profitability from these businesses, and our future results of operations and growth prospects may be materially and adversely affected.

***If we fail to continue to innovate and provide products and services to attract and retain users, we may not be able to generate sufficient user traffic levels to remain competitive.***

Our success depends on providing products and services to attract users and enable users to have a high-quality internet experience. In order to attract and retain users and compete against our competitors, we must continue to invest significant resources in research and development to enhance our internet search technology, improve our existing products and services and introduce additional high-quality products and services. If we are unable to anticipate user preferences or industry changes, or if we are unable to enhance the quality of our products and services on a timely basis or fail to provide sufficient content, we may lose users. Our results of operations may also suffer if our innovations do not respond to the needs of our users, are not appropriately timed with market opportunities or are not effectively brought to market. As search technology continues to develop and mobile devices and applications are increasingly used to access the internet, our competitors may be able to offer products and services that are, or that are perceived to be, substantially similar to or better than those provided by us. This may force us to expend significant resources in research and development and strategic investments and acquisitions in order to remain competitive.

***If we fail to keep up with rapid changes in technologies and user behavior, our future success may be adversely affected.***

Our future success will depend on our ability to respond to rapidly changing technologies, adapt our products and services to evolving industry standards and improve the performance and reliability of our products and services. Our failure to adapt to such changes could harm our business. In addition, changes in user behavior resulting from technological developments may also adversely affect us. For example, the number of people accessing the internet through mobile devices, including mobile phones, tablets and other hand-held devices, has increased in recent years, and we expect this trend to continue while 3G/4G and more advanced mobile communications technologies are broadly implemented. If we fail to develop products and technologies that are compatible with all mobile devices and operating systems, or if the products and services we develop are not widely accepted and used by users of various mobile devices and operating systems, our further penetration in the mobile internet market may be hindered. In addition, the widespread adoption of new internet, networking or telecommunications technologies or other technological changes could require substantial expenditures to modify or integrate our products, services or infrastructure. If we fail to keep up with rapid technological changes to remain competitive, or consequently fail to retain users with products and service of exceptional quality, our future success may be adversely affected.

*Interruption or failure of our own information technology and communications systems or those of third-party service providers we rely upon could impair our ability to provide products and services, which could damage our reputation and harm our results of operations.*

Our ability to provide products and services depends on the continuing operation of our information technology and communications systems. Any damage to or failure of our systems could interrupt our services. Service interruptions could reduce our revenues and profits and damage our brand if our systems are perceived to be unreliable. Our systems are vulnerable to damage or interruption as a result of terrorist attacks, wars, earthquakes, floods, fires, power loss, telecommunications failures, undetected errors or "bugs" in our software, computer viruses, interruptions in access to our websites through the use of "denial of service" or similar attacks, hacking or other attempts to harm our systems, and similar events. Some of our systems are not fully redundant, and our disaster recovery planning does not account for all possible scenarios. In May 2014, the service of our Baidu Cloud was inaccessible to some users for approximately four hours due to a failure of the internet infrastructure.

Our servers, which are hosted at third-party or our own internet data centers, are vulnerable to break-ins, sabotage and vandalism. The occurrence of natural disasters or closure of an internet data center by a third-party provider without adequate notice could result in lengthy service interruptions. In addition, our domain names are resolved into internet protocol (IP) addresses by systems of third-party domain name registrars and registries. Any interruptions or failures of those service providers' systems, which are beyond our control, could significantly disrupt our own services. If we experience frequent or persistent system failures on our websites, whether due to interruptions and failures of our own information technology and communications systems or those of third-party service providers that we rely upon, our reputation and brand could be severely harmed. The steps we take to increase the reliability and redundancy of our systems may cause us to incur heavy costs and reduce our operating margin, and may not be successful in reducing the frequency or duration of service interruptions.

*More people are using devices other than personal computers to access the internet. If users do not widely adopt versions of our web search technology, products and services developed for these devices, our business could be adversely affected.*

The number of people who access the internet through devices other than personal computers, including mobile phones, smartphones, handheld computers and other tablets such as iPad, and television set-top devices, is increasing dramatically. The varying display sizes, functionality, and memory associated with some alternative devices may require us to tailor the user experience and interfaces to those devices and the versions of our products and services developed for these devices may not be compelling to users, manufacturers, or distributors of devices. Each manufacturer or distributor may establish unique technical standards for its devices, and our products and services may not work or be accessible on these devices. Some manufacturers may also elect not to include our products on their devices. In addition, user time spent on search queries is being divided across "apps" tailored to particular devices or social media platforms. A shift in user behavior to perform search queries on other apps rather than a search engine could affect our share of the search market over time. As new devices and new platforms are continually being released, it is difficult to predict the future channels to access search. We may encounter challenges in developing versions of our products and services for use on these alternative devices, and we may need to devote significant resources to the creation, support, and maintenance of our products and services tailored for such devices. If we are unable to attract and retain a substantial number of alternative device manufacturers, distributors, and users to adopt and use our products and services, or if we are slow to develop products and technologies that are more compatible with alternative devices, we may fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business.

*We may not be able to manage our expanding operations effectively.*

We have significantly expanded our operations in recent years. We expect this expansion trend to continue as we grow our user and customer base and explore new opportunities. To manage the further expansion of our

8

business and growth of our operations and personnel, we need to continually improve our operational and financial systems, procedures and controls, and expand, train, manage and maintain good relations with our growing employee base. We have experienced labor disputes in the past. Although these disputes were resolved promptly, we cannot assure you that there will not be any new labor dispute in the future. In addition, we must maintain and expand our relationships with other websites, internet companies and other third parties. Our current and future personnel, systems, procedures and controls may not be adequate to support our expanding operations. In addition, as we expand into certain new businesses, such as internet finance, we may be required to apply for specific operation permits to be qualified to conduct the business. We are in the process of applying for such permits but we cannot assure you that we will be able to obtain them in a timely manner, if at all.

*We may face intellectual property infringement claims and other related claims that could be time-consuming and costly to defend and may result in an adverse impact over our operations.*

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement of intellectual property rights, unfair competition, invasion of privacy, defamation and other violations of other parties' rights. The validity, enforceability and scope of protection of intellectual property in internet-related industries, particularly in China, are uncertain and still evolving. As we face increasing competition and as litigation becomes more common in China in resolving commercial disputes, we face a higher risk of being the subject of intellectual property infringement claims. We may be subject to administrative actions brought by the PRC State Copyright Bureau and in the most severe scenario criminal prosecution for alleged copyright infringement, and as a result may be subject to fines and other penalties and be required to discontinue infringing activities. Furthermore, as we expand our operations outside of China, we may be subject to claims brought against us in jurisdictions outside of China.

Our search products and services, such as Baidu Video Search, link to materials in which third parties may claim ownership of trademarks, copyrights or other rights. Our audio and video player, Baidu Media Player, enables users to play multimedia files, which may be protected by copyright or other intellectual property rights. In addition, as we adopt new technologies and roll out new products and services, we face the risk of being subject to intellectual property infringement claims that may arise from our use of new technologies and provision of new products and services. Our products and services including those based on cloud computing technology, such as Baidu Cloud, Baidu WenKu and Baidu Post Bar, allow our users to upload, store and share documents, images, audios and videos on our servers, or share, link to or otherwise provide access to contents from other websites, and we also operate distribution platforms whereby developers can upload, share and sell their applications or games to users. Although we have made commercially reasonable efforts to request users or developers to comply with applicable intellectual property laws, we cannot ensure that all of our users or developers have the rights to upload or share these contents or applications. In addition, we have been and may continue to be subject to copyright or trademark infringement and other related claims from time to time, in China and internationally.

We have been making continuous efforts to keep ourselves informed of and to comply with all applicable laws and regulations affecting our business. However, PRC laws and regulations are evolving, and uncertainties still exist with respect to the legal standards as well as the judicial interpretation of the standards for determining liabilities of internet search and other internet service providers for providing links to contents on third-party websites that infringe upon others' copyrights or hosting such contents, or providing information storage space, file sharing technology or other internet services that are used by internet users to disseminate such contents. The Supreme People's Court of China promulgated a judicial interpretation on infringement of the right of dissemination through internet in December 2012. This judicial interpretation, like certain court rulings and certain other judicial interpretations, provide that the courts will place the burden on internet service providers to remove not only links or contents that have been specifically mentioned in the notices of infringement from right holders, but also links or contents they "should have known" to contain infringing content. The interpretation further provides that where an internet service provider has directly obtained economic benefits from any contents made available by an internet user, it has a higher duty of care with respect to internet users' infringement of third-party copyrights. A guidance on the trial of audio/video sharing copyright disputes promulgated by the Higher People's Court of Beijing in December 2012 provides that where an internet service

provider has directly obtained economic benefits from any audio/video contents made available by an internet user who has no authorization for sharing such contents, the internet service provider shall be presumed to be at fault. These interpretations could subject us and other internet service providers to significant administrative burdens and litigation risks.

We conduct our business operations primarily in China. There might be claims that we are subject to U.S. copyright laws, including the legal standards for determining indirect liability for copyright infringement, although we believe such claims are without merits. We cannot assure you that we will not be subject to copyright infringement lawsuits or other proceedings in the U.S. or elsewhere in the future.

Intellectual property litigation is expensive and time-consuming and could divert resources and management attention from the operations of our business. We are currently named as a defendant in some copyright infringement suits in connection with our Baidu Music, P4P, Baidu Post Bar, Baidu Cloud, Baidu Nuomi, iQiyi and certain other products or services. See "Item 8.A. Financial Information—Consolidated Statements and Other Financial Information—Legal Proceedings." There is no guarantee that the competent courts will accept our defenses and rule in our favor. If there is a successful claim of infringement, we may be required to discontinue the infringing activities, pay substantial fines and damages and/or enter into royalty or license agreements that may not be available on commercially acceptable terms, if at all. Our failure to obtain a license of the rights on a timely basis could harm our business. Any intellectual property litigation by third parties and/or negative publicity alleging our intellectual property infringement could have an adverse effect on our business, reputation, financial condition or results of operations. To address the risks relating to intellectual property infringement, we may have to substantially modify, limit or terminate some of our search services. Any such change could materially affect user experience and in turn have an adverse impact on our business.

***We have been and may again be subject to claims based on the content found on our websites, the results in our paid search listings or other products and services we offer.***

In addition to the content developed by ourselves and posted on our websites, our users are free to post information on Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, Baidu WenKu and other sections of our websites, and our P4P customers may create text-based descriptions, image descriptions and other phrases to be used as text, image or keywords in our search listings, and users can also use our personal cloud computing service, Baidu Cloud, to upload, store and share documents, images, audios and videos on our cloud servers. We have been and may continue to be subject to claims for intellectual property infringement, defamation, negligence or other legal theories based on the content found on our websites, the results in our paid search listings or our other products and services, which, with or without merit, may result in diversion of management attention and financial resources and negative publicity on our brand and reputation. See "Item 8.A. Financial Information—Consolidated Statements and Other Financial Information—Legal Proceedings." Furthermore, if the content posted on our websites or found, stored or shared through our other products and services contains information that government authorities find objectionable, our websites or relevant products or services may be shut down and we may be subject to other penalties. See "—Risks Related to Doing Business in China—Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our websites and negative publicity in international media."

Under PRC advertising laws and regulations, we are obligated to monitor the advertising content posted on our websites to ensure that such content is fair and accurate and in compliance with applicable law. In addition, where a special government review is required for specific categories of advertisements before posting, we are obligated to confirm that such review has been performed and approval has been obtained. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations on Advertisements." Our P4P services are not subject to PRC advertising laws and regulations, because PRC laws and regulations and administrative authorities currently do not classify P4P services as a form of online advertising. However, in July 2015, the State Administration for Industry and Commerce promulgated the Interim Measures for the

Supervision and Administration of Online Advertising (Draft for Comment), or the Draft Online Advertising Measures, for seeking comments. The Draft Online Advertising Measures classifies "paid search results" as a form of online advertising and require search engine service providers to clearly identify any paid search results to avoid causing any confusion to customers. The Draft Online Advertising Measures also requires internet information service providers to examine business licenses of advertisers, advertising operators and advertising distributors using the service providers' internet media resources and other qualifications that the goods or services being advertised are subject to. If an internet information service provider has the right to decide the content of the online advertisements or the online advertisements are directly displayed or stored on the internet service provider's websites or other internet media resources, the internet information service provider will also be obligated to examine content of the online advertisements in accordance with PRC advertising laws and regulations. There are substantial uncertainties as to if and when the Draft Online Advertising Measures will be adopted into law and what further changes will be made to such measures prior to or during such adoption. If our P4P services are classified as a form of online advertising and we meet the conditions requiring internet information service providers to examine the content of the online advertisements under the new regulations adopted in the future, we would be obligated to examine the content of our P4P customers' listings on our websites, which could be excessively burdensome such that we may have to stop posting certain categories of listings on our websites or otherwise cease our P4P services for certain categories of customers. If advertisements shown on our websites are in violation of relevant PRC advertising laws and regulations, or if the supporting documentation and government approvals provided to us by our advertising clients in connection with the advertising content are not complete or accurate, we may be subject to legal liabilities and our reputation could be harmed.

We have been and in the future may again be subject to claims or negative publicity based on the results in our paid search listings. Claims have been filed against us after we allowed certain customers to register keywords containing trademarks, trade names or brand names owned by others and displayed links to such customers' websites in our paid search listings. While we maintain a database of certain well-known trademarks and continually update our system algorithms and functions aiming at preventing customers from submitting a keyword containing the well-known trademarks that we know are owned by others, it is not possible for us to completely prevent our customers from bidding on keywords that contain trademarks, trade names or brand names owned by others. There has been negative publicity about fraudulent information in our paid search listings. Although we have been continually enhancing our technology, control and oversight to prevent fraudulent websites, web pages and information from our paid search listings, there is no guarantee that the measures we have taken are effective at all times. Claims and negative publicity based on the results in our paid search listings, regardless of their merit, may divert management attention, severely disrupt our operations, adversely affect our results of operations and harm our reputation.

***We may be subject to patent infringement claims with respect to our P4P platform.***

Our technologies and business methods, including those relating to our P4P platform, may be subject to third-party claims or rights that limit or prevent their use. In June 2005, we applied for a patent in China for our P4P platform, but our application was rejected on the ground that it is not patentable. Certain U.S.-based companies, including Overture Services Inc., have been granted patents in the United States relating to P4P platforms and similar business methods and related technologies. While we believe that we are not subject to U.S. patent laws since we conduct our business operations primarily in China, we cannot assure you that U.S. patent laws would not be applicable to our business operations, or that holders of patents relating to a P4P platform would not seek to enforce such patents against us in the United States or China.

Many parties are actively developing and seeking protection for internet-related technologies, including patent protection. They may hold patents issued or pending that relate to certain aspects of our technologies, products, business methods or services. Any patent infringement claims, regardless of their merits, could be time-consuming and costly to us. If we were sued for patent infringement claims with respect to our P4P platform and

11

were found to infringe upon the patents and were not able to adopt non-infringing technologies, we may be severely limited in our ability to operate our P4P platform, which would have a material and adverse effect on our results of operations and prospects.

***Our business may be adversely affected by third-party software applications or practices that interfere with our receipt of information from, or provision of information to, our users, which may impair our users' experience.***

Our business may be adversely affected by third-party malicious or unintentional software applications that make changes to our users' computers and interfere with our products and services. These software applications may change our users' internet experience by hijacking queries to our websites, altering or replacing our search results, or otherwise interfering with our ability to connect with our users. The interference often occurs without disclosure to or consent from users, resulting in a negative experience, which users may associate with our websites. These software applications may be difficult to remove or disable, may reinstall themselves and may circumvent other applications' efforts to block or remove them. In addition, our business may be adversely affected by the practices of third-party website owners, content providers and developers which interfere with our ability to crawl and index their web pages and contents including applications. The ability to provide a superior user experience is critical to our success. If we are unable to successfully combat malicious third-party software applications that interfere with our products and services, our reputation may be harmed. If a significant number of website owners, content providers and developers prevent us from indexing and including their high-quality web pages and contents including applications in our search results, the quality of our search results may be impaired.

***We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.***

We rely on a combination of copyright, trademark and trade secret laws, as well as nondisclosure agreements and other methods to protect our intellectual property rights. The protection of intellectual property rights in China may not be as effective as those in the United States or other countries. The steps we have taken may be inadequate to prevent the misappropriation of our technology. Reverse engineering, unauthorized copying or other misappropriation of our technologies could enable third parties to benefit from our technologies without paying us. Moreover, unauthorized use of our technology could enable our competitors to offer products and services that are comparable to or better than ours, which could harm our business and competitive position. We have in the past resorted to litigation to enforce our intellectual property rights, and may have to do so from time to time in the future. There is no guarantee that the competent courts will accept our claims and rule in our favor. Such litigation may result in substantial costs and diversion of resources and management attention.

***Our success depends on the continuing and collaborative efforts of our management team and other key personnel, and our business may be harmed if we lose their services.***

Our future success depends heavily upon the continuing services of our management team, in particular our chairman and chief executive officer, Robin Yanhong Li. If one or more of our executives or other key personnel are unable or unwilling to continue in their present positions, we may not be able to replace them easily or at all, and our business may be disrupted and our financial condition and results of operations may be materially and adversely affected. Competition for management and key personnel is intense, the pool of qualified candidates is limited, and we may not be able to retain the services of our executives or key personnel, or attract and retain experienced executives or key personnel in the future.

If any of our executives or other key personnel joins a competitor or forms a competing company, we may lose customers, distributors, know-how and key personnel. Each of our executive officers and key employees has entered into an employment agreement with us, containing confidentiality and non-competition provisions. If any disputes arise between any of our executives or key personnel and us, we cannot assure you the extent to which any of these agreements may be enforced.

12

***We rely on highly skilled personnel. If we are unable to retain or motivate them or hire additional qualified personnel, we may not be able to grow effectively.***

Our performance and future success depend on the talents and efforts of highly skilled individuals. We will need to continue to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization and business operations. Competition in the internet industry for qualified employees is intense. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees. As competition in the internet industry intensifies, it may be more difficult for us to hire, motivate and retain highly skilled personnel. If we do not succeed in attracting additional highly skilled personnel or retaining or motivating our existing personnel, we may be unable to grow effectively.

***Our strategy of investments and acquiring complementary businesses and assets may fail.***

As part of our business strategy, we have pursued, and intend to continue to pursue, selective strategic investments and acquisitions of businesses and assets that complement our existing business. In the past year, we invested in Ctrip by exchanging our shares in Qunar for shares of Ctrip. We intend to make other strategic investments and acquisitions in the future if suitable opportunities arise. Investments and acquisitions involve uncertainties and risks, including:

- potential ongoing financial obligations and unforeseen or hidden liabilities, including liability for infringement of third-party copyrights or other intellectual property;

- failure to achieve the intended objectives, benefits or revenue-enhancing opportunities;

- costs and difficulties of integrating acquired businesses and managing a larger business;

- potentially significant goodwill impairment charges;

- high acquisition and financing costs;

- possible loss of key employees of a target business;

- potential claims or litigation regarding our board's exercise of its duty of care and other duties required under applicable law in connection with any of our significant acquisitions or investments approved by the board;

- diversion of resources and management attention; and

- in the case of acquisitions of businesses or assets outside of China, the need to integrate operations across different business cultures and languages and to address the particular economic, currency, political, and regulatory risks associated with specific countries.

Any failure to address these risks successfully may have a material and adverse effect on our financial condition and results of operations. Investments and acquisitions may require a significant amount of capital investment, which would decrease the amount of cash available for working capital or capital expenditures. In addition, if we use our equity securities to pay for investments and acquisitions, we may dilute the value of our ADSs and the underlying ordinary shares. If we borrow funds to finance investments and acquisitions, such debt instruments may contain restrictive covenants that could, among other things, restrict us from distributing dividends. Moreover, acquisitions may also generate significant amortization expenses related to intangible assets. We may also incur impairment charges to earnings for investments and acquired businesses and assets which are determined to be impaired, and recognize the proportional share of the net losses of the investees to the extent of the amount of the investments for the equity method investments.

*We are subject to risks and uncertainties faced by companies in a rapidly evolving industry.*

We operate in the rapidly evolving internet industry, which makes it difficult to predict our future results of operations. Accordingly, you should consider our future prospects in light of the risks and uncertainties experienced by companies in evolving industries. Some of these risks and uncertainties relate to our ability to:

- maintain our leading position in the Chinese language internet search market;

- offer new, innovative products and services and enhance our existing products and services with innovative and advanced technology to attract and retain a larger user base;

- attract users' continuing use of internet search services;

- retain existing customers and attract additional customers and increase spending per customer;

- upgrade our technology to support increased traffic and expanded product and service offerings;

- further enhance our brand;

- respond to competitive market conditions;

- respond to evolving user preferences or industry changes;

- respond to changes in the regulatory environment and manage legal risks, including those associated with intellectual property rights;

- maintain effective control of our costs and expenses;

- execute our strategic investments and acquisitions and post-acquisition integrations effectively;

- attract, retain and motivate qualified personnel and maintain good relations with a young and growing work force; and

- build profitable operations in new markets and other overseas internet markets we have entered into.

If we are unsuccessful in addressing any of these risks and uncertainties, our business may be materially and adversely affected.

*Our historical growth rate may not be indicative of our future growth rate.*

We have experienced substantial growth in recent years. Our total revenues and net income attributable to Baidu, Inc. grew at a compound annual growth rate of 46.3% and 50.1%, respectively, from 2011 to 2015. Our growth was driven in part by the growth in China's internet and online marketing industries, which may not be indicative of future growth or be sustainable. Our past growth rate may not be indicative of our future growth rate.

*Our indebtedness could adversely affect our financial condition and our ability to obtain additional capital on reasonable terms when necessary.*

As of December 31, 2015, we had an aggregate of US$5.5 billion of outstanding indebtedness that will mature between 2016 and 2025 and we may incur additional indebtedness in the future. Our current and future debt requires us to dedicate a portion of our cash flow to service interest and principal payments and may limit our ability to engage in other transactions. Our ability to pay interest and repay the principal for our indebtedness is dependent upon our ability to manage our business operations, generate sufficient cash flows to service such debt and the other factors discussed in this section. There can be no assurance that we will be able to manage any of these risks successfully.

We may require additional capital to support our business growth or to respond to business opportunities, challenges or unforeseen circumstances. Our ability to obtain additional capital, if and when required, will

14

depend on our business plans, investor demand, our operating performance, the condition of the capital markets, and other factors, and our indebtedness may limit our ability to borrow additional funds. We may have difficulty incurring new debt on terms that we would consider to be commercially reasonable, if at all. In addition, we may also need to refinance a portion of our outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or that the terms of any refinancing may not be as favorable as the terms of our existing debt.

***Our results of operations may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.***

Our results of operations may fluctuate as a result of a number of factors, many of which are beyond our control. For these reasons, comparing our results of operations on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly and annual revenues and costs and expenses as a percentage of our revenues may be significantly different from our historical or projected figures. Our results of operations in future quarters may fall below expectations. Any of these events could cause the price of our ADSs to fall. Any of the risk factors listed in this "Risk Factors" section, and in particular the following factors, could cause our results of operations to fluctuate from quarter to quarter:

- general economic conditions in China and economic conditions specific to the internet, internet search and online marketing industries;

- our ability to continue to attract users to our websites despite the emergence of mobile applications;

- our ability to attract additional customers and increase spending per customer;

- the announcement or introduction of new or enhanced products and services by us or our competitors;

- the amount and timing of operating costs and capital expenditures related to the maintenance and expansion of our businesses, operations and infrastructure;

- the results of our acquisitions of, or investments in, other businesses or assets;

- PRC regulations or government actions pertaining to activities on the internet, including various forms of entertainment, online payment and activities otherwise affecting our online marketing customers, and those relating to the new products and services we may introduce from time to time;

- unforeseen events, such as negative publicity arising from widespread media coverage and other sources and labor disputes; and

- geopolitical events, natural disasters or epidemics.

Because of the rapid growth of our business, our historical results of operations may not be useful to you in predicting our future results of operations. Our user traffic tends to be seasonal. For example, we generally experience less user traffic during public holidays and other special event periods in China. In addition, advertising and other marketing spending in China has historically been cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. Our rapid growth has lessened the impact of the cyclicality and seasonality of our business. As we continue to grow, we expect that the cyclicality and seasonality in our business may cause our results of operations to fluctuate.

***A severe and prolonged global economic recession and the slowdown in the Chinese economy may adversely affect our business, results of operations and financial condition.***

The global macroeconomic environment is facing challenges, including the escalation of the European sovereign debt crisis since 2011, the end of quantitative easing by the U.S. Federal Reserve and the economic slowdown in the Eurozone in 2014. The growth of the Chinese economy has slowed since 2012 and such slowdown may continue. According to the National Bureau of Statistics of China, China's gross domestic

15

product (GDP) growth slowed to 6.9% in 2015. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. There have been concerns over unrest and terrorist threats in the Middle East and Africa, which have resulted in volatility in oil and other markets, and over the conflicts involving Ukraine and Syria. There have also been concerns on the relationship among China and other Asian countries, which may result in or intensify potential conflicts in relation to territorial disputes. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Any prolonged slowdown in the global or Chinese economy may have a negative impact on our business, results of operations and financial condition, and continued turbulence in the international markets may adversely affect our ability to access the capital markets to meet liquidity needs. Our customers may reduce or delay spending with us, while we may have difficulty expanding our customer base fast enough, or at all, to offset the impact of decreased spending by our existing customers. In addition, to the extent we offer credit to any customer and the customer experiences financial difficulties due to the economic slowdown, we could have difficulty collecting payment from the customer.

***Because we rely to a large extent on distributors in providing our online marketing services, failure to retain key distributors or attract additional distributors could materially and adversely affect our business. Moreover, there is no assurance that our direct sales model in some key geographic markets will continue to be successful.***

Online marketing is at a development stage in China and is not as widely accepted by or available to businesses in China as in the United States. As a result, we rely, to a large extent, on a nationwide distribution network of third-party distributors for our sales to, and collection of payment from, our customers. If our distributors do not provide quality services to our customers or otherwise breach their contracts with our customers, we may lose customers and our results of operations may be materially and adversely affected. Since most of our distributors are not bound by long-term contracts, we cannot assure you that we will continue to maintain favorable relationships with them. If we fail to retain our key distributors or attract additional distributors on terms that are commercially reasonable, our business and results of operations could be materially and adversely affected.

We have transitioned to using our direct sales force to serve customers in some key geographic markets, such as Beijing, Shanghai and major cities in Guangdong Province. There is no assurance that our direct sales model in those markets will continue to be successful. If we fail to maintain an adequate direct sales force, retain existing customers and continue to attract new customers in those markets, our business, results of operations and prospects could be materially and adversely affected.

***We rely on our Baidu Union members for a significant portion of our revenues. If we fail to retain existing Baidu Union members or attract additional members, our revenue growth and profitability may be adversely affected.***

We pay Baidu Union members a portion of our revenues based on click-throughs by users of Baidu Union members' properties. Some of our Baidu Union members, however, may compete with us in one or more areas of our business. Therefore, they may decide in the future to terminate their relationships with us. If our Baidu Union members decide to use a competitor's or their own internet search services, our user traffic may decline, which may adversely affect our revenues. If we fail to attract additional Baidu Union members, our revenue growth may be adversely affected. In addition, if we have to share a larger portion of our revenues to retain existing Baidu Union members or attract additional members, our profitability may be adversely affected.

16

*Our overseas operations may not be successful.*

We have launched products and services in local languages to internet users in several countries. It is uncertain when the operation will become profitable, if at all. In particular, we rely on local telecommunication operators and service providers to provide us with network services and data center hosting services, and our systems for these international products and services are not redundant across different regions and data centers. Any interruption to the internet infrastructure or any data center may render our products and services in the region unavailable.

We face certain risks inherent in doing business internationally, including:

- difficulties in developing, staffing and simultaneously managing a foreign operation as a result of distance, language and cultural differences;
- longer customer payment cycles;
- currency exchange rate fluctuations;
- political or social unrest or economic instability;
- unexpected changes in laws or regulations;
- severe natural disasters; and
- potentially adverse tax consequences.

One or more of these factors could harm our overseas operations and consequently, could harm our overall results of operations.

*If we are unable to adapt or expand our existing technology infrastructure to accommodate greater traffic, content or additional customer requirements, our business may be harmed.*

Our *Baidu.com* website regularly serves a large number of users and customers and delivers a large number of daily page views. Our technology infrastructure is highly complex and may not provide satisfactory service in the future, especially as the number of users and customers increases. We may be required to upgrade our technology infrastructure to keep up with the increasing traffic on our *Baidu.com* website, such as increasing the capacity of our servers and the sophistication of our software. If we fail to adapt our technology infrastructure to accommodate greater traffic or customer requirements, our users and customers may become dissatisfied with our services and switch to our competitors' websites, which could harm our business.

*If we fail to detect fraudulent click-throughs, our customers' confidence in us could be damaged and our revenues could decline.*

We are exposed to the risk of click-through fraud on our paid search results. Click-through fraud occurs when a person clicks paid search results for a reason other than to view the underlying content of search results. If we fail to detect fraudulent clicks or otherwise are unable to prevent this fraudulent activity, the affected customers may experience a reduced return on investments, or ROI, in our online marketing services and lose confidence in the integrity of our systems, and we may have to issue refunds to our customers. If this happens, we may be unable to retain existing customers or attract new customers for our online marketing services, and our online marketing revenues could decline. In addition, affected customers may also file legal actions against us claiming that we have over-charged or failed to refund them. Any such claims or similar claims, regardless of their merits, could be time-consuming and costly for us to defend against and could also adversely affect our brand and our customers' confidence in the integrity of our systems.

*The fraudulent or fictitious transactions perpetrated by third-party sellers or service providers on our transaction platforms could damage our brand and reputation.*

We face the risks that third-party sellers or service providers may engage in fictitious or fraudulent transactions with themselves or collaborators in order to artificially inflate their own ratings and search result rankings on our platforms, and obtain sales-based monetary incentives provided by our platforms. These

17

activities may harm other sellers and service providers by enabling the perpetrating sellers and service providers to be favored over the legitimate ones, and may harm buyers by deceiving them into believing that a seller or service provider is more reliable or trusted than it actually is.

If we fail to detect fraudulent transactions or otherwise are unable to prevent these fraudulent activities, our brand and reputation as an operator of trusted transaction platforms may be compromised and the incentives provided by our platforms may become ineffective.

***The successful operation of our business depends upon the performance and reliability of the internet infrastructure and fixed telecommunications networks in China.***

Our business depends on the performance and reliability of the internet infrastructure in China. Almost all access to the internet is maintained through state-owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Industry and Information Technology, or the MIIT. In addition, the national networks in China are connected to the internet through international gateways controlled by the PRC government. These international gateways are the only channels through which a domestic user can connect to the internet. It is unpredictable whether a more sophisticated internet infrastructure will be developed in China. We may not have access to alternative networks in the event of disruptions, failures or other problems with China's internet infrastructure. In addition, the internet infrastructure in China may not support the demands associated with continued growth in internet usage.

We rely heavily on China Telecommunications Corporation, or China Telecom, China United Network Communications Group Company Limited, or China Unicom, and China Mobile Communications Corporation, or China Mobile, to provide us with network services and data center hosting services. We have entered into contracts with various local branches or subsidiaries of China Telecom, China Unicom and China Mobile to obtain data communications capacity. We have limited access to alternative services in the event of disruptions, failures or other problems with the fixed telecommunications networks of these companies, or if these companies otherwise fail to provide the services. In May 2014, the service of our Baidu Cloud was inaccessible to some users for approximately four hours due to a failure of the internet infrastructure. In March 2015, our search services to some users were interrupted for over ten minutes as a result of a temporary malfunction of regional telecommunications infrastructure. Any unscheduled service interruption could damage our reputation and result in a decrease in our revenues. Furthermore, we have no control over the costs of the services provided by these telecommunication companies. If the prices that we pay for telecommunications and internet services rise significantly, our gross margins could be adversely affected. In addition, if internet access fees or other charges to internet users increase, our user traffic may decrease, which in turn may harm our revenues.

***Failure of information security and privacy concerns could subject us to penalties, damage our reputation and brand, and harm our business and results of operations.***

The internet industry is facing significant challenges regarding information security and privacy, including the storage, transmission and sharing of confidential information. We transmit and store over our systems confidential and private information of our users, customers, distributors and Baidu Union members, such as personal information, including names, user IDs and passwords, and payment or transaction related information.

We are required by PRC law to ensure the confidentiality, integrity, availability and authenticity of the information of our users, customers, distributors and Baidu Union members, which is also essential to maintain their confidence in our online products and services. We have adopted strict information security policies and deployed advanced measures to implement the policies, including, among others, advanced encryption technologies. However, advances in technology, increased level of sophistication and diversity of our products and services, increased level of expertise of hackers, new discoveries in the field of cryptography or others could still result in a compromise or breach of the measures that we use. Because of our leading market position in the internet industry in China, we believe we are a particularly attractive target for security breaches and hacking attacks. We have experienced in the past, and may experience in the future, such attacks. In December 2012, the Standing Committee of the PRC National People's Congress promulgated the Decision on Strengthening Network Information Protection, or the Network Information Protection Decision, to enhance the legal protection of information security and privacy on the internet. The Network Information Protection Decision also requires

18

internet operators to take measures to ensure confidentiality of information of users. In July 2013, the MIIT promulgated the Provisions on Protection of Personal Information of Telecommunication and Internet Users to regulate the collection and use of users' personal information in the provision of telecommunication service and internet information service in China. However, the effect of these laws on curbing hacking and other illegal online activities still remains to be seen. Significant capital, managerial and human resources are required to comply with legal requirements, enhance information security and to address any issues caused by security failures. If we are unable to protect our systems, hence the information stored in our systems, from unauthorized access, use, disclosure, disruption, modification or destruction, such problems or security breaches could cause loss or give rise to our liabilities to the owners of confidential information, such as our users, customers, distributors and Baidu Union members, subject us to penalties imposed by administrative authorities, and disrupt our operations. In addition, complying with various laws and regulations could cause us to incur substantial costs or require us to change our business practices, including our data practices, in a manner adverse to our business.

Furthermore, concerns have been expressed from time to time about whether our products, services or processes could compromise the privacy of users and others. Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, and any negative publicity on our information safety or privacy protection mechanism and policy, even if unfounded, could damage our reputation and brand and adversely affect our business and results of operations.

***If we fail to maintain an effective system of internal control over financial reporting, we may lose investor confidence in the reliability of our financial statements.***

We are subject to reporting obligations under the U.S. securities laws. The SEC, as required by Section 404 of the Sarbanes-Oxley Act of 2002, adopted rules requiring every public company to include a management report on the company's internal control over financial reporting in its annual report, which contains management's assessment of the effectiveness of our internal control over financial reporting. In addition, an independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting. We have been subject to these requirements since the fiscal year ended December 31, 2006.

Our management has concluded that our internal control over financial reporting was effective as of December 31, 2015. See "Item 15. Controls and Procedures." Our independent registered public accounting firm has issued an attestation report, which has concluded that our internal control over financial reporting was effective in all material aspects as of December 31, 2015. However, if we fail to maintain effective internal control over financial reporting in the future, our management and our independent registered public accounting firm may not be able to conclude that we have effective internal control over financial reporting at a reasonable assurance level. This could in turn result in loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. Furthermore, we have incurred and anticipate that we will continue to incur considerable costs, management time and other resources in an effort to comply with Section 404 and other requirements of the Sarbanes-Oxley Act.

***We have limited business insurance coverage.***

The insurance industry in China is still at a relatively early stage of development. Insurance companies in China offer limited business insurance products. We do not have any business liability or disruption insurance coverage for our operations in China. Any business disruption may result in our incurring substantial costs and the diversion of our resources.

***We face risks related to health epidemics, severe weather conditions and other outbreaks.***

Our business could be adversely affected by the effects of avian influenza, severe acute respiratory syndrome (SARS), the influenza A virus, Ebola virus, severe weather conditions or other epidemic or outbreak. Health or other government regulations adopted in response to an epidemic, severe weather conditions such as snow storm, flood or hazardous air pollution, or other outbreaks may require temporary closure of our offices or internet cafes where many users access our websites. Such closures may disrupt our business operations and adversely affect our results of operations.

**Risks Related to Our Corporate Structure**

***PRC laws and regulations governing our businesses and the validity of certain of our contractual arrangements are uncertain. If we are found to be in violation, we could be subject to sanctions. In addition, changes in PRC laws and regulations or changes in interpretations thereof may materially and adversely affect our business.***

The PRC government restricts or imposes conditions on foreign investment in internet, online advertising, online audio and video services and mobile application distribution businesses. We and our PRC subsidiaries are considered foreign persons or foreign-invested enterprises under PRC foreign investment related laws. As a result, we and our PRC subsidiaries are subject to PRC legal restrictions on or conditions for foreign ownership of internet, online advertising, online audio and video services and mobile application distribution businesses. Due to these restrictions and conditions, we operate our websites and conduct online advertising, online audio and video services and mobile application distribution businesses in China through our consolidated affiliated entities. As all the nominee shareholders of our consolidated affiliated entities are either PRC citizens or PRC domestic enterprises, these entities are therefore considered as PRC domestic enterprises under PRC law. The "nominee shareholders" refer to those shareholders who have pledged their equity interest in our consolidated affiliated entities to us and entered into exclusive equity purchase and transfer option agreements with us as part of the contractual arrangements. Our contractual arrangements with our consolidated affiliated entities and the nominee shareholders allow us to have the power to direct the activities of these entities that most significantly impact their economic performance. These contractual arrangements demonstrate our ability and intention to continue to exercise the ability to absorb substantially all of the profits and the expected losses of the affiliated entities. In 2013, 2014 and 2015, we derived approximately 28%, 27% and 31% of our total revenues, respectively, from our consolidated affiliated entities through contractual arrangements.

There are substantial uncertainties regarding the interpretation and application of PRC laws and regulations, including, but not limited to, the laws and regulations governing our business, or the enforcement and performance of our contractual arrangements with our consolidated affiliated entities, including but not limited to Baidu Netcom and the nominee shareholders. These laws and regulations may be subject to change, and their official interpretation and enforcement may involve substantial uncertainty. New laws and regulations that affect existing and proposed future businesses may also be applied retroactively.

Although we believe we comply with current PRC laws and regulations, we cannot assure you that the PRC government would agree that our contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. The PRC government has broad discretion in determining penalties for violations of laws and regulations. If the PRC government determines that we do not comply with applicable law, it could revoke our business and operating licenses, require us to discontinue or restrict our operations, restrict our right to collect revenues, block our websites, require us to restructure our operations, impose additional conditions or requirements with which we may not be able to comply, impose restrictions on our business operations or on our customers, or take other regulatory or enforcement actions against us that could be harmful to our business. Any of these or similar occurrences could significantly disrupt our business operations or restrict us from conducting a substantial portion of our business operations, which could materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of any of our consolidated affiliated entities that most significantly impact its economic performance, and/or our failure to receive the economic benefits from any of our consolidated affiliated entities, we may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

***If the PRC government were to classify P4P services as a form of online advertising or as part of internet content services, our effective tax rate may increase and we might be subject to sanctions and required to pay delinquent taxes.***

PRC laws and regulations and administrative authorities currently do not classify P4P services as a form of online advertising or as part of internet content services that require an ICP license, or ICP services. However, we

20

cannot assure you that the PRC government will not classify P4P services as a form of online advertising or as part of ICP services in the future. If new regulations characterize P4P services as a form of online advertising or as part of ICP services, our tax liability may increase, given the advertising revenues are subject to a 3% construction fee for culture undertakings in addition to the 6% value-added tax, or VAT, which has replaced the original 5% business tax for advertising revenues. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation" for more information on PRC business tax and VAT. Moreover, if the change in classification of P4P services were to be retroactively applied, we might be subject to sanctions, including payment of delinquent taxes and fines. In addition, the classification of P4P services as a form of online advertising could subject us to an obligation to examine the content of our P4P customers' listings on our websites and the associated risks. See "—Risks Related to Our Business—We have been and may again be subject to claims based on the content found on our websites, the results in our paid search listings or other products and services we offer." Such examinations could be burdensome and increase our operating costs and expenses. Any change in the classification of P4P by the PRC government may materially and adversely affect our business, results of operations and financial condition.

### *Our contractual arrangements with our consolidated affiliated entities in China and the individual nominee shareholders may not be as effective in providing control over these entities as direct ownership.*

Since PRC law restricts or imposes conditions on foreign equity ownership in internet, online advertising, online audio and video services and mobile application distribution companies in China, we operate our websites and conduct our online advertising, online audio and video services and mobile application distribution businesses through our consolidated affiliated entities in China. We have no equity interest in any of these entities and must rely on contractual arrangements to control and operate the businesses and assets held by our consolidated affiliated entities, including the domain names and trademarks that have been transferred from our subsidiaries to our consolidated affiliated entities in accordance with requirements of PRC law. These contractual arrangements may not be as effective in providing control over these entities as direct ownership. For example, our consolidated affiliated entities and the individual nominee shareholders could breach their contractual arrangements with us by, among other things, failing to operate our business, such as using the domain names and trademarks our subsidiaries have transferred to them or maintaining our websites, in an acceptable manner or taking other actions that are detrimental to our interests. If our consolidated affiliated entities or the individual nominee shareholders fail to perform their obligations under these contractual arrangements, we may have to incur substantial costs to enforce such arrangements, and rely on legal remedies under PRC law, including contract remedies, which may not be sufficient or effective. If we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to have the power to direct the activities that most significantly affect the economic performance of our consolidated affiliated entities, and we may lose control over the assets owned by our consolidated affiliated entities, including our *Baidu.com* domain name and website, and any other domain names and websites we have access to may not attract a large number of users and customers at the same level as *Baidu.com*. As a result, our ability to conduct our business may be materially and adversely affected, and we may not be able to consolidate the financial results of the relevant affiliated entities into our consolidated financial statements in accordance with U.S. GAAP, which may materially and adversely affect our results of operations and damage our reputation.

### *Our contractual arrangements with our consolidated affiliated entities in China may result in adverse tax consequences to us.*

As a result of our corporate structure and the contractual arrangements between our subsidiaries and each of our consolidated affiliated entities in China, we are subject to VAT at a rate of 6% as a result of the VAT reform program on both revenues generated by our consolidated affiliated entities' operations in China and revenues derived from our subsidiaries' contractual arrangements with these consolidated affiliated entities. Where our consolidated affiliated entity is qualified as a VAT general taxpayer, the VAT charged by our subsidiaries on the revenues obtained from such consolidated affiliated entity based on the contractual arrangement between our

21

subsidiaries and such consolidated affiliated entity will constitute input VAT for the consolidated affiliated entity, and will be creditable against output VAT arising in connection with VAT taxable activities carried out by the consolidated affiliated entity. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation" for more information on the VAT reform program. Moreover, we would be subject to adverse tax consequences if the PRC tax authorities were to determine that the contracts between our subsidiaries and these consolidated affiliated entities were not on an arm's-length basis and therefore constituted a favorable transfer pricing. Under the PRC Enterprise Income Tax Law, or the EIT Law, an enterprise must submit its annual tax return together with information on related-party transactions to the PRC tax authorities. The PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. For example, the PRC tax authorities could request that our consolidated affiliated entities adjust their taxable income upward for PRC tax purposes. Such adjustment could adversely affect us by increasing our consolidated affiliated entities' tax expenses without reducing our subsidiaries' tax expenses, which could subject our consolidated affiliated entities to interest due on late payments and other penalties for under-payment of taxes.

***We may have exposure to greater than anticipated tax liabilities.***

We are subject to enterprise income tax, or EIT, business tax, VAT, and other taxes in many provinces and cities in China and our tax structure is subject to review by various local tax authorities. The determination of our provision for income tax and other tax liabilities requires significant judgment. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. For example, under the EIT Law, the PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. Particularly, the State Administration of Tax issued a Public Notice, or Public Notice 16, on March 18, 2015, to further regulate and strengthen the transfer pricing administration on outbound payments by a PRC enterprise to its overseas related parties. In addition to emphasizing that outbound payments by a PRC enterprise to its overseas related parties must comply with arm's-length principles, Public Notice 16 specifies certain circumstances whereby such payments are not deductible for the purpose of the enterprise income tax of the PRC enterprise, including payments to an overseas related party which does not undertake any function, bear any risk or has no substantial operation or activities, payments for services which do not enable the PRC enterprise to obtain direct or indirect economic benefits, or for services that are unrelated to the functions and risks borne by the PRC enterprise, or relate to the protection of the investment interests of the direct or indirect investor of the PRC enterprise, or for services that have already been purchased from a third party or undertaken by the PRC enterprise itself, and royalties paid to an overseas related party which only owns the legal rights of the intangible assets but has no contribution to the creation of such intangible assets. Although we believe all our related party transactions, including all payments by our PRC subsidiaries and consolidated affiliated entities to our non-PRC entities, are made on an arm's-length basis and our estimates are reasonable, the ultimate decisions by the relevant tax authorities may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

***The individual nominee shareholders of our consolidated affiliated entities may have potential conflicts of interest with us, which may adversely affect our business. We do not have any arrangements in place to address such potential conflicts.***

We have designated individuals who are PRC nationals to be the nominee shareholders of our consolidated affiliated entities in China. For example, Robin Yanhong Li, our chairman, chief executive officer and co-founder, is also the principal nominee shareholder of Baidu Netcom, which is our principal consolidated affiliated entity.

Although the individual nominee shareholders are contractually obligated to act in good faith and in our best interest, they may still have potential conflicts of interest with us. For example, some individual nominee shareholders of our consolidated affiliated entities do not have a significant equity stake in our company other

than the share options granted to them. We cannot assure you that when conflicts of interest arise, any or all of these individuals will act in the best interests of our company or such conflicts will be resolved in our favor. In addition, these individuals may breach, cause our consolidated affiliated entities to breach or refuse to renew, the existing contractual arrangements with us. Currently, we do not have any arrangements to address potential conflicts of interest between these individuals and our company, except that we could exercise our transfer option under the exclusive equity purchase and transfer option agreement with the relevant individual nominee shareholder to request him/her to transfer all of his/her equity ownership in the relevant consolidated affiliated entity to a PRC entity or individual designated by us. We rely on Mr. Robin Yanhong Li, who is also a director of our company, to abide by the Cayman Islands law, which provides that directors owe a fiduciary duty to the company, and those who are also directors or officers of our PRC subsidiaries to abide by PRC law, which provides that directors and officers owe a fiduciary duty to the company. Such fiduciary duty requires directors and/or officers to act in good faith and in the best interests of the company and not to use their positions for personal gains. There are, however, no specific provisions under the Cayman Islands or PRC law on how to address potential conflicts of interest. If we cannot resolve any conflict of interest or dispute between us and the individual nominee shareholders of our consolidated affiliated entities, we would have to rely on legal proceedings, which could disrupt our business, distract management and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

***We may be unable to collect long-term loans to the nominee shareholders of our consolidated affiliated entities in China.***

As of the date of this annual report, we have made long-term loans in an aggregate principal amount of RMB4.3 billion (US$665.7 million) to the nominee shareholders of our consolidated affiliated entities. We extended these loans to enable the nominee shareholders to fund the capitalization of these entities. As of the date of this annual report, all of the registered capital of our consolidated affiliated entities in China has been fully funded. We may in the future provide additional loans to the nominee shareholders of our consolidated affiliated entities in China in connection with any increase in their capitalization to the extent necessary and permissible under applicable law. Our ability to ultimately collect these loans will depend on the profitability of these consolidated affiliated entities and their operational needs, which are uncertain.

***We are in the process of registering the pledges of equity interests by nominee shareholders of some of our consolidated affiliated entities, and we may not be able to enforce the equity pledges against any third parties who acquire the equity interests in good faith in the relevant consolidated affiliated entities before the pledges are registered.***

The nominee shareholders of each of our consolidated affiliated entities have pledged all of their equity interests in the relevant consolidated affiliated entities to our subsidiaries pursuant to equity pledge agreements under the contractual arrangements. An equity pledge agreement becomes effective among the parties upon execution. However, according to the PRC Property Rights Law, an equity pledge is not perfected as a security property right unless it is registered with the relevant local administration for industry and commerce. We are in the process of registering the pledge relating to each of Baidu Netcom and Beijing Perusal Technology Co., Ltd., or Beijing Perusal, as well as certain other consolidated affiliated entities, relating to recent increases of their registered capital, which we anticipate will be completed in the next few months. We are also in the process of registering the pledge relating to certain newly established consolidated affiliated entities. Prior to the completion of the registration, we may not be able to successfully enforce the equity pledge against any third parties who have acquired property right interests in good faith in the equity interests in the relevant consolidated affiliated entities.

**Risks Related to Doing Business in China**

*Changes in China's economic, political or social conditions or government policies could have a material and adverse effect on our business and operations.*

Most of our business operations are conducted in China. Accordingly, our business, results of operations, financial condition and prospects are affected by economic, political and social conditions in China generally and by continued economic growth in China as a whole.

China's economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development. The Chinese government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

Growth of China's economy has been uneven, both geographically and among various sectors of the economy, and the rate of growth has been slowing. Since 2012, growth of the Chinese economy has slowed down. Some of the government measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations. Any stimulus measures designed to boost the Chinese economy may contribute to higher inflation, which could adversely affect our results of operations and financial condition. For example, certain operating costs and expenses, such as employee compensation and office operating expenses, may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets.

*Uncertainties with respect to the PRC legal system could adversely affect us.*

We conduct our business primarily through our subsidiaries and consolidated affiliated entities in China. Our operations in China are governed by PRC laws and regulations. Our subsidiaries are generally subject to laws and regulations applicable to foreign investments in China. The PRC legal system is based on written statutes. Prior court decisions may be cited for reference but have limited precedential value.

PRC laws and regulations have significantly enhanced the protections afforded to various forms of foreign investments in China for the past decades. However, China has not developed a fully integrated legal system and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, because these laws and regulations are relatively new, and because of the limited volume of published decisions and their nonbinding nature, the interpretation and enforcement of these laws and regulations involve uncertainties.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all. As a result, we may not be aware of our potential violation of these policies and rules. In addition, any litigation in China may be protracted and result in substantial costs and diversion of resources and management attention.

*We may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet business and companies.*

The PRC government regulates the internet industry extensively, including foreign ownership of, and the licensing and permit requirements pertaining to, companies in the internet industry. These internet-related laws

24

and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainty. As a result, under certain circumstances it may be difficult to determine what actions or omissions may be deemed to be violations of applicable laws and regulations. Issues, risks and uncertainties relating to PRC government regulation of the internet industry include, but are not limited to, the following:

- We only have contractual control over our websites. We do not own the websites due to the restriction of foreign investment in businesses providing value-added telecommunications services in China, including online information services.

- The licensing requirements relating to the internet business in China are uncertain and evolving. This means that permits, licenses or operations at some of our PRC subsidiaries and consolidated affiliated entities may be subject to challenge, or we may not be able to obtain or renew certain permits or licenses, including without limitation, a Value-Added Telecommunication Business Operating License, which is issued by the MIIT, an Internet News License, which is issued by the State Council News Office, a Short Messaging Service Access Code Certificate, which is issued by the MIIT, an Online Audio/Video Program Transmission License, which is issued by the State Administration of Press Publication, Radio, Film and Television, or the SAPPRFT, a Radio and Television Program Production License, which is issued by the SAPPRFT, a Surveying and Mapping Qualification Certificate for internet map services, which is issued by the National Administration of Surveying, Mapping and Geo-information, an Internet Culture Business Permit with the permitted scope of business covering online game operation and online game virtual currency issuance or trading, which is issued by the Ministry of Culture, an Internet Publication License, which is issued by the SAPPRFT, a Payment Service Permit, which is issued by the People's Bank of China, and a Qualification Certificate for Internet Drug Information Services, which is issued by provincial branch of the State Food and Drug Administration. Failure to obtain or renew these permits and licenses may significantly disrupt our business, or subject us to sanctions, requirements to increase capital or other conditions or enforcement, or compromise enforceability of related contractual arrangements, or have other harmful effects on us.

- New laws and regulations may be promulgated to regulate internet activities, including online advertising and online payment. Other aspects of our online operations may be regulated in the future. If these new laws and regulations are promulgated, additional licenses may be required for our online operations. If our operations do not comply with these new regulations at the time they become effective, or if we fail to obtain any licenses required under these new laws and regulations, we could be subject to penalties.

We provide value-added telecommunications services through our consolidated affiliated entities, which hold the required licenses. In July 2006, the MIIT issued the Notice of the Ministry of Industry and Information Technology on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services. This notice prohibits domestic telecommunication service providers from leasing, transferring or selling telecommunication business operating licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. According to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by the license holder in its provision of value-added telecommunications services. The notice also requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain these facilities in the regions covered by its license. Baidu Netcom, Beijing Perusal and Beijing BaiduPay Science and Technology Co., Ltd., or BaiduPay, our consolidated affiliated entities, own the necessary domain names and trademarks, including pending trademark applications and have the necessary personnel and facilities to operate our websites.

We offer online games provided by our game operator partners on our websites owned and operated by our consolidated affiliated entities. We have also acquired 91 Wireless, which operates two leading smartphone application distribution platforms in China as well as a mobile game platform through its consolidated affiliated entities. In September 2009, the GAPP (currently known as the SAPPRFT) together with several other

government agencies issued a notice, or the Circular 13, prohibiting foreign investors from participating in online game operating businesses through wholly-owned enterprises, equity joint ventures or cooperative joint ventures in China. Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form, such as incorporating user registration, user account management or payment through game cards into online game platforms that are ultimately controlled or owned by foreign investors. Other government agencies that also have the authority to regulate online game operations in China, such as the Ministry of Culture and the MIIT, did not join the GAPP in issuing the Circular 13. To date, neither the GAPP nor the SAPPRFT has issued any interpretation of the Circular 13. Due to the ambiguity among various regulations on online games and a lack of interpretations from the relevant PRC authorities governing online game operations, there are uncertainties regarding whether PRC authorities would consider our relevant contractual arrangements to be foreign investment in online game operation businesses. While we are not aware of any online game companies which use the same or similar contractual arrangements as ours having been penalized or ordered to terminate operation by PRC authorities claiming that the contractual arrangements constitute control over, or participation in, the operation of online game operations through indirect means, it is unclear whether and how the various regulations of the PRC authorities might be interpreted or implemented in the future. If our relevant contractual arrangements were deemed to be "indirect means" or "disguised form" under the Circular 13, the relevant contractual arrangements may be challenged by the SAPPRFT or other governmental authorities. If we were found to be in violation of the Circular 13 to operate our mobile game platform, the SAPPRFT, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending or revoking the relevant licenses and registrations. If we were found to be in violation of any existing or future PRC laws or regulations, including the MIIT notice and the Circular 13, the relevant regulatory authorities would have broad discretion in dealing with such violations.

As we enter into new businesses, we may encounter additional regulatory uncertainties. For example, it remains unclear whether the provision of online payment services by BaiduPay will require BaiduPay to apply for a Value-Added Telecommunication Business Operating License for "online data processing and transaction processing businesses" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT. However, Baidu Netcom, parent company of BaiduPay, has applied for a Trans-Regional Value-Added Telecommunication Business Operating License, which would cover online data processing and transaction processing businesses. Baidu Netcom plans to submit an application to allow its subsidiary BaiduPay to operate online data processing and transaction processing businesses.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet industry have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including our business.

*Substantial uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.*

The Ministry of Commerce published a discussion draft of the proposed Foreign Investment Law in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. The draft Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. The Ministry of Commerce is currently soliciting comments on this draft and substantial uncertainties exist with

respect to its enactment timetable, interpretation and implementation. The draft Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance and business operations in many aspects.

Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company should be treated as a foreign-invested enterprise, or an FIE. According to the definition set forth in the draft Foreign Investment Law, FIEs refer to enterprises established in China pursuant to PRC law that are solely or partially invested by foreign investors. The draft Foreign Investment Law specifically provides that entities established in China (without direct foreign equity ownership) but "controlled" by foreign investors, through contract or trust for example, will be treated as FIEs. Once an entity falls within the definition of FIE, it may be subject to foreign investment "restrictions" or "prohibitions" set forth in a "negative list" to be separately issued by the State Council later. If an FIE proposes to conduct business in an industry subject to foreign investment "restrictions" in the "negative list," the FIE must go through a market entry clearance by the Ministry of Commerce before being established. If an FIE proposes to conduct business in an industry subject to foreign investment "prohibitions" in the "negative list," it must not engage in the business. However, an FIE, during the market entry clearance process, may apply in writing to be treated as a PRC domestic enterprise if its foreign investor(s) is/are ultimately "controlled" by PRC government authorities and its affiliates and/or PRC citizens. In this connection, "control" is broadly defined in the draft law to cover the following summarized categories: (i) holding 50% of more of the voting rights of the subject entity; (ii) holding less than 50% of the voting rights of the subject entity but having the power to secure at least 50% of the seats on the board or other equivalent decision making bodies, or having the voting power to exert material influence on the board, the shareholders' meeting or other equivalent decision making bodies; or (iii) having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations.

The "variable interest entity" structure, or VIE structure, has been adopted by many PRC-based companies, including us, to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. See "—Risks Related to Our Corporate Structure" and "Item 4.C. Information on the Company—Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders." Under the draft Foreign Investment Law, variable interest entities that are controlled via contractual arrangement would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is included in the "negative list" as restricted industry, the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC government authorities and its affiliates or PRC citizens). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as FIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal.

Through our dual-class share structure, Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, a PRC citizen, possessed and controlled 53.8% of the voting power of our company as of February 29, 2016. The draft Foreign Investment Law has not taken a position on what actions shall be taken with respect to the existing companies with a VIE structure, whether or not these companies are controlled by Chinese parties, while it is soliciting comments from the public on this point. Moreover, it is uncertain whether the internet, online advertising, online audio and video services and mobile application distribution businesses, in which our variable interest entities operate, will be subject to the foreign investment restrictions or prohibitions set forth in the "negative list" to be issued. If the enacted version of the Foreign Investment Law and the final "negative list" mandate further actions, such as Ministry of Commerce market entry clearance, to be completed by companies with existing VIE structure like us, we face uncertainties as to whether such clearance can be timely obtained, or at all.

The draft Foreign Investment Law, if enacted as proposed, may also materially impact our corporate governance practice and increase our compliance costs. For instance, the draft Foreign Investment Law imposes stringent ad hoc and periodic information reporting requirements on foreign investors and the applicable FIEs.

Aside from investment implementation report and investment amendment report that are required at each investment and alteration of investment specifics, an annual report is mandatory, and large foreign investors meeting certain criteria are required to report on a quarterly basis. Any company found to be non-compliant with these information reporting obligations may potentially be subject to fines and/or administrative or criminal liabilities, and the persons directly responsible may be subject to criminal liabilities.

***Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our websites and negative publicity in international media.***

The PRC government has adopted regulations governing internet access and distribution of news and other information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China, contains terrorism or extremism content, or is reactionary, obscene, superstitious, fraudulent or defamatory. Failure to comply with these requirements may result in the revocation of licenses to provide internet content and other licenses and the closure of the concerned websites. In the past, failure to comply with these requirements has resulted in the closure of certain websites. The website operator may also be held liable for the censored information displayed on or linked to the website.

In particular, the MIIT has published regulations that subject website operators to potential liability for content displayed on their websites and the actions of users and others using their systems, including liability for violations of PRC laws and regulations prohibiting the dissemination of content deemed to be socially destabilizing. The Ministry of Public Security has the authority to order any local internet service provider to block any internet website at its sole discretion. From time to time, the Ministry of Public Security has stopped the dissemination over the internet of information which it believes to be socially destabilizing. The State Secrecy Bureau is also authorized to block any website it deems to be leaking state secrets or failing to meet the relevant regulations relating to the protection of state secrets in the dissemination of online information. Furthermore, we are required to report any suspicious content to relevant governmental authorities, and to undergo computer security inspections. If we fail to implement the relevant safeguards against security breaches, our websites may be shut down and our business and ICP licenses may be revoked.

The Anti-Terrorism Law, which took effect on January 1, 2016, further requires internet service providers to verify the identity of their users, and to not provide services to anyone whose identity is unclear or who declines verification. Although the identity verification requirements are already embodied in some internet related regulations, the Anti-Terrorism Law extends these requirements to all types of internet services. The internet service providers are also required to provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities.

Although we attempt to monitor the content in our search results and on our online communities such as Baidu Post Bar, we are not able to control or restrict the content of other internet content providers linked to or accessible through our websites, or content generated or placed on our Baidu Post Bar message boards or our other online communities by our users. To the extent that PRC regulatory authorities find any content displayed on our websites illegal, they may require us to limit or eliminate the dissemination of such information on our websites. To the extent that PRC regulatory authorities find any content displayed on our websites objectionable, they may suggest that we limit or eliminate the dissemination of such information on our websites. If third-party websites linked to or accessible through our websites conduct unlawful activities such as online gambling on their websites, PRC regulatory authorities may require us to report such unlawful activities to relevant authorities and to remove the links to such websites, or they may suspend or shut down the operation of these third-party websites. PRC regulatory authorities may also temporarily block access to certain websites for a period of time for reasons beyond our control. Any of these actions may reduce our user traffic and adversely affect our business. In addition, we may be subject to penalties for violations of those regulations arising from information displayed on or linked to our websites, including a suspension or shutdown of our online operations.

Moreover, our compliance with PRC regulations governing internet access and distribution of news and other information over the internet may subject us to negative publicity or even legal actions outside of China. In May 2011, eight New York residents filed a lawsuit against us before the U.S. District Court for the Southern District of New York accusing us of aiding Chinese censorship in violation of the U.S. Constitution. In March 2014, the U.S. District Court for the Southern District of New York granted our motion for judgment on the pleadings based upon the First Amendment to the U.S. Constitution and dismissed the plaintiffs' complaint in its entirety. Even though we have won the case, our reputation may be adversely affected among users and investors outside of China.

***The discontinuation of any of the preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition.***

Pursuant to the EIT Law, as further clarified by subsequent tax regulations implementing the EIT Law, foreign-invested enterprises and domestic enterprises are subject to EIT at a uniform rate of 25%. Certain enterprises may still benefit from a preferential tax rate of 15% under the EIT Law if they qualify as "High and New Technology Enterprises strongly supported by the state," subject to certain general factors described in the EIT Law and the related regulations.

A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online Network Technology (Beijing) Co., Ltd., or Baidu Online, and Baidu Netcom are entitled to enjoy a preferential tax rate of 15% due to their qualification as "High and New Technology Enterprise," which has a term of three years. If any or some of these PRC subsidiaries and consolidated affiliated entities fail to maintain the "High and New Technology Enterprise" qualification, their applicable EIT rate will be up to 25%. Furthermore, Baidu Online was entitled to a preferential income tax rate of 10% for 2013 and 2014 due to its "Key Software Enterprise" status designated by the relevant government authorities. Baidu Online enjoyed a reduced tax rate of 15% as a qualified "High and New Technology Enterprise" starting from 2015. The "Key Software Enterprise" status of Baidu Online for 2015 and beyond is being determined by the relevant government authorities. There is no assurance that Baidu Online will continue to be granted the "Key Software Enterprise" status. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax."

The discontinuation of any of the above-mentioned preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition. We cannot assure you that we will be able to maintain our current effective tax rate in the future.

***If our PRC subsidiaries declare and distribute dividends to their respective offshore parent companies, we will be required to pay more taxes, which could have a material and adverse effect on our result of operations.***

Under the EIT Law and related regulations, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its foreign non-resident enterprise investors, and proceeds from any such foreign enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to a 10% withholding tax, unless the foreign enterprise investor's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax. Undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 are exempted from any withholding tax. The British Virgin Islands, where Baidu Holdings Limited, the direct parent company of our PRC subsidiary Baidu Online, is incorporated, does not have such a tax treaty with China. Hong Kong has a tax arrangement with China that provides for a 5% withholding tax on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. For example, Baidu (Hong Kong) Limited, which directly owns our PRC subsidiaries Baidu China and Baidu Times, is incorporated in Hong Kong. However, if Baidu (Hong Kong) Limited is not considered to be the beneficial owner of dividends paid to it by Baidu China and Baidu Times under the tax circulars promulgated in February and October 2009, such dividends would be subject to

29

withholding tax at a rate of 10%. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, such payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

***We may be deemed a PRC resident enterprise under the EIT Law, which could subject us to PRC taxation on our global income, and which may have a material and adverse effect on our results of operations.***

Under the EIT Law and related regulations, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a PRC resident enterprise and is subject to the EIT at the rate of 25% on its worldwide income as well as PRC EIT reporting obligations. The related regulations define the term "de facto management body" as "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise." The State Administration of Taxation issued a SAT Circular 82 in April 2009, which provides certain specific criteria for determining whether the "de facto management body" of a Chinese-controlled overseas-incorporated enterprise is located in China. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." Although the SAT Circular 82, the additional guidance and amendment apply only to overseas registered enterprises controlled by PRC enterprises, not to those controlled by PRC individuals or foreigners, the criteria set forth in SAT Circular 82 may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises or individuals. If we are deemed a PRC resident enterprise, we may be subject to the EIT at 25% on our global income, except that the dividends we receive from our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed as "dividends among qualified PRC resident enterprises." If we are deemed a PRC resident enterprise and earn income other than dividends from our PRC subsidiaries, a 25% EIT on our global income could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

***Under PRC tax laws, dividends payable by us and gains on the disposition of our shares or ADSs may be subject to PRC taxation.***

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the EIT at the rate of 10% upon the dividends payable by us or upon any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. If we are required under the EIT Law to withhold PRC income tax on our dividends payable to our non-PRC resident enterprise shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident enterprise shareholders and ADS holders are subject to the EIT, your investment in our shares or ADSs could be materially and adversely affected.

Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is possible that such dividends and gains earned by non-resident individuals may be subject to PRC individual income tax at a rate of 20%. If we are required under PRC tax laws to withhold PRC income tax on dividends payable to our non-PRC investors that are non-resident individuals or if you are required to pay PRC income tax on the transfer of our shares or ADSs, the value of your investment in our shares or ADSs may be materially and adversely affected.

***Our subsidiaries and consolidated affiliated entities in China are subject to restrictions on paying dividends and making other payments to our holding company.***

Baidu, Inc. is our holding company incorporated in the Cayman Islands and does not conduct any business operations other than holding equity interests in our subsidiaries. As a result of the holding company structure, it currently relies on dividend payments from our subsidiaries in China. However, PRC regulations currently permit payment of dividends only out of accumulated profits, as determined in accordance with PRC accounting standards and regulations. Our subsidiaries and consolidated affiliated entities in China are also required to set aside a portion of their after-tax profits according to PRC accounting standards and regulations to fund certain reserve funds. The PRC government also imposes controls on the conversion of RMB into foreign currencies and the remittance of foreign currencies out of China. We may experience difficulties in completing the administrative procedures necessary to obtain and remit foreign currency. See "—Governmental control of currency conversion may affect the value of your investment." Furthermore, if our subsidiaries or consolidated affiliated entities in China incur debt on their own in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments. If our subsidiaries and consolidated affiliated entities in China are unable to pay dividends or make other payments to us, we may be unable to pay dividends on our ordinary shares and ADSs.

***Governmental control of currency conversion may affect the value of your investment.***

The PRC government imposes controls on the convertibility of RMB into foreign currencies and, in certain cases, the remittance of foreign currency out of China. We receive most of our revenues in RMB. Under our current structure, our income at the Cayman Islands holding company level will primarily be derived from dividend payments from our PRC subsidiaries. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. However, approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may also at its discretion restrict access in the future to foreign currencies for current account transactions. If the foreign exchange control system prevents us from obtaining sufficient foreign currency to satisfy our currency demands, we may not be able to pay dividends in foreign currencies to our shareholders or ADS holders.

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business.***

Baidu, Inc. is our offshore holding company conducting operations in China through our PRC subsidiaries and consolidated affiliated entities. We may make loans to our PRC subsidiaries and consolidated affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Loans by Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries, which are treated as foreign-invested enterprises under PRC law, are subject to PRC regulations and foreign exchange loan registrations. Such loans to any of our PRC subsidiaries to finance their activities cannot exceed statutory limits and must be registered with the local counterpart of SAFE. The statutory limit for the total amount of foreign debts of a foreign-invested enterprise is the difference between the amount of total investment as approved by the Ministry of Commerce or its local counterpart and the amount of registered capital of such foreign-invested enterprise. Any medium or long-term loans by Baidu, Inc. or any of our offshore subsidiaries to our consolidated affiliated entities, which are domestic PRC entities, must be approved by the National Development and Reform Commission and SAFE, or their relevant local counterparts. We may also decide to finance our PRC subsidiaries by means of capital

31

contributions. These capital contributions must be approved by the Ministry of Commerce or its local counterpart. Meanwhile, we are not likely to finance the activities of our consolidated affiliated entities by means of capital contributions given the PRC legal restrictions on foreign ownership of internet, online advertising, online audio and video services and mobile application distribution businesses.

On March 30, 2015, SAFE promulgated SAFE Circular No. 19, which came into force replacing SAFE Circular No. 142 on June 1, 2015. SAFE Circular No. 19 removed certain restrictions previously provided under Circular No. 142 for conversion by a foreign-invested enterprise of foreign currency registered capital into RMB and use of such RMB capital. However, SAFE Circular No. 19 continues to prohibit foreign-invested enterprises from, among other things, using RMB fund converted from its foreign exchange capitals for expenditure beyond its business scope, providing entrusted loans or repaying loans between non-financial enterprises.

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, including SAFE Circulars referred to above, we cannot assure you that we will be able to complete the necessary government registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans by us to our PRC subsidiaries or consolidated affiliated entities or additional capital contributions by us to our PRC subsidiaries, and conversion of such loans or capital contributions into RMB. If we fail to complete such registrations or obtain such approvals, our ability to capitalize or otherwise fund our PRC operations may be negatively affected, which could adversely affect our ability to fund and expand our business.

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may limit our ability to inject capital into our PRC subsidiaries, limit our subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

The Notice on Issues Relating to the Administration of Foreign Exchange in Fund-Raising and Round-Trip Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Companies, or SAFE Circular No. 75, and a series of implementation rules and guidance issued by SAFE, including the circular relating to operating procedures that came into effect in July 2011, require PRC residents and PRC corporate entities to register with local branches of SAFE in connection with their direct or indirect offshore investment in an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. On February 28, 2015, SAFE promulgated a Notice on Further Simplifying and

Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, which became effective on June 1, 2015. In accordance with SAFE Notice 13, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

As it is uncertain how the SAFE regulations described above will be interpreted or implemented, we cannot predict how these regulations will affect our business operations or future strategy. For example, we may be subject to more stringent review and approval process with respect to our foreign exchange activities, such as remittance of dividends and foreign currency-denominated borrowings, which may adversely affect our results of operations and financial condition. In addition, if we decide to acquire a PRC domestic company, we cannot assure you that we or the owners of such company will be able to obtain the necessary approvals or complete the necessary filings and registrations required by the SAFE regulations. This may restrict our ability to implement our acquisition strategy and could adversely affect our business and prospects.

***Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC optionees fail to comply with these regulations in the future, we or our PRC optionees and their local employers may be subject to fines and legal sanctions.

***PRC regulations establish complex procedures for some acquisitions conducted by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, adopted by six PRC regulatory agencies in August 2006 and amended in June 2009, among other things, established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time-consuming and complex. In addition, the Implementing Rules Concerning Security Review on the Mergers and Acquisitions by Foreign Investors of Domestic Enterprises, issued by the Ministry of Commerce in August 2011, specify that mergers and acquisitions by foreign investors involved in "an industry related to national security" are subject to strict review by the Ministry of Commerce, and prohibit any activities attempting to bypass such security review, including by structuring the transaction through a proxy or contractual control arrangement. We believe that our business is not in an industry related to national security, but we cannot preclude the possibility that the Ministry of Commerce or other government agencies may publish explanations contrary to our

understanding or broaden the scope of such security reviews in the future, in which case our future acquisitions in the PRC, including those by way of entering into contractual control arrangements with target entities, may be closely scrutinized or prohibited. Moreover, the Anti-Monopoly Law requires that the Ministry of Commerce be notified in advance of any concentration of undertaking if certain filing thresholds are triggered. We may grow our business in part by directly acquiring complementary businesses in China. Complying with the requirements of the laws and regulations mentioned above and other PRC regulations to complete such transactions could be time-consuming, and any required approval processes, including obtaining approval from the Ministry of Commerce, may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share. Our ability to expand our business or maintain or expand our market share through future acquisitions would as such be materially and adversely affected.

***Our auditor, like other independent registered public accounting firms operating in China, is not permitted to be subject to inspection by Public Company Accounting Oversight Board, and as such, investors may be deprived of the benefits of such inspection.***

Our independent registered public accounting firm that issues the audit reports included in our annual reports filed with the SEC, as an auditor of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or PCAOB, is required by the laws of the United States to undergo regular inspections by PCAOB to assess its compliance with the laws of the United States and professional standards. Because our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, our auditor, like other independent registered public accounting firms operating in China, is currently not inspected by PCAOB. In May 2013, PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the CSRC and the Ministry of Finance, which establishes a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations undertaken by PCAOB, the China Securities Regulatory Commission, or the CSRC, or the Ministry of Finance in the United States and the PRC, respectively. PCAOB continues to be in discussions with the CSRC and the Ministry of Finance to permit joint inspections in the PRC of audit firms that are registered with PCAOB and audit Chinese companies that trade on U.S. exchanges.

Inspections of other firms that PCAOB has conducted outside of China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. The inability of PCAOB to conduct inspections of independent registered public accounting firms operating in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

***Proceedings instituted by the SEC against certain PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act.***

In December 2012, the SEC brought administrative proceedings against five accounting firms in China, including our independent registered public accounting firm, alleging that they had refused to produce audit work papers and other documents related to certain other China-based companies under investigation by the SEC. On January 22, 2014, an initial administrative law decision was issued, censuring these accounting firms and suspending four of these firms from practicing before the SEC for a period of six months. The decision is neither final nor legally effective unless and until reviewed and approved by the SEC. On February 12, 2014, four of these PRC-based accounting firms appealed to the SEC against this decision. In February 2015, each of the four PRC-based accounting firms agreed to a censure and to pay a fine to the SEC to settle the dispute and avoid suspension of their ability to practice before the SEC. The settlement requires the firms to follow detailed procedures to seek to provide the SEC with access to Chinese firms' audit documents via the CSRC. If the firms do not follow these procedures, the SEC could impose penalties such as suspensions, or it could restart the administrative proceedings.

34

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about the proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to our delisting from the NASDAQ Global Select Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

### *Fluctuation in the value of the RMB may have a material and adverse effect on your investment.*

The value of the RMB against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in China's political and economic conditions and foreign exchange policies. The conversion of RMB into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The PRC government allowed the RMB to appreciate by more than 20% against the U.S. dollar between July 2005 and July 2008. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the RMB and the U.S. dollar remained within a narrow band. Since June 2010, the RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably, and in recent months the RMB has depreciated significantly against the U.S. dollar. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future.

Our revenues and costs are mostly denominated in RMB. Any significant revaluation of RMB may materially and adversely affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, an appreciation of RMB against the U.S. dollar would make any new RMB denominated investments or expenditures more costly to us, to the extent that we need to convert U.S. dollars into RMB for such purposes. An appreciation of RMB against the U.S. dollar would also result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated financial assets into RMB, as RMB is our reporting currency. Conversely, a significant depreciation of the RMB against the U.S. dollar may significantly reduce the U.S. dollar equivalent of our earnings, which in turn could adversely affect the price of our ADSs. Furthermore, a significant depreciation of the RMB against the U.S. dollar may have a material adverse impact on our cash flow in the event we need to convert our RMB into U.S. dollars to repay our U.S. dollar denominated notes or other payment obligations.

### *We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.*

Pursuant to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises, or Circular 698, issued by the State Administration of Taxation, which became effective retroactively as of January 1, 2008, where a non-resident enterprise investor transfers equity interests in a PRC resident enterprise indirectly by way of disposing of equity interests in an overseas holding company, the non-resident enterprise investor, being the transferor, may be subject to PRC enterprise income tax, if the indirect transfer is considered to be an abusive use of company structure without reasonable commercial purposes. As a result, gains derived from such indirect transfer may be subject to PRC withholding tax at the rate of up to 10%. In addition, the PRC resident enterprise may be required to provide necessary assistance to support the enforcement of Circular 698.

On February 3, 2015, the State Administration of Tax issued a Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises, or Public Notice 7. Public Notice 7 has introduced a new tax regime that is significantly different from that under Circular 698. Public Notice 7 extends its tax jurisdiction to not only indirect transfers set forth under Circular 698 but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may re-characterize such indirect transfer as a direct transfer of the equity interests in the PRC tax resident enterprise and other properties in China. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of up to 10% for the transfer of equity interests in a PRC resident enterprise. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

We face uncertainties with respect to the reporting and consequences of private equity financing transactions, share exchange or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises, or sale or purchase of shares in other non-PRC resident companies or other taxable assets by us. Our company and other non-resident enterprises in our group may be subject to filing obligations or being taxed if our company and other non-resident enterprises in our group are transferors in such transactions, and may be subject to withholding obligations if our company and other non-resident enterprises in our group are transferees in such transactions, under Circular 698 and Public Notice 7. For the transfer of shares in our company by investors that are non-PRC resident enterprises, our PRC subsidiaries may be requested to assist in the filing under Circular 698 and Public Notice 7. As a result, we may be required to expend valuable resources to comply with Circular 698 and Public Notice 7 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our company and other non-resident enterprises in our group should not be taxed under these circulars. The PRC tax authorities have the discretion under Circular 698 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. If the PRC tax authorities make adjustments to the taxable income of the transactions under Circular 698 and Public Notice 7, our income tax costs associated with such transactions will be increased, which may have an adverse effect on our financial condition and results of operations. We have made acquisitions in the past and may conduct additional acquisitions in the future. We cannot assure you that the PRC tax authorities will not, at their discretion, adjust any capital gains and impose tax return filing obligations on us or require us to provide assistance to them for the investigation of any transactions we were involved in. Heightened scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.

**Risks Related to Our ADSs**

***The trading price of our ADSs has been volatile and may continue to be volatile regardless of our operating performance.***

The trading price of our ADSs has been and may continue to be subject to wide fluctuations. The market price for our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including the following:

- actual or anticipated fluctuations in our quarterly results of operations;

36

- changes in financial estimates by securities research analysts;

- conditions in internet search and online marketing markets;

- changes in the operating performance or market valuations of other internet search or internet companies;

- announcements by us or our competitors or other internet companies of new products, acquisitions, strategic partnerships, joint ventures or capital commitments;

- addition or departure of key personnel;

- fluctuations of exchange rates between RMB and the U.S. dollar;

- intellectual property litigation; and

- general economic or political conditions in China or elsewhere in the world.

In addition, the stock market in general, and the market prices for internet-related companies and companies with operations in China in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. The securities of some China-based companies that have listed their securities in the United States have experienced significant volatility since their initial public offerings in recent years, including, in some cases, substantial declines in the trading prices of their securities. The trading performances of these companies' securities after their offerings may affect the attitudes of investors towards Chinese companies listed in the United States in general, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or other matters of other Chinese companies may also negatively affect the attitudes of investors towards Chinese companies in general, including us, regardless of whether we have engaged in any inappropriate activities. In particular, the global financial crisis and the ensuing economic recessions in many countries have contributed and may continue to contribute to extreme volatility in the global stock markets. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted options or other equity incentives.

***Substantial future sales or the perception of sales of our ADSs in the public market could cause the price of our ADSs to decline.***

Sales of our ADSs in the public market, or the perception that these sales could occur, could cause the market price of our ADSs to decline. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate. If any existing shareholder or shareholders sell a substantial amount of ADSs, the prevailing market price for our ADSs could be adversely affected. In addition, if we pay for our future acquisitions in whole or in part with additionally issued ordinary shares, your ownership interests in our company would be diluted and this, in turn, could have a material and adverse effect on the price of our ADSs.

***You may not have the same voting rights as the holders of our ordinary shares and may not receive voting materials in time to be able to exercise your right to vote.***

Except as described in this annual report and in the deposit agreement, holders of our ADSs will not be able to exercise voting rights attached to the shares evidenced by our ADSs on an individual basis. Holders of our ADSs will appoint the depositary or its nominee as their representative to exercise the voting rights attached to the shares represented by the ADSs. You may not receive voting materials in time to instruct the depositary to vote, and it is possible that you, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. Upon our written request, the depositary will mail to you a shareholder meeting notice which contains, among other things, a statement as to the manner in which your voting instructions may be given, including an express indication that such instructions may be given or deemed

given to the depositary to give a discretionary proxy to a person designated by us if no instructions are received by the depositary from you on or before the response date established by the depositary. However, no voting instruction will be deemed given and no such discretionary proxy will be given with respect to any matter as to which we inform the depositary that (i) we do not wish such proxy given, (ii) substantial opposition exists, or (iii) such matter materially and adversely affects the rights of shareholders.

### *You may not be able to participate in rights offerings and may experience dilution of your holdings as a result.*

We may from time to time distribute rights to our shareholders, including rights to acquire our securities. Under the deposit agreement for the ADSs, the depositary will not offer those rights to ADS holders unless both the rights and the underlying securities to be distributed to ADS holders are either registered under the Securities Act of 1933, or exempt from registration under the Securities Act with respect to all holders of ADSs. We are under no obligation to file a registration statement with respect to any such rights or underlying securities or to endeavor to cause such a registration statement to be declared effective. In addition, we may not be able to take advantage of any exemptions from registration under the Securities Act. Accordingly, holders of our ADSs may be unable to participate in our rights offerings and may experience dilution in their holdings as a result.

### *You may be subject to limitations on transfer of your ADSs.*

Your ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

### *You may face difficulties in protecting your interests, and your ability to protect your rights through the U.S. federal courts may be limited, because we are incorporated under Cayman Islands law, conduct most of our operations in China and all of our officers reside outside of the United States.*

We are incorporated in the Cayman Islands, and conduct most of our operations in China through our subsidiaries and consolidated affiliated entities in China. All of our officers and a majority of our directors reside outside of the United States and some or all of the assets of these persons are located outside of the United States. As a result, it may not be possible to effect service of process within the United States or elsewhere outside of China upon our executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws.

It may also be difficult or impossible for you to bring an action against us or against our directors and officers in the Cayman Islands or in China in the event that you believe that your rights have been infringed under the securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers. There is no statutory recognition in the Cayman Islands of judgments obtained in the United States, although the courts of the Cayman Islands will generally recognize and enforce a non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. Moreover, our PRC counsel has advised us that the PRC does not have treaties with the United States or many other countries providing for the reciprocal recognition and enforcement of judgment of courts.

Our corporate affairs are governed by our memorandum and articles of association and by the Companies Law (2013 Revision) and common law of the Cayman Islands. The rights of shareholders to take legal action against our directors and us, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the

Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedents in the United States. In particular, the Cayman Islands has a less developed body of securities laws as compared to the United States, and provides significantly less protection to investors. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action before the federal courts of the United States.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests through actions against our management, directors or major shareholders than would shareholders of a corporation incorporated in a jurisdiction in the United States.

*Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.*

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering. Our co-founder, chairman and chief executive officer, Robin Yanhong Li, who acquired our shares prior to our initial public offering, holds our Class B ordinary shares. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate of such holder, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time Robin Yanhong Li and his affiliates collectively own less than 5% of the total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share will be automatically and immediately converted into one Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

Due to the disparate voting powers attached to these two classes, certain shareholders have significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control could discourage or prevent others from pursuing any potential merger, takeover or other change of control transactions with our company, which could deprive our shareholders and ADS holders of an opportunity to receive a premium for their shares or ADSs as part of a sale of our company and might reduce the price of our ADSs.

*Our articles of association contain anti-takeover provisions that could adversely affect the rights of holders of our ordinary shares and ADSs.*

Our articles of association include certain provisions that could limit the ability of others to acquire control of our company, and therefore may deprive the holders of our ordinary shares and ADS of the opportunity to sell their ordinary shares or ADS at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. These provisions include the following:

- A dual-class ordinary share structure.

- Our board of directors has the authority, without approval by the shareholders, to issue up to a total of 10,000,000 preferred shares in one or more series. Our board of directors may establish the number of shares to be included in each such series and may fix the designations, preferences, powers and other rights of the shares of a series of preferred shares.

- Our board of directors has the right to elect directors to fill a vacancy created by the increase of the board of directors or the resignation, death or removal of a director, which prevents shareholders from having the sole right to fill vacancies on our board of directors.

39

*We may be classified as a passive foreign investment company, which could result in adverse U.S. federal income tax consequence to U.S. Holders of our ADSs or ordinary shares.*

A non-U.S. corporation, such as our own, will be considered a passive foreign investment company, or "PFIC", for any taxable year if either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. The value of our assets is generally determined by reference to the market price of the ADSs and ordinary shares, which may fluctuate considerably. In addition, because there are uncertainties in the application of the relevant rules and because PFIC status is a fact-intensive determination made on an annual basis, no assurance may be given with respect to our PFIC status for the current or any future taxable year.

Although under certain interpretations of how one determines what portion of goodwill and certain other assets are treated as "passive", we may have been a PFIC for 2015, we believe under more reasonable approaches for our circumstances, based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, that we were not a PFIC for our taxable year ended December 31, 2015. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. We do not expect to be a PFIC for our taxable year ending December 31, 2016 or for the foreseeable future. However, our PFIC status for the current taxable year ending December 31, 2016 will not be determinable until the close of the taxable year, and, accordingly, there is no guarantee that we will not be a PFIC for the current taxable year (or any future taxable year).

If we were treated as a PFIC for any taxable year during which a U.S. Holder (defined below) held an ADS or an ordinary share, certain adverse U.S. federal income tax consequences could apply to the U.S. Holder. See "Item 10.E. Additional Information—Taxation—United States Federal Income Taxation—Passive Foreign Investment Company."

**Item 4.    Information on the Company**

**A.    History and Development of the Company**

We were incorporated in the Cayman Islands in January 2000. Since our inception, we have conducted our operations in China principally through Baidu Online, our wholly owned subsidiary in Beijing, China. Since June 2001, we also have conducted part of our operations in China through Baidu Netcom, a consolidated affiliated entity in Beijing, China, which holds the licenses and approvals necessary to operate our websites and provide online advertising services. In more recent years, we have established additional subsidiaries inside and outside of China and assisted in establishing additional PRC consolidated affiliated entities to conduct part of our operations.

On August 5, 2005, we listed our ADSs on The NASDAQ National Market (later renamed The NASDAQ Global Market) under the symbol "BIDU." We and certain selling shareholders of our company completed the initial public offering of 4,604,224 ADSs, each then representing one Class A ordinary share, on August 10, 2005. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split. Our ADSs are currently traded on The NASDAQ Global Select Market.

In December 2008, our shareholders approved our name change from Baidu.com, Inc. to Baidu, Inc. In November 2009, we moved into our new corporate headquarters, which we name as Baidu Campus. Our principal executive offices are located at Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, the People's Republic of China. Our telephone number at this address is +86 (10) 5992-8888.

In November 2012, we obtained the controlling interest in Qiyi.com, Inc., or iQiyi, a prior equity method investee, and have since then consolidated its financial results into our consolidated financial statements. In

May 2013, we acquired the online video business of PPStream Inc., or PPS, and have merged it with iQiyi and have since then consolidated its financial results into our consolidated financial statements. In February 2016, we received a non-binding proposal from Mr. Robin Yanhong Li, chairman and chief executive officer of Baidu, and Mr. Yu Gong, chief executive officer of iQiyi, proposing to acquire all of the outstanding shares of iQiyi beneficially owned by us based on an enterprise valuation of US$2.8 billion for 100% of iQiyi on a cash-free and debt-free basis. Pursuant to the non-binding proposal, the buyers expect that iQiyi will remain a strategic partner to us after the consummation of the proposed transaction and enter into business cooperation agreements with us.

In October 2013, we acquired 100% equity interest of 91 Wireless from NetDragon Websoft Inc., or NetDragon, and the other shareholders of 91 Wireless, and have since then consolidated its financial results into our consolidated financial statements.

We consolidated the financial results of Qunar, an online travel services provider, in our consolidated financial statements from July 2011 to October 2015. In July 2011, we acquired a majority stake in Qunar. In November 1, 2013, Qunar listed its ADSs, each representing three Class B ordinary shares of Qunar, on NASDAQ in connection with its initial public offering. In October 2015, we completed a share exchange transaction with Ctrip, in which we exchanged 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares in Qunar for 11,488,381 newly-issued ordinary shares of Ctrip, at an exchange ratio of 0.725 Ctrip ADSs per Qunar ADS. As a result of the transaction, we have ceased consolidating the financial results of Qunar, and we have become a major shareholder of Ctrip, owning approximately 25% of Ctrip's aggregate voting interest.

### B.   Business Overview

We are the leading Chinese language internet search provider. As a technology-based media company, we aim to provide the best and most equitable way for people to find what they are looking for. In addition to serving individual internet search users, we provide an effective platform for businesses to reach potential customers.

Our business consists of three segments, namely, search services, transaction services and iQiyi. Search services are keyword-based marketing services targeted at and triggered by internet users' search queries, which mainly include our P4P services and other online marketing services. Transaction services include Baidu Nuomi, Baidu Takeout Delivery, Baidu Maps, Baidu Connect, Baidu Wallet and others. iQiyi is an online video platform with a content library that includes licensed movies, television series, cartoons, variety shows and other programs.

Our *Baidu.com* website is the largest website in China and the fourth largest website globally, as measured by average daily visitors and page views during the three-month period ended December 31, 2015, according to Alexa.com, an internet analytics firm. In addition, our "Baidu" brand is one of the highest ranking brands in China in BrandZ Top 50 Most Valuable Chinese Brands 2015, a study published by Millward Brown Optimor, a brand strategy research company.

We conduct our operations primarily in China. Revenues generated from our operations in China accounted for approximately 99.8%, 99.5% and 98.9% of our total revenues in 2013, 2014 and 2015, respectively.

We serve three types of online participants:

*Users.* We offer a Chinese language search platform on our *Baidu.com* website that enables users to find relevant information online, including web pages, news, images, documents and multimedia files, through links provided on our website. We also offer transaction platforms, such as *Nuomi.com,* to connect online and offline services provided by third-parties. We provide a broad range of products and services to enrich user experience, including search services, transaction services and iQiyi. Our products and services can be accessed through PCs and mobile devices. We aspire to provide the best experience to our users. To this end, we have invested in advanced technology such as deep learning and semantic intelligence.

41

*Customers.* We deliver online marketing services to a diverse customer base operating in a variety of industries. In 2015, we had approximately 1,049,000 active online marketing customers. Consistent with previously reported numbers, the number of active online marketing customers excluded those for our group-buying related businesses. Our online marketing customers consist of SMEs throughout China, large domestic companies and Chinese divisions and subsidiaries of large, multinational companies. We have a diverse customer base in terms of industries and geographical locations. Our defined industries in which our customers operate include retail and ecommerce, local services, medical and healthcare, financial services, education, tourism and ticketing, online games, transportation, construction and decoration, and business services. Customers in our top five industries contributed more than 50.0% of our total online marketing revenues in 2015. Although we have customers located throughout China, we have a more active and larger customer base in coastal regions, reflecting the current general economic demographics in China.

Customers for our transaction services primarily consist of merchants that act as service providers on our transaction platforms, such as *Nuomi.com*. The merchants that operate on our transaction platforms mainly cover businesses such as restaurants, hotels and cinemas.

We reach and serve our customers through our direct sales force as well as a network of third-party distributors across China. As many of our customers are SMEs, we use distributors to help us identify potential SME customers, collect payments and assist SMEs in setting up accounts with us and using our online marketing services. We have also engaged third-party agencies to identify and reach potential customers outside of China. To better enable our customers to capture the mobile opportunity, we provide free tools to customers to help them build and modify mobile landing pages and proactively educate customers about mobile marketing. We also have an integrated bidding system to better streamline the bidding experience for PC and mobile channels for our customers. Mobile revenues accounted for 52.7% of our total revenues for 2015.

*Baidu Union Members.* Baidu Union consists of a large number of third-party web content, software and mobile application providers. Baidu Union members can display on their properties our customers' promotional links that match the content of such members' properties. Some Baidu Union members also embed some of our products and services into their properties. We allow Baidu Union members to provide high-quality and relevant search results to their users without the cost of building and maintaining advanced search capabilities in-house and to monetize their traffic through revenue sharing arrangements with us. We reward Baidu Union members by sharing with these members revenues as a percentage of total revenues recognized by us. As a result of our continued effort to optimize the quality of Baidu Union members, the traffic and revenue contributed by Baidu Union members continue to increase, along with the growth of organic revenues generated by our own properties.

**Search Services**

*Search Products and Services for Users*

We focus on offering products and services that enable our users to find relevant information quickly and easily. We offer our main products and services to users through *Baidu.com* free of charge generally. These products and services can be accessed through PCs, mobile and other non-mobile devices.

**Baidu Web Search.** Baidu's web search allows users to locate information through search queries. After typing a search query, users generally receive a list of ranked search results, which may include our customers' content presented in a specific format. Users can then access the desired information by examining the returned search snippets, or clicking on the hypertext links displayed in the search results. The number of average monthly active users of mobile search, defined as users who used the service at least once in a given month, was approximately 657 million for December 2015, an increase of 21.0% over the corresponding period in the prior year.

We have integrated many features into our web search system to help users easily access the right information out of a huge number of web pages. The Baidu web search includes, but not limited to, the following features:

- Query Suggestion—based on the keywords in users' search queries and their search history, we recommend related topics (such as books, historical figures, movies and games) that may be of interest to users in order to unleash their potential demands. With our machine learning and big data analytics technologies, we predict the queries that the users may need later on and display them in the dropdown list under the search box.

- Instant Search—returns search results when a user is typing a search query to speed up the search process and save time, by leveraging on our innovative asynchronous pre-fetch technology and big data prediction capability.

- In-depth Answers—provides relevant and in-depth answers to search inquiries using our deep learning technology to locate, summarize and integrate relevant information from massive data.

- Rich Content—by analyzing users' intention and the content of search pages, provides users with more structural and in-depth data in the snippets of search results. For example, we directly display answers, marked in red, in the search result snippets for Q&A-type query; we directly display valuable sub-links and images in search result snippets.

- Personalization—provides personalized suggestions and search results, based on users' past search behavior and situational information, such as time, location, type of device and internet connection speed.

- Recommendation for Web Search—recommends interesting results (such as books, music, novels, movies, and games) to enhance user engagements and satisfaction. We have developed sophisticated algorithms and launched several innovative features including entity-collection recommendation, post-click keywords recommendation, interactive recommendation, task-oriented recommendation and knowledge graph-based recommendation.

- Baidu Personalized Homepage—offers a customizable homepage providing signed-in users a personalized experience. We recommend information, websites and service information of interest based on a user's past behavior. Users may also add and subscribe to websites and apps.

- HTTPS Connection—has significantly advanced the security of our products by protecting the information and privacy of our PC and mobile users through HTTPS protocols.

- English Language Resources—addresses the ever-growing needs among our users to search English language resources by providing a wealth of high-quality English webpage data. To improve the English search experience of our users, we made significant improvements to our English query understanding and English web result ranking. We also leverage our Baidu machine translation technology to present users with Chinese translations of English snippets and webpages.

In order to improve mobile user experience, we have also undertaken a series of product innovations and developments, including but not limited to, the following features:

- Enriched Services—are connected with our mobile search function, such as takeout delivery, movie tickets, hotel stays, air tickets, home services and other types of local lifestyle services, which expand the usefulness of our search services. We also select and recommend suitable services to users based on their interest, location, time of the day and other mobile situational traits in order to improve user experience.

- Multi-modal Search—allows users to obtain accurate, fast and rich search results by simply talking to the PC or mobile device, or by taking or uploading a picture. As methods through which users express their requests become more diversified, the interaction between search engines and users is also

43

expanding to include multi-media input and output models such as text, voice and images. Multi-media interactive search provides users with a more convenient, diverse and imaginative mobile search experience.

- Colloquial Language Understanding—provides higher quality search results using semantic analyzing technology in response to increasingly colloquial voice inputs from users.

- Results from Mobile Applications—complement resources from traditional web pages. Our mobile search can obtain and present unique information in mobile applications. Users can view search results from mobile applications and launch such applications directly, if they are already installed on the mobile device, or download such mobile applications.

- Re-formatting of Search Results—allows us to improve the mobile viewing experience and information gathering efficiency of users by processing and re-formatting search results into compatible and easy-to-read content for mobile device users.

**Baidu Image Search.** Baidu Image Search enables users to search for images on the internet by term queries or various categories and offers advanced features, such as search by image file type and search within a designated website or web page. Baidu Image Search is accessible through both web page and mobile device. Baidu Image Search also allows users to search information on an image or search other similar images by allowing users to upload an image or enter its uniform resource locator (URL). In addition, registered users can upload, label and share with others high-quality pictures through Baidu Image Search.

**Baidu Post Bar.** Baidu Post Bar is a social media platform that attracts users through topics of common interest. Users post text, image, audio and video content and reply to original content, thus forming social networks around topics of discussions. Baidu Post Bar draws new users through close integration with search and user-generated content. Baidu Post Bar has become a leading platform for celebrity fans, online game players, online novel readers and virtual local communities. Owing to its characteristic of equality and openness, Baidu Post Bar sees new online cultural trends and catch phrases being generated constantly, and Baidu Post Bar has become a social media platform as result of its ability to cultivate and deliver high-quality content.

**Baidu Knows.** Baidu Knows provides users with a query-based searchable community to share knowledge and experiences. Through Baidu Knows, registered users can post specific questions for other users to respond as well as respond to questions posted by others. Baidu Knows is accessible through both web page and mobile application. Any users of our *Baidu.com* website can also search, read and browse questions and answers contributed by registered users of Baidu Knows. Baidu Knows has also invited institutional and personal experts in many fields such as medical care, maternal and child health, education, finance and law to address users' questions.

**Baidu Encyclopedia.** Baidu Encyclopedia is an evolving encyclopedia compiled by registered users. Registered users can share their knowledge by adding new terms and new content in Baidu Encyclopedia. Baidu Encyclopedia has experts in many fields, such as medical care and studio arts, among its registered users, which experts have contributed a rich collection of influential content. Any users of our *Baidu.com* website can also search, read and browse all terms and content contributed by registered users of Baidu Encyclopedia. Baidu Encyclopedia has produced a number of characteristic columns, such as Encyclopedia of Intangible Cultural Heritage, Digital Museum, Recorder of History, etc., which aim to meet the high-quality content requirements of users.

**Baidu WenKu.** Baidu WenKu is an online document sharing platform, through which registered users of our *Baidu.com* website can search, browse or read, by categories, documents in various formats such as Microsoft WORD, PDF and Microsoft Excel. Baidu WenKu also allows registered users to upload documents to and download from this user-created documents database. For senior high school students, Baidu WenKu introduced the Baidu GaoKao service, which provides one-on-one tutoring services to students preparing for the Chinese national college entrance exam by leveraging Baidu big data technology. For teachers, Baidu WenKu provides high-quality teaching resources, such as instructional materials, through *youke.baidu.com*.

44

**Hao123.com**. Hao123.com is a popular Chinese website directory navigation site in China.

**Baidu Mobile Search.** As one of our flagship mobile applications, Baidu Mobile Search enables users to access our search and community-based products and services using mobile devices, including WAP-enabled mobile phones. Baidu Mobile Search supports text, voice and image search to better serve users of mobile devices. By minimizing graphics and interactive contents, Baidu Mobile Search offers a user-friendly and productive mobile internet search experience.

**Baidu Mobile Assistant.** Baidu Mobile Assistant is a mobile application marketplace designed for Android mobile devices. The platform offers an extensive and diversified array of applications, and selects and recommends high-quality applications based on big data analytics. Baidu Mobile Assistant presents contents of applications to users, helping them to find the most suitable applications. Baidu Mobile Assistant helps improve users' phone management, allowing users to download, upgrade, manage and delete applications easily and conveniently. It also allows users to share files such as applications, videos, audios and images easily without data usage.

**Baidu Mobile Browser.** Baidu Mobile Browser is a mobile internet browser. Users can search for their favorite websites and customize their Baidu Mobile Browser landing pages. Users can land Baidu Mobile Browser through their mobile phones based on Windows, Android and iOS.

**Baidu Mobile Guardian.** Baidu Mobile Guardian is a powerful phone security software, using mobile anti-virus technology. It can provide users with free system optimization, mobile handset accelerator, virus sweeper, data privacy, harassing phone intercept, secure payment and other features. Throughout 2015, Baidu Mobile Guardian was recognized as one of the top-ranked players by AV-Test, an authoritative international testing organization.

**Duer.** Duer, introduced in 2015, is an intelligent personal virtual assistant that provides secretarial search service to users. Duer provides high-quality personal assistant services such as performing tasks, information seeking, answering questions and casual chatting through conversational user interface. Its implementation leverages our search, natural language processing, artificial intelligence and machine learning technology.

### *Search Products and Services for Customers*

We focus on providing customers with cost-effective and targeted marketing solutions. We generate a large majority of our revenues from online marketing services, including online marketing services based on search queries, contextuals, audience attributes, media and placement attributes and online marketing services of other forms. Our online marketing services generally comprise text links, images, multimedia files and interactive forms.

### *Online Marketing Services Based on Search Queries*

Online marketing services based on search queries are keyword-based marketing services targeted at and triggered by internet users' search queries, which include our P4P services and other search query–based online marketing services, for example, BrandZone. Typically, a P4P customer pays us when users click on one of its website links on Baidu search result pages or Baidu Union members' properties, while a Brand-Link customer pays us based on the duration of the placement on Baidu search result pages. Users could reach our P4P sponsored links and Brand-Link on either mobile or non-mobile devices.

**P4P.** Our auction-based P4P services enable our customers to bid for priority placement of their links in keyword search results. Our P4P platform enables our customers to reach users who search for information related to their products or services. Customers may use our automated online tools to create text-based descriptions of their web pages and bid on keywords that trigger the display of their web page information and links. Our P4P platform features an automated online sign-up process that allows customers to activate and manage their accounts at any time.

45

Our P4P platform is an online marketplace that introduces internet search users to customers who bid for priority placement in the search results. Our intelligent ranking system takes into consideration the "quality factor" of a sponsored link for a search query in addition to the price bid on the keyword. The quality factor of a sponsored link for a search query is determined based on the relevance and certain other factors. The relevance is determined based on our analysis of past search and click-through results. Links to customers' websites are ranked according to a comprehensive ranking index, calculated based on both the quality factor of a sponsored link for a search query and the price bid on that keyword. Our P4P online marketing customers may choose to set a daily limit on the amount spent and may also choose to target only users accessing our website from specified regions in China and/or during specific time period of the day.

We customize search results by vertical industries through commercial knowledge graph. The commercial knowledge graph enhances the presentation of our customers' commercial promotions through a structured format, and allows users to purchase or acquire the products or services offered by our customers in the search results. The search results of commercial knowledge graph consist of a special aggregated type of promotion called "Card" in the search results page, and a corresponding landing page that aggregates customers' promotions and information.

Phoenix Nest, one of our current online marketing systems, is designed to improve relevance in paid search and increase value for customers, thus driving monetization efficiency. We have made enhancements continually to our Phoenix Nest platform. We have opened online marketing on mobile search to all customers to allow them to promote their products and services. In addition to text descriptions, customers can also promote their applications on mobile search. In order to help customers achieve better ROI from mobile search campaigns, we provide a series of special management tools in Phoenix Nest, including upgraded site building tool such as SiteApp for enhanced user experience, online chatting tool for better user engagement, mobile statistics analysis tool for enhanced conversion tracking, and performance reporting for managing campaign effectiveness. We have provided additional geo-targeting options in Phoenix Nest to enable customers to engage in city-level and distance proximity bidding. Moreover, we have launched Phoenix Nest App (Android and iOS) allowing customers to manage their online marketing anywhere and anytime. We provide tools and features, such as Phone Calls, App Downloads, Site-Links on Mobile, Brand-Link on Mobile, allowing customers to manage and optimize mobile marketing and understand the mobile opportunity properly. Leveraging on our ability to precisely recognize the search intent of users and matching the intent with the website content of the customers, our dynamic marketing solutions present marketing content in varying formats, including living images, product discount information, and photo and textual illustrations of specific merchandise.

In 2015 we further upgraded Phoenix Nest by introducing a suite of new functionalities and services. We launched Local Express, which provides merchants with a turn-key solution to easily participate in our online marketing and transaction services, without high start-up costs or the need for infrastructure investment. Local Express merchant accounts can be accessed by users via search, Baidu Maps and Baidu Nuomi. Local Express helps local merchants to reach users more effectively.

To increase the return and efficiency of marketing spending for customers, we assist our customers in their mobile situational marketing spending, i.e. directing their marketing spending based on the target audience, time of the day and location. We deliver data analysis reports on marketing spending to our customers after their marketing campaigns. In 2015, we integrated data on online clicks, registration and offline store visits, allowing for intelligent marketing spending. Furthermore, we continue to study mobile search behavior of our users and to deliver customized push results by automatically mining and analyzing the advertising content of our customers.

**BrandZone.** BrandZone is our flagship branding display marketing product. The marketing message for a customer can integrate text description, image and video, and appear in a prominent position of the search result page. The display position for BrandZone includes not only our web search but also various vertical search products, such as Baidu Knows and Baidu Image Search. BrandZone allows the brand image of an advertiser to be displayed in all the vertical search products in a structured and uniform manner.

46

**Aladdin.** Aladdin is a form of commercialization of our Baidu data open platform. Based on our analysis of user search needs, we collaborate with vertical websites, who supply us with high quality and structured data for our inclusion in the search results to our users, and in return receive high-quality user traffic generated by us. We generate revenues from Aladdin service typically based on the duration of contract, while some customers pay us based on the number of clicks on our customers' links that we help to generate.

*Online Marketing Services Based on Contextuals, Audience Attributes, Media and Placement Attributes*

Online marketing services based on contextuals, audience attributes, media and placement attributes refer to our programmatic marketing service transaction system, which is composed of four part: supply-side platform (SSP); demand-side platform, or (DSP); Baidu exchange service platform, or (BES); and data-management platform, or (DMP).

SSP covers media resources of Baidu and third-party Baidu Union members. SSP intelligently manages media advertising space inventory and optimizes marketing spending by analyzing matching content, target audience and characteristics of different media and platforms. SSP has connected more advertising resources through technological upgrades. SSP currently supports a number of main-stream media formats, including textual links, images, open screen, interstitial, banner, information flow and video. SSP also supports native advertisement placement.

DSP is an integrated sales service platform for advertisers and advertising agents, providing programmatic media buy service. DSP supports PC web, WAP, in-app, and in-stream traffic multi-screen advertisement placement. DSP also supports the advertisement placement of standard creativity, intelligent creativity and customized creativity, as well as multiple payment methods including CPT, CPM, CPC and CPA.

BES is a traffic transaction platform that combines DSP with media resources, by leveraging the traffic advantage and big-data capabilities of BES. BES automatically conducts the ad-media buy process on behalf of advertisers using a digital platform, i.e. a programmatic buy process. The primary method for conducting such programmatic buy process is real time bidding, or RTB, which secures advertisement display opportunities in a very short period of time by bidding on the target audience. In addition to RTB, we also support programmatic premium buying (PPB) and guaranteed delivery (GD) methods. PPB targets specific high-quality media resources and engages in programmatic buy only after reaching agreement on the terms of the purchase with the advertisers. GD is conducted based on the agreed-upon price and time period reached by both sides to the transaction.

DMP collects data from the various parties in a programmatic buy process and stores, integrates, analyzes and optimizes such data. DMP integrates data from advertisers, Baidu and third-party DMPs, which cover searches, offline visits, target audience tags, sequential placements and crowd portraits, in order to improve the effectiveness and accuracy of DSP.

*Value-added Consultative Services Provided for Customers*

We also offer certain value-added consultative services that help customers maximize their ROI.

**Baidu Marketing Platform**. On Baidu Marketing Platform, customers can not only get an understanding of but also use our various online marketing services and enjoy our value-added services. At the early phase of their marketing placement, we provide various consulting services to assist customers in better understanding the market conditions and help them design suitable marketing solutions. We also provide all-around marketing infrastructure services, including guidance on building mobile sites, site building tools such as SiteApp, and site testing tools. During the marketing placement, our experts on the platform can assist customers in understanding and using our various products and services to increase customer satisfaction. At the later phase of the placement, our statistics analysis tools can help customers assess the marketing effectiveness and achieve better ROI.

47

**Certification Services**. We classify and certify merchants based on the standards developed based on our experiences, and evaluate the credibility of merchants periodically based on their behavior on Baidu Marketing Platform and other business activities. We have adopted related reward and penalty measures aiming to guide the merchants to improve their credibility.

**Baidu Credit**. Based on customers' historical marketing placements and credibility on the Baidu Marketing Platform, we provide a short-term credit line to customers so that they can continue their marketing activities when they are short of capital. We received authorization from the People's Bank of China on enterprise credit investigation in November 2015.

**Transaction Services**

We offer products and services that enable or facilitate our users and customers to conduct online and offline transactions.

**Baidu Nuomi.** Baidu Nuomi offers multiple services and products to its users, including entertainment (such as film, transportation ticketing and tourism), dining, hotel reservation, health and beauty services. Baidu Nuomi users can access the services through *Nuomi.com*, Baidu Nuomi's mobile application and additional channels such as Baidu Mobile Search and Baidu Maps.

In 2015, Baidu Nuomi introduced a host of new services, such as pre-paid cards, memberships, payment at store, spending credits, unified shopping carts and movie theme mall, to help local merchants build lasting relationships with users. Pre-paid cards allow users to store value for consumption with merchants, including merchant-specific pre-paid cards and Baidu general pre-paid cards. The membership service is aimed at providing premium services to loyal Baidu Nuomi users. Payment at store function enables users to only pay for the products and services when they have arrived at the offline store. Unified shopping carts allow users to complete multiple orders at the same time. Movie theme mall offer derivative products of popular movies and television shows. Baidu Nuomi has also expanded its product offerings and distribution channels through strategic partnerships with third parties, such as hotel reservation service providers. In addition, Baidu Nuomi provides convenient credit payment service for users. Baidu Nuomi has also launched a platform to introduce third-party services, such as laundry and mobile phone top up, to further complement and diversify its service offerings.

For merchants, Baidu Nuomi provides them with their own Baidu Nuomi pages in order to allow users to browse all the services and discounts offered by the merchants. Baidu Nuomi also provides self-promotion tools to merchants that help them attract and retain users. In addition, Baidu Nuomi provides merchants with comprehensive check-out service that helps them improve payment experience and efficiency. Baidu Nuomi also provides data services such as store statistics, user group analysis and an open platform providing a complete set of tools and processes to help merchants launch products more conveniently.

**Baidu Takeout Delivery.** Baidu Takeout Delivery is an online platform on which users can place food delivery orders with restaurants. Leveraging our map, data, and software capabilities and supported by logistics delivery system, Baidu Takeout Delivery offers users food deliveries from a wide range of quality restaurants within short delivery time. In addition to restaurants, we have also expanded our takeout delivery service to grocery stores, convenience stores, and flower shops, among others. Users can locate restaurants or stores on either PCs or mobile devices. When accessing from mobile devices, users can search for restaurants or stores close to their current location.

**Baidu Maps.** Baidu Maps integrates map data from third-party suppliers and web information, providing users with services relating to locations, routes, and local merchants on their PCs and mobile devices in both offline and online modes. Baidu Maps for mobile devices (Baidu Mobile Maps) increasingly serves as a gateway

for users to conduct local searches. In addition to Mainland China, Baidu Maps currently also covers Hong Kong, Macau and Taiwan, providing both offline and online modes of service in these regions. It has an open platform that integrates location-based services from third-party partners. The number of monthly active users of Baidu Mobile Maps, defined as users who used the service at least once in a given month, was approximately 302 million for December 2015, an increase of 43% over the corresponding period in the prior year.

**Baidu Navigation.** Baidu Navigation is a professional navigation application that can be used in both offline and online modes. It can support both Android and iOS systems. Baidu Navigation provides users with destination searching, positioning, route planning and navigation service, all based on real-time traffic situations. Baidu Navigation also supports site searching and navigation launching through voice commands and is compatible with a wide variety of automobile-connected hardware devices.

**Baidu Telematics.** We have developed four OEM solutions, CarLife, MyCar, CoDriver and CarGuard, for automobile manufacturers. CarLife provides intelligent connection between the smartphone and the car during driving. MyCar is a private cloud service which transforms car data into services for its owner. CoDriver is voice-recognition based virtual assistant installed in the car. CarGuard provides cybersecurity solutions for the car connected with internet. Baidu Telematics has already partnered with well-known automobile manufacturers and suppliers to implement the four OEM solutions and to co-develop leading telematics technology.

**Baidu Wallet.** Baidu Wallet, formerly branded as BaiduPay, provides online and mobile payment services and enables our users to complete a closed loop transaction in a seamless manner. Through integration with Baidu and third-party products, Baidu Wallet fulfills payment in a wide array of scenarios, including purchases of movie tickets, services provided by Baidu Nuomi, takeout delivery and daily commutes. Baidu Wallet has introduced the *Baidu Spring Business Platform*, which precisely places the offline coupons and gift cards offered by local merchants into the Baidu Wallet accounts of our users, and allows users to use such coupons and gift cards offline when completing the relevant transactions through Baidu Wallet. In order to further cultivate the mobile payment habit of users, Baidu Wallet began to offer a variety of rewards and promotions to its users from November 2015. Baidu Wallet has continued to grow, reaching 53 million activated accounts as of December 31, 2015.

**Baidu Mobile Game.** Baidu Mobile Game platform collaborates with Chinese and international licensed content providers in providing a diverse array of licensed and healthy games to users, hosting dedicated mobile channels and up-to-date licensed games, and has attracted a large community of mobile game players. Our platform connects users with game content providers and we share revenues from game operations with game developers pursuant to the terms of our cooperation agreements.

**Baidu Connect**. We launched Baidu Connect in September 2014. Building upon Light Apps, Baidu Connect is a tool for merchants that can bring in leads from other Baidu products such as search and maps. It is built with functionality that enables conversion and offers merchants a CRM system. We provide easy-to set-up templates tailored for specific industries. Baidu Connect helps merchants reach new customers and maintain engagement with existing ones. Once a user follows a business or makes a purchase, the merchant can broadcast relevant information to the user to increase the likelihood of future transactions. Baidu Connect also features a number of technology services, such as App Builder, which is a set of tools to assist content publishers and service providers in building applications through a swift process.

**Baidu Cloud.** Baidu Cloud, our personal cloud computing service, allows users to upload documents, images, audios and videos to its cloud servers, stores the uploaded data with security control and provides real-time back-ups, and making the data accessible across different terminals including tablets, smartphones and desktops. Users can also share their data through Baidu Cloud.

**International Products and Services.** We offer numerous mobile products and services for emerging and developed markets around the world. Our mobile applications for overseas markets include DU Battery Saver,

49

DU Speed Booster, ES File Explorer, Photo Wonder, Simeji, and Baidu Browser, among others. Our PC products for overseas markets include Baidu Antivirus, PC Faster, Hao123, Baidu IME and more.

### iQiyi

**iQiyi and PPS.** iQiyi is an online video platform with a content library that includes licensed movies, television series, cartoons, variety shows and other programs. The programs are provided by content providers under licensing arrangements. Apart from sourcing licensed contents, iQiyi also produces a wide array of original content. In addition, iQiyi provides online community services to facilitate user communication and interaction. Users can also search and watch ad-supported iQiyi.com videos on their mobile devices free of charge. Paying subscribers can enjoy premium services on iQiyi, including ad-free video streaming and access to premium content. In May 2013, we acquired the online video business of PPS and have merged it with iQiyi. PPS has since then operated as a sub-brand of iQiyi. The combined platform is one of the leaders of online video business in China.

### Sales and Distribution

We offer search and transaction services directly and through our distribution network. We have direct sales presence in Beijing, Shanghai and major cities in Guangdong Province, covering the major regional markets for our online marketing services.

Our search service distributors provide numerous services, including identifying customers, collecting payments, assisting customers in setting up accounts with us, suggesting keywords to maximize ROI and engaging in other marketing and educational services aimed at acquiring customers. We offer discounts to distributors as consideration for their services. We have relied on distributors for several reasons. Our P4P customer base in China is geographically diverse and fragmented, as many of our P4P customers are SMEs located in different regions in China. Moreover, SMEs are generally less experienced with online marketing as compared to large companies and therefore benefit from the extensive services provided by distributors. Finally, secure online payment and credit card systems are in early stages of development in China. Distributors serve as an important channel to reach SME customers throughout China and collect payments from them. We offer our online marketing services to medium and large corporate customers through third-party agencies and our direct sales force. We have also engaged third-party agencies to identify and reach the potential customers outside of China.

Transaction services are provided directly in most first and second tier cities based on the high population concentration and well-constructed infrastructure. We reach customers and promote our transaction services via distributors mainly in third and fourth tier cities because customers in these areas are geographically diverse and fragmented. Our distributors identify customers and assist customers to set up accounts in order to improve market share and penetrate rate in these areas.

### Marketing

We focus on continually improving the quality of our products and services, as we believe satisfied users and customers are more likely to recommend our products and services to others. Through these efforts and the increased use of internet in China, we have built our brand with modest marketing expenditures.

Our initial public offering in 2005 and subsequent positive media coverage have significantly enhanced our brand recognition. We have also implemented a number of marketing initiatives designed to promote our brand awareness among potential users, customers and Baidu Union members. In addition to our brand positioning in the market, we have also initiated a series of marketing activities to promote our products, especially those in relation to mobile applications, among existing and potential users and customers. In 2015, we launched a number of Baidu Nuomi-specific holiday promotional campaigns to enhance its market recognition. In May 2015, we hosted the 2015 Baidu Union Summit and the *Charity One-Hour* event, co-organized the Baidu

Cheung Kong Lecture with Cheung Kong Graduate School of Business. In our "Baidu World" event in September 2015, we introduced Duer and plan to further incorporate advanced technology to connect people with services. In November 2015, we hosted the "Baidu Moments Marketing Ceremony," during which we published the *2015 Brand Digital Asset Ranking*, and teamed up with some well-known companies exploring innovative marketing. In 2015, we promoted flagship Baidu products and enhance user recognition using a wide variety of activities, such as Baidu Wallet year-long cash-back event.

**Competition**

The internet search, transaction service and internet video service industries in China are rapidly evolving and highly competitive.

For internet search, our primary competitors include U.S.-based internet search providers providing Chinese language internet search services and China-based internet companies. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance) and safety and user experience of search results, availability and ease of use of products and services, the number of customers, distribution channels and the number of associated third-party websites. We also face competition from traditional advertising media.

*U.S.-based Internet Search Providers.* U.S.-based internet search providers such as Google have a strong global presence, well established brand names, more users and customers and significantly greater financial resources than we do. We may also continue to face competition from other existing competitors and new entrants in the Chinese language search market.

*China-based Internet Companies.* Chinese internet companies such as Sohu and Tencent offer a broad range of online services, including search service. Tencent has merged its search engine "SOSO" related business with Sohu's search engine "Sogou" as part of Tencent's investment in Sogou in 2013. These companies have widely recognized brand names in China and significant financial resources. We compete with these portals primarily for user traffic, display advertisement and online marketing. We also compete with B2B service providers such as Alibaba, which also offers search services on its websites. In addition, Qihoo 360, a company operating an internet platform and primarily providing security products, launched its search services in 2012 and competes with us on internet search.

*Other Advertising Media.* Other advertising media, such as newspapers, yellow pages, magazines, billboards, other forms of outdoor media, television, radio and mobile applications compete for a share of our customers' marketing budgets. Large enterprises currently spend a relatively small percentage of their marketing budgets on online marketing as compared to other advertising media.

For transaction services, our primary competitors include China-based internet companies such as Meituan-Dianping and Koubei. We leverage our user traffic, product design and various market campaigns to enhance users' reliance on our platforms and services.

For iQiyi, our primary competitors include companies that operate online video websites in China, such as Youku-Tudou and Tencent Video. We compete with these market players for both users and advertisers primarily on the basis of user base and demographics, quality and quantity of video content, brand name and user experience.

**Technology**

We have three labs under the umbrella of Baidu Research, the Silicon Valley Artificial Intelligence (AI) Lab, the Beijing Deep Learning Lab and the Beijing Big Data Lab. We recently opened the Silicon Valley AI Lab in May 2014, enhancing our research and development capabilities in Silicon Valley. We established the Baidu Institute of Deep Learning, currently known as the Beijing Deep Learning Lab, in January 2013. Deep

51

learning is an emerging computer science field that seeks to mimic the human brain with hardware and software. It has helped us develop cutting-edge speech and image recognition technologies, enhance the search experience we provide to users and improve our ad targeting technology and monetization capability.

We have developed a proprietary technological infrastructure which consists of technologies for web search, mobile, P4P, targetizement and large-scale systems. Our established infrastructure serves as the backbone for both our PC and mobile platforms.

In 2015, our autonomous driving project at the Beijing Deep Learning Lab reached a key milestone by completing rigorous fully autonomous tests under a variety of complex environmental conditions. To develop and support autonomous driving, we have invested in AI technologies such as high definition mapping, environment perception, sensor fusion, and motion planning and control over the past two years.

### Web Search Technology

Our web search is powered by a set of advanced technologies including, among others, the following:

*Link Analysis.* Link analysis is a technique that determines the importance of a web page by evaluating the combination of the anchor texts and the number of web pages linked to that web page. We treat a link from web page A to web page B as a "vote" by page A in favor of page B. The subject of the "vote" is described in the anchor texts of that link. The more "votes" a web page gets, the higher the importance.

*Ranking.* We compare search queries with the content of web pages to help determine relevance. We have significantly improved the relevancy and freshness of ranking using our machine learning modules to analyze the rich internet and user interaction data and prioritize the search results. For example, our technology determines the proximity of individual search terms to each other on a given web page, and prioritizes results where the search terms are near each other. Other aspects of a page's content are also considered. We have innovatively applied our machine learning technology to better understand the semantics beyond simple text of the keywords inputted by our users, allowing us to provide more relevant search results to users. Starting from 2013, we applied deep learning technology in our search ranking system, and such technology is playing an increasingly important role.

*Information Extraction.* We extract information from a web page using high performance algorithms and information extraction techniques. Our techniques enable us to understand web page content, delete extraneous data, build link structures, identify duplicate and junk pages and decide whether to include or exclude a web page based on its quality. Our techniques can process millions of web pages quickly. In addition, our anti-spam algorithms and tools can identify and respond to spam web pages quickly and effectively.

*Web Crawling.* Our powerful computer clusters and intelligent scheduling algorithms allow us to crawl web pages efficiently. We can easily scale up our system to collect an ever-growing number of Chinese web pages. Our spider technology enables us to refresh web indices at intervals ranging from every few minutes to every few weeks. We set the index refresh frequency based on our knowledge of internet search users' needs and the nature of the information. For example, our news index is typically updated every five minutes, and can be as frequent as every minute, throughout the day given the importance of timely information for news. We also mine multimedia and other forms of files from web page repositories.

*Knowledge Graph.* Our knowledge graph aggregates the contents from multiple sources and classifies them into billions of different knowledge entities, where each knowledge entity is of well-defined structure, consisting of various attributes and operations. We have also developed applied computing technology based on our knowledge graph that has generated rich new knowledge based on existing knowledge data to meet the demands of users. Our knowledge graph provides a powerful link between knowledge entities and online services in a wide range of areas.

52

*Natural Language Processing.* We analyze and understand user queries and web pages by using various natural language processing techniques, including, among others, word segmentation, named entity recognition, syntax and semantic analysis, paraphrasing and language dependent encoding, all of which enhance the accuracy of our search results. For Q&A type searches, we provide relevant and in-depth answers to search inquiries using our deep analysis and learning technology to locate, summarize and integrate relevant information from massive data.

*Multimedia Technologies.* We work on developing intelligent algorithms and systems to better understand human spoken languages, identify audio contents, and recognize the meaning of images and videos. These technologies will enable users to access information in a most natural way, and help our search engine better organize the vast amount of multimedia contents on the web. For example, our speech recognition technology has been applied to our mobile search on smartphones, and our face recognition technology has been applied to generate relevant photos when a person is searched. We have also launched similar image search engine, which can recognize the object and scene in the image that users want to search for and return an image that contains the most similar object and scene.

Aladdin aims at discovering useful information of the "Hidden Web," which usually refers to the invisible database of the numerous websites and the part of the internet that traditional search engine technology may not be able to index. The resulted Aladdin platform enriches our search index and hence provides richer search results to our users. Our Aladdin platform, which not only provides a better and faster way to integrate new "hidden web" information into our search index, but also revolutionizes the search result presentation of the search result page.

### P4P Technology

Our P4P platform serves billions of relevant, targeted sponsored links each day based on search terms users enter or content they view on the web page. Our key P4P technology includes:

*P4P Auction System.* We use a web-based auction system to enable customers to bid for positions and automatically deliver relevant, targeted promotional links on Baidu's properties and Baidu Union members' properties. The system starts by screening the relevance between the sponsored links and a particular query. Our intelligent ranking system takes into consideration the quality factor of a sponsored link for a search query in addition to the price bid on the keyword. The quality factor of a sponsored link for a search query is determined based on the relevance and certain other factors. The relevance is determined based on the analysis of past search and click-through results. Links to customers' websites are ranked according to a comprehensive ranking index, calculated based on both the quality factor of a sponsored link for a search query and the price bid on that keyword. We employ a dynamic mechanism in determining the minimum bidding price for each keyword.

Phoenix Nest is designed to generate more relevant results. Phoenix Nest helps customers more easily find users' favorite search terms to bid on, and provides customers with more tools for budget management and more data for the effective measurement of ROI. We have been continually improving our click-through rate, or CTR, estimation technology. For example, we have introduced deep neutral network, or DNN, technology into our CTR estimation. We have also developed a new generation Phoenix Nest deep learning network CTR estimation modeling system, which enables the estimation of clicks on different combinations of advertisement materials and significantly improved the timeliness of the model estimations.

We have also developed new keyword targeting engine technology, which includes query rewrite and auto-trigger technologies, enabling more accurate match between search intent and search results. We continue to enrich our business knowledge database in order to better understand the search intent of our users, and to present dynamic results in order to satisfy user demand.

*P4P Billing System.* We record every click and charge customers a fee by multiplying the number of clicks by the cost per click. Our system is designed to detect fraudulent clicks based on factors such as click patterns and timestamps. This system also computes the amount a Baidu Union member or a distributor should be paid. The billing information is integrated with our internal Oracle ERP financial system.

*P4P Customer Service System.* This system offers data and tools to analyze data for our customers to evaluate and optimize the performance of our online marketing services provided to them. Through this system, our customers can also manage information relating to online marketing services such as their budgets and time periods for the services.

*ProTheme Contextual Promotion Technology.* Our ProTheme technology employs techniques that consider factors such as theme finding, keyword analysis, word frequency and the overall link structure of the web to analyze the content of individual web pages and to match sponsored links in our P4P platform to the web pages almost instantaneously. With this targeting technology, we can automatically provide contextually relevant promotional links. For example, our technology can provide links offering tickets to fans of a specific sports team or a news story about that team.

### Targetizement Technology

Our targetizement technology matches our customers' promotional links with their targeted internet users. Our automatic algorithm can analyze a user's audience attributes based on his or her past search experience and display promotional links that the user may be interested in viewing.

### Large-Scale Systems and Technologies

*Large Size Cluster Management.* In order to provide highly efficient and stable search services, we have developed an automated management platform for large size clusters. The platform enables us to intelligently manage and allocate resources and automatically debug and relocate services, thereby allowing tens of thousands of different source requests on the Baidu search engine and other non-search business to function stably across multiple internet data centers and thousands of servers.

*Storage.* We have developed an efficient, distributed and structured storage system to support our search services. Our storage system supports PB-level holistic, sequential data storage, and ten thousand times of real-time processing per second per device. Our storage system also has dynamic data attribute addition and subtraction function and historical data management capability.

*Distributed Computing System.* We have developed our proxy computing system, a comprehensive set of ultra-large scale distributed computer system, to increase the utility rate of idle resources, providing a strong base support for our core operations. Our proxy computing system has realized various distributed computing software stacks, such as resource isolation, resource distribution, computing modeling and application framework, and supports commonly used computing modules such as MapReduce, Spark, Stream and WebService.

*Indexing Technology.* Our indexing technology supports billions of daily search requests on over tens of thousands of servers located across multiple internet data centers of different network operators. Through our indexing technology, we have been able to index over one hundred billion of web pages without utilizing additional resources and have improved the freshness of indexed information.

### Intellectual Property

We rely on a combination of trademark, copyright and trade secret protection laws in China and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect our intellectual property

54

and our brand. We have 387 issued patents in China and intend to apply for more patents to protect our core technologies. We also enter into confidentiality, non-compete and invention assignment agreements with our employees and consultants and nondisclosure agreements with selected third parties. "百度", our company's name "Baidu" in Chinese, has been recognized as a well-known trademark in China by the Trademark Office under the State Administration for Industry and Commerce. In addition to owning "百度", and the related logos, we have applied for registration of various other trademarks. We also have registered certain trademarks in the United States, Hong Kong, Singapore, Indonesia and several other jurisdictions. In addition, we have registered our domain name *Baidu.com* and certain other websites with China National Network Information Center, or CNNIC.

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement or other violations of intellectual property rights. Furthermore, the application of laws governing intellectual property rights in China and abroad is uncertain and evolving and could involve substantial risks to us. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may face intellectual property infringement claims and other related claims that could be time-consuming and costly to defend and may result in an adverse impact over our operations" and "—We may be subject to patent infringement claims with respect to our P4P platform."

**Regulation**

The PRC government extensively regulates the telecommunications industry, including the internet sector. The State Council, the MIIT and other relevant government authorities have promulgated an extensive regulatory scheme governing internet-related services. This section summarizes the principal PRC laws and regulations relating to our business.

In the opinion of Han Kun Law Offices, our PRC legal counsel, (i) the ownership structure relating to our consolidated affiliated entities complies with current PRC laws and regulations; (ii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulation," our contractual arrangements with our consolidated affiliated entities and the nominee shareholders are valid and binding on all parties to these arrangements and do not violate current PRC laws or regulations; and (iii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulation," the business operations of our consolidated affiliated entities, as described herein, comply with current PRC laws and regulations in all material respects.

China's internet industry, online advertising market and e-commerce market are evolving. There are substantial uncertainties regarding the interpretation and application of existing or proposed PRC laws and regulations. We cannot assure you that the PRC regulatory authorities would find that our corporate structure and our business operations comply with PRC laws and regulations. If the PRC government finds us to be in violation of PRC laws and regulations, we may be required to pay fines and penalties, obtain certain licenses or permits and change, suspend or discontinue our business operations until we comply with applicable PRC laws and regulations.

*Regulations on Value-Added Telecommunications Services and Internet Content Services*

*Internet content services*. The Telecommunications Regulations promulgated by the PRC State Council in September 2000 categorize all telecommunication businesses in the PRC as either basic or value-added. Internet content services, or ICP services, are classified as value-added telecommunication businesses. Pursuant to the Telecommunications Regulations, commercial operators of value-added telecommunications services must first obtain an operating license from the MIIT or its provincial level counterparts. The Administrative Measures on Internet Information Services, also promulgated by the PRC State Council in September 2000, require companies engaged in the provision of commercial internet content services to obtain an ICP license from the relevant

55

government authorities before providing any commercial internet content services within the PRC. "Commercial internet content services" generally refer to provision of information service through public telecommunication network or internet for a fee. The Catalog of Classification of Telecommunications Services promulgated by the MIIT in December 2015 and taking effect from March 1, 2016 further divides ICP services into information publication platform and delivery services, information search and inquiry services, information communities platform services, instant message services, and information securities and management services. We do not believe our P4P services are categorized as part of internet content services that require an ICP license under these regulations. Although our PRC subsidiary Baidu Online conducts the P4P business by, among other things, designing P4P keywords, interacting with potential P4P customers and engaging in sales activities with our customers, P4P search results are displayed on the websites operated by Baidu Netcom, including *Baidu.com*. Baidu Netcom, as the owner of our domain name *Baidu.com* and holder of the necessary licenses and approvals, such as an ICP license, operates the website to display P4P search results and other marketing content.

The Administrative Measures for Telecommunication Business Operating License, promulgated by the MIIT with latest amendments becoming effective in April 2009, set forth the types of licenses required for value-added telecommunications services and the qualifications and procedures for obtaining such licenses. For example, a value-added telecommunications service operator providing commercial value-added services in multiple provinces is required to obtain an inter-regional license, whereas a value-added telecommunications service operator providing the same services in one province is required to obtain a local license.

*Content regulation*. National security considerations are an important factor in the regulation of internet content in China. The National People's Congress, the PRC's national legislature, has enacted laws with respect to maintaining the security of internet operation and internet content. Under these laws and applicable regulations, violators may be subject to penalties, including criminal sanctions, for internet content that:

- opposes the fundamental principles stated in the PRC constitution;

- compromises national security, divulges state secrets, subverts state power or damages national unity;

- harms the dignity or interests of the state;

- incites ethnic hatred or racial discrimination or damages inter-ethnic unity;

- undermines the PRC's religious policy or propagates heretical teachings or feudal superstitions;

- disseminates rumors, disturbs social order or disrupts social stability;

- disseminates obscenity or pornography, encourages gambling, violence, murder or fear or incites the commission of a crime;

- insults or slanders a third party or infringes upon the lawful rights and interests of a third party; or

- is otherwise prohibited by law or administrative regulations.

ICP operators are required to monitor their websites, including electronic bulletin boards. They may not post or disseminate any content that falls within the prohibited categories and must remove any such content from their websites. The PRC government may shut down the websites of ICP license holders that violate any of the above-mentioned content restrictions and revoke their ICP licenses.

### Restrictions on Foreign Ownership in Value-Added Telecommunications Services

Pursuant to the Provisions on Administration of Foreign-Invested Telecommunications Enterprises, promulgated by the PRC State Council with latest amendments becoming effective in September 2008, the ultimate foreign equity ownership in a value-added telecommunications service provider must not exceed 50%. However, the Guidance Catalog of Industries for Foreign Investment, as recently amended in 2015, allows a foreign investor to own more than 50% of the total equity interest in an e-commerce business. The MIIT further

56

released an announcement in June 2015 to remove the restriction on foreign equity for "online data processing and transaction processing businesses" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT. In order to acquire any equity interest in a value-added telecommunication business in China, a foreign investor must satisfy a number of stringent performance and operational experience requirements, including demonstrating good track records and experience in operating value-added telecommunication business overseas. Foreign investors that meet these requirements must obtain approvals from the MIIT and the Ministry of Commerce (or the Ministry of Commerce's authorized local counterparts), which retain considerable discretion in granting approvals. According to publicly available information, the PRC government has issued telecommunication business operating licenses to only a limited number of foreign-invested companies. We believe that it would be impracticable for us to acquire any equity interest in our consolidated affiliated entities without diverting management attention and resources. Moreover, we believe that our contractual arrangements with these entities and the individual nominee shareholders provide us with sufficient and effective control over these entities. Accordingly, we currently do not plan to acquire any equity interest in any of these entities.

A Notice on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, issued by the MIIT in July 2006, prohibits domestic telecommunication service providers from leasing, transferring or selling telecommunication business operating licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. Pursuant to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by such license holders in their provision of value-added telecommunications services. The notice further requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain the facilities in the regions covered by its license. If a license holder fails to comply with the requirements in the notice and cure such non-compliance, the MIIT or its local counterparts have the discretion to take measures against such license holders, including revoking their Value-Added Telecommunication Business Operating Licenses.

Due to the restrictions under these PRC regulations, we operate our websites mainly through Baidu Netcom and Beijing Perusal, and operate an online payment platform through BaiduPay. Baidu Netcom, Beijing Perusal and BaiduPay are our PRC consolidated affiliated entities, and are considered domestic PRC entities under PRC law given that the nominee shareholders are PRC citizens or PRC entities. Each of Baidu Netcom, Beijing Perusal, BaiduPay and some of our other PRC consolidated affiliated entities holds a Value-Added Telecommunication Business Operating License. In compliance with the Notice of the MIIT on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, Baidu Netcom, Beijing Perusal and BaiduPay, our consolidated affiliated entities, own the necessary domain names and trademarks, including pending trademark applications and have the necessary personnel and facilities to operate our websites. It remains unclear whether the provision of online payment services by BaiduPay will require BaiduPay to apply for a Value-Added Telecommunication Business Operating License for "online data processing and transaction processing businesses" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT, although in practice many companies conducting such business do not apply for such license. Baidu Netcom, parent company of BaiduPay, has applied for a Trans-Regional Value-Added Telecommunication Business Operating License, which would cover online data processing and transaction processing businesses. Baidu Netcom plans to submit an application to allow its subsidiary BaiduPay to operate online data processing and transaction processing businesses in 2016.

*Regulations on News Display*

Displaying news on a website and disseminating news through the internet are highly regulated in the PRC. The Provisional Measures for Administrating Internet Websites Carrying on the News Displaying Business, jointly promulgated by the State Council News Office and the MIIT in November 2000, require an ICP operator (other than a government authorized news unit) to obtain State Council News Office approval to post news on its

57

website or disseminate news through the internet. Furthermore, the disseminated news must come from government-approved sources pursuant to contracts between the ICP operator and the sources, copies of which must be filed with the relevant government authorities.

In September 2005, the State Council News Office and the MIIT jointly issued the Provisions on the Administration of Internet News Information Services, requiring internet news information service organizations to provide services as approved by the State Council News Office, subject to annual inspection under the provisions. Pursuant to the provisions, no internet news information service organizations may take the form of a foreign-invested enterprise, whether a joint venture or a wholly foreign-owned enterprise, and no cooperation between internet news information service organizations and foreign-invested enterprises is allowed prior to the security evaluation by the State Council News Office.

Baidu Netcom obtained the Internet News License, which permits it to publish internet news pursuant to the relevant PRC laws and regulations, in December 2006, and had the license renewed in June 2010. The Internet News License is subject to annual inspection by relevant government authorities.

### *Regulations on Internet Drug Information Services*

According to the Measures for the Administration of Internet Drug Information Services, issued by the State Food and Drug Administration in July 2004, an ICP operator publishing drug-related information must obtain a qualification certificate from the State Food and Drug Administration or its provincial level counterpart.

Baidu Netcom obtained the Qualification Certificate for Internet Drug Information Services, which permits it to publish drug-related information on its website, in November 2007, and had the certificate renewed in September 2012. We have several other entities in our group that have obtained the Qualification Certificate for Internet Drug Information Services.

### *Regulations on Internet Culture Activities*

The amended Internet Culture Administration Measures, promulgated by the Ministry of Culture and becoming effective in April 2011, require ICP operators engaging in "internet culture activities" to obtain a permit from the Ministry of Culture. The "internet culture activities" include, among other things, online dissemination of internet cultural products (such as audio-video products, games, performances of plays or programs, works of art and cartoons) and the production, reproduction, importation, distribution and broadcasting of internet cultural products. Imported internet cultural products are subject to content review by the Ministry of Culture before they are disseminated online, while domestic internet cultural products must be filed with the local branch of the Ministry of Culture within 30 days following the online dissemination. Service providers are also required to conduct self-review of the content of internet cultural products before they are put on internet or submitted to the Ministry of Culture for approvals or filings. Baidu Netcom was granted an Internet Culture Business Permit in April 2007, which was renewed again in November 2013. Beijing Perusal and some other entities in our group were also granted an Internet Culture Business Permit.

The Several Suggestions on the Development and Administration of the Internet Music, issued by the Ministry of Culture and becoming effective in November 2006, reiterate the requirement for the internet service provider to obtain the Internet Culture Business Permit to carry on any business of internet music products. In addition, foreign investors are prohibited from engaging in the internet culture business operation.

Furthermore, the Notice on Strengthening and Improving the Content Review of Online Music, issued by Ministry of Culture in August 2009, provides that only "internet culture operating entities" approved by the Ministry of Culture may engage in the production, release, dissemination (including providing direct links to music products) and importation of online music products. Internet culture operating entities should establish

58

strict self-monitoring system of online music content and set up special department in charge of such monitoring. In October 2015, the Ministry of Culture promulgated a notice, which took effect on January 1, 2016, to further strengthen its regulation over online music, including requiring online platform allowing users to upload self-created or performed music to set up real-time monitoring system and requiring the online music service providers to make quarterly filings of information related to their content self-review with the local counterpart of the Ministry of Culture from April 1, 2016.

### *Regulations on Internet Publishing*

On February 4, 2016, the State Administration of Press, Publication, Radio, Film and Television, or the SAPPRFT, and the MIIT jointly issued the Administrative Provisions on Internet Publishing Services, or the Internet Publishing Regulation, which took effect on March 10, 2016 and replaced the Interim Provisions for the Administration of Internet Publishing promulgated in 2002. The Internet Publishing Regulation requires that any entity engaged in provision of online publications to the public via information network shall obtain an Internet Publication License, which will have a term of five years, from the SAPPRFT. Online publications refer to digital works with editing, production, processing and other publishing features, provided to the public via information network, which mainly include: (i) informative and thoughtful text, pictures, maps, games, animation, audio and video digitizing books and other original digital works in the field of literature, art, science and etc.; (ii) digital works consistent with the content of published books, newspapers, periodicals, audio-visual products and electronic publications; (iii) the network literature database or other digital works formed through aforementioned works by selecting, organizing, compiling and other means; and (iv) other types of digital works determined by the SAPPRFT. The servers and storage facilities used by internet publishers must be located within the territory of the PRC. The Internet Publishing Regulation also requires internet service providers providing manual intervention search ranking, advertising, promotion and other services to customers providing online publishing services, shall check and examine the Internet Publication Licenses obtained by their customers and business scope of such licenses. Beijing Perusal and another entity in our group have obtained the Internet Publication Licenses.

### *Regulation on Broadcasting Audio/Video Programs through the Internet*

In July 2004, the State Administration of Radio, Film and Television, or the SARFT (currently known as SAPPRFT) promulgated the Rules for the Administration of Broadcasting of Audio/Video Programs through the Internet and Other Information Networks, or the Audio/Video Broadcasting Rules. The Audio/Video Broadcasting Rules apply to the opening, broadcasting, integration, transmission or download of audio/video programs through internet and other information networks. Anyone who wishes to engage in internet broadcasting activities must first obtain an Online Audio/Video Program Transmission License, with a term of two years, issued by the SARFT and operate in accordance with the scope as stipulated in such license. Foreign-invested enterprises are not allowed to engage in the above-mentioned business activities.

The Rules for the Administration of Internet Audio and Video Program Services, commonly known as Document 56, jointly promulgated by the SARFT and the MIIT in December 2007, reiterate the requirement set forth in the Audio/Video Broadcasting Rules that online audio/video service provider must obtain a license from the SARFT. Furthermore, Document 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled. According to some official answers to press inquiries published on the SARFT's website in February 2008, officials from the SARFT and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Document 56 may re-register and continue to operate without becoming state-owned or controlled, provided that the providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Document 56 was issued. Baidu Netcom has renewed its Online Audio/Video Program Transmission License, which remains valid till July 2018, iQiyi has an Online Audio/Video Program Transmission License valid till October 2018, and another entity in our group has recently renewed its Online Audio/Video Program Transmission License, which remains valid till March 2017.

*Regulations on Payment Services by Non-financial Institutions*

Pursuant to the People's Bank of China's Measures Concerning Payment Services by Non-financial Institutions, which took effect in September 2010, and its implementation rules, non-financial institutions that have been providing monetary transfer services as an intermediary between payees and payers, including online payment, issuance and acceptance of prepaid card or bank card, and other payment services as specified by the People's Bank of China, must obtain a license from the People's Bank of China prior to September 1, 2011, in order to continue providing monetary transfer services. BaiduPay applied for the license after the regulations mentioned above were promulgated and prior to September 1, 2011, and was granted the license for online payment in July 2013.

In addition, in December 2015, the People's Bank of China promulgated the Administrative Measures on the Online Payment Business of Non-Bank Payment Institutions, or the Measures on Online Payment Business, which will take effect on July 1, 2016. The Measures on Online Payment Business requires payment institutions to comply with the "Know Your Client" principle and establish a client identification mechanism. Payment institutions shall register and verify real-name and basic identification of clients that open account with them. In addition, the Measures on Online Payment Business categorizes online payment accounts of individuals into three types, with each type subject to particular use of purposes and different limits on the amounts that can be paid from the accounts. Individuals that pass more verifications are entitled to open accounts that are allowed be used for more purposes and have higher caps on the amount payable through such accounts. For example, an individual client whose identity is verified by the payment institution or by a partner authorized by the payment institution face to face, or whose basic identity information is subject to multiple cross-validation by at least five legal and safe external channels in a non-face-to-face manner, may open Type-III payment accounts, the balance in which may be used for consumption, account transfers, and procurement of financial products. The accumulative amount of balance payment transactions through all payment accounts of such individual shall not exceed RMB200,000 during a year (excluding account transfers from the payment account to the client's same-name bank account). An individual client that passes the verification of basic identity information in a non-face-to-face manner through at least one legal and safe external channel and opening a payment account with the institution for the first time may open a Type-I payment account, the balance in which may be used for consumption and account transfers only. The accumulative amount of balance payment transactions through such payment account shall not exceed RMB1,000 (including account transfer from the payment account to the client's same-name bank account), from the date of the opening of such account.

*Regulations on Internet Map Services*

According to the Administrative Rules of Surveying Qualification Certificate and the amended Standard for Internet Map Services issued by the National Administration of Surveying, Mapping and Geo-information (formerly known as the State Bureau of Surveying and Mapping) in March 2009 and May 2010, respectively, the provision of internet map services by any non-surveying and mapping enterprise is subject to the approval of the National Administration of Surveying, Mapping and Geo-information and requires a Surveying and Mapping Qualification Certificate. Internet maps refer to maps called or transmitted through internet. Pursuant to the Notice on Further Strengthening the Administration of Internet Map Services Qualification issued by the National Administration of Surveying, Mapping and Geo-information in December 2011, any entity without applying for a Surveying and Mapping Qualification Certificate for internet map services is prohibited from providing any internet map services. Baidu Netcom currently provides online traffic information inquiry services as well as internet map services and has obtained a Surveying and Mapping Qualification Certificate for internet map services. Another entity in our group has also obtained the Surveying and Mapping Qualification Certificate.

*Regulations on Online Games*

Pursuant to the Interim Provisions for the Administration of Internet Publishing, the online games services provided on our websites by our online game operator partners may be deemed as a type of "internet publication"

60

provided by us, and we may be required to obtain an Internet Publication License from the GAPP. Beijing Perusal and another entity in our group have obtained the Internet Publication Licenses. The required approval by the GAPP of each online game provided on our websites is handled by our online game operator partners.

In June 2010, the Ministry of Culture promulgated the Interim Administration Measures of Online Games. In accordance with these measures, an ICP service provider operating online games, must obtain an Internet Culture Business Permit. Baidu Netcom and some other entities in our group have obtained an Internet Culture Business Permit for operating online games. These measures also specify that the Ministry of Culture is responsible for the censorship of imported online games and the filing of records of domestic online games. The procedures for the filing of records of domestic online games must be conducted with the Ministry of Culture within 30 days after the commencement date of the online operation of such online games or the occurrence date of any material alteration of such online games. The approval by or filing with the Ministry of Culture of each online game provided on our websites has been handled primarily by our online game operator partners.

In September 2009, the GAPP (currently known as the SAPPRFT) together with several other government agencies issued a Circular 13, which explicitly prohibits foreign investors from participating in online game operating businesses through wholly-owned enterprises, equity joint ventures or cooperative joint ventures in China. The Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form, such as incorporating user registration, user account management or payment through game cards into online game platforms that are ultimately controlled or owned by foreign investors. We offer online games provided by our game operator partners on our websites owned and operated by our consolidated affiliated entities. We have also acquired 91 Wireless, which operates two leading smartphone application distribution platforms in China as well as a mobile game platform through its consolidated affiliated entities. If our contractual arrangements were deemed to be "indirect means" or "disguised form" under the Circular 13, our relevant contractual arrangements may be challenged by the SAPPRFT or other governmental authorities. If we were found to be in violation of the Circular 13 to operate our online game platform, the SAPPRFT, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending and revoking the relevant licenses and registrations.

### Regulations on Online Game Virtual Currency

The Interim Administration Measures of Online Games require companies that (i) issue online game virtual currency (including prepaid cards and/or pre-payment or prepaid card points), or (ii) offer online game virtual currency transaction services to apply for the Internet Culture Business Permit from provincial branches of the Ministry of Culture. The regulations prohibit companies that issue online game virtual currency from providing services that would enable the trading of such virtual currency. Any company that fails to submit the requisite application will be subject to sanctions, including but not limited to termination of operation, confiscation of incomes and fines. The regulations also prohibit online game operators from allocating virtual items or virtual currency to players based on random selection through lucky draw, wager or lottery that involves cash or virtual currency directly paid by the players. In addition, companies that issue online game virtual currency must comply with certain specific requirements, for example, online games virtual currency can only be used for products and services related to the issuance company's own online games. Baidu Netcom and some other entities in our group have obtained the Internet Culture Business Permit for issuing online game virtual currency.

### Regulations on Advertisements

The PRC government regulates advertising, including online advertising, principally through the State Administration for Industry and Commerce. The PRC Advertising Law, as recently amended in April 2015, outlines the regulatory framework for the advertising industry, and allows foreign investors to own up to all

61

equity interests in PRC advertising companies. The Administrative Regulations for Advertising Operation Licenses, taking effect in January 2005, exempt enterprises (other than radio stations, television stations, newspapers and magazines, non-corporate entities and other specified entities) from the previous requirement to obtain an advertising operation license in addition to a business license.

We conduct our online advertising business through our consolidated affiliated entities in China, Baidu Netcom and Beijing Perusal, each of which holds a business license that covers online advertising in its business scope. Our subsidiaries Baidu Times and Baidu China have also expanded their respective business license to cover advertising in their respective business scope.

Advertisers, advertising operators and advertising distributors are required by PRC advertising laws and regulations to ensure that the contents of the advertisements they prepare or distribute are true and in full compliance with applicable laws and regulations. For example, pursuant to PRC Advertising Law, advertisements must not contain, among other prohibited contents, terms such as "the state-level", "the highest grade", "the best" or other similar words. In addition, where a special government review is required for certain categories of advertisements before publishing, the advertisers, advertising operators and advertising distributors are obligated to confirm that such review has been performed and the relevant approval has been obtained. Pursuant to the PRC Advertising Law, the use of internet to distribute advertisements shall not affect the normal use of the internet by users. Particularly, advertisements distributed on internet pages such as pop-up advertisements shall be indicated with conspicuous mark for close to ensure the close of such advertisements by one click. Where internet information service providers know or should know that illegal advertisements are distributed using their services, they shall prevent such advertisements from being distributed. Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In the case of serious violations, the State Administration for Industry and Commerce or its local branches may force the violator to terminate its advertising operation or even revoke its business license. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties.

### Tort Liability Law

In accordance with the PRC Tort Liability Law, which became effective in July 2010, internet users and internet service providers bear tortious liabilities in the event that they infringe upon other persons' rights and interests through the internet. Where an internet user conducts tortious acts through internet services, the infringed person has the right to request the internet service provider take necessary actions such as deleting contents, screening and de-linking. Failing to take necessary actions after being informed, the internet service provider will be subject to joint and several liabilities with the internet user with regard to the additional damages incurred. Where an internet service provider knows that an internet user is infringing upon other persons' rights and interests through its internet service but fails to take necessary actions, it is jointly and severally liable with the internet user.

### Regulations on Intellectual Property Rights

China has adopted legislation governing intellectual property rights, including patents, copyrights, trademarks, and domain names.

*Patent.* The PRC Patent Law provides for patentable inventions, utility models and designs, which must meet three conditions: novelty, inventiveness and practical applicability. The State Intellectual Property Office under the State Council is responsible for examining and approving patent applications. A patent is valid for a term of twenty years in the case of an invention and a term of ten years in the case of utility models and designs.

*Copyright.* The PRC Copyright Law and its implementation rules extend copyright protection to products disseminated over the internet and computer software. There is a voluntary registration system administered by the China Copyright Protection Center. Creators of protected works enjoy personal and property rights, including, among others, the right of disseminating the works through information network.

Pursuant to the relevant PRC regulations, rules and interpretations, ICP operators will be jointly liable with the infringer if they (i) participate in, assist in or abet infringing activities committed by any other person through the internet, (ii) are or should be aware of the infringing activities committed by their website users through the internet, or (iii) fail to remove infringing content or take other action to eliminate infringing consequences after receiving a warning with evidence of such infringing activities from the copyright holder. The court will determine whether an internet service provider should have known of their internet users' infringing activities based on how obvious the infringing activities are by taking into consideration a number of factors, including (i) the information management capabilities that the provider should have based on the possibility that the services provided by it may trigger infringing acts, (ii) the degree of obviousness of the infringing content, (iii) whether it has taken the initiative to select, edit, modify or recommend the contents involved, (iv) whether it has taken positive and reasonable measures against infringing acts, and (v) whether it has set up convenient programs to receive notices of infringement and made timely and reasonable responses to the notices. Where an internet service provider has directly obtained economic benefits from any contents made available by an internet user, it shall have a higher duty of care with respect to the internet user's act of infringement of others' copyrights. Advertisements placed for or other benefits particularly connected with specific contents may be deemed as direct economic benefits from such contents, but general advertising fees or service fees charged by an internet service provider for its internet services will not be included. In addition, where an ICP operator is clearly aware of the infringement of certain content against another's copyright through the internet, or fails to take measures to remove relevant contents upon receipt of the copyright holder's notice, and as a result, it damages the public interest, the ICP operator could be ordered to stop the tortious act and be subject to other administrative penalties such as confiscation of illegal income and fines. An ICP operator is also required to retain all infringement notices for a minimum of six months and to record the content, display time and IP addresses or the domain names related to the infringement for a minimum of 60 days.

An internet service provider may be exempted from liabilities for providing links to infringing or illegal content or providing other internet services which are used by its users to infringe others' copyright, if it does not know and does not have constructive knowledge that such content is infringing upon other parties' rights or is illegal. However, if the legitimate owner of the content notifies the internet service provider and requests removal of the links to the infringing content, the internet service provider would be deemed to have constructive knowledge upon receipt of such notification, but would be exempted from liabilities if it removes or disconnects the links to the infringing content at the request of the legitimate owner. At the request of the alleged infringer, the internet service provider should immediately restore links to content previously disconnected upon receipt of initial non-infringing evidence.

We have adopted measures to mitigate copyright infringement risks. For example, our policy is to remove links to web pages and materials uploaded by the users if we know these web pages or materials contain materials that infringe upon third-party rights or if we are notified by the legitimate copyright holder of the infringement with proper evidence.

*Software Products*. The amended Administrative Measures on Software Products, promulgated by the MIIT and becoming effective in April 2009, provide a registration and filing system with respect to software products made in or imported into China. Software products may be registered with the relevant local authorities in charge of software industry administration. Registered software products may enjoy preferential treatment status granted by applicable software industry regulations. Software products can be registered for five years, and the registration is renewable upon expiration.

In addition, the Computer Software Protection Regulations and the Computer Software Copyright Registration Procedures apply to software copyright registration, license agreement registration and transfer agreement registration. Although such registration is not mandatory under PRC law, software copyright owners are encouraged to go through the registration process and registered software may receive better protection.

*Trademark.* The PRC Trademark Law and its implementation rules protect registered trademarks. The Trademark Office under the State Administration for Industry and Commerce handles trademark registrations and grants a term of ten years to registered trademarks. Trademark license agreements must be filed with the Trademark Office for record. "百度" is recognized as a well-known trademark in China by the Trademark Office under the State Administration for Industry and Commerce. In addition to owning "百度" and the related logos, we have applied for registration of various other trademarks.

*Domain name*. Domain names are protected under the Administrative Measures on the Internet Domain Names promulgated by the MIIT in November 2004. The MIIT is the major regulatory body responsible for the administration of the PRC internet domain names, under supervision of which the China Internet Network Information Center, or CNNIC, is responsible for the daily administration of .cn domain names and Chinese domain names. We have registered *Baidu.cn*, *Baidu.com.cn*, *hao123.com* and certain other domain names with CNNIC.

### Regulations on Information Security

The National People's Congress has enacted legislation that prohibits use of the internet that breaches the public security, disseminates socially destabilizing content or leaks state secrets. Breach of public security includes breach of national security and infringement on legal rights and interests of the state, society or citizens. Socially destabilizing content includes any content that incites defiance or violations of PRC laws or regulations or subversion of the PRC government or its political system, spreads socially disruptive rumors or involves cult activities, superstition, obscenities, pornography, gambling or violence. State secrets are defined broadly to include information concerning PRC national defense, state affairs and other matters as determined by the PRC authorities.

Pursuant to applicable regulations, ICP operators must complete mandatory security filing procedures and regularly update information security and censorship systems for their websites with local public security authorities, and must also report any public dissemination of prohibited content.

On December 27, 2015, the Standing Committee of the National People's Congress promulgated Anti-Terrorism Law, which took effect on January 1, 2016. According to the Anti-Terrorism Law, telecommunication service operators or internet service providers shall (i) carry out pertinent anti-terrorism publicity and education to society; (ii) provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities; (iii) implement network security, information monitoring systems as well as safety and technical prevention measures to avoid the dissemination of terrorism information, delete the terrorism information, immediately halt its dissemination, keep relevant records and report to the competent departments once the terrorism information is discovered; and (iv) examine customer identities before providing services. Any violation of the Anti-Terrorism Law may result in severe penalties, including substantial fines.

In addition, the State Secrecy Bureau has issued provisions authorizing the blocking of access to any website it deems to be leaking state secrets or failing to comply with the relevant legislation regarding the protection of state secrets during online information distribution. Specifically, internet companies in China with bulletin boards, chat rooms or similar services must apply for specific approval prior to operating such services.

Furthermore, the Provisions on Technological Measures for Internet Security Protection, promulgated by the Ministry of Public Security, require all ICP operators to keep records of certain information about its users (including user registration information, log-in and log-out time, IP address, content and time of posts by users) for at least 60 days and submit the above information as required by laws and regulations. The Network Information Protection Decision states that ICP operators must request identity information from users when ICP operators provide information publication services to the users. If ICP operators come across prohibited information, they must immediately cease the transmission of such information, delete the information, keep relevant records, and report to relevant government authorities.

Baidu Netcom, Beijing Perusal, BaiduPay and some other entities in our group are ICP operators, and are therefore subject to the regulations relating to information security. They have taken measures to comply with these regulations. They are registered with the relevant government authority in accordance with the mandatory registration requirement. Baidu Netcom's policy is to remove links to web pages which to its knowledge contain information that would be in violation of PRC laws or regulations. In addition, we monitor our websites to ensure our compliance with the above-mentioned laws and regulations.

### *Regulations on Internet Privacy*

The PRC Constitution states that PRC law protects the freedom and privacy of communications of citizens and prohibits infringement of these rights. In recent years, PRC government authorities have enacted legislation on internet use to protect personal information from any unauthorized disclosure. The Network Information Protection Decision provides that electronic information that identifies a citizen or involves privacy of any citizen is protected by law and must not be unlawfully collected or provided to others. ICP operators collecting or using personal electronic information of citizens must specify the purposes, manners and scopes of information collection and uses, obtain consent of the relevant citizens, and keep the collected personal information confidential. ICP operators are prohibited from disclosing, tampering with, damaging, selling or illegally providing others with, collected personal information. ICP operators are required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. The Administrative Measures on Internet Information Services prohibit an ICP operator from insulting or slandering a third party or infringing upon the lawful rights and interests of a third party. Pursuant to the Internet Electronic Messaging Service Administrative Measures, ICP operators that provide electronic messaging services must keep users' personal information confidential and must not disclose the personal information to any third party without the users' consent or unless required by law. According to the Provisions on Protection of Personal Information of Telecommunication and Internet Users, telecommunication business operators and ICP operators shall be responsible for the security of the personal information of users they collect or use in the course of their provision of services. Without obtaining the consent from the users, telecommunication business operators and ICP operators may not collect or use the users' personal information. The personal information collected or used in the course of provision of services by the telecommunication business operators or ICP operators must be kept in strict confidence, and may not be divulged, tampered with or damaged, and may not be sold or illegally provided to others. The ICP operators are required to take certain measures to prevent any divulge, damage, tamper or loss of users' personal information.

The relevant telecommunications authorities are further authorized to order ICP operators to rectify unauthorized disclosure. ICP operators are subject to legal liability, including warnings, fines, confiscation of illegal gains, revocation of licenses or filings, closing of the relevant websites, administrative punishment, criminal liabilities, or civil liabilities, if they violate relevant provisions on internet privacy. Pursuant to the Ninth Amendment to the Criminal Law issued by the Standing Committee of the National People's Congress in August 2015 and becoming effective in November 2015, any ICP provider that fails to fulfill the obligations related to internet information security administration as required by applicable laws and refuses to rectify upon orders, will be subject to criminal liability for (i) any dissemination of illegal information in large scale; (ii) any severe effect due to the leakage of the client's information; (iii) any serious loss of evidence of criminal activities; or (iv) other severe situations, and any individual or entity that (i) sells or provides personal information to others

unlawfully, or (ii) steals or illegally obtains any personal information, will be subject to criminal liability in severe situations. The PRC government, however, has the power and authority to order ICP operators to turn over personal information if an internet user posts any prohibited content or engages in illegal activities on the internet.

### *Regulations on Foreign Exchange*

#### *Foreign Currency Exchange*

Pursuant to the Foreign Currency Administration Rules, as amended, and various regulations issued by SAFE and other relevant PRC government authorities, RMB is freely convertible to the extent of current account items, such as trade related receipts and payments, interest and dividends. Capital account items, such as direct equity investments, loans and repatriation of investment, unless expressly exempted by laws and regulations, still require prior approval from SAFE or its provincial branch for conversion of RMB into a foreign currency, such as U.S. dollars, and remittance of the foreign currency outside of the PRC. After a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, became effective on June 1, 2015, instead of applying for approvals regarding foreign exchange registrations of foreign direct investment and overseas direct investment from SAFE, entities and individuals will be required to apply for such foreign exchange registrations from qualified banks. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

Payments for transactions that take place within the PRC must be made in RMB. Foreign currency revenues received by PRC companies may be repatriated into China or retained outside of China in accordance with requirements and terms specified by SAFE.

#### *Dividend Distribution*

Wholly foreign-owned enterprises and Sino-foreign equity joint ventures in the PRC may pay dividends only out of their accumulated profits, if any, as determined in accordance with PRC accounting standards and regulations. Additionally, these foreign-invested enterprises may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the enterprise's registered capital. In addition, these companies also may allocate a portion of their after-tax profits based on PRC accounting standards to employee welfare and bonus funds at their discretion. These reserves are not distributable as cash dividends.

#### *Foreign Exchange Registration of Offshore Investment by PRC Residents*

Pursuant to SAFE's Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents to Engage in Financing and Inbound Investment via Overseas Special Purpose Vehicles, or SAFE Circular No. 75, issued in October 2005, and a series of implementation rules and guidance, including the circular relating to operating procedures that came into effect in July 2011, PRC residents, including PRC resident natural persons or PRC companies, must register with local branches of SAFE in connection with their direct or indirect offshore investment in an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE No. Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means

66

as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. After SAFE Notice 13 became effective on June 1, 2015, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. Failure of the option holders to complete their SAFE registrations may subject these PRC employees to fines and legal sanctions and may also limit the ability of the overseas publicly listed company to contribute additional capital into its PRC subsidiary and limit the PRC subsidiary's ability to distribute dividends.

### Regulations on Labor

The Labor Contract Law, which became effective in January 2008, and its implementation rules, impose more restrictions on employers and have been deemed to increase labor costs for employers, compared to the Labor Law, which became effective in January 1995. For example, pursuant to the Labor Contract Law, an employer is obliged to sign labor contract with unlimited term with an employee if the employer continues to hire the employee after the expiration of two consecutive fixed-term labor contracts. The employer has to compensate the employee upon the expiration of a fixed-term labor contract, unless the employee refuses to renew such contract on terms the same as or more favorable to the employee than those contained in the expired contract. The employer also has to indemnify an employee if the employer terminates a labor contract without a cause permitted by law. In addition, under the Regulations on Paid Annual Leave for Employees, which became effective in January 2008, employees who have served more than one year for an employer are entitled to a paid vacation ranging from 5 to 15 days per year, depending on their length of service. Employees who waive such vacation time at the request of employers must be compensated for three times their regular salaries for each waived vacation day.

67

*Regulations on Taxation*

For a discussion of applicable PRC tax regulations, see "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation."

## C.   Organizational Structure

The following is a list of our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:

| Name | Place of Formation | Relationship |
| --- | --- | --- |
| Baidu Online Network Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu Holdings Limited | British Virgin Islands | Wholly owned subsidiary |
| Beijing Baidu Netcom Science Technology Co., Ltd. | China | Consolidated affiliated entity |
| Baidu (China) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu.com Times Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Beijing Perusal Technology Co., Ltd. | China | Consolidated affiliated entity |
| Baidu Japan Inc. | Japan | Wholly owned subsidiary |
| Baidu (Hong Kong) Limited | Hong Kong | Wholly owned subsidiary |
| Beijing BaiduPay Science and Technology Co., Ltd. | China | Consolidated affiliated entity |
| Qiyi.com, Inc. | Cayman Islands | Majority-owned subsidiary |
| B.D. Mobile Telecommunications Limited | Cayman Islands | Wholly owned subsidiary |
| Baidu Cloud Computing Technology (Shanxi) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu Cloud Computing Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| 91 Wireless Websoft Limited | Cayman Islands | Wholly owned subsidiary |

The following diagram illustrates our corporate structure, including our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:



\*    The diagram above omits the names of subsidiaries and consolidated affiliated entities that are insignificant individually and in the aggregate.

(1)    Beijing Baidu Netcom Science Technology Co., Ltd. is 99.5% owned by Mr. Robin Yanhong Li, our chairman and chief executive officer, and 0.5% owned by Mr. Zhan Wang, an employee of ours. Please see "Item 6.E. Directors, Senior Management and Employees—Share Ownership" for Mr. Robin Yanhong Li's beneficial ownership in our company. Mr. Zhan Wang's beneficial ownership of our company is less than 1% of our total outstanding shares.

(2)    Beijing Perusal Technology Co., Ltd. is 80% owned by Mr. Jiping Liu and 20% owned by Ms. Yazhu Zhang. Mr. Jiping Liu and Ms. Yazhu Zhang are third-party individuals designated by us, and their respective beneficial ownership in our company is less than 1% of our total outstanding shares.

(3)    Beijing BaiduPay Science and Technology Co., Ltd. is 91% owned by Beijing Baidu Netcom Science Technology Co., Ltd. and 9% owned by Mr. Zhixiang Liang, an employee of ours. Mr. Zhixiang Liang's beneficial ownership in our company is less than 1% of our total outstanding shares.

## Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders

PRC laws and regulations restrict and impose conditions on foreign investment in internet, online advertising, online audio and video services and mobile application distribution businesses. Accordingly, we operate these businesses in China through our consolidated affiliated entities. We have entered into a series of contractual arrangements with our consolidated affiliated entities and the nominee shareholders of our consolidated affiliated entities. These contractual arrangements enable us to:

- receive substantially all of the economic benefits from our consolidated affiliated entities in consideration for the services provided by our subsidiaries;

- exercise effective control over our consolidated affiliated entities; and

- hold an exclusive option to purchase all or part of the equity interests in our consolidated affiliated entities when and to the extent permitted by PRC law.

We do not have any equity interest in our consolidated affiliated entities. However, as a result of contractual arrangements, we have effective control over and are considered the primary beneficiary of these companies, and we have consolidated the financial results of these companies in our consolidated financial statements. If our consolidated affiliated entities or the nominee shareholders fail to perform their respective obligations under the contractual arrangements, we could be limited in our ability to enforce the contractual arrangements that give us effective control over our consolidated affiliated entities. Further, if we are unable to maintain effective control, we would not be able to continue to consolidate the financial results of our consolidated affiliated entities in our financial statements. In 2013, 2014 and 2015, we derived approximately 28%, 27% and 31% of our total revenues, respectively, from our consolidated affiliated entities through contractual arrangements. For a detailed description of the regulatory environment that necessitates the adoption of our corporate structure, see "Item 4.B. Information on the Company—Business Overview—Regulation." For a detailed description of the risks associated with our corporate structure, see "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

### *Contractual Arrangements relating to Baidu Netcom, Beijing Perusal and BaiduPay*

The following is a summary of the material provisions of the agreements among (i) our wholly-owned PRC subsidiary, Baidu Online, (ii) each of Baidu Netcom, Beijing Perusal and BaiduPay, our principal consolidated affiliated entities, and (iii) the nominee shareholders of these consolidated affiliated entities.

### *Exclusive Technology Consulting and Services Agreement*

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide to Baidu Netcom technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and e-commerce technical services. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom agrees to pay a monthly service fee to Baidu Online based on the formula as provided in the agreement in exchange for the technology consulting and services provided by Baidu Online. Under the agreement, the monthly service fee is equal to the product of the standard monthly fee for page view per thousand times multiplied by the actual times of page view for the month divided by 1,000. Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The exclusive technology consulting and services agreement between Baidu Online and each of Beijing Perusal and BaiduPay contains the same terms as those between Baidu Online and Baidu Netcom described above. Each of the agreements shall be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The amount of service fees Baidu Netcom paid to Baidu Online was 89% of its net income before income taxes and the service fees were charged for 2013. After paying service fees to Baidu Online, net income of Baidu Netcom is insignificant because substantially all of its operating profits have been paid as service fees to Baidu Online. In 2014 and 2015, Baidu Netcom only paid an insignificant amount of service fees to Baidu Online due to its operating loss incurred. Beijing Perusal did not pay any service fees to Baidu Online due to its operating loss in 2013, 2014 and 2015. BaiduPay has not paid any service fees to Baidu Online due to its break-even or loss position since its inception.

### *Operating Agreement*

Pursuant to the operating agreement by and among Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and financial affairs. Baidu Online has the right to appoint senior executives of Baidu Netcom. The

70

nominee shareholders of Baidu Netcom must appoint candidates recommended by Baidu Online as their representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement shall be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The operating agreement by and among Baidu Online, each of Beijing Perusal and BaiduPay and the respective nominee shareholders contains the same terms as those described above. Each of the agreements shall be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*License Agreements*

Baidu Online and Baidu Netcom have entered into a software license agreement and a web layout copyright license agreement. Pursuant to these license agreements, Baidu Online has granted to Baidu Netcom the right to use, including but not limited to, a software license and a web layout copyright license. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement have been renewed and are in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The web layout copyright license agreements that Baidu Online has entered into with each of Beijing Perusal and BaiduPay contain the same terms as the one between Baidu Online and Baidu Netcom described above. Each of the agreements is in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

Baidu Online had also entered into a domain name license agreement and a trademark license agreement with each of Baidu Netcom, Beijing Perusal and BaiduPay previously. After the transfers of the relevant domain names and trademarks (including pending trademark applications) from Baidu Online to Baidu Netcom, Beijing Perusal or BaiduPay, the domain name license agreements and trademark license agreements were terminated. As of December 31, 2015, no domain license agreement and trademark license agreement were outstanding between Baidu Online and each of Baidu Netcom, Beijing Perusal and BaiduPay.

*Exclusive Equity Purchase and Transfer Option Agreement*

Pursuant to the exclusive equity purchase and transfer option agreement by and among Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have irrevocably granted Baidu Online an exclusive option to purchase, or require any of the nominee shareholders of Baidu Netcom to transfer to another person designated by Baidu Online, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. The nominee shareholders shall remit to Baidu Online any amount that is paid by Baidu Online or its designated person in connection with the purchased equity interest. Baidu Online has sole discretion to decide when to exercise the option, whether in part or in full. Any and all dividends and other capital distributions from Baidu Netcom to the nominee shareholders shall be paid to Baidu Online in full. Baidu Online shall provide unlimited financial support to Baidu Netcom, if Baidu Netcom shall become in need of any form of reasonable financial support in the normal operation of business. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu Online,

71

Baidu Online shall unconditionally forgive any such loans to Baidu Netcom given that Baidu Netcom provides sufficient proof for its loss and incapacity to repay. The agreement shall terminate upon the nominee shareholders of Baidu Netcom have transferred all their equity interests in Baidu Netcom to Baidu Online or its designated person or upon expiration of the term of business of Baidu Online or Baidu Netcom.

The exclusive equity purchase and transfer option agreement by and among Baidu Online, each of Beijing Perusal and BaiduPay and the respective nominee shareholders contains the same terms as those described above. Each of the agreements shall terminate upon the nominee shareholders of Beijing Perusal or BaiduPay have transferred all their equity interests in Beijing Perusal or BaiduPay, as the case may be, to Baidu Online or its designated person or upon expiration of the term of business of Baidu Online or the relevant consolidated affiliated entity.

*Loan Agreements*

Pursuant to loan agreements between Baidu Online and the nominee shareholders of Baidu Netcom, Baidu Online provided interest-free loans with an aggregate amount of RMB890.0 million (US$137.4 million) to the nominee shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from sale of the nominee shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person. The term of each loan is ten years from the date of the agreement and can be extended with the written consent of both parties before expiration. With some of the loan agreements amended and renewed, the earliest will expire on December 30, 2025.

The loan agreements between Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contain the same terms as those described above, except that the amount of loans extended to the nominee shareholders is RMB1.255 billion (US$193.7 million) and RMB90.0 million (US$13.9 million), respectively. The term of the loans will expire on December 15, 2025 and December 21, 2025, respectively, and can be extended with the written consent of both parties before expiration.

*Proxy Agreement/Power of Attorney*

Pursuant to the proxy agreement between Baidu Online and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom agree to entrust all the rights to exercise their voting power to the person(s) designated by Baidu Online. Each of the nominee shareholders of Baidu Netcom has executed an irrevocable power of attorney to appoint the person(s) designated by Baidu Online as his/her attorney-in-fact to vote on his/her behalf on all matters requiring shareholder approval. The proxy agreement shall be in effect for an unlimited term unless terminated in writing by Baidu Online. The power of attorney shall be in effect for as long as the nominee shareholders of Baidu Netcom hold any equity interests in Baidu Netcom.

Each of the proxy agreements and powers of attorney between Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contains the same terms as those described above. Each of the proxy agreements shall be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney shall be in effect for as long as the relevant nominee shareholder of Beijing Perusal or BaiduPay holds any equity interests in Beijing Perusal or BaiduPay, as the case may be.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement between Baidu Online and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreement and Baidu Netcom's performance of its obligations under the exclusive technology consulting and service agreement. If Baidu Netcom or the nominee

shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The nominee shareholders of Baidu Netcom agree not to dispose of the pledged equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge agreement will expire two years after expiration of the term of or the fulfillment by Baidu Netcom and the nominee shareholders of their respective obligations under the exclusive technology consulting and service agreement and the loan agreement.

Each of the equity pledge agreements between Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contains the same terms as those described above.

We are in the process of perfecting the equity pledges of Baidu Netcom and Beijing Perusal described above by registration with the relevant local administration for industry and commerce as required for a property right under the PRC Property Rights Law, due to recent increases in the registered capital of these entities.

Through the design of the aforementioned agreements, the nominee shareholders of these affiliated entities effectively assigned their full voting rights to Baidu Online, which gives Baidu Online the power to direct the activities that most significantly impact the affiliated entities' economic performance. Baidu Online obtains the ability to approve decisions made by the affiliated entities and the ability to acquire the equity interests in the affiliated entities when permitted by PRC law. Baidu Online is obligated to absorb a majority of the expected losses from the affiliated entities' activities through providing unlimited financial support to the affiliated entities and is entitled to receive a majority of residual returns from the affiliated entities through the exclusive technology consulting and service fees. As a result of these contractual arrangements, Baidu Online is determined to be the primary beneficiary of these affiliated entities. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between us and these affiliated entities through these contractual arrangements, and we consolidate these affiliated entities through Baidu Online.

We have also entered into contractual arrangements with several other affiliated entities and their respective nominee shareholders through our subsidiaries other than Baidu Online, which results in these subsidiaries being the primary beneficiary of the relevant affiliated entities. As a result of these contractual arrangements, there exists a parent-subsidiary relationship between us and the relevant affiliated entities, and we consolidate these affiliated entities through subsidiaries besides Baidu Online.

### D.   **Property, Plant and Equipment**

Baidu Campus, our corporate headquarters, is located in Shangdi, an area designated by the Beijing municipal government as the center of the city's information technology industry.

In 2015, we completed the construction of another office building, Baidu Science Park, in Beijing. We commenced the construction in August 2012, and paid RMB493.3 million (US$76.2 million) for the land use right. Our capital expenditure in connection with the construction of Baidu Science Park was RMB663.4 million (US$102.4 million) in 2015.

We also lease some offices in Beijing, Tokyo (Japan), California (USA), Thailand, Brazil, Egypt, Indonesia and many other cities in China.

We host our servers in China at the internet data centers of China Telecom, China Unicom and China Mobile in ten selected cities in China, and we also have content delivery network locations in various cities across China. We plan to deploy three additional data centers in 2016. We also have a data center of our own in Shanxi and plan to build another one in Beijing, the first stage of which will be completed in the first half of 2016.

73

In December 2011, we commenced construction of an office building in Shenzhen, which will serve as our international center in Southern China. We have paid RMB129.5 million (US$20.0 million) for the land use right. Our capital expenditure in connection with the construction of this office building in Shenzhen was RMB214.1 million (US$33.0 million) in 2015. We currently expect to complete the planned construction in 2018.

In September 2012, we commenced construction of Shanxi Cloud Computing Center, which will serve as one of our internet data centers in China. We have paid RMB71.5 million (US$11.0 million) for the land use right. Our capital expenditure in connection with the construction of Shanxi Cloud Computing Center was RMB237.5 million (US$36.7 million) in 2015. We expect to fully complete the planned construction in 2018.

In April 2014, we commenced construction of part of Beijing Cloud Computing Center, which will serve as our internet data center in Beijing. We have paid RMB165.6 million (US$25.6 million) for the right to use the land where we plan to build our Beijing Cloud Computing Center. Our capital expenditure in connection with the construction of Beijing Cloud Computing Center was RMB163.8 million (US$25.3 million) in 2015. We expect to complete the first phase of construction in 2016, and we are in the process of planning the rest of the construction work with the completion date not determinable at this stage.

We currently plan to fund these expenditures with our cash, cash equivalents, short-term investments and anticipated cash flow generated from our operating activities.

**Item 4A.    Unresolved Staff Comments**

None.

**Item 5.    Operating and Financial Review and Prospects**

The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our audited consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3.D. Key Information—Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

**A.    Operating Results**

**Overview**

Our operations are primarily based in China, where we derive almost all of our revenues. Total revenues in 2015 were RMB66.4 billion (US$10.2 billion), a 35.3% increase over 2014. Operating profit in 2015 was RMB11.7 billion (US$1.8 billion), an 8.8% decrease over 2014. Net income attributable to Baidu, Inc. in 2015 was RMB33.7 billion (US$5.2 billion), a 155.1% increase over 2014. Mobile revenues accounted for 52.7% of our total revenues in 2015.

Our total assets as of December 31, 2015 were RMB147.9 billion (US$22.8 billion), of which cash and cash equivalent amounted to RMB10.0 billion (US$1.5 billion). Our total liabilities as of December 31, 2015 were RMB63.6 billion (US$9.8 billion), accounting for 43.0% of total liabilities and equity. As of December 31, 2015, our retained earnings accumulated to RMB74.7 billion (US$11.5 billion).

In November 2012, we obtained the controlling interest in Qiyi.com, Inc., a prior equity method investee, and have since then consolidated its financial results into our consolidated financial statements. In May 2013, we acquired the online video business of PPS and have merged it with iQiyi and have since then consolidated its financial results into our consolidated financial statements.

In October 2013, we acquired 100% equity interest of 91 Wireless from NetDragon and the other shareholders of 91 Wireless, and have since then consolidated its financial results into our consolidated financial statements.

We consolidated the financial results of Qunar in our consolidated financial statements from July 2011 to October 2015. In July 2011, we acquired a majority stake in Qunar. In October 2015, we completed a share exchange transaction with Ctrip, in which we exchanged 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares of Qunar for 11,488,381 newly-issued ordinary shares of Ctrip, at an exchange ratio of 0.725 Ctrip ADSs per Qunar ADS. As a result of the transaction, we have ceased consolidating the financial results of Qunar and recognized a disposition gain of RMB24.4 billion (US$3.8 billion).

The major factors affecting our results of operations and financial condition are discussed below.

**Reorganization of Operating Segments**

In the second quarter of 2015, we reorganized our operating segments from one operating segment into three operating segments, namely search services, transaction services and iQiyi. The primary reason for such reorganization is that our chief operating decision maker increasingly assesses the performance of our company and makes decisions in respect of the allocation of company resources by analyzing the operational results of these three business units separately.

**Revenues**

We generate revenues from the provision of search services, transaction services and iQiyi. The following table sets forth our revenues by segment, with each segment revenues including inter-segment revenues:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2013** | **2014** | **2015** | |
| | **RMB** | **RMB** | **RMB** | **US$** |
| | (In thousands, except percentages) | | | |
| Revenues: | | | | |
| Search Services | 29,590,276 | 43,727,459 | 55,667,478 | 8,593,577 |
| Transaction Services | 1,319,187 | 3,822,456 | 7,005,941 | 1,081,531 |
| iQiyi | 1,345,042 | 2,873,552 | 5,295,760 | 817,525 |

*Revenue Generation*

*Search Services.* Search services are keyword-based marketing services targeted at and triggered by internet users' search queries, which include our P4P services and other online marketing services, such as BrandZone, Aladdin and mobile app distribution. Search services contribute the largest proportion of our total revenues among our three operating segments.

A majority of our revenues from search services are derived from our P4P services. Our P4P platform is an online marketplace that introduces internet search users to customers who pay us a fee based on click-throughs for priority placement of their links in the search results. We recognize P4P revenues when a user clicks on a customer's link in the search results, based on the amount that the customer has agreed to pay for each click-through. Our P4P services revenues have primarily been driven by the increase in the number of page views, the increase in the number of P4P customers, and our success in optimizing the display of sponsored links. We believe that an increase in the number of active P4P customers generally leads to an increase in the number of sponsored links and a higher average price per click-through for selected keywords. Our P4P customer growth has primarily been driven by the adoption of our P4P services by SMEs and, to a lesser extent, large enterprises.

75

We also provide our customers with other performance-based and display-based online marketing services. For other performance-based online marketing services, our customers pay us based on performance criteria other than click-throughs, such as the number of telephone calls brought to our customers, the number of users registered with our customers, or the number of minimum click-throughs. For display-based online marketing services, our customers pay us based on the duration or the number of display of the advertisement placed on our properties and Baidu Union members' properties.

Our search services have historically been driven by the general increase in our customers' online marketing budgets. We expect the number of our online marketing customers to grow and our customer mix may change. However, we expect our online marketing customer base to remain diverse for the foreseeable future. Any prolonged economic slowdown in China may cause our customers to decrease or delay their online marketing spending, hamper our efforts to grow our customer base, or result in fewer clicks by users on sponsored links or advertisements displayed on our or Baidu Union members' properties. Any of these consequences could negatively affect our search service revenues.

Our search customers are increasingly seeking marketing solutions with measurable results in order to maximize their ROI. To meet customers' needs, we will continue to evaluate the effectiveness of our various products and services and adjust the mix of our service offerings to optimize our customers' ROI. We expect that we will continue to earn a majority of our revenues from our search services.

*Transaction Services*. Transaction services mainly include Qunar, Baidu Nuomi and Baidu Takeout Delivery.

We consolidated the financial results of Qunar in our consolidated financial statements from July 2011 to October 2015. Qunar's revenues are primarily derived from distribution of travel products and services. Qunar generates revenue by charging customers on a cost-per-click or cost-per-sale basis for qualified clicks generated from Qunar's search results, text links and other products on the Qunar website and mobile platform.

Baidu Nuomi operates an online local commerce marketplace that connects merchants with users by offering goods and services provided by third-party merchants with discount prices. Baidu Nuomi generates revenue primarily by acting as a marketing agent for local merchants. Baidu Nuomi presents its revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants.

Baidu Takeout Delivery operates an online platform on which users can place restaurant delivery orders. Baidu Takeout Delivery presents its revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants, to whom we provide online marketing and technology support services. Such revenue is typically a percentage of the transaction amount of orders processed through Baidu Takeout Delivery platform. Baidu Takeout Delivery also generates delivery revenue by providing food distribution services to users.

For the fiscal year ended December 31, 2015, our total transaction service revenues grew 83.3% year-over-year and had a total gross merchandise value, or GMV, of RMB152.9 billion (US$23.6 billion). The GMV of transaction services refer to GMV generated by the Baidu platform, through products such as Baidu Nuomi, Baidu Takeout Delivery and Baidu Wallet. GMV is defined as the value of confirmed orders of products and services, regardless of whether the products or services are consumed or delivered. The GMV generated by Qunar in the last three months of 2015 has been excluded from the total GMV in light of our exchange of Qunar shares with Ctrip.

*iQiyi*. iQiyi is an online video platform with a content library that includes copyrighted movies, television series, cartoons, variety shows and other programs. iQiyi derives a majority of its revenues from online advertising services. As is customary in the advertising industry in China, iQiyi offers commissions to third-party

76

advertising agencies and recognizes revenue net of these commissions. iQiyi also derives an increasing portion of its revenues from other sources, such as subscription services and sub-licensing of licensed contents to other online video websites.

*Revenue Collection*

For most search services, we collect payments both from our customers directly and through our distributors. We require our P4P customers to pay a deposit before using our P4P services and remind them by an automated notice to replenish the accounts after their account balance falls below a designated amount. We deduct the amount due to us from the deposit paid by a customer when a user clicks on the customer's link in the search results. In addition, we offer payment terms to some of our customers other than P4P customers based on their historical marketing placements and credibility. We also offer longer payment terms to certain qualified distributors, consistent with industry practice.

For most transaction services, we collect payments directly from users when they purchase goods or services on our platforms. We further settle with merchants in accordance with the terms agreed upon.

For most services provided by iQiyi, customers may enter into different payment terms based on their historical marketing placements and credibility. Users are also encouraged to purchase subscription services to get enhanced user experience, and such payments are collected from the users by iQiyi or through agents such as China Mobile.

As of December 31, 2015, we had accounts receivable of RMB4.1 billion (US$635.5 million), net of allowance of RMB189.6 million (US$29.3 million).

**Operating Costs and Expenses**

Our operating costs and expenses consist of cost of revenues, selling, general and administrative expenses, and research and development expenses. Share-based compensation expenses are allocated among the above three categories of operating costs and expenses, based on the nature of the work of the employees who have received share-based compensation. Our total operating costs and expenses increased significantly from 2013 to 2015 due to the growth of our business.

*Cost of Revenues*

The following table sets forth the components of our cost of revenues both in absolute amount and as a percentage of total revenues for the periods indicated.

| | For the Years Ended December 31, | | | | | | |
| | 2013 | | 2014 | | 2015 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (In thousands, except percentages) | | | | | | |
|---|---|---|---|---|---|---|---|
| Total revenues .............. | 31,943,924 | 100.0 | 49,052,318 | 100.0 | 66,381,729 | 10,247,573 | 100.0 |
| **Cost of revenues:** | | | | | | | |
| Sales tax and surcharges ...... | (2,329,558) | (7.3) | (3,597,763) | (7.3) | (4,644,357) | (716,965) | (7.0) |
| Traffic acquisition costs ...... | (3,704,146) | (11.6) | (6,328,155) | (12.9) | (8,860,861) | (1,367,881) | (13.3) |
| Bandwidth costs ............ | (1,938,520) | (6.1) | (2,847,770) | (5.8) | (3,716,747) | (573,767) | (5.6) |
| Depreciation of servers and other equipment .......... | (1,533,150) | (4.7) | (1,987,690) | (4.1) | (2,559,623) | (395,138) | (3.9) |
| Operational costs ........... | (1,082,794) | (3.4) | (2,217,555) | (4.5) | (3,881,609) | (599,217) | (5.9) |
| Content costs .............. | (859,695) | (2.7) | (1,871,906) | (3.8) | (3,745,063) | (578,138) | (5.6) |
| Share-based compensation expenses ................ | (23,976) | (0.1) | (34,611) | (0.1) | (49,770) | (7,683) | (0.1) |
| Total cost of revenues ....... | (11,471,839) | (35.9) | (18,885,450) | (38.5) | (27,458,030) | (4,238,789) | (41.4) |

*Traffic Acquisition Costs*. Traffic acquisition costs typically represent the portion of our online marketing revenues that we share with our Baidu Union members. We typically pay a Baidu Union member, based on a pre-agreed arrangement, a portion of the online marketing revenues generated from valid click-throughs by users of that member's properties.

*Bandwidth Costs*. Bandwidth costs are the fees we pay to telecommunications carriers such as China Telecom and China Unicom for telecommunications services and for hosting our servers at their internet data centers. We expect our bandwidth costs, as variable costs, to increase with the increasing number of racks of servers and the increasing traffic on our websites and mobile platform. Our bandwidth costs could also increase if the telecommunications carriers increase their service charges.

*Depreciation of Servers and Other Equipment*. We include in our cost of revenues depreciation expenses of servers and other computer hardware that are directly related to our business operations and technical support.

*Operational Costs*. Operational costs include primarily salary and benefit expenses, intangible assets amortization, payment platform charges, delivery expense of Baidu Nuomi and Baidu Takeout Delivery and other expenses incurred by our operating and technical support personnel. Salary and benefit expenses include wages, bonuses, medical insurance, unemployment insurance, pension benefits, employee housing fund and other welfare benefits.

*Content Costs*. Content costs consist primarily of the fees we paid for the licensed content from copyright owners or content distributors, and the amortization of the licensed copyrights for video content.

*Operating Expenses*

The following table sets forth the components of our operating expenses both in absolute amount and as a percentage of total revenues for the periods indicated.

| | For the Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2013** | | **2014** | | **2015** | | |
| | **RMB** | **%** | **RMB** | **%** | **RMB** | **US$** | **%** |
| | **(In thousands, except percentages)** | | | | | | |
| Total revenues . . . . . . . . . . . . . | 31,943,924 | 100.0 | 49,052,318 | 100.0 | 66,381,729 | 10,247,573 | 100.0 |
| Cost of revenues . . . . . . . . . . . . | (11,471,839) | (35.9) | (18,885,450) | (38.5) | (27,458,030) | (4,238,789) | (41.4) |
| **Operating expenses:** | | | | | | | |
| Selling, general and administrative . . . . . . . . . . . | (5,173,533) | (16.2) | (10,382,142) | (21.2) | (17,076,383) | (2,636,139) | (25.7) |
| Selling and marketing . . . | (4,012,709) | (12.6) | (8,298,558) | (16.9) | (14,503,787) | (2,238,999) | (21.8) |
| General and administrative . . . . . . . . | (1,160,824) | (3.6) | (2,083,584) | (4.3) | (2,572,596) | (397,140) | (3.9) |
| Research and development . . . . | (4,106,832) | (12.9) | (6,980,962) | (14.2) | (10,175,762) | (1,570,867) | (15.3) |
| Total costs and operating expenses . . . . . . . . . . . . . . . . | (20,752,204) | (65.0) | (36,248,554) | (73.9) | (54,710,175) | (8,445,795) | (82.4) |

*Selling, General and Administrative Expenses*

Our selling and marketing expenses primarily consist of promotional and marketing expenses and compensation for our sales and marketing personnel. We expect to incur higher selling and marketing expenses as a result of efforts on our transaction services and diversified mobile and PC applications distribution and operation, increased compensation for our sales and marketing personnel and our intensified marketing and brand promotion efforts.

Our general and administrative expenses consist primarily of salaries and benefits for our general and administrative personnel and fees and expenses for legal, accounting and other professional services.

*Research and Development Expenses*

Research and development expenses primarily consist of salaries and benefits for research and development personnel. We expense research and development costs as they are incurred, except for capitalized software development costs that fulfill the capitalization criteria under Accounting Standards Codification, or ASC, subtopic 350-40, Intangibles-Goodwill and Other: Internal-Use Software.

*Share-based Compensation Expenses*

Baidu, Inc. grants options and restricted shares to our employees, directors and consultants as share-based compensation awards. As of December 31, 2015, there was RMB349.0 million (US$53.9 million) unrecognized share-based compensation cost related to options of Baidu, Inc., which is expected to be recognized over a weighted-average vesting period of 2.6 years. As of December 31, 2015, there was RMB2.4 billion (US$366.0 million) unrecognized share-based compensation cost related to restricted shares, which is expected to be recognized over a weighted-average vesting period of 3.1 years. To the extent the actual forfeiture rate is different from our original estimate, actual share-based compensation cost related to these awards may be different from our expectation.

Other subsidiaries also have equity incentive plans granting share-based awards. Total share-based compensation expenses recognized and unrecognized were insignificant, both individually and in the aggregate.

The following table sets forth the allocation of our share-based compensation expenses both in absolute amount and as a percentage of total share-based compensation expenses among our employees based on the nature of work which they were assigned to perform.

| | For the Year Ended December 31, | | | | | | |
| | 2013 | | 2014 | | 2015 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (In thousands, except percentages) | | | | | | |
| **Allocation of Share-based Compensation Expenses** | | | | | | | |
| Cost of revenues ...................... | 23,976 | 4.7 | 34,611 | 3.6 | 49,770 | 7,683 | 3.6 |
| Selling, general and administrative ........ | 164,704 | 32.0 | 426,052 | 44.3 | 486,760 | 75,143 | 35.1 |
| Research and development .............. | 326,047 | 63.3 | 502,077 | 52.1 | 850,588 | 131,308 | 61.3 |
| Total share-based compensation expenses .. | 514,727 | 100.0 | 962,740 | 100.0 | 1,387,118 | 214,134 | 100.0 |

## Taxation

### *Cayman Islands and BVI*

We are not subject to income or capital gain tax under the current laws of the Cayman Islands and the British Virgin Islands. Additionally, none of these jurisdictions impose a withholding tax on dividends.

### *Hong Kong*

Our subsidiaries in Hong Kong are subject to the uniform tax rate of 16.5%. Under Hong Kong tax law, our subsidiaries in Hong Kong are exempted from income tax on their foreign-derived income and there is no withholding tax in Hong Kong on remittance of dividends.

### *Japan*

Our subsidiaries in Japan with paid-in capital in excess of JPY100 million are subject to a national corporate income tax rate of 25.5% through March 31, 2015, and since April 1, 2015 the income tax rate has been reduced to 23.9%. The subsidiaries with paid-in capital of no more than JPY100 million will be taxed at a tax rate of 15% on first JPY8 million and at 23.9% on the portion over JPY8 million from April 1, 2015. Local income taxes, which are local inhabitant tax and enterprise tax, are also imposed on corporate income. The resulting effective corporate income tax rates of our Japanese subsidiaries range from approximately 34% to 37%.

### *PRC Enterprise Income Tax*

Effective from January 1, 2008, the PRC's statutory enterprise income tax, or EIT, rate is 25%. An enterprise may benefit from a preferential tax rate of 15% under the EIT Law if it qualifies as a "High and New Technology Enterprise" strongly supported by the state. Pursuant to the Administrative Measures on the Recognition of High and New Technology Enterprises, the provincial counterparts of the Ministry of Science and Technology, the Ministry of Finance and the State Administration of Taxation shall jointly determine whether an enterprise is qualified as a "High and New Technology Enterprise" under the EIT Law. In making such determination, these government agencies shall consider, among other factors, ownership of core technology, whether the products or services fall within the scope of high and new technology strongly supported by the state as specified in the measures, the ratios of research and development personnel to total personnel, the ratio of research and development expenditures to annual sales revenues, the ratio of revenues attributed to high and new technology products or services to total revenues, and other measures set forth in relevant guidance. All enterprises that had been granted the "High and New Technology Enterprise" status before the effectiveness of the EIT Law are required to be re-examined in accordance with the measures mentioned above before they can

be entitled to the preferential tax rate. A "High and New Technology Enterprise" certificate is effective for a period of three years and could be renewed for another three years. After that, an entity needs to re-apply for the "High and New Technology Enterprise" status in order to be able to enjoy the preferential tax rate of 15%. A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online and Baidu Netcom, obtained the "High and New Technology Enterprise" certificates. The related tax holiday under such "High and New Technology Enterprise" certificates of these entities will expire in 2016, 2017 or 2018.

If any entity fails to maintain the "High and New Technology Enterprise" qualification under the EIT Law, their tax rates will increase, which could have a material and adverse effect on our results of operations and financial position. Historically, all of the PRC subsidiaries and consolidated affiliated entities mentioned above successfully re-applied for the certificates when the prior ones expired.

An enterprise may benefit from a preferential tax rate of 10% under the EIT law if it qualifies as a "Key Software Enterprise" designated jointly by the National Development and Reform Commission, the MIIT, the Ministry of Commerce, the Ministry of Finance and the State Administration of Taxation. A "Key Software Enterprise" certificate is effective for a period of two years. After that, an entity needs to re-apply for the "Key Software Enterprise" status in order to be able to enjoy the preferential tax rate of 10%. Baidu Online was entitled to a preferential income tax rate of 10% for 2013 and 2014 due to its "Key Software Enterprise" status designated by the relevant government authorities. Baidu Online enjoyed a reduced tax rate of 15% as a qualified "High and New Technology Enterprise" starting from 2015. The "Key Software Enterprise" status of Baidu Online for 2015 and beyond is being determined by the relevant government authorities.

If our PRC subsidiaries or consolidated affiliated entities that have enjoyed preferential tax treatment no longer qualify for the treatment, we will consider available options under applicable law that would enable us to qualify for alternative preferential tax treatment. To the extent we are unable to offset the impact of the expiration of existing preferential tax treatment with new tax exemptions, tax incentives or other tax benefits, the expiration of existing preferential tax treatment may cause our effective tax rate to increase. The amount of income tax payable by our PRC subsidiaries and consolidated affiliated entities in the future will depend on various factors, including, among other things, the results of operations and taxable income of, and the statutory tax rate applicable to, each of the entities. Our effective tax rate depends partially on the extent of the relative contribution of each of our subsidiaries and consolidated affiliated entities to our consolidated taxable income. In 2013, 2014 and 2015, our consolidated effective tax rate was 15.01%, 15.41% and 14.44%, respectively.

### *Withholding Tax*

Under the EIT Law and its implementation rules, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its non-resident enterprise investors, and proceeds from any such non-resident enterprise investor's disposition of assets (after deducting the net value of such assets) shall be subject to a 10% EIT, namely withholding tax, unless the non-resident enterprise investor's jurisdiction of incorporation has a tax treaty or arrangement with China that provides for a reduced withholding tax rate or an exemption from withholding tax. The Caishui (2008) No. 1 Notice clarifies that undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 will be exempted from any withholding tax.

The British Virgin Islands, where Baidu Holdings Limited, the sole shareholder of certain of our PRC subsidiaries such as Baidu Online, was incorporated, does not have such a tax treaty with China.

Hong Kong, where Baidu (Hong Kong) Limited, our wholly owned subsidiary and the sole shareholder of certain of our PRC subsidiaries such as Baidu Times and Baidu China, was incorporated, has a tax arrangement with China that provides for a lower withholding tax rate of 5% on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the

81

distribution of dividends and be a "beneficial owner" of the dividends. However, pursuant to a SAT Circular 81 issued by the State Administration of Taxation in February 2009, if the relevant PRC tax authorities determine, in their discretion, that a company benefits from the reduced withholding tax rate on dividends due to a structure or arrangement designed for the primary purpose of obtaining favorable tax treatment, the PRC tax authorities may adjust the preferential tax treatment. Moreover, pursuant to a SAT Circular 601 issued by the State Administration of Taxation in October 2009, a resident of a contracting state will not qualify for the benefits under the tax treaties or arrangements, if it is not the "beneficial owner" with respect to dividend, interest and royalty income. According to SAT Circular 601, a "beneficial owner" shall have ownership and right to dispose of the income or the rights and properties giving rise to the income, and generally engages in substantive business activities. An agent or conduit company will not be regarded as a "beneficial owner" and, therefore, will not qualify for treaty benefits. A conduit company normally refers to a company that is set up primarily for the purpose of evading or reducing taxes or transferring or accumulating profits. In August 2015, the State Administration of Taxation promulgated the Administrative Measures for Non-Resident Taxpayers to Enjoy Treatments under Tax Treaties, or SAT Circular 60, which became effective on November 1, 2015. SAT Circular 60 provides that non-resident enterprises are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, non-resident enterprises may, if they determine by self-assessment that the prescribed criteria to enjoy the tax treaty benefits are met, directly apply for the reduced withholding tax rate, and file necessary forms and supporting documents when performing tax filings, which will be subject to post-filing examinations by the relevant tax authorities.

If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, the dividend payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

### *Tax Residence*

Under the EIT Law and its implementation rules, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a resident enterprise and will be subject to the EIT at the rate of 25% on its worldwide income. The term "de facto management body" refers to "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise."

Pursuant to SAT Circular 82 issued by the State Administration of Taxation in April 2009, an overseas registered enterprise controlled by a PRC company or a PRC company group will be classified as a "resident enterprise" with its "de facto management body" located within China if the following requirements are satisfied: (i) the senior management and core management departments in charge of its daily operations are mainly located in the PRC; (ii) its financial and human resources decisions are subject to determination or approval by persons or bodies located in the PRC; (iii) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (iv) no less than half of the enterprise's directors or senior management with voting rights reside in the PRC. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. Although the SAT Circular 82, the additional guidance and its amendment only apply to overseas registered enterprises controlled by PRC enterprises and not those controlled by PRC individuals or foreigners, the determining criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

If our offshore entities are deemed PRC resident enterprises, these entities may be subject to the EIT at the rate of 25% on their global incomes, except that the dividends distributed by our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed "dividends among qualified resident enterprises."

82

Should our offshore entities be deemed as PRC resident enterprises, such changes could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

*PRC Business Tax and VAT*

In November 2011, the Ministry of Finance and the State Administration of Taxation jointly issued two circulars setting out the details of the pilot VAT reform program, which change the charge of sales tax from business tax to VAT for certain pilot industries. The VAT reform program initially applied only to the pilot industries in Shanghai, and was expanded to eight additional regions, including, among others, Beijing and Guangdong province, in 2012. In August 2013, the program was further expanded nationwide.

With respect to all of our PRC entities for the period immediately prior to the implementation of the VAT reform program, revenues from our services are subject to a 5% PRC business tax. Revenues from our online advertising services are subject to an additional 3% cultural business construction fee.

Our entities located in Shanghai, Beijing and Guangdong Province fall within the scope of the program and have been recognized as the VAT general taxpayers since January 1, 2012, September 1, 2012 and November 1, 2012, respectively, the effective time of the program in each of the regions. Our entities located outside of Shanghai, Beijing and Guangdong Province have been subject to VAT since August 1, 2013. From the applicable effective time onwards, these entities are required to pay VAT instead of business tax for services that are deemed by the relevant tax authorities to be within the pilot industries at a rate of 6%. In addition, cultural business construction fee is imposed at the rate of 3% on revenues derived from our online advertising services.

*PRC Urban Maintenance and Construction Tax and Education Surcharge*

Any entity, foreign-invested or purely domestic, or individual that is subject to consumption tax, VAT and business tax is also required to pay PRC urban maintenance and construction tax. The rates of urban maintenance and construction tax are 7%, 5% or 1% of the amount of consumption tax, VAT and business tax actually paid depending on where the taxpayer is located. All entities and individuals who pay consumption tax, VAT and business tax are also required to pay education surcharge at a rate of 3%, and local education surcharges at a rate of 2%, of the amount of VAT, business tax and consumption tax actually paid.

### Results of Operations

The following table sets forth a summary of our consolidated results of operations for the periods indicated. The period-to-period comparisons of results of operations should not be relied upon as indicative of future performance.

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | US$ |
| | (In thousands) | | | |
| **Consolidated Statements of Comprehensive Income Data** | | | | |
| Revenues: | | | | |
| Online marketing services | 31,802,219 | 48,495,215 | 64,037,006 | 9,885,610 |
| Others | 141,705 | 557,103 | 2,344,723 | 361,963 |
| Total revenues | 31,943,924 | 49,052,318 | 66,381,729 | 10,247,573 |
| Operating costs and expenses:[1] | | | | |
| Cost of revenues | (11,471,839) | (18,885,450) | (27,458,030) | (4,238,789) |
| Selling, general and administrative | (5,173,533) | (10,382,142) | (17,076,383) | (2,636,139) |
| Research and development | (4,106,832) | (6,980,962) | (10,175,762) | (1,570,867) |
| Total operating costs and expenses | (20,752,204) | (36,248,554) | (54,710,175) | (8,445,795) |
| Operating profit | 11,191,720 | 12,803,764 | 11,671,554 | 1,801,778 |
| Interest income | 1,308,542 | 1,992,818 | 2,362,632 | 364,728 |
| Interest expense | (447,084) | (628,571) | (1,041,394) | (160,764) |
| Other income, net, including exchange gains or losses | 140,951 | 336,338 | 24,909,964 | 3,845,435 |
| Income / (loss) from equity method investments | 22,578 | (19,943) | 3,867 | 597 |
| Taxation | (1,828,930) | (2,231,172) | (5,474,377) | (845,098) |
| Net income | 10,387,777 | 12,253,234 | 32,432,246 | 5,006,676 |
| Less: Net loss attributable to non-controlling interests | (162,880) | (943,698) | (1,231,927) | (190,177) |
| Net income attributable to Baidu, Inc. | 10,550,657 | 13,196,932 | 33,664,173 | 5,196,853 |
| *(1) Share-based compensation expenses:* | | | | |
| *Cost of revenues* | *(23,976)* | *(34,611)* | *(49,770)* | *(7,683)* |
| *Selling, general and administrative* | *(164,704)* | *(426,052)* | *(486,760)* | *(75,143)* |
| *Research and development* | *(326,047)* | *(502,077)* | *(850,588)* | *(131,308)* |
| | *(514,727)* | *(962,740)* | *(1,387,118)* | *(214,134)* |

***Year Ended December 31, 2015 Compared to Year Ended December 31, 2014***

*Consolidated revenues.* Our total revenues increased by 35.3% from RMB49.1 billion in 2014 to RMB66.4 billion (US$10.2 billion) in 2015. This increase was due to a substantial increase in our revenues from online marketing services. Our online marketing revenues increased by 32.0% from RMB48.5 billion in 2014 to RMB64.0 billion (US$9.9 billion) in 2015. This increase was mainly attributable to the increase in the number of our active online marketing customers from approximately 813,000 in 2014 to approximately 1,049,000 in 2015, and the increase in the average revenue per customer from approximately RMB59,400 in 2014 to approximately RMB60,500 (US$9,340) in 2015. Consistent with previously reported numbers, the number of active online marketing customers and average revenue per customer exclude those for our group-buying related businesses.

*Consolidated operating costs and expenses.* Our consolidated operating costs and expenses increased by 50.9% from RMB36.2 billion in 2014 to RMB54.7 billion (US$8.4 billion) in 2015. This increase was primarily due to the expansion of our business, and in particular the expansion of our mobile platform and transaction related services.

*Cost of Revenues.* Our cost of revenues increased by 45.4% from RMB18.9 billion in 2014 to RMB27.5 billion (US$4.2 billion) in 2015. This increase was primarily due to the following factors:

- *Traffic Acquisition Costs.* Our traffic acquisition costs increased by 40.0% from RMB6.3 billion in 2014 to RMB8.9 billion (US$1.4 billion) in 2015. Traffic acquisition costs represent 13.3% of total revenues in 2015, compared to 12.9% in 2014. The increase in our traffic acquisition costs mainly reflected the increased contribution of Baidu Union members.

- *Bandwidth Costs and Depreciation Expenses.* Our bandwidth costs increased by 30.5% from RMB2.8 billion in 2014 to RMB3.7 billion (US$573.8 million) in 2015. Our depreciation expenses of servers and other equipment increased by 28.8% from RMB2.0 billion in 2014 to RMB2.6 billion (US$395.1 million) in 2015. The increases in these costs were mainly due to our investment in increasing our network infrastructure capacity.

- *Sales Tax and Surcharges.* Our sales tax and surcharges increased by 29.1% from RMB3.6 billion in 2014 to RMB4.6 billion (US$717.0 million) in 2015, in line with the increase in revenues.

- *Operational Costs.* Our operational costs increased by 75.0% from RMB2.2 billion in 2014 to RMB3.9 billion (US$599.2 million) in 2015, primarily due to the increase of delivery expense of Baidu Nuomi and Baidu Takeout Delivery business, payment platform charges and staff-related costs.

- *Content Costs.* Our content costs increased by 100.1% from RMB1.9 billion in 2014 to RMB3.7 billion (US$578.1 million) in 2015, primarily due to the increase in video content costs of iQiyi, one of our subsidiaries.

*Selling, General and Administrative Expenses.* Our selling, general and administrative expenses increased by 64.5% from RMB10.4 billion in 2014 to RMB17.1 billion (US$2.6 billion) in 2015. This increase was primarily due to the following factors:

- Total salaries and benefits and staff-related expenses increased by 31.1% from RMB3.3 billion in 2014 to RMB4.3 billion (US$658.4 million) in 2015, primarily due to the increased headcount to support our expanded online marketing services during 2015;

- Marketing and promotion expenses increased by 98.4% from RMB4.9 billion in 2014 to RMB9.8 billion (US$1.5 billion) in 2015, primarily due to the increased marketing and promotion activities relating to our transaction services and mobile products;

- Total office operating expenses increased by 24.9% from RMB527.0 million in 2014 to RMB658.4 million (US$101.6 million) in 2015, primarily as a result of increase and expansion of our offices;

- Total traveling, communication and business development expenses increased by 35.8% from RMB276.5 million in 2014 to RMB375.6 million (US$58.0 million) in 2015, primarily due to the increased headcount and activities to support our expanded online marketing services;

- Share-based compensation expenses allocated to selling, general and administrative expenses increased by 14.2% from RMB426.1 million in 2014 to RMB486.8 million (US$75.1 million) in 2015.

*Research and Development Expenses.* Our research and development expenses increased by 45.8% from RMB7.0 billion in 2014 to RMB10.2 billion (US$1.6 billion) in 2015, primarily due to the increase in staff-related costs of research and development staff.

85

*Operating profit*. As a result of the foregoing, we generated an operating profit of RMB11.7 billion (US$1.8 billion) in 2015, an 8.8% decrease from RMB12.8 billion in 2014.

*Other income, net, including exchange gains or losses*. Our other income, net, including exchange gains or losses was RMB24.9 billion (US$3.8 billion) in 2015, compared to RMB336.3 million in 2014. The other income, net, including exchange gains or losses in 2015 was primarily attributable to the disposition gain of RMB24.4 billion (US$3.8 billion) recognized as a result of our exchange of Qunar shares with Ctrip.

*Income (loss) from equity method investments*. We had income from equity method investments of RMB3.9 million (US$0.6 million) in 2015, as compared to loss from equity method investments of RMB19.9 million in 2014.

*Taxation*. Our income tax expenses increased by 145.4% from RMB2.2 billion in 2014 to RMB5.5 billion (US$845.1 million) in 2015, primarily due to the tax expense recognized in relation to our exchange of Qunar shares with Ctrip.

*Net income attributable to Baidu, Inc*. As a result of the foregoing, net income attributable to Baidu, Inc. increased from RMB13.2 billion in 2014 to RMB33.7 billion (US$5.2 billion) in 2015.

### Year Ended December 31, 2014 Compared to Year Ended December 31, 2013

*Consolidated revenues*. Our total revenues increased by 53.6% from RMB31.9 billion in 2013 to RMB49.1 billion in 2014. This increase was due to a substantial increase in our revenues from online marketing services. Our online marketing revenues increased by 52.5% from RMB31.8 billion in 2013 to RMB48.5 billion in 2014. This increase was mainly attributable to the increase in the number of our active online marketing customers from approximately 753,000 in 2013 to approximately 813,000 in 2014, and the increase in the average revenue per customer from approximately RMB42,200 in 2013 to approximately RMB59,400 in 2014. The increase in our active online marketing customers was mainly due to our effective distribution network and our expanded direct sales. The increase in the average revenue per customer was primarily attributable to the increase in the number of paid clicks and the higher price per click as more customers participated in our P4P auction platform. Consistent with previously reported numbers, the number of active online marketing customers and average revenue per customer exclude those for our group-buying related businesses. The number of paid clicks increased by approximately 40.2% from 2013 to 2014.

*Consolidated operating costs and expenses*. Our total operating costs and expenses increased by 74.7% from RMB20.8 billion in 2013 to RMB36.2 billion in 2014. This increase was primarily due to the expansion of our business, and in particular the expansion of our mobile platform.

*Cost of Revenues*. Our cost of revenues increased by 64.6% from RMB11.5 billion in 2013 to RMB18.9 billion in 2014. This increase was primarily due to the following factors:

*Traffic Acquisition Costs*. Our traffic acquisition costs increased by 70.8% from RMB3.7 billion in 2013 to RMB6.3 billion in 2014. Traffic acquisition costs represent 12.9% of total revenues in 2014, compared to 11.6% in 2013. The increase in our traffic acquisition costs mainly reflected the increased contribution of contextual ads, Baidu Union promotion and Hao123 promotions through our network.

*Bandwidth Costs and Depreciation Expenses*. Our bandwidth costs increased by 46.9% from RMB1.9 billion in 2013 to RMB2.8 billion in 2014. Our depreciation expenses of servers and other equipment increased by 29.6% from RMB1.5 billion in 2013 to RMB2.0 billion in 2014. The increases in these costs were mainly due to our investment in increasing our network infrastructure capacity.

*Sales Tax and Surcharges*. Our sales tax and surcharges increased by 54.4% from RMB2.3 billion in 2013 to RMB3.6 billion in 2014, in line with the increase in revenues.

*Operational Costs*. Our operational costs increased by 104.8% from RMB1.1 billion in 2013 to RMB2.2 billion in 2014, primarily due to the increase of amortization of acquired intangible assets, staff-related costs and payment platform charges.

*Content Costs*. Our content costs increased by 117.7% from RMB859.7 million in 2013 to RMB1.9 billion in 2014, primarily due to the increase in video content cost of iQiyi, one of our subsidiaries.

*Selling, General and Administrative Expenses*. Our selling, general and administrative expenses increased by 100.7% from RMB5.2 billion in 2013 to RMB10.4 billion in 2014. This increase was primarily due to the following factors:

Total salaries and benefits and staff-related expenses increased by 71.7% from RMB1.9 billion in 2013 to RMB3.3 billion in 2014, primarily due to the increased headcount to support our expanded online marketing services.

Marketing and promotion expenses increased by 133.4% from RMB2.1 billion in 2013 to RMB4.9 billion in 2014, primarily due to the increased marketing and promotion activities relating to our mobile products.

Total office operating expenses increased by 86.9% from RMB281.9 million in 2013 to RMB527.0 million in 2014, primarily as a result of increase and expansion of our offices.

Total traveling, communication and business development expenses increased by 63.6% from RMB169.0 million in 2013 to RMB276.5 million in 2014, primarily due to the increased headcount and activities to support our expanded online marketing services.

Share-based compensation expenses allocated to selling, general and administrative expenses increased by 158.7% from RMB164.7 million in 2013 to RMB426.1 million in 2014.

*Research and Development Expenses*. Our research and development expenses increased by 70.0% from RMB4.1 billion in 2013 to RMB7.0 billion in 2014, primarily due to an increase in the number of research and development staff.

*Operating profit*. As a result of the foregoing, we generated an operating profit of RMB12.8 billion in 2014, a 14.4% increase from RMB11.2 billion in 2013.

*Other income, net, including exchange gains or losses*. Our other income, net, including exchange gains or losses was RMB336.3 million in 2014, compared to RMB141.0 million in 2013. The other income, net, including exchange gains or losses in 2014 was primarily attributable to government subsidies with non-operating nature.

*Income (loss) from equity method investments*. We had a RMB19.9 million loss from equity method investments in 2014, as compared to an income of RMB22.6 million in 2013.

*Taxation*. Our income tax expenses increased by 22.0% from RMB1.8 billion in 2013 to RMB2.2 billion in 2014, primarily due to the increase in profit before tax in 2014.

*Net income attributable to Baidu, Inc.* As a result of the foregoing, net income attributable to Baidu, Inc. increased from RMB10.6 billion in 2013 to RMB13.2 billion in 2014.

*Segment Revenues*

The following table sets forth our revenues by segment and year-over-year rate of growth for the periods indicated, with each segment revenues including inter-segment revenues:

| | Year ended December 31, | | | | | |
| | 2013 | 2014 | | 2015 | | |
| | RMB | RMB | YoY% | RMB | US$ | YoY% |
| | | (In thousands, except percentages) | | | | |
| Revenues: | | | | | | |
| Search Services ................. | 29,590,276 | 43,727,459 | 47.8 | 55,667,478 | 8,593,577 | 27.3 |
| Transaction Services ............. | 1,319,187 | 3,822,456 | 189.8 | 7,005,941 | 1,081,531 | 83.3 |
| iQiyi ........................ | 1,345,042 | 2,873,552 | 113.6 | 5,295,760 | 817,525 | 84.3 |

*Search Services.* Our search services revenues increased by 27.3% from RMB43.7 billion in 2014 to RMB55.7 billion (US$8.6 billion) in 2015. This increase was primarily attributable to the increase in the number of active online marketing customers of our search services and the increase in the average revenue per customer. The total number of paid clicks increased by 34.1% from 2014 to 2015.

Our search services revenues increased by 47.8% from RMB29.6 billion in 2013 to RMB43.7 billion in 2014. This increase was primarily attributable to the increase in the number of active online marketing customers of our search services and the increase in the average revenue per customer. The total number of paid clicks increased by 40.2% from 2013 to 2014.

*Transaction Services.* Our transaction services revenues increased by 83.3% from RMB3.8 billion in 2014 to RMB7.0 billion (US$1.1 billion) in 2015.

Our transaction services mainly include Qunar, Baidu Nuomi, Baidu Takeout Delivery and others.

- *Qunar.* Qunar's GMV in the first nine months of 2015 increased by 37.9% compared to that in 2014 and significantly contributed to the growth of Qunar's service revenues. The increase of GMV was primarily attributable to the increase in estimated flight ticket, estimated hotel room night stayed volume and revenue per ticket. We have ceased consolidating the financial results of Qunar since October 26, 2015, when we completed a share exchange transaction with Ctrip pursuant to which we exchanged certain shares in Qunar for shares of Ctrip.

- *Baidu Nuomi.* Baidu Nuomi started operation in October 2013. Baidu Nuomi has also experienced rapid growth in GMV and engaged with more merchants in 2015.

- *Baidu Takeout Delivery.* Baidu Takeout Delivery started operation in May 2014. Total GMV generated from Baidu Takeout Delivery steadily increased from 2014 to 2015, primarily as a result of its increased geographic coverage.

Our transaction services revenues increased by 189.8% from RMB1.3 billion in 2013 to RMB3.8 billion in 2014. This increase was primarily attributable to the increase in revenues generated by Qunar and other products.

*iQiyi.* Our iQiyi revenues increased by 84.3% from RMB2.9 billion in 2014 to RMB5.3 billion (US$0.8 billion) in 2015. This increase was mainly attributable to the increase in online marketing revenues and subscription services revenues.

iQiyi revenues increased by 113.6% from RMB1.3 billion in 2013 to RMB2.9 billion in 2014. This increase was mainly attributable to the increase in online marketing revenues.

*Segment Operating Costs and Expenses*

The following table sets forth our operating costs and expenses by segment and year-over-year rate of growth percentage for the periods indicated:

| | Year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2013** | **2014** | | **2015** | | |
| | **RMB** | **RMB** | **YoY%** | **RMB** | **US$** | **YoY%** |
| | | (In thousands, except percentages) | | | | |
| Operating Costs and Expenses: | | | | | | |
| Search Services . . . . . . . . . . . . . . . | (15,411,424) | (23,179,666) | 50.4 | (27,549,641) | (4,252,931) | 18.9 |
| Transaction Services . . . . . . . . . . . | (2,841,466) | (9,796,434) | 244.8 | (20,151,386) | (3,110,838) | 105.7 |
| iQiyi . . . . . . . . . . . . . . . . . . . . . . | (2,088,055) | (3,983,851) | 90.8 | (7,679,198) | (1,185,464) | 92.8 |

*Search Services*. Operating costs and expenses of search services mainly consist of traffic acquisition costs, staff related costs, business tax and surcharges, depreciation and intangible amortization expenses, bandwidth costs and marketing and promotion expenses.

Operating costs and expenses of search services were RMB27.5 billion (US$4.3 billion) in 2015, compared to RMB23.2 billion in 2014. The increase was primarily due to a 27.4% increase in traffic acquisition costs, a 28.3% increase in staff related costs, a 21.8% increase in business tax and surcharges, and a 15.4% increase in depreciation and intangible amortization expenses, compared to the figures in 2014.

Operating costs and expenses of search services were RMB23.2 billion in 2014, compared to RMB15.4 billion in 2013. The increase was primarily due to a 69.7% increase in traffic acquisition costs, a 42.5% increase in staff related costs, a 71.7% increase in marketing and promotion expenses, and a 43.8% increase in business tax and surcharges, compared to the figures in 2013.

*Transaction Services*. Operating costs and expenses of transaction services mainly consist of marketing and promotion expenses, staff related costs, depreciation and intangible amortization expenses, bandwidth costs, traffic acquisition costs and payment platform charges.

Operating costs and expenses of transaction services were RMB20.2 billion (US$3.1 billion) in 2015, compared to RMB9.8 billion in 2014. The increase was primarily a result of a 157.9% increase in marketing and promotion expenses, a 53.9% increase in staff related costs and a 128.0% increase in traffic acquisition costs, compared to the figures in 2014.

Operating costs and expenses of transaction services were RMB9.8 billion in 2014, compared to RMB2.8 billion in 2013. The increase was primarily due to a 364.5% increase in marketing and promotion expenses, a 172.8% increase in staff related costs, a 479.7% increase in traffic acquisition costs, and a 254.0% increase in bandwidth costs, compared to the figures in 2013.

*iQiyi*. Operating costs and expenses of iQiyi mainly consist of content costs, bandwidth costs, staff related costs, marketing and promotion expenses, and business tax and surcharges.

Operating costs and expenses of iQiyi were RMB7.7 billion (US$1.2 billion) in 2015, compared to RMB4.0 billion in 2014. The increase was primarily due to a 136.0% increase in content costs, a 80.5% increase in bandwidth costs, a 44.6% increase in staff related costs, and a 79.8% increase in marketing and promotion expenses, compared to the figures in 2014.

Operating costs and expenses of iQiyi were RMB4.0 billion in 2014, compared to RMB2.1 billion in 2013. The increase was primarily a result of a 135.7% increase in content costs, a 75.6% increase in bandwidth costs, a 47.9% increase in staff related costs, and a 119.2% increase in marketing and promotion expenses, compared to the figures in 2013.

**Inflation**

Inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the annual average percent changes in the consumer price index in China for 2013, 2014 and 2015 were 2.6%, 2.0% and 1.4%, respectively. The year-over-year percent change in the consumer price index for January 2014, 2015 and 2016 was increase of 2.5%, 0.8% and 1.8%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected in the future by higher rates of inflation in China. For example, certain operating costs and expenses, such as employee compensation and office operating expenses may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets. We are not able to hedge our exposure to higher inflation in China.

**Foreign Currency**

The average exchange rate between U.S. dollar and RMB has declined from RMB8.2264 per U.S. dollar in July 2005 to RMB6.4778 per U.S. dollar in December 2015. As of December 31, 2015, we recorded RMB1.1 billion (US$170.7 million) of net foreign currency translation loss in accumulated other comprehensive income as a component of shareholders' equity. We have not hedged exposures to exchange fluctuations using any hedging instruments. See also "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on your investment." and "Item 11. Quantitative and Qualitative Disclosures about Market Risk—Foreign Exchange Risk."

**Critical Accounting Policies**

We prepare financial statements in accordance with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect the reported amounts of our assets and liabilities and the disclosure of our contingent assets and liabilities at the end of each fiscal period and the reported amounts of revenues and expenses during each fiscal period. We continually evaluate these judgments and estimates based on our own historical experience, knowledge and assessment of current business and other conditions, our expectations regarding the future based on available information and assumptions that we believe to be reasonable, which together form our basis for making judgments about matters that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, our actual results could differ from those estimates. Some of our accounting policies require a higher degree of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. For further information on our significant accounting policies, see Note 2 to our consolidated financial statements. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements.

*Consolidation of Affiliated Entities*

In order to comply with PRC laws and regulations limiting foreign ownership of or imposing conditions on internet, online advertising, online audio and video services and mobile application distribution businesses, we

90

operate our websites and conduct our online advertising, online audio and video services and mobile application distribution businesses through our affiliated entities in China by means of contractual arrangements. We have entered into certain exclusive agreements with the affiliated entities through our subsidiaries, which obligate them to absorb a majority of the risk of loss and receive a majority of the residual returns from the affiliated entities' activities. In addition, we have entered into certain agreements with the affiliated entities and the nominee shareholders of affiliated entities through our subsidiaries, which enable us to direct the activities that most significantly affect the economic performance of the affiliated entities. Based on these contractual arrangements, we consolidate the affiliated entities as required by SEC Regulation SX-3A-02 and ASC topic 810, *Consolidation*, because we hold all the variable interests of the affiliated entities through the subsidiaries, which are the primary beneficiaries of the affiliated entities. We will reconsider the initial determination of whether a legal entity is a consolidated affiliated entity upon certain events listed in ASC 810-10-35-4 occurred. We will also continuously reconsider whether we are the primary beneficiaries of our affiliated entities as facts and circumstances change. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

### *Segment Reporting*

We historically had only one single reportable segment because our chief operating decision maker, or CODM, formerly relied on the consolidated results of operations when making decisions on allocating our resources and assessing our performance. Beginning in the quarter ended June 30, 2015, we have changed our reportable segments as a result of significant growth in our operations and expansion of services to multiple businesses in recent years. Our chief executive officer, who has been identified as the CODM, reviews the operating results of different service lines in order to allocate resources and assess our performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC topic 280, or ASC 280, *Segment Reporting*. We restated the presentation of our reportable segments for prior years to conform with the current year's presentation.

### *Revenue Recognition*

We recognize revenues based on the following principles:

### *(1)   Performance-based online marketing services*

*Cost-per-click.* Our auction-based P4P platform enables a customer to place its website link and related description on our search result list on the website which could be accessed through personal computers or mobile devices. Customers make bids on keywords based on how much they are willing to pay for each click to their listings in the search results listed on our website and the relevance between the keywords and the customer's businesses. Internet users' search of the keyword will trigger the display of the listings. The ranking of the customer's listing depends on both the bidding price and the listing's relevance to the keyword searched. Customer pays us only when a user clicks on one of its website links. Other than the auction-based P4P platform, we have certain vertical platforms from which we generate revenue through pre-determined prices per click. Revenue is recognized when a user clicks on one of the customer-sponsored website links, as there is persuasive evidence of an arrangement, the fee is fixed or determinable and collection is reasonably assured, as prescribed by ASC topic 605, or ASC 605, *Revenue Recognition*.

*Other performance-based online marketing services.* To the extent we provide online marketing services based on performance criteria other than cost-per-click, such as the number of successful reservation of hotels or issuance of air tickets, the number of downloads (and user registration) of mobile applications, the number of incremental end users and the total incremental revenue generated, revenue is recognized when the specified performance criteria are met together with satisfaction of other applicable revenue recognition criteria as prescribed by ASC 605.

*(2)  Display-based online advertising services*

For displayed-based online advertising services such as text links, banners, icons or other forms of graphical advertisements in the websites or mobile applications, we recognize revenue, in accordance with ASC 605, on a pro-rata basis over the contractual term for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on a specified webpage or mobile applications, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements. For certain display-based contractual agreements, we may also provide certain performance guarantees, in which cases revenue is recognized at the later of the completion of the time commitment or performance guarantee.

*(3)  Online marketing services involving Baidu Union*

Baidu Union is the program through which we expand distribution of our customers' sponsored links or advertisements by leveraging traffic of the Baidu Union members' internet properties. We make payments to Baidu Union members for acquisition of traffic. We recognize gross revenue for the amount of fees we receive from our customers. Payments made to Baidu Union members are included in cost of revenues as traffic acquisition costs.

*(4)  Barter transactions*

*Nonmonetary exchanges of licensed copyrights of video contents.*

We enter into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies ("OVBC") from time to time. The exchanged licensed copyrights provide rights for each respective party only to broadcast the licensed copyrights received on its own website; meanwhile, each party retains the right to continue broadcasting and / or sublicense the rights to the content it surrendered in the exchange. We account for these nonmonetary exchanges in accordance with ASC topic 845 ("ASC 845"), *Nonmonetary Transactions*, and record the transaction based on the fair value of the asset surrendered.

We estimate the fair value of the contents surrendered by deriving an "average transaction price" using actual cash sublicensing transactions for the same content with comparable counterparties, when available. The comparability of counterparties is assessed based on a number of factors, including relative size and scale, as well as market share of online viewership traffic they generate. In instances when we do not have actual cash sublicensing transactions for the same content as reference points, the estimates of fair value of the content surrendered is derived using an average transaction price of cash sub-licenses of content that is similar in nature with comparable counterparties. To assess whether the content is similar in nature to the bartered content, we consider, amongst others, (i) the type and the popularity of content (i.e. movie, television series); (ii) the geographic origination source of the content; and (iii) the unique visitor statistics for each OVBC.

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926 ("ASC 926"), *Entertainment—Films*. We recognized barter sublicensing revenues of RMB366.25 million (US$56.54 million) and the related cost of RMB277.82 million (US$42.89 million) for the year ended December 31, 2015. The barter sublicensing revenues and the related cost were insignificant for the years ended December 31, 2013 and 2014.

*Other nonmonetary exchanges.*

We engage in certain barter transactions other than licensed copyrights of video contents from time to time and in such situations follows the guidance set forth in ASC 845. While nonmonetary transactions are generally recorded at fair value, if such value is not determinable within reasonable limits, or the transaction lacks commercial substance, or the transaction is an exchange of a product or property held for sale in the ordinary

92

course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, the transaction is recognized based on the carrying value of the product or services provided. We also engage in certain advertising barter transactions and follows the guidance set forth in ASC subtopic 605-20 ("ASC 605-20"), *Revenue Recognition: Services*. The advertising barter transactions generally are recorded at fair value. If the fair value of the advertising surrendered in the barter transaction is not determinable within required limits, the barter transaction is recorded based on the carrying amount of the advertising surrendered, which likely to be zero. The amount of revenues recognized for barter transactions other than licensed copyrights of video contents was insignificant for each of the years presented.

### (5)   *Other revenue recognition related policies*

In accordance with ASC subtopic 605-25, or ASC 605-25, *Revenue Recognition: Multiple-Deliverable Revenue Arrangements*, for arrangements that include multiple deliverables, primarily for advertisements to be displayed in different spots, placed under different forms and at different time, we evaluate all the deliverables in the arrangement to determine whether they represent separate units of accounting. For the arrangements with deliverable items to be considered separate units of accounting, we allocate the total consideration of the arrangement based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence of selling price, or VSOE, third-party evidence or TPE of selling price, or management's best estimate of the selling price, or BESP, and recognize revenue on a periodic basis during the arrangement when each deliverable is provided. We consider all reasonably available information in determining the BESP, including both market and entity-specific factors. For the arrangements with all deliverable items to be determined as a single unit of accounting due to lack of value on a standalone basis or a contingent revenue feature, we recognize the revenue at the point of last deliverable item being provided.

We deliver some of our online marketing services to end customers through engaging third party distributors. In this context, we may provide cash incentives to distributors. The cash incentives are accounted for as reduction of revenue in accordance with ASC subtopic 605-50, or ASC 605-50, *Revenue Recognition: Customer Payments and Incentives*.

We provide sales incentives to customers to entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. We account for these award credits granted to customers in conjunction with a current sale of products or services as a multiple-element arrangement by analogy to ASC 605-25. The consideration allocated to the award credits, as deferred revenue, is based on the assumption that the customer will purchase the minimum amount of future service necessary to obtain the maximum award credits available. The deferred revenue is recognized as revenue proportionately as the future services are delivered to the customer or when the award credits expire.

We provide certain online marketing services as an agent by offering goods and services provided by third-party partners. We present revenues from such services on a net basis as we are not the primary obligor in the arrangement in accordance with ASC subtopic 605-45, or ASC 605-45, *Revenue Recognition: Principal Agent Consideration*.

### *Share-based Compensation*

We account for share-based compensation in accordance with ASC topic 718, or ASC 718, *Compensation-Stock Compensation*. We have elected to recognize share-based compensation using the straight-line method for all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the

93

terms of the cancelled award, or the modified awards. The compensation costs associated with the modified awards are recognized if either the original vesting conditions or the new vesting conditions have been achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement awards over the fair value of the cancelled awards at the cancellation date. Therefore, in relation to the modified awards, we recognize share-based compensation over the vesting periods of the new awards, which comprises (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term, and (ii) any unrecognized compensation cost of original awards, using either the original term or the new term, whichever results in higher expenses for each reporting period.

We account for share awards issued to non-employees in accordance with the provisions of ASC subtopic 505-50, or ASC 505-50, *Equity: Equity-based Payments to Non-Employees*. We use the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 also requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

### *Income Taxes*

We recognize income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. We record valuation allowance against the amount of deferred tax assets that we determine is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date. For reconciliation of tax computed by applying the respective statutory income tax rate to pre-tax income, please see "Income taxes" under Note 12 to our audited consolidated financial statements.

We comply with the provisions of ASC topic 740, or ASC 740, *Income Taxes,* in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. We have elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2013, 2014 and 2015, the amounts of unrecognized tax benefits as well as interest and penalties associated with uncertainty in income taxes were insignificant.

### *Accounts Receivable*

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off as incurred. We generally do not require collateral from our customers.

We maintain allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. We review the accounts receivable on a periodic basis and make general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, we consider many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

### *Impairment of Long-Lived Assets Other Than Goodwill*

We evaluate long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC topic 360, or ASC 360, *Property, Plant and Equipment*.

When such events occur, we assess the recoverability of the assets group based on the undiscounted future cash flow the assets group is expected to generate and recognize an impairment loss when estimated undiscounted future cash flow expected to result from the use of the assets group plus net proceeds expected from disposition of the assets group, if any, is less than the carrying value of the assets group. If we identify an impairment, we reduce the carrying amount of the assets group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. We use estimates and judgments in our impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheet. The impairment charges of long-lived assets are RMB6.7 million, RMB1.6 million and nil for 2013, 2014 and 2015, respectively.

### *Impairment of Goodwill*

We assess goodwill for impairment in accordance with ASC subtopic 350-20, or ASC 350-20, *Intangibles—Goodwill and Other: Goodwill*, which requires that goodwill to be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

As of December 31, 2014, we had three reporting units, consisting of Qunar, iQiyi and the rest of our company. Immediately upon the change in segment reporting in the quarter ended June 30, 2015, we had four reporting units representing search services, Qunar, iQiyi, and transaction services excluding Qunar. The goodwill was reassigned to the reporting units affected using a relative fair value allocation approach. Subsequent to the share exchange transaction with Ctrip, we no longer control Qunar. Accordingly, Qunar was no longer a reporting unit and the goodwill balance related to Qunar was derecognized. As a result, we had three reporting units as of December 31, 2015.

We have the option to first assess qualitative factors to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. If we believe, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, we consider primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit compared to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and we are not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then we must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

In 2015, we performed a qualitative assessment for search services and transaction services. Based on the requirements of ASC350-20, we evaluated all relevant factors, weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of each of the reporting units, and further impairment testing on goodwill was unnecessary as of December 31, 2015. We elected to assess goodwill for impairment using the two-step process for iQiyi. The fair value of iQiyi exceeded its carrying amount, and therefore goodwill related to this reporting unit was not impaired and we were not required to perform further testing.

The impairment charges of goodwill are nil for 2013, 2014 and 2015.

95

*Impairment of Long-term Investments*

Our long-term investments consist of cost method investments and equity method investments in privately-held companies, held-to-maturity investments with original and remaining maturities of greater than 12 months, and available-for-sale investments.

We periodically review our cost method investments and equity method investments for impairment. If we conclude that any of such investments is impaired, we will assess whether such impairment is other-than-temporary. Factors we consider to make such determination include the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment.

For long-term held-to-maturity investments, we evaluate whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with our policy and ASC topic 320, or ASC 320, *Investments—Debt and Equity Securities*. When we intend to sell an impaired debt security or it is more-likely-than-not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in earnings equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made. When we do not intend to sell an impaired debt security and it is more-likely-than-not that it will not be required to sell prior to recovery of its amortized cost basis, we must determine whether or not it will recover its amortized cost basis. If we conclude that it will not, an other-than-temporary impairment exists and that portion of the credit loss is recognized in earnings, while the portion of loss related to all other factors is recognized in other comprehensive income.

As available-for-sale investment is reported at fair value, an impairment loss on the long-term available-for-sale securities would be recognized in the consolidated statements of comprehensive income when the decline in value is determined to be other-than-temporary.

The fair value determination, particularly for investments in privately-held companies, requires significant judgment to determine appropriate estimates and assumptions. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments and the determination of whether any identified impairment is other-than-temporary. If impairment is considered other-than-temporary, we will write down the asset to its fair value and take the corresponding charge to the consolidated financial statements. The impairment charges of long-term investments are RMB17.5 million, RMB93.4 million and RMB117.0 million (US$18.1 million) for 2013, 2014 and 2015, respectively.

*Business Combination*

We account for business combinations using the purchase method of accounting in accordance with ASC topic 805, or ASC 805, *Business Combinations.* The purchase method accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities we acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

In a business combination achieved in stages, we re-measured our previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. We determine discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

## B.    Liquidity and Capital Resources

As of December 31, 2015, our principal source of liquidity was RMB67.9 billion (US$10.5 billion) of cash, cash equivalents and short-term investments. Our cash and cash equivalents consist of cash on hand and investments in interest bearing demand deposit accounts, time deposits, money market funds and other liquid investments which have original maturities of three months or less. The short-term investments primarily consist of fixed-rate and adjustable-rate debt investments with original maturity of less than one year. We believe that our current cash, cash equivalents, short-term investments and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs, including our cash needs for working capital and capital expenditures, for at least the next 12 months. We may, however, require additional cash due to changing business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If our existing cash is insufficient to meet our requirements, we may seek to sell additional equity securities, debt securities or borrow from banks.

Furthermore, cash transfers from our PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Governmental control of currency conversion may affect the value of your investment." As of December 31, 2015, our PRC subsidiaries and consolidated affiliated entities held RMB64.8 billion (US$10.0 billion) of cash, cash equivalents and short-term investments, RMB684.7 million (US$105.7 million) of which were in the form of foreign currencies.

In July 2013, we entered into a loan agreement with Sumitomo Mitsui Banking Corporation, whereby we were entitled to borrow an unsecured loan of US$150.0 million for general working capital purposes. We drew down US$150.0 million in July 2013 under the loan commitment, with a term of two years and a fixed annual interest rate of 1.17%. In July 2015, the loan was repaid when it became due.

In August 2013, we entered into a loan agreement with Australia and New Zealand Banking Group Limited (Hong Kong Branch), whereby we were entitled to borrow an unsecured loan of AU$235.0 million (US$200.0 million) for general working capital purposes. We drew down AU$235.0 million (US$200.0 million) in August 2013 under the loan commitment, with a term of two years and a fixed annual interest rate of 1.65%. In August 2015, the loan was repaid when it became due.

In May 2014, one of our subsidiaries, 91 Wireless, entered into a banking facility agreement with Hong Kong and Shanghai Banking Corporation Limited (Hong Kong branch), or HSBC, pursuant to which 91 Wireless was entitled to borrow a US$ denominated loan of US$20.0 million with an interest rate of 0.8% per annum plus 1, 3 or 6 months LIBOR. The banking facility was subject to HSBC's overriding right of repayment on demand and the loan under this facility was intended for the general working capital of 91 Wireless. In May 2014, 91 Wireless drew down US$7.0 million with a fixed interest rate of 1.12% under the loan commitment, and in

September 2014, 91 Wireless drew down another US$8.0 million with a fixed interest rate of 1.13% under the loan commitment, both of which were secured by cash collateral of a subsidiary of 91 Wireless. In 2015, both the US$7.0 million loan and the US$8.0 million loan were repaid when they became due.

In December 2014, we entered into two loan agreements with Bank of China (Los Angeles Branch), pursuant to which we borrowed a two-year unsecured loan of US$150.0 million and a three-year unsecured loan of US$150.0 million. Both loans were intended for our general working capital and with a floating interest rate. In connection with the loan agreements, we entered into two interest swap agreements, pursuant to which the loans will be settled in a fixed annual interest rate of 2.31% and 2.45%, respectively, during the respective term of the loans. As of December 31, 2015, we had an outstanding balance of US$150.0 million and US$150.0 million for the two loans, respectively.

In July 2015, we entered into a loan agreement with Sumitomo Mitsui Banking Corporation, pursuant to which we were entitled to borrow an unsecured US$ denominated loan of US$150.0 million with a floating interest rate for general working capital purposes. In August 2015, we drew down US$150.0 million with a term of two years under the facility commitment. In connection with the loan agreement, we entered into an interest swap agreement, pursuant to which the loan will be settled with a fixed annual interest rate of 1.41% during the term of the loan. As of December 31, 2015, we had an outstanding balance of US$150.0 million, which will be due in August 2017.

In August 2015, we entered into a loan agreement with HSBC, pursuant to which we were entitled to borrow an unsecured US$ denominated loan of US$200.0 million, with a fixed annual interest rate of 1.42%, for general working capital purposes. In August 2015, we drew down US$200.0 million with a term of two years under the facility commitment. As of December 31, 2015, we had an outstanding balance of US$200.0 million, which will be due in August 2017.

In September 2015, we entered into a banking facility agreement with China Merchants Bank (Shanghai Branch), pursuant to which we were entitled to borrow a RMB denominated loan of RMB100.0 million (US$15.4 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by People's Bank of China. The loan was intended for the general working capital purposes. In September 2015, we drew down RMB9.9 million (US$1.5 million) with a fixed interest rate of 4.60%. In November and December 2015, the rest of RMB90.1 million (US$ 13.9 million) was drew down with fixed interest rate of 4.35%. As of December 31, 2015, we had an outstanding balance of RMB100.0 million (US$15.4 million), which will be due in 2016.

We have conducted the following four rounds of issuances of debt securities, which remain outstanding as of the date of this annual report:

- In November 2012, we issued an aggregate of US$1.5 billion senior unsecured notes in two equal tranches, due in 2017 and 2022, with stated annual interest rates of 2.25% and 3.50%, respectively. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2015, the total carrying value and estimated fair value of these notes were US$1.5 billion and US$1.5 billion. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2015. We are not subject to any financial covenants or other significant restrictions under the notes. During 2015, we paid an aggregate of US$43.1 million in interest payments related to these notes.

- In August 2013, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2018, with stated annual interest rate of 3.25%. The net proceeds from the sale of the notes were used for general corporate purposes, including merger and acquisition activities. As of December 31, 2015, the total carrying value and estimated fair value of these notes were US$1.0 billion and US$1.0 billion, respectively. The estimated fair value was based on quoted prices for our publicly-traded debt

securities as of December 31, 2015. We are not subject to any financial covenants or other significant restrictions under the notes. During 2015, we paid an aggregate of US$32.5 million in interest payments related to these notes.

- In June 2014, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2019, with stated annual interest rate of 2.75%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2015, the total carrying value and estimated fair value of these notes were US$1.0 billion and US$1.0 billion, respectively. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2015. We are not subject to any financial covenants or other significant restrictions under the notes. During 2015, we paid an aggregate of US$27.5 million in interest payments related to these notes.

- In June 2015, we issued an aggregate of US$750 million senior unsecured notes due in 2020, with stated annual interest rate of 3.00%, and an aggregate of US$500 million senior unsecured notes due in 2025, with stated annual interest rate of 4.125%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2015, the total carrying value and estimated fair value were US$750.0 million and US$743.0 million, respectively, with respect to the notes due in 2020, and US$500.0 million and US$498.0 million, respectively, with respect to the notes due in 2025. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2015. We are not subject to any financial covenants or other significant restrictions under the notes. During 2015, we paid an aggregate of US$22.0 million in interest payments related to these notes.

We may use the net proceeds from our issuance and sale of the notes to fund the operations of our PRC subsidiaries by making additional capital contribution to our existing PRC subsidiaries, injecting capital to establish new PRC subsidiaries and/or providing loans to our PRC subsidiaries. Such transfer of funds from Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries is subject to the PRC regulatory restrictions and procedures: (i) capital increase of the existing PRC subsidiaries and establishment of new PRC subsidiaries must be approved by the Ministry of Commerce or its local counterpart and registered with SAFE or its local counterpart; and (ii) loans to any of our PRC subsidiaries must not exceed the statutory limit, which is the difference between the amount of total investment as approved by the Ministry of Commerce or its local counterpart and the amount of registered capital of the PRC subsidiary, and must be registered with the local counterpart of SAFE. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business."

As of December 31, 2015, we had RMB34.9 billion (US$5.4 billion) in long-term loans and notes payables (including current portion of RMB974.8 million (US$150.5 million)) and had RMB100.0 million (US$15.4 million) in short-term loans.

*Cash Flows and Working Capital*

As of December 31, 2013, 2014 and 2015, we had RMB37.2 billion, RMB56.6 billion and RMB67.9 billion (US$10.5 billion) in cash, cash equivalents and short-term investments.

The following table sets forth a summary of our cash flows for the years indicated.

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | US$ |
| | (In thousands) | | | |
| Net cash generated from operating activities . . . . . . . . . . | 13,792,971 | 17,937,175 | 19,422,438 | 2,998,307 |
| Net cash used in investing activities . . . . . . . . . . . . . . . | (23,062,940) | (22,467,774) | (31,272,444) | (4,827,632) |
| Net cash generated from financing activities . . . . . . . . . . | 7,281,682 | 8,611,960 | 7,778,032 | 1,200,721 |
| Effect of exchange rate changes on cash . . . . . . . . . . . . . | (200,548) | 79,567 | 179,181 | 27,661 |
| Net increase (decrease) in cash and cash equivalents . . . | (2,188,835) | 4,160,928 | (3,892,793) | (600,943) |
| Cash and cash equivalents at beginning of the period . . . | 11,880,632 | 9,691,797 | 13,852,725 | 2,138,492 |
| Cash and cash equivalents at end of the period . . . . . . . . | 9,691,797 | 13,852,725 | 9,959,932 | 1,537,549 |

### *Operating Activities*

Net cash generated from operating activities increased to RMB19.4 billion (US$3.0 billion) in 2015 from RMB17.9 billion in 2014. This increase was primarily due to the integrated effect of growth in net income, as adjusted for non-cash items and the effects of changes in working capital and other activities.

Net cash generated from operating activities increased to RMB17.9 billion in 2014 from RMB13.8 billion in 2013. This increase was primarily due to the integrated effect of growth in net income, as adjusted for non-cash items and the effects of changes in working capital and other activities.

### *Investing Activities*

Net cash used in investing activities increased to RMB31.3 billion (US$4.8 billion) in 2015 from RMB22.5 billion in 2014. This increase was primarily due to the increased acquisition of fixed assets and intangible assets, purchase of long-term investments and disposal of subsidiaries which resulted in the reduction of cash balance.

Net cash used in investing activities decreased to RMB22.5 billion in 2014 from RMB23.1 billion in 2013. This decrease was primarily due to fewer acquisitions of businesses accomplished in 2014 compared to 2013, which was offset partially by the increased purchasing of short-term, long-term investments and fixed assets.

### *Financing Activities*

Net cash generated from financing activities was RMB7.8 billion (US$1.2 billion) in 2015, compared to net cash of RMB8.6 billion generated from financing activities in 2014. The decrease was primarily due to the repayment of long-term loans and the payment for share repurchase program, partially offset by the proceeds from the non-controlling interest shareholders and proceeds from loans and notes issued in 2015.

Net cash generated from financing activities was RMB8.6 billion in 2014, compared to net cash of RMB7.3 billion generated from financing activities in 2013. The increase was primarily due to the proceeds from the long-term loans issued in December 2014, partially offset by our settlement with non-controlling shareholders for acquiring the remaining minority equity interest of subsidiaries.

### *Capital Expenditures*

We made capital expenditures of RMB2.8 billion, RMB4.8 billion and RMB5.2 billion (US$807.3 million) in 2013, 2014 and 2015, representing 8.6%, 9.8% and 7.9% of our total revenues, respectively. In 2015, our capital expenditures were primarily attributable to the purchase of servers, network equipment and other computer hardware to increase our network infrastructure capacity. We funded our capital expenditures primarily with net cash flow generated from operating activities.

We commenced construction of office buildings in Shenzhen in December 2011, Shanxi Cloud Computing Center in September 2012, and the internet data center of Beijing Cloud Computing Center in April 2014, and we expect to complete the planned construction of these projects in 2018, 2018 and 2016, respectively. See "Item 4.D. Information on the Company—Property, Plant and Equipment" for more details of our capital expenditures associated with these projects.

Our capital expenditures may increase in the future as our business continues to grow, in connection with the expansion and improvement of our network infrastructure and the construction of additional office buildings and cloud computing based data centers. We currently plan to fund these expenditures with our current cash, cash equivalents, short-term investments and anticipated cash flow generated from our operating activities.

### *Holding Company Structure*

Baidu, Inc. is a holding company with no operations of its own. We conduct our operations in China primarily through our subsidiaries and consolidated affiliated entities in China. As a result, although other means are available for us to obtain financing at the holding company level, Baidu, Inc.'s ability to pay dividends to the shareholders and to service any debt it may incur may depend upon dividends paid by our PRC subsidiaries and license and service fees paid by our PRC consolidated affiliated entities. If any of our subsidiaries incurs debt on its own behalf in the future, the instruments governing such debt may restrict its ability to pay dividends to Baidu, Inc. In addition, our PRC subsidiaries and consolidated affiliated entities are required to make appropriations to certain statutory reserve funds, which are not distributable as cash dividends except in the event of a solvent liquidation of the companies.

Our PRC subsidiaries, being foreign-invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely, a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of our PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the board of directors of the PRC subsidiaries.

Our consolidated affiliated entities must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of our consolidated affiliated entities is required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are at the discretion of our consolidated affiliated entities.

Under PRC laws and regulations, our PRC subsidiaries and consolidated affiliated entities are subject to certain restrictions with respect to paying dividends or otherwise transferring any of their net assets to us. The amounts restricted include the paid up capital and the statutory reserve funds of our PRC subsidiaries and the net assets of our consolidated affiliated entities in which we have no legal ownership, totaling approximately RMB3.7 billion, RMB7.5 billion and RMB10.6 billion (US$1.6 billion) as of December 31, 2013, 2014 and 2015, respectively.

### C.   **Research and Development**

We have a team of experienced engineers who are mostly based at our headquarters in Beijing. We recruit most of our engineers locally and have established various recruiting and training programs with leading universities in China. We have also recruited experienced engineers from overseas. We compete aggressively for engineering talent to help us address challenges such as Chinese language processing, information retrieval and high performance computing.

101

In the three years ended December 31, 2013, 2014 and 2015, our research and development expenditures, including share-based compensation expenses for research and development staff, were RMB4.1 billion, RMB7.0 billion and RMB10.2 billion (US$1.6 billion), representing 12.9%, 14.2% and 15.3% of our total revenues for 2013, 2014 and 2015, respectively. Our research and development expenses consist primarily of personnel-related costs. We have expensed substantially all of the development costs for the research and development of products and new functionality as incurred, except for certain internal-use software.

### D.    Trend Information

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2015 that are reasonably likely to have a material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

### E.    Off-Balance Sheet Arrangements

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any off-balance sheet derivative instruments. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

### F.    Contractual Obligations

The following table sets forth our contractual obligations by specified categories as of December 31, 2015.

| | | Payment Due by Period | | | |
|---|---|---|---|---|---|
| | Total | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
| | | (In RMB thousands) | | | |
| Long-Term Debt Obligations[1] | 39,697,200 | 1,998,601 | 16,408,905 | 12,251,139 | 9,038,555 |
| Capital Lease Obligations[2] | 47,095 | 39,658 | 7,437 | — | — |
| Operating Lease Obligations[3] | 6,870,364 | 3,358,242 | 2,346,485 | 1,018,222 | 147,415 |
| Purchase Obligations[4] | 5,599,897 | 3,531,170 | 620,449 | 425,315 | 1,022,963 |
| Total | 52,214,556 | 8,927,671 | 19,383,276 | 13,694,676 | 10,208,933 |

(1)  The long-term debt obligations represent (i) a two-year loan and a three-year loan from Bank of China (Los Angeles Branch), (ii) a two-year loan from Sumitomo Mitsui Banking Corporation, (iii) a two-year loan from Hong Kong and Shanghai Banking Corporation Limited, (iv) senior unsecured notes due in 2017 and 2022, (v) senior unsecured notes due in 2018, (vi) senior unsecured notes due in 2019, (vii) senior unsecured notes due in 2020, and (viii) senior unsecured notes due in 2025. The total interest to be paid for these loans is RMB71.1 million (US$11.0 million), RMB24.3 million (US$3.8 million), RMB32.6 million (US$5.0 million), RMB1.4 billion (US$217.5 million), RMB631.6 million (US$97.5 million), RMB623.5 million (US$96.3 million), RMB655.9 million (US$101.3 million) and RMB1.3 billion (US$195.9 million), respectively. Please see "Loans Payable" under Note 10 and "Notes payable" under Note 11 to our audited consolidated financial statements.

(2)  Capital lease obligations represent our obligations for leasing servers, and the total amount of interest to be paid is RMB2.0 million (US$0.3 million).

(3)  Operating lease obligations represent our obligations for leasing premises and bandwidth.

(4)  Purchase obligations consist primarily of expenditures in connection with the expansion and improvement of network infrastructure, our plan to build or acquire additional office buildings and cloud computing-based data centers, and expenditures for video content.

Other than the contractual obligations set forth above, we do not have any contractual obligations that are long-term debt obligations, capital (finance) lease obligations, purchase obligations or other long-term liabilities reflected on our balance sheet.

**Item 6.     Directors, Senior Management and Employees**

**A.     Directors and Senior Management**

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Robin Yanhong Li . . . . . . . . . . . . . . . . . . | 47 | Chairman and Chief Executive Officer |
| Jennifer Xinzhe Li . . . . . . . . . . . . . . . . . . | 48 | Chief Financial Officer |
| Ya-Qin Zhang . . . . . . . . . . . . . . . . . . . . . | 50 | President |
| Jing Wang . . . . . . . . . . . . . . . . . . . . . . . | 51 | Senior Vice President |
| Hailong Xiang . . . . . . . . . . . . . . . . . . . . . | 38 | Senior Vice President |
| Mingyuan Li . . . . . . . . . . . . . . . . . . . . . . | 32 | Vice President |
| William Decker . . . . . . . . . . . . . . . . . . . . | 69 | Independent Director |
| James Ding . . . . . . . . . . . . . . . . . . . . . . . | 50 | Independent Director |
| Greg Penner . . . . . . . . . . . . . . . . . . . . . . | 46 | Independent Director |
| Brent Callinicos . . . . . . . . . . . . . . . . . . . . | 50 | Independent Director |
| Yuanqing Yang . . . . . . . . . . . . . . . . . . . . . | 51 | Independent Director |

*Robin Yanhong Li* is co-founder, chairman and chief executive officer of our company, and oversees our overall strategy and business operations. Mr. Li has been serving as the chairman of our board of directors since our inception in January 2000 and as our chief executive officer since January 2004. Mr. Li served as our president from February 2000 to December 2003. Prior to founding our company, Mr. Li worked as a staff engineer for Infoseek, a pioneer in the internet search engine industry, from July 1997 to December 1999. Mr. Li was a senior consultant for IDD Information Services from May 1994 to June 1997. Mr. Li currently serves on the board of New Oriental Education & Technology Group Inc., a NYSE-listed company that provides private educational services in China, and on the board of Ctrip.com International, Ltd., a NASDAQ-listed company that provides travel services in China. Mr. Li also acts as the vice chairman of the Internet Society of China (ISC). Mr. Li has also been a vice chairman of All-China Federation of Industry & Commerce since December 2012. Mr. Li received a bachelor's degree in information science from Peking University in China and a master's degree in computer science from the State University of New York at Buffalo.

*Jennifer Xinzhe Li* has served as our chief financial officer since March 2008 and is in charge of our overall finance functions. Ms. Li has extensive experience in U.S. GAAP reporting and in developing and leading finance and accounting teams before she joined us. Prior to joining Baidu, Ms. Li served as controller of General Motors Acceptance Corporation (GMAC)'s North American Operations from 2005 to 2008. Prior to that, Ms. Li worked at General Motors China, where she was responsible for overseeing finance functions of General Motors' wholly owned and joint venture businesses in China from 2001 to 2004, with the last post as its chief financial officer. From 1994 to 2001, she held several other finance positions at General Motors in Canada, the United States and Singapore. Ms. Li currently serves on the Board of Philip Morris International, Inc.. Ms. Li holds an M.B.A. degree from the University of British Columbia in Vancouver, B.C., Canada and a bachelor of art degree from Tsinghua University in China.

*Ya-Qin Zhang* joined us in September 2014. He currently serves as president in charge of marketing and our emerging businesses and operations. Prior to joining us, Dr. Zhang was Microsoft Corporation's corporate vice president and the chairman of Microsoft Asia-Pacific R&D Group for a decade, leading Microsoft's overall research and development efforts in the Asia-Pacific region. Before joining Microsoft in 1999, Dr. Zhang was a director for the Multimedia Technology Laboratory at Sarnoff Corp. Dr. Zhang currently serves on the board of Tarena International, Inc. and ChinaCache International Holdings Ltd., both of which are listed on NASDAQ. Dr. Zhang received his bachelor's and master's degrees in electrical engineering from the University of Science and Technology of China, and a Ph.D. in electrical engineering from George Washington University.

*Jing Wang* has served as our senior vice president since December 2013, and is in charge of our technology functions. From April 2010 to December 2013, Mr. Wang served as our vice president of engineering. Prior to joining us, Mr. Wang served as deputy managing director of Google China's R&D Institute from 2006 to 2010, as general manager of eBay China's Development Center from 2004 to 2006, as the chief technology officer of eBay China from 2003 to 2004, and as senior technical director for Alibaba from 2000 to 2001. From 1991 to 2000, Mr. Wang held various managerial and technical positions in companies based in Silicon Valley, including Oracle, Informix and E-Loan. Mr. Wang currently serves on the board of China National Software & Service Co., Ltd., a company listed on the Shanghai Stock Exchange. Mr. Wang received a bachelor's degree from the University of Science and Technology of China and a master's degree in computer science from the University of Chinese Academy of Sciences. He later obtained his second master's degree in computer science from the University of Florida.

*Hailong Xiang* has served as our senior vice president since October 2014, and is in charge of our business products and sales force management. Mr. Xiang joined us in February 2005 following our acquisition of Shanghai Qilang, an internet services firm established by Mr. Xiang in 2000. Mr. Xiang received his bachelor's degree in computer science from East China Normal University.

*Mingyuan Li* has served as our vice president since July 2013, and is in charge of our mobile products and operations. Mr. Li first joined us in 2004. He was responsible for the early content management system for our social content, and built and managed our user product marketing operations system. From August 2010 to November 2011, Mr. Li served as vice president of product at UCWeb. Mr. Li returned to our company in November 2011. Mr. Li received his bachelor's degree from Communication University of China, and an Executive M.B.A. from the China Europe International Business School.

*William Decker* has served as our independent director and chairman of the audit committee since October 2005. Mr. Decker is a retired partner at PricewaterhouseCoopers LLP. Prior to his retirement in July 2005, Mr. Decker was the partner in charge of PricewaterhouseCoopers LLP's Global Capital Markets Group. He led a team of more than 300 professionals in 25 countries that provided technical support to non-U.S. companies on SEC regulations, U.S. GAAP reporting and assistance with Sarbanes-Oxley Act compliance work. Mr. Decker received a bachelor of science degree in accounting from Fairleigh Dickinson University in New Jersey.

*James Ding* has served as our independent director since our initial public offering in August 2005. Mr. Ding is currently a general partner and managing director of GSR Ventures, an early stage venture fund focusing on semiconductor, internet, wireless, new media and green technology investment in China. Mr. Ding served as a co-chairman of the board of directors of AsiaInfo-Linkage Inc., a former NASDAQ-listed company, from July 2010 to January 2014. Prior to that, Mr. Ding served as the chairman of the board of AsiaInfo from April 2003 to July 2010, and a member of the board since AsiaInfo's inception in 1993. Mr. Ding served as the chief executive officer and president of AsiaInfo from 1999 to 2003 and as senior vice president and chief technology officer of AsiaInfo from 1993 to 1999. Mr. Ding also serves as an independent director of Huayi Brothers Media Corporation, a ChiNext Shenzhen-listed company. Mr. Ding received a master's degree in information science from the University of California, Los Angeles and a bachelor's degree in chemistry from Peking University in China.

*Greg Penner* has served as our director since July 2004. Mr. Penner is the chairman of the board of Wal-Mart Stores, Inc. and a general partner at Madrone Capital Partners, an investment management firm based in Menlo Park, California. From 2002 to 2004, Mr. Penner was the senior vice president and chief financial officer of Wal-Mart Japan. From 2000 to 2002, Mr. Penner was senior vice president of finance and strategy for Walmart.com. From 1997 to 2000, Mr. Penner was a general partner at Peninsula Capital, an early stage venture capital fund. Previously, Mr. Penner worked in strategic planning at Wal-Mart Stores, Inc. and corporate finance at Goldman, Sachs & Co. Mr. Penner is also a director of Teach for America. Mr. Penner received an M.B.A. degree from the Stanford Graduate School of Business and a bachelor's degree in international economics from the School of Foreign Service at Georgetown University.

*Brent Callinicos* has served as our independent director since October 2015. Mr. Callinicos most recently served as the chief financial officer of Uber Technologies Inc. from September 2013 to March 2015, where he remains an advisor. Prior to joining Uber, he worked at Google from January 2007 to September 2013, where he last served as vice president, treasurer and chief accountant. He also led green energy investments and financial services at Google Inc. From 1992 to 2007, he served in a variety of increasingly senior roles at Microsoft Corporation, where he last served as corporate vice-president and divisional chief financial officer of the Platforms and Services Division, and oversaw Microsoft's Worldwide Licensing and Pricing and Microsoft Financing. He currently serves on the board of directors of PVH Corp., a NYSE-listed company, and two private companies. Mr. Callinicos is a certified public accountant. Mr. Callinicos received a bachelor's degree from the University of North Carolina at Chapel Hill and an M.B.A. degree from the Kenan-Flagler School of Business at Chapel Hill.

*Yuanqing Yang* has served as our independent director since October 2015. Mr. Yang is currently the chairman and chief executive officer of Lenovo Group Limited, a Hong Kong-listed company. Mr. Yang joined Lenovo in 1989 and has led the company from the initial China-based PC maker to a diversified global technology leader. In 2011, FinanceAsia named Mr. Yang the Best CEO in China. In 2004 and 2012, Mr. Yang was named one of the "CCTV China Annual Economic Figures." He was listed on Barron's list of Best CEOs in 2013, 2014 and 2015. In 2014, Mr. Yang won an Edison Achievement Award for Innovation. Mr. Yang currently serves as a member of the Chinese People's Political Consultative Conference. Mr. Yang holds a master's degree in computer science from the University of Science and Technology of China.

## B.    Compensation

In 2015, we paid an aggregate of approximately RMB52.9 million (US$8.2 million) in cash compensation and granted options to purchase an aggregate of 59,283 Class A ordinary shares and 49,524 restricted Class A ordinary shares to our executive officers as a group. We also paid an aggregate of approximately RMB0.5 million (US$83.5 thousand) in cash compensation and granted options to purchase an aggregate of 513 restricted Class A ordinary shares to our non-executive directors as a group. Our PRC subsidiaries and consolidated affiliated entities are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, housing fund, unemployment insurance and other statutory benefits. Other than the above-mentioned statutory contributions mandated by applicable PRC law, we have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. No executive officer is entitled to any severance benefits upon termination of his or her employment with our company except as required under applicable PRC law.

Our board of directors and shareholders approved the issuance of up to 5,040,000 ordinary shares upon exercise of awards granted under our 2000 option plan. Our 2000 option plan terminated in January 2010 upon the expiration of its ten-year term. At the annual general meeting held on December 16, 2008, our shareholders approved a 2008 share incentive plan, which has reserved an additional 3,428,777 Class A ordinary shares for awards to be granted pursuant to its terms. As of December 31, 2015, options to purchase an aggregate of 319,935 Class A ordinary shares and an aggregate of 527,806 restricted Class A ordinary shares had been granted under the 2008 share incentive plan.

The following table summarizes, as of December 31, 2015, the outstanding options and restricted Class A ordinary shares that we granted to our current directors and executive officers and to other individuals as a group under our 2000 option plan and 2008 share incentive plan. Each Class A ordinary share is represented by 10 ADSs.

| Name | Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Grant Date | Expiration Date |
|---|---|---|---|---|
| Robin Yanhong Li . . . . . . . . . . . . . . . . . . . | 6,500 | 133.86 | February 11, 2009 | February 11, 2019 |
| | 4,247 | 1,058.90 | January 25, 2011 | January 25, 2021 |
| | 4,515 | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | 10,598 | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | 2,415 | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | 665[1] | — | February 24, 2014 | N/A |
| | 11,977 | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | 4,377[1] | — | February 11, 2015 | N/A |
| | 43,904 | 2,069.00 | April 16, 2015 | April 16, 2025 |
| | 43,904[1] | — | April 16, 2015 | N/A |
| Jennifer Xinzhe Li . . . . . . . . . . . . . . . . . . | * | 1,058.90 | January 25, 2011 | January 25, 2021 |
| | * | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | * | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *[1] | — | February 24, 2014 | N/A |
| | * | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | *[1] | — | February 11, 2015 | N/A |
| Ya-Qin Zhang . . . . . . . . . . . . . . . . . . . . . | *[1] | — | October 29, 2014 | N/A |
| | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| Jing Wang . . . . . . . . . . . . . . . . . . . . . . . . | * | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | * | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | *[1] | — | February 24, 2014 | N/A |
| | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *[1] | — | April 23, 2014 | N/A |
| | * | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | *[1] | — | February 11, 2015 | N/A |
| Hailong Xiang . . . . . . . . . . . . . . . . . . . . . | * | 1,501.70 | July 21, 2011 | July 21, 2021 |
| | * | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | * | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | *[1] | — | July 18, 2013 | N/A |
| | * | 1,112.00 | July 18, 2013 | July 18, 2023 |
| | *[1] | — | February 24, 2014 | N/A |
| | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *[1] | — | October 29, 2014 | N/A |
| | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| Mingyuan Li . . . . . . . . . . . . . . . . . . . . . . | *[1] | — | February 16, 2012 | N/A |
| | * | 1,067.00 | November 1, 2012 | November 1, 2022 |
| | *[1] | — | January 31, 2013 | N/A |
| | *[1] | — | October 23, 2013 | N/A |
| | *[1] | — | February 24, 2014 | N/A |
| | *[1] | — | April 23, 2014 | N/A |
| | *[1] | — | July 15, 2014 | N/A |
| | * | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | *[1] | — | February 11, 2015 | N/A |
| William Decker . . . . . . . . . . . . . . . . . . . . | *[1] | — | February 24, 2014 | N/A |
| James Ding . . . . . . . . . . . . . . . . . . . . . . . . | *[1] | — | February 24, 2014 | N/A |
| Greg Penner . . . . . . . . . . . . . . . . . . . . . . . | *[1] | — | February 24, 2014 | N/A |
| Brent Callinicos . . . . . . . . . . . . . . . . . . . . | *[1] | — | October 22, 2015 | N/A |
| Yuanqing Yang . . . . . . . . . . . . . . . . . . . . . | *[1] | — | October 22, 2015 | N/A |
| Other individuals as a group . . . . . . . . . . | 379,855 | — | — | — |

---

\* The options and restricted shares in aggregate held by each of these directors and officers represent less than 1% of our total outstanding shares.

(1) Restricted shares.

The following paragraphs summarize the key terms of our 2008 share incentive plan adopted on December 16, 2008.

### 2008 Share Incentive Plan

*Types of Awards.* We may grant the following types of awards under our 2008 share incentive plan:

- options;
- restricted shares;
- restricted share units; and
- any other form of awards granted to a participant pursuant to the 2008 plan.

*Plan Administration.* The compensation committee of our board of directors administers our 2008 share incentive plan, but may delegate to a committee of one or more members of our board of directors the authority to grant or amend awards to participants other than independent directors and executive officers. The compensation committee will determine the provisions and terms and conditions of each award grant, including, but not limited to, the exercise price, the grant price or purchase price, any restrictions or limitations on the award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an award, and accelerations or waivers thereof, any provisions related to non-competition and recapture of gain on an award, based in each case on such considerations as the committee in its sole discretion determines. The compensation committee has the sole power and discretion to cancel, forfeit or surrender an outstanding award (whether or not in exchange for another award or combination or awards).

*Award Agreement.* Awards granted under our 2008 share incentive plan are evidenced by an award agreement that sets forth the terms, conditions and limitations for each award which may include the term of an award, the provisions applicable in the event the participant's employment or service ends, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an award.

*Eligibility.* We may grant awards to employees, directors and consultants of our company or any of our related entities, which include our subsidiaries or any entities in which we hold a substantial ownership interest. However, we may grant ISOs only to our employees and employees of our majority-owned subsidiaries.

*Acceleration of Awards upon Corporate Transactions.* The outstanding awards will accelerate (i) upon occurrence of a change-of-control corporate transaction where any person acquires at least 50% of the total combined voting power of our outstanding securities or the incumbent board members no longer constitute at least 50% of our board, or (ii) upon occurrence of any other change-of-control corporate transaction in which the successor entity does not assume our outstanding awards under our 2008 share incentive plan, provided that the plan participant remains an employee, consultant or member of our board of directors on the effective date of the corporate transaction. In such event, each outstanding award will become fully exercisable and all forfeiture restrictions on such award will lapse immediately prior to the specified effective date of the corporate transaction.

If the successor entity assumes our outstanding awards and later terminates the grantee's employment or service without cause within 12 months of the corporate transaction, or if the grantee resigns voluntarily with good reason, the outstanding awards automatically will become fully vested and exercisable. The compensation committee may also, in its sole discretion, upon or in anticipation of a corporate transaction, accelerate awards, purchase the awards from the plan participants, replace the awards, or provide for the payment of the awards in cash.

*Exercise Price and Term of Awards.* The exercise price per share subject to an option may be amended or adjusted in the absolute discretion of the compensation committee, the determination of which shall be final,

107

binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices of options mentioned in the preceding sentence shall be effective without the approval of our shareholders or the approval of the affected grantees. If we grant an ISO to an employee, who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of our share capital, the exercise price cannot be less than 110% of the fair market value of our ordinary shares on the date of that grant. The compensation committee will determine the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting. The term may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of our share capital.

*Restricted Shares and Restricted Share Unites.* The compensation committee is also authorized to make awards of restricted shares and restricted share units. Except as otherwise determined by the compensation committee at the time of the grant of an award or thereafter, upon termination of employment or service during the applicable restriction period, restricted shares that are at the time subject to restrictions shall be forfeited or repurchased in accordance with the respective award agreements.

*Vesting Schedule*. The compensation committee determines, and the award agreement specifies, the vesting schedule of options and other awards granted. The compensation committee determines the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting, and also determines any conditions that must be satisfied before all or part of an option may be exercised. At the time of grant for restricted share units, the compensation committee specifies the date on which the restricted share units become fully vested and non-forfeitable, and may specify such conditions to vesting as it deems appropriate.

*Amendment and Termination.* With the approval of our board of directors, the compensation committee may at any time amend, suspend or terminate our 2008 share incentive plan. Amendments to our 2008 share incentive plan are subject to shareholder approval, to the extent required by law, or by stock exchange rules or regulations. Any amendment, suspension or termination of our 2008 share incentive plan must not adversely affect in any material way awards already granted without written consent of the recipient of such awards. Unless terminated earlier, our 2008 share incentive plan shall continue in effect for a term of ten years from the date of adoption.

## C.   **Board Practices**

### Board of Directors

Our board of directors has six directors. A director is not required to hold any shares in the company by way of qualification. A director may vote with respect to any contract, proposed contract or arrangement in which he is materially interested. A director may exercise all the powers of the company to borrow money, mortgage its undertakings, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. The remuneration to be paid to the directors is determined by the board of directors. There is no age limit requirement for directors.

### Committees of the Board of Directors

We have three committees under the board of directors: an audit committee, a compensation committee and a corporate governance and nominating committee. We have adopted a charter for each of the three committees.

### *Audit Committee*

Our audit committee consists of William Decker, James Ding, Greg Penner and Brent Callinicos, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules and Rule 10A-3 under the Exchange Act. Our board of directors has determined that each of Mr. Decker and Mr. Callinicos is an audit committee financial expert as defined in the instructions to Item 16A of the

Form 20-F. The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- appointing, retaining and overseeing the work of the independent auditors, including resolving disagreements between the management and the independent auditors relating to financial reporting;

- pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing annually the independence and quality control procedures of the independent auditors;

- reviewing and approving all proposed related party transactions;

- discussing the annual audited financial statements with the management;

- meeting separately with the independent auditors to discuss critical accounting policies, management letters, recommendations on internal controls, the auditor's engagement letter and independence letter and other material written communications between the independent auditors and the management; and

- attending to such other matters that are specifically delegated to our audit committee by our board of directors from time to time.

In 2015, our audit committee held meetings or passed resolutions by unanimous written consent five times.

### *Compensation Committee*

Our compensation committee consists of James Ding, Greg Penner and Yuanqing Yang, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules. The compensation committee assists the board in reviewing and approving our compensation structure, including all forms of compensation relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting while his compensation is deliberated. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our chief executive officer and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

In 2015, our compensation committee held meetings or passed resolutions by unanimous written consent five times.

### *Corporate Governance and Nominating Committee*

Our corporate governance and nominating committee consists of James Ding and Greg Penner, both of whom satisfy the "independence" requirements of Rule 5605(a) (2) of the NASDAQ Stock Market Rules. The corporate governance and nominating committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The corporate governance and nominating committee is responsible for, among other things:

- recommending to the board nominees for election or re-election to the board or for appointments to fill any vacancies;

- reviewing annually the performance of each incumbent director in determining whether to recommend such director for an additional term;

- overseeing the board in the board's annual review of its own performance and the performance of the management; and

- considering, preparing and recommending to the board such policies and procedures with respect to corporate governance matters as may be required or required to be disclosed under the applicable laws or otherwise considered to be material.

In 2015, our corporate governance and nominating committee passed resolutions by unanimous written consent two times.

**Terms of Directors and Executive Officers**

All directors hold office until their successors have been duly elected and qualified. None of our directors is subject to a fixed term of office. In addition, the service agreements between us and the directors do not provide benefits upon termination of their services. Director nomination is subject to the approval of our corporate governance and nominating committee. Our shareholders may remove any director by ordinary resolution and may in like manner appoint another person in his stead. A valid ordinary resolution requires a majority of the votes cast at a shareholder meeting that is duly constituted and meets the quorum requirement. Officers are elected by and serve at the discretion of the board of directors.

**D.    Employees**

We had 31,676, 46,391 and 41,467 employees as of December 31, 2013, 2014 and 2015, respectively. As of December 31, 2015, we had 2,172 employees in management and administration, 18,077 employees in research and development, 4,120 employees in operation and service, and 17,098 employees in sales and marketing. As of December 31, 2015, we had 23,130 employees in Beijing, 17,495 employees outside of Beijing but within China, and 842 employees outside of China. We also hire temporary employees and contractors from time to time. Our employees are not covered by any collective bargaining agreement. We consider our relations with our employees to be generally good. However, as our operations and employee base further expand, we cannot assure you that we will always be able to maintain good relations with all of our employees. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may not be able to manage our expanding operations effectively."

**E.    Share Ownership**

The following table sets forth information with respect to the beneficial ownership of our shares as of February 29, 2016 by:

- each of our current directors and executive officers; and

- each person known to us to own beneficially more than 5% of our shares.

110

See "—B. Compensation" for more details on options and restricted shares granted to our directors and executive officers.

| Directors and Executive Officers: | Shares Beneficially Owned | |
| --- | --- | --- |
| | Number[1] | %[2] |
| Robin Yanhong Li[3] | 5,590,294 | 16.1% |
| Jennifer Xinzhe Li | * | * |
| Ya-Qin Zhang | * | * |
| Jing Wang | * | * |
| Hailong Xiang | * | * |
| Mingyuan Li | * | * |
| William Decker[4] | * | * |
| James Ding[5] | * | * |
| Greg Penner[6] | * | * |
| Brent Callinicos | * | * |
| Yuanqing Yang[7] | * | * |
| All Directors and Executive Officers as a Group[8] | 5,795,101 | 16.7% |
| **Principal Shareholders:** | | |
| Handsome Reward Limited[9] | 5,490,000 | 15.9% |
| Baillie Gifford & Co (Scottish partnership)[10] | 2,486,003 | 7.2% |

\*    Less than 1% of our total outstanding Class A ordinary shares and Class B ordinary shares.

\*\*   Except for William Decker, James Ding, Gregg Penner and Yuanqing Yang, the business address of our directors and executive officers is c/o Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(1)  The number of shares beneficially owned by each named director and executive officer includes the shares beneficially owned by such person, the shares underlying all options held by such person that have vested or will vest within 60 days after February 29, 2016, and restricted shares held by such person that will vest within 60 days after February 29, 2016. The options and restricted shares were granted under our 2008 share incentive plan.

(2)  Percentage of beneficial ownership of each named director and executive officer is based on 34,625,025 ordinary shares (consisting of 27,132,104 Class A ordinary shares and 7,492,921 Class B ordinary shares) of our company outstanding as of February 29, 2016, the number of ordinary shares underlying options that have vested or will vest within 60 days after February 29, 2016, and the number of restricted shares that will vest within 60 days after February 29, 2016, each as held by such person as of that date.

(3)  Includes (i) 37,665 Class A Ordinary Shares directly held by Mr. Li on record; (ii) 20,460 Class A ordinary shares in the form of ADSs held in the brokerage account of the administrator of the issuer's employee stock option program; (iii) 3,781 restricted Class A Ordinary Shares that had vested as of February 29, 2016; (iv) 38,388 Class A Ordinary Shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of February 29, 2016; and (v) 5,490,000 Class B Ordinary Shares held by Handsome Reward Limited, a British Virgin Islands company wholly owned and controlled by Mr. Li, and excludes 25,000 Class A Ordinary Shares, 1,576,667 Class B Ordinary Shares and 17,000 Class A Ordinary Shares in the form of ADSs in her brokerage account, held by Melissa Ma, Mr. Li's wife, of which Mr. Li disclaims beneficial ownership.

(4)  The address of Mr. Decker is 24 Nordic Way, Saranac Lake, New York 12983, U.S.A.

(5)  The business address of Mr. Ding is 56/F, China World Tower 3, No. 1 Jianguomenwai Street, Chaoyang District, Beijing 100004, PRC.

(6)  The business address of Mr. Penner is 3000 Sand Hill Road, Building 1, Suite 150, Menlo Park, California 94025, U.S.A.

(7)  The business address of Mr. Yang is c/o Lenovo, No. 6 Shangdi West Road, Haidian District, Beijing 100085, PRC.

(8)  Includes ordinary shares, ordinary shares issuable upon exercise of options and restricted shares, held by all of our directors and executive officers as a group.

(9)  Represents 5,490,000 Class B ordinary shares held by Handsome Reward Limited, a British Virgin Island company wholly owned and controlled by Mr. Robin Yanhong Li. The business address of Handsome Reward Limited is c/o Robin Yanhong Li, Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(10) Represents 2,486,003 Class A ordinary shares in the form of ADSs held by Baillie Gifford & Co (Scottish partnership), as reported on Schedule 13G filed by Baillie Gifford & Co (Scottish partnership) on January 28, 2016. The percentage of beneficial ownership was calculated based on the total number of our ordinary shares outstanding as of February 29, 2016. The address of Baillie Gifford & Co (Scottish partnership) is Calton Square, 1 Greenside Row, Edinburgh EH1 3AN, Scotland, UK.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering in 2005. Holders of our Class B ordinary shares may choose to convert their Class B ordinary shares into the same

111

number of Class A ordinary shares at any time. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our ADSs—Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial."

As of February 29, 2016, 34,625,025 of our ordinary shares were issued and outstanding. To our knowledge, approximately 79.0% of our total outstanding ordinary shares were held by four record shareholders in the United States, including approximately 78.2% held by The Bank of New York Mellon, the depositary of our ADS program. The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

**Item 7.   Major Shareholders and Related Party Transactions**

**A.   Major Shareholders**

Please refer to "Item 6.E. Directors, Senior Management and Employees—Share Ownership."

**B.   Related Party Transactions**

See "Item 4.C. Information on the Company—Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders."

Our subsidiaries, consolidated affiliated entities, and the subsidiaries of the consolidated affiliated entities have engaged, during the ordinary course of business, in a number of customary transactions with each other. All of these inter-company balances have been eliminated in consolidation.

As of December 31, 2013, 2014 and 2015, we had RMB371.0 million, RMB50.1 thousand and RMB2.0 billion (US$301.1 million), respectively, due from related parties. The increase of the balance from December 31, 2014 to December 31, 2015 was primarily due to unsettled loans provided to certain investees and amount incurred by transactions in the ordinary course of business with certain investees that were determined to be related parties. The decrease of the balance from December 31, 2013 to December 31, 2014 was primarily due to the borrowings provided by us to one noncontrolling shareholder of an acquired subsidiary, which was settled in 2014. The amount outstanding as of April 7, 2016 was RMB75.9 million (US$11.7 million).

As of December 31, 2013, 2014 and 2015, we had RMB373.6 million, RMB8.4 million and RMB785.9 million (US$121.3 million), respectively, due to related parties. The increase of the balance from December 31, 2014 to December 31, 2015 was primarily due to an unsettled loan provided by certain investee, as well as amount incurred by transactions in the ordinary course of business with certain investees that were determined to be related parties. The decrease of the balance from December 31, 2013 to December 31, 2014 was primarily due to the settlement of unsecured and interest free loans provided by a noncontrolling shareholder of an acquired subsidiary, partially offset by the payable to Mr. Robin Yanhong Li for reimbursement of his use of an aircraft for our business purposes. The amount outstanding as of April 7, 2016 was RMB137.8 million (US$21.3 million).

For the year ended December 31, 2015, the related party transactions mainly represented the online marketing services that we provided to Ctrip, which was in the total amount of RMB89.2 million (US$13.8 million).

In 2014 and 2015, with the approval from our board of directors, we reimbursed Mr. Robin Yanhong Li the fees and expenses incurred in connection with his use of an aircraft beneficially owned by his family member for

our business purposes. The hourly rate for use of the aircraft was determined based on an analysis of market rates for the charter of comparable aircrafts. The service charges for the use of the aircraft for 2014 and 2015 were insignificant.

In 2014 and 2015, certain subsidiaries of ours rent an office building owned by the family members of Mr. Hailong Xiang, one of our executive officers. The amount of rental expenses for 2014 and 2015 were insignificant.

In February 2016, we received a non-binding proposal from Mr. Robin Yanhong Li, chairman and chief executive officer of Baidu, and Mr. Yu Gong, chief executive officer of iQiyi, proposing to acquire all of the outstanding shares of iQiyi beneficially owned by us based on an enterprise valuation of US$2.8 billion for 100% of iQiyi on a cash-free and debt-free basis. Pursuant to the non-binding proposal, the buyers expect that iQiyi will remain a strategic partner to us after the consummation of the proposed transaction and enter into business cooperation agreements with us. Our board of directors has formed a special committee, which consists solely of independent and disinterested directors, to consider the non-binding proposal, with the assistance of its financial and legal advisors.

**Share Options and Restricted Shares Grants**

Please refer to "Item 6.B. Directors, Senior Management and Employees—Compensation."

**C.    Interests of Experts and Counsel**

Not applicable.

**Item 8.    Financial Information**

**A.    Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

**Legal Proceedings**

From time to time, we have been involved in litigation or other disputes regarding, among other things, copyright and trademark infringement, defamation, unfair competition and labor disputes. Our search results provide links to materials, and our Baidu Music, P4P, Baidu Post Bar, Baidu Cloud, Baidu Nuomi, iQiyi and certain other products or services may contain materials, in which others may allege to own copyrights, trademarks or image rights or which others may claim to be defamatory or objectionable. We have received notice letters from third parties asserting copyright infringement, unfair competition, defamation, breach of contract and labor-related claims against us.

In 2015, 869 complaints were filed against us before various courts in China, the U.S. and Brazil, and the aggregate amount of the damages sought in these complaints totals approximately RMB761.2 million (US$117.5 million). As of December 31, 2015, 315 cases against us were pending in various PRC, U.S. and Brazilian courts. The aggregate amount of damages sought under these pending cases is approximately RMB1.1 billion (US$170.0 million).

For many of these legal proceedings, we are currently unable to estimate the reasonably possible loss or a range of reasonably possible loss as the proceedings are in the early stages, or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such proceedings, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss

or a range of reasonably possible loss cannot be made. With respect to the limited number of proceedings for which we are able to estimate the reasonably possible loss or the range of reasonably possible loss, such estimates are immaterial. However, we believe that such proceedings, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material and adverse effect on our results of operations, financial position and cash flows.

**Dividend Policy**

Baidu, Inc., our holding company in the Cayman Islands, has never declared or paid any dividends on our ordinary shares, nor do we have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

Our board of directors has complete discretion as to whether to distribute dividends. Even if our board of directors decides to pay dividends, the form, frequency and amount of our dividends will depend upon our future operations and earnings, capital requirements and surplus, financial condition, contractual restrictions and other factors that our board of directors may deem relevant. If we pay any dividends, we will pay our ADS holders to the same extent as holders of our ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

**B.    Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**Item 9.    The Offer and Listing**

**A.    Offering and Listing Details**

Our ADSs have been listed on The NASDAQ Global Market since August 5, 2005. Our ADSs currently trade on The NASDAQ Global Select Market under the symbol "BIDU." Prior to May 12, 2010, one ADS represented one Class A ordinary share. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split.

The following table provides the high and low trading prices for our ADSs on NASDAQ for (i) the years 2011, 2012, 2013, 2014 and 2015, (ii) each of the four quarters of 2014 and 2015, and (iii) each of the past six full months.

| | Trading Price | |
| --- | --- | --- |
| | **High** | **Low** |
| **Annual Highs and Lows** | | |
| 2011 | 165.96 | 97.58 |
| 2012 | 154.15 | 85.96 |
| 2013 | 181.25 | 82.98 |
| 2014 | 251.99 | 140.66 |
| 2015 | 234.67 | 100.00 |
| **Quarterly Highs and Lows** | | |
| First Quarter 2014 | 189.34 | 144.16 |
| Second Quarter 2014 | 188.66 | 140.66 |
| Third Quarter 2014 | 231.41 | 176.69 |
| Fourth Quarter 2014 | 251.99 | 194.31 |
| First Quarter 2015 | 234.67 | 199.70 |
| Second Quarter 2015 | 223.95 | 188.60 |
| Third Quarter 2015 | 210.00 | 100.00 |
| Fourth Quarter 2015 | 217.97 | 135.31 |
| **Monthly Highs and Lows** | | |
| October 2015 | 189.55 | 135.31 |
| November 2015 | 217.97 | 185.39 |
| December 2015 | 215.20 | 188.33 |
| January 2016 | 189.84 | 154.53 |
| February 2016 | 176.81 | 139.61 |
| March 2016 | 193.73 | 169.28 |
| April 2016 (through April 7, 2016) | 192.35 | 181.44 |

**B.    Plan of Distribution**

Not applicable.

**C.    Markets**

Our ADSs have been listed on NASDAQ since August 5, 2005 under the symbol "BIDU."

**D.    Selling Shareholders**

Not applicable.

**E.    Dilution**

Not applicable.

**F.    Expenses of the Issue**

Not applicable.

115

**Item 10.    Additional Information**

**A.    Share Capital**

Not applicable.

**B.    Memorandum and Articles of Association**

The following are summaries of material provisions of our third amended and restated memorandum and articles of association, as well as the Companies Law (2013 Revision) insofar as they relate to the material terms of our ordinary shares.

**Registered Office and Objects**

The Registered Office of our company is at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands or at such other place as our board of directors may from time to time decide. The objects for which our company is established are unrestricted and we have full power and authority to carry out any object not prohibited by the Companies Law (2013 Revision), as amended from time to time, or any other law of the Cayman Islands.

**Board of Directors**

See "Item 6.C. Directors, Senior Management and Employees—Board Practices—Board of Directors."

**Ordinary Shares**

*General.* Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. All of our outstanding ordinary shares are fully paid and non-assessable. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are nonresidents of the Cayman Islands may freely hold and vote their shares.

*Dividends.* The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors subject to the Companies Law.

*Conversion.* Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate of such holder (as defined in our articles of incorporation), such Class B ordinary shares shall be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time our chairman and chief executive officer, Robin Yanhong Li, and his affiliates collectively own less than 5% of the total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share shall be automatically and immediately converted into one share of Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

*Voting Rights.* All of our shareholders have the right to receive notice of shareholders' meetings and to attend, speak and vote at such meetings. In respect of matters requiring shareholders' vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to 10 votes. A shareholder may participate at a shareholders' meeting in person, by proxy or by telephone conference or other communications equipment by means of which all the shareholders participating in the meeting can communicate with each other. At any shareholders' meeting, a resolution put to the vote of the meeting shall be decided on a poll conducted by the chairman of the meeting.

A quorum for a shareholders' meeting consists of one or more shareholders holding at least one third of the paid up voting share capital present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative. We shall, if required by the Companies Law, hold a general meeting of shareholders as our annual general meeting and shall specify the meeting as such in the notices calling it. Our board of directors may call extraordinary general meetings, and they must on shareholders' requisition convene an extraordinary general meeting. A shareholder requisition is a requisition of shareholders holding at the date of deposit of the requisition not less than a majority of the voting power represented by the issued shares of our company as at that date carries the right of voting at general meetings of our company. Advance notice of at least five days is required for the convening of our annual general meeting and other shareholders' meetings.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast in a general meeting, while a special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to the ordinary shares cast in a general meeting. A special resolution is required for matters such as a change of name. Holders of the ordinary shares may effect certain changes by ordinary resolution, including consolidating and dividing all or any of our share capital into shares of larger amount than our existing share capital and canceling any shares.

*Transfer of Shares.* Subject to the restrictions of our memorandum and articles of association, as applicable, any of our shareholders may transfer any or all of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

Our board of directors may, in their absolute discretion (except with respect to a transfer from a shareholder to its affiliate(s)), decline to register any transfer of shares without assigning any reason thereof. If our board of directors refuses to register a transfer they shall notify the transferee within two months of such refusal. Notwithstanding the foregoing, if a transfer complies with the holder's transfer obligations and restrictions set forth under applicable law (including but not limited to U.S. securities law provisions related to insider trading) and our articles of association, our board of directors shall promptly register such transfer. Further, any director is authorized to confirm in writing addressed to the registered office to authorize a share transfer and to instruct that the register of members be updated accordingly, provided that the transfer complies with the holder's transfer obligations and restrictions set forth under applicable law and our articles of association and such holder is not the director who authorizes the transfer or an entity affiliated with such director. Any director is authorized to execute a share certificate in respect of such shares for and on behalf of our company.

The registration of transfers may be suspended at such time and for such periods as our board of directors may from time to time determine, provided, however, that the registration of transfers shall not be suspended for more than 45 days in any year.

*Liquidation.* On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of shares), assets available for distribution among the holders of ordinary shares may be distributed among the holders of the ordinary shares as determined by the liquidator, subject to sanction of a special resolution of our company. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately to the capital paid up, or which ought to have been paid up, at the commencement of the winding up on the shares held by such shareholders respectively.

*Calls on Shares and Forfeiture of Shares.* Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 days prior to the specified time and place of payment. The shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

*Redemption of Shares.* Subject to the provisions of the Companies Law and our articles of association, we may issue shares on terms that are subject to redemption, at our option or at the option of the holders, on such terms and in such manner as our board of directors may determine.

*Repurchase of Shares.* Subject to the provisions of the Companies Law and our articles of association, our board of directors may authorize repurchase of our shares in accordance with the manner of purchase specified in our articles of association without seeking shareholder approval.

*Variations of Rights of Shares.* All or any of the special rights attached to any class of shares may, subject to the provisions of the Companies Law, be varied either with the written consent of the holders of a majority of the issued shares of that class or with the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

*Inspection of Books and Records.* No holders of our ordinary shares who is not a director shall have any right of inspecting any of our accounts, books or documents except as conferred by the Companies Law or authorized by the directors or by us in general meeting. However, we will make this annual report, which contains our audited financial statements, available to shareholders and ADS holders. See "Item 10.H. Additional Information—Documents on Display."

**Preferred Shares**

Our board of directors has the authority, without shareholder approval, to issue up to a total of 10,000,000 shares of preferred shares in one or more series. Our board of directors may establish the number of shares to be included in each such series and may set the designations, preferences, powers and other rights of the shares of a series of preferred shares. While the issuance of preferred shares provides us with flexibility in connection with possible acquisitions or other corporate purposes, it could, among other things, have the effect of delaying, deferring or preventing a change of control transaction and could adversely affect the market price of our ADSs. We have no current plan to issue any preferred shares.

**C.    Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" or elsewhere in this annual report on Form 20-F.

**D.    Exchange Controls**

See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations on Foreign Exchange."

**E.    Taxation**

The following summary of the material Cayman Islands, People's Republic of China and United States federal income tax consequences of an investment in our ADSs or ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or ordinary shares, such as the tax consequences under state, local and other tax laws.

**Cayman Islands Taxation**

According to Maples and Calder, our Cayman Islands counsel, the Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or brought within, the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Taxation**

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the 10% EIT on the dividends payable by us or any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider the dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is also possible that such dividends and gains earned by non-resident individuals may be subject to the 20% PRC individual income tax. It is uncertain whether, if we are considered a PRC resident enterprise, holders of our shares or ADSs would be able to claim the benefit of tax treaties or arrangements entered into between China and other jurisdictions.

If we are required under the PRC tax law to withhold PRC income tax on our dividends payable to our non-PRC resident shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident shareholders and ADS holders are subject to the EIT or the individual income tax, your investment in our shares or ADSs could be materially and adversely affected.

**United States Federal Income Taxation**

The following discussion is a summary of U.S. federal income tax considerations under present law of the ownership and disposition of the ADSs or ordinary shares. This summary applies only to investors that are U.S. Holders (as defined below) and that hold the ADSs or ordinary shares as capital assets. This discussion is based on the tax laws of the United States as in effect on the date of this annual report on Form 20-F and on U.S. Treasury regulations in effect or, in some cases, proposed, as of the date of this annual report on Form 20-F, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax considerations described below.

The following discussion does not deal with the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- financial institutions;

- insurance companies;

- broker dealers;

- persons that elect to mark their securities to market;

- tax-exempt entities;

- persons liable for the alternative minimum tax;

- regulated investment companies;

- certain expatriates or former long-term residents of the United States;

- governments or agencies or instrumentalities thereof;

- persons holding an ADS or ordinary share as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own 10% or more of our voting shares;

- persons whose functional currency is other than the U.S. dollar; or

119

- persons who acquired ADSs or ordinary shares pursuant to the exercise of any employee share option or otherwise as consideration.

**U.S. Holders are urged to consult their tax advisors about the application of the U.S. federal tax rules to their particular circumstances as well as the state, local and foreign tax consequences to them of the purchase, ownership and disposition of ADSs or ordinary shares.**

The discussion below of the U.S. federal income tax consequences will apply if you are a "U.S. Holder." You are a "U.S. Holder" if you are the beneficial owner of ADSs or ordinary shares and you are, for U.S. federal income tax purposes,

- a citizen or individual resident of the United States;

- a corporation (or other entity subject to tax as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any State or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (i) is subject to the supervision of a court within the United States and the control of one or more United States persons or (ii) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

This discussion does not consider the tax treatment of partnerships or other pass-through entities that hold the ADSs or ordinary shares, or of persons who hold the ADSs or ordinary shares through such entities. If a partnership (or other entity classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of the ADSs or ordinary shares, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold ADSs, you will be treated as the holder of the underlying ordinary shares represented by those ADSs for U.S. federal income tax purposes.

This discussion does not address any aspect of U.S. federal non-income tax laws, such as gift or estate tax laws, or state, local or non-U.S. tax laws. We have not sought, and will not seek, a ruling from the Internal Revenue Service (the "IRS"), or an opinion as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court.

### *Taxation of Dividends and Other Distributions on the ADSs or Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, the gross amount of all our distributions to you with respect to the ADSs or ordinary shares will be included in your gross income as dividend income on the date of receipt by the depositary, in the case of ADSs, or by you, in the case of ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (computed under U.S. federal income tax principles). Because we do not intend to determine our earnings and profits on the basis of U.S. federal income tax principles, any distribution paid will generally be treated as a "dividend" for U.S. federal income tax purposes. Dividends paid by us will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from U.S. corporations.

With respect to non-corporate U.S. Holders (including individual U.S. Holders), dividends may be taxed at the lower applicable capital gains rate provided that (i) the ADSs or ordinary shares are readily tradable on an established securities market in the United States or we are eligible for the benefit of the income tax treaty between the United States and the PRC, (ii) we are not a passive foreign investment company (as discussed below) for either our taxable year in which the dividend was paid or for the preceding taxable year, (iii) certain

holding period requirements are met, and (iv) such non-corporate U.S. Holders are not under an obligation to make related payments with respect to positions in substantially similar or related property. For this purpose, ADSs listed on the NASDAQ Global Select Market will generally be considered to be readily tradable on an established securities market in the United States. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

For U.S. foreign tax credit purposes, dividends paid on the ADSs or ordinary shares generally will be treated as income from foreign sources and generally will constitute passive category income. If PRC withholding taxes apply to dividends paid to you with respect to the ADSs or ordinary shares, you may be able to obtain a reduced rate of PRC withholding taxes under the income tax treaty between the United States and the PRC if certain requirements are met. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends may be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. If you do not elect to claim a foreign tax credit, you may instead claim a deduction for U.S. federal income tax purposes in respect of such withholding, but only for a year in which you elect to do so for all creditable foreign income taxes. You should consult your tax advisor regarding the creditability of any PRC tax.

### *Sale, Exchange or Other Disposition of the ADSs or ordinary shares*

Subject to the passive foreign investment company rules discussed below, you will recognize gain or loss on any sale, exchange or other taxable disposition of an ADS or ordinary share equal to the difference between the amount realized for the ADS or ordinary share and your tax basis in the ADS or ordinary share. The gain or loss will generally be capital gain or loss. If you are a non-corporate U.S. Holder, including an individual U.S. Holder, who has held the ADS or ordinary share for more than one year, you will generally be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes, which will generally limit the availability of foreign tax credits. However, in the event we are deemed to be a PRC "resident enterprise" under PRC tax law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC. In such event, if PRC tax were to be imposed on any gain from the disposition of the ADSs or ordinary shares, a U.S. Holder that is eligible for the benefits of the income tax treaty between the United States and the PRC may elect to treat such gain as PRC source income. U.S. Holders should consult their tax advisors regarding the creditability of any PRC tax.

### *Passive Foreign Investment Company*

A non-U.S. corporation, such as our own, is considered a passive foreign investment company or "PFIC" for any taxable year if either (i) at least 75% of its gross income is passive income, or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income (the "asset test"). We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the shares.

Although under certain interpretations of how one determines what portion of goodwill and certain other assets are treated as "passive", we may have been a PFIC for 2015, we believe under more reasonable approaches for our circumstances, based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, that we were not a PFIC for our taxable year ended December 31, 2015. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. We do not expect to be a PFIC for our taxable year ending December 31, 2016 or for the foreseeable future. However, our PFIC status for the current taxable year ending December 31, 2016 will not be determinable until the close of the taxable year, and, accordingly, there is no guarantee that we will not be a PFIC for the current taxable year (or any future taxable year).

We must make a separate determination each year as to whether we are a PFIC. As a result, our PFIC status may change. In particular, because the total value of our assets for purposes of the asset test will generally be

calculated using the market price of the ADSs and ordinary shares, our PFIC status will depend in large part on the market price of the ADSs and ordinary shares, which may fluctuate considerably. Accordingly, fluctuations in the market price of the ADSs and ordinary shares may result in our being a PFIC for any year. If we are a PFIC for any year during which you hold the ADS or ordinary shares, we will generally continue to be treated as a PFIC for all succeeding years during which you hold such ADS or ordinary shares. However, if we cease to be a PFIC, provided that you have not made a mark-to-market election, as described below, you may avoid some of the adverse effects of the PFIC regime by making a deemed sale election with respect to the ADSs or ordinary shares, as applicable.

If we are a PFIC for any taxable year during which you hold ADSs or ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the ADSs or ordinary shares, unless you make a mark-to-market election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ADSs or ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the ADSs or ordinary shares,

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we became a PFIC, will be treated as ordinary income, and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for you for such year and would be increased by an additional tax equal to interest on the resulting tax deemed deferred with respect to each such other taxable year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the ADSs or ordinary shares cannot be treated as capital, even if you hold the ADSs or ordinary shares as capital assets.

Alternatively, a U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock of a PFIC to elect out of the tax treatment discussed in the two preceding paragraphs. If you make a valid mark-to-market election for the ADSs or ordinary shares, you will include in income each year an amount equal to the excess, if any, of the fair market value of the ADSs or ordinary shares as of the close of your taxable year over your adjusted basis in such ADSs or ordinary shares. You are allowed a deduction for the excess, if any, of the adjusted basis of the ADSs or ordinary shares over their fair market value as of the close of the taxable year. Such deductions, however, are allowable only to the extent of any net mark-to-market gains on the ADSs or ordinary shares included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ADSs or ordinary shares, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ADSs or ordinary shares, as well as to any loss realized on the actual sale or disposition of the ADSs or ordinary shares, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ADSs or ordinary shares. Your basis in the ADSs or ordinary shares will be adjusted to reflect any such income or loss amounts. If you make such a mark-to-market election, tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us (except that the lower applicable capital gains rate would not apply).

The mark-to-market election is available only for "marketable stock," which is stock that is traded in other than *de minimis* quantities on at least 15 days during each calendar quarter, or "regularly traded," on a qualified exchange or other market, as defined in applicable Treasury regulations. We expect that the ADSs will continue to be listed on the NASDAQ Global Select Market, which is a qualified exchange for these purposes, and, consequently, assuming that the ADSs are regularly traded, if you are a holder of ADSs, it is expected that the mark-to-market election would be available to you were we to become a PFIC.

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the general PFIC rules described above with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for United States federal income tax purposes.

Alternatively, a U.S. Holder may avoid the PFIC tax consequences described above in respect to its ADSs and ordinary shares by making a timely "qualified electing fund," or QEF, election. To comply with the requirements of a QEF election, a U.S. Holder must receive certain information from us. Because we do not intend to provide such information, however, such election will not be available to you with respect to the ADSs or ordinary shares.

If you hold ADSs or ordinary shares in any year in which we are a PFIC, you will be required to file an annual information report containing such information as the U.S. Treasury may require.

You are urged to consult your tax advisor regarding the application of the PFIC rules to your investment in ADSs or ordinary shares.

### Medicare Tax

An additional 3.8% tax is imposed on a portion or all of the net investment income of certain individuals with a modified adjusted gross income of over $200,000 (or $250,000 in the case of joint filers or $125,000 in the case of married individuals filing separately) and on the undistributed net investment income of certain estates and trusts. For these purposes, "net investment income" generally includes interest, dividends (including dividends paid with respect to the ADSs or ordinary shares), annuities, royalties, rents, net gain attributable to the disposition of property not held in a trade or business (including net gain from the sale, exchange or other taxable disposition of an ADS or ordinary share) and certain other income, reduced by any deductions properly allocable to such income or net gain. U.S. Holders are urged to consult their tax advisors regarding the applicability of this tax to their income and gains in respect of an investment in the ADSs or ordinary shares.

### Information Reporting and Backup Withholding

Dividend payments with respect to ADSs or ordinary shares and proceeds from the sale, exchange or redemption of ADSs or ordinary shares may be subject to information reporting to the IRS and possible U.S. backup withholding. Backup withholding will not apply to you, however, if you furnish a correct taxpayer identification number and make any other required certification or that are otherwise exempt from backup withholding. U.S. Holders that are required to establish their exempt status generally must provide such certification on IRS Form W-9. You should consult your tax advisor regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding can be credited against your U.S. federal income tax liability, and you may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS and furnishing any required information in a timely manner.

Individual U.S. Holders and certain entities may be required to submit to the IRS certain information with respect to his or her beneficial ownership of the ADSs or ordinary shares, if such ADSs or ordinary shares are not held on his or her behalf by a financial institution. This law also imposes penalties if an individual U.S. Holder is required to submit such information to the IRS and fails to do so.

### F.  Dividends and Paying Agents

Not applicable.

**G.    Statement by Experts**

Not applicable.

**H.    Documents on Display**

We previously filed with the SEC our registration statement on Form F-1, as amended and prospectus under the Securities Act of 1933, with respect to our ordinary shares. We have also previously filed with the SEC our registration statement on Form F-3 with respect to the sale of debt securities by our company on a continuous basis, a prospectus under the Securities Act with respect to our issuance of US$1.5 billion senior unsecured notes in two equal tranches, due in 2017 and 2022 with stated interest rates of 2.25% and 3.50%, respectively, a prospectus under the Securities Act with respect to our issuance of US$1.0 billion senior unsecured notes due in 2018 with stated interest rate of 3.25%, a prospectus under the Securities Act with respect to our issuance of US$1.0 billion senior unsecured notes due in 2019 with stated interest rate of 2.75%, and a prospectus under the Securities Act with respect to our issuance of US$1.25 billion senior unsecured notes in two tranches consisting of US$750 million notes due in 2020 with stated interest rate of 3.00% and US$500 million notes due in 2025 with stated interest rate of 4.125%.

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the Commission at 1-800-SEC-0330. The SEC also maintains a website at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish The Bank of New York Mellon, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

In accordance with NASDAQ Stock Market Rule 5250(d), we will post this annual report on Form 20-F on our website at http://ir.baidu.com. In addition, we will provide hardcopies of our annual report free of charge to shareholders and ADS holders upon request.

**I.    Subsidiary Information**

Not applicable.

**Item 11.    Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Risk**

Our exposure to interest rate risk primarily relates to excess cash invested in short-term instruments with original maturities of less than a year and long-term held-to-maturity securities with maturities of greater than a year. Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate

124

risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectations due to changes in interest rates, or we may suffer losses in principal if we have to sell securities which have declined in market value due to changes in interest rates. We have not been, and do not expect to be, exposed to material interest rate risks, and therefore have not used any derivative financial instruments to manage our interest risk exposure, other than interest swap agreements entered into in connection with the two loan agreements with Bank of China (Los Angeles Branch) dated December 2014 and in connection with the loan agreement with Sumitomo Mitsui Banking Corporation dated July 2015. See "Item 5.B. Operating and Financial Review and Prospects—Liquidity and Capital Resources."

We had RMB1.8 billion (US$283.9 million) in long-term held-to-maturity investments as of December 31, 2015, with a weighted average duration of approximately 1.43 years. A hypothetical one percentage point (100 basis-point) increase in interest rates would have resulted in a decrease of approximately RMB25.6 million (US$4.0 million) in the fair value of these long-term held-to-maturity investments as of December 31, 2015.

### Foreign Exchange Risk

Most of our revenues and costs are denominated in RMB, while a portion of our cash and cash equivalents, short-term financial assets, long-term loans payable and notes payable are denominated in U.S. dollars. Our exposure to foreign exchange risk primarily relates to those financial assets and financial liabilities denominated in U.S. dollars. Any significant revaluation of RMB against the U.S. dollar may materially affect our earnings and financial position, and the value of, and any dividends payable on, our ADS in U.S. dollars. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on your investment." In addition, we commenced operation in Japan in late 2007. To the extent we need to make capital injections into our Japan operation by converting U.S. dollars into Japanese Yen, we will be exposed to the fluctuations in the exchange rate between the U.S. dollar and the Japanese Yen. We have not hedged exposures denominated in foreign currencies using any derivative financial instruments.

The RMB depreciated by 4.22% against the U.S. dollar in 2015. A hypothetical 10% increase in the exchange rate of the U.S. dollar against the RMB would have resulted in an increase of RMB3.5 billion (US$539.0 million) in the value of our U.S. dollar-denominated long-term loans payable and notes payable at December 31, 2015.

### Item 12.   Description of Securities Other than Equity Securities

### A.   Debt Securities

Not applicable.

### B.   Warrants and Rights

Not applicable.

### C.   Other Securities

Not applicable.

### D.   American Depositary Shares

### Fees and Charges Our ADS holders May Have to Pay

The Bank of New York Mellon, the depositary of our ADS program, collects its fees for delivery and surrender of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal

125

or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deductions from cash distributions or by directly billing investors or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide fee-attracting services until its fees for those services are paid. The depositary's corporate trust office at which the ADSs will be administered is located at 225 Liberty Street, 21st Floor, New York, New York 10286. The depositary's principal executive office is located at One Wall Street, New York, New York 10286.

| Persons depositing or withdrawing shares must pay: | For: |
|---|---|
| US$5.00 (or less) per 1,000 ADSs (or portion of 1,000 ADSs) | • Issuance of ADSs, including issuances resulting from a distribution of shares or rights or other property |
| US$0.05 (or less) per ADS | • Cancellation of ADSs for the purpose of withdrawal, including if the deposit agreement terminates |
| US$0.02 (or less) per ADS | • Any cash distribution to registered ADS holders |
| A fee equivalent to the fee that would be payable if securities distributed had been shares and the shares had been deposited for issuance of ADSs | • Distribution of securities distributed to holders of deposited securities which are distributed by the depositary to registered ADS holders |
| US$0.02 (or less) per ADS per calendar year (if the depositary has not collected any cash distribution fee during that year) | • Depositary services |
| Expenses of the depositary | • Cable, telex and facsimile transmissions (when expressly provided in the deposit agreement) |
| | • Converting foreign currency to U.S. dollars |
| Registration or transfer fees | • Transfer and registration of shares on our share register to or from the name of the depositary or its agent when you deposit or withdraw shares |
| Taxes and other governmental charges the depositary or the custodian have to pay on any ADS or share underlying an ADS, for example, stock transfer taxes, stamp duty or withholding taxes | • As necessary |
| Any charges incurred by the depositary or its agents for servicing the deposited securities | • As necessary |

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us annually for our expenses incurred in connection with investor relationship programs and any other program related to our ADS facility and the travel expense of our key personnel in connection with such programs. The depositary has also agreed to provide additional payments to us based on the applicable performance indicators relating to our ADS facility. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not necessarily tied to the amount of fees the depositary collects from investors. In 2015, we received approximately US$4.0 million (after tax) reimbursement from the depositary for our expenses incurred in connection with investor relationship programs related to the ADS facility and the travel expense of our key personnel in connection with such programs.

**PART II**

**Item 13.    Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14.    Material Modifications to the Rights of Security Holders and Use of Proceeds**

None.

**Item 15.    Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2015, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2015.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Our independent registered public accounting firm, Ernst & Young Hua Ming LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2015, as stated in its report, which appears on page F-3 of this annual report on Form 20-F.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 16A.    Audit Committee Financial Expert**

Our board of directors has determined that each of Mr. William Decker and Mr. Brent Callinicos, an independent director (under the standards set forth in NASDAQ Stock Market Rule 5605(a)(2) and Rule 10A-3 under the Exchange Act) and member of our audit committee, is an audit committee financial expert.

**Item 16B.   Code of Ethics**

Our board of directors adopted a code of business conduct and ethics that applies to our directors, officers, employees and advisors in July 2005. We have posted a copy of our code of business conduct and ethics on our website at http://ir.baidu.com.

**Item 16C.   Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Ernst & Young Hua Ming LLP, our principal external auditors, for the periods indicated.

|  | 2014 | 2015 |
|---|---|---|
| Audit fees[1] | US$3,720,586 | US$3,673,825 |
| Audit-related fees[2] | US$    — | US$  229,184 |
| Tax fees[3] | US$  112,187 | US$   52,355 |
| All other fees[4] | US$    2,128 | US$    — |

(1)   "Audit fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for the audit of our annual financial statements and assistance with and review of documents filed with the SEC. In 2014 and 2015, the audit refers to financial audit and audit pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.

(2)   "Audit-related fees" means fees billed in year 2015 for professional services rendered by our principal auditors associated with certain due diligence projects.

(3)   "Tax fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for tax compliance, tax advice, and tax planning. In 2014 and 2015, the tax fees refer to fees paid to our principal auditors for reviewing the compliance of our tax documentation and providing tax advices.

(4)   "All other fees" means the aggregate fees billed in 2014 for our subscription of certain U.S. GAAP reading materials from our principal auditors.

All audit and non-audit services provided by our independent auditors must be pre-approved by our audit committee. Our audit committee has adopted a combination of two approaches in pre-approving proposed services: general pre-approval and specific pre-approval. With general approval, proposed services are pre-approved without consideration of specific case-by-case services; with specific approval, proposed services require the specific pre-approval of the audit committee. Unless a type of service has received general pre-approval, it will require specific pre-approval by our audit committee. Any proposed services exceeding pre-approved cost levels or budgeted amounts will also require specific pre-approval by our audit committee.

All requests or applications for services to be provided by our independent auditors that do not require specific approval by our audit committee will be submitted to our chief financial officer and must include a detailed description of the services to be rendered. The chief financial officer will determine whether such services are included within the list of services that have received the general pre-approval of the audit committee. The audit committee will be informed on a timely basis of any such services. Requests or applications to provide services that require specific approval by our audit committee will be submitted to the audit committee by both our independent auditors and our chief financial officer and must include a joint statement as to whether, in their view, the request or application is consistent with the SEC's rules on auditor independence.

**Item 16D.   Exemptions from the Listing Standards for Audit Committees**

Not applicable.

128

**Item 16E.    Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

On July 30, 2015, our board of directors authorized a share repurchase program, under which we may repurchase up to US$1.0 billion of our ADSs or ordinary shares over 12 months from July 30, 2015 through July 29, 2016. The share repurchase program was publicly announced on July 30, 2015. On October 29, 2015, we announced the completion of share repurchase program, under which we repurchased approximately 6.0 million ADSs for approximately $1.0 billion.

The table below is a summary of the shares repurchased by us during 2015. No shares were repurchased during 2015 except during the months indicated and all shares were purchased in the open market pursuant to the share repurchase program announced in July 2015.

| Period | Total Number of ADSs Purchased | Average Price Paid Per ADS | Total Number of ADSs Purchased as Part of the Publicly Announced Plan | Approximate Dollar Value of ADSs that May Yet Be Purchased Under the Plan |
|---|---|---|---|---|
| July 30 – July 31 | 400,541 | $174.73 | 400,541 | $930,013,256 |
| August 01 – August 31 | 5,636,711 | $163.21 | 6,037,252 | $ 10,018,916 |
| September 01 – September 22 | 8 | $137.18 | 6,037,260 | $ 10,017,819 |
| **Total** | **6,037,260** | **$163.98** | **6,037,260** | **$ 10,017,819** |

On October 22, 2015, our board of directors authorized a second share repurchase program, under which we may repurchase up to US$2.0 billion of our ADSs or ordinary shares over 24 months from October 22, 2015 through October 21, 2017. The share repurchase program was publicly announced on October 29, 2015. We did not conduct any repurchase under this program in 2015.

**Item 16F.    Change in Registrant's Certifying Accountant**

Not applicable.

**Item 16G.    Corporate Governance**

NASDAQ Stock Market Rule 5620 requires each issuer to hold an annual meeting of shareholders no later than one year after the end of the issuer's fiscal year-end. However, NASDAQ Stock Market Rule 5615(a)(3) permits foreign private issuers like us to follow "home country practice" in certain corporate governance matters. Maples and Calder, our Cayman Islands counsel, has provided a letter to the NASDAQ Stock Market certifying that under Cayman Islands law, we are not required to hold annual shareholder meetings every year. We follow home country practice with respect to annual meetings and did not hold an annual meeting of shareholders in 2015. We may, however, hold annual shareholder meetings in the future if there are significant issues that require shareholders' approvals.

Other than the annual meeting practice described above, there are no significant differences between our corporate governance practices and those followed by U.S. domestic companies under NASDAQ Stock Market Rules.

**Item 16H. Mine Safety Disclosure**

Not applicable.

**PART III**

**Item 17.   Financial Statements**

We have elected to provide financial statements pursuant to Item 18.

**Item 18.   Financial Statements**

The consolidated financial statements of Baidu, Inc., its subsidiaries and its consolidated affiliated entities are included at the end of this annual report.

**Item 19.   Exhibits**

| Exhibit Number | Description of Document |
| --- | --- |
| 1.1 | Third Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated by reference to Exhibit 99.2 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 2.1 | Registrant's Specimen American Depositary Receipt (incorporated by reference to Exhibit 1 of the prospectus filed with the Securities and Exchange Commission on January 5, 2009 pursuant to Rule 424(b)(3) under the Securities Act) |
| 2.2 | Registrant's Specimen Certificate for Class A Ordinary Shares (incorporated by reference to Exhibit 4.2 of Amendment No. 5 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on August 2, 2005) |
| 2.3 | Form of Deposit Agreement among the Registrant, the depositary and holder of the American Depositary Receipts (incorporated by reference to Exhibit 4.3 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 2.4 | Indenture, dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.5 | First Supplemental Indenture dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.6 | Form of 2.250% Notes due 2017 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.7 | Form of 3.500% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.8 | Second Supplemental Indenture dated August 6, 2013 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.9 | Form of 3.250% Notes due 2018 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.10 | Third Supplemental Indenture dated June 9, 2014 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |
| 2.11 | Form of 2.750% Notes due 2019 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |

| Exhibit Number | Description of Document |
|---|---|
| 2.12 | Fourth Supplemental Indenture dated June 30, 2015 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.13 | Form of 3.00% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.14 | Form of 4.125% Notes due 2025 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 4.1 | 2000 Option Plan (amended and restated effective December 16, 2008) (incorporated by reference to Exhibit 99.3 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.2 | 2008 Share Incentive Plan (incorporated by reference to Exhibit 99.4 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.3 | Form of Indemnification Agreement between the Registrant and the Registrant's directors (incorporated by reference to Exhibit 10.3 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.4 | Form of Employment Agreement between the Registrant and an Executive Officer of the Registrant (incorporated by reference to Exhibit 10.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.5 | Translation of Exclusive Technology Consulting and Services Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.6 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.6 | Translation of Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.7 | Translation of Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.5 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.8 | Translation of Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 99.8 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.9 | Translation of Proxy Agreement dated August 9, 2004 among Baidu Online, Baidu Netcom, Robin Yanhong Li and Eric Yong Xu (incorporated by reference to Exhibit 99.9 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.10 | Translation of Form of Irrevocable Powers of Attorney issued by the shareholders of Baidu Netcom (incorporated by reference to Exhibit 99.13 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.11 | Translation of the form of Technology Consulting and Services Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.19 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |

131

| Exhibit Number | Description of Document |
|---|---|
| 4.12 | Translation of the form of Operating Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.20 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.13 | Translation of the form of Web Layout Copyright License Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.21 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.14 | Translation of the form of Proxy Agreement among Baidu Online, a consolidated affiliated PRC entity and the shareholders of the consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.22 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.15 | Translation of the form of Equity Pledge Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.23 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.16 | Translation of the form of Exclusive Equity Purchase and Transfer Option Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.24 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.17 | Translation of the form of Loan Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.25 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.18 | Translation of the Supplementary Agreement to Exclusive Technology Consulting and Services Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal, dated as of April 22, 2010 (incorporated by reference to Exhibit 4.25 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.19 | Translation of the Operating Agreement dated June 23, 2006 between Baidu Online, Beijing Perusal, Jiping Liu and Yazhu Zhang and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.26 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.20 | Translation of the Web Layout Copyright License Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal (incorporated by reference to Exhibit 4.27 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.21 | Translation of the Proxy Agreement dated June 23, 2006 among Jiping Liu, Yazhu Zhang and Baidu Online (incorporated by reference to Exhibit 4.28 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.22* | Translation of the Amended and Restated Equity Pledge Agreements between Baidu Online and Yazhu Zhang, and between Baidu Online and Jiping Liu, both dated December 16, 2015 |
| 4.23* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreements between Baidu Online, Jiping Liu and Beijing Perusal, and between Baidu Online, Yazhu Zhang and Beijing Perusal, both dated December 16, 2015 |
| 4.24 | Translation of Irrevocable Powers of Attorney issued by Jiping Liu and Yazhu Zhang, the shareholders of Beijing Perusal, both dated June 23, 2006 (incorporated by reference to Exhibit 4.31 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |

132

| Exhibit Number | Description of Document |
|---|---|
| 4.25* | Translation of the Amended and Restated Loan Agreements between Baidu Online and Jiping Liu and between Baidu Online and Yazhu Zhang, both dated December 16, 2015 |
| 4.26 | Translation of the Technology Consulting and Services Agreement dated February 28, 2008 between Baidu Online and BaiduPay and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.33 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.27 | Translation of the Operating Agreement dated February 28, 2008 between Baidu Online, BaiduPay, Jun Yu and Baidu Netcom and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.34 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.28 | Translation of the Web Layout Copyright License Agreement dated February 28, 2008 between Baidu Online and BaiduPay (incorporated by reference to Exhibit 4.35 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.29 | Translation of the Proxy Agreement between Zhixiang Liang and Baidu Online, dated April 23, 2012 (incorporated by reference to Exhibit 4.33 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.30* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Zhixiang Liang, dated December 22, 2015 |
| 4.31* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement between Baidu Online, Zhixiang Liang and BaiduPay, dated December 22, 2015 |
| 4.32 | Translation of Irrevocable Power of Attorney issued by Zhixiang Liang, the individual shareholder of BaiduPay, dated April 23, 2012 (incorporated by reference to Exhibit 4.36 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.33* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Zhixiang Liang, dated December 22, 2015 |
| 4.34 | Translation of the supplementary agreements, dated March 11, 2010 and April 22, 2010 to the Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.48 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.35 | Translation of the supplementary agreement dated March 1, 2010 to the Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 4.50 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.36 | Translation of the supplementary agreement dated April 22, 2010 to the Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.37 | Translation of the supplementary agreement by and among Baidu Online, Beijing Perusal, Jiping Liu and Yazhu Zhang dated September 6, 2011 (incorporated by reference to Exhibit 4.55 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |

133

| Exhibit Number | Description of Document |
|---|---|
| 4.38 | Translation of the supplementary agreement to the Loan Agreement by and among Robin Yanhong Li, Baidu Netcom and Baidu Online dated September 6, 2011 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.39 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.68 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.40 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.69 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.41* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Robin Yanhong Li dated December 31, 2015 |
| 4.42* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Zhan Wang dated December 31, 2015 |
| 4.43 | Translation of the Supplementary Agreement by and among Baidu Online, Baidu Netcom, Robin Yanhong Li and Zhan Wang dated September 6, 2011 (incorporated by reference to Exhibit 4.75 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.44* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Robin Yanhong Li and Baidu Netcom dated December 31, 2015 |
| 4.45* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Zhan Wang and Baidu Netcom dated December 31, 2015 |
| 4.46 | Translation of the Supplementary Agreement to the Operating Agreement and its Supplementary Agreement among Baidu Online, Baidu Netcom, Robin Yanhong Li, Haoyu Shen and Zhan Wang dated August 26, 2011 (incorporated by reference to Exhibit 4.77 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.47 | Translation of the Proxy Agreement among Robin Yanhong Li, Zhan Wang and Baidu Online dated August 26, 2011 (incorporated by reference to Exhibit 4.78 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.48 | Translation of Supplementary Agreement among Baidu Online, BaiduPay, Baidu Netcom and Hu Cai dated September 6, 2011 (incorporated by reference to Exhibit 4.79 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.49 | Translation of the Supplementary Agreement to Exclusive Technology Consulting and Services Agreement between Baidu Online and BaiduPay dated September 6, 2011 (incorporated by reference to Exhibit 4.80 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.50 | Translation of the Supplementary Agreement to Web Layout Copyright License Agreement between Baidu Online and BaiduPay dated September 6, 2011 (incorporated by reference to Exhibit 4.74 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.51 | Translation of Domain Name License Termination Agreement between Baidu Online and Baidu Netcom dated December 31, 2012 (incorporated by reference to Exhibit 4.78 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |

| Exhibit Number | Description of Document |
|---|---|
| 4.52 | Translation of Domain Name License Termination Confirmation between Baidu Online and Beijing Perusal dated December 31, 2012 (incorporated by reference to Exhibit 4.79 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.53 | Translation of Trademark License Termination Agreement between Baidu Online and Baidu Netcom dated February 1, 2013 (incorporated by reference to Exhibit 4.80 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.54 | Translation of Trademark License Termination Agreement between Baidu Online and Beijing Perusal dated February 1, 2013 (incorporated by reference to Exhibit 4.81 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.55 | Translation of Trademark License Termination Agreement between Baidu Online and BaiduPay dated February 1, 2013 (incorporated by reference to Exhibit 4.82 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.56 | Translation of Domain Name License Termination Agreement between Baidu Online and BaiduPay dated December 31, 2012 (incorporated by reference to Exhibit 4.83 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.57 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.64 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.58 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.59 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Beijing Perusal dated August 15, 2013 (incorporated by reference to Exhibit 4.66 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.60 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and BaiduPay dated August 15, 2013 (incorporated by reference to Exhibit 4.67 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.61* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Robin Yanhong Li dated December 31, 2015 |
| 4.62* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Zhan Wang dated December 31, 2015 |
| 4.63 | Loan Agreement between Baidu, Inc. and Bank of China, Los Angeles Branch dated December 9, 2014 (incorporated by reference to Exhibit 4.72 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2015) |
| 4.64 | Loan Agreement between Baidu, Inc. and Bank of China, Los Angeles Branch dated December 9, 2014 (incorporated by reference to Exhibit 4.73 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2015) |

| Exhibit Number | Description of Document |
|---|---|
| 4.65 | Share Exchange Agreement among Baidu, Inc., Baidu Holdings Limited and Ctrip.com International, Ltd. dated October 24, 2015 (incorporated by reference to Exhibit 2 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 5, 2015) |
| 4.66 | Standstill Agreement between Baidu, Inc. and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 3 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 5, 2015) |
| 4.67 | Registration Rights Agreement between Baidu Holdings Limited and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 4 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 5, 2015) |
| 4.68* | Facility Agreement between Baidu, Inc. and Sumitomo Mitsui Banking Corporation dated July 17, 2015 |
| 4.69* | Facility Agreement between Baidu, Inc. and The HongKong And Shanghai Banking Corporation Limited dated August 25, 2015 |
| 8.1* | List of Principal Subsidiaries and Consolidated Affiliated Entities |
| 11.1 | Code of Business Conduct and Ethics (incorporated by reference to Exhibit 99.14 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 12.1* | Certification by Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | Certification by Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | Certification by Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | Certification by Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Maples and Calder |
| 15.2* | Consent of Han Kun Law Offices |
| 15.3* | Consent of Ernst & Young Hua Ming LLP |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*      Filed herewith

\*\*    Furnished herewith

136

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

Baidu, Inc.

By:  /s/ Robin Yanhong Li

Name:Robin Yanhong Li
Title: Chairman and Chief Executive Officer

Date: April 8, 2016

BAIDU, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page(s) |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 – F-3 |
| Consolidated Balance Sheets as of December 31, 2014 and 2015 | F-4 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2013, 2014 and 2015 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2013, 2014 and 2015 | F-6 – F-7 |
| Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2013, 2014 and 2015 | F-8 |
| Notes to the Consolidated Financial Statements | F-9 – F-65 |

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders of Baidu, Inc.

We have audited the accompanying consolidated balance sheets of Baidu, Inc. (the "Company") as of December 31, 2015 and 2014, and the related consolidated statements of comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2015. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Baidu, Inc. at December 31, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Baidu, Inc.'s internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated April 8, 2016 expressed an unqualified opinion thereon.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
April 8, 2016

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Baidu, Inc.

We have audited Baidu, Inc.'s internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). Baidu, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Baidu, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Baidu, Inc. as of December 31, 2015 and 2014, and the related consolidated statements of comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2015 of Baidu, Inc., and our report dated April 8, 2016 expressed an unqualified opinion thereon.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
April 8, 2016

BAIDU, INC.
CONSOLIDATED BALANCE SHEETS
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"), except for number of shares and per share data)

| | Notes | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2014 | 2015 | 2015 |
| | | RMB | RMB | US$ |
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 13,852,725 | 9,959,932 | 1,537,549 |
| Restricted cash | | 413,010 | 95,997 | 14,819 |
| Short-term investments | 4 | 42,698,831 | 57,969,242 | 8,948,909 |
| Accounts receivable, net of allowance of RMB93,877 and RMB189,563 (US$29,263) for 2014 and 2015, respectively | 5 | 3,664,447 | 3,927,256 | 606,263 |
| Amounts due from related parties | 19 | 50 | 1,940,559 | 299,571 |
| Other current assets, net | 6 | 3,407,427 | 4,340,677 | 670,084 |
| **Total current assets** | | **64,036,490** | **78,233,663** | **12,077,195** |
| **Non-current assets:** | | | | |
| Fixed assets, net | 7 | 8,705,364 | 10,627,127 | 1,640,546 |
| Intangible assets, net | 8 | 3,574,359 | 3,334,619 | 514,776 |
| Goodwill | 8 | 17,418,895 | 15,395,573 | 2,376,667 |
| Long-term investments, net | 4 | 3,544,923 | 37,958,591 | 5,859,797 |
| Deferred tax assets, net | 12 | 944,079 | 1,008,174 | 155,635 |
| Amounts due from related parties | 19 | — | 9,725 | 1,501 |
| Other non-current assets | | 893,952 | 1,285,836 | 198,499 |
| **Total non-current assets** | | **35,081,572** | **69,619,645** | **10,747,421** |
| **Total assets** | | **99,118,062** | **147,853,308** | **22,824,616** |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB9,813,366 and RMB14,739,528 (US$2,275,391) as of December 31, 2014 and 2015, respectively): | 1 | | | |
| Short-term loans | 10 | 93,000 | 100,000 | 15,437 |
| Accounts payable and accrued liabilities | 9 | 12,964,893 | 17,840,192 | 2,754,051 |
| Customer advances and deposits | | 4,296,440 | 5,420,230 | 836,739 |
| Deferred revenue | | 164,809 | 375,672 | 57,994 |
| Deferred income | | 518,543 | 559,855 | 86,427 |
| Long-term loans, current portion | 10 | 2,167,405 | 974,820 | 150,486 |
| Amounts due to related parties | 19 | 8,385 | 785,945 | 121,329 |
| Capital lease obligation | | 57,346 | 46,088 | 7,115 |
| **Total current liabilities** | | **20,270,821** | **26,102,802** | **4,029,578** |
| **Non-current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB781,835 and RMB2,718,124 (US$419,606) as of December 31, 2014 and 2015, respectively): | 1 | | | |
| Deferred income | | 39,626 | 17,413 | 2,688 |
| Long-term loans | 10 | 1,860,000 | 3,239,676 | 500,120 |
| Notes payable | 11 | 21,556,782 | 30,702,116 | 4,739,590 |
| Deferred tax liabilities | 12 | 1,143,821 | 3,441,290 | 531,245 |
| Amounts due to related parties | 19 | 8 | — | — |
| Capital lease obligation | | 50,079 | 8,435 | 1,302 |
| Other non-current liabilities | | 144,542 | 125,860 | 19,429 |
| **Total non-current liabilities** | | **24,794,858** | **37,534,790** | **5,794,374** |
| **Total liabilities** | | **45,065,679** | **63,637,592** | **9,823,952** |
| **Commitments and contingencies** | 14 | | | |
| **Redeemable noncontrolling interests** | 15 | **1,894,502** | **3,947,879** | **609,447** |
| **Equity** | | | | |
| Class A ordinary shares, par value US$0.00005 per share, 825,000,000 shares authorized, and 27,613,315 shares and 27,113,541 shares issued and outstanding as at December 31, 2014 and 2015, respectively | 16 | 12 | 12 | 2 |
| Class B ordinary shares, par value US$0.00005 per share, 35,400,000 shares authorized, and 7,492,921 shares and 7,492,921 shares issued and outstanding as at December 31, 2014 and 2015, respectively | 16 | 3 | 3 | — |
| Additional paid-in capital | | 3,650,601 | 6,402,349 | 988,352 |
| Retained earnings | 16 | 47,701,326 | 74,659,355 | 11,525,418 |
| Accumulated other comprehensive income | 16 | (279,518) | (806,056) | (124,434) |
| **Total Baidu, Inc. shareholders' equity** | | **51,072,424** | **80,255,663** | **12,389,338** |
| **Noncontrolling interests** | | **1,085,457** | **12,174** | **1,879** |
| **Total equity** | | **52,157,881** | **80,267,837** | **12,391,217** |
| **Total liabilities, redeemable noncontrolling interests and equity** | | **99,118,062** | **147,853,308** | **22,824,616** |

The accompanying notes are an integral part of the consolidated financial statements.

BAIDU, INC.
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"), except for number of shares and per share (or ADS) data)

| | Notes | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2013 | 2014 | 2015 | 2015 |
| | | RMB | RMB | RMB | US$ |
| Revenues: | | | | | |
| Online marketing services | | 31,802,219 | 48,495,215 | 64,037,006 | 9,885,610 |
| Others | | 141,705 | 557,103 | 2,344,723 | 361,963 |
| **Total revenues** | | **31,943,924** | **49,052,318** | **66,381,729** | **10,247,573** |
| Operating costs and expenses: | | | | | |
| Cost of revenues | | (11,471,839) | (18,885,450) | (27,458,030) | (4,238,789) |
| Selling, general and administrative | | (5,173,533) | (10,382,142) | (17,076,383) | (2,636,139) |
| Research and development | | (4,106,832) | (6,980,962) | (10,175,762) | (1,570,867) |
| **Total operating costs and expenses** | | **(20,752,204)** | **(36,248,554)** | **(54,710,175)** | **(8,445,795)** |
| **Operating profit** | | **11,191,720** | **12,803,764** | **11,671,554** | **1,801,778** |
| Other income: | | | | | |
| Interest income | | 1,308,542 | 1,992,818 | 2,362,632 | 364,728 |
| Interest expense | | (447,084) | (628,571) | (1,041,394) | (160,764) |
| Foreign exchange (loss) income, net | | (48,379) | 75,780 | 181,802 | 28,065 |
| Income (loss) from equity method investments | 4 | 22,578 | (19,943) | 3,867 | 597 |
| Others, net | 4 | 189,330 | 260,558 | 24,728,162 | 3,817,370 |
| **Total other income, net** | | **1,024,987** | **1,680,642** | **26,235,069** | **4,049,996** |
| **Income before income taxes** | | **12,216,707** | **14,484,406** | **37,906,623** | **5,851,774** |
| Income taxes | 12 | (1,828,930) | (2,231,172) | (5,474,377) | (845,098) |
| **Net income** | | **10,387,777** | **12,253,234** | **32,432,246** | **5,006,676** |
| Net loss attributable to noncontrolling interests | | 162,880 | 943,698 | 1,231,927 | 190,177 |
| **Net income attributable to Baidu, Inc.** | | **10,550,657** | **13,196,932** | **33,664,173** | **5,196,853** |
| Earnings per share for Class A and Class B ordinary shares: | 17 | | | | |
| Basic | | 300.66 | 374.88 | 954.56 | 147.36 |
| Diluted | | 300.23 | 373.43 | 951.49 | 146.88 |
| Earnings per ADS (1 Class A ordinary share equals 10 ADSs): | 17 | | | | |
| Basic | | 30.07 | 37.49 | 95.46 | 14.74 |
| Diluted | | 30.02 | 37.34 | 95.15 | 14.69 |
| Weighted average number of Class A and Class B ordinary shares outstanding: | | | | | |
| Basic | | 34,986,228 | 35,062,466 | 34,921,782 | 34,921,782 |
| Diluted | | 35,036,346 | 35,198,474 | 35,034,470 | 35,034,470 |
| Other comprehensive income (loss): | 16 | | | | |
| Foreign currency translation adjustment | | 185,389 | (422,925) | (644,896) | (99,555) |
| Unrealized gains (losses) on available-for-sale investments, net of reclassification | | 11,467 | (17,698) | 294,559 | 45,472 |
| **Other comprehensive income (loss), net of tax** | | **196,856** | **(440,623)** | **(350,337)** | **(54,083)** |
| **Comprehensive income** | | **10,584,633** | **11,812,611** | **32,081,909** | **4,952,593** |
| Comprehensive loss attributable to noncontrolling interests and redeemable noncontrolling interests | | 225,560 | 923,545 | 1,055,726 | 162,976 |
| **Comprehensive income attributable to Baidu, Inc.** | | **10,810,193** | **12,736,156** | **33,137,635** | **5,115,569** |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2013** | **2014** | **2015** | **2015** |
| | **RMB** | **RMB** | **RMB** | **US$** |
| **Cash flows from operating activities:** | | | | |
| Net income | 10,387,777 | 12,253,234 | 32,432,246 | 5,006,676 |
| Adjustments to reconcile net income to net cash generated from operating activities: | | | | |
| Depreciation of fixed assets and computer parts | 1,702,140 | 2,223,907 | 2,886,254 | 445,561 |
| Gain on disposal of fixed assets | (16,051) | (24,395) | (24,233) | (3,741) |
| Amortization of intangible assets and licensed copyrights | 949,850 | 1,748,387 | 2,974,658 | 459,208 |
| Deferred income tax, net | 330,636 | (693,448) | 2,260,739 | 348,998 |
| Share-based compensation | 514,727 | 962,740 | 1,387,118 | 214,134 |
| Provision for doubtful accounts | 39,137 | 77,472 | 246,878 | 38,111 |
| Investment income | (1,103,361) | (1,932,046) | (2,709,222) | (418,232) |
| Net gain from step-acquisition and settlement of pre-existing relationship | — | (75,229) | — | — |
| Assets impairment | 24,197 | 95,049 | 116,978 | 18,058 |
| (Income) loss from equity method investments | (22,578) | 19,943 | (3,867) | (597) |
| Gain on disposal of subsidiaries | — | — | (24,435,554) | (3,772,200) |
| Other non-cash expenses | 19,186 | 32,435 | 52,959 | 8,175 |
| Changes in operating assets and liabilities, net of effects of acquisitions and disposals: | | | | |
| Restricted cash | (151,435) | (51,077) | (1,555,178) | (240,078) |
| Accounts receivable | (773,787) | (1,462,086) | (868,564) | (134,083) |
| Other assets | (1,303,334) | (1,628,737) | (2,085,509) | (321,945) |
| Amounts due from related parties | (54) | 370,970 | (795,977) | (122,878) |
| Customer advances and deposits | 866,620 | 1,313,806 | 1,468,595 | 226,712 |
| Accounts payable and accrued liabilities | 2,005,559 | 5,028,890 | 7,179,338 | 1,108,299 |
| Deferred revenue | 122,347 | (61,790) | 210,763 | 32,536 |
| Deferred income | 199,272 | 104,391 | 19,099 | 2,948 |
| Amounts due to related parties | 2,123 | (365,241) | 664,917 | 102,645 |
| **Net cash generated from operating activities** | **13,792,971** | **17,937,175** | **19,422,438** | **2,998,307** |
| **Cash flows from investing activities:** | | | | |
| Acquisition of fixed assets | (2,756,629) | (4,827,163) | (5,229,616) | (807,314) |
| Acquisition of computer parts | (12,194) | (4,302) | (20,634) | (3,185) |
| Proceeds from disposal of fixed assets | 18,476 | 20,422 | 33,271 | 5,136 |
| Acquisition of businesses, net of cash acquired (Note 3) | (13,201,126) | (328,891) | (332,679) | (51,357) |
| Disposal of subsidiaries and business | — | — | (3,541,228) | (546,671) |
| Acquisition of intangible assets | (909,717) | (1,563,746) | (2,492,855) | (384,830) |
| Capitalization of software costs | (2,448) | — | (31,351) | (4,840) |
| Purchases of held-to-maturity investments | (30,441,279) | (55,356,781) | (50,207,364) | (7,750,681) |
| Sales and maturities of held-to-maturity investments | 29,562,045 | 37,449,747 | 51,961,778 | 8,021,516 |
| Purchases of available-for-sale investments | (53,921,661) | (78,033,523) | (126,155,824) | (19,475,103) |
| Sales and maturities of available-for-sale investments | 48,947,811 | 81,931,252 | 110,652,993 | 17,081,880 |
| Purchases of other long-term investments | (350,361) | (1,777,331) | (5,940,309) | (917,026) |
| Sales of other long-term investments | — | 22,362 | 23,141 | 3,572 |
| Cash distribution from long-term investments | 4,143 | 180 | 8,233 | 1,271 |
| **Net cash used in investing activities** | **(23,062,940)** | **(22,467,774)** | **(31,272,444)** | **(4,827,632)** |

F-6

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | 2015 |
| | RMB | RMB | RMB | US$ |
| **Cash flows from financing activities:** | | | | |
| Restricted cash (served) released as collateral for borrowings | — | (102,400) | 102,400 | 15,808 |
| Proceeds from issuance of subsidiaries' shares | 1,397,283 | 1,846,819 | 3,527,945 | 544,621 |
| Payments to acquire subsidiaries' shares from noncontrolling interests | (259,879) | (622,961) | — | — |
| Proceeds from short-term loans | — | 92,432 | 100,000 | 15,438 |
| Repayment of short-term loans | (47,200) | — | (84,850) | (13,099) |
| Proceeds from long-term loans | 2,144,450 | 1,807,646 | 2,161,701 | 333,709 |
| Repayment of long-term loans | (2,144,450) | (347,659) | (2,173,010) | (335,455) |
| Payment of dividends by a subsidiary to noncontrolling interests | — | (337,964) | — | — |
| Proceeds from issuance of notes payable | 6,111,200 | 6,188,232 | 10,406,115 | 1,606,427 |
| Payment of capital lease obligation | (36,629) | (72,817) | (58,837) | (9,083) |
| Payment of debt issuance costs | (39,400) | (32,216) | (51,624) | (7,969) |
| Repurchase of ordinary shares | — | — | (6,376,964) | (984,434) |
| Proceeds from exercise of share options | 156,307 | 192,848 | 225,156 | 34,758 |
| **Net cash generated from financing activities** | **7,281,682** | **8,611,960** | **7,778,032** | **1,200,721** |
| Effect of exchange rate changes on cash and cash equivalents | (200,548) | 79,567 | 179,181 | 27,661 |
| **Net (decrease) increase in cash and cash equivalents** | **(2,188,835)** | **4,160,928** | **(3,892,793)** | **(600,943)** |
| Cash and cash equivalents at beginning of the year | 11,880,632 | 9,691,797 | 13,852,725 | 2,138,492 |
| Cash and cash equivalents at end of the year | 9,691,797 | 13,852,725 | 9,959,932 | 1,537,549 |
| **Supplemental disclosures:** | | | | |
| Interests paid | 302,055 | 592,759 | 867,039 | 133,848 |
| Income taxes paid | 1,656,513 | 2,798,040 | 2,763,119 | 426,552 |
| **Non-cash investing and financing activities:** | | | | |
| Capital lease obligation | 45,554 | 94,336 | 6,081 | 939 |
| Acquisition of fixed assets included in accounts payable and accrued liabilities | 787,154 | 1,131,870 | 1,028,171 | 158,722 |
| Acquisition of other non-current assets included in accounts payable and accrued liabilities | 40,303 | 39,437 | 44,215 | 6,826 |
| Non-cash acquisitions of investments | — | 75,229 | 24,431,441 | 3,771,565 |

The accompanying notes are an integral part of the consolidated financial statements.

BAIDU, INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"), except for number of shares)

| | Attributable to Baidu, Inc. | | | | | | |
| | Ordinary shares | | Additional paid-in capital | Retained earnings | Accumulated other comprehensive income (loss) | Noncontrolling interests | Total shareholders' equity |
| | Number of shares | Amount | | | | | |
| | | RMB | RMB | RMB | RMB | RMB | RMB |
|---|---|---|---|---|---|---|---|
| **Balances at December 31, 2012** | **34,965,710** | **15** | **2,095,273** | **24,038,219** | **(78,278)** | **126,613** | **26,181,842** |
| Net income | — | — | — | 10,550,657 | — | (101,023) | 10,449,634 |
| Other comprehensive income (loss) | — | — | — | — | 259,536 | (7,260) | 252,276 |
| Business combination | — | — | — | — | — | 427,813 | 427,813 |
| Reclassification of redeemable noncontrolling interests | — | — | — | — | — | 888,934 | 888,934 |
| Acquisition of a subsidiary's shares from noncontrolling shareholders | — | — | (138,439) | — | — | — | (138,439) |
| Accretion of redeemable noncontrolling interests | — | — | — | (31,799) | — | — | (31,799) |
| Exercise of share-based awards | 64,663 | — | 167,127 | — | — | 850 | 167,977 |
| Share-based compensation | — | — | 485,185 | — | — | 20,468 | 505,653 |
| Issuance of subsidiary shares | — | — | 448,996 | — | — | 883,940 | 1,332,936 |
| **Balances at December 31, 2013** | **35,030,373** | **15** | **3,058,142** | **34,557,077** | **181,258** | **2,240,335** | **40,036,827** |
| Net income | — | — | — | 13,196,932 | | (943,698) | 12,253,234 |
| Other comprehensive income (loss) | — | — | — | — | (460,776) | 20,153 | (440,623) |
| Business combination | — | — | — | — | — | 150,000 | 150,000 |
| Acquisition of subsidiaries' redeemable shares from noncontrolling shareholders | — | — | (406,285) | — | — | (216,676) | (622,961) |
| Accretion of redeemable noncontrolling interests | — | — | — | (52,683) | — | — | (52,683) |
| Dividends distribution by a subsidiary | — | — | — | — | — | (337,964) | (337,964) |
| Exercise of share-based awards | 75,863 | — | 199,773 | — | — | 8,033 | 207,806 |
| Share-based compensation | — | — | 798,971 | — | — | 160,274 | 959,245 |
| Issuance of subsidiary shares | — | — | — | — | — | 5,000 | 5,000 |
| **Balances at December 31, 2014** | **35,106,236** | **15** | **3,650,601** | **47,701,326** | **(279,518)** | **1,085,457** | **52,157,881** |
| Net income | — | — | — | 33,664,173 | — | (1,231,927) | 32,432,246 |
| Other comprehensive income (loss) | — | — | — | — | (526,538) | 34,130 | (492,408) |
| Business combination | — | — | 3,384 | — | — | 7,551 | 10,935 |
| Issuance of subsidiary shares | | | 975,679 | | | 959,391 | 1,935,070 |
| Issuance of convertible notes by a disposed subsidiary | | | 278,316 | | | 281,259 | 559,575 |
| Exercise of share-based awards | 103,952 | — | 254,003 | — | — | 24,571 | 278,574 |
| Share-based compensation | — | — | 1,240,366 | — | — | 143,355 | 1,383,721 |
| Accretion of redeemable noncontrolling interests | — | — | — | (329,180) | — | — | (329,180) |
| Repurchase and retirement of ordinary shares | (603,726) | — | — | (6,376,964) | — | — | (6,376,964) |
| Disposal of subsidiaries | — | — | — | — | — | (1,291,613) | (1,291,613) |
| **Balances at December 31, 2015** | **34,606,462** | **15** | **6,402,349** | **74,659,355** | **(806,056)** | **12,174** | **80,267,837** |
| **Balances at December 31, 2015, in US$** | | **2** | **988,352** | **11,525,418** | **(124,434)** | **1,879** | **12,391,217** |

The accompanying notes are an integral part of the consolidated financial statements.

F-8

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

## 1. ORGANIZATION, CONSOLIDATION AND PRESENTATION OF FINANCIAL STATEMENTS

Baidu, Inc. ("Baidu" or the "Company") was incorporated under the laws of the Cayman Islands on January 18, 2000.

As of December 31, 2015, the Company has subsidiaries incorporated in countries and jurisdictions including the People's Republic of China ("PRC"), Hong Kong, Japan, Cayman Islands and British Virgin Islands ("BVI"). As of December 31, 2015, the Company also effectively controls a number of variable interest entities ("VIE") through the Primary Beneficiaries, as defined below. The VIEs include:

- Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), controlled through Baidu Online Network Technology (Beijing) Co., Ltd. ("Baidu Online"), one of the Company's wholly-owned subsidiaries;

- Beijing Perusal Technology Co., Ltd. ("Beijing Perusal"), controlled through Baidu Online; and

- Beijing BaiduPay Science and Technology Co., Ltd. ("BaiduPay"), controlled through Baidu Online; and

- Other VIEs controlled through Primary Beneficiaries other than Baidu Online.

The Company, its subsidiaries, VIEs and subsidiaries of the VIEs are hereinafter collectively referred to as the "Group". The Group offers internet search solutions and online marketing solutions, operates an online payment platform which enables users to make payments online, develops and markets scalable web/mobile application software and provides related services, offers transaction services and conducts online advertising business through online video contents broadcasting. The Group's principal geographic market is in the PRC. The Company does not conduct any substantive operations of its own, but conducts its primary business operations through its subsidiaries and VIEs in the PRC.

PRC laws and regulations prohibit or restrict foreign ownership of internet content, advertising, and audio and video services. To comply with these foreign ownership restrictions, the Group operates its websites and primarily provides services subject to such restriction in the PRC through the VIEs, the PRC legal entities that were established or whose equity shares were held by the individuals authorized by the Group. The paid-in capital of the VIEs was mainly funded by the Group through loans extended to the authorized individuals who were the shareholders of the VIEs. The Group has entered into proxy agreements or power of attorney and exclusive equity purchase option agreement with the VIEs and nominee shareholders of the VIEs through the Group's subsidiaries ("Primary Beneficiaries"), which give the Primary Beneficiaries the power to direct the activities that most significantly affect the economic performance of the VIEs and to acquire the equity interests in the VIEs when permitted by the PRC laws, respectively. Certain exclusive agreements have been entered into with the VIEs through the Primary Beneficiaries or their wholly-owned subsidiaries in the PRC, which obligate the Primary Beneficiaries to absorb a majority of the risk of loss from the VIEs' activities and entitle the Primary Beneficiaries to receive a majority of their residual returns. In addition, the Group has entered into certain agreements with the shareholders of the VIEs through the Primary Beneficiaries or their wholly-owned subsidiaries in the PRC, including loan agreements for the paid-in capital of the VIEs and share pledge agreements for the equity interests in the VIEs held by the shareholders of the VIEs.

Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between the Primary Beneficiaries and the VIEs through the aforementioned agreements with the shareholders of the VIEs. The shareholders of the VIEs effectively assigned all of their voting rights underlying their equity interest in the VIEs to the Primary Beneficiaries. In addition, through the other exclusive agreements, which consist of operating agreements, technology consulting and services agreements and license agreements, the Primary

F-9

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

Beneficiaries, by themselves or their wholly-owned subsidiaries in the PRC, demonstrate their ability and intention to continue to exercise the ability to absorb substantially all of the profits and all of the expected losses of the VIEs. The VIEs are subject to operating risks, which determine the variability of the Company's interest in those entities. Based on these contractual arrangements, the Company consolidates the VIEs as required by SEC Regulation S-X Rule 3A-02 and Accounting Standards Codification ("ASC") topic 810 ("ASC 810"), *Consolidation*, because the Company holds all the variable interests of the VIEs through the Primary Beneficiaries.

Unrecognized revenue-producing assets held by the VIEs include certain internet content provisions and other licenses, domain names and trademarks. The internet content provisions and other licenses, which are held by the VIEs that provide the relevant services, are required under relevant PRC laws, rules and regulations for the operation of Internet businesses in the PRC, and therefore are integral to the Company's operations.

The principal terms of the agreements entered into amongst the VIEs, their respective shareholders and the Primary Beneficiaries are further described below.

### *Loan Agreements*

Pursuant to loan agreements amongst the shareholders of Baidu Netcom and Baidu Online, Baidu Online provided interest-free loans with an aggregate amount of RMB890.00 million to the shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from sale of the shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person. The terms of the loan agreements will expire on December 30, 2025 at the earliest and can be extended with the written consent of both parties before its expiration.

Each of the loan agreements amongst Baidu Online and the respective shareholders of Beijing Perusal and BaiduPay contains the same terms as those described above, except that the amount of the loans extended to the respective shareholders is RMB1.26 billion and RMB90.00 million, respectively. The term of the loan agreements will expire on December 15, 2025 and December 21, 2025, respectively, and can be extended with the written consent of both parties before its expiration.

### *Exclusive Equity Purchase and Transfer Option Agreement*

Pursuant to the exclusive equity purchase and transfer option agreement amongst the shareholders of Baidu Netcom, Baidu Netcom and Baidu Online, the shareholders of Baidu Netcom irrevocably granted Baidu Online or its designated person(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. The shareholders should remit to Baidu Online any amount that is paid by Baidu Online or its designated person(s) in connection with the purchased equity interest. Baidu Online or its designated person(s) have sole discretion to decide when to exercise the option, whether in part or in full. Any and all dividends and other capital distributions from Baidu Netcom to its shareholders should be paid to Baidu Online in full amount. Baidu Online would provide unlimited financial support to Baidu Netcom if, in the normal operation of business, Baidu Netcom would become in need of any form of reasonable financial support. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu Online, Baidu Online should unconditionally forgive any such loans to Baidu Netcom given that Baidu Netcom provides sufficient proof for its loss and incapacity to repay. The agreement will terminate when the shareholders of Baidu Netcom have transferred all their equity interests in Baidu Netcom to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online or Baidu Netcom.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

Each of the exclusive equity purchase and transfer option agreements amongst Baidu Online and Beijing Perusal, BaiduPay and their respective shareholders contains the same terms as those described above. Each of the agreements will terminate upon the shareholders of Beijing Perusal or BaiduPay have transferred all their equity interests in Beijing Perusal or BaiduPay, as the case may be, to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online, Beijing Perusal or BaiduPay.

### Proxy Agreement/Power of Attorney

Pursuant to the proxy agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom agreed to entrust all the rights to exercise their voting power to the person(s) designated by Baidu Online. The shareholders of Baidu Netcom have each executed an irrevocable power of attorney to appoint the person(s) designated by Baidu Online as their attorney-in-fact to vote on their behalf on all matters requiring shareholder approval. The proxy agreement would be in effect for an unlimited term unless terminated in writing by Baidu Online earlier. The power of attorney would be in effect for as long as the shareholders of Baidu Netcom hold any equity interests in Baidu Netcom.

Each of the proxy agreements amongst Baidu Online and the shareholders of Beijing Perusal and BaiduPay contains the same terms as those described above. Each of the proxy agreements will be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney will be in effect for as long as the shareholder of Beijing Perusal or BaiduPay holds any equity interests in Beijing Perusal or BaiduPay, as the case may be.

### Operating Agreement

Pursuant to the operating agreement amongst Baidu Online, Baidu Netcom and the shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and financial affairs. Baidu Online has the power to appoint senior executives of Baidu Netcom. The shareholders of Baidu Netcom must appoint the candidates recommended by Baidu Online as their representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. In return, Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement will be in effect for an unlimited term, until the term of business of Baidu Online or Baidu Netcom expires and extension is denied by the relevant approval authorities.

Each of the operating agreements amongst Baidu Online and Beijing Perusal, BaiduPay and their respective shareholders contains the same terms as those described above. Each of the agreements will be in effect for an unlimited term, until the term of business of Baidu Online, Beijing Perusal or BaiduPay expires and extension is denied by the relevant approval authorities.

### Exclusive Technology Consulting and Services Agreement

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide to Baidu Netcom technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

e-commerce technical services. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom pays a monthly service fee to Baidu Online based upon a pre-agreed formula as defined in the agreement. Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

Each of the exclusive technology consulting and services agreements between Baidu Online and Beijing Perusal and between Baidu Online and BaiduPay contains the same terms as those described above, except for the formula calculating the service fees. Baidu Netcom and Beijing Perusal should pay Baidu Online a monthly service fee equal to the product of the standard monthly fee for page view per thousand times multiplied by the actual times of page view for the month divided by 1,000; and the agreement between Baidu Online and BaiduPay does not provide a formula to calculate the quarterly fee, as BaiduPay has yet to achieve profitability. Each of the agreements will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*License Agreements*

Baidu Online and Baidu Netcom entered into a software license agreement, a trademark license agreement, a domain name license agreement and a web layout copyright license agreement (collectively, the "License Agreements"). Pursuant to the License Agreements between Baidu Online and Baidu Netcom, Baidu Online has granted to Baidu Netcom the right to use (including but not limited to) a software license, a web layout copyright license, a trademark license and a domain name. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement were renewed since their original expiration and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities. The domain name license agreement was terminated in 2012 as Baidu Online transferred the relevant domain names to Baidu Netcom. The trademark license agreement was terminated in February 2013 after Baidu Online transferred its trademarks (including pending trademark applications) to Baidu Netcom.

Baidu Online entered into a trademark license agreement, a domain name license agreement and a web layout copyright license agreement with both Beijing Perusal and BaiduPay. Each of the license agreements between Baidu Online and Beijing Perusal and between Baidu Online and BaiduPay contains the same terms as those described above. Each of the web layout copyright license agreements was renewed since original expiration and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities. Each of the domain name license agreement was terminated in 2012 as Baidu Online transferred the relevant domain names to Beijing Perusal and BaiduPay. Each of the trademark license agreement was terminated in February 2013 after Baidu Online transferred its trademarks (including pending trademark applications) to Beijing Perusal and BaiduPay.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreement and Baidu Netcom's performance of its obligations under the exclusive technology consulting and services agreement. If Baidu Netcom or its shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The shareholders of Baidu Netcom agreed not to dispose of the pledged

F-12

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge agreement will expire two years after expiration of the term or the fulfillment by Baidu Netcom and its shareholders of their respective obligations under the exclusive technology consulting and services agreement and the loan agreement.

Each of the equity pledge agreements amongst Baidu Online and the respective shareholders of Beijing Perusal and BaiduPay contains the same terms, including term period, as those described above.

The equity pledges of Baidu Netcom and Beijing Perusal described above are in the process of perfecting by registration with the relevant local administration for industry and commerce as required for a property right under the PRC Property Rights Law due to recent increase in registered capital of these entities.

Through the design of the aforementioned agreements, the shareholders of the VIEs effectively assigned their full voting rights to Baidu Online, which gives Baidu Online the power to direct the activities that most significantly impact the VIEs' economic performance. Baidu Online obtains the ability to approve decisions made by the VIEs and the ability to acquire the equity interests in the VIEs when permitted by PRC law. Baidu Online is obligated to absorb a majority of the expected losses from the VIEs' activities through providing unlimited financial support to the VIEs and is entitled to receive a majority of residual returns from the VIEs through the exclusive technology consulting and service fees. As a result of these contractual agreements, Baidu Online is determined to be the primary beneficiary of the VIEs. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between the Company and the VIEs through these contractual agreements, and the Company consolidates the VIEs through Baidu Online.

There are similar agreements entered into by Primary Beneficiaries besides Baidu Online with their VIEs and the respective shareholders, which resulted in a parent-subsidiary relationship between the Company and these VIEs.

In the opinion of the Company's legal counsel, (i) the ownership structure of the Company and its VIEs is in compliance with existing PRC laws and regulations; (ii) the contractual arrangements with the VIEs and their shareholders are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and (iii) the Group's business operations are in compliance with existing PRC laws and regulations in all material respects.

However, uncertainties in the PRC legal system could cause the Company's current ownership structure to be found in violation of any existing and/or future PRC laws or regulations and could limit the Company's ability, through the Primary Beneficiaries, to enforce its rights under these contractual arrangements. Furthermore, shareholders of the VIEs may have interests that are different with those of the Company, which could potentially increase the risk that they would seek to act in contrary to the terms of the aforementioned agreements.

In addition, if the current structure or any of the contractual arrangements were found to be in violation of any existing or future PRC law, the Company may be subject to penalties, which may include but not be limited to, the cancellation or revocation of the Company's business and operating licenses, being required to restructure the Company's operations or discontinue the Company's operating activities. The imposition of any of these or other penalties may result in a material and adverse effect on the Company's ability to conduct its operations. In such case, the Company may not be able to operate or control the VIEs, which may result in deconsolidation of the VIEs.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The following tables set forth the assets, liabilities, results of operations, and changes in cash and cash equivalents of the VIEs and their subsidiaries included in the Company's consolidated balance sheets and statements of comprehensive income:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2015 |
| | RMB | RMB (In thousands) | US$ |
| **Assets** | | | |
| Current | | | |
| Cash and cash equivalents | 2,250,298 | 4,723,964 | 729,254 |
| Accounts receivable, net | 2,744,793 | 2,881,902 | 444,889 |
| Others | 3,665,314 | 6,075,006 | 937,819 |
| | 8,660,405 | 13,680,872 | 2,111,962 |
| Non-current | | | |
| Fixed assets, net | 1,796,162 | 1,829,170 | 282,375 |
| Others | 2,157,922 | 4,641,014 | 716,449 |
| | 3,954,084 | 6,470,184 | 998,824 |
| Total | 12,614,489 | 20,151,056 | 3,110,786 |
| **Third-party liabilities** | | | |
| Current | | | |
| Accounts payable and accrued liabilities | 6,073,083 | 10,680,518 | 1,648,788 |
| Customer advances and deposits | 802,362 | 1,367,536 | 211,111 |
| Others | 2,937,921 | 2,691,474 | 415,492 |
| | 9,813,366 | 14,739,528 | 2,275,391 |
| Non-current | 781,835 | 2,718,124 | 419,606 |
| Total | 10,595,201 | 17,457,652 | 2,694,997 |
| **Inter-company liabilities** | | | |
| Inter-company payable to subsidiaries for technology consulting and service fees | 1,479,423 | 2,702,300 | 417,163 |
| Others | 889,530 | 1,131,024 | 174,600 |
| Total | 2,368,953 | 3,833,324 | 591,763 |

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | 2015 |
| | RMB | RMB | RMB (In thousands) | US$ |
| Total revenues | 9,040,058 | 13,166,712 | 20,668,198 | 3,190,620 |
| Net loss | (248,664) | (352,125) | (4,398,409) | (678,997) |
| Net cash provided by operating activities | 1,354,802 | 1,392,039 | 3,563,049 | 550,040 |
| Net cash used in investing activities | (1,303,612) | (2,430,505) | (7,024,700) | (1,084,427) |
| Net cash provided by financing activities | 595,132 | 1,778,444 | 5,935,317 | 916,255 |

As of December 31, 2015, there was no pledge or collateralization of the VIEs' assets. The amount of the net liabilities of the VIEs was RMB1.14 billion (US$175.97 million) as of December 31, 2015. The creditors of the VIEs' third-party liabilities did not have recourse to the general credit of the Primary Beneficiaries in normal

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

course of business. The Company did not provide or intend to provide financial or other supports not previously contractually required to the VIEs during the years presented.

### Basis of Presentation

The consolidated financial statements are prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP").

### Principles of Consolidation

The consolidated financial statements include the financial statements of the Company, its subsidiaries, VIEs and subsidiaries of the VIEs. All inter-company transactions and balances between the Company, its subsidiaries, VIEs and subsidiaries of the VIEs are eliminated upon consolidation. The Company included the results of operations of acquired businesses from the respective dates of acquisition.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Management evaluates estimates, including those related to the accounts receivable allowances, fair values of options to purchase the Company's or its subsidiaries' ordinary shares, fair values of certain debt and equity investments, amortization and impairment of licensed copyrights, impairment of long-lived assets, long-term investments and goodwill, the purchase price allocation and fair value of noncontrolling interests with respect to business combinations and acquisition of equity method investees, and deferred tax valuation allowance, among others. Management bases the estimates on historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results could differ from these estimates.

### Comparative Information

Certain items in the consolidated financial statements have been adjusted to conform with the current year's presentation to facilitate comparison.

### Currency Translation for Financial Statements Presentation

Translations of amounts from RMB into US$ for the convenience of the reader have been calculated at the exchange rate of RMB6.4778 per US$1.00 on December 31, 2015, the last business day in fiscal year 2015, as published on the website of the United States Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted into U.S. dollars at such rate.

## 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Foreign Currency

The Company's functional currency is the US$. The Company's subsidiaries, VIEs and subsidiaries of the VIEs determine their functional currencies based on the criteria of ASC topic 830 ("ASC 830"), *Foreign Currency Matters*. The Company uses the RMB as its reporting currency. The Company uses the average exchange rate for

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

the year and the exchange rate at the balance sheet date to translate its operating results and financial position, respectively. Any translation gains (losses) are recorded in other comprehensive income (loss). Transactions denominated in foreign currencies are translated into the functional currency at the exchange rates prevailing on the transaction dates. Assets and liabilities denominated in foreign currencies are translated into the functional currency at the exchange rates prevailing at the balance sheet date. Exchange gains and losses are included in earnings as a component of other income.

### Segment Reporting

The Company historically had only one single reportable segment because the Company's chief operating decision maker ("CODM") formerly relied on the consolidated results of operations when making decisions on allocating resources and assessing performance of the Company. Beginning in the quarter ended June 30, 2015, the Company changed its reportable segments as a result of significant growth in the Company's operations and expansion of services to multiple businesses in recent years. The Company's chief executive officer, who has been identified as the CODM, now reviews the operating results of different service lines in order to allocate resources and assess the Company's performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC topic 280 ("ASC 280"), *Segment Reporting*. The Company restated the presentation of its reportable segments for prior years to conform with the current year's presentation.

### Business Combinations

The Company accounts for its business combinations using the purchase method of accounting in accordance with ASC topic 805 ("ASC 805"), *Business Combinations*. The purchase method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities the Company acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

In a business combination achieved in stages, the Company remeasures its previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. The Company determines discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

### *Cash and Cash Equivalents*

Cash and cash equivalents

Cash and cash equivalents primarily consist of cash and investments in interest bearing demand deposit accounts, time deposits, highly liquid investments and money market funds with original maturities of three months or less from the date of purchase and are stated at cost which approximates their fair value.

Restricted cash

Restricted cash mainly consists of the cash reserved in escrow accounts for the remaining payments in relation to compensation for post-combination services, cash collateral for repayment of short-term loans (Note 10), as well as the cash balances deposited by users or customers of the Group that were held for designated purposes.

The cash balances deposited by users or customers of the Group for certain businesses are considered restricted because they cannot be used for the operations of the Group or any other purposes not designated by the users or customers. The deposited balance is included in the Group's bank accounts until being used for the designated purposes or withdrawn by the users or customers.

### *Accounts Receivable*

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off as incurred. The Company generally does not require collateral from its customers.

The Company maintains allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. The Company reviews the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, the Company considers many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

### *Receivables from Online Payment Agencies*

Receivables from online payment agencies are cash due from the third-party online payment service providers for clearing transactions. The cash was paid or deposited by customers or users through these online payment agencies for services provided by the Company. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers used. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Receivable balances are written off after all collection efforts have been exhausted. As of December 31, 2014 and 2015, no allowance for doubtful accounts was provided for the receivables from online payment agencies.

### *Investments*

Short-term investments

All highly liquid investments with original maturities of greater than three months, but less than 12 months, are classified as short-term investments. Investments that are expected to be realized in cash during the next 12 months are also included in short-term investments. The Company accounts for short-term investments in

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

accordance with ASC topic 320 ("ASC 320"), *Investments – Debt and Equity Securities.* The Company classifies the short-term investments in debt and equity securities as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Dividend and interest income, including amortization of the premium and discount arising at acquisition, for all categories of investments in securities are included in earnings. Any realized gains or losses on the sale of the short-term investments are determined on a specific identification method, and such gains and losses are reflected in earnings during the period in which gains or losses are realized.

The securities that the Company has the positive intent and the ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with the Company's policy and ASC 320. When the Company intends to sell an impaired debt security or it is more-likely-than-not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in earnings equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made. When the Company does not intend to sell an impaired debt security and it is more-likely-than-not that it will not be required to sell prior to recovery of its amortized cost basis, the Company must determine whether or not it will recover its amortized cost basis. If the Company concludes that it will not, an other-than-temporary impairment exists and that portion of the credit loss is recognized in earnings, while the portion of loss related to all other factors is recognized in other comprehensive income.

The securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss). Realized gains or losses are included in earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities is recognized in the consolidated statements of comprehensive income when the decline in value is determined to be other-than-temporary.

Long-term investments

The Company's long-term investments consist of cost method investments, equity method investments, held-to-maturity investments with original and remaining maturities of greater than 12 months, and available-for-sale investments.

In accordance with ASC subtopic 325-20 ("ASC 325-20"), *Investments-Other: Cost Method Investments*, the Company carries at cost its investments in investees which do not have readily determinable fair value and the Company does not have significant influence. The Company only adjusts for other-than-temporary declines in fair value and distributions of earnings that exceed the Company's share of earnings since its investment. Management regularly evaluates the impairment of the cost method investments based on performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

Investments in entities in which the Company can exercise significant influence but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323 ("ASC 323"), *Investments-Equity Method and Joint Ventures*. Under the equity method, the Company initially records its investment at cost and the difference between the cost of the equity investee and the fair value of the underlying equity in the net assets of the equity investee is recognized as equity method goodwill, which is included in the equity method investment on the consolidated balance sheets. The Company subsequently adjusts the carrying amount of its investment to recognize the Company's proportionate share of each equity investee's net income or loss into earnings after the date of investment. The Company will discontinue applying the equity method if an investment (and additional financial supports to the investee, if any) has been reduced to zero. If the Company is not required to advance additional funds to an investee and the equity-method investment in ordinary shares is reduced to zero, the Company would recognize losses based on its percentage of the investment with the same liquidation preference for further investments made with a higher liquidation preference than ordinary shares. Such losses are first applied to those investments of a lower liquidation preference before being further applied to the investments of a higher liquidation preference. The Company evaluates the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

Long-term held-to-maturity investments and long-term available-for-sale investments are measured in the same manner as short-term held-to-maturity investments and short-term available-for-sale investments, respectively.

### *Fair Value Measurements of Financial Instruments*

Financial instruments are in the form of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, amounts due from and due to related parties, other receivables, long-term investments, short-term loans, accounts payable and accrued liabilities, customer advances and deposits, derivative instruments, capital lease obligation, notes payable and long-term loans. The carrying amounts of these financial instruments, except for long-term cost method investments, long-term equity method investments, long-term available-for-sale investments, long-term held-to-maturity investments, derivative instruments, notes payable and long-term loans, approximate their fair values because of their generally short maturities. Available-for-sale investments and derivative instruments were adjusted to fair value at each reporting date. The carrying amounts of long-term held-to-maturity investments and long-term loans approximate their fair values due to the fact that the related interest rates approximate rates currently offered by financial institutions for similar debt instruments of comparable maturities. The fair value of notes payable is either extracted directly from the quoted market price or evaluated using an equivalent market interest rate for a similar bond without a conversion option with the assistance of a third party valuation firm.

### *Research, Development and Computer Software*

Capitalization of software developed for internal use

The Company capitalized certain internal use software development costs in accordance with ASC subtopic 350-40 ("ASC 350-40"), *Intangibles-Goodwill and Other: Internal-Use Software*, amounting to RMB2.68 million, nil and RMB32.73 million (US$5.05 million) for the years ended December 31, 2013, 2014 and 2015, respectively. The Company capitalizes certain costs relating to software acquired, developed, or modified solely to meet the Company's internal requirements and for which there are no substantive plans to market the software. These costs mainly include payroll and payroll-related costs for employees who are directly associated with and who devote time to the internal-use software projects during the application development stage. Capitalized internal-use software costs are included in "Intangible assets, net". The amortization expense for capitalized

F-19

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

software costs amounted to RMB31.65 million, RMB28.24 million and RMB13.24 million (US$2.04 million) for the years ended December 31, 2013, 2014 and 2015, respectively. The unamortized amount of capitalized internal use software development costs was RMB13.24 million and RMB32.73 million (US$5.05 million) as of December 31, 2014 and 2015, respectively.

Research and development expenses

Research and development expenses consist primarily of personnel-related costs. The Company expensed substantially all development costs incurred in the research and development of new products and new functionality added to the existing products except for certain internal use software development costs.

*Fixed Assets*

Fixed assets are stated at cost less accumulated depreciation. Depreciation is recorded on a straight-line basis over the shorter of the estimated useful lives of the assets or the term of the related lease, as follows:

| | |
|---|---|
| Office building | – 45 years |
| Office building related facility, machinery and equipment | – 15 years |
| Computer equipment | – 3 or 5 years |
| Office equipment | – 3 or 5 years |
| Vehicles | – 5 years |
| Leasehold improvements | – over the shorter of lease terms or estimated useful lives of the assets |

Fixed assets have no estimated residual value except for the office building and its related facility, machinery and equipment, which have an estimated residual value of 4% of the cost.

Repair and maintenance costs are charged to expense as incurred, whereas the cost of renewals and betterments that extend the useful life of fixed assets are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts with any resulting gain or loss reflected in earnings.

All direct and indirect costs that are related to the construction of fixed assets and incurred before the assets are ready for their intended use are capitalized as construction in progress. Construction in progress is transferred to specific fixed assets items and depreciation of these assets commences when they are ready for their intended use.

Interest costs are capitalized if they are incurred during the acquisition, construction or production of a qualifying asset and such costs could have been avoided if expenditures for the assets have not been made. Capitalization of interest costs commences when the activities to prepare the asset are in progress and expenditures and borrowing costs are being incurred. Interest costs are capitalized until the assets are ready for their intended use. Interest costs capitalized for the years ended December 31, 2013, 2014 and 2015 were insignificant.

*Licensed Copyrights of Video Content*

The current and non-current portions of licensed copyrights of video content are recorded in "Other current assets, net" or "Intangible assets, net", respectively, at the lower of amortized cost or net realizable value. In

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

accordance with ASC topic 920 ("ASC 920"), *Entertainment-Broadcasters*, costs incurred in purchased copyrights of video content are capitalized and amortized over the shorter of the license period or projected useful life of the video content. Any licensed copyrights that do not meet the criteria to be recorded are included in the commitments disclosure. The Company amortizes the licensed copyrights in "Cost of revenues" on an accelerated or on a straight line basis, as appropriate. If expectations of the usefulness of a video content are revised downward, the unamortized cost is written down to the estimated net realizable value. A write-down from unamortized cost to a lower estimated net realizable value establishes a new cost basis.

### *Goodwill and Intangible Assets*

Goodwill

The Company assesses goodwill for impairment in accordance with ASC subtopic 350-20 ("ASC 350-20"), *Intangibles – Goodwill and Other: Goodwill*, which requires that goodwill to be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

As of December 31, 2014, the Company had three reporting units, consisting of Qunar Cayman Islands Limited ("Qunar"), its online video business ("iQiyi"), and the rest of the Group. Immediately upon the change in segment reporting in the quarter ended June 30, 2015, there were four reporting units representing core search business ("Search Services"), Qunar, iQiyi, and other online-to-offline e-commence initiatives ("Transaction Services") excluding Qunar. The goodwill was reassigned to the reporting units affected using a relative fair value allocation approach. However, as more fully described in Note 4, subsequent to the share exchange transaction with Ctrip.com International, Ltd. ("Ctrip") the Company no longer controls Qunar. Accordingly, Qunar was no longer a reporting unit and the goodwill balance related to Qunar was derecognized. As a result, there were three reporting units as of December 31, 2015.

The Company has the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC subtopic 350-20 ("ASC 350-20"), *Intangibles-Goodwill and Other: Goodwill*. If the Company believes, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, the Company considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and the Company is not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then the Company must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

The Company performed a qualitative assessment for the Search Services and Transaction Services. Based on the requirements of ASC 350-20, the Company evaluated all relevant factors, weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of each of the

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

reporting unit, and further impairment testing on goodwill was unnecessary as of December 31, 2015. The Company elected to assess goodwill for impairment using the two-step process for iQiyi. The fair value of iQiyi exceeded its carrying amount, and therefore goodwill related to this reporting unit was not impaired and the Company was not required to perform further testing.

Intangible assets

Intangible assets with finite lives are carried at cost less accumulated amortization. Land use rights are amortized using a straight-line method over the shorter of their estimated economic lives or the terms of related land use right contracts. All other intangible assets with finite lives except for the sublicensing rights obtained from barter transactions are amortized using the straight-line method over the estimated economic lives.

Intangible assets have weighted average economic lives from the date of purchase as follows:

| | |
|---|---|
| Land use rights | – 50 years |
| Customer relationships | – 3.3 years |
| Software | – 4.0 years |
| Trademarks | – 9.6 years |
| User list | – 3.5 years |
| Licensed copyrights of video contents | – 2.8 years |
| Others | – 5.8 years |

Intangible assets with an indefinite useful life are not amortized and are tested for impairment annually or more frequently if events or changes in circumstances indicate that they might be impaired in accordance with ASC subtopic 350-30 ("ASC 350-30"), *Intangibles-Goodwill and Other: General Intangibles Other than Goodwill*.

***Impairment of Long-Lived Assets Other Than Goodwill***

The Company evaluates long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC topic 360 ("ASC 360"), *Property, Plant and Equipment*. When such events occur, the Company assesses the recoverability of the assets group based on the undiscounted future cash flow the assets group is expected to generate and recognizes an impairment loss when estimated undiscounted future cash flow expected to result from the use of the assets group plus net proceeds expected from disposition of the assets group, if any, is less than the carrying value of the assets group. If the Company identifies an impairment, the Company reduces the carrying amount of the assets group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. The Company uses estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheets.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

***Revenue Recognition***

The Company recognizes revenue based on the following principles:

Performance-based online marketing services

*Cost-per-click*

The Company's auction-based pay-for-performance ("P4P") platform enables a customer to place its website link and related description on the Company's search result list on the website which could be accessed through personal computer or mobile devices. Customers make bids on keywords based on how much they are willing to pay for each click to their listings in the search results listed on the Company's website and the relevance between the keywords and the customer's businesses. Internet users' search of the keyword will trigger the display of the listings. The ranking of the customer's listing depends on both the bidding price and the listing's relevance to the keyword searched. Customer pays the Company only when a user clicks on one of its website links. Other than the auction-based P4P platform, the Company has certain vertical platforms from which it generates revenue through pre-determined prices per click. Revenue is recognized when a user clicks on one of the customer-sponsored website links, as there is persuasive evidence of an arrangement, the fee is fixed or determinable and collection is reasonably assured, as prescribed by ASC topic 605 ("ASC 605"), *Revenue Recognition*.

*Other performance-based online marketing services*

To the extent the Company provides online marketing services based on performance criteria other than cost-per-click, such as the number of successful reservation of hotels or issuance of air tickets, the number of downloads (and user registration) of mobile applications, the number of incremental end users and the total incremental revenue generated, revenue is recognized when the specified performance criteria are met together with satisfaction of other applicable revenue recognition criteria as prescribed by ASC 605.

Display-based online advertising services

For display-based online advertising services such as text links, banners, icons or other forms of graphical advertisements in the websites or mobile applications, the Company recognizes revenue in accordance with ASC 605, on a pro-rata basis over the contractual term for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on a specified webpage or mobile applications, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements. For certain display-based contractual agreements, the Company may also provide certain performance guarantees, in which cases revenue is recognized at the later of the completion of the time commitment or performance guarantee.

Revenue-sharing services

*Online game services*

The Company operates online game platforms on which registered users can access games provided by third-party game developers. The rights and obligations of each party to the arrangement indicate that the Company is acting as an agent because the game developer is the primary obligor in the arrangement in accordance with ASC subtopic 605-45 ("ASC 605-45"), *Revenue Recognition: Principal Agent Consideration*. The Company recognizes the shared revenue from these online promotional services, on a net basis, based on the ratios pre-determined with the online game developers when all the revenue recognition criteria set forth in ASC 605 are met, which is generally when the user purchases virtual currencies issued by the game developers.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

*Services provided by Baidu Nuomi*

The Company generates revenue from services as a marketing agent by offering goods and services provided by third-party merchant partners at a discount through the website or mobile application that connects merchants to users. The Company presents revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants, in accordance with ASC 605-45. The Company acts as an agent rather than as the principal in the delivery of the products or services as it does not assume the risks and rewards of ownership of products nor is it responsible for the actual fulfillment of services. Both of these are the responsibilities of the merchants. The Company recognizes revenue when all of the criteria prescribed in ASC 605 are met, which is generally when the merchants provide the services or when the products are delivered to the users. Since the Company's paying users have the ability to request for a full refund before redemption for the products or services offered by the merchants, the underlying sale from which the Company earns the related commission revenue as an agent is not culminated until its paying users actually redeem.

*Takeout delivery services*

The Company generates revenue from takeout delivery services as a marketing agent by offering foods, drinks and snacks provided by third-party merchant partners at a discount through the website or mobile application that connects merchants to users. The Company presents revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants, in accordance with ASC 605-45. The Company acts as an agent rather than as the principal in the delivery of the products or services as it does not assume the risks and rewards of ownership of products nor is it responsible for the actual fulfillment of services. Both of these are the responsibilities of the merchants. The Company recognizes revenue when all of the criteria prescribed in ASC 605 are met, which is generally when the foods, drinks or snacks are delivered to the users.

The Company also provides delivery services and charges a fee to users if the merchants do not provide such services. The Company recognizes delivery fees from users as part of its takeout delivery services revenue. The costs for providing the delivery services are included in cost of revenues.

Online marketing services involving Baidu Union

Baidu Union is the program through which the Company expands distribution of its customers' sponsored links or advertisements by leveraging traffic of the Baidu Union members' internet properties. The Company makes payments to Baidu Union members for acquisition of traffic. The Company recognizes gross revenue for the amount of fees it receives from its customers. Payments made to Baidu Union members are included in cost of revenues as traffic acquisition costs.

Barter transactions

*Nonmonetary exchanges of licensed copyrights of video contents*

The Company enters into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies ("OVBC") from time to time. The exchanged licensed copyrights provide rights for each respective party only to broadcast the licensed copyrights received on its own website; meanwhile, each party retains the right to continue broadcasting and/or sublicense the rights to the content it surrendered in the exchange. The Company accounts for these nonmonetary exchanges in accordance with ASC topic 845 ("ASC 845"), *Nonmonetary Transactions*, and records the transaction based on the fair value of the asset surrendered.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The Company estimates the fair value of the contents surrendered by deriving an "average transaction price" using actual cash sublicensing transactions for the same content with comparable counterparties, when available. The comparability of counterparties is assessed based on a number of factors, including relative size and scale, as well as market share of online viewership traffic they generate. In instances when the Company does not have actual cash sublicensing transactions for the same content as reference points, the estimates of fair value of the content surrendered is derived using an average transaction price of cash sub-licenses of content that is similar in nature with comparable counterparties. To assess whether the content is similar in nature to the bartered content, the Company considers, amongst others, (i) the type and the popularity of content (i.e. movie, television series); (ii) the geographic origination source of the content; and (iii) the unique visitor statistics for each OVBC.

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926 ("ASC 926"), *Entertainment—Films*. The Company recognized barter sublicensing revenues of RMB366.25 million (US$56.54 million) and the related cost of RMB277.82 million (US$42.89 million) for the year ended December 31, 2015. The barter sublicensing revenues and the related cost of barter sublicensing revenues were insignificant for the years ended December 31, 2013 and 2014.

*Other nonmonetary exchanges*

The Company engages in certain barter transactions other than licensed copyrights of video contents from time to time and in such situations follows the guidance set forth in ASC 845. While nonmonetary transactions are generally recorded at fair value, if such value is not determinable within reasonable limits, or the transaction lacks commercial substance, or the transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, the transaction is recognized based on the carrying value of the product or services provided. The Company also engages in certain advertising barter transactions and follows the guidance set forth in ASC subtopic 605-20 ("ASC 605-20"), *Revenue Recognition: Services*. The advertising barter transactions generally are recorded at fair value. If the fair value of the advertising surrendered in the barter transaction is not determinable within required limits, the barter transaction is recorded based on the carrying amount of the advertising surrendered, which likely to be zero. The amount of revenues recognized for barter transactions other than licensed copyrights of video contents was insignificant for each of the years presented.

Other revenue recognition related policies

In accordance with ASC subtopic 605-25 ("ASC 605-25"), *Revenue Recognition: Multiple-Deliverable Revenue Arrangements,* for arrangements that include multiple deliverables, primarily for advertisements to be displayed in different spots, placed under different forms and occur at different time, the Company would evaluate all the deliverables in the arrangement to determine whether they represent separate units of accounting. For the arrangements with deliverable items to be considered a separate unit of accounting, the Company allocates the total consideration of the arrangements based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence ("VSOE") of selling price, third-party evidence ("TPE") of selling price, or management's best estimate of the selling price ("BESP"), and recognizes revenue on a periodic basis during the arrangements when each deliverable is provided. The Company considers all reasonably available information in determining the BESP, including both market and entity-specific factors. For the arrangements with deliverable items to be determined as a single unit of accounting due to lack of value on a standalone basis or a contingent revenue feature, the Company recognizes the revenue at the point of last deliverable item has been provided.

F-25

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The Company delivers some of its online marketing services to end customers through engaging third-party distributors. In this context, the Company may provide cash incentives to distributors. The cash incentives are accounted for as reduction of revenue in accordance with ASC subtopic 605-50 ("ASC 605-50"), *Revenue Recognition: Customer Payments and Incentives*.

The Company provides sales incentives to customers which entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. The Company accounts for these award credits granted to customers in conjunction with a current sale of products or services as a multiple-element arrangement by analogy to ASC 605-25. The consideration allocated to the award credits, as deferred revenue, is based on the assumption that the customer will purchase the minimum amount of future service necessary to obtain the maximum award credits available. The deferred revenue is recognized as revenue proportionately as the future services are delivered to the customer or when the award credits expire.

The Company provides coupons and credits to the end users in certain businesses, including services provided by Baidu Nuomi and takeout delivery services, for expanding market share. The coupons and credits can be used to reduce the purchase price or to redeem for gifts. Coupons issued to end users as a result of a concurrent sale are recognized as reduction of corresponding revenue in accordance with ASC 605-50. Coupons issued to end users for free and without concurrent sales are recognized as advertising and promotional expenses upon the actual usage of the coupons. Credits provided to end users for redeeming gifts in the future are accrued as advertising and promotional expenses upon issuance.

Cash received in advance from customers is recorded as customer advances and deposits. The unused cash balances remaining in the customers' accounts are included as liabilities of the Company. Deferred revenue is recorded when services are provided before the other revenue recognition criteria set forth in ASC 605 are fulfilled.

### Cost of Revenues

Cost of revenues consists primarily of sales taxes (including business tax and value-added tax) and surcharges, traffic acquisition costs, bandwidth costs, depreciation, content costs, payroll and related costs of operations.

The Company incurs sales taxes and surcharges in connection with the provision of online marketing services, technical and consultative service fees charged by its subsidiaries to VIEs and other taxable services in the PRC. In accordance with ASC 605-45, the Company includes the sales tax and surcharges incurred on its online marketing revenues in cost of revenues. The sales tax and surcharges in cost of revenues for the years ended December 31, 2013, 2014 and 2015 were RMB2.33 billion, RMB3.60 billion and RMB4.64 billion (US$716.29 million), respectively. Traffic acquisition costs represent the amounts paid or payable to Baidu Union members who direct search queries to the Company's websites or distribute the Company's customers' paid links through their properties. These payments are primarily based on revenue sharing arrangements under which the Company pays its Baidu Union members and other business partners a percentage of the fees it earns from its online marketing customers.

### Advertising and Promotional Expenses

Advertising and promotional expenses, including advertisements through various forms of media and kinds of marketing and promotional activities, are included in "Selling, general and administrative expense" in the consolidated statements of comprehensive income and are expensed when incurred. Advertising and promotional

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

expenses for the years ended December 31, 2013, 2014 and 2015 were RMB2.11 billion, RMB4.93 billion and RMB9.80 billion (US$1.51 billion), respectively.

### Government Subsidies

Government subsidies primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. For certain government subsidies, there are no defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government subsidies of non-operating nature with no further conditions to be met are recorded as non-operating income in "Other income, net" when received. The government subsidies with certain operating conditions are recorded as liabilities when received and will be recorded as operating income when the conditions are met.

### Leases

Leases are classified as either capital or operating leases. Leases that transfer substantially all the benefits and risks incidental to the ownership of assets are accounted for as capital leases as if there was an acquisition of an asset and incurrence of an obligation at the inception of the lease. All other leases are accounted for as operating leases wherein rental payments are expensed as incurred.

### Income Taxes

The Company recognizes income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. The Company records a valuation allowance against the amount of deferred tax assets that it determines is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date.

The Company applies the provisions of ASC topic 740 ("ASC 740"), *Income Taxes*, in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company has elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2013, 2014 and 2015, the amounts of unrecognized tax benefits as well as interest and penalties associated with uncertainty in income taxes were insignificant.

### Share-based Compensation

The Company accounts for share-based compensation in accordance with ASC topic 718 ("ASC 718"), *Compensation-Stock Compensation.* The Company has elected to recognize share-based compensation using the straight-line method for all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award ("modified awards"). The compensation costs associated with the modified awards are

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified awards, the Company recognizes share-based compensation over the vesting periods of the new options, which comprises, (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term and (ii) any unrecognized compensation cost of original award, using either the original term or the new term, whichever results in higher expenses for each reporting period.

The Company accounts for share awards issued to non-employees in accordance with the provisions of ASC subtopic 505-50 ("ASC 505-50"), *Equity: Equity-based Payments to Non-Employees*. The Company uses the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

### *Earnings Per Share ("EPS")*

The Company computes earnings per Class A and Class B ordinary shares in accordance with ASC topic 260 ("ASC 260"), *Earnings Per Share*, using the two-class method. Under the provisions of ASC 260, basic net income per share is computed using the weighted average number of ordinary shares outstanding during the period except that it does not include unvested ordinary shares subject to repurchase or cancellation. The Company accounts for the accretion of the redeemable noncontrolling interests in the calculation of income available to ordinary shareholders of the Company used in the earnings per share calculation.

Diluted net income per share is computed using the weighted average number of ordinary shares and, if dilutive, potential ordinary shares outstanding during the period. Potentially dilutive securities have been excluded from the computation of diluted net income per share if their inclusion is anti-dilutive. Potential ordinary shares consist of the incremental ordinary shares issuable upon the exercise of stock options, restricted shares subject to forfeiture, and contracts that may be settled in the Company's stock or cash. The dilutive effect of outstanding stock options and restricted shares is reflected in diluted earnings per share by application of the treasury stock method. The computation of the diluted net income per share of Class A ordinary shares assumes the conversion of Class B ordinary shares, while the diluted net income per share of Class B ordinary shares does not assume the conversion of such shares.

The liquidation and dividend rights of the holders of the Company's Class A and Class B ordinary shares are identical, except with respect to voting rights. As a result, and in accordance with ASC 260, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B ordinary shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as the conversion of Class B ordinary shares is assumed in the computation of the diluted net income per share of Class A ordinary shares, the undistributed earnings are equal to net income for that computation.

For the purposes of calculating the Company's basic and diluted earnings per Class A and Class B ordinary shares, the ordinary shares relating to the options that were exercised are assumed to have been outstanding from the date of exercise of such options.

F-28

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

*Contingencies*

The Company records accruals for certain of its outstanding legal proceedings or claims when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. The Company evaluates, on a quarterly basis, developments in legal proceedings or claims that could affect the amount of any accrual, as well as any developments that would make a loss contingency both probable and reasonably estimable. The Company discloses the amount of the accrual if it is material.

When a loss contingency is not both probable and estimable, the Company does not record an accrued liability but discloses the nature and the amount of the claim, if material. However, if the loss (or an additional loss in excess of the accrual) is at least reasonably possible, then the Company discloses an estimate of the loss or range of loss, if such estimate can be made and material, or states that such estimate is immaterial if it can be estimated but immaterial, or discloses that an estimate cannot be made. The assessment of whether a loss is probable or reasonably possible, and whether the loss or a range of loss is estimable, often involves complex judgments about future events. Management is often unable to estimate the loss or a range of loss, particularly where (i) the damages sought are indeterminate, (ii) the proceedings are in the early stages, or (iii) there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. In such cases, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, including eventual loss, fine, penalty or business impact, if any.

*Concentration of Risks*

Concentration of credit risk

Financial instruments that potentially subject the Company to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, amounts due from related parties and long-term held-to-maturity investments. As of December 31, 2015, the Company has RMB69.90 billion (US$10.79 billion) in cash and cash equivalents, restricted cash, short-term investments and long-term held-to-maturity investments, 95.30% and 4.70% of which are held by financial institutions in the PRC and international financial institutions outside of the PRC, respectively. The Company's total cash and cash equivalents, restricted cash, short-term investments and long-term held-to-maturity investments held at China Merchants Bank, Bank of China and China Construction Bank exceeded 10%, representing 28.40%, 24.31% and 10.14% of the Company's total cash and cash equivalents, restricted cash, short-term investments and long-term held-to-maturity investments as of December 31, 2015, respectively.

PRC state-owned banks, such as Bank of China, are subject to a series of risk control regulatory standards, and PRC bank regulatory authorities are empowered to take over the operation and management when any of those banks faces a material credit crisis. The Company does not foresee substantial credit risk with respect to cash and cash equivalents, restricted cash and short-term investments held at the PRC state-owned banks. Meanwhile, China does not have an official deposit insurance program, nor does it have an agency similar to what was the Federal Deposit Insurance Corporation (FDIC) in the U.S. In the event of bankruptcy of one of the financial institutions in which the Company has deposits or investments, it may be unlikely to claim its deposits or investments back in full. The Company selected reputable international financial institutions with high rating rates to place its foreign currencies. The Company regularly monitors the rating of the international financial institutions to avoid any potential defaults. There has been no recent history of default in relation to these financial institutions.

Accounts receivable are typically unsecured and derived from revenue earned from customers and agents in China, which are exposed to credit risk. The risk is mitigated by credit evaluations the Company performs on its

F-29

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

customers and its ongoing monitoring process of outstanding balances. The Company maintains reserves for estimated credit losses and these losses have generally been within its expectations. As of December 31, 2015, the Company had no single customer with a receivable balance exceeding 10% of the total accounts receivable balance.

No customer or any Baidu Union member generated greater than 10% of total revenues in any of the years presented.

Amounts due from related parties are typically unsecured and repayable on demand. In evaluating the collectability of the amounts due from related parties balance, the Company considers many factors, including the related parties' repayment history and their credit-worthiness. An allowance for doubtful accounts is made when collection of the full amount is no longer probable.

Business and economic risks

The Company participates in a dynamic high technology industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operations or cash flows: changes in the overall demand for services and products; changes in business offerings; competitive pressures due to new entrants; advances and new trends in new technologies and industry standards; changes in bandwidth suppliers; changes in certain strategic relationships or customer relationships; regulatory considerations; copyright regulations; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.

The Company's operations could be adversely affected by significant political, economic and social uncertainties in the PRC.

Currency convertibility risk

Substantially all of the Company's businesses are transacted in RMB, which is not freely convertible into foreign currencies. All foreign exchange transactions take place either through Bank of China or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the People's Bank of China. Approval of foreign currency payments by the People's Bank of China or other regulatory institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

Foreign currency exchange rate risk

The functional currency and the reporting currency of the Company are the US$ and RMB, respectively. The Company's exposure to foreign currency exchange rate risk primarily relates to cash and cash equivalents, short-term investments, long-term investments and notes payable denominated in the US$. On June 19, 2010, the People's Bank of China announced the end of the RMB's de facto peg to the US$, a policy which was instituted in late 2008 in the face of the global financial crisis, to further reform the RMB exchange rate regime and to enhance the RMB's exchange rate flexibility. On March 15, 2014, the People's Bank of China announced the widening of the daily trading band for RMB against US$. The appreciation of the US$ against RMB was approximately 4.40% in 2015. Most of revenues and costs of the Company are denominated in RMB, while a portion of cash and cash equivalents, short-term financial assets, investments and notes payable are denominated in U.S. dollars. Any significant revaluation of RMB may materially and adversely affect the Company's cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, the ADS in US$.

F-30

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

*Derivative Instruments*

ASC topic 815 ("ASC 815"), *Derivatives and Hedging*, requires all contracts which meet the definition of a derivative to be recognized on the balance sheet as either assets or liabilities and recorded at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in earnings or in other comprehensive income depending on the use of the derivative and whether it qualifies for hedge accounting. Changes in fair values of derivatives not qualified as hedges are reported in earnings. The estimated fair values of derivative instruments are determined at discrete points in time based on the relevant market information. These estimates are calculated with reference to the market rates using industry standard valuation techniques. The fair value of the derivative instruments held by the Company was insignificant for all years presented.

*Recent Accounting Pronouncement*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09 ("ASU 2014-09"), *Revenue from Contracts with Customers.* ASU 2014-09 supersedes the revenue recognition requirements in ASC 605, and requires entities to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. ASU 2014-09 is originally effective for the annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. ASU 2015-14, *Revenue from Contracts with Customers*, defers the effective date of ASU 2014-09 by one year. As a result, ASU 2014-09 is effective for annual reporting periods beginning after December 15, 2017 and interim periods therein. Early adoption is permitted to the original effective date. The Company is currently evaluating the timing of its adoption and the impact of adopting the new revenue standard on its consolidated financial statements and considering additional disclosure requirements.

In April 2015, the FASB issued ASU No. 2015-03 ("ASU 2015-03"), *Interest – Imputation of Interest*. ASU 2015-03 requires debt issuance costs related to a recognized debt liability to be presented in the balance sheet as a direct deduction from the debt liability rather than as an asset. ASU 2015-03 is effective for annual reporting periods beginning after December 15, 2015, including interim periods within that reporting period. Early adoption is permitted. The Company early adopted ASU 2015-03 on a retrospective basis. The balance sheet of each individual period presented was adjusted to reflect the period-specific effects of applying ASU 2015-03. The impact of the adoption of ASU 2015-03 for each year presented was insignificant.

In September 2015, the FASB issued ASU No. 2015-16 ("ASU 2015-16"), *Business Combinations (Topic 805) Simplifying the Accounting for Measurement – Period Adjustments*. ASU 2015-16 requires the acquirer to recognize adjustments to provisional amounts that are identified during the measurement period in the reporting period in which the adjustment amount is determined. The acquirer is required to also record, in the same period's financial statements, the effect on earnings of changes in depreciation, amortization, or other income effects, if any, as a result of the change to the provisional amounts, calculated as if the accounting had been completed at the acquisition date. In addition, an entity is required to present separately on the face of the income statement or disclose in the notes to the financial statements the portion of the amount recorded in current-period earnings by line item that would have been recorded in previous reporting periods if the adjustment to the provisional amounts had been recognized as of the acquisition date. For public business entities, ASU 2015-16 is effective for fiscal years beginning after December 15, 2015. Early adoption is permitted. The Company does not expect the adoption of ASU 2015-16 will have a significant impact on the consolidated financial statements.

In November 2015, the FASB issued ASU No. 2015-17 ("ASU 2015-17"), *Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes*. ASU 2015-17 simplifies the presentation of deferred income taxes by

F-31

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

eliminating the separate classification of deferred income tax liabilities and assets into current and noncurrent amounts in the consolidated balance sheet statement of financial position. The amendments in the update require that all deferred tax liabilities and assets be classified as noncurrent in the consolidated balance sheet. The amendments in this update are effective for fiscal years beginning after December 15, 2016, and interim periods therein and may be applied either prospectively or retrospectively to all periods presented. Early adoption is permitted. The Company early adopted ASU 2015-17 in the fourth quarter of 2015 on a retrospective basis. The adoption of ASU 2015-17 resulted in a decrease of RMB684.95 million (US$105.74 million) to current deferred tax assets and a corresponding increase to noncurrent deferred tax asset on the consolidated balance sheet as of December 31, 2014.

In February 2016, the FASB issued ASU No. 2016-02 ("ASU 2016-02"), *Leases.* ASU 2016-02 specifies the accounting for leases. For operating leases, ASU 2016-02 requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. ASU 2016-02 is effective for public companies for annual reporting periods, and interim periods within those years beginning after December 15, 2018. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements.

### 3.  BUSINESS COMBINATIONS

*Business Combinations in 2015:*

During the year ended December 31, 2015, the Company completed two business combinations, which the Company expected to complement its existing businesses and achieve significant synergies. The total purchase consideration was RMB331.95 million (US$51.24 million). The acquired entities were considered insignificant, both individually and in aggregate. The results of the acquired entities' operations have been included in the Company's consolidated financial statements since their respective dates of acquisition.

Neither the results of operations since the acquisition dates nor the pro forma results of operations of the acquirees were presented because the effects of these business combinations, individually and in the aggregate, were not significant to the Company's consolidated results of operations.

*Business Combinations in 2014:*

During the year ended December 31, 2014, the Company completed several business combinations, which the Company expected to complement its existing businesses and achieve significant synergies. The acquired entities were considered insignificant, both individually and in aggregate. The results of the acquired entities' operations have been included in the Company's consolidated financial statements since their respective dates of acquisition.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The Company completed the valuations necessary to assess the fair values of the tangible and intangible assets acquired and liabilities assumed and the fair value of noncontrolling interests, resulting from which the amount of goodwill was determined and recognized as of the respective acquisition dates. The following table summarizes the estimated aggregate fair values of the assets acquired, liabilities assumed and the noncontrolling interests as of the respective dates of acquisition:

|  | RMB |
| --- | --- |
|  | (In thousands) |
| Purchase consideration | 398,410 |
| Net assets acquired, excluding intangible assets and the related deferred tax liabilities | (95,961) |
| Intangible assets, net | 249,452 |
| Deferred tax liabilities, non-current | (67,945) |
| Pre-existing equity interests | (91,677) |
| Noncontrolling interests | (150,000) |
| Goodwill | 554,541 |

Goodwill, which is not tax deductible, is primarily attributable to the synergies expected to be achieved from the acquisitions.

*Business Combinations in 2013:*

Acquisition of 91 Wireless

On October 1, 2013, the Company acquired 100% of the outstanding ordinary shares of 91 Wireless Websoft Limited ("91 Wireless"), a leading Chinese mobile application marketplaces and mobile games operator, with which the Company expected to enhance its ability and market share in the mobile online marketing business. The results of 91 Wireless's operations have been included in the Company's consolidated financial statements since October 1, 2013.

Among the total purchase consideration, US$1.83 billion was paid upon the consummation of the acquisition and US$10.00 million was deposited in an escrow account in case of any breach of the representations and warranties made upon the acquisition or indemnifiable loss incurred, if any, such as claims, damages or penalties. The escrowed amount will be released and transferred to the original shareholders after a period of 18 months from the acquisition date. The remaining of the consideration represented the settlement of the pre-existing relationships between the Company and 91 Wireless, which was insignificant.

The Company has completed the valuations necessary to assess the fair values of the tangible and intangible assets acquired and liabilities assumed, resulting from which the amount of goodwill was determined and recognized as of the acquisition date. The following table summarizes the estimated fair values of the assets acquired and liabilities assumed as of October 1, 2013, the date of acquisition:

|  | RMB |
| --- | --- |
|  | (In thousands) |
| Purchase consideration | 11,196,235 |
| Net assets acquired, excluding intangible assets and the related deferred tax liabilities | 483,341 |
| Intangible assets, net | 1,146,300 |
| Deferred tax liabilities, non-current | (278,346) |
| Goodwill | 9,844,940 |

Goodwill, which is not tax deductible, is primarily attributable to synergies expected to be achieved from the acquisition. The synergies are mainly attributable to the enhancement of the Company's leading position on the rapidly emerging mobile area, especially the distribution of applications for mobile devices, which could better

F-33

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

promote the Company's products, reduce costs and expenses by sharing the infrastructure, distribution channel and common research and development results, and further foster an ecosystem with better user experience for mobile products, stronger user loyalty, and greater value for both customers and developers that enhance the Company's monetization ability on the emerging mobile markets.

Other acquisitions

The Company also completed other business combinations during 2013, which the Company expected to complement its existing businesses and achieve significant synergies. The results of the acquired entities' operations have been included in the Company's consolidated financial statements since their respective dates of acquisition.

The Company completed the valuations necessary to assess the fair values of the tangible and intangible assets acquired and liabilities assumed and the fair value of noncontrolling interests, resulting from which the amount of goodwill was determined and recognized as of the respective acquisition dates. The following table summarizes the estimated aggregate fair values of the assets acquired, liabilities assumed and the noncontrolling interests as of the respective dates of acquisition:

|  | RMB |
| --- | --- |
|  | (In thousands) |
| Purchase consideration | 3,865,378 |
| Net assets acquired, excluding intangible assets and the related deferred tax liabilities | 467,159 |
| Intangible assets, net | 796,415 |
| Deferred tax liabilities, non-current | (112,233) |
| Noncontrolling interests | (427,813) |
| Goodwill | 3,141,850 |

Goodwill, which is not tax deductible, is primarily attributable to the synergies expected to be achieved from the acquisitions.

4.  INVESTMENTS

*Short-term Investments*

As of December 31, 2015, all of the short-term held-to-maturity investments were time deposits in commercial banks with a maturity of less than one year. The short-term available-for-sale investments are debt securities with a maturity of less than one year purchased from commercial banks and other financial institutions, and equity securities of a publicly listed company.

During the years ended December 31, 2013, 2014 and 2015, the Company recorded interest income from its short-term investments of RMB1.07 billion, RMB1.81 billion and RMB2.20 billion (US$339.20 million) in the consolidated statements of comprehensive income, respectively.

*Long-term Investments*

The Company's long-term investments consist of cost method investments, equity method investments, held-to-maturity investments with original and remaining maturities of greater than 12 months and available-for-sale investments.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

Cost method investments

The carrying amount of cost method investments was RMB1.74 billion and RMB7.30 billion (US$1.13 billion) as of December 31, 2014 and 2015, respectively. The increase is primarily due to additional equity investments in the form of preferred shares in 2015. The Company's investments in preferred shares of the investees are not considered in-substance common stock since these preferred shares contain terms such as dividend and liquidation preferences over ordinary shares. In addition, the preferred shares do not have readily determinable fair values. As a result, these investments in preferred shares are accounted for under the cost method.

Equity method investments

*Equity Investment in Ctrip.* On October 26, 2015, the Company completed a share exchange transaction with Ctrip ("Ctrip transaction"), a company engaged in the online travelling business. The Company exchanged its beneficially owned 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares of its majority-owned subsidiary Qunar in exchange for 11,488,381 newly-issued ordinary shares of Ctrip. Subsequent to the transaction, the Company lost control over Qunar and owned 24.39% equity interests in Ctrip when combined with the Ctrip ADS previously acquired in the open market in 2013. The Company accounts for the investment in Ctrip as an equity method investment in accordance with ASC 323 due to its significant influence over the entity. The Company recorded the investment in Ctrip at the fair value of the shares acquired on the closing date of the Ctrip transaction. The Company recognized a total gain of RMB24.42 billion (US$3.77 billion) from the Ctrip transaction in "Other income, net" in the consolidated statements of comprehensive income for the year ended December 31, 2015. The deconsolidation of Qunar did not meet the definition of a discontinued operation in accordance with ASC subtopic 205-20 ("ASC 205-20"), *Presentation of Financial Statements – Discontinued Operations*, as the disposal of Qunar did not represent a shift in the Company's strategy.

Through this transaction, the Company strengthened its position in the online travelling business of the online to offline marketplace. The carrying amount of the Ctrip investment in excess of the Company's proportionate interest in Ctrip is recognized as equity method goodwill, intangible assets and related deferred income tax expenses.

| | RMB | US$ |
|---|---|---|
| | (In thousands) | |
| Carrying value of investment in Ctrip | 26,662,337 | 4,115,956 |
| Proportionate share of net assets of Ctrip | (8,550,531) | (1,319,975) |
| Excess of carrying value of investment over proportionate share of net assets | 18,111,806 | 2,795,981 |
| | | |
| The excess carrying value has been primarily assigned to: | | |
| Goodwill | 15,563,126 | 2,402,533 |
| Intangible assets | 2,845,081 | 439,205 |
| Deferred income taxes | (283,187) | (43,716) |
| Property, plant and equipment | 52,323 | 8,077 |
| Land use rights | 13,487 | 2,082 |
| Equity investments | (79,024) | (12,200) |
| Total | 18,111,806 | 2,795,981 |

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

As the financial statements of Ctrip may not be available in timely manner for the Company to apply the equity method, the Company elects to record its share of the profits or losses of Ctrip on a quarter lag basis. When reporting its proportionate share of profits or losses of Ctrip, the Company will adjust for its basis difference related to the amortization of intangible assets and deferred income taxes discussed above.

The following tables set forth the summarized financial information of Ctrip:

| | As of September 30,* | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2015 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| Current assets | 16,194,113 | 25,750,458 | 3,975,186 |
| Non-current assets | 12,073,373 | 23,500,517 | 3,627,855 |
| Current liabilities | 10,253,664 | 18,873,779 | 2,913,609 |
| Non-current liabilities | 8,051,191 | 17,492,002 | 2,700,300 |
| Noncontrolling interests | 536,042 | 1,063,306 | 164,146 |

| | For the six months ended September 30,* | For the twelve months ended September 30,* | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | 2015 |
| | RMB | RMB | RMB | US$ |
| | | (In thousands) | | |
| Total revenues | 2,960,637 | 7,280,123 | 10,484,967 | 1,618,600 |
| Gross profit | 2,097,599 | 4,962,670 | 7,072,995 | 1,091,882 |
| Income (loss) from operations | 495,482 | 433,052 | (115,056) | (17,762) |
| Net income | 540,651 | 625,520 | 2,052,526 | 316,855 |
| Net income attributable to the investees | 583,369 | 728,644 | 2,207,503 | 340,780 |

\* The Company adopted an one-quarter lag in reporting its share of equity income in Ctrip

In accordance with ASC 323, when Baidu obtained the ability to exercise significant influence over Ctrip that was previously accounted for at fair value as an available-for-sale equity investment in accordance with ASC 320, the investment and results of operations in prior years were adjusted retrospectively on a step-by-step basis as if the equity method had been in effect during all previous years in which the investment was held.

The retrospective effects of applying the equity method of accounting to the consolidated statements of balance sheets and the consolidated statements of comprehensive income are as follows:

| | As of December 31, 2014 | |
| --- | --- | --- |
| | As originally reported | As adjusted for retrospective application |
| | RMB | RMB |
| | (In thousands) | |
| Short-term investments | 43,818,037 | 42,698,831 |
| Long-term investments, net | 2,878,922 | 3,544,923 |
| Additional paid-in capital | 3,633,919 | 3,650,601 |
| Retained earnings | 47,659,772 | 47,701,326 |
| Accumulated other comprehensive income (loss) | 231,923 | (279,518) |

F-36

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

| | For the year ended December 31, 2013 | | For the year ended December 31, 2014 | |
| --- | --- | --- | --- | --- |
| | As originally reported | As adjusted for retrospective application | As originally reported | As adjusted for retrospective application |
| | RMB | RMB | RMB | RMB |
| | | (In thousands) | | |
| Income (loss) from equity method investments | (5,806) | 22,578 | (26,952) | (19,943) |
| Other, net | 186,023 | 189,330 | 257,704 | 260,558 |
| Net income | 10,356,086 | 10,387,777 | 12,243,371 | 12,253,234 |

As of December 31, 2014 and 2015, the Company holds several other equity method investments besides Ctrip through its subsidiaries or VIEs, all of which were accounted for under the equity method since the Company can exercise significant influence but does not own a majority equity interest in or control them. The carrying amount of all of the equity method investments was RMB869.15 million and RMB28.54 billion (US$4.41 billion) as of December 31, 2014 and 2015, respectively. The Company excluded the summarized information for these other equity method investments, as the other equity investees were insignificant for all the years presented.

Long-term held-to-maturity investments were time deposits in commercial banks with original and remaining maturities of greater than one year. The held-to-maturity investments are stated at amortized cost. Long-term available-for-sale equity investments represent investments in the equity securities of publicly listed companies. As the Company does not have significant influence over the investees, the investments were classified as available-for-sale and reported at fair value.

The methodology used in the determination of fair values for held-to-maturity investments and available-for-sale investments were summarized in Note 21.

The total impairment charges on long-term investments were RMB17.52 million, RMB93.42 million and RMB116.98 million (US$18.06 million) for the years ended December 31, 2013, 2014 and 2015, respectively.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The short-term held-to-maturity debt investments as well as the short-term available-for-sale investments will mature within one year; whereas the long-term held-to-maturity debt investments as well as the long-term available-for-sale debt investments will mature after one year through five years.

| | As of December 31, 2014 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Cost or amortized cost | Gross unrecognized holding gains | Gross unrecognized holding losses | Gross unrealized gains | Gross unrealized losses | Fair value |
| | RMB | RMB | RMB (In thousands) | RMB | RMB | RMB |
| **Short-term investments** | | | | | | |
| **Held-to-maturity investments** | | | | | | |
| Fixed-rate investments | 38,159,394 | 104,718 | (15,389) | | | 38,248,723 |
| Adjustable-rate investments | 60,290 | — | (771) | | | 59,519 |
| **Available-for-sale investments** | | | | | | |
| Fixed-rate debt investments | 2,854,682 | | | 10,414 | | 2,865,096 |
| Adjustable-rate debt investments | 1,568,812 | | | | (269) | 1,568,543 |
| Equity investments | 42,137 | | | 3,371 | | 45,508 |
| **Long-term investments:** | | | | | | |
| **Held-to-maturity investments** | | | | | | |
| Fixed-rate investments | 545,930 | — | (14,612) | | | 531,318 |
| **Available-for-sale investments** | | | | | | |
| Debt investment | 272,680 | | | — | | 272,680 |
| Equity investment | 124,000 | | | | (8,079) | 115,921 |

| | As of December 31, 2015 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Cost or amortized cost | Gross unrecognized holding gains | Gross unrecognized holding losses | Gross unrealized gains | Gross unrealized losses | Fair value | Fair value |
| | RMB | RMB | RMB (In thousands) | RMB | RMB | RMB | US$ |
| **Short-term investments** | | | | | | | |
| **Held-to-maturity investments** | | | | | | | |
| Fixed-rate investments | 36,942,840 | 197,848 | (6,592) | | | 37,134,096 | 5,732,517 |
| **Available-for-sale investments** | | | | | | | |
| Fixed-rate debt investments | 6,872,077 | | | 86,322 | | 6,958,399 | 1,074,192 |
| Adjustable-rate debt investments | 13,137,500 | | | 187,885 | | 13,325,385 | 2,057,085 |
| Equity investment | 600,543 | | | 142,075 | | 742,618 | 114,640 |
| **Long-term investments:** | | | | | | | |
| **Held-to-maturity investments** | | | | | | | |
| Fixed-rate investments | 1,838,953 | | (32,507) | | | 1,806,446 | 278,867 |
| **Available-for-sale investments** | | | | | | | |
| Equity investments | 322,269 | | | | (45,304) | 276,965 | 42,756 |

F-38

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

### 5.  ACCOUNTS RECEIVABLE

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2015 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| Accounts receivable | 3,758,324 | 4,116,819 | 635,526 |
| Allowance for doubtful accounts | (93,877) | (189,563) | (29,263) |
| | 3,664,447 | 3,927,256 | 606,263 |

The movements in the allowance for doubtful accounts were as follows:

| | 2013 | 2014 | 2015 | 2015 |
| --- | --- | --- | --- | --- |
| | RMB | RMB | RMB | US$ |
| | | | (In thousands) | |
| Balance as of January 1 | 5,768 | 43,814 | 93,877 | 14,492 |
| Amounts charged to expenses | 38,046 | 50,063 | 115,261 | 17,793 |
| Amounts written off | — | — | (19,575) | (3,022) |
| Balance as of December 31 | 43,814 | 93,877 | 189,563 | 29,263 |

### 6.  OTHER CURRENT ASSETS

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2015 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| Prepaid expenses | 420,227 | 339,264 | 52,373 |
| Advances to suppliers | 1,225,972 | 1,953,717 | 301,602 |
| Tax prepayments | 323,618 | 3,074 | 475 |
| Loans receivables | 5,067 | 226,838 | 35,018 |
| Receivables from online payment agencies | 692,277 | 318,528 | 49,172 |
| Deposits | 279,727 | 380,152 | 58,685 |
| Purchased copyrights | 180,392 | 432,730 | 66,802 |
| Others | 280,147 | 686,374 | 105,957 |
| | 3,407,427 | 4,340,677 | 670,084 |

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

**7.   FIXED ASSETS**

|  | As of December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2015 |
|  | RMB | RMB (In thousands) | US$ |
| Computer equipment | 9,764,297 | 12,520,942 | 1,932,900 |
| Office building | 1,776,651 | 3,094,551 | 477,716 |
| Office building related facility, machinery and equipment | 577,178 | 1,593,090 | 245,931 |
| Vehicles | 29,363 | 31,450 | 4,855 |
| Office equipment | 342,452 | 433,144 | 66,866 |
| Leasehold improvements | 311,076 | 302,304 | 46,668 |
| Construction in progress | 1,783,641 | 682,314 | 105,331 |
|  | 14,584,658 | 18,657,795 | 2,880,267 |
| Accumulated depreciation | (5,879,294) | (8,030,668) | (1,239,721) |
|  | 8,705,364 | 10,627,127 | 1,640,546 |

The Company obtained certain computer servers and equipment by entering into capital leases. The gross amount and the accumulated depreciation of these servers and equipment were RMB224.03 million and RMB122.43 million, respectively, as of December 31, 2014 and RMB224.71 million (US$34.69 million) and RMB174.63 million (US$26.96 million), respectively, as of December 31, 2015. Future minimum lease payments of RMB47.10 million are payable in the amounts of RMB39.66 million, RMB7.10 million, RMB0.34 million, nil and nil in 2016, 2017, 2018, 2019, and 2020, respectively.

Depreciation expense of the fixed assets, including assets under capital leases, was RMB1.64 billion, RMB2.19 billion and RMB2.87 billion (US$442.57 million) for the years ended December 31, 2013, 2014 and 2015, respectively. The Company recognized impairment loss on fixed assets of RMB2.06 million, nil and nil for the years ended December 31, 2013, 2014 and 2015, respectively.

F-40

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

## 8. GOODWILL AND INTANGIBLE ASSETS

*Goodwill*

| | Search Services | Transaction Services excluding Qunar | Qunar | iQiyi | Total |
|---|---|---|---|---|---|
| | RMB | RMB | RMB | RMB | RMB |
| | | | (In thousands) | | |
| Balance at December 31, 2012 | 125,275 | — | 2,293,007 | 1,459,282 | 3,877,564 |
| Goodwill acquired | 10,340,893 | 816,985 | — | 1,828,912 | 12,986,790 |
| Foreign currency translation adjustment | (4) | — | — | — | (4) |
| Balance at December 31, 2013 | 10,466,164 | 816,985 | 2,293,007 | 3,288,194 | 16,864,350 |
| Goodwill acquired | 133,509 | 433,119 | — | (12,087) | 554,541 |
| Foreign currency translation adjustment | 4 | — | — | — | 4 |
| Balance at December 31, 2014 | 10,599,677 | 1,250,104 | 2,293,007 | 3,276,107 | 17,418,895 |
| Goodwill acquired | 222,987 | 46,692 | — | — | 269,679 |
| Goodwill disposed in Ctrip transaction (Note 4) | — | — | (2,293,007) | — | (2,293,007) |
| Foreign currency translation adjustment | 6 | — | — | — | 6 |
| Balance at December 31, 2015 | 10,822,670 | 1,296,796 | — | 3,276,107 | 15,395,573 |
| Balance at December 31, 2015, in US$ | 1,670,732 | 200,191 | — | 505,744 | 2,376,667 |

*Intangible Assets*

Finite-lived intangible assets

| | As of December 31, 2014 | | |
|---|---|---|---|
| | Gross carrying value | Accumulated amortization | Net carrying value |
| | RMB | RMB | RMB |
| | | (In thousands) | |
| Land use right | 519,474 | (37,357) | 482,117 |
| Customer relationships | 693,712 | (304,208) | 389,504 |
| Software | 519,239 | (274,818) | 244,421 |
| Trademarks | 916,735 | (189,588) | 727,147 |
| User list | 854,467 | (452,730) | 401,737 |
| Licensed copyrights of video contents | 1,768,141 | (935,238) | 832,903 |
| Others | 695,562 | (213,929) | 481,633 |
| | 5,967,330 | (2,407,868) | 3,559,462 |

F-41

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

| | As of December 31, 2015 | | | |
| | Gross carrying value | Accumulated amortization | Net carrying value | Net carrying value |
| | RMB | RMB | RMB | US$ |
| | | (In thousands) | | |
| Land use right | 464,165 | (44,428) | 419,737 | 64,796 |
| Customer relationships | 472,013 | (364,310) | 107,703 | 16,626 |
| Software | 513,470 | (352,099) | 161,371 | 24,911 |
| Trademarks | 613,032 | (144,983) | 468,049 | 72,254 |
| User list | 699,872 | (497,283) | 202,589 | 31,274 |
| Licensed copyrights of video contents | 3,039,164 | (1,478,285) | 1,560,879 | 240,959 |
| Others | 776,522 | (375,797) | 400,725 | 61,862 |
| | 6,578,238 | (3,257,185) | 3,321,053 | 512,682 |

The Company recognized impairment loss on intangible assets of RMB4.62 million, RMB1.63 million and nil for the years ended December 31, 2013, 2014 and 2015, respectively. Amortization expense of intangible assets for the years ended December 31, 2013, 2014 and 2015 was RMB949.85 million, RMB1.59 billion and RMB2.97 billion (US$459.21 million), respectively. Estimated amortization expense relating to the existing intangible assets with finite lives for each of the next five years is as follows:

| | RMB | US$ |
| | (In thousands) | |
| For the years ending December 31, | | |
| 2016 | 1,270,794 | 196,177 |
| 2017 | 502,510 | 77,574 |
| 2018 | 297,853 | 45,981 |
| 2019 | 124,432 | 19,209 |
| 2020 | 95,543 | 14,749 |

Indefinite-lived intangible assets

| | As of December 31, | | |
| | 2014 | 2015 | 2015 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| Domain names | 9,360 | 9,360 | 1,445 |
| Trademarks | 5,537 | 4,206 | 649 |
| | 14,897 | 13,566 | 2,094 |

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

### 9.    ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2014** | **2015** | **2015** |
| | **RMB** | **RMB** | **US$** |
| | | **(In thousands)** | |
| Accrued payroll and welfare | 1,703,029 | 1,629,794 | 251,597 |
| Accrued operating expenses | 3,694,869 | 5,112,984 | 789,309 |
| Tax payable | 624,781 | 334,058 | 51,570 |
| Interest payable | 121,907 | 127,799 | 19,729 |
| Users' and distributors' deposits | 354,459 | 888,098 | 137,099 |
| Purchase of fixed assets and spare parts | 1,314,841 | 1,495,958 | 230,936 |
| Traffic acquisition costs | 1,159,362 | 1,852,949 | 286,046 |
| Bandwidth costs | 748,072 | 1,080,657 | 166,825 |
| Content acquisition costs | 718,072 | 1,821,217 | 281,147 |
| Fund collected on behalf of service providers | 1,563,564 | 1,640,460 | 253,243 |
| Payable to merchants | 359,190 | 801,282 | 123,697 |
| Others | 602,747 | 1,054,936 | 162,853 |
| | 12,964,893 | 17,840,192 | 2,754,051 |

### 10.    LOANS PAYABLE

*Short-term Loans*

On May 13, 2014, 91 Wireless entered into a banking facility agreement with Hong Kong and Shanghai Banking Corporation Limited (Hong Kong branch) ("HSBC"), pursuant to which 91 Wireless is entitled to borrow a US$ denominated loan of RMB129.56 million (US$20.00 million) with an interest rate of 0.8% per annum over 1, 3 or 6 months LIBOR. The banking facility is subject to HSBC's overriding right of repayment on demand and the loan under this facility is intended for the general working capital of 91 Wireless. On May 23, 2014, 91 Wireless drew down RMB45.34 million (US$7.00 million) with a fixed interest rate of 1.12% under the loan commitment, and on September 25, 2014, 91 Wireless drew down another RMB51.82 million (US$8.00 million) with a fixed interest rate of 1.13% under the loan commitment, both of which were secured by cash collateral of a subsidiary of 91 Wireless. On May 21, 2015, the loan amounting to RMB45.34 million (US$7.00 million) was repaid in full when it became due, and on December 18, 2015, the loan amounting to RMB51.82 million (US$8.00 million) was repaid in full when it became due.

On September 22, 2015, the Company entered into a banking facility agreement with China Merchants Bank (Shanghai Branch), pursuant to which the Company is entitled to borrow a RMB denominated loan of RMB100.00 million (US$15.44 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by People's Bank of China. The loan is intended for the general working capital purposes. In September 2015, the Company drew down RMB9.90 million (US$1.53 million) with a fixed interest rate of 4.60%. In November and December 2015, the remaining of RMB90.10 million (US$13.90 million) was drawn down with a fixed interest rate of 4.35%.

*Long-term Loans*

On July 24, 2013, the Company entered into a loan agreement with Sumitomo Mitsui Banking Corporation, pursuant to which the Company is entitled to borrow an unsecured US$ denominated loan of RMB971.67 million

F-43

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

(US$150.00 million) with a floating interest rate. The loan is intended for the general working capital of the Company. On July 29, 2013, the Company drew down RMB971.67 million (US$150.00 million) with a term of two years under the facility commitment. In connection with the loan agreement, the Company entered into an interest swap agreement, pursuant to which the loan will be settled with a fixed annual interest rate of 1.17% during the term of the loan. On July 24, 2015, the loan was repaid in full when it became due.

On August 13, 2013, the Company entered into a loan agreement with Australia and New Zealand Banking Group Limited (Hong Kong Branch), pursuant to which the Company is entitled to borrow an unsecured AU$ denominated loan of RMB1.30 billion (AU$235.00 million) with a floating interest rate. The loan is intended for the general working capital of the Company. On August 19, 2013, the Company drew down RMB1.30 billion (AU$235.00 million) with a term of two years under the facility commitment. In connection with the loan agreement, the Company entered into a currency swap agreement, pursuant to which the loan will be settled in a fixed US$ amount of US$200.00 million with a fixed annual interest rate of 1.65% during the term of the loan. On August 19, 2015, the loan was repaid in full when it became due.

On December 9, 2014, the Company entered into two loan agreements with Bank of China (Los Angeles Branch), pursuant to which the Company borrowed two unsecured US$ denominated loans of RMB971.67 million (US$150.00 million) with a term of two years and RMB971.67 million (US$150.00 million) with a term of three years. Both loans are intended for the general working capital of the Company and have a floating interest rate. In connection with the loan agreements, the Company entered into two interest swap agreements, pursuant to which the loans will be settled with a fixed annual interest rate of 2.31% and 2.45%, respectively, during the respective term of the loans.

On July 17, 2015, the Company entered into a loan agreement with Sumitomo Mitsui Banking Corporation, pursuant to which the Company is entitled to borrow an unsecured US$ denominated loan of RMB971.67 million (US$150.00 million) with a floating interest rate. The loan is intended for the general working capital of the Company. On August 10, 2015, the Company drew down RMB971.67 million (US$150.00 million) with a term of two years under the facility commitment. In connection with the loan agreement, the Company entered into an interest swap agreement, pursuant to which the loan will be settled with a fixed annual interest rate of 1.41% during the term of the loan.

On August 25, 2015, the Company entered into a loan agreement with HSBC, pursuant to which the Company is entitled to borrow an unsecured US$ denominated loan of RMB1.30 billion (US$200.00 million) with a fixed annual interest rate of 1.42%. The loan is intended for the general working capital of the Company. On August 28, 2015, the Company drew down RMB1.30 billion (US$200.00 million) with a term of two years under the facility commitment.

The interest swap agreements and currency swap agreement met the definition of a derivative in accordance with ASC 815. The fair value of the derivatives related to the interest swap agreements and currency swap agreement was insignificant for the years ended December 31, 2013, 2014 and 2015.

## 11.   NOTES PAYABLE

### *Baidu, Inc.*

On November 28, 2012, the Company issued and sold two tranches of unsecured senior notes: (i) an aggregate principal amount of US$750.00 million which will mature on November 28, 2017 (the "2017 Notes"), and (ii) an aggregate principal amount of US$750.00 million which will mature on November 28, 2022 (the "2022 Notes"). On August 6, 2013, the Company issued and sold publicly another tranche of unsecured senior notes with an

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

aggregate principal amount of US$1.00 billion which will mature on August 6, 2018 (the "2018 Notes"). On June 9, 2014, the Company issued and sold publicly the fourth tranche of unsecured senior notes with an aggregate principal amount of US$1.00 billion which will mature on June 9, 2019 (the "2019 Notes"). On June 30, 2015, the Company issued and sold publicly two tranches of unsecured senior notes: (i) an aggregate principal amount of US$750.00 million which will mature on June 30, 2020 (the "2020 Notes"), and (ii) an aggregate principal amount of US$500.00 million which will mature on June 30, 2025 (the "2025 Notes"). The 2017 Notes, 2018 Notes, 2019 Notes, 2020 Notes, 2022 Notes and 2025 Notes are collectively referred to as the "Notes".

The 2017 Notes bear interest at the rate of 2.25% per annum and the 2022 Notes bear interest at the rate of 3.50% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on May 28, 2013. The 2018 Notes bear interest at the rate of 3.25% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on February 6, 2014. The 2019 Notes bear interest at the rate of 2.75% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on December 9, 2014. The 2020 Notes bear interest at the rate of 3.00% per annum and the 2025 Notes bear interest at the rate of 4.13% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on December 30, 2015. At maturity, the Notes are payable at their principal amount plus accrued and unpaid interest thereon.

The net proceeds from the Notes, which will be used for general corporate purposes, were RMB6.11 billion, RMB6.19 billion and RMB7.75 billion (US$1.20 billion) for the years ended December 31, 2013, 2014 and 2015, respectively.

The Notes do not contain any financial covenants or other significant restrictions. In addition, the Notes are unsecured and rank lower than any secured obligation of the Group and have the same liquidation priority as any other unsecured liabilities of the Group, but senior to those expressly subordinated obligations, if any. The Company may, at its discretion, redeem all or any portion of the Notes at any time, at the principal amount plus any unpaid interest. As of December 31, 2015, the Company does not intend to redeem any portion of the Notes prior to the stated maturity dates. The Company has the obligation to redeem the Notes if a change in control occurs as defined in the indenture of the Notes.

The Notes were issued at a discount amounting to RMB74.36 million (US$11.48 million). The issuance costs of RMB149.59 million (US$23.09 million) were presented as a direct deduction from the principal amount of the Notes on the consolidated balance sheets. Both the discount and the issuance costs are amortized as interest expense using the effective interest rate method through the maturity dates of the Notes. The effective interest rate was 2.36%, 3.39%, 3.00%, 3.13%, 3.59% and 4.22% for the 2017 Notes, the 2018 Notes, the 2019 Notes, the 2020 Notes, the 2022 Notes and the 2025 Notes, respectively.

The principal amount and unamortized discount and debt issuance costs as of December 31, 2014 and 2015 were as follows:

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | 2014 | 2015 | 2015 |
|  | RMB | RMB (In thousands) | US$ |
| Principal amount | 21,700,000 | 30,869,300 | 4,765,399 |
| Unamortized discount and debt issuance costs | (143,218) | (167,184) | (25,809) |
|  | 21,556,782 | 30,702,116 | 4,739,590 |

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The following table summarizes the aggregate required repayments of the principal amounts of the Company's long-term debts, including the notes payable and loans payable (Note 10), in the succeeding five years and thereafter:

|  | RMB | US$ |
|---|---|---|
|  | (In thousands) | |
| For the years ending December 31, | | |
| 2016 | 971,670 | 150,000 |
| 2017 | 8,097,250 | 1,250,000 |
| 2018 | 6,477,800 | 1,000,000 |
| 2019 | 6,477,800 | 1,000,000 |
| 2020 | 4,858,350 | 750,000 |
| Thereafter | 8,097,250 | 1,250,000 |

*Subsidiaries – Qunar*

On June 17, 2015, Qunar issued US$500.00 million senior unsecured convertible notes (the "Qunar Notes") in a private placement. The Qunar Notes bear interest at a coupon rate of 2% per annum with a maturity date of June 17, 2021. The Qunar Notes can be convertible at any time, at the holder's option, into Qunar ADSs, at an initial conversion price of US$55.00 per Qunar ADS, subject to adjustment under the terms of the Qunar Notes. Upon conversion, Qunar shall pay or deliver its ADSs or cash, or any combination of cash and ADSs at the election of Qunar. Except for the other embedded features therein, the conversion option is eligible for a scope exception from derivative accounting under ASC 815. Qunar separated the Notes into equity component of RMB569.22 million (US$87.87 million) and debt component of RMB2.53 billion (US$391.30 million) in accordance with the Cash Conversion Subsection under ASC subtopic 470-20 ("ASC 470-20"), *Debt with Conversion and Other Options*, so that Qunar recognizes the same interest cost as if it had issued a comparable debt instrument without the embedded conversion option. The equity component is measured as the residual amount, reflecting the interest cost paid with the conversion option. The allocated issuance costs to the debt component of RMB42.94 million (US$6.63 million) were presented as a direct deduction from the principal amount of the Qunar Notes. The Company evaluated all the other embedded derivative features therein and concluded all the other embedded derivative features are clearly and closely related to the debt host except for two features which require bifurcation from the debt host. The fair values of the two embedded derivative features were estimated to be insignificant as of the debt issuance date. Qunar was deconsolidated at the closing date of the Ctrip transaction (Note 4).

## 12.   INCOME TAXES

*Cayman Islands and BVI*

Under the current laws of the Cayman Islands and BVI, the Company is not subject to tax on income or capital gains. Additionally, upon payments of dividends by the Company to its shareholders, neither Cayman Islands nor BVI withholding tax will be imposed.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they may be exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

*Japan*

Under the Japan tax laws, a company with paid-in capital in excess of JPY100 million was subject to a national corporate income tax rate of 25.5% up to March 31, 2015 and from April 1, 2015 the income tax rate has been reduced to 23.9%. A company with paid-in capital equals JPY100 million or less will be taxed at a tax rate of 15% on first JPY8 million and at 23.9% on the portion over JPY8 million from April 1, 2015. Local income taxes, which are local inhabitant tax and enterprise tax, are also imposed on corporate income. The resulting effective corporate income tax rates of the Company's Japanese subsidiaries range from approximately 34% to 37%.

*China*

Effective from January 1, 2008, the PRC's statutory, Enterprise Income Tax ("EIT") rate is 25%. Preferential EIT rates at 15% and 10% are available for qualified "High and New Technology Enterprises" ("HNTEs") and "Key Software Enterprise" ("KSE"). The HNTE certificate is effective for a period of 3 years and the KSE certificate is effective for a period of 2 years.

Baidu Online enjoyed a reduced tax rate of 10% as a qualified KSE until the end of 2014 and a reduced tax rate of 15% as a qualified HNTE starting from 2015. Certain other PRC subsidiaries and VIEs, including Baidu Netcom, are qualified HNTEs and enjoy a reduced tax rate of 15% for the years presented, which will expire in 2016, 2017 or 2018. An entity could re-apply for the HNTE or KSE certificate when the prior certificate expires. Historically, all of the Company's subsidiaries and VIEs successfully re-applied for the certificates when the prior ones expired.

A certificate for the current year might be obtained in the following year as a result of the stringent inspection and approval process by the governmental authorities. The Company would record an income tax reversal in the year when the certificate is obtained for the over-paid or over-accrued provisional tax in connection with the grant of a more favorable tax rate for the prior year.

Under the current EIT Law, dividends for earnings derived from January 1, 2008 and onwards paid by PRC entities to any of their foreign non-resident enterprise investors are subject to a 10% withholding tax. A lower tax rate will be applied if tax treaty or arrangement benefits are available. Under the tax arrangement between the PRC and Hong Kong, the reduced withholding tax rate for dividends paid by PRC entities is 5% provided the Hong Kong investors meet the requirements as stipulated by relevant PRC tax regulations, such as the beneficiary owner test. Capital gains derived from PRC are also subject to a 10% PRC withholding tax.

Moreover, the current EIT Law treats enterprises established outside of China with "effective management and control" located in China as PRC resident enterprises for tax purposes. The term "effective management and control" is generally defined as exercising overall management and control over the business, personnel, accounting, properties, etc. of an enterprise. The Company, if considered a PRC resident enterprise for tax purposes, would be subject to the PRC Enterprise Income Tax at the rate of 25% on its worldwide income for the period after January 1, 2008. As of December 31, 2015, the Company has not accrued for PRC tax on such basis. The Company will continue to monitor its tax status.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The Company had minimal operations in jurisdictions other than the PRC. Income (loss) before income taxes consists of:

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2013 | 2014 | 2015 | 2015 |
|  | RMB | RMB | RMB | US$ |
|  | | (In thousands) | | |
| PRC | 13,815,469 | 17,783,174 | 16,877,599 | 2,605,452 |
| Non-PRC | (1,598,762) | (3,298,768) | 21,029,024 | 3,246,322 |
|  | 12,216,707 | 14,484,406 | 37,906,623 | 5,851,774 |

Except for the investment related gain as mentioned in Note 4, the pre-tax losses from non-PRC operations consist primarily of operating costs, administration expenses, interest expenses and share-based compensation expenses.

Income taxes consist of:

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2013 | 2014 | 2015 | 2015 |
|  | RMB | RMB | RMB | US$ |
|  | | (In thousands) | | |
| Current income tax | 2,006,980 | 2,942,173 | 3,213,638 | 496,100 |
| Income tax refund due to reduced tax rate | (508,686) | (17,553) | — | — |
| Adjustments of deferred tax assets due to reduced tax rates | 21,573 | 28,146 | 79,947 | 12,342 |
| Deferred income tax (benefit) expense | 309,063 | (721,594) | 2,180,792 | 336,656 |
|  | 1,828,930 | 2,231,172 | 5,474,377 | 845,098 |

The reconciliation of the actual income taxes to the amount of tax computed by applying the aforementioned statutory income tax rate to pre-tax income is as follows:

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2013 | 2014 | 2015 | 2015 |
|  | RMB | RMB | RMB | US$ |
|  | | (In thousands, except for per share data) | | |
| Expected taxation at PRC statutory tax rate | 3,046,254 | 3,587,693 | 9,476,656 | 1,462,944 |
| Effect of differing tax rates in different jurisdictions | 312,938 | 676,663 | (5,253,700) | (811,032) |
| Non-taxable income | (69,673) | (12,504) | (65,411) | (10,098) |
| Non-deductible expenses | 168,735 | 123,245 | 165,264 | 25,512 |
| Research and development super-deduction | (318,652) | (538,305) | (767,858) | (118,537) |
| Effect of PRC preferential tax rates and tax holiday | (2,152,806) | (1,897,184) | (1,547,392) | (238,876) |
| Effect of tax rate changes on deferred taxes | 21,573 | 28,146 | 79,947 | 12,342 |
| Over-accrued EIT for previous years | (32,982) | (153,121) | (248,673) | (38,388) |
| PRC withholding tax | 560,243 | — | 2,470,733 | 381,415 |
| Addition to valuation allowance | 293,300 | 416,539 | 1,164,811 | 179,816 |
| Taxation for the year | 1,828,930 | 2,231,172 | 5,474,377 | 845,098 |
| Effective tax rate | 15.01% | 15.41% | 14.44% | 14.44% |
| Effect of preferential tax rates inside the PRC on basic earnings per Class A and Class B ordinary share | 61.53 | 53.61 | 44.31 | 6.84 |

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The tax effects of temporary differences that gave rise to the deferred tax balances at December 31, 2014 and 2015 are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2015 |
| | RMB | RMB (In thousands) | US$ |
| Deferred tax assets: | | | |
| Provision for doubtful receivables | 23,179 | 120,612 | 18,619 |
| Accrued expenses, payroll and others | 1,084,113 | 1,745,810 | 269,506 |
| Fixed assets depreciation | 38,157 | 19,659 | 3,035 |
| Net operating loss carry-forward | 930,456 | 1,320,496 | 203,850 |
| Less: valuation allowance | (1,131,826) | (2,198,403) | (339,375) |
| Deferred tax assets, net | 944,079 | 1,008,174 | 155,635 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2015 |
| | RMB | RMB (In thousands) | US$ |
| Long-lived assets arising from acquisitions | 549,485 | 359,531 | 55,502 |
| Withholding tax on PRC subsidiaries' undistributed earnings | 594,336 | 592,719 | 91,500 |
| Withholding tax on capital gains derived from PRC | — | 2,489,040 | 384,243 |
| Deferred tax liabilities | 1,143,821 | 3,441,290 | 531,245 |

As of December 31, 2015 the Company had net losses of approximately RMB8.05 billion (US$1.24 billion) deriving from entities in the PRC, Hong Kong and Japan. The net loss in the PRC and Japan can be carried forward for five years and nine years, respectively, to offset future net profit for income tax purposes. The net loss of entities in the PRC and Japan will begin to expire in 2018, if not utilized. The net loss in Hong Kong can be carried forward without an expiration date.

The Company evaluated its income tax uncertainty under ASC 740. ASC 740 clarifies the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company elects to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2014 and 2015, there was no significant impacts from tax uncertainty on the Company's financial position and result of operations. The Company does not expect the amount of unrecognized tax benefits would increase significantly in the next 12 months. In general, the PRC tax authorities have up to five years to conduct examinations of the tax filings of the Company's PRC subsidiaries. Accordingly, the PRC subsidiaries' tax years of 2011 through 2015 remain open to examination by the respective tax authorities. The Company may also be subject to the examinations of the tax filings in other jurisdictions, which are not material to the consolidated financial statements.

The Company accrued withholding tax of RMB580.72 million for the potential remittance of earnings from the PRC subsidiaries to their offshore parent companies in the form of dividend distribution as of December 31, 2013, because the Company believes that the underlying dividends will be distributed in the future considering future merger and acquisition activities. The Company did not provide for additional deferred income taxes and

F-49

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

foreign withholding taxes on the undistributed earnings of foreign subsidiaries in 2014 and 2015 on the basis of its intent to permanently reinvest foreign subsidiaries' earnings. As of December 31 2015, the total amount of undistributed earnings from the PRC subsidiaries for which no withholding tax has been accrued was RMB70.13 billion (US$10.83 billion). Determination of the amount of unrecognized deferred tax liability related to these earnings is not practicable. In the case of its VIEs in the PRC, undistributed earnings were insignificant as of each of the balance sheet dates.

## 13.   EMPLOYEE DEFINED CONTRIBUTION PLAN

Full time employees of the Group in the PRC participate in a government mandated multi-employer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the Group make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Company has no legal obligation for the benefits beyond the contributions. The total amounts for such employee benefits, which were expensed as incurred, were RMB1.05 billion, RMB1.64 billion and RMB2.23 billion (US$344.43 million) for the years ended December 31, 2013, 2014 and 2015, respectively.

## 14.   COMMITMENTS AND CONTINGENCIES

### Capital Commitments

The Company's capital commitments primarily relate to commitments in connection with the expansion and improvement of its network infrastructure and its plan to build additional office buildings and cloud computing based data centers. Total capital commitments contracted but not yet reflected in the financial statements amounted to RMB589.93 million (US$91.07 million) as of December 31, 2015. All of the commitments relating to the network infrastructure are to be fulfilled in 2016 and the commitments relating to the office building and cloud computing based data centers will be settled in installments as various stages of the construction plan are completed in the next four to six years.

### Operating Lease Commitments

The Company leases facilities in the PRC under non-cancelable operating leases expiring on different dates. Payments under operating leases are expensed on a straight-line basis over the periods of the respective leases. Total rental expense for offices was RMB284.58 million, RMB525.31 million and RMB647.09 million (US$99.89 million) for the years ended December 31, 2013, 2014 and 2015, respectively. Total operating lease expense for Internet Data Centre ("IDC") facilities was RMB1.94 billion, RMB2.85 billion and RMB3.72 billion (US$574.27 million) for the years ended December 31, 2013, 2014 and 2015, respectively.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

Future minimum payments under non-cancelable operating leases with initial terms of one-year or more consist of the following as of December 31, 2015:

|  | RMB | US$ |
|---|---|---|
|  | (In thousands) | |
| 2016 | 3,358,242 | 518,423 |
| 2017 | 1,300,298 | 200,731 |
| 2018 | 1,046,187 | 161,503 |
| 2019 | 620,844 | 95,842 |
| 2020 | 397,378 | 61,345 |
| Thereafter | 147,415 | 22,757 |
|  | 6,870,364 | 1,060,601 |

The Group's lease arrangements have no renewal options, rent escalation clauses and restriction or contingent rents.

### *Commitments for Licensed Copyrights*

The Company enters into non-cancelable licensing agreements with third-party vendors to acquire licensed copyrights of video contents for its online video platform.

Future minimum payments under non-cancelable licensing agreements consist of the following as of December 31, 2015:

|  | RMB | US$ |
|---|---|---|
|  | (In thousands) | |
| 2016 | 3,122,843 | 482,084 |
| 2017 | 217,219 | 33,533 |
| 2018 | 241,014 | 37,206 |
| 2019 | 251,674 | 38,852 |
| 2020 | 154,250 | 23,812 |
| Thereafter | 1,022,963 | 157,918 |
|  | 5,009,963 | 773,405 |

### *Guarantees*

The Company accounts for guarantees in accordance with ASC topic 460 ("ASC 460"), *Guarantees.* Accordingly, the Company evaluates its guarantees if any to determine whether (a) the guarantee is specifically excluded from the scope of ASC 460, (b) the guarantee is subject to ASC 460 disclosure requirements only, but not subject to the initial recognition and measurement provisions, or (c) the guarantee is required to be recorded in the financial statements at fair value.

The corporate by-laws require that the Company indemnify its officers and directors, as well as those who act as directors and officers of other entities at the Company's request, against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceedings arising out of their services to the Company. In addition, the Company entered into separate indemnification agreements with each director and each executive officer of the Company that provide for indemnification of these directors and officers under similar circumstances and under additional circumstances. The indemnification obligations are more fully described in the by-laws and the indemnification agreements. The Company purchases standard directors and officers insurance to cover claims or a portion of the claims made against its directors and officers.

F-51

Case 1:20-cv-01830-DG-TAM    Document 160-18    Filed 03/03/23    Page 192 of 487
PageID #: 8022

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

Since a maximum obligation is not explicitly stated in the Company's by-laws or in the indemnification agreements and will depend on the facts and circumstances that arise out of any future claims, the overall maximum amount of the obligations cannot be reasonably estimated.

Historically, the Company was not required to make payments related to these obligations, and the fair value for these obligations was nil on the consolidated balance sheets as of December 31, 2014 and 2015.

### *Litigation*

The Group was involved in certain cases pending in various PRC and U.S. courts and arbitration as of December 31, 2015. These cases include copyright infringement cases, unfair competition cases, and defamation cases, among others. Adverse results in these lawsuits may include awards of damages and may also result in, or even compel, a change in the Company's business practices, which could result in a loss of revenue or otherwise harm the business of the Company.

For many proceedings, the Company is currently unable to estimate the reasonably possible loss or a range of reasonably possible losses as the proceedings are in the early stages, and/or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible losses cannot be made. However, the Company believes that such matters, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material adverse effect on the Company's consolidated results of operations, financial position and cash flows. With respect to the limited number of proceedings for which the Company was able to estimate the reasonably possible losses or the range of reasonably possible losses, such estimated loss amounts were insignificant.

### 15. REDEEMABLE NONCONTROLLING INTERESTS

| | 2013 | 2014 | 2015 | |
| --- | --- | --- | --- | --- |
| | RMB | RMB | RMB | US$ |
| | | (In thousands) | | |
| Balance as of January 1 | 1,033,283 | — | 1,894,502 | 292,461 |
| Net losses | (61,857) | — | — | — |
| Other comprehensive income (loss) | (55,420) | — | 142,071 | 21,932 |
| Exercise of share-based awards | 464 | — | — | — |
| Share-based compensation | 11,259 | — | — | — |
| Issuance of subsidiary shares | 51,368 | 1,841,819 | 1,582,126 | 244,237 |
| Accretion of redeemable noncontrolling interests | 31,799 | 52,683 | 329,180 | 50,817 |
| Acquisition of subsidiaries' redeemable shares from shareholders | (121,962) | — | — | — |
| Reclassification of redeemable noncontrolling interests | (888,934) | — | — | — |
| Balance as of December 31 | — | 1,894,502 | 3,947,879 | 609,447 |

On November 14, 2014, iQiyi completed a round of preferred shares financing. The new preferred shareholders acquired 13.42% of the then outstanding equity interest of iQiyi for a total consideration of US$300.00 million.

On October 1, 2015, Xiaodu Life Technology Ltd ("Xiaodu"), a wholly owned subsidiary of the Company primarily engaged in the business of takeout delivery services, issued 250,000,000 preferred shares at par value

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

to certain shareholders for a total consideration of US$250.00 million. As the preferred shares could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of Xiaodu, these preferred shares are accounted for as redeemable noncontrolling interests.

The Company accounts for the accrete changes in the redemption value in accordance with ASC topic 480 ("ASC 480"), *Distinguishing Liabilities from Equity.* The Company elects to use the effective interest method for the changes of redemption value over the period from the date of issuance to the earliest redemption date of the noncontrolling interest.

## 16.  SHAREHOLDERS' EQUITY

*Ordinary Shares*

The authorized share capital consisted of 870,400,000 ordinary shares at a par value of US$0.00005 per share, of which 825,000,000 shares were designated as Class A ordinary shares, 35,400,000 as Class B ordinary shares, and 10,000,000 shares designated as preferred shares. The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting and conversion rights. Each share of Class A ordinary shares is entitled to one vote per share and is not convertible into Class B ordinary shares under any circumstances. Each share of Class B ordinary shares is entitled to ten votes per share and is convertible into one Class A ordinary share at any time by the holder thereof. Upon any transfer of Class B ordinary shares by the holder thereof to any person or entity that is not an affiliate of such holder, such Class B ordinary shares would be automatically converted into an equal number of Class A ordinary shares. The number of Class B ordinary shares transferred to Class A ordinary shares was 225,079, 45,000 and nil in the years ended December 31, 2013, 2014 and 2015, respectively.

As of December 31, 2015, there were 27,113,541 and 7,492,921 Class A and Class B ordinary shares outstanding, respectively. As of December 31, 2014 and 2015, there were no preferred shares issued and outstanding.

On July 30, 2015, the Company announced a share repurchase program in which the Company proposed to acquire up to an aggregate of US$1.00 billion of its shares over the next 12 months. On October 30, 2015, the Company announced another share repurchase program under which the Company proposed to acquire up to an aggregate of US$2.00 billion of its shares over the next 24 months in the open market or through privately negotiated transactions, depending on market conditions and in accordance with applicable rules and regulations. The Company repurchased 603,726 Class A ordinary shares from the open market with an aggregate purchase price of US$990.16 million during the year ended December 31, 2015. The repurchased shares were cancelled under Cayman Islands law upon repurchase and the difference between the par value and the repurchase price was debited to retained earnings.

*Retained Earnings*

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Company's PRC subsidiaries, being foreign invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of the Company's PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the Company's subsidiaries.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

In accordance with the China Company Laws, the Company's VIEs must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of the Company's VIEs is required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are made at the discretion of the Company's VIEs.

General reserve and statutory surplus funds are restricted to set-off against losses, expansion of production and operation and increasing registered capital of the respective company. Staff welfare and bonus fund and statutory public welfare funds are restricted to capital expenditures for the collective welfare of employees. The reserves are not allowed to be transferred to the Company in terms of cash dividends, loans or advances, nor are they allowed for distribution except under liquidation.

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | 2014 | 2015 | 2015 |
|  | RMB | RMB (In thousands) | US$ |
| PRC statutory reserve funds | 375,193 | 417,911 | 64,514 |
| Unreserved retained earnings | 47,326,133 | 74,241,444 | 11,460,904 |
| Total retained earnings | 47,701,326 | 74,659,355 | 11,525,418 |

Under PRC laws and regulations, there are restrictions on the Company's PRC subsidiaries and VIEs with respect to transferring certain of their net assets to the Company either in the form of dividends, loans, or advances. Amounts of net assets restricted include paid in capital and statutory reserve funds of the Company's PRC subsidiaries and the net assets of the VIEs in which the Company has no legal ownership, totaling RMB7.54 billion and RMB10.58 billion (US$1.63 billion) as of December 31, 2014 and 2015, respectively.

Furthermore, cash transfers from the Company's PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of the PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to the Company, or otherwise satisfy their foreign currency denominated obligations.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

*Accumulated Other Comprehensive Income (Loss)*

The changes in accumulated other comprehensive income (loss) by component, net of tax, were as follows:

| | Foreign currency translation adjustment | Unrealized gains on available-for-sale investments | Total |
|---|---|---|---|
| | RMB | RMB | RMB |
| | | (In thousands) | |
| Balance at December 31, 2012 | (89,714) | 11,436 | (78,278) |
| Other comprehensive income before reclassification | 185,389 | 73,599 | 258,988 |
| Amounts reclassified from accumulated other comprehensive income | — | (62,132) | (62,132) |
| Net current-period other comprehensive income | 185,389 | 11,467 | 196,856 |
| Other comprehensive loss attribute to noncontrolling interests and redeemable noncontrolling interests | 62,680 | — | 62,680 |
| Balance at December 31, 2013 | 158,355 | 22,903 | 181,258 |
| Other comprehensive income (loss) before reclassification | (422,925) | 27,327 | (395,598) |
| Amounts reclassified from accumulated other comprehensive income | — | (45,025) | (45,025) |
| Net current-period other comprehensive loss | (422,925) | (17,698) | (440,623) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (20,153) | — | (20,153) |
| Balance at December 31, 2014 | (284,723) | 5,205 | (279,518) |
| Other comprehensive income (loss) before reclassification | (644,896) | 489,010 | (155,886) |
| Amounts reclassified from accumulated other comprehensive income | — | (194,451) | (194,451) |
| Net current-period other comprehensive income (loss) | (644,896) | 294,559 | (350,337) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (176,201) | — | (176,201) |
| Balance at December 31, 2015 | (1,105,820) | 299,764 | (806,056) |
| Balance at December 31, 2015, in US$ | (170,709) | 46,276 | (124,434) |

The amounts reclassified out of accumulated other comprehensive income represent realized gains on the available-for-sale investments upon their sales, which were then recorded in "Other income, net" in the consolidated statements of comprehensive income. The amounts reclassified were determined on the basis of specific identification.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The following table sets forth the tax effect allocated to each component of other comprehensive income for the years ended December 31, 2014 and 2015:

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2015 |
| | RMB | RMB | RMB | US$ |
| | | | (In thousands) | |
| Unrealized gains on available-for-sale investments | | | | |
| Unrealized holding (losses) gains during the year | (1,157) | 1,680 | (68,303) | (10,544) |
| Reclassified for gains realized | — | — | 28,885 | 4,459 |
| Net unrealized (losses) gains | (1,157) | 1,680 | (39,418) | (6,085) |
| Foreign currency translation adjustment | — | — | — | — |
| Other comprehensive (loss) income | (1,157) | 1,680 | (39,418) | (6,085) |

## 17.  EARNINGS PER SHARE ("EPS")

A reconciliation of net income attributable to Baidu, Inc. in the consolidated statements of comprehensive income to the numerator for the computation of basic and diluted per share for the years ended December 31, 2013, 2014 and 2015 is as follows:

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2015 |
| | RMB | RMB | RMB | US$ |
| | | | (In thousands) | |
| Net income attributable to Baidu, Inc. | 10,550,657 | 13,196,932 | 33,664,173 | 5,196,853 |
| Accretion of the redeemable noncontrolling interests | (31,799) | (52,683) | (329,180) | (50,817) |
| Numerator for EPS computation | 10,518,858 | 13,144,249 | 33,334,993 | 5,146,036 |

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The following table sets forth the computation of basic and diluted net income attributable to Baidu, Inc. per share for Class A and Class B ordinary shares.

| | For the years ended December 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2013 | | 2014 | | 2015 | | | |
| | Class A RMB | Class B RMB | Class A RMB | Class B RMB | Class A RMB | Class A US$ | Class B RMB | Class B US$ |
| | (In thousands, except for number of shares, per share and per ADS data) | | | | | | | |
| **Earnings per share – basic:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. | 8,200,353 | 2,318,505 | 10,328,517 | 2,815,732 | 26,182,538 | 4,041,887 | 7,152,455 | 1,104,149 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,274,769 | 7,711,459 | 27,551,463 | 7,511,003 | 27,428,861 | 27,428,861 | 7,492,921 | 7,492,921 |
| Denominator used for earnings per share | 27,274,769 | 7,711,459 | 27,551,463 | 7,511,003 | 27,428,861 | 27,428,861 | 7,492,921 | 7,492,921 |
| **Earnings per share – basic** | 300.66 | 300.66 | 374.88 | 374.88 | 954.56 | 147.36 | 954.56 | 147.36 |
| **Earnings per share – diluted:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. for diluted computation | 8,203,670 | 2,315,188 | 10,339,397 | 2,804,852 | 26,205,544 | 4,045,439 | 7,129,449 | 1,100,597 |
| Reallocation of net income attributable to Baidu, Inc. as a result of conversion of Class B to Class A shares | 2,315,188 | — | 2,804,852 | — | 7,129,449 | 1,100,597 | | |
| Allocation of net income attributable to Baidu, Inc. | 10,518,858 | 2,315,188 | 13,144,249 | 2,804,852 | 33,334,993 | 5,146,036 | 7,129,449 | 1,100,597 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,274,769 | 7,711,459 | 27,551,463 | 7,511,003 | 27,428,861 | 27,428,861 | 7,492,921 | 7,492,921 |
| Conversion of Class B to Class A ordinary shares | 7,711,459 | — | 7,511,003 | — | 7,492,921 | 7,492,921 | | |
| Share-based awards | 50,118 | — | 136,008 | — | 112,688 | 112,688 | | |
| Denominator used for earnings per share | 35,036,346 | 7,711,459 | 35,198,474 | 7,511,003 | 35,034,470 | 35,034,470 | 7,492,921 | 7,492,921 |
| **Earnings per share – diluted** | 300.23 | 300.23 | 373.43 | 373.43 | 951.49 | 146.88 | 951.49 | 146.88 |
| **Earnings per ADS:** | | | | | | | | |
| Denominator used for earnings per ADS – basic | 272,747,690 | | 275,514,630 | | 274,288,610 | 274,288,610 | | |
| Denominator used for earnings per ADS – diluted | 350,363,460 | | 351,984,740 | | 350,344,700 | 350,344,700 | | |
| **Earnings per ADS – basic** | 30.07 | | 37.49 | | 95.46 | 14.74 | | |
| **Earnings per ADS – diluted** | 30.02 | | 37.34 | | 95.15 | 14.69 | | |

The Company did not include certain stock options and restricted shares in the computation of diluted earnings per share for the years ended December 31, 2013, 2014 and 2015 because those stock options and restricted shares were anti-dilutive for earnings per share for the respective years.

## 18.   SHARE-BASED AWARDS PLAN

*Baidu, Inc.*

Incentive compensation plans

In December 2008, the Company adopted a share incentive plan (the "2008 Plan"), which provides for the granting of share incentives, including incentive share option ("ISO"), restricted shares and any other form of award pursuant to the 2008 Plan, to members of the board, employees and consultants of the Company. However, the Company may grant ISOs only to its employees. The Company reserved 3,428,777 ordinary shares for issuance under the 2008 Plan, which will expire in the year 2018. The vesting schedule, time and condition to

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

exercise options will be determined by the compensation committee. The term of the options may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of the Company's share capital.

Under the 2008 Plan, share options are subject to vesting schedules varying from two years to four years, the exercise price of an option may be amended or adjusted at the discretion of the compensation committee, the determination of which would be final, binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices would be effective without the approval of the Company's shareholders or the approval of the affected grantees. If the Company grants an ISO to an employee who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of the Company's share capital, the exercise price cannot be less than 110% of the fair market value of the Company's ordinary shares on the date of that grant.

Starting from February 15, 2006, the Company granted restricted Class A ordinary shares of the Company ("Restricted Shares"). Terms for the Restricted Shares are the same as share options except that Restricted Shares do not require exercise and have a two to four years vesting term.

Share options

The following table summarizes the option activity for the year ended December 31, 2015:

| | Number of shares | Weighted average exercise price (US$) | Weighted average remaining contractual life (Years) | Aggregate intrinsic value (US$ in thousands) |
|---|---|---|---|---|
| **Share options** | | | | |
| Outstanding, December 31, 2014 | 198,392 | 1,141.00 | 7.83 | 225,915 |
| Granted | 65,013 | 2,094.20 | | |
| Exercised | (32,603) | 1,062.30 | | |
| Forfeited/Cancelled | (10,637) | 1,067.00 | | |
| Outstanding, December 31, 2015 | 220,165 | 1,437.70 | 7.55 | 115,458 |
| Vested and expected to vest at December 31, 2015 | 190,759 | 1,426.70 | 7.50 | 101,807 |
| Exercisable at December 31, 2015 | 82,485 | 1,086.50 | 6.43 | 66,942 |

The aggregate intrinsic value in the table above represents the difference between the Company's closing stock price on the last trading day in 2015 and the exercise price.

Total intrinsic value of options exercised for the years ended December 31, 2013, 2014 and 2015 was RMB114.21 million, RMB224.80 million and RMB199.88 million (US$30.86 million), respectively. The total fair value of options vested during the years ended December 31, 2013, 2014 and 2015 was RMB123.44 million, RMB149.22 million and RMB149.00 million (US$23.00 million), respectively.

As of December 31, 2015, there was RMB349.03 million (US$53.88 million) unrecognized share-based compensation cost related to share options. That deferred cost is expected to be recognized over a weighted-average vesting period of 2.63 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The fair value of each option award was estimated on the date of grant using the Black-Scholes-Merton valuation model. The volatility assumption was estimated based on historical volatility of the Company's share price applying the guidance provided by ASC 718. Assumptions of the expected term were based on the vesting and contractual terms and employee demographics. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

The following table presents the assumptions used to estimate the fair values of the share options granted in the years presented:

| | 2013 | 2014 | 2015 |
|---|---|---|---|
| Risk-free interest rate | 0.40%~1.35% | 1.52%~1.77% | 1.31%~1.36% |
| Dividend yield | — | — | — |
| Expected volatility range | 42.33%~44.17% | 40.96%~41.59% | 40.04%~40.57% |
| Weighted average expected volatility | 43.33% | 41.36% | 40.21% |
| Expected life (in years) | 3.08~4.57 | 4.57 | 5.02~5.13 |

In addition, the Company recognizes share-based compensation expense net of an estimated forfeiture rate and therefore only recognizes compensation cost for those shares expected to vest over the service period of the award. The estimation of the forfeiture rate is primarily based on historical experience of employee turnover. To the extent the Company revises this estimate in the future, the share-based payments could be materially impacted in the year of revision, as well as in the following years.

The exercise price of options granted during the years 2013, 2014 and 2015 equaled the market price of the ordinary shares on the grant date. The weighted-average grant-date fair value of options granted during the years 2013, 2014, and 2015 was US$419.80, US$755.00, and US$790.00, respectively.

Restricted shares

Restricted shares activity for the year ended December 31, 2015 was as follows:

| | Number of shares | Weighted average grant date fair value (US$) |
|---|---|---|
| **Restricted shares** | | |
| Unvested, December 31, 2014 | 219,404 | 1,582.60 |
| Granted | 247,141 | 1,979.30 |
| Vested | (71,348) | 1,516.00 |
| Forfeited | (50,674) | 1,767.80 |
| Unvested, December 31, 2015 | 344,523 | 1,853.40 |

The total fair value of the restricted shares vested during the years ended December 31, 2013, 2014 and 2015 was RMB247.24 million, RMB324.41 million, RMB700.66 million (US$108.16 million), respectively. The weighted-average grant-date fair value of the restricted shares granted during the years 2013, 2014, and 2015 was US$1,137.00, US$1,815.60, and US$1,979.30, respectively.

As of December 31, 2015, there was RMB2.37 billion (US$365.95 million) unrecognized share-based compensation cost related to restricted shares. That deferred cost will be recognized over a weighted-average vesting period of 3.13 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

*Subsidiaries*

The Company's subsidiaries also have equity incentive plans granting share-based awards. Total share-based compensation expenses recognized and unrecognized were insignificant, both individually and in aggregate, for the year ended December 31, 2015.

The following table summarizes the total share-based compensation cost recognized by the Group:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | 2015 |
| | RMB | RMB | RMB | US$ |
| | | | (In thousands) | |
| Expensed as cost of revenues | 23,976 | 34,611 | 49,770 | 7,683 |
| Expensed as selling, general and administrative | 164,704 | 426,052 | 486,760 | 75,143 |
| Expensed as research and development | 326,047 | 502,077 | 850,588 | 131,308 |
| Capitalized as part of internal-used software | 229 | — | 1,381 | 213 |

## 19.   RELATED PARTY TRANSACTIONS

For the year ended December 31, 2015, the related party transactions mainly represented online marketing services provided by the Company to Ctrip amounting to RMB89.24 million (US$13.78 million). Other related party transactions, including the reimbursements to Mr. Robin Yanhong Li's use of an aircraft beneficially owned by his family member for the Company's business purposes and the rental expense for an office building owned by the family members of an executive officer, were insignificant for each of the years presented.

As of December 31, 2014 and 2015, amounts due from/due to related parties were as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2015 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| **Amounts due from related parties, current:** | | | |
| Qunar (i) | — | 1,869,380 | 288,583 |
| Ctrip (ii) | — | 30,950 | 4,778 |
| Other related parties (ii) | 50 | 40,229 | 6,210 |
| **Total** | 50 | 1,940,559 | 299,571 |
| **Amounts due from related parties, non-current:** | | | |
| Other related parties (iii) | — | 9,725 | 1,501 |
| **Amounts due to related parties, current:** | | | |
| Qunar (iv) | — | 711,433 | 109,827 |
| Ctrip | — | 6,966 | 1,075 |
| Other related parties | 8,385 | 67,546 | 10,427 |
| **Total** | 8,385 | 785,945 | 121,329 |
| **Amounts due to related parties, Non-current:** | | | |
| Other related parties | 8 | — | — |

(i)   It mainly represents short-term loans of RMB1,774.00 million (US$273.86 million) provided by the Company to Qunar, which was a majority-owned subsidiary of the Company prior to October 26, 2015 and became a majority-owned subsidiary of Ctrip on December 31, 2015. These loans are interest-bearing and repayable within one year.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

(ii)   Balances in connection with services provided between the Company and its equity method investees arose in the ordinary course of business.
(iii)  Rental deposit paid in advance to the related party of one of the executive officers. Pursuant to the rental agreements, certain subsidiaries of the Company rent an office building owned by the family members of the executive officer.
(iv)   It mainly represents a short-term loan provided by Qunar to the Company of US$100.00 million in October 2015. The loan is interest-bearing and repayable within one year.

**20.   SEGMENT REPORTING**

The operations of the Company are organized into three segments, consisting of the search services, transaction services, and iQiyi. Search services include the traditional search engine related businesses such as auction-based P4P services and display-based online advertising services. Transaction services include the newly developed internet businesses such as services provided by Baidu Nuomi, takeout delivery services and other online-to-offline services. iQiyi represents online video business.

The Company derives the results of the segments directly from its internal management reporting system. The CODM measures the performance of each segment based on metrics of revenue and earnings from operations and uses these results to evaluate the performance of, and to allocate resources to, each of the segments. The Company does not allocate any share-based compensation expenses and certain operating expenses to its segments as the CODM does not use this information to measure the performance of the operating segments. Because substantially all of the Group's long-lived assets and revenues are located in and derived from the PRC, geographical segments are not presented.

The table below provides a summary of the Group's operating segment results for the years ended December 31, 2013, 2014 and 2015.

|  | For the years ended December 31, | | | |
|---|---|---|---|---|
|  | 2013 | 2014 | 2015 | 2015 |
|  | RMB | RMB | RMB | US$ |
|  | | | (In thousands) | |
| **Search Services** | | | | |
| Revenues | 29,590,276 | 43,727,459 | 55,667,478 | 8,593,577 |
| Operating profit | 14,178,852 | 20,547,793 | 28,117,837 | 4,340,646 |
| **Transaction Services** | | | | |
| Revenues | 1,319,187 | 3,822,456 | 7,005,941 | 1,081,531 |
| Operating profit | (1,522,279) | (5,973,978) | (13,145,445) | (2,029,307) |
| **iQiyi** | | | | |
| Revenues | 1,345,042 | 2,873,552 | 5,295,760 | 817,525 |
| Operating profit | (743,013) | (1,110,299) | (2,383,438) | (367,939) |
| **Inter-segment** | | | | |
| Revenues | (310,581) | (1,371,149) | (1,587,450) | (245,060) |
| Operating profit | (207,113) | 302,988 | 469,718 | 72,512 |
| **Segment operating profit** | 11,706,447 | 13,766,504 | 13,058,672 | 2,015,912 |
| Unallocated expenses | (514,727) | (962,740) | (1,387,118) | (214,134) |
| **Group consolidated operating profit** | 11,191,720 | 12,803,764 | 11,671,554 | 1,801,778 |

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

## 21.   FAIR VALUE MEASUREMENT

ASC topic 820 ("ASC 820"), *Fair Value Measurements and Disclosures,* establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

Level 1 – Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets

Level 2 – Include other inputs that are directly or indirectly observable in the marketplace

Level 3 – Unobservable inputs which are supported by little or no market activity

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

### *Assets and Liabilities Measured or Disclosed at Fair Value*

In accordance with ASC 820, the Company measures available-for-sale investments at fair value on a recurring basis. The fair values of the Company's held-to-maturity investments as disclosed are determined based on the discounted cash flow model using the discount curve of market interest rates. The fair value of the Company's long-term available-for-sale debt investment is measured using the market approach. The fair values of the Company's available-for-sale equity investments in the equity securities of publicly listed companies are measured using quoted market prices.

The Company measures certain financial assets, including equity method investments and cost method investments, at fair value on a nonrecurring basis only if an impairment charge were to be recognized. The Company's non-financial assets, such as intangible assets, goodwill and fixed assets, would be measured at fair value only if they were determined to be impaired on an other-than-temporary basis.

The fair value of the long-term notes payable is disclosed using quoted market price.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

Assets and liabilities measured or disclosed at fair value are summarized below:

| | Total fair value at December 31, 2014 | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Total losses |
|---|---|---|---|---|---|
| | RMB | RMB | RMB (In thousands) | RMB | RMB |
| *Fair value disclosure (Notes 2 and 4)* | | | | | |
| Cash equivalents | | | | | |
| Time deposits | 1,746,888 | | 1,746,888 | | |
| Money market fund | 755,095 | 755,095 | | | |
| Short-term investments | | | | | |
| Held-to-maturity investments | | | | | |
| Fixed-rate investments | 38,248,723 | | 38,248,723 | | |
| Adjustable-rate investments | 59,519 | | 59,519 | | |
| Long-term investments | | | | | |
| Held-to-maturity investments | | | | | |
| Fixed-rate investments | 531,318 | | 531,318 | | |
| Long-term notes payable | 21,811,666 | 21,811,666 | | | |
| *Fair value measurement* | | | | | |
| *Recurring* | | | | | |
| Short-term investments | | | | | |
| Available-for-sale investments | | | | | |
| Fixed-rate debt investments | 2,865,096 | | 2,865,096 | | |
| Adjustable-rate debt investments | 1,568,543 | | 1,568,543 | | |
| Equity investments | 45,508 | 45,508 | | | |
| Long-term investments | | | | | |
| Available-for-sale investments | | | | | |
| Debt investment | 272,680 | | | 272,680 | |
| Equity investment | 115,921 | 115,921 | | | |
| *Non-recurring* | | | | | |
| Long-term investments | — | | | — | (93,424) |
| Intangible assets | — | | | — | (1,625) |
| **Total assets measured at fair value** | 4,867,748 | 161,429 | 4,433,639 | 272,680 | (95,049) |

As of December 31, 2014, long-term available-for-sale debt investment was measured at fair value on a recurring basis using significant unobservable inputs (Level 3).

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

As of December 31, 2014, certain intangible assets (Note 8) and equity method investments (Note 4) were written down from their respective carrying value to fair value of nil, which were measured using significant unobservable inputs (Level 3), with impairment charges incurred and recorded in earnings for the year then ended.

| | Total fair value at December 31, 2015 | | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Total losses | |
|---|---|---|---|---|---|---|---|
| | RMB | US$ | RMB | RMB | RMB | RMB | US$ |
| | | | | (In thousands) | | | |
| **Fair value disclosure (Notes 2 and 4)** | | | | | | | |
| Cash equivalents | | | | | | | |
| Time deposits | 678,000 | 104,665 | | 678,000 | | | |
| Money market fund | 608,353 | 93,914 | 608,353 | | | | |
| Short-term investments | | | | | | | |
| Held-to-maturity investments | | | | | | | |
| Fixed-rate investments | 37,134,096 | 5,732,517 | | 37,134,096 | | | |
| Long-term investments | | | | | | | |
| Held-to-maturity investments | | | | | | | |
| Fixed-rate investments | 1,806,446 | 278,867 | | 1,806,446 | | | |
| Long-term notes payable | 30,714,586 | 4,741,515 | 30,714,586 | | | | |
| **Fair value measurement** | | | | | | | |
| *Recurring* | | | | | | | |
| Short-term investments | | | | | | | |
| Available-for-sale investments | | | | | | | |
| Fixed-rate debt investments | 6,958,399 | 1,074,192 | | 6,958,399 | | | |
| Adjustable-rate debt investments | 13,325,385 | 2,057,085 | | 13,325,385 | | | |
| Equity investments | 742,618 | 114,640 | 742,618 | | | | |
| Long-term investments | | | | | | | |
| Available-for-sale investments | | | | | | | |
| Equity investments | 276,965 | 42,756 | 276,965 | | | | |
| *Non-recurring* | | | | | | | |
| Long-term investments | — | — | | | — | (116,978) | (18,058) |
| **Total assets measured at fair value** | 21,303,367 | 3,288,673 | 1,019,583 | 20,283,784 | — | (116,978) | (18,058) |

As of December 31, 2015, a cost method investment (Note 4) was written down from its carrying value to fair value of nil, which was measured using significant unobservable inputs (Level 3), with impairment charges incurred and recorded in earnings for the year then ended.

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013, 2014 and 2015

The following table presents a reconciliation of long-term available-for-sale debt investment at fair value on a recurring basis using significant unobservable inputs (Level 3).

|  | Long-term available-for-sale debt investment | |
|---|---|---|
|  | RMB | US$ |
|  | (In thousands) | |
| Balance as of January 1, 2015 | 272,680 | 42,095 |
| Reclassification as a cost method investment | (272,680) | (42,095) |
| Balance as of December 31, 2015 | — | — |

As of December 31, 2014, long-term available-for-sale debt investment represented investment in the redeemable preferred shares of a private company. As the preferred shares were redeemable at the option of the Company, the investment was classified as available-for-sale debt securities and measured at fair value. In June 2015, the redemption right was modified such that the preferred shares are only redeemable upon the occurrence of certain events out of the Company's control. The modification was accounted for as an extinguishment of the available-for-sale debt investment and any relevant unrealized gains/losses in other comprehensive income was recognized in earnings immediately upon reclassification to a cost method investment. Subsequent to the modification, the preferred shares were reclassified to cost method investments as the investment was not an in-substance common stock investment in a corporation and did not have a readily determinable fair value.

## 22.  SUBSEQUENT EVENTS

In February, 2016, the Board of the Company received a non-binding proposal from Mr. Robin Yanhong Li, chairman and chief executive officer of the Company, and Mr. Yu Gong, chief executive officer of iQiyi, proposing to acquire all of the outstanding shares of iQiyi beneficially owned by the Company based on an enterprise valuation of US$2.80 billion for 100% of iQiyi on a cash-free and debt-free basis.

**Exhibit 4.22**

*This document is a translation of the original text in Chinese*

**Amended and Restated Equity Pledge Agreement 5**

This Amended and Restated Equity Pledge Agreement (this "Agreement"), dated December 16, 2015 is made in Beijing by and between:

Pledgee:

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing

Pledgor:

Party B: Yazhu Zhang

Address:

WHEREAS:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC and owns 20% of the equity interest in Beijing Perusal Technology Co., Ltd., a limited liability company registered in Beijing, PRC ("Beijing Perusal").

3. Party A and Party B entered into an Amended and Restated Loan Agreement 5 on December 16, 2015, pursuant to which Party A made a loan in an amount of RMB251,000,000 (the "Loan") to Party B (the "Loan Arrangement").

4. Party A and Beijing Perusal entered into an Exclusive Technology Consulting and Service Agreement (the "Service Agreement") on June 23, 2006. The term of the Service Agreement is 10 years. Pursuant to the Service Agreement, Beijing Perusal shall pay Party A consulting and service fees (the "Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will perform the obligations under the Loan Agreement and Party A can collect the Fees from Beijing Perusal which is held by Party B, Party B agrees to pledge all the equity interest in Beijing Perusal as security for the Loan and the Fees. Therefore, Party A (the "Pledgee") and Party B (the "Pledgor") intend to enter into this Agreement to specify their rights and obligations.

NOW THEREFORE, through friendly negotiation, the Pledgee and the Pledgor agree as follows:

1. Definitions:

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge" shall have the meaning specified in Section 2 of this Agreement.

1.2 "Equity Interest": refers to all of the equity interest in Beijing Perusal legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Loan and the Fees.

1.4 "Term of Pledge": refers to the period specified in Section 3.2 of this Agreement.

1.5 "Principal Agreements": refers to the Service Agreement and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Section 7.1 of this Agreement.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. Pledge

The Pledgor agrees to pledge the Equity Interest in Beijing Perusal to the Pledgee as security for (i) the obligations under the Loan Arrangement; and (ii) the obligations of Beijing Perusal under the Service Agreement. "Pledge" refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.

3. Rate of Pledge and Term of Pledge

3.1 Rate of Pledge

The rate of the Pledge shall be approximately 100%.

3.2 Term of Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the register of shareholders of Beijing Perusal and registered with the competent industrial and commercial authorities, and shall remain in effect until two (2) years after the obligations under the Principal Agreements have been fulfilled.

2

3.2.2 During the Term of Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that Pledgor do not perform the obligation under the Loan Arrangement or Beijing Perusal fails to pay the Fees under the Service Agreement.

4. Physical Possession Of Pledge Documents

4.1 During the Term of Pledge under this Agreement, the Pledgor shall deliver the physical possession of the certificate of capital contribution and the register of shareholders of Beijing Perusal to the Pledgee within one (1) week after the date of this Agreement.

4.2 The Pledgee shall be entitled to collect the dividends for the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the register of shareholders of Beijing Perusal (see Appendix I).

5. Representation and Warranty of the Pledgor

5.1 The Pledgor is the legal owner of the Equity Interest pledged. The Pledge has been duly approved by the shareholders' resolutions (see Appendix II).

5.2 The Pledgor did not pledge the Equity Interest and the Equity Interest is not encumbered to any other person except for the Pledgee.

6. Undertaking of the Pledgor

6.1 During the effective term of this Agreement, the Pledgor undertakes to the Pledgee for its benefit that the Pledgor shall:

6.1.1 Not transfer the Equity Interest, create or permit to create any pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent from the Pledgee;

6.1.2 Comply with and implement laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by the competent authority within five (5) days upon receiving such notices, orders or suggestions; and comply with such notices, orders or suggestions; or object to the foregoing matters at the reasonable request of the Pledgee or with consent from the Pledgee;

6.1.3 Timely notify the Pledgee of any events or any received notices which may affect the Pledgor's Equity Interest or any part of the Pledgor's right, and any events or any received notices which may change the Pledgor's any warranty and obligation under this Agreement or affect the Pledgor's performance of the obligations under this Agreement.

3

6.2 The Pledgor agrees that the Pledgee's right to the Pledge under this Agreement shall not be suspended or inhibited by any legal procedure launched by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any such other person.

6.3 The Pledgor undertakes to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute all the title certificates, contracts, and perform actions and cause other parties who have interests to take action, as required by the Pledgee, and facilitate the Pledgee to exercise its rights under this Agreement.

6.4 The Pledgor undertakes to the Pledgee to execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (natural person or a legal entity), and provide the notice, order and decision to the Pledgee within reasonable time if the Pledgee considers necessary.

6.5 The Pledgor undertakes to the Pledgee to comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefits of the Pledgee. The Pledgor shall compensate all the losses suffered by the Pledgee for the reasons that the Pledgor does not perform or fully perform such guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this agreement, in order to preserve and increase the value of the pledged Equity Interest, the Pledgor shall refrain from any act or omission that may negatively affect the value of the pledged Equity Interest. If any events that may negatively affect the value of the pledged Equity Interest or the Pledgor's obligation under this Agreement occurs, the Pledgor shall notify the Pledgee immediately, and the Pledgor shall provide financial guarantee for the amount of decrease in the value of the pledged Equity Interest in a form satisfactory to the Pledgee, if so requested by the Pledgee.

6.7 If permitted under applicable laws and regulations, the Pledgor shall undertake, or actively cooperate with the Pledgee to assist the Pledgee, to complete the relevant registration, filing or any other procedures required by the law and regulations in respect of the pledged Equity Interest.

7. Event of Default

7.1 The following events shall be regarded as events of default:

7.1.1 The Pledgor fails to perform the obligations under the Loan Arrangement and its supplementary agreements;

7.1.2 Beijing Perusal fails to make full payment of the Fees as scheduled under the Service Agreement;

7.1.3 The Pledgor makes any material misleading or mistaken representations or warranties under Section 5, and/or the Pledgor breaches any warranties under Section 5;

4

7.1.4 The Pledgor breaches the covenants under Section 6;

7.1.5 The Pledgor breaches other terms or conditions herein;

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent of the Pledgee;

7.1.7 The Pledgor's any external loan, security, compensation, covenants or any other compensation liabilities (1) are required to be repaid or performed prior to the scheduled date due to breach; or (2) are due but cannot be repaid or performed as scheduled and thereby cause the Pledgee to believe that the Pledgor's capacity to perform the obligations herein is affected;

7.1.8 Beijing Perusal is incapable of repaying the general debt or other debt;

7.1.9 This Agreement is illegal or the Pledgor is not capable of continuing to perform the obligations herein due to any reason except force majeure;

7.1.10 The property of the Pledgor is adversely changed causing the Pledgee to believe that the capability of the Pledgor to perform the obligations herein is affected;

7.1.11 The successors or agents of Beijing Perusal are only able to perform a portion of or refuse to perform the payment obligation under the Service Agreement;

7.1.12 The breach of the other terms by action or omission under this Agreement by the Pledgor.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor is aware of or realize any event under Section 7.1 or any event that may result in the foregoing events.

7.3 Unless the event of default under Section 7.1 has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default happens or thereafter, may give a written Notice of Default to the Pledgor and require the Pledgor to immediately make full payment of the Loan and the outstanding Fees under the Service Agreement and other payables or exercise the Pledge right in accordance with Section 8.

8. Exercise of the Pledge

8.1 The Pledgor shall not transfer the Equity Interest without prior written consent of the Pledgee prior to the full repayment of the Loan or the Fees under the Service Agreement (whichever is later).

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the right of pledge.

8.3 Subject to Section 7.3, the Pledgee may exercise the right of pledge at any time when the Pledgee gives a Notice of Default in accordance with Section 7.3 or thereafter.

5

8.4 The Pledgee is entitled to a priority in receiving payment by the evaluation or proceeds from the auction or sale of whole or part of the Equity Interest pledged herein in accordance with legal procedure until the unpaid Fees under the Service Agreement, the outstanding debt and all other payables of Pledgor under Loan Arrangement are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the right of pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee can realize the Pledge.

9. Assignment

9.1 The Pledgor shall not donate or transfer the rights and obligations herein without prior consent of the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and the successors of the Pledgor, and be binding on the Pledgee and its each successor and assignee.

9.3 The Pledgee may transfer or assign its all or any rights and obligations under the Service Agreement, the Loan Arrangement and its supplementary agreements to any individual it specifies (natural person or legal entity) at any time. In this case, the assignee shall enjoy and undertake the same rights and obligations herein of the Pledgee as if the assignee is a party hereto. When the Pledgee transfers or assigns the rights and obligations under the Service Agreement, the Loan Arrangement and its supplementary agreements, and such transfer shall only be subject to a written notice serviced to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee's change resulting from the transfer or assignment, the new parties to the pledge shall execute a new pledge contract.

10. Effectiveness and Term

The agreement is executed as of the date first set forth above and effective from the date when the pledge is recorded on the register of shareholders of Beijing Perusal.

11. Termination

This Agreement shall not be terminated until the Loan under the Loan Arrangement and the Fees under the Service Agreement are paid off and the Pledgor does not undertake any obligations under the Loan Arrangement and Beijing Perusal does not undertake any obligations under the Service Agreement any more, and the Pledgee shall cancel or terminate this Agreement within reasonable time as soon as practicable thereafter.

6

12. Formalities Fees And Other Charges

12.1 [The Pledgor] shall be responsible for all the fees and actual expenses in relation to this Agreement including but not limited to legal fees, cost of production, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, [the Pledgor shall fully indemnify the Pledgee such taxes paid by the Pledgee.]

12.2 [The Pledgor shall be responsible for all the fees (including but not limited to any taxes, formalities fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with disposition of Pledge) incurred by the Pledgor for the reason that the Pledgor fails to pay any payable taxes, fees or charges for other reasons which cause the Pledgee to recourse by any means or ways.]

13. Force Majeure

13.1 Force Majeure, which includes but not limited to acts of governments, acts of nature, fire, explosion, typhoon, flood, earthquake, tide, lightning, war, refers to any unforeseen events beyond the party's reasonable control and cannot be prevented with reasonable care. However, any shortage of credit, capital or finance shall not be regarded as an event beyond a Party's reasonable control. The affected party by Force Majeure shall notify the other party of such event resulting in exemption promptly.

13.2 In the event that the affected party is delayed in or prevented from performing its obligations under this Agreement by Force Majeure, only within the scope of such delay or prevention, the affected party will not be responsible for any damage by reason of such a failure or delay of performance. The affected party shall take appropriate means to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both parties agree to resume the performance of this Agreement with their best efforts.

14. Confidentiality

The parties of this agreement acknowledge and make sure that all the oral and written materials exchanged relating to this contract are confidential. All the parties have to keep them confidential and cannot disclose them to any other third party without other parties' prior written approval, unless: (a) the public know and will know the materials (not because of the disclosure by any contractual party); (b) the disclosed materials are required by laws or stock exchange rules; or (c) materials relating to this transaction are disclosed to parties' legal consultants or financial advisors, however, who have to keep them confidential as well. Disclosure of the confidential by Employees or hired institutions of the parties is deemed as the act by the parties, therefore, subjecting them to liability.

15. Dispute Resolution

15.1 This Agreement shall be governed by and construed in accordance with the PRC law.

7

15.2 The parties shall strive to settle any dispute arising from the interpretation or performance, or in connection with this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, and the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing. The arbitration award shall be final and binding upon the parties.

16. Notice

Any notice which is given by the parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. Where such notice is delivered in person, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business date or reaches the addressee after the business time, the next business day following such day is the date of notice. The delivery place is the address first written above of the parties hereto or the address advised in writing including facsimile and telex from time to time.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing

Telephone: 010-59928888

Party B: Yazhu Zhang

Address:

Telephone:

17. Entire Agreement

Notwithstanding the provisions under Article 10, all parties agree that this Agreement constitute the entire agreement of the Parties with respect to the subject matters therein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to this Agreement.

18. Severability

Any provision of this Agreement which is invalid or unenforceable because of inconsistency with the relevant laws shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without affecting in any way the remaining provisions hereof.

8

19. Appendices

The appendices to this Agreement are integral parts of this Agreement.

20. Amendment or Supplement

20.1 The parties may amend and supply this Agreement with a written agreement. The amendment and supplement duly executed and signed by both parties shall be part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modification, supplements, additions or changes hereto shall be in writing and come into effect upon being executed and sealed by the parties hereto.

21. Counterparts

This Agreement is executed in Chinese in two originals, each party holding one original. All the originals shall have the same legal effect.

[No text below]

9

IN WITNESS WHEREOF, each party hereto have caused this Agreement to be duly executed by its legal representative or authorized representative on its behalf as of the date first set forth above.

Pledgee: Baidu Online Network Technology (Beijing) Co., Ltd.

Legal representative/authorized representative: /s/ Zhan Wang

Company seal (with the company seal of Baidu Online Network Technology (Beijing) Co., Ltd.)

Pledgor:    Yazhu Zhang

Signature:  /s/ Yazhu Zhang

10

Appendix:

1. Register of shareholders of Beijing Perusal.

2. Resolutions of the General Shareholders' Meeting of Beijing Perusal.

11

Appendix I

Register of shareholders of Beijing Perusal

Name of the shareholder: Jiping Liu

ID number:

Residential address:

Capital contribution: RMB1,004,000,000

Percentage of capital contribution: 80%

No. of the certificate of capital contribution:

Name of the shareholder: Yazhu Zhang

ID number:

Residential address:

Capital contribution: RMB251,000,000,000

Percentage of capital contribution: 20%

No. of the certificate of capital contribution:

Jiping Liu holds 80% of the shares of Beijing Perusal Technology Co., Ltd. which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Yazhu Zhang holds 20% of the shares of Beijing Perusal Technology Co., Ltd. which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the shares in Beijing Perusal Technology Co., Ltd.

Beijing Perusal Technology Co., Ltd.

Signature: /s/ Zhan Wang
Title:      Legal representative (with the company
            seal of Beijing Perusal Technology Co.,
            Ltd.)

Date: December 16, 2015

12

Appendix II

Resolutions of the General Shareholders' Meeting of Beijing Perusal

As for the Amended and Restated Equity Pledge Agreement executed on December 16, 2015 between the shareholders of Beijing Perusal Technology Co., Ltd. (the "Company") and Baidu Online Network Technology (Beijing) Co., Ltd., the general shareholders' meeting of the Company made a resolution unanimously as follows:

Approve the shareholders of the Company to pledge all their equity interest of the company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was executed and submitted on December 16, 2015 by the following shareholders:

Shareholder:  Jiping Liu

Signature:     /s/ Jiping Liu

Shareholder:  Yazhu Zhang

Signature:     /s/ Yazhu Zhang

13

*This document is a translation of the original text in Chinese*

**Amended and Restated Equity Pledge Agreement 5**

This Amended and Restated Equity Pledge Agreement (this "Agreement"), dated December 16, 2015 is made in Beijing by and between:

Pledgee:

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing

Pledgor:

Party B: Jiping Liu

Address:

WHEREAS:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC and owns 80% of the equity interest in Beijing Perusal Technology Co., Ltd., a limited liability company registered in Beijing, PRC ("Beijing Perusal").

3. Party A and Party B entered into an Amended and Restated Loan Agreement 5 on December 16, 2015, pursuant to which Party A made a loan in an amount of RMB1,004,000,000 (the "Loan") to Party B (the "Loan Arrangement").

4. Party A and Beijing Perusal entered into an Exclusive Technology Consulting and Service Agreement (the "Service Agreement") on June 23, 2006. The term of the Service Agreement is 10 years. Pursuant to the Service Agreement, Beijing Perusal shall pay Party A consulting and service fees (the "Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will perform the obligations under the Loan Agreement and Party A can collect the Fees from Beijing Perusal which is held by Party B, Party B agrees to pledge all the equity interest in Beijing Perusal as security for the Loan and the Fees. Therefore, Party A (the "Pledgee") and Party B (the "Pledgor") intend to enter into this Agreement to specify their rights and obligations.

NOW THEREFORE, through friendly negotiation, the Pledgee and the Pledgor agree as follows:

14

1. Definitions:

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge" shall have the meaning specified in Section 2 of this Agreement.

1.2 "Equity Interest": refers to all of the equity interest in Beijing Perusal legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Loan and the Fees.

1.4 "Term of Pledge": refers to the period specified in Section 3.2 of this Agreement.

1.5 "Principal Agreements": refers to the Service Agreement and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Section 7.1 of this Agreement.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. Pledge

The Pledgor agrees to pledge the Equity Interest in Beijing Perusal to the Pledgee as security for (i) the obligations under the Loan Arrangement; and (ii) the obligations of Beijing Perusal under the Service Agreement. "Pledge" refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.

3. Rate of Pledge and Term of Pledge

3.1 Rate of Pledge

The rate of the Pledge shall be approximately 100%.

3.2 Term of Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the register of shareholders of Beijing Perusal and registered with the competent industrial and commercial authorities, and shall remain in effect until two (2) years after the obligations under the Principal Agreements have been fulfilled.

15

3.2.2 During the Term of Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that Pledgor do not perform the obligation under the Loan Arrangement or Beijing Perusal fails to pay the Fees under the Service Agreement.

4. Physical Possession Of Pledge Documents

4.1 During the Term of Pledge under this Agreement, the Pledgor shall deliver the physical possession of the certificate of capital contribution and the register of shareholders of Beijing Perusal to the Pledgee within one (1) week after the date of this Agreement.

4.2 The Pledgee shall be entitled to collect the dividends for the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the register of shareholders of Beijing Perusal (see Appendix I).

5. Representation and Warranty of the Pledgor

5.1 The Pledgor is the legal owner of the Equity Interest pledged. The Pledge has been duly approved by the shareholders' resolutions (see Appendix II).

5.2 The Pledgor did not pledge the Equity Interest and the Equity Interest is not encumbered to any other person except for the Pledgee.

6. Undertaking of the Pledgor

6.1 During the effective term of this Agreement, the Pledgor undertakes to the Pledgee for its benefit that the Pledgor shall:

6.1.1 Not transfer the Equity Interest, create or permit to create any pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent from the Pledgee;

6.1.2 Comply with and implement laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by the competent authority within five (5) days upon receiving such notices, orders or suggestions; and comply with such notices, orders or suggestions; or object to the foregoing matters at the reasonable request of the Pledgee or with consent from the Pledgee;

6.1.3 Timely notify the Pledgee of any events or any received notices which may affect the Pledgor's Equity Interest or any part of the Pledgor's right, and any events or any received notices which may change the Pledgor's any warranty and obligation under this Agreement or affect the Pledgor's performance of the obligations under this Agreement.

16

6.2 The Pledgor agrees that the Pledgee's right to the Pledge under this Agreement shall not be suspended or inhibited by any legal procedure launched by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any such other person.

6.3 The Pledgor undertakes to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute all the title certificates, contracts, and perform actions and cause other parties who have interests to take action, as required by the Pledgee, and facilitate the Pledgee to exercise its rights under this Agreement.

6.4 The Pledgor undertakes to the Pledgee to execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (natural person or a legal entity), and provide the notice, order and decision to the Pledgee within reasonable time if the Pledgee considers necessary.

6.5 The Pledgor undertakes to the Pledgee to comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefits of the Pledgee. The Pledgor shall compensate all the losses suffered by the Pledgee for the reasons that the Pledgor does not perform or fully perform such guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this agreement, in order to preserve and increase the value of the pledged Equity Interest, the Pledgor shall refrain from any act or omission that may negatively affect the value of the pledged Equity Interest. If any events that may negatively affect the value of the pledged Equity Interest or the Pledgor's obligation under this Agreement occurs, the Pledgor shall notify the Pledgee immediately, and the Pledgor shall provide financial guarantee for the amount of decrease in the value of the pledged Equity Interest in a form satisfactory to the Pledgee, if so requested by the Pledgee.

6.7 If permitted under applicable laws and regulations, the Pledgor shall undertake, or actively cooperate with the Pledgee to assist the Pledgee, to complete the relevant registration, filing or any other procedures required by the law and regulations in respect of the pledged Equity Interest.

7. Event of Default

7.1 The following events shall be regarded as events of default:

7.1.1 The Pledgor fails to perform the obligations under the Loan Arrangement and its supplementary agreements;

7.1.2 Beijing Perusal fails to make full payment of the Fees as scheduled under the Service Agreement;

7.1.3 The Pledgor makes any material misleading or mistaken representations or warranties under Section 5, and/or the Pledgor breaches any warranties under Section 5;

17

7.1.4 The Pledgor breaches the covenants under Section 6;

7.1.5 The Pledgor breaches other terms or conditions herein;

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent of the Pledgee;

7.1.7 The Pledgor's any external loan, security, compensation, covenants or any other compensation liabilities (1) are required to be repaid or performed prior to the scheduled date due to breach; or (2) are due but cannot be repaid or performed as scheduled and thereby cause the Pledgee to believe that the Pledgor's capacity to perform the obligations herein is affected;

7.1.8 Beijing Perusal is incapable of repaying the general debt or other debt;

7.1.9 This Agreement is illegal or the Pledgor is not capable of continuing to perform the obligations herein due to any reason except force majeure;

7.1.10 The property of the Pledgor is adversely changed causing the Pledgee to believe that the capability of the Pledgor to perform the obligations herein is affected;

7.1.11 The successors or agents of Beijing Perusal are only able to perform a portion of or refuse to perform the payment obligation under the Service Agreement;

7.1.12 The breach of the other terms by action or omission under this Agreement by the Pledgor.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor is aware of or realize any event under Section 7.1 or any event that may result in the foregoing events.

7.3 Unless the event of default under Section 7.1 has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default happens or thereafter, may give a written Notice of Default to the Pledgor and require the Pledgor to immediately make full payment of the Loan and the outstanding Fees under the Service Agreement and other payables or exercise the Pledge right in accordance with Section 8.

8. Exercise of the Pledge

8.1 The Pledgor shall not transfer the Equity Interest without prior written consent of the Pledgee prior to the full repayment of the Loan or the Fees under the Service Agreement (whichever is later).

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the right of pledge.

8.3 Subject to Section 7.3, the Pledgee may exercise the right of pledge at any time when the Pledgee gives a Notice of Default in accordance with Section 7.3 or thereafter.

18

8.4 The Pledgee is entitled to a priority in receiving payment by the evaluation or proceeds from the auction or sale of whole or part of the Equity Interest pledged herein in accordance with legal procedure until the unpaid Fees under the Service Agreement, the outstanding debt and all other payables of Pledgor under Loan Arrangement are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the right of pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee can realize the Pledge.

9. Assignment

9.1 The Pledgor shall not donate or transfer the rights and obligations herein without prior consent of the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and the successors of the Pledgor, and be binding on the Pledgee and its each successor and assignee.

9.3 The Pledgee may transfer or assign its all or any rights and obligations under the Service Agreement, the Loan Arrangement and its supplementary agreements to any individual it specifies (natural person or legal entity) at any time. In this case, the assignee shall enjoy and undertake the same rights and obligations herein of the Pledgee as if the assignee is a party hereto. When the Pledgee transfers or assigns the rights and obligations under the Service Agreement, the Loan Arrangement and its supplementary agreements, and such transfer shall only be subject to a written notice serviced to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee's change resulting from the transfer or assignment, the new parties to the pledge shall execute a new pledge contract.

10. Effectiveness and Term

The agreement is executed as of the date first set forth above and effective from the date when the pledge is recorded on the register of shareholders of Beijing Perusal.

11. Termination

This Agreement shall not be terminated until the Loan under the Loan Arrangement and the Fees under the Service Agreement are paid off and the Pledgor does not undertake any obligations under the Loan Arrangement and Beijing Perusal does not undertake any obligations under the Service Agreement any more, and the Pledgee shall cancel or terminate this Agreement within reasonable time as soon as practicable thereafter.

19

12. Formalities Fees And Other Charges

12.1 [The Pledgor] shall be responsible for all the fees and actual expenses in relation to this Agreement including but not limited to legal fees, cost of production, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, [the Pledgor shall fully indemnify the Pledgee such taxes paid by the Pledgee.]

12.2 [The Pledgor shall be responsible for all the fees (including but not limited to any taxes, formalities fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with disposition of Pledge) incurred by the Pledgor for the reason that the Pledgor fails to pay any payable taxes, fees or charges for other reasons which cause the Pledgee to recourse by any means or ways.]

13. Force Majeure

13.1 Force Majeure, which includes but not limited to acts of governments, acts of nature, fire, explosion, typhoon, flood, earthquake, tide, lightning, war, refers to any unforeseen events beyond the party's reasonable control and cannot be prevented with reasonable care. However, any shortage of credit, capital or finance shall not be regarded as an event beyond a Party's reasonable control. The affected party by Force Majeure shall notify the other party of such event resulting in exemption promptly.

13.2 In the event that the affected party is delayed in or prevented from performing its obligations under this Agreement by Force Majeure, only within the scope of such delay or prevention, the affected party will not be responsible for any damage by reason of such a failure or delay of performance. The affected party shall take appropriate means to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both parties agree to resume the performance of this Agreement with their best efforts.

14. Confidentiality

The parties of this agreement acknowledge and make sure that all the oral and written materials exchanged relating to this contract are confidential. All the parties have to keep them confidential and cannot disclose them to any other third party without other parties' prior written approval, unless: (a) the public know and will know the materials (not because of the disclosure by any contractual party); (b) the disclosed materials are required by laws or stock exchange rules; or (c) materials relating to this transaction are disclosed to parties' legal consultants or financial advisors, however, who have to keep them confidential as well. Disclosure of the confidential by Employees or hired institutions of the parties is deemed as the act by the parties, therefore, subjecting them to liability.

15. Dispute Resolution

15.1 This Agreement shall be governed by and construed in accordance with the PRC law.

20

15.2 The parties shall strive to settle any dispute arising from the interpretation or performance, or in connection with this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, and the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing. The arbitration award shall be final and binding upon the parties.

16. Notice

Any notice which is given by the parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. Where such notice is delivered in person, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business date or reaches the addressee after the business time, the next business day following such day is the date of notice. The delivery place is the address first written above of the parties hereto or the address advised in writing including facsimile and telex from time to time.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing

Telephone: 010-59928888

Party B: Jiping Liu

Address:

Telephone:

17. Entire Agreement

Notwithstanding the provisions under Article 10, all parties agree that this Agreement constitute the entire agreement of the Parties with respect to the subject matters therein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to this Agreement.

18. Severability

Any provision of this Agreement which is invalid or unenforceable because of inconsistency with the relevant laws shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without affecting in any way the remaining provisions hereof.

21

19. Appendices

The appendices to this Agreement are integral parts of this Agreement.


20. Amendment or Supplement

20.1 The parties may amend and supply this Agreement with a written agreement. The amendment and supplement duly executed and signed by both parties shall be part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modification, supplements, additions or changes hereto shall be in writing and come into effect upon being executed and sealed by the parties hereto.


21. Counterparts

This Agreement is executed in Chinese in two originals, each party holding one original. All the originals shall have the same legal effect.

[No text below]

22

IN WITNESS WHEREOF, each party hereto have caused this Agreement to be duly executed by its legal representative or authorized representative on its behalf as of the date first set forth above.

Pledgee:    Baidu Online Network Technology (Beijing) Co., Ltd.

Legal representative/authorized representative:    /s/ Zhan Wang

Company seal (with the company seal of Baidu Online Network Technology (Beijing) Co., Ltd.)

Pledgor:    Yazhu Zhang

Signature:  /s/ Yazhu Zhang

23

Appendix:

1. Register of shareholders of Beijing Perusal.

2. Resolutions of the General Shareholders' Meeting of Beijing Perusal.

24

Appendix I

Register of shareholders of Beijing Perusal

Name of the shareholder: Jiping Liu

ID number:

Residential address:

Capital contribution: RMB1,004,000,000

Percentage of capital contribution: 80%

No. of the certificate of capital contribution:

Name of the shareholder: Yazhu Zhang

ID number:

Residential address:

Capital contribution: RMB251,000,000,000

Percentage of capital contribution: 20%

No. of the certificate of capital contribution:

Jiping Liu holds 80% of the shares of Beijing Perusal Technology Co., Ltd. which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Yazhu Zhang holds 20% of the shares of Beijing Perusal Technology Co., Ltd. which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the shares in Beijing Perusal Technology Co., Ltd.

Beijing Perusal Technology Co., Ltd.

Signature: /s/ Zhan Wang
Title:      Legal representative (with the company
            seal of Beijing Perusal Technology Co.,
            Ltd.)

Date: December 16, 2015

25

Appendix II

Resolutions of the General Shareholders' Meeting of Beijing Perusal

As for the Amended and Restated Equity Pledge Agreement executed on December 16, 2015 between the shareholders of Beijing Perusal Technology Co., Ltd. (the "Company") and Baidu Online Network Technology (Beijing) Co., Ltd., the general shareholders' meeting of the Company made a resolution unanimously as follows:

Approve the shareholders of the Company to pledge all their equity interest of the company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was executed and submitted on December 16, 2015 by the following shareholders:

Shareholder:  Jiping Liu

Signature:      /s/ Jiping Liu

Shareholder:  Yazhu Zhang

Signature:      /s/ Yazhu Zhang

26

**Exhibit 4.23**

*This document is a translation of the original text in Chinese*

**Amended and Restated Equity Purchase and Transfer Option Agreement 5**

This Amended and Restated Equity Purchase and Transfer Option Agreement (this "Agreement") is entered into by and among the following parties as of December 16, 2015 in Beijing:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Jiping Liu**

**Party C: Beijing Perusal Technology Co., Ltd.**

Address:   Room A2, 2/F, No.17 Building, Zhongguancun Software Park, No.8
           Northeast Wangxi Road, Haidian District, Beijing

Parties A, B and C are referred to as a "Party" individually and "Parties" collectively hereinafter.

**WHEREAS:**

1.   Party A, a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "PRC"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and professionals in information technology and service;

2.   Party C is a limited liability company incorporated in the PRC and engages in value-added telecommunication services, including internet information services.

3.   Party B is a shareholder of Party C, holding 80% of the shares in Party C (the "Equity Interest").

4.   Parties A and B entered into the Amended and Restated Loan Agreement 5 on December 16, 2015, pursuant to which Party B obtained an interest-free loan of RMB1,004,000,000 from Party A (the "Loan Arrangement") for Party B to invest in Party C.

5.   Parties A and C entered into a series of agreements, including Exclusive Technology Consulting and Service Agreement (the "Service Agreement"), on June 23, 2006.

6.   Parties A and B entered into the Amended and Restated Equity Pledge Agreement 5 (the "Equity Pledge Agreement) on December 16, 2015.

**NOWTHEREFORE,** the parties agree as follows:

1.   Purchase and Sale of Equity Interest

1.1   Grant of Rights

Party B (the "Transferor") hereby irrevocably grants to Party A an option to purchase or cause any designated person(s) ("Designated Persons") to purchase, to the extent permitted under PRC Law, according to the steps determined by Party A, at the price specified in Section 1.3 of this Agreement, at any time from the Transferor a portion or all of the equity interests held by Transferor in Party C (the "Option"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to the granting of the Option by Party B to Party A and/or the Designated Persons. The "person" set forth in this clause and this Agreement means an individual person, corporation, joint venture, partnership, enterprise, trust or a non-corporation organization.

1.2   Exercise Steps

Subject to the stipulations of PRC laws and regulation, Party A and/or the Designated Persons may exercise Option by issuing a written notice (the "Notice") to the Transferor and specifying the equity interest purchased from Transferor (the "Purchased Equity Interest") and the manner of purchase.

1.3    Purchase Price

1.3.1    For Party A to exercise the Option, the purchase price of the Purchased Equity Interest ("Purchase Price") shall be equal to the actual paid-in price of the Purchased Equity Interest by the Transferor, unless the applicable PRC laws and regulations require appraisal of the equity interests or stipulate other restrictions on the purchase price of equity interests.

1.3.2    If the applicable PRC laws require appraisal of the equity interests or stipulates other restrictions on the purchase price of Equity Interest at the time that Party A exercise the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under the applicable laws.


1.4    Transfer of the Purchased Equity Interest

Upon the exercise of the Option:

1.4.1    The Transferor shall, upon the terms and conditions of this Agreement and the Notice related to the Purchased Equity Interest, enter into Equity Interest Transfer Agreement with Party A and/or the Designated Persons (as applicable) in form satisfactory to Party A;

1.4.2    The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite approval and consent of the government, conduct all necessary actions, without any security interest or other conditions, transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons, and cause Party A and/or the Designated Persons to be the registered owner of the Purchased Equity Interest. In this Clause and this Agreement, "Security Interest" includes but is not limited to the ensure, mortgage, pledge, the right or interest of the third party, any purchase right of equity interest, right of acquisition, right of first refusal, right of set-off, ownership detainment or other security arrangements. But it does not include any security interest subject to the Equity Pledge Agreement.


1.5    Payment

The payment of the Purchase Price shall be determined by the consultation of Party A and/or the Designated Persons with the Transferor according to the applicable laws at the performance of Option. The Parties hereby agree that, subject to compliance with applicable laws and regulations, Transferor shall repay any amount that is paid by Party A and/or the Designated Persons to Transferor in connection with the Purchased Equity Interest to Party A (provided however that the Transferor may deduct from such repayment the amount of taxes and fees, if any, that were incurred as a result of the transaction contemplated by the Equity Interest Transfer Agreement).


2.    <u>Undertakings related to the Equity Interest</u>

2.1    Undertakings related to Party C

Party B and Party C hereby undertake that in relation to Party C:

2.1.1    Without prior written consent by Party A, not, in any form, to supplement, amend or modify the Articles of Association of Party C, to increase or decrease registered capital of the corporation, or to change the structure of the registered capital in any other forms;

2.1.2    According to fair finance and business standard and tradition, to maintain the existence of the corporation, prudently and effectively operate business and deal with works;

2.1.3    Without prior written consent by Party A, not, upon the execution of this Agreement, to sale, transfer, mortgage or dispose, in any other form, any asset, legitimate or beneficial interest of business or income of Party C, or to approve any other security interest set on it;

2.1.4    Without prior written notice by Party A, not cause, inherit, guarantee or allow the existence of any debt, other than (i) the debt arising from normal or daily business but not from borrowing; and (ii) the debt disclosed to Party A and obtained the written consent from Party A;

2.1.5    To normally operate all business to maintain the asset value of Party C, without make any action or nonfeasance that sufficiently affects its operation and asset value;

2

2.1.6    Without prior written consent by Party A, not to enter into any material agreement, other than the agreements in the process of normal business (as in this paragraph, the amount in the Agreement that exceeds five hundred thousand Yuan (RMB 500,000) shall be deemed as a material agreement);

2.1.7    Without prior written consent by Party A, not to provide loan or credit loan to any others;

2.1.8    Upon the request of Party A, to provide all materials of operation and finance of Party C;

2.1.9    Purchases and holds the insurance from the insurance company accepted by Party A. The insurance amount and category shall be the same with those held by the companies in the same area, operating the similar business and owning the similar properties and assets with Party C;

2.1.10    Without prior written consent by Party A, not to merger or associate with any person, or acquire or invest in any person;

2.1.11    To notify Party A of the occurrence or the potential occurrence of the litigation, arbitration or administrative procedure related to the assets, business and income of Party C;

2.1.12    In order to keep the ownership of Party C to all its assets, to execute all requisite or appropriate documents, do all requisite or appropriate action, and advance all requisite or appropriate accusation, or make requisite or appropriate plea for all claims;

2.1.13    Without prior written notice by Party A, not to assign dividends in any form to shareholders in any form, but to assign all or part of its assignable profits to their own shareholders upon the request by Party A;

2.1.14    According to the request of Party A, to appoint any person designated by Party A to be the directors of Party C.


2.2    Undertakings related to the Transferor

Party B hereby undertakes:

2.2.1    Without prior written consent by Party A, not, upon the execution of this Agreement, to sell, transfer, mortgage or dispose in any other form any legitimate or beneficial interest of equity interest, or to approve any other security interest set on it, with the exception of the pledge set on the equity interest of the Transferor subject to the Equity Pledge Agreement;

2.2.2    Without the prior written notice by Party A, not to decide or support or execute any shareholders resolution on the Party C's shareholders' meeting that approves any sale, transfer, mortgage or dispose of any legitimate or beneficial interest of equity interest, or allows any other security interest set on it, other than the pledge on the equity interests of Transferor pursuant to Equity Pledge Agreement;

2.2.3    With no prior written notice by Party A, not to agree or support or execute any shareholders resolution on the Party C's shareholders' meeting that approves Party C to merger or associate with any person, acquire any person or invest in any person;

2.2.4    To notify Party A the occurrence or the potential occurrence of the litigation, arbitration or administrative procedure related to the equity interest owned by Party B;

2.2.5    In order to keep its ownership of the equity interest, to execute all requisite or appropriate documents, conduct all requisite or appropriate actions, and make all requisite or appropriate claims, or make requisite or appropriate defense against claims of compensation;

2.2.6    Upon the request of Party A, to appoint any person designated by Party A to be the directors of Party C;

2.2.7    Upon the request of Party A at any time, to transfer its equity interest immediately to the representative designated by Party A unconditionally at any time and abandon its prior right of first refusal of such equity interest transferring to another current shareholder;

2.2.8    To prudently comply with the provisions of this Agreement and other agreements entered into collectively or respectively by the Transferor, Party C and Party A and perform all obligations under these agreements, without taking any action or any nonfeasance that sufficiently affects the validity and enforceability of these agreements;

3

2.2.9    To transfer all the dividends and profits in any other forms distributed by Party C to Party A.

2.3    Undertakings related to Party A

Party A undertakes:

2.3.1    Party A shall provide unlimited financial support to Party C unconditionally within an acceptable and reasonable scope when Party C needs any loan or financial support in any other form during its course of business;

2.3.2    Party A agrees to waive its right to Party C's repayment to the loans provided by Party A when Party C incurs losses during its operation and is unable to repay. Such inability of repayment shall be supported by sufficient evidence.

3.    Representations and Warranties

As of the execution date of this Agreement and every transferring date, the Transferor and Party C hereby represent and warrant collectively and respectively to Party A as follows:

3.1    It has the power and ability to enter into and deliver this Agreement, and any equity interest transferring Agreement (a "Transferring Agreement", respectively) to which it is a party, for every single transfer of the Purchased Equity Interest according to this Agreement, and to perform its obligations under this Agreement and any Transferring Agreement. Upon execution, this Agreement and the Transferring Agreements to which it is a party constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2    The execution, delivery of this Agreement and any Transferring Agreement and performance of the obligations under this Agreement and any Transferring Agreement does not: (i) cause to violate any relevant laws and regulations of PRC; (ii) constitute a conflict with its Articles of Association or other organizational documents; (iii) cause to breach any agreement or instruments to which it is a party or having binding obligation on it, or constitute the breach under any agreement or instruments to which it is a party or having binding obligation on it; (iv) cause to violate relevant authorization of any consent or approval to it and/or any continuing valid condition; or (v) cause any consent or approval authorized to it to be suspended, removed, or into which other requests be added;

3.3    Party C bears the kind and sellable ownership of all assets. Party C does not set any security interest on the said assets;

3.4    Party C does not have any unpaid debt, other than (i) debt arising from its normal business; and (ii) debt disclosed to Party A and obtained by the written consent from Party A;

3.5    No litigation, arbitration or administrative procedure relevant to the equity interest and assets of Party C or the corporation is in the process, to be settled or potentially take place;

3.6    The Transferor bears the fair and salable ownership of its equity interest without setting any security interest on the aforesaid assets, other than the security interest pursuant to the Equity Pledge Agreement.

4.    Assignment of Agreement

4.1    Party B and Party C shall not transfer their rights and obligations under this Agreement to any third party without the prior written consent of the Party A.

4.2    Party B and Party C hereby agree that Party A shall be able to transfer all of its rights and obligation under this Agreement to any third party with its needs, and such transfer shall only be subject to a written notice sent to Party B and Party C by Party A, and no any further consent from Party B and Party C will be required.

5.    Effective Date and Term

5.1    This Agreement shall be effective as of the date first set forth above.

4

5.2    This Agreement shall be terminated upon the legal transfer of all the shares held by Party B to Party A and/or its Designated Person pursuant to this Agreement.

5.3    If Party A or Party C is terminated by the expiration of its operating period (including any extended period) or other causes in the term set forth in Section 5.2, this Agreement shall be terminated simultaneously, except Party A has transferred its rights and obligations in accordance with Section 4.2 of this Agreement.

6.    Applicable Law and Dispute Resolution

6.1    Applicable Law

The execution, validity, construing and performance of this Agreement and the disputes resolution under this Agreement shall be governed by the laws of PRC.

6.2    Dispute Resolution

The parties shall strive to settle any dispute arising from the interpretation or performance in connection with this Agreement through friendly consultation. In case no settlement can be reached through consultation within thirty (30) days after such dispute is raised, each party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its rules. The arbitration shall take place in Beijing and the proceedings shall be conducted in Chinese. The arbitration award shall be final conclusive and binding upon both parties.

7.    Taxes and Expenses

Every Party shall, according to the PRC laws, bear any and all registering taxes, costs and expenses for equity transfer arising from the preparation and execution of this Agreement and all Transferring Agreements, and the completion of the transactions under this Agreement and all Transferring Agreements.

8.    Notices

Notices or other communications required to be given by any party pursuant to this Agreement shall be written in Chinese and delivered personally or sent by registered mail or postage prepaid mail or by a recognized courier service or by facsimile transmission to the address of relevant each party or both parties set forth below or other address of the party or of the other addressees specified by such party from time to time. The date when the notice is deemed to be duly served shall be determined as the follows: (a) a notice delivered personally is deemed duly served upon the delivery; (b) a notice sent by mail is deemed duly served the tenth (10th) day after the date when the air registered mail with postage prepaid has been sent out (as is shown on the postmark), or the fourth (4th) day after the delivery date to the internationally recognized courier service agency; and (c) a notice sent by facsimile transmission is deemed duly served upon the receipt time as is shown on the transmission confirmation of relevant documents.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing
Telephone: 010-59928888
Fax: 010-59928888

**Party B: Jiping Liu**
Address:
Telephone:
Fax:

**Party C: Beijing Perusal Technology Co., Ltd.**
Address: Room A2, 2/F, No.17 Building, Zhongguancun Software Park, No.8
    Northeast Wangxi Road, Haidian District, Beijing
Fax: 010-59927435
Telephone: 010-59928888

5

9.    Confidentiality

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the secrecy and confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

a.    The materials that is known or may be known by the public (but not include the materials disclosed by each party receiving the materials);

b.    The materials required to be disclosed subject to the applicable laws or the rules or provisions of stock exchange; or

c.    The materials disclosed by each Party to its legal or financial consultant relating the transaction of this Agreement, and this legal or financial consultant shall comply with the confidentiality set forth in this Section. The disclosure of the confidential materials by staff or employed institution of any Party shall be deemed as the disclosure of such materials by such Party, and such Party shall bear the liabilities for breaching the contract. This Clause shall survive whatever this Agreement is invalid, amended, revoked, terminated or unable to implement by any reason.

The disclosure of information by the staff of consultants of any party shall be deemed as the disclosure by the party itself. This Section 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10.    Further Warranties

The Parties agree to promptly execute documents reasonably required to perform the provisions and the aim of this Agreement or documents beneficial to it, and to take actions reasonably required to perform the provisions and the aim of this Agreement or actions beneficial to it.

11.    Miscellaneous

11.1    Amendment, Modification and Supplement

Any amendment and supplement of this Agreement shall be made by the Parties in writing. The amendment and supplement duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2    Entire Agreement

Notwithstanding Section 5 of this Agreement, the Parties acknowledge that this Agreement constitutes the entire agreement of the Parties with respect to the subject matters therein and supercede and replace all prior or contemporaneous agreements and understandings orally or/and in writing.

11.3    Severability

If any provision of this Agreement is judged as invalid or non-enforceable according to relevant Laws, the provision shall be deemed invalid only within the applicable area of the PRC Laws, and the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through fairly consultation, replace those invalid, illegal or non-enforceable provisions with valid provisions that may bring the similar economic effects with the effects caused by those invalid, illegal or non-enforceable provisions.

11.4    Headings

The headings contained in this Agreement are for the convenience of reference only and shall not affect the interpretation, explanation or in any other way the meaning of the provisions of this Agreement.

11.5    Language and Copies

This Agreement is executed in Chinese in three (3) copies; each Party holds one and each original copy has the same legal effect.

6

11.6    Successor

This Agreement shall bind and benefit the successor of each Party and the transferee allowed by each Party.

11.7    Survival

Any obligation taking place or at term hereof prior to the end or termination ahead of the end of this Agreement shall continue in force and effect notwithstanding the occurrence of the end or termination ahead of the end of the Agreement. Sections 6, 8, 9 and 11.7 hereof shall continue in force and effect after the termination of this Agreement.

11.8    Waiver

Any Party may waive the terms and conditions of this Agreement in writing with the signature of the Parties. Any waiver by a Party to the breach by other Parties within certain situation shall not be construed as a waiver to any similar breach by other Parties within other situations.

[No text below]

7

**IN WITNESS THEREFORE,** the parties hereof have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal representative/Authorized representative:      /s/ Zhan Wang

Company seal: (with the company seal of Baidu Online Network Technology (Beijing) Co., Ltd.)

**Party B: Jiping Liu**

Signature:      /s/ Jiping Liu

**Party C: Beijing Perusal Technology Co., Ltd.**

Legal representative/Authorized representative:      /s/ Zhan Wang

Company seal: (with the company seal of Beijing Perusal Technology Co., Ltd.)

*This document is a translation of the original text in Chinese*

**Amended and Restated Equity Purchase and Transfer Option Agreement 5**

This Amended and Restated Equity Purchase and Transfer Option Agreement (this "Agreement") is entered into by and among the following parties as of December 16, 2015 in Beijing:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Yazhu Zhang**

**Party C: Beijing Perusal Technology Co., Ltd.**

Address: Room A2, 2/F, No.17 Building, Zhongguancun Software Park, No.8
      Northeast Wangxi Road, Haidian District, Beijing

Parties A, B and C are referred to as a "Party" individually and "Parties" collectively hereinafter.

**WHEREAS:**

1.  Party A, a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "PRC"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and professionals in information technology and service;

2.  Party C is a limited liability company incorporated in the PRC and engages in value-added telecommunication services, including internet information services.

3.  Party B is a shareholder of Party C, holding 20% of the shares in Party C (the "Equity Interest").

4.  Parties A and B entereed into the Amended and Restated Loan Agreement 5 on December 16, 2015, pursuant to which Party B obtained an interest-free loan of RMB251,000,000 from Party A (the "Loan Arrangement") for Party B to invest in Party C.

5.  Parties A and C entered into a series of agreements, including Exclusive Technology Consulting and Service Agreement (the "Service Agreement"), on June 23, 2006.

6.  Parties A and B entered into the Amended and Restated Equity Pledge Agreement (the "Equity Pledge Agreement) on December 16, 2015.

**NOWTHEREFORE,** the parties agree as follows:

1.  Purchase and Sale of Equity Interest

1.1  Grant of Rights

Party B (the "Transferor") hereby irrevocably grants to Party A an option to purchase or cause any designated person(s) ("Designated Persons") to purchase, to the extent permitted under PRC Law, according to the steps determined by Party A, at the price specified in Section 1.3 of this Agreement, at any time from the Transferor a portion or all of the equity interests held by Transferor in Party C (the "Option"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to the granting of the Option by Party B to Party A and/or the Designated Persons. The "person" set forth in this clause and this Agreement means an individual person, corporation, joint venture, partnership, enterprise, trust or a non-corporation organization.

1.2  Exercise Steps

Subject to the stipulations of PRC laws and regulation, Party A and/or the Designated Persons may exercise Option by issuing a written notice (the "Notice") to the Transferor and specifying the equity interest purchased from Transferor (the "Purchased Equity Interest") and the manner of purchase.

1.3  Purchase Price

1.3.1  For Party A to exercise the Option, the purchase price of the Purchased Equity Interest ("Purchase

9

Price") shall be equal to the actual paid-in price of the Purchased Equity Interest by the Transferor, unless the applicable PRC laws and regulations require appraisal of the equity interests or stipulate other restrictions on the purchase price of equity interests.

1.3.2    If the applicable PRC laws require appraisal of the equity interests or stipulates other restrictions on the purchase price of Equity Interest at the time that Party A exercise the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under the applicable laws.

1.4    Transfer of the Purchased Equity Interest

Upon the exercise of the Option:

1.4.1    The Transferor shall, upon the terms and conditions of this Agreement and the Notice related to the Purchased Equity Interest, enter into Equity Interest Transfer Agreement with Party A and/or the Designated Persons (as applicable) in form satisfactory to Party A;

1.4.2    The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite approval and consent of the government, conduct all necessary actions, without any security interest or other conditions, transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons, and cause Party A and/or the Designated Persons to be the registered owner of the Purchased Equity Interest. In this Clause and this Agreement, "Security Interest" includes but is not limited to the ensure, mortgage, pledge, the right or interest of the third party, any purchase right of equity interest, right of acquisition, right of first refusal, right of set-off, ownership detainment or other security arrangements. But it does not include any security interest subject to the Equity Pledge Agreement.

1.5    Payment

The payment of the Purchase Price shall be determined by the consultation of Party A and/or the Designated Persons with the Transferor according to the applicable laws at the performance of Option. The Parties hereby agree that, subject to compliance with applicable laws and regulations, Transferor shall repay any amount that is paid by Party A and/or the Designated Persons to Transferor in connection with the Purchased Equity Interest to Party A (provided however that the Transferor may deduct from such repayment the amount of taxes and fees, if any, that were incurred as a result of the transaction contemplated by the Equity Interest Transfer Agreement).

2.    <u>Undertakings related to the Equity Interest</u>

2.1    Undertakings related to Party C

Party B and Party C hereby undertake that in relation to Party C:

2.1.1    Without prior written consent by Party A, not, in any form, to supplement, amend or modify the Articles of Association of Party C, to increase or decrease registered capital of the corporation, or to change the structure of the registered capital in any other forms;

2.1.2    According to fair finance and business standard and tradition, to maintain the existence of the corporation, prudently and effectively operate business and deal with works;

2.1.3    Without prior written consent by Party A, not, upon the execution of this Agreement, to sale, transfer, mortgage or dispose, in any other form, any asset, legitimate or beneficial interest of business or income of Party C, or to approve any other security interest set on it;

2.1.4    Without prior written notice by Party A, not cause, inherit, guarantee or allow the existence of any debt, other than (i) the debt arising from normal or daily business but not from borrowing; and (ii) the debt disclosed to Party A and obtained the written consent from Party A;

2.1.5    To normally operate all business to maintain the asset value of Party C, without make any action or nonfeasance that sufficiently affects its operation and asset value;

2.1.6    Without prior written consent by Party A, not to enter into any material agreement, other than the agreements in the process of normal business (as in this paragraph, the amount in the Agreement that exceeds five hundred thousand Yuan (RMB 500,000) shall be deemed as a material agreement);

10

2.1.7    Without prior written consent by Party A, not to provide loan or credit loan to any others;

2.1.8    Upon the request of Party A, to provide all materials of operation and finance of Party C;

2.1.9    Purchases and holds the insurance from the insurance company accepted by Party A. The insurance amount and category shall be the same with those held by the companies in the same area, operating the similar business and owning the similar properties and assets with Party C;

2.1.10    Without prior written consent by Party A, not to merger or associate with any person, or acquire or invest in any person;

2.1.11    To notify Party A of the occurrence or the potential occurrence of the litigation, arbitration or administrative procedure related to the assets, business and income of Party C;

2.1.12    In order to keep the ownership of Party C to all its assets, to execute all requisite or appropriate documents, do all requisite or appropriate action, and advance all requisite or appropriate accusation, or make requisite or appropriate plea for all claims;

2.1.13    Without prior written notice by Party A, not to assign dividends in any form to shareholders in any form, but to assign all or part of its assignable profits to their own shareholders upon the request by Party A;

2.1.14    According to the request of Party A, to appoint any person designated by Party A to be the directors of Party C.


2.2    Undertakings related to the Transferor

Party B hereby undertakes:

2.2.1    Without prior written consent by Party A, not, upon the execution of this Agreement, to sell, transfer, mortgage or dispose in any other form any legitimate or beneficial interest of equity interest, or to approve any other security interest set on it, with the exception of the pledge set on the equity interest of the Transferor subject to the Equity Pledge Agreement;

2.2.2    Without the prior written notice by Party A, not to decide or support or execute any shareholders resolution on the Party C's shareholders' meeting that approves any sale, transfer, mortgage or dispose of any legitimate or beneficial interest of equity interest, or allows any other security interest set on it, other than the pledge on the equity interests of Transferor pursuant to Equity Pledge Agreement;

2.2.3    With no prior written notice by Party A, not to agree or support or execute any shareholders resolution on the Party C's shareholders' meeting that approves Party C to merger or associate with any person, acquire any person or invest in any person;

2.2.4    To notify Party A the occurrence or the potential occurrence of the litigation, arbitration or administrative procedure related to the equity interest owned by Party B;

2.2.5    In order to keep its ownership of the equity interest, to execute all requisite or appropriate documents, conduct all requisite or appropriate actions, and make all requisite or appropriate claims, or make requisite or appropriate defense against claims of compensation;


2.2.6    Upon the request of Party A, to appoint any person designated by Party A to be the directors of Party C;

2.2.7    Upon the request of Party A at any time, to transfer its equity interest immediately to the representative designated by Party A unconditionally at any time and abandon its prior right of first refusal of such equity interest transferring to another current shareholder;

2.2.8    To prudently comply with the provisions of this Agreement and other agreements entered into collectively or respectively by the Transferor, Party C and Party A and perform all obligations under these agreements, without taking any action or any nonfeasance that sufficiently affects the validity and enforceability of these agreements;

2.2.9    To transfer all the dividends and profits in any other forms distributed by Party C to Party A.

11

2.3    Undertakings related to Party A

Party A undertakes:

2.3.1    Party A shall provide unlimited financial support to Party C unconditionally within an acceptable and reasonable scope when Party C needs any loan or financial support in any other form during its course of business;

2.3.2    Party A agrees to waive its right to Party C's repayment to the loans provided by Party A when Party C incurs losses during its operation and is unable to repay. Such inability of repayment shall be supported by sufficient evidence.

3.    Representations and Warranties

As of the execution date of this Agreement and every transferring date, the Transferor and Party C hereby represent and warrant collectively and respectively to Party A as follows:

3.1    It has the power and ability to enter into and deliver this Agreement, and any equity interest transferring Agreement (a "Transferring Agreement", respectively) to which it is a party, for every single transfer of the Purchased Equity Interest according to this Agreement, and to perform its obligations under this Agreement and any Transferring Agreement. Upon execution, this Agreement and the Transferring Agreements to which it is a party constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2    The execution, delivery of this Agreement and any Transferring Agreement and performance of the obligations under this Agreement and any Transferring Agreement does not: (i) cause to violate any relevant laws and regulations of PRC; (ii) constitute a conflict with its Articles of Association or other organizational documents; (iii) cause to breach any agreement or instruments to which it is a party or having binding obligation on it, or constitute the breach under any agreement or instruments to which it is a party or having binding obligation on it; (iv) cause to violate relevant authorization of any consent or approval to it and/or any continuing valid condition; or (v) cause any consent or approval authorized to it to be suspended, removed, or into which other requests be added;

3.3    Party C bears the kind and sellable ownership of all assets. Party C does not set any security interest on the said assets;

3.4    Party C does not have any unpaid debt, other than (i) debt arising from its normal business; and (ii) debt disclosed to Party A and obtained by the written consent from Party A;

3.5    No litigation, arbitration or administrative procedure relevant to the equity interest and assets of Party C or the corporation is in the process, to be settled or potentially take place;

3.6    The Transferor bears the fair and salable ownership of its equity interest without setting any security interest on the aforesaid assets, other than the security interest pursuant to the Equity Pledge Agreement.

4.    Assignment of Agreement

4.1    Party B and Party C shall not transfer their rights and obligations under this Agreement to any third party without the prior written consent of the Party A.

4.2    Party B and Party C hereby agree that Party A shall be able to transfer all of its rights and obligation under this Agreement to any third party with its needs, and such transfer shall only be subject to a written notice sent to Party B and Party C by Party A, and no any further consent from Party B and Party C will be required.

5.    Effective Date and Term

5.1    This Agreement shall be effective as of the date first set forth above.

5.2    This Agreement shall be terminated upon the legal transfer of all the shares held by Party B to Party A and/or its Designated Person pursuant to this Agreement.

5.3    If Party A or Party C is terminated by the expiration of its operating period (including any extended period) or other causes in the term set forth in Section 5.2, this Agreement shall be terminated simultaneously, except Party A has transferred its rights and obligations in accordance with Section 4.2 of this Agreement.

12

6.    Applicable Law and Dispute Resolution

6.1    Applicable Law

The execution, validity, construing and performance of this Agreement and the disputes resolution under this Agreement shall be governed by the laws of PRC.

6.2    Dispute Resolution

The parties shall strive to settle any dispute arising from the interpretation or performance in connection with this Agreement through friendly consultation. In case no settlement can be reached through consultation within thirty (30) days after such dispute is raised, each party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its rules. The arbitration shall take place in Beijing and the proceedings shall be conducted in Chinese. The arbitration award shall be final conclusive and binding upon both parties.

7.    Taxes and Expenses

Every Party shall, according to the PRC laws, bear any and all registering taxes, costs and expenses for equity transfer arising from the preparation and execution of this Agreement and all Transferring Agreements, and the completion of the transactions under this Agreement and all Transferring Agreements.

8.    Notices

Notices or other communications required to be given by any party pursuant to this Agreement shall be written in Chinese and delivered personally or sent by registered mail or postage prepaid mail or by a recognized courier service or by facsimile transmission to the address of relevant each party or both parties set forth below or other address of the party or of the other addressees specified by such party from time to time. The date when the notice is deemed to be duly served shall be determined as the follows: (a) a notice delivered personally is deemed duly served upon the delivery; (b) a notice sent by mail is deemed duly served the tenth (10th) day after the date when the air registered mail with postage prepaid has been sent out (as is shown on the postmark), or the fourth (4th) day after the delivery date to the internationally recognized courier service agency; and (c) a notice sent by facsimile transmission is deemed duly served upon the receipt time as is shown on the transmission confirmation of relevant documents.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Address: Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing
Telephone: 010-59928888
Fax: 010-59928888

**Party B: Yazhu Zhang**
Address:
Telephone:
Fax:

**Party C: Beijing Perusal Technology Co., Ltd.**
Address: Room A2, 2/F, No.17 Building, Zhongguancun Software Park, No.8 Northeast Wangxi Road, Haidian District, Beijing
Fax: 010-59927435
Telephone: 010-59928888

9.    Confidentiality

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the secrecy and confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

13

a. The materials that is known or may be known by the public (but not include the materials disclosed by each party receiving the materials);

b. The materials required to be disclosed subject to the applicable laws or the rules or provisions of stock exchange; or

c. The materials disclosed by each Party to its legal or financial consultant relating the transaction of this Agreement, and this legal or financial consultant shall comply with the confidentiality set forth in this Section. The disclosure of the confidential materials by staff or employed institution of any Party shall be deemed as the disclosure of such materials by such Party, and such Party shall bear the liabilities for breaching the contract. This Clause shall survive whatever this Agreement is invalid, amended, revoked, terminated or unable to implement by any reason.

The disclosure of information by the staff of consultants of any party shall be deemed as the disclosure by the party itself. This Section 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10. Further Warranties

The Parties agree to promptly execute documents reasonably required to perform the provisions and the aim of this Agreement or documents beneficial to it, and to take actions reasonably required to perform the provisions and the aim of this Agreement or actions beneficial to it.

11. Miscellaneous

11.1 Amendment, Modification and Supplement

Any amendment and supplement of this Agreement shall be made by the Parties in writing. The amendment and supplement duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2 Entire Agreement

Notwithstanding Section 5 of this Agreement, the Parties acknowledge that this Agreement constitutes the entire agreement of the Parties with respect to the subject matters therein and supercede and replace all prior or contemporaneous agreements and understandings orally or/and in writing.

11.3 Severability

If any provision of this Agreement is judged as invalid or non-enforceable according to relevant Laws, the provision shall be deemed invalid only within the applicable area of the PRC Laws, and the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through fairly consultation, replace those invalid, illegal or non-enforceable provisions with valid provisions that may bring the similar economic effects with the effects caused by those invalid, illegal or non-enforceable provisions.

11.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not affect the interpretation, explanation or in any other way the meaning of the provisions of this Agreement.

11.5 Language and Copies

This Agreement is executed in Chinese in three (3) copies; each Party holds one and each original copy has the same legal effect.

11.6 Successor

This Agreement shall bind and benefit the successor of each Party and the transferee allowed by each Party.

11.7 Survival

Any obligation taking place or at term hereof prior to the end or termination ahead of the end of this Agreement shall continue in force and effect notwithstanding the occurrence of the end or termination ahead of the end of the Agreement. Sections 6, 8, 9 and 11.7 hereof shall continue in force and effect after the termination of this Agreement.

11.8    Waiver

Any Party may waive the terms and conditions of this Agreement in writing with the signature of the Parties. Any waiver by a Party to the breach by other Parties within certain situation shall not be construed as a waiver to any similar breach by other Parties within other situations.

[No text below]

15

**IN WITNESS THEREFORE,** the parties hereof have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal representative/Authorized representative:     /s/ Zhan Wang

Company seal: (with the company seal of Baidu Online Network Technology (Beijing) Co., Ltd.)

**Party B: Yazhu Zhang**

Signature:     /s/ Yazhu Zhang

**Party C: Beijing Perusal Technology Co., Ltd.**

Legal representative/Authorized representative:     /s/ Zhan Wang

Company seal: (with the company seal of Beijing Perusal Technology Co., Ltd.)

16

**Exhibit 4.25**

*This document is a translation of the original text in Chinese*

**Amended and Restated Loan Agreement 5**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on December 16, 2015 in Beijing, by and between:

**Party A:   Baidu Online Network Technology (Beijing) Co., Ltd.**

Registered Address: 3/F, No. 10 Shanghdi 10th Street, Haidian District, Beijing

**Party B: Jiping Liu**

WHEREAS,

1.   Party A is a foreign invested enterprise incorporated under the laws of the PRC,

2.   Party B is a Chinese citizen, holding 80% of equity interests of Beijing Perusal Technology Co., Ltd. ("Beijing Perusal), and is the shareholder of Beijing Perusal;

3.   On July 9, 2015, Party A provided Party B with an interest-free loan of RMB 976 million yuan, used towards the investment in Beijing Perusal. With regards to such loan, Party A and Party B signed the Fourth Amended and Restated Loan Agreement (the "Original Loan Agreement") on July 9, 2015.

4.   The Parties propose to amend and restate the Original Loan Agreement as expressed herein.

Party A and Party B, through friendly consultation, agree as follows:

1.   In accordance with the terms and conditions of this Agreement, Party A agrees to provide an interest-free loan in the amount of RMB 1.004 billion yuan (RMB 1,004,000,000.00) to Party B, and Party B agrees to accept such loan.

2.   Party B confirms the receipt of such loan and has applied such loan toward payment of capital contribution of Beijing Perusal.

3.   The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

   a.   Party B leaves or is terminated from Party A or an affiliated company of Party A;

   b.   Party B's death, lack or limitation of civil capacity;

   c.   Party B engages in criminal act or is involved in criminal activities;

d.    Any third party filed a claim against Party B that exceeds RMB 100,000; or

e.    Subject to the laws of the PRC, Party A or a person designated by Party A is permitted invest in Beijing Perusal to conduct internet information service business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Beijing Perusal to such party pursuant to the provisions of the Exclusive Option Contract mentioned in article 4 hereof, to exercise purchase rights.

4.    The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designated other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Beijing Perusal held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Beijing Perusal to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance to the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the purchase price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to the above matters and have executed the Exclusive Option Contract.

5.    The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall transfer the equity interest in Beijing Perusal to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6.    The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Beijing Perusal to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, the extra amount over the principal of proceeds will be considered as the interests or capital use cost, to the extent permitted by the law, which shall be repaid to Party A.

7.    The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if the following requirements are met:

a.    Party B has transferred all his equity interests in Beijing Perusal to Party A and/or its designated person; and

b.    Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

8.    To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Beijing Perusal to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

2

9.  Party A hereby represents and warrants to Party B that, as of the execution date of this agreement:

    a.  Party A is a wholly-owned foreign enterprise incorporated and validly existing under the laws of the PRC;

    b.  Party A has the right to execute and perform this agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has taken necessary actions to get all necessary and appropriate approvals and authorizations;

    c.  The principal of the loan to Party B is legally owned by Party A;

    d.  The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party A and any third party, or any promise made by Party A to a third party; and

    e.  This Agreement shall constitute the legal, valid and binding obligations of Party A upon execution.

10. Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

    a.  Beijing Perusal is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Beijing Perusal;

    b.  Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

    c.  The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party B and any third party, or any promise made by Party B to a third party;

    d.  This Agreement shall constitute the legal, valid and binding obligations of Party B upon execution;

    e.  Party B has paid contribution in full for the equity interests he holds in Beijing Perusal in accordance with applicable laws and regulations;

    f.  Except the provisions stipulated in the equity pledge agreement and exclusive option agreement, Party B did not create any pledge or other security over his equity interest in Beijing Perusal, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

    g.  There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Beijing Perusal held by Party B;

    h.  Beijing Perusal has completed all necessary governmental approvals, licenses, registrations and filings.

11. Party B undertakes, during the term of this Agreement, to:

    a.  Not sell, transfer, pledge, dispose in any other manner of his equity interests in Beijing Perusal or other interests, and not allow to create other security interests over his equity interests without the prior written consent of Party A, except pledges or other rights created in the interest of Party A;

3

b.  Not consent, support or execute any shareholder resolutions at Beijing Perusal's shareholder's meetings that permit the sale, transfer, pledge, disposal in any manner of, and the creation of other security interests on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except where transferring his equity interest to Party A;

c.  Not consent, support or execute any shareholder resolutions at Beijing Perusal's shareholder meetings that permit Beijing Perusal to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

d.  Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to the equity interests of Beijing Perusal;

e.  Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain the equity interests of Beijing Perusal held by Party B;

f.  Refrain from any act or omission that may materially affect the assets, business and liabilities of Beijing Perusal without the prior written consent of Party A;

g.  Appoint any person nominated by Party A as the director of Beijing Perusal, subject to Party A's request;

h.  Transfer promptly and unconditionally, at any time, all equity interests in Beijing Perusal held by Party B to Party A or its designated person subject to the request of Party A, provided that such transfer is permitted under the laws of the PRC;

i.  Not request Beijing Perusal to distribute dividends or profits;

j.  Once Party B transfers his equity interest in Beijing Perusal to Party A or its designated person, he shall repay the consideration he receives as the principal and the interests or capital use cost to Party A if such repayment is permitted under the laws of the PRC;

k.  Strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that affects the validity and enforceability of this Agreement.

12. Party B, as the shareholder of Beijing Perusal, undertakes to cause Beijing Perusal, during the term of this Agreement, to:

a.  Not supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

b.  Operate its business and handle matters prudently and affectively according to good financial and business rules and practices;

c.  Not sell, transfer, mortgage, dispose of in any other manner, or to create other security interests on, any of its assets, business or legal or beneficial rights to its income without the prior written consent of Party A from the date of this Agreement;

d.  Not create, succeed to, guarantee or permit any liability, without the prior written consent of Party A, except (i) the liability arising from the ordinary or daily course of business operations, but not arising from the loan; and (ii) the liability disclosed to Party A or approved by Party A in writing;

e.  Operate all businesses on a continued basis and maintain the value of its assets;

4

f.  Not execute any material contracts (for the purpose of this section, a contract will be deemed material if its value exceeds RMB 100,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

g.  Provide information of all its operations and financial affairs at Party A's request;

h.  Not merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

i.  Not distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all profits that may be distributed to all shareholders.

j.  Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to its assets, business or revenue;

k.  Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain ownership of its assets;

l.  Strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Beijing Perusal and Party A and other agreements, duly perform its obligations under the Service Agreement and other agreements, and refrain from any act or omission that affects the validity and enforceability of the Service Agreement.

13. This Agreement shall be binding on, and only in the interest of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or assign any right, interest or obligation hereunder.

14. Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15. The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

a.  Both Parties shall strive to settle any dispute, conflicts, or compensation claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, each party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its rules. The arbitration award shall be final and conclusive and binding upon the Parties.

b.  The arbitration shall take place in Beijing.

c.  The arbitration language shall be Chinese.

17. This Agreement shall become effective on the date of execution. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B receives the loan, and shall expire as of the date on which both Parties complete their obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a material error, fraud, or other material unlawful action; or (b) upon Party A's bankruptcy.

5

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter herein and supersedes and replaces all prior or contemporaneous verbal and written agreements and understandings between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is due before the expiration or early termination of this agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, each Party shall hold on counterpart. All counterparts shall have the same legal effect.

**IN WITNESS WHEREOF**, each party hereto have caused this Agreement to be duly executed by its legal representative on its behalf as of the date first set forth above.

[No text below]

6

[No text on this page]

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal representative/authorized representative:

Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B:    Jiping Liu**

Signature: /s/ Jiping Liu

7

*This document is a translation of the original text in Chinese*

**Amended and Restated Loan Agreement 5**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on December 16, 2015 in Beijing, by and between:

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**

Registered Address: 3/F, No. 10 Shanghdi 10th Street, Haidian District, Beijing

**Party B: Yazhu Zhang**

WHEREAS,

5.    Party A is a foreign invested enterprise incorporated under the laws of the PRC,

6.    Party B is a Chinese citizen, holding 20% of equity interests of Beijing Perusal Technology Co., Ltd. ("Beijing Perusal), and is the shareholder of Beijing Perusal;

7.    On July 9, 2015, Party A provided Party B with an interest-free loan of RMB 244 million yuan, used towards the investment in Beijing Perusal. With regards to such loan, Party A and Party B signed the Fourth Amended and Restated Loan Agreement (the "Original Loan Agreement") on July 9, 2015.

8.    The Parties propose to amend and restate the Original Loan Agreement as expressed herein.

Party A and Party B, through friendly consultation, agree as follows:

25.    In accordance with the terms and conditions of this Agreement, Party A agrees to provide an interest-free loan in the amount of RMB 251 million yuan (RMB 251,000,000.00) to Party B, and Party B agrees to accept such loan.

26.    Party B confirms the receipt of such loan and has applied such loan toward payment of capital contribution of Beijing Perusal.

27.    The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

a.    Party B leaves or is terminated from Party A or an affiliated company of Party A;

b.    Party B's death, lack or limitation of civil capacity;

c.    Party B engages in criminal act or is involved in criminal activities;

d.    Any third party filed a claim against Party B that exceeds RMB 100,000; or

e.    Subject to the laws of the PRC, Party A or a person designated by Party A is permitted invest in Beijing Perusal to conduct internet information service

8

business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Beijing Perusal to such party pursuant to the provisions of the Exclusive Option Contract mentioned in article 4 hereof, to exercise purchase rights.

28. The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designated other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Beijing Perusal held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Beijing Perusal to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance to the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the purchase price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to the above matters and have executed the Exclusive Option Contract.

29. The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall transfer the equity interest in Beijing Perusal to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

30. The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Beijing Perusal to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, the extra amount over the principal of proceeds will be considered as the interests or capital use cost, to the extent permitted by the law, which shall be repaid to Party A.

31. The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if the following requirements are met:

    a.   Party B has transferred all his equity interests in Beijing Perusal to Party A and/or its designated person; and

    b.   Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

32. To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Beijing Perusal to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

33. Party A hereby represents and warrants to Party B that, as of the execution date of this agreement:

    a.   Party A is a wholly-owned foreign enterprise incorporated and validly existing under the laws of the PRC;

9

b.  Party A has the right to execute and perform this agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has taken necessary actions to get all necessary and appropriate approvals and authorizations;

c.  The principal of the loan to Party B is legally owned by Party A;

d.  The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party A and any third party, or any promise made by Party A to a third party; and

e.  This Agreement shall constitute the legal, valid and binding obligations of Party A upon execution.

34. Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

a.  Beijing Perusal is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Beijing Perusal;

b.  Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

c.  The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party B and any third party, or any promise made by Party B to a third party;

d.  This Agreement shall constitute the legal, valid and binding obligations of Party B upon execution;

e.  Party B has paid contribution in full for the equity interests he holds in Beijing Perusal in accordance with applicable laws and regulations;

f.  Except the provisions stipulated in the equity pledge agreement and exclusive option agreement, Party B did not create any pledge or other security over his equity interest in Beijing Perusal, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

g.  There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Beijing Perusal held by Party B;

h.  Beijing Perusal has completed all necessary governmental approvals, licenses, registrations and filings.

35. Party B undertakes, during the term of this Agreement, to:

a.  Not sell, transfer, pledge, dispose in any other manner of his equity interests in Beijing Perusal or other interests, and not allow to create other security interests over his equity interests without the prior written consent of Party A, except pledges or other rights created in the interest of Party A;

b.  Not consent, support or execute any shareholder resolutions at Beijing Perusal's shareholder's meetings that permit the sale, transfer, pledge, disposal in any manner of, and the creation of other security interests on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except where transferring his equity interest to Party A;

10

c.  Not consent, support or execute any shareholder resolutions at Beijing Perusal's shareholder meetings that permit Beijing Perusal to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

d.  Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to the equity interests of Beijing Perusal;

e.  Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain the equity interests of Beijing Perusal held by Party B;

f.  Refrain from any act or omission that may materially affect the assets, business and liabilities of Beijing Perusal without the prior written consent of Party A;

g.  Appoint any person nominated by Party A as the director of Beijing Perusal, subject to Party A's request;

h.  Transfer promptly and unconditionally, at any time, all equity interests in Beijing Perusal held by Party B to Party A or its designated person subject to the request of Party A, provided that such transfer is permitted under the laws of the PRC;

i.  Not request Beijing Perusal to distribute dividends or profits;

j.  Once Party B transfers his equity interest in Beijing Perusal to Party A or its designated person, he shall repay the consideration he receives as the principal and the interests or capital use cost to Party A if such repayment is permitted under the laws of the PRC;

k.  Strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that affects the validity and enforceability of this Agreement.

36.  Party B, as the shareholder of Beijing Perusal, undertakes to cause Beijing Perusal, during the term of this Agreement, to:

a.  Not supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

b.  Operate its business and handle matters prudently and affectively according to good financial and business rules and practices;

c.  Not sell, transfer, mortgage, dispose of in any other manner, or to create other security interests on, any of its assets, business or legal or beneficial rights to its income without the prior written consent of Party A from the date of this Agreement;

d.  Not create, succeed to, guarantee or permit any liability, without the prior written consent of Party A, except (i) the liability arising from the ordinary or daily course of business operations, but not arising from the loan; and (ii) the liability disclosed to Party A or approved by Party A in writing;

e.  Operate all businesses on a continued basis and maintain the value of its assets;

f.  Not execute any material contracts (for the purpose of this section, a contract will be deemed material if its value exceeds RMB 100,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

11

g.  Provide information of all its operations and financial affairs at Party A's request;

h.  Not merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

37.  This Agreement shall be binding on, and only in the interest of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or assign any right, interest or obligation hereunder.

38.  Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

39.  The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

40.  Arbitration

a.  Both Parties shall strive to settle any dispute, conflicts, or compensation claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, each party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its rules. The arbitration award shall be final and conclusive and binding upon the Parties.

b.  The arbitration shall take place in Beijing.

c.  The arbitration language shall be Chinese.

41.  This Agreement shall become effective on the date of execution. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B receives the loan, and shall expire as of the date on which both Parties complete their obligations hereunder.

42.  Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a material error, fraud, or other material unlawful action; or (b) upon Party A's bankruptcy.

43.  This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

44.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter herein and supersedes and replaces all prior or contemporaneous verbal and written agreements and understandings between the Parties.

45.  This Agreement is severable. The invalidity or unenforceability of any clause shall not affect the validity or enforceability of other clauses herein.

46.  Each Party shall protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

47.  Any obligation that is due before the expiration or early termination of this agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

12

48.  This Agreement shall be executed in two counterparts, each Party shall hold on counterpart. All counterparts shall have the same legal effect.

**IN WITNESS WHEREOF**, each party hereto have caused this Agreement to be duly executed by its legal representative on its behalf as of the date first set forth above.

[No text below]

13

[No text on this page]


**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal representative/authorized representative:

Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B:    Yazhu Zhang**

Signature: /s/ Yazhu Zhang

14

**Exhibit 4.30**

*This document is a translation of the original text in Chinese*

**AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT**

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC by the following parties on December 22, 2015:

Pledgee:

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Legal Address: 3/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

Pledgor:

Party B: Zhixiang Liang

WHEREAS,

1. Party A (the "Pledgee"), a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC"), and

2. Party B (the "Pledgor"), is a citizen of the PRC. The Pledgor owns 9% of the equity interest in Beijing BaiduPay Science and Technology Co., Ltd. (the "Company"), a limited liability company registered in Beijing, PRC (the "Company").

3. Party A made a loan in an amount of RMB 90,000,000 (hereinafter the "Loan") to Party B and the parties executed an amended and restated loan agreement (the "Loan Agreement") on December 22, 2015.

4. Party A and the Company entered into an Exclusive Technology Consulting and Services Agreement (the "Services Agreement") on February 28, 2008, the term of which will continue indefinitely. According to the Services Agreement, the Company shall pay fees relating to the technology consulting and services (the "Service Fees") provided by Party A.

5. In order to ensure that Party B will perform its obligations under the Loan Agreement and Party A will be able to collect Service Fees from the Company, the Pledgor agrees to pledge all his equity interest in the Company as security for the performance of his obligations under the Loan Agreement and for the Service Fees.

NOW THEREFORE, the Pledgee and the Pledgor through friendly negotiations hereby enter into this Agreement based upon the following terms:

1. Definitions and Interpretation

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interest": refers to all of the equity interest in the Company legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreement and the Loan Agreement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. Pledge

The Pledgor agrees to pledge his Equity Interest in the Company to the Pledgee as security for (i) his obligations under the Loan Agreement and (ii) the Company's obligations under the Services Agreement. The term "Pledge" under this Agreement refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.

3. Rate of Pledge and Term of Pledge

3.1 The rate of the Pledge

The rate of the Pledge shall be approximately 100%.

3.2 The term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of the Company and when the pledge is registered with the Administration for Industry and Commerce and shall remain in effect until two (2) years after the obligations under the Principal Agreement will have been fulfilled.

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that the Pledgor does not perform his obligations under the Loan Agreement or the Company does not perform his obligations under the Services Agreement.

2

4. Physical Possession of Documents

4.1 During the term of the Pledge under this Agreement, the Pledgor shall deliver the physical possession of his Certificate of Capital Contribution and the Register of Shareholders of the Company to the Pledgee within one (1) week from the execution date of this Agreement.

4.2 The Pledgee shall be entitled to collect the dividends for the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of the Company (See Appendix I).

5. Representation and Warranty of the Pledgor

5.1 The Pledgor is the legal owner of the Equity Interest pledged and the Pledge is officially passed on the Shareholders' Resolutions (See Appendix II).

5.2 Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6. Covenants of the Pledgor

6.1 During the term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

6.1.1 Not transfer or assign the Equity Interest, create or permit the existence of any other pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 Comply with laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions;

6.1.3 Timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2 The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

3

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and make access to exercise the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he/she will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he/she will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not perform any action/non-action which may affect the value of the Equity Interest to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any events which may affect the value decrease of the Equity Interest or the obligations under this Agreement, and shall provide security satisfactory to the Pledgee of the decreased value of the Equity Interest upon the Pledgee's request.

6.7 Under the permission of the applied laws or regulations, the Pledgor shall use his/her best efforts to cooperate with all the registration, record or other procedures relating to the Pledge.

7. Event of Default

7.1 The following events shall be regarded as events of default:

7.1.1 Pledgor fails to perform his obligations under the Loan Agreement;

7.1.2 The Company fails to pay the Services Fees in due course in full amount or perform other obligations under the Services Agreement;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches the covenants under Article 6 hereof;

7.1.5 The Pledgor breaches any other provision of this Agreement;

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

4

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8 The Company is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than force majeure;

7.1.10 There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or custodian of the Company only partially performs or refuses to perform the payment obligation under the Services Agreement.

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to his act or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at any time thereafter, may give a written notice of default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Agreement or under the Services Agreement or requesting to exercise the Pledge in accordance with Article 8 hereof.

8. Exercise of the Pledge

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full performance of his obligations under the Loan Agreement and full payment of all Service Fees under the Services Agreement, whichever is later.

8.2 The Pledgee shall give a notice of default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a notice of default in accordance with Article 7.3 or at anytime thereafter.

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Agreement and Services Agreement are repaid.

5

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9. Assignment

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Agreement to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee was an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Loan Agreement, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10. Effectiveness and Term

This Agreement is effective as of the date first set forth above and from the date when the pledge is recorded on the Company's Register of Shareholders.

11. Termination

This Agreement shall terminate when the loan under the Loan Agreement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Agreement and the Company no longer has any outstanding obligations under the Services Agreement. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

12. Fees and Other Charges

12.1 [The Pledgor] shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, [the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee].

6

12.2 [In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge)].

13. Force Majeure

13.1 Force Majeure, which includes but is not limited to acts of governments, acts of nature, fires, explosions, typhoons, floods, earthquake, tides, lightning or war, refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care. However, any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both parties agree to resume the performance of this Agreement using their best efforts.

14. Confidentiality

The parties to this Agreement acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the parties is deemed as an act by the parties, therefore, subjecting them to liability.

15. Dispute Resolution

15.1 This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the parties.

7

16. Notice

Any notice which is given by the parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. Where such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Address: 3/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

Facsimile: 5992-8888

Telephone:

Party B: Liang Zhixiang

Address:

Facsimile:

Telephone:

17. Entire Agreement

Notwithstanding Article 10, the parties agree that this Agreement constitutes the entire agreement of the parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

18. Severability

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

19. Appendices

The appendices to this Agreement shall constitute an integral part of this Agreement.

8

20. Amendment or Supplement

20.1 The parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the parties hereto.

21. Counterparts

This Agreement is executed in Chinese in duplicate, with each party hereto holding one copy. Both originals have the same legal effect.

[no text below]

9

[Signature Page]

Pledgee: Baidu Online Network Technology (Beijing) Co., Ltd.

Legal Representative/Authorized Representative:              /s/ Zhan Wang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

Pledgor: Liang Zhixiang

Signature: /s/ Zhixiang Liang

10

Appendix I

Register of shareholders of Beijing BaiduPay Science and Technology Co., Ltd.

Name of the Shareholder: Beijing Baidu Netcom Science Technology Co., Ltd.

Residential Address: 2/F, No. 10 Shangdi 10th Street, Haidian District, Beijing 10085.

Capital contribution: RMB 910,000,000

Percentage of capital contribution: 91%

No. of the certificate of capital contribution:

Name of shareholder: Zhixiang Liang

ID number:

Capital contribution: RMB 910,000,000

Percentage of capital contribution: 9%

No. of the certificate of capital contribution:

Liang Zhixiang holds 9% of the shares of Beijing BaiduPay Science and Technology Co., Ltd., which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 9% of the shares in Beijing BaiduPay Science and Technology Co., Ltd.

Beijing Baidu Netcom Science Technology Co., Ltd.

Signature: /s/ Zhixiang Liang

Name: Zhixiang Liang

Title: Legal representative (with the company seal of Beijing Baidu Netcom Science Technology Co., Ltd.)

Date: December 22, 2015

11

Appendix II

Resolutions of the General Shareholders' Meeting of Beijing BaiduPay Science and Technology Co., Ltd.

In respect of the Amended and Restated Equity Pledge Agreement executed on December 22, 2015 between the shareholders of Beijing BaiduPay Science and Technology Co., Ltd. and Beijing Online Network Technology (Beijing) Co., Ltd., the general shareholders' meeting of the Company made a resolution unanimously as follows:

Approve Zhixiang Liang, a shareholder of the Company, to pledge all of his equity interest in BaiduPay Science and Technology Co., Ltd. to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was executed and submitted on December 22, 2015.

Shareholder: Beijing Baidu Netcom Science Technology Co., Ltd.

Seal: /s/ Beijing Baidu Netcom Science Technology Co., Ltd.

Shareholder: Zhixiang Liang

Signature: /s/ Zhixiang Liang

Date: December 22, 2015

12

**Exhibit 4.31**

*This document is a translation of the original text in Chinese*

### AMENDED AND RESTATED EXCLUSIVE EQUITY PURCHASE AND TRANSFER OPTION AGREEMENT

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "Agreement") is entered into among the following parties in Beijing, PRC on December 22, 2015:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

**Legal Address:** Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Liang Zhixiang**

**ID Number:**

**Party C: Beijing BaiduPay Science and Technology Co., Ltd.**

**Legal Address**: 5/F., Baidu Building B, No. 10 Shangdi 10th Street, Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "Parties" and each of them is a "Party."

**WHEREAS:**

1. Party A, is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "PRC"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and expertise in information technology and service;

2. Party C, a liability limited company incorporated in the PRC and engages in value-added telecommunication services such as Internet information services;

3. Party B is the shareholder of Party C. Party B has ownership of 9% of the equity interest in Party C (the "Equity Interest");

4. Party A and Party B entered into an amended and restated loan agreement on December 22, 2015, pursuant to which Party B obtained an interest-free loan of RMB 90,000,000 from Party A (the "Loan Agreement") for Party B to invest in Party C;

5. Party A and Party C entered into an exclusive technology consulting and services agreement (the "Services Agreement") on February 28, 2008 and a series of agreements; and

6. Party A and Party B entered into an amended and restated equity pledge agreement (the "Equity Pledge Agreement") on December 22, 2015.

**NOW, THEREFORE**, the Parties upon negotiation hereby agree as follows:

1. Purchase and Sale of Equity Interest

1.1  Granting of Rights

Party B (hereafter, the "Transferor") hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("Designated Persons") to purchase, to the extent permitted under

PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from the Transferor, a portion of, or all of, the equity interests held by the Transferor in Party C (the "Option"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to the granting of the Option by Party B to Party A and/or the Designated Persons. The "person" set forth in this article and this Agreement means an individual person, corporation, joint venture, partnership, enterprise, trust or a non-corporation organization.

1.2     Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "Notice") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "Purchased Equity Interest") and the manner of such purchase.

1.3     Purchase Price

1.3.1   If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("Purchase Price") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2   If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

1.4     Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1   The Transferor shall, in accordance the terms and conditions of this Agreement and the Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in form satisfactory to Party A;

1.4.2   The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. In this article and this Agreement, "Security Interest" means guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership, detainment or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

1.5     Payment

The manner of payment of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor according to the applicable laws at the time of the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (excluding the tax fees and other fees incurred by the proposed transaction according to transfer agreements paid by the Transferor).

2

2.      Covenants Relating to the Equity Interest

2.1     Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1   Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2   To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3   Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

2.1.4   Not to create, succeed to, guarantee or permit any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5   To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6   Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7   Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8   To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

2.1.9   To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10  Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11  To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12  To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13  Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14  At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;


2.2     Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1   Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on Party B's Equity Interest in accordance with the Equity Pledge Agreement;

3

2.2.2   Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3   Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4   To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5   To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6   At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;

2.2.7   At any time, upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8   To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9   To transfer all dividends and any other form of profit allocated by Party C to Party A.


2.3   Covenants Relating to Party A

Party A hereby convenant:

2.3.1   Party A shall provide unlimited financial support to Party C unconditionally within an acceptable and reasonable scope when Party C needs any loan or financial support in any other form during its course of business;

2.3.2   If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it shall give up the rights of requiring Party C to repay the loan.


3.   <u>Representations and Warranties</u>

As of the execution date of this Agreement and every transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1   It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement ("Transfer Agreement") to which it is party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2   The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3   Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4   Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

4

3.5   There are currently no existing, pending or threatened litigation, arbitration or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6   The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.

4.   Assignment of Agreement

4.1   Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2   Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party without the consent of Party B and Party C, but such assignment shall be notified in writing to Party B and Party C.

5.   Effective Date and Term

5.1   This Agreement shall be effective as of the date first set forth above.

5.2   This Agreement is effective from the signing date, and will terminate after the newly created part of Equity Interest owned by Party B has been fully and legally transferred to Party A and/or the Designated Persons according to this Agreement.

5.3   If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.2, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.

6.   Applicable Law and Dispute Resolution

6.1   Applicable Law

The formation, validity, interpretation and performance of and settlement of disputes under this Agreement shall be governed by the laws of the PRC.

6.2   Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7.   Taxes and Expenses

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8.   Notices

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Address: 3/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile: (010)5992-8888
Telephone: (010)5992-8888

**Party B: Liang Zhixiang**
Address:
Facsimile:
Telephone:

**Party C: Beijing BaiduPay Science and Technology Co., Ltd.**
Address: 5/F., Baidu Building B, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile:
Telephone:

9.   Confidentiality

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

9.1      Materials that are or will become known by the public (through no fault of the receiving party);

9.2      Materials required to be disclosed by the applicable laws or rules of the stock exchange;

9.3      Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Section 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10.   Further Assurances

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11.   Miscellaneous

11.1   Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2   Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

11.3   Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

6

11.4   Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

11.5   Language and Copies

This Agreement is executed in Chinese in three copies; each Party holds one copy and each copy has the same legal effect.

11.6   Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

11.7   Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

11.8   Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

[Signature Page]

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal Representative/Authorized Representative: /s/ Zhan Wang

Seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Zhixiang Liang**

Signature: /s/ Zhixiang Liang

**Party C: Beijing BaiduPay Science and Technology Co., Ltd.**

Legal Representative/Authorized Representative: /s/ Zhixiang Liang

Seal: /s/ Beijing BaiduPay Science and Technology Co., Ltd.

7

**Exhibit 4.33**

*This document is a translation of the original text in Chinese*

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on December 22, 2015 in Beijing, by and between:

**Party A:   Baidu Online Network Technology (Beijing) Co., Ltd.**

Registered Address: 3/F, No. 10 Shanghdi 10th Street, Haidian District, Beijing

**Party B: Zhixiang Liang**

WHEREAS,

1. Party A is a foreign invested enterprise incorporated under the laws of the PRC,

2. Party B is a Chinese citizen, holding 9% of equity interests of Beijing Baidupay Science and Technology Co., Ltd. ("Baidupay"), and is the shareholder of Baidupay;

3. On September 16, 2014, Party A provided Party B with an interest-free loan of RMB 31.5 million yuan, used towards the investment in Baidupay. With regards to such loan, Party A and Party B signed the Amended and Restated Loan Agreement (the "Original Loan Agreement") on September 16, 2014.

4. The Parties propose to amend and restate the Original Loan Agreement as expressed herein.

Party A and Party B, through friendly consultation, agree as follows:

1. In accordance with the terms and conditions of this Agreement, Party A agrees to provide an interest-free loan in the amount of RMB 90 million yuan (RMB 90,000,000.00) to Party B, and Party B agrees to accept such loan.

2. Party B confirms the receipt of such loan and has applied such loan toward payment of capital contribution of Baidupay.

3. The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

    a. Party B leaves or is terminated from Party A or an affiliated company of Party A;

    b. Party B's death, lack or limitation of civil capacity;

    c. Party B engages in criminal act or is involved in criminal activities;

    d. Any third party filed a claim against Party B that exceeds RMB 100,000; or

e.   Subject to the laws of the PRC, Party A or a person designated by Party A is permitted invest in Baidupay to conduct internet information service business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Baidupay to such party pursuant to the provisions of the Exclusive Option Contract mentioned in article 4 hereof, to exercise purchase rights.

4.   The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designated other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Baidupay held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Baidupay to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance to the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the purchase price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to the above matters and have executed the Exclusive Option Contract.

5.   The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall transfer the equity interest in Baidupay to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6.   The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Baidupay to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, the extra amount over the principal of proceeds will be considered as the interests or capital use cost, to the extent permitted by the law, which shall be repaid to Party A.

7.   The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if the following requirements are met:

a.   Party B has transferred all his equity interests in Baidupay to Party A and/or its designated person; and

b.   Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

8.   To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Baidupay to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

2

9.  Party A hereby represents and warrants to Party B that, as of the execution date of this agreement:

    a.  Party A is a wholly-owned foreign enterprise incorporated and validly existing under the laws of the PRC;

    b.  Party A has the right to execute and perform this agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has taken necessary actions to get all necessary and appropriate approvals and authorizations;

    c.  The principal of the loan to Party B is legally owned by Party A;

    d.  The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party A and any third party, or any promise made by Party A to a third party; and

    e.  This Agreement shall constitute the legal, valid and binding obligations of Party A upon execution.

10. Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

    a.  Baidupay is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Baidupay;

    b.  Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

    c.  The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party B and any third party, or any promise made by Party B to a third party;

    d.  This Agreement shall constitute the legal, valid and binding obligations of Party B upon execution;

    e.  Party B has paid contribution in full for the equity interests he holds in Baidupay in accordance with applicable laws and regulations;

    f.  Except the provisions stipulated in the equity pledge agreement and exclusive option agreement, Party B did not create any pledge or other security over his equity interest in Baidupay, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

    g.  There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Baidupay held by Party B;

    h.  Baidupay has completed all necessary governmental approvals, licenses, registrations and filings.

11. Party B undertakes, during the term of this Agreement, to:

    a.  Not sell, transfer, pledge, dispose in any other manner of his equity interests in Baidupay or other interests, and not allow to create other security interests over his equity interests without the prior written consent of Party A, except pledges or other rights created in the interest of Party A;

3

b.   Not consent, support or execute any shareholder resolutions at Baidupay's shareholder's meetings that permit the sale, transfer, pledge, disposal in any manner of, and the creation of other security interests on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except where transferring his equity interest to Party A;

c.   Not consent, support or execute any shareholder resolutions at Baidupay's shareholder meetings that permit Baidupay to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

d.   Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to the equity interests of Baidupay;

e.   Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain the equity interests of Baidupay held by Party B;

f.   Refrain from any act or omission that may materially affect the assets, business and liabilities of Baidupay without the prior written consent of Party A;

g.   Appoint any person nominated by Party A as the director of Baidupay, subject to Party A's request;

h.   Transfer promptly and unconditionally, at any time, all equity interests in Baidupay held by Party B to Party A or its designated person subject to the request of Party A, provided that such transfer is permitted under the laws of the PRC;

i.   Not request Baidupay to distribute dividends or profits;

j.   Once Party B transfers his equity interest in Baidupay to Party A or its designated person, he shall repay the consideration he receives as the principal and the interests or capital use cost to Party A if such repayment is permitted under the laws of the PRC;

k.   Strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that affects the validity and enforceability of this Agreement.

12.   Party B, as the shareholder of Baidupay, undertakes to cause Baidupay, during the term of this Agreement, to:

a.   Not supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

b.   Operate its business and handle matters prudently and affectively according to good financial and business rules and practices;

c.   Not sell, transfer, mortgage, dispose of in any other manner, or to create other security interests on, any of its assets, business or legal or beneficial rights to its income without the prior written consent of Party A from the date of this Agreement;

d.   Not create, succeed to, guarantee or permit any liability, without the prior written consent of Party A, except (i) the liability arising from the ordinary or daily course of business operations, but not arising from the loan; and (ii) the liability disclosed to Party A or approved by Party A in writing;

e.   Operate all businesses on a continued basis and maintain the value of its assets;

4

f.   Not execute any material contracts (for the purpose of this section, a contract will be deemed material if its value exceeds RMB 100,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

g.   Provide information of all its operations and financial affairs at Party A's request;

h.   Not merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

i.   Not distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all profits that may be distributed to all shareholders.

j.   Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to its assets, business or revenue;

k.   Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain ownership of its assets;

l.   Strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Baidupay and Party A and other agreements, duly perform its obligations under the Service Agreement and other agreements, and refrain from any act or omission that affects the validity and enforceability of the Service Agreement.

13. This Agreement shall be binding on, and only in the interest of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or assign any right, interest or obligation hereunder.

14. Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15. The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

a.   Both Parties shall strive to settle any dispute, conflicts, or compensation claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, each party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its rules. The arbitration award shall be final and conclusive and binding upon the Parties.

b.   The arbitration shall take place in Beijing.

c.   The arbitration language shall be Chinese.

17. This Agreement shall become effective on the date of execution. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B receives the loan, and shall expire as of the date on which both Parties complete their obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a material error, fraud, or other material unlawful action; or (b) upon Party A's bankruptcy.

5

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter herein and supersedes and replaces all prior or contemporaneous verbal and written agreements and understandings between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is due before the expiration or early termination of this agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, each Party shall hold on counterpart. All counterparts shall have the same legal effect.

**IN WITNESS WHEREOF**, each party hereto have caused this Agreement to be duly executed by its legal representative on its behalf as of the date first set forth above.

[No text below]

6

[No text on this page]

**Party A:   Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal representative/authorized representative:

Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B:   Zhixiang Liang**

Signature: /s/ Zhixiang Liang

7

**Exhibit 4.41**

*This document is a translation of the original text in Chinese*

**AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT**

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC on December 31, 2015 by the following parties:

**Pledgee:**

**Party A:  Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal Address: 3rd Floor, Baidu Campus, No. 10, Shangdi 10th Street,, Haidian District, Beijing, PRC

**Pledgor:**

**Party B: Yanhong Li**

**WHEREAS,**

1.  Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2.  Party B is a citizen of the PRC and owns 99.5% of the equity interest in Beijing Baidu Netcom Science and Technology Co., Ltd., a limited liability company registered in Beijing, PRC (the "Company").

3.  Party A and Party B signed an amended and restated loan agreement on December 31, 2015, according to which Party B receives a loan (the "Loan Arrangement") in an amount of RMB 885,550,000.00 (the "Loan") from Party A.

4.  Party A and the Company signed an Exclusive Technology Consulting and Service Agreement (the "Service Agreement") on December 31, 2015, according to which the Company shall pay Party A consulting and services fees (the "Fees") for the technology consulting and services provided by Party A.

5.  In order to ensure that Party B will perform its obligations under the Loan Agreement and Party A will be able to receive the Fees from the Company, Party B agrees to pledge all his equity interest in the Company as security for the performance of his obligations under the Loan Agreement. Party A and Party B intend to enter into this Agreement to specify their respective rights and obligations.

6.  Each of Party A and Party B has entered into a number of equity pledge agreements set forth in Schedule I attached hereto with the parties thereto (collectively, the "Original Equity Pledge Agreements"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Equity Pledge Agreements.

**NOW THEREFORE**, the Pledgee and the Pledgor through friendly negotiations hereby enter into this Agreement based upon the following terms:

1.  Definitions and Interpretation

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1  "Pledge": refers to the full content of Article 2.

1.2  "Equity Interest": refers to all of the equity interest in the Company legally held by the Pledgor.

1.3  "Rate of Pledge": refers to the ratio between the value of the Pledge and the services fees under this Agreement and the total amount of the Loan.

1.4  "Term of Pledge": refers to the period set forth under Article 3.2.

1.5    "Master Agreement": refers to the Service Agreement and agreements under the Loan arrangement.

1.6    "Event of Default": refers to any event listed in Article 7.1.

1.7    "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2.    Pledge

The Pledgor agrees to pledge his Equity Interest in the Company to the Pledgee as security for (i) all his obligations under the Loan arrangement and (ii) all the liabilities of the Company under Service Agreement. The term "Pledge" under this Agreement refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.

3.    Rate of Pledge and Term of Pledge

3.1    The rate of the Pledge

The rate of the Pledge shall be approximately 100%.

3.2    The term of the Pledge

3.2.1    The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of the Company and registered in authorized administration of industry and commerce, and shall remain in effect until two (2) years after the obligations under the Master Agreement will have been fulfilled.

3.2.2    During the term of the Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that the Pledgor does not perform his obligations under the Loan arrangement or the Company fails to pay services fees under the Service Agreement.

4.    Physical Possession of Documents

4.1    During the term of the Pledge under this Agreement, the Pledgor shall deliver the physical possession of his/her Certificate of Capital Contribution and the Register of Shareholders of the Company to the Pledgee within one (1) week from the execution date of this Agreement.

4.2    The Pledgee shall be entitled to collect the dividends for the Equity Interest.

4.3    The Pledge under this Agreement will be recorded in the Register of Shareholders of the Company (See Schedule II).

5.    Representation and Warranty of the Pledgor

5.1    The Pledgor is the legal owner of the Equity Interest pledged and has received approval for the pledge under this agreement through resolutions of shareholders' meetings (see Schedule III).

5.2    Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6.    Covenants of the Pledgor

6.1    During the effective term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

2

6.1.1    Not transfer or assign the Equity Interest, create or permit the existence of any other pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2    Comply with laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions;

6.1.3    Timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2    The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

6.3    The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and provide facilities for exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4    The Pledgor promises to the Pledgee that he will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5    The Pledgor promises to the Pledgee that he/she will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6    During the term of this Agreement, the Pledgor will not conduct any act and omission that may influence the value of the pledged shares for the purpose to keep or increase the value of the pledged shares. The Pledgor will notice the Pledgee immediately when there are issues that may decrease the value of the Pledged shares or influence the Pledgor's performance of any obligations under this Agreement and, as required by the Pledgee, provide guarantee for the difference of the decreased pledged shares to the Pledgee's satisfaction.

6.7    To the extent permitted by applicable laws and regulations, the Pledgor shall assist the Pledgee with the registration, filing or any other processes as required by the laws and regulations.


7.    Event of Default

7.1    The following events shall be regarded as events of default:

7.1.1    Pledgor fails to perform his obligations under the Loan Arrangement;

7.1.2    The Company fails to fully pay the fees on schedule under the Service Agreement;

3

7.1.3   Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4   The Pledgor breaches the covenants under Article 6 hereof;

7.1.5   The Pledgor breaches any other provision of this Agreement;

7.1.6   The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

7.1.7   Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8   The Company is incapable of repaying its ordinary debts or other debts;

7.1.9   This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than force majeure;

7.1.10  There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11  Successor or trustee of the Company can only perform part of, or refuses to perform, the payment obligations under the Service Agreement;

7.1.12  The breach of the other provisions of this Agreement by the Pledgor due to his/her act or omission.

7.2   The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3   Unless an event of default under Article 7.1 hereof has been resolved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at anytime thereafter, may give a written notice of default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Service Agreement and Loan arrangement or requesting to exercise the Pledge in accordance with Article 8 hereof.


8.   Exercise of the Pledge

8.1   The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full repayment of the Fees under the Service Agreement or full performance of his/her obligations under the Loan Agreement, whichever is later.

8.2   The Pledgee shall give a notice of default to the Pledgor when the Pledgee exercises the Pledge.

8.3   Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a notice of default in accordance with Article 7.3 or at anytime thereafter.

8.4   The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Service Agreement are repaid.

4

8.5     The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9.     Assignment

9.1     The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2     This Agreement shall be binding upon the Pledgor and his/her successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3     To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Service Agreement and Loan arrangement to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee was an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Service Agreement and Loan arrangement, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4     After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10.     Effectiveness and Term

This Agreement is effective as of the date first set forth above and from the date when the pledge is recorded on the Company's Register of Shareholders.

11.     Termination

This Agreement shall terminate when the Loan under the Loan arrangement the Fees under Service Agreement have been fully repaid, and the Pledgor no longer has any outstanding obligations under the Loan Agreement. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

12.     Fees and Other Charges

12.1     The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2     In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

13.     Force Majeure

13.1     Force Majeure, which includes but is not limited to acts of governments, change of laws and regulations, acts of nature, fires, explosions, typhoons, floods, earthquake, tides, lightning or war, refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care. However, any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2     In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both parties agree to resume the performance of this Agreement using their best efforts.

5

14. Confidentiality

The parties to this Agreement acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and can not disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the parties is deemed as an act by the parties, therefore, subjecting them to liability.

15. Dispute Resolution

15.1  This Agreement shall be governed by and construed in accordance with PRC law.

15.2  The parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the parties.

16. Notice

Any notice which is given by the parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing to the bellowing address. Where such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

**Party A:Baidu Online Network Technology (Beijing) Co., Ltd.**
Legal Address: 3rd Floor, Baidu Campus, No. 10, Shangdi 10th Street,, Haidian District, Beijing, PRC
Fax: 5992-7435
Tel: 5992-8888

**Party B: Yanhong Li**
Address:
Fax:
Tel:

17. Entire Agreement

Notwithstanding the provisions in Article 10, the Parties agree that this Agreement constitutes the entire agreement of the parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

18. Severability

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

6

19. Appendices

The appendices to this Agreement shall constitute an integral part of this Agreement.

20. Amendment or Supplement

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the parties hereto.

21. Counterparts

This Agreement is executed in Chinese in duplicate, with each party hereto holding one copy. Both originals have the same legal effect.

[no text below]

7

[Signature Page]

**Pledgee: Baidu Online Network Technology (Beijing) Co., Ltd.**

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

Legal/authorized representative:    /s/Zhan Wang

**Pledgor: Yanhong Li**

Signature: /s/Yanhong Li

Schedule I

Original Equity Pledge Agreements

| Serial number | Name | Parties | Date |
|---|---|---|---|
| 1 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.<br>Yanhong Li<br>Yong Xu | 20050322 |
| 2 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.<br>Haoyu Shen | 20110119 |
| 3 | Supplement to the Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.<br>Yanhong Li<br>Haoyu Shen<br>Zhan Wang | 20110826 |
| 4 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.<br>Yanhong Li | 20111201 |
| 5 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.<br>Yanhong Li | 20151130 |

Schedule II

Register of shareholders of Beijing Baidu Netcom Science and Technology Co., Ltd.

Name of the Shareholder: Yanhong Li

ID number:

Residential Address:

Capital contribution: RMB 885,550,000.00

Percentage of capital contribution: 99.5%

No. of the certificate of capital contribution: 001

Yanhong Li holds 99.5% of the shares of Beijing Baidu Netcom Science and Technology Co., Ltd., all of which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Name of shareholder: Zhan Wang

ID number:

Residential Address:

Capital contribution: RMB 4,450,000.00

Percentage of capital contribution: 0.5%

No. of the certificate of capital contribution: 002

Zhan Wang holds 0.5% of the shares of Beijing Baidu Netcom Science and Technology Co., Ltd., all of which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% shares in Baidu Online Network Technology (Beijing) Co., Ltd.

Beijing Baidu Netcom Science Technology Co., Ltd.

Signature: /s/ Zhixiang Liang

Name: Zhixiang Liang

Title: Legal representative (with the company seal of Beijing Baidu Netcom Science Technology Co., Ltd.)

Date: December 31, 2015

Schedule III

Resolutions of the General Shareholders' Meeting of Beijing Baidu Netcom Science and Technology Co., Ltd.

In respect of the Amended and Restated Equity Pledge Agreement executed on December 31, 2015 between the shareholders of Beijing Baidu Netcom Science and Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., the general shareholders' meeting of the Company made a resolution unanimously as follows:

Approve each shareholder of the Company to pledge all of his equity interest in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was executed and submitted on December 31, 2015.

Shareholders:

/s/ Yanhong Li

/s/ Zhan Wang

**Exhibit 4.42**

*This document is a translation of the original text in Chinese*

## AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC on December 31, 2015 by the following parties:

**Pledgee:**

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal Address: 3rd Floor, Baidu Campus, No. 10, Shangdi 10th Street,, Haidian District, Beijing, PRC

**Pledgor:**

**Party B: Zhan Wang**

Address:

**WHEREAS,**

1.   Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2.   Party B is a citizen of the PRC and owns 0.5% of the equity interest in Beijing Baidu Netcom Science and Technology Co., Ltd., a limited liability company registered in Beijing, PRC (the "Company").

3.   Party A and Party B signed an amended and restated loan agreement on December 31, 2015, according to which Party B receives a loan (the "Loan Arrangement") in an amount of RMB 4,450,000.00 (the "Loan") from Party A.

4.   Party A and the Company signed an Exclusive Technology Consulting and Service Agreement (the "Service Agreement") on December 31, 2015, according to which the Company shall pay Party A consulting and services fees (the "Fees") for the technology consulting and services provided by Party A.

5.   In order to ensure that Party B will perform its obligations under the Loan Agreement and Party A will be able to receive the Fees from the Company, Party B agrees to pledge all his equity interest in the Company as security for the performance of his obligations under the Loan Agreement. Party A and Party B intend to enter into this Agreement to specify their respective rights and obligations.

6.   Each of Party A and Party B has entered into a number of equity pledge agreements set forth in Schedule I attached hereto with the parties thereto (collectively, the "Original Equity Pledge Agreements"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Equity Pledge Agreements.

**NOW THEREFORE**, the Pledgee and the Pledgor through friendly negotiations hereby enter into this Agreement based upon the following terms:

1.   Definitions and Interpretation

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1   "Pledge": refers to the full content of Article 2.

1.2   "Equity Interest": refers to all of the equity interest in the Company legally held by the Pledgor.

1.3   "Rate of Pledge": refers to the ratio between the value of the Pledge and the services fees under this Agreement and the total amount of the Loan.

1.4  "Term of Pledge": refers to the period set forth under Article 3.2.

1.5  "Master Agreement": refers to the Service Agreement and agreements under the Loan arrangement.

1.6  "Event of Default": refers to any event listed in Article 7.1.

1.7  "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2.  Pledge

The Pledgor agrees to pledge his Equity Interest in the Company to the Pledgee as security for (i) all his obligations under the Loan arrangement and (ii) all the liabilities of the Company under Service Agreement. The term "Pledge" under this Agreement refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.

3.  Rate of Pledge and Term of Pledge

3.1  The rate of the Pledge

The rate of the Pledge shall be approximately 100%.

3.2  The term of the Pledge

3.2.1  The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of the Company and registered in authorized administration of industry and commerce, and shall remain in effect until two (2) years after the obligations under the Master Agreement will have been fulfilled.

3.2.2  During the term of the Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that the Pledgor does not perform his obligations under the Loan arrangement or the Company fails to pay services fees under the Service Agreement.

4.  Physical Possession of Documents

4.1  During the term of the Pledge under this Agreement, the Pledgor shall deliver the physical possession of his/her Certificate of Capital Contribution and the Register of Shareholders of the Company to the Pledgee within one (1) week from the execution date of this Agreement.

4.2  The Pledgee shall be entitled to collect the dividends for the Equity Interest.

4.3  The Pledge under this Agreement will be recorded in the Register of Shareholders of the Company (See Schedule II).

5.  Representation and Warranty of the Pledgor

5.1  The Pledgor is the legal owner of the Equity Interest pledged and has received approval for the pledge under this agreement through resolutions of shareholders' meetings (see Schedule III).

5.2  Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6.  Covenants of the Pledgor

6.1  During the effective term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

2

6.1.1   Not transfer or assign the Equity Interest, create or permit the existence of any other pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2   Comply with laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions;

6.1.3   Timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2   The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

6.3   The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and provide facilities for exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4   The Pledgor promises to the Pledgee that he will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5   The Pledgor promises to the Pledgee that he/she will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6   During the term of this Agreement, the Pledgor will not conduct any act and omission that may influence the value of the pledged shares for the purpose to keep or increase the value of the pledged shares. The Pledgor will notice the Pledgee immediately when there are issues that may decrease the value of the Pledged shares or influence the Pledgor's performance of any obligations under this Agreement and, as required by the Pledgee, provide guarantee for the difference of the decreased pledged shares to the Pledgee's satisfaction.

6.7   To the extent permitted by applicable laws and regulations, the Pledgor shall assist the Pledgee with the registration, filing or any other processes as required by the laws and regulations.

7.   Event of Default

7.1   The following events shall be regarded as events of default:

7.1.1   Pledgor fails to perform his obligations under the Loan Arrangement;

7.1.2   The Company fails to fully pay the fees on schedule under the Service Agreement;

3

7.1.3   Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4   The Pledgor breaches the covenants under Article 6 hereof;

7.1.5   The Pledgor breaches any other provision of this Agreement;

7.1.6   The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

7.1.7   Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8   The Company is incapable of repaying its ordinary debts or other debts;

7.1.9   This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than force majeure;

7.1.10  There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11  Successor or trustee of the Company can only perform part of, or refuses to perform, the payment obligations under the Service Agreement;

7.1.12  The breach of the other provisions of this Agreement by the Pledgor due to his/her act or omission.

7.2   The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3   Unless an event of default under Article 7.1 hereof has been resolved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at anytime thereafter, may give a written notice of default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Service Agreement and Loan arrangement or requesting to exercise the Pledge in accordance with Article 8 hereof.

8.   Exercise of the Pledge

8.1   The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full repayment of the Fees under the Service Agreement or full performance of his/her obligations under the Loan Agreement, whichever is later.

8.2   The Pledgee shall give a notice of default to the Pledgor when the Pledgee exercises the Pledge.

8.3   Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a notice of default in accordance with Article 7.3 or at anytime thereafter.

8.4   The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Service Agreement are repaid.

4

8.5    The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9.    Assignment

9.1    The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2    This Agreement shall be binding upon the Pledgor and his/her successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3    To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Service Agreement and Loan arrangement to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee was an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Service Agreement and Loan arrangement, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4    After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10.    Effectiveness and Term

This Agreement is effective as of the date first set forth above and from the date when the pledge is recorded on the Company's Register of Shareholders.

11.    Termination

This Agreement shall terminate when the Loan under the Loan arrangement the Fees under Service Agreement have been fully repaid, and the Pledgor no longer has any outstanding obligations under the Loan Agreement. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

12.    Fees and Other Charges

12.1    The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2    In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

13.    Force Majeure

13.1    Force Majeure, which includes but is not limited to acts of governments, change of laws and regulations, acts of nature, fires, explosions, typhoons, floods, earthquake, tides, lightning or war, refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care. However, any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2    In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to

5

resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both parties agree to resume the performance of this Agreement using their best efforts.

14. Confidentiality

The parties to this Agreement acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and can not disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the parties is deemed as an act by the parties, therefore, subjecting them to liability.

15. Dispute Resolution

15.1  This Agreement shall be governed by and construed in accordance with PRC law.

15.2  The parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the parties.

16. Notice

Any notice which is given by the parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing to the bellowing address. Where such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

**Party A:Baidu Online Network Technology (Beijing) Co., Ltd.**
Legal Address: 3rd Floor, Baidu Campus, No. 10, Shangdi 10th Street,, Haidian District, Beijing, PRC
Fax: 5992-7435
Tel: 5992-8888

**Party B: Zhan Wang**
Address:
Fax:
Tel:

17. Entire Agreement

Notwithstanding the provisions in Article 10, the Parties agree that this Agreement constitutes the entire agreement of the parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

18. Severability

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

19. Appendices

The appendices to this Agreement shall constitute an integral part of this Agreement.

20. Amendment or Supplement

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the parties hereto.

21. Counterparts

This Agreement is executed in Chinese in duplicate, with each party hereto holding one copy. Both originals have the same legal effect.

[no text below]

7

[Signature Page]

**Pledgee: Baidu Online Network Technology (Beijing) Co., Ltd.**

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

Legal/authorized representative:    /s/Zhan Wang

**Pledgor: Zhan Wang**

Signature: /s/Zhan Wang

Schedule I

Original Equity Pledge Agreements

| Serial number | Name | Parties | Date |
|---|---|---|---|
| 1 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Yanhong Li Yong Xu | 20050322 |
| 2 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Haoyu Shen | 20110119 |
| 3 | Supplement to the Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Yanhong Li Haoyu Shen Zhan Wang | 20110826 |
| 5 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Zhan Wang | 20151130 |

Schedule II

Register of shareholders of Beijing Baidu Netcom Science and Technology Co., Ltd.

Name of the Shareholder: Yanhong Li

ID number:

Residential Address:

Capital contribution: RMB 885,550,000.00

Percentage of capital contribution: 99.5%

No. of the certificate of capital contribution: 001

Yanhong Li holds 99.5% of the shares of Beijing Baidu Netcom Science and Technology Co., Ltd., all of which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Name of shareholder: Zhan Wang

ID number:

Residential Address:

Capital contribution: RMB 4,450,000.00

Percentage of capital contribution: 0.5%

No. of the certificate of capital contribution: 002

Zhan Wang holds 0.5% of the shares of Beijing Baidu Netcom Science and Technology Co., Ltd., all of which have been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% shares in Baidu Online Network Technology (Beijing) Co., Ltd.

Beijing Baidu Netcom Science Technology Co., Ltd.

Signature: /s/ Zhixiang Liang

Name: Zhixiang Liang

Title: Legal representative (with the company seal of Beijing Baidu Netcom Science Technology Co., Ltd.)

Date: December 31, 2015

Schedule III

Resolutions of the General Shareholders' Meeting of Beijing Baidu Netcom Science and Technology Co., Ltd.

In respect of the Amended and Restated Equity Pledge Agreement executed on December 31, 2015 between the shareholders of Beijing Baidu Netcom Science and Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., the general shareholders' meeting of the Company made a resolution unanimously as follows:

Approve each shareholder of the Company to pledge all of his equity interest in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was executed and submitted on December 31, 2015.

Shareholders:

/s/ Yanhong Li

/s/ Zhan Wang

**Exhibit 4.44**

*This document is a translation of the original text in Chinese*

**AMENDED AND RESTATED EXCLUSIVE EQUITY PURCHASE AND TRANSFER OPTION AGREEMENT**

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "Agreement") is entered into among the following parties in Beijing, PRC on December 31, 2015:

Party A:             Baidu Online Network Technology (Beijing) Co., Ltd.

Legal Address: 3/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

Party B:             Yanhong Li

Address:

Party C:             Beijing Baidu Netcom Science and Technology Co., Ltd.

Registered Address: 2/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "Parties" and each of them is a "Party."

WHEREAS:

1. Party A, is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "PRC"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and expertise in information technology and service;

2. Party C, a liability limited company incorporated in the PRC, is licensed by is licensed by Beijing Communications Administration to carry out the business of value-added telecommunication services such as Internet information services;

3. Party B is the shareholder of Party C. Party B has ownership of 99.5% of the equity interest in Party C (the "Equity Interest");

4. Party A and Party B entered into an amended and restated loan agreement (the "Loan Agreement") on December 31, 2015;

5. Party A and Party C entered into a number of agreements including an exclusive technology consulting and services agreement (the "Services Agreement") on March 22, 2005;

6. Party A and Party B entered into an amended and restated equity pledge agreement (the "Equity Pledge Agreement") on December 31, 2015; and

7. Each of Parties has entered into a number of exclusive equity purchase option agreements set forth in Schedule I attached hereto with the parties thereto (collectively, the "Original Exclusive Equity Purchase Option Agreements"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Equity Purchase Option Agreements and this Agreement will replace and substitute the Original Equity Purchase Option Agreements as of the date of its effectiveness.

NOW, THEREFORE, the Parties upon negotiation hereby agree as follows:

1. Purchase and Sale of Equity Interest

1.1 Granting of Rights

Party B (hereafter, the "Transferor") hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("Designated Persons") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from the Transferor, a portion of, or all of, the equity interests held by the Transferor in Party C (the "Option"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to the granting of the Option by Party B to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means an individual person, corporation, joint venture, partnership, enterprise, trust or a non-corporation organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "Notice") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "Purchased Equity Interest") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("Purchase Price") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

2

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" means guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership, detainment or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

The manner of payment of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor according to the applicable laws at the time of the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (excluding the tax fees and other fees incurred by the proposed transaction according to transfer agreements paid by the Transferor).

2. Covenants Relating to the Equity Interest

2.1 Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1 Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

3

2.1.4 Not to create, succeed to, guarantee or permit any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;

2.2 Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on Party B's Equity Interest in accordance with the Equity Pledge Agreement;

4

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;

2.2.7 At any time, upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer all dividends and any other form of profit allocated by Party C to Party A.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party C needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide capital support;

2.3.2 If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it shall give up the rights of requiring Party C to repay the loan.

5

3. Representations and Warranties

As of the execution date of this Agreement and every transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement ("Transfer Agreement") to which it is party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4 Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigation, arbitration or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.

4. Assignment of Agreement

4.1 Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party without the consent of Party B and Party C, but such assignment shall be notified in writing to Party B and Party C.

5. Effective Date and Term

5.1 This Agreement shall be effective as of the date first set forth above.

5.2 The term of this Agreement shall be ten (10) years unless it is early terminated under this Agreement or any other agreement separately agreed upon by the Parties. Party B and Party C hereby confirm that this Agreement may be extended by Party A in writing prior to its expiry without consent from Party B and Party C. The term to be extended shall be subject to agreement of the Parties.

6

5.3 If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.2, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.

6. Applicable Law and Dispute Resolution

6.1 Applicable Law

The formation, validity, interpretation and performance of and settlement of disputes under this Agreement shall be governed by the laws of the PRC.

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7. Taxes and Expenses

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8. Notices

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

7

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.
Address: Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile: 5992-7435
Telephone: 5992-8888

Party B: Yanhong Li
Address:
Facsimile:
Telephone:
Party C: Beijing Baidu Netcom Science and Technology Co., Ltd.
Address: 2/F, Baidu Building B, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile: 5992-7435
Telephone: 5992-8888

9. Confidentiality

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

9.1 Materials that are or will become known by the public (through no fault of the receiving party);

9.2 Materials required to be disclosed by the applicable laws or rules of the stock exchange;

9.3 Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Section 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10. Further Assurances

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

## 11. Miscellaneous

### 11.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

### 11.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

### 11.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

### 11.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

### 11.5 Language and counterparts

This Agreement is executed in Chinese in three originals; each Party holds one original and each original has the same legal effect.

### 11.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

### 11.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

9

11.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

[No text below]

10

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Legal Representative/Authorized Representative:          /s/ Zhan Wang

Seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

Party B: Yanhong Li

Signature: /s/ Yanhong Li

Party C: Beijing Baidu Netcom Science and Technology Co., Ltd.

Legal Representative/Authorized Representative:          /s/ Zhixiang Liang

Seal: /s/ Beijing Baidu Netcom Science and Technology Co., Ltd.

11

Original Exclusive Equity Purchase Option Agreements

| Serial number | Name | Parties | Date |
|---|---|---|---|
| 1 | Amended and Restated Exclusive Equity Purchase Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li Yong Xu | 20050322 |
| 2 | Exclusive Equity Purchase Option Agreement regarding Additional Shares | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li | 20060210 |
| 3 | Exclusive Equity Purchase Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li | 20080306 |
| 4 | Supplement to Amended and Restated Exclusive Equity Purchase Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li Yong Xu | 20100422 |
| 5 | Amendment to the Amended and Restated Exclusive Equity Purchase Option Agreement and the Supplement thereto | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li Haoyu Shen Zhan Wang | 20110826 |

12

| 6 | Restated and Amended Exclusive Equity Purchase Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li | 20151130 |

13

**Exhibit 4.45**

*This document is a translation of the original text in Chinese*

### AMENDED AND RESTATED EXCLUSIVE EQUITY PURCHASE AND TRANSFER OPTION AGREEMENT

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "Agreement") is entered into among the following parties in Beijing, PRC on December 31, 2015:

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Legal Address: 3/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

Party B: Zhan Wang

Address:

Party C: Beijing Baidu Netcom Science and Technology Co., Ltd.

Registered Address: 2/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "Parties" and each of them is a "Party."

WHEREAS:

1. Party A, is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "PRC"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and expertise in information technology and service;

2. Party C, a liability limited company incorporated in the PRC, is licensed by is licensed by Beijing Communications Administration to carry out the business of value-added telecommunication services such as Internet information services;

3. Party B is the shareholder of Party C. Party B has ownership of 0.5% of the equity interest in Party C (the "Equity Interest");

4. Party A and Party B entered into an amended and restated loan agreement (the "Loan Agreement") on December 31, 2015;

5. Party A and Party C entered into a number of agreements including an exclusive technology consulting and services agreement (the "Services Agreement") on March 22, 2005;

6. Party A and Party B entered into an amended and restated equity pledge agreement (the "Equity Pledge Agreement") on December 31, 2015; and

7. Each of Parties has entered into a number of exclusive equity purchase option agreements set forth in Schedule I attached hereto with the parties thereto (collectively, the "Original Exclusive Equity Purchase Option Agreements"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Equity Purchase Option Agreements and this Agreement will replace and substitute the Original Equity Purchase Option Agreements as of the date of its effectiveness.

NOW, THEREFORE, the Parties upon negotiation hereby agree as follows:

1. Purchase and Sale of Equity Interest

1.1 Granting of Rights

Party B (hereafter, the "Transferor") hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("Designated Persons") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from the Transferor, a portion of, or all of, the equity interests held by the Transferor in Party C (the "Option"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to the granting of the Option by Party B to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means an individual person, corporation, joint venture, partnership, enterprise, trust or a non-corporation organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "Notice") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "Purchased Equity Interest") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("Purchase Price") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

2

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" means guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership, detainment or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

The manner of payment of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor according to the applicable laws at the time of the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (excluding the tax fees and other fees incurred by the proposed transaction according to transfer agreements paid by the Transferor).

2. Covenants Relating to the Equity Interest

2.1 Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1 Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

3

2.1.4 Not to create, succeed to, guarantee or permit any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;

2.2 Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on Party B's Equity Interest in accordance with the Equity Pledge Agreement;

4

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;

2.2.7 At any time, upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer all dividends and any other form of profit allocated by Party C to Party A.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party C needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide capital support;

2.3.2 If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it shall give up the rights of requiring Party C to repay the loan.

5

3. Representations and Warranties

As of the execution date of this Agreement and every transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement ("Transfer Agreement") to which it is party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4 Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigation, arbitration or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.


4. Assignment of Agreement

4.1 Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party without the consent of Party B and Party C, but such assignment shall be notified in writing to Party B and Party C.


5. Effective Date and Term

5.1 This Agreement shall be effective as of the date first set forth above.

5.2 The term of this Agreement shall be ten (10) years unless it is early terminated under this Agreement or any other agreement separately agreed upon by the Parties. Party B and Party C hereby confirm that this Agreement may be extended by Party A in writing prior to its expiry without consent from Party B and Party C. The term to be extended shall be subject to agreement of the Parties.

6

5.3 If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.2, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.


6. Applicable Law and Dispute Resolution

6.1 Applicable Law

The formation, validity, interpretation and performance of and settlement of disputes under this Agreement shall be governed by the laws of the PRC.


6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.


7. Taxes and Expenses

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.


8. Notices

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

7

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.
Address: Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile: 5992-7435
Telephone: 5992-8888

Party B: Zhan Wang
Address:
Facsimile:
Telephone:
Party C: Beijing Baidu Netcom Science and Technology Co., Ltd.
Address: 2/F, Baidu Building B, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile: 5992-7435
Telephone: 5992-8888

9. Confidentiality

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

9.1 Materials that are or will become known by the public (through no fault of the receiving party);

9.2 Materials required to be disclosed by the applicable laws or rules of the stock exchange;

9.3 Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Section 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10. Further Assurances

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

8

11. Miscellaneous

11.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

11.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

11.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

11.5 Language and counterparts

This Agreement is executed in Chinese in three originals; each Party holds one original and each original has the same legal effect.

11.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

11.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

9

11.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

[No text below]

10

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.

Legal Representative/Authorized Representative:    /s/ Zhan Wang

Seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

Party B: Zhan Wang

Signature:  /s/ Zhan Wang

Party C: Beijing Baidu Netcom Science and Technology Co., Ltd.

Legal Representative/Authorized Representative:   /s/ Zhixiang Liang

Seal: /s/ Beijing Baidu Netcom Science and Technology Co., Ltd.

11

Original Exclusive Equity Purchase Option Agreements

| Serial number | Name | Parties | Date |
|---|---|---|---|
| 1 | Amended and Restated Exclusive Equity Purchase Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li Yong Xu | 20050322 |
| 2 | Supplement to Amended and Restated Exclusive Equity Purchase Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li Yong Xu | 20100422 |
| 3 | Amendment to the Amended and Restated Exclusive Equity Purchase Option Agreement and the Supplement thereto | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Yanhong Li Haoyu Shen Zhan Wang | 20110826 |
| 4 | Restated and Amended Exclusive Equity Purchase Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. Beijing Baidu Netcom Science and Technology Co., Ltd. Zhan Wang | 20151130 |

12

**Exhibit 4.61**

*This document is a translation of the original text in Chinese*

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on December 31, 2015 in Beijing, by and between:

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**

Registered Address: 3/F, No. 10 Shanghdi 10th Street, Haidian District, Beijing

**Party B: Yanhong Li**

WHEREAS,

1.    Party A is a foreign invested enterprise incorporated under the laws of the PRC,

2.    Party B is a Chinese citizen, and is the shareholder of Baidu Network Information Technology Co., Ltd. ("Baidu Network");

3.    Party A, Party B and other related parties executed a series of loan agreements as set forth in Schedule 1 of this Agreement (collectively, the "Original Loan Agreements"), the Parties now agree to execute this Agreement to amend and restate the Original Loan Agreements, and this Agreement shall replace and substitute the Original Loan Agreements as of the date of execution.

Party A and Party B, through friendly consultation, agree as follows:

1.    In accordance with the terms and conditions of this Agreement, Party A agrees to provide an interest-free loan in the amount of RMB 885.55 million yuan (RMB 885,550,000.00) to Party B, and Party B agrees to accept such loan.

2.    Party B confirms the receipt of such loan and has applied such loan toward payment of capital contribution of Beijing Network.

3.    The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

    a.    Party B leaves or is terminated from Party A or an affiliated company of Party A;

    b.    Party B's death, lack or limitation of civil capacity;

    c.    Party B engages in criminal act or is involved in criminal activities;

    d.    Any third party filed a claim against Party B that exceeds RMB 100,000; or

    e.    Subject to the laws of the PRC, Party A or a person designated by Party A is permitted invest in Beijing Network to conduct internet information service

business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Beijing Network to such party pursuant to the provisions of the Exclusive Option Contract mentioned in article 4 hereof, to exercise purchase rights.

4. The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designated other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Beijing Network held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Beijing Network to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance to the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the purchase price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to the above matters and have executed the Exclusive Option Contract.

5. The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall transfer the equity interest in Beijing Network to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6. The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Beijing Network to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, the extra amount over the principal of proceeds will be considered as the interests or capital use cost, to the extent permitted by the law, which shall be repaid to Party A.

7. The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if the following requirements are met:

   a. Party B has transferred all his equity interests in Beijing Network to Party A and/or its designated person; and

   b. Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

8. To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Beijing Network to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

9. Party A hereby represents and warrants to Party B that, as of the execution date of this agreement:

   a. Party A is a wholly-owned foreign enterprise incorporated and validly existing under the laws of the PRC;

2

b.   Party A has the right to execute and perform this agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has taken necessary actions to get all necessary and appropriate approvals and authorizations;

c.   The principal of the loan to Party B is legally owned by Party A;

d.   The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party A and any third party, or any promise made by Party A to a third party; and

e.   This Agreement shall constitute the legal, valid and binding obligations of Party A upon execution.

10.  Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

a.   Beijing Network is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Beijing Network;

b.   Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

c.   The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party B and any third party, or any promise made by Party B to a third party;

d.   This Agreement shall constitute the legal, valid and binding obligations of Party B upon execution;

e.   Party B has paid contribution in full for the equity interests he holds in Beijing Network in accordance with applicable laws and regulations;

f.   Except the provisions stipulated in the equity pledge agreement and exclusive option agreement, Party B did not create any pledge or other security over his equity interest in Beijing Network, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

g.   There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Beijing Network held by Party B;

h.   Beijing Network has completed all necessary governmental approvals, licenses, registrations and filings.

11.  Party B undertakes, during the term of this Agreement, to:

a.   Not sell, transfer, pledge, dispose in any other manner of his equity interests in Beijing Network or other interests, and not allow to create other security interests over his equity interests without the prior written consent of Party A, except pledges or other rights created in the interest of Party A;

b.   Not consent, support or execute any shareholder resolutions at Beijing Network's shareholder's meetings that permit the sale, transfer, pledge, disposal in any manner of, and the creation of other security interests on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except where transferring his equity interest to Party A;

3

c.  Not consent, support or execute any shareholder resolutions at Beijing Network's shareholder meetings that permit Beijing Network to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

d.  Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to the equity interests of Beijing Network;

e.  Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain the equity interests of Beijing Network held by Party B;

f.  Refrain from any act or omission that may materially affect the assets, business and liabilities of Beijing Network without the prior written consent of Party A;

g.  Appoint any person nominated by Party A as the director of Beijing Network, subject to Party A's request;

h.  Transfer promptly and unconditionally, at any time, all equity interests in Beijing Network held by Party B to Party A or its designated person subject to the request of Party A, provided that such transfer is permitted under the laws of the PRC;

i.  Not request Beijing Network to distribute dividends or profits;

j.  Once Party B transfers his equity interest in Beijing Network to Party A or its designated person, he shall repay the consideration he receives as the principal and the interests or capital use cost to Party A if such repayment is permitted under the laws of the PRC;

k.  Strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that affects the validity and enforceability of this Agreement.

12. Party B, as the shareholder of Beijing Network, undertakes to cause Beijing Network, during the term of this Agreement, to:

a.  Not supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

b.  Operate its business and handle matters prudently and affectively according to good financial and business rules and practices;

c.  Not sell, transfer, mortgage, dispose of in any other manner, or to create other security interests on, any of its assets, business or legal or beneficial rights to its income without the prior written consent of Party A from the date of this Agreement;

d.  Not create, succeed to, guarantee or permit any liability, without the prior written consent of Party A, except (i) the liability arising from the ordinary or daily course of business operations, but not arising from the loan; and (ii) the liability disclosed to Party A or approved by Party A in writing;

e.  Operate all businesses on a continued basis and maintain the value of its assets;

f.  Not execute any material contracts (for the purpose of this section, a contract will be deemed material if its value exceeds RMB 100,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

4

    g.   Provide information of all its operations and financial affairs at Party A's request;

    h.   Not merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

    i.   Not distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all profits that may be distributed to all shareholders.

    j.   Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to its assets, business or revenue;

    k.   Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain ownership of its assets;

    l.   Strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Beijing Network and Party A and other agreements, duly perform its obligations under the Service Agreement and other agreements, and refrain from any act or omission that affects the validity and enforceability of the Service Agreement.

13. This Agreement shall be binding on, and only in the interest of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or assign any right, interest or obligation hereunder.

14. Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15. The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

    a.   Both Parties shall strive to settle any dispute, conflicts, or compensation claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, each party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its rules. The arbitration award shall be final and conclusive and binding upon the Parties.

    b.   The arbitration shall take place in Beijing.

    c.   The arbitration language shall be Chinese.

17. This Agreement shall become effective on the date of execution. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B receives the loan, and shall expire as of the date on which both Parties complete their obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a material error, fraud, or other material unlawful action; or (b) upon Party A's bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

5

20. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter herein and supersedes and replaces all prior or contemporaneous verbal and written agreements and understandings between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is due before the expiration or early termination of this agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, each Party shall hold on counterpart. All counterparts shall have the same legal effect.

**IN WITNESS WHEREOF**, each party hereto have caused this Agreement to be duly executed by its legal representative on its behalf as of the date first set forth above.

[No text below]

6

[No text on this page]

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal representative/authorized representative:

Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B:    Yanhong Li**

Signature: /s/ Yanhong Li

7

**Schedule 1**

**Original Loan Agreements**

| No. | Contract Name | Parties | Execution Date |
|---|---|---|---|
| 1. | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Yong Xu | 20050322 |
| 2. | Capital Increase Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20060210 |
| 3. | Capital Increase Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20080306 |
| 4. | Supplemental Agreement to the Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Yong Xu; Haoyu Shen | 20110111 |
| 5. | Renewed Agreement of the Amended and Restated Loan agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Haoyu Shen; Zhan Wang | 20110826 |
| 6. | Supplemental Agreement to the Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Zhan Wang | 20140301 |
| 7. | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20151130 |

8

**Exhibit 4.62**

*This document is a translation of the original text in Chinese*

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on December 31, 2015 in Beijing, by and between:

**Party A:   Baidu Online Network Technology (Beijing) Co., Ltd.**

    Registered Address: 3/F, No. 10 Shanghdi 10th Street, Haidian District, Beijing

**Party B: Zhan Wang**

WHEREAS,

1.  Party A is a foreign invested enterprise incorporated under the laws of the PRC,

2.  Party B is a Chinese citizen, and is the shareholder of Baidu Network Information Technology Co., Ltd. ("Baidu Network");

3.  Party A, Party B and other related parties executed a series of loan agreements as set forth in Schedule 1 of this Agreement (collectively, the "Original Loan Agreements"), the Parties now agree to execute this Agreement to amend and restate the Original Loan Agreements, and this Agreement shall replace and substitute the Original Loan Agreements as of the date of execution.

Party A and Party B, through friendly consultation, agree as follows:

1.  In accordance with the terms and conditions of this Agreement, Party A agrees to provide an interest-free loan in the amount of RMB 4.45 million yuan (RMB 4,450,000.00) to Party B, and Party B agrees to accept such loan.

2.  Party B confirms the receipt of such loan and has applied such loan toward payment of capital contribution of Beijing Network.

3.  The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

    a.  Party B leaves or is terminated from Party A or an affiliated company of Party A;

    b.  Party B's death, lack or limitation of civil capacity;

    c.  Party B engages in criminal act or is involved in criminal activities;

    d.  Any third party filed a claim against Party B that exceeds RMB 100,000; or

    e.  Subject to the laws of the PRC, Party A or a person designated by Party A is permitted invest in Beijing Network to conduct internet information service

business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Beijing Network to such party pursuant to the provisions of the Exclusive Option Contract mentioned in article 4 hereof, to exercise purchase rights.

4. The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designated other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Beijing Network held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Beijing Network to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance to the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the purchase price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to the above matters and have executed the Exclusive Option Contract.

5. The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall transfer the equity interest in Beijing Network to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6. The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Beijing Network to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, the extra amount over the principal of proceeds will be considered as the interests or capital use cost, to the extent permitted by the law, which shall be repaid to Party A.

7. The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if the following requirements are met:

   a. Party B has transferred all his equity interests in Beijing Network to Party A and/or its designated person; and

   b. Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

8. To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Beijing Network to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

9. Party A hereby represents and warrants to Party B that, as of the execution date of this agreement:

   a. Party A is a wholly-owned foreign enterprise incorporated and validly existing under the laws of the PRC;

2

b.  Party A has the right to execute and perform this agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has taken necessary actions to get all necessary and appropriate approvals and authorizations;

c.  The principal of the loan to Party B is legally owned by Party A;

d.  The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party A and any third party, or any promise made by Party A to a third party; and

e.  This Agreement shall constitute the legal, valid and binding obligations of Party A upon execution.

10. Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

a.  Beijing Network is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Beijing Network;

b.  Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

c.  The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice, other governmental document, any agreement between Party B and any third party, or any promise made by Party B to a third party;

d.  This Agreement shall constitute the legal, valid and binding obligations of Party B upon execution;

e.  Party B has paid contribution in full for the equity interests he holds in Beijing Network in accordance with applicable laws and regulations;

f.  Except the provisions stipulated in the equity pledge agreement and exclusive option agreement, Party B did not create any pledge or other security over his equity interest in Beijing Network, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

g.  There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Beijing Network held by Party B;

h.  Beijing Network has completed all necessary governmental approvals, licenses, registrations and filings.

11. Party B undertakes, during the term of this Agreement, to:

a.  Not sell, transfer, pledge, dispose in any other manner of his equity interests in Beijing Network or other interests, and not allow to create other security interests over his equity interests without the prior written consent of Party A, except pledges or other rights created in the interest of Party A;

b.  Not consent, support or execute any shareholder resolutions at Beijing Network's shareholder's meetings that permit the sale, transfer, pledge, disposal in any manner of, and the creation of other security interests on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except where transferring his equity interest to Party A;

3

c. Not consent, support or execute any shareholder resolutions at Beijing Network's shareholder meetings that permit Beijing Network to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

d. Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to the equity interests of Beijing Network;

e. Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain the equity interests of Beijing Network held by Party B;

f. Refrain from any act or omission that may materially affect the assets, business and liabilities of Beijing Network without the prior written consent of Party A;

g. Appoint any person nominated by Party A as the director of Beijing Network, subject to Party A's request;

h. Transfer promptly and unconditionally, at any time, all equity interests in Beijing Network held by Party B to Party A or its designated person subject to the request of Party A, provided that such transfer is permitted under the laws of the PRC;

i. Not request Beijing Network to distribute dividends or profits;

j. Once Party B transfers his equity interest in Beijing Network to Party A or its designated person, he shall repay the consideration he receives as the principal and the interests or capital use cost to Party A if such repayment is permitted under the laws of the PRC;

k. Strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that affects the validity and enforceability of this Agreement.

12. Party B, as the shareholder of Beijing Network, undertakes to cause Beijing Network, during the term of this Agreement, to:

a. Not supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

b. Operate its business and handle matters prudently and affectively according to good financial and business rules and practices;

c. Not sell, transfer, mortgage, dispose of in any other manner, or to create other security interests on, any of its assets, business or legal or beneficial rights to its income without the prior written consent of Party A from the date of this Agreement;

d. Not create, succeed to, guarantee or permit any liability, without the prior written consent of Party A, except (i) the liability arising from the ordinary or daily course of business operations, but not arising from the loan; and (ii) the liability disclosed to Party A or approved by Party A in writing;

e. Operate all businesses on a continued basis and maintain the value of its assets;

f. Not execute any material contracts (for the purpose of this section, a contract will be deemed material if its value exceeds RMB 100,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

4

g.   Provide information of all its operations and financial affairs at Party A's request;

h.   Not merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

i.   Not distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all profits that may be distributed to all shareholders.

j.   Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory procedures relating to its assets, business or revenue;

k.   Execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain ownership of its assets;

l.   Strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Beijing Network and Party A and other agreements, duly perform its obligations under the Service Agreement and other agreements, and refrain from any act or omission that affects the validity and enforceability of the Service Agreement.

13. This Agreement shall be binding on, and only in the interest of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or assign any right, interest or obligation hereunder.

14. Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15. The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

a.   Both Parties shall strive to settle any dispute, conflicts, or compensation claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, each party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its rules. The arbitration award shall be final and conclusive and binding upon the Parties.

b.   The arbitration shall take place in Beijing.

c.   The arbitration language shall be Chinese.

17. This Agreement shall become effective on the date of execution. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B receives the loan, and shall expire as of the date on which both Parties complete their obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a material error, fraud, or other material unlawful action; or (b) upon Party A's bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

5

20. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter herein and supersedes and replaces all prior or contemporaneous verbal and written agreements and understandings between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is due before the expiration or early termination of this agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, each Party shall hold on counterpart. All counterparts shall have the same legal effect.

**IN WITNESS WHEREOF**, each party hereto have caused this Agreement to be duly executed by its legal representative on its behalf as of the date first set forth above.

[No text below]

6

[No text on this page]

**Party A:     Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal representative/authorized representative:

Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B:     Zhan Wang**

Signature: /s/ Zhan Wang

7

**Schedule 1**

**Original Loan Agreements**

| No. | Contract Name | Parties | Execution Date |
|---|---|---|---|
| 1. | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Yong Xu | 20050322 |
| 2. | Capital Increase Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20060210 |
| 3. | Capital Increase Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20080306 |
| 4. | Supplemental Agreement to the Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Yong Xu; Haoyu Shen | 20110111 |
| 5. | Renewed Agreement of the Amended and Restated Loan agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Haoyu Shen; Zhan Wang | 20110826 |
| 6. | Supplemental Agreement to the Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Zhan Wang | 20140301 |
| 7. | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Zhan Wang | 20151130 |

8

**Exhibit 4.68**

**FACILITY AGREEMENT**

dated 17th July 2015

in respect of

US$150,000,000 Unsecured Term Loan Facility

FOR **BAIDU, INC.**

as Company

and

**SUMITOMO MITSUI BANKING CORPORATION**

as Lender

**CONTENTS**

**Page**

**Clause**

| | | |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Facility | 10 |
| 3. | Purpose | 10 |
| 4. | Conditions precedent | 11 |
| 5. | Utilisation—Loan | 11 |
| 6. | Repayment | 12 |
| 7. | Prepayment and cancellation | 12 |
| 8. | Interest | 14 |
| 9. | Terms | 15 |
| 10. | Market disruption | 16 |
| 11. | Taxes | 17 |
| 12. | Increased Costs | 21 |
| 13. | Mitigation | 22 |
| 14. | Payments | 23 |
| 15. | Representations and warranties | 23 |
| 16. | Information covenants | 26 |
| 17. | Financial covenants | 28 |
| 18. | General covenants | 32 |
| 19. | Default | 37 |
| 20. | Evidence and calculations | 41 |
| 21. | Fee | 41 |
| 22. | Indemnities and Break Costs | 41 |
| 23. | Expenses | 43 |
| 24. | Amendments and waivers | 44 |
| 25. | Changes to the Parties | 44 |
| 26. | Disclosure of information | 47 |
| 27. | Set-off | 48 |
| 28. | Severability | 48 |
| 29. | Counterparts | 49 |
| 30. | Notices | 49 |
| 31. | Language | 50 |
| 32. | Governing law | 50 |
| 33. | Enforcement | 50 |
| **Schedule 1** | Conditions precedent documents | 52 |
| **Schedule 2** | Form of Request | 55 |
| **Schedule 3** | Form of Transfer Certificate | 57 |
| **Schedule 4** | Form of Compliance Certificate | 61 |
| Signatories | | 62 |

**THIS AGREEMENT** is dated 17th July 2015 and is made **BETWEEN**:

(1) **BAIDU, INC.**, a limited liability company incorporated under the laws of the Cayman Islands with registered number 96019 as borrower (the **Company**); and

(2) **SUMITOMO MITSUI BANKING CORPORATION** as lender (the **Lender**).

**IT IS AGREED** as follows:

1. **INTERPRETATION**

   **1.1  Definitions**

   In this Agreement:

   **Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

   **APLMA** means the Asia Pacific Loan Market Association.

   **Availability Period** means the period from and including the date of this Agreement to and including the date falling one month after the date of this Agreement.

   **Basel III** means:

   (a) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

   (b) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement — Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

   (c) any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

   **Beijing Baidu Netcom** means Beijing Baidu Netcom Science Technology Co., Ltd., a limited liability company established under the laws of the PRC.

   **Break Costs** means the amount (if any) which the Lender is entitled to receive under Clause 22.3 (Break Costs).

   **Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in Hong Kong and the PRC and, in relation to any day for the payment of US Dollars, New York City.

**Code** means the US Internal Revenue Code of 1986.

**Commitment** means US$150,000,000, to the extent not cancelled, transferred or reduced under this Agreement.

**Compliance Certificate** means a certificate substantially in the form of Schedule 4 (Form of Compliance Certificate) setting out, among other things, calculations of the financial covenants.

**Confidentiality Undertaking** means a confidentiality undertaking substantially in a recommended form of the APLMA or in any other form agreed between the Company and the Lender.

**Consolidated Assets** means, at any time, the total assets of the Group as shown on the latest consolidated financial statements of the Company delivered to the Lender pursuant to the provisions of this Agreement.

**Default** means:

(a)    an Event of Default; or

(b)    an event or circumstance specified in Clause 19 (Default) which would be (with the expiry of a grace period, the giving of notice or the making of any determination under the Finance Documents or any combination of them) an Event of Default.

**Disposal Threshold** means, at any time, an amount equal to 30% of the Consolidated Assets.

**Disruption Event** means:

(a)    a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Finance Documents, which is not caused by, and is beyond the control of, any of the Parties; or

(b)    the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing it, or any other Party from:

(i)    performing its payment obligations under the Finance Documents; or

(ii)    communicating with other Parties under the Finance Documents,

and which is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**Dollar, US$** or **US Dollar** means the lawful currency for the time being of the United States of America.

2

**Event of Default** means an event or circumstance specified as such in Clause 19 (Default).

**Existing Facility** means the term loan facility borrowed by the Company pursuant to a facility agreement dated 24 July 2013 (as amended by a Supplemental Facility Agreement dated 3 June 2014, a Second Supplemental Facility Agreement dated 9 June 2015 and as further amended, restated and/or supplemented from time to time) between the Company and the Lender.

**Facility** means the credit facility made available under this Agreement.

**Facility Office** means the office notified by the Lender to the Company through which the Lender will perform its obligations under this Agreement.

**FATCA** means:

(a)    sections 1471 to 1474 of the Code or any associated regulations;

(b)    any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)    any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA.

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction.

**FATCA FFI** means a foreign financial institution as defined in section 1471(d)(4) of the Code which, if the Lender is not a FATCA Exempt Party, could be required to make a FATCA Deduction.

**Final Maturity Date** means the date falling on the second anniversary of the Utilisation Date.

**Finance Document** means:

(a)    this Agreement;

(b)    a Transfer Certificate; or

(c)    any other document designated as such by the Lender and the Company.

**Financial Indebtedness** means any indebtedness for or in respect of:

(a)    moneys borrowed;

3

(b)    any acceptance credit (including any dematerialised equivalent);

(c)    any bond, note, debenture, loan stock or other similar instrument;

(d)    any redeemable preference share;

(e)    any agreement treated as a finance or capital lease in accordance with GAAP;

(f)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(g)    the acquisition cost of any asset or service to the extent payable before or after its acquisition or possession by the party liable where the advance or deferred payment:

   (i)    is arranged primarily as a method of raising finance or of financing the acquisition of that asset or service or the construction of that asset or service; or

   (ii)    involves a period of more than six months before or after the date of acquisition or supply;

(h)    any derivative transaction protecting against or benefiting from fluctuations in any rate or price (and, except for non-payment of an amount, the then mark-to-market value of the derivative transaction will be used to calculate its amount);

(i)    any other transaction (including any forward sale or purchase agreement) which has the commercial effect of a borrowing;

(j)    any counter-indemnity obligation in respect of any guarantee, indemnity, bond, letter of credit or any other instrument issued by a bank or financial institution; or

(k)    any guarantee, indemnity or similar assurance against financial loss of any person in respect of any item referred to in the above paragraphs,

in each case, for the avoidance of doubt, excluding any indebtedness arising in the ordinary course of trading.

**GAAP** means generally accepted accounting principles in the United States of America.

**Group** means the Company and its Subsidiaries.

**HKD** mean the lawful currency of Hong Kong.

**Holding Company** of any other person, means a person in respect of which that other person is a Subsidiary.

**Increased Cost** means:

(a)    an additional or increased cost;

4

(b)    a reduction in the rate of return from the Facility or on the Lender's (or its Affiliate's) overall capital; or

(c)    a reduction of an amount due and payable under any Finance Document,

which is incurred or suffered by the Lender or any of its Affiliates but only to the extent attributable to the Lender having entered into any Finance Document or funding or performing its obligations under any Finance Document.

**Law or Regulation** means

(a)    any applicable law or regulation of Hong Kong or any other place; or

(b)    any agreement entered into between the Lender and any competent tax, prosecuting, regulatory or governmental authority in Hong Kong or any other place (the **Authority**).

**LIBOR** means for a Term of the Loan or overdue amount:

(a)    the applicable Screen Rate; or

(b)    if no Screen Rate is available for the relevant currency or Term of the Loan or overdue amount, the rate quoted by the Lender to leading banks in the London interbank market,

as at 11.00 a.m. (London time) on the Rate Fixing Day for the offering of deposits in the currency of the Loan or overdue amount for a period comparable to that Term.

**Loan** means, unless otherwise stated in this Agreement, the principal amount of the borrowing under this Agreement or the principal amount outstanding of that borrowing.

**London Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in London.

**Mandatory Prepayment Request** has the meaning given to it in Clause 7.2(a) (Mandatory prepayment — disposals).

**Margin** means 0.40 per cent. per annum.

**Market Disruption Event** has the meaning given to it in Clause 10.1(a) (Market Disruption).

**Material Adverse Effect** means a material adverse effect on:

(a)    the business or financial condition of the Group as a whole;

(b)    the ability of the Company to perform its payment obligation or any other material obligation under any Finance Document (which, for the avoidance of doubt, includes but is not limited to its obligation under Clause 17 (Financial Covenants) below); or

5

(c)    the validity or enforceability of any Finance Document.

**NASDAQ** means the NASDAQ Stock Market in the United States.

**Original Financial Statements** means the audited consolidated financial statements of the Company for the year ended 31 December 2014.

**PRC** means the People's Republic of China, but excluding the Hong Kong Special Administrative Region, the Macau Special Administrative Region and Taiwan.

**Party** means a party to this Agreement.

**Permitted Transaction** means:

(a)    an intra-Group re-organisation on a solvent basis and (if the Company is involved in such re-organisation) where the Company remains a surviving entity; or

(b)    any other transactions agreed by the Lender.

**Quasi-Security Interest** has the meaning given to it in Clause 18.5(a) (Negative pledge).

**Rate Fixing Day** means the second London Business Day before the first day of a Term or such other day as the Lender determines is generally treated as the rate fixing day by market practice in the relevant interbank market.

**Repeating Representations** means the representations and warranties set out in Clauses 15.2 (Status) to 15.13 (Information) (inclusive) (other than Clause 15.12 (No material adverse change).

**Request** means a request for the Loan, substantially in the form of Schedule 2 (Form of Request).

**Restricted Group** means the Company and its Restricted Subsidiaries.

**Restricted Subsidiary** means, at any time, a Subsidiary of the Company if the gross Tangible Assets or turnover of that Subsidiary then equal to or exceed 10 per cent. of the gross Tangible Assets or turnover of the Group provided that in no circumstances shall Beijing Baidu Netcom be or become a Restricted Subsidiary.

For this purpose:

(a)    subject to paragraph (b) below:

    (i)    the contribution of a Subsidiary of the Company will be determined from its financial statements which were consolidated into the latest audited consolidated financial statements of the Company; and

    (ii)    the financial condition of the Group will be determined from the latest audited consolidated financial statements of the Company;

6

(b)     if a Subsidiary of the Company becomes a member of the Group after the date on which the latest audited consolidated financial statements of the Company were prepared:

(i)      the contribution of the Subsidiary will be determined from its latest financial statements; and

(ii)     the financial condition of the Group will be determined from the latest audited consolidated financial statements of the Company but adjusted to take into account any subsequent acquisition or disposal of a business or a company (including that Subsidiary);

(c)     the contribution of a Subsidiary will, if it has Subsidiaries, be determined from its consolidated financial statements;

(d)     if a Restricted Subsidiary disposes of all or substantially all of its assets to another member of the Group, it will immediately cease to be a Restricted Subsidiary and the other member of the Group (if it is not the Company or already a Restricted Subsidiary) will immediately become a Restricted Subsidiary;

(e)     a Subsidiary of the Company (if it is not already a Restricted Subsidiary) will become a Restricted Subsidiary on completion of any other intra-Group transfer or reorganisation if it would have been a Restricted Subsidiary had the intra-Group transfer or reorganisation occurred on the date of the latest audited consolidated financial statements of the Company; and

(f)     except as specifically mentioned in paragraph (d) above, a member of the Group will remain a Restricted Subsidiary until the next audited consolidated financial statements of the Company show otherwise under paragraph (a) above.

If there is a dispute as to whether or not a member of the Group is a Restricted Subsidiary, a certificate of the auditors of the Company will be, in the absence of manifest error, conclusive.

**RMB** means the lawful currency for the timing being of the PRC.

**Screen Rate** means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for US Dollars for the relevant period displayed on pages LIBOR01 or LIBOR02 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters. If such page or service ceases to be available, the Lender may specify another page or service displaying the relevant rate after consultation with the Company.

**Security Interest** means any mortgage, pledge, lien, charge or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

7

**Subsidiary** means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 per cent. of the voting capital or similar right of ownership and control for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise.

**Tangible Assets** of a person means its total assets, less:

(a) its net intangible assets; and

(b) goodwill.

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**Tax Payment** means a payment made by the Company to the Lender in any way relating to a Tax Deduction or under any indemnity given by the Company in respect of Tax under any Finance Document.

**Term** means each period determined under this Agreement by reference to which interest on the Loan or an overdue amount is calculated.

**Transaction Costs** means, in respect of a disposal, all Taxes and reasonable costs and expenses incurred by any member of the Group in connection with such disposal.

**Transfer Certificate** means a certificate, substantially in the form of Schedule 3 (Form of Transfer Certificate), with such amendments as the Lender may approve or reasonably require or any other form agreed between the Lender and the Company.

**US** means the United States of America.

**US Tax Obligor** means the Company, if:

(a) it is or becomes resident for tax purposes in the US; or

(b) some or all of its payments under the Finance Documents are from sources within the US for US federal income tax purposes.

**Utilisation Date** means the date on which the Facility is utilised.


**1.2    Construction**

(a) In this Agreement, unless the contrary intention appears, a reference to:

    (i) an amendment includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (however fundamental and whether or not more onerous) and amended will be construed accordingly;

8

(ii)   assets includes present and future properties, revenues and rights of every description;

(iii)   an authorisation includes an authorisation, consent, approval, resolution, permit, licence, exemption, filing, registration or notarisation;

(iv)   disposal means a sale, transfer, assignment, grant, lease, licence, declaration of trust or other disposal, whether voluntary or involuntary, and dispose will be construed accordingly (for the avoidance of doubt, the meaning of disposal does not include issue of new shares by a member of the Group);

(v)   indebtedness includes any obligation (whether incurred as principal or as surety and whether present or future, actual or contingent) for the payment or repayment of money;

(vi)   customer due diligence requirements are to the identification checks that the Lender requests in order to meet its obligations under any applicable law or regulation to identify a person who is (or is to become) its customer;

(vii)   a person includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, fund, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(viii)   a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(ix)   a currency is a reference to the lawful currency for the time being of the relevant country;

(x)   a Default or an Event of Default being outstanding means that it has not been remedied or waived;

(xi)   a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(xii)   a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(xiii)   a Party or any other person includes its successors in title, permitted assigns and permitted transferees;

(xiv)   a Finance Document or other document or security includes (without prejudice to any prohibition on amendments) any amendment to that Finance Document or other document or security, including any change in the purpose of, any extension for or any increase in the amount of a facility or any additional facility; and

9

(xv)   a time of day is a reference to Hong Kong time.

(b)   Unless the contrary intention appears, a reference to a **month** or **months** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)   if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)   if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)   notwithstanding subparagraph (i) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)   Unless the contrary intention appears:

(i)   a reference to a Party will not include that Party if it has ceased to be a Party under this Agreement;

(ii)   a word or expression used in any other Finance Document or in any notice given in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement; and

(iii)   any obligation of the Company under the Finance Documents which is not a payment obligation remains in force for so long as any payment obligation of the Company is, may be or is capable of becoming outstanding under the Finance Documents.

(d)   The headings in this Agreement do not affect its interpretation.

## 2.   FACILITY

### 2.1   Amount

Subject to the terms of this Agreement, the Lender makes available to the Company a US$ term loan facility in an amount equal to the Commitment in one lump sum.

## 3.   PURPOSE

### 3.1   Loan

The Loan may only be used for:

(a)   refinancing the Existing Facility; and

10

(b)    general working capital requirements of the Group.

### 3.2    No obligation to monitor

The Lender is not bound to monitor or verify the utilisation of the Facility.

## 4.    CONDITIONS PRECEDENT

### 4.1    Conditions precedent documents

(a)    A Request may not be given until the Lender has notified the Company that it has received (or waived receipt of) all of the documents and evidence set out in Part 1 (Conditions precedent) of Schedule 1 (Conditions precedent documents) in form and substance satisfactory to the Lender.

(b)    The Lender shall give this confirmation to the Company promptly upon being so satisfied.

### 4.2    Further conditions precedent

The obligations of the Lender to participate in the Loan are subject to the further conditions precedent that on both the date of the Request and the Utilisation Date for the Loan:

(a)    the Repeating Representations are correct in all material respects; and

(b)    no Default is outstanding or would result from the Loan.

## 5.    UTILISATION — LOAN

### 5.1    Giving of Requests

(a)    The Company may borrow the Loan by giving to the Lender a duly completed Request.

(b)    Unless the Lender otherwise agrees, the latest time for receipt by the Lender of a duly completed Request is 11.00 a.m. one (1) Business Day before the Rate Fixing Date for the proposed borrowing.

(c)    Only one Request may be given under this Agreement. Only one Loan may be requested in the Request. The Request, once given, is irrevocable.

### 5.2    Completion of Requests

A Request for the Loan will not be regarded as having been duly completed unless:

(a)    the Utilisation Date is a Business Day falling within the Availability Period;

(b)    the amount of the Loan requested is:

   (i)    the amount of the Commitment; or

   (ii)    such other amount as the Lender may agree;

11

(c)    the proposed Term complies with this Agreement; and

(d)    the currency specified in the Request is US Dollars.

### 5.3    Availability of Loan

If the conditions set out in Clause 4 (Conditions Precedent), Clause 5.1 (Giving of Requests) and Clause 5.2 (Completion of Requests) have been met, the Lender shall make the Loan available to the Company directly from the Lender's Facility Office on the Utilisation Date.

## 6.    REPAYMENT

The Company must repay the Loan in full on the Final Maturity Date.

## 7.    PREPAYMENT AND CANCELLATION

### 7.1    Mandatory prepayment — illegality

(a)    The Lender must notify the Company promptly if it becomes aware that it is unlawful in any applicable jurisdiction for the Lender to perform any of its obligations under a Finance Document.

(b)    After notification under paragraph (a) above the Lender must notify the Company promptly that:

(i)    the Company must repay or prepay the Loan on the date specified in paragraph (c) below; and

(ii)    the Commitment of the Lender will be immediately cancelled.

(c)    The date for repayment or prepayment of the Loan will be:

(i)    the last day of the current Term of the Loan; or

(ii)    if earlier, the date specified by the Lender in the notification under paragraph (a) above and which must not be earlier than the last day of any applicable grace period allowed by law.

### 7.2    Mandatory prepayment — disposals

(a)    If a member of the Group (other than Beijing Baidu Netcom):

(i)    in a single transaction or a series of transactions (whether related or not) sells, leases, transfers or otherwise disposes of any asset by means of any sale, lease, transfer or other disposal save for the ones allowed under sub-paragraphs (b)(ii) to (vi) (inclusive) of Clause 18.6 (Disposals); and

(ii)    the consideration receivable for that disposal (when aggregated with the consideration receivable for any other sale, lease, transfer or other disposal by a member of the Group excluding those allowed under sub-

12

paragraphs (b)(ii) to (vi) (inclusive) of Clause 18.6 (Disposals) exceeds the Disposal Threshold (such excess amount being the **Excess Amount**),

then the Company must (x) promptly notify the Lender of such a disposal and (y) if within 21 days of such notification, the Lender delivers a written request to the Company (a **Mandatory Prepayment Request**) procure that:

    (A)   an amount equal to the Excess Amount less the Transaction Costs for that disposal is applied towards prepaying the Loan; and

    (B)   an amount equal to the net proceeds of any subsequent sale, lease, transfer or other disposal (other than any allowed under sub-paragraphs (b)(ii) to (vi) (inclusive) of Clause 18.6 (Disposals)) (a **Subsequent Disposal**) is applied towards prepaying the Loan.

(b)   The Company must promptly notify the Lender of any Subsequent Disposal.

(c)   Any prepayment under this Clause 7.2 must be made within 45 days of the date of the relevant Mandatory Prepayment Request.

### 7.3   Voluntary prepayment

(a)   The Company may, by giving not less than three Business Days' prior notice to the Lender prepay the Loan in whole or in part on or at any time after (i) the first anniversary of the Utilisation Date; or (ii) the date on which a Market Disruption Event occurs.

(b)   A prepayment of part of the Loan must be in a minimum amount of US$50,000,000 and an integral multiple of US$10,000,000.

### 7.4   Automatic cancellation

Any part of the Commitment of the Lender which, at that time, is unutilised will be automatically cancelled at the close of business on the last day of the Availability Period and shall not be available for utilisation thereafter.

### 7.5   Right of repayment and cancellation of a single Lender

(a)   If the Company is, or will be, required to pay to the Lender:

    (i)   a Tax Payment; or

    (ii)   an Increased Cost,

the Company may, while the requirement continues, give notice to the Lender requesting prepayment and cancellation in respect of the Lender.

(b)   After notification under paragraph (a) above:

13

(i)     the Company must repay or prepay the Loan on the date specified in paragraph (c) below; and

(ii)    the Commitment of the Lender will be immediately cancelled.

(c)   The date for repayment or prepayment of the Loan will be:

(i)     the last day of the current Term for the Loan ; or

(ii)    if earlier, the date specified by the Company in its notification.

### 7.6   Partial prepayment of the Loan

No amount of the Loan prepaid under this Agreement may subsequently be re-borrowed.

### 7.7   Miscellaneous provisions

(a)   Any notice of prepayment and/or cancellation under this Agreement is irrevocable and must specify the date or dates upon which the relevant prepayment is to be made and the amount of that prepayment.

(b)   All prepayments under this Agreement must be made with accrued interest on the amount prepaid. No premium or penalty is payable in respect of any prepayment except for Break Costs.

(c)   The Lender may agree a shorter notice period for a voluntary prepayment.

(d)   No prepayment or cancellation is allowed except in accordance with the express terms of this Agreement.

(e)   No amount of the Commitment cancelled under this Agreement may subsequently be reinstated.

## 8.   INTEREST

### 8.1   Calculation of interest

The rate of interest on the Loan for each Term is the percentage rate per annum equal to the aggregate of the applicable:

(a)   Margin; and

(b)   LIBOR.

### 8.2   Payment of interest

Except where it is provided to the contrary in this Agreement, the Company must pay accrued interest on the Loan made to it on the last day of each Term and also, if the Term is longer than three months, on the dates falling at three-monthly intervals after the first day of that Term.

14

**8.3    Interest on overdue amounts**

(a)    If the Company fails to pay any amount payable by it under the Finance Documents, it must immediately on demand by the Lender pay interest on the overdue amount from its due date up to the date of actual payment, both before, on and after judgment.

(b)    Interest on an overdue amount is payable at a rate determined by the Lender to be one per cent. per annum above the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted the Loan in the currency of the overdue amount. For this purpose, the Lender may:

(i)    select successive Terms of any duration of up to three months; and

(ii)    determine the appropriate Rate Fixing Day for that Term.

(c)    Notwithstanding paragraph (b) above, if the overdue amount is a principal amount of the Loan and becomes due and payable before the last day of its current Term, then:

(i)    the first Term for that overdue amount will be the unexpired portion of that Term; and

(ii)    the rate of interest on the overdue amount for that first Term will be one per cent. per annum above the rate then payable on the Loan.

After the expiry of the first Term for that overdue amount, the rate on the overdue amount will be calculated in accordance with paragraph (b) above.

(d)    Interest (if unpaid) on an overdue amount will be compounded with that overdue amount at the end of each of its Terms but will remain immediately due and payable.

**8.4    Notification of rates of interest**

The Lender must promptly notify the Company of the determination of a rate of interest under this Agreement.

**9.    TERMS**

**9.1    Selection**

(a)    The Loan has successive Terms. Each Term for the Loan will start on the Utilisation Date or on the expiry of its preceding Term.

(b)    Subject to the provisions of this Clause 9, each Term for the Loan shall be three months or any other period agreed by the Company and the Lender. If the length of a Term is not determined in accordance with this Clause 9, the Company shall be deemed to have selected a duration of three months for such Term.

15

**9.2    No overrunning the Final Maturity Date**

If a Term would otherwise overrun the Final Maturity Date, it will be shortened so that it ends on the Final Maturity Date.

**9.3    Other adjustments**

The Lender and the Company may enter into such other arrangements as they may agree for the adjustment of Terms and the consolidation and/or splitting of the Loan, but no Term in excess of six months may be agreed by the Lender.

**9.4    Notification**

The Lender must notify the Company of the duration of each Term promptly after ascertaining its duration.

**10.    MARKET DISRUPTION**

**10.1  Market disruption**

(a)    In this Clause, each of the following events is a Market Disruption Event:

   (i)    at or about 12:00 noon (London time) on the Rate Fixing Day for the relevant Term, the Screen Rate is not available or the Screen Rate is zero or negative and the Lender is unable to obtain a quotation to determine LIBOR for the relevant Term; or

   (ii)   by close of business on the Rate Fixing Day, the Company receives a notification from the Lender that the cost to it of funding the Loan from whatever source it may reasonably select would be in excess of LIBOR for the relevant Term.

(b)    The Lender must promptly notify the Company of a Market Disruption Event.

(c)    Subject to any alternative basis agreed and consented to by the Company and the Lender as contemplated by Clause 10.2 (*Alternative basis of interest or funding*), after notification under paragraph (b) above, the rate of interest on the Loan for the relevant Term will be the aggregate of the applicable:

   (i)    Margin; and

   (ii)   the rate which expresses as a percentage rate per annum the cost to the Lender from whatever source it may reasonably select.

**10.2  Alternative basis of interest or funding**

If a Market Disruption Event occurs and the Lender or the Company so requires, the Company and the Lender must enter into negotiations for a period of not more than 30 days with a view to agreeing an alternative basis for determining the rate of interest and/or funding for the affected Loan.

16

## 11.  TAXES

### 11.1  General

In this Clause 11:

**Tax Credit** means a credit against any Tax or any relief or remission for Tax (or its repayment).

**VAT** means consumption tax, sales tax, value added tax or any other Tax of a similar nature which is imposed in any jurisdiction from time to time.

### 11.2  Tax gross-up

(a)  The Company must make all payments to be made by it under the Finance Documents without any Tax Deduction, unless a Tax Deduction is required by law.

(b)  If the Company is aware that the Company must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it must promptly notify the Lender.

(c)  If a Tax Deduction is required by law to be made by the Company or the Lender, the amount of the payment due from the Company will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)  If the Company is required to make a Tax Deduction, it must make the minimum Tax Deduction allowed by law and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(e)  Within 30 days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, the Company must deliver to the Lender evidence satisfactory to the Lender (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

### 11.3  Tax indemnity

(a)  Except as provided below, the Company must indemnify the Lender against any loss or liability or cost which the Lender determines will be or has been suffered (directly or indirectly) by the Lender for or on account of Tax in relation to a payment received or receivable (or any payment deemed to be received or receivable) under a Finance Document.

(b)  Paragraph (a) above does not apply with respect to any Tax assessed on the Lender under the laws of the jurisdiction in which:

(i)  the Lender is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Lender is treated as resident for tax purposes; or

(ii)  the Lender's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

17

if that Tax is imposed on or calculated by reference to the net income received or receivable by the Lender. However, any payment deemed to be received or receivable, including any amount treated as income but not actually received by the Lender, such as a Tax Deduction, will not be treated as net income received or receivable for this purpose.

(c)   Paragraph (a) above does not apply to the extent a loss, liability or cost:

   (i)   is compensated for by an increased payment under Clause 11.2 (Tax gross-up), Clause 11.8 (*FATCA Deduction and gross-up by the Company*) or paragraph (b) of Clause 11.9 (*FATCA Deduction by the Lender*);

   (ii)   would have been compensated for by an increased payment under Clause 11.2 (Tax gross-up) but was not compensated solely because one of the exclusions in that Clause applied; or

   (iii)   is compensated for by a payment under paragraph (d) of Clause 11.9 (*FATCA Deduction by the Lender*).

(d)   If the Lender makes or intends to make a claim under paragraph (a) above it must promptly notify the Company of the event which will give, or has given, rise to the claim.

## 11.4 Tax Credit

If the Company makes a Tax Payment and the Lender determines that:

(a)   a Tax Credit is attributable either to an increased payment of which that Tax Payment forms part, or to that Tax Payment; and

(b)   it has obtained, used and retained that Tax Credit,

the Lender must pay an amount to the Company which the Lender determines will leave it (after that payment) in the same after-Tax position as it would have been if the Tax Payment had not been required to be made by the Company.

## 11.5 Stamp taxes

The Company must pay and indemnify the Lender against any cost, loss or liability the Lender incurs in relation to all stamp duty, stamp duty land tax, registration or other similar Tax payable in connection with the entry into, performance or enforcement of the Lender, except for any such Tax payable in connection with the entry into of a Transfer Certificate.

## 11.6 Value added taxes

(a)   All amounts set out, or expressed to be payable under a Finance Document by the Lender which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is or becomes chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is chargeable on any supply made by the Lender to the

18

Company under a Finance Document and the Lender is required to account for the VAT, the Company must pay to the Lender (in addition to and at the same time as paying the consideration for such supply) an amount equal to the amount of the VAT and the Lender shall promptly provide an appropriate VAT invoice to the Company.

(b)     Where a Finance Document requires any Party to reimburse or indemnify the Lender for any costs or expenses, that Party must also at the same time reimburse and indemnify (as the case may be) the Lender against all VAT incurred by the Lender in respect of those costs or expenses but only to the extent that the Lender (acting reasonably) determines that it is not entitled to credit or repayment from the relevant tax authority in respect of the VAT.

(c)     If VAT is chargeable on any supply made by the Lender to any Party under a Finance Document and if reasonably requested by the Lender, that Party must promptly give the Lender details of its VAT registration number (if applicable) and any other information as is reasonably requested in connection with the Lender's reporting requirements for the supply.

### 11.7  FATCA Information

(a)     Subject to paragraph (c) below, a Party shall, within ten Business Days of a reasonable request by the other Party:

   (i)      confirm to that other Party whether it is:

      (A)   a FATCA Exempt Party; or

      (B)   not a FATCA Exempt Party;

   (ii)     supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA;

   (iii)    supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b)     If a Party confirms to the other Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)     Paragraph (a) above shall not oblige the Lender to do anything, and paragraph (a)(iii) above shall not oblige any Party to do anything, which would or might in its reasonable opinion constitute a breach of:

   (i)      any law or regulation;

   (ii)     any fiduciary duty; or

19

(iii)    any duty of confidentiality.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

**11.8    FATCA Deduction and gross-up by the Company**

(a)    If the Company is required to make a FATCA Deduction, it shall make that FATCA Deduction and any payment required in connection with that FATCA Deduction within the time allowed and in the minimum amount required by FATCA.

(b)    If a FATCA Deduction is required to be made by the Company, the amount of the payment due from the Company shall be increased to an amount which (after making any FATCA Deduction) leaves an amount equal to the payment which would have been due if no FATCA Deduction had been required.

(c)    The Company shall promptly upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of a FATCA Deduction) notify the Lender accordingly. Similarly, the Lender shall notify the Company on becoming so aware in respect of a payment payable to the Lender.

(d)    Within 30 days of making either a FATCA Deduction or any payment required in connection with that FATCA Deduction, the Company making that FATCA Deduction or payment shall deliver to the Lender evidence reasonably satisfactory to the Lender that the FATCA Deduction has been made or (as applicable) any appropriate payment has been paid to the relevant governmental or taxation authority.

**11.9    FATCA Deduction by the Lender**

(a)    The Lender may make any FATCA Deduction it is required by FATCA to make, and any payment required in connection with that FATCA Deduction, and the Lender shall not be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction. The Lender which becomes aware that it must make a FATCA Deduction in respect of a payment to the Company (or that there is any change in the rate or the basis of such FATCA Deduction) shall notify the Company.

(b)    If the Lender is required to make a FATCA Deduction which relates to a payment by the Company, the amount of the payment due from the Company shall be increased to an amount which (after the Lender has made such FATCA Deduction), leaves the Lender with an amount equal to the payment if no FATCA Deduction had been required.

20

(c)    The Lender shall promptly upon becoming aware that it must make a FATCA Deduction which relates to a payment by the Company (or that there is any change in the rate or the basis of such a FATCA Deduction) notify the Company.

(d)    The Company shall (within three Business Days of demand by the Lender) pay to the Lender an amount equal to the loss, liability or cost which the Lender determines will be or has been (directly or indirectly) suffered by the Lender as a result of its making a FATCA Deduction in respect of a payment due to it under a Finance Document. This paragraph shall not apply to the extent a loss, liability or cost is compensated for by an increased payment under paragraph (b) above.

(e)    The Lender making, or intending to make, a claim under paragraph (d) above shall promptly notify the Company of the FATCA Deduction which will give, or has given, rise to the claim.


## 12.    INCREASED COSTS

### 12.1  Increased Costs

Except as provided below in this Clause 12, the Company must pay to the Lender the amount of any Increased Cost incurred by the Lender or any of its Affiliates as a result of:

(a)    the introduction of, or any change in, or any change in the interpretation, administration or application of, any Law or Regulation; or

(b)    compliance with any Law or Regulation or any applicable direction, request or requirement (whether or not having the force of law) of any Authority made after the date of this Agreement.


### 12.2  Exceptions

The Company need not make any payment for an Increased Cost to the extent that the Increased Cost is:

(a)    compensated for under another Clause or would have been but for an exception to that Clause;

(b)    attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (but excluding any amendment arising out of Basel III) (**Basel II**) or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, the Lender or any of its Affiliates); or

(c)    attributable to the Lender or any Affiliate of the Lender wilfully failing to comply with any Law or Regulation.

21

**12.3 Claims**

(a) If the Lender intends to make a claim for an Increased Cost it must notify the Company of the circumstances giving rise to and the amount of the claim.

(b) The Lender must, as soon as practicable after making a demand, provide a certificate confirming the amount of its Increased Cost.

## 13. MITIGATION

**13.1 Mitigation**

(a) The Lender must, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which result or would result in:

    (i) any Tax Payment or Increased Cost being payable to the Lender;

    (ii) the Lender being able to exercise any right of prepayment and/or cancellation under this Agreement by reason of any illegality; or

    (iii) the Lender incurring any cost of complying with the minimum reserve requirements of the European Central Bank,

    including transferring its rights and obligations under the Finance Documents to an Affiliate or changing its Facility Office.

(b) Paragraph (a) above does not in any way limit the obligations of the Company under the Finance Documents.

(c) The Company must indemnify the Lender for all costs and expenses reasonably incurred by the Lender as a result of any step taken by it under this Subclause.

(d) The Lender is not obliged to take any step under this Subclause if, in the opinion of the Lender (acting reasonably), to do so might be prejudicial to it.

**13.2 Conduct of business by the Lender**

No term of any Finance Document will:

(a) interfere with the right of the Lender to arrange its affairs (Tax or otherwise) in whatever manner it thinks fit;

(b) oblige the Lender to investigate or claim any credit, relief, remission or repayment available to it in respect of Tax or the extent, order and manner of any claim; or

(c) oblige the Lender to disclose any information relating to its affairs (Tax or otherwise) or any computation in respect of Tax.

**14.  PAYMENTS**

**14.1  Currency**

(a)  Unless a Finance Document specifies that payments under it are to be made in a different manner, the currency of each amount payable under the Finance Documents is determined under this Subclause.

(b)  Amounts payable in respect of Taxes, fees, costs and expenses are payable in the currency in which they are incurred.

(c)  Each other amount payable under the Finance Documents is payable in US Dollars.

**14.2  No set-off or counterclaim**

All payments made by the Company under the Finance Documents must be calculated and made without (and free and clear of any deduction for) set-off or counterclaim.

**14.3  Business Days**

(a)  If a payment under the Finance Documents is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not) or whatever day the Lender determines (acting reasonably) is market practice.

(b)  During any extension of the due date for payment of any principal under this Agreement interest is payable on that principal at the rate payable on the original due date.

**14.4  Disruption to payment systems**

If the Company receives a notification from the Lender that a Disruption Event has occurred or the Company notifies the Lender that a Disruption Event has occurred, the Lender may, and must if requested by the Company, enter into discussions with the Company for a period of not more than five days with a view to agreeing any changes to the operation or administration of the Facility as the Parties may decide are necessary, provided that the Lender is not obliged to agree to any changes if, in its reasonable opinion, it is not practicable to do so.

**15.  REPRESENTATIONS AND WARRANTIES**

**15.1  Representations and warranties**

The representations and warranties set out in this Clause 15 are made by the Company to the Lender.

**15.2  Status**

(a)  It is a limited liability company, duly incorporated and validly existing under the laws of the Cayman Islands.

(b)  It and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

23

(c)    It is acting as principal on its account and not as agent or trustee in any capacity on behalf of any party in relation to this Agreement.

(d)    It is not a FATCA FFI or a US Tax Obligor.

### 15.3  Powers and authority

It has the power to enter into and perform, and has taken all necessary action to authorise the entry into and performance of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

### 15.4  Legal validity

(a)    Subject to any general principles of law limiting its obligations and referred to in any legal opinion required under this Agreement, each Finance Document to which it is a party is its legally binding, valid and enforceable obligation.

(b)    Each Finance Document to which it is a party is in the proper form for its enforcement in the jurisdiction of its incorporation.

### 15.5  Non-conflict

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not conflict with:

(a)    any law or regulation applicable to it;

(b)    its or any of its Subsidiaries' constitutional documents;

(c)    any document which is binding upon it or any of its Subsidiaries or any of its or its Subsidiaries' assets.

### 15.6  No default

(a)    No Event of Default is outstanding or will result from the entry into of, or the performance of any transaction contemplated by, any Finance Document; and

(b)    No other event or circumstance is outstanding which constitutes a default under any document which is binding on it or any of its Subsidiaries or any of its or its Subsidiaries' assets to an extent or in a manner which has or is reasonably likely to have a Material Adverse Effect.

### 15.7  Authorisations

All authorisations required to enable it to enter into and perform its obligations under, and for the validity and enforceability of, and the transactions contemplated by, the Finance Documents have been, or will, by the time required, have been obtained or effected (as appropriate) and are, or will, by the time required be, in full force and effect.

24

**15.8    Financial statements**

Its audited consolidated financial statements most recently delivered to the Lender (which, at the date of this Agreement, are the Original Financial Statements):

(a)    have been prepared in accordance with GAAP, consistently applied; and

(b)    give a true and fair view of its consolidated financial condition as at the date to which they were drawn up,

except, in each case, as disclosed to the contrary in those financial statements.

**15.9    Litigation**

No litigation, arbitration or administrative proceedings against any member of the Group has been started or, to its knowledge, threatened, which have or, if adversely determined, are reasonably likely to have a Material Adverse Effect.

**15.10    Issued share capital**

It has a paid up share capital of not less than HKD1,000,000 or an equivalent amount in any other approved currency.

For the purpose of this Subclause, **approved currency** means a currency which is freely convertible into Hong Kong dollars or a currency approved in writing by the Registrar of Money Lenders appointed under section 4 of the Money Lenders Ordinance (Cap. 163, Laws of Hong Kong) (the **MLO**) for the purpose of paragraph 12 of Part 2 of Schedule 1 to the MLO.

**15.11    OFAC**

No member of the Group will:

(a)    use (or otherwise make available) the proceeds of the Loan for the purpose of financing directly or indirectly the activities of any person or entity which is currently listed on the Specially Designated Nationals (the **SDN**) List or in a country which is subject to U.S. economic sanctions administered by the U.S. Treasury Department Office of Foreign Assets Control (the **OFAC Sanctions**) to the extent such financing would be prohibited by the OFAC Sanctions if conducted by a person in the United States of America; or

(b)    contribute or otherwise make available the proceeds of the Loan to any person or entity if the relevant member of the Group has actual knowledge that such party intends to use such proceeds for the purpose of financing the activities of any person or entity which is on the SDN List or in a country which is subject to the OFAC Sanctions, to the extent such financing would be prohibited by the OFAC Sanctions if conducted by a person in the United States of America.

**15.12    No material adverse change**

There has been no material adverse change in its consolidated financial condition since the date to which the Original Financial Statements were drawn up.

25

**15.13    Information**

All written, factual information supplied by the Company or on its behalf to the Lender in connection with the Finance Documents (including any information supplied prior to the date of this Agreement) is true and accurate in all material respects as at its date or (if appropriate) as at the date (if any) at which it is stated to be given and the Company has not omitted to supply any information which, if disclosed, might make the information supplied untrue or misleading in any material respect.

**15.14    Restricted Group**

The following is a complete list of all the members of the Restricted Group as of the date of this Agreement:

(a)    Baidu.com Times Technology (Beijing) Co., Ltd;

(b)    Baidu Online Network Technology (Beijing) Co., Ltd; and

(c)    Baidu (China) Co., Ltd.

**15.15    Stamp duties**

Except for any registration fees, stamp duty or other similar Tax or charge referred to in any legal opinion required under this Agreement (which will be paid within any applicable time limit), as at the date of this Agreement, no stamp or registration duty or similar Tax or charge is payable in its jurisdiction of incorporation in respect of any Finance Document.

**15.16    Security Interest**

As at the date of this Agreement, no Security Interest or Quasi-Security Interest exists over the assets of any member of the Restricted Group.

**15.17    Times for making representations and warranties**

(a)    The representations and warranties set out in this Clause are made by the Company on the date of this Agreement.

(b)    Each Repeating Representation is deemed to be repeated by the Company on the date of the Request and the first day of each Term.

(c)    When a representation and warranty is repeated, it is applied to the circumstances existing at the time of repetition.

**16.    INFORMATION COVENANTS**

**16.1    Financial statements**

(a)    The Company must supply to the Lender:

(i)    its audited consolidated financial statements for each of its financial years; and

26

(ii)    its interim financial statements for the first half-year of each of its financial years.

(b)    All financial statements must be supplied as soon as they are available and:

(i)    in the case of the Company's audited consolidated financial statements, within 180 days; and

(ii)    in the case of the Company's interim financial statements, within 120 days,

of the end of the relevant financial period.

### 16.2  Form of financial statements

(a)    The Company must ensure that each set of financial statements supplied under this Agreement gives (if audited) a true and fair view of, or (if unaudited) fairly represents, its financial condition (consolidated or otherwise) as at the date to which those financial statements were drawn up.

(b)    The Company must notify the Lender of any change to the manner in which its audited consolidated financial statements are prepared.

(c)    If requested by the Lender, the Company must supply to the Lender:

(i)    a full description of any change notified under paragraph (b) above; and

(ii)    sufficient information to enable the Lender to make a proper comparison between the financial position shown by the set of financial statements prepared on the changed basis and its most recent audited consolidated financial statements delivered to the Lender under this Agreement.

### 16.3  Compliance Certificate

(a)    The Company must supply to the Lender a Compliance Certificate with each set of its financial statements sent to the Lender under this Agreement.

(b)    A Compliance Certificate must be signed by two authorised signatories of the Company.

### 16.4  Information — miscellaneous

(a)    The Company must, subject to paragraph (b) below, supply to the Lender if the Lender so requests:

(i)    copies of all documents despatched by the Company to its shareholders (or any class of them) or to its creditors generally at the same time as they are despatched;

27

(ii)     promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings against any member of the Group which are current, threatened or pending and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(iii)    promptly on request, a list of the then current Restricted Subsidiaries; and

(iv)     promptly on request, such further information regarding the financial condition, business and operations of any member of the Group as the Lender may reasonably request.

(b)    Nothing in paragraph (a) above shall require the Company to supply any document or information to the Lender if and for so long such disclosure will cause the Company to be in breach of the relevant listing rules of NASDAQ or any mandatory provisions of applicable laws or any confidentiality agreements or undertakings.

## 16.5 Notification of Default

(a)    The Company must notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

(b)    Promptly on request by the Lender, the Company must supply to the Lender a certificate, signed by two of its authorised signatories on its behalf, certifying that no Default is outstanding or, if a Default is outstanding, specifying the Default and the steps, if any, being taken to remedy it.

## 16.6 Year end

The Company must not change its financial year end except with the prior written consent of the Lender (which consent shall not be unreasonably withheld or delayed).

## 17. FINANCIAL COVENANTS

### 17.1 Definitions

In this Clause 17:

**Adjusted Consolidated EBITDA** means, in relation to a Measurement Period, Consolidated EBITDA for the period adjusted by:

(a)    including the operating profit before interest, tax, depreciation, amortisation and impairment charges (EBITDA) of a member of the Group or attributable to a business or assets acquired during the Measurement Period for that part of the Measurement Period when it was not a member of the Group and/or the business or assets were not owned by a member of the Group; and

(b)    excluding the EBITDA attributable to any member of the Group or to any business or assets sold during that Measurement Period.

28

**Consolidated Cash Balance** means, at any time, the aggregate of all cash and cash equivalents and short-term investments held by the Group at that time which would be included on a consolidated balance sheet of the Group drawn up at that time in accordance with GAAP as "Cash and cash equivalents" or "Short-term investments" and for so long as repayment of that cash or realisation of those cash equivalents or short-term investments is not contingent on the prior discharge of any other indebtedness of any member of the Group or of any other person whatsoever or on satisfaction of any other condition outside the control of the Group.

**Consolidated EBIT** means, in relation to a Measurement Period, the aggregate of:

(a)   the consolidated operating profits of the Group (including the results from discontinued operations) before finance costs and tax for that Measurement Period;

(b)   plus or minus the Group's share of the profits or losses of associates for that period (after finance costs and tax) and the Group's share of the profits or losses of any joint ventures;

adjusted by:

(i)    taking no account of any Exceptional Item;

(ii)   taking no account of any unrealised gains or losses on any derivative instrument or other financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis) which is reported through the income statement;

(iii)  taking no account of any income or charge attributable to a post-employment benefit scheme other than the current service costs and any past service costs and curtailments and settlements attributable to the scheme;

(iv)   taking no account of any expense referable to equity-settled share-based compensation of employees.

**Consolidated EBITDA** means, in relation to a Measurement Period, Consolidated EBIT for that Measurement Period after adding back any depreciation and amortisation and taking no account of any charge for impairment or any reversal of any previous impairment charge made in the period.

**Consolidated Tangible Net Worth** means at any time the aggregate of:

(a)   the amount paid up or credited as paid up on the issued share capital of the Company; and

(b)   the net amount standing to the credit (or debit) of the consolidated reserves of the Company,

based on the latest published audited or unaudited consolidated balance sheet of the Company (the **latest balance sheet**) (and in each case, the balance sheet of the

29

Company to be provided by the Company as at 31 December of each year shall always be audited) but adjusted by:

    (i)    deducting any dividend or other distribution proposed, declared or made by the Company (except to the extent it has been taken into account in the latest balance sheet);

    (ii)    deducting any amount attributable to goodwill or any other intangible asset;

    (iii)    deducting any amount attributable to an upward revaluation of assets (other than financial instruments) after 31 December 2014 or, in the case of assets of a company which becomes a member of the Group after that date, the date on which that company becomes a member of the Group;

    (iv)    reflecting any variation in the amount of the issued share capital of the Company after the date of the latest balance sheet (and any change in the consolidated reserves of the Group resulting from that variation);

    (v)    reflecting any variation in the interest of the Company in any other member of the Group since the date of the latest balance sheet (to be calculated on the assumption that the variation had occurred immediately before the latest balance sheet date); and

    (vi)    excluding any amounts debited or credited to deferred tax which relates to the revaluation of any item which is excluded from the calculation.

**Consolidated Total Borrowings** means, in respect of the Group, at any time, the aggregate of the following liabilities calculated at the nominal, principal or other amount at which the liabilities would be carried in a consolidated balance sheet of the Company drawn up at that time (or in the case of any guarantee, indemnity or similar assurance referred to in paragraph (i) below, the maximum liability under the relevant instrument):

(a)    any moneys borrowed;

(b)    any redeemable preference shares;

(c)    any acceptance under any acceptance credit (including any dematerialised equivalent);

(d)    any bond, note, debenture, loan stock or other similar instrument;

(e)    any indebtedness under a finance or capital lease in accordance with the GAAP;

(f)    any moneys owing in connection with the sale or discounting of receivables (except to the extent that there is no recourse);

(g)     any indebtedness arising from any deferred payment agreements arranged primarily as a method of raising finance or financing the acquisition of an asset;

(h)     any indebtedness arising in connection with any other transaction (including any forward sale or purchase agreement) which has the commercial effect of a borrowing; and

(i)     any indebtedness of any person of a type referred to in the above paragraphs which is the subject of a guarantee, indemnity or similar assurance against financial loss given by a member of the Group,

in each case, for the avoidance of doubt, excluding any indebtedness arising (a) in the ordinary course of trading and (b) between members of the Group.

**Exceptional Item** means any material item of income or expense that represents:

(a)     any gain or loss arising from:

  (i)     write-downs of inventories to net realisable value or of property, plant and equipment to recoverable amount, and reversals of such write-downs;

  (ii)    restructuring the activities of the Group or any member of the Group and any reversals of any provision for the costs of restructuring;

  (iii)   disposals of items of property, plant or equipment;

  (iv)    disposals of investments; or

  (v)     disposals or settlements of liabilities of any member of the Group that fall within the definition of Consolidated Total Borrowings; or

(b)     any gain of a highly unusual or non-recurring nature; or

(c)     any gain or loss arising from a transaction entered into otherwise than in the carrying on of the normal core business operations of the Group.

**Measurement Period** means the last four full financial quarters of the Company ending on the date of the latest balance sheet (as defined in **Consolidated Tangible Net Worth** above).


**17.2  Interpretation**

(a)     Except as provided to the contrary in this Agreement, an accounting term used in this Clause is to be construed in accordance with the principles applied in connection with the Original Financial Statements.

(b)     Any amount in a currency other than US Dollars is to be taken into account at its US Dollar equivalent calculated on the basis of:

31

(i)    the Lender's spot rate of exchange for the purchase of the relevant currency in the London foreign exchange market with US Dollars at or about 11.00 a.m. on the day the relevant amount falls to be calculated; or

(ii)   if the amount is to be calculated on the last day of a financial period of the Company, the relevant rates of exchange used by the Company in, or in connection with, its financial statements for that period.

(c)  No item must be credited or deducted more than once in any calculation under this Clause 17.

### 17.3 Consolidated Tangible Net Worth

The Company must ensure that Consolidated Tangible Net Worth is not at any time less than RMB 10 billion.

### 17.4 Gearing

The Company must ensure that Consolidated Total Borrowings do not at any time exceed 150 per cent. of Consolidated Tangible Net Worth at that time.

### 17.5 Leverage

The Company must ensure that Consolidated Total Borrowings do not, at the end of each Measurement Period, exceed 2.5 times of the Adjusted Consolidated EBITDA for that Measurement Period.

### 17.6 Consolidated Cash Balance

The Company must ensure that Consolidated Cash Balance is not at any time less than Consolidated Total Borrowings at that time.

## 18.  GENERAL COVENANTS

### 18.1 General

The Company agrees to be bound by the covenants set out in this Clause 18 relating to it and, where the covenant is expressed to apply to any other member of the Group, the Company must ensure that its relevant Subsidiaries perform that covenant.

### 18.2 Authorisations

The Company must promptly:

(a)   obtain, maintain and comply with the terms; and

(b)   if requested by the Lender, supply certified copies to the Lender,

of any authorisation required under any law or regulation to enable it to perform its obligations under, or for the validity or enforceability of, any Finance Document.

32

**18.3  Compliance with laws**

Each member of the Group must comply in all respects with all laws to which it is subject where failure to do so would have a Material Adverse Effect.

**18.4  Pari passu ranking**

The Company must ensure that its payment obligations under the Finance Documents at all times rank at least pari passu with all its other present and future unsecured payment obligations, except for obligations mandatorily preferred by law applying to companies generally.

**18.5  Negative pledge**

(a)   For the purpose of this Subclause, **Quasi-Security Interest** means an arrangement or transaction described in paragraph (c) below.

(b)   Except as provided below, no member of the Restricted Group may create or allow to exist any Security Interest on any of its assets.

(c)   No member of the Restricted Group may:

(i)    sell, transfer or otherwise dispose of any of its assets on terms where it is or may be leased to or re-acquired or acquired by a member of the Restricted Group;

(ii)   sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iii)  enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(iv)   enter into any other preferential arrangement having a similar effect,

in circumstances where the transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(d)   Paragraphs (b) and (c) do not apply to:

(i)    any Security Interest or Quasi-Security Interest comprising a netting, set-off or cash-pooling arrangement entered into by a member of the Restricted Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(ii)   any payment or close out netting or set-off arrangement pursuant to any hedging transaction entered into by a member of the Restricted Group but excluding any Security Interest or Quasi-Security Interest under a credit support arrangement;

(iii)  any lien arising by operation of law and in the ordinary course of business;

33

(iv)    any Security Interest or Quasi-Security Interest on an asset, or an asset of any person, acquired by a member of the Restricted Group after the date of this Agreement but only for the period of 6 months from the date of acquisition and to the extent that the principal amount secured by that Security Interest has not been incurred or increased in contemplation of, or since, the acquisition;

(v)    any Security Interest or Quasi-Security Interest arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Restricted Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Restricted Group;

(vi)    any Security Interest or Quasi-Security Interest over goods or documents of title arising in the ordinary course of letter of credit transactions entered into in the ordinary course of trade;

(vii)    any Security Interest or Quasi-Security Interest provided with the prior consent of the Lender; and

(viii)    any Security Interest or Quasi-Security Interest securing indebtedness the amount of which (when aggregated with the amount of any other indebtedness which has the benefit of a Security Interest not allowed under the preceding sub-paragraphs) does not exceed RMB500,000,000 or its equivalent at any time.

## 18.6 Disposals

(a)    Except as provided below, no member of the Group (other than Beijing Baidu Netcom) may, either in a single transaction or in a series of transactions and whether related or not, dispose of all or any part of its assets without the prior written consent of the Lender.

(b)    Paragraph (a) above does not apply to any disposal:

(i)    where the consideration receivable of that disposal (when aggregated with the consideration for any other disposal of assets by any member of the Group not allowed under sub-paragraphs (ii) to (vi) below) (A) does not exceed the Disposal Threshold or (B) exceeds the Disposal Threshold but no Mandatory Prepayment Request has been delivered by the Lender to the Company within the applicable time period specified in Clause 7.2(a) (Mandatory prepayment — disposals); or (C) exceeds the Disposal Threshold where the net proceeds of that disposal are applied towards mandatory prepayment of the Loan in accordance with Clause 7.2(a) (Mandatory prepayment — disposals);

(ii)    made to another member of the Group (other than Beijing Baidu Netcom);

(iii)    made in the ordinary course of trading of the disposing entity;

34

(iv)      of assets in exchange for other assets comparable or superior as to type, value and quality;

(v)       of obsolete or redundant vehicles, plant or equipment for cash; or

(vi)      arising as result of a Permitted Transaction.

(c)      Each disposal shall only be permitted under this Subclause if it is made (i) on arm's length commercial terms or (ii) (other than in respect of any disposal permitted under paragraph (b)(ii) above) on more favourable terms to the disposing entity than arms' length commercial terms and at least for fair market value.

## 18.7    Change of business

The Company must ensure that no substantial change is made to the general nature of the business of the Restricted Group from that carried on at the date of this Agreement.

## 18.8    Merger

The Company may not enter into any amalgamation, demerger, merger or reconstruction other than a Permitted Transaction.

## 18.9    Insurance

Each member of the Restricted Group must insure its business and assets with insurance companies to such an extent and against such risks as companies engaged in a similar business normally insure.

## 18.10    "Know Your Customer" Checks

The Company shall promptly upon the request of the Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Lender (for itself or on behalf of any prospective assignee or transferee) in order for the Lender or any prospective assignee or transferee to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations.

## 18.11    Anti-Money Laundering and Counter-Terrorist Financing

Each member of the Group shall comply in all respects with all anti-money laundering and counter-terrorist financing laws and regulations (**AML/CTF Laws**) to which it may be subject. The Company shall promptly provide all information to the Lender which the Lender may require in order to manage its money-laundering and terrorist-financing risks or to comply with AML/CTF Laws.

## 18.12   Anti-Corruption

No member of the Group nor its directors, and officers, and (to the best of the Company's knowledge having made all reasonable enquiries) agents, employees and any other persons acting for it or on its behalf (each a **Relevant Person**) have:

35

(a)     violated (and will violate) any applicable anti-bribery or anti-corruption laws;

(b)     offered, paid, promised to pay or authorized the payment of (and will offer, pay, promise to pay or authorize the payment of) any money; or

(c)     offered, given, promised to give or authorized the giving of (and will offer, give, promise to give or authorize the giving of) anything of value to any Government Official (**Government Official** means any officer, employee or any other person acting in an official capacity for any government authority or any political party or any candidate for political office (both individually and collectively)) or to any person,

under circumstances where any member of the Group or the Relevant Person knew or was aware of a high probability that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, in each case for the purpose of:

    *(i)*      *any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity;*

    *(ii)*      *influencing any act or decision of such Government Official in his official capacity (including a decision to fail to perform his official function);*

    *(iii)*      *inducing such Government Official to do any act in relation to his lawful duty;*

    *(iv)*      *securing any improper advantage;*

    *(v)*      *inducing such Government Official to influence or affect any act or decision of any Government Entity (Government Entity means government or any department, agency or instrumentality thereof, including any entity or enterprise owned or controlled by a government, or a public international organisation); or*

    *(vi)*      *assisting any member of the Group or the Relevant Person in obtaining or retaining business for or with a Government Entity, or directing business to the Group or the Relevant Person (and such conduct a "Corrupt Activity"),*

provided that the Company shall not be in breach of the representation in this Clause 18.12 if, within thirty (30) days of becoming aware of any Corrupt Activity, the Company takes appropriate action to remedy such Corrupt Activity.

### 18.13    Restrictions on Transactions

The Company agrees that the Lender may refuse to act on any instruction of the Company or delay, block or refuse to process any transaction under this Agreement without incurring any liability if the Lender has fair reason to suspect that:

(a)     the instruction or transaction may breach any Law or Regulation;

36

(b)    the instruction or transaction involves any person (natural, corporate or governmental) that is itself subject to any applicable sanction imposed by the United Nations or any relevant country or is connected, directly or indirectly, to any person that is subject to such sanction;

(c)    the instruction or transaction may directly or indirectly involve the proceeds of, or be applied for the purposes of, any unlawful conduct; or

(d)    by carrying out the instruction or transaction, the Lender may breach any Law or Regulation.

### 18.14   No Immunity

The Company agrees that in any legal action or proceedings against it or its assets in connection with this Agreement, no immunity from such legal action or proceedings shall be claimed by or on behalf of any member of the Group or with respect to its assets, and that member (including the Company) irrevocably waives any such right of immunity which it or its assets now has/have or may hereafter acquire or which may be attributed to it or its assets and consents generally in respect of any such legal action or proceedings to the giving of any relief or the issue of any process in connection with such action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever, of any order or judgment which may be made or given in such action or proceedings.

### 18.15   Provision of Information

(a)    Each member of the Group agrees that it shall provide the Lender with such information as the Lender may require from time to time to enable the Lender to comply with any Law or Regulation.

(b)    If any information provided by or on behalf of the Company to the Lender includes information or personal data of any third party, the Company confirms and warrants that it has obtained the consent of such third party to the provision of such information or personal data to the Lender for such purposes and for disclosure to such persons (whether in or outside Hong Kong) as it may be disclosed to in accordance with the terms of this Agreement or the Lender's policies on use and disclosure of personal data set out in statements, circulars, terms and conditions or notices made available by the Lender to its customers from time to time.

### 18.16   Application of FATCA

The Company shall procure that it shall not become a FATCA FFI or a US Tax Obligor.

## 19.   DEFAULT

### 19.1   Events of Default

Each of the events or circumstances set out in this Clause 19 (other than Clause 19.13 (Acceleration)) is an Event of Default.

**19.2 Non-payment**

The Company does not pay on the due date any amount payable by it under the Finance Documents in the manner required under the Finance Documents, unless the non-payment

(a)    is caused by technical or administrative error and is remedied within five Business Days of the due date; or

(b)    is caused by a Disruption Event and is remedied within five Business Days of the due date.

**19.3 Breach of other obligations**

(a)    The Company does not comply with any term of Clause 17 (Financial covenants); or

(b)    the Company does not comply with any term of the Finance Documents (other than any term referred to in Clause 19.2 (Non-payment) or in paragraph (a) above), unless the non-compliance:

    (i)    is capable of remedy; and

    (ii)    is remedied within 20 Business Days of the earlier of the Lender giving notice of the failure to comply to the Company and the Company becoming aware of the non-compliance.

**19.4 Misrepresentation**

A representation or warranty made or deemed to be repeated by the Company in any Finance Document or in any document delivered by or on behalf of the Company under any Finance Document is incorrect or misleading in any material respect when made or deemed to be repeated, unless the circumstances giving rise to the misrepresentation or breach of warranty:

(a)    are capable of remedy; and

(b)    are remedied within 20 Business Days of the earlier of the Lender giving notice of the misrepresentation or breach of warranty to the Company and the Company becoming aware of the misrepresentation or breach of warranty.

**19.5 Cross-default**

Any of the following occurs in respect of a member of the Restricted Group:

(a)    any of its Financial Indebtedness is not paid when due (after the expiry of any originally applicable grace period);

(b)    any of its Financial Indebtedness:

    (i)    becomes prematurely due and payable;

(ii)    is placed on demand; or

(iii)   is capable of being declared by or on behalf of a creditor to be prematurely due and payable or of being placed on demand,

in each case, as a result of an event of default or any provision having a similar effect (howsoever described); or

(c)    any commitment for its Financial Indebtedness is cancelled or suspended as a result of an event of default or any provision having a similar effect (howsoever described),

unless the aggregate amount of Financial Indebtedness falling within all or any of paragraphs (a) to (c) above is less than US$50,000,000 or its equivalent.

**19.6 Insolvency**

Any of the following occurs in respect of a member of the Restricted Group:

(a)    it is, or is deemed for the purposes of any applicable law to be, unable to pay its debts as they fall due or insolvent;

(b)    it admits its inability to pay its debts as they fall due;

(c)    it suspends making payments on its debts generally or announces an intention to do so;

(d)    by reason of actual or anticipated financial difficulties, it begins negotiations with any creditor for the rescheduling or restructuring of any of its indebtedness;

(e)    the value of its assets is less than its liabilities (taking into account contingent and prospective liabilities); or

(f)    any of its indebtedness is subject to a moratorium.

**19.7 Insolvency proceedings**

(a)    Except as provided below, any of the following occurs in respect of a member of the Restricted Group:

(i)    any corporate action or legal proceedings is taken with a view to the suspension of payments, a moratorium or a composition, assignment or similar arrangement with any of its creditors;

(ii)    a meeting of its shareholders, directors or other officers resolves to petition for or to file documents with a court or any registrar for, its winding-up, administration or dissolution or any such resolution is passed;

(iii)   any person presents a petition, or files documents with a court or any registrar, for its winding-up, administration, dissolution or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise);

39

(iv)  any Security Interest is enforced over any of its assets having an aggregate value of at least US$50,000,000;

(v)  an order for its winding-up, administration or dissolution is made;

(vi)  any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator or similar officer is appointed in respect of it or any of its assets; or

(vii)  any analogous step or procedure is taken in any jurisdiction.

(b)  Paragraph (a) above does not apply to:

(i)  any step or procedure which is part of a Permitted Transaction; or

(ii)  a petition for winding-up, administration or dissolution which is being contested in good faith and with due diligence and is discharged or struck out within 30 days.

### 19.8    Creditors' process

Any attachment, sequestration, distress, execution or analogous event affects any asset(s) of a member of the Restricted Group, having an aggregate value of at least US$50,000,000 which is not discharged within 30 days.

### 19.9    Cessation of business

A member of the Restricted Group ceases, or threatens to cease, to carry on business except:

(a)  as part of a Permitted Transaction; or

(b)  as a result of any disposal allowed under this Agreement.

### 19.10    De-listing or suspension of shares trading

The shares in the Company cease to be listed on NASDAQ or trading of the shares in the Company has been suspended for more than five (5) consecutive Business Days on which NASDAQ is generally open for trading and such delisting or suspension has a Material Adverse Effect.

### 19.11    Effectiveness of Finance Documents

(a)  It is or becomes unlawful for the Company to perform any of its obligations under the Finance Documents.

(b)  The Company repudiates a Finance Document or evidences an intention to repudiate a Finance Document.

40

**19.12    Material adverse change**

Any event or series of events occurs which, in the opinion of the Lender (acting reasonably), would have a Material Adverse Effect.

**19.13    Acceleration**

If an Event of Default is outstanding, the Lender may by notice to the Company:

(a)    cancel all or any part of the Commitments; and/or

(b)    declare that all or part of any amounts outstanding under the Finance Documents are:

    (i)    immediately due and payable; and/or

    (ii)    payable on demand by the Lender.

Any notice given under this Subclause will take effect in accordance with its terms.

**20.    EVIDENCE AND CALCULATIONS**

**20.1    Accounts**

Accounts maintained by the Lender in connection with this Agreement are prima facie evidence of the matters to which they relate for the purpose of any litigation or arbitration proceedings.

**20.2    Certificates and determinations**

Any certification or determination by the Lender of a rate or amount under the Finance Documents will be, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**20.3    Calculations**

Any interest or fee accruing under this Agreement accrues from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or in any case where the London interbank market differs, in accordance with that market practice.

**21.    FEE**

The Company shall pay to the Lender a front-end fee in an amount equal to USD1,200,000.00 (or 0.8 per cent. of USD150,000,000) within fifteen (15) days of the Utilisation Date. The front-end fee shall be non-refundable whether or not any amount is drawn hereunder.

**22.    INDEMNITIES AND BREAK COSTS**

**22.1    Currency indemnity**

(a)    The Company must, as an independent obligation, indemnify the Lender against any loss or liability which the Lender incurs as a consequence of:

41

(i)     the Lender receiving an amount in respect of the Company's liability under the Finance Documents; or

(ii)    that liability being converted into a claim, proof, judgment or order,

in a currency other than the currency in which the amount is expressed to be payable under the relevant Finance Document.

(b)   Unless otherwise required by law, the Company waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency other than that in which it is expressed to be payable.


## 22.2  Other indemnities

(a) The Company must indemnify the Lender (and its officers, employees, agents, delegates and nominees) against any fees, expenses (including those of legal counsel), loss or liability which the Lender incurs as a consequence of:

(i)     the occurrence of any Event of Default;

(ii)    written information produced or approved by the Company being or being alleged to be misleading or deceptive in any respect;

(iii)   any enquiry, investigation, subpoena (or similar order) or litigation with respect to the Company or with respect to the transactions contemplated or financed under the Finance Documents;

(iv)    any failure by the Company to pay any amount due under a Finance Document on its due date;

(v)     (other than by reason of gross negligence or wilful misconduct by the Lender) the Loan not being made after the Request has been delivered for the Loan; or

(vi)    the Loan (or part of the Loan ) not being prepaid in accordance with this Agreement.

The Company's liability in each case includes any loss or expense on account of funds borrowed, contracted for or utilised to fund any amount payable under any Finance Document or the Loan.

(b)   The Company must indemnify the Lender against any loss or liability incurred by the Lender as a result of:

(i)     investigating any event which the Lender believes to be a Default; or

(ii)    acting or relying on any notice, request or instruction which the Lender believes to be genuine, correct and appropriately authorised.

(c)   The provisions of this Clause 22.2 shall survive the termination of the Finance Documents or the Lender ceasing to be a Party under the Finance Documents.

42

**22.3 Break Costs**

(a)    The Company must pay to the Lender its Break Costs if the Loan (or any part of it) or an overdue amount is repaid or prepaid otherwise than on the last day of any Term applicable to it.

(b)    Break Costs are the amount (if any) determined by the Lender by which:

(i)    the interest (excluding the Margin) which the Lender would have received for the period from the date of receipt of any part of its share in the Loan or an overdue amount to the last day of the applicable Term for the Loan or overdue amount if the principal or overdue amount received had been paid on the last day of that Term;

exceeds

(ii)    the amount which the Lender would be able to obtain by placing an amount equal to the amount received by it on deposit with a leading bank in the appropriate interbank market for a period starting on the Business Day following receipt and ending on the last day of the applicable Term.

(c)    The Lender must supply to the Company details of the amount of any Break Costs claimed by it under this Subclause.

**23.    EXPENSES**

**23.1  Initial costs**

The Company must pay the Lender the amount of all out-of-pocket costs and expenses reasonably incurred by it up to an agreed level in connection with the negotiation, preparation, or printing the Finance Documents.

**23.2  Subsequent costs**

The Company must pay to the Lender the amount of all costs and expenses (including reasonable legal fees) reasonably incurred by it in connection with:

(a)    the negotiation, preparation, printing and entry into of any Finance Document (other than a Transfer Certificate) entered into after the date of this Agreement; and

(b)    any amendment, waiver or consent requested by or on behalf of the Company or specifically allowed by a Finance Document.

**23.3  Enforcement costs**

The Company must pay to the Lender the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of, or the preservation of any rights under, any Finance Document.

43

**24. AMENDMENTS AND WAIVERS**

**24.1 Procedure**

(a) Unless otherwise specified in the Finance Documents, any term of the Finance Documents may be amended or waived only with the consent of the Company and the Lender and any such amendment or waiver will be binding on all the Parties.

**24.2 Change of currency**

If a change in any currency of a country occurs (including where there is more than one currency or currency unit recognised at the same time as the lawful currency of a country), the Finance Documents will be amended to the extent the Lender reasonably determines after consultation with the Company is necessary to reflect the change.

**24.3 Waivers and remedies cumulative**

The rights of the Lender under the Finance Documents:

(a) may be exercised as often as necessary;

(b) are cumulative and not exclusive of its rights under the general law; and

(c) may be waived only in writing and specifically.

Delay in exercising or non-exercise of any right is not a waiver of that right.

**25. CHANGES TO THE PARTIES**

**25.1 Assignments and transfers by the Company**

The Company may not assign or transfer any of its rights and obligations under the Finance Documents without the prior consent of the Lender.

**25.2 Assignments and transfers by Lender**

Subject to the following provisions of this Clause 25, the Lender (the **Existing Lender**) may at any time:

(a) assign any of its rights; or

(b) transfer by way of novation any of its rights or obligations under this Agreement,

to another bank or financial institution (the **New Lender**) without the consent of the Company provided that the Existing Lender has given the Company no less than 15 days prior written notice of such assignment or transfer.

**25.3 Other conditions to assignment or transfer**

(a) The Lender is not obliged to enter into a Transfer Certificate or otherwise give effect to an assignment or transfer until it has completed all customer due diligence or any "know your customer" or other checks in relation to any relevant person or other legal requirements to its satisfaction.

44

(b)   any reference in this Agreement to the Lender includes a New Lender but excludes a Lender if no amount is or may be owed to or by it under this Agreement.

### 25.4  Procedure for transfer using a Transfer Certificate

(a)   In this Subclause:

**Transfer Date** means, in relation to a transfer, the later of:

   (i)   the proposed Transfer Date specified in that Transfer Certificate; and

   (ii)   the date on which the Existing Lender enters into that Transfer Certificate.

(b)   A transfer of rights or obligations using a Transfer Certificate will be effective if:

   (i)   the New Lender delivers to the Existing Lender a duly completed Transfer Certificate; and

   (ii)   the Existing Lender enters into it.

(c)   On the Transfer Date:

   (i)   the New Lender will assume the rights and obligations of the Existing Lender expressed to be the subject of the novation in the Transfer Certificate in substitution for the Existing Lender;

   (ii)   the Existing Lender will be released from those obligations and cease to have those rights; and

   (iii)   the New Lender will become the Lender under this Agreement and be bound by the terms of this Agreement as Lender.

(d)   The Existing Lender shall, subject to subclause 25.4, enter into a Transfer Certificate delivered to it and which appears on its face to be in order as soon as reasonably practicable and, as soon as reasonably practicable after it has entered into a Transfer Certificate, send a copy of that Transfer Certificate to the Company.

### 25.5  Original consents and waivers

The New Lender shall be bound by any consent, waiver, election or decision given or made by the Existing Lender under or pursuant to any Finance Document prior to the coming into effect of the relevant assignment or transfer to that New Lender.

### 25.6  Limitation of responsibility of Existing Lender

(a)   Unless expressly agreed to the contrary, the Existing Lender makes no representation or warranty and assumes no responsibility to the New Lender for:

45

(i)     the financial condition of the Company; or

(ii)    the legality, validity, effectiveness, enforceability, adequacy, accuracy, completeness or performance of:

(A)   any Finance Document or any other document;

(B)   any statement or information (whether written or oral) made in or supplied in connection with any Finance Document, or

(C)   any observance by the Company of its obligations under any Finance Document or other document,

and any representations or warranties implied by law are excluded.

(b)   The New Lender confirms to the Existing Lender that it:

(i)     has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) in connection with its participation in this Agreement;

(ii)    has not relied on any information supplied to it by the Existing Lender in connection with any Finance Document;

(iii)   has conducted its own investigation in connection with the Finance Documents and has not relied upon the Existing Lender to conduct any due diligence investigation on its behalf;

(iv)    has access to all information that it believes is necessary or appropriate in connection with its participation of this Agreement and it is able to obtain or access business and financial information without undue difficulty;

(v)     has consulted its own independent advisors or otherwise has satisfied itself concerning, without limitation, the tax, legal, currency and other economic considerations related to its participation in this Agreement, and has only relied on the advice of, or has only consulted with, such independent advisers;

(vi)    has not relied and will not rely on any investigation or due diligence that the Existing Lender or any of its affiliates or employees or any person acting on behalf of the Existing Lender may have conducted in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets), and none of such persons has made any representation, warranty or recommendation to that New Lender, express or implied, in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent

46

of any recourse against any Party or its assets) or the accuracy, completeness or adequacy of any information that New Lender obtain from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind); and

(vii)   will not hold the Existing Lender, its affiliates or the officers, directors or employees responsible for any misstatements in or omissions from information it obtains from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind).

(c)   Nothing in any Finance Document requires the Existing Lender to:

(i)   accept a re-transfer from the New Lender of any of the rights and obligations assigned or transferred under this Clause; or

(ii)   support any losses incurred by the New Lender by reason of the non-performance by the Company of its obligations under any Finance Document or otherwise.

### 25.7  Costs resulting from change of Lender or Facility Office

If:

(a)   the Lender assigns or transfers any of its rights and obligations under the Finance Documents or changes its Facility Office; and

(b)   as a result of circumstances existing at the date the assignment, transfer or change occurs, the Company would be obliged to pay a Tax Payment or an Increased Cost,

then the Company needs only pay that Tax Payment or Increased Cost to the same extent that it would have been obliged to if no assignment, transfer or change had occurred provided that this clause does not apply to the extent that the payment under Clause 11 (*Taxes*) relates to a FATCA Deduction.

## 26.   DISCLOSURE OF INFORMATION

(a)   The Lender must keep confidential any information supplied to it by or on behalf of the Company in connection with the Finance Documents. However, the Lender is entitled to disclose information:

(i)     which is publicly available, other than as a result of a breach by the Lender of this Clause;

(ii)    to the extent required for the purpose of any legal or arbitration proceedings;

(iii)   to the extent required to be disclosed under any Law or Regulation;

(iv)    to a governmental, banking, taxation, other regulatory authority or any other Authority;

(v)    to its professional advisers or any rating agency (provided that such person is under a duty of confidentiality to the Lender);

(vi)    to the extent allowed under paragraph (b) below; or

(vii)    with the agreement of the Company.

(b)    The Lender may disclose to an Affiliate, its head office and any representative or other branches or any person (a third party) with (or through) whom the Lender enters into (or may enter into) any kind of transfer, participation or hedge agreement in relation to this Agreement or any other transaction under which payments are to be made by reference to this Agreement or the Company:

(i)    a copy of any Finance Document; and

(ii)    any information which the Lender has acquired under or in connection with any Finance Document.

However, before a third party may receive any confidential information, it must have entered into a Confidentiality Undertaking.

(c)    This Clause 26 supersedes any previous confidentiality undertaking given by the Lender in connection with this Agreement prior to it becoming a Party.

## 27.  SET-OFF

The Lender may, for so long as an Event of Default is outstanding, set off any matured obligation owed to it by the Company under the Finance Documents (to the extent beneficially owned by the Lender) against any obligation (whether or not matured) owed by the Lender to the Company, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Lender may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 28.  SEVERABILITY

If a term of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any jurisdiction, that will not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other term of the Finance Documents; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other term of the Finance Documents.

48

**29.  COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

**30.  NOTICES**

**30.1  In writing**

(a)  Any communication in connection with a Finance Document must be in writing and, unless otherwise stated, may be given:

   (i)   in person, by post or fax; or

   (ii)  to the extent agreed by the Parties making and receiving communication, by e-mail or other electronic communication.

(b)  For the purpose of the Finance Documents, an electronic communication will be treated as being in writing.

(c)  Unless it is agreed to the contrary, any consent or agreement required under a Finance Document must be given in writing.

**30.2  Contact details**

(a)  Except as provided below, the contact details of each Party for all communications in connection with the Finance Documents are those notified by that Party for this purpose to the any Party under this Agreement on or before the date it becomes a Party.

(b)  The contact details of the Company for this purpose are:

Address:     Baidu Campus No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC
Fax number:  +86 10 5992 6613
E-mail:      zhoumao@baidu.com
Attention:   Ms. Zhou Mao

(c)  The contact details of the Lender for this purpose are:

Address:     8/F., One International Finance Centre1 Harbour View Street Hong Kong
Fax number:  +852 2206 2968
E-mail:      charing.chung@smbc.com.hk
Attention:   Ms. Charing Chung

Any Party may change its contact details by giving five Business Days' notice to the other Party.

(d)  Where a Party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

49

**30.3 Effectiveness**

(a)   Except as provided below, any communication in connection with a Finance Document will be deemed to be given as follows:

    (i)   if delivered in person, at the time of delivery;

    (ii)   if posted, five Business Days after being deposited in the post, postage prepaid, in a correctly addressed envelope;

    (iii)   if by fax, when received in legible form; and

    (iv)   if by e-mail or any other electronic communication, when received in legible form.

(b)   A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

(c)   A communication to the Lender will only be effective on actual receipt by it.

**31.   LANGUAGE**

(a)   Any notice given in connection with a Finance Document must be in English.

(b)   Any other document provided in connection with a Finance Document must be:

    (i)   in English; or

    (ii)   (unless the Lender otherwise agrees) accompanied by a certified English translation. In this case, the English translation prevails unless the document is a statutory or other official document.

**32.   GOVERNING LAW**

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by Hong Kong law.

**33.   ENFORCEMENT**

**33.1 Jurisdiction**

(a)   The Hong Kong courts have non-exclusive jurisdiction to settle any dispute including a dispute relating to any non-contractual obligation arising out of or in connection with any Finance Document.

(b)   The Hong Kong courts are the most appropriate and convenient courts to settle any such dispute in connection with any Finance Document. The Company agrees not to argue to the contrary and waives objection to those courts on the grounds of inconvenient forum or otherwise in relation to proceedings in connection with any Finance Document.

(c)    This Clause is for the benefit of the Lender only. To the extent allowed by law, the Lender may take:

   (i)    proceedings in any other court; and

   (ii)   concurrent proceedings in any number of jurisdictions.

(d)    References in this Clause 33 to a dispute in connection with a Finance Document include any dispute as to the existence, validity or termination of that Finance Document.

**33.2  Service of process**

(a)    The Company irrevocably appoints Messrs. Li & Partners of 22nd Floor, World-Wide House, 19, Des Voeux Road, Central, Hong Kong as its agent under the Finance Documents for service of process in any proceedings before the Hong Kong courts in connection with any Finance Document.

(b)    If any person appointed as process agent under this Clause is unable for any reason to so act, the Company must immediately (in any event within 14 days of the event taking place) appoint another agent on terms acceptable to the Lender. Failing this, the Lender may appoint another process agent for this purpose.

(c)    The Company agrees that failure by a process agent to notify it of any process will not invalidate the relevant proceedings.

(d)    This Clause does not affect any other method of service allowed by law.

**33.3  Waiver of immunity**

The Company irrevocably and unconditionally:

(a)    agrees not to claim any immunity from proceedings brought by the Lender against the Company in relation to a Finance Document and to ensure that no such claim is made on its behalf;

(b)    consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)    waives all rights of immunity in respect of it or its assets.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

51

**SCHEDULE 1**
**CONDITIONS PRECEDENT DOCUMENTS**

**PART 1 (CONDITIONS PRECEDENT)**

**Corporate documentation**

1. A copy of the constitutional documents of the Company.

2. A copy of a resolution of the board of directors of the Company approving the terms of, and the transactions contemplated by, each Finance Document to which it is a party.

3. A copy of the certificate of good standing of the Company issued by the Registrar of Companies of the Cayman Islands within one month of the date of this Agreement.

4. A copy of the certificate of incumbency of the Company issued by its Cayman Islands registered office provider within one month of the date of this Agreement.

5. A copy of the Original Financial Statements.

6. A Director's Certificate for the Company substantially in the form of Part 2 of this Schedule.

7. Evidence that the agent of the Company under the Finance Documents for service of process in Hong Kong has accepted its appointment.

**Legal opinions**

8. A legal opinion of Maples and Calder, legal advisers in the Cayman Islands to the Company, substantially in the form distributed to the Lender prior to the signing of this Agreement.

**Other documents and evidence**

9. A copy of any other authorisation or other document, opinion or assurance which the Lender has notified the Company in writing prior to the date of this Agreement, is necessary in connection with the entry into and performance of, and the transactions contemplated by, any Finance Document or for the validity and enforceability of any Finance Document.

52

**PART 2**

**FORM OF DIRECTOR'S CERTIFICATE**

To:    SumitomoMitsui Banking Corporation

**BAIDU, INC. - US$150,000,000 Facility Agreement**
**dated 17th July, 2015 (the Agreement)**

I refer to the Agreement. Terms defined in the Agreement have, unless defined in this certificate, the same meaning when used in this certificate.

I am a director of Baidu, Inc. (the **Company**), an exempt company incorporated with limited liability in the Cayman Islands with registered office at [●]. I am authorised to give this certificate and certify as follows:

1.    Each [original] and copy document delivered by the Company to the Lender under Part 1 of Schedule 1 (Conditions precedent documents) to the Agreement (including the documents listed below and attached to this certificate) is true, complete and in full force and effect on the date of this certificate:

   (a)    the Third Amended and Restated Memorandum and Articles of Association of the Company adopted on 16 December 2008 (the **Memorandum and Articles**);

   (b)    the Certificate of Incorporation of the Company dated 18 January 2000;

   (c)    the Certificate of Incorporation on Change of Name of Company dated 2 January 2009;

   (d)    the Certificate of Good Standing of the Company dated [●] 2015;

   (e)    the Certificate of Incumbency of the Company dated [●] 2015; and

   (f)    the minutes of a meeting of the Board of Directors of the Company held on [    ].

2.    Borrowing the Commitments will not cause any borrowing or similar limit binding on the Company under the Memorandum or Articles or other constitutional documents or any law applicable to it to be exceeded.

3.    Each resolution adopted at the meeting referred to in 1(f) above is in full force and effect without modification.

4.    The resolutions adopted at the meeting referred to in 1(f) above constitute all corporate action necessary on the part of the Company to:

   (a)    approve the terms of and transactions contemplated by the Finance Documents; and

   (b)    authorise the signing of, any communications and/or other action under or in connection with, the Finance Documents.

53

5.   The following is a complete list of all persons who are the Directors and Company Secretary of the Company as at the date of this Certificate and who were the Directors and Company Secretary on the date of the meeting referred to above.

[   ]

6. Each person listed below:

   (a)   occupies the position stated against his name (and occupied that position on the date each Finance Document was signed by him);

   (b)   is the person duly authorised in the resolutions adopted at the meeting referred to in l(f) above to sign the Finance Documents (and any other document in connection with the Finance Documents) on behalf of the Company; and

   (c)   has his true signature appearing opposite his name.

| **Name** | **Position** | **Specimen Signature** |
| --- | --- | --- |

7.   Unless we notify you to the contrary in writing, you may assume that this Certificate remains true and correct up until the date of the first Utilisation by the Company under the Agreement.

For

**Baidu, Inc.**

_____

Director

54

**SCHEDULE 2**
**FORM OF REQUEST**

To:  Sumitomo Mitsui Banking Corporation **8/F., One International Finance Centre** 1 Harbour View Street Hong Kong

Attention: [Head of Loan Operations Department ]

From:  BAIDU, INC.

Date:    [    ]

**BAIDU, INC.-US$150,000,000 Facility Agreement**
**dated 17th July, 2015 (the Agreement)**

1.    We refer to the Agreement. This is a Request. Terms defined in the Agreement have the same meaning in this Request.

2.    We wish to borrow the Loan on the following terms:

    (a)    Utilisation Date: [    ];

    (b)    Amount: [    ];

    (c)    Term: [    Three months].

3.    The proceeds of the Loan should be credited to: [*accounts (including accounts for settlement of fees and expenses)*]; or

    We hereby irrevocably authorize and direct you to apply the above Drawing towards full repayment of our existing outstanding loan principal of [    ] to be matured on [    ] under the Facility Agreement dated 24 Jul 2013.

4.    We confirm that each condition precedent specified in Clause 4.2 (*Further conditions precedent*) under the Agreement which must be satisfied on the date of this Request is so satisfied.

5.    This Request is irrevocable.

6.    For the next rollover period is deemed to be [    ] months in accordance with the Agreement, and to match with the respective settlement date(s) of the interest rate swap as per the confirmation to be executed on [    ]. We shall transfer the loan interest to your Bank for the settlement of the accrued interest due on each loan maturity date.

55

By:

**BAIDU, INC.**

_____

Name:
[Director]

56

**SCHEDULE 3**
**FORM OF TRANSFER CERTIFICATE**

To:  Sumitomo Mitsui Banking Corporation (the **Existing Lender**)
     **8/F., One International Finance Centre**
     1 Harbour View Street
     Hong Kong

Attention: [    ]

From: [NEW LENDER] (the **New Lender**)

Date: [    ]

**BAIDU, INC. - US$150,000,000 Facility Agreement**
**dated 17ᵗʰ July6, 2015 (the Agreement)**

We refer to the Agreement. This is a Transfer Certificate. Terms defined in the Agreement have, unless defined in this certificate, the same meaning when used in this Transfer Certificate.

1.  The Existing Lender transfers by novation to the New Lender the Existing Lender's rights and obligations referred to in the Schedule below in accordance with the terms of the Agreement.

2.  The proposed Transfer Date is [        ].

3.  The administrative details of the New Lender for the purposes of the Agreement are set out in the Schedule.

4.  The New Lender expressly acknowledges the limitations on the Existing Lender's obligations in respect of this Transfer Certificate contained in the Agreement.

    In particular, the New Lender expressly acknowledges and confirms that:

    (a)  the Existing Lender makes no representation or warranty and assumes no responsibility to the New Lender for:

        (i)   the financial condition of the Company; or

        (ii)  the legality, validity, effectiveness, enforceability, adequacy, accuracy, completeness or performance of:

            (A)  any Finance Document or any other document;

            (B)  any statement or information (whether written or oral) made in or supplied in connection with any Finance Document, or

            (C)  any observance by the Company of its obligations under any Finance Document or other document,

    and any representations or warranties implied by law are excluded; and

57

(b)    it:

    (i)    has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) in connection with its participation in the Agreement;

    (ii)    has not relied on any information supplied to it by the Existing Lender in connection with any Finance Document;

    (iii)    has conducted its own investigation in connection with the Finance Documents and has not relied upon the Existing Lender to conduct any due diligence investigation on its behalf;

    (iv)    has access to all information that it believes is necessary or appropriate in connection with its participation of the Agreement and it is able to obtain or access business and financial information without undue difficulty;

    (v)    has consulted its own independent advisors or otherwise has satisfied itself concerning, without limitation, the tax, legal, currency and other economic considerations related to its participation in the Agreement, and has only relied on the advice of, or has only consulted with, such independent advisers;

    (vi)    has not relied and will not rely on any investigation or due diligence that the Existing Lender or any of its affiliates or employees or any person acting on behalf of the Existing Lender may have conducted in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets), and none of such persons has made any representation, warranty or recommendation to the New Lender, express or implied, in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) or the accuracy, completeness or adequacy of any information the New Lender obtain from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind); and

    (vii)    will not hold the Existing Lender, its affiliates or the officers, directors or employees responsible for any misstatements in or omissions from information it obtains from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind).

58

5.    This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Transfer Certificate.

6.    This Transfer Certificate and any non-contractual obligations arising out of or in connection with it are governed by Hong Kong law.

59

**THE SCHEDULE**

**Rights and obligations to be transferred by novation**
[insert relevant details, including applicable Commitment (or part)]

**Administrative details of the New Lender**
[insert details of Facility Office, address for notices, *fax number and attention details* and
account details for payment etc.]

**[EXISTING LENDER]**                    **[NEW LENDER]**

By:                                       By:

The Transfer Date is confirmed by the Lender as [     ]

[●]

By:

**Note: The New Lender is alone responsible for checking whether any further formalities should be complied with. An
assignment may give rise to a stamp duty or transfer tax issues.**

60

**SCHEDULE 4**
**FORM OF COMPLIANCE CERTIFICATE**

To:  Sumitomo Mitsui Banking Corporation as Lender

From: BAIDU, INC.

Date: [    ]

**BAIDU, INC. - US$150,000,000 Facility Agreement**
**dated [    ], 2015 (the Agreement)**

1.  We refer to the Agreement. This is a Compliance Certificate. Terms defined in the Agreement have the same meanings in this Compliance Certificate.

2.  We confirm that as at [relevant testing date]:

    (a)  Consolidated Tangible Net Worth is [    ]; and

    (b)  Consolidated Total Borrowings are [    ] and therefore, Consolidated Total Borrowings are [    ] per cent. ([    ]%) of Consolidated Tangible Net Worth.

    (c)  Adjusted Consolidated EBITDA is [    ] and therefore, Consolidated Total Borrowings are [    ] per cent. ([    ]%) of Adjusted Consolidated EBITDA.

    (d)  Consolidated Cash Balance is [    ] and therefore Consolidated Cash Balance is not less than Consolidated Total Borrowings as stated in (b) above.

3.  We set out below calculations establishing the figures in paragraph 2 above:

    [    ]

4.  We confirm that as at [relevant testing date] [no Default is outstanding]/[the following Default[s] [is/are] outstanding and the following steps are being taken to remedy [it/them]:

    [    ]].

**BAIDU, INC.**

By:

61

**SIGNATORIES**

**Company**

**BAIDU, INC.**

By: /s/ Robin Yanhong Li

**Lender**

**SUMITOMO MITSUI BANKING CORPORATION**

By: /s/ Authorized Signatory

62

**Exhibit 4.69**

**FACILITY AGREEMENT**

dated 25 August 2015

in respect of

US$200,000,000 Unsecured Term Loan Facility

FOR **BAIDU, INC.**

as Company

and

**THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED**

as Lender

**CONTENTS**

| **Clause** | | **Page** |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Facility | 11 |
| 3. | Purpose | 11 |
| 4. | Conditions precedent | 11 |
| 5. | Utilisation - Loan | 11 |
| 6. | Repayment | 12 |
| 7. | Prepayment and cancellation | 12 |
| 8. | Interest | 14 |
| 9. | Terms | 16 |
| 10. | Market disruption | 16 |
| 11. | Taxes | 17 |
| 12. | Increased Costs | 21 |
| 13. | Mitigation | 22 |
| 14. | Payments | 23 |
| 15. | Representations and warranties | 24 |
| 16. | Information covenants | 28 |
| 17. | Financial covenants | 30 |
| 18. | General covenants | 34 |
| 19. | Default | 39 |
| 20. | Evidence and calculations | 42 |
| 21. | Fee | 42 |
| 22. | Indemnities and Break Costs | 43 |
| 23. | Expenses | 44 |
| 24. | Amendments and waivers | 45 |
| 25. | Changes to the Parties | 45 |
| 26. | Disclosure of information | 49 |
| 27. | Set-off | 49 |
| 28. | Severability | 50 |
| 29. | Counterparts | 50 |
| 30. | Notices | 50 |
| 31. | Language | 51 |
| 32. | Governing law | 52 |
| 33. | Enforcement | 52 |
| **Schedule 1** | Conditions precedent documents | 54 |
| **Schedule 2** | Form of Request | 57 |
| **Schedule 3** | Form of Transfer Certificate | 58 |
| **Schedule 4** | Form of Compliance Certificate | 62 |
| Signatories | | 63 |

**THIS AGREEMENT** is dated 25 August 2015 and is made **BETWEEN**:

(1)     **BAIDU, INC.**, a limited liability company incorporated under the laws of the Cayman Islands with registered number 96019 as borrower (the **Company**); and

(2)     **THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED** as lender (the **Lender**).

**IT IS AGREED** as follows:

1.      **INTERPRETATION**

  **1.1      Definitions**

  In this Agreement:

  **Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

  **APLMA** means the Asia Pacific Loan Market Association Limited.

  **Availability Period** means the period from and including the date of this Agreement to and including the date falling three months after the date of this Agreement.

  **Basel III** means:

  (a)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

  (b)     the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement — Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

  (c)     any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

  **Beijing Baidu Netcom** means 北京百度网·科技有限公司 (Beijing Baidu Netcom Science Technology Co., Ltd.), a limited liability company established under the laws of the PRC, with business licence no. 110108002734659.

  **Break Costs** means the amount (if any) which the Lender is entitled to receive under Clause 22.3 (Break Costs).

**Business Day** means a day (other than a Saturday, a Sunday or a public holiday) on which banks are open for general business in Hong Kong and the PRC and, in relation to any day for the payment of US Dollars, New York City.

**Code** means the US Internal Revenue Code of 1986.

**Commitment** means US$200,000,000, to the extent not cancelled, transferred or reduced under this Agreement.

**Compliance Certificate** means a certificate substantially in the form of Schedule 4 (Form of Compliance Certificate) setting out, among other things, calculations of the financial covenants.

**Confidentiality Undertaking** means a confidentiality undertaking substantially in a recommended form of the APLMA or in any other form agreed between the Company and the Lender.

**Consolidated Assets** means, at any time, the total assets of the Group as shown on the latest consolidated financial statements of the Company delivered to the Lender pursuant to the provisions of this Agreement.

**Cost of Funds** means the rate which expresses as a percentage rate per annum as the cost to the Lender of funding the Loan for a Term of 24 months from the Utilisation Date from whatever source it may reasonably select.

**Default** means:

(a)     an Event of Default; or

(b)     an event or circumstance specified in Clause 19 (Default) which would be (with the expiry of a grace period, the giving of notice or the making of any determination under the Finance Documents or any combination of them) an Event of Default.

**Disposal Threshold** means, at any time, an amount equal to 30% of the Consolidated Assets.

**Disruption Event** means:

(a)     a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Finance Documents, which is not caused by, and is beyond the control of, any of the Parties; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing it, or any other Party from:

(i)     performing its payment obligations under the Finance Documents; or

(ii)     communicating with other Parties under the Finance Documents,

2

and which is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**Dollar, US$** or **US Dollar** means the lawful currency for the time being of the US.

**Event of Default** means an event or circumstance specified as such in Clause 19 (Default).

**Facility** means the credit facility made available under this Agreement as described in Clause 2 (Facility).

**Facility Office** means the office notified by the Lender to the Company through which the Lender will perform its obligations under this Agreement.

**FATCA** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraph (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA.

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction.

**FATCA FFI** means a foreign financial institution as defined in section 1471(d)(4) of the Code which, if the Lender is not a FATCA Exempt Party, could be required to make a FATCA Deduction.

**Final Maturity Date** means the date falling 24 months from the Utilisation Date.

**Finance Document** means:

(a)     this Agreement;

(b)     the Request;

(c)     a Transfer Certificate; or

(d)     any other document designated as such by the Lender and the Company.

**Financial Indebtedness** means any indebtedness for or in respect of:

(a)     moneys borrowed;

3

(b)     any acceptance credit (including any dematerialised equivalent);

(c)     any bond, note, debenture, loan stock or other similar instrument;

(d)     any redeemable preference share;

(e)     any agreement treated as a finance or capital lease in accordance with GAAP;

(f)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(g)     the acquisition cost of any asset or service to the extent payable before or after its acquisition or possession by the party liable where the advance or deferred payment:

   (i)     is arranged primarily as a method of raising finance or of financing the acquisition of that asset or service or the construction of that asset or service; or

   (ii)    involves a period of more than six months before or after the date of acquisition or supply;

(h)     any derivative transaction protecting against or benefiting from fluctuations in any rate or price (and, except for non-payment of an amount, the then mark-to-market value of the derivative transaction will be used to calculate its amount);

(i)     any other transaction (including any forward sale or purchase agreement) which has the commercial effect of a borrowing;

(j)     any counter-indemnity obligation in respect of any guarantee, indemnity, bond, letter of credit or any other instrument issued by a bank or financial institution; or

(k)     any guarantee, indemnity or similar assurance against financial loss of any person in respect of any item referred to in the above paragraphs,

in each case, for the avoidance of doubt, excluding any indebtedness arising in the ordinary course of trading (other than, for the avoidance of doubt, any indebtedness or borrowed moneys incurred to finance the relevant trade).

**GAAP** means generally accepted accounting principles in the US.

**Group** means the Company and its Subsidiaries from time to time.

**HKD** or **Hong Kong Dollars** means the lawful currency of Hong Kong.

**Hong Kong** means the Hong Kong Special Administrative Region of the People's Republic of China.

**Holding Company** of any other person, means a person in respect of which that other person is a Subsidiary.

4

**Increased Cost** means:

(a)     an additional or increased cost;

(b)     a reduction in the rate of return from the Facility or on the Lender's (or its Affiliate's) overall capital (including as a result of any reduction in the rate of return on capital brought about by more capital being required to be allocated by the Lender); or

(c)     a reduction of an amount due and payable under any Finance Document,

which is incurred or suffered by the Lender or any of its Affiliates but only to the extent attributable to the Lender having entered into any Finance Document or funding or performing its obligations under any Finance Document.

**Law or Regulation** means:

(a)     any applicable law or regulation of Hong Kong or any other place; or

(b)     any agreement entered into between the Lender and any competent tax, prosecuting, regulatory or governmental authority in Hong Kong or any other place (the **Authority**).

**LIBOR** means for a Term of the Loan or overdue amount:

(a)     the applicable Screen Rate; or

(b)     if no Screen Rate is available for the relevant currency or Term of the Loan or overdue amount, the rate quoted to the Lender by leading banks in the London interbank market,

as at 11.00 a.m. (London time) on the Rate Fixing Day for the offering of deposits in the currency of the Loan or overdue amount for a period comparable to that Term and if any such rate is below zero, LIBOR will be deemed to be zero.

**Loan** means, unless otherwise stated in this Agreement, the principal amount of the borrowing under this Agreement or the principal amount outstanding of that borrowing.

**London Business Day** means a day (other than a Saturday, a Sunday or a public holiday) on which banks are open for general business in London.

**Mandatory Prepayment Request** has the meaning given to it in Clause 7.2(a) (Mandatory prepayment — disposals).

**Margin** means 0.6 per cent. per annum.

**Market Disruption Event** has the meaning given to it in Clause 10.1(a) (Market disruption).

**Material Adverse Effect** means a material adverse effect on:

5

(a)    the business or financial condition of the Group as a whole;

(b)    the ability of the Company to perform its payment obligation or any other material obligation under any Finance Document (which, for the avoidance of doubt, includes but is not limited to its obligation under Clause 17 (Financial Covenants) below); or

(c)    the validity or enforceability of, or the rights or remedies of the Lender under, any Finance Document.

**NASDAQ** means the NASDAQ Stock Market in the US.

**Original Financial Statements** means the audited consolidated financial statements of the Company for the year ended 31 December 2014.

**PRC** means the People's Republic of China, but excluding Hong Kong, the Macau Special Administrative Region and Taiwan.

**Party** means a party to this Agreement.

**Permitted Transaction** means:

(a)    an intra-Group re-organisation on a solvent basis and (if the Company is involved in such re-organisation) where the Company remains a surviving entity; or

(b)    any other transactions agreed by the Lender.

**Quasi-Security Interest** has the meaning given to it in Clause 18.5(a) (Negative pledge).

**Rate Fixing Day** means the second London Business Day before the first day of a Term or such other day as the Lender determines is generally treated as the rate fixing day by market practice in the relevant interbank market.

**Repeating Representations** means the representations and warranties set out in Clauses 15.2 (Status) to 15.17 (Information) (inclusive) (other than Clause 15.16 (No material adverse change).

**Request** means a request for the Loan, substantially in the form of Schedule 2 (Form of Request).

**Restricted Group** means the Company and its Restricted Subsidiaries.

**Restricted Subsidiary** means, at any time, a Subsidiary of the Company if the gross Tangible Assets or turnover of that Subsidiary then equal to or exceed 10 per cent. of the gross Tangible Assets or turnover of the Group provided that in no circumstances shall Beijing Baidu Netcom be or become a Restricted Subsidiary.

For this purpose:

(a)    subject to paragraph (b) below:

6

(i)      the contribution of a Subsidiary of the Company will be determined from its financial statements which were consolidated into the latest audited consolidated financial statements of the Company; and

(ii)     the financial condition of the Group will be determined from the latest audited consolidated financial statements of the Company;

(b)     if a Subsidiary of the Company becomes a member of the Group after the date on which the latest audited consolidated financial statements of the Company were prepared:

(i)      the contribution of the Subsidiary will be determined from its latest financial statements; and

(ii)     the financial condition of the Group will be determined from the latest audited consolidated financial statements of the Company but adjusted to take into account any subsequent acquisition or disposal of a business or a company (including that Subsidiary);

(c)     the contribution of a Subsidiary will, if it has Subsidiaries, be determined from its consolidated financial statements;

(d)     if a Restricted Subsidiary disposes of all or substantially all of its assets to another member of the Group, it will immediately cease to be a Restricted Subsidiary and the other member of the Group (if it is not the Company or already a Restricted Subsidiary) will immediately become a Restricted Subsidiary;

(e)     a Subsidiary of the Company (if it is not already a Restricted Subsidiary) will become a Restricted Subsidiary on completion of any other intra-Group transfer or reorganisation if it would have been a Restricted Subsidiary had the intra-Group transfer or reorganisation occurred on the date of the latest audited consolidated financial statements of the Company; and

(f)     except as specifically mentioned in paragraph (d) above, a member of the Group will remain a Restricted Subsidiary until the next audited consolidated financial statements of the Company show otherwise under paragraph (a) above.

If there is a dispute as to whether or not a member of the Group is a Restricted Subsidiary, a certificate of the auditors of the Company will be, in the absence of manifest error, conclusive.

**RMB** means the lawful currency for the timing being of the PRC.

**Sanction** means any sanction administered or enforced by the US Department of the Treasury's Office of Foreign Assets Control, the US Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or the Hong Kong Monetary Authority.

**Screen Rate** means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the

7

administration of that rate) for US Dollars for the relevant period displayed on page LIBOR01 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters. If such page or service ceases to be available, the Lender may specify another page or service displaying the relevant rate after consultation with the Company.

**Security Interest** means any mortgage, pledge, lien, charge or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Subsidiary** means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 per cent. of the voting capital or similar right of ownership and control for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise.

**Tangible Assets** of a person means its total assets, determined on a consolidated basis if it has any Subsidiaries, less:

(a)        its net intangible assets; and

(b)        goodwill.

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**Tax Payment** means a payment made by the Company to the Lender in any way relating to a Tax Deduction or under any indemnity given by the Company in respect of Tax under any Finance Document.

**Term** means each period determined under this Agreement by reference to which interest on the Loan or an overdue amount is calculated.

**Transaction Costs** means, in respect of a disposal, all Taxes and reasonable costs and expenses incurred by any member of the Group in connection with such disposal.

**Transfer Certificate** means a certificate, substantially in the form of Schedule 3 (Form of Transfer Certificate), with such amendments as the Lender may approve or reasonably require or any other form agreed between the Lender and the Company.

**US** means the United States of America.

**US Tax Obligor** means the Company, if:

(a)        it is or becomes resident for tax purposes in the US; or

(b)        some or all of its payments under the Finance Documents are from sources within the US for US federal income tax purposes.

8

**Utilisation Date** means the date on which the Facility is utilised.

**1.2    Construction**

(a)    In this Agreement, unless the contrary intention appears, a reference to:

(i)    an **amendment** includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (however fundamental and whether or not more onerous) and amended will be construed accordingly;

(ii)    **assets** includes present and future properties, revenues and rights of every description;

(iii)    an **authorisation** includes an authorisation, consent, approval, resolution, permit, licence, exemption, filing, registration or notarisation;

(iv)    **disposal** means a sale, transfer, assignment, grant, lease, licence, declaration of trust or other disposal, whether voluntary or involuntary, and dispose will be construed accordingly (for the avoidance of doubt, the meaning of disposal does not include issue of new shares by a member of the Group);

(v)    **indebtedness** includes any obligation (whether incurred as principal or as surety and whether present or future, actual or contingent) for the payment or repayment of money;

(vi)    **customer due diligence requirements** are to the identification checks that the Lender requests in order to meet its obligations under any applicable law or regulation to identify a person who is (or is to become) its customer;

(vii)    a **person** includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, fund, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(viii)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(ix)    a currency is a reference to the lawful currency for the time being of the relevant country;

(x)    a **Default** or an **Event of Default** being outstanding means that it has not been remedied or waived;

9

(xi)     a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(xii)    a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(xiii)   a **Party** or any other person includes its successors in title, permitted assigns and permitted transferees;

(xiv)    a **Finance Document** or other document or security includes (without prejudice to any prohibition on amendments) any amendment to that Finance Document or other document or security, including any change in the purpose of, any extension for or any increase in the amount of a facility or any additional facility;

(xv)     a time of day is a reference to Hong Kong time; and

(xvi)    **including** shall be construed as including without limitation (and cognate expressions shall be construed similarly).

(b)    Unless the contrary intention appears, a reference to a **month** or **months** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)      if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)     if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)    notwithstanding subparagraph (i) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate,

provided that the above rules will apply only to the last month of the period.

(c)    Unless the contrary intention appears:

(i)      a reference to a Party will not include that Party if it has ceased to be a Party under this Agreement;

(ii)     a word or expression used in any other Finance Document or in any notice given in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement; and

(iii)    any obligation of the Company under the Finance Documents which is not a payment obligation remains in force for so long as any payment obligation of the Company is, may be or is capable of becoming outstanding under the Finance Documents.

10

(d)        The headings in this Agreement do not affect its interpretation.

## 2.        FACILITY

Subject to the terms of this Agreement, the Lender makes available to the Company a US$ term loan facility in an amount equal to the Commitment in one lump sum.

## 3.        PURPOSE

### 3.1        Loan

The Loan may only be used for:

(a)        refinancing any existing Financial Indebtedness of the Group; and

(b)        general working capital requirements of the Group.

### 3.2        No obligation to monitor

The Lender is not bound to monitor or verify the utilisation of the Facility.

## 4.        CONDITIONS PRECEDENT

### 4.1        Conditions precedent documents

(a)        A Request may not be given until the Lender has notified the Company that it has received (or waived receipt of) all of the documents and evidence set out in Part 1 (Conditions precedent) of Schedule 1 (Conditions precedent documents) in form and substance satisfactory to the Lender.

(b)        The Lender shall give this confirmation to the Company promptly upon being so satisfied.

### 4.2        Further conditions precedent

The obligations of the Lender to participate in the Loan are subject to the further conditions precedent that on both the date of the Request and the Utilisation Date for the Loan:

(a)        the Repeating Representations are correct in all material respects; and

(b)        no Default is outstanding or would result from the Loan.

## 5.        UTILISATION - LOAN

### 5.1        Giving of Requests

(a)        The Company may borrow the Loan by giving to the Lender a duly completed Request.

(b)        Unless the Lender otherwise agrees, the latest time for receipt by the Lender of a duly completed Request is 11.00 a.m. two (2) Business Days before the Rate Fixing Day for the proposed borrowing.

11

(c)     Only one Request may be given under this Agreement. Only one Loan may be requested in the Request. The Request, once given, is irrevocable.

### 5.2     Completion of Requests

A Request for the Loan will not be regarded as having been duly completed unless:

(a)     the Utilisation Date is a Business Day falling within the Availability Period;

(b)     the amount of the Loan requested is:

    (i)     the amount of the Commitment; or

    (ii)    such other amount as the Lender may agree;

(c)     the proposed Term complies with this Agreement; and

(d)     the currency specified in the Request is US Dollars.

### 5.3     Availability of Loan

If the conditions set out in Clause 4 (Conditions Precedent), Clause 5.1 (Giving of Requests) and Clause 5.2 (Completion of Requests) have been met, the Lender shall make the Loan available to the Company directly from the Lender's Facility Office on the Utilisation Date.

## 6.     REPAYMENT

The Company must repay the Loan in full on the Final Maturity Date.

## 7.     PREPAYMENT AND CANCELLATION

### 7.1     Mandatory prepayment – illegality

(a)     The Lender must notify the Company promptly if it becomes aware that it is unlawful in any applicable jurisdiction for the Lender to perform any of its obligations under a Finance Document or to fund or maintain the Loan.

(b)     After notification under paragraph (a) above the Lender must notify the Company promptly that:

    (i)     the Company must repay or prepay the Loan on the date specified in paragraph (c) below; and

    (ii)    the Commitment of the Lender will be immediately cancelled.

(c)     The date for repayment or prepayment of the Loan will be:

    (i)     the last day of the current Term of the Loan; or

    (ii)    if earlier, the date specified by the Lender in the notification under paragraph (a) or (b) above and which must not be earlier than the last day of any applicable grace period allowed by law.

12

**7.2   Mandatory prepayment — disposals**

(a)   If a member of the Group (other than Beijing Baidu Netcom):

   (i)   in a single transaction or a series of transactions (whether related or not) sells, leases, transfers or otherwise disposes of any asset by means of any sale, lease, transfer or other disposal save for the ones allowed under sub-paragraphs (b)(ii) to (vi) (inclusive) of Clause 18.6 (Disposals); and

   (ii)   the consideration receivable for that disposal (when aggregated with the consideration receivable for any other sale, lease, transfer or other disposal by a member of the Group excluding those allowed under sub-paragraphs (b)(ii) to (vi) (inclusive) of Clause 18.6 (Disposals) exceeds the Disposal Threshold (such excess amount being the **Excess Amount**),

then the Company must (x) promptly notify the Lender of such a disposal and (y) if within 21 days of such notification, the Lender delivers a written request to the Company (a **Mandatory Prepayment Request**) procure that:

   (A)   an amount equal to the Excess Amount less the Transaction Costs for that disposal is applied towards prepaying the Loan; and

   (B)   an amount equal to the net proceeds of any subsequent sale, lease, transfer or other disposal (other than any allowed under sub-paragraphs (b)(ii) to (vi) (inclusive) of Clause 18.6 (Disposals)) (a **Subsequent Disposal**) is applied towards prepaying the Loan.

(b)   The Company must promptly notify the Lender of any Subsequent Disposal.

(c)   Any prepayment under this Clause 7.2 must be made within 45 days of the date of the relevant Mandatory Prepayment Request or, in the case of any Subsequent Disposal, within 45 days of such Subsequent Disposal.

**7.3   Voluntary prepayment**

(a)   The Company may, by giving not less than three Business Days' prior notice to the Lender prepay the Loan in whole or in part on or at any time after (i) the first anniversary of the Utilisation Date; or (ii) the date on which a Market Disruption Event occurs.

(b)   A prepayment of part of the Loan must be in a minimum amount of US$50,000,000 and an integral multiple of US$10,000,000.

**7.4   Automatic cancellation**

Any part of the Commitment of the Lender which, at that time, is unutilised will be automatically cancelled at the close of business in Hong Kong on the last day of the Availability Period and shall not be available for utilisation thereafter.

13

**7.5    Additional right of repayment and cancellation**

(a)    If the Company is, or will be, required to pay to the Lender:

   (i)    a Tax Payment; or

   (ii)    an Increased Cost,

the Company may, while the requirement continues, give notice to the Lender requesting prepayment and cancellation in respect of the Lender.

(b)    After notification under paragraph (a) above:

   (i)    the Company must repay or prepay the Loan on the date specified in paragraph (c) below; and

   (ii)    the Commitment of the Lender will be immediately cancelled.

(c)    The date for repayment or prepayment of the Loan will be:

   (i)    the last day of the current Term for the Loan; or

   (ii)    if earlier, the date specified by the Company in its notification.

**7.6    Partial prepayment of the Loan**

No amount of the Loan prepaid under this Agreement may subsequently be re-borrowed.

**7.7    Miscellaneous provisions**

(a)    Any notice of prepayment and/or cancellation under this Agreement is irrevocable and must specify the date or dates upon which the relevant prepayment is to be made and the amount of that prepayment.

(b)    All prepayments under this Agreement must be made with accrued interest on the amount prepaid. No premium or penalty is payable in respect of any prepayment except for Break Costs.

(c)    The Lender may agree a shorter notice period for a voluntary prepayment.

(d)    No prepayment or cancellation is allowed except in accordance with the express terms of this Agreement.

(e)    No amount of the Commitment cancelled under this Agreement may subsequently be reinstated.

**8.    INTEREST**

**8.1    Calculation of interest**

The rate of interest on the Loan for each Term is the percentage rate per annum equal to the aggregate of the applicable:

14

(a)      Margin; and

(b)      LIBOR or, if the Term is 24 months, the Cost of Funds.

**8.2      Payment of interest**

Except where it is provided to the contrary in this Agreement, the Company must pay accrued interest on the Loan on the last day of each of its Terms and also, if the Term is longer than three months, on the dates falling at three-monthly intervals after the first day of that Term. For the avoidance of doubt, if the Term of the Loan is 24 months, the Company must pay accrued interest on the Loan on the dates falling at three-monthly intervals after the Utilisation Date and on the last day of the Term.

**8.3      Interest on overdue amounts**

(a)      If the Company fails to pay any amount payable by it under the Finance Documents, it must immediately on demand by the Lender pay interest on the overdue amount from its due date up to the date of actual payment, both before, on and after judgment.

(b)      Interest on an overdue amount is payable at a rate determined by the Lender to be one per cent. per annum above the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted the Loan in the currency of the overdue amount. For this purpose, the Lender may:

    (i)      select successive Terms of any duration of up to three months; and

    (ii)      determine the appropriate Rate Fixing Day for that Term.

(c)      Notwithstanding paragraph (b) above, if the overdue amount is a principal amount of the Loan and becomes due and payable before the last day of its current Term, then:

    (i)      the first Term for that overdue amount will be the unexpired portion of that Term; and

    (ii)      the rate of interest on the overdue amount for that first Term will be one per cent. per annum above the rate then payable on the Loan.

After the expiry of the first Term for that overdue amount, the rate on the overdue amount will be calculated in accordance with paragraph (b) above.

(d)      Interest (if unpaid) on an overdue amount will be compounded with that overdue amount at the end of each of its Terms but will remain immediately due and payable.

**8.4      Notification of rates of interest**

The Lender must promptly notify the Company of the determination of a rate of interest under this Agreement.

15

9.    **TERMS**

9.1    **Selection**

(a)    The Loan has successive Terms. The first Term for the Loan will start on the Utilisation Date and each subsequent Term will start on the expiry of its preceding Term.

(b)    Subject to the provisions of this Clause 9, each Term for the Loan shall be three or, subject to availability of funding to the Lender, 24 months or any other period agreed between the Company and the Lender. If the length of a Term is not determined in accordance with this Clause 9, the Company shall be deemed to have selected a duration of three months for such Term.

9.2    **No overrunning the Final Maturity Date**

If a Term would otherwise overrun the Final Maturity Date, it will be shortened so that it ends on the Final Maturity Date.

9.3    **Other adjustments**

The Lender and the Company may enter into such other arrangements as they may agree for the adjustment of Terms and the consolidation and/or splitting of the Loan.

9.4    **Notification**

The Lender must notify the Company of the duration of each Term promptly after ascertaining its duration.

10.    **MARKET DISRUPTION**

10.1    **Market disruption**

(a)    In this Clause, each of the following events is a **Market Disruption Event** (if the interest rate for the relevant Term is to be determined by reference to LIBOR):

(i)    at or about 12:00 noon (London time) on the Rate Fixing Day for the relevant Term, the Screen Rate is not available and the Lender is unable to obtain a quotation to determine LIBOR for the relevant Term; or

(ii)    by close of business in Hong Kong on the Business Day after the Rate Fixing Day, the Company receives a notification from the Lender that the cost to it of funding the Loan from whatever source it may reasonably select would be in excess of LIBOR for the relevant Term.

(b)    The Lender must promptly notify the Company of a Market Disruption Event.

(c)    Subject to any alternative basis agreed and consented to by the Company and the Lender as contemplated by Clause 10.2 (*Alternative basis of interest or funding*), after notification under paragraph (b) above, the rate of interest on the Loan for the relevant Term will be the aggregate of the applicable:

16

(i)     Margin; and

(ii)    the rate which expresses as a percentage rate per annum as the cost to the Lender of funding the Loan from whatever source it may reasonably select.

## 10.2    Alternative basis of interest or funding

If a Market Disruption Event occurs and the Lender or the Company so requires, the Company and the Lender must enter into negotiations for a period of not more than 30 days with a view to agreeing an alternative basis for determining the rate of interest and/or funding for the affected Loan.

## 11.    TAXES

### 11.1    General

In this Clause 11:

**Tax Credit** means a credit against any Tax or any relief or remission for Tax (or its repayment).

**VAT** means goods and services tax, consumption tax, sales tax, value added tax or any other Tax of a similar nature which is imposed in any jurisdiction from time to time.

### 11.2    Tax gross-up

(a)     The Company must make all payments to be made by it under the Finance Documents without any Tax Deduction, unless a Tax Deduction is required by law.

(b)     If the Company is aware that the Company must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it must promptly notify the Lender.

(c)     If a Tax Deduction is required by law to be made by the Company or the Lender, the amount of the payment due from the Company will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)     If the Company is required to make a Tax Deduction, it must make the minimum Tax Deduction allowed by law and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(e)     Within 30 days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, the Company must deliver to the Lender evidence satisfactory to the Lender (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

17

**11.3    Tax indemnity**

(a)    Except as provided below, the Company must, within five Business Days of demand, indemnify the Lender against any loss or liability or cost which the Lender determines will be or has been suffered (directly or indirectly) by the Lender for or on account of Tax in relation to a payment received or receivable (or any payment deemed to be received or receivable) under a Finance Document.

(b)    Paragraph (a) above does not apply with respect to any Tax assessed on the Lender under the laws of the jurisdiction in which:

   (i)    the Lender is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Lender is treated as resident for tax purposes; or

   (ii)   the Lender's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

   if that Tax is imposed on or calculated by reference to the net income received or receivable by the Lender. However, any payment deemed to be received or receivable, including any amount treated as income but not actually received by the Lender, such as a Tax Deduction, will not be treated as net income received or receivable for this purpose.

(c)    Paragraph (a) above does not apply to the extent a loss, liability or cost:

   (i)    is compensated for by an increased payment under Clause 11.2 (Tax gross-up), Clause 11.8 (*FATCA Deduction and gross-up by the Company*) or paragraph (b) of Clause 11.9 (*FATCA Deduction by the Lender*); or

   (ii)   is compensated for by a payment under paragraph (d) of Clause 11.9 (*FATCA Deduction by the Lender*).

(d)    If the Lender makes or intends to make a claim under paragraph (a) above it must promptly notify the Company of the event which will give, or has given, rise to the claim.

**11.4    Tax Credit**

If the Company makes a Tax Payment and the Lender determines that:

(a)    a Tax Credit is attributable either to an increased payment of which that Tax Payment forms part, or to that Tax Payment; and

(b)    it has obtained, used and retained that Tax Credit,

the Lender must pay an amount to the Company which the Lender determines will leave it (after that payment) in the same after-Tax position as it would have been if the Tax Payment had not been required to be made by the Company.

18

**11.5    Stamp taxes**

The Company must pay, and, within five Business Days of demand, indemnify the Lender against any cost, loss or liability the Lender incurs in relation to all stamp duty, stamp duty land tax, registration or other similar Tax payable in connection with the entry into, performance or enforcement of the Lender, except for any such Tax payable in connection with the entry into of a Transfer Certificate.

**11.6    Value added taxes**

(a)    All amounts set out, or expressed to be payable under a Finance Document by the Lender which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is or becomes chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is chargeable on any supply made by the Lender to the Company under a Finance Document and the Lender is required to account for the VAT, the Company must pay to the Lender (in addition to and at the same time as paying the consideration for such supply) an amount equal to the amount of the VAT and the Lender shall promptly provide an appropriate VAT invoice to the Company.

(b)    Where a Finance Document requires the Company to reimburse or indemnify the Lender for any costs or expenses, the Company must also at the same time reimburse and indemnify (as the case may be) the Lender against all VAT incurred by the Lender in respect of those costs or expenses but only to the extent that the Lender (acting reasonably) determines that it is not entitled to credit or repayment from the relevant tax authority in respect of the VAT.

(c)    If VAT is chargeable on any supply made by the Lender to the Company under a Finance Document and if reasonably requested by the Lender, the Company must promptly give the Lender details of its VAT registration number (if applicable) and any other information as is reasonably requested in connection with the Lender's reporting requirements for the supply.

**11.7    FATCA Information**

(a)    Subject to paragraph (c) below, a Party shall, within ten Business Days of a reasonable request by the other Party:

(i)    confirm to the other Party whether it is:

(A)    a FATCA Exempt Party; or

(B)    not a FATCA Exempt Party;

(ii)    supply to the other Party such forms, documentation and other information relating to its status under FATCA as the other Party reasonably requests for the purposes of the other Party's compliance with FATCA;

(iii)    supply to the other Party such forms, documentation and other information relating to its status as the other Party reasonably requests for the purposes of the other Party's compliance with any other law, regulation, or exchange of information regime.

19

(b)     If a Party confirms to the other Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)     Paragraph (a) above shall not oblige the Lender to do anything, and paragraph (a)(iii) above shall not oblige any Party to do anything, which would or might in its reasonable opinion constitute a breach of:

   (i)     any law or regulation;

   (ii)     any fiduciary duty; or

   (iii)     any duty of confidentiality.

(d)     If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (a)(ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.


**11.8     FATCA Deduction and gross-up by the Company**

(a)     If the Company is required to make a FATCA Deduction, it shall make that FATCA Deduction and any payment required in connection with that FATCA Deduction within the time allowed and in the minimum amount required by FATCA.

(b)     If a FATCA Deduction is required to be made by the Company, the amount of the payment due from the Company shall be increased to an amount which (after making any FATCA Deduction) leaves an amount equal to the payment which would have been due if no FATCA Deduction had been required.

(c)     The Company shall promptly upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of a FATCA Deduction) notify the Lender accordingly. Similarly, the Lender shall notify the Company on becoming so aware in respect of a payment payable to the Lender.

(d)     Within 30 days of making either a FATCA Deduction or any payment required in connection with that FATCA Deduction, the Company shall deliver to the Lender evidence reasonably satisfactory to the Lender that the FATCA Deduction has been made or (as applicable) any appropriate payment has been paid to the relevant governmental or taxation authority.

20

**11.9    FATCA Deduction by the Lender**

(a)    The Lender may make any FATCA Deduction it is required by FATCA to make, and any payment required in connection with that FATCA Deduction, and the Lender shall not be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction. If the Lender becomes aware that it must make a FATCA Deduction in respect of a payment to the Company (or that there is any change in the rate or the basis of such FATCA Deduction), it shall notify the Company.

(b)    If the Lender is required to make a FATCA Deduction which relates to a payment by the Company, the amount of the payment due from the Company shall be increased to an amount which (after the Lender has made such FATCA Deduction), leaves the Lender with an amount equal to the payment if no FATCA Deduction had been required.

(c)    The Lender shall promptly upon becoming aware that it must make a FATCA Deduction which relates to a payment by the Company (or that there is any change in the rate or the basis of such a FATCA Deduction) notify the Company.

(d)    The Company shall (within three Business Days of demand by the Lender) pay to the Lender an amount equal to the loss, liability or cost which the Lender determines will be or has been (directly or indirectly) suffered by the Lender as a result of its making a FATCA Deduction in respect of a payment due to it under a Finance Document. This paragraph shall not apply to the extent a loss, liability or cost is compensated for by an increased payment under paragraph (b) above.

(e)    If the Lender makes, or intends to make, a claim under paragraph (d) above, it shall promptly notify the Company of the FATCA Deduction which will give, or has given, rise to the claim.


**12.    INCREASED COSTS**

**12.1    Increased Costs**

Except as provided below in this Clause 12, the Company must, within five Business Days of demand, pay to the Lender the amount of any Increased Cost incurred by the Lender or any of its Affiliates as a result of:

(a)    the introduction of, or any change in, or any change in the interpretation, administration or application of, any Law or Regulation; or

(b)    compliance with any Law or Regulation or any applicable direction, request or requirement (whether or not having the force of law) of any Authority made after the date of this Agreement.


**12.2    Exceptions**

The Company need not make any payment for an Increased Cost to the extent that the Increased Cost is:

21

(a)    compensated for under another Clause or would have been but for an exception to that Clause;

(b)    attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (but excluding any amendment arising out of Basel III) (**Basel II**) or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, the Lender or any of its Affiliates); or

(c)    attributable to the Lender or any Affiliate of the Lender wilfully failing to comply with any Law or Regulation.

### 12.3    Claims

(a)    If the Lender intends to make a claim for an Increased Cost it must notify the Company of the circumstances giving rise to and the amount of the claim.

(b)    The Lender must, as soon as practicable after making a demand, provide a certificate confirming the amount of its Increased Cost.

## 13.    MITIGATION

### 13.1    Mitigation

(a)    The Lender must, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which result or would result in:

    (i)    any Tax Payment or Increased Cost being payable to the Lender; or

    (ii)    the Lender being able to exercise any right of prepayment and/or cancellation under this Agreement by reason of any illegality;

including transferring its rights and obligations under the Finance Documents to an Affiliate or changing its Facility Office.

(b)    Paragraph (a) above does not in any way limit the obligations of the Company under the Finance Documents.

(c)    The Company must promptly indemnify the Lender for all costs and expenses reasonably incurred by the Lender as a result of any step taken by it under this Subclause.

(d)    The Lender is not obliged to take any step under this Subclause if, in the opinion of the Lender (acting reasonably), to do so might be prejudicial to it.

### 13.2    Conduct of business by the Lender

No term of any Finance Document will:

22

(a)      interfere with the right of the Lender to arrange its affairs (Tax or otherwise) in whatever manner it thinks fit;

(b)      oblige the Lender to investigate or claim any credit, relief, remission or repayment available to it in respect of Tax or the extent, order and manner of any claim; or

(c)      oblige the Lender to disclose any information relating to its affairs (Tax or otherwise) or any computation in respect of Tax.

## 14. PAYMENTS

### 14.1 Currency

(a)      Unless a Finance Document specifies that payments under it are to be made in a different manner, the currency of each amount payable under the Finance Documents is determined under this Subclause.

(b)      Amounts payable in respect of Taxes, fees, costs and expenses are payable in the currency in which they are incurred.

(c)      Each other amount payable under the Finance Documents is payable in US Dollars.

### 14.2 No set-off or counterclaim

All payments made by the Company under the Finance Documents must be calculated and made without (and free and clear of any deduction for) set-off or counterclaim.

### 14.3 Business Days

(a)      If a payment under the Finance Documents is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not) or whatever day the Lender determines (acting reasonably) is market practice.

(b)      During any extension of the due date for payment of any principal under this Agreement interest is payable on that principal at the rate payable on the original due date.

### 14.4 Disruption to payment systems

If the Company receives a notification from the Lender that a Disruption Event has occurred or the Company notifies the Lender that a Disruption Event has occurred, the Lender may, and must if requested by the Company, enter into discussions with the Company for a period of not more than five days with a view to agreeing any changes to the operation or administration of the Facility as the Parties may decide are necessary, provided that the Lender is not obliged to agree to any changes if, in its reasonable opinion, it is not practicable to do so.

23

**15.    REPRESENTATIONS AND WARRANTIES**

**15.1    Representations and warranties**

The representations and warranties set out in this Clause 15 are made by the Company to the Lender.

**15.2    Status**

(a)    It is a limited liability company, duly incorporated and validly existing under the laws of the Cayman Islands.

(b)    It and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

(c)    It is acting as principal on its account and not as agent or trustee in any capacity on behalf of any party in relation to this Agreement.

(d)    It is not a FATCA FFI or a US Tax Obligor.

**15.3    Powers and authority**

It has the power to enter into and perform, and has taken all necessary action to authorise the entry into and performance of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

**15.4    Legal validity**

(a)    Subject to any general principles of law limiting its obligations and referred to in any legal opinion required under this Agreement, each Finance Document to which it is a party is its legally binding, valid and enforceable obligation.

(b)    Each Finance Document to which it is a party is in the proper form for its enforcement in the jurisdiction of its incorporation and in Hong Kong.

**15.5    Non-conflict**

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not conflict with:

(a)    any law or regulation applicable to it;

(b)    its or any of its Subsidiaries' constitutional documents;

(c)    any document which is binding upon it or any of its Subsidiaries or any of its or its Subsidiaries' assets.

**15.6    No default**

(a)    No Event of Default is outstanding or will result from the entry into of, or the performance of any transaction contemplated by, any Finance Document; and

(b)    No other event or circumstance is outstanding which constitutes a default under any document which is binding on it or any of its Subsidiaries or any of its or its Subsidiaries' assets to an extent or in a manner which has or is reasonably likely to have a Material Adverse Effect.

24

**15.7    Authorisations**

All authorisations required to enable it to enter into and perform its obligations under, and for the validity and enforceability of, and the transactions contemplated by, the Finance Documents have been, or will, by the time required, have been obtained or effected (as appropriate) and are, or will, by the time required be, in full force and effect.

**15.8    Financial statements**

Its audited consolidated financial statements most recently delivered to the Lender (which, at the date of this Agreement, are the Original Financial Statements):

(a)    have been prepared in accordance with GAAP, consistently applied; and

(b)    give a true and fair view of its consolidated financial condition as at the date to which they were drawn up,

except, in each case, as disclosed to the contrary in those financial statements.

**15.9    Litigation**

No litigation, arbitration or administrative proceedings against any member of the Group has been started or, to its knowledge, threatened, which have or, if adversely determined, are reasonably likely to have a Material Adverse Effect.

**15.10    Issued share capital**

It has a paid up share capital of not less than HKD1,000,000 or an equivalent amount in any other approved currency.

For the purpose of this Subclause, **approved currency** means a currency which is freely convertible into Hong Kong Dollars or a currency approved in writing by the Registrar of Money Lenders appointed under section 4 of the Money Lenders Ordinance (Cap. 163, Laws of Hong Kong) (the **MLO**) for the purpose of paragraph 12 of Part 2 of Schedule 1 to the MLO.

**15.11    OFAC**

No member of the Group will:

(a)    use (or otherwise make available) the proceeds of the Loan for the purpose of financing directly or indirectly the activities of any person or entity which is currently listed on the Specially Designated Nationals (the **SDN**) List or in a country which is subject to U.S. economic sanctions administered by the US Treasury Department Office of Foreign Assets Control (the **OFAC Sanctions**) to the extent such financing would be prohibited by the OFAC Sanctions if conducted by a person in the US; or

25

(b)      contribute or otherwise make available the proceeds of the Loan to any person or entity if the relevant member of the Group has actual knowledge that such party intends to use such proceeds for the purpose of financing the activities of any person or entity which is on the SDN List or in a country which is subject to the OFAC Sanctions, to the extent such financing would be prohibited by the OFAC Sanctions if conducted by a person in the US.

## 15.12    Sanctions

None of the Company, any other member of the Group, any director, officer, employee, agent or Affiliate of the Company or any other member of the Group is, or is owned or controlled by any person(s) that is:

(a)      the subject of any Sanction; or

(b)      located, organised or resident in a country or territory that is, or whose government is, the subject of any Sanction, including, currently, the Crimea region, Cuba, Iran, North Korea, Sudan and Syria.

## 15.13    Anti-corruption

No member of the Group nor its directors or officers or (to the best of the Company's knowledge having made all reasonable enquiries) its agents or employees or any other persons acting for it or on its behalf (each a **Relevant Person**) have:

(a)      violated (and will violate) any applicable anti-bribery or anti-corruption laws;

(b)      offered, paid, promised to pay or authorised the payment of (and will offer, pay, promise to pay or authorise the payment of) any money; or

(c)      offered, given, promised to give or authorised the giving of (and will offer, give, promise to give or authorise the giving of) anything of value to any Government Official (**Government Official** means any officer, employee or any other person acting in an official capacity for any government authority or any political party or any candidate for political office (both individually and collectively)) or to any person,

under circumstances where any member of the Group or the Relevant Person knew or was aware of a high probability that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, in each case for the purpose of:

i.       any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity;

ii.      influencing any act or decision of such Government Official in his official capacity (including a decision to fail to perform his official function);

iii.     inducing such Government Official to do any act in relation to his lawful duty;

iv.      securing any improper advantage;

26

v.    inducing such Government Official to influence or affect any act or decision of any Government Entity (**Government Entity** means government or any department, agency or instrumentality thereof, including any entity or enterprise owned or controlled by a government, or a public international organisation); or

vi.    assisting any member of the Group or the Relevant Person in obtaining or retaining business for or with a Government Entity, or directing business to the Group or the Relevant Person (and such conduct a **Corrupt Activity**),

provided that the Company shall not be in breach of the representation in this Clause 15.13 if, within thirty (30) days of becoming aware of any Corrupt Activity, the Company takes appropriate action to remedy such Corrupt Activity.

### 15.14    Governing law and enforcement

(a)    The choice of Hong Kong law as the governing law of the Finance Documents will be recognised and enforced in its jurisdiction of incorporation.

(b)    Subject to any qualification referred to in any legal opinion required under this Agreement, any judgment obtained in Hong Kong in relation to a Finance Document will be recognised and enforced in its jurisdiction of incorporation.

### 15.15    Authorised signatory

Any person specified as its authorised signatory in the director's certificate to be delivered under Part 1 (Conditions precedent) of Schedule 1 (Conditions precedent documents) or paragraph (a)(v) of Clause 16.4 (Information – miscellaneous) is authorised to sign the Request and other notices on its behalf.

### 15.16    No material adverse change

There has been no material adverse change in its consolidated financial condition since the date to which the Original Financial Statements were drawn up.

### 15.17    Information

All written, factual information supplied by the Company or on its behalf to the Lender in connection with the Finance Documents (including any information supplied prior to the date of this Agreement) is true and accurate in all material respects as at its date or (if appropriate) as at the date (if any) at which it is stated to be given and the Company has not omitted to supply any information which, if disclosed, might make the information supplied untrue or misleading in any material respect.

### 15.18    Restricted Group

The following is a complete list of all the members of the Restricted Group (other than the Company) as of the date of this Agreement:

(a)    Baidu.com Times Technology (Beijing) Co., Ltd;

27

(b)    Baidu Online Network Technology (Beijing) Co., Ltd; and

(c)    Baidu (China) Co., Ltd.

### 15.19    Stamp duties

Except for any registration fees, stamp duty or other similar Tax or charge referred to in any legal opinion required under this Agreement (which will be paid within any applicable time limit), as at the date of this Agreement, no stamp or registration duty or similar Tax or charge is payable in its jurisdiction of incorporation in respect of any Finance Document.

### 15.20    Security Interest

As at the date of this Agreement, no Security Interest or Quasi-Security Interest exists over the assets of any member of the Restricted Group.

### 15.21    Times for making representations and warranties

(a)    The representations and warranties set out in this Clause are made by the Company on the date of this Agreement.

(b)    Each Repeating Representation is deemed to be repeated by the Company on the date of the Request and the first day of each Term and, if the Term of the Loan is 24 months, on the dates falling at three-monthly intervals after the Utilisation Date.

(c)    When a representation and warranty is repeated, it is applied to the circumstances existing at the time of repetition.

## 16.    INFORMATION COVENANTS

### 16.1    Financial statements

(a)    The Company must supply to the Lender:

    (i)    its audited consolidated financial statements for each of its financial years; and

    (ii)    its interim financial statements for the first half-year of each of its financial years.

(b)    All financial statements must be supplied as soon as they are available and:

    (i)    in the case of the Company's audited consolidated financial statements, within 180 days; and

    (ii)    in the case of the Company's interim financial statements, within 120 days,

of the end of the relevant financial period.

**16.2    Form of financial statements**

(a)    The Company must ensure that each set of financial statements supplied under this Agreement is prepared using GAAP and gives (if audited) a true and fair view of, or (if unaudited) fairly represents, its financial condition (consolidated or otherwise) as at the date to which those financial statements were drawn up.

(b)    The Company must notify the Lender of any change to the manner in which its consolidated financial statements are prepared.

(c)    If requested by the Lender, the Company must supply to the Lender:

(i)    a full description of any change notified under paragraph (b) above;

(ii)    sufficient information to enable the Lender to make a proper comparison between the financial position shown by the set of financial statements prepared on the changed basis and its most recent consolidated financial statements delivered to the Lender under this Agreement; and

(iii)    sufficient information, in form and substance as may be reasonably required by the Lender, to enable the Lender to determine whether Clause 17 (Financial covenants) has been complied with and make an accurate comparison between the financial position indicated in those financial statements and the Original Financial Statements.

**16.3    Compliance Certificate**

(a)    The Company must supply to the Lender a Compliance Certificate with each set of its financial statements sent to the Lender under this Agreement.

(b)    A Compliance Certificate must be signed by at least one authorised signatory of the Company.

**16.4    Information - miscellaneous**

(a)    The Company must, subject to paragraph (b) below, supply to the Lender:

(i)    copies of all documents despatched by the Company to its shareholders (or any class of them) or to its creditors generally at the same time as they are despatched;

(ii)    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings against any member of the Group which are current, threatened or pending and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(iii)    promptly on request, a list of the then current Restricted Subsidiaries;

(iv)    promptly on request, such further information regarding the financial condition, business and operations of any member of the Group as the Lender may reasonably request; and

29

(v)     promptly, notice of any change in authorised signatories of the Company signed by a director or company secretary of the Company accompanied by specimen signatures of any new authorised signatories.

(b)     Nothing in paragraph (a) above shall require the Company to supply any document or information to the Lender if and for so long such disclosure will cause the Company to be in breach of the relevant listing rules of NASDAQ or any mandatory provisions of applicable laws or any confidentiality agreements or undertakings.

### 16.5     Notification of Default

(a)     The Company must notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

(b)     Promptly on request by the Lender, the Company must supply to the Lender a certificate, signed by two of its authorised signatories on its behalf, certifying that no Default is outstanding or, if a Default is outstanding, specifying the Default and the steps, if any, being taken to remedy it.

### 16.6     Year end

The Company must not change its financial year end except with the prior written consent of the Lender (which consent shall not be unreasonably withheld or delayed).

## 17.     FINANCIAL COVENANTS

### 17.1     Definitions

In this Clause 17:

**Adjusted Consolidated EBITDA** means, in relation to a Measurement Period, Consolidated EBITDA for the period adjusted by:

(a)     including the operating profit before interest, tax, depreciation, amortisation and impairment charges (EBITDA) of a member of the Group or attributable to a business or assets acquired during the Measurement Period for that part of the Measurement Period when it was not a member of the Group and/or the business or assets were not owned by a member of the Group; and

(b)     excluding the EBITDA attributable to any member of the Group or to any business or assets sold during that Measurement Period.

**Consolidated Cash Balance** means, at any time, the aggregate of all cash and cash equivalents and short-term investments held by the Group at that time which would be included on a consolidated balance sheet of the Group drawn up at that time in accordance with GAAP as "Cash and cash equivalents" or "Short-term investments" and for so long as repayment of that cash or realisation of those cash equivalents or short-term investments is not contingent on the prior discharge of any other indebtedness of any member of the Group or of any other person whatsoever or on satisfaction of any other condition outside the control of the Group.

30

**Consolidated EBIT** means, in relation to a Measurement Period, the aggregate of:

(a)    the consolidated operating profits of the Group (including the results from discontinued operations) before finance costs and tax for that Measurement Period;

(b)    plus or minus the Group's share of the profits or losses of associates for that period (after finance costs and tax) and the Group's share of the profits or losses of any joint ventures;

adjusted by:

(i)    taking no account of any Exceptional Item;

(ii)    taking no account of any unrealised gains or losses on any derivative instrument or other financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis) which is reported through the income statement;

(iii)    taking no account of any income or charge attributable to a post-employment benefit scheme other than the current service costs and any past service costs and curtailments and settlements attributable to the scheme;

(iv)    taking no account of any expense referable to equity-settled share-based compensation of employees.

**Consolidated EBITDA** means, in relation to a Measurement Period, Consolidated EBIT for that Measurement Period after adding back any depreciation and amortisation and taking no account of any charge for impairment or any reversal of any previous impairment charge made in the period.

**Consolidated Tangible Net Worth** means at any time the aggregate of:

(a)    the amount paid up or credited as paid up on the issued share capital of the Company; and

(b)    the net amount standing to the credit (or debit) of the consolidated reserves of the Company,

based on the latest published audited or unaudited consolidated balance sheet of the Company (the **latest balance sheet**) (and in each case, the balance sheet of the Company to be provided by the Company as at 31 December of each year shall always be audited) but adjusted by:

(i)    deducting any dividend or other distribution proposed, declared or made by the Company (except to the extent it has been taken into account in the latest balance sheet);

(ii)    deducting any amount attributable to goodwill or any other intangible asset;

31

(iii)    deducting any amount attributable to an upward revaluation of assets (other than financial instruments) after 31 December 2014 or, in the case of assets of a company which becomes a member of the Group after that date, the date on which that company becomes a member of the Group;

(iv)    reflecting any variation in the amount of the issued share capital of the Company after the date of the latest balance sheet (and any change in the consolidated reserves of the Group resulting from that variation); and

(v)    excluding any amounts debited or credited to deferred tax which relates to the revaluation of any item which is excluded from the calculation.

**Consolidated Total Borrowings** means, in respect of the Group, at any time, the aggregate of the following liabilities calculated at the nominal, principal or other amount at which the liabilities would be carried in a consolidated balance sheet of the Company drawn up at that time (or in the case of any guarantee, indemnity or similar assurance referred to in paragraph (i) below, the maximum liability under the relevant instrument):

(a)    any moneys borrowed;

(b)    any redeemable preference shares;

(c)    any acceptance under any acceptance credit (including any dematerialised equivalent);

(d)    any bond, note, debenture, loan stock or other similar instrument;

(e)    any indebtedness under a finance or capital lease in accordance with the GAAP;

(f)    any moneys owing in connection with the sale or discounting of receivables (except to the extent that there is no recourse);

(g)    any indebtedness arising from any deferred payment agreements arranged primarily as a method of raising finance or financing the acquisition of an asset;

(h)    any indebtedness arising in connection with any other transaction (including any forward sale or purchase agreement) which has the commercial effect of a borrowing; and

(i)    any indebtedness of any person of a type referred to in the above paragraphs which is the subject of a guarantee, indemnity or similar assurance against financial loss given by a member of the Group,

in each case, for the avoidance of doubt, excluding any indebtedness arising (a) in the ordinary course of trading (other than, for the avoidance of doubt, any indebtedness or borrowed moneys incurred to finance the relevant trade) and (b) between members of the Group.

32

**Exceptional Item** means any material item of income or expense that represents:

(a)    any gain or loss arising from:

    (i)    write-downs of inventories to net realisable value or of property, plant and equipment to recoverable amount, and reversals of such write-downs;

    (ii)    restructuring the activities of the Group or any member of the Group and any reversals of any provision for the costs of restructuring;

    (iii)    disposals of items of property, plant or equipment;

    (iv)    disposals of investments; or

    (v)    disposals or settlements of liabilities of any member of the Group that fall within the definition of Consolidated Total Borrowings; or

(b)    any gain of a highly unusual or non-recurring nature; or

(c)    any gain or loss arising from a transaction entered into otherwise than in the carrying on of the normal core business operations of the Group.

**Measurement Period** means the last four full financial quarters of the Company ending on the date of the latest balance sheet (as defined in the definition of Consolidated Tangible Net Worth above).

**17.2    Interpretation**

(a)    Except as provided to the contrary in this Agreement, an accounting term used in this Clause is to be construed in accordance with the principles applied in connection with the Original Financial Statements.

(b)    Any amount in a currency other than US Dollars is to be taken into account at its US Dollar equivalent calculated on the basis of:

    (i)    the Lender's spot rate of exchange for the purchase of the relevant currency in the London foreign exchange market with US Dollars at or about 11.00 a.m. on the day the relevant amount falls to be calculated; or

    (ii)    if the amount is to be calculated on the last day of a financial period of the Company, the relevant rates of exchange used by the Company in, or in connection with, its financial statements for that period.

(c)    No item must be credited or deducted more than once in any calculation under this Clause 17.

**17.3    Consolidated Tangible Net Worth**

The Company must ensure that Consolidated Tangible Net Worth is not at any time less than RMB 10,000,000,000.

**17.4    Gearing**

The Company must ensure that Consolidated Total Borrowings does not at any time exceed 150 per cent. of Consolidated Tangible Net Worth at that time.

**17.5    Leverage**

The Company must ensure that Consolidated Total Borrowings does not, at the end of each Measurement Period, exceed 2.5 times of the Adjusted Consolidated EBITDA for that Measurement Period.

**17.6    Consolidated Cash Balance**

The Company must ensure that Consolidated Cash Balance is not at any time less than Consolidated Total Borrowings at that time.

**18.    GENERAL COVENANTS**

**18.1    General**

The Company agrees to be bound by the covenants set out in this Clause 18 relating to it and, where the covenant is expressed to apply to any other member of the Group, the Company must ensure that its relevant Subsidiaries perform that covenant.

**18.2    Authorisations**

The Company must promptly:

(a)    obtain, maintain and comply with the terms; and

(b)    if requested by the Lender, supply certified copies to the Lender,

of any authorisation required under any law or regulation to enable it to perform its obligations under, or for the validity or enforceability of, any Finance Document.

**18.3    Compliance with laws**

Each member of the Group must comply in all respects with all laws to which it is subject where failure to do so would have a Material Adverse Effect.

**18.4    Pari passu ranking**

The Company must ensure that its payment obligations under the Finance Documents at all times rank at least pari passu with all its other present and future unsecured payment obligations, except for obligations mandatorily preferred by law applying to companies generally.

**18.5    Negative pledge**

(a)    For the purpose of this Subclause, **Quasi-Security Interest** means an arrangement or transaction described in paragraph (c) below.

(b)    Except as provided below, no member of the Restricted Group may create or allow to exist any Security Interest on any of its assets.

(c)    No member of the Restricted Group may:

    (i)    sell, transfer or otherwise dispose of any of its assets on terms where it is or may be leased to or re-acquired or acquired by a member of the Restricted Group;

    (ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

    (iii)    enter into or permit to subsist any title retention arrangement;

    (iv)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

    (v)    enter into any other preferential arrangement having a similar effect,

in circumstances where the transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(d)    Paragraphs (b) and (c) do not apply to:

    (i)    any Security Interest or Quasi-Security Interest comprising a netting, set-off or cash-pooling arrangement entered into by a member of the Restricted Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

    (ii)    any payment or close out netting or set-off arrangement pursuant to any hedging transaction entered into by a member of the Restricted Group but excluding any Security Interest or Quasi-Security Interest under a credit support arrangement;

    (iii)    any lien arising by operation of law and in the ordinary course of business;

    (iv)    any Security Interest or Quasi-Security Interest on an asset, or an asset of any person, acquired by a member of the Restricted Group after the date of this Agreement but only for the period of 6 months from the date of acquisition and to the extent that the principal amount secured by that Security Interest has not been incurred or increased in contemplation of, or since, the acquisition;

    (v)    any Security Interest or Quasi-Security Interest arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Restricted Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Restricted Group;

35

(vi)   any Security Interest or Quasi-Security Interest over goods or documents of title arising in the ordinary course of letter of credit transactions entered into in the ordinary course of trade;

(vii)   any Security Interest or Quasi-Security Interest provided with the prior consent of the Lender; and

(viii)   any Security Interest or Quasi-Security Interest securing indebtedness the amount of which (when aggregated with the amount of any other indebtedness which has the benefit of a Security Interest not allowed under the preceding sub-paragraphs) does not exceed RMB500,000,000 or its equivalent at any time.

**18.6   Disposals**

(a)   Except as provided below, no member of the Group (other than Beijing Baidu Netcom) may, either in a single transaction or in a series of transactions and whether related or not, dispose of all or any part of its assets without the prior written consent of the Lender.

(b)   Paragraph (a) above does not apply to any disposal:

(i)   where the consideration receivable of that disposal (when aggregated with the consideration for any other disposal of assets by any member of the Group not allowed under sub-paragraphs (ii) to (vi) below) (A) does not exceed the Disposal Threshold or (B) exceeds the Disposal Threshold but no Mandatory Prepayment Request has been delivered by the Lender to the Company within the applicable time period specified in Clause 7.2(a) (Mandatory prepayment — disposals); or (C) exceeds the Disposal Threshold where the net proceeds of that disposal are applied towards mandatory prepayment of the Loan in accordance with Clause 7.2(a) (Mandatory prepayment — disposals);

(ii)   made to another member of the Group (other than Beijing Baidu Netcom);

(iii)   made in the ordinary course of trading of the disposing entity;

(iv)   of assets in exchange for other assets comparable or superior as to type, value and quality;

(v)   of obsolete or redundant vehicles, plant or equipment for cash; or

(vi)   arising as result of a Permitted Transaction.

(c)   Each disposal shall only be permitted under this Subclause if it is made (i) on arm's length commercial terms or (ii) (other than in respect of any disposal permitted under paragraph (b)(ii) above) on more favourable terms to the disposing entity than arms' length commercial terms and at least for fair market value.

36

**18.7    Change of business**

The Company must ensure that no substantial change is made to the general nature of the business of the Restricted Group from that carried on at the date of this Agreement.

**18.8    Merger**

The Company shall not enter into any amalgamation, demerger, merger or reconstruction other than a Permitted Transaction.

**18.9    Insurance**

Each member of the Restricted Group must insure its business and assets with insurance companies to such an extent and against such risks as companies engaged in a similar business normally insure.

**18.10    "Know Your Customer" Checks**

The Company shall promptly upon the request of the Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Lender (for itself or on behalf of any prospective assignee or transferee) in order for the Lender or any prospective assignee or transferee to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations.

**18.11    Sanction**

The Company shall not, directly or indirectly, use the proceeds of the Facility, or lend, contribute or otherwise make available such proceeds to any other member of the Group, any joint venture partner or any other person:

(a)    to fund any activities or business of or with any person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of any Sanction; or

(b)    in any other manner that would result in a violation of any Sanction by any person (including any person participating in the Facility, whether as underwriter, advisor, investor or otherwise).

**18.12    Anti-Money Laundering and Counter-Terrorist Financing**

Each member of the Group shall comply in all respects with all anti-money laundering and counter-terrorist financing laws and regulations (**AML/CTF Laws**) to which it may be subject. The Company shall promptly provide all information to the Lender which the Lender may require in order to manage its money-laundering and terrorist-financing risks or to comply with AML/CTF Laws.

**18.13    Restrictions on Transactions**

The Company agrees that the Lender may refuse to act on any instruction of the Company or delay, block or refuse to process any transaction under this Agreement without incurring any liability if the Lender has fair reason to suspect that:

(a)       the instruction or transaction may breach any Law or Regulation;

(b)       the instruction or transaction involves any person (natural, corporate or governmental) that is itself subject to any applicable sanction imposed by the United Nations or any relevant country or is connected, directly or indirectly, to any person that is subject to such sanction;

(c)       the instruction or transaction may directly or indirectly involve the proceeds of, or be applied for the purposes of, any unlawful conduct; or

(d)       by carrying out the instruction or transaction, the Lender may breach any Law or Regulation.


**18.14    No Immunity**

The Company agrees that in any legal action or proceedings against it or its assets in connection with this Agreement, no immunity from such legal action or proceedings shall be claimed by or on behalf of any member of the Group or with respect to its assets, and that member (including the Company) irrevocably waives any such right of immunity which it or its assets now has/have or may hereafter acquire or which may be attributed to it or its assets and consents generally in respect of any such legal action or proceedings to the giving of any relief or the issue of any process in connection with such action or proceedings including, without limitation, the making, enforcement or execution against any property whatsoever, of any order or judgment which may be made or given in such action or proceedings.


**18.15    Provision of Information**

(a)       Each member of the Group agrees that it shall provide the Lender with such information as the Lender may require from time to time to enable the Lender to comply with any Law or Regulation.

(b)       If any information provided by or on behalf of the Company to the Lender includes information or personal data of any third party, the Company confirms and warrants that it has obtained the consent of such third party to the provision of such information or personal data to the Lender for such purposes and for disclosure to such persons (whether in or outside Hong Kong) as it may be disclosed to in accordance with the terms of this Agreement or the Lender's policies on use and disclosure of personal data set out in statements, circulars, terms and conditions or notices made available by the Lender to its customers from time to time.


**18.16    Application of FATCA**

The Company shall procure that it shall not become a FATCA FFI or a US Tax Obligor.

38

**19.     DEFAULT**

**19.1     Events of Default**

Each of the events or circumstances set out in this Clause 19 (other than Clause 19.13 (Acceleration)) is an Event of Default.

**19.2     Non-payment**

The Company does not pay on the due date any amount payable by it under the Finance Documents in the manner required under the Finance Documents, unless the non-payment

(a)     is caused by technical or administrative error and is remedied within five Business Days of the due date; or

(b)     is caused by a Disruption Event and is remedied within five Business Days of the due date.

**19.3     Breach of other obligations**

(a)     The Company does not comply with any term of Clause 17 (Financial covenants); or

(b)     the Company does not comply with any term of the Finance Documents (other than any term referred to in Clause 19.2 (Non-payment) or in paragraph (a) above), unless the non-compliance:

(i)     is capable of remedy; and

(ii)     is remedied within 20 Business Days of the earlier of the Lender giving notice of the failure to comply to the Company and the Company becoming aware of the non-compliance.

**19.4     Misrepresentation**

A representation or warranty made or deemed to be repeated by the Company in any Finance Document or in any document delivered by or on behalf of the Company under any Finance Document is incorrect or misleading in any material respect when made or deemed to be repeated, unless the circumstances giving rise to the misrepresentation or breach of warranty:

(a)     are capable of remedy; and

(b)     are remedied within 20 Business Days of the earlier of the Lender giving notice of the misrepresentation or breach of warranty to the Company and the Company becoming aware of the misrepresentation or breach of warranty.

**19.5     Cross-default**

Any of the following occurs in respect of a member of the Restricted Group:

(a)     any of its Financial Indebtedness is not paid when due (after the expiry of any originally applicable grace period);

39

(b)      any of its Financial Indebtedness:

    (i)      becomes prematurely due and payable;

    (ii)     is placed on demand; or

    (iii)    is capable of being declared by or on behalf of a creditor to be prematurely due and payable or of being placed on demand,

in each case, as a result of an event of default or any provision having a similar effect (howsoever described); or

(c)      any commitment for its Financial Indebtedness is cancelled or suspended as a result of an event of default or any provision having a similar effect (howsoever described),

unless the aggregate amount of Financial Indebtedness falling within all or any of paragraphs (a) to (c) above is less than US$50,000,000 or its equivalent.

## 19.6      Insolvency

Any of the following occurs in respect of a member of the Restricted Group:

(a)      it is, or is deemed for the purposes of any applicable law to be, unable to pay its debts as they fall due or insolvent;

(b)      it admits its inability to pay its debts as they fall due;

(c)      it suspends making payments on its debts generally or announces an intention to do so;

(d)      by reason of actual or anticipated financial difficulties, it begins negotiations with any creditor for the rescheduling or restructuring of any of its indebtedness;

(e)      the value of its assets is less than its liabilities (taking into account contingent and prospective liabilities); or

(f)      any of its indebtedness is subject to a moratorium.

## 19.7      Insolvency proceedings

(a)      Except as provided below, any of the following occurs in respect of a member of the Restricted Group:

    (i)      any corporate action or legal proceedings is taken with a view to the suspension of payments, a moratorium or a composition, assignment or similar arrangement with any of its creditors;

    (ii)     a meeting of its shareholders, directors or other officers resolves to petition for or to file documents with a court or any registrar for, its winding-up, administration or dissolution or any such resolution is passed;

40

(iii)    any person presents a petition, or files documents with a court or any registrar, for its winding-up, administration, dissolution or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise);

(iv)    any Security Interest is enforced over any of its assets having an aggregate value of at least US$50,000,000;

(v)     an order for its winding-up, administration or dissolution is made;

(vi)    any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator or similar officer is appointed in respect of it or any of its assets; or

(vii)   any analogous step or procedure is taken in any jurisdiction.

(b)    Paragraph (a) above does not apply to:

(i)     any step or procedure which is part of a Permitted Transaction; or

(ii)    a petition for winding-up, administration or dissolution which is being contested in good faith and with due diligence and is discharged or struck out within 30 days.

## 19.8    Creditors' process

Any attachment, sequestration, distress, execution or analogous event affects any asset(s) of a member of the Restricted Group, having an aggregate value of at least US$50,000,000 which is not discharged within 30 days.

## 19.9    Cessation of business

A member of the Restricted Group ceases, or threatens to cease, to carry on business except:

(a)    as part of a Permitted Transaction; or

(b)    as a result of any disposal allowed under this Agreement.

## 19.10    De-listing or suspension of shares trading

The shares in the Company cease to be listed on NASDAQ or trading of the shares in the Company has been suspended for more than five (5) consecutive days on which NASDAQ is generally open for trading and such delisting or suspension has a Material Adverse Effect.

41

**19.11    Effectiveness of Finance Documents**

(a)    It is or becomes unlawful for the Company to perform any of its obligations under the Finance Documents.

(b)    The Company repudiates a Finance Document or evidences an intention to repudiate a Finance Document.

**19.12    Material adverse change**

Any event or series of events occurs which, in the opinion of the Lender (acting reasonably), would have a Material Adverse Effect.

**19.13    Acceleration**

If an Event of Default is outstanding, the Lender may by notice to the Company:

(a)    cancel the Commitment (or any part thereof); and/or

(b)    declare that all or part of any amounts outstanding under the Finance Documents are:

    (i)    immediately due and payable; and/or

    (ii)    payable on demand by the Lender.

Any notice given under this Subclause will take effect in accordance with its terms.

**20.    EVIDENCE AND CALCULATIONS**

**20.1    Accounts**

Accounts maintained by the Lender in connection with this Agreement are prima facie evidence of the matters to which they relate for the purpose of any litigation or arbitration proceedings.

**20.2    Certificates and determinations**

Any certification or determination by the Lender of a rate or amount under the Finance Documents will be, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**20.3    Calculations**

Any interest or fee accruing under this Agreement accrues from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or in any case where the London interbank market differs, in accordance with that market practice.

**21.    FEE**

The Company shall pay to the Lender a front-end fee in an amount equal to USD600,000 (being 0.3 per cent. of USD200,000,000) within fifteen (15) days of the date of this Agreement or, if earlier, on the Utilisation Date. The front-end fee shall be non-refundable whether or not any amount is drawn hereunder.

42

**22.    INDEMNITIES AND BREAK COSTS**

**22.1    Currency indemnity**

(a)    The Company must, as an independent obligation, within five Business Days of demand, indemnify the Lender against any loss or liability which the Lender incurs as a consequence of:

(i)    the Lender receiving an amount in respect of the Company's liability under the Finance Documents; or

(ii)    that liability being converted into a claim, proof, judgment or order,

in a currency other than the currency in which the amount is expressed to be payable under the relevant Finance Document.

(b)    Unless otherwise required by law, the Company waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency other than that in which it is expressed to be payable.

**22.2    Other indemnities**

(a)    The Company must, within five Business Days of demand, indemnify the Lender (and its officers, employees, agents, delegates and nominees) against any fees, expenses (including those of legal counsel), loss or liability which the Lender incurs as a consequence of:

(i)    the occurrence of any Event of Default;

(ii)    written information produced or approved by the Company being or being alleged to be misleading or deceptive in any respect;

(iii)    any enquiry, investigation, subpoena (or similar order) or litigation with respect to the Company or with respect to the transactions contemplated or financed under the Finance Documents;

(iv)    any failure by the Company to pay any amount due under a Finance Document on its due date or in the relevant currency;

(v)    (other than by reason of gross negligence or wilful misconduct by the Lender) the Loan not being made after the Request has been delivered for the Loan; or

(vi)    the Loan (or part of the Loan ) not being prepaid in accordance with this Agreement.

The Company's liability in each case includes any loss or expense on account of funds borrowed, contracted for or utilised to fund any amount payable under any Finance Document or the Loan.

(b)    The Company must, within five Business Days of demand, indemnify the Lender against any loss or liability incurred by the Lender as a result of:

43

(i) investigating any event which the Lender believes to be a Default; or

(ii) acting or relying on any notice, request or instruction which the Lender believes to be genuine, correct and appropriately authorised.

(c) The provisions of this Clause 22.2 shall survive the termination of the Finance Documents or the Lender ceasing to be a Party under the Finance Documents.

### 22.3 Break Costs

(a) The Company must, within three Business Days of demand, pay to the Lender its Break Costs if the Loan (or any part of it) or an overdue amount is repaid or prepaid otherwise than on the last day of any Term applicable to it.

(b) Break Costs are the amount (if any) determined by the Lender by which:

(i) the interest (excluding the Margin) which the Lender would have received for the period from the date of receipt of the Loan or an overdue amount to the last day of the applicable Term for the Loan or overdue amount if the principal or overdue amount received had been paid on the last day of that Term;

exceeds

(ii) the amount which the Lender would be able to obtain by placing an amount equal to the amount received by it on deposit with a leading bank in the appropriate interbank market for a period starting on the Business Day following receipt and ending on the last day of the applicable Term.

(c) The Lender must supply to the Company details of the amount of any Break Costs claimed by it under this Subclause.

## 23. EXPENSES

### 23.1 Initial costs

The Company must, within five Business Days of demand, pay the Lender the amount of all out-of-pocket costs and expenses reasonably incurred by it up to an agreed level in connection with the negotiation, preparation, or printing the Finance Documents.

### 23.2 Subsequent costs

The Company must, within five Business Days of demand, pay to the Lender the amount of all costs and expenses (including reasonable legal fees) reasonably incurred by it in connection with:

(a) the negotiation, preparation, printing and entry into of any Finance Document (other than a Transfer Certificate) entered into after the date of this Agreement; and

44

(b)   any amendment, waiver or consent requested by or on behalf of the Company or specifically allowed by a Finance Document.

### 23.3   Enforcement costs

The Company must, within five Business Days of demand, pay to the Lender the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of, or the preservation of any rights under, any Finance Document.

## 24.   AMENDMENTS AND WAIVERS

### 24.1   Procedure

(a)   Unless otherwise specified in the Finance Documents, any term of the Finance Documents may be amended or waived only with the consent of the Company and the Lender and any such amendment or waiver will be binding on all the Parties.

### 24.2   Change of currency

If a change in any currency of a country occurs (including where there is more than one currency or currency unit recognised at the same time as the lawful currency of a country), the Finance Documents will be amended to the extent the Lender reasonably determines after consultation with the Company is necessary to reflect the change.

### 24.3   Waivers and remedies cumulative

The rights of the Lender under the Finance Documents:

(a)   may be exercised as often as necessary;

(b)   are cumulative and not exclusive of its rights under the general law; and

(c)   may be waived only in writing and specifically.

Delay in exercising or non-exercise of any right is not a waiver of that right.

## 25.   CHANGES TO THE PARTIES

### 25.1   Assignments and transfers by the Company

The Company may not assign or transfer any of its rights and obligations under the Finance Documents without the prior consent of the Lender.

### 25.2   Assignments and transfers by Lender

Subject to the following provisions of this Clause 25, the Lender (the **Existing Lender**) may at any time:

(a)   assign any of its rights; or

45

(b)      transfer by way of novation any of its rights or obligations under this Agreement,

to another bank or financial institution (the **New Lender**) without the consent of the Company provided that the Existing Lender has given the Company no less than 15 days prior written notice of such assignment or transfer.

**25.3      Other conditions to assignment or transfer**

(a)      The Lender is not obliged to enter into a Transfer Certificate or otherwise give effect to an assignment or transfer until it has completed all customer due diligence or any "know your customer" or other checks in relation to any relevant person or other legal requirements to its satisfaction.

(b)      any reference in this Agreement to the Lender includes a New Lender but excludes a Lender if no amount is or may be owed to or by it under this Agreement.

**25.4      Procedure for transfer using a Transfer Certificate**

(a)      In this Subclause:

**Transfer Date** means, in relation to a transfer, the later of:

(i)      the proposed Transfer Date specified in that Transfer Certificate; and

(ii)      the date on which the Existing Lender enters into that Transfer Certificate.

(b)      A transfer of rights or obligations using a Transfer Certificate will be effective if:

(i)      the New Lender delivers to the Existing Lender a duly completed Transfer Certificate; and

(ii)      the Existing Lender enters into it.

(c)      On the Transfer Date:

(i)      the New Lender will assume the rights and obligations of the Existing Lender expressed to be the subject of the novation in the Transfer Certificate in substitution for the Existing Lender;

(ii)      the Existing Lender will be released from those obligations and cease to have those rights; and

(iii)      the New Lender will become the Lender under this Agreement and be bound by the terms of this Agreement as Lender.

(d)      The Existing Lender shall, subject to subclause 25.4, enter into a Transfer Certificate delivered to it and which appears on its face to be in order as soon as reasonably practicable and, as soon as reasonably practicable after it has entered into a Transfer Certificate, send a copy of that Transfer Certificate to the Company.

46

**25.5    Original consents and waivers**

The New Lender shall be bound by any consent, waiver, election or decision given or made by the Existing Lender under or pursuant to any Finance Document prior to the coming into effect of the relevant assignment or transfer to that New Lender.

**25.6    Limitation of responsibility of Existing Lender**

(a)    Unless expressly agreed to the contrary, the Existing Lender makes no representation or warranty and assumes no responsibility to the New Lender for:

    (i)    the financial condition of the Company; or

    (ii)    the legality, validity, effectiveness, enforceability, adequacy, accuracy, completeness or performance of:

        (A)    any Finance Document or any other document;

        (B)    any statement or information (whether written or oral) made in or supplied in connection with any Finance Document, or

        (C)    any observance by the Company of its obligations under any Finance Document or other document,

    and any representations or warranties implied by law are excluded.

(b)    The New Lender confirms to the Existing Lender that it:

    (i)    has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) in connection with its participation in this Agreement;

    (ii)    has not relied on any information supplied to it by the Existing Lender in connection with any Finance Document;

    (iii)    has conducted its own investigation in connection with the Finance Documents and has not relied upon the Existing Lender to conduct any due diligence investigation on its behalf;

    (iv)    has access to all information that it believes is necessary or appropriate in connection with its participation of this Agreement and it is able to obtain or access business and financial information without undue difficulty;

47

(v)     has consulted its own independent advisors or otherwise has satisfied itself concerning, without limitation, the tax, legal, currency and other economic considerations related to its participation in this Agreement, and has only relied on the advice of, or has only consulted with, such independent advisers;

(vi)    has not relied and will not rely on any investigation or due diligence that the Existing Lender or any of its Affiliates or employees or any person acting on behalf of the Existing Lender may have conducted in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets), and none of such persons has made any representation, warranty or recommendation to that New Lender, express or implied, in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) or the accuracy, completeness or adequacy of any information that New Lender obtain from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind); and

(vii)   will not hold the Existing Lender, its Affiliates or the officers, directors or employees responsible for any misstatements in or omissions from information it obtains from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind).

(c)     Nothing in any Finance Document requires the Existing Lender to:

(i)     accept a re-transfer from the New Lender of any of the rights and obligations assigned or transferred under this Clause; or

(ii)    support any losses incurred by the New Lender by reason of the non-performance by the Company of its obligations under any Finance Document or otherwise.

**25.7    Costs resulting from change of Lender or Facility Office**

If:

(a)     the Lender assigns or transfers any of its rights and obligations under the Finance Documents or changes its Facility Office; and

(b)     as a result of circumstances existing at the date the assignment, transfer or change occurs, the Company would be obliged to pay a Tax Payment or an Increased Cost,

then the Company needs only pay that Tax Payment or Increased Cost to the same extent that it would have been obliged to if no assignment, transfer or change had occurred provided that this clause does not apply to the extent that the payment under Clause 11 (*Taxes*) relates to a FATCA Deduction.

48

**26.    DISCLOSURE OF INFORMATION**

(a)    The Lender must keep confidential any information supplied to it by or on behalf of the Company in connection with the Finance Documents. However, the Lender is entitled to disclose information:

   (i)    which is publicly available, other than as a result of a breach by the Lender of this Clause;

   (ii)    to the extent required for the purpose of any legal or arbitration proceedings;

   (iii)    to the extent required to be disclosed under any Law or Regulation;

   (iv)    to a governmental, banking, taxation, other regulatory authority or any other Authority;

   (v)    to its professional advisers or any rating agency (provided that such person is under a duty of confidentiality to the Lender);

   (vi)    to the extent allowed under paragraph (b) below; or

   (vii)    with the agreement of the Company.

(b)    The Lender may disclose to an Affiliate, its head office and any representative or other branches or any person (a third party) with (or through) whom the Lender enters into (or may enter into) any kind of transfer, participation or hedge agreement in relation to this Agreement or any other transaction under which payments are to be made by reference to this Agreement or the Company:

   (i)    a copy of any Finance Document; and

   (ii)    any information which the Lender has acquired under or in connection with any Finance Document.

   However, before a third party may receive any confidential information under this paragraph (b), it must have entered into a Confidentiality Undertaking.

(c)    This Clause 26 supersedes any previous confidentiality undertaking given by the Lender in connection with this Agreement prior to it becoming a Party.

**27.    SET-OFF**

The Lender may, for so long as an Event of Default is outstanding, set off any matured obligation owed to it by the Company under the Finance Documents against any obligation (whether or not matured) owed by the Lender to the Company, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Lender may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

49

**28.    SEVERABILITY**

If a term of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any jurisdiction, that will not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other term of the Finance Documents; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other term of the Finance Documents.

**29.    COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

**30.    NOTICES**

**30.1    In writing**

(a)    Any communication in connection with a Finance Document must be in writing and, unless otherwise stated, may be given:

(i)    in person, by post or fax; or

(ii)    to the extent agreed by the Parties making and receiving communication, by e-mail or other electronic communication.

(b)    For the purpose of the Finance Documents, an electronic communication will be treated as being in writing.

(c)    Unless it is agreed to the contrary, any consent or agreement required under a Finance Document must be given in writing.

**30.2    Contact details**

(a)    Except as provided below, the contact details of each Party for all communications in connection with the Finance Documents are those notified by that Party for this purpose to the any Party under this Agreement on or before the date it becomes a Party.

(b)    The contact details of the Company for this purpose are:

Address:      Baidu Campus No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC
Fax number:   +86 10 5992 6613
E-mail:       zhoumao@baidu.com
Attention:    Ms. Zhou Mao

50

(c)    The contact details of the Lender for this purpose are:

Address:        Banking (LLC4 Team), Hong Kong, Global Banking and Markets, Level 16,
                HSBC Main Building, 1 Queen's Road Central, Hong Kong
Fax number:     +852 3418 7093
E-mail:         forrestzhang@hsbc.com.hk / anqidong@hsbc.com.hk
Attention:      Mr. Zhengmin (Forrest) Zhang / Ms. Anqi Dong

Any Party may change its contact details by giving five Business Days' notice to the other Party.

(d)    Where a Party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

**30.3    Effectiveness**

(a)    Except as provided below, any communication in connection with a Finance Document will be deemed to be given as follows:

   (i)     if delivered in person, at the time of delivery;

   (ii)    if posted, five Business Days after being deposited in the post, postage prepaid, in a correctly addressed envelope;

   (iii)   if by fax, when received in legible form; and

   (iv)    if by e-mail or any other electronic communication, when received in legible form.

(b)    A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

(c)    A communication to the Lender will only be effective on actual receipt by it.

**31.    LANGUAGE**

(a)    Any notice given in connection with a Finance Document must be in English.

(b)    Any other document provided in connection with a Finance Document must be:

   (i)     in English; or

   (ii)    (unless the Lender otherwise agrees) accompanied by a certified English translation. In this case, the English translation prevails unless the document is a statutory or other official document.

51

**32.    GOVERNING LAW**

This Agreement is governed by Hong Kong law.

**33.    ENFORCEMENT**

### 33.1    Jurisdiction

(a)    The Hong Kong courts have exclusive jurisdiction to settle any dispute including a dispute relating to any non-contractual obligation arising out of or in connection with any Finance Document.

(b)    The Hong Kong courts are the most appropriate and convenient courts to settle any such dispute in connection with any Finance Document. The Company agrees not to argue to the contrary and waives objection to those courts on the grounds of inconvenient forum or otherwise in relation to proceedings in connection with any Finance Document.

(c)    This Clause is for the benefit of the Lender only. To the extent allowed by law, the Lender may take:

 (i)    proceedings in any other court; and

 (ii)    concurrent proceedings in any number of jurisdictions.

(d)    References in this Clause 33 to a dispute in connection with a Finance Document include any dispute as to the existence, validity or termination of that Finance Document.

### 33.2    Service of process

(a)    The Company irrevocably appoints Messrs. Li & Partners of 22nd Floor, World-Wide House, 19, Des Voeux Road, Central, Hong Kong as its agent under the Finance Documents for service of process in any proceedings before the Hong Kong courts in connection with any Finance Document.

(b)    If any person appointed as process agent under this Clause is unable for any reason to so act, the Company must immediately (in any event within 14 days of the event taking place) appoint another agent on terms acceptable to the Lender. Failing this, the Lender may appoint another process agent for this purpose.

(c)    The Company agrees that failure by a process agent to notify it of any process will not invalidate the relevant proceedings.

(d)    This Clause does not affect any other method of service allowed by law.

### 33.3    Waiver of immunity

The Company irrevocably and unconditionally:

(a)    agrees not to claim any immunity from proceedings brought by the Lender against the Company in relation to a Finance Document and to ensure that no such claim is made on its behalf;

52

(b)      consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)      waives all rights of immunity in respect of it or its assets.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

53

**SCHEDULE 1**
**CONDITIONS PRECEDENT DOCUMENTS**

**PART 1**
**CONDITIONS PRECEDENT**

**Corporate documentation**

1.    A copy of the constitutional documents of the Company.

2.    A copy of a resolution of the board of directors of the Company approving the terms of, and the transactions contemplated by, each Finance Document to which it is a party.

3.    A copy of the certificate of good standing of the Company issued by the Registrar of Companies of the Cayman Islands within one month of the date of this Agreement.

4.    A copy of the certificate of incumbency of the Company issued by its Cayman Islands registered office provider within one month of the date of this Agreement.

5.    A copy of the Original Financial Statements.

6.    A Director's Certificate for the Company substantially in the form of Part 2 of this Schedule.

7.    Evidence that the agent of the Company under the Finance Documents for service of process in Hong Kong has accepted its appointment.

**Legal opinions**

8.    A legal opinion of Mayer Brown JSM, legal advisers in Hong Kong to the Lender, obtained at the cost of the Lender, substantially in the form distributed to the Lender prior to the signing of this Agreement.

9.    A legal opinion of Maples and Calder, legal advisers in the Cayman Islands to the Lender, obtained at the cost of the Lender, substantially in the form distributed to the Lender prior to the signing of this Agreement.

**Other documents and evidence**

10.   A copy of any other authorisation or other document, opinion or assurance which the Lender considers to be necessary (and which it has notified the Company accordingly in writing) in connection with the entry into and performance of, and the transactions contemplated by, any Finance Document or for the validity and enforceability of any Finance Document.

11.   Evidence that the fees, costs and expenses then due from the Company pursuant to Clause 21 (Fee) and Clause 23 (Expenses) have been paid or will be paid by the Utilisation Date.

54

## PART 2

## FORM OF DIRECTOR'S CERTIFICATE

To:    THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED

**BAIDU, INC. - US$200,000,000 Facility Agreement**
**dated    August, 2015 (the Agreement)**

I refer to the Agreement. Terms defined in the Agreement have, unless defined in this certificate, the same meaning when used in this certificate.

I am a director of Baidu, Inc. (the **Company**), an exempt company incorporated with limited liability in the Cayman Islands with registered number 96019. I am authorised to give this certificate and certify as follows:

1.    Each [original] and copy document delivered by the Company to the Lender under Part 1 of Schedule 1 (Conditions precedent documents) to the Agreement (including the documents listed below and attached to this certificate) is true, complete and in full force and effect on the date of this certificate:

   (a)    the Third Amended and Restated Memorandum and Articles of Association of the Company adopted on 16 December 2008 (the **Memorandum and Articles**);

   (b)    the Certificate of Incorporation of the Company dated 18 January 2000;

   (c)    the Certificate of Incorporation on Change of Name of Company dated 2 January 2009;

   (d)    the Certificate of Good Standing of the Company dated [●] 2015;

   (e)    the Certificate of Incumbency of the Company dated [●] 2015; and

   (f)    the written resolutions of the Board of Directors of the Company passed on [    ].

2.    Borrowing the Commitment will not cause any borrowing or similar limit binding on the Company under the Memorandum or Articles or other constitutional documents or any law applicable to it to be exceeded.

3.    Each resolution passed by way of written resolutions referred to in 1(f) above is in full force and effect without modification.

4.    The resolutions passed by way of written resolutions referred to in 1(f) above constitute all corporate action necessary on the part of the Company to:

   (a)    approve the terms of and transactions contemplated by the Finance Documents; and

   (b)    authorise the signing of, any communications and/or other action under or in connection with, the Finance Documents.

55

5.    The following is a complete list of all persons who are the Directors and Company Secretary of the Company as at the date of this Certificate and who were the Directors and Company Secretary on the date of the passing of the written resolutions referred to in 1(f) above.

[   ]

6.    Each person listed below:

   (a)    occupies the position stated against his name (and occupied that position on the date each Finance Document was signed by him);

   (b)    is the person duly authorised in the resolutions adopted at the meeting referred to in l(f) above to sign the Finance Documents (and any other document in connection with the Finance Documents) on behalf of the Company; and

   (c)    has his true signature appearing opposite his name.

| **Name** | **Position** | **Specimen Signature** |
|---|---|---|

7.    Unless we notify you to the contrary in writing, you may assume that this Certificate remains true and correct up until the date of the first Utilisation by the Company under the Agreement.


For
**Baidu, Inc.**

_____
Director

56

## SCHEDULE 2
## FORM OF REQUEST

To:     THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED
        Banking (LLC4 Team), Hong Kong, Global Banking and Markets
        Level 16, HSBC Main Building
        1 Queen's Road Central
        Hong Kong

Attention: Mr. Zhengmin (Forrest) Zhang / Ms. Anqi Dong

From:   BAIDU, INC.

Date:   [    ]

**BAIDU, INC.-US$200,000,000 Facility Agreement
dated      August, 2015 (the Agreement)**

1.      We refer to the Agreement. This is a Request. Terms defined in the Agreement have the same meaning in this Request.

2.      We wish to borrow the Loan on the following terms:

        (a)     Utilisation Date: [    ];

        (b)     Amount: [    ]; and

        (c)     Term: [Three months] / [24 months and we confirm that the Cost of Funds to the Lender of funding the Loan for a Term of 24 months is acceptable to us].

3.      The proceeds of the Loan should be credited to: [*accounts (including accounts for settlement of fees and expenses)*].

4.      We confirm that each condition precedent specified in Clause 4.2 (*Further conditions precedent*) under the Agreement which must be satisfied on the date of this Request is so satisfied.

5.      This Request is irrevocable.

By:
**BAIDU, INC.**

---

Name:
[Director]

57

**SCHEDULE 3**
**FORM OF TRANSFER CERTIFICATE**

To:     (the **Existing Lender**)

Attention: [     ]

From: [NEW LENDER] (the **New Lender**)

Date: [     ]

**BAIDU, INC. - US$200,000,000 Facility Agreement**
**dated     August, 2015 (the Agreement)**

We refer to the Agreement. This is a Transfer Certificate. Terms defined in the Agreement have, unless defined in this certificate, the same meaning when used in this Transfer Certificate.

1.      The Existing Lender transfers by novation to the New Lender the Existing Lender's rights and obligations referred to in the Schedule below in accordance with the terms of the Agreement.

2.      The proposed Transfer Date is [     ].

3.      The administrative details of the New Lender for the purposes of the Agreement are set out in the Schedule.

4.      The New Lender expressly acknowledges the limitations on the Existing Lender's obligations in respect of this Transfer Certificate contained in the Agreement.

        In particular, the New Lender expressly acknowledges and confirms that:

        (a)     the Existing Lender makes no representation or warranty and assumes no responsibility to the New Lender for:

                (i)     the financial condition of the Company; or

                (ii)    the legality, validity, effectiveness, enforceability, adequacy, accuracy, completeness or performance of:

                        (A)     any Finance Document or any other document;

                        (B)     any statement or information (whether written or oral) made in or supplied in connection with any Finance Document, or

                        (C)     any observance by the Company of its obligations under any Finance Document or other document,

        and any representations or warranties implied by law are excluded; and

58

(b)    it:

   (i)    has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) in connection with its participation in the Agreement;

   (ii)   has not relied on any information supplied to it by the Existing Lender in connection with any Finance Document;

   (iii)  has conducted its own investigation in connection with the Finance Documents and has not relied upon the Existing Lender to conduct any due diligence investigation on its behalf;

   (iv)   has access to all information that it believes is necessary or appropriate in connection with its participation of the Agreement and it is able to obtain or access business and financial information without undue difficulty;

   (v)    has consulted its own independent advisors or otherwise has satisfied itself concerning, without limitation, the tax, legal, currency and other economic considerations related to its participation in the Agreement, and has only relied on the advice of, or has only consulted with, such independent advisers;

   (vi)   has not relied and will not rely on any investigation or due diligence that the Existing Lender or any of its Affiliates or employees or any person acting on behalf of the Existing Lender may have conducted in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets), and none of such persons has made any representation, warranty or recommendation to the New Lender, express or implied, in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) or the accuracy, completeness or adequacy of any information the New Lender obtain from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind); and

   (vii)  will not hold the Existing Lender, its Affiliates or the officers, directors or employees responsible for any misstatements in or omissions from information it obtains from public sources or from the Company in any form (including, without limitation, oral statements, written materials and electronic communications and data of any kind).

59

5.      This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Transfer Certificate.

6.      This Transfer Certificate and any non-contractual obligations arising out of or in connection with it are governed by Hong Kong law.

60

## THE SCHEDULE

### Rights and obligations to be transferred by novation
[insert relevant details, including applicable Commitment (or part)]

### Administrative details of the New Lender
[insert details of Facility Office, address for notices, *fax number and attention details* and account details for payment etc.]

[**EXISTING LENDER**]                     [**NEW LENDER**]

By:                                        By:

The Transfer Date is confirmed by the Lender as [    ].

[●]

By:

**Note: The New Lender is alone responsible for checking whether any further formalities should be complied with. An assignment may give rise to a stamp duty or transfer tax issues.**

61

**SCHEDULE 4**
**FORM OF COMPLIANCE CERTIFICATE**

To:    THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED as Lender

From: BAIDU, INC.

Date: [    ]

**BAIDU, INC. - US$200,000,000 Facility Agreement**
**dated [    ] August, 2015 (the Agreement)**

1.    We refer to the Agreement. This is a Compliance Certificate. Terms defined in the Agreement have the same meanings in this Compliance Certificate.

2.    We confirm that as at [relevant testing date]:

   (a)    Consolidated Tangible Net Worth is [    ]; and

   (b)    Consolidated Total Borrowings is [    ] and therefore, Consolidated Total Borrowings is [    ] per cent. ([    ]%) of Consolidated Tangible Net Worth.

   (c)    Adjusted Consolidated EBITDA for the relevant Measurement Period is [    ] and therefore, Consolidated Total Borrowings at the end of the relevant Measurement Period is [    ] times of Adjusted Consolidated EBITDA for the relevant Measurement Period.

   (d)    Consolidated Cash Balance is [    ] and therefore Consolidated Cash Balance is not less than Consolidated Total Borrowings as stated in (b) above.

3.    We set out below calculations establishing the figures in paragraph 2 above:

   [    ]

4.    We confirm that as at [relevant testing date] [no Default is outstanding]/[the following Default[s] [is/are] outstanding and the following steps are being taken to remedy [it/them]:

   [    ]].

**BAIDU, INC.**

By:

**SIGNATORIES**

**Company**

**BAIDU, INC.**

By: /s/ Robin Yanhong Li

**Lender**

**THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED**

By:

/s/ Taisy Liu

Managing Director, Co-Head of Banking, China

63

**EXHIBIT 8.1**

**List of Principal Subsidiaries and Consolidated Affiliated Entities**

**Subsidiaries:**

Baidu Online Network Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu Holdings Limited — Incorporated in the British Virgin Islands

Baidu (China) Co., Ltd. — Incorporated in the PRC

Baidu.com Times Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu Japan Inc. — Incorporated in Japan

Baidu (Hong Kong) Limited — Incorporated in Hong Kong

Qiyi.com, Inc. — Incorporated in the Cayman Islands

B.D. Mobile Telecommunications Limited — Incorporated in the Cayman Islands

Baidu Cloud Computing Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu Cloud Computing Technology (Shanxi) Co., Ltd. — Incorporated in the PRC

91 Wireless Websoft Limited — Incorporated in the Cayman Islands

**Consolidated Affiliated Entities:**

Beijing Baidu Netcom Science Technology Co., Ltd. — Incorporated in the PRC

Beijing Perusal Technology Co., Ltd. — Incorporated in the PRC

Beijing BaiduPay Science and Technology Co., Ltd. — Incorporated in the PRC

1

**EXHIBIT 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Robin Yanhong Li, certify that:

1. I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 8, 2016

By:    /s/ Robin Yanhong Li
       Name: Robin Yanhong Li
       Title: Chief Executive Officer

1

**EXHIBIT 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jennifer Xinzhe Li, certify that:

1. I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 8, 2016

By:    /s/ Jennifer Xinzhe Li
      Name:Jennifer Xinzhe Li
      Title: Chief Financial Officer

1

**EXHIBIT 13.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robin Yanhong Li, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 8, 2016

By:    /s/ Robin Yanhong Li
       Name: Robin Yanhong Li
       Title: Chief Executive Officer

1

**EXHIBIT 13.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jennifer Xinzhe Li, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 8, 2016

By:    /s/ Jennifer Xinzhe Li
       Name:Jennifer Xinzhe Li
       Title: Chief Financial Officer

1

**EXHIBIT 15.1**

[Maples and Calder Letterhead]

Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing 100085
The People's Republic of China

8 April 2016

Dear Sirs

**Baidu, Inc.**

We consent to the reference to our firm under the heading "Item 10.E. Additional Information — Taxation — Cayman Islands Taxation" and "Item 16G. Corporate Governance" in Baidu Inc.'s Annual Report on Form 20-F for the year ended 31 December 2015 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of April 2016, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-184757) of Baidu, Inc. of the summary of our opinion under the heading "Item 10.E. Additional Information — Taxation — Cayman Islands Taxation" and "Item 16G. Corporate Governance" in the Annual Report. We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Maples and Calder

1

**EXHIBIT 15.2**

[Han Kun Law Offices Letterhead]

April 8, 2016

Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing
People's Republic of China 100085

Dear Sir/Madam:

We hereby consent to the reference of our name under the heading "Item 4.B. Information on the Company — Business Overview — Regulation" in Baidu, Inc.'s Annual Report on Form 20-F for the year ended December 31, 2015 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of April 2016, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-184757) of Baidu, Inc. of the summary of our opinion under the heading "Item 4.B. Information on the Company — Business Overview — Regulation" in the Annual Report. We also consent to the filing of this consent letter with the SEC as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Very truly yours,

/s/ Han Kun Law Offices

1

**EXHIBIT 15.3**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)    Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan,

(2)    Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and

(3)    Registration Statement (Form F-3 No. 333-184757) of Baidu, Inc.;

of our reports dated April 8, 2016, with respect to the consolidated financial statements of Baidu, Inc. and the effectiveness of internal control over financial reporting of Baidu, Inc. included in this Annual Report (Form 20-F) of Baidu Inc. for the year ended December 31, 2015.

/s/ Ernst & Young Hua Ming LLP

Beijing, the People's Republic of China
April 8, 2016

1