1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
                               :

IN RE: IQIYI, INC, SECURITIES     : 20-cv-01830 (DG)
LITIGATION                        :
                               :

----------------------------X     :
                               :

IN RE: BAIDU, INC. SECURITIES     : 20-cv-03794(DG)
LITIGATION                        :
                               :

                               : United States Courthouse
                                 Brooklyn, New York

                                   Monday, February 26, 2024

----------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE DIANE GUJARATI
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the iQIYI and      THE ROSEN LAW FIRM
Baidu Lead                  275 Madison Avenue
Plaintiffs:                 40th Floor
                            New York, New York 10016
                       BY: DANIEL TYRE-KARP, ESQ.

For the iQIYI          LABATON KELLER SUCHAROW LLP
Plaintiffs:                 140 Broadway
                            New York, New York 10005
                       BY: PHILIP LEGGIO, ESQ.

Court Reporter:  Nicole J. Sesta, RMR, CRR
                 Official Court Reporter
                 E-mail:  NSestaRMR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

2

For Baidu Lead          ROBBINS GELLER RUDMAN & DOWD LLP
Plaintiffs:                  58 South Service Road
                             Suite 200
                             Melville, New York 11747
                         BY:  WILLIAM J. GEDDISH, ESQ.


For the Defendants      SKADDEN, ARPS, SLATE, MEAGHER & FLOM
Baidu, Inc., et al      LLP
                             One Manhattan West
                             New York, New York 10001
                         BY:  ROBERT A. FUMERTON, ESQ.
                              SCOTT D. MUSOFF, ESQ.
                              MICHAEL C. GRIFFIN, ESQ.
                              HOPE O'LEARY, ESQ.


For the Defendants      O'MELVENY & MYERS LLP
Goldman                      7 Times Square
Sachs(Asia)LLC, et           New York, New York  10036
al:                      BY: WILLIAM J. SUSHON, ESQ.
                              JONATHAN ROSENBERG, ESQ.

THE COURTROOM DEPUTY:  Your Honor, this is the matter iQIYI, Inc. Securities Corporation and in re: Baidu, Inc. Securities Litigation.

Is counsel for the plaintiffs ready?  Please state your appearances, for the record.

MR. TYRE-KARP:  Your Honor, this is Daniel Tyre-Karp from the Rosen Law Firm for the iQIYI plaintiff.

MR. LEGGIO:  Good morning.  This is Philip Leggio from Labaton Keller Sucharow for the iQIYI plaintiffs.

MR. GEDDISH:  Good morning, Your Honor.

William Geddish from Robbins Geller Rudman & Dowd for the Baidu plaintiffs.

THE COURT:  Good morning to you all.

THE COURTROOM DEPUTY:  Are the defendants ready?

MR. FUMERTON:  Good morning, Your Honor.

Robert Fumerton from Skadden Arps for the iQ and Baidu defendants.  I'm joined by my colleagues, Michael Griffin, Hope O'Leary, and Scott Musoff.

THE COURT:  Good morning to everyone.

MR. SUSHON:  Good morning, Your Honor.

Bill Sushon from O'Melveny & Myers for the underwriter defendants.  And with me is my partner, Jonathan Rosenberg.

THE COURT:  Good morning to you, as well.

MR. SUSHON:  Thank you, Your Honor.

THE COURT:  We are convened today for oral argument on the defendants' motions to dismiss.  We have a lot to go through today.  I think what is going to be most helpful is to at least start by having one representative from defendants and one from plaintiffs.

I know the underwriter defendants were, of course, represented by different counsel than the other defendants, and to the extent that I ask a question that it makes sense -- that you all think makes sense to have a particular person answer, I think that's fine.  But I don't want to have, necessarily, repetitive arguments by multiple lawyers.

I think everyone did a good job of consolidating or coordinating, rather, the briefing.  And I would like to keep along those lines today to the extent possible.

Let me start with the defendants.  I guess what I'd like to start by discussing is your position that plaintiffs have to show scienter for the Securities Act claims, and I wondered whether you had any more law to point the Court to on that argument.

MR. FUMERTON:  Your Honor, I think that's better addressed by Mr. Sushon for the underwriters.

THE COURT:  I should also note that you're welcome to stay seated, if you'd like.  It might be easier to speak into the microphones.  The microphones tend to be a bit low here.

*Proceedings*                                                          5

MR. SUSHON:  Your Honor, I've been standing for argument for like 30 years.  I can't break the habit.

THE COURT:  You're welcome to stand, as well, whatever is most convenient for any of you.

MR. SUSHON:  As we've already pointed out to the Court in our brief on page 10, note 7, a bunch of authorities stand for the proposition that anytime Rule 9(b) applies to a Section 11 claim, scienter must be pleaded.

Most recently, just this past September, this Court joined that chorus of voices in in re: Meta Materials, Inc. Securities litigation.  That's 2023 WL 6385563, and at page 22, note 18, the Court held, "When Section 11 claims sound in fraud, the scienter requires that Rule 9(b) apply."

THE COURT:  Do you have Second Circuit law, though? You're citing a district case, right?

MR. SUSHON:  That is correct, Your Honor.  No Second Circuit authority since then.

THE COURT:  Okay.  Let me talk about standing.  The defendants argue that there's no standing for the Section 11 claims.  I want to hear more about that argument.

MR. FUMERTON:  Again, Mr. Sushon.  Your Honor, we prepared a demonstrative that we're going to refer to in the presentation to address some of these questions.

May I approach?

THE COURT:  Sure.  Have you given it to your

adversary?

MR. FUMERTON:  Yes.

MR. SUSHON:  And, Your Honor, the material I'll be covering is at page 25 of the dec.  So I'll give you a moment to get there.

THE COURT:  Go ahead.

MR. SUSHON:  Your Honor, plaintiffs don't dispute that where they have no cognizable damages under Section 11, they don't have standing to bring those claims.

Now, Section 11 has statutory language that defines what the damages are, and relevant here it's the difference between the IPO price and the price on the day such suit was brought.

THE COURT:  Let me ask you about this.  Because the term is value, right, that's used?

MR. SUSHON:  That is correct, Your Honor.

THE COURT:  So would the stock price be an appropriate measure of the value here?

MR. SUSHON:  It should be, Your Honor, because plaintiffs themselves allege that iQIYI's stock created in an efficient market and immediately impacted into the share price whatever information was available about the company.

And so under those circumstances, market price and value are the same.

THE COURT:  What about the relevant date for

comparison purposes?

MR. SUSHON:  So if you look at Section 11(e), which defines damages, it says at the time such suit was brought, referring back to the language at the beginning of the provision, the suit authorized under subsection A.

So the question is what is a suit authorized by subsection A.  Subsection A describes a suit where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein."

In other words, such suit means any suit that alleges a misrepresentation or omission in the registration statement.

Here, the first suit to do that with respect to iQIYI was the Lee case, which was filed on April 16, 2020.  It block quoted disclosures from the registration statement and alleged that those disclosures were materially false and misleading because they relied on allegedly inflated revenues and user numbers, the same types of allegations we have here.

Now if you turn to page 26 of our dec, you see that we've got a stock price graph and it shows that when the lead complaint was filed here, the closing price or iQIYI was $19.24 above the $18 IPO price.

Now, plaintiffs argue that we should use the *Jenkins*

complaint that was filed in the Northern District of California a few days later, because that was the first suit that alleged a Section 11 claim but that ignores the plain language of subsection A, which says that a suit is one that alleges a misrepresentation or omission in a registration statement.

If you were to take plaintiffs' argument at face value, then the relevant date, at least for the underwriters, should be the first time the underwriters were named in the suit.  When did that happen?

If you look further on the timeline, that was January 19, 2021, when the consolidated amended complaint was filed and the underwriters were first joined in the case, and the training price for iQIYI on that date was $19.49, again in excess of the $18 IPO price.

So whether you accept their argument, you accept our argument, at least as to the underwriters, they don't have cognizable damages and their claim should be dismissed.

THE COURT:  Thank you.  Running throughout the briefing, I think really from plaintiffs' side or at least I should say in a few places in the briefing, is the argument that certain of the arguments that are being made are really not legal.  They're really factual arguments, which are not appropriately dealt with at a motion to dismiss stage.

I'm going to ask the defendants about certain of

these issues, and you can tell me why you think that they're appropriate for the Court to be deciding at this point.  Let's start with, for example, how the DAUs are being calculated.

MR. FUMERTON:  Sure, Your Honor.  If it's helpful to Your Honor, you can flip to slide five where we address that argument.

So plaintiffs' entire argument here is that iQ inflated its DAU numbers because two third party market research firms, QuestMobile and Aurora, allegedly estimated lower numbers.  But there's not a single fact, Your Honor, in either complaint showing that these third parties used the same methodology for calculating DAUs as did iQ.

That's what you need for falsity here.  You need to show the disclosed methodology was not the one that was actually used.  There's no mystery about what iQ did.  We quote the excerpt from the prospectus, which is ECF 160-1.  IQ stated, we're calculating mobile DAUs by looking at the number of unique mobile devices that have accessed our platform through our iQ mobile app at least once during the day.

The company specifically tells investors that if the same person accesses multiple mobile devices on the same day, that will over count DAUs.  And conversely, if a family of three is sitting around watching a movie that is streaming, that will under count the DAUs.  But iQ says exactly how they're doing it.  Right?

We have no facts that show how QuestMobile calculated DAUs, and we have no facts showing how Aurora calculated DAUs.  None are alleged in the complaint.  But, Your Honor, if these are reliable sources and plaintiffs are required to plead under Elan.  Judge Holwell held they have to plead the reliability of their sources.  If these are reliable sources, then they're using different methodologies.

If Your Honor turns to slide six, look at the numbers here.  The numbers of QuestMobile's estimates of DAUs and Aurora's DAUs vary incredibly.  As an example, if Your Honor goes -- this is all in the record, all taken from the complaints.

The fourth quarter of 2017, iQ estimates a 126 million, QuestMobile estimates 113 million, Aurora estimates 86 million.  The iQ in QuestMobile numbers are much closer than the QuestMobile and Aurora numbers.  The QuestMobile and Aurora numbers are off by more than 30 percent.

Your Honor, if these are reliable sources, the only plausible inference to draw is they're using different methodologies.  Absent facts showing that they're using the same methodology as iQ disclosed to investors, Your Honor has no basis to infer falsity under any standard, much less the standards required by Rule 9(b) in the PSLRA.

Your Honor, what plaintiffs are arguing here --

THE COURT:  Can I just ask you to slow down for the

benefit of the court reporter?

MR. FUMERTON:  Apologies.  What plaintiffs are asking you to conclude here, really, if you take their argument, is that QuestMobile and Aurora both made false statements about DAUs.  All they're saying is any discrepancy between DAU numbers means there's a false statement.

So did QuestMobile make a false statement?  Did Aurora make a false statement?  Which number is the right number here?  Plaintiffs don't even allege in either complaint is the true number of DAUs QuestMobile's, is it Aurora's, is it some third party?  This is a Securities Fraud Act, Your Honor.  They're very serious claims and they're lacking any facts to infer any kind of misstatement here.

THE COURT:  I'm going to want to hear from your adversary on that, but I have some additional questions for you before we go there.

Let's talk about the deferred revenue comparison.  Does the comparison make sense in terms of what is being compared, in your view?

MR. FUMERTON:  Your Honor, it does not.  If you turn to slide eight.  I'm sorry.  Your Honor, if you turn to slide eight, this is where we address this deferred revenue argument.

What plaintiffs have done here is they claim that iQ and Baidu overstated deferred revenue because certain

*Proceedings*                                                                 12

third-party credit reports, which were purportedly based on PRC tax filings for certain iQ affiliates, they don't tell us which ones, allegedly show lower revenues for 2015 through 2017.

So plaintiffs are saying look at these credit reports for unspecified affiliated entities, let's add those up, and the total should equal iQ's disclosed total revenue.

As a threshold issue, plaintiffs allege nothing about these credit reports.  They don't attach them to the complaint.  They don't tell Your Honor who prepared them.

THE COURT:  I do have a question about whether all of the VIEs are accounted for in the credit reports, which I'll ask your adversary.

MR. FUMERTON:  Your Honor, we'll go right to that, if Your Honor wishes.

THE COURT:  Go ahead.

MR. FUMERTON:  So plaintiffs don't tell us which entities they're looking at to add up.  All we know, if Your Honor turns to slide nine, is that they've copied a chart verbatim from this Wolfpack short seller, this self interested short seller.

The chart on nine, which is in paragraph 59 of the iQ complaint, 83 of the Baidu complaint, is verbatim from the Wolfpack, same numbers.  The rows and columns are transposed but it's the same data.

We don't know how, from the complaint, you don't know how you calculated those.  But if Your Honor turns to slide ten, Wolfpack actually tells us they looked at five iQ entities.  They've come up with a chart that plaintiffs copied in their complaint.

But, Your Honor, plaintiffs also allege there are 17 iQ entities, and Wolfpack only accounts for five of them.  What plaintiffs are asking Your Honor to infer is that because the deferred revenue for 5 out of 17 affiliated entities didn't match iQ's total deferred revenue, there must be fraud.

What about the other 12?   They don't allege any facts showing that the other 12 entities had no deferred revenue.  Your Honor, this case is squarely aligned with Judge Daniels' decision in the *China XD Plastics* case.

Judge Daniels states, "It is not reasonable to infer that *China XD's* SEC filings must be false based on a comparison to less than a complete set of subsidiaries' SAIC filings."

That's exactly what you have here.  You have a comparison of a subset of credit reports, credit reports for a subset of entities, with no factual allegations about the remaining entities.

Judge Daniels held absent any such allegation of falsity is pure speculation, not supported by the factual allegations in filings incorporated by reference.  It thus

fails to state a claim that's plausible on its face.  That's 2016 WL 1241522 at star sixth.

So Your Honor's question is the exact right one. Even crediting the Wolfpack conclusions here, the Wolfpack chart that they've copied, it's not -- it's an apples to oranges comparison because it's a less than complete set.

If we step back here, plaintiffs need to allege sufficient reliability about these credit reports.  They don't tell you who authored them.  They don't tell you what methodologies were used.  They don't tell you what PRC tax filings are reflected on them.  They don't tell you which iQ affiliates.  They don't tell you which definition of deferred revenue, is it GAAP, or is it something else, all of these things are needed to be pled for Your Honor to conclude they've alleged a false statement based on deferred revenue.

And, Your Honor, that's for 2015 to 2017.  If Your Honor flips to slide 11, I think it also bears emphasis they challenge Baidu's deferred revenue for 2018 and 2019.  For some reason they don't challenge iQ's.  They challenge Baidu's, but they don't even allege any credit reports were pulled by anybody for those two years.  At a minimum, regardless of what Your Honor thinks of those credit reports, those claims would have to be dismissed.

THE COURT:  Another question about the Section 11 claims.  And there's a discrepancy between the parties, or

among the parties, about whether or not those claims sound in fraud.  Do you want to speak to that?

MR. FUMERTON:  Sure.  Your Honor, if it's helpful, on slide three there's a lot of different misstatements alleged and a lot of different documents across the two actions.  So in slide three, we've actually summarized.

Each of the alleged misstatements falls into one of the four categories on the left.  And Your Honor has already asked about the DAUs and the deferred revenue.  We've also listed the claims here.  You can see that the overwhelming majority of the claims are Exchange Act claims, including all of the claims with respect to the last two categories, the membership services revenue and the accounting for the transaction was Xin'ai Sports.

So the overwhelming majority are Exchange Act claims that are unquestionably subject to Rule 9(b) and the PSLRA. We agree with our colleagues that if there's ever a case where Section 11 claims sound in fraud, it's this.  The allegations are identical, they're verbatim.  The Section 11 allegations are listed verbatim from the Section 10(b).

But, Your Honor, we submit that you don't need to resolve that to dismiss these claims on falsity.  If you look at the daily active users, even under Rule 8, showing two third parties that are completely contradictory with respect to estimates of DAUs without a single fact showing the

methodology they used, we would submit it's not sufficient under Rule 8.  We think the same is true for the couple of misstatements where they have Securities Act claims under deferred revenue.  But the overwhelming majority of claims here, Your Honor, against the iQ and Baidu defendants are Exchange Act claims.

MR. SUSHON:  Your Honor, if I could just supplement that.

THE COURT:  Yes.  Go ahead.

MR. SUSHON:  Not only if you turn to slide 29, you'll see we did a comparison of a handful of the Exchange Act allegations and Securities Act allegations.  And you'll see that they are identical, or they may be one or two words off.  They challenge the exact same registration statement disclosures in both sets of claims.

But it's not just for that reason that the Section 11 claims sound in fraud, even though that would be sufficient under *Caiafa* from the Second Circuit, *Cozzarelli* from the Fourth Circuit, and *Rubke* from the Ninth Circuit.

Go beyond that, turning to page 30 of the dec, the complaint consistently makes allegations of fraudulent misconduct against the defendants as a whole, which would include the underwriter defendants.  It also uses classic fraud language.  So, for example, it talks about, in the first bullet, overstating the number of daily active users and

overstating deferred revenue; and then the third bullet talks about inflating the company's daily activity users.  These are words that are classically associated with fraud.

It's not like the cases that plaintiffs have cited where the claims just use materially false and misleading, or the statutory language.  These are fraud words.  They also say that among the common questions of law and fact for the Exchange Act claims is, "Whether defendants, not the Exchange Act defendants, all defendants, acted with the requisite level of scienter."

Of course, in the Securities Act section of the complaint, they do level a knowledge allegation at the underwriters.  Saying, alleging, "As a result of constant contact and communications between the underwriter defendants' representatives and iQIYI's management and top executives, the underwriter defendants knew of, or in the exercise of reasonable care should have known of, iQIYI's existing problems.  That's 313(e).

They continued this in their briefing.  They consistently lumped together all the defendants in talking about inflating key metrics and inflating deferred revenue.  That's in their opposition in pages 5 and 6.  So it's not just that the allegations are identical.  It's also that there are actual fraud allegations against the underwriters, and that's where Rule 9(b)'s protection should come in to help maintain

the defendants' reputations and defend them from unfounded allegations of fraud, which ties back to why the scienter requirement is so important.

THE COURT:  I'm going to turn to plaintiffs now. I'll turn back to defense at some point.  Let me turn to plaintiffs now.  You've heard a lot from your adversaries. Let me ask you some specific questions before I open it more generally to what you want to let me know.

I think I started with the defense, but talk to me about your position on scienter with respect to the Securities Act claims.  Who is going to be speaking?

MR. TYRE-KARP:  We've separated this, and I will be handling -- the Rosen Law Firm is co-lead counsel on both cases.  So I'll be handling the issues that are common to both cases.  Mr. Leggio will be handling the iQ specific issues, and Mr. Geddish will be handling the Baidu specific issues.

THE COURT:  Okay.  Who wants to take this?  Go ahead.

MR. LEGGIO:  I will, Your Honor.  Good morning.

You asked about the Section 11 and scienter issue, in particular.  You started off by asking if there's any Second Circuit decisions on that point and defendants couldn't name any, and it's because it's just a matter of fact that just because it's Section 9(b), even if it does apply, scienter still is not a substantive element of Section 11.

And you asked for Second Circuit decisions.  So first, I could direct the Court's attention to a Second Circuit affirmation of a Southern District of New York decision that explicitly held -- and this in re: *Sanofi.*  The Southern District held, which the Second Circuit affirmed, that claims that sound -- they held that while claims that sound in fraud must satisfy the elements from the standards of 9(b) --

THE COURT:  The court reporter is just asking you to repeat it.

MR. LOGGIO:  Absolutely, yes.  The Second Circuit affirmed a Southern District of New York decision in re: *Sanofi*, citation 87 F Supp 3d 510.  And in that decision the Court explicitly held that while claims that sound in fraud must satisfy the heightened pleading requirements of Rule 9(b), that rule does not add substantive elements such as scienter to any claim.

The Court further noted that defendants argue that plaintiffs other federal claims, sound in fraud, and therefore also require proof of scienter.  And the Southern District held that's wrong.

And just last year, less than a year ago, in *IAM National Pension Fund versus Farfetch Ltd*, the Second Circuit -- and the citation is 2023 WL 2879304, the Second Circuit found and acknowledged that although claims that sound in

fraud is subject to a heightened pleading standard, they noted that scienter is not an element of Securities Act claim.

And, Your Honor, so even if you did find that Rule 9(b) does apply here, it's just the fact that scienter is not an element so plaintiffs should not have to establish scienter for Section 11.

THE COURT:  Your position is also that these don't sound in fraud; is that right?

MR. LEGGIO:  Correct.

THE COURT:  Tell me about that.  Isn't there, essentially, a complete overlap of factual allegations?

MR. LEGGIO:  Yes, Your Honor, but that is not a dispositive fact here.  In fact, the Eastern District of New York specifically addressed this in in re: *NIO, Inc. Securities Litigation*, the citation being 2021 WL 3566300.

In that case they found that even if Section 10(b) claims and Section 11 claims allege the same misrepresentations, it still does not sound in fraud.  They addressed this issue.

THE COURT:  What can you point me to in the complaint to suggest that this doesn't sound in fraud?

MR. LEGGIO:  Sure.  Specific allegations of negligence.  For instance, one of the citations that defendants made about the underwriters, for instance, was that they knew or should have known about the misstatements.

However -- so the statement they're referring to is underwriter defendants knew of or in the exercise of reasonable care should have known of iQIYIE's existing problems as detailed herein.  That's paragraph 313.

The Southern District in *OSG Securities Litigation*, citation 971 F Supp 2d 387, had almost identical language, which is plaintiffs' assertion that in the exercise of reasonable care, the individual defendants knew or should have known of the misstatements or omissions does not constitute an allegation of fraud, but rather of negligence.  So that is one example.

We also allege that the underwriters failed to conduct an adequate and reasonable investigation, paragraph 313.  Securities Act defendants negligently prepared the offering documents, paragraph 316.  None of the Securities Act defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the registration statement were true and without omissions of any material facts and were not misleading, paragraph 341.

In fact, in re: *NIO, Inc. Securities Litigation* from the Eastern District, the case I cited before, found that Section 11 claims did not sound in fraud where plaintiffs pled each allegation separately, which we have done here, and based the allegations on defendants failure to make a reasonable

investigation or possess reasonable grounds for the facts presented to investors in the registration statement.  That language is almost identical to what we allege here.

Additionally, we also disclaim all allegations of fraud in our Section 11 claim, which is just an additional fact to consider, Your Honor.

THE COURT:  Let me ask you more generally, how are you showing scienter on any of the claims?  Can you point to me, very specifically, what you're relying on for scienter?

MR. LEGGIO:  In terms of the Section 10(b) claim, Your Honor?

THE COURT:  Yes.  Is your position that it's not required for the Section 11 claims?

MR. LEGGIO:  Correct.  So here, scienter is established through multiple ways, one of which is that iQIYI's DAUs and their deferred revenues and revenue figures were just so important to the company that they must have been aware of these during the class period.  What do we have here?  We have a streaming service company, whose only purpose is to get eyeballs on their platform, like a Netflix or a Twitter.

The most important metric to them is knowing how many people are watching their platform and how much money they're making from that.  In other words, how many DAUs, which is daily active users, do they have and how much money are they making from those memberships?

Because of this, because of the importance of those metrics to the company, defendants had a duty to familiarize themselves with those facts and courts allow the inference that through the course of that duty that they -- that defendants recognized that iQIYIE was not in a strong financial position as they were.  Let's take Twitter, for example.  Just like iQIYIE, the DAUs to Twitter were critical to their success.

In *Shenwick versus Twitter*, for example, the Northern District of California held that Twitter's DAUs were so integral to Twitter's success that it would be absurd to argue that defendants were unaware of those metrics.  The same is true here for iQIYIE.

THE COURT:  Let me stop you, because you heard my questions to your adversaries about the DAUs and the calculations, and I want to hear you speak to that.

MR. LEGGIO:  In terms of the falsity of the actual DAUs?

THE COURT:  Yes, but also in terms of how they're being calculated.  I believe I asked them whether that's sort of a legal issue or a factual issue, and there was a response on that.  I'm giving you a chance to be heard on that.

MR. TYRE-KARP:  Your Honor, I'll handle this.

THE COURT:  Go ahead.

MR. TYRE-KARP:  The plaintiffs in both actions

*Proceedings*                                                    24

allege that iQIYI's daily activity users, which they call mobile daily active users, were overstated during the periods of 2015 through 2017.  And we rely on a few different things for that.

One, we look at the QuestMobile reports.  And defendants try to say that the QuestMobile reports are not reliable, that they're not using the same methodology.  But as we've shown and we attached to our briefing, both the Baidu defendants and the iQIYI defendants repeatedly refer to the QuestMobile numbers for their daily active user calculations.

Defendants say, oh, we only pointed to them for the trends, not the underlying numbers, but that's not true.  They pointed to them for the actual numbers when investors, or analysts, that had anything changed recently, say no, look at the QuestMobile numbers.  They look at the trends.  We're trending up.  Look at the QuestMobile numbers.  That's for both monthly average users and daily active users.  So the company can't say that these are not reliable figures when they are pointing investors and analysts to these same figures for questions about their DAUs.

They claim that the methodologies -- the difference in the numbers reported by QuestMobile and Aurora from the company are explained by differences in methodologies.  What they haven't done is explain how a different methodology could possibly cause the huge disparity between the numbers that are

reported.

THE COURT:  It's your complaint.  What do you point to?

MR. TYRE-KARP:  That the DAUs are calculated.  There are not a lot of ways to calculate DAUs.  The way that iQIYI calculates them, which is the unique mobile devices that access IQIYI services per day, there are other ways to calculate them, which you could not just include the unique devices.  You can include one device more than once.

You could look at desktop access, instead of just mobile.  But the different ways of looking at it would increase the number and not decrease it.  There are not a lot of ways to decrease it.  They haven't pointed to any, and there is no methodology that anyone uses that would cause such a huge disparity between these.

Defendants make a lot of hay out of the fact that the Aurora numbers and the QuestMobile numbers do not completely align.  This is if we allege that defendants are overvaluing one of their assets by 40 percent, and we point to an independent third-party audit of that to say they're over valued by 40 percent, defendants say but this other thing, another third-party independent source says we're overvaluing it by 50 percent.  That would not be a defense to our claims that they're overvaluing their assets.  That's another piece of evidence that they're overvaluing their assets.

The fact that there are two independent firms that both have numbers that are far below what defendants are reporting is additional evidence.  It's not contradictory.  It's additional evidence, confirming evidence, that they're overstating their numbers.

THE COURT:  Who wants to speak to the issue of the VIEs, the question that I asked earlier about whether they are all accounted for in the credit reports?

MR. TYRE-KARP:  Yes.  So defendants say that we don't identify which VIEs are accounted for.  That's incorrect.  We do identify which VIEs are accounted for.  We identify the five VIEs, and defendants can't point to any VIE that was not included and for any deferred revenue from any VIE that was not included.

Defendants make a lot of hay out of the fact that this came from the Wolfpack report, and the Wolfpack report is what alerted the defendants and the market to this fraud.  But the falsity allegations here do not depend on the Wolfpack report.  We obtained, plaintiffs' counsel obtained credit reports that the Wolfpack report is based on.  We read them.

We had them translated.  We had them analyzed by experts, and we calculated the VIE revenue, the deferred revenue reported in those, and we added it up.  And Wolfpack got it right on those.  We didn't include every allegation in the Wolfpack because we couldn't verify every allegation.  We

only included the allegations that we, ourselves, could verify that we, ourselves, could add particularized allegations about, and this is one of them.

We calculated the deferred revenue from the five VIEs.  We added it up.  There were no other -- there are other entities that were cited for their tax filings that did not report deferred revenue and they're not included.  But the five VIEs that reported deferred revenue, they're all included.  They can't point to any -- they don't point to a single entity that's not included.

If they could say you didn't include this one, then they might have something; but they don't.  They're just saying you didn't include the entities.  We disclosed exactly which five entities we're including, and that's the complete list, the entities that reported deferred revenue.

THE COURT:  Let me ask you about one of the alleged misstatements.  It appears in paragraph 151 of the Baidu complaint, and 124 and 318, I believe, of the other, and that's the statement about a massive and highly engaged user base, et cetera.  I want you to talk about your argument with respect to that statement.

MR. TYRE-KARP:  Yes.  So this is from the registration statement that iQIYI put out in prep for their IPO.  One of the things that they told investors is that their user base was one of the things that differentiated them from

rival companies, and that would lead to future growth and they said that it was massive and highly engaged, which are both concepts that are based on their daily active user count.  And their daily active user count, which they also spoke of, were overstated.  And so this statement is quantifiable, is not as massive as they said, it's not engaged as they said, and we believe that's a misstatement.

THE COURT:  Let me go back to scienter, switching back to your colleague.  It sounds like you're arguing, maybe exclusively, a core operations theory; is that right?

MR. LEGGIO:  That is not right, Your Honor.

THE COURT:  Tell me what else you're arguing.

MR. LEGGIO:  Yes.  So scienter is established here not just because of the fact that defendants must have known about the real numbers during the class period, but also defendants waited to disclose the SEC and NASDAQ investigations for almost four months, also sought the inference of scienter.

This is true even if they did not have a duty to disclose that investigation, because deciding to hide the investigations from investors supports the inference that they were aware of the Wolfpack allegations and the severity of them, and knew their numbers and revenues were misleading, yet they were trying to downplay it.

Additionally, defendants' false assurances against

the Wolfpack report further supports scienter. And, Your Honor, it's not just because of those reasons, but we also allege that defendants' scienter is further supported by iQIYI's accounting treatment of its Xin'ai Sports investment, specifically to mask the disparity between the -- the large disparity between the deferred revenues that they were reporting and that they actually had. They needed a way to make it look like their revenues track what they were reporting publicly.

Accepting these allegations as true, as the Court must at this stage, those facts also support an inference that defendants knew it had overstated its revenues, yet tried to cover it up by creating deferred revenue out of thin air.

And, additionally, Congress made it clear that they do want executives to be held accountable for the statements that defendants had companies report to investors. That's why they require the executives to read and review the financial statements and the filings that they filed and certified their accuracy. That's what defendants did here.

The Court should, therefore, also consider, as part of its holistic analysis, the fact that defendants Gong and Wang both signed stock certifications attesting to the accuracy of iQIYI's financial reporting evidencing their access to and review of the financial data during a class period.

Given the sworn certification that the information was accurate, they either knew or they were reckless in not knowing the underlying facts that ran into statements false and misleading.

THE COURT:  Do you have any allegations that any individual defendant was presented with information that was contrary?

MR. LEGGIO:  We don't have specific direct evidence of them seeing a document.  However, that is not required at this stage.  We're allowed to take scienter through circumstantial evidence, and given all their facts together, we did plead that they should have known.

In fact, their stock certifications alone for that reason, they're attesting that they did read them.  It's either they did read them and knew that they were false and they continued attesting to them and issuing false and misleading statements, or they didn't read them and they're severely reckless in still certifying the accuracy of them. Yet, either way scienter is established because we proved scienter both ways.

MR. GEDDISH:  Your Honor, if I may.  Could I jump in on behalf of the Baidu plaintiffs?

THE COURT:  Yes.

MR. GEDDISH:  I don't want to waste your time and go through it all, again, but the Baidu plaintiffs allege the

same grounds for scienter, including that the defendants knew or had access to information that suggests their public statements were not accurate.

THE COURT:  Slow down a bit.

MR. GEDDISH:  Sorry.  The defendants had a duty to monitor the revenues in DAUs, which is shown, as Mr. Leggio just said, through their signed stock certifications and registration statement, the delay in reporting Wolfpack.

But the one thing I did want to cover was the core operations.  We kind of glossed over it.  Just this Friday, the Southern District of New York decision was issued by Judge Failla.

THE COURT:  Failla.

MR. GEDDISH:  Failla.  In the re: Barclays PC Securities litigation.  And, again, the opinion order is dated the 23rd of February.  The civil action number is 22-cv-1872. It's not up on Westlaw yet, otherwise I would have given the Westlaw cite.

In its decision, the Court sustained a Securities Act case based in part on the core operations doctrine.  So there's a bunch of cases suggesting that the core operations doctrine is dead in the Second Circuit.  But just on Friday, a judge upheld the complaint based on, in part, the core operations theory.

THE COURT:  Did you have more?

MR. GEDDISH:  I'm good, unless you have specific questions with respect to Baidu scienter issues.

THE COURT:  No.  There are references in plaintiffs' papers to amendment.

Do you have more that you've held back that you would add if the Court were to grant leave to amend?

MR. TYRE-KARP:  Your Honor, there are no allegations that we're holding back, that we're aware of.  But, obviously, further investigation could reveal further facts.  But most of defendants' arguments are nitpicks about what was pleaded and what was identified.

Did they identify the VIEs?  We did.  Did they identify the sources of information?  Did they identify the precise methodology?  Those are the types of things that could be addressed via amendment.  And one of the things, which we can discuss later --

THE COURT:  Tell me more, specifically, because you have had defense papers for quite some time.  You've seen what they've argued about deficiencies in the two complaints.

What would you add, very specifically?  I mean, I hear you to be saying maybe you don't need to, but I'm asking you if you were granted leave to amend, what would you add, specifically, to your complaint or change?

MR. TYRE-KARP:  It would depend on the grounds for dismissal.  We believe that we have pleaded particularized

facts for each of the causes of actions, and each of the alleged misstatements, and for scienter and lost foundation. If Your Honor were to hold that we were lacking particularity for any of our specific allegations, we would add particularized facts.

THE COURT:  I mean, I'm not looking to give an advisory opinion and then to have you get a second chance at fleshing things out.  You have more.  You've asked for, at least in one of your -- with respect to one of the complaints, you've asked for leave to amend.  I'm asking you now, we're having argument, what would you add?

MR. GEDDISH:  Sure.  I can address that.  The Baidu complaint specifically requested leave to amend, and one of the things that we would add was a partial disclosure that occurred on May 16, 2019, after which Baidu stock plummeted $25.39 a share, or 16.5 percent.

That would correct the standing issue for the Iveriones plaintiffs, which we discussed this at length in our brief.  It would also strengthen allegations regarding the defendants' argument that Baidu's deferred revenue was lacking.  And, again, like co-counsel said, we would address any other issues that the Court had.

But that is an additional event where the stock dropped in relation to either a corrective disclosure or materialization of the risk.  So that is one thing that we

would add in the Baidu complaint.

MR. TYRE-KARP:  I would add, Your Honor, Your Honor's individual rules call for pre-motion letters to be exchanged to feel out the parties' position on whether the pleading has been met, pleadings have been met.

And in the Baidu action, there were no pre-motion letters.  We went straight to the briefing, consolidated briefing.  So it's, potentially, some of these issues could have been worked out earlier.

THE COURT:  Now, there's briefing, right, in a more fulsome way than you would have if there was a couple page letter.  You've seen what the defendants, the various defendants, have highlighted as deficiencies in the two complaints.

What I'm asking you is, are you seeking leave to amend at this time, and if so, what allegations would you add? Of course, I will hear the defendants out here but for efficiency purposes, it seems to me that the Court ought to be presented with the best complaints that the plaintiffs think they have so that you don't end up in an iterative process that goes on and on and on for years.

So I'm asking, I've raised some specific areas of interest, and I'm asking you what, if anything.  If there is nothing you would add or change, that's an answer.  But if there is, this is the time to be heard on it.

MR. TYRE-KARP:  Thank you, Your Honor.  We do not believe it is necessarily an iterative process either.  We have no intention of filing a complaint that's insufficient and having it dismissed and then amending it.

We filed complaints we believe are sufficient, and we believe this complaint is sufficient and adequate and meets all the pleadings standards.  There are times, being that securities fraud is a complicated issue, there are times when courts disagree with us, sometimes on whether something is pleaded with the requisite particularity, especially for Rule 10(b) claims, Section 10(b) claims and Rule 9.

So there are times where we could add additional facts that we didn't want to burden the Court with, necessarily.  We've taken quite long enough.  We could add more description of things that Your Honor has pointed out methodology issues of how DAUs are calculated, or the specific VIEs that the deferred revenue was drawn from.  We believe that we pleaded all of these sufficiently.

We also understand that Courts do not always agree with one party or the other, and sometimes they disagree with them and we seek to be able to amend to correct any deficiencies Your Honor finds.

THE COURT:  Let me turn to the defense on this issue of amendment.

MR. FUMERTON:  Sure, Your Honor.  We think any

amendment here would be futile.  Plaintiffs have certainly had ample opportunity to allege facts on these various misstatements.

And, Your Honor, if I could just respond briefly on a couple of the points.

THE COURT:  Yes.

MR. FUMERTON:  Counsel asked on deferred revenue, they said we haven't pointed to any entities that are missing. Your Honor, that is exactly what we do on slide ten.  We've pointed to 13 entities from their own complaint.

IQ entities that they do not claim to uphold any credit report for, and they don't allege a single fact suggesting that these 13 entities that they ignore had zero dollars of deferred revenue.  That's what makes this case squarely in line with Judge Daniels' decision with China Plastics.

There's 13 other entities they just ignore and say oh no, we looked at five and the five didn't add up to your total of iQ deferred revenue.  What about the other 13?

Your Honor, with respect to the DAUs, they say there's no way to lower numbers.  Aurora had to do something to lower numbers.  They got numbers that were 30 to 40 percent less than QuestMobile.

Your Honor, the iQ disclosed how they could be over counting here.  They said if the same person is accessing

multiple mobile devices on the same day, you're going to be over counting.  If QuestMobile or Aurora was cutting out those people and using a survey or doing something where they only counted that once, that would result in lower numbers.

Your Honor, we're not asking you to conclude QuestMobile is unreliable at all.  We did point to QuestMobile for various trends, but what we're saying is there's nothing in this record to suggest that this is an apples to apples comparison because they don't tell you how QuestMobile or Aurora did their methodology.

Aurora and QuestMobile could be 100 percent accurate, just using the different methodologies in iQ that didn't result in the over counting that iQIYI talked about.  But this is all rank conjecture that they're asking you to infer securities fraud from.

Your Honor, on the massive engaged user base, that's classic puffery under several cases in the Second Circuit.  But more to the point, even under the lowest numbers, Aurora numbers, we're talking about 86 million daily active users.  That's not a massive and engaged user base?  That's an objective statement that plaintiff -- that the Court concludes is false.

Your Honor, with respect to scienter, Your Honor asked I think exactly the right question.  Is core operations enough here without more?  They don't allege a confidential

witness that provided access, provided these individuals access to contrary information.  If you look at their own authority, the Freudenberg case, for example, they do allege confidential witnesses the defendants did have access to contrary information.  This is core operations and nothing more.

In the *Jackson* case, the Second Circuit said that's not enough, that merely alleging the core importance of a subject is, "Plainly insufficient to raise a strong inference of scienter, absent particularized allegations of specific information defendants had at their disposal that rendered their statements false or misleading."

There's not a single allegation here that these defendants have access to different DAU numbers, different internal numbers, different deferred revenue numbers.  There's none of that.  That's just all rank conjecture that's insufficient in the Second Circuit.

Plaintiffs point to the disclosures of these SEC and NASDAQ investigations.  The company had no duty to disclose those.  The company didn't open the door on those topics.  The company never said anything about whether an investigation would follow this Wolfpack report.

So the fact that the company did disclose them, we would suggest shows -- the inference there is that it shows the opposite of scienter.

Your Honor, the denial of the Wolfpack report itself, I mean that's completely circular.  Plaintiffs don't allege any facts showing that any individual did not believe the denial of the allegations in the Wolfpack report.

And then the last allegation we heard was that this is all a scheme to cover up the deferred revenue fraud and the DAU fraud.  That's rank conjecture.  There's no factual allegations, much less particularized allegations to support that.

Your Honor, that's iQ.  Baidu, there's literally nothing here.  They've abandoned their allegation that Baidu and the CEO had a motive to defraud because it had large stock ownership, which courts have repeatedly rejected, and they don't allege that Baidu had anything to do with iQ's account, that they were even in a position to know any figures that were contrary to what was disclosed.

So we think that the scienter allegations are plainly insufficient for both, but certainly for the Baidu defendants there's no factual allegation of any involvement anywhere.

MR. SUSHON:  Your Honor, Bill Sushon.  May I be heard, briefly, on the Rule 9(b) Securities Act issues?

THE COURT:  Go ahead.

MR. SUSHON:  We haven't heard from the plaintiffs. They addressed one allegation about the underwriter

defendants' knowledge, but they haven't addressed the many allegations in the Exchange Act portion of the complaint that charged all the defendants with fraud, with overstating numbers, with inflating numbers, and with the allegation that one of the common questions of law in fact in the Exchange Act case is whether defendants acted with the requisite level of scienter.  There's no explanation for how that doesn't make the complaint sound in fraud.

I would also point out, although I don't think it's necessary, the language of the allegation in the OSG case is different than the language in the allegation against the underwriter defendants here.

The allegation against the underwriter defendants here is that as a result of constant contact and communications with iQIYI officers, the underwriter defendants knew of, or in the exercise of reasonable care should have known of the problems.

The allegation in OSG was in the exercise of reasonable care, the individual defendants should have known.  So it's different.

Turning to whether 9(b) requires scienter pleading, the notion that the Second Circuit in *Tongue versus Sanofi* said anything about this is just wrong.  The Second Circuit affirmed Judge Engelmayer's opinion on other grounds.  Judge Engelmayer's statement about whether Rule 9(b) requires

scienter allegations was in a footnote in dicta without any analysis.  It just said that that is a wrong concept.

If we're looking at Second Circuit affirmances of a lower court decision, then we should look at *Caiafa*, which we cited in our papers.

The district court in *Caiafa* held that where 9(b) applies, they must plead with particularity a strong inference of scienter in connection with material misrepresentation or omission, close quote.

The Second Circuit affirmed that decision, and I think the language is at least equivocal and very well could be read as an affirmance of that part of the holding because the Second Circuit said, "Here plaintiff's Section 11 claim relies on the same factual allegations that served as a basis for their 10(b) claim, because those allegations do not speak with sufficient particularity the fraud alleged.  The district court properly dismissed plaintiffs' Section 11 claim."

So, again, if we're going to read anything into Second Circuit affirmances, I think that there's a much stronger argument that the Second Circuit agrees that scienter allegations are required where Rule 9(b) applies.

THE COURT:  Do you want to be heard on amendment?

MR. SUSHON:  Your Honor, with respect to the iQIYI case, we went through the pre-motion letter process. Plaintiffs have had adequate opportunities to try to further

investigate and amend.  And I think that at this point, dismissal should be with prejudice.

THE COURT:  Do you want to respond on any of the issues you just heard?

MR. LEGGIO:  Yes, Your Honor.

So I'll try to go backwards.  Just on the last point he made about the *Caiafa* case, the Second Circuit decision, I don't believe that does compel any contrary conclusion.  The facts there were just so different than here.

For example, the Court specifically held the reason they did was because, "Plaintiffs there made no attempt to differentiate Section 11 claims to plaintiffs' fraud claims."

What they did in that case was they had everything in one complaint, so both it was one story of one fraudulent theory, and then all of a sudden they explain in a paragraph, for purposes of their Section 11 claim, we disclaim any fraud.

That was all plaintiffs did and, in fact, in the same paragraph they said -- they reassert the allegations made in the remainder of the complaint.

That's not what we did here.  It's completely different.  We have, essentially, two separate complaints in one document, just because it's one document.  But it's two complaints.  Not only do we disclaim it and separate it completely, but we have two different theories.  The 10(b) theory is one of fraudulent intent and the one of Section 11

is negligence.  There was no negligence alleged in the Second Circuit decision.  So that doesn't compel a different conclusion here.

Your Honor, they mention that there was some language of -- even if there was some language of fraudulent intent in the section of the claim, that still doesn't compel any different answer, different conclusions, because the Southern District has held a few different times that even if a Section 11 claim contains some fraudulent sounding language, a complete isolation of Section 11 claims is not necessary to allow plaintiffs to plead theory of negligence.

So even that -- and I could cite Southern District case there, that's from the *City of Roseville Employees' Retirement System versus Energy Solutions*, 814 F Supp 2d 395, and *Silvercreek Management versus Citigroup*, citation 248 F Supp 3d 428, held that the mere presence of fraud allegations elsewhere does not poison the well.

And they also note that I think in the Exchange Act defendant, in the Exchange Act part of the complaint, we say defendants.  But that's in the Exchange Act complaint.  That's referring to Exchange Act defendants and, again, so that's referring to the -- that can't be referring to the Securities Act defendants, especially as the underwriters and directors aren't even named as defendants in the Section 10(b) claim. So it can't be referring to them.

Also, can I address the Section 11 damages issue since I have -- unless you have something to add.

MR. GEDDISH:  One quick thing on scienter, because I want to respond to what he said.

THE COURT:  Go ahead.

MR. GEDDISH:  First, a lack of motive in the form of stock sales isn't dispositive here.  We cite Tellabs and Ganino as law for that.  The other thing that defense counsel said was that we really have no allegations regarding this specific Baidu people.

But as we allege throughout our complaint, these two entities were intertwined, and Baidu owned 70 percent of iQ and incorporated its revenue numbers into Baidu revenue numbers.  And aside from that, the individual defendants, the Baidu individual defendants, who were Robin Li and Herman Yu, both were Baidu executives that were on the iQ board.  Mr. Li was the chairman of the board of directors.

So these two entities are intertwined in a way that is -- that makes them overlap, and I think that that was just something that I wanted to highlight for the Court, the overlapping nature of these two entities.

MR. LEGGIO:  Your Honor, if I could just clarify in terms of the Baidu and iQIYI action.  They mention there was no scienter.  We allege Baidu under controlled personal liability, Section 20(a), in which scienter is not a

requirement.  So I just -- that's the reply in terms of that, at least.

MR. TYRE-KARP:  I wanted to discuss the deferred revenue and daily active users that Mr. Fumerton had addressed.

THE COURT:  It sounds like you might have something additional in terms of allegations that you might want to add, is that right, on those issues, or no?

MR. TYRE-KARP:  I want to make clear that contrary to what Mr. Fumerton said, we do identify the VIEs that were consolidated.  We identified the GAAP that required the company to consolidate them.  We identify the company's internal policies that required them to consolidate their VIEs.  We included all the VIEs.  They don't cite to any VIEs that were not included.  There are other entities that did have their tax filings mentioned in the credit reports, and they did not have deferred revenue.

We identified -- they said we don't identify the name of the credit report author.  That's also not true.  We identify the name of the credit report authors.  They're claiming that these things were not pleaded, they were not disclosed.  They were disclosed and they have no counterargument to them, other than falsely claiming that they weren't disclosed.

For the daily active users, the defendant's argument

*Proceedings* 46

is that there's an obvious explanation for the discrepancies, which is that there are different methodologies and that iQIYI's methodology must have been counting far more based on methodological differences. That's an obvious alternative explanation. They don't provide any evidence that directionally would go that way, or for the direction or the magnitude of the difference.

The only thing they've mentioned that could possibly explain why the Aurora and QuestMobile numbers would be so much lower, is that iQIYI only counts one device per person. Sorry. They count multiple devices per person, should a person use multiple mobile devices that Aurora and QuestMobile count those as a single device for a single user.

They provide no evidence that that's how they calculate those, or that that would cause them to be overstating DAUs by 40 percent. It's not obvious that 40 percent of users are using multiple devices and that explains the difference. The fact that there are other possible non-fraudulent explanations does not defeat a plausible allegation in the complaint.

Every inference goes to the plaintiffs, and the fact that there could be other inferences that could be drawn and other possibilities, other alternatives, is insufficient to the claim.

THE COURT: We've been going a while. I'll give

both sides a couple of minutes.  If you want to raise anything, sum up at all for me and I'll talk about next steps. Go ahead.

MR. FUMERTON:  Sure, Your Honor.  Just briefly on that last point, what plaintiffs are essentially asking you to do is prove the negative on a motion to dismiss.  That's flipping the burden around.  They have the burden to plead falsity with particularity.

And, again, the fact that these two third parties have vastly different numbers, the only inference, I think the reasonable inference to draw from that, is that they were using a different methodology.  None of that shows falsity. Again, there's nothing in the record that alleges that these 13 -- on deferred revenue, the 13 entities had zero dollars of deferred revenue.

That's just not in the record.  It's not in the complaint.  It's what they're asking Your Honor -- they're asking Your Honor to take an incomplete set of affiliated entities, add them up, and say that that number should equal the total deferred revenue.  That's exactly what plaintiffs tried to do before Judge Daniels in the *China Plastics* case.

Just lastly on scienter, this argument that Baidu and iQ are intertwined, that's classic group leading that the Second Circuit has held is insufficient.  Sitting on the board of directors does not show that the person had anything to do

with the accounting, much less these specific issues or had access to contrary information.  They're relying purely on poor operations.  They don't have confidential witnesses.  They can't point to any company data that contradicts this stuff that the individuals had.  We think that's plainly insufficient.

Your Honor, for the reasons in our papers, and the authority we submitted on Friday, we don't think plaintiffs can show loss causation here.  The short seller reports by their own terms are based on purely publicly available information.  They have to be, or the short sellers would be liable for insider trader.

Judge Gonzalez, in this court, just recently held that repackaging or putting your spin on already publicly available information by a short seller, should not constitute loss causation.  That's exactly what they've done here.  They've taken numbers that everyone has access to and a self-interested short seller says they must be fraudulent and disclose that to the market.

And the market did nothing in response to these reports.  We have a chart that shows that the iQ price actually went up, Baidu's went down, and was already up seven days later.  So any authority they have showing the short seller reports can constitute a corrective disclosure are cases where you had a significant stock price following them.

Thank you, Your Honor.

MR. SUSHON:  Your Honor, as to the underwriter defendants' issues, I believe the horse is dead.  There is nothing more.

THE COURT:  I'll turn to plaintiff.

MR. LEGGIO:  Thank you, Your Honor.  I'll quickly -- I know the timing, so I'll quickly address at least those loss causation arguments.  The main argument with the Wolfpack report was that the information was already public.  That's just not true.  The Second Circuit actually addressed this very specific issue in *Lea versus TAL Education Group*.  Citation, 837 F App'x 20.

That was from four years ago.  They found that despite the fact that defendants like this argue that information was public, they explicitly rejected that argument finding that where reports rely on information such as SAIC filings in a different language, and even if the report states that all information contained herein has been obtained from public sources, then the information is not readily accessible to investors and, thus, not public to US investors.

The Southern District, likewise, held in in re: *China Mobile Games*, citation 2016 WL 922711, that the short seller report contained information that was not readily accessible, including information and financial filings in Chinese.  Your Honor, that is exactly what we're alleging

here, that the underlying reports are not in English and they are not public to US investors.

With respect to the -- they claim that stock did not drop. That is not accurate, as well. We do claim that there was a 4.3 percent stock drop, and we cite to multiple cases in the briefing that shows that courts allow multiday drops, including the Eastern District of New York in *Maverick Fund versus Commerce Tech*, they held that a stock declined following the second day of trading insufficient to establish loss causation. And the citation is 801 F Supp 2d 41.

And just very briefly, only just out of completeness, at the beginning we began with Section 11, damages. Defendants claim it was very clear from the language that it's the first complaint filed regardless of the claims. I find that -- well, that's just not wrong.

First off, it was so plain I don't think Your Honor would be asking the question and I don't think courts would explicitly reject that finding.

In fact, it's not just the first complaint that was filed in action. They say because it included statements in the registration statement, but it's not where the statements were made. It's what claims were brought. The first complaint in this case that brought a Section 11 claim was on April 27th, 2020, and multiple courts found that it's the first day that the claim is brought that's the relevant date

to be filed.

And the underwriters also made a specific argument that even if just for the underwriters, even if it was that date, then it doesn't apply to them.  That's also not accurate as -- because the Section 11 claim was brought on that date, they were put on notice that they could have been defendants, as well.  So it would so apply to them, Your Honor.

MR. GEDDISH:  I hate to do this because I feel like I'm cleaning up here and I feel like I have to say something.  There's two points I want to make.

One, defense counsel raised the issue that the stock price went up after it went down.  They did that on a reply.  We didn't have an opportunity to address that issue.  So I wanted to address that.  I would point the Court to the case, the Second Circuit case, *Acticon AG versus China NE Petroleum Holdings*.  The cite for that is 692 F 3d 34.  The Court there said the motion to dismiss the -- at the motion to dismiss stage, it is inappropriate to "resolve why the stock price rose after its initial fall" because "district courts should assume that the price rose for reasons unrelated to its initial stock drop."

I want to make sure the Court has that case.  As to the letter that was submitted on Friday, we didn't want to burden the Court over the weekend with more papers, I would just say quickly that the first two cases that they referred

to, *Hershewe versus Joyy* and *NG versus Berkeley Lights*, they're the short seller reports are found unreliable because there was no information about the sources on which the reports were based, and the plaintiffs nearly adopted the substance of those reports.

Here we provided you with the information, the backup, and we tested the information and that's in the complaint, too, that we confirmed those.

The last three cases, only one of which is within the Circuit, go to the fact that loss causation can't be based on a short seller report. We would point the Court to, at least on my end, the Baidu brief, the opposition on page 18, we cite a slew of cases that suggest you could have loss causation based on a short seller report.

MR. FUMERTON: Just 15 seconds. TAL was our case. In TAL you had witnesses who were former employees, you had confidential interviews, and you had a significant stock price drop. None of those are present here, and none of the cases that found loss causation to the stock did not react the day after the report was issued.

On page 22 of our dec, we show exactly what happened to the stock. The idea that they're going to go out two days and ignore the next seven, to say that this was a disclosure of new information is just not a reasonable inference to draw.

THE COURT: Okay. I'll give 30 seconds.

MR. TYRE-KARP:  I want to address the other alleged misstatements in the complaint.

THE COURT:  Go ahead.

MR. TYRE-KARP:  We allege five total misstatements. We've covered the daily active users and we've covered the deferred revenues.  We covered, briefly, the denial of the Wolfpack report, which we believe is, I think, the parties agree is wrapped up in the other allegation that the Court credits those other allegations and the denial is also a misstatement.

One of the things that we haven't touched yet is the Xin'ai Sports, which is a joint venture that iQIYI announced they had entered into in August 2018.  They announced they acquired 32 percent of the entity.

THE COURT:  Are you going to add something to what's in your papers?  Because I have, of course, read everything.

MR. TYRE-KARP:  I am.

THE COURT:  Go ahead, then.

MR. TYRE-KARP:  They said that they required $32 million in cash, 32 million R and B in cash, and 763 million in non-cash.  They attach two things to the reply, two reports in their reply, one of which is the document that's mentioned in our complaint, which is the Wuhan DDMC, their filing with the Shanghai exchange, which shows all five investors in this joint project.  It shows exactly what they put in, and each of

them invested cash only.  One of them invested $42.5 million in cash.  This is Exhibit X to their briefing; $42.5 million in cash for 42.5 percent of the company.

IQIYI invested 38.25 million in cash for 38.25 percent.  Other investors invested 15 million or 15 percent. In total, which they add up in the short disclosure, in total there's 100 million dollars in -- 100 million R and B in cash for 100 percent of the entity.

So the evidence is crystal clear that the entity was 100 million R and B and that their 38 million bought them 38 percent.  There was another investor that was added later, which was 32 percent.

So the company claims that they put 763 million, which is 96 percent of their investment in non-cash purposes. There is no evidence that they put that in.  The filings flatly contradict that they put that in.  For that to be true, then each of these entities in addition to their cash, would have had to put up 20 times that much in non-cash consideration to receive the percentage of the joint entity that they received.

And there's no evidence any of that happened.  The defendants say that there's a filing the next day, which they attach as Exhibit Y.  We believe that it's improperly included at all because it's not referenced in the complaint, but it's a filing from the Wuhan DDMC from the next day.  And they say

that that filing mentioned that iQIYI will provide some services to the joint entity, which they say proves that 96 percent of their investment was non-cash.

But the Exhibit Y says -- also says that they are only cash investments, and it says nothing about content distribution, or licenses of intellectual property, which are what iQIYI says the non-cash contributions were.  It's only support for advertising on their web site.  It doesn't say anything about content distribution or licenses of intellectual property.

So we don't believe that they have any defense to this claim.  We think it's very straightforward.  They booked this huge amount of deferred revenue that there's no evidence they actually had.  We also think that even if they had contributed non-cash, and this is in our papers, that that's improperly booked as deferred revenue when it's not a revenue contract, it's an investment contract, and you can't book your investment as deferred revenue.

THE COURT:  We're going to take a very short break, five minutes or so.  But I want to leave you with this.  When I come back on the bench, I want to get an articulation from the plaintiffs as to whether you are, in fact, seeking leave to amend.

There has been discussion about lots of different issues today, including the DAUs, deferred revenue, and

scienter.  I'll leave you with this thought, which is that plaintiffs should not assume that, and I haven't -- I spent a lot of time with the briefing here, but I have not, obviously, made any decisions yet and will very carefully consider what everybody has said today.  The plaintiffs should not assume that if the motions to dismiss are granted, that they will automatically be granted leave to amend.

So I'm asking you to give some thought as to whether you seek to amend.  If so, and if I decide to grant it, I would not be looking to have this extend for a lengthy period of time.  This would be something that I would expect to be done quickly, and I would also, anticipating that the defendants would want to have their current briefing carried over to any amended complaint, maybe with some supplementation, I would be willing to consider something like that.

But, again, if plaintiffs don't feel any need to seek leave to amend, they think that they want to rest on this as their best complaints, you can let me know that.  We're going to take a five-minute break.

(Recess taken.)

THE COURT:  We'll resume.  Everybody is back.  We went about, I guess, just under an hour-and-a-half.  I don't want to keep you too much longer.  Let me start by getting answers to the question that I asked about whether the

plaintiffs are seeking leave to amend at this time.

MR. TYRE-KARP:  Your Honor, thank you.

I wanted to reiterate what I said before, which is that plaintiffs always endeavor and would never file a claim that they don't believe is sufficient and they don't believe will be upheld.  The same is true here.  We believe that our claim is sufficient.

We also believe that there is some confusion about some of our claims that have been brought about in the discussions today, and thank you, Your Honor, for your close reading of the papers and the precise questions you've asked. We believe that there are additional facts that we could add to clarify some of our claims that have been raised by defendants as dispositive, and we would appreciate the opportunity to be able to make those amendments.

THE COURT:  Do you wish to be heard?

MR. GEDDISH:  Same.  That was a unified response from both of us.

THE COURT:  Okay.  I am going to grant leave to amend.  Rule 15(a)(2) of the Federal Rules of Civil Procedure instructs me to freely give leave to amend when justice so requires, and I conclude that leave to amend is appropriate here where defendants have not demonstrated that there's any undue delay or bad faith by plaintiffs, or that amendment at this stage will result in undue prejudice to defendants or

*Proceedings*                                                                 58

that amendment would be futile.  I can't make that determination on the record before me at this time.  I recognize, of course, as I alluded to earlier, that defendants have, of course, both parties, all parties have engaged in motion practice already, and my intention here is not to inject any inefficiency or much more time here.

But I do think it's important for the Court to have what the plaintiffs think is their best complaint, because the plaintiffs, as I said earlier, should not assume that if they did not ask for leave to amend that they would be entitled to it later on if the Court were to grant the motions to dismiss, and I have not made any determination.

But, again, we had a lengthy oral argument earlier, and there were issues raised and I think productively raised and addressed by the parties, and I think that some further clarification of the amendments or in addition to the -- excuse me, of the complaints or addition to the complaints I think at this stage is appropriate.

But, again, I want to do this on a shorter time frame than if we were sort of restarting everything.  So what I'm going to do is, I'm going to require that any amended consolidated complaints be filed two weeks from today, which is March 11th, and I will give the defendants an opportunity to file a consolidated supplemental brief two weeks out from that, which is March 25th.

I'll give plaintiffs a response, again consolidated, by April 8th, and I'll give defendants a reply by April 22nd. So, again, the dates are March 11, 2024 for the filing of the amended consolidated complaints; March 25, 2024, for the defendants' consolidated supplemental brief; April 8th, 2024, for the plaintiffs' response, one response; and April 22nd, 2024 for defendants' reply.

And, obviously, the complaints should be filed on the respective dockets, but because the briefing is going to be just one set of briefing, it should be filed on both of the relevant dockets.

I am going to put a ten page double space page limit on all of the filings and, again, as I said, as I was indicating earlier, I will consider the motion, the briefing that has been already submitted, the motions and the briefing, as well as the supplemental briefing to be applying to the amended complaints, unless anyone has any issue with that.

I think it could be a little tricky if you're talking about certain allegation numbers. I leave it to the parties to be able to figure out a way to do that that is not overly confusing. I think that is much more efficient at this stage, given that the briefing was done a while ago, rather than having all new briefing. I'll hear from the parties if anyone thinks a whole new briefing makes sense at this time.

MR. TYRE-KARP:  Your Honor, we do not believe that a

*Proceedings* 60

whole new briefing is required.  I did want to address the time frame.  The primary documents in this case are all in Chinese, and we work with translators and we work with experts on Chinese accounting and Chinese GAAP, and we drafted the original iQIYI complaint in 2001, so almost three years ago.

THE COURT:  Not 2001, 2021.

MR. TYRE-KARP:  Sorry, 2021.  Almost three years ago, and we would need to get back in touch with some of our sources to get some of the information to add, and potentially we could do that within two weeks.  We don't know if they're available.

(Continued on next page.)

Proceedings                                          61

THE COURT:  Let's leave the dates as is.  And if the parties want to put in a joint letter with, you know, you need some extra time, you can put in a letter and ask me for that.  I think right now, given that the bulk of the work obviously was done already, based on your presentation, so I'm going to leave the dates as is for now.  If there is really a need I'll hear you out on that at the appropriate time.

MR. TYRE-KARP:  Thank you, your Honor.

THE COURT:  Let me just make -- nobody else wanted to be heard on nobody else is looking to redo the briefing?

MR. FUMERTON:  No, your Honor.

MR. TYRE-KARP:  No.

MR. SUSHON:  No, your Honor.

THE COURT:  I'm going to hold in abeyance the motions to dismiss pending the amended consolidated complaints being filed and the supplemental briefing.  And upon completion of the supplemental briefing I'll consider the motions to dismiss and the supplemental briefing together and consider it with respect to the amended consolidated complaints.

Is there any lack of clarity that anybody perceives?  It's a bit of a hybrid in terms of you filed motions and I'm asking for supplementation.  If there is any clarification anyone needs, ask me now; if not, that's the schedule we'll

Proceedings                                              62

operate on.

Plaintiffs?

MR. TYRE-KARP:  Understood, your Honor.

MR. FUMERTON:  Thank you, your Honor.

MR. SUSHAN:  Thank you, your Honor.

THE COURT:  I think I did not mention it, but I think the parties are well aware of my individual rules.  But with respect to amended complaints I do require red lines.  I think in this particular case it's going to be very helpful to the parties to really be able to -- for the defense -- to see quickly what has changed.  Just follow my individual rules on the filing of those documents.

Anything else we need to take up?  If not, I'll let you all go.  We've been here for quite some time.

Plaintiffs?

MR. TYRE-KARP:  No, your Honor.

THE COURT:  Defense?

MR. FUMERTON:  Nothing from defense.

MR. SUSHAN:  No, thank you.

THE COURT:  Thank you all.  We're adjourned.

(Proceedings concluded.)